# FILED
*LAL*

NOV 1 8 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**



GEORGE MCREYNOLDS,
on behalf of himself and all others
similarly situated,

    Plaintiffs,

v.

MERRILL LYNCH & Co., INC.

    Defendant.



)
)
)
)
)
)
)
)
)
)
)

**05C 6583**

JURY TRIAL DEMANDED

JUDGE GETTLEMAN

MAGISTRATE JUDGE MASON

## COMPLAINT

Plaintiff, George McReynolds, on behalf of himself and all others similarly

situated, by and through his attorneys, Stowell & Friedman, Ltd., for his Complaint

against Defendant, Merrill Lynch & Co., Inc. states as follows:

### JURISDICTION

1.    Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of

pendent and supplemental jurisdiction.

### PARTIES

2.    Plaintiff George McReynolds ("McReynolds") is a current employee of

Merrill Lynch, & Co., Inc. ("Merrill Lynch" or "the firm"). McReynolds seeks to

represent a nationwide class of similarly situated current and former employees of Merrill

Lynch.

3.    Defendant Merrill Lynch is a full service securities firm engaged in the

retail and institutional sale of securities, options contracts and various other financial

1

products. Merrill Lynch employs in excess of 14,000 persons nationwide as financial

advisors ("FA" or "broker") and is among the country's largest providers of brokerage

and brokerage-related services. Merrill Lynch is a publicly traded Fortune 100

corporation incorporated in Delaware. In 2004, Merrill Lynch had a net worth of over

$30 billion and achieved net earnings that exceeded $4 billion.

## FACTUAL ALLEGATIONS

### Merrill Lynch Systemically Excludes
### African-Americans From Employment Opportunities

4.      Merrill Lynch has engaged, and continues to engage, in systemic and

pervasive race discrimination and retaliation against African-Americans, as well as

unequal pay practices and unequal opportunities.

5.      Merrill Lynch's discriminatory treatment of African-Americans is also

evidenced by the high attrition rate of African-American employees.

6.      Merrill Lynch's human resources department is ineffective at resolving

complaints of race discrimination and, as a result, many African-Americans recognize the

futility of lodging internal complaints.

### Pattern Allegations

7.      Merrill Lynch's nationwide pattern and practice of discrimination and

retaliatory conduct against African-Americans includes but is not limited to the following

practices:

        a)  failing to hire African-Americans;

        b)  failing to promote African-Americans, including to management;

        c)  underutilizing African-Americans in high paying jobs;

2

d) steering African-Americans into clerical positions, investment advisor positions, or other non-producing roles;

e) employing discriminatory recruiting, hiring and promotion practices;

f) denying African-Americans the opportunity to participate in the Management Assessment Center and to become managers;

g) taking race into account when making employment decisions, including but not limited to decisions regarding training, and decisions regarding transferring and assigning walk-ins, leads, referrals, departing brokers' books and initial public offerings ("IPOs");

h) targeting the accounts and clients of African-American brokers and reassigning them to white brokers;

i) failing to credit African-Americans for their experience on the same basis as non-African-Americans and failing to consider African-Americans for timely promotions or title changes on the same basis as non African-Americans;

j) employing policies and practices are that disproportionately to the disadvantage of African-American brokers and/or that reinforce and continue the effects of past discrimination, including but not limited to policies and practices regarding account distributions and partnerships;

k) employing partnerships in a manner that excludes African-Americans from income-generating opportunities, including but not limited to refusing to include African-Americans in significant partnership opportunities;

l) using partnerships to target the accounts of African-American brokers;

m) using partnerships to deny African-American brokers the opportunity to receive valuable account distributions or to otherwise participate in lucrative business opportunities;

n) systematically paying African-Americans lower wages and/or denying African-Americans opportunities to increase their earnings, including commissions;

o) negligently hiring and/or retaining individuals with known propensities to discriminate against or harass African-Americans;

p) creating an environment that is hostile and offensive to African-Americans;

q) retaliating against African-Americans who complain of discrimination by, among other things, subjecting them to further discrimination, retaliation, verbal attacks, discipline, reassignment of their clients or accounts, and/or termination;

r) making employment decisions based on racial stereotypes;

4

s)  adopting and implementing policies and practices that have a
disparate impact against African-Americans;

t)  manipulating the length of service ("LOS") designation of non
African-Americans to safeguard non African-Americans from
termination or disciplinary action and/or to manipulate earnings
and performance;

u)  terminating African-Americans on account of race and/or due to
diminished performance and/or production that was lower than it
would have been but for the unlawful conduct of Merrill Lynch;
and

v)  defaming African-Americans to their clients and on their Uniform
Termination Notice For Securities Industry Registration Form U-
5's ("Form U-5"), but issuing clean Form U-5's to non African-
Americans who were charged with disciplinary violations or race
discrimination.

**Merrill Lynch's Workforce Statistics Have A Zero Chance Of Occurrence In A
Race-Neutral Sampling**

8.      In 1974, the Equal Employment Opportunity Commission filed suit
against Merrill Lynch regarding its failure to employ women and minorities as brokers.
Merrill Lynch agreed to the entry of a Consent Decree which required Merrill Lynch to
increase its representation of African-American brokers to 6.5%. More than 30 years
later, Merrill Lynch employs only approximately 2% African-Americans as brokers.
The representation of African-Americans at Merrill Lynch is greater than 20 standard

5

deviations below the goal in the EEOC Consent Decree and more than 10 standard deviations below the percentage representation in the industry reflected in EEOC data.

9.      Merrill Lynch has experienced a cumulative five-year attrition rate in excess of 25% for African-American brokers - a rate that significantly higher than the attrition rate for non-minorities.

10.     Merrill Lynch relies on a rewards system where production is used to distribute or assign titles, offices, sales assistance, accounts, walk-ins, leads, referrals, client assets, IPOs, partnerships, expense accounts and managerial support. African-Americans are underrepresented in the first and highest quintile (as million dollar producers) and are over represented in the fifth and lowest producing quintile. Moreover, acts of discrimination compound in the quintile system to cause further injury.

11.     African-Americans are also excluded from partnerships with other brokers because Merrill Lynch does not support or foster inter-racial partnerships.

## Racial Discrimination and Retaliation at Merrill Lynch is National in Scope

12.     Although McReynolds worked at Merrill Lynch in its Nashville Branch Office, more than 30 putative class members from across the country were interviewed by Stowell & Friedman, Ltd., prior to the filing of this Complaint.

13.     The putative class members who have spoken to Stowell & Friedman, Ltd., include current and former employees from, including but not limited to, Arizona, California, Maryland, Georgia, Illinois, Missouri, North Carolina, New York, Pennsylvania, South Carolina, Tennessee and Texas. Hundreds of additional putative class members reside throughout the country, including in Illinois. The putative class members fit into four categories: 1) applicants; 2) broker-trainees; 3) brokers with 3-9

6

years with Merrill Lynch; and 4) brokers with in excess of 10 years of service with Merrill Lynch. The putative class members are relying on McReynolds, Stowell & Friedman, Ltd., and this lawsuit to protect their rights.

14.    Stowell & Friedman, Ltd., and the putative class placed Merrill Lynch on notice of the class wide allegations of racial discrimination through the firm's Employment Dispute Resolution ("EDR") process. The EDR was enacted in response to a class action gender discrimination suit, *Cremin et al. v. Merrill Lynch, 96 C 3773 (Castillo, J)*. McReynolds, Stowell & Friedman, Ltd., and the putative class members and Merrill Lynch are in ongoing discussions about improving the firm's diversity initiatives and otherwise creating a discrimination-free workplace.

**Merrill Lynch's Discrimination and Retaliation Against African-Americans is Ongoing**

15.    Merrill Lynch's pattern and practice of systematically discriminating and retaliating against African-Americans is ongoing as a continuing violation of the civil rights laws.

**McReynolds Is An Appropriate Class Representative**

16.    McReynolds began his employment with Merrill Lynch in 1983 and is currently a FA.

17.    Notwithstanding his impressive job performance and consistent with the allegations of race discrimination against African-Americans, McReynolds is a victim of Merrill Lynch's pattern and practice of systemic and pervasive racial discrimination, including unequal pay and retaliation.

7

## McReynold's Experiences Are Typical

18.     In early 2005, McReynolds formally raised a complaint of discrimination and retaliation against Merrill Lynch through the EDR program. In his EDR Complaint, McReynolds alleged that Merrill Lynch intentionally created a segregated workforce where African-Americans were steered into less desirable positions and were denied career opportunities routinely extended to non African-Americans. As a result, African-Americans were denied not only job promotions and titles, but also increased earning and other benefits. In his EDR claim, McReynolds cited numerous examples of Merrill Lynch's segregated workforce.

19.     For example, when McReynolds was hired as a financial advisor in 1983 in Merrill Lynch's Nashville, Tennessee office, he was one of only two African-American brokers in the state of Tennessee. McReynolds remained the only African-American broker in his office until Cathy Bender ("Bender") was hired in 1987.[1] Despite the growth of the Nashville complex to approximately 65-70 brokers, the complex has never employed more than three African-American brokers at any one time.

20.     Further, the Nashville complex recruits almost exclusively at predominantly white colleges and universities. Well-qualified African-American graduates are not welcomed by Merrill Lynch. To illustrate, in approximately 2002, white Managing Director of the Nashville-Memphis complex, Robert Shaffer ("Shaffer"), refused to interview an African-American graduate of West Point, Jeff Cleveland, who had been recommended by Bender. Having served nine years as an Army officer and

---

[1] Bender was hired only as the result of a recommendation by McReynolds's wife, who happened to be the Commissioner of Commerce and Insurance for the State of Tennessee, a position with the responsibility for the issuance and trading of securities under the laws of Tennessee.

spent four years in management at a large corporation, Cleveland was well qualified and eager to pursue a career at Merrill Lynch. According to Merrill Lynch's initiative, Shaffer was to interview Cleveland or introduce him to management at another office. Shaffer made no effort to hire Cleveland.

21.     McReynolds's own efforts to enhance diversity at Merrill Lynch were likewise stymied. For example, McReynolds recruited and hired a number of African-American interns. However, Merrill Lynch made no effort to recruit McReynolds's interns to work for the firm after their internships were completed. To wit, one of the interns McReynolds hired moved to New York after his internship to join a sophisticated hedge fund; Merrill Lynch made no effort to retain him at Merrill Lynch.

22.     Throughout McReynolds's employment, Merrill Lynch maintained a discriminatory system of account distributions and allocation of referrals, leads, walk-ins, call-ins, and IPOs as part of its pattern and practice of unlawful conduct.

23.     For example, rather than assigning accounts, leads or referrals to the more junior African-American brokers, Merrill Lynch managers told these brokers to prospect in the African-American community. Members of the African-American community were aware that Merrill Lynch was a revolving door for African-American brokers and were reluctant to place their assets with a financial advisor who was unlikely to be retained by Merrill Lynch.

24.     Consistent with its stereotypical views of African-Americans, the potential clients or referrals Merrill Lynch steered toward McReynolds and other African-American brokers were typically minorities or individuals with a low net worth.

25. Additionally, Merrill Lynch has not provided McReynolds with the same quality or quantity of sales and administrative support that his white colleagues receive, including brokers with similar production. McReynolds has always shared a sales assistant, at times with as many as seven other brokers, including rookie brokers. These rookie brokers often require more time and attention of the sales assistants because of their inexperience. As a result, McReynolds has performed a substantial amount of administrative and sales support work, which diverted valuable time away from activities to develop his book of business.

26. McReynolds further alleges in his EDR complaint that beneficial partnerships for African-American brokers were not encouraged. Any partnerships allowed were often to the detriment of the African-American broker.

27. In October 2001, McReynolds was forced by Robert Kennedy ("Kennedy"), (then the Nashville Office Branch Manager) to enter into and surrender his accounts to a partnership with white rookie Professional Development Program ("PDP") brokers Charles Grummon ("Grummon") and Jonathon Evans ("Evans"). McReynolds believed that he had no choice but to partner with Grummon and Evans and, relying on Kennedy's representations that McReynolds would benefit from the partnership, he reluctantly did what he was told.

28. Contrary to Kennedy's representations, the partnership was highly detrimental to McReynolds. Although McReynolds had contributed the vast majority of the partnership assets, he received credit for less than half of the partnership's production. McReynolds's earnings and production decreased significantly as a result of the

10

partnership. When the partnership dissolved, McReynolds received no account transfers to compensate him for the loss.

29.     Additionally, in approximately 1989-1990, McReynolds formed a partnership with Lona Spencer ("Spencer"), a white female broker in his office. McReynolds's white branch manager, Roy Williams ("Williams"), was resistant and hostile to the partnership although he supported other partnerships composed entirely of white male brokers.

30.     That partnership ended when Spencer left Merrill Lynch. At the meeting announcing Spencer's departure, Williams announced to the entire office that any broker who wanted any of the accounts held by Spencer's partnership with McReynolds should contact Williams and they would get the account from McReynolds. Williams did not make similar statements when a white broker was the only broker remaining after the dissolution of a partnership. On the contrary, the white remaining brokers retained the assets of the partnership upon dissolution.

31.     Merrill Lynch also steers African-Americans into clerical postions, investment advisor postions, or other non-producing roles. For example, Kennedy told McReynolds that he should surrender his broker position to become an investment advisor ("IA") for Grummon and Evans.

32.     Merrill Lynch also employs discriminatory promotional practices. The management assessment process is performed predominantly by white men and is replete with racial stereotypes. As a result of racial bias, the skills of African-Americans are overlooked and undervalued. To illustrate, McReynolds has never reported to an African-American manager during his tenure at Merrill Lynch, and neither Shaffer nor

11

anyone else at Merrill Lynch has ever approached McReynolds regarding opportunities to join management, despite the fact that McReynolds has over ten years of management experience.

**McReynolds Suffers Economic Loss Today From This Differential Treatment**

33.     In spite of nearly twenty years of dedicated service to Merrill Lynch and its clients, McReynolds's office was taken away and he was moved to the bullpen in a cubicle immediately adjacent to the women's restroom. Due to the traffic and noise by his cubicle, it is difficult for McReynolds to concentrate on his work or to speak to his clients without frequent interruption and distraction. In addition, the cubicle is so small that McReynolds can meet with clients only if he is able to arrange for a conference room.

**Systemic Racism**

34.     McReynolds, like other African-Americans at Merrill Lynch, also has been subjected to a hostile work environment where African-Americans are treated as inferior and are subjected to abusive and harassing treatment, comments and behavior.

35.     For example, upon meeting McReynolds for the first time, Shaffer said, "Oh, you're the one," or words to that effect. McReynolds asked him what he meant by the statement, to which Shaffer replied "oh, nothing."

36.     Merrill Lynch has also publicly disparaged African-American brokers in the Nashville complex. For example, in the fall of 2004, at a meeting attended by all brokers and Shaffer, Merrill Lynch announced that all of the African-American brokers in the complex were in the 5th quintile. In another meeting, supposedly aimed at diversity and mentoring, a representative from human resources announced that African-

12

Americans were disproportionately in the bottom quintile of brokers at Merrill Lynch.
These public statements were not made with a critical eye toward improving Merrill
Lynch's policies and practices, but instead simply served to reinforce the perception
among McReynolds's managers and peers that African-Americans are inferior and
incapable of competing as brokers.

**McReynolds and the Putative Class**
**Suffered Injury as a Consequence of the Discrimination**

37.     McReynolds and the putative class lost wages and other benefits, suffered
embarrassment and humiliation and their careers were irreparably injured as a result of
Merrill Lynch's discriminatory conduct.

38.     Merrill Lynch's conduct was reckless and/or in willful violation of the
civil rights laws.

## CLASS ALLEGATIONS

39.     The class of African-American employees and former employees who
have been subjected to discrimination due to their race and have been subject to
retaliation due to their opposition to discrimination is so numerous and geographically
spread that joinder of all members is impracticable.

40.     There are questions of law and fact common to the class.

41.     The claims of McReynolds will fairly and adequately protect the interests
of the class.

42.     The questions of law and fact common to the members of the class
predominate over any questions affecting only individual members and a class action is

13

superior to other available methods for the fair and efficient adjudication of the controversy.

### COUNT I

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. Section 1981
### (Against Merrill Lynch)

43.     McReynolds and all others similarly situated reallege paragraphs 1 through 42 and incorporate them by reference as paragraphs 1 through 42 of Count I of this Complaint.

44.     Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all person the same right to make and enforce contracts as whites. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

45.     Merrill Lynch subjected McReynolds and all others similarly situated to racial discrimination in violation of 42 U.S.C. Section 1981.

### PRAYER FOR RELIEF

**WHEREFORE**, McReynolds respectfully requests that this Court find in his favor and against Merrill Lynch as follows:

a.      Declare that the acts and conduct of Merrill Lynch violate 42 U.S.C. Section 1981;

b.      Declare that Merrill Lynch engaged in a pattern and practice of racial discrimination and certify a class of persons similarly situated to McReynolds eligible for relief;

c.     Order appropriate equitable relief and diversity initiatives to remedy the discrimination;

d.     Award McReynolds and all others similarly situated the value of all compensation and benefits lost as a result of Merrill Lynch's unlawful conduct;

e.     Award McReynolds and all others similarly situated the value of all compensation and benefits they will lose in the future as a result of Merrill Lynch's unlawful conduct;

f.     Award McReynolds and all others similarly situated compensatory damages;

g.     Award McReynolds and all others similarly situated punitive damages;

h.     Award McReynolds and all others similarly situated prejudgment interest;

i.     Award McReynolds and all others similarly situated attorneys' fees, costs and disbursements;

j.     Award McReynolds and all others similarly situated such other equitable and legal relief as this Court deems just and proper.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: _____

Linda D. Friedman

Mary Stowell
Linda D. Friedman
**STOWELL & FRIEDMAN, LTD.**
321 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604
(312) 431-0888

15