# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE MCREYNOLDS, on behalf of himself and all others similarly situated | ) ) ) ) | Case No. 05 C 6583 |
| Plaintiffs, | ) ) ) | Honorable Robert W. Gettleman |
| v. | ) ) | Magistrate Judge Morton Denlow |
| MERRILL LYNCH & CO., INC. | ) | |
| Defendant. | | |

## ANSWER OF DEFENDANT MERRILL LYNCH & CO., INC. TO FIRST AMENDED COMPLAINT

Defendant, Merrill Lynch & Co., Inc. ("Merrill Lynch"), by its attorneys, Weil Gotshal & Manges, LLP, and Mayer, Brown, Rowe & Maw LLP, for its Answer to the First Amended Complaint of Plaintiff George McReynolds ("McReynolds" of "Plaintiff") herein, states:

## JURISDICTION

1.     Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of pendent and supplemental jurisdiction.

### ANSWER

Admits that Plaintiff seeks to invoke the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1343, and principles of pendent and supplemental jurisdiction and states that the allegations set forth in paragraph 1 of the Complaint constitute conclusions of law to which no responsive pleading is required.

## PARTIES

2.     Plaintiff and the class of persons he seeks to represent are applicants, current and former employees of Merrill Lynch, & Co., Inc. ("Merrill Lynch" or "the Firm").

**ANSWER**

Denies the allegations set forth in paragraph 2 of the Complaint, and avers that

Plaintiff and the class of persons he seeks to represent are applicants, current and former

employees of Merrill Lynch, Pierce, Fenner, & Smith, Incorporated (rather than deny each

further allegation that misidentifies Plaintiff's employer, Defendant will respond to each

allegation as if Plaintiff had correctly identified Merrill Lynch, Pierce, Fenner & Smith,

Incorporated (hereinafter "Merrill Lynch") as Plaintiff's employer and the employer of the class

of persons he seeks to represent).

3.      Defendant Merrill Lynch is a full service securities Firm engaged in the
retail and institutional sale of securities, options contracts and various other financial products.
Merrill Lynch employs in excess of 15,000 persons nationwide as financial advisors ("FAs" or
"brokers") who sell its products and services at its offices located throughout the country,
including in Chicago, Illinois. Merrill Lynch is the country's largest provider of brokerage and
brokerage-related services. Merrill Lynch is a publicly traded, Fortune 100 corporation
incorporated in Delaware. In 2005, Merrill Lynch had a net worth of over $37 billion and net
earnings exceeding five billion dollars.

**ANSWER**

Admits the allegations set forth in paragraph 3 of the Complaint, except denies

that Merrill Lynch employs persons as Financial Advisors to "sell its products and services" and

avers that Merrill Lynch employs Financial Advisors to aid clients in identifying and reaching

their financial goals through a diverse range of investment strategies and investment products.

## FACTUAL ALLEGATIONS

**Merrill Lynch Systemically Discriminates Against And Excludes
African-Americans From Employment Opportunities**

4.      Merrill Lynch has engaged, and continues to engage, in systemic and
pervasive racial discrimination against African-American applicants and employees.

**ANSWER**

Denies the allegations set forth in paragraph 4 of the Complaint.

5.      Merrill Lynch's discriminatory treatment of African-Americans is

evidenced in part by the low representation and high attrition rates of African-Americans. In addition, African-Americans are paid lower wages and denied income-earning and promotional opportunities.

### ANSWER

Denies the allegations set forth in paragraph 5 of the Complaint.

6.      Merrill Lynch's human resources department ("Human Resources") caters to and perpetuates the white male dominated culture and discrimination at the Firm. Because the Firm has no sincere desire to employ or retain African-Americans on equal terms as non-African-Americans, the Firm does not effectively monitor the treatment of its African-American employees or fully investigate and resolve complaints of racial discrimination. As a result of the historical and ongoing discrimination at the Firm and the failings of Human Resources, African-Americans recognize the futility of lodging internal complaints and are driven out or leave the Firm when they can no longer tolerate the differential treatment. Those who complain of racial discrimination are often subjected to retaliation, which reinforces Merrill Lynch's racist culture.

### ANSWER

Denies the allegations set forth in paragraph 6 of the Complaint.

## Pattern Allegations

7.      Merrill Lynch's nationwide pattern and practice of discrimination and retaliatory conduct against African-Americans includes but is not limited to the following practices:

a)      failing to hire African-Americans;

b)      failing to retain African-Americans on the same basis as non-African-Americans;

c)      failing to promote African-Americans, including to management;

d)      underutilizing African-Americans in high paying jobs;

e)      steering African-Americans into clerical positions, investment advisor positions, or other non-producing or lower paid positions;

f)      denying African-Americans the opportunity to participate in the Management Assessment Center ("MAC") and to become managers;

g)      taking race into account when making employment decisions, including but not limited to decisions regarding training, partnering brokers, transferring and assigning walk-ins, leads, referrals, departing brokers' books and initial public offerings ("IPOs");

h) targeting the accounts and clients of African-American brokers and reassigning them to non-African-American brokers;

i) failing to credit African-Americans for their experience on the same basis as non-African-Americans and failing to consider African-Americans for timely promotions or title changes on the same basis as non-African-Americans;

j) allocating significant resources to brokers based on "performance" rankings that Merrill Lynch knows are the product of past and ongoing discrimination, including but not limited to policies and practices regarding account distributions and partnerships;

k) promoting the teaming or partnering of brokers in a manner that excludes African-Americans from income-generating opportunities, including but not limited to refusing to include African-Americans in significant partnership opportunities;

l) using partnerships to target the accounts of African-American brokers;

m) using partnerships to deny African-American brokers the opportunity to receive valuable account distributions or to otherwise participate in lucrative business opportunities;

n) systematically paying African-Americans lower wages and/or denying African-Americans opportunities to increase their earnings, including commissions and stock;

o) negligently hiring and/or retaining individuals with known propensities to discriminate against or harass African-Americans;

p) creating an environment that is hostile and offensive to African-Americans;

q) selecting managers with known propensities to discriminate against African-Americans to serve as assessors at the MAC;

r) retaliating against African-Americans who complain of discrimination by, among other things, subjecting them to further discrimination, retaliation, verbal attacks, discipline, reassignment of their clients or accounts, and/or termination;

s) making employment decisions based on race and/or racial stereotypes;

t) intentionally or knowingly adopting, implementing and retaining policies and practices that have a disparate impact on African-Americans;

u) manipulating the length of service ("LOS") designation of non-African-Americans to manipulate earnings and performance;

**PAGE 4**

v) terminating African-Americans on account of race and/or due to diminished performance and/or production that was lower than it would have been but for the unlawful conduct of Merrill Lynch;

w) applying standards that are less favorable for disciplining and terminating African-Americans than standards applied to non-African-Americans; and

x) defaming African-Americans to their clients and on their Uniform Termination Notice For Securities Industry Registration Form U-5's ("Form U-5"), but issuing "clean" Form U-5s to non-African-Americans who were charged with equally or more serious disciplinary violations or for race discrimination.

### ANSWER

Denies the allegations set forth in paragraph 7 of the Complaint and all

subparagraphs thereto.

### Merrill Lynch's Workforce Statistics Have A Zero Chance Of Occurrence In A Random or Race-Neutral Sampling

8. In 1974, the Equal Employment Opportunity Commission sued Merrill Lynch based on its refusal to employ women and minorities as brokers. To resolve the lawsuit, Merrill Lynch agreed to the entry of a Consent Decree (the "*O'Bannon* Consent Decree") that required Merrill Lynch to increase its representation of African-American brokers to 6.5%. On information and belief, Merrill Lynch never met the goals to which it agreed in the *O'Bannon* Consent Decree. Indeed, more than 30 years later, only 2% of the brokers employed by Merrill Lynch are African-American. The representation of African-American brokers at Merrill Lynch is greater than 20 standard deviations below the goal in the 1978 EEOC Consent Decree and more than 10 standard deviations below the percentage representation in the industry, as reflected in EEOC census data. The probability of these disparities in representation occurring in a race-neutral or random selection is zero. Because of the high attrition resulting from Merrill Lynch's systemic discrimination, the percentage of Merrill Lynch brokers with tenure in excess of ten years who are African-American is approximately 0.5%.

### ANSWER

Admits that in 1974, the Equal Employment Opportunity Commission sued

Defendant as set forth in the allegations in paragraph 8 of the Complaint, and denies the

remaining allegations set forth in the first sentence of paragraph 8 of the Complaint. In response

to the allegations set forth in the second sentence of paragraph 8 of the Complaint, Defendant

respectfully refers the Court to the 1974 Consent Decree as the best evidence of the contents

thereof. Denies the allegations set forth in the third and fourth sentences of paragraph 8 of the

Complaint. Denies the allegations set forth in the fifth sentence of paragraph 8 of the Complaint,

except denies knowledge or information sufficient to form a belief as to the truth of the

allegations concerning "EEOC data," as set forth in the fifth sentence of paragraph 8 of the

Complaint. Denies the allegations set forth in the sixth and seventh sentences of paragraph 8 of

the Complaint.

        9.     In or around 1994, a group of approximately fifty African-American
brokers from Merrill Lynch convened in Chicago to discuss the Firm's failure to hire African-
Americans and the differential treatment experienced by those who were hired. After learning of
the existence of this group, and to placate its African-American brokers, Merrill Lynch began to
hold annual symposia for African-American brokers at its headquarters in Princeton, New Jersey,
inviting African-American brokers from around the country. Conspicuously absent from the
symposia were attendees representing about fifty percent of the states. A review of the lists of
employees invited to the symposia revealed the dearth of African-American brokers at Merrill
Lynch. For example, at the time that this lawsuit was filed, Merrill Lynch employed no African-
American brokers[1] in approximately 25 states, including all states between Illinois and
California. Moreover, in 2005, there were no African-American brokers working at 552 of the
639 Merrill Lynch office locations.[2] The following map reflects the state-by-state representation
of African-American brokers across the United States as of year-end 2005; states in which
Merrill Lynch employs no African-American brokers are depicted in red:



The symposia made clear that Merrill Lynch's exclusion of African-American brokers was not
random but was intentional and systematic.

---

[1] Merrill Lynch's broker training program is two years; thus, "broker" here refers to a person who has been at the
Firm for two years and excludes trainees.

[2] Again, broker does not include trainees.

## **ANSWER**

Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the first sentence of paragraph 9 of the Complaint. Denies the allegations in the second sentence of paragraph 9 of the Complaint, except admits that Defendant has held annual symposia for African-Americans and has invited African-American Financial Advisors from around the country to the annual symposia. Denies knowledge or information sufficient to establish a belief concerning the truth of the allegations set forth in the third and fourth sentences of paragraph 9. Denies the allegations set forth in the fifth sentence of paragraph 9 of the Complaint, except admits that Defendant's Paths of Achievement training program is designed to offer FAs two years of training opportunities and that Plaintiff purports to use "broker" to refer "to a person who has been at the [Defendant] for two years and excludes trainees" as alleged in footnote 1. Denies the allegations set forth in the sixth sentence of paragraph 9 of the Complaint, except admits that Plaintiff's purported use of the term "broker" does not include trainees, as set forth in footnote 2. Denies the allegations set forth in the seventh and eighth sentences of paragraph 9 of the Complaint.

10.    Notwithstanding its persistent refusal to employ African-Americans, Merrill Lynch regularly seeks out and participates in business opportunities with publicly traded companies, governmental organizations, not-for-profit entities, and unions that employ and/or represent African-Americans. These opportunities include managing the assets of publicly traded corporations' pension and profit sharing plans and underwriting initial public offerings and other equity and debt offerings. The Firm also seeks out and participates in business opportunities from various municipalities and states, such as bond transactions. In these business pursuits, Merrill Lynch falsely represents that it is an equal opportunity employer. The Firm also fails to mention that it employs no African-American brokers in many of the states in which these companies do business. Instead, Merrill Lynch assembles "diverse" teams to make presentations for the business opportunities that generate commissions almost exclusively for non-diverse Merrill Lynch employees. Class members have been asked to participate in these presentations to create a false appearance of inclusion at Merrill Lynch but then have been excluded from receiving the benefits if the presentation is successful. Merrill Lynch also promotes itself to the public as an equal opportunity employer by including African-Americans in commercials airing in states in which Merrill Lynch employs no African-American brokers. As a result of these efforts, Merrill Lynch's retail business has netted billions of dollars in

profits.

### ANSWER

In response to the allegations set forth in the first sentence of paragraph 10 of the Complaint, denies that Defendant has a "persistent refusal to employ African-Americans," but admits that it "seeks out and participates in business opportunities with publicly traded companies, governmental organizations, not-for-profit entities, and unions that employ and/or represent African-Americans." Admits the allegations set forth in the second and third sentences of paragraph 10 of the Complaint. Denies the allegations set forth in the fourth sentence of paragraph 10 of the Complaint, and avers that Defendant is, and represents itself as, an equal opportunity employer. Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the fifth sentence of paragraph 10. Denies the allegations set forth in the sixth and seventh sentences of paragraph 10 of the Complaint. Denies the allegations set forth in the eighth sentence of paragraph 10 of the Complaint, except Defendant admits that it is and promotes itself as an "equal opportunity employer" and admits that Defendant includes people of color in its advertisements, including African-Americans. Denies the allegations set forth in the ninth sentence of paragraph 10 of the Complaint.

11.     The few African-Americans whom Merrill Lynch hires fare worse than Caucasians. For example, in various years in the class period, approximately 75% of African-American trainee brokers were forced to leave Merrill Lynch as a result of discriminatory treatment prior to completing the training program. Merrill Lynch has acknowledged during the African-American symposia over the past decade that the attrition rate for African-American brokers has been and remains significantly higher than the attrition rate for Caucasians.

### ANSWER

Denies the allegations set forth in the first and second sentences of paragraph 11 of the Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the third sentence of paragraph 11 of the Complaint.

12.     African-American brokers also earn lower wages on account of the Firm's racial discrimination. Merrill Lynch ranks its brokers by placing them in quintiles. The top 20% in commissions is the "first quintile" and the bottom 20% in commissions is the "fifth quintile." Merrill Lynch relies on these quintile rankings to distribute a variety of benefits, as explained below. Merrill Lynch has acknowledged at the symposia and/or to its Advisory Council to Management that no fewer than 70% of African-American brokers with a length of service in excess of ten years are in the bottom two quintiles. White brokers, on the other hand, are evenly distributed in these quintiles. The under-representation of African-American brokers in the top quintiles and over-representation in the bottom quintiles is the result of Merrill Lynch's ongoing and systemic race discrimination.

## ANSWER

Denies the allegations set forth in the first sentence of paragraph 12 of the Complaint. Denies the allegations set forth in the second sentence of paragraph 12 of the Complaint, and avers that Defendant publishes to Financial Advisors various reports which array Financial Advisors by quintile, including, for example, the production of Financial Advisors during various time periods. Denies the allegations set forth in the third and fourth sentences of paragraph 12 of the Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the fifth sentence of paragraph 12 of the Complaint. Denies the allegations set forth in the sixth and seventh sentences of paragraph 12 of the Complaint.

13.     The following chart reflects that in 2003 there were no African-American brokers with six to nine years tenure in the first quintile but 55% in the fifth quintile:

**DISTRIBUTION OF LOS 6-9 FCs BY QUINTILE AND RACE**



**ANSWER**

Denies the allegations set forth in paragraph 13 of the Complaint, but admits that

the chart in paragraph 13 purports to depict that in 2003 there were no African-American

Financial Advisors with six to nine years of tenure in the first quintile, but 55% in the fifth

quintile.

14.    Likewise, in 2003, of the African-Americans who survived the Firm's
discriminatory employment practices for more than 10 years, 50% were in the fifth quintile as
compared to 20% of Caucasian brokers:

**DISTRIBUTION OF LOS 10+ FCs BY QUINTILE AND RACE**



**ANSWER**

Denies the allegations set forth in paragraph 14 of the Complaint.

15.     Merrill Lynch relies on this quintile system based on commissions generated to determine eligibility for titles, offices, sales assistance, distributions of accounts of departing brokers, leads, walk-ins, referrals, IPO opportunities, membership in partnerships or teams, recognition clubs, expense allowance, and managerial support. Thus, favorable treatment garners commissions, which are then used to justify even more favorable treatment. For example, if a broker is given account distributions that generate commissions, the commissions earned from the donated accounts will entitle him to even more account distributions and other perks. Success breeds success at Merrill Lynch, and African-Americans are excluded from significant income earning opportunities giving rise to greater success, due to Merrill Lynch's discriminatory employment practices, as reflected in the charts above.

### ANSWER

Denies the allegations set forth in first, second, and third sentences of paragraph 15 of the Complaint. In response to the allegations set forth in the fourth sentence of paragraph denies the allegations set forth in the fourth sentence of paragraph 15 of the Complaint, but admits that in many instances more support and opportunities are afforded to those who have been successful than to those who have not been successful.

16.     A broker denied resources will have lower production or commissions and, consequently, will be deemed ineligible for a variety of resources. For example, during the class period, fourth and fifth quintile brokers were often ineligible to receive accounts of departing or retiring brokers. Because approximately 70% of African-American brokers at Merrill Lynch with a tenure in excess of 10 years are in the fourth and fifth quintile due to race discrimination, they have been largely excluded from account distributions. Merrill Lynch's policy or practice of excluding fourth and fifth quintile brokers from distributions is a pretext to distribute accounts to non-African-Americans.

### ANSWER

Denies the allegations set forth in the paragraph 16 of the Complaint.

17.     Likewise, during most of the class period, only first or second quintile brokers have been eligible to attend the MAC where sponsored candidates are selected to become managers at the Firm. Thus, the overwhelming majority of African-Americans have been excluded from management opportunities due to the Firm's discriminatory practices. As a result, there are only a few African-American managers in over 600 branches. Again, the quintile qualification is a pretext for racial discrimination and has served to maintain a managerial workforce that is largely devoid of African-Americans.

### ANSWER

Denies the allegations set forth in the first, second and fourth sentences of paragraph 17 of the Complaint. Denies the allegations set forth in the third sentence of paragraph of the Complaint, except avers that there is no under-representation of African-Americans in management as compared to the available applicant pool.

## Merrill Lynch Does Not Provide A Diverse, Non-Discriminatory Workplace

18.    African-Americans are also treated with disrespect and experience a hostile work environment in Merrill Lynch's branch offices despite proclamations in the Firm's internal materials and advertisements that it is built on the principle of "Respect for the Individual." The phrase "Total Merrill" is also used in advertisements, yet the "Total Merrill" experienced by African-Americans is far different from that experienced by non-African-Americans. Although the Firm teaches its managers to use the word "diversity," its commitment to diversity is illusory. For example:

- One manager freely expressed what is widely believed by African-Americans to be common thought within Merrill Lynch, "[t]his whole diversity thing, there isn't a business case for it; it's more of a shareholder and public relations thing." He also commented, "[i]f I were running the Diversity Program, I'd hire a smart white guy and have a black guy for the face."

- A district manager in San Antonio was offered a promotion after it was alleged in a federal class action gender discrimination complaint that he told African-American trainees to "split up" because they were "forming a ghetto." When asked at a hearing years later if he made this comment, the district manager admitted, "I could have."

- The term, "ghetto" was also used in another office to describe a run-down part of that branch office where two African-American brokers were seated.

- In New York, when African-Americans were seen congregating, they were asked,"[y]ou planning an uprising?" Other examples of the acceptance of the racist culture abound.

- One class member was handed a pencil emblazoned with a confederate flag to take a Merrill Lynch examination.

- Some class members have been referred to as "niggers," without repercussion to the individuals making such remarks. One manager even mocked a non-African-American broker by asking, "[a]re you going to let a nigger beat you?" When a client complained to a manager that Merrill Lynch had "niggers" working in the office, the manager apologized to the client, evidencing the Firm's willingness to accede to customer bias.

- Another manager who was photographing brokers for a bulletin board display told an African-American class member in front of other brokers, words to the effect, "[t]hat's okay, I can find your picture down at the precinct."

- Brokers openly make insensitive remarks without fear of repercussions such as one asking a co-worker, "what now, are you gonna grow cornrows?"

- An African-American broker was repeatedly asked, "[w]hat do you think of O.J.?" Another African-American broker was required to endure a barrage of bigoted remarks about Kobe Bryant's "raping a white woman."

- Class members have been excluded from golf outings because the club where the event was taking place did not allow African-Americans. Others attended golf functions where the only other African-Americans on the course were caddies.

- A class member in a Southern city was invited to a business dinner at the home of his Sales Manager but did not attend because he was told that the Sales Manager had the "Stars and Bars" (Confederate flag) prominently displayed in his home.

These are but a few of the offensive comments made to or in the presence of class members.

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 18 of the Complaint, except admits that Defendant has an internal document entitled "Respect for the Individual," and has used the term "Respect for the Individual" in advertising materials. Denies the allegations set forth in the second sentence of paragraph 18 of the Complaint, except admits the phrase "Total Merrill" is used in Defendant's advertisements. Denies the allegations set forth in the third sentence of Paragraph 18 of the Complaint. Denies the allegations that Defendant has an "acceptance of the racist culture" as set forth in the fourth bullet-point in the fourth sentence of paragraph 18 of the Complaint, denies that the Defendant has a "willingness to accede to customer bias" as set forth in the second sentence of the sixth bullet-point in the fourth sentence of paragraph 18 of the Complaint, and denies the allegations that "[b]rokers openly make insensitive remarks without fear of repercussions" as set forth in the eighth bullet-point in

the fourth sentence of paragraph 18 of the Complaint, and denies knowledge or information

sufficient to form a belief concerning the truth of the remaining allegations set forth in the fourth

sentence of paragraph 18 of the Complaint. Denies knowledge or information sufficient to form

a belief concerning the truth of the allegations set forth in the fifth sentence of paragraph 18 of

the Complaint.

19.     As alleged above, African-American brokers are also excluded from
lucrative teams or partnerships with other brokers because Merrill Lynch does not support or
foster inter-racial partnerships or support partnerships between African-American brokers.
Within Merrill Lynch, the excuse, "we cannot arrange marriages," is offered even by Human
Resources personnel as the excuse for the low representation of African-Americans on teams.
However, partnerships at Merrill Lynch must be approved by management, who frequently
"arrange" such partnerships to the benefit of white brokers and the detriment of African-
American brokers. The obvious implication of Merrill Lynch's purported rationale is that inter-
racial partnerships would exist only if they were forced on the non-African-American brokers.
This view is consistent with prevailing negative stereotypes regarding African-Americans at
Merrill Lynch. Indeed, these pervasive stereotypes infect all employment practices and harm
African-Americans.

### ANSWER

Denies the allegations set forth in the first and second sentences of paragraph 19

of the Complaint. Denies the allegations set forth in the third sentence of paragraph 19 of the

Complaint, except avers that an authorized member of Merrill Lynch branch management must

approve each partnership upon request of the Financial Advisors who wish to form such an

agreement. Denies the allegations set forth in the fourth, fifth, and sixth sentences of paragraph

19 of the Complaint.

### Racial Discrimination And Retaliation At Merrill Lynch Is National In Scope

20.     George McReynolds ("McReynolds") has support in this litigation as over
100 current or former Merrill Lynch brokers from across the country have requested to join or
support the lawsuit. These putative class members were denied employment or were employed
at Merrill Lynch offices across the country. The current employees manage billions of dollars of
client assets and range in years of service from a few months to over 25 years. Thus, putative
class members fall into five categories: 1) applicants; 2) broker-trainees; 3) brokers with three to
nine years of service with Merrill Lynch; 4) brokers with or in excess of ten years of service with
Merrill Lynch; and/or 5) brokers who expressed interest in management or were excluded from

consideration due to discriminatory practices and policies. The putative class members are relying on McReynolds, Stowell & Friedman, Ltd., and this lawsuit to protect their rights.

### ANSWER

Denies knowledge or information sufficient to form a belief concerning the truth

of the allegations set forth in the first, second, and third sentences of paragraph 20 of the

Complaint. The allegations set forth in the fourth sentence of paragraph 20 constitute

conclusions of law to which no responsive pleading is required, but Defendant nevertheless avers

that Plaintiff neither has standing nor is typical of a putative class comprised of 1) applicants; 2)

broker-trainees; 3) brokers with three to nine years of service with Merrill Lynch; or 4) brokers

who expressed interest in management or were excluded from consideration due to alleged

discriminatory practices and policies. Denies knowledge or information sufficient to form a

belief concerning the truth of the allegations set forth in the fifth sentence of paragraph 20 of the

Complaint.

21.     Stowell & Friedman, Ltd., and the putative class placed Merrill Lynch on notice of the class-wide allegations of racial discrimination by McReynolds through the Firm's Employment Dispute Resolution ("EDR") process. The EDR was enacted in response to a class action gender discrimination suit, *Cremin et al. v. Merrill Lynch*, 96 C 3773 (Castillo, J).

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 21 of the

Complaint, except admits that Merrill Lynch received a complaint from Plaintiff, through his

attorneys, in lieu of filing a complaint through Merrill Lynch's standard EDR process. Admits

the allegations set forth in the second sentence of paragraph 21 of the Complaint.

### Merrill Lynch's Discrimination And Retaliation Against African-Americans is Ongoing

22.     Merrill Lynch's pattern and practice of systematically discriminating and retaliating against African-Americans is ongoing and constitutes a continuing violation of the civil rights laws, notwithstanding McReynolds' class-based Employment Dispute Resolution ("EDR") complaint.

**ANSWER**

Denies the allegations set forth in paragraph 22 of the Complaint.

## McReynolds Is An Appropriate Class Representative

23.     McReynolds began his employment with Merrill Lynch in 1983 and is currently a broker in the Nashville, Tennessee office.

**ANSWER**

Admits the allegations set forth in paragraph 23 of the Complaint.

24.     Notwithstanding his impressive job performance and consistent with the allegations of race discrimination against African-Americans, McReynolds was subjected to and harmed by Merrill Lynch's ongoing, nationwide pattern and practice of systemic and pervasive racial discrimination.

**ANSWER**

Denies the allegations set forth in paragraph 24 of the Complaint.

## McReynolds' Experiences Are Typical

25.     In early 2005, McReynolds formally raised a complaint of discrimination and retaliation against Merrill Lynch through the Firm's EDR Process. McReynolds alleged that Merrill Lynch intentionally created a segregated workforce where African-Americans were steered into less desirable positions and were denied income earning and career opportunities routinely extended to non-African-Americans. In his EDR claim, McReynolds cited numerous examples of Merrill Lynch's discriminatory practices and policies.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 25 of the

Complaint, except admits that Merrill Lynch received a complaint from Plaintiff, through his

attorneys, in lieu of filing the complaint through Merrill Lynch's standard EDR process. In

response to the allegations set forth in the second sentence of paragraph 25 of the Complaint,

Defendant respectfully refers the Court to Plaintiff's Initial Demand Letter of May 18, 2005 as

the best evidence of the contents thereof. In response to the allegations set forth in the third

sentence of paragraph 25, Defendant respectfully refers the Court to Plaintiff's Initial Demand

Letter of May 18, 2005 as the best evidence of the contents thereof, and denies any allegations of

"discriminatory practices and policies."

26.     For example, when McReynolds was hired as a financial advisor in 1983 in Merrill Lynch's Nashville, Tennessee office, he was one of only two African-American brokers in the state of Tennessee. McReynolds remained the only African-American broker in his office until Cathy Bender ("Bender") was hired in 1987.[3] Despite the growth of the Nashville complex to approximately 65 to 70 brokers, the complex has never employed more than three African-American brokers at any one time.

### ANSWER

Denies knowledge or information sufficient to form a belief concerning the truth

of the allegations set forth in the first sentence of paragraph 26 of the Complaint, but admits that

McReynolds was hired by Merrill Lynch in 1983.  Admits the allegations set forth in the second

sentence of paragraph 26 of the Complaint, except denies knowledge or information sufficient to

form a belief concerning the truth of the allegations set forth in footnote 3.  Denies the

allegations set forth in the third sentence of paragraph 26 of the Complaint.

27.     Consistent with the Firm's discriminatory hiring practices, the Nashville complex recruits almost exclusively at predominantly white colleges and universities.  Well-qualified African-American graduates are not welcome at Merrill Lynch.  To illustrate, in approximately 2002, white Managing Director of the Nashville-Memphis complex, Robert Shaffer ("Shaffer"), refused to interview an African-American graduate of West Point, Jeff Cleveland, who had been recommended by Bender.  Having served nine years as an Army officer and having spent four years in management at a large corporation, Cleveland was well qualified and eager to pursue a career at Merrill Lynch.  According to Merrill Lynch's initiative, Shaffer was to interview Cleveland or introduce him to management at another office.  Shaffer did neither.  Similarly, a Merrill Lynch manager stated that he would consider recruiting at universities with large African-American student populations only if those students had earned Masters degrees.  Merrill Lynch had no such requirement for non-African-American candidates.

### ANSWER

Denies the allegations set forth in the first and second sentences of paragraph 27

of the Complaint.  Denies the allegations set forth in the third, fourth, fifth, and sixth sentences

---

[3] Bender was hired only as the result of a recommendation by McReynolds's wife, who was then the Commissioner of Commerce and Insurance for the State of Tennessee, a position with the responsibility for the issuance and trading of securities under the laws of Tennessee.

of paragraph 27 of the Complaint to the extent that they presume that Mr. Shaffer discriminated

against an applicant for employment, except denies knowledge or information sufficient to form

a belief concerning the truth of the remaining allegations in the third, fourth, fifth, and sixth

sentences of paragraph 27 of the Complaint. In response to the allegations set forth in the

seventh sentence of paragraph 27 of the Complaint, denies the allegation that Defendant "recruits

from universities with large African-American student populations only if those students had

earned Masters degrees," except denies knowledge or information sufficient to form a belief

concerning the truth of the remaining allegations set forth in the seventh sentence of paragraph

27 of the Complaint. In response to the allegations set forth in the eighth sentence of paragraph

27 of the Complaint, admits that Defendant does not require non-African-Americans to hold a

Masters degree as a qualification for employment at Merrill Lynch, except denies that any such

requirement applied to African-American candidates.

28.    McReynolds's efforts to enhance diversity at Merrill Lynch were likewise
stymied. For example, McReynolds recruited and hired a number of African-American interns.
However, Merrill Lynch made no effort to recruit McReynolds's interns to work for the Firm
despite their qualifications. One of the interns McReynolds hired went to work for a
sophisticated New York hedge fund after Merrill Lynch made no effort to retain him. Similarly
situated white interns were aggressively pursued for employment at Merrill Lynch.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 28 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second, third, fourth, and fifth sentences of paragraph 28 of the

Complaint.

29.    Throughout McReynolds's employment, Merrill Lynch maintained a
discriminatory system of account distributions and allocation of referrals, leads, walk-ins, call-
ins, and IPOs as part of its pattern and practice of unlawful conduct, including conduct occurring
in its Nashville complex. For example, rather than assigning accounts, leads or referrals to the
more junior African-American brokers, Merrill Lynch managers told these brokers to prospect in
the African-American community. Members of the African-American community were aware

that Merrill Lynch offered only a revolving door to African-American brokers and were reluctant to place their assets with brokers who were unlikely to be retained by the Firm.

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 29 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second sentence of paragraph 29 of the Complaint. Denies that

"[Defendant]" offered only a revolving door to African-American brokers," and denies

knowledge or information sufficient to form a belief concerning the truth of the allegations as to

what "[m]embers of the African-American Community were aware" or their investing decisions,

as set forth in the third sentence of paragraph 29 of the Complaint.

30.    Consistent with its stereotypical views of African-Americans, the only potential clients or referrals Merrill Lynch steered toward McReynolds and other African-American brokers were typically minorities or individuals with a low net worth.

### ANSWER

Denies the allegations set forth in the paragraph 30 of the Complaint.

31.    McReynolds also was denied the same quality or quantity of sales and administrative support as his non-African-American colleagues. McReynolds shared a sales assistant, at times with as many as seven other brokers, including rookie brokers, who often require more of the sales assistants' time and attention because of their inexperience. As a result, McReynolds has performed a substantial amount of administrative and sales support work, diverting valuable time away from activities to develop his book of business.

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 31 of the

Complaint. In response to the allegations set forth in the second sentence of paragraph 31 of the

Complaint, admits that McReynolds shared a sales assistant, at times with as many as seven

other Financial Advisors, and that less-experienced Financial Advisors may require more

assistance from sales assistants than do more experienced Financial Advisors, but denies

knowledge or information sufficient to form a belief concerning the truth of the remaining

allegations in the second sentence of paragraph 31 of the Complaint. Denies knowledge or

information sufficient to form a belief concerning the truth of the allegations set forth in the third

sentence of paragraph 31 of the Complaint.

32.     The experiences of McReynolds are also typical of the Firm's pattern and
practice of discrimination with regard to partnerships, which work to the advantage of white
brokers and to the disadvantage of African-American brokers. In October 2001, McReynolds
was forced by Robert Kennedy ("Kennedy") (then the Nashville Office Branch Manager) to
enter into and surrender his accounts to a partnership with white junior or trainee Professional
Development Program ("PDP") brokers Charles Grummon ("Grummon") and Jonathon Evans
("Evans"). McReynolds believed that he had no choice but to partner with Grummon and Evans
and, relying on Kennedy's representations that McReynolds would benefit from the partnership,
he reluctantly did what he was told.

**ANSWER**

Denies the allegations set forth in the first and second sentences of paragraph 32

of the Complaint. Denies knowledge or information sufficient to form a belief concerning the

truth of the allegations set forth in the third sentence of paragraph 32 of the Complaint

concerning McReynolds's beliefs, and denies the allegations set forth in the third sentence of

paragraph 32 of the Complaint concerning "Kennedy's representations."

33.     Contrary to Kennedy's representations, the partnership was highly
detrimental to McReynolds. Although McReynolds contributed the vast majority of the assets to
the partnership, he received credit for less than half of the partnership's production.
McReynolds's earnings and production decreased significantly as a result of the partnership.
The junior white brokers, however, benefited greatly from the forced partnership with
McReynolds.

**ANSWER**

Denies the allegations set forth in paragraph 33 of the Complaint.

34.     Consistent with its pattern and practice of steering African-Americans into
clerical positions, investment advisor positions, or other non-producing roles, Kennedy told
McReynolds that he should surrender his broker position to become an investment advisor
("IA") for the partnership. When McReynolds refused to work for Grumman and Evans as an
IA, the partnership between the three was dissolved on terms that were very unfavorable to
McReynolds. Upon dissolution of this partnership, McReynolds did not receive account
transfers to compensate him for his considerable loss of assets.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 34 of the

Complaint, but admits that Mr. Kennedy suggested that Plaintiff consider becoming an

Investment Advisor in an effort to help him increase his compensation, as a number of other

Financial Advisors had done in the past. Denies the allegations set forth in the second and third

sentences of paragraph 34 of the Complaint.

35.     In approximately 1989 or 1990, McReynolds formed a partnership with
Lona Spencer ("Spencer"), a white female broker in his office. McReynolds's white branch
manager, Roy Williams ("Williams"), was resistant and hostile to the partnership, although he
supported other partnerships composed entirely of non-African-American male brokers.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 35 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second sentence of paragraph 35 of the Complaint.

36.     That partnership ended when Spencer left Merrill Lynch. At the meeting
announcing Spencer's departure, Williams announced to the entire office that any broker who
wanted any of the accounts held by Spencer's partnership with McReynolds should contact
Williams and they would get the account from McReynolds. Williams did not make similar
statements when a white broker was the only broker remaining after the dissolution of a
partnership. On the contrary, the white remaining brokers retained the assets of the partnership
upon dissolution. Beneficial partnerships for African-American brokers were not encouraged.
Any partnerships allowed were often to the detriment of the African-American broker.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 36 of the

Complaint. Denies the allegations set forth in the second, third, fourth, fifth, and sixth sentences

of paragraph 36 of the Complaint.

37.     Merrill Lynch also employs discriminatory promotional practices. The
management assessment process is performed predominantly by white men and is replete with
racial stereotypes. As a result of racial bias, the skills of African-Americans are overlooked and
undervalued. To illustrate, McReynolds has never reported to an African-American manager
during his tenure at Merrill Lynch, and no one at Merrill Lynch has ever approached

McReynolds regarding opportunities to join management, despite the fact that McReynolds has over ten years of management experience.

### ANSWER

Denies the allegations set forth in the first, second and third sentences of paragraph 37 of the Complaint. In response to the fourth sentence of paragraph 37 of the Complaint, admits that Plaintiff has never reported to an African-American manager, but denies knowledge or information sufficient to for a belief concerning the truth of the remaining allegations set forth in the fourth sentence of paragraph 37 of the Complaint.

### McReynolds Suffers Economic Loss Today From This Differential Treatment

38. As a result of the Firm's discriminatory employment practices, McReynolds lost opportunities and accounts, as well as the referrals and commissions resulting from those accounts. As further evidence of discrimination and retaliation, in spite of nearly twenty years of dedicated service to Merrill Lynch and its clients, McReynolds's office was taken away and he was moved to the "bullpen" in a cubicle immediately adjacent to the women's restroom where he sat until recently. Due to the traffic and noise by his cubicle, it was difficult for McReynolds to concentrate on his work and to speak to his clients without frequent interruption and distraction. In addition, the cubicle was so small that McReynolds could meet with clients only if he was able to arrange for a conference room. Following the filing of this lawsuit, McReynolds was reassigned to an office.

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 38 of the Complaint. Denies the allegations set forth in the second sentence of paragraph 38 of the Complaint, except avers that McReynolds was moved from an office to a board room/bullpen where he sat until recently. Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the third sentence of paragraph 38 of the Complaint. Admits the allegations set forth in the fourth sentence of paragraph 38 of the Complaint. Admits the allegations set forth in the fifth sentence of paragraph 38 of the Complaint.

### Systemic Racism

39.     McReynolds, like other African-Americans at Merrill Lynch, also has been subjected to a hostile work environment where African-Americans are treated as inferior and are subjected to abusive and harassing treatment, comments and behavior.

**ANSWER**

Denies the allegations set forth in paragraph 39 of the Complaint.

40.     For example, upon meeting McReynolds for the first time, Shaffer said, "[o]h, you're the one," or words to that effect. McReynolds asked him what he meant by the statement, to which Shaffer replied "[o]h, nothing."

**ANSWER**

Denies the allegations set forth in paragraph 40 of the Complaint.

41.     Merrill Lynch has also publicly disparaged African-American brokers in the Nashville complex. For example, in the fall of 2004, at a meeting attended by all brokers and Shaffer, Merrill Lynch announced that all African-American brokers in the complex were in the fifth quintile. In another meeting, supposedly aimed at diversity and mentoring, a representative from Human Resources announced that African-Americans were disproportionately in the bottom quintile. These public statements were not made for the purpose of improving Merrill Lynch's policies and practices, but instead simply to reinforce the perception among McReynolds's managers and peers that African-Americans are inferior and incapable of competing as brokers.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 41 of the

Complaint. Denies the allegations set forth in the second sentence of paragraph 41 of the

Complaint, except admits that a meeting aimed at diversity took place and avers that any

statements made concerning African-American brokers in the complex falling into the fifth

quintile were made in an attempt to have a frank and honest discussion of how to improve

diversity in the work place. Denies the allegations set forth in the third and fourth sentences of

paragraph 41 of the Complaint.

**McReynolds And The Putative Class**
**Suffered Injury As A Consequence Of The Discrimination**

42.     McReynolds and the putative class lost wages and other benefits, suffered embarrassment and humiliation, and their careers were irreparably injured as a result of Merrill Lynch's discriminatory conduct.

**ANSWER**

Denies the allegations set forth in paragraph 42 of the Complaint.

43.    Merrill Lynch's conduct was reckless and/or in willful violation of the civil rights laws. Indeed, this is the third class action against Merrill Lynch to allege that the Firm favors non-African-American males in hiring over women and minorities. As alleged above, the EEOC found that Merrill Lynch failed to employ African-Americans nearly thirty years ago. The EEOC filed a suit and entered into the *O'Bannon* Consent Decree, which opened the doors at Merrill Lynch for women and minorities. In 1996, female brokers, many of whom were hired under the *O'Bannon* Consent Decree, filed a class action lawsuit, *Cremin et al. v. Merrill Lynch*. Findings were entered in favor of the women that Merrill Lynch engaged in a pattern and practice of discrimination in compensation and promotional opportunities. This suit, like the *Cremin* action, is brought by employees hired as a result of the *O'Bannon* Consent Decree. Merrill Lynch's refusal to hire and equally employ African-Americans is a willful violation of the civil rights laws.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 43 of the

Complaint. In response to the allegations set forth in the second sentence of paragraph 43 of the

Complaint, Defendant respectfully refers the Court to the complaints in each of the litigations as

the best evidence of the contents thereof. In response to the allegations set forth in the third

sentence, Defendant respectfully refers the Court to the complaint filed by the EEOC as the best

evidence of the contents thereof. In response to the allegations in the fourth sentence of

paragraph 43 of the Complaint, admits that the EEOC filed a suit and that Defendant entered into

a Consent Decree, but denies that the Consent Decree "opened the doors at Merrill Lynch for

women and minorities." Denies that female Financial Advisors filed a class action lawsuit

against Defendant styled *Cremin et al v. Merrill Lynch* in 1996 as set forth in the fifth sentence

of paragraph 43 of the Complaint, and avers that the *Cremin et al v. Merrill Lynch* lawsuit was

filed in 1997. Denies the allegations set forth in the sixth, seventh, and eighth sentences of

paragraph 43.

44.    Representative charges of racial discrimination were filed and are pending with the EEOC. The putative class will add a Title VII claim for discrimination based on a

disparate impact theory when the EEOC issues the class a Right to Sue.

**ANSWER**

In response to the allegations set forth in the first sentence of paragraph 44 of the Complaint, admits that charges of racial discrimination were filed and remain pending with the EEOC, but denies that such charges are "representative." Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the second sentence of paragraph 44 of the Complaint.

## CLASS ALLEGATIONS

45.    The class of African-American employees and former employees who have been subjected to discrimination due to their race and who have been subjected to retaliation due to their opposition to discrimination is so numerous and geographically spread that joinder of all members is impracticable.

**ANSWER**

Denies the allegations set forth in paragraph 45 of the Complaint.

46.    There are questions of law and fact common to the class.

**ANSWER**

Denies the allegations set forth in paragraph 46 of the Complaint.

47.    The claims of McReynolds are typical, and McReynolds will fairly and adequately represent and protect the interests of the class.

**ANSWER**

Denies the allegations set forth in paragraph 47 of the Complaint.

48.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**ANSWER**

Denies the allegations set forth in paragraph 48 of the Complaint.

## COUNT I

## RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981

**(Against Merrill Lynch)**

49.     McReynolds and all others similarly situated reallege paragraphs 1 through 48 and incorporate them by reference as though fully stated herein as part of Count I of this Complaint.

### ANSWER

Admits that Plaintiff purports to incorporate by reference the preceding

paragraphs.

50.     Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

### ANSWER

In response to the allegations set forth in the first sentence of paragraph 50 of the

Complaint, Defendant respectfully refers the Court to the text of 42 U.S.C. § 1981 as the best

evidence of the contents thereof.  Defendant states that the allegations set forth in the second

sentence of paragraph 44 of the Complaint constitute conclusions of law to which no responsive

pleading is required.

51.     Merrill Lynch subjected McReynolds and all others similarly situated to racial discrimination in violation of 42 U.S.C. Section 1981.

### ANSWER

Denies the allegations set forth in paragraph 51 of the Complaint.

### PRAYER FOR RELIEF

**WHEREFORE**, McReynolds respectfully requests that this Court find in his favor and against

Merrill Lynch as follows:

a.     Declare that the acts and conduct of Merrill Lynch violate 42 U.S.C. Section

1981;

b.      Declare that Merrill Lynch engaged in a pattern and practice of racial

discrimination and certify a class of persons similarly situated to McReynolds eligible for relief;

c.      Order appropriate equitable and injunctive relief and diversity initiatives to

remedy the discrimination;

d.      Award McReynolds and all others similarly situated the value of all compensation

and benefits lost as a result of Merrill Lynch's unlawful conduct;

e.      Award McReynolds and all others similarly situated the value of all compensation

and benefits they will lose in the future as a result of Merrill Lynch's unlawful conduct;

f.      Award McReynolds and all others similarly situated compensatory damages;

g.      Award McReynolds and all others similarly situated punitive damages;

h.      Award McReynolds and all others similarly situated a common fund for make

whole relief and statutory, compensatory and punitive damages;

i.      Award McReynolds and all others similarly situated prejudgment interest;

j.      Award McReynolds and all others similarly situated attorneys fees, costs and

disbursements.

### ANSWER

Defendant admits that Plaintiff prays that the Court award the relief as set forth in

paragraphs "a" through "j" of the "Prayer," and denies that Plaintiff is entitled to any of the relief

prayed for in the Prayer.

### DEFENSES

1.      The Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiff lacks standing to raise some or all of the claims.

3.      Some, or all, of Plaintiff's claims are barred by applicable statutes of limitation.

4.      Plaintiff's claims on behalf of the purported class are barred by the Plaintiff's failure to meet all four of the mandatory requirements of Fed. R. Civ. P. 23(a), or any of the requirements of Fed. R. Civ. P. 23(b).

5.      The claims alleged by the Plaintiff are neither common nor typical of those claims, if any, of the members of the purported class.

6.      The Plaintiff is an inadequate representative of the purported class.

7.      The types of claims alleged by the Plaintiff are matters in which individual questions predominate and, accordingly, are not appropriate for class treatment.

8.      Plaintiff has failed to identify a pattern or practice of discrimination on the basis of race.

9.      Merrill Lynch had legitimate non-discriminatory reasons for the employment actions taken in connection with Plaintiff.

10.      Merrill Lynch denies that race or any other impermissible factor plays any role in its hiring, training, promotion, compensation, distribution of accounts, length of service designation procedures, or in any other policy or procedure that Plaintiff is, or may be, challenging.

11.      In the alternative, in the event that the Court or a jury concludes that race was a motivating factor in any of the employment decisions challenged by Plaintiff, which Merrill Lynch expressly denies, Merrill Lynch affirmatively avers that the same decisions would have been made even absent consideration of race.

12.      Merrill Lynch has taken reasonable care to prevent and remedy promptly any incidents of alleged racial discrimination and/or harassment brought to its attention; it has policies banning discrimination and/or harassment in the workplace and a reasonable and available procedure for handling complaints thereof, which provides for prompt and effective responsive action. To the extent that Plaintiff has not availed himself of these policies or procedures or acted reasonably to

otherwise avoid harm, his claims of racial discrimination and/or harassment by managers, supervisors, and/or co-workers are barred. To the extent that Plaintiff has used these policies and procedures and his alleged concerns have been dealt with promptly and effectively, Plaintiff's claims are barred and/or he has suffered no damages as a result.

13.     Any instances of discriminatory or harassing conduct by co-workers, which Merrill Lynch denies, would have contravened Merrill Lynch's good faith efforts to enforce and follow anti-discrimination laws. Merrill Lynch has issued policies and established procedures for complaints of alleged discrimination and/or harassment and have promulgated, taught, and enforced those policies and procedures in its workplaces. Merrill Lynch has exercised reasonable care to prevent and correct promptly any discriminatory and/or harassing behavior. To the extent that Plaintiff is unable to prove that Merrill Lynch knew or should have known of the alleged discrimination and/or harassment and that Merrill Lynch failed to take prompt remedial action, he is barred from recovering from Merrill Lynch.

14.     To the extent that Merrill Lynch discovers during the course of this action that Plaintiff engaged in any conduct that would warrant discharge from Merrill Lynch, Plaintiff's right to recover damages beyond the date of that conduct are cut off.

15.     Plaintiff has failed to mitigate his damages.

16.     Plaintiff's claims are barred by the doctrines of laches and waiver.

17.     Plaintiff is not entitled to punitive damages because Merrill Lynch did not act with an evil motive or intent or with reckless or callous indifference to the federally protected rights of the Plaintiff.

18.     Merrill Lynch hereby reserves its right to assert other defenses and affirmative defenses as this action proceeds.

Respectfully submitted,


By: /s Lori E. Lightfoot_____

MAYER, BROWN, ROWE & MAW, LLP
Lori E. Lightfoot, Esq.
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

-- and –

WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein, Esq.
Mindy J. Spector, Esq.
Nicholas J. Pappas, Esq.
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)


ATTORNEYS FOR DEFENDANT

## CERTIFICATE OF SERVICE

I, Lori E. Lightfoot, hereby certify that I caused a copy of the foregoing Answer of Defendant Merrill Lynch and Co. Inc. to the First Amended Complaint to be served upon:

Stowell & Friedman, Ltd.
Mary Stowell, Esq.
Linda Friedman, Esq.
312 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604

via First Class Mail on or before 4:30 p.m. on August 2, 2006 by causing the same to be deposited into a mail receptacle.

_/s Lori E. Lightfoot_____
Lori E. Lightfoot
Mayer, Brown, Rowe & Maw LLP
71 S. Wacker
Chicago, IL  60606
(312) 782-0600