**FILED**

**NOVEMBER 15, 2006**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE McREYNOLDS, MAROC | ) | |
| HOWARD, LARUE GIBSON, JENNIFER | ) | |
| MADRID, FRANKIE ROSS, MARVA YORK | ) | |
| LESLIE BROWNE, HENRY WILSON, | ) | |
| LEROY BROWN, GLENN CAPEL, | ) | |
| CHRISTINA COLEMAN, J. YVES LABORDE, | ) | |
| MARSHELL MILLER, CARNELL MOORE, | ) | |
| MARK JOHNSON, CATHY BENDER- | ) | |
| JACKSON, and STEPHEN SMARTT, | ) | |
| Individually on behalf of themselves | ) | |
| and all others | ) | |
| similarly situated | ) | Case No. 05C6583 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Judge Gettleman |
| v. | ) | Magistrate Judge Denlow |
| | ) | |
| MERILL LYNCH, PIERCE, FENNER | ) | |
| & SMITH, INCORPORATED, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs, George McReynolds, Maroc Howard, LaRue Gibson, Jennifer Madrid, Frankie

Ross, Marva York, Leslie Browne, Henry Wilson, LeRoy Brown, Glenn Capel, Christina

Coleman, J. Yves LaBorde, Marshell Miller, Carnell Moore, Mark Johnson, Cathy Bender-

Jackson, and Stephen Smartt, individually and on behalf of all others similarly situated

("Plaintiffs"), by and through their attorneys, Stowell & Friedman, Ltd., for their Second

Amended Complaint against Defendant, Merrill Lynch & Co., Inc. state as follows:

## JURISDICTION

1.   Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of pendent and

supplemental jurisdiction.

## PARTIES

2.  Plaintiffs and the class of persons they seek to represent are current and former employees of Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch" or "the Firm").

3.  Defendant Merrill Lynch is a full service securities firm engaged in the retail and institutional sale of securities, options contracts and various other financial products. Merrill Lynch employs in excess of 15,000 persons nationwide as financial advisors ("FAs" or "brokers") who sell its products and services at its offices located throughout the country, including in Chicago, Illinois. Merrill Lynch is the country's largest provider of brokerage and brokerage-related services. Merrill Lynch is a publicly traded, Fortune 100 corporation incorporated in Delaware. In 2005, Merrill Lynch had a net worth of over $37 billion and net earnings exceeding five billion dollars.

## FACTUAL ALLEGATIONS

**Merrill Lynch Systemically Discriminates Against And Excludes
African-Americans From Employment Opportunities**

4.  Merrill Lynch has engaged, and continues to engage, in systemic and pervasive racial discrimination against African-Americans.

5.  Merrill Lynch's discriminatory treatment of African-Americans is evidenced in part by the low representation and high attrition rates of African-Americans. In addition, African-Americans are paid lower wages and denied income-earning and promotional opportunities.

6.  Merrill Lynch's human resources department ("Human Resources") caters to and perpetuates the white male dominated culture and discrimination at the Firm. Because the Firm has no sincere desire to employ or retain African-Americans on equal terms as non-African-Americans, the Firm does not effectively monitor the treatment of its African-American

2

employees or fully investigate and resolve complaints of racial discrimination.  Rather, Merrill

Lynch justifies its conduct by reliance on racial stereotypes or by shifting blame to what it

presumes are its racist clients.  Without evidence to support its belief, Merrill Lynch believes that

its African-American Financial Advisors do not have access to wealth as compared to its white

brokers and, therefore, will not be as profitable to the Firm in bringing in wealthy clients.  In part

for that reason, Merrill Lynch does not employ tenured African-American brokers in the majority

of states.  Further, whatever racial animus or bias that may exist in society is intentionally

institutionalized, magnified and perpetuated by Merrill Lynch by its distributing clients and

resources in a manner mimicking any societal bias that may exist.  As a result of the historical

and ongoing discrimination at the Firm and the failings of Human Resources, African-Americans

recognize the futility of lodging internal complaints and are driven out or leave the Firm when

they can no longer tolerate the ongoing discrimination.  Those who complain of racial

discrimination are often subjected to retaliation, which reinforces Merrill Lynch's racist culture.

**Pattern Allegations**

7.   Merrill Lynch's nationwide pattern or practice of discrimination and retaliatory

conduct against African-Americans includes but is not limited to the following practices:

a)  failing to hire African-Americans;

b)  failing to retain African-Americans on the same basis as non-African-
    Americans;

c)  failing to promote African-Americans, including to management;

d)  underutilizing African-Americans in high paying jobs;

e)  steering African-Americans into clerical positions, investment advisor

positions, or other non-producing or lower paid positions;

f)  denying African-Americans the opportunity to participate in the Management Assessment Center ("MAC") and to become managers;

g)  taking race into account when making employment decisions, including but not limited to decisions regarding training, partnering brokers, and transferring and assigning walk-ins, leads, referrals, departing brokers' books and initial public offerings ("IPOs");

h)  targeting the accounts and clients of African-American brokers and reassigning them to non-African-American brokers;

i)  failing to credit African-Americans for their experience on the same basis as non-African-Americans and failing to consider African-Americans for timely promotions or title changes on the same basis as non-African-Americans;

j)  allocating significant resources to brokers based on "performance" rankings that Merrill Lynch knows are the product of past and ongoing discrimination, including but not limited to policies and practices regarding account distributions and partnerships;

k)  promoting the teaming or partnering of brokers in a manner that excludes African-Americans from income-generating opportunities, including but not limited to refusing to include African-Americans in significant partnership opportunities;

l)  using partnerships to target the accounts of African-American brokers;

4

m)  using partnerships to deny African-American brokers the opportunity to receive valuable account distributions or to otherwise participate in lucrative business opportunities;

n)  systematically paying African-Americans lower wages and/or denying African-Americans opportunities to increase their earnings, including commissions and stock;

o)  negligently hiring and/or retaining individuals with known propensities to discriminate against or harass African-Americans;

p)  creating an environment that is hostile and offensive to African-Americans;

q)  selecting managers with known propensities to discriminate against African-Americans to serve as assessors at the MAC;

r)  retaliating against African-Americans who complain of discrimination by, among other things, subjecting them to further discrimination, retaliation, verbal attacks, discipline, reassignment of their clients or accounts, and/or termination;

s)  making employment decisions based on race and/or racial stereotypes;

t)  intentionally or knowingly adopting, implementing and retaining policies and practices that have a disparate impact on African-Americans;

u)  manipulating the length of service ("LOS") designation of non-African-Americans to manipulate earnings and performance;

v)  terminating African-Americans on account of race and/or due to

5

diminished performance and/or production that was lower than it would

have been but for the unlawful conduct of Merrill Lynch;

w)  publicizing throughout the Firm under the guise of diversity initiatives the

quintile rankings, attrition rates and lower earnings of African-Americans

to perpetuate a perception that African-Americans are not competent, will

fail at the job and would not make good partners in teams;

x)  negligently retaining managers who fail to hire and discriminate against

African-Americans;

y)  applying standards that are less favorable for disciplining and terminating

African-Americans than standards applied to non-African-Americans; and

z)  defaming African-Americans to their clients and on their Uniform

Termination Notice For Securities Industry Registration Form U-5's

("Form U-5"), but issuing "clean" Form U-5s to non-African-Americans

who were charged with equally or more serious disciplinary violations or

for race discrimination.

**Merrill Lynch's Workforce Statistics Have A Zero Chance Of Occurrence In A
Random Or Race-Neutral Sampling**

8.  In 1974, the Equal Employment Opportunity Commission sued Merrill Lynch based

on its refusal to employ women and minorities as brokers.  To resolve the lawsuit, Merrill Lynch

agreed to the entry of a Consent Decree (the "*O'Bannon* Consent Decree") that required Merrill

Lynch to increase its representation of African-American brokers to 6.5%.  On information and

belief, Merrill Lynch never met the goals to which it agreed in the *O'Bannon* Consent Decree.

Indeed, more than 30 years later when this suit was filed, only 2% of the brokers employed by

6

Merrill Lynch are African-American. The representation of African-American brokers at Merrill Lynch is greater than 20 standard deviations below the goal in the 1978 EEOC Consent Decree and more than 10 standard deviations below the percentage representation in the industry, as reflected in EEOC census data. The probability of these disparities in representation occurring in a race-neutral or random selection is zero. Because of the high attrition resulting from Merrill Lynch's systemic discrimination, the percentage of Merrill Lynch brokers with tenure in excess of ten years who are African-American is approximately 0.5%.

9.   In or around 1994, a group of approximately fifty African-American brokers from Merrill Lynch convened in Chicago to discuss the Firm's failure to hire African-Americans and the differential treatment experienced by those who were hired. After learning of the existence of this group, and to placate its African-American brokers, Merrill Lynch began to hold annual symposia for African-American brokers. Conspicuously absent from the symposia were attendees representing about fifty percent of the states. A review of the lists of employees invited to the symposia revealed the dearth of African-American brokers at Merrill Lynch. For example, at the time that this lawsuit was filed, Merrill Lynch employed no African-American brokers[1] in approximately 25 states, including all states between Illinois and California. Moreover, in 2005, there were no African-American brokers working at 552 of the 639 Merrill Lynch office locations.[2] The following map reflects the state-by-state representation of African-American brokers across the United States as of year-end 2005; states in which Merrill Lynch employs no African-American brokers are depicted in red:

---

[1] Merrill Lynch's broker training program is two years; thus, "broker" here refers to a person who has been at the Firm for two years and excludes trainees.

[2] Again, broker here does not include trainees.

7



The symposia made clear that Merrill Lynch's exclusion of African-American brokers was not random but was intentional and systematic.

10. Notwithstanding its persistent refusal to employ African-Americans, Merrill Lynch regularly seeks out and participates in business opportunities with publicly traded companies, governmental organizations, not-for-profit entities, and unions that employ and/or represent African-Americans. It also creates racial profiles of its clients and targets and markets its services to affluent African-Americans. Likewise, Merrill Lynch advertises its diversity initiatives and seeks out business opportunities, including managing the assets of publicly traded corporations' pension and profit-sharing plans and underwriting initial public offerings and other equity and debt offerings. The Firm also seeks out and participates in business opportunities, such as bond transactions, from various municipalities and states. In these business pursuits, Merrill Lynch falsely represents that it is an equal opportunity employer. The Firm also fails to mention that it employs no African-American brokers in many of the states in which these

8

companies do business or that the majority of its African-American brokers do not survive the Firm for more than two years. Instead, Merrill Lynch assembles "diverse" teams to make presentations for the business opportunities that generate commissions almost exclusively for non-diverse Merrill Lynch employees. Through the concept of "virtual teams," Merrill Lynch uses African-American brokers to create the false impression with clients that Merrill Lynch is an equal opportunity employer. Class members have been asked to participate in these presentations to create a false appearance of inclusion at Merrill Lynch but then have been excluded from receiving the benefits if the presentation is successful. Merrill Lynch also promotes itself as an equal opportunity employer by including African-Americans in commercials airing in states in which Merrill Lynch employs no African-American brokers. As a result, in part of these efforts, Merrill Lynch's retail business has unjustly netted billions of dollars in profits.

11. The few African-Americans whom Merrill Lynch hires fare worse than Caucasians. For example, in various years in the class period, approximately 75% of African-American trainee brokers were forced to leave Merrill Lynch as a result of discriminatory treatment prior to completing the training program. Merrill Lynch has acknowledged during the African-American symposia over the past decade that the attrition rate for African-American brokers has been and remains significantly higher than the attrition rate for Caucasians.

12. African-American brokers also earn lower wages on account of the Firm's racial discrimination. Merrill Lynch ranks its brokers by placing them in quintiles. The top 20% in commissions is the "first quintile" and the bottom 20% in commissions is the "fifth quintile." Merrill Lynch relies on these quintile rankings to distribute a variety of benefits or resources, as explained below. Merrill Lynch has acknowledged at the symposia and/or to its Advisory

9

Council to Management that no fewer than 70% of African-American brokers with a length of service in excess of ten years are in the bottom two quintiles. White brokers, on the other hand, are evenly distributed in these quintiles at or around an expected 20% representation. The under-representation of African-American brokers in the top quintiles and over-representation in the bottom quintiles is the result of Merrill Lynch's ongoing and systemic race discrimination.

13. The following chart reflects that in 2003 there were no African-American brokers with six to nine years tenure in the first quintile but 55% in the fifth quintile:

## DISTRIBUTION OF LOS 6-9 FCs BY QUINTILE AND RACE



14. Likewise, in 2003, of the African-Americans who survived the Firm's discriminatory employment practices for more than 10 years, 50% were in the fifth quintile as compared to 20% of Caucasian brokers:

10

## DISTRIBUTION OF LOS 10+ FCs BY QUINTILE AND RACE



15. Merrill Lynch relies on this quintile system based on commissions generated to determine eligibility for titles, offices, sales assistance, distributions of accounts of departing brokers, leads, walk-ins, referrals, IPO opportunities, membership in partnerships or teams, recognition clubs, expense allowance, and managerial support.  Merrill Lynch relies on this system even though it believes that its customers' bias impacts the performance of African-American brokers on account of the brokers' race.  Favorable treatment garners commissions, which are then used to justify even more favorable treatment.  For example, if a broker is given account distributions that generate commissions, the commissions earned from the donated accounts will entitle him to even more account distributions and other perks.  Success breeds success at Merrill Lynch, and African-Americans are excluded from significant income earning opportunities giving rise to greater success due to Merrill Lynch's discriminatory employment practices, as reflected in the charts above.   Through these practices, Merrill Lynch intentionally

11

perpetuates its own discrimination and any bias that may exist in society.

16. A broker who is denied resources will have lower production or commissions and, consequently, will be deemed ineligible for a variety of resources. For example, during the class period, fourth and fifth quintile brokers were often ineligible to receive accounts of departing or retiring brokers. Because approximately 70% of African-American brokers at Merrill Lynch with a tenure in excess of 10 years are in the fourth and fifth quintile due to race discrimination, they have been largely excluded from account distributions. Merrill Lynch's policy or practice of excluding fourth and fifth quintile brokers from distributions is a pretext to distribute accounts to non-African-Americans. This policy or practice also has a disparate impact on African-Americans.

17. Likewise, during most of the class period, only first or second quintile brokers have been eligible to attend the MAC where sponsored candidates are selected to become managers at the Firm. Thus, the overwhelming majority of African-Americans have been excluded from management opportunities due to the Firm's discriminatory practices. As a result, there are only a few African-American managers in over 600 branches. Again, the quintile qualification is a pretext for racial discrimination and has served to maintain a managerial workforce that is largely devoid of African-Americans. This policy or practice also has a disparate impact on African-Americans.

**Merrill Lynch Does Not Provide A Diverse, Non-Discriminatory Workplace**

18. African-Americans are also treated with disrespect and experience a hostile work environment in Merrill Lynch's branch offices despite proclamations in the Firm's internal materials and advertisements that it is built on the principle of "Respect for the Individual." The phrase "Total Merrill" is also used in advertisements, yet the "Total Merrill" experienced by

12

African-Americans is far different from that experienced by non-African-Americans. Although the Firm teaches its managers to use the word "diversity," its commitment to diversity is illusory. For example:

- One manager freely expressed what is widely believed by African-Americans to be common thought within Merrill Lynch, "[t]his whole diversity thing, there isn't a business case for it; it's more of a shareholder and public relations thing." He also commented, "[i]f I were running the Diversity Program, I'd hire a smart white guy and have a black guy for the face."

- A district manager in San Antonio was offered a promotion after it was alleged in a federal class action gender discrimination complaint that he told African-American trainees to "split up" because they were "forming a ghetto." When asked at a hearing years later if he made this comment, the district manager admitted, "I could have."

- The term, "ghetto" was also used in another office to describe a run-down part of that branch office where two African-American brokers were seated.

- In New York, when African-Americans were seen congregating, they were asked, "[y]ou planning an uprising?" Other examples of the acceptance of the racist culture abound.

- One class member was handed a pencil emblazoned with a confederate flag to take a Merrill Lynch examination.

- Some class members have been referred to as "niggers," without repercussion to the individuals making such remarks. One manager even mocked a non-African-American broker by asking, "[a]re you going to let a nigger beat you?" When a client complained to a manager that Merrill Lynch had "niggers" working in the office, the

13

manager apologized to the client, evidencing the Firm's willingness to accede to customer bias.

- Another manager who was photographing brokers for a bulletin board display told an African-American class member in front of other brokers, words to the effect, "[t]hat's okay, I can find your picture down at the precinct."

- Brokers openly make insensitive remarks without fear of repercussions such as one asking a co-worker, "what now, are you gonna grow cornrows?"

- An African-American broker was repeatedly asked, "[w]hat do you think of O.J.?" Another African-American broker was required to endure a barrage of bigoted remarks about Kobe Bryant's "raping a white woman."

- Class members have been excluded from golf outings because the club where the event was taking place did not allow African-Americans. Others attended golf functions where the only other African-Americans on the course were caddies.

- A class member in a Southern city was invited to a business dinner at the home of his Sales Manager but did not attend because he was told that the Sales Manager had the "Stars and Bars" (Confederate flag) prominently displayed in his home.

- Managers believe that the diversity initiatives are incompatible with the Firm's revenue goals and therefore have little or no commitment to the diversity initiatives.

These are but a few of the offensive comments made to or in the presence of class members.

19. As alleged above, African-American brokers are also excluded from lucrative teams or partnerships with other brokers because Merrill Lynch does not support or foster inter-racial partnerships or support partnerships between African-American brokers. Within Merrill Lynch, the excuse, "we cannot arrange marriages," is offered even by Human Resources personnel as

the excuse for the low representation of African-Americans on teams. However, partnerships at Merrill Lynch must be approved by management, who frequently "arrange" such partnerships to the benefit of white brokers and the detriment of African-American brokers. The obvious implication of Merrill Lynch's purported rationale is that inter-racial partnerships would exist only if they were forced on the non-African-American brokers. This view is consistent with prevailing negative stereotypes regarding African-Americans at Merrill Lynch. Indeed, these pervasive stereotypes infect all employment practices and harm African-Americans. Upon the retirement, death, disability or departure of a team member, the remaining team members inherit assets from the team. African-American brokers are excluded from this form of account distribution, which has dramatically increased with the Firm's emphasis on teaming from 2001 to the present.

## Racial Discrimination And Retaliation At Merrill Lynch Is National In Scope

20. George McReynolds ("McReynolds") and the other named Plaintiffs are supported in this litigation by over 100 current or former Merrill Lynch brokers from across the country who have requested to join or expressed support for the lawsuit. These putative class members were denied employment or were employed at Merrill Lynch offices across the country. The current employees manage billions of dollars of client assets and range in years of service from a few months to over 25 years. Thus, putative class members fall into five categories: 1) applicants; 2) broker-trainees; 3) brokers with three to nine years of service with Merrill Lynch; 4) brokers with or in excess of ten years of service with Merrill Lynch; and/or 5) brokers who expressed interest in management or were excluded from consideration due to discriminatory practices and policies (the "putative class"). The putative class members are relying on McReynolds, Stowell & Friedman, Ltd., and this lawsuit to protect their rights.

15

21. Stowell & Friedman, Ltd., and the putative class placed Merrill Lynch on notice of the class-wide allegations of racial discrimination by McReynolds through the Firm's Employment Dispute Resolution ("EDR") process. The EDR was enacted in response to a class action gender discrimination suit, *Cremin et al. v. Merrill Lynch,* 96 C 3773 (Castillo, J).

**Merrill Lynch's Discrimination And Retaliation Against**
**African-Americans Is Ongoing**

22. Merrill Lynch's pattern or practice of systematically discriminating and retaliating against African-Americans is ongoing and constitutes a continuing violation of the civil rights laws, that culminated with the filing of McReynolds' class-based Employment Dispute Resolution ("EDR") complaint. Plaintiffs Howard, York and Wilson filed charges with the Equal Employment Opportunity Commission and received Notice of Rights to Sue.

**The Named Plaintiffs Are Class Representatives**

23. McReynolds and the other named Plaintiffs have performed their jobs in an impressive manner but were subjected to and harmed by Merrill Lynch's ongoing, nationwide pattern or practice of systemic and pervasive racial discrimination.

**McReynolds' Experiences Are Typical**

24. In early 2005, McReynolds formally raised a complaint of discrimination and retaliation against Merrill Lynch through the Firm's EDR Process. McReynolds alleged that Merrill Lynch intentionally created a segregated workforce where African-Americans were steered into less desirable positions and were denied income earning and career opportunities routinely extended to non-African-Americans. In his EDR claim, McReynolds cited numerous examples of Merrill Lynch's discriminatory practices and policies.

25. For example, when McReynolds was hired as a financial advisor in 1983 in Merrill Lynch's Nashville, Tennessee office, he was one of only two African-American brokers in the

16

state of Tennessee. McReynolds remained the only African-American broker in his office until Cathy Bender ("Bender") was hired in 1987.[3] Despite the growth of the Nashville complex to approximately 65 to 70 brokers, the complex has never employed more than three African-American brokers at any one time.

26. Consistent with the Firm's discriminatory hiring practices, the Nashville complex recruits almost exclusively at predominantly white colleges and universities. Well-qualified African-American graduates are not welcome at Merrill Lynch. To illustrate, in approximately 2002, white Managing Director of the Nashville-Memphis complex Robert Shaffer ("Shaffer") refused to interview an African-American graduate of West Point, Jeff Cleveland, who had been recommended by Bender. Having served nine years as an Army officer and having spent four years in management at a large corporation, Cleveland was well qualified and eager to pursue a career at Merrill Lynch. According to Merrill Lynch's initiative, Shaffer was to interview Cleveland or introduce him to management at another office. Shaffer did neither. Similarly, a Merrill Lynch manager stated that he would consider recruiting at universities with large African-American student populations only if those students had earned Masters degrees. Merrill Lynch had no such requirement for non-African-American candidates.

27. McReynolds's efforts to enhance diversity at Merrill Lynch were likewise stymied. For example, McReynolds recruited and hired a number of African-American interns. However, Merrill Lynch made no effort to recruit McReynolds's interns to work for the Firm despite their qualifications. One of these interns ultimately went to work for a sophisticated New York hedge fund after Merrill Lynch made no effort to retain him. Similarly situated white interns were aggressively pursued for employment at Merrill Lynch.

---

[3] Bender was hired only as the result of a recommendation by McReynolds's wife, who was then the Commissioner of Commerce and Insurance for the State of Tennessee.

28. Throughout McReynolds's employment, Merrill Lynch maintained a discriminatory system of account distributions and allocation of referrals, leads, walk-ins, call-ins, and IPOs as part of its pattern or practice of unlawful conduct, including conduct occurring in its Nashville complex.  For example, rather than assigning accounts, leads or referrals to the more junior African-American brokers, Merrill Lynch managers told these brokers to prospect in the African-American community.  Members of the African-American community were aware that Merrill Lynch offered only a revolving door to African-American brokers and were reluctant to place their assets with brokers who were unlikely to be retained by the Firm.

29. Consistent with its stereotypical views of African-Americans, the only potential clients or referrals Merrill Lynch steered toward McReynolds and other African-American brokers were typically minorities or low net worth individuals.

30. McReynolds also was denied the same quality or quantity of sales and administrative support as his non-African-American colleagues.  McReynolds shared a sales assistant, at times with as many as seven other brokers, including rookie brokers, who often require more of the sales assistants' time and attention because of their inexperience.  As a result, McReynolds has performed a substantial amount of administrative and sales support work, diverting valuable time away from activities to develop his book of business.

31. The experiences of McReynolds are also typical of the Firm's pattern or practice of discrimination with regard to partnerships, which work to the advantage of white brokers and to the disadvantage of African-American brokers.  In October 2001, McReynolds was forced by Robert Kennedy ("Kennedy"), then the Nashville Office Branch Manager, to enter into and surrender his accounts to a partnership with white junior brokers or trainee Professional Development Program ("PDP") brokers Charles Grummon ("Grummon") and Jonathon Evans

("Evans"). McReynolds believed that he had no choice but to partner with Grummon and Evans and, relying on Kennedy's representations that McReynolds would benefit from the partnership, he reluctantly did what he was told.

32. Contrary to Kennedy's representations, the partnership was highly detrimental to McReynolds. Although McReynolds contributed the vast majority of the assets to the partnership, he received credit for less than half of the partnership's production. McReynolds's earnings and production decreased significantly as a result of the partnership. The junior white brokers, however, benefited greatly from the forced partnership with McReynolds.

33. Consistent with its pattern or practice of steering African-Americans into clerical positions, investment advisor positions, or other non-producing roles, Kennedy told McReynolds that he should surrender his broker position to become an investment advisor ("IA") for the partnership. When McReynolds refused to work for Grumman and Evans as an IA, the partnership among the three was dissolved on terms that were unfavorable to McReynolds. Upon dissolution of this partnership, McReynolds did not receive account transfers to compensate him for his considerable loss of assets.

34. In approximately 1989 or 1990, McReynolds formed a partnership with Lona Spencer ("Spencer"), a white female broker in his office. McReynolds's white branch manager, Roy Williams ("Williams"), was resistant and hostile to the partnership, although he supported other partnerships composed entirely of non-African-American male brokers.

35. That partnership ended when Spencer left Merrill Lynch. McReynolds was not allowed to retain the accounts in the partnership. At the meeting announcing Spencer's departure, Williams announced to the entire office that any broker who wanted any of the accounts held by Spencer's partnership with McReynolds should contact Williams and they

19

would get the account from McReynolds. Williams did not make similar statements when a white broker was the only broker remaining after the dissolution of a partnership. On the contrary, subject to well-established practice, the remaining brokers retained the assets of the partnership upon dissolution. Beneficial partnerships for African-American brokers were not encouraged. Any partnerships allowed were often to the detriment of the African-American broker.

36. Merrill Lynch also employs discriminatory promotional practices. The management assessment process is performed predominantly by white men and is replete with racial stereotypes. As a result of racial bias, the skills of African-Americans are overlooked and undervalued. To illustrate, McReynolds has never reported to an African-American manager during his tenure at Merrill Lynch and no one at Merrill Lynch has ever approached McReynolds regarding opportunities to join management, despite the fact that McReynolds has over ten years of management experience.

37. The experiences of the other named Plaintiffs are consistent with the class wide allegations and the pattern or practice of racial discrimination at Merrill Lynch.

**Plaintiffs And The Putative Class Suffered Economic Loss**

38. As a result of the Firm's discriminatory employment practices, Plaintiffs and class members lost opportunities and accounts, as well as the referrals and commissions resulting from those accounts.

**Systemic Racism**

39. Plaintiffs, like other African-Americans at Merrill Lynch, also have been subjected to a hostile work environment where African-Americans are treated as inferior and are subjected to abusive and harassing treatment, comments and behavior.

40. Merrill Lynch frequently publishes "metrics" that demonstrate that African-Americans are disproportionately in the bottom quintiles. These public statements reinforce the perception among managers and peers that African-Americans are inferior and incapable of competing as brokers. Merrill Lynch seldom acknowledges that discrimination is the real reason for the lower rankings.

41. Even the African-American brokers who succeed to the first quintile are excluded from the perks and benefits awarded to top performers.

**Plaintiffs And The Putative Class**
**Suffered Injury As A Consequence Of The Discrimination**

42. Plaintiffs and the putative class lost wages and other benefits, suffered embarrassment and humiliation, and their careers were irreparably injured as a result of Merrill Lynch's discriminatory conduct.

43. Merrill Lynch's conduct was reckless and/or in willful violation of the civil rights laws. Indeed, this is the third class action against Merrill Lynch to allege that the Firm favors non-African-American males in hiring over women and minorities. As alleged above, the EEOC found that Merrill Lynch failed to employ African-Americans nearly thirty years ago. The EEOC filed a suit and entered into the *O'Bannon* Consent Decree, which opened the doors at Merrill Lynch for women and minorities. In 1996, female brokers, many of whom were hired under the *O'Bannon* Consent Decree, filed a class action lawsuit, *Cremin et al. v. Merrill Lynch*. Findings were entered in favor of the women that Merrill Lynch engaged in a pattern or practice of discrimination in compensation and promotional opportunities. This suit, like the *Cremin* action, is brought by employees hired as a result of the *O'Bannon* Consent Decree. Merrill Lynch's refusal to hire and equally employ African-Americans is a willful violation of the civil rights laws.

21

## CLASS ALLEGATIONS

44. The class of African-American employees and former employees who have been subjected to discrimination due to their race and who have been subjected to retaliation due to their opposition to discrimination is so numerous and geographically spread that joinder of all members is impracticable.

45. There are questions of law and fact common to the class.

46. The claims of the named Plaintiffs are typical, and the named Plaintiffs will fairly and adequately represent and protect the interests of the class. The Plaintiffs represent a cross-section of Merrill Lynch brokers whom they seek to represent. The Plaintiffs work in offices across the country, were ranked in all quintiles and have tenure from first-year rookie to seasoned broker.

47. The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

## COUNT I

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e et seq.
### (Against Merrill Lynch)

48. Plaintiffs reallege and incorporate paragraphs 1-47 of this Second Amended Complaint as paragraphs 1-47 of Count I.

49. Plaintiffs Maroc Howard, Marva York and Henry Wilson filed charges of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") and received Notice of Rights to Sue. Merrill Lynch was placed on notice of the representative allegations contained in this Complaint in the EEOC charges.

22

50. Title VII of the Civil Rights of 1964, 42 U.S.C. 2000e et seq. and amendments thereto ("Title VII") make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms or conditions, or privileges of employment, because of such individual's race, color or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, or national origin.

51. It is unlawful for an employer to engage in racially biased decision-making and treatment. It is also unlawful for an employer to make decisions infected by stereotypical thinking or other forms of less conscious bias. Employers are not lawfully allowed to engage in racially motivated conduct driven by business concerns, for example, concerns about the effect on employee relations, or the negative reaction of clients or customers. Thus, an employer violates the law when it acquiesces, accedes to or perpetuates perceived customer bias. Nor may race or color ever be a bona fide occupational qualification under the law.

52. Through the conduct alleged in this Second Amended Complaint, Merrill Lynch violated Title VII of the Civil Rights Act of 1964 and amendments thereto by subjecting Plaintiffs and all others similarly situated to differential treatment and by adopting policies and practices that had a disparate impact against African-Americans.

53. Merrill Lynch is strictly responsible for the acts and conduct of its managers and knew of should have known of a culture created by its managers and employees that discriminated against and was hostile to African-Americans.

23

## COUNT II

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981
### (Against Merrill Lynch)

54. Plaintiffs and all others similarly situated reallege paragraphs 1 through 53 and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

55. Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

56. Merrill Lynch subjected Plaintiffs and all others similarly situated to racial discrimination in violation of 42 U.S.C. Section 1981.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and all others similarly situated respectfully request that this Court find in their favor and against Merrill Lynch as follows:

a. Declare that the acts and conduct of Merrill Lynch violate 42 U.S.C. Section 1981;

b. Declare that the acts and conduct of Merrill Lynch violate Title VII;

c. Declare that Merrill Lynch engaged in a pattern and practice of racial discrimination and certify a class of persons similarly situated to Plaintiffs eligible for relief;

d. Order appropriate equitable and injunctive relief and diversity initiatives to remedy the discrimination;

e. Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost as a result of Merrill Lynch's unlawful conduct;

24

f.      Award Plaintiffs and all others similarly situated the value of all compensation and benefits they will lose in the future as a result of Merrill Lynch's unlawful conduct;

g.      Award Plaintiffs and all others similarly situated compensatory damages;

h.      Award Plaintiffs and all others similarly situated punitive damages;

i.      Award Plaintiffs and all others similarly situated a common fund for make whole relief and statutory, compensatory and punitive damages;

j.      Award Plaintiffs and all others similarly situated prejudgment interest;

k.      Award Plaintiffs and all others similarly situated attorneys fees, costs and disbursements;

l.      Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate the class.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By:

      s/Linda D. Friedman

Mary Stowell – Attorney No. 02750015
Linda D. Friedman – Attorney No. 06190092
**STOWELL & FRIEDMAN, LTD**.
321 S. Plymouth Court
Suite 1400
Chicago, Illinois 60604
(312) 431-0888

341382-2