IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
------------------------------------------------------- x
GEORGE MCREYNOLDS, MAROC           :
HOWARD, LARUE GIBSON, JENNIFER     :
MADRID, FRANKIE ROSS, MARVA YORK   :
LESLIE BROWNE, HENRY WILSON,       :
LEROY BROWN, GLENN CAPEL,          :
CHRISTINA COLEMAN, J. YVES LABORDE, :
MARSHELL MILLER, CARNELL MOORE,    :
MARK JOHNSON, CATHY BENDER-        :  Case No. 05C6583
JACKSON, and STEPHEN SMARTT,       :
Individually on behalf of themselves   :
and all others similarly situated      :  Hon. Robert W. Gettleman
                                   :  Magistrate Judge Denlow
           Plaintiffs,             :
                                   :
 - against-                        :
                                   :
MERRILL LYNCH, PIERCE, FENNER      :
& SMITH, INCORPORATED,             :
                 Defendant.        :
------------------------------------------------------- x
```

## ANSWER OF DEFENDANT TO SECOND AMENDED COMPLAINT

Defendant, Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch"), by its attorneys, Weil Gotshal & Manges, LLP, and Mayer, Brown, Rowe & Maw LLP, for its Answer to the Second Amended Complaint of Plaintiffs George McReynolds, Maroc Howard, LaRue Gibson, Jennifer Madrid, Frankie Ross, Marva York, Leslie Browne, Henry Wilson, Leroy Brown, Glenn Capel, Christina Coleman, J. Yves LaBorde, Marshell Miller, Carnell Moore, Mark Johnson, Cathy Bender-Jackson and Stephen Smartt ("Plaintiffs") herein, states:

## JURISDICTION

1.     Jurisdiction is based on 28 U.S.C. §§1331 and 1343, and principles of pendent and supplemental jurisdiction.

**ANSWER**

Admits that Plaintiffs seek to invoke the jurisdiction of this Court under 28 U.S.C.

§§ 1331 and 1343, and principles of pendent and supplemental jurisdiction and state that the

allegations set forth in paragraph 1 of the Complaint constitute conclusions of law to which no

responsive pleading is required.

**PARTIES**

2.    Plaintiffs and the class of persons they seek to represent are current and
former employees of Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch" or
"the Firm").

**ANSWER**

Admits the allegations set forth in paragraph 2 of the Complaint.

3.    Defendant Merrill Lynch is a full service securities Firm engaged in the
retail and institutional sale of securities, options contracts and various other financial products.
Merrill Lynch employs in excess of 15,000 persons nationwide as financial advisors ("FAs" or
"brokers") who sell its products and services at its offices located throughout the country,
including in Chicago, Illinois.  Merrill Lynch is the country's largest provider of brokerage and
brokerage-related services.  Merrill Lynch is a publicly traded, Fortune 100 corporation
incorporated in Delaware.  In 2005, Merrill Lynch had a net worth of over $37 billion and net
earnings exceeding five billion dollars.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 3 of the

Complaint.  Denies the allegations set forth in the second sentence of paragraph 3 of the

Complaint, and avers that Merrill Lynch employs in excess of 15,000 persons nationwide as

financial advisors at its offices located throughout the country to aid clients in identifying and

reaching their financial goals through a diverse range of investment strategies and investment

products.  Admits the allegations set forth in the third sentence of paragraph 3 of the Complaint.

Denies the allegations set forth in the fourth sentence of paragraph 3 of the Complaint, and avers

that Merrill Lynch & Co., Inc. is a publicly traded Fortune 100 corporation incorporated in

Delaware. Denies the allegations set forth in the fifth sentence of paragraph 3 of the Complaint, and avers that in 2005, Merrill Lynch & Co., Inc. had a net worth of over $37 billion and net earnings exceeding five billion dollars.

## FACTUAL ALLEGATIONS

**Merrill Lynch Systemically Discriminates Against And Excludes**
**African-Americans From Employment Opportunities**

4.     Merrill Lynch has engaged, and continues to engage, in systemic and pervasive racial discrimination against African-Americans.

### ANSWER

Denies the allegations set forth in paragraph 4 of the Complaint.

5.     Merrill Lynch's discriminatory treatment of African-Americans is evidenced in part by the low representation and high attrition rates of African-Americans. In addition, African-Americans are paid lower wages and denied income-earning and promotional opportunities.

### ANSWER

Denies the allegations set forth in paragraph 5 of the Complaint.

6.     Merrill Lynch's human resources department ("Human Resources") caters to and perpetuates the white male dominated culture and discrimination at the Firm. Because the Firm has no sincere desire to employ or retain African-Americans on equal terms as non-African-Americans, the Firm does not effectively monitor the treatment of its African-American employees or fully investigate and resolve complaints of racial discrimination. Rather, Merrill Lynch justifies its conduct by reliance on racial stereotypes or by shifting blame to what it presumes are its racist clients. Without evidence to support its belief, Merrill Lynch believes that its African-American Financial Advisors do not have access to wealth as compared to its white brokers and, therefore, will not be as profitable to the Firm in bringing in wealthy clients. In part for that reason, Merrill Lynch does not employ tenured African-American brokers in the majority of states. Further, whatever racial animus or bias that may exist in society is intentionally institutionalized, magnified and perpetuated by Merrill Lynch by its distributing clients and resources in a manner mimicking any societal bias that may exist. As a result of the historical and ongoing discrimination at the Firm and the failings of Human Resources, African-Americans recognize the futility of lodging internal complaints and are driven out or leave the Firm when they can no longer tolerate the ongoing discrimination. Those who complain of racial discrimination are often subjected to retaliation, which reinforces Merrill Lynch's racist culture.

**ANSWER**

Denies the allegations set forth in paragraph 6 of the Complaint.

**Pattern Allegations**

7.     Merrill Lynch's nationwide pattern or practice of discrimination and retaliatory conduct against African-Americans includes but is not limited to the following practices:

a)     failing to hire African-Americans;

b)     failing to retain African-Americans on the same basis as non-African-Americans;

c)     failing to promote African-Americans, including to management;

d)     underutilizing African-Americans in high paying jobs;

e)     steering African-Americans into clerical positions, investment advisor positions, or other non-producing or lower paid positions;

f)     denying African-Americans the opportunity to participate in the Management Assessment Center ("MAC") and to become managers;

g)     taking race into account when making employment decisions, including but not limited to decisions regarding training, partnering brokers, and transferring and assigning walk-ins, leads, referrals, departing brokers' books and initial public offerings ("IPOs");

h)     targeting the accounts and clients of African-American brokers and reassigning them to non-African-American brokers;

i)     failing to credit African-Americans for their experience on the same basis as non-African-Americans and failing to consider African-Americans for timely promotions or title changes on the same basis as non-African-Americans;

j)     allocating significant resources to brokers based on "performance" rankings that Merrill Lynch knows are the product of past and ongoing discrimination, including but not limited to policies and practices regarding account distributions and partnerships;

k)     promoting the teaming or partnering of brokers in a manner that excludes African-Americans from income-generating opportunities, including but not limited to refusing to include African-Americans in significant partnership opportunities;

l)     using partnerships to target the accounts of African-American brokers;

m)     using partnerships to deny African-American brokers the

4

opportunity to receive valuable account distributions or to otherwise participate in lucrative business opportunities;

n) systematically paying African-Americans lower wages and/or denying African-Americans opportunities to increase their earnings, including commissions and stock;

o) negligently hiring and/or retaining individuals with known propensities to discriminate against or harass African-Americans;

p) creating an environment that is hostile and offensive to African-Americans;

q) selecting managers with known propensities to discriminate against African-Americans to serve as assessors at the MAC;

r) retaliating against African-Americans who complain of discrimination by, among other things, subjecting them to further discrimination, retaliation, verbal attacks, discipline, reassignment of their clients or accounts, and/or termination;

s) making employment decisions based on race and/or racial stereotypes;

t) intentionally or knowingly adopting, implementing and retaining policies and practices that have a disparate impact on African-Americans;

u) manipulating the length of service ("LOS") designation of non-African-Americans to manipulate earnings and performance;

v) terminating African-Americans on account of race and/or due to diminished performance and/or production that was lower than it would have been but for the unlawful conduct of Merrill Lynch;

w) publicizing throughout the Firm under the guise of diversity initiatives the quintile rankings, attrition rates and lower earnings of African-Americans to perpetuate a perception that African-Americans are not competent, will fail at the job and would not make good partners in teams;

x) negligently retaining managers who fail to hire and discriminate against African-Americans;

y) applying standards that are less favorable for disciplining and terminating African-Americans than standards applied to non-African-Americans; and

z) defaming African-Americans to their clients and on their Uniform Termination Notice For Securities Industry Registration Form U-5's ("Form U-5"), but issuing "clean" Form U-5s to non-African-Americans who were charged with equally or more serious disciplinary violations or for race discrimination.

**ANSWER**

Denies the allegations set forth in paragraph 7 of the Complaint and all

subparagraphs thereto.

## Merrill Lynch's Workforce Statistics Have A Zero Chance Of Occurrence In A Random or Race-Neutral Sampling

8.     In 1974, the Equal Employment Opportunity Commission sued Merrill
Lynch based on its refusal to employ women and minorities as brokers. To resolve the lawsuit,
Merrill Lynch agreed to the entry of a Consent Decree (the "*O'Bannon* Consent Decree") that
required Merrill Lynch to increase its representation of African-American brokers to 6.5%. On
information and belief, Merrill Lynch never met the goals to which it agreed in the *O'Bannon*
Consent Decree. Indeed, more than 30 years later when this suit was filed, only 2% of the
brokers employed by Merrill Lynch are African-American. The representation of African-
American brokers at Merrill Lynch is greater than 20 standard deviations below the goal in the
1978 EEOC Consent Decree and more than 10 standard deviations below the percentage
representation in the industry, as reflected in EEOC census data. The probability of these
disparities in representation occurring in a race-neutral or random selection is zero. Because of
the high attrition resulting from Merrill Lynch's systemic discrimination, the percentage of
Merrill Lynch brokers with tenure in excess of ten years who are African-American is
approximately 0.5%.

**ANSWER**

Admits that in 1974, the Equal Employment Opportunity Commission sued

Defendant as set forth in the allegations in paragraph 8 of the Complaint, and denies the

remaining allegations set forth in the first sentence of paragraph 8 of the Complaint. In response

to the allegations set forth in the second sentence of paragraph 8 of the Complaint, Defendant

respectfully refers the Court to the 1974 Consent Decree as the best evidence of the contents

thereof. Denies the allegations set forth in the third and fourth sentences of paragraph 8 of the

Complaint. Denies the allegations set forth in the fifth sentence of paragraph 8 of the Complaint,

except denies knowledge or information sufficient to form a belief as to the truth of the

allegations concerning "EEOC data," as set forth in the fifth sentence of paragraph 8 of the

Complaint. Denies the allegations set forth in the sixth and seventh sentences of paragraph 8 of

the Complaint.

9.    In or around 1994, a group of approximately fifty African-American brokers from Merrill Lynch convened in Chicago to discuss the Firm's failure to hire African-Americans and the differential treatment experienced by those who were hired. After learning of the existence of this group, and to placate its African-American brokers, Merrill Lynch began to hold annual symposia for African-American brokers. Conspicuously absent from the symposia were attendees representing about fifty percent of the states. A review of the lists of employees invited to the symposia revealed the dearth of African-American brokers at Merrill Lynch. For example, at the time that this lawsuit was filed, Merrill Lynch employed no African-American brokers[1] in approximately 25 states, including all states between Illinois and California. Moreover, in 2005, there were no African-American brokers working at 552 of the 639 Merrill Lynch office locations.[2] The following map reflects the state-by-state representation of African-American brokers across the United States as of year-end 2005; states in which Merrill Lynch employs no African-American brokers are depicted in red:



The symposia made clear that Merrill Lynch's exclusion of African-American brokers was not random but was intentional and systematic.

## ANSWER

Denies knowledge or information sufficient to form a belief concerning the truth

of the allegations set forth in the first sentence of paragraph 9 of the Complaint. Denies the

allegations in the second sentence of paragraph 9 of the Complaint, except admits that Defendant

has held annual symposia for African-Americans and has invited African-American Financial

Advisors from around the country to the annual symposia. Denies knowledge or information

---

[1] Merrill Lynch's broker training program is two years; thus, "broker" here refers to a person who has been at the Firm for two years and excludes trainees.

[2] Again, broker does not include trainees.

sufficient to establish a belief concerning the truth of the allegations set forth in the third and

fourth sentences of paragraph 9. Denies the allegations set forth in the fifth sentence of

paragraph 9 of the Complaint, except admits that Defendant's Paths of Achievement training

program is designed to offer FAs two years of training opportunities and that Plaintiff purports to

use "broker" to refer "to a person who has been at the [Defendant] for two years and excludes

trainees" as alleged in footnote 1. Denies the allegations set forth in the sixth sentence of

paragraph 9 of the Complaint, except admits that Plaintiffs' purported use of the term "broker"

does not include trainees, as set forth in footnote 2. Denies the allegations set forth in the

seventh and eighth sentences of paragraph 9 of the Complaint.

       10.    Notwithstanding its persistent refusal to employ African-Americans,
Merrill Lynch regularly seeks out and participates in business opportunities with publicly traded
companies, governmental organizations, not-for-profit entities, and unions that employ and/or
represent African-Americans. It also creates racial profiles of its clients and targets and markets
its services to affluent African-Americans. Likewise, Merrill Lynch advertises its diversity
initiatives and seeks out business opportunities, including managing the assets of publicly traded
corporations' pension and profit sharing plans and underwriting initial public offerings and other
equity and debt offerings. The Firm also seeks out and participates in business opportunities,
such as bond transactions, from various municipalities and states. In these business pursuits,
Merrill Lynch falsely represents that it is an equal opportunity employer. The Firm also fails to
mention that it employs no African-American brokers in many of the states in which these
companies do business or that the majority of its African-American brokers do not survive the
Firm for more than two years. Instead, Merrill Lynch assembles "diverse" teams to make
presentations for the business opportunities that generate commissions almost exclusively for
non-diverse Merrill Lynch employees. Through the concept of "virtual teams," Merrill Lynch
uses African-American brokers to create the false impression with clients that Merrill Lynch is
an equal opportunity employer. Class members have been asked to participate in these
presentations to create a false appearance of inclusion at Merrill Lynch but then have been
excluded from receiving the benefits if the presentation is successful. Merrill Lynch also
promotes itself as an equal opportunity employer by including African-Americans in
commercials airing in states in which Merrill Lynch employs no African-American brokers. As
a result, in part, of these efforts, Merrill Lynch's retail business has unjustly netted billions of
dollars in profits.

## ANSWER

       In response to the allegations set forth in the first sentence of paragraph 10 of the

Complaint, denies that Defendant has a "persistent refusal to employ African-Americans," but

admits that it "seeks out and participates in business opportunities with publicly traded companies, governmental organizations, not-for-profit entities, and unions that employ and/or represent African-Americans." Denies the allegations set forth in the second sentence of paragraph 10 of the Complaint, except admits that Defendant markets its products and services to affluent African-Americans. Denies the allegations set forth in the third sentence of paragraph 10 of the Complaint, except admits that Defendant seeks out the business opportunities referenced therein. Admits the allegations set forth in the fourth sentence of paragraph 10 of the Complaint. Denies the allegations set forth in the fifth sentence of paragraph 10 of the Complaint, and avers that Defendant is, and represents itself as, an equal opportunity employer. Denies knowledge or information sufficient to form a belief concerning the truth of the allegations set forth in the sixth sentence of paragraph 10. Denies the allegations set forth in the seventh, eighth and ninth sentences of paragraph 10 of the Complaint. Denies the allegations set forth in the tenth sentence of paragraph 10 of the Complaint, except Defendant admits that it promotes itself as an "equal opportunity employer" and admits that Defendant includes people of color in its advertisements, including African-Americans. Denies the allegations set forth in the eleventh sentence of paragraph 10 of the Complaint.

11.     The few African-Americans whom Merrill Lynch hires fare worse than Caucasians. For example, in various years in the class period, approximately 75% of African-American trainee brokers were forced to leave Merrill Lynch as a result of discriminatory treatment prior to completing the training program. Merrill Lynch has acknowledged during the African-American symposia over the past decade that the attrition rate for African-American brokers has been and remains significantly higher than the attrition rate for Caucasians.

**ANSWER**

Denies the allegations set forth in the first and second sentences of paragraph 11

of the Complaint.  Denies knowledge or information sufficient to form a belief concerning the

truth of the allegations set forth in the third sentence of paragraph 11 of the Complaint.

12.      African-American brokers also earn lower wages on account of the Firm's
racial discrimination.  Merrill Lynch ranks its brokers by placing them in quintiles.  The top 20%
in commissions is the "first quintile" and the bottom 20% in commissions is the "fifth quintile."
Merrill Lynch relies on these quintile rankings to distribute a variety of benefits or resources, as
explained below.  Merrill Lynch has acknowledged at the symposia and/or to its Advisory
Council to Management that no fewer than 70% of African-American brokers with a length of
service in excess of ten years are in the bottom two quintiles.  White brokers, on the other hand,
are evenly distributed in these quintiles at or around an expected 20% representation.  The under-
representation of African-American brokers in the top quintiles and over-representation in the
bottom quintiles is the result of Merrill Lynch's ongoing and systemic race discrimination.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 12 of the

Complaint.  Denies the allegations set forth in the second sentence of paragraph 12 of the

Complaint, and avers that Defendant publishes to Financial Advisors various reports which array

Financial Advisors by quintile, including, for example, the production of Financial Advisors

during various time periods.  Denies the allegations set forth in the third and fourth sentences of

paragraph 12 of the Complaint.  Denies knowledge or information sufficient to form a belief

concerning the truth of the allegations set forth in the fifth sentence of paragraph 12 of the

Complaint.  Denies the allegations set forth in the sixth and seventh sentences of paragraph 12 of

the Complaint.

13.      The following chart reflects that in 2003 there were no African-American
brokers with six to nine years tenure in the first quintile but 55% in the fifth quintile:

10

**DISTRIBUTION OF LOS 6-9 FCs BY QUINTILE AND RACE**



## ANSWER

Denies the allegations set forth in paragraph 13 of the Complaint, but admits that the chart in paragraph 13 purports to depict that in 2003 there were no African-American Financial Advisors with six to nine years of tenure in the first quintile, but 55% in the fifth quintile.

14.    Likewise, in 2003, of the African-Americans who survived the Firm's discriminatory employment practices for more than 10 years, 50% were in the fifth quintile as compared to 20% of Caucasian brokers:

**DISTRIBUTION OF LOS 10+ FCs BY QUINTILE AND RACE**



**ANSWER**

Denies the allegations set forth in paragraph 14 of the Complaint.

15.    Merrill Lynch relies on this quintile system based on commissions generated to determine eligibility for titles, offices, sales assistance, distributions of accounts of departing brokers, leads, walk-ins, referrals, IPO opportunities, membership in partnerships or teams, recognition clubs, expense allowance, and managerial support. Merrill Lynch relies on this system even though it believes that its customers' bias impacts the performance of African-American brokers on account of the brokers' race. Favorable treatment garners commissions, which are then used to justify even more favorable treatment. For example, if a broker is given account distributions that generate commissions, the commissions earned from the donated accounts will entitle him to even more account distributions and other perks. Success breeds success at Merrill Lynch, and African-Americans are excluded from significant income earning opportunities giving rise to greater success, due to Merrill Lynch's discriminatory employment practices, as reflected in the charts above. Through these practices, Merrill Lynch intentionally perpetuates its own discrimination and any bias that may exist in society.

**ANSWER**

Denies the allegations set forth in first, second, third and fourth sentences of

paragraph 15 of the Complaint. Denies the allegations set forth in the fifth sentence of paragraph

15 of the Complaint, but admits that in many instances more support and opportunities are

afforded to those who have been successful than to those who have not been successful. Denies

the allegations set forth in the sixth sentence of paragraph 15 of the Complaint.

16.    A broker who is denied resources will have lower production or commissions and, consequently, will be deemed ineligible for a variety of resources. For example, during the class period, fourth and fifth quintile brokers were often ineligible to receive accounts of departing or retiring brokers. Because approximately 70% of African-American brokers at Merrill Lynch with a tenure in excess of 10 years are in the fourth and fifth quintile due to race discrimination, they have been largely excluded from account distributions. Merrill Lynch's policy or practice of excluding fourth and fifth quintile brokers from distributions is a pretext to distribute accounts to non-African-Americans. This policy or practice also has a disparate impact on African-Americans.

**ANSWER**

Denies the allegations set forth in paragraph 16 of the Complaint.

17.    Likewise, during most of the class period, only first or second quintile brokers have been eligible to attend the MAC where sponsored candidates are selected to become managers at the Firm. Thus, the overwhelming majority of African-Americans have

been excluded from management opportunities due to the Firm's discriminatory practices. As a result, there are only a few African-American managers in over 600 branches. Again, the quintile qualification is a pretext for racial discrimination and has served to maintain a managerial workforce that is largely devoid of African-Americans. This policy or practice also has a disparate impact on African-Americans.

## ANSWER

Denies the allegations set forth in the first, second, fourth and fifth sentences of

paragraph 17 of the Complaint. Denies the allegations set forth in the third sentence of

paragraph 17 of the Complaint, except avers that there is no under-representation of African-

Americans in management as compared to the available applicant pool.

## Merrill Lynch Does Not Provide A Diverse, Non-Discriminatory Workplace

18.     African-Americans are also treated with disrespect and experience a hostile work environment in Merrill Lynch's branch offices despite proclamations in the Firm's internal materials and advertisements that it is built on the principle of "Respect for the Individual." The phrase "Total Merrill" is also used in advertisements, yet the "Total Merrill" experienced by African-Americans is far different from that experienced by non-African-Americans. Although the Firm teaches its managers to use the word "diversity," its commitment to diversity is illusory. For example:

- One manager freely expressed what is widely believed by African-Americans to be common thought within Merrill Lynch, "[t]his whole diversity thing, there isn't a business case for it; it's more of a shareholder and public relations thing." He also commented, "[i]f I were running the Diversity Program, I'd hire a smart white guy and have a black guy for the face."

- A district manager in San Antonio was offered a promotion after it was alleged in a federal class action gender discrimination complaint that he told African-American trainees to "split up" because they were "forming a ghetto." When asked at a hearing years later if he made this comment, the district manager admitted, "I could have."

- The term, "ghetto" was also used in another office to describe a run-down part of that branch office where two African-American brokers were seated.

- In New York, when African-Americans were seen congregating, they were asked,"[y]ou planning an uprising?" Other examples of the acceptance of the racist culture abound.

- One class member was handed a pencil emblazoned with a confederate flag to take a Merrill Lynch examination.

- Some class members have been referred to as "niggers," without repercussion to the individuals making such remarks. One manager even mocked a non-African-American broker by asking, "[a]re you going to let a nigger beat you?" When a client complained to a manager that Merrill Lynch had "niggers" working in the office, the manager apologized to the client, evidencing the Firm's willingness to accede to customer bias.

- Another manager who was photographing brokers for a bulletin board display told an African-American class member in front of other brokers, words to the effect, "[t]hat's okay, I can find your picture down at the precinct."

- Brokers openly make insensitive remarks without fear of repercussions such as one asking a co-worker, "what now, are you gonna grow cornrows?"

- An African-American broker was repeatedly asked, "[w]hat do you think of O.J.?" Another African-American broker was required to endure a barrage of bigoted remarks about Kobe Bryant's "raping a white woman."

- Class members have been excluded from golf outings because the club where the event was taking place did not allow African-Americans. Others attended golf functions where the only other African-Americans on the course were caddies.

- A class member in a Southern city was invited to a business dinner at the home of his Sales Manager but did not attend because he was told that the Sales Manager had the "Stars and Bars" (Confederate flag) prominently displayed in his home.

- Managers believe that the diversity initiatives are incompatible with the Firm's revenue goals and therefore have little or no commitment to the diversity initiatives.

These are but a few of the offensive comments made to or in the presence of class members.

## ANSWER

Denies the allegations set forth in the first sentence of paragraph 18 of the Complaint, except admits that Defendant has an internal document entitled "Respect for the Individual," and has used the term "Respect for the Individual" in advertising materials. Denies the allegations set forth in the second sentence of paragraph 18 of the Complaint, except admits the phrase "Total Merrill" is used in Defendant's advertisements. Denies the allegations set forth in the third sentence of Paragraph 18 of the Complaint. Denies the allegations that Defendant

has an "acceptance of the racist culture" as set forth in the fourth bullet-point in the fourth

sentence of paragraph 18 of the Complaint, denies that the Defendant has a "willingness to

accede to customer bias" as set forth in the second sentence of the sixth bullet-point in the fourth

sentence of paragraph 18 of the Complaint, denies the allegations that "[b]rokers openly make

insensitive remarks without fear of repercussions" as set forth in the eighth bullet-point in the

fourth sentence of paragraph 18 of the Complaint, denies the allegations that "[m]anagers believe

that the diversity initiatives are incompatible with the Firm's revenue goals and therefore have

little or no commitment to the diversity initiatives" as set forth in the twelfth bullet-point in the

fourth sentence of paragraph 18 of the Complaint, and denies knowledge or information

sufficient to form a belief concerning the truth of the remaining allegations set forth in the fourth

sentence of paragraph 18 of the Complaint. Denies knowledge or information sufficient to form

a belief concerning the truth of the allegations set forth in the fifth sentence of paragraph 18 of

the Complaint.

      19.    As alleged above, African-American brokers are also excluded from
lucrative teams or partnerships with other brokers because Merrill Lynch does not support or
foster inter-racial partnerships or support partnerships between African-American brokers.
Within Merrill Lynch, the excuse, "we cannot arrange marriages," is offered even by Human
Resources personnel as the excuse for the low representation of African-Americans on teams.
However, partnerships at Merrill Lynch must be approved by management, who frequently
"arrange" such partnerships to the benefit of white brokers and the detriment of African-
American brokers. The obvious implication of Merrill Lynch's purported rationale is that inter-
racial partnerships would exist only if they were forced on the non-African-American brokers.
This view is consistent with prevailing negative stereotypes regarding African-Americans at
Merrill Lynch. Indeed, these pervasive stereotypes infect all employment practices and harm
African-Americans. Upon the retirement, death, disability or departure of a team member, the
remaining team members inherit assets from the team. African-American brokers are excluded
from this form of account distribution, which has dramatically increased with the Firm's
emphasis on teaming from 2001 to the present.

**ANSWER**

      Denies the allegations set forth in the first and second sentences of paragraph 19

of the Complaint. Denies the allegations set forth in the third sentence of paragraph 19 of the

Complaint, except avers that an authorized member of Merrill Lynch branch management must

approve each partnership upon request of the Financial Advisors who wish to form such an

agreement. Denies the allegations set forth in the fourth, fifth, and sixth sentences of paragraph

19 of the Complaint. Denies the allegations set forth in the seventh sentence of paragraph 19 of

the Complaint, except avers that a partnership agreement may, in certain instances, set forth the

manner of distribution of partnership assets upon the retirement, death, disability or departure of

a partner. Denies the allegations set forth in the eighth sentence of paragraph 19 of the

Complaint.

## Racial Discrimination And Retaliation At Merrill Lynch Is National In Scope

20.     George McReynolds ("McReynolds") and the other named Plaintiffs are
supported in this litigation by over 100 current or former Merrill Lynch brokers from across the
country who have requested to join or expressed support for the lawsuit. These putative class
members were denied employment or were employed at Merrill Lynch offices across the
country. The current employees manage billions of dollars of client assets and range in years of
service from a few months to over 25 years. Thus, putative class members fall into five
categories: 1) applicants; 2) broker-trainees; 3) brokers with three to nine years of service with
Merrill Lynch; 4) brokers with or in excess of ten years of service with Merrill Lynch; and/or 5)
brokers who expressed interest in management or were excluded from consideration due to
discriminatory practices and policies (the "putative class"). The putative class members are
relying on McReynolds, Stowell & Friedman, Ltd., and this lawsuit to protect their rights.

### ANSWER

Denies knowledge or information sufficient to form a belief concerning the truth

of the allegations set forth in the first, second, and third sentences of paragraph 20 of the

Complaint. The allegations set forth in the fourth sentence of paragraph 20 constitute

conclusions of law to which no responsive pleading is required, but Defendant nevertheless avers

that Plaintiffs neither have standing nor are typical of a putative class comprised of 1) applicants;

2) broker-trainees; 3) brokers with three to nine years of service with Merrill Lynch; 4) brokers

with or in excess of ten years of service with Merrill Lynch; and/or 5) brokers who expressed

interest in management or were excluded from consideration due to alleged discriminatory

practices and policies. Denies knowledge or information sufficient to form a belief concerning

the truth of the allegations set forth in the fifth sentence of paragraph 20 of the Complaint.

21.     Stowell & Friedman, Ltd., and the putative class placed Merrill Lynch on
notice of the class-wide allegations of racial discrimination by McReynolds through the Firm's
Employment Dispute Resolution ("EDR") process. The EDR was enacted in response to a class
action gender discrimination suit, *Cremin et al. v. Merrill Lynch*, 96 C 3773 (Castillo, J.).

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 21 of the

Complaint, except admits that Merrill Lynch received a complaint from Plaintiff George

McReynolds, through his attorneys, in lieu of filing a complaint through Merrill Lynch's

standard EDR process. Admits the allegations set forth in the second sentence of paragraph 21

of the Complaint.

**Merrill Lynch's Discrimination And Retaliation Against
African-Americans is Ongoing**

22.     Merrill Lynch's pattern or practice of systematically discriminating and
retaliating against African-Americans is ongoing and constitutes a continuing violation of the
civil rights laws, that culminated with the filing of McReynolds' class-based Employment
Dispute Resolution ("EDR") complaint. Plaintiffs Howard, York and Wilson filed charges with
the Equal Employment Opportunity Commission and received Notice of Rights to Sue.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 22 of the

Complaint. Admits the allegations set forth in the second sentence of paragraph 22 of the

Complaint.

**The Named Plaintiffs Are Class Representative**

23.     McReynolds and the other named Plaintiffs have performed their jobs in
an impressive manner but were subjected to and harmed by Merrill Lynch's ongoing, nationwide
pattern or practice of systemic and pervasive racial discrimination.

**ANSWER**

Denies the allegations set forth in paragraph 23 of the Complaint, except avers

that certain of the named Plaintiffs have performed their jobs in an impressive manner at various times during their employment with Merrill Lynch.

## McReynolds' Experiences are Typical

24. In early 2005, McReynolds formally raised a complaint of discrimination and retaliation against Merrill Lynch through the Firm's EDR Process. McReynolds alleged that Merrill Lynch intentionally created a segregated workforce where African-Americans were steered into less desirable positions and were denied income earning and career opportunities routinely extended to non-African-Americans. In his EDR claim, McReynolds cited numerous examples of Merrill Lynch's discriminatory practices and policies.

### ANSWER

Denies the allegations set forth in the first sentence of paragraph 24 of the Complaint, except admits that Merrill Lynch received a complaint from Plaintiff, through his attorneys, in lieu of filing the complaint through Merrill Lynch's standard EDR process. In response to the allegations set forth in the second sentence of paragraph 24 of the Complaint, Defendant respectfully refers the Court to Plaintiff's Initial Demand Letter of May 18, 2005 as the best evidence of the contents thereof. In response to the allegations set forth in the third sentence of paragraph 24, Defendant respectfully refers the Court to Plaintiff's Initial Demand Letter of May 18, 2005 as the best evidence of the contents thereof, and denies any allegations of "discriminatory practices and policies."

25. For example, when McReynolds was hired as a financial advisor in 1983 in Merrill Lynch's Nashville, Tennessee office, he was one of only two African-American brokers in the state of Tennessee. McReynolds remained the only African-American broker in his office until Cathy Bender ("Bender") was hired in 1987.[3] Despite the growth of the Nashville complex to approximately 65 to 70 brokers, the complex has never employed more than three African-American brokers at any one time.

### ANSWER

---

[3] Bender was hired only as the result of a recommendation by McReynolds's wife, who was then the Commissioner of Commerce and Insurance for the State of Tennessee.

18

Denies knowledge or information sufficient to form a belief concerning the truth

of the allegations set forth in the first sentence of paragraph 25 of the Complaint, but admits that

McReynolds was hired by Merrill Lynch in 1983. Admits the allegations set forth in the second

sentence of paragraph 25 of the Complaint, except denies knowledge or information sufficient to

form a belief concerning the truth of the allegations set forth in footnote 3. Denies the

allegations set forth in the third sentence of paragraph 25 of the Complaint.

26.     Consistent with the Firm's discriminatory hiring practices, the Nashville complex recruits almost exclusively at predominantly white colleges and universities. Well-qualified African-American graduates are not welcome at Merrill Lynch. To illustrate, in approximately 2002, white Managing Director of the Nashville-Memphis complex, Robert Shaffer ("Shaffer"), refused to interview an African-American graduate of West Point, Jeff Cleveland, who had been recommended by Bender. Having served nine years as an Army officer and having spent four years in management at a large corporation, Cleveland was well qualified and eager to pursue a career at Merrill Lynch. According to Merrill Lynch's initiative, Shaffer was to interview Cleveland or introduce him to management at another office. Shaffer did neither. Similarly, a Merrill Lynch manager stated that he would consider recruiting at universities with large African-American student populations only if those students had earned Masters degrees. Merrill Lynch had no such requirement for non-African-American candidates.

**ANSWER**

Denies the allegations set forth in the first and second sentences of paragraph 26

of the Complaint. Denies the allegations set forth in the third, fourth, fifth, and sixth sentences

of paragraph 26 of the Complaint to the extent that they presume that Mr. Shaffer discriminated

against an applicant for employment, except denies knowledge or information sufficient to form

a belief concerning the truth of the remaining allegations in the third, fourth, fifth, and sixth

sentences of paragraph 26 of the Complaint. In response to the allegations set forth in the

seventh sentence of paragraph 26 of the Complaint, denies the allegation that Defendant "recruits

from universities with large African-American student populations only if those students had

earned Masters degrees," except denies knowledge or information sufficient to form a belief

concerning the truth of the remaining allegations set forth in the seventh sentence of paragraph

26 of the Complaint. In response to the allegations set forth in the eighth sentence of paragraph

26 of the Complaint, admits that Defendant does not require non-African-Americans to hold a

Masters degree as a qualification for employment at Merrill Lynch, except denies that any such

requirement applied to African-American candidates.

27.     McReynolds's efforts to enhance diversity at Merrill Lynch were likewise
stymied. For example, McReynolds recruited and hired a number of African-American interns.
However, Merrill Lynch made no effort to recruit McReynolds's interns to work for the Firm
despite their qualifications. One of these interns ultimately went to work for a sophisticated New
York hedge fund after Merrill Lynch made no effort to retain him. Similarly situated white
interns were aggressively pursued for employment at Merrill Lynch.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 27 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second, third, fourth, and fifth sentences of paragraph 27 of the

Complaint.

28.     Throughout McReynolds's employment, Merrill Lynch maintained a
discriminatory system of account distributions and allocation of referrals, leads, walk-ins, call-
ins, and IPOs as part of its pattern or practice of unlawful conduct, including conduct occurring
in its Nashville complex. For example, rather than assigning accounts, leads or referrals to the
more junior African-American brokers, Merrill Lynch managers told these brokers to prospect in
the African-American community. Members of the African-American community were aware
that Merrill Lynch offered only a revolving door to African-American brokers and were reluctant
to place their assets with brokers who were unlikely to be retained by the Firm.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 28 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second sentence of paragraph 28 of the Complaint. Denies that

"Merrill Lynch offered only a revolving door to African-American brokers," and denies

knowledge or information sufficient to form a belief concerning the truth of the allegations as to

what "[m]embers of the African-American Community were aware" or their investing decisions, as set forth in the third sentence of paragraph 28 of the Complaint.

29.     Consistent with its stereotypical views of African-Americans, the only potential clients or referrals Merrill Lynch steered toward McReynolds and other African-American brokers were typically minorities or individuals with a low net worth.

**ANSWER**

Denies the allegations set forth in the paragraph 29 of the Complaint.

30.     McReynolds also was denied the same quality or quantity of sales and administrative support as his non-African-American colleagues. McReynolds shared a sales assistant, at times with as many as seven other brokers, including rookie brokers, who often require more of the sales assistants' time and attention because of their inexperience. As a result, McReynolds has performed a substantial amount of administrative and sales support work, diverting valuable time away from activities to develop his book of business.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 30 of the

Complaint. In response to the allegations set forth in the second sentence of paragraph 30 of the

Complaint, admits that McReynolds shared a sales assistant, at times with as many as seven

other Financial Advisors, and that less-experienced Financial Advisors may require more

assistance from sales assistants than do more experienced Financial Advisors, but denies

knowledge or information sufficient to form a belief concerning the truth of the remaining

allegations in the second sentence of paragraph 30 of the Complaint. Denies knowledge or

information sufficient to form a belief concerning the truth of the allegations set forth in the third

sentence of paragraph 30 of the Complaint.

31.     The experiences of McReynolds are also typical of the Firm's pattern and practice of discrimination with regard to partnerships, which work to the advantage of white brokers and to the disadvantage of African-American brokers. In October 2001, McReynolds was forced by Robert Kennedy ("Kennedy") (then the Nashville Office Branch Manager) to enter into and surrender his accounts to a partnership with white junior brokers or trainee Professional Development Program ("PDP") brokers Charles Grummon ("Grummon") and Jonathon Evans ("Evans"). McReynolds believed that he had no choice but to partner with Grummon and Evans and, relying on Kennedy's representations that McReynolds would benefit

from the partnership, he reluctantly did what he was told.

**ANSWER**

Denies the allegations set forth in the first and second sentences of paragraph 31

of the Complaint. Denies knowledge or information sufficient to form a belief concerning the

truth of the allegations set forth in the third sentence of paragraph 31 of the Complaint

concerning McReynolds's beliefs, and denies the allegations set forth in the third sentence of

paragraph 31 of the Complaint concerning "Kennedy's representations."

32. Contrary to Kennedy's representations, the partnership was highly
detrimental to McReynolds. Although McReynolds contributed the vast majority of the assets to
the partnership, he received credit for less than half of the partnership's production.
McReynolds's earnings and production decreased significantly as a result of the partnership.
The junior white brokers, however, benefited greatly from the forced partnership with
McReynolds.

**ANSWER**

Denies the allegations set forth in paragraph 32 of the Complaint.

33. Consistent with its pattern or practice of steering African-Americans into
clerical positions, investment advisor positions, or other non-producing roles, Kennedy told
McReynolds that he should surrender his broker position to become an investment advisor
("IA") for the partnership. When McReynolds refused to work for Grumman and Evans as an
IA, the partnership among the three was dissolved on terms that were unfavorable to
McReynolds. Upon dissolution of this partnership, McReynolds did not receive account
transfers to compensate him for his considerable loss of assets.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 33 of the

Complaint, but admits that Mr. Kennedy suggested that Plaintiff consider becoming an

Investment Advisor in an effort to help him increase his compensation, as a number of other

Financial Advisors had done in the past. Denies the allegations set forth in the second and third

sentences of paragraph 33 of the Complaint.

34. In approximately 1989 or 1990, McReynolds formed a partnership with
Lona Spencer ("Spencer"), a white female broker in his office. McReynolds's white branch

manager, Roy Williams ("Williams"), was resistant and hostile to the partnership, although he supported other partnerships composed entirely of non-African-American male brokers.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 34 of the

Complaint. Denies knowledge or information sufficient to form a belief concerning the truth of

the allegations set forth in the second sentence of paragraph 34 of the Complaint.

35.    That partnership ended when Spencer left Merrill Lynch. McReynolds was not allowed to retain the accounts in the partnership. At the meeting announcing Spencer's departure, Williams announced to the entire office that any broker who wanted any of the accounts held by Spencer's partnership with McReynolds should contact Williams and they would get the account from McReynolds. Williams did not make similar statements when a white broker was the only broker remaining after the dissolution of a partnership. On the contrary, subject to well-established practice, the remaining brokers retained the assets of the partnership upon dissolution. Beneficial partnerships for African-American brokers were not encouraged. Any partnerships allowed were often to the detriment of the African-American broker.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 35 of the

Complaint. Denies the allegations set forth in the remainder of paragraph 35 of the Complaint.

36.    Merrill Lynch also employs discriminatory promotional practices. The management assessment process is performed predominantly by white men and is replete with racial stereotypes. As a result of racial bias, the skills of African-Americans are overlooked and undervalued. To illustrate, McReynolds has never reported to an African-American manager during his tenure at Merrill Lynch, and no one at Merrill Lynch has ever approached McReynolds regarding opportunities to join management, despite the fact that McReynolds has over ten years of management experience.

**ANSWER**

Denies the allegations set forth in the first, second and third sentences of

paragraph 36 of the Complaint. In response to the fourth sentence of paragraph 36 of the

Complaint, admits that Plaintiff has never reported to an African-American manager, but denies

knowledge or information sufficient to form a belief concerning the truth of the remaining

allegations set forth in the fourth sentence of paragraph 36 of the Complaint.

23

37.     The experiences of the other named Plaintiffs are consistent with the class wide allegations and the pattern or practice of racial discrimination at Merrill Lynch.

**ANSWER**

Denies the allegations set forth in paragraph 37 of the Complaint.

## Plaintiffs and The Putative Class Suffered Economic Loss

38.     As a result of the Firm's discriminatory employment practices, Plaintiffs and class members lost opportunities and accounts, as well as the referrals and commissions resulting from those accounts.

**ANSWER**

Denies the allegations set forth in paragraph 38 of the Complaint.

## Systemic Racism

39.     Plaintiffs, like other African-Americans at Merrill Lynch, also have been subjected to a hostile work environment where African-Americans are treated as inferior and are subjected to abusive and harassing treatment, comments and behavior.

**ANSWER**

Denies the allegations set forth in paragraph 39 of the Complaint.

40.     Merrill Lynch frequently publishes "metrics" that demonstrate that African-Americans are disproportionately in the bottom quintiles.  These public statements reinforce the perception among managers and peers that African-Americans are inferior and incapable of competing as brokers.  Merrill Lynch seldom acknowledges that discrimination is the real reason for the lower rankings.

**ANSWER**

Denies the allegations set forth in the first and second sentences of paragraph 40 of the Complaint.  Denies the allegations set forth in the third sentence of paragraph 40 of the Complaint, and avers that Merrill Lynch has never acknowledged that discrimination is the reason for any purported "lower rankings" of African-Americans.

41.     Even the African-American brokers who succeed to the first quintile are excluded from the perks and benefits awarded to top performers.

**ANSWER**

Denies the allegations set forth in paragraph 41 of the Complaint.

**McReynolds And The Putative Class**
**Suffered Injury As A Consequence Of The Discrimination**

42.     Plaintiffs and the putative class lost wages and other benefits, suffered embarrassment and humiliation, and their careers were irreparably injured as a result of Merrill Lynch's discriminatory conduct.

**ANSWER**

Denies the allegations set forth in paragraph 42 of the Complaint.

43.     Merrill Lynch's conduct was reckless and/or in willful violation of the civil rights laws. Indeed, this is the third class action against Merrill Lynch to allege that the Firm favors non-African-American males in hiring over women and minorities. As alleged above, the EEOC found that Merrill Lynch failed to employ African-Americans nearly thirty years ago. The EEOC filed a suit and entered into the *O'Bannon* Consent Decree, which opened the doors at Merrill Lynch for women and minorities. In 1996, female brokers, many of whom were hired under the *O'Bannon* Consent Decree, filed a class action lawsuit, *Cremin et al. v. Merrill Lynch*. Findings were entered in favor of the women that Merrill Lynch engaged in a pattern or practice of discrimination in compensation and promotional opportunities. This suit, like the *Cremin* action, is brought by employees hired as a result of the *O'Bannon* Consent Decree. Merrill Lynch's refusal to hire and equally employ African-Americans is a willful violation of the civil rights laws.

**ANSWER**

Denies the allegations set forth in the first sentence of paragraph 43 of the

Complaint. In response to the allegations set forth in the second sentence of paragraph 43 of the

Complaint, Defendant respectfully refers the Court to the complaints in each of the litigations as

the best evidence of the contents thereof. In response to the allegations set forth in the third

sentence, Defendant respectfully refers the Court to the complaint filed by the EEOC as the best

evidence of the contents thereof. In response to the allegations in the fourth sentence of

paragraph 43 of the Complaint, admits that the EEOC filed a suit and that Defendant entered into

a Consent Decree, but denies that the Consent Decree "opened the doors at Merrill Lynch for

women and minorities." Denies that female Financial Advisors filed a class action lawsuit

against Defendant styled *Cremin et al v. Merrill Lynch* in 1996 as set forth in the fifth sentence

of paragraph 43 of the Complaint, and avers that the *Cremin et al v. Merrill Lynch* lawsuit was

filed in 1997. Denies the allegations set forth in the sixth, seventh, and eighth sentences of

paragraph 43.

## CLASS ALLEGATIONS

44.    The class of African-American employees and former employees who have been subjected to discrimination due to their race and who have been subjected to retaliation due to their opposition to discrimination is so numerous and geographically spread that joinder of all members is impracticable.

### ANSWER

Denies the allegations set forth in paragraph 44 of the Complaint.

45.    There are questions of law and fact common to the class.

### ANSWER

Denies the allegations set forth in paragraph 45 of the Complaint.

46.    The claims of the named Plaintiffs are typical, and the named Plaintiffs will fairly and adequately represent and protect the interests of the class. The Plaintiffs represent a cross-section of Merrill Lynch brokers whom they seek to represent. The Plaintiffs work in offices across the country, were ranked in all quintiles and have tenure from first-year rookie to seasoned broker.

### ANSWER

Denies the allegations set forth in the first and second sentences of paragraph 46 of the Complaint. Denies the allegations set forth in the third sentence of paragraph 46 of the Complaint, except avers that the named Plaintiffs work or have worked in various Merrill Lynch offices across the country for varying lengths of time and have been ranked in varying quintiles.

47.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### ANSWER

Denies the allegations set forth in paragraph 47 of the Complaint.

## COUNT I

### RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e et seq.
### (Against Merrill Lynch)

48.    Plaintiffs reallege and incorporate paragraphs 1-47 of this Second

Amended Complaint as paragraphs 1-47 of Count I.

**ANSWER**

Admits that Plaintiffs purport to incorporate by reference the preceding paragraphs.

49.     Plaintiffs Maroc Howard, Marva York and Henry Wilson filed charges of racial discrimination with the Equal Employment Opportunity Commission ("EEOC") and received Notice of Rights to Sue. Merrill Lynch was placed on notice of the representative allegations contained in this Complaint in the EEOC charges.

**ANSWER**

Admits the allegations set forth in the first sentence of paragraph 49 of the Complaint. Denies the allegations set forth in the second sentence of paragraph 49 of the Complaint, except avers that Merrill Lynch was placed on notice of the allegations set forth in the EEOC charges when it received the EEOC charges.

50.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. and amendments thereto ("Title VII") make it an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms or conditions, or privileges of employment, because of such individual's race, color or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, or national origin.

**ANSWER**

In response to the allegations set forth in paragraph 50 of the Complaint,

Defendant respectfully refers the Court to the text of 42 U.S.C. § 2000e as the best evidence of

the contents thereof.

51.     It is unlawful for an employer to engage in racially biased decision-making and treatment. It is also unlawful for an employer to make decisions infected by stereotypical thinking or other forms of less conscious bias. Employers are not lawfully allowed to engage in racially motivated conduct driven by business concerns, for example, concerns about the effect on employee relations, or the negative reaction of clients or customers. Thus, an employer violates the law when it acquiesces, accedes to or perpetuates perceived customer bias. Nor may race or color ever be a bona fide occupational qualification under the law.

**ANSWER**

The allegations set forth in paragraph 51 of the Complaint constitute conclusions of law to which no responsive pleading is required.

52.     Through the conduct alleged in this Second Amended Complaint, Merrill Lynch violated Title VII of the Civil Rights Act of 1964 and amendments thereto by subjecting Plaintiffs and all others similarly situated to differential treatment and by adopting policies and practices that had a disparate impact against African-Americans.

## ANSWER

Denies the allegations set forth in paragraph 52 of the Complaint.

53.     Merrill Lynch is strictly responsible for the acts and conduct of its managers and knew of should have known of a culture created by its managers and employees that discriminated against and was hostile to African-Americans.

## ANSWER

Denies the allegations set forth in paragraph 53 of the Complaint.

## COUNT II

## RACIAL DISCRIMINATION IN VIOLATION OF 42 U.S.C. SECTION 1981
### (Against Merrill Lynch)

54.     Plaintiffs and all others similarly situated reallege paragraphs 1 through 53 and incorporate them by reference as though fully stated herein as part of Count II of this Complaint.

## ANSWER

Admits that Plaintiffs purport to incorporate by reference the preceding

paragraphs.

55.     Section 1977 of the Revised Statutes, 42 U.S.C. Section 1981 as amended guarantees all persons the same right to make and enforce contracts as non-African-Americans. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of contractual relationship.

## ANSWER

In response to the allegations set forth in the first sentence of paragraph 55 of the

Complaint, Defendant respectfully refers the Court to the text of 42 U.S.C. § 1981 as the best

evidence of the contents thereof.  Defendant states that the allegations set forth in the second

sentence of paragraph 55 of the Complaint constitute conclusions of law to which no responsive

pleading is required.

56.     Merrill Lynch subjected Plaintiffs and all others similarly situated to racial discrimination in violation of 42 U.S.C. Section 1981.

**ANSWER**

Denies the allegations set forth in paragraph 56 of the Complaint.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs and all others similarly situated respectfully request that this Court

find in their favor and against Merrill Lynch as follows:

a.     Declare that the acts and conduct of Merrill Lynch violate 42 U.S.C. Section

1981;

b.     Declare that the acts and conduct of Merrill Lynch violate Title VII;

c.     Declare that Merrill Lynch engaged in a pattern and practice of racial

discrimination and certify a class of persons similarly situated to Plaintiffs eligible for relief;

d.     Order appropriate equitable and injunctive relief and diversity initiatives to

remedy the discrimination;

e.     Award Plaintiffs and all others similarly situated the value of all compensation

and benefits lost as a result of Merrill Lynch's unlawful conduct;

f.     Award Plaintiffs and all others similarly situated the value of all compensation

and benefits they will lose in the future as a result of Merrill Lynch's unlawful conduct;

g.     Award Plaintiffs and all others similarly situated compensatory damages;

h.     Award Plaintiffs and all others similarly situated punitive damages;

i.     Award Plaintiffs and all others similarly situated a common fund for make whole

relief and statutory, compensatory and punitive damages;

j.     Award Plaintiffs and all others similarly situated prejudgment interest;

k.     Award Plaintiffs and all others similarly situated attorneys fees, costs and

disbursements;

l.     Award Plaintiffs and all others similarly situated such other make whole

equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination

and fairly compensate the class.

## ANSWER

Defendant admits that Plaintiffs pray that the Court award the relief as set forth in

paragraphs "a" through "l" of the "Prayer," and denies that Plaintiffs are entitled to any of the

relief prayed for in the Prayer.

## DEFENSES

1.     The Complaint fails to state a claim upon which relief can be granted.

2.     Plaintiffs lack standing to raise some or all of the claims.

3.     Some, or all, of Plaintiffs' claims are barred by applicable statutes of limitation.

4.     Plaintiffs' claims on behalf of the purported class are barred by the Plaintiffs' failure to

meet all four of the mandatory requirements of Fed. R. Civ. P. 23(a), or any of the requirements

of Fed. R. Civ. P. 23(b).

5.     The claims alleged by the Plaintiffs are neither common nor typical of those claims, if

any, of the members of the purported class.

6.     Plaintiffs are inadequate representatives of the purported class.

7.     The types of claims alleged by the Plaintiffs are matters in which individual questions

predominate and, accordingly, are not appropriate for class treatment.

8.     Plaintiffs have failed to identify a pattern or practice of discrimination on the basis of

race.

9.      Merrill Lynch had legitimate non-discriminatory reasons for the employment actions

taken in connection with Plaintiffs.

10.     Merrill Lynch denies that race or any other impermissible factor plays any role in its

hiring, training, promotion, compensation, distribution of accounts, length of service designation

procedures, or in any other policy or procedure that Plaintiffs are, or may be, challenging.

11.     In the alternative, in the event that the Court or a jury concludes that race was a

motivating factor in any of the employment decisions challenged by Plaintiffs, which Merrill

Lynch expressly denies, Merrill Lynch affirmatively avers that the same decisions would have

been made even absent consideration of race.

12.     Merrill Lynch has taken reasonable care to prevent and remedy promptly any incidents of

alleged racial discrimination and/or harassment brought to its attention; it has policies banning

discrimination and/or harassment in the workplace and a reasonable and available procedure for

handling complaints thereof, which provides for prompt and effective responsive action.  To the

extent that Plaintiffs have not availed themselves of these policies or procedures or acted

reasonably to otherwise avoid harm, their claims of racial discrimination and/or harassment by

managers, supervisors, and/or co-workers are barred.  To the extent that Plaintiffs have used

these policies and procedures and their alleged concerns have been dealt with promptly and

effectively, Plaintiffs' claims are barred and/or they have suffered no damages as a result.

13.     Any instances of discriminatory or harassing conduct by co-workers, which Merrill

Lynch denies, would have contravened Merrill Lynch's good faith efforts to enforce and follow

anti-discrimination laws.  Merrill Lynch has issued policies and established procedures for

complaints of alleged discrimination and/or harassment and have promulgated, taught, and

enforced those policies and procedures in its workplaces. Merrill Lynch has exercised reasonable care to prevent and correct promptly any discriminatory and/or harassing behavior. To the extent that Plaintiffs are unable to prove that Merrill Lynch knew or should have known of the alleged discrimination and/or harassment and that Merrill Lynch failed to take prompt remedial action, they are barred from recovering from Merrill Lynch.

14.     To the extent that Merrill Lynch discovers during the course of this action that Plaintiffs engaged in any conduct that would warrant discharge from Merrill Lynch, Plaintiffs' right to recover damages beyond the date of that conduct are cut off.

15.     Plaintiffs have failed to mitigate their damages.

16.     Plaintiffs' claims are barred by the doctrines of laches and waiver.

17.     Plaintiffs are not entitled to punitive damages because Merrill Lynch did not act with an evil motive or intent or with reckless or callous indifference to the federally protected rights of the Plaintiffs.

18.     Any compensatory or punitive damages are limited to the amounts authorized by 42 U.S.C. §1981(b)(1).

19.     To the extent plaintiffs seek relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, from or for employment decisions or actions that were not included in a charge timely filed with the appropriate administrative agency, such claims are barred because of the failure to exhaust administrative remedies and/or the failure to satisfy the statutory prerequisites and the Court therefore lacks subject matter jurisdiction over such claims.

20.     To the extent plaintiffs seek relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 200e *et seq.*, from or for employment decisions or actions that were not made the subject of a timely charge with the appropriate agency, such claims are barred.

21.     To the extent plaintiffs' Complaint was not filed within 90 days of Plaintiffs' receipt of a

Notice of Right to Sue, plaintiffs' claims under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 200e *et seq.*, are barred.

22.     To the extent plaintiffs seek to impose liability based on claims that Defendant applies

differing standards of compensation, or different terms, conditions, or privileges of employment,

Defendant cannot be liable because such differences are applied pursuant to a bona fide seniority

or merit system, or a system which measures earnings by quantity or quality of production, and

such differences are not the result of an intention to discriminate because of race or color.

        Defendant hereby reserves its right to assert other defenses and affirmative defenses as

this action proceeds.

Dated:  December 15, 2006

                                    By:  /s Lori E. Lightfoot_____

                                         MAYER, BROWN, ROWE & MAW, LLP
                                         Lori E. Lightfoot, Esq.
                                         71 S. Wacker Drive
                                         Chicago, IL 60606
                                         (312) 782-0600 (Phone)
                                         (312) 701-7711 (Facsimile)

                                         -- and –

                                         WEIL, GOTSHAL & MANGES LLP
                                         Jeffrey S. Klein, Esq.
                                         Nicholas J. Pappas, Esq.
                                         767 Fifth Avenue
                                         New York, NY 10153
                                         (212) 310-8000 (Phone)
                                         (212) 310-8007 (Facsimile)


                                         ATTORNEYS FOR DEFENDANT

## <u>CERTIFICATE OF SERVICE</u>

     I,  Lori E. Lightfoot, hereby certify that I caused a copy of the foregoing Defendant's Answer to Second Amended Complaint served upon:

Stowell & Friedman, Ltd.
Mary Stowell
Linda Friedman
321 S. Plymouth Court
Suite 1400
Chicago, Illinois  60604

via e-mail and First Class Mail on or before 5:00 p.m. on December 15, 2006 by causing the same to be deposited into a mail receptacle.


                       _/s Lori E. Lightfoot_
                       Lori E. Lightfoot