IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------------x
GEORGE MCREYNOLDS, :
Individually on behalf of themselves :
and all others similarly situated, : Case No. 05C6583
:
                        Plaintiffs, : Hon. Robert W. Gettleman
: Magistrate Judge Denlow
- against - :
:
MERRILL LYNCH, PIERCE, FENNER :
& SMITH, INCORPORATED, :
:
                        Defendant. :
-----------------------------------------------------------x

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL RESPONSIVE DATA AND RELATED INFORMATION AND RELIEF

Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch") submits this Memorandum in Opposition to Plaintiffs' Motion to Compel Responsive Data and Related Information and Relief ("Motion").

## PRELIMINARY STATEMENT

It is important to place Plaintiffs' Motion in context. During the past year, Merrill Lynch has produced 260 data files, and updated 19 files to include information through December 31, 2006. The amount of data in this production is enormous – 1,054 gigabytes or the equivalent of more than 79 million pages (31,600 boxes) of hard copy documents electronically imaged for production. This data production has proceeded in conjunction with a document production totaling more than 4.5 million pages and involving over 250 custodians. Throughout discovery, Merrill Lynch also has devoted

substantial time and resources to providing information about the data production:

Merrill Lynch has presented four 30(b)(6) deponents on data issues alone, as well as six

30(b)(6) depositions on other topics and seven 30(b)(1) witnesses, including Merrill

Lynch's Chief Executive Officer, and it has investigated and responded to dozens of

questions from Plaintiffs informally during the discovery process. Yet, Plaintiffs file this

motion seeking relief that, frankly, makes no sense when viewed in light of the facts.

      First, Plaintiffs' Motion seeks all data and documents from 2000. This

demand is a reaction to Merrill Lynch's limited production of three data files that reflect

compensation amounts paid to Financial Advisors ("FAs"). Two of the three data files

had been produced earlier in discovery for the 2001-2006 time period. Merrill Lynch

subsequently updated these same two files to include data from the year 2000 (as well as

information on FAs hired since the previous production of these data files), because the

United States Supreme Court recently held that pay discrimination that occurred outside

Title VII's limitations period was not actionable despite the continuing effects of those

discriminatory acts within Title VII's limitation period. *Ledbetter v. Goodyear Tire &*

*Rubber Co.*, 127 S. Ct. 2162 (2007). The third data file consists of the same sort of

payroll information that had been previously provided for the Subject Population (as

defined *infra* at Point II), but for a discrete set of trainees for whom it had not yet been

produced. Merrill Lynch expects Plaintiffs to argue that African American FAs were

discriminated against in comparison to similarly situated White FAs as evidenced from

the different amounts earned by these two groups during the limitations period. In

making any such calculation, the Court is required to exclude any disparities caused by

acts that occurred outside the limitations period, and the Court will thus need to examine

the compensation data for the year immediately prior to the longest possible limitations period.

Merrill Lynch is willing to consider producing additional compensation data for the year 2000 to the extent Plaintiffs can articulate that it is relevant in refuting the limited purpose for which Merrill Lynch intends to use the 2000 compensation data that it has produced. However, Plaintiffs have refused to articulate a legitimate basis for the wholesale production of 257 data files, some of which are enormous tables, as well as all documents for the year 2000. Moreover, Plaintiffs have not articulated a legitimate basis for the production of even <u>some</u> of these data files for the year 2000. Indeed, the Supreme Court's decision in *Ledbetter* demonstrates the complete irrelevance of such data files.

Second, Plaintiffs' Motion seeks additional information, including depositions, about a small category of individuals – Institutional Advisory Division Account Executives ("IAD AEs") – who had been mistakenly included in some of the data Merrill Lynch originally produced. A total of *80* IAD AEs should have been excluded from the original data production. More than *26,000* FAs were included in the original and supplemental data productions. Accordingly, <u>less than one-third of one percent</u> of the individuals in the data is affected. By June 2007, Plaintiffs had the entirely correct data for this population, which excluded the 80 individuals. However, Merrill Lynch will also agree to provide this list of 80 people to Plaintiffs as well as a written explanation of the population that is included in its data production. That should resolve this very minor issue.

Third, Plaintiffs' Motion seeks (a) responses to questions raised by Plaintiffs' counsel regarding the data and (b) a "formula" to determine what Plaintiffs characterize as an FA's actual compensation earned in a particular year. Merrill Lynch has already informed Plaintiffs that it is in the process of preparing responses as to the first issue. These questions are complex, and they require investigation before Merrill Lynch is able to formulate an answer. As Defendant has already advised Plaintiffs, however, answers are indeed forthcoming, and no motion was necessary. As to the second issue, Merrill Lynch has produced all the information necessary for Plaintiffs to propose a formula for determining what Plaintiffs characterize as the actual compensation earned in a particular year, *as well as a 30(b)(6) witness to answer Plaintiffs' questions about this data*. Merrill Lynch informed Plaintiffs months ago that if Plaintiffs wish to stipulate to a formula for calculating actual compensation, they should make a proposal and specify exactly what use such information has in the litigation, and specifically for class certification. However, under no circumstances is Merrill Lynch obligated to make such a proposal in a vacuum and for some unspecified use in the litigation. To this day, Plaintiffs have never proffered a draft. Nor have Plaintiffs explained how Defendant can be compelled to agree to such a stipulation.

Merrill Lynch should not be required to perform Plaintiffs' analysis of data for them, or be subject to motion practice if it does not jump as quickly or as high as Plaintiffs request. Plaintiffs' motion to compel should be denied.

## ARGUMENT

I.  Plaintiffs Are Not Entitled To The Production of All Documents And Data From 2000 Or To Bar Merrill Lynch From Using Limited Data Files From 2000 To Oppose Class Certification

        Merrill Lynch has objected to the production of data and documents that predate 2001 on the grounds that such documents exceed the four-year statute of limitations period applicable to many of Plaintiffs claims under 42 U.S.C. § 1981 ("§ 1981"), and are therefore not relevant to any of Plaintiffs' claims for purposes of class certification.  28 U.S.C. § 1658.  In addition, the production of pre-2001 documents and data would be unduly burdensome.  Plaintiffs agreed to this scope of production and reserved their rights to seek discovery that predated 2001. [1]

        On May 29, 2007, the Supreme Court decided *Ledbetter v. Goodyear Tire & Rubber Co.*, 127 S. Ct. 2162 (2007), which is directly relevant to issues in this case. *Ledbetter* held that the statute of limitations bars pay discrimination claims where the allegedly discriminatory decision occurred before the limitations period, even if the effects of that decision continued during the limitations period.  Therefore, a current pay disparity arising from conduct that occurred prior to the limitations period cannot be the subject of a pay discrimination claim because it would be barred by the statute of limitations.

        The Supreme Court's decision in *Ledbetter* clarified significant ambiguity in the applicable statute of limitations.  The case highlighted the need for Merrill Lynch

---

[1] Indeed, Plaintiffs have recognized this in note 1 of their motion, which provides: "Plaintiffs agreed to analyze data from 2001 on in the interests of compromise and solely for purposes of class certification, on the understanding that both parties would be bound by the same time frame."

to produce and analyze compensation data for a full year prior to the longest limitations
period applicable to plaintiffs' pay discrimination claims, a period that includes the full
2000 calendar year. As required by *Ledbetter*, Merrill Lynch will attempt to quantify pay
disparities that existed prior to the limitations period, as those disparities cannot be
actionable under any circumstances. The use of data related to compensation from the
year 2000 is relevant to class certification issues because, among other things, it refutes
any attempt by Plaintiffs to rely on the entire amount of any alleged disparity in
compensation between African Americans and non-African American FAs during the
class period.

       Following the *Ledbetter* decision concerning pay discrimination, Merrill
Lynch produced three discrete compensation data files that included year 2000 data.[2]
Merrill Lynch had previously produced this data on the Subject Population for the period
between 2001 through 2006, so this new production included just one additional year on
a data set that Plaintiffs were, or should have been, already familiar with. Further, the
recent Merrill Lynch production was limited to three out of the 260 data files that have
been produced in this case because, in Merrill Lynch's opinion, only these files are

---

[2] Specifically, Merrill Lynch produced the following three files from two different tables:
(1) The "FC Compensation Table" (TBFCBFCC), which contains production and
compensation information concerning FAs on a monthly basis, such as the number of
production credits generated by an FA at a given point in time, the amount of computed
compensation that an FA earned as a result of production credits generated, hard dollars
paid by Merrill Lynch to an FA for his or her production, and incentive compensation
earned for a particular month; (2) W2 Payroll Data File, which contains yearly pay
information for FAs such as Federal wages, Medicare wages, deferred compensation
earned to be paid out at a later date, and assistant pay; (2) W2 Payroll Data File For
Trainees, which is identical to information in the W2 Payroll Data File but as it applies to
trainees for the FA position who have not yet received a Production Number.

necessary to perform the compensation analysis required by *Ledbetter*. As previously stated, the third file produced was the same type of payroll data already produced for individuals in the Subject Population, but this production included a discrete set of trainees. These 260 data files are described for the Court's reference in the chart annexed as Exhibit A. Plaintiffs have failed to establish that any of this data – except for the three files Merrill Lynch already has produced – is relevant to the analysis required by *Ledbetter*.

Data that does not provide total compensation information for FAs in a given year has no impact on such an analysis. For example, Merrill Lynch has produced an enormous volume of data that details every transaction in a customer's account. *See* Exhibit A Chart of Data Production. These data files do not set forth the dollar amounts in total compensation earned by FAs. Nor do any other data tables that Merrill Lynch produced contain total compensation data, including the files reflecting the following information: the pools and account splits that FAs form with one another where they divide earnings from particular accounts, employment history information, licensing information, account transfers, the distribution of shares from initial public offerings and other types of data. *Ledbetter* establishes that this data for the period prior to the statute of limitations period is irrelevant; and it is certainly irrelevant at this class certification phase.

Burdening Defendant with the task of producing such a large volume of data that serves no analytic purpose on class certification issues would be unnecessary and unreasonable. Merrill Lynch has easily devoted hundreds if not thousands of hours

to the production of data and addressing data production issues from 2001-2006. It would take months to identify and produce all the data in this case for the year 2000.

II.     **Plaintiffs Should Not Be Permitted To Re-Open Discovery Because Merrill Lynch Erroneously Included 80 People In Its Data Production Before June 2007**

Plaintiffs have sought quite extraordinary relief based on Merrill Lynch's correction of a mistake in a previously produced data set to remove 80 IAD AEs in a population of more than 26,000 FAs for whom Merrill Lynch has been producing data (the "Subject Population"). Merrill Lynch removed these IAD AEs from the Subject Population solely to ensure that its data set would be accurate, as these 80 should not be included in analytic comparisons. In a complex data production of 1,054 gigabytes from multiple databases throughout Merrill Lynch, technical issues with the data are bound to arise. Plaintiffs should not be entitled to draconian relief simply because Merrill Lynch has brought this insignificant change in the Subject Population to their attention in order to avoid confusion later in the litigation.

A.     **Plaintiffs Are Not Prejudiced By Merrill Lynch's Removal of 80 Individuals From A Population of 26,000 FAs**

The Subject Population has only been modified in only two minor ways since the time it was provided to Plaintiffs on July 27, 2006, which is more than one year ago. First, 80 individuals in the Subject Population were removed because they were middle-market IAD AEs who report up the management hierarchy to an IAD Office in the IAD Sales Organization and are paid out of a different compensation system, thereby making them inappropriate subjects of analytic comparisons. Second, 1,426 FAs hired since the July 27, 2006 production were added to the Subject Population to update the data as Plaintiffs had requested.

8

Plaintiffs have not been prejudiced by this production. First, the number of IAD AEs that needed to be removed from the data is minimal – approximately 0.3% of the Subject Population. It strains credulity to contend that this difference would require Plaintiffs' experts to jettison the analyses they have been performing over the past year. Second, the two data tables which summarize each FA's identity and credentials, the "All FA List" and the "FA Profile Table" were re-produced as replacement files on June 6, 2007. The All FA List and the FA Profile Table are critical data files that contain general information, such as race, about the Subject Population. Data tables produced in this litigation must be cross-referenced with these two tables to perform most, if not all, relevant analyses, including those based on race. Once these two data files were produced with the current Subject Population in June 2007, IAD AEs that report up to the IAD Sales Organization would automatically have been excluded from any data analysis because they no longer appeared in these two tables. As of that date, all data runs performed by Plaintiffs' experts would have included the correct subject population.[3]

B.      Plaintiffs Are Not Entitled To The Relief They Seek

Plaintiffs are, or should be, aware of the identity of the 80 IAD AEs who have been removed from the Subject Population, based on the updated data that Merrill Lynch produced on June 6, 2007. Merrill Lynch is willing to provide Plaintiffs with a list of the 80 IAD AEs and a written description of the Subject Population. This should fully and finally resolve Plaintiffs' concerns.

---

[3] Further, these tables were produced more than two weeks before Merrill Lynch produced three 30(b)(6) deponents to testify about data. If Plaintiffs had questions concerning the Subject Population, they had weeks to analyze these two tables and question deponents about that issue.

However, Plaintiffs are not entitled to any additional depositions about Merrill Lynch's data production. Merrill Lynch already has produced three individuals for 30(b)(6) depositions on data: William Schetler, Leopoldo Marichal, Jr.; Pao-Ling Yu; and Michael Dauber. The parties agreed to the scope of these depositions before they took place on December 20, 2006 and June 21, 2007. *See* Exhibit B, Dec. 15, 2006 Pappas email; *see also* Exhibit C, June 15, 2007 Pappas email. Aside from depositions, Plaintiffs have also obtained information about Merrill Lynch's data production in response to their interrogatories. Plaintiffs have had extensive discovery and ample opportunity to question Merrill Lynch about its data production. Discovery has closed and Plaintiffs are not entitled to seize upon this issue to re-open it. If Plaintiffs failed to obtain the information regarding the data that they needed for their class certification motion as they now claim, that failure cannot be attributed to Merrill Lynch which expended significant time and effort to respond to Plaintiffs' discovery requests.

Nor are Plaintiffs entitled to reimbursement for the cost of their expert work to date. Plaintiffs have shown no evidence of harm and have cited no authority suggesting that they are entitled to this relief. In short, Plaintiffs' demand for reimbursement is unfounded.

Finally, Plaintiffs' request for an extension of the deadline to serve expert reports is premature. Plaintiffs expert reports are not due until November 5, 2007, and they have provided no basis at this juncture to change that date. If Plaintiffs require an extension, they should meet and confer with Defendant in advance of filing a motion.

III.	Plaintiffs "Other Data Questions and Issues" Can Be Easily Resolved

A.	Deferred Compensation Data

Plaintiffs contend that Merrill Lynch denied the existence of data reflecting vested deferred compensation, and imply that Plaintiffs only became aware that this data existed when Merrill Lynch produced it on August 24, 2007.  *See* Motion, at ¶ 13.  Contrary to Plaintiffs' implication, Plaintiffs were made aware of the existence of data relating to vested deferred compensation at the end of 2006 when Merrill Lynch provided Plaintiffs with a list of all earnings identifier codes used by the Payroll Department, including the identifiers at issue, for example "Deferred Comp Payment" (#44).  *See* Exhibit D, Dec. 5, 2006, Dray email.  Even if Plaintiffs ignored this communication, the existence of vested deferred compensation data was discussed on June 21, 2007, when Plaintiffs' counsel deposed Michael Dauber, one of Merrill Lynch's 30(b)(6) designees on data issues.  Mr. Dauber testified that data reflecting vested deferred compensation was not readily available, but could be derived using the sum of several distinct earnings identifiers.  *See* Exhibit E, June 21, 2007 Dauber Deposition Transcript, at Page 23, line 16 through Page 30, line 17.  Contrary to the allegations in Plaintiffs' motion, Merrill Lynch has never taken the position that vested deferred compensation data did not exist.

Further, in June 2007, nearly a week before the deposition related to payroll data, Merrill Lynch had again provided Plaintiffs with all earnings identifiers used by the Merrill Lynch Payroll Department.  *See* Exhibit F, June 15, 2007 Dray email. These earnings identifiers comprise the various components of an FA's total yearly pay. Plaintiffs could have opted to select and request the earnings identifiers that collectively

constitute the payout of vested deferred compensation.[4]  In any event, the data has been produced and Merrill Lynch does not understand why such an issue was brought to the Court's attention by way of motion practice.

      B.      <u>Computation of Actual Earnings</u>

Plaintiffs contend in their motion that Merrill Lynch has "steadfastly declined to provide Plaintiffs with a formula for how to compute actual earnings from the W-2 Medicare field." *See* Motion, at ¶ 13.  Once again, Plaintiffs have misstated the record.  At Plaintiffs' insistence, Merrill Lynch has previously offered, both orally and in writing, to consider a stipulation concerning a proposed methodology for calculating a bottom-line earnings number.  *See, e.g.*, Exhibit G, June 4, 2007 Pappas email.  These offers were premised on Plaintiffs making a proposal in this regard, as it is Plaintiffs that have sought such a stipulation for purposes in the litigation known only to them.  In effect, Plaintiffs are seeking a stipulation for unstated reasons, but expect Merrill Lynch to make a proposal as to the scope of the stipulation.  Merrill Lynch has refused to engage in such speculation.  If Plaintiffs want Merrill Lynch to agree to a stipulation, Plaintiffs should make a proposal in this regard and disclose precisely the relevance and intended use of such a stipulation to this case, specifically with respect to class certification.

Additionally, Plaintiffs' requested relief is not justified.  Plaintiffs seek an order requiring Merrill Lynch to provide a formula for computing actual earnings "or to bar Defendant from challenging the method Plaintiffs use to compute actual earnings."

---

[4] As noted below, Plaintiffs requested this information at the June 21 data deposition.  In response to that request, Merrill Lynch began preparing the production of that information and produced it prior to the close of discovery.

*See* Motion, at ¶ 13.  Merrill Lynch has made Rule 30(b)(6) witnesses available regarding

its payroll data and compensation data, and produced documents setting forth specifically

all of the earnings identifiers for its payroll data.  Plaintiffs have had every opportunity to

determine how to compute what they deem to be the "actual" earnings.  Accordingly, in

the absence of a stipulation, Plaintiffs are free to make whatever calculations they deem

appropriate in arriving at an "actual earnings" computation.  Merrill Lynch is under no

obligation to provide such a "formula" nor can it be barred from challenging Plaintiffs'

computation by failing to agree to such a "formula."

      C.    <u>Information Requested in Depositions</u>

        Plaintiffs ask that the Court order Defendant to answer questions initially

raised by Plaintiffs' counsel during the June 21, 2007 data depositions.  *See* Motion, at ¶

14.  During those depositions, Merrill Lynch's attorneys requested, and Plaintiffs agreed,

that Plaintiffs would memorialize their requests in a letter.  *See* Exhibit H, June 21, 2007

Deposition Transcript of Michael Dauber, Page 36, Lines 7-10; *see also* Exhibit I, June

21, 2007 Deposition Transcript of Leopoldo Marichal, Jr., Page 148, Lines 11-18.

Notwithstanding this agreement, Plaintiffs waited over two months to do so, by sending

Merrill Lynch's counsel an email on August 24, 2007, just one business day before the

close of discovery.  *See* Exhibit J, Aug. 24, 2007 Robot email.  Rather than immediately

putting these issues in writing (as agreed upon during the June depositions and as

required by the plain words of Rule 34 of the Federal Rules of Civil Procedure), Plaintiffs

chose to wait two months to do so and filed this motion only one business day after

sending their email.  Motion practice with respect to this issue could have been avoided

had Plaintiffs simply acted promptly and documented the questions raised during the June

depositions.  Merrill Lynch has informed Plaintiffs that it intends to answer the questions contained in Plaintiffs' August 24, 2007 email, and is in the process of gathering the necessary information to do so.

       D.      <u>Applicant Flow Information</u>

       Plaintiffs contend that Merrill Lynch has not produced sufficient applicant-flow logs in data and/or electronic format.  *See* Motion, at ¶ 15.  Merrill Lynch has informed Plaintiffs on numerous occasions that it does not maintain a central database consisting of national applicant-flow information.  Rather, Merrill Lynch only centrally maintains applicant-flow information for those local offices that have been audited.  Merrill Lynch has produced all such centrally maintained information.  To the extent that any of these applicant flow logs are maintained in electronic format, Defendant is willing to provide such documents in native form, provided that the information is readily available and that Plaintiffs will agree that the information will be produced after any metadata has been removed.

## <u>CONCLUSION</u>

Merrill Lynch respectfully request that the Court deny Plaintiffs' Motion to Compel, as the requested information is either irrelevant, has been produced, or Merrill Lynch has agreed to produce.


Dated: September 4 , 2007

By: <u>s/Lori E. Lightfoot</u>
WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

--and--

MAYER, BROWN, ROWE & MAW
LLP
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of Defendant's Opposition to

Plaintiffs' Motion to Compel Responsive Data and Related Information and Relief was

served upon counsel for Plaintiff:

Linda Friedman
Mary Stowell
George Robot
Stowell & Friedman, Ltd.
321 S. Plymouth Court, Suite 1400
Chicago, Illinois 60604

via Email and ECF system on February 4, 2007.


By: s/Lori E. Lightfoot