IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

| | | |
|---|---|---|
| GEORGE MCREYNOLDS et al., | ) | |
| Individually on behalf of themselves | ) | |
| and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.  05 C 6583 |
| | ) | |
| vs. | ) | Judge Robert W. Gettleman |
| | ) | |
| MERRILL LYNCH, PIERCE, FENNER | ) | Magistrate Judge Denlow |
| & SMITH, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

---

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT (REDACTED)

---

Lori E. Lightfoot
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

*Attorneys for Defendant*
*Merrill Lynch, Pierce, Fenner*
*& Smith, Incorporated*

TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Introduction ........................................................................................................................... 1

Statement of Facts ................................................................................................................. 3

    A.    By Basing Compensation on Production and Revenues, Merrill Lynch Aligns FAs' Incentives with the Firm's Business Strategy and Financial Success ...................................................................................................... 3

    B.    In This Lawsuit Filed Almost Three Years Ago, Plaintiffs Assert Claims Challenging Merrill Lynch's Compensation Program .......................................... 4

Summary of the Argument ..................................................................................................... 5

Argument ............................................................................................................................... 5

I.    The Court Should Grant Summary Judgment Rejecting Plaintiffs' Attacks on Merrill Lynch's Compensation Program, Which Are Barred by Title VII §703(h) .......... 5

    A.    Summary Judgment Should Be Granted Rejecting Claims on Which No Genuine Issue of Material Fact Exists ................................................................. 5

    B.    No Fact Issue Exists for Claims Based on Merrill Lynch's Compensation Program, Which is a Production and Merit System Protected Under §703(h) ........................................................................................................... 6

        1.    Section 703(h) Expressly Bars Any Claim Against Production or Merit Systems Absent Discriminatory Intent ............................................ 6

        2.    Merrill Lynch's Compensation Program Is a Production System ............. 7

        3.    Merrill Lynch's Compensation Program Is a Merit System ..................... 9

        4.    Merrill Lynch's Compensation Program Was Developed and Is Maintained Free From Any Discriminatory Intent ................................. 10

            a.    Section 703(h) Requires Discriminatory Intent with Regard to the Compensation System Itself ............................................. 11

            b.    Merrill Lynch's Compensation Program Applies Equally to All FAs ............................................................................................ 12

            c.    Merrill Lynch's Compensation Program is in Accord with Industry Practice ........................................................................ 13

            d.    Merrill Lynch's Compensation Program Did Not Have Its Genesis in Racial Discrimination and Was Adopted to Effectuate Business Objectives ................................................... 13

            e.    Merrill Lynch's Compensation Program Has Been Maintained Free From Any Illegal Purpose ................................ 14

Conclusion .......................................................................................................................... 15

i

## TABLE OF AUTHORITIES

### CASES

*Am. Nurses' Ass'n v. Ill.*,
  783 F.2d 716 (7th Cir. 1986) ...............................................................10, 11, 14

*Am. Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982)......................................................................................7, 10, 11

*Byrd v. Ronayne*,
  61 F.3d 1026 (1st Cir. 1995) ..................................................................14

*Cal. Brewers Ass'n v. Bryant*,
  444 U.S. 598 (1980).................................................................................. 12

*Carroll v. United Steelworkers of Am.*,
  498 F. Supp. 976 (D.Md. 1980) ..............................................................6, 13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................5

*Cowen v. Bank United of Tex.*,
  70 F.3d 937 (7th Cir. 1995) ...................................................................3, 5

*Cullen v. Ind. Univ. Bd. of Trs.*,
  338 F.3d 693 (7th Cir. 2003) ..................................................................14

*Curtin v. United Airlines, Inc.*,
  275 F.3d 88 (D.C. Cir. 2001) ..................................................................5

*Day v. Patapsco & Back Rivers R.R. Co.*,
  504 F. Supp. 1301 (D.Md. 1981) ...........................................................10, 11, 13

*Diamond v. T. Rowe Price Assocs., Inc.*,
  852 F. Supp. 372 (D. Md. 1994) .............................................................9

*EEOC v. Aetna Ins. Co.*,
  616 F.2d 719 (4th Cir. 1980) ..................................................................8, 9

*EEOC v. Consol. Serv. Sys.*,
  989 F.2d 233 (7th Cir. 1993) ..................................................................13

*Gerbush v. Hunt Real Estate Corp.*,
  79 F. Supp. 2d 260 (W.D.N.Y. 1999) .....................................................9

*Greenlee County, Ariz. v. United States*, 487 F.3d 871 (Fed. Cir. 2007), *cert. denied*, 128
    S. Ct. 1082 (2008) ........................................................................................5

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)..........................................................................11, 12, 13

*Larkin v. Pullman-Standard Div., Pullman, Inc.*,
    854 F.2d 1549 (11th Cir. 1988), *vacated on other grounds by*
    *Pullman-Standard, Inc. v. Swint*, 493 U.S. 929 (1989) .............................11, 12

*Loeb Indus., Inc. v. Sumitomo Corp.*,
    306 F.3d 469 (7th Cir. 2002) ............................................................................5

*Lorance v. AT&T Techs., Inc.*,
    490 U.S. 900 (1989)....................................................................................7, 10

*McCormack Baron Ragan Mgt. Servs., Inc. v. Bately*,
    No. 04 C 167, 2004 U.S. Dist. LEXIS 14881 (N.D. Ill. July 30, 2004) .............6

*McDougal-Wilson v. Goodyear Tire & Rubber Co.*,
    427 F. Supp. 2d 595 (E.D.N.C. 2006)..........................................................9, 14

*Morgado v. Birmingham-Jefferson County Civil Def. Corps*,
    706 F.2d 1184 (11th Cir. 1983) ........................................................................9

*NAACP, Detroit Branch v. Detroit Police Officers Ass'n*,
    900 F.2d 903 (6th Cir. 1990) ................................................................7, 10, 11

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982)..........................................................................10, 11, 15

*Rehling v. City of Chi.*,
    207 F.3d 1009 (7th Cir. 2000) ..........................................................................6

*Selan v. Kiley*,
    969 F.2d 560 (7th Cir. 1992) ............................................................................6

*Schutz v. W. Publ'g Co.*,
    609 F. Supp. 888 (N.D. Ill. 1985) ................................................................9, 14

*Schweizer v. Trans Union Corp.*,
    136 F.3d 233 (2d Cir. 1998)..............................................................................5

*Scott v. Dallas County Hosp. Dist.*,
    No. 3:01-CV-2659-K, 2003 U.S. Dist. LEXIS 6744 (N.D. Tex. Apr. 21, 2003) ...............9

*Sprague v. Thorn Ams., Inc.*,
129 F.3d 1355 (10th Cir. 1997) ...................................................................14

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) ................................................................14, 15

*Talley v. NCO Fin. Sys., Inc.*,
No. 2:06-CV-48-PPS-PRC, 2006 U.S. Dist. LEXIS 74419
(N.D. Ind. Oct. 12, 2006) ...........................................................................3

*Taylor v. Mueller Co.*,
660 F.2d 1116 (6th Cir. 1981) ..............................................................11, 12

*Trans World Airlines, Inc. v. Hardison*,
432 U.S. 63 (1977) ...............................................................................7, 10

*Urrutia v. Valero Energy Corp.*,
No. SA-86-CA-1186, 1988 U.S. Dist. LEXIS 16715 (W.D. Tex. Dec. 12, 1988).............9

*Waters v. Wis. Steel Works of Int'l Harvester Co.*,
502 F.2d 1309 (7th Cir. 1974) ......................................................................7

*Williams v. Mead Coated Bd., Inc.*,
836 F. Supp. 1552 (M.D. Ala. 1993) ...........................................................12

*Yi v. Sterling Collision Ctrs., Inc.*,
480 F.3d 505 (7th Cir. 2007) .....................................................................13

*Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*,
313 F.3d 385 (7th Cir. 2002) .......................................................................6

## STATUTES AND RULES

29 U.S.C. §206(d) .............................................................................7, 8

29 U.S.C. §206(d)(1) ..............................................................................8

42 U.S.C. §1981 ............................................................................ *passim*

42 U.S.C. §2000e-2(a) .............................................................................6

42 U.S.C. §2000e-2(h), Title VII §703(h) ................................................. *passim*

Fed. R. Civ. P. 30(b)(6)...........................................................................10

Fed. R. Civ. P. 56(b) ............................................................................5, 6

Fed. R. Civ. P. 56(c) ..................................................................................................5, 6

Fed. R. Civ. P. 56(d) ..................................................................................................5, 6

**OTHER AUTHORITIES**

110 Cong. Rec. 10 (1964) ..........................................................................................6, 7

S. Rep. No. 79-1576 (1946) ........................................................................................8, 9

S. Rep. No. 88-176 (1963) ...............................................................................................8

## INTRODUCTION

Plaintiffs filed this putative class action alleging a pattern or practice of discrimination by Merrill Lynch, based on allegations that African American financial advisors ("FAs") do not do as well at Merrill Lynch as Caucasian FAs.  But all FAs, regardless of race, are judged by the same metric—production and new business development.  The rule is simple: produce more, earn more.  In this meritocracy, quantitative measures of performance incentivize and reward employees in direct relation to their contribution to Merrill Lynch's bottom line.  It is, quite simply, the most efficient compensation system and, of particular importance here, it also achieves the high-water mark for objectivity.  Rather than relying on subjective performance reviews or abstract notions of achievement, Merrill Lynch compensates FAs based on the objective results they actually obtain.  This is precisely what Congress stated was not actionable when it included §703(h) in Title VII, which explicitly protects production and merit-based compensation systems, irrespective of whether African Americans do not do as well as Caucasians under that system.[1]

The application of §703(h) to Merrill Lynch's compensation program is not an abstract or tangential question in this litigation; it goes to its very core.  While plaintiffs set forth various assertions regarding their ability to earn compensation at Merrill Lynch, such as the level of support received from hundreds of different managers throughout the country, the issue clearly common to all putative class members is the incentive compensation grid under which all FAs are paid.  Plaintiffs have made their attack on this grid a central part of their case, asserting that:

> Merrill Lynch acknowledges that racial bigotry exists, yet compensates African[] American FAs and evaluates their performance based on total production. . . . [C]ontinued implementation of the grid compensation method intentionally incorporates customer bias into the compensation system.  The compensation system is not performance or merit based . . . [and it] forces African[]American attrition, resulting in a . . . workforce that mirrors customer preferences.  The compensation system discriminates against African[]Americans by paying them lower wages than whites and further excludes them from business opportunities.

Plaintiffs' Resp. and Object. to Def. Third Set of Inter., at 8-9 (Bonk Aff. Ex. F).

In this motion Merrill Lynch asks the Court to resolve this central issue: whether Merrill Lynch can be held liable because its objective compensation system pays more to those who produce more and less to those who produce less, if some African American FAs earn less—

---

[1] *See* 42 U.S.C. §2000e-2(h).  As discussed below, this provision also governs claims under §1981.

because they produce less—than other FAs. If Merrill Lynch is correct that §703(h) protects exactly such a system, then the question in this litigation, as posed by plaintiffs, is alleged racial bias by hundreds of different managers, manifesting itself in an almost infinite number of ways. That is a very different class-certification question than whether Merrill Lynch's national incentive compensation program for over 15,000 FAs is actionable. Therefore, it is important for the Court to resolve this threshold issue now, because resolution of the issue will frame the class-certification debate and, as demonstrated below, no material fact issues bear on this question.[2]

The law is clear that Merrill Lynch's compensation grid cannot be found impermissible under Title VII or §1981 unless it is motivated by discriminatory intent, and plaintiffs cannot reasonably contend that Merrill Lynch's compensation program is intended to disadvantage African American FAs. Indeed, the fact that more than ███████████████—of the firm's poorest producing, and thus lowest paid, FAs are Caucasian, not African American, demonstrates that the compensation program, which is standard in the industry, plainly serves an entirely different, legitimate purpose: to effectuate the firm's businesses interests and market strategies.

In light of this insurmountable barrier to their claims, plaintiffs must resort to asserting that *awareness* that African Americans may fare less well than others under a particular business practice is equivalent to *intentional* discrimination—an argument the Seventh Circuit has rejected and that cannot support plaintiffs' claims. To conclude otherwise would write the intent element out of Title VII and §1981, and it also would lead to illogical and unreasonable results, protecting only the ostriches—companies that lack awareness because they never attempt to identify or to rectify disadvantages faced by persons of a particular sex, race, religion, or national origin. Better informed companies would be precluded from efficiently and profitably compensating employees through merit and production systems, except when persons from *all* protected groups fare equally well under the practice at issue. Congress, of course, intended exactly the opposite—to preserve equally applied merit and production systems under which protected groups of employees fare disproportionately poorly.

Because Congress's protection of production and merit systems applies here, and because plaintiffs have not raised and cannot raise any issue of material fact regarding Merrill Lynch's compensation system, the Court should grant summary judgment rejecting plaintiffs' claims to

---

[2] Plaintiffs' other challenges to the firm's policies also may be barred by §703(h), and depending on how plaintiffs brief class certification, Merrill Lynch may move to dismiss those challenges based on the standards set forth here.

the extent they are premised on the firm's incentive compensation program. The resolution of substantive motions while certification issues are pending is an accepted practice in this Circuit, *Cowen v. Bank United of Tex.*, 70 F.3d 937, 941 (7th Cir. 1995); and courts often resolve the substantive motions first when, as in this case, it would further "the interests of judicial economy and efficiency." *See, e.g.*, *Talley v. NCO Fin. Sys., Inc.*, No. 2:06-CV-48-PPS-PRC, 2006 U.S. Dist. LEXIS 74419, at *6-*7 (N.D. Ind. Oct. 12, 2006) (citing cases).

STATEMENT OF FACTS

**A.     By Basing Compensation on Production and Revenues, Merrill Lynch Aligns FAs' Incentives with the Firm's Business Strategy and Financial Success.**

Throughout the relevant time period and for many years before, Merrill Lynch has applied a national, incentive-based compensation system under which FAs are paid based on their provision of financial products and wealth-management services. SUMF ¶¶6, 8, 25.[3] Although some of the system's mechanics have changed with time, its overall operation has remained the same—compensation is based entirely on objective measures, and those measures are tied directly to FAs' business and revenue generation and production levels, which are key to Merrill Lynch's ability to compete and succeed. *See id.* ¶¶8, 10, 21-25.

No "black box" of subjective judgments determines compensation for the putative class members (███████████████████). For all FAs, regardless of race, compensation consists of a salary that generally covers minimum wage requirements and, much more important to the FA, incentive compensation based on production credits or other revenue generated when the FA's clients purchase products or services.[4] *See id.* ¶¶6, 8. Earnings disparities between FAs virtually always result from differences in their incentive pay, which reflect differences in their production, and FAs can determine their incentive compensation for any transaction based on a

---

[3] Citations to the Statement of Uncontroverted Material Facts in Support of Defendant's Motion for Summary Judgment, filed simultaneously with this memorandum, are noted as "SUMF ¶_."
[4] Merrill Lynch seeks summary judgment regarding the firm's incentive compensation program but does not, in this motion, address any differences in compensation that allegedly result from FAs' salaries, which generally comprise only a minor part of their total compensation and virtually always are subsumed by their incentive pay. SUMF ¶26, Hogarty Aff. ¶9. For example, an FA with an annual salary of $30,000 would not begin to earn incentive pay until, based on her production levels, it exceeded her $30,000 salary. *See* Hogarty Aff. ¶9. Salaries for FAs are set at a fraction of their total production so that, on a yearly basis, incentive pay virtually always exceeds salaries by a significant margin. *Id.*; SUMF ¶6. Differences in FAs' compensation thus are not the result of differences in their salaries, but of differences in their production. SUMF ¶¶6, 26; Hogarty Aff. ¶9. This motion also does not address any differences in compensation that allegedly result from salaries paid to new, relatively inexperienced FAs under the firm's Paths of Achievement program. SUMF ¶19.

3

mathematical formula and grid. *Id.* ¶¶ 6-8, 26.



### B. In This Lawsuit Filed Almost Three Years Ago, Plaintiffs Assert Claims Challenging Merrill Lynch's Compensation Program.

Plaintiffs initiated this putative class action almost three years ago. They assert claims under Title VII and §1981, broadly alleging discriminatory conduct toward African American FAs and claiming that Merrill Lynch "systematically pay[s] . . . lower wages" to, and applies "policies and practices that have a disparate impact" on, African Americans as part of a "nationwide pattern or practice" of discrimination. Sec. Am. Compl. ¶7(n), (t).

*Much* discovery, to put it mildly, has taken place in the context of the class certification proceedings. For example, Merrill Lynch has produced approximately 2.5 terabytes of data, over 6.6 million pages of documents, and seventeen depositions relating to plaintiffs' claims, including those relating to the compensation program. SUMF ¶3. The merits of the class certification issues have not yet been briefed, and depositions of the experts who have filed or will file certification-related reports are not scheduled to commence until early 2009. May 20, 2008 Agreed Order at 2. As demonstrated above, however, these certification proceedings provide no reason to delay summary judgment on the issue presented here.

4

SUMMARY OF THE ARGUMENT

Merrill Lynch's compensation program, which measures earnings based on "production" or "merit," is expressly protected under §703(h) of Title VII and cannot be held unlawful provided that it is "not the result of an intention to discriminate because of race . . . ." 42 U.S.C. §2000e-2(h).  Here, no reasonable basis exists for concluding that Merrill Lynch's objective, facially neutral, and equally applicable compensation program is motivated by intent to harm or oppress African Americans.  To the contrary, far more Caucasian than African American FAs fare poorly under the program, and the firm's practice of rewarding FAs based on production and revenues reflects the same, legitimate business motivations that have led to industry-wide adoption of similar policies.  Because no genuine issue of material fact exists, the Court should grant summary judgment rejecting plaintiffs' challenges to Merrill Lynch's incentive compensation program.

ARGUMENT

**I. THE COURT SHOULD GRANT SUMMARY JUDGMENT REJECTING PLAINTIFFS' ATTACKS ON MERRILL LYNCH'S COMPENSATION PROGRAM, WHICH ARE BARRED BY TITLE VII §703(H).**

**A. Summary Judgment Should Be Granted Rejecting Claims on Which No Genuine Issue of Material Fact Exists.**

To withstand summary judgment, a plaintiff must produce evidence supporting each element of every claim for which the defendant demonstrates the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56(b), (c), (d); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Evidence produced during class certification proceedings is part of the summary judgment record, *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir. 2002), and when the record contains the facts necessary to resolve a summary judgment motion, a court properly acts within its discretion in ruling on the motion, regardless whether class certification issues previously have been decided.  *E.g.*, *Curtin v. United Airlines, Inc.*, 275 F.3d 88, 92 (D.C. Cir. 2001) (citing *Cowen*, 70 F.3d at 941).[5]

"Class actions are expensive," not only for defendants, *Cowen*, 70 F.3d at 941, but also in terms of the Court's time and resources, *Curtin*, 275 F.3d at 92-93.  As a result, defendants may seek to narrow the litigation and focus the proceedings by showing that plaintiffs' allegations

---

[5] *See also, e.g.*, *Greenlee County, Ariz. v. United States*, 487 F.3d 871, 880 (Fed. Cir. 2007), *cert. denied*, 128 S.Ct. 1082 (2008); *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 239 (2d Cir. 1998).

lack merit. That approach is particularly appropriate here because the legality of the firm's compensation program is at the core of the litigation, and its resolution will assist the Court in adjudicating, as well as guiding and limiting, the issues for class certification. Accordingly, the Court should grant summary judgment and hold that Merrill Lynch's compensation program is protected by §703(h) and does not violate Title VII or §1981. Fed. R. Civ. P. 56(b), (c), (d); *see, e.g.*, *Carroll v. United Steelworkers of Am.*, 498 F.Supp. 976, 977 (D.Md. 1980) (granting summary judgment based on §703(h) while a class-certification motion was pending).[6]

**B.      No Fact Issue Exists for Claims Based on Merrill Lynch's Compensation Program, Which is a Production and Merit System Protected Under §703(h).**

**1.      Section 703(h) Expressly Bars Any Claim Against Production or Merit Systems Absent Discriminatory Intent.**

Title VII's prohibition against employment discrimination, 42 U.S.C. §2000e-2(a), was adopted alongside express limits on the legislation's reach. By including §703(h), Congress expressly precluded any interpretation of Title VII that would bar merit- or production-based compensation systems absent a showing that the system was motivated by discriminatory intent: "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice . . . to apply different standards of *compensation*, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or *merit system*, or a system which measures earnings by quantity or quality of *production*," when "such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . ." *Id.* §2000e-2(h) (emphasis added).

The reasons for this statutory provision are clear from the legislative history. Congress anticipated that "seniority, merit, or other incentive system[s]," or different terms of employment applied at different locations, might result in less "pay" to a substantial number of persons of a particular race, religion, sex, or national origin. *See* 110 Cong. Rec. 10, 12723 (1964) (Ex. 1

---

[6] Courts routinely grant summary judgment on unsupported or untenable aspects of discrimination claims, *see, e.g.*, *Rehling v. City of Chi.*, 207 F.3d 1009, 1013-14, 1017 (7th Cir. 2000) (affirming rejection of reasonable accommodation aspect of discrimination case), *Selan v. Kiley*, 969 F.2d 560, 563-67 (7th Cir. 1992) (affirming rejection of aspects of discrimination claims related to specific events), and in any event Rule 56(d) "explicit[ly]" authorizes "summary judgment on less than the plaintiff's whole claim." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002) (concluding that district court erred by denying a motion for partial summary judgment solely because it did not address a separate, appealable claim); *see also McCormack Baron Ragan Mgt. Servs., Inc. v. Bately*, No. 04 C 167, 2004 U.S. Dist. LEXIS 14881, at *5 (N.D. Ill. July 30, 2004) (rejecting argument that Rule 56 does not permit summary judgment motions on issues as opposed to entire claims).

hereto). Rather than permit lawsuits on this basis, Congress adopted §703(h) to protect these employment practices "unless it is shown that the employer was intending to discriminate for or against one of the [protected] groups." *Id.* As a result, seniority, merit, or production systems cannot be held unlawful "absent a discriminatory purpose . . . even if the system has some discriminatory consequences." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 82 (1977).

Unlike a similar provision in the Equal Pay Act, 29 U.S.C. §206(d), Title VII §703(h) does not operate as an affirmative defense. *Lorance v. AT&T Techs., Inc.*, 490 U.S. 900, 908-09 (1989); *NAACP, Detroit Branch v. Detroit Police Officers Ass'n*, 900 F.2d 903, 908 (6th Cir. 1990). "Section 703(h) is a definitional provision . . . [that] delineates which employment practices are illegal and thereby prohibited and which are not." *Hardison*, 432 U.S. at 82 (internal quotation marks and citation omitted); *see also* 110 Cong. Rec. 10, 12723 ("[Section 703(h)] does not narrow application of [Title VII], but merely clarifies its present intent and effect.") (Ex. 1 hereto). As a result, plaintiffs must establish that an employer's practice falls outside the scope of §703(h), and "actual intent to discriminate *must be proved*." *Lorance*, 490 U.S. at 908-09 (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 65 (1982)). Otherwise no claim of discrimination may succeed. As courts repeatedly have held, §703(h) applies equally to claims under Title VII and §1981, *NAACP*, 900 F.2d at 912-14 (citing cases), and an employment practice that has "passed scrutiny under the substantive requirements of Title VII"—and §703(h) in particular—"is not violative of 42 U.S.C. §1981." *Waters v. Wis. Steel Works of Int'l Harvester Co.*, 502 F.2d 1309, 1320 n.4 (7th Cir. 1974).

In this case, plaintiffs challenge a compensation program that is both a production system and a merit system and therefore protected by §703(h). Because the program cannot reasonably be found to be the "result of an intention to discriminate because of race," 42 U.S.C. §2000e-2(h), plaintiffs' challenge to the compensation program cannot succeed.

## 2. Merrill Lynch's Compensation Program Is a Production System.

Section 703(h) expressly permits differences in compensation pursuant to a production system—*i.e.*, a system "which measures earnings by quantity or quality of production." 42 U.S.C. §2000e-2(h). The legislative history for a similar provision in the Equal Pay Act, on which §703(h) was modeled,[7] confirms that Congress meant exactly what it said: production-

---

[7] Section 206(d) precludes employers from paying wages at a rate less than is paid "to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and

7

based systems need not result in equal pay for all employees. "[M]easur[ing] either the quantity or quality of production or performance can result in far greater gross earnings by one person compared to another, even though both are technically doing the same type of work." S. Rep. No. 88-176, at 4 (1963) (Ex. 2 hereto); *EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 725 (4th Cir. 1980). "Obviously," such systems will be valid. S. Rep. No. 88-176, at 4 (Ex. 2 hereto); *Aetna*, 616 F.2d at 725.

Merrill Lynch's compensation program falls squarely within this statutory protection for production systems, rewarding FAs based on new business or revenues generated, transactions completed, or services utilized. SUMF ¶¶8, 12. Incentive pay is calculated methodically and without discretion under a facially neutral, nationally applied, objective formula and grid, which sets compensation levels in a way that aligns FA's interests with the firm's business objectives. *Id.* ¶¶8, 21-25. For example, FAs whose production levels are highest contribute heavily to the firm's success, and therefore they receive higher levels of compensation: "[P]ay outs are geared based on level of production overall . . . , which is consistent with a profit-making enterprise"; "as production increases and productivity increases, . . . there are higher payouts for production." O'Neal Dep. at 245 (Bonk Aff. Ex. A); *see also* SUMF ¶21. Likewise, products or transactions that yield greater benefits or opportunities for the firm also yield greater compensation for FAs. SUMF ¶21. Compensation levels also encourage FAs to develop higher net-worth accounts, which they can serve effectively, rather than smaller accounts that, in the firm's business judgment, are best served by a central service center. *Id.* ¶22.

While incentive pay varies by, among other things, product type and account size, this is no impediment to production-system status. Applying "different standards of compensation" is expressly authorized under §703(h), 42 U.S.C. §2000e-2(h), and in the context of production-based systems, it is particularly appropriate. Even the most basic commission programs vary payment percentages according to product or transaction, and Congress was not oblivious to this reality. "*Very clearly* the amount to be paid . . . should depend on the *value* of the work done." S. Rep. No. 79-1576, at 6 (1946) (emphasis added) (Ex. 3 hereto). As a congressman pointed out many years ago, "[i]t should not be necessary at this stage of American economic development

---

responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. §206(d)(1).

to belabor the proposition that wages should be based on *job content* or that there should be a *rate for the job*," *id.* (emphasis added)—which is the program in place at Merrill Lynch. The firm's compensation system is the type of objective, "rate for the job" program that the enactors of Title VII and the Equal Pay Act intended not only to protect but also to encourage.

Thus, as plaintiffs have conceded, Merrill Lynch's compensation program is a "production" system protected by §703(h). *See* Plaintiffs' Resp. and Object. to Def. Third Set of Inter., at 8 (stating that Merrill Lynch "compensates African[]American FAs and evaluates their performance based on *total production*" (emphasis added)) (Bonk Aff. Ex. F); *see also, e.g.*, *McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 605 (E.D.N.C. 2006) (upholding a compensation system that varied pay based on store volume); *Diamond v. T. Rowe Price Assocs., Inc.*, 852 F. Supp. 372, 377-78, 380-81, 391, 396 (D. Md. 1994) (upholding a compensation system that tied pay to performance of mutual funds); *Schutz v. W. Publ'g Co.*, 609 F. Supp. 888, 892-93, 897, 906 (N.D. Ill. 1985) (upholding a compensation system that based percentages, bonuses, and other incentive compensation on sales volume and objective achievements).

### 3. Merrill Lynch's Compensation Program Is a Merit System.

Merrill Lynch's compensation program also is a merit system—an organized and structured procedure for systematically evaluating employees based on predetermined criteria, as set forth in the compensation program and summarized in the grid. *See, e.g.*, *Aetna*, 616 F.2d at 725. As noted above, plaintiffs have conceded that Merrill Lynch "compensates African[] American FAs and *evaluates their performance* based on *total production*." Plaintiffs' Resp. and Object. to Def. Third Set of Inter., at 8 (emphasis added) (Bonk Aff. Ex. F).

Thus, unlike companies that lack any formal system for rewarding merit, *see, e.g.*, *Morgado v. Birmingham-Jefferson County Civil Def. Corps*, 706 F.2d 1184, 1188 (11th Cir. 1983), Merrill Lynch compensates FAs based on objective, job-related measures of production and revenues, *i.e.*, a "merit" system. *See, e.g.*, *Scott v. Dallas County Hosp. Dist.*, No. 3:01-CV-2659-K, 2003 U.S. Dist. LEXIS 6744, at *5-*6 (N.D. Tex. Apr. 21, 2003) (mathematical matrix for awarding compensation was a "merit system"); *Gerbush v. Hunt Real Estate Corp.*, 79 F.Supp.2d 260, 264 (W.D.N.Y. 1999) (tying salaries to branch revenues and awarding bonuses for exceeding predicted revenue levels was a "merit system"); *Urrutia v. Valero Energy Corp.*,

No. SA-86-CA-1186, 1988 U.S. Dist. LEXIS 16715 (W.D. Tex. Dec. 12, 1988) (awarding compensation based on objective, job-related criteria and evaluations was a "merit pay system").

### 4. Merrill Lynch's Compensation Program Was Developed and Is Maintained Free From Any Discriminatory Intent.

Because Merrill Lynch's compensation program is both a production system and a merit system—the type of system encouraged and protected by Congress through §703(h)—it cannot be held unlawful unless plaintiffs establish that the program is intended specifically to disadvantage employees of a particular race, sex, religion, or national origin. "[Section] 703(h) unequivocally mandates that there is no statutory violation in the absence of a showing of discriminatory purpose." *Hardison*, 432 at 82 & 82 n.13; *see also Patterson*, 456 U.S. at 65, 69-70 (same); *Pullman-Standard v. Swint*, 456 U.S. 273, 289 (1982) (same); *Lorance*, 490 U.S. at 909 (same). This is a hurdle plaintiffs cannot clear. Despite years of discovery—including a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6), several fact depositions, and the production of thousands of documents—no evidence shows, nor could plaintiffs establish, intentional discrimination regarding Merrill Lynch's compensation program.

Intent to discriminate is not a watered-down element that lacks substance or meaning. As the Seventh Circuit explained, in Title VII and equal protection cases "intent as volition or intent as awareness of consequences" cannot suffice; discriminatory purpose requires more. *Am. Nurses' Ass'n v. Ill.*, 783 F.2d 716, 722 (7th Cir. 1986) (internal quotation marks and citation omitted). The "particular course of action" must have been "selected or reaffirmed . . . at least in part *because of*, *not merely in spite of*, its adverse effects upon an identifiable group." *Id.* (internal quotation marks and citation omitted) (emphasis added); *Day v. Patapsco & Back Rivers R.R. Co.*, 504 F.Supp. 1301, 1310 (D.Md. 1981) (applying this standard to §703(h)).

Accordingly, mere awareness that a business practice produces disparate results among persons of a particular race, gender, or religion is *not* equivalent to discriminatory intent. As the Sixth Circuit concluded in *NAACP, Detroit Branch v. Detroit Police Officers Association*, an employer who "*knew* that enforcement of the seniority plan would have a discriminatory impact on newly hired black officers" was not at fault; application of the seniority plan was "congressionally immunized by §703(h) and by the decisions of the Supreme Court." 900 F.2d at 909 (emphasis added). To conclude otherwise would virtually eliminate the protection §703(h) was intended to provide, particularly for the most deserving employers—those who know of a negative effect because they study, learn of, and attempt to rectify disparities that

10

result from their business practices. As a general rule, courts refuse to interpret statutes in a manner that would thwart Congress's purpose or lead to absurd results, and Title VII is no exception. *E.g.*, *Patterson*, 456 U.S. at 71. Thus, under Title VII and §1981, "[k]nowledge of a disparity is not the same thing as an intent to cause or maintain it." *Am. Nurses*, 783 F.2d at 722.

Plaintiffs lack any viable claim that Merrill Lynch's compensation system is motivated by discriminatory intent, as the case law confirms. When examining whether such intent exists, courts first separate the §703(h) system from other challenged practices and then consider whether the system (1) "applies equally to all races and ethnic groups," (2) is "in accord with the industry practice," (3) "ha[d] its genesis in racial discrimination," and (4) was "negotiated and has been maintained free from any illegal purpose."[8] *See, e.g.*, *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 347-48, 355-56 (1977).[9] These factors point conclusively to an absence of discriminatory intent, and because Merrill Lynch's industry-accepted, equally applicable, performance-based compensation program is *not* the result of any intent negatively to affect African American FAs, plaintiffs' assertions to the contrary should be rejected.

### a. Section 703(h) Requires Discriminatory Intent with Regard to the Compensation System Itself.

When examining whether a §703(h) system has a discriminatory purpose, courts distinguish between challenges to the system itself and "challenges to other discriminatory conduct that in turn manipulates the system to the detriment of" protected class members. *Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1576 (11th Cir. 1988), *vacated on other grounds by Pullman-Standard, Inc. v. Swint*, 493 U.S. 929 (1989). A §703(h) system cannot be attacked merely because it allegedly perpetuates discrimination in other employment practices. *Teamsters*, 431 U.S. at 347-48. When other practices, such as "hiring, assignment, transfer and promotion policies," are allegedly discriminatory, plaintiffs may obtain "all appropriate relief as a direct remedy for [that] discrimination." *Id.* But to overcome §703(h), plaintiffs must establish "that the [§703(h)] *system itself* was negotiated or maintained with an actual intent to discriminate." *Larkin*, 854 F.2d at 1576. Any purported evidence regarding other practices does

---

[8] Although these factors have been applied primarily in the context of seniority systems, they are equally applicable to merit and production systems because the underlying question—whether the system is motivated by discriminatory intent—is the same.

[9] *See also, e.g.*, *Taylor v. Mueller Co.*, 660 F.2d 1116, 1121-22 (6th Cir. 1981) (citing cases); *Day*, 504 F.Supp. at 1309 (citing cases); *see also Swint*, 456 U.S. at 279-84 (discussing these factors); *cf. NAACP*, 900 F.2d at 909-10 (considering whether the system was adopted or negotiated with discriminatory intent or "administered in an irregular or arbitrary way with intent to harm" the protected group).

11

not relate "directly to [the employer's] intent regarding" the *system*, but "tends to prove instead that [the employer] engaged in a number of other, separate discriminatory practices, and . . . the Supreme Court has required us to keep such distinctions in mind." *Id.* at 1577.

A §703(h) "system" includes those rules that directly measure production, merit, or seniority and those that are "ancillary" to that purpose. *See Cal. Brewers Ass'n v. Bryant*, 444 U.S. 598, 607 (1980) (defining seniority system to include rules "directly related to length of employment" as well as "ancillary rules that accomplish certain necessary functions," such as defining "which passages of time will 'count'" for seniority purposes). Here, the compensation system includes rules set forth in the compensation grid, such as what types of accounts or transactions generate particular rates of incentive pay. But rules governing other practices—*e.g.*, account distributions or promotion policies—are not part of that system, *see id.* at 608 (excluding rules falling outside commonly accepted notions of seniority systems, regardless whether they "have some nexus to an arrangement that concededly operates on the basis of seniority"), *see also Teamsters*, 431 U.S. at 347-48 (distinguishing between a §703(h) system and other challenged practices), *Larkin*, 854 F.2d at 1576-77 (same), and plaintiffs cannot establish discriminatory intent with regard to the compensation program itself.

### b. Merrill Lynch's Compensation Program Applies Equally to All FAs.

When evidence establishes that a facially neutral production, merit, or seniority system applies equally to all employees, regardless of race, that evidence weighs heavily against any inference of discriminatory intent. *See, e.g.*, *Teamsters*, 431 U.S. 355-56; *Taylor*, 660 F.2d at 1123; *Williams v. Mead Coated Bd., Inc.*, 836 F. Supp. 1552, 1568-69 (M.D. Ala. 1993). Indeed, the possibility of discriminatory intent nearly vanishes when the majority of the employees negatively affected by the system are not of the allegedly targeted group. *See Teamsters*, 431 U.S. 355-56. That is the case here. Under Merrill Lynch's facially neutral, equally applicable compensation program—administered from mid-2001 through late 2007 under the leadership of African American E. Stanley O'Neal, *see* O'Neal Dep. at 11 (Bonk Aff. Ex. A)—

*Id.* The possibility of intentional discrimination against African American FAs thus is too remote to support any viable claim, as the remaining factors confirm.

12

      **c.**     **Merrill Lynch's Compensation Program is in Accord with Industry Practice.**

The compensation program at issue here is not an aberrational or idiosyncratic practice of Merrill Lynch.  To the contrary, plaintiffs attack a practice almost universally adopted by financial services and wealth-management companies, SUMF ¶20, effectively challenging the propriety of an entire industry's method of motivating and rewarding employees.  Widespread use of a practice strongly suggests that it reflects legitimate business concerns, not discriminatory intent, and challenges to mainstream practices rarely succeed.  *See, e.g.*, *Teamsters*, 431 U.S. at 355-56; *Day*, 504 F.Supp. at 1309; *Carroll*, 498 F.Supp. at 987-89.  While "[i]t is possible for an entire industry to be in violation of the [law] for a long time without [the government] noticing[,] . . . a more plausible hypothesis is that the . . . industry has been left alone because the character of its compensation system has been recognized for what it is—a bona fide commission system." *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 510-11 (7th Cir. 2007).

Challenges to mainstream practices also should be scrutinized carefully, given the severe consequences of prohibiting their use.  Plaintiffs would require Merrill Lynch to forego the most efficient method of aligning FAs' interests with the firm's objectives and compensate all FAs at the same rates, regardless of their vastly different job performances and contributions to the firm, its clients, and its shareholders.  The consequences of plaintiffs' theory should not be ignored.  If Merrill Lynch is barred from following the industry-wide practice of paying higher compensation to the most profitable FAs, these highly sought-after employees could be snatched up by competitors, who would offer compensation consistent with the FAs' production levels. Plaintiffs offer no basis for imposing on Merrill Lunch such an enormous competitive disadvantage.  When, as here, a company's nationally applied, facially neutral program "was (and is) an industry-wide practice, . . . it is plainly established that bona fide business purposes" motivate the program's use.  *Day*, 504 F.Supp. at 1309-10.  In other words, when "the most efficient method" of a running a business is "adopted *because* it is the most efficient," there is no intentional discrimination. *EEOC v. Consol. Serv. Sys.*, 989 F.2d 233, 236 (7th Cir. 1993).

      **d.**     **Merrill Lynch's Compensation Program Did Not Have Its Genesis in Racial Discrimination and Was Adopted to Effectuate Business Objectives.**

Another factor weighing heavily against any inference of discriminatory intent is whether the system had "its genesis in racial discrimination." *Teamsters*, 431 U.S. at 356.  In this case,

the record is barren of any evidence suggesting that discriminatory intent factored into the compensation program's adoption. The program has been applied to further the same purpose it currently serves—to position Merrill Lynch "competitively within the marketplace" by measuring and rewarding performance in a manner that "align[s] the objectives of the financial adviser with the firm, and shareholders with the client." Hogarty Dep. at 19 (Bonk Aff. Ex. B); *see also* SUMF ¶¶21-25; Hogarty Aff. ¶¶11-13. As courts frequently conclude, payment of additional compensation to those who generate or are responsible for greater revenues or production is a legitimate business practice not motivated by discriminatory intent. *See, e.g.*, *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 700, 703, 704 (7th Cir. 2003); *McDougal-Wilson*, 427 F. Supp. 2d at 605; *Sprague v. Thorn Ams., Inc.*, 129 F.3d 1355, 1363 (10th Cir. 1997); *Byrd v. Ronayne*, 61 F.3d 1026, 1034 (1st Cir. 1995); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322-23 (9th Cir. 1994); *Schutz*, 609 F. Supp. at 892-93, 897, 906.

> **e.      Merrill Lynch's Compensation Program Has Been Maintained Free From Any Illegal Purpose.**

As noted above, plaintiffs must show that Merrill Lynch's compensation program was applied "*because of*, *not merely in spite of*," any adverse effects on African American FAs. *Am. Nurses*, 783 F.2d at 722 (internal quotation marks and citation omitted) (emphasis added). But no basis exists for concluding that the program has been maintained with a specific intent to disadvantage African American FAs. To the extent *any* FA is paid more or less than any other, that differential stems from the FA's level of production and revenue generation, *i.e.*, from that individual's job performance. SUMF ¶26. The compensation-system criteria are inextricably tied to the firm's strategy and success: "We are a commercial enterprise that sustains itself on the basis of how many clients we serve, how well we serve them and how much money we make in the process of doing that . . . ." O'Neal Dep. at 162 (Bonk Aff. Ex. A); *see also* SUMF ¶¶21-25.

Plaintiffs may assert that the compensation program has been applied despite biases, pressures, or other circumstances external to Merrill Lynch that purportedly affect African American FAs' production or revenues; for example, plaintiffs may claim that some African American FAs face challenges amassing high net-worth accounts or building a diverse client base. But regardless whether these or other difficulties exist, and regardless whether Merrill Lynch were aware of them, the firm cannot be required to alter its compensation program on that basis. Neither Title VII nor §1981 requires employers to rectify imbalances or biases present in

14

employees' external environments or to forego merit or production systems if those factors lead to disparate results. To the contrary, §703(h) encourages employers to make production or merit—not the employee's external environment—the controlling benchmark.

Similar issues were raised in *Stanley v. University of Southern California*, in which the plaintiff challenged the pay differential between male and female sports teams' coaches. 13 F.3d at 1319. The difference in pay reflected, in part, the greater revenues generated by the male sports team. *Id.* at 1322-23. Although the plaintiff asserted that fans' biases in favor of men's verses women's sports were responsible for the difference in revenues, the court concluded that any "societal discrimination in preferring to witness men's sports in greater numbers cannot be attributed to" the employer, who could pay its employees based on the revenues the teams generated. *Id.* at 1323; *see also Swint*, 456 U.S. at 292 n.23 (concluding that knowledge of or even acquiescence in another entity's discriminatory conduct is not equivalent to discriminatory purpose). As in *Stanley*, the compensation program at Merrill Lynch properly pays employees based on production and revenues, regardless whether external factors may lead to differences in employees' performances.

As with the previous three factors, review of whether a system is maintained free from any illegal purpose serves a singular purpose: to root out discriminatory intent not manifest on the face of a particular employment policy. Here no invidious motivation lurks in the shadows, nor could a jury be permitted to find one. The compensation policy is what it appears to be—an objective, systematic method for rewarding employees based on their contributions to the firm's business strategy and financial success. The program's equal applicability to persons of all races, and the fact that its negative effects are born by far more Caucasians than African Americans, weighs strongly against any inference of discriminatory intent; when coupled with the program's pervasive use and business-oriented origins, no inference of discriminatory intent may be drawn. Therefore, plaintiffs' challenges to Merrill Lynch's compensation program should be rejected.

## CONCLUSION

Merrill Lynch respectfully requests that the Court grant partial summary judgment and hold that Merrill Lynch's incentive compensation program does not violate Title VII or §1981.

15

Respectfully submitted,


                                        s/Lori E. Lightfoot
                                        Lori E. Lightfoot
                                        MAYER BROWN LLP
                                        71 South Wacker Drive
                                        Chicago, Illinois 60606
                                        (312) 782-0600 (Phone)
                                        (312) 701-7711 (Facsimile)

                                        Jeffrey S. Klein
                                        Nicholas J. Pappas
                                        Salvatore A. Romanello
                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        (212) 310-8000 (Phone)
                                        (212) 310-8007 (Facsimile)

                                        *Attorneys for Defendant*
                                        *Merrill Lynch, Pierce, Fenner*
                                        *& Smith, Incorporated*

September 6, 2008