IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
--------------------------------------------------------x
GEORGE MCREYNOLDS, MAROC              :
HOWARD, LARUE GIBSON, JENNIFER        :
MADRID, FRANKIE ROSS, MARVA YORK      :
LESLIE BROWNE, HENRY WILSON,          :
LEROY BROWN, GLENN CAPEL,             :
CHRISTINA COLEMAN, J. YVES LABORDE,   :
MARSHELL MILLER, CARNELL MOORE,       :
MARK JOHNSON, CATHY BENDER-           :  Case No. 05C6583
JACKSON, and STEPHEN SMARTT,          :
Individually on behalf of themselves  :
and all others similarly situated,    :  Hon. Robert W. Gettleman
                                      :  Magistrate Judge Denlow
                  Plaintiffs,         :
                                      :
- against -                           :
                                      :
MERRILL LYNCH, PIERCE, FENNER         :
& SMITH, INCORPORATED,                :
                                      :
                  Defendant.          :
--------------------------------------------------------x
```

## DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill Lynch") requests that the Court deny Plaintiffs' Motion To Compel dated December 16, 2008 ("Motion"). In Opposition to Plaintiffs' Motion, Merrill Lynch respectfully states:

## PRELIMINARY STATEMENT

1.     In the Motion, Plaintiffs ask this Court to compel Merrill Lynch to produce some of the most sensitive, private and competitively valuable data in Merrill Lynch's possession: a list of the names and addresses of the clients associated with Merrill Lynch's 3.2 million unique client accounts, and a link between this list and previously produced customer financial information. The Court should reject this

extraordinary request because of the significant risk such production would pose to privacy of clients' financial data, and the security risk associated with producing such data. Such risks greatly outweigh the illogical and speculative use to which Plaintiffs seek to make of such data.

2.      Plaintiffs' belated request for this data is but a thinly disguised effort by Plaintiffs, again, to reopen fact discovery to obtain data that they knew about but elected not to pursue during fact discovery. None of Plaintiffs' document requests ask that Merrill Lynch produce the names and addresses of all of its customers, nor was this information relied upon by Merrill Lynch's experts. Having waived their rights either to request, or to move to compel production of this data during fact discovery, Plaintiffs cannot now be heard to demand such data because Defendant's expert used a different, albeit related, data set, the de-identified 100-block address data.

3.      In any event, Plaintiffs are certainly able to test their theory that the data includes both business and residential addresses, and are therefore able to explore their speculations about the implications of the possibility that the data mixes address types. Moreover, Plaintiffs can attempt to impeach the use of this 100-block data through its deposition of Dr. Ali Saad, and are not prejudiced in any way by their inability to examine precise customer names and addresses.

## STATEMENT OF FACTS

4.      Plaintiffs do not -- and cannot -- dispute that they have obtained all of the data that was used and relied upon by Defendant's experts as it relates to customer addresses. In Request For Production No. 2 of Plaintiffs' First Request For Production of Expert Documents ("Expert Requests") seeks "[a]ll documents, data, and other things

provided to, or received from, any Expert in connection with this litigation that were relied upon by an Expert in his or her report…." Plaintiffs' request for data relied upon by Defendant's experts was specifically contemplated in paragraph 4 of the parties' September 11, 2007 Expert Discovery Stipulation and Order ("Order") which states that documents responsive to a parties' request for documents relied upon by the expert in rendering opinions set forth in the expert report "shall be produced no later than (5) days after service of the expert report." The parties likewise stipulated and this court ordered that "material or information . . .not relied upon by the expert" . . . "shall be excluded from expert discovery."

     5.    Merrill Lynch produced its expert reports on November 14, 2008 and produced all documents and data relied upon by its experts on November 21, 2008. This backup data included the 100-block customer address data provided by Merrill Lynch to Dr. Ali Saad, which he used to formulate his conclusions.[1] The only change made to precise addresses before providing this data to Dr. Saad and to Plaintiffs was that each numerical street address was de-identified and broadened such that it reflected only the 100-block on which the property was located. The de-identification of customer address was a transparent, mechanical process, and certainly not an effort by Merrill Lynch to "insulate the data from discovery by serving as its own consultant" as Plaintiffs contend. There is absolutely no foundation or factual support for the notion that Merrill Lynch did

---

[1]    Precise addresses were de-identified to reflect the 100-block where the property is located. For instance, 456 Smith Street would appear as 400 Smith Street in the data produced; likewise, 4,566 Smith Street would appear as 4,500 in the produced data.

anything other than a mechanical de-identification when it converted its actual address data to 100-block address data.

6.       In order to comply with important legal obligations under the Gramm-Leach-Bliley Act (15 U.S.C. §6801), Securities and Exchange Commission Regulation S-P (17 C.F.R. 248), and other applicable state privacy laws, Merrill Lynch de-identified precise customer name and address before providing this information to Dr. Saad and to Plaintiffs.. The 100-block addresses were produced with accompanying account numbers, and so if one had precise address information rather than the broadened 100-block, it would enable linking this address data with other data that contains highly sensitive and detailed personal and account information regarding Merrill Lynch's customers. This private information includes, among other things, account asset value, account liability value, account activity, types of assets held with Merrill Lynch, investment patterns, and Internal Revenue Service tax activity related to each account held at Merrill Lynch. The potential harm resulting from the dissemination of this information would be irreparable, both from each individual client's perspective and from a business perspective.

7.       Because customer name and precise address data was never used or relied upon by Dr. Saad, Plaintiffs already have agreed, and this Court has ordered that such data is outside the scope of expert discovery. See September 10, 2007 Stipulation and Order.

8.       Apparently recognizing that under the September 10, 2007 Stipulation they cannot obtain this data as part of expert discovery, Plaintiffs incorrectly seek to revisit issues previously disposed of during fact discovery. They assert that they sought

customer name and precise address information during fact discovery and that Merrill

Lynch is using the same data it declined to provide to Plaintiffs.  See Motion, at par. 9.

However, none of Plaintiffs' document requests include a request that Merrill Lynch

produce the names and addresses of all of its customers.  Rather, Plaintiffs erroneously

seek to manufacture such a request by referring to Requests for Production Nos. 1

through 6 of Plaintiffs' Second Set of Class Requests for Production ("Requests").  In the

Requests, Plaintiffs sought underlying data transmitted to and from InfoUSA, a third

party vendor contractually employed by Merrill Lynch to engage in selected analyses

used subsequently for strategic marketing practices.  The face of the requests make no

reference to customer name and address.  Rather, Plaintiffs' requests related to the race

approximation analysis conducted by InfoUSA ("Donnelley Data").  See, e.g., 12/16/06

email from L. Friedman to L. Lightfoot, attached hereto as Ex. 1.

       9.     Aside from Plaintiffs' inaccurate portrayal of what they actually requested

during fact discovery, the underlying customer name and customer address data

transmitted to InfoUSA is a different set of data than what they currently are requesting.

The customer name and address data transmitted to InfoUSA consisted of customer

names and addresses as of a specific timeframe and for a specific purpose: approximating

the race, religion, and gender of clients.  Plaintiffs repeatedly sought so-called "ethnic

append" data in order to ascertain what this data disclosed as to the presumed race of

Merrill Lynch clients for marketing purposes.  Plaintiffs now seek to compel the

production of a different data set, all of Merrill Lynch's clients' names and addresses, and

in a format that links such data to customer account information.

10.     On June 7, 2007, after months of recurring discussions between the parties on the issue, Defendant produced the Donnelley Data to Plaintiffs in a format consistent with the parties' discussions related to what data fields would be included.  Specifically, Merrill Lynch produced precisely the data Plaintiffs repeatedly stated they were seeking: the ethnicity approximation resulting from the Donnelley analysis performed by InfoUSA, along with a unique account identifier, city and state of the account, zip code of the account, and gender, language, and religion approximations reached through the Donnelley analysis.  The Donnelley analysis did not link customer name and address to customer account numbers, asset amounts, or other financial data Plaintiffs now seek.

11.     Due to the privacy concerns mentioned above and discussed in additional detail below, Merrill Lynch redacted customer names and addresses from the data produced to Plaintiffs.  Defendant made this required step clear during ongoing communication between the parties, and it was only after these redactions were settled upon that Merrill Lynch even considered producing the Donnelley Data sought by Plaintiffs.  As Plaintiffs acknowledged in their papers, Merrill Lynch even shared a draft of its motion for protective order with Plaintiffs' counsel in an effort to explain the seriousness of its concerns over customer privacy and security of its customer data.

12.     Months following the June 7, 2007 production of the Donnelley Data, Plaintiffs indicated that they intended to file a motion seeking outstanding discovery, including "data [Merrill Lynch] maintains about its clients' racial and ethnic identity, including the data sent to and received from InfoUSA."  See 8/23/07 letter from S. Bish to L. Dray, attached hereto as Ex. 2.  The following day, Defendant sent a reply letter stating in part:

[W]e do not recall having agreed to produce 'all data' sent to and received from InfoUSA. As we recall, *we* discussed our objections to this production in May, including that the production of this data would be so large it would dwarf even the voluminous data files we already have produced and **that we cannot turn over the names and addresses of all our clients**. You had agreed to narrow that request, but we do not recall having received any proposal from you. If your recollection is different, please let us know what you were expecting us to produce. We are available to meet and confer about any of these items. (emphasis added)

<u>See</u> 8/24/07 letter from L. Dray to S. Bish, attached hereto as Ex. 3.

13.     On August 27, 2007, Plaintiffs filed a Motion to Compel Production of Documents, Data, Interrogatory Responses and Identification of Responsive Information ("Discovery Motion"). In the Discovery Motion, Plaintiffs made no mention of customer name or address information, and even more generally, no mention of information transmitted to or from InfoUSA. Merrill Lynch understood that Plaintiffs had concluded that they had no need for customer name and address data, having accomplished their stated objective of obtaining InfoUSA's ethnic approximation data.

14.     Plaintiffs assert without citation to any correspondence among the parties that they were "assured that addresses and names were not relevant to class certification." Merrill Lynch made no such assurance, and disputes Plaintiffs' representation about any such "assurance."

15.     Now, over a year since filing the Discovery Motion, Plaintiffs seek to revisit the issue of customer name and address data. The issue was open and has long since closed, as Plaintiffs could have sought the same materials in their Discovery Motion in the fall of 2007.

16.     Plaintiffs point to this Court's December 20, 2007 order as a basis for asserting that this Court limited Merrill Lynch's ability unilaterally to produce additional data to Plaintiffs during class discovery.  See Motion, at par. 10.  First, Plaintiffs incorrectly describe the Court's order.  In context the Court's order was the product of a settlement of Plaintiffs' motion to extend fact discovery following Defendant's re-production of data previously requested by Plaintiffs.  The order was clearly focused on limiting further re-production of data previously requested by Plaintiffs so as to avoid further extending fact discovery, an objective shared by both parties and the Court.  The order has no bearing whatsoever on the instant matter which relates to documents and data relied upon by Defendant's expert, but not previously pursued by Plaintiffs during fact discovery.

17.     Contrary to Plaintiffs' assertion, the parties and this Court specifically contemplated the possibility that the parties might provide materials to their experts that were not requested in fact discovery, and created a procedure for the parties to request production of those materials along with the expert's report.  See September 11, 2007 Order.  In producing 100-block customer address data to Plaintiffs, this is exactly what Defendant did.

## ARGUMENT

I.      **Plaintiffs Have Established No Legitimate Basis For Requiring The Materials Requested, and The Risk of Harm That Could Result Outweighs Plaintiffs' Interests In Obtaining The Requested Materials**

18.     Plaintiffs state that they seek precise customer name and address information in order to "impeach [Defendant's study] by showing that Merrill Lynch supplied the '100-block' address for its clients but neglected to inform its experts that the

addresses included businesses or business addresses for individuals." See Motion, at par. 8. However, Plaintiffs offer no basis by which one could conclude that obtaining precise customer name and address would enable Plaintiffs to impeach Defendant's study any differently or more effectively than the 100-block address data that Merrill Lynch did provide to Plaintiffs.

19. Indeed, Defendant's study is based solely on data that was either provided to Plaintiffs along with Defendant's expert reports or data that is publicly available. Defendant also provided Plaintiffs with all programming used to reach conclusions that appear in its expert reports. Plaintiffs need nothing more than the same materials and programming utilized by Defendant's experts in order to attempt to impeach Defendant's experts' conclusions. As a preliminary matter, Defendant does not understand, and notes that Plaintiffs do not even attempt to assert, how customer name is in any way relevant to studies which they wish to employ as part of their attempt to impeach Merrill Lynch's experts' conclusions.

20. With respect to customer address data, there are approximately 3.2 million unique account addresses that Merrill Lynch produced to Plaintiffs in the 100-block format. As noted above, the only de-identification performed by Merrill Lynch to the precise address information was broadening the address to reflect the hundred block on which each property is located. Defendant fails to see how Plaintiffs would be better equipped to evaluate the presence of business addresses in the data if provided with precise address information. It is not feasible for Plaintiffs to expect to examine 3.2 million records to determine precisely whether each and every address reflects a business or residential property. Further, if Plaintiffs intend to utilize a random sample of

9

addresses in order to represent the property type of the full set of account addresses, there is no reason that they cannot similarly do so with the 100-block address information.

21.     Irrespective of their lack of need for precise address information, Plaintiffs have asserted no grounds upon which one could conclude that the inclusion of business addresses in Defendant's analysis would in any way undermine the conclusions reached by Merrill Lynch's experts. Hypothetically assuming that some business addresses may have been included in the analysis, these addresses would have been included for both White and African American clients, and for accounts held by both White and African American FAs. If Plaintiffs purport to show that any potential inclusion of business addresses in the data distorts the conclusions reached by Merrill Lynch's experts unfavorably toward African American FAs, Plaintiffs would have to show that: a) Whites tend more often than African Americans to list their business addresses for account statement mailing purposes; and that b) Whites tend more often than African Americans to have business addresses located in more affluent 100-blocks than their residential addresses. If Plaintiffs intend to make such arguments, there is no reason that they cannot do so with the data already provided to them.

22.     Plaintiffs' attempt to impeach Defendant's conclusions would be based on studies conducted by Merrill Lynch's experts – studies which employed the same 100-block addresses already in Plaintiffs' possession. Should Plaintiffs pursue analyses furthering this attempt at impeachment, they should most appropriately do so using the same methodology employed by Defendant's experts. Plaintiffs have ample opportunity to do just this given that they were provided with the data relied upon by Merrill Lynch's experts and have the opportunity to submit rebuttal expert reports as part of the parties'

10

agreed expert discovery schedule. As previously stated, Plaintiffs have not asserted a legitimate basis for which they need precise customer name or address information.

23.     The potential harm that could result from the inadvertent release of non-public Merrill Lynch client information strongly outweighs Plaintiffs' interest in obtaining client names and precise address information. As previously noted in this jurisdiction, "[i]f it is established that confidential information is being sought, the burden is on the party seeking discovery to establish that the information is sufficiently relevant and necessary to his case to outweigh the harm disclosure would cause." Shields Enters., Inc. v. First Chicago Corp., No. 86 C 10213, 1988 LEXIS 14950, *10, (N.D. Ill. Dec. 28, 1988). Disclosure of the Merrill Lynch client list to unauthorized third parties could lead to identification theft or other harm to clients whose information was so exposed and could cause Merrill Lynch material reputation and financial loss. See Affidavit of Robert Coles, attached hereto as Ex. 4.

24.     If Plaintiffs seek to undermine the validity of the actual process employed by Merrill Lynch in order to de-identify precise customer addresses so that they are reflected by a 100-block address, they will have more than sufficient opportunity to do so through the deposition of Dr. Saad, the expert who used the 100-block data. Given the confidentiality and sensitivity of the underlying address information, the potential harm resulting from release of this information to a third party, and the ability for Plaintiffs to test the validity of Defendant's conclusions using the same information relied upon by Merrill Lynch's experts, the interests in protecting the privacy of Merrill Lynch's clients undoubtedly outweighs Plaintiffs' asserted interest in obtaining precise Merrill Lynch customer address information.

11

## II.    **Plaintiffs' Request Is Untimely**

25.    Fact discovery on class certification issues closed on August 27, 2007.  To use this Court's language, "all good things must come to an end, and you're always going to find a reason why you need more and more and more."  <u>See</u> September 6, 2007 transcript.  As discussed above, Plaintiffs cannot now bootstrap their current request for all of Merrill Lynch's customer's names and addresses to their previous request for information transmitted to and from a third party vendor.  Aside from the fact that customer name and addresses were not previously requested, the customer names and addresses provided to InfoUSA consist of a different set of customer names and addresses that Plaintiffs currently seek to obtain, and such names and addresses were not linked to customer account information.

26.    Furthermore, Defendant made Plaintiffs aware that it redacted customer name and address information from the Donnelley Data before production as a result of legal obligations to protect its clients' non-public and private information.  With respect to customer name, Plaintiffs waived their right to seek this information by not responding to Merrill Lynch's August 23, 2007 invitation to do so and through Plaintiffs' silence on this issue in their August 2007 Discovery Motion.  Moreover, Defendant indicated its willingness to meet and confer on this and the customer address issue, and clearly indicated that it remained open to an alternate proposal for production of customer information if Plaintiffs felt that they needed this data in some form.

27.    Merrill Lynch would have been willing to produce a de-identified form of customer address information similar or identical to the format of the 100-block data relied upon by Dr. Saad.  Plaintiffs neglected, however, to offer any proposal or meet and

confer on the issue of customer addresses.  The reason for this is plain.  For strategic

reasons or otherwise, Plaintiffs simply elected no to pursue customer name and address

data during fact discovery.

28.     It is well-established in the Seventh Circuit that information not requested

during class discovery may subsequently be relied upon by an expert witness, so long as

those new materials are produced subsequent to a party serving an expert report and so

long as the other party is not prejudiced.  Orgler Homes, Inc. v. Chicago Reg'l Council of

Carpenters, No. 06 C 50097, 2008 LEXIS 42878, *11 (N.D. Ill., May 30, 2008); see also

Armstrong v. Amstead Indus., Inc., 2004 U.S. Dist. LEXIS 12427, rev'd on other

grounds (N.D. Ill. 2004).  Clearly, Plaintiffs are not prejudiced here since they have

ample time to use the 100-block data provided to them in order to arrive at conclusions in

their rebuttal expert reports.  Moreover, the parties' September 11, 2007 Expert

Discovery Stipulation and Order expressly contemplates that the parties would produce

data along with an expert report that was not requested during class discovery but that an

expert relied upon.

## CONCLUSION

29.     Merrill Lynch respectfully request that the Court deny Plaintiffs' Motion

to Compel.

Dated: December 19, 2008

By:  s/Lori E. Lightfoot
WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)

(212) 310-8007 (Facsimile)

--and--

MAYER BROWN LLP
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of Defendant's Opposition to

Plaintiffs' Motion to Compel was served upon counsel for Plaintiff addressed as follows:


Linda Friedman
Mary Stowell
George Robot
Stowell & Friedman, Ltd.
321 S. Plymouth Court, Suite 1400
Chicago, Illinois 60604

via facsimile and U.S. mail on December 19, 2008.


By:  <u>s/Lori E. Lightfoot</u>