IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE McREYNOLDS, et al.<br>On behalf of themselves and all other similarly situated<br><br>   Plaintiffs<br><br>v.<br><br>MERRILL LYNCH, PIERCE, FENNER & SMITH<br><br>   Defendant | Case No. 05 C 6583<br><br>Judge Robert W. Gettleman<br>Magistrate Judge Morton Denlow |

**OBJECTIONS TO MAGISTRATE JUDGE DENLOW'S ORDER DENYING MOTION TO COMPEL AND/OR MOTION FOR PROTECTIVE ORDER**

     Plaintiffs, George McReynolds, et al., by and through their attorneys, Stowell & Friedman, Ltd., file these Objections to Magistrate Judge Denlow's Order denying their Motion to Compel. Alternatively, Plaintiffs file this Motion for Protective Order. In support thereof, Plaintiffs state as follows:

     1. In 2006, this matter was referred to Magistrate Judge Denlow for discovery, including expert discovery. Over the last two years, the parties have appeared before Magistrate Judge Denlow on many occasions and he has resolved complex issues. Plaintiffs have accepted those rulings and have not filed objections or otherwise asked this Court to reconsider any ruling issued by Magistrate Judge Denlow. However, Plaintiffs file these objections to the December 22, 2008 denial of their Motion to Compel. Alternatively, Plaintiffs seek a protective order from this Court holding that should this matter proceed to Class merits that they have not waived any rights of the Class to respond fully to the experts reports during merits discovery by failing to file and/or prosecute objections to Magistrate Judge Denlow's December 22, 2008 Order.

1

Specifically, as explained below, Plaintiffs ask for an opportunity to respond fully to the defense expert reports during the merits.

2. On December 22, 2008, Plaintiffs appeared before Magistrate Judge Denlow on a Motion to Compel production of a data table Plaintiffs' experts sought in order to refute several expert reports Defendants tendered to Plaintiffs on November 18, 2008. Through a series of expert reports and testimony of its executives, Merrill Lynch advances a class-wide explanation to the undisputed statistically significant higher attrition rate for African American Financial Advisors and the statistically significant compensation disparities. Defendant's executives and now its experts opine that the less favorable outcome for African Americans is not due to systemic discrimination as Plaintiffs allege but instead is the unfortunate result of the race of the Plaintiffs, the race of Merrill Lynch's clients and the demographics of wealth. Plaintiffs strongly believe that nothing speaks more eloquently to the need for a class action than the class-based defense. They believe that the issue of causation is one best left for the merits and that discovery on these expert reports should be deferred pending the outcome of the motion for class certification. However, Defendant confirmed during the December 22, 2008 hearing that it intends to rely on these expert reports on class certification. Plaintiffs file this motion to protect their rights.

3. In a nutshell, Defendant's experts opine: 1) first that Financial Advisors use "social prospecting" as their most effective mechanism for landing clients rather than any other mechanism; 2) that people socialize with others who are the same race—whites socialize with whites and African Americans socialize with African Americans; 3) whites have more money than African Americans; 4) The clients of African American Financial Advisors live in neighborhoods that have a higher representation of African Americans and are consequently less affluent based on home values; 5) That African Americans must cross into the "white community" but have difficulties crossing "cultural barriers." To Defendant this all means that African American Financial Advisors owe their status as former employees or lower earners not to their race but to their race coupled with the demographics of race and wealth. Putting aside Plaintiffs' disdain for this race-laced defense, Plaintiffs seek at this point in the litigation only to debunk Defendant's expert's reports by exposing fundamental flaws in the data and methodology.

4. To support their opinions, Defendant's experts speculated as to the race of Merrill Lynch clients using census data. They also speculated as to the wealth of Merrill Lynch clients using real estate values based on client address within a "100 block." Thus, the address of a client was converted to the "100 block" so that an address such as 219 S. Dearborn would appear in the data as the 200 block of S. Dearborn. Merrill Lynch deleted the name of the clients and actual addresses from the data set before the data set was given to its experts. Thus, all persons in the same "100 block" were deemed to be of the same race or racial composition of the designated area, reside at the same address, own the same real estate and have the same wealth. In other words, the expert assumed homogeneity at the 100 block level.

5. Plaintiffs seek the names of the clients in the experts' study to show that businesses were included in the study and that the actual addresses matter, particularly in cities as densely populated as Chicago and New York. For example, Stowell & Friedman's firm 401(k) account has statements sent to employees at 321 S. Plymouth Court, which is the Chicago Bar Association building. Plaintiffs seek to prove that no one lives at 321 S. Plymouth Court even though the Fisher Building condominiums are in the 300 block of Plymouth Court. Likewise, Plaintiffs seeks to prove that while some people may live in studio apartments at a particular address that the range of real estate values in that building may vary tenfold between studios and penthouses. For example, prices in the new Trump Tower reportedly range from $851,000 to $9,642,000. Further, Plaintiffs also seek to expose the error of including all persons at the same address as owners of the property since all lawyers and staff at Stowell & Friedman would under the defense study be shown as the same race and the same wealth—all presumably owning a piece of the Chicago Bar Association. Finally, even mail addressed to an individual such as Mary Stowell or Linda D. Friedman at their business address would assume that each lived at the Chicago Bar Association rather than in the residential neighborhoods in which they actually reside. This data is necessary to respond quickly and without matching the exorbitant cost of Merrill Lynch's expert study, an investment neither the Plaintiffs nor Stowell & Friedman is capable of matching.[1]

---

[1] One of the defense experts alone charged over $9.9 million for his report. These expert reports are not the sort typically tendered on class certification.

3

6. Plaintiffs sought information similar to this during discovery in anticipation of the "race-based" defense once it surfaced during depositions of Merrill Lynch executives. Plaintiffs learned that Defendant racially profiled its clients by studying names and addresses of the clients. Plaintiffs served a subpoena on the Third Party Vendor who appended race to the client names and addresses and sought production of the data Merrill Lynch produced to the vendor to reach these conclusions. Defendant responded first threatening the Third Party Vendor should it opt to comply with the subpoena and, second, by serving a Draft Motion for Protective Order on Plaintiffs in which it charged that Plaintiffs were on a "fishing expedition" for information that was not relevant. *See* Plaintiffs' Motion to Compel attached hereto as Exhibit A. Plaintiffs reasonably concluded that if Defendants accused them of seeking information that was not relevant or likely to lead to relevant information that Defendant would not engage in racial profiling in its expert reports. Now that Defendant has produced its expert reports, the names and addresses of clients are clearly relevant and should be produced to Plaintiffs.

7. Defendant argues that it cannot produce the data to Plaintiffs because of the privacy interests of its clients. However, Defendant should not be permitted to act as its own consultant by cutting the data and then barring Plaintiffs from testing the cut of the data or the underlying data. Magistrate Judge Denlow ruled that because Plaintiffs would have what Defendants' experts were given that no more is required. Plaintiffs' respectfully disagree with this ruling and assert that the standard is not what Defendant unilaterally chose to give its expert but what is relevant or likely to lead to relevant information and that includes the starting point which was the first cut of the data by Merrill Lynch. Clearly, had Merrill Lynch not performed this step of the analysis, the data would have been produced. Merrill Lynch should not be allowed to evade producing the data by manipulating it prior to tendering it to the experts. While Plaintiffs do agree that without the introduction of this race-based defense that client information is not relevant which is why Plaintiffs acquiesced in withdrawing the Third Party Subpoena for the data, the information is now relevant and necessary to refute the experts' reports. Defendant should not be allowed to study the data but deny Plaintiffs the right to refute the study or test the methodology.

8. Plaintiffs do agree that the data is highly personal which is why Plaintiffs offered to accept the data under the Protective Order, on an attorneys-eyes/experts-eyes only basis or whatever other means Defendant proposed where necessary to protect the privacy interests. Plaintiffs do not agree that a Federal Court Order is insufficient protection and emphasize that Defendant sent the same information to a Third Party Vendor without anything more than a contractual promise of confidentiality. Finally, during the hearing before Magistrate Judge Denlow, Plaintiffs counsel offered a compromise to production for all clients that Defendant produce a sample of client names and addresses for the Plaintiffs. By this Plaintiffs meant that the client names and addresses of the clients who were assigned to Plaintiffs would be produced and nothing more in order to test the data. Obviously, the Plaintiffs already know the names and addresses of their clients and have access to private information about their clients. Defendant and Magistrate Judge Denlow rejected this proposal.

9. Plaintiffs understand that it is unusual for a Court to reconsider a Magistrate Judge's ruling, especially when the requesting party concedes that the Magistrate Judge has conscientiously resolved matters. However, the process for filing objections exists because there are times when a district judge might have ruled differently on important issues. We have not abused the privilege of filing objections and do not lightly file these objections. In the event that the Court declines to reconsider Magistrate Judge Denlow's Order, Plaintiffs ask that the Court issue a Protective Order providing that Defendant preserve the data and further holding that nothing prohibits Plaintiffs from seeking this discovery during Class merits discovery should the Court grant Plaintiffs' motion to certify and to allow Plaintiffs to fully respond to the Defendant's expert reports should Defendants express its intent to rely on these reports during the merits phase.

10. Plaintiffs appreciate the Court's consideration of these Objections and/or request for a Protective Order.

WHEREFORE, Plaintiffs request that the Court grant their Motion to Compel Production of Data and/or grant their Motion for Protective Order.

Respectfully submitted,

**STOWELL & FRIEDMAN, LTD.**

By:

/s/ Linda D. Friedman

Mary Stowell – Attorney No. 02750015
Linda D. Friedman – Attorney No. 06190092
**STOWELL & FRIEDMAN, LTD.**
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888

6