# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| GEORGE McREYNOLDS, et al., Individually and as Class Representatives | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No.: 05-C-6583 |
| v. | ) ) | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, | ) ) ) | Judge Robert W. Gettleman Magistrate Judge Denlow |
| Defendant. | ) ) ) | |

## MERRILL LYNCH'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WILLIAM T. BIELBY, Ph.D.

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

**MAYER BROWN LLP**
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

*Attorneys for Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated*

Dated: May 15, 2009

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT .......................................................................................................................... 2

I.    Dr. Bielby's Opinions Are Not Relevant And Should Be Disregarded............................ 3

    A.    Dr. Bielby Does Not Assert A Pattern And Practice Of Intentional
        Discrimination............................................................................................................. 3

    B.    Dr. Bielby's Reliance On Managerial Discretion Is Not Sufficient To
        Demonstrate Intentional Discrimination.............................................................. 5

    C.    Dr. Bielby's Report Is Not Relevant To Class Certification Because He
        Does Not Address Commonality ........................................................................... 6

II.    Dr. Bielby's Methodology Is Not Scientifically Reliable................................................. 8

    A.    Dr. Bielby's Methodology Does Not Meet the Standards Of His Field ............... 8

        1.    Dr. Bielby's Methods Are Not Able To Be Replicated ........................... 10

        2.    Dr. Bielby Has Failed To Employ The Level Of Intellectual Rigor
            Required Of Social Scientists ................................................................. 12

        3.    Dr. Bielby Relies On Insufficient Facts And Data .................................. 14

        4.    Dr. Bielby Relies On Unsupportive And Self-Limiting Scientific
            Literature.................................................................................................. 17

    B.    Dr. Bielby's Unreliable Methodology Has Been Rejected By Multiple
        Courts..................................................................................................................... 19

CONCLUSION........................................................................................................................ 20

## TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Allison v. McGhan Med. Corp.*, 184 F.3d 1300 (11th Cir. 1999)......................................12

*Arnold v. Cargill, Inc.*, 2006 U.S. Dist. LEXIS 41555 (D. Minn. June 20, 2006)............19

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005)........................................................2

*Braun v. Lorillard, Inc.*, 84 F.3d 230 (7th Cir. 1996)...........................................................8

*Camp v. Lockheed Martin Corp.*, 1998 U.S. Dist. LEXIS 20750
(S.D. Tex. Dec. 29, 1998)......................................................................................................7

*Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999)..................................................13, 19

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir. 1996) ...........................................................9

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)............................................2, 3

*Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090 (E.D. Tenn. 1999)..............13

*EEOC v. Cherry-Burrell Corp.*, 35 F.3d 356 (8th Cir. 1994) ...............................................7

*EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292 (7th Cir. 1991) ...........................4

*EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451 (S.D.N.Y. 2004), *rev'd in
part on other grounds*, 2004 U.S. Dist. LEXIS 12724 (S.D.N.Y. July 8, 2004)...............19

*EEOC v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791 (N.D. Ill. 1999)....................................9

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901 (7th Cir. 2007)........................................2

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ..................................................................13

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977) ...........................................4

*Jackson v. Harvard Univ.*, 721 F. Supp. 1397 (D. Mass. 1989)..........................................7

*Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137 (1999)..................................................8

*LeClercq v. Lockformer Co.*, 2005 U.S. Dist. LEXIS 7602 (N.D. Ill.
Apr. 28, 2005)......................................................................................................................15

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576 (S.D.N.Y. 2007) ......................8

ii

**Page**

*In re Methyl Tertiary Butyl Ether Products Liab. Litig.*, 2008 U.S. Dist.
LEXIS 44216 (S.D.N.Y. June 4, 2008) ........................................................... 12

*Oddi v. Ford Motor Co.*, 234 F.3d 136 (3d Cir. 2000) ...................................... 12

*People Who Care v. Rockford Bd. of Educ., Sch. Dist., No. 205*, 111
F.3d 528 (7th Cir. 1997) .............................................................................. 8, 12

*Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607 (7th Cir. 1993) .................. 13

*Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450 (N.D. Ill. 2009) ........................... 5-6

*In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ...... 13

*Remien v. EMC Corp.*, 2008 WL 597439 (N.D. Ill. Mar. 3, 2008) .................. 2, 9

*Robinson v. Metro-North Commuter R.R.*, 175 F.R.D. 46 (S.D.N.Y. 1997),
*rev'd on other grounds, Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283
(2d Cir. 1999) ............................................................................................ 19-20

*Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 U.S. Dist. LEXIS
15976 (S.D.N.Y. Sept. 15, 2003) ..................................................................... 17

*Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940 (7th Cir. 1997), *cert. denied*,
521 U.S. 1104 (1997) ........................................................................................ 9

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) .................................... 8

*Sperling v. Hoffmann-LaRoche, Inc.*, 924 F. Supp. 1346 (D.N.J. 1996) ........... 5

*Srail v. Village of Lisle*, 249 F.R.D. 544 (N.D. Ill. 2008) .................................. 2

*Tyus v. Urban Search Mgmt.*, 102 F.3d 256 (7th Cir. 1996) .............................. 2

*In re Visa Check/Mastermoney Antitrust Litigation*, 192 F.R.D. 68
(E.D.N.Y. 2000) ................................................................................................ 2

*Viterbo v. Dow Chem. Co.*, 826 F.2d 420 (5th Cir. 1987) *superseded by statute
on other grounds*, Civil Rights Act of 1991, 42 U.S.C. § 2000e-2 ................. 17

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988) .............................. 17

*Wessmann v. Gittens*, 160 F.3d 790 (1st Cir. 1998) .......................................... 8

Page

*Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416 (7th Cir. 2005) ............ 10

## DOCKETED CASES

*Gosho v. United States Bancorp Piper Jaffray, Inc.*, No. C00-1611-PJH,
Doc. No. 427 (N.D. Cal. Oct. 1, 2002) ............................................................................. 19

## FEDERAL STATUTES

Fed. R. Civ. P. 23(a) ................................................................................................................ 6

## PRELIMINARY STATEMENT

Dr. William Bielby's opinions should be disregarded as irrelevant because he admits that he has no opinion as to whether or not the disparities between white and African American Financial Advisors ("FAs") are caused by Merrill Lynch's intentional discrimination.[1] In fact, when examined about the observable sociological phenomena that form the foundation of his opinions – what he terms social isolation, in-group favoritism/out-group bias, and opportunity hoarding – Dr. Bielby concedes that none of the phenomena (i) were caused by a pattern and practice of race discrimination at Merrill Lynch or (ii) impacted African American FAs *because of their race*. As such, his opinions are irrelevant with respect to whether the putative class should be certified in this race discrimination case. Similarly, because Dr. Bielby acknowledges the variability inherent in the operation of these phenomena across all 611 of Merrill Lynch's offices and from FA to FA, Dr. Bielby is unable to opine as to the alleged common experiences of the putative class and thus does not assist in the class certification determination. And, Dr. Bielby admits that he cannot say what is actually going on in any office or what the basis was of any particular managerial decision. The irrelevance of Dr. Bielby's opinions is significant because they are the foundation of Plaintiffs' causation argument – Plaintiffs cite to Dr. Bielby nearly 40 times in their brief in support of class certification.[2]

Putting aside these fatal defects, Dr. Bielby's opinions are premised on nothing more than his own *ipse dixit* and his methodology fails to adhere to scientific standards, rendering his conclusions wholly unreliable. His report offers unscientific speculations as to what causes African American FAs at Merrill Lynch to be less productive than their white colleagues, and falls far short of the "level of intellectual rigor" that is required of any social scientist offering an expert opinion in a litigation, whether at the class certification stage or otherwise.

---

[1] Dr. Bielby did not submit a sworn affidavit setting forth his opinions and testimony. Presumably the opinions and testimony that Dr. Bielby is prepared to present in support of class certification are contained in: (1) his report which was attached as Exhibit 2 to Plaintiffs' Memorandum in Support of Class Certification, dated November 11, 2008 ("Bielby Rep."), attached hereto as Exhibit A; (2) his rebuttal report, dated February 23, 2009 ("Bielby Reb."), attached hereto as Exhibit B hereto; and, (3) at his deposition on March 30, 2009 ("Bielby Dep."), attached in relevant part hereto as Exhibit C.

[2] *See* Plaintiffs' Corrected Memorandum of Law in Support of Motion for Class Certification, dated Nov. 21, 2008, Doc. No. 262 at 3, 4, 12, 15, 19, 21, 22, n. 37, 28, 29, 30, 32, 33, 34, 38, 42, and n. 72.

## ARGUMENT

Dr. Bielby's testimony and opinions fail the admissibility test of Federal Rule of Evidence 702 and the standards established by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, "courts determine whether the expert testimony is both relevant and reliable." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). There are three requirements for admissibility: (1) "the witness must be qualified as an expert by knowledge, skill, experience, training, or education;" (2) "the expert's reasoning or methodology underlying the testimony must be scientifically reliable;" and (3) "the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (citations omitted). These requirements apply equally in the class certification context. *See Srail v. Village of Lisle*, 249 F.R.D. 544, 557, 562 (N.D. Ill. 2008) (addressing admissibility of expert and applying the *Daubert* factors before determining class certification); *Remien v. EMC Corp.*, 2008 WL 597439 (N.D. Ill. Mar. 3, 2008) (granting motion to strike expert testimony at the class certification stage); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005).[3]

Specifically, Dr. Bielby opines that: (i) African American FAs are deprived of opportunities such as teaming and account distributions because of "social isolation" and "opportunity hoarding" (Bielby Rep. ¶¶ 30, 42, 82; Bielby Dep. 80:14-17); (ii) managerial discretion coupled with vague and ambiguous criteria cause African American FAs to be deprived of opportunities to become managers and receive accounts through the account distribution procedures (Bielby Rep. ¶¶ 23, 38, 62); (iii) the existence of Multi-Cultural Marketing documents at Merrill Lynch causes pigeon-holing of African American FAs (Bielby Rep. ¶¶ 46-47); and (iv) Merrill Lynch's diversity programs, offices and initiatives have inadequate accountability and responsibility structures (Bielby Rep. ¶ 87).

As demonstrated here, however, Dr. Bielby's opinions are not relevant to the Court's determination of class certification, and the methodology he employs to reach his conclusions is

---

[3] Unreliable expert reports simply have no place in a court's class certification inquiry. *See, e.g., In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 76 (E.D.N.Y. 2000) ("It cannot be that a court could certify a class . . . on the basis of an expert opinion so flawed that it is inadmissible as a matter of law."). These standards also apply with equal vigor to testimony proffered by social scientists, like Dr. Bielby, in the same way they apply to experts in the hard sciences. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 264 (7th Cir. 1996) (remanding to district court because "the court failed to use anything like the *Daubert* framework in assessing" the expert's testimony).

unreliable. As described below (*infra* Section II), Dr. Bielby's methodology is unreliable for a host of reasons and cannot pass muster, and other courts have previously rejected his expert testimony because of these same methodological deficiencies.

## I.    Dr. Bielby's Opinions Are Not Relevant And Should Be Disregarded

It is well settled that, to be admissible, an expert's testimony must be relevant, *i.e.*, "sufficiently tied to the facts of the case that it will aid the [fact finder] in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir. 1985)).

### A.    Dr. Bielby Does Not Assert A Pattern And Practice Of Intentional Discrimination

Dr. Bielby's opinions as to the cause of the racial disparity in production (and therefore compensation) largely rely on a syllogism that the social isolation of African American FAs (where there is only one African American FA in an office (Bielby Rep. ¶ 16)) causes in-group favoritism and out-group bias (to the detriment of the sole African American FA), which manifests itself in African American FAs being excluded from teams and account distributions by the high producing FAs in the office who are predominantly white (a phenomenon Dr. Bielby calls "opportunity hoarding"). (Bielby Rep. ¶¶ 16, 22-23, 30, 32, 35, 42.) Whether this syllogism actually explains the cause of disparities in FA production generally is subject to debate, but it is irrelevant to this case because Dr. Bielby does not opine that these sociological phenomena are caused by a pattern or practice of race discrimination by Merrill Lynch, or even that African American FAs are impacted because of their race. Specifically, Dr. Bielby does not opine that social isolation is caused by Merrill Lynch, since he does not conclude that Merrill Lynch either did something inappropriate or failed to do something with respect to the representation of African Americans at Merrill Lynch. (*See* Bielby Dep. at 72:18-77:25; 86:10-87:16.)

Likewise, when asked whether opportunity hoarding – where "the dominant group forms tight social networks that have control over resources" (Bielby Rep. ¶ 32) – was the result of a "conscious decision" by white FAs, Dr. Bielby responded that "[i]t's not my opinion that white, successful FAs get in a room and make that decision." (Bielby Dep. at 134:1-6.) Rather, Dr. Bielby opined that successful FAs, who are mostly white, have the "clout" to sustain a system that "provides the greatest rewards to themselves and to resist efforts or resist changes that are

likely to benefit African Americans either objectively at their expense or in a way that is perceived to be at their expense." (Bielby Dep. at 134:6-13.) When pressed, Dr. Bielby also conceded that he has *no opinion* as to whether a team of white FAs would resist having a successful African American FA join the team because of his or her race. (Bielby Dep. at 135:12-23.) Dr. Bielby also opined that "*regardless* of *color*, less successful FAs are … much less likely to be on teams." (Bielby Dep. at 85:9-15) (emphasis added.)

In other words, Dr. Bielby admitted that he could not opine whether the "in-group" was Caucasian FAs and the "out-group" African American FAs such that race was the "categorical" boundary separating the in- and out-groups, or whether success, not race, was the boundary such that the mechanism at work within Merrill Lynch was not a system of Caucasians excluding African Americans from limited opportunities, but instead successful FAs excluding unsuccessful FAs from those opportunities regardless of their race. Dr. Bielby even admits that the "success breeds success" or cumulative advantage system, of which he is so critical, is not inherently discriminatory. (Bielby Rep. ¶ 18 ("A cumulative advantage system is not inherently discriminatory, so long as disparities are attributable to individual differences in productivity that have not emerged as a result of differential, discriminatory treatment by the organization."))

Therefore, Dr. Bielby is not able to opine that Merrill Lynch engages in a pattern-and-practice of intentional discrimination against African American FAs or that Merrill Lynch policies impact African Americans because of their race. Of course, the relevant issue in a pattern-or-practice discrimination claim is that a plaintiff must prove intent, that is, intentional discrimination by the employer. *See EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 298 (7th Cir. 1991) ("The central inquiry…is an evaluation of the intent of the employer."). Plaintiffs must establish "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts;" rather, they must establish that racial discrimination was the defendant's "standard operating procedure the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Dr. Bielby fails to offer any opinion that Merrill Lynch acted with the requisite intent to discriminate against African American FAs as its standard operating procedure.

**B.** **Dr. Bielby's Reliance On Managerial Discretion Is Not Sufficient To Demonstrate Intentional Discrimination**

In the absence of any evidence of a companywide policy of intentional discrimination, Dr. Bielby opines that because Merrill Lynch gives managers discretion in allocating resources among FAs, it creates a framework in which managers will use that discretion "in a way that disadvantages African Americans." (Bielby Dep. at 101:2-15.) Dr. Bielby opines that to the extent decision-makers at Merrill Lynch have substantial discretion and the criteria used to make decisions are vague and ambiguous, managers are more likely to rely on stereotypes and display out-group bias to the detriment of African American FAs, thus depriving African Americans of opportunities such as receiving distributed accounts and selection for management. (Bielby Rep. ¶¶ 23, 38, 42, 62.)[4] However, Dr. Bielby's methodology did not enable him to identify a single incident of racial bias or stereotyping at Merrill Lynch. As he testified: "I have not made any effort to ascertain what factors are in play in any given decision regarding the assignment of an account or allocation of a resource and so on." (Bielby Dep. at 128:1-4.)

In deciding summary judgment on a pattern-or-practice claim, the court in *Sperling v. Hoffmann-LaRoche, Inc.*, 924 F. Supp. 1346 (D.N.J. 1996), rejected as a matter of law the relevance of a causation theory similar to that offered by Dr. Bielby here. In that case, the plaintiff claimed that defendant's practice of giving managers "a great deal of discretion in determining who would be terminated . . . *happened to result in* both conscious and unconscious discrimination against Roche's older workers." *Id.* at 1361 (emphasis added). In rejecting that claim, the court reasoned:

> [A] decision by a company to give managers the discretion to make employment decisions, and the subsequent exercise of that discretion by some managers in a discriminatory manner, is not tantamount to a decision by a company to pursue a systematic, companywide policy of intentional discrimination, i.e., a pattern or practice of discrimination. Rather, the exercise by some managers of their discretion to discriminate would constitute "the mere occurrence of isolated or 'accidental' of [sic] sporadic discriminatory acts," which is not a pattern or practice of discrimination.

*Id.* at 1363-64 (quoting *Teamsters*, 431 U.S. at 336); *see also Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450, 468 (N.D. Ill. 2009) (finding expert report of plaintiffs' organizational sociologist

---

[4] While Dr. Bielby appears to de-emphasize this line of argument (*see* Bielby Dep. at 128:5-10), he never fully disentangles his opinions from his reliance on bias and stereotyping. *See also infra* Section I.C.

unpersuasive on the issue of commonality because of her reliance on "laboratory studies, 'experimental research,' and various historical trends and ideas which lead her to the conclusion that subjective decisionmaking is inherently flawed: a conclusion that flies in the face of the governing case law") (citing *Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005) (holding that subjective decision making plays an important and legitimate role in employment decisions)).

### C. Dr. Bielby's Report Is Not Relevant To Class Certification Because He Does Not Address Commonality

Dr. Bielby's report is offered by plaintiffs in support of their Motion for Class Certification. Pursuant to Federal Rule of Civil Procedure 23, plaintiffs must demonstrate that, among other things, there are common questions of law or fact in order for a class to be certified. Fed. R. Civ. P. 23(a). But, Dr. Bielby's report does not even attempt to establish whether African Americans FAs at Merrill Lynch, who are spread throughout approximately one hundred offices nationwide and who report to hundreds of different managers, have common experiences and thus does not assist in the class certification determination. When asked why he did not rely on the depositions of the named plaintiffs, Dr. Bielby stated that he was not "trying to determine whether the perceptions of a small number of people are common to one another . . . it's generally reasonable to assume that they're not a representative sample of people in the protected group." (Bielby Dep. at 41:13-42:6.)

Rather, having failed to tie any of the sociological phenomena he identified to a policy of intentional discrimination, Dr. Bielby reverts to asserting that stereotyping is the cause of the racial disparities at Merrill Lynch. Specifically, when asked about categorical boundaries with regard to opportunity hoarding, Dr. Bielby responded: "Well, it's success versus lack of success – I suppose this is someplace where stereotyping does come in." (Bielby Dep. at 134:14-19.)

Dr. Bielby conceded, however, that studies in this area demonstrate that a distribution/ gradation exists for implicit bias such that some people have high measures of implicit bias, while others have low measures, and indeed some measure no implicit bias at all. (Bielby Dep. at 168:23-170:11.) He admitted that there was no reason to believe that the distribution of implicit bias measures for Merrill Lynch's managers would be different than those measures for society as a whole. (Bielby Dep. at 170:12-15.) Dr. Bielby also acknowledged that the amount of individuating information (information about a specific individual) a decision-maker has can impact the operation of stereotypes, and that, "generally implicit bias expresses itself when

there's less individuating information than more." (Bielby Dep. at 173:10-174:2; 181:24-183:4.) In other words, Dr. Bielby conceded that individual managers would vary in the degree to which their decisions were affected by stereotypes, with some not being affected at all, and that to the extent individuating information was available, such implicit bias was less likely to express itself. Clearly, a manager who has hired an African American FA and managed him or her for some period of time has a significant amount of individuating information pertaining to that FA.[5]

When questioned as to how the alleged stereotypes and implicit bias held by Merrill Lynch managers impact African American FAs, Dr. Bielby's responses highlighted the variability of experiences of the putative class members. Dr. Bielby conceded that key decisions related to the alleged discriminatory conduct occur at the local level by individual managers (Bielby Dep. at 99:13-19; 100:15-101:1), that the level of discretion varied from office to office (Bielby Dep. at 101:24-25), and that his methodology does not provide a way of assessing any specific decisions (Bielby Dep. at 136:1-137:3). For example, Dr. Bielby acknowledged that teaming decisions occurred at the local level and that it was the individual local managers who had the discretion to depart from the account distribution policy (Bielby Dep. at 81:14-17; 96:25-97:4) and to determine which account distribution method to utilize (Bielby Dep. at 99:7-11).

At bottom, Dr. Bielby has no evidence of widespread race stereotyping and in-group favoritism by Merrill Lynch managers, and his own admissions demonstrate that any such stereotyping or bias would vary considerably among the managers in Merrill Lynch's numerous offices.[6] In light of this variation, Dr. Bielby's opinion does not address commonality amongst

---

[5] Not surprisingly, courts have specifically held that subconscious attitudes or acts cannot serve as a proxy for proof of intentional discrimination. In striking expert testimony that "unconscious age stereotyping" potentially influenced the employer's personnel decisions, one court explained that this opinion "while perhaps of considerable interest to psychologists and sociologists, is not relevant to the issue whether [the employer] *intentionally* discriminated against [plaintiff] because of his age." *Camp v. Lockheed Martin Corp.*, 1998 U.S. Dist. LEXIS 20750, at *9 (S.D. Tex. Dec. 29, 1998) (emphasis added); *see also EEOC v. Cherry-Burrell Corp.*, 35 F.3d 356, 363 (8th Cir. 1994) (a violation of Title VII "requires a finding of intentional misconduct, not subconscious unlawful action."); *Jackson v. Harvard Univ.*, 721 F. Supp. 1397, 1432-1433 (D. Mass. 1989) ("Disparate treatment analysis is concerned with intentional discrimination, not subconscious attitudes" and was not designed to "police" such "subconscious stereotypes and prejudices.") (citation omitted).

[6] *See also infra* Section II.A.2.a. Dr. Saad compared account distributions under the existing Merrill Lynch system (which allows some managerial discretion) with how accounts would have been distributed in the absence of any manager discretion, and found that the exercise of discretion helped African American FAs such that they received <u>more</u> than they would have received under a strict operation of the

the putative class members and is therefore irrelevant to the Court's class certification determination.

**II.      Dr. Bielby's Methodology Is Not Scientifically Reliable**

Not only are Dr. Bielby's opinions of no moment in assisting this Court at the class certification stage of a race discrimination case, they are also the product of a methodology that is neither scientific nor reliable. The *Daubert* inquiry exists in large part to prevent "the hiring of reputable scientists, impressively credentialed, to testify for a fee to propositions that they have not arrived at through the methods that they use when they are doing their regular professional work rather than being paid to give an opinion helpful to one side in a lawsuit." *Braun v. Lorillard, Inc.*, 84 F.3d 230, 235 (7th Cir. 1996). Therefore, the "[Daubert] test requires . . . that the methods used by the expert to derive his opinion satisfy the standards for scientific methodology that his profession would require of his out-of-court research." *People Who Care v. Rockford Bd. of Educ., Sch. Dist., No. 205*, 111 F.3d 528, 537 (7th Cir. 1997). The unscientific methodology employed by Dr. Bielby in this case should be rejected as unreliable just as it has been by other courts that have stricken his expert testimony because of the same methodological deficiencies.

**A.      Dr. Bielby's Methodology Does Not Meet the Standards Of His Own Field**

Scientific methodology requires that a scientist follow specific steps in order for his or her findings to be considered valid. Courts are required to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd., v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Smith v. Ford Motor Co.*, 215 F.3d 713, 718-719 (7th Cir. 2000); *Wessmann v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998) ("When scientists (including social scientists) testify in court, they must bring the same intellectual rigor to the task that is required of them in other professional settings."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 576, 648 (S.D.N.Y. 2007) (stating that an expert's methodology must be "sufficiently close to the generally accepted methods in the field" so as to

---

non-discretionary criteria. (*See* Exhibit D, Affidavit of Dr. Ali Saad, dated May 12, 2009, attaching Expert Report of Dr. Ali Saad, dated Nov. 14, 2008 ("Saad Rep.") at 40, Ex. 25.)

provide reliable conclusions).[7] In assessing reliability under *Daubert*, the court "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (citation omitted).

At his deposition, Dr. Bielby recognized the Code of Ethics of the American Sociological Association (American Sociological Association, *Code of Ethics and Policies and Procedures of the ASA Committee on Professional Ethics*, 1999 ("ASA Code of Ethics"), attached hereto as Exhibit E) as articulating standards that sociologists, like him, must follow in reaching scientific conclusions. (Bielby Dep. at 8:9-9:16.) Dr. Bielby is familiar with such mandates, as he was the President of the ASA from 2002-2003. (Bielby Dep. at 8:3-5.) Dr. Bielby also recognized *Approaches to Social Research* by Royce A. Singleton, Jr. and Bruce C. Straits[8] (the "Singelton text") as "a reliable authority on the issue of methodology and sociology" and admitted that it was a book he used in teaching a course on research methodology. (Bielby Dep. at 9:17-10:6.) Dr. Bielby confirmed that his appearance in this case is as a scientist, not as an advocate (Bielby Dep. at 7:18-24), and that, the standards outlined in the ASA Code of Ethics are applicable to his work as an expert for the plaintiffs here. (Bielby Dep. at 9:13-16.) Dr. Bielby's methodology, however, fails to meet the standards of the ASA or the Singleton text and, as such, his opinions are not reliable.

Dr. Bielby's purported methodology was to search for documents that describe Merrill Lynch practices and polices that have "distinctive features," which he claims social science literature "shows to be factors that create and sustain bias." (Bielby Rep. ¶ 8.) However, not only is Dr. Bielby's methodology inconsistent with what is required by the ASA Code of Ethics and the Singleton text, but also, according to Harvard sociologist, Dr. Christopher Winship, who

---

[7] *See also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997), *cert. denied*, 521 U.S. 1104 (1997) ("*Daubert* ... requires the district judge to satisfy himself that the expert is being as careful as he would be in his regular professional work outside of his paid litigation consulting."); *Remien v. EMC Corp.*, 2008 WL 597439 at *3 (striking expert report where there was "no question . . . that the methods he employed and the studies he made were, indeed, oriented to results the Plaintiffs sought" and [t]here was an abandonment of the principles of [the expert's] discipline and intellectual independence necessary to the predication of a minimum level of reliability on his opinions and findings"); *EEOC v. Rockwell Int'l Corp.*, 60 F. Supp. 2d 791, 795-97 (N.D. Ill. 1999) (testimony excluded where expert did not review full range of information or follow the methodology that he would have reviewed in his regular professional work).

[8] Royce A. Singleton, Jr. and Bruce C. Straits, *Approaches to Social Research* (4th ed. 2005).

is a prominent and well-respected scholar and sociologist (Bielby Dep. at 22:12-15), Dr. Bielby's opinion and purported methodology are inconsistent with the scientific method and generally accepted standards in the social sciences. (*See* Exhibit F, Affidavit of Dr. Christopher Winship, dated May 12, 2009, attaching Expert Report of Dr. Christopher Winship, dated Nov. 14, 2008 ("Winship Rep.") at 10.)

Specifically, Dr. Bielby's opinions are unreliable because: (1) his methodology cannot be replicated by another scientist since he relied on unidentified search terms to select Merrill Lynch documents and it is not transparent as to how he evaluated these documents; (2) he offers unqualified speculative conclusions as fact and provides no means of testing his hypotheses; (3) he failed to consider alternative explanations for the racial disparities; (4) he relied on insufficient facts and data since he ignored the plaintiffs' depositions and other non-confirmatory information; and (5) he cites to social science research that expressly limits these studies to the specific settings studied and cautions against extrapolating to other contexts (*e.g.*, different jobs, industries, etc.) without explaining how this research can be reliably applied here.

## 1.    Dr. Bielby's Methods Are Not Able To Be Replicated

It is well settled that to be reliable, "[a]n expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result." *Zenith Electronics Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005). Likewise, the ASA Code of Ethics articulates the importance of other scientists being able to replicate a study: "Consistent with the spirit of full disclosure of methods and analyses, once findings are publicly disseminated, sociologists permit their open assessment and verification by other responsible researchers." Section 13.04(e). Yet, despite Dr. Bielby's admission that replicability is an "important reason" for setting out a methodology section in a report and is "an important part of science" (Bielby Dep. at 19:3-21), Dr. Bielby offered an opinion in this case that would be impossible for another scientist to replicate.

With respect to documents that Dr. Bielby reviewed to determine which practices and policies of Merrill Lynch have "distinctive features" (Bielby Rep. ¶ 8), Dr. Bielby states that "for every topic I addressed in my report I was able to (and did) search through the entire database of documents with the Concordance Database (e.g. on terms such as 'office of diversity,' 'multicultural marketing,' 'account transfers,' etc. and with Boolean operators applied to

combinations of terms), as well as the entire database of depositions, to get a full and balanced view of what appears in the evidentiary record." (Bielby Reb. at 40.) But Dr. Bielby failed to provide a list of the search terms he used or explain how those terms were selected.[9] Dr. Bielby acknowledges the shortcomings in his own report:

> Q: So there's no way to replicate what those searches are; correct?
> A: No. I did thousands of searches.

(Bielby Dep. at 45:15-17.) Dr. Bielby's lack of transparency with regard to his search terms renders his report unreliable because he provides no means of evaluating how thorough and balanced his searches actually were, how he chose search terms, what the searches revealed, and whether he systematically analyzed the products of the searches. Tellingly, Dr. Bielby acknowledged that "had I been submitting this to the American Sociological Review, I probably would have had a methodology section and long description about the inductive approach .... That's not something I do when I'm opining in a litigation context." (Bielby Dep. at 50:12-17.)

Dr. Bielby also relied on several sources that were not even cited in his report. For instance, when questioned at his deposition about how he reached conclusions related to the backgrounds of African American FAs, Dr. Bielby stated that certain Financial Industry Regulatory Authority ("FINRA") Reports had "informed [his] knowledge that not all African American FAs came from modest social backgrounds." (Bielby Dep. at 35:5-21.) Dr. Bielby, however, acknowledged that he did not cite the FINRA reports in his expert report, nor did he list them in his appendix identifying the materials on which he relied, and that any scientists seeking to judge the validity of his report would not have been able to consider these materials. (*Id.*) Dr. Bielby even concedes that his report does not give readers a basis for knowing which documents he did or did not rely on. (Bielby Dep. at 51:7-12.)

Most significantly, Dr. Bielby fails to provide sufficient information with regard to the methodology he used to evaluate those documents he found and the policies described therein. Dr. Bielby does not define "distinctive features" nor does he define what "factors create and sustain bias." (Bielby Rep. ¶ 8.) While Dr. Bielby opines that allowing decision-makers

---

[9] Plaintiffs' counsel asserted at Dr. Bielby's deposition that questions regarding Dr. Bielby's use of non-disclosed search terms were barred by the parties' stipulation limiting the scope of expert discovery. (Bielby at 43:12-45:23). The stipulation, however, plainly does not exempt from discovery materials or information "relied upon" by the experts which would be necessary to determine whether the expert's opinion is scientifically reliable. *See* Stipulation and Order, dated Sept. 11, 2007, Doc. No. 175 at ¶ 3.

discretion may lead to stereotyping (Bielby Rep. ¶ 23), he provides no means of measuring or evaluating discretion such that one could compare two policies to determine which one allowed for greater discretion. Thus, there is no way of knowing what criteria Dr. Bielby used to evaluate policies, nor any way of verifying that he consistently applied the same criteria. Because Dr. Bielby is not bound by any objective measure of discretion, he is able to "move the goalposts" ex post based on his own subjective impressions as needed to fit plaintiffs' theory of the case.

Dr. Bielby could have conducted a content analysis, which involves developing "systemic and objective criteria for transforming written text into highly reliable quantitative data" (Singleton at 371), which would have allowed another scientist to evaluate and replicate his evaluation of Merrill Lynch's policies, but instead, he asks the Court to simply rely on his own say-so. Dr. Bielby's lack of transparency renders his report unreliable. *See In re Methyl Tertiary Butyl Ether Products Liab. Litig.*, 2008 U.S. Dist. LEXIS 44216, at *13 (S.D.N.Y. June 4, 2008) ("One cannot assess the reliability of reasoning or methodology that is unexplained.") (quoting *Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999).

In sum, Dr. Bielby simply does not provide sufficient information to allow another scientist to understand or evaluate his methodology. Such a deficiency is antithetical to the scientific method and makes it impossible for another scientist to replicate his methodology.

### 2. Dr. Bielby Has Failed To Employ The Level Of Intellectual Rigor Required Of Social Scientists

Dr. Bielby does not apply the same rigor to his expert report as he would to his regular work as a sociologist, rendering his report and opinion unreliable and speculative. *See, e.g., People Who Care*, 111 F.3d at 537. Specifically, Dr. Bielby fails to test his hypotheses or even articulate tests that could be run to support his theories, nor does he properly qualify or limit his conclusions in light of this lack of testing. Rather, Dr. Bielby essentially makes up "findings" and reports these constructions to be facts arising from data he has purportedly analyzed.

A hypothesis must be tested to be admitted into evidence. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000) (excluding expert testimony as unreliable where not tested: "[expert] testified that he never tested either hypothesis. Consequently, he has not satisfied the first of the *Daubert* factors.").[10] According to Dr. Winship, a scientist must ask if "the data they

---

[10] *See also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1319 (11th Cir. 1999) (rejecting expert opinion as unreliable where it had not been tested: "[w]hile [expert's] theories may be proven in the future, and

have collected [is] likely to disconfirm their hypotheses if those hypotheses are in fact false." (Winship Rep. at 5.) Instead, Dr. Bielby simply asserts as true a series of hypotheses without providing any empirical support, even where such data was available to be tested. Such hypotheses without data are nothing more than speculations and as such are not scientific. (Winship Rep. at 11.) As the Singleton text notes, without "objective testability" of hypotheses describing a causal relationship, "it is impossible to tell if one event has caused the other; [and] such post hoc generalizations thus give us a false sense of understanding." Singleton at 20-21. Likewise, the ASA Code of Ethics requires that "[s]ociologists take particular care to state all relevant qualifications on the findings and interpretation of their research." Section 13.04(d). Dr. Winship found it particularly disingenuous for Dr. Bielby to not only fail to test his hypotheses or indicate why certain testing would have been impossible, but also to then offer these speculations as fact without making it clear to the reader that he is offering conjectures. (Winship Dep. at 217:9-24, attached in relevant part hereto as Exhibit G.)

Dr. Bielby hypothesizes about what is "likely to have created disparities by race." (Bielby Reb. at 38.) However, without any testing or objective analysis, these hypotheses are nothing more than inadmissible "subjective belief or unsupported speculation." *See Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999) (citation omitted); *see also Porter v. Whitehall Laboratories, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993) (affirming the trial court's exclusion of expert testimony where the record showed that the expert "admitted that he could not state to a reasonable degree of scientific certainty" what caused the injury); *In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004) ("musings as to defendant's motivations . . . would not be admissible if given by any witness – lay or expert") (citations omitted). In the absence of empirical evidence, these hypotheses are pure speculation and therefore should be inadmissible as unreliable. Dr. Bielby's report, based on nothing more than his *ipse dixit*, is exactly the type of expert opinion that has been rejected as unscientific and unreliable. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to [the facts of the case] only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the [facts of the case] and the opinion proffered.").

---

although he has strong beliefs ... we find that his testimony is based more on personal opinion than on scientific knowledge"); *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1127 (E.D. Tenn. 1999) (failure to test a hypothesis is an "extremely negative" factor under *Daubert*).

In fact, Dr. Bielby ignored data that was available to test many of his hypotheses. (Winship Rep. at 15.) Merrill Lynch's expert Dr. Ali Saad, tested these hypotheses and found empirical results that contradict Dr. Bielby's conjectures. (Saad Rep. at 70-74; Winship Rep. at 15-18.) For example, Dr. Bielby criticizes Merrill Lynch's Account Distribution Program for the discretion it allows managers in the distribution of accounts, and opined that managers would exercise this discretion "in a way that disadvantages African Americans." Bielby Dep. at 101:4-15. Dr. Saad compared account distributions under the existing Merrill Lynch system (which allows for some managerial discretion) with how accounts would have been distributed in the absence of manager discretion, and found that the exercise of discretion actually helped African American FAs such that they received more than they would have received under a strict operation of the criteria. (Saad Rep. at 40; Ex. 25.) Significantly, Dr. Bielby conceded that if one were to find that a strict application of the non-discretionary account distribution criteria would have resulted in African Americans receiving less, he would conclude that the "exercised discretion was not disadvantageous to African Americans." (Bielby Dep. at 105:20-25.) Dr. Bielby's failure to take this empirical evidence into consideration renders his opinion utterly unreliable, speculative, and inadmissible.

Furthermore, Dr. Bielby fails to even articulate tests that could be developed in order to test his hypotheses, despite admitting their availability. (Bielby Dep. at 27:8-11 ("With appropriate data, one could possibly fashion . . . a valid test").)[11] He also admitted that there are ways to measure stereotyping versus implicit bias and how often a person will act in a discriminatory manner. (Bielby Dep. at 165:6-21, 171:9-172:5.) However, Dr. Bielby made no mention of these potential tests in his report. Instead, he stated his speculations as scientifically valid opinions without qualifying those opinions as untested and without any quantitative analyses or support.

### 3.    Dr. Bielby Relies On Insufficient Facts And Data

The ASA establishes clear standards for social scientists conducting research: "In presenting their work, sociologists report their findings fully and do not omit relevant data. They report results whether they support or contradict the expected outcomes." ASA Code of Ethics at

---

[11] While Dr. Bielby may prefer the phrase "evaluating whether my assertions are appropriate," rather than "testing hypotheses" (Bielby Dep. 24:11-13), the end result remains the same: there is no way of knowing whether an assertion or a hypothesis is true without testing or evaluating its validity.

Section 13.04(c). Contrary to these standards, Dr. Bielby cherry-picked snippets of documents and deposition testimony from the voluminous litigation materials and presented them in a misleading, out-of-context fashion. It is clear that Dr. Bielby looked at the available materials with the intention of simply finding data to support his conclusions, rather than objectively analyzing the data as is required by the ASA Code of Ethics. For example, Dr. Bielby cites only a single line from one deposition to conclude that "African American FAs needed to possess unique talents not identified as success factors for non-African American FAs" (Bielby Rep. ¶ 54 (citing Barry Dep. at 293)). However, even a cursory review of the context of the cited testimony reveals that the deponent, Subha Barry, was discussing success factors applicable to all FAs, not just diverse FAs (*see* Barry Dep. at 298-99, attached in relevant part hereto as Exhibit H), which Dr. Bielby acknowledged at his deposition. (Bielby Dep. at 151:18-152:4.)

Tellingly, Dr. Bielby testified that although he reviewed the named plaintiffs' depositions, he chose not to rely on them. (Bielby Dep. at 33:13-21.)[12] He admits, however, that if African Americans typically reported that their managers were supportive of them, this "evidence would have to be taken into account in terms of any conclusions [he has] drawn about management support." (Bielby Dep. at 185:21-186:7.) In fact, the depositions of the named plaintiffs, who purport to be typical of the absent class members, contain these very facts. For example, Plaintiff Jennifer Madrid stated that Jim Porz, her manager, was a supporter of and did not discriminate against her (Madrid Dep. at 92-93; attached in relevant part hereto as Exhibit I); that "Porz was unbelievably supportive of [her]." (*Id.* at 359:5-6.) Plaintiff Stephen Smartt testified that he thought his manager was "a good manager in a sense that so far to date he has been supportive of what" Mr. Smart was "looking to do" (Smartt Dep. at 125:11-13; attached in relevant part hereto as Exhibit J). And Plaintiff Marva York testified that her manager in Newark served as a mentor. (York Dep. at 82:6-10; attached in relevant part hereto as Exhibit K). But Dr. Bielby chose to ignore this non-confirmatory evidence which, as he concedes, if considered, could have changed his conclusions. Such blatant cherry-picking renders Dr. Bielby's opinion unreliable and inadmissible. *See LeClercq v. Lockformer Co.*, 2005 U.S. Dist. LEXIS 7602, at *13-14 (N.D. Ill. Apr. 28, 2005) (barring expert testimony where expert ignored

---

[12] Dr. Bielby also decided not to interview any FAs at Merrill Lynch, including the named plaintiffs or any other African American FA represented by plaintiffs' counsel. (Bielby Dep. 39:10-20.)

"obvious and uncontested facts" and "failed to consider other documented sources of [groundwater] contamination").

Equally problematic, is Dr. Bielby's admission that he has "not done a systemic analysis," but rather relied only on "anecdotal materials" (Bielby Rep. ¶ 21), a manifestly unscientific methodology, in concluding that African American FAs at Merrill Lynch "attended prestigious colleges and universities, had prior experience in professional careers before joining the firm, and come from relatively advantaged family backgrounds." (*Id.*) According to Dr. Bielby's report, he draws these conclusions only from the profiles of FAs listed in the African American FA Yearbook – which fewer than half of the African American FAs participated in and whose entries did not always provide information about the schools the FAs attended or the prior positions that they held, which, according to Dr. Bielby, are the two key factors for assessing social networks. (Bielby Dep. at 30:6-33:12; 35:5-8.) And, only two of the yearbook entries contain information about household income or occupation of parents, the two factors Dr. Bielby cites as essential for evaluating family background. (Bielby Dep. at 36:21-37:11; 55:20-56:5.)

Likewise, Dr. Bielby's conclusions regarding the impact of efforts by the Multi-Cultural Marketing Group ("MMG") and his opinions of Merrill Lynch's diversity programs are the product of Dr. Bielby's cherry-picking system, looking at only a handful of documents and drawing broad and conclusory assessments without any consideration for their context. Specifically, Dr. Bielby concludes that the MMG documents resulted in "pigeon-holing" of African American FAs (to prospect in less wealthy diverse communities) based on the fact that the person selected to head each of the multi-cultural networking groups was a Merrill Lynch employee of that same race or culture. (Bielby Rep. ¶¶ 47-48.) But, Dr. Bielby draws this conclusion without having spoken to a single African American FA; without reviewing the books of business of any African American FA; and without relying on the deposition testimony of the named plaintiffs – all sources that falsify his opinion. (*See, e.g.*, Deposition of Frankie Ross, May 17, 2007 at 217:11-229:13 (discussing diverse ethnicities of top ten clients), attached in relevant part hereto as Exhibit L); Deposition of Leroy Brown, May 30, 2007 at 180:3-203:18

(same), attached in relevant part hereto as Exhibit M; Deposition of Carnell Moore, June 5, 2007 at 118:16-136:18 (same) attached in relevant part hereto as Exhibit N.)[13]

Similarly, Dr. Bielby opines that "all" of Merrill Lynch's diversity programs "were implemented in a context of ambiguous, unstable, and diffuse structures of responsibility and authority." (Bielby Rep. ¶ 67.) In support of this opinion, Dr. Bielby implies that there was confusion amongst Merrill Lynch executives, Kim Pillar, Subha Barry and Mac Gardner, as to who had responsibility for diversity at Global Private Client. (Bielby Rep. ¶ 70.) In actuality, however, each of these executives testified in exactly the same manner: that the business had responsibility for diversity with assistance from HR. (*See* Bielby Rep. ¶¶ 70-71, 75 (citing Barry Dep. at 151-152, 154, 160-161, 248-251; Gardner Dep. at 208-09; Pillar Dep. at 52, 53, 214, 217, attached in relevant part hereto as Exhibits H, O, and P).)

Courts routinely grant motions to exclude expert reports that are based on flawed or incomplete data, as is the case here. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996-97 (1988), *superseded by statute on other grounds*, Civil Rights Act of 1991, 42 U.S.C. § 2000e-2, (citing incomplete data sets as an example of unreliable statistical evidence); *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 423-24 (5th Cir. 1987) (excluding expert opinion based on incomplete data); *Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2003 U.S. Dist. LEXIS 15976, at *15 (S.D.N.Y. Sept. 15, 2003) ("'an analysis is only as good as the data upon which it rests[,]' and 'it is important to verify the accuracy of the data collection'") (quoting Federal Judicial Center Reference Manual on Scientific Evidence, 90 (2d ed. 2000)). Accordingly, the Court should disregard and exclude Dr. Bielby's report because he fails to rely on sufficient data and facts and ignores non-confirmatory information.

### 4. Dr. Bielby Relies On Unsupportive And Self-Limiting Scientific Literature

Dr. Bielby also fails to present a fair and unbiased summary of general social scientific findings about the types of practices and policies that research "shows to be factors that create and sustain bias." (Bielby Rep. ¶ 8.) Dr. Bielby's analysis is both unreliable and unscientific

---

[13] Dr. Saad also tested Dr. Bielby's speculation that the MMG documents negatively impacted African Americans by promulgating stereotypes. Bielby Rep. ¶¶ 44-55. Dr. Saad found that there was no meaningful change in pooling or hiring rates of African Americans before and after the distribution of MMG materials that Dr. Bielby cites. *See* Saad Rep. at 72; Exhibit 67. This study is not contradicted by plaintiffs.

because he fails to describe how research that on its face either does not support the proposition for which it is cited or contains self-limiting language is germane to his opinions. (Winship Rep. at 8-9 (noting that many of the articles cited in footnotes 22 and 23 of Dr. Bielby's report are unsupportive of or irrelevant to the assertions proffered by Dr. Bielby).)

In Footnote 22 of his expert report, Dr. Bielby string-cites numerous articles for the proposition that stereotypes and out-group bias are likely to affect decisions when criteria are vague and ambiguous and when decision-makers have substantial discretion about which criteria to use and how to weigh them. (Bielby Rep. ¶ 23 n.22.) However, many of these studies include explicit limitations on their results that Dr. Bielby fails to mention or address. For example, Dr. Bielby cites an article called "The Impact of Race on Managers' Experiences of Developmental Relationships (Mentoring and Sponsorship): An Intra-Organizational Study,"[14] in which the author states that a limitation of the survey is "its potential lack of generalizability" *Id.* at 489. and proposes that further research "must be expanded to other organizational settings, especially those that differ in form from industrial, hierarchal organizations." *Id.* at 490. Likewise, in another article cited by Dr. Bielby, "Race-Related Differences in Promotions and Support: Underlying Effects of Human and Social Capital,"[15] the author noted that the findings may not be applicable to organizations in other industries and with different structures: "I cannot be sure whether similar patterns of results would be found in organizations that differ in their demographic and structural composition." *Id.* at 505. The study focused on middle managers with staff or line jobs in a traditional hierarchal organization.

Additionally, many of the studies about race relations that Dr. Bielby cites are more than 20 years old.[16] Given the significant changes that have occurred in racial attitudes in the United

---

[14] David A. Thomas, *The Impact of Race on Managers' Experiences of Developmental Relationships (Mentoring and Sponsorship): An Intra-Organizational Study*, Journal of Organizational Behavior, Vol. 11, 1990.

[15] Erika H. James, *Race-Related Differences in Promotions and Support: Underlying Effects of Human and Social Capital*, Organization Science, Vol. 11, 2000.

[16] *See, e.g.*, Thomas, *supra*, n. 13 (study done before 1987 examining influence of race on protégé's experiences of developmental relationships in a very "pyramidal" utilities company); Regina Nixon, *Black Managers in Corporate America: Alienation or Integration?* National Urban League, 1985 (based on data collected in 1975); Taylor H. Cox and Stella M. Nkomo, *A Race and Gender-Group Analysis of the Early Career Experience of MBAs*, Work and Occupations, Vol. 18, 1991 (based on data collected from 1986-88; examines race and gender differences in different dimensions of career experience among MBAs).

States in recent years, it would have been particularly important for Dr. Bielby to describe how he assessed which of these studies could be applied to Merrill Lynch for a class period that begins in 2001.

Simply put, Dr. Bielby's report does not include information sufficient to allow the Court to conclude that he employed methods to evaluate social science literature in a way that is consistent with scientific methodology and, as such, the Court should exclude Dr. Bielby's opinions. *Clark*, 192 F.3d at 759 n.5 ("A supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method.").

### B. Dr. Bielby's Unreliable Methodology Has Been Rejected By Multiple Courts

This is not the first time Dr. Bielby has presented his unreliable methodology to a court in an attempt to prove discrimination, and other courts have rejected such analyses as unscientific. *See, e.g, EEOC v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004) (restricting Bielby's testimony in gender bias action), *rev'd in part on other grounds*, 2004 U.S. Dist. LEXIS 12724, at *4-5 (S.D.N.Y. July 8, 2004); *Gosho v. United States Bancorp Piper Jaffray, Inc.*, No. C00-1611-PJH, Doc. No. 427 (N.D. Cal. Oct. 1, 2002) (excluding Bielby testimony in race discrimination action); *Robinson v. Metro-North Commuter R.R.*, 175 F.R.D. 46, 48 (S.D.N.Y. 1997) (excluding Bielby report in race discrimination action), *rev'd on other grounds, Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) (reversing district court's denial of class certification and criticizing their analysis of another expert's report, but remaining silent on the rejection of Bielby's report).[17] Significantly, in *Robinson*, the court excluded Dr. Bielby's report because – as is the case here – it "simply assumes its conclusion, rather than meaningfully establishing it." *Id.* at 49. The court there excluded the report because it consisted of "little more than rank conclusion and gross speculation."

> For example, the opinion baldly premises that negative stereotypes result in African-American's being considered "inappropriate for higher level jobs" .... Similarly, the opinion simply presumes that Metro-North's personnel and disciplinary systems are inherently subjective and allow managers to materially circumvent policies that would reduce subjectivity and bias. No

---

[17] While some Courts have admitted Dr. Bielby's opinions in other instances (*see, e.g., Arnold v. Cargill, Inc.*, 2006 U.S. Dist. LEXIS 41555, at *13-14 (D. Minn. June 20, 2006)), the opinions he offers here are based on the type of rank speculation and unscientific methods that render them irrelevant and unreliable to the issues of Class Certification before this Court.

meaningful weight can reasonably be attributed, even at this state of the proceedings, to a report so facially suspect.

Similarly, here, Dr. Bielby's opinions and testimony should be rejected.

## CONCLUSION

The Court should exclude Dr. Bielby's report and any testimony or evidence regarding his opinions because his opinions are irrelevant to the class certification issues before this Court, are premised on unscientific methods, and are nothing more than unreliable and subjective speculation.

Dated: May 15, 2009

WEIL, GOTSHAL & MANGES LLP

By: /s/ Nicholas J. Pappas
    Jeffrey S. Klein
    Nicholas J. Pappas
    Salvatore A. Romanello
    Allan Dinkoff
    767 Fifth Avenue
    New York, NY 10153
    (212) 310-8000 (Phone)
    (212) 310-8007 (Facsimile)

-- and --

MAYER BROWN LLP
    Lori E. Lightfoot
    71 S. Wacker Drive
    Chicago, IL 60606
    (312) 782-0600 (Phone)
    (312) 701-7711 (Facsimile)

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 15, 2009 she caused copies of Defendant Merrill Lynch's (1) NOTICE OF MOTION, (2) MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERT WILLIAM T. BIELBY, PH.D. AND (3) MEMORANDUM IN SUPPORT to be served by ECF to each attorney having an email address on file with the Court and by hand delivery to:

Linda Friedman
Stowell & Friedman
321 S. Plymouth Court, 14th Floor
Chicago, IL 60604

May 15, 2009                    _____/s/ Lori E. Lightfoot_____
                                      Lori E. Lightfoot