Merrill Lynch's Memorandum in Opposition to Plaintiffs' Motion for
Class Certification

# APPENDIX I:
# JONES REP.

# Expert Report

Merrill Lynch's Diversity and Inclusion Efforts

Prepared by Olivet Jones
November 14, 2008

# Table of Contents

**Executive Summary** ................................................................ 1

**Purpose of This Report** ........................................................... 2

**Qualifications of Olivet Jones and Factors Shaping the Point of View of This Report** ....................................................... 3

**Basic Definitions and Context** .................................................. 3

**Methodology for Research and Analysis** ..................................... 5

**What Drove Merrill Lynch: Legal Motive or Business Motive?** .............. 6

**The Evolution of Diversity and Inclusion at Merrill Lynch** ................ 12

    The Early Years (1987-2000) ..................................................... 13

    Moving Toward a Strategic Approach (2001-2005) ........................... 16

    The Journey to the Future (2006-Present) ................................... 19

**A Detailed Look at Moving Toward a Strategic Approach (2001-2005)** ... 20

    Leadership Commitment: Thought Leadership and Behaviors ............... 20

    Human Resources Systems, Processes and Programs ....................... 24

    Diversity-Specific Processes and Programs .................................. 25

    Accountability and Measurements ............................................. 26

**A Detailed Look at the Journey to the Future (2006-Present)** ............. 27

    Leadership Commitment: Thought Leadership and Behaviors ............... 27

    Human Resources Systems, Processes and Programs ....................... 30

    Diversity-Specific Processes and Programs .................................. 33

    Accountability and Measurements ............................................. 35

**Conclusions** ...................................................................... 37

**Appendix A: Bibliography**

**Appendix B: Interview Subjects**

**Appendix C: Deposition Transcripts Reviewed**

**Appendix D: Olivet Jones CV**

# Executive Summary

Based on my expertise, I opine that Merrill Lynch has demonstrated a consistent and persistent commitment to understanding diversity and to putting in place policies, programs and practices that would reasonably lend themselves to building a robust, diverse and highly talented workforce (I refer specifically to the Financial Advisor, or FA, population) and a culture that respects and values employees regardless of any demographic characteristics. The remainder of this report presents data that substantiates this opinion.

It is also my opinion that any shortcomings associated with the design and execution of Merrill Lynch's diversity work can be attributed to a typical learning curve associated with any substantial change effort. In my view, there are instances of activity that I deem to be on par with organizations that are recognized as exemplary, especially in the area of using measurements and data to drive accountability. I further opine that Merrill Lynch went to exceeding lengths to understand the unique challenges African-Americans face in building and sustaining a successful book of business.

I disagree with plaintiffs' expert Dr. William T. Bielby's assertion[1] that some of Merrill Lynch's diversity work was undertaken in an attempt merely to appear concerned about diversity and inclusion (rather than as a sincere effort to build a diverse and fully engaged workforce). It is my opinion that there are much easier ways to appear to demonstrate commitment than the pathways Merrill Lynch journeyed. Philanthropy, community relations, and supplier development are all established ways corporations use to avoid the tougher issues of employee performance and engagement. I also opine that Merrill Lynch's business is not aligned around a model of corporate hierarchy. Matrixed structures, like those in place at Merrill Lynch and other brokerage firms, can indeed create different challenges from those encountered in more vertically structured and managed organizations.

It is clear to me that Merrill Lynch's efforts and progress occurred in fits and starts which is a typical pattern for both programs and processes. In large companies, programs such as those Merrill Lynch instituted at various points are tested before a full launch. Some programs were initiated, assessed and found to be lacking. In response, Merrill Lynch reassessed and mapped a new course of action. This, in my opinion, is what is most significant. Business literature, both academic and popular, is replete with examples of how companies learn from failure and apply that learning to improve business outcomes. In this case, I conclude that while Merrill Lynch may not have been optimally effective in all of its efforts, it continued and continues to reach for a winning formula in workforce representation and the creation of a culture of inclusion.

---

[1] All references to Dr. Bielby's opinions and assertions are to the Expert Report of William T. Bielby, Ph.D., dated June 5, 2008 (rev. June 26, 2008).

# Purpose of This Report

This report has been prepared in response to a request by attorneys for Merrill Lynch, Fenner, Pierce and Smith Incorporated. The author of this report, Olivet Jones, Executive Consultant for Novations Group, Inc., has been asked to opine on the following:

1. Merrill Lynch's diversity and inclusion efforts, including its commitment to diversity as reflected through its leadership, programs and practices from 2001 to 2005.

2. The same considerations for the period from 2005 to the present.

3. Dr. Bielby's assertion (at ¶ 67) that Merrill Lynch programs were implemented "in a context of ambiguous, unstable, and diffuse structures of responsibility and authority … the kind of organizational context that social science and management research shows can make them ineffective or even counterproductive."

4. Dr. Bielby's assertion (at ¶ 72) that pushing responsibility for diversity down into the business created diffuse and ambiguous lines of responsibility and accountability for diversity.

5. Dr. Bielby's assertion (at ¶ 71, 81) that the absence of effective responsibility structures at Merrill Lynch is not merely due to a lack of focus, knowledge and competence regarding the issues of diversity, but rather that the absence is intentional in that organizations make deliberate decisions about whether or not to decouple their diversity efforts from their core operations and from their legal obligations not to discriminate.

To address questions 1 through 3, I have considered three key sub-questions regarding the diversity work Merrill Lynch engaged in from 1998 to the present.

- Is there evidence to support or refute the argument that Merrill Lynch demonstrated a commitment to diversity and inclusion in general?

- Over the period of time in question, did Merrill Lynch take action that indicates a willingness and commitment to continuously improve its diversity and inclusion outcomes?

- Did Merrill Lynch institute what, in my opinion, constitutes appropriate measurement and accountability structures for the outcomes it sought to achieve?

Questions 4 and 5 are directly addressed in several sections of this report, most specifically the section entitled "Legal Motive or Business Motive: What Drove Merrill Lynch?"

## Qualifications of Olivet Jones and Factors Shaping the Point of View of This Report

As an Executive Consultant, both with Novations and in other capacities, I have worked with more than 30 companies, at both the corporate and operating division level, on issues of diversity and inclusion ranging from high-level strategy development with the most senior executives to training program design and implementation. I have worked with equal frequency and depth at the C-Suite level as at the shop floor level. Most of my work has been with Fortune 500 companies based in the U.S. My work for clients has been conducted not only in the U.S., but also in Canada, France, Spain, the U.K., Costa Rica, Brazil and Hong Kong.

My specific knowledge of the financial services industry comes from working with clients in the brokerage and banking arenas. For several years, I worked with a direct competitor of Merrill Lynch, serving as engagement director for an innovative project to support the hiring and retention of African-American financial advisors or stockbrokers. As engagement director, I worked alongside a cadre of industrial psychologists, instructional designers, facilitators and consultants who have a wealth of knowledge in the fields of organizational development and diversity as well as considerable experience as professionals in business. Based on my experience, I was featured on ABC News *20/20* as a diversity and inclusion subject matter expert. Other relevant experience is listed in Appendix D.

I have been privy to discussions about the true challenges organizations and their leaders face. I have seen their failures and foibles, as well as their successes. Most importantly, I have witnessed good ideas come to fruition—and good (and not so good) ideas fail dismally. These insights and experiences provide me with a well-grounded capacity not just to review the data, but to grasp its significance in a real-world business context.

I have never before provided an expert opinion in a litigation or any other legal context. I am being compensated for my time at a rate of $150.00 per hour.

## Basic Definitions and Context

In this report, I use the terms "diversity" and "inclusion." While the two are related, their meanings are distinct.

- Dr. Roosevelt Thomas, formerly President of the American Institute for Managing Diversity, adopted the word "diversity" from the field of biology to the field of organizational development more than 30 years ago. In his seminal article "From Affirmative Action to Affirming Diversity," published in the *Harvard Business Review* in 1990, Dr. Thomas introduced a new usage for this term to represent his belief that organizations would benefit by consciously seeking and using a wider base of talent than was customary at the time in public and private corporations in the United States. Dr. Thomas originally wrote and taught about basic characteristics of human differences, such as race, ethnicity, gender, national origin, and sexual orientation.

3

- Dr. Taylor Cox, formerly a professor at the University of Michigan Business School, helped clarify the thinking on diversity through the introduction of the term "diversity competency." His work consciously moved the discussion from one limited primarily to assessments of workforce representation to a dialogue on how organizations can achieve a culture with minimal institutional barriers to individual performance.[2] In the nomenclature of Novations, the goal of diversity is to "get the best talent in the house." The goal of inclusion is to ensure a sense of belonging and meaningful contribution for all employees.

I define "diversity" in its simplest terms—all of the ways in which people differ from one another. Some of those differences are innate and more readily ascertained, such as race, gender, ethnicity, physical ability, and national origin. Others are less readily apparent, at least initially. They include, but are not limited to, generational differences, sexual orientation, work styles, organizational roles, systems or values and beliefs, personality and/or thinking styles.

"Inclusion" refers to the extent to which a company creates and sustains a corporate culture that is welcoming to all employees, regardless of personal differences. The term connotes the degree of engagement that employees experience in the environment and the extent to which the environment minimizes institutional barriers to employees contributing their best work.

At an individual level, inclusion is a function of the quality of one-to-one and team interactions. At the corporate or macro level, it is driven by policies, systems and procedures, both formal and informal, that support the acquisition, development and retention of diverse talent.

Since Dr. Thomas's article was published in 1990, businesses of all sizes and shapes have sought to understand how diversity relates to better achieving their business strategies, goals, and objectives. Approximately 15 years ago, the term "inclusion" was paired with "diversity," and a new generation of study, trial and error, and application was born.

The significance of this context to the current scenario is the distinction between what academics study and what business people address on a day-to-day basis in the real world. Drs. Thomas and Cox set forth separately the premise that achieving both diversity and inclusion is a process—a journey. And, as is the case with any journey, along with the successes, there were detours, pitfalls, roadblocks and the occasional need for course correction. Such has been the case at Merrill Lynch.

---

[2] Cox, T.H., *Cultural Diversity in Organization: Theory Research and Practice,* 1993, San Francisco: Berrett-Koehler Publishing (Co-winner, George R. Terry Book Award for outstanding contribution to advancing management knowledge, National Academy of Management, 1994) and Cox, T.H., *Creating the Multicultural Organization,* 2001, San Francisco, CA: Jossey-Bass Publishing.

4

# Methodology for Research and Analysis

My methodology in developing this report was straightforward.

1. First I determined what aspects of Merrill Lynch's efforts would serve as indicators of committed intention, however skillful the execution of those efforts. I examined the factors I consider when working with a new client and making an initial assessment of the organization's efforts. My determination of factors to consider, is based on experience working with more than 30 large, complex, multi-national companies to design, evaluate, and implement diversity and inclusion programs.

2. In addition, to provide background for my analysis, I also examined my opinion in the context of research provided by other credible sources. To do so, I conducted a review of relevant articles from academic literature and business literature to identify the key drivers of success in diversity and inclusion. A list of referenced sources appears in Appendix A at the end of this document. I looked at drivers of both quantitative and qualitative outcomes. On that basis, and in the context of my experience, I identified four critical areas for consideration:

   - Leadership commitment: thought leadership and behaviors.

   - Human resources systems, processes and programs that support acquisition and development of a diverse workforce.

   - Diversity-specific processes and programs.

   - Accountability and measurements.

   For each of these areas, I identified three to five critical success factors. For example, in the area of thought leadership, one important sub-area is the business case. In keeping with the methodology, I examined, for example, the degree to which the business case aligns with the critical business objectives of Merrill Lynch and how it was communicated to the staff and reinforced.

3. Next, I conducted research on how Merrill Lynch actually addressed these key drivers. The research process included both a review of documents produced by Merrill Lynch in discovery, deposition transcripts and exhibits to those depositions, as well as face-to-face and telephone interviews with relevant Merrill Lynch personnel. The individuals interviewed have intimate knowledge of various practices or groups of practices and/or programs. A list of the deposition transcripts that I reviewed and a list of interview subjects appears at the end of this document.

4. My next step was to examine the data I gathered and review it in terms of the previously defined key drivers. Again, the critical questions that emerged were:

   - Is there evidence to support or refute that Merrill Lynch demonstrated a commitment to diversity and inclusion in general?

5

- Over the period of time in question, did Merrill Lynch take action that indicates a willingness and commitment to continuously improve its diversity and inclusion outcomes?

- Did Merrill Lynch institute what, in my opinion, constitutes appropriate measurement and accountability structures for the outcomes it sought to achieve?

5. The final step was the actual writing of this report.

## What Drove Merrill Lynch: Legal Motive or Business Motive?

I was specifically asked to respond to three assertions in Dr. Bielby's report. To recap, they are:

1. Dr. Bielby's assertion (at ¶ 67) that Merrill Lynch programs were implemented "in a context of ambiguous, unstable, and diffuse structures of responsibility and authority … the kind of organizational context that social science and management research shows can make them ineffective or even counterproductive."

2. Dr. Bielby's assertion (at ¶ 72) that pushing responsibility for diversity down into the business created diffuse and ambiguous lines of responsibility and accountability for diversity.

3. Dr. Bielby's assertion (at ¶ 71, 81) that the absence of effective responsibility structures at Merrill Lynch is not merely due to a lack of focus, knowledge and competence regarding the issues of diversity, but rather that the absence is intentional in that organizations make deliberate decisions about whether or not to decouple their diversity efforts from their core operations and from their legal obligations not to discriminate.

I will begin my response with the third point. It is beyond the scope of my mandate to evaluate the relevance or thoroughness of the research presented as the basis of Dr. Bielby's report. I can, however, offer an opinion on two aspects of the structure of responsibility for diversity and inclusion at Merrill Lynch.

- It is true that different parts of the organization had responsibilities for various components of work that might be construed as diversity and inclusion.

- It is also true that what is clearly a matrixed versus a hierarchical structure cannot be construed as "decoupling" diversity efforts from Merrill Lynch's core operations, nor as an attempt to ignore "their legal obligations not to discriminate."

Dr. Bielby cites extensive research (see ¶ 44) to support his statement that Merrill Lynch's "racialized" jobs place African-Americans at a disadvantage. One particular citation refers to the work of Drs. David Thomas and Robin Ely, which was published in the *Harvard*

6

*Business Review* in 1996. The seminal piece, entitled "Making Differences Matter: A New Paradigm for Managing Diversity," does indeed lay out the *historical* paradigms companies applied to their diversity work, as Dr. Bielby states.[3] More important than a recitation of history, however, is the thought leadership this article offers in laying out eight factors that typify a new paradigm for diversity and inclusion whereby companies are motivated by the belief that "diversity will be good for business" rather than legal or moral reasons.[4]

The research cited in the article, which covered a period of six years, sought to understand three management challenges that companies like, and including, Merrill Lynch typically face:

- How do organizations successfully achieve and sustain racial and gender diversity?

- What is the impact of diversity on an organization's practices, processes and performance?

- How do leaders influence whether diversity becomes an enhancing or detracting element in the organization?

The research group was made up of a total of 12 organizations, including two financial services firms. Research methods included surveys, interviews, archival data and observation.[5]

According to Thomas and Ely, "Two perspectives have guided most diversity initiatives to date: the *discrimination-and-fairness paradigm* and the *access-and-legitimacy paradigm*."[6] Dr. Bielby cites each of these paradigms in his report (see ¶44). Dr. Bielby's report excludes the third paradigm, which the authors describe as the more desirable of the three mentioned.

Continuing, Thomas and Ely state: "But I have identified a new, emerging approach to this complex management issue. This approach, which I call the *learning-and-effectiveness paradigm*, incorporates aspects of the first two paradigms but goes beyond them by concretely connecting diversity to approaches to work. Our goal is to help business leaders see what their own approach to diversity currently is and how it may already have influenced their companies' diversity efforts. Managers can learn to assess whether they need to change their diversity initiatives. . . and if so, how to accomplish that change."[7] It is my opinion that for some time Merrill Lynch has attempted to understand and operate from this third paradigm. The sections on specific eras of Merrill Lynch's diversity and inclusion journey provide considerable detail to substantiate this point of view.

As a context for considering the company's efforts, it is useful to identify key elements of Merrill Lynch's approach from 1998 to 2008 and compare them to what Drs. Thomas and

---

[3] D. A. Thomas and R. J. Ely, "Making Differences Matter: A New Paradigm for Managing Diversity," *Harvard Business Review*, Vol. 74, 1996 (September-October), p. 79-90 (quoted at p.79).
[4] Ibid.
[5] Ibid (see p. 85).
[6] Ibid (quoted at p. 80).
[7] Ibid (quoted at pp. 80-81).

7

Ely represent as "eight preconditions for making the paradigm shift"[8] from diversity and inclusion as a compliance matter to diversity and inclusion as a strategic business imperative. Based on my analysis of Merrill Lynch's programs, practices and policies, which is represented in detail in this document, I opine that Merrill Lynch's motivations for attention to diversity and inclusion fall squarely in the domain of enlightened self-interest and parallel the approaches followed by savvy businesses that exist for profit.

The eight factors Thomas and Ely identify, along with my opinion as to Merrill Lynch's compliance with each factor, are as follows:

1. **"The leadership must understand that a diverse workforce will embody different perspectives and approaches to work and must truly value variety of opinion and insight."**

   a. As early as 1999, Merrill Lynch expressed this viewpoint to all employees in writing. In a document entitled "Diversity at Work, A U.S. Progress Report," issued to all employees, management stated that the goal is to create a culture of inclusion, "where diversity of cultures, people and ideas provide the catalyst for personal and professional achievement."[9]

   b. I refer more extensively to other points related to how Merrill Lynch crafted and communicated its business case in the section of this report entitled "A Detailed Look at Moving Toward a Strategic Approach, 2001-2005: Leadership Commitment, Thought Leadership and Behaviors," which appears on pages 21-28 of this report.

   c. I conclude that long before the 2005 lawsuit that Dr. Bielby purports is the primary motivator for change at Merrill Lynch, leadership had already begun to shift to what Thomas and Ely, and other business thought leaders, perceive as a more relevant and potentially effective framework for approaching diversity and inclusion.

2. **"The leadership must recognize both the learning opportunities and the challenges that the expression of different perspectives presents for an organization."** In my opinion, there is no question that Merrill Lynch has wrestled with the learning applications for at least ten years. Documents I have reviewed are replete with both qualitative and quantitative data attempting to capture perspectives on both workforce representation issues and organizational culture issues.

   What are the right drivers? What infrastructure works best given the nature of our business? How do we recruit people who are likely to succeed in this unique industry? What is the balance between centralization of responsibility and the decentralized nature of our business? Do we use control or persuasion to engage our field managers? These are the questions that Merrill Lynch has examined over time.

---

[8] Ibid (see pp. 86-87).
[9] MLE00121-000154 - MLE00121-000165. Quoted text at MLE 00121-000155.

8

Although, Merrill Lynch did not always get the answer right the first or second time, in the face of both successes and failures, the company persisted. Through research, engagement of employees, direct solicitation of input from employees (both before and after the Cremin settlement), Merrill Lynch drove hard to find a mix of variables that would produce results.

3. **"The organizational culture must create an expectation of high standards of performance from everyone."** In a section entitled "How Racial Bias Is Embedded in Merrill Lynch's Everyday Business Practices," Dr.Bielby states (at ¶ 82): "Merrill Lynch's top executives frequently describe their system for rewarding and advancing employees as a 'meritocracy' in which hard work is rewarded without regard to race." Further, Dr. Bielby describes (at ¶ 83) Merrill Lynch's system as a "success-breeds-success system. . . in which African-Americans are barely visible in its workforce and have very low representation among its managers and senior executives [.] [I]t is inevitable that the most successful and influential people in the organization will come from the dominant, mostly white male, majority." According to his logic, there is a correlation between low representation in the management and executive ranks and personal capacity to achieve. Thomas and Ely, on the other hand, assert that high performance standards for all is a desirable emphasis for organizations.

In my opinion, to attribute the performance gap of African-Americans to institutional factors on the one hand or individual factors on the other is speculative. No longitudinal study of the factors that contribute to the low performance rate of African-American FAs appears to be a part of the Bielby report. What is known is that Merrill Lynch observed that *something* was driving a lower performance rate from African-Americans, and, in response to that, specific actions were taken, including:

    a.  Extensive internal research to attempt to isolate and control factors.[10]

    b.  Focus groups with African-American employees to attempt to identify factors driving the performance gap.[11]

    c.  Organizational responses through the formation of Symposia, combined educational/business development/relationship enhancement events developed initially for women in 1996 and later expanded to include ethnic groups, beginning with African-Americans.[12]

    d.  The inclusion of a coaching element usually reserved for more senior persons in the corporate environment in the Paths of Achievement ("POA")[13]

---

[10] Maura Gallagher interview.
[11] For example, see MLE00179-000514 and MLE00188-000712.
[12] Maura Gallagher interview, Tamara Cassidy interview.
[13] Recently, Merrill Lynch replaced the POA program with the Practice Management Development Program ("PMDP"). For the remainder of this report, references to POA will refer to both the POA program and the current PMDP program.

JumpStart program for diverse FAs, including African-Americans.[14]

e. Throughout this report, I further detail the specific organizational responses to Merrill Lynch's observation of the phenomenon of lower performance for African-American FAs. Again, I do not see evidence that definitive drivers were identified. I do see evidence that Merrill Lynch took what I believe to be reasonable steps to a) pinpoint drivers without waiting for a definitive answer before b) attempting an aggressive organizational response to provide support to its African-American FAs.[15]

4. **"The organizational culture must stimulate personal development."** Thomas and Ely state that this occurs through both job design and training, and education programs. In the instance of Merrill Lynch, the job design was set. In the sections of this report entitled "Diversity-specific processes and programs," I offer extensive evidence of the level and type of training and education that was specifically available to African-American FAs for the period 2001-2005 and the period 2006-present. This report also extensively explores leadership training for managers that focused on skills and competencies for creating a culture of inclusion.[16]

5. **"The organizational culture must encourage openness."** With regard to the challenges African-Americans face, there is considerable evidence that Merrill Lynch actively sought input from its African-American employees. Again, I have not seen any evidence that the organization lacked openness in this matter. As an example, the creation of a Diversity Advisory Council to Management,[17] detailed later in this report, is the best example of not only willingness but eagerness on the part of leadership to engage in a dialogue on diversity and inclusion issues. Additional documents discussed in this report further indicate a willingness to talk truthfully and candidly about the challenges Merrill Lynch faced.

6. **"The culture must make workers feel valued."** In terms of effort to demonstrate to African-American employees that their viewpoints mattered (only one measure of value), Merrill Lynch made a considerable effort. Evidence for this conclusion is:

a. The active and visible presence of senior leaders through the years in various organizations comprised of African-American employees.[18]

b. The conference call held by former Chief Executive Officer E. Stanley O'Neal with African-American employees, which was touted as a "breakthrough" by African-American employees.

c. The African-American Symposia, which have continued and been expanded for a number of years.

---

[14] Tamara Cassidy interview.
[15] See, for example, MLE00179-000467, MLE00177-000837, MLE00029-000073.
[16] See, for example, MLE00114-000696, MLE00174-000356, MLE00190-000423, MLE00190-000937, MLE00176-000078.
[17] Catherine Kapferer interview.
[18] Catherine Kapferer interview.

    d.  The engagement of the best minds in business education (Dr. David Thomas and Dr. Martin Davidson) to teach Merrill Lynch executives how to achieve diversity and inclusion more effectively.[19]

**7.**    **"The organization must have a well-articulated and widely understood mission."** Merrill Lynch expresses its mission through a statement of Shared Values and Principles. Merrill Lynch's Guiding Principles specifically state the aspiration of "support[ing] an environment where people of different backgrounds can reach their fullest potential with equal access to opportunities."[20]

**8.**    **"The organization must have a relatively egalitarian, non-bureaucratic structure."** This particular element of the new business paradigm for diversity is especially germane to Merrill Lynch. The Bielby report concludes that a non-hierarchical structure of accountability is by design an attempt to circumvent the requirements of good business practices and the law.

    If, however, the research conducted by Drs. Thomas and Ely is credible, and I along with Dr. Bielby believe that it is, it suggests that a centralized, bureaucratic structure is neither the ideal nor singular model for fostering diversity and inclusion. Contemporary management theory strongly encourages a balance of centralized and decentralized authority. What is more subtle, however, is Dr. Bielby's implication that without a centralized structure, no one at Merrill Lynch was truly accountable for results. The most compelling evidence refuting this conclusion based on my review is that Merrill Lynch appears to have managed diversity and inclusion as it would any important business objective, i.e., through a combination of executive oversight and field-level accountability.

In my 20-plus years of experience in the field, I have worked with or have personal knowledge of a good number of large, complex corporations that adhere to this model. Programs are designed and developed at the corporate level (centralized), but implemented with accountability at the divisional or operating unit level (the Merrill Lynch equivalent of the field). The logic behind this is that the corporate level sets strategy and vision and holds the field accountable (as Merrill Lynch did through the Critical Few Objectives ["CFO"] and through the financial incentives for diversity and inclusion results, both discussed later in this report),[21] while implementation is the purview of the line organization. This is done intentionally to drive ownership closest to the level of profit and loss responsibility. Transforming an organization is a journey. Merrill Lynch has invested considerable effort in moving from compliance to commitment.[22]

---

[19] Interviews with Susan Rogers and Catherine Kapferer.
[20] See MLE00065-000304 - MLE00065-000314. Quoted text at MLE00065-000306.
[21] MLE00117-000077.
[22] As Dr. John Kotter, Professor at the Harvard Business School states: "The most general lesson to be learned from the more successful cases is that the change process goes through a series of phases that, in total, usually require a considerable length of time. Skipping steps creates only the

11

In the remainder of this document, I present my assessment of the critical milestones along Merrill Lynch's diversity journey in response to the request to opine on Merrill Lynch's diversity and inclusion efforts including its commitment to diversity as reflected through its leadership, programs and practices from 2001-2005 and 2005 to the present.

## The Evolution of Diversity and Inclusion at Merrill Lynch

Companies that demonstrate an extraordinary level of integration of diversity and inclusion in all aspects of their business did not achieve their lofty status overnight.

Diversity work is tough. It involves changing perceptions, causing organizations and individuals to rethink (and often release) cherished mindsets. Developing a culture that seeks talent in all its demographic forms and that develops talent with minimal influence of bias is a journey. Looking at those companies that are now viewed as legends in the field, one sees that the journey was begun ten, 20, 30 and in some cases 40 years ago.

What then determines how quickly and how well a company moves forward on its journey in diversity and inclusion? Stated otherwise, what constitutes a "commitment effort?" My observation is that five key factors must be in place in order for an overall diversity and inclusion plan to be effective:

1. Clarity about what aspects of business the company wants to impact.

2. A strategy that is broad enough to encompass the ultimate goal, yet specific enough to focus on what matters at each stage of the journey.

3. An understanding that change is a long-term process and a plan for continuous improvement despite organizational changes.

4. Meaningful milestones along the pathway that let the organization feel and see success even before the ultimate goal is achieved.

5. The ability to correct course quickly where needed.

To analyze Merrill Lynch's efforts, I have identified three time periods characterized by similar types of activities. I refer to them in this report as follows:

- The Early Years (1987-2000)

- Moving Toward a Strategic Approach (2001-2005)

- Journey to the Future (2006-Present)

---

illusion of speed and never produces a satisfying result. A second very general lesson is that critical mistakes in any of the phases can have a devastating impact, slowing momentum and negating hard-won gains." See Kotter, John P., *Harvard Business Review*, Volume 73, Number 2, March-April 1995, pp. 59-67, quoted at p. 59-60.

## The Early Years (1987-2000)

During this period, according to the data available to me, Merrill Lynch began a variety of programs and approaches that appear to be focused on raising internal awareness around diversity as an issue (see timeline in Figure 1, page 24*).[23]

- Beginning in 1994, emphasis was placed on developing both awareness and skills needed to create an environment where Merrill Lynch would be viewed as an "employer of choice," which was the language used to describe companies that not only addressed workforce representation, but also focused on creating an environment that would attract top talent.[24]

- In 1996, Merrill Lynch recognized that it must "attract, keep and develop the best people," as explained in a detailed brochure called "Diversity at Work." Signatories on the letter to colleagues accompanying the brochure are Daniel P. Tully, then Chairman and CEO, and David H. Komansky, then President and COO.[25] The brochure clearly lays out a business case for excellence in diversity and inclusion: "Now, with an increasingly heterogeneous client base, diversity fits hand and glove with another of the company's principles—Client Focus. In other words, diversity makes good business sense."[26]

- In 1998, the firm published a Diversity Strategic Plan for Workforce Preparation and Development that laid out a strategy for sourcing, hiring, retaining and promoting "female and minority candidates."[27] The business-oriented tone of the strategy was clearly set via a quote from Arthur Levitt, then chairman of the SEC: "Exclusion is no longer just immoral it's unprofitable."[28] An update on progress occurred in September of the same year. Upon review of the extensive list of accomplishments for that year, I conclude that the organization was making clear progress toward its diversity goals at the field level.[29]

- Documents I reviewed indicate that, by 1999, branch managers were encouraged to take ownership of diversity and inclusion results, in that those results were part of the company's CFOs, an important formula for their compensation. In 1999, five out of 100 points in the CFO point system were tied to achieving diversity objectives. In 2000, the reward for achieving diversity objectives was increased to

---

[23] Because the information available to me for this period was limited, my conclusions may understate the volume of efforts undertaken regarding diversity and inclusion.

[24] Bates MLE00080-000363 describes a program for training managers called "Leading in a Diverse Organization II: Management Skills." Topics covered included communication skills, coaching across differences, conflict resolution and skills for addressing the climate, among others. The program was delivered by two members of the Wharton School of Business faculty. A full day and one half was devoted to the training.

[25] MLE 00114-000604 - MLE 00114-000613, quoted at MLE00114-000605

[26] Ibid. The brochure includes direct quotes from senior officers such as then Chairman and CEO Daniel P. Tully and COO David Komansky.

[27] MLE00060-000289 - MLE00060-000300, quoted at MLE00060-000290.

[28] Ibid.

[29] Ibid, see MLE00060-000289 - MLE00060-000299

ten points.[30]

- A strategy document presented by the U.S. Private Client Group (now Global Wealth Management) laid out a specific business-related case for diversity and inclusion and posed questions to Merrill Lynch in what it described as a "Proactive Vision."[31] Interestingly, the questions it posed closely parallel the challenges Thomas and Ely cite as essential to paradigm change.[32]

There are many other instances that illustrate that Merrill Lynch was clearly looking at diversity and inclusion as a business imperative as early as 1999. Much of the emphasis was on recruiting and developing women and people of color and on putting in place infrastructure components that would support the achievement of the stated objectives. My experience shows that this is common among companies in the early stages of the diversity journey.

In fact, the strategy's business case, described as a "local market implication,"[33] suggests that Merrill Lynch always intended to link diversity and inclusion with local market tactics and other important business processes, and that Merrill Lynch was not seeking a generic approach to diversity but rather one that was relevant and therefore sustainable over time. Finally, the model for change is just that—a change model indicating that the expectation was that something important would be different as a result of Merrill Lynch's work. These are not the actions or attitudes of a company motivated purely by being in alignment with the law. I conclude that, even in the early years of its diversity and inclusion initiative, proficiency, not intent, was Merrill Lynch's greatest challenge.

Interestingly, two programs launched during this period ultimately emerged as very important components of Merrill Lynch's strategy some years later.

- In 1996, Merrill Lynch launched its first Paths Of Achievement ("POA") Professional Development Program to improve upon the prior Professional Development Program.

- In 1996, Merrill Lynch held the first nationally sponsored African-American Symposium. The Symposia (which now include other cultural groups) appear to be unique to Merrill Lynch. They offer a potent blend of skills development and networking opportunities. I comment further on the importance of the Symposia in a later section.[34]

That these two programs were developed so early in the journey is significant. In my view, it is further evidence that Merrill Lynch has consistently attempted to determine how to support the success of African-American FAs in its environment.

---

[30] MLE 00178-000504 - MLE 00178-000510, see MLE 00178-000505 and 00178-000506.
[31] MLE 00043-000255 - MLE 00043-000258.
[32] Thomas and Ely at p. 83.
[33] MLE 00043-000255 - MLE 00043-000258 at Bates MLE 00043-000258.
[34] Tamara Cassidy interview; Keith Henry interview.



Figure 1
Timeline of Merrill Lynch Diversity Efforts
Pre- 2002

15

## Moving Toward a Strategic Approach (2001-2005)

This period in Merrill Lynch's diversity and inclusion journey saw the Firm continuing to introduce new programs with varying degrees of success. In particular, the Firm began to tackle the question of "What is different about success in our environment for people of color compared to our traditional FA employee base?" To gain an understanding of the similarities and unique aspects of success for specific demographic groups, Merrill Lynch designed, developed and launched an innovative management tool called Dashboard. Dashboard enables managers in all locations at all levels to see and access their workforce statistics in real time. This is particularly important because it enables the manager to identify where an employee may need constructive coaching and development or what one might call an "early warning system."[35] Similarly, Dashboard lets managers identify and acknowledge successes in real time as well.

A second major area of activity in this stage was the development of a series of programs to support the career development of African-Americans. One such program was introduced in 2002: FAST (Financial Advisor Success Track).[36] FAST was developed with considerable input from African-Americans in the field environment, in particular Keith Henry. It was an effort to build development around what matters in the financial advisory environment and to respond to real-world challenges African-Americans might face in understanding and mastering the environment. FAST was aborted in 2005 because it was not as successful as Merrill Lynch has hoped.

Merrill Lynch is continually revising and refreshing its training programs for all FAs. Thus, what may appear to be a period of fits and starts could also be perceived as a typical pattern of testing programs before a full launch. What is clear is that Merrill Lynch continued to search for the right formula for supporting the career growth of African-Americans in the FA position.

In what I believe was a reasonable move, the company began to shift from specific career development programs to a more strategic approach for impacting, if not changing, the culture. During this same period, the level of visibility associated with diversity and inclusion was raised.

In particular, it is noteworthy that during this period of time Stan O'Neal became Chief Operating Officer, then Chief Executive Officer of Merrill Lynch. At the time, Mr. O'Neal was one of three African-Americans heading a major financial institution.[37] During this time, various high-level executives became engaged in sponsorship of a regenerated Diversity Employee Advisory Council (2003),[38] and Bob McCann, head of U.S. Private Client Services, personally served as Executive Sponsor for the Black Professional Network.[39]

---

[35] Maura Gallagher interview.
[36] Keith Henry interview.
[37] www.answers.com/topic/stanley-o-neal. Accessed November 7, 2008
[38] MLE00117-000077.
[39] Tamara Cassidy and Maura Gallagher interviews and MLE00116-000353.

Training was launched for the more senior leaders to help them connect diversity to the work of the Firm.[40]

Based on these and other actions, which are detailed in the timeline on the following page (Figure 2), I conclude that the Firm's objective of sending a message to the organization about the importance of diversity and inclusion was met during this stage.

---

[40] See, for example, MLE 00099-000302 - MLE 00099-000331; MLE 00099-000635 - MLE 00099-000641; MLEE 047 002088 - MLEE 047 002104; MLE 00190-000104 - MLE 00190-000121; MLE 00205-000288 - MLE 00205-000305; MLE 00043-000463 - MLE 00043-000489.

17



**Figure 2**
Timeline of Merrill Lynch Diversity Efforts
2002—2007

2001 also marked the shift to a focus on data as a basis for action. Between 2001 and 2005, Merrill Lynch employed a variety of feedback approaches, ranging from interviews with employees to employee opinion surveys (which have been used for more than a decade), to try to determine how African-Americans and other diverse employees experienced the Merrill Lynch environment.[41] I conclude, therefore, that this period marks the realization that not only would the workforce demographics have to change if Merrill Lynch was to have greater diversity, but also that a foundation for a conscious culture of inclusion would need additional work. The theme of "culture evolution" is threaded throughout much of Merrill Lynch's work during this phase.

Perhaps the strongest message was delivered by former CEO Stan O'Neal in an internal message entitled "Building a Performance-Based Culture: Next Steps for Workforce Diversity."[42] In this memorandum to the organization, Mr. O'Neal clearly laid out goals and articulated how each component in the equation would support achievement of those goals. He also addressed directly who was accountable for achieving those results. Finally, he stated that *"...I believe a business-focused approach represents a significant new stage in our efforts to create a diverse workforce here at Merrill Lynch. Over the years, we have employed best-practice initiatives and strategies, from affirmative action and equal employment opportunity policies to employee networks and multicultural business development. These efforts have contributed to our understanding of many issues involved in making Merrill Lynch a better place to work and are the building blocks of our strategy."* This statement by Mr. O'Neal signaled that Merrill Lynch viewed diversity just as it did any other business objective. "Achieving excellence at Merrill Lynch can only be realized when people are accountable and rewarded for delivering superior solutions . . . in keeping with our Principles."[43]

## The Journey to the Future (2006-Present)

After launching Quantum Leap II ("QL II) in 2006, a one-time program designed to increase participants acquisition of new households, it was determined that a longer term program containing elements of business development, external coaching, and regular follow-up was a better approach.  Another program was launched in late 2006 to replace QL II – the JumpStart Program[44] -- which has the same elements but a long-term platform.

Following the appointment of Ron Meraz, a successful complex director in the Pasadena, California area, to head the Office of Diversity in 2007, the Office of Diversity was repositioned to focus on oversight (more than on data dissemination), analysis and influence with field management. This new strategy consists of three parts: communication, coordination of effort, and leveraging of effort to achieve results. The expectation is to achieve results through more carefully managed partnerships with the various entities within Merrill Lynch that link directly with diversity and inclusion.

---

[41] For example, see MLE00114-000696 and MLE00029-000073.
[42] MLE00117-000077 - MLE00117-000078.
[43] Ibid at MLE00117-000078.
[44] Keith Henry and Tamara Cassidy interviews.

In my opinion, this approach is sound and practical. In describing it, Mr. Meraz articulated a very candid understanding and appreciation of the subtle ways in which barriers for people of color can unintentionally be allowed to exist in the field environment. The Office of Diversity has also deployed significant resources within Merrill Lynch to examine best practices in other companies and industries.

In summary, Merrill Lynch's journey is not atypical, despite some missteps in approach, they have continually sought to implement programs and initiatives to increase diversity and inclusion.  Continuity of concerted effort, in my opinion, is the hallmark of commitment.

## A Detailed Look at Moving Toward a Strategic Approach (2001-2005)

In this section I consider what Merrill Lynch did in the time period 2001-2005 as it relates to each of my key indicators. To recap, they are as follows:

- Leadership commitment: thought leadership and behaviors.

- Human resources systems, processes and programs that support acquisition and development of a diverse workforce.

- Diversity-specific processes and programs.

- Accountability and measurements.

### Leadership Commitment: Thought Leadership and Behaviors

I looked for three kinds of indicators that Merrill Lynch's thought leadership was committed to supporting diversity and inclusion: attempts to frame why diversity is important to the business vitality of Merrill Lynch, champions of diversity work among leaders at the most senior levels, and appropriate incentives for making strides in this area. I found all three.

In the private sector, the highest level of commitment is what one reports to the Board of Directors as a statement of commitment. A document dated June 4, 2001, entitled "USPC Diversity Review[,] Board of Directors,"[45] outlines a five-point program to build on momentum that the document indicates occurred between 1991 and 2001. The pillars of this focus, in my opinion, constitute a sound strategic approach. They were:

- Transforming USPC For the Future

- Change Management: Human Resources

---

[45] MLE00196-001002 – MLE00196-001011 at MLE00196-001003 – MLE00196-10007. This document does not specify whether it is intended for the entire Board of Directors or the Public Policy Committee. The title is as stated in the text. Similar documents dated 2004 and later specify Public Policy Committee.

- Change Management: Talent Review

- Change Management: Training

- Change Management: Community Outreach and Responsible Citizenship

In fact, these pillars were preceded by a broader thought leadership piece published in July 1999. A detailed document entitled "Diversity at Work: A U.S. Progress Report"[46] sets forth what I believe to be two critical messages that are indicators of commitment and seriousness.

The first message is a statement issued jointly by Mary E. Taylor, Senior Vice President of Human Resources at the time, and Westina Matthews Shatteen, First Vice President, Corporate Responsibility, Human Resources. This statement clearly identifies diversity as a strategic imperative for Merrill Lynch and specifically articulates a Diversity Priority Goal of increasing the representation of women and minorities in management positions holding the title of Vice President and above. This statement further lays out expectations of "each member of Executive Management."[47] Finally, the statement (which I define as the business case) specifically refers to a culture of inclusion "where a diversity of cultures, people and ideas provide the catalyst for personal and professional achievement."[48]

The document then proceeds to lay out:

- Diversity mission statement.

- Commitment to Diversity.

- Setting the Groundwork (update on specific strategies).

- Global Diversity Strategic Plan (a business-relevant strategic plan).

I was particularly impressed with Merrill Lynch's breakout of minorities by ethnic group in this report to all employees. Why is this document significant?

- It put the company on public notice (in the presence of all of its employees) regarding its intentions.

- It is transparent. Any reader would clearly understand what had or had not been accomplished at the point of publication.

- It links the significance of diversity to what is relevant for Merrill Lynch's business in particular—not just any business.

---

[46] MLE00121-000154 – MLE00121-000165 at MLE00121-000154 – MLE00121-000159.
[47] Ibid at MLE00121-000155.
[48] Ibid.

- It speaks in clear, direct language appropriate to business—thus potentially providing a message map that leaders in the organization could adapt to their communications about diversity.

Is a brochure alone sufficient to effect culture change? Absolutely not. However, in order for change to begin, a vision of the motivation for change and the pathway to change must be clear. Merrill Lynch presented such a vision in this document.

On November 8, 2001, Robert E. Mulholland, Senior Vice President ("SVP") of USPC, and Daniel Sontag, SVP USPC, Head of Advisory, issued a memorandum[49] to District Managing Directors, Managing Directors and Directors announcing a "comprehensive project to collect and analyze information relating to our business practices and their effect on the achievement of success for our Financial Advisors who are women or persons of diverse ethnicity."[50] In my experience, business people study issues they intend to address. This is another clear indication of commitment through action.

In 2003, a pivotal thought leadership communication was issued by then CEO, Stan O'Neal. "Building a Performance-Based Culture: Next Steps for Workforce Diversity"[51] was sent to everyone at Merrill Lynch. The message reiterated that "Merrill Lynch is committed to building a meritocracy in which people are recognized and rewarded on the basis of their skills and accomplishments. This performance-based culture is key to our strategy for ensuring workforce diversity at Merrill Lynch." O'Neal further stated that "accountability for diversity will be shared by me, SVP Terry Kassel, head of Human Resources, and the members of executive management."

In addition to formal communications to the organization, leaders exhibited their commitment through their own actions. For example:

- The president of Merrill Lynch U.S. Private Client Business was the keynote speaker at the African-American Symposium, where he talked about the history of diversity at Merrill Lynch and the contributions of the African-American Symposium. Other Merrill Lynch leaders also attended this event, including Mac Gardner and Dan Sontag, SVP U.S. Private Client, Head of Advisory Division. Stan O'Neal gave the closing presentation at this event and explained the goals of recruiting more African-American FAs and developing as well as retaining a veteran cadre of African-American FAs.

- Speakers at the November 2005 FA Diversity Advisory Council to Management meeting included Bob McCann, Executive VP, Vice Chairman and President of U.S. Private Client; Mac Gardner, SVP, Head of Americas Region and Global Bank Group; Brett Bernard, Divisional Director of the Central Division; Stephany Thompson, Head of Training for Advisory and U.S. Private Client FA Excellence Program; and Maura Gallagher, Director of Diversity. At that meeting, Mr. McCann said that Merrill Lynch strives to be a true meritocracy, a place where people are

---

[49] MLE00060-000278.
[50] The name of this business unit evolved over time. I refer to it as U.S. Private Client through the remainder of this report.
[51] MLE00117-000077 – MLE00117-000078.

measured on the merit of their individual performance. "Talent is what defines us and what allows us to succeed. We must choose the best people for the job at hand...I can't say it any plainer, in order to be in management at this firm, managers need to possess the ability and skill to lead all types of people and talent."[52] He reiterated his commitment to making Merrill Lynch a place that attracts diverse talent and allows that talent to be judged on the basis of its work in order to ultimately succeed.

- In 2004, Bob McCann, head of U.S. Private Client, was executive sponsor for the Black Professional Network.[53]

- In 2005, as has been the case in all years, senior leaders played an active role in the African-American FA Training Symposium. For example, Bob McCann gave the dinner address. Closing remarks were made by Stan O'Neal.[54]

I believe it is particularly important to pause and emphasize the significance and opportunity associated with the Symposia. I have reviewed the agenda for five years and found each event to be an impressive orchestration of relevant business information presented by top producers in the Firm. Moreover, one could have an extraordinary opportunity to not only meet but engage in significant dialogue with senior leaders and top producers. The Symposia is a clear indicator that Merrill Lynch desired to provide maximum career support to its African-American FAs and ultimately to other groups for whom Symposia existed.

In reality, Merrill Lynch (at least on the brokerage side) operates as a series of entrepreneurial enterprises. Although they are legally part of the same entity, each FA is essentially a "businesses within a business." The question this raises is, if this is the case, what did Merrill Lynch do to cultivate commitment at the level of field management that has critical profit and loss responsibility on a day-to-day basis? This level impacts the bottom line of the organization and has the greatest impact on the degree of coaching, guidance and support FAs receive. The answer is straightforward: educate and stimulate, then impact compensation.

Because Merrill Lynch is a for-profit organization, the best way to gain the attention of field-level leaders would be to appeal to their profit motive, the basis of their compensation and performance measures. This is precisely what occurred at Merrill Lynch. A series of corporate strategic goals, called the Critical Few Objectives (or CFOs), determined 100 percent of the compensation of field leaders at the managing director and director levels. Beginning in 1999, diversity recruitment (and later retention) goals were included in the CFOs.[55]

CFOs include Core Objectives and Bonus Objectives. Each item is assigned a point value. Diversity is assigned a significant point value. During my interview with Keith Henry, Director

[52] MLEE018076460 - MLEE018076461 at MLEE018076460.
[53] MLE00116-000353 - MLE00116-000354 at MLE00116-000353.
[54] MLE00190-000423 - MLE00190-000433 at MLE00190-000424, MLEE018067672 - MLEE018067675 at  MLEE018067672 and MLEE018067674
[55] MLE000178-000504 - MLE000178-000510.

of Merrill Lynch's Bridgewater complex, Mr. Henry explained that, "We could be talking about a significant amount of money—thousands and in some cases tens of thousands of dollars."[56] Mr. Henry emphatically stated that this was an outstanding way to reinforce the importance of diversity because, as he stated, "you need to understand that the top people in this business are highly motivated by money. They are not going to leave money on the table. That's the strongest message you could send in our environment about whether we are serious. Communication is not just about memos. It's letting people know what to pay attention to. This is the right approach for our business."[57]

## Human Resources Systems, Processes and Programs

During this phase, Human Resources developed and improved programs based on data rather than opinion and to craft education and/or training to prepare leaders to lead and effectively develop a diverse cadre of FAs.

By 2002, Merrill Lynch had acknowledged that despite a formal focus on diversity since 1994, "USPC has made little progress in improving its small representation of Women, Blacks, Hispanics, or Asian Financial Advisors since 1994."[58]

In a presentation on the Firm's newly developed FAST[59] program given by Keith Henry, an extensive analysis of the current state of workforce representation and a root cause analysis were presented. Based on that data, several proposals were made that would attempt to improve the success rates and retention of women and minorities. The FAST program was piloted in the fall of that year. A two-part Diversity Management Development Program was also proposed and implemented to address a broad understanding of diversity in the context of Merrill Lynch's business and to address specific skills managers needed to effectively lead a potentially changing workforce.

The significance of the recommendations in this report is that they were data driven. In other words, they were based on significant input from FAs of color, as well as analytical data from other sources within Merrill Lynch. Merrill Lynch's response to the recommendations was swift and deliberate. By July 2002, the FAST pilots, which were the cornerstones of the recommendation, were launched.

The counterpart to development programs for FAs of color, especially African-Americans, can be found in management training designed to strengthen the ability of managers to coach and develop employees who may on the surface appear to have different backgrounds than their own.

In 2004, Merrill Lynch expanded and refined its management education program called "Inclusive Leadership," a case-study-based management training program developed and delivered in conjunction with Dr. David Thomas, an African-American professor at the Harvard School of Business. All regional managers, complex managers and office

---

[56] Keith Henry interview.
[57] Ibid.
[58] MLEE016014060 - MLEE016014080 at MLEE016014061.
[59] MLEE009003383 - MLEE009003403 at MLEE009003383 – MLEE009003406.

managers attended this one-day program that used real-life diversity-related management challenges.[60]

In May 2005, Merrill Lynch Launched a workshop called "Sourcing Diverse Hires, Employee Development and Mentoring Strategies[:] Diversity vs. Inclusion."[61] My review of the workshop materials leads me to conclude that the workshop appropriately addressed issues and approaches commonly associated with building the capacity of leaders in organizations. While the workshop was ultimately succeeded by a program more tailored to the Merrill Lynch business environment, it provided a sound learning experience about what elements of education would be most impactful for leaders and managers in the Firm.

Also in 2005, a number of initiatives were put in place to help cast a wider net for diverse candidates.[62] These included:

- Employee referral program.

- Career nights.

- Career fairs and conferences.

- An external professional organization strategy.

## Diversity-Specific Processes and Programs

With regard to programs that were designed specifically to identify and respond to the needs of diverse employees and to embed an emphasis on diversity and inclusion into the culture, two key initiatives were launched during the period of discussion. They are the Diversity Advisory Council to Management ("ACTM") and the Symposia for diverse FAs. It is my opinion that the quality and relevance of these initiatives go above and beyond a passing interest. The Diversity ACTM began in 2001 "To advise senior Advisory management on the direction and climate for a truly inclusive Advisory Division."[63]

The Council consisted of regional representatives plus representatives for each of the employee networks: African-American, Hispanic, Asian, female, and Lesbian, Gay, Bisexual, Transgender. Through interviews with Ron Meraz and Tamara Cassidy, I have come to understand the significance of the Council. ACTMs are created to address what are viewed as Firm priorities. They report to and interface regularly with the highest levels of management. Employees within Merrill Lynch understand that an Advisory Council to Management is a powerful signal regarding the importance of a given area of focus. Therefore, I opine that the creation of an ACTM on diversity shows strong commitment not to just the idea of diversity and inclusion, but to diversity and inclusion as being important from a business perspective.

---

[60] Rosanna Innes, Catherine Kapferer and Susan Rogers interviews.
[61] MLE00114-000696 - MLE00114-000745.
[62] Catherine Kapferer and Tamara Cassidy interviews.
[63] MLE 00099-000213 - MLE 00099-000245 at MLE 00099-000213.

25

I have previously discussed the Symposia. The potential for events like the Symposia to support positive career development is enormous. The opportunity to learn from some of the most successful people in the company can play a significant role in one's career effectiveness. The Symposia offer such opportunities.

## Accountability and Measurements

There is an adage in business that "what gets measured gets done." In my opinion, it was during the period under discussion that Merrill Lynch began to aggressively use measurements as both a driver to achieve outcomes and as a powerful tool to dig more deeply into root causes of underperformance in achieving certain aspects of its diversity objectives.

In 2004, Merrill Lynch formally implemented manager accountability through the Diversity Dashboards[64]. Many companies can answer the question: "How are our people of color doing?" Merrill Lynch's Dashboard enables a manager to determine how a specific FA of color is doing in real time. The Dashboard is a tremendous asset to managers in that it enables them to address developmental needs and opportunities in the shortest possible timeframe.

Created in 2004 as a static spreadsheet, the Dashboard has evolved into a dynamic, interactive computer-based tool that literally sits on the manager's desktop. Dashboard provides a topline view of all FAs' status indicators and offers drill-down capability to look at supporting details. Dashboard uses green, yellow and red indicators to show the manager who is on target, who needs attention, and who has slipped outside the parameters defined by the success indicators. Until 2007, managers worked with Dashboard independently. In 2008, Division Diversity Managers will work with managers to ensure that they are apprised of the full capabilities of Dashboard as a management response tool. [65]

During my interview with Keith Henry, I had the opportunity to see the Dashboard in a "live" setting and to examine the degree of specific information it provides. Descriptions of the Dashboard do not overstate its power as a management tool. For a firm to have developed such a sophisticated yet simple to understand tool makes a strong statement about commitment and intention.

The period from 2006 to the present reflects both a deeper understanding of the needs of the organization and a more evolved way of approaching those needs effectively. My review, however, clearly indicates that the seeds of that understanding were planted between the years 2001 and 2005, and even earlier, in ways that are far beyond superficial. Merrill Lynch demonstrates, in my opinion, exactly the kind of pattern that organizations committed to diversity exhibit.

---

[64] Tamara Cassidy interview.
[65] Ron Meraz and Tamara Cassidy interviews.

# A Detailed Look at the Journey to the Future
# (2006-Present)

The final part of my report offers an opinion on Merrill Lynch's commitment to diversity and inclusion from 2006 to the present. To formulate a point of view, I have reviewed those actions as substantiated in various documents and as articulated in interviews with personnel from Merrill Lynch. To recap, the criteria I have used to construct an opinion are:

- Leadership commitment: thought leadership and behaviors.

- Human resources systems, processes and programs that support acquisition and development of a diverse workforce.

- Diversity-specific processes and programs.

- Accountability and measurements.

## Leadership Commitment: Thought Leadership and Behaviors

In my experience as a consultant, I observed that by 2006, major corporations had begun to approach their diversity and inclusion efforts from a more highly developed strategic vantage point. In part, I believe, this occurred because by that time companies had a history of trying a variety of approaches to diversity and inclusion and learning through their own experience, as well as that of other corporations, what worked and what did not.

Again, Merrill Lynch follows a pattern that is common to companies as they continue on the diversity and inclusion journey. By 2006, Merrill Lynch leadership had begun to articulate the focus and purpose of diversity and inclusion as an organizational competency in a more crisp, concise, and relevant manner. The line of sight between diversity and inclusion and Merrill Lynch's business objectives is much more clearly stated in documents created during this latter timeframe. The following is excerpted from a September 2006 Global Private Client Diversity Review.[66]

The Mission stated: "We are committed to creating a workplace environment that promotes mutual respect, acceptance, cooperation and productivity among people from diverse backgrounds."[67]

The Vision stated: "Merrill Lynch endeavors to be the employer, advisor and strategic partner of choice."[68]

In the same document, three areas of strategic focus were defined:[69]

---

[66] MLE01367-000503 - MLE01367-000520; see also MLE 00196-001002 through 001011.
[67] Ibid at MLE01367-000504.
[68] Ibid at MLE01367-000504.
[69] Ibid at MLE01367-000505.

- Workforce: Maximizing Individual and Team Performance.

- Clients: Increasing Our Client Base.

- Community: Increasing Brand Awareness in Communities.

Finally, the document presented a solid business case for diversity and inclusion and defined five areas of strategic focus:[70]

- Share of global wealth by women and minorities rising steadily

- By 2008, women and minorities are expected to make up 70% of new entrants to the workforce in the U.S.

- Significant growth of woman/ minority-owned businesses.

- Spending power of ethnic America >$1 trillion

- Cost of employee turnover.

For each of these areas, specific strategies were developed.

Beginning in September 2006 there is a progression of internal dialogues that demonstrates a forward progression in thought leadership. The documents I reviewed demonstrate substantive thinking about the tougher issues associated with diversity and inclusion. Different from previous documents is an emphasis on strategic approaches that focus on more than workforce representation. Also, there is evidence that Merrill Lynch was beginning to grapple with the cultural norms of the organization in a more intensified manner. Specifically I found:

- Cogent analysis of restraining and enabling forces in the environment.[71]

- Comparative analysis of Merrill Lynch to the industry (using research from the Securities Industry Association).[72]

- Processes defined that more tightly aligned with the broader business needs.[73]

- A solid organizational structure for the Office of Diversity.[74]

- Articulated windows of opportunity for both the Office of Diversity and U.S. Private Client as an organization.

---

[70] Ibid at MLE01367-000506.
[71] MLMRE_004_000528 - MLMRE_004_000545 at MLMRE_004_000532.
[72] Ibid at MLMRE_004_000533.
[73] Ibid at MLMRE_004_000536.
[74] Ibid at MLMRE_004_000537.

More recently, the Office of Diversity has developed an aggressive plan to strengthen leadership engagement through a strategy of influence, communication and dialogue. I particularly like this approach because in my experience leadership dialogue is the driver of long-lasting change. The specifics of the approach are as follows:[75]

1. Closer working relationships with field leadership. In the Merrill Lynch environment, this should prove to be an effective approach because of the entrepreneurial nature of the business. Change is better supported by influence than edict.

2. Stronger definition of the vision and more intense messaging.

3. Greater coordination with the Global Office of Diversity and various components of the infrastructure that impact the quality of outcome in diversity and inclusion.

4. Repositioning of Diversity Division Managers (DDMs) to act more as champions for diversity and inclusion and serve as a consultancy to the field. Previously, DDMs were tasked in a more informational role. Again, through one-on-one dialogue, there is a concerted effort to support leaders in linking the value of diversity and inclusion to their specific organizations.

In addition to continually refining its thought leadership, Merrill Lynch executives continued to demonstrate commitment through personal involvement during this period. Also, Merrill Lynch created stronger infrastructures that would enable leadership to keep its fingers on the pulse of the needs and interests of its diverse FAs by affording representatives of those groups even stronger access to the highest levels of the organization.

- In 2006, an email entitled "Introducing the Diversity and Inclusion Council" was sent to everyone from Executive Vice President Robert J. McCann, Vice Chairman and President of U.S. Private Client and Executive Vice President Greg Fleming, President of Global Markets and Investment Banking. The message announced that the Diversity Employee Advisory Council would be evolving into the Diversity and Inclusion Council and have more responsibility for advising the businesses on achieving their diversity deliverables. These two leaders will continue to chair the Council.[76]

- In 2006, Bob McCann conducted two national conference calls, sponsored by the Black Professional Network (BPN) and open to all members of BPN and African-American employees. The calls were a continuing dialogue on leadership, diversity, and BPN initiatives.

- Also in 2006 Bob McCann announced the formation of the Office of Diversity to be headed by Managing Director Colbert Narcisse.[77] This occurred on June 5, 2006. Documents I reviewed show that a structure and a plan of focus were designed by

---

[75] Items 1-4 in this sequence are taken from interview with Ron Meraz.
[76] MLMRE_002_002773.
[77] MLMRE_004_000971 - MLMRE_004_000972.

September 2006. I find this process and timetable to be in alignment with what I have observed in other organizations with which I have worked.[78]

## Human Resources Systems, Processes and Programs

I have described Merrill Lynch's work in diversity as a journey. Based on my experience, I would expect that by the period in question Merrill Lynch's human resources systems, processes and programs would begin to show signs of a more mature approach to diversity and inclusion in terms of focus. Therefore, I determined that two factors were most important at this stage in considering the extent of Merrill Lynch's commitment:

- How does the company attempt to build the capacity of its leaders in managing inclusion?

- To what extent does the company go above and beyond basic efforts to support the unique development needs of its FAs of color?

As one considers the data presented below, one must also consider that while these programs are more mature and well developed during this period, most of the foundation work was done in earlier periods.

The first area I discuss is leadership development. U.S. Private Client has a well-defined leadership development process.[79] The two cornerstones are curriculum offerings and validated assessment supported by rigorous training upon successful completion of the Merrill Lynch assessment process.

The anchors for the curriculum offerings for the advisory business are four core competencies, each of which has sub-competencies. They are:

- Business results.

- Personal effectiveness.

- Strategic thinking.

- People leadership.

Part of the people leadership is talent building, which is further defined to include encouraging diversity in the organization. According to Erin Magnuson, Director of Leadership Development for Global Wealth Management, the decision not to have a separate category called diversity competency was intentional. After robust internal dialogue, the conclusion was reached that in the Merrill Lynch culture, the stronger message would be sent if diversity and inclusion was a thread throughout all competencies. In my opinion, this is consistent with the best practice philosophy of determining which approaches are likely to be effective in a specific company.

---

[78] MLMRE_004_000528 - MLMRE_004_000545 at MLMRE_004_000537.
[79] Erin Magnuson interview, Susan Rogers interview.

Competencies are significant. They represent the observable behaviors of the top producers, best business developers and best people developers throughout Merrill Lynch. Merrill Lynch has invested heavily in developing competencies that produce exceptional leaders. Inclusion of diversity and inclusion in the competency process is a best practice.

The other cornerstone of developing leaders to lead with a focus on diversity and inclusion is the customized curriculum that expressly focuses on the subject. It includes four components:

- Managing Inclusion.

- Leveraging Differences 1.

- Leveraging Differences 2.

- Leveraging Differences 3.

Developed in conjunction with Dr. Martin Davidson of the Darden School of Business, the Leveraging Differences series is a practical, real-world, four-hour learning experience. It is highly customized for the Merrill Lynch environment. Core methods include case studies, role-plays, and candid feedback provided by Dr. Davidson, who also leads the sessions.

A part of the people leadership competency is talent building. The target group is directors, managing directors and senior vice presidents, a group that Ms. Magnuson estimated to include approximately 650 people. Delivery occurs on a rolling basis to ensure that everyone in the target group ultimately completes each of the four segments.

The final mechanism for competency development is the inclusion of diversity and inclusion in what Ms. Magnuson described as "program offerings." These are intermittent (non-curricular) events designed to build leadership capacity. Ms. Magnuson states that, without exception, there is a diversity and inclusion component in all program offerings.

Though Leveraging Differences stands as an exemplary training program today, it is in fact the product of almost ten years of attention of helping leaders learn to lead diversity and foster inclusion in their areas of responsibility.

The second major area of inquiry was the extent to which Merrill Lynch sought to develop the core skills FAs of color would need to be successful in the business. I have referred earlier to the iterations of programs with this intent. In 2006, Merrill Lynch piloted a program called "Pathways of Achievement JumpStart" to support diverse FAs in understanding and mastering the business fundamentals.[80]

- The program rolled out in 2006. All members of the diverse population are eligible as well as 20 percent randomly selected from the general population of FAs. One may opt out of JumpStart (and between 20 and 25 percent do). When an individual opts out, specific steps are taken to ensure that the individual fully grasps the

---

[80] Catherine Kapferer interview.

31

potential benefits of participation.

- JumpStart participants receive the exact same training as all FAs plus eight hours of virtual classroom work, completed bi-weekly, with an outside professional coach in a program component known as "Coaching for Success." Ten to 12 people participate in each virtual classroom group. While the coach acts as a facilitator for the classroom approach, the coaching component is an additional support resource.

- The coaching relationship is highly structured and delivered by International Coaching Federation certified coaches from the firm of Maddox and Smye.

- In addition, personalized attention from the coach, combined with the opportunity to interact virtually with peers from across the country, not only provides strong technical support to the FA but also may accelerate the development of relationships with peers who will be valuable internal resources in the months and years to come. Notably, while all POA participants receive coaching from their managers, only JumpStart participants benefit from the skills of a certified coach.

The POA program covers FAs from Length of Service (LOS) 0-2 years. At the two-year mark, FAs are covered by the Regional Business Development Program ("RBDP"). Again, the RBDP is not exclusively tailored to diverse FAs; however, care is taken to ensure that topics covered in this 1.5-day session address needs that may be unique to this group. The RDPD was piloted in 2005.

- The program is dynamic, changing each year to reflect the learning needs of the specific group of attendees and changes in the market environment.

- The RBDP is always focused on business development.

- Faculty includes internal people and external subject matter experts.

- RBDP provides an excellent opportunity to network and bond with colleagues from around the region. Again, these collegial relationships provide invaluable access as to "how this works in the real world."

- Inclusion in the RBDP is automatic based on LOS designation. In other words, managers cannot "select" who attends and who doesn't.

An additional supplemental program is the Associate Financial Advisor (AFA) Program for African-Americans. Piloted in 2006, the program provided for 30-31 AFAs, one per region. The primary distinction of this program is that it provides a longer lead time (five years) for African-Americans, during which participants are supported by full salary and before they go on straight commission. The program requires that participants be formal members of a team and meet yearly performance hurdles for the program duration. Year-end bonuses are delivered beginning at the end of Year 2 if performance hurdles are met.

It is important to note that accountability for program execution results rests at the highest level of the Firm. On a regular basis, the U.S. Private Client Executive Committee receives an update from the Office of Diversity and Inclusion, which integrates training and other initiatives that affect diverse FAs and the overall diversity and inclusion effort. This update, which is incorporated into the Chief Operating Officer Monthly Review, sits on par with critical business strategies in terms of positioning as a key business initiative.

Development support at Merrill Lynch is not limited to FA training. Another process that supports career assessment for all FAs is the Management Assessment Center process, which is the pathway into leadership (director level and above). Opportunity dinners are held to share with FAs the benefits of moving into leadership roles, so that FAs can determine whether these unique roles are suitable for them. Though these opportunity dinners are open to all, special attention is given to encouraging participation by people of color and women. There are performance criteria for all to be considered for leadership. The relevance of this process to diversity and inclusion is that members of the Director's Advisory Council to Management (all of whom are top producers and leaders) are asked to specifically mentor at least one diverse candidate.[81]

## Diversity-Specific Processes and Programs

Merrill Lynch's programs that demonstrate a sustained commitment to diversity are extensive and are housed in various parts of the organization. I identified seven types of programmatic efforts that are most relevant to the questions at hand. I note, however, that through philanthropic and other components of Merrill Lynch's outreach, other high-quality programs also exist. The core programs I reference are as follows:[82]

1. Community leadership training: Merrill Lynch approaches community leadership development as a partnership between employees and local community organizations. On the one hand, Merrill Lynch offers employees an opportunity to become involved with a community organization of their choice under the aegis of their employment with Merrill Lynch. At the same time, Merrill Lynch also seeks opportunities to bring community leaders into the Merrill Lynch environment. Political, philanthropic and business leaders in the community are invited to address Merrill Lynch employees on areas of importance in the local area. The mutually beneficial nature of these relationships is that local organizations gain from the involvement of talented business personnel. The relationship simultaneously provides Merrill Lynch exposure to and access to prospective employees of color.

2. Community involvement in sales force recognition: To further encourage employees to become engaged with their communities, Merrill Lynch provides local offices with a roadmap detailing ways in which positive employee recognition can occur. At the local office level, an office community coordinator is tasked to identify employee accomplishments in this arena and bring those achievements to the attention of the branch manager. Broader collaborative community accomplishments are

---

[81] Susan Rogers interview. Note that the Directors Advisory Council to Management is not the same as the Diversity Advisory Council to Management. This body is comprised of complex directors who have responsibility for multiple offices.
[82] MLMRE 013_002101-002123 for all programs listed in this sequence.

recognized at the Managing Director level. An internal best practices template provides specific ways in which employees can be acknowledged in the area of community development. Suggested recognition methods range from acknowledgment at various meetings (sales, district, training, etc.) to inclusion in internal paper and electronic publications to personal outreach from senior members of the Firm.

3. Speakers' Bureau: Community organizations rely on outside speakers to provide content for a variety of scheduled events. Merrill Lynch offers its employees in this capacity through an internal speakers' bureau. For example, a non-profit organization may need a speaker at its board of directors meeting who can provide training on a particular financial instrument that could enhance fundraising effectiveness. Or, an ethnic economic development group might benefit from advice on small business cash management and lending. Through collaborative partnerships with a variety of external organizations, Merrill Lynch provides an important service at no cost to the sponsoring organization.

4. Community Referrals: Through community organizations, Merrill Lynch is able to reach ethnically diverse candidates who might not otherwise be aware of the career opportunities it offers. I note that the specific extent to which these efforts produce candidates for the FA position is unclear. Although diversity and inclusion is not the primary reason for this program, such efforts can and have proven fruitful as a resource for a variety of employment opportunities with the Firm.

5. Loaned Executive Program: Merrill Lynch offers POA trainees "on loan" to community organizations to help in their fundraising efforts. This enables the non-profit community group to benefit from the skills of a resource trained in accessing and gaining commitment from high net worth individuals. Clearly, Merrill Lynch benefits in that the loaned executive has an opportunity to develop or strengthen their relationship with people in the high net worth donor base. In addition, the POA employee experiences a valuable training assignment.

6. Financial Advisor Networks: Financial Advisor Networks are internal groups within Merrill Lynch that support FAs of color by providing practical support in the form of marketing tools and idea-sharing forums. There is a Financial Advisor Network for African Americans, the Black Professional Network discussed above.

7. External Diversity Advisory Council: A unique practice within Merrill Lynch is the use of an External Advisory Board. This is a select group of well-known professionals who advise Merrill Lynch executives on diversity and inclusion matters. The strategies represented in this section speak specifically to Merrill Lynch's efforts to create a strong, positive presence in local communities by forming partnerships with external constituencies. I note that to some degree there is overlap between efforts of this kind and those that relate more directly to recruiting FAs of color.

In sum, what is significant, in my opinion, is the shift from a programmatic approach to a more strategic approach with concrete benefits outlined for both the Firm as a whole and FAs in specific demographic groups. Merrill Lynch's focus on creating metrics that indicate

how well the intended support is working to support FA business development is, in my opinion, worthy of positive note.

## Accountability and Measurements

In my opinion, Merrill Lynch's approach to measurement is exemplary in two ways. Considerable attention has been placed on developing the right measurements. And Merrill Lynch has consistently used measurement as the basis of refining and revising its approach.

Merrill Lynch uses two types of metrics: measurements that are unique to the industry and, more recently, a CEO scorecard developed under the leadership of Barry Salzberg, CEO of Deloitte LLP, as a CEO initiative of Diversity Best Practices.[83]

- Metrics used within Merrill Lynch are quite thorough. Merrill Lynch measures both quantitative outcomes (such as workforce representation by gender and ethnicity) and qualitative outcomes (such as impact of training).[84] Further, Merrill Lynch has developed and deployed an innovative approach that actually looks at success indicators for FAs and enables managers to examine each FA's status against those indicators in real time.[85]

- In October 2007, Merrill Lynch began taking steps to bring the quality of its measurement and accountability practices to the next level. Recognizing the potential gap between measurement as a diagnostic tool and measurement as a tool to drive strong manager execution, the Office of Diversity launched a process to revamp the role of the analyst.[86]

- Whereas the original design of the measurement/accountability process relied on managers seeking out data, the new design is incorporating a rolling audit of the offices each year. By proactively partnering with the offices, Merrill Lynch will be better positioned to identify specific needs and support managers in fulfilling that part of their job.[87]

- Personnel within the Analytics Group will be tasked with serving more proactively as coaches/counselors to managers. Analysts will become true partners at the table with managers, helping them to see not only what the data shows, but also what they have done or need to do to help FAs in their area succeed. For example, if the data shows that an FA is lower in quintile ranking, the analyst will work with the manager to identify root causes (poor marketing plan, etc.) and to create specific response strategies. Similarly, if patterns emerge around specific dimensions of

---

[83] Diversity Best Practices, CEO Scorecard Project, www.diversitybestpractices.com.
[84] Maura Gallagher interview.
[85] Maura Gallagher interview, Keith Henry interview.
[86] Keith Henry interview.
[87] Tamara Cassidy interview.

diversity, the analyst will support the manager in determining potential problem areas and their resolution, sooner rather than later.[88]

This approach not only creates a safety net to quickly identify systemic issues; it also represents a strong commitment not just to hire people of color, but to offer them the opportunity for a robust and productive career.

With regard to diversity and inclusion at Merrill Lynch employs three types of measurements:

- General diversity statistics. These are statistics collected and analyzed by ethnicity and gender and include data on workforce representation, recruiting source performance, hiring, promotion and turnover.

- Success ratio comparisons. The success ratio formula looks at where an FA stands in terms of quintile ranking. Although this section is devoted to measurements and accountability, I feel it is important to note that historically, the development part of this equation was repositioned under various training programs for FAs in general and FAs of color in particular.[89]

- Impact of training efforts. Post-training metrics include post-/pre-production assessments and net new households for individual FAs and FA retention for complex directors.[90]

Given that production is the ultimate measure of success for the FA, and that changes in workforce representation and retention is a primary goal of the Merrill Lynch diversity initiatives, these measurements appear to be not only appropriate, but potentially effective levers for results.

In the section discussing the period 2001-2005 I referenced a unique measurement tool called the Dashboard that enables managers to know how FAs of color are performing in real time. Created in 2004 as a static spreadsheet, the Dashboard has evolved into an interactive computer-based tool that allows managers to closely track the performance of each FA.

---

[88] Tamara Cassidy interview.
[89] Maura Gallagher interview.
[90] Tamara Cassidy Interview, Maura Gallagher interview. In our interview Tamara Cassidy stated that she would describe the training impact analyses conducted as a "best practices" within Merrill Lynch.

# Conclusions

I began this report by addressing the request for an opinion made by attorneys for Merrill Lynch, as follows:

1. Merrill Lynch's diversity and inclusion efforts, including its commitment to diversity as reflected through its leadership, programs and practices from 2001 to 2005.

2. The same considerations for the period from 2005 to the present.

3. Bielby's assertion (at ¶ 67) that Merrill Lynch programs were implemented "in a context of ambiguous, unstable, and diffuse structures of responsibility and authority … the kind of organizational context that social science and management research shows can make them ineffective or even counterproductive."

4. Dr. Bielby's assertion (at ¶ 72) that pushing responsibility for diversity down into the business created diffuse and ambiguous lines of responsibility and accountability for diversity.

5. Dr. Bielby's assertion (at ¶ 71, 81) that the absence of effective responsibility structures at Merrill Lynch is not merely due to a lack of focus, knowledge and competence regarding the issues of diversity, but rather that the absence is intentional in that organizations make deliberate decisions about whether or not to decouple their diversity efforts from their core operations and from their legal obligations not to discriminate.

To frame my responses, I considered three additional questions:

- Is there evidence to support or refute that Merrill Lynch demonstrated a commitment to diversity and inclusion in general?

- Over the period of time in question, did Merrill Lynch take action that indicates a willingness and commitment to continuously improve its diversity and inclusion outcomes?

- Did Merrill Lynch institute what, in my opinion, constitute appropriate measurements and accountability structures for the outcomes it sought to achieve?

The central question to be answered is "Can one equate iimperfect effort with a lack of commitment?" My answer to this question is no. I base this conclusion on my experience with large corporations both inside and outside the United States. Those who study organizations academically do so by observing what transpires in organizations and creating models and theories that support what they observe. As a practitioner of diversity and inclusion work for many years, I have found those models to be useful in my own work. I must note, however, that models are usually developed after the fact. They do not, therefore, reflect the challenges that businesses face in making decisions in real time.

My opinion is that Merrill Lynch has worked diligently to understand what it would take to create a more diverse workforce and a more inclusive culture. The Firm has been actively involved in Diversity Best Practices, a respected benchmarking group, for some time. The Firm has also participated in research projects sponsored by the Securities Industry Association. Merrill Lynch has, at various points in time, sought outside support from respected consultants and from industry leaders who might offer a helpful perspective. These, in my view, are not the actions of a company with the intent to pay lip service to a commitment to diversity. The potential for public exposure of its fallacies is too great to take such risks unless the company actually seeks to be what it says, "an employer of choice."

Based on the information I have reviewed, it would be nonsensical to conclude that a company of its ilk would be content to just meet the requirements of the law. Too much money, time and brain power has been devoted for this effort to be viewed as window dressing.

I further opine that Merrill Lynch did effectively apply what it learned in many instances. Some components of its work, like the Symposia and the Dashboard, would be viewed as models for other companies to follow, while other aspects of its work failed.

As to the assertion that the infrastructure was intentionally flawed to circumvent a legal requirement not to discriminate, in my opinion, is not true. Looking at the period 2001-2005 specifically, I observe that execution at Merrill Lynch, and at many companies, is deliberately driven at the business unit/field level. In fact, a common and accepted business practice is to intentionally drive the ownership for results to the lowest possible level in the organization. Total Quality Management, Business Process Reengineering and other methods that grew in use during the past 15 years were specifically designed to ensure that this occurred. If Merrill Lynch's acceptance of this approach was wrong, the same would be true of most of the Fortune 500 companies. In this approach, senior leaders are not expected to focus on tactics. Their role is to capture and communicate a vision, not to micromanage day-to-day details of execution. It is, therefore, not only appropriate but essential that functional areas be afforded the opportunity to problem-solve in ways that make sense for specific areas of the business. My review of the data clearly indicates that this is what occurred at Merrill Lynch.

During the same period, 2001-2005, senior leadership engaged in the second key role that the executive leadership should play—"getting the word out." Through a series of communications approaches, senior executives at Merrill Lynch communicated the importance of diversity to the Firm. This was accomplished formally, through written communications, and was afforded gravity through personal, repeated and active participation in important events by senior leaders. Business people understand that where senior executives spend their time is a critical indicator of the true priority of a strategic initiative. Again, Merrill Lynch executives exhibited the type of behavior in this area that would correlate to commitment.

Additional evidence that Merrill Lynch was committed to supporting a diverse and inclusive workforce is the creation of an Advisory Council to Management focused on diversity during this time period. The ACTM format, in my understanding, is an important one in the Merrill Lynch culture. The existence of a Diversity ACTM is a signal to the organization that this area is viewed as essential to the business and that the efforts associated with it are

intended to be sustainable. One does not create highly visible infrastructure where there is no commitment.

Much has been made of the presence or absence of an Office of Diversity and how that office evolved over time. In my opinion, the importance of an office of this type in the Merrill Lynch environment is overstated. In working with my clients, I strive to help them find infrastructures that make sense for their businesses. So, whether or not there is an Office of Diversity (usually a Human Resources-based function) is not the core question. More relevant is whether those charged with influencing culture are viewed as credible. And in a sales organization, credibility does not come from a staff function—it comes from having demonstrated success in what matters most to that business, i.e., revenue generation and client business development. This is the approach Merrill Lynch attempted to take in engaging persons from the field in shaping the broader diversity effort. It is possible that over-reliance on such persons may have been ineffective. What matters in my opinion, is that Merrill Lynch proceeded in a manner that made sense for its business and, therefore, substantiates my conclusion that there is strong evidence of commitment to diversity.

I note that numerous programs designed to better prepare both FAs of color and their managers have been introduced since 2002. Many of the programs were developed by none other than Dr. David Thomas, a highly regarded African-American professor at the Harvard Business School known for his work in mentoring and professional development for African-Americans, a body of research he began while on the faculty at the Wharton School of Business. It is noteworthy that Merrill Lynch engaged support from an expert in the particular areas of challenge that the Firm and its African-American FAs were facing.

With regard to diversity-specific programs, the first formal African-American Training Symposium occurred in 1996. This multiple-day event provided an extraordinary opportunity for skills and relationship building for those African-Americans who chose to attend. The Symposia faculty were the highest producers from within the Merrill Lynch organization, meaning that individuals had the opportunity to specifically address questions and build longer-term developmental relationships with people who could informally mentor and coach them going forward. This was an opportunity that was not afforded to all FAs. The Symposia are just one of the diversity-specific processes launched before 2005. Again, the opportunity to interface with the most senior leaders within the organization, to build networks across regions, and to learn from some of the most successful people in one's field cannot be overestimated.

Also, I observe that in 2004 Merrill Lynch moved aggressively in the area of manager accountability, by introducing the Dashboard.

As I examine the period from 2001-2005, I cannot agree with the assertion that Merrill Lynch's efforts to strengthen its diversity and inclusion initiative lagged until 2006. On the contrary, it is apparent that during this period several important pieces of work were put in place that began to develop more fully after 2006.

I next address Dr. Bielby's assertion that absence of effective responsibility structures at Merrill Lynch is not merely due to a lack of focus, knowledge and competence regarding the issues of diversity, but rather that the absence is intentional in that organizations make

39

deliberate decisions about whether or not to decouple their diversity efforts from their core operations and from their legal obligations not to discriminate. I saw no evidence that Merrill Lynch intentionally decoupled diversity from its core operations. The ACTM, the Dashboard, the Symposia and all of the processes I have presented in this report point to exactly the opposite conclusion. These were not "cookie cutter" approaches to handling the challenges of supporting a diverse workforce. They were integral parts of Merrill Lynch's core operations.

With respect to Merrill Lynch's diversity efforts since 2006, it is my opinion that Merrill Lynch has further refined and built upon the work done in previous years and has begun to respond to lessons learned. What strikes me particularly is Merrill Lynch's continued willingness to take action based upon input from its diverse FA population. During this period:

- The Office of Diversity continued to evolve with new leadership.

- The Diversity Employee Advisory Council evolved into the Diversity and Inclusion Council.

- Bob McCann continued to show personal support through his work with the Black Professional Network.

- Additional management training was introduced.

- A specific program to support diverse FAs in building stronger businesses, JumpStart, was piloted. This included a strong coaching component of the type that is usually reserved for the most senior people in an organization.

- The Regional Business Development Program, a pathway to leadership beyond the FA level, was revisited to ensure that substantial attention was given to reaching out to potential leaders of color.

- Merrill Lynch expanded its community outreach to minority communities.

- A scorecard approach to measurement was introduced alongside Dashboard.

- An advisory function to help managers better interpret and respond to their Dashboard metrics was introduced into the role of the Division Diversity Managers.

To conclude, I return to my original three questions, which were my pathway for responding to the specific questions posed by attorneys for Merrill Lynch.

- Is there evidence to support or refute that Merrill Lynch demonstrated a commitment to diversity and inclusion in general? I conclude that Merrill Lynch did indeed demonstrate strong commitment to diversity and inclusion in general and to the development of its African-American FAs in particular.

40

- Over the period of time in question, did Merrill Lynch take action that indicates a willingness and commitment to continuously improve its diversity and inclusion outcomes? My answer is an unequivocal yes.

- Did Merrill Lynch institute what, in my opinion, constitute appropriate measurements and accountability structures for the outcomes it sought to achieve? Again, I answer yes.


_____

Olivet Benbow Jones

11/14/08

_____

Date

41

# Appendix A: Bibliography

*2003 Functional Diversity Primer*. Washington, D.C.: Diversity Best Practices, 2003.

*2005 Report on Diversity Strategy, Development and Demographics: Key Findings*. Securities Industry Association, 2005.

*Achieving Diversity Competencies*. Diversity Best Practices, 2006 <www.bpincc.com>.

*Best Practices in Achieving Workforce Diversity:* U.S. Department of Commerce and Vice President Al Gore's National Partnership for Reinventing Government Benchmarking Study, 2007, <http://govinfo.library.unt.edu/npr/library/workforce-diversity.pdf>.

"Best Practices of Private Sector Employers." *The United States Equal Employment Commission,* May 30, 2008. <www.eeoc.gov/abouteeoc/task_reports/prac2.html - 31k >.

Burton-Goss, Sadie. *Training Managers to Better Manage Diversity*. Presented to the American Society for Training and Development, May 6, 1990.

Caudron , Shari. "Are Diversity Programs Benefiting?" *Black Enterprise* May 2008, pp. 121-132.

Caudron, Shari. "Monsanto Responds to Diversity." *Personnel Journal* Nov. 1990, pp. 72-78.

*The Challenge of Diversity*. Equal Employment Opportunities and Managing Differences in the 1990s. Rockville, Maryland: BNA Communications, 1991, pp. 5-24.

*Chief Diversity Officer Insights: Corporate Mentoring Programs: Increasing Your Diversity Advantage*. Washington, D.C.: Diversity Best Practices, 2007.

Cuyjet, Cynthia. *Executive Leadership Council Foundation: Diversity Best Practices Report*. Private Working Papers, Sept. 11, 2007.

*Disentangling the Meanings of Diversity and Inclusion*. Center for Advanced Human Resources Studies, Cornell University, 2008. <www.ilr.cornell.edu/CAHRS>.

*Diversity Best Practices Business Women's Network Conference Call on Chief Operating and Chief Diversity Officer*. Diversity Best Practices, May 30, 2008. <www.diversitybestpractices.com>.

*Diversity Best Practices Conference Call*. The Business Case for Diversity, a CEO Caste Study, CEO Engagement in Mission Success, Hosted by Antonio Perez, Chairman and CEO of Eastman Kodak. Co. Washington D.C.: Diversity Best Practices (Electronic Transcript Services), June 7, 2006.

*Diversity Best Practices Conference Call Transcript*. Conference Call on CEO Leadership. Washington, D.C. : Diversity Best Practices, Feb. 24, 2005, pp. 1-33.

*Diversity Best Practices Conference Call, Corporate Diversity Councils*. Diversity Best Practices. May 30, 2008. <www.diversitybestpractices.com>.

*Diversity Best Practices Conference Call: Engaging the Entire C-Suite in the Diversity Mission*. Diversity Best Practices, May 30, 2008. <www.diversitybestpractices.com>.

*Diversity Best Practices Guide*. National Association for Legal Career Professionals, March 3, 2006, pp. 1-3.

*Diversity Best Practices White Paper: Succession Planning and Retention*. Collaboration of Diversity Best Practices, Business Women's Network and Best Practices in Corporation Communications. Washington, D.C. : Diversity Best Practices, 2004.

*Diversity Best Practices: Conference Call on Corporate Networks and Affinity Groups*. Transcript. New York, Aug. 25, 2005, pp. 1-40.

*The Diversity Department*. Transcript of Conference Call Presentation by Edie Fraser, Diversity Best Practices; May Snowden, Vice President Global Diversity, Starbucks Coffee Company; Kay Hoogland, Vice President Corporate Director Global Diversity Motorola; Dr. Ashley Fields, Director of Organization Management Development and Diversity, BMC Software; and Deb Dagit, Executive Director of the Diversity and Work Environment, Merck & Co., Inc. Jan. 12, 2005.

"Diversity in the Finance Industry." *United States Equal Opportunity Commission*. 2008. <www.eeoc.gov/stats/reports>.

"Diversity in the Workplace: Achieving Top to Bottom Engagement (Conference Call Transcript)." *Diversity Best Practices*. May 30, 2008. <www.diversitybestpractices.com>.

*The Diversity Officer: Special Report, An Innovative Change Leader Operating in the C-Suite*. Washington, D.C.: Diversity Best Practices, an iVillage Company, 2004, pp. 1-331.

"Diversity Practices That Work: The American Worker Speaks." *Published by The National Urban League,* 2004 <www.nul.org/news/2004/diversity_rel16.html>.

*Diversity Training: A Research Report*. New York, New York: The Conference Board, 2005.

*Draft: Sixteen Trends in Diversity*. Primer for Best Practices, Business Diversity and Inclusion. Diversity Best Practices, an iVillage Company, May 2002.

*Framework for Diversity at Amoco*. Joint Collaboration of the Diversity Advisory Councils of Amoco Oil. Chicago, Illinois: Amoco Internal Communications, 1994, pp. 1-16.

Gaskins, Richard. *IDS Benchmarking Study*. IDS/American Express, 1994.

Griggs, Ph.D., Thomas. "Ten Critical Success Factors for a Multicultural Initiative." *Visions, Inc.,* May 30, 2008. <www.nscgroup.com>.

Hansen, Frederick. *Changing Workforce Practices with Behavioral Feedback: A Longitudinal Study*. Applied Personnel Technologies. Minneapolis, MN: Honeywell Corporation, 1999, pp. 3-9.

*Industry Leaders in Diversity: A Special Report*. Washington, D.C.: Diversity Best Practices, 2006, pp. 2-308.

Rasmussen, Tina. *Correspondence with Office of Olivet Jones Regarding Nestle Best Practices Study,* Feb. 7, 1994.

Reichenberg, Neil E. *Best Practices in Diversity Management*. United Nations Headquarters: International Personnel Management Association , May 4, 2001.

Roberson, Quinetta M. *Examining the LInk Between Diversity and Firm Performance: The Effects of Diversity Reputation and Leader Racial Diversity*. Research Paper Published by the Center for Advanced Human Resource Studies (CAHRS), Cornell University. Ed. Hyeon Park. Ithaca, New York: Cornell University, 2006.

Solomon, Charlene M. "The Corporate Response to Work Force Diversity." *Personnel Journal,* Aug. 1989, pp. 43-53.

Thomas, Roosevelt. "From Affirmative Action to Affirming Diversity." *Harvard Business Review Reprint* 90.2 (1990): pp. 107-116.

Vance, Jeff. *Diversity Initiative at the Northern Trust*. Presentation to the Human Resource Management Advisory Council, Private Papers. Chicago: Feb. 11, 1994, pp. 1-6.

*Vault/SEO Guide to Investment Bank Diversity Programs*. New York, New York: Vault, Inc., 2006.

Walker, Barbara. *How the Valuing Differences Approach Evolved at Digital Equipment Corporation: Draft of Internal Working Document*. 1991.

"White Male Engagement: Inclusion Is Key." *CDO Insights,* Apr. 2007, pp. 1-12.

White, Lynda. "Closing the Gender Gap: The Royal Bank Experience." *The Diversity Factor,* Sept. 1995, pp. 1-7.

*Women and Minorities on Fortune 100 Boards*. The Alliance for Board Diversity. Catalyst, the Prout Group, the Executive Leadership Council and the Hispanic Association on Corporate Responsibility, 2005.

*Workforce Diversity Office*. Ernest Orlando Lawrence Berkley National Laborato May 30, 2008. <www.lbl.gov>.

## Appendix B: Interview Subjects

| Merrill Lynch Leader Interviewed | Title | Date(s) of Interview |
|---|---|---|
| Subha Barry | First Vice President and Head of Global Diversity and Inclusion | 10/29/2007 |
| Westina Matthews Shatteen | Managing Director of Diversity and Community Relations | 10/29/2007 |
| Keith Henry | Director of Bridgewater Complex | 11/1/07 |
| Phil Sieg | Managing Director, Strategic Leadership and Financial Advisor Development | 11/2/2007 |
| Tamara Cassidy | Vice President, Analytics and Assessment | 1/23/2008, 2/8/2008 |
| Catherine Kapferer | Vice President, Diversity Programs Development and Retention | 1/23/2008, 2/8/2008 |
| Maura Gallagher | Director, Office of Diversity, Business Analytics and Compliance | 3/14/2008 |
| Rosanna Innes | Vice President, Global Wealth Management, Human Resources/Director, Global Training and Organizational Design Group | 3/24/2008 |
| Nancy Deering | Confidential Workplace Advisor and Manager, Reverse Mentoring Program | 3/25/2008 |
| Susan Rogers | Director, Global Wealth Management Leadership Development | 5/1/2008 |
| Todd Sears | Northeast Division Diversity Manager | 5/6/2008 |
| Dee Kerrison | Western Division Diversity Manager | 5/8/2008 |
| Ron Meraz | Managing Director and Head of Global Diversity | 5/16/2008 |
| Elizabeth Moriarty | Director of Leadership Development | 5/29/2008 |
| Erin Magnuson | Director of Leadership Development, Global Wealth Management | 5/29/2008 |

## Appendix C: Deposition Transcripts Reviewed

- Subha Barry, April 12, 2007
- Tamara Cassidy, December 20, 2006
- Jyoti Chopra, June 8, 2007
- John Hogarty, October 5, 2006
- Robert McCann, February 22, 2007
- E. Stanley O'Neal, November 1, 2006
- Kim Pillar, February 23, 2007
- William P. Sieg, November 29, 2006 and December 1, 2006
- Daniel C. Sontag, January 17, 2007

# Appendix D: Olivet Jones CV

### Olivet Benbow Jones

Olivet Benbow Jones is an Executive Consultant under contract to Novations Group, Inc. and Managing Director of her own firm, a Chicago-based consortium that specializes in human resources, management development, organization development, and training. Her overall responsibility is to ensure total client satisfaction with all areas of the firm's work. Recently, she was selected as a reviewer for the Academy of Management.

For the past 26 years, Olivet has served a wide range of clients, including Fortune 500 companies and nonprofit organizations. Her work has included both the management of consulting teams and integral involvement in the design, development and delivery of numerous assignments. Examples of recent assignments include:

- Serving as a senior coach on a 20-person coaching team, which is charged with supporting professionals of color in their ascension to senior levels in corporate and other organizations. The coaching is linked to an intensive self-development called "Efficacy," which is the proprietary intellectual property of Novations Group, Inc. In the past year, she has completed more than 400 coaching hours with 15 mid-level managers and will assume an additional 16 coaching clients, each of whom will receive 20 coaching hours over the course of 8 months.

- Serving as a lead faculty member in the Diversity Champions Initiative for the YMCA of the USA, one of the largest nonprofits in the world. Her specific contribution was the application of organizational development principles to develop and implement processes that foster a diverse and inclusive culture. She was co-designer of the first ever Diversity Champions Faculty for the organization.

- Developing a process for assessing employee alignment with diversity for a large, regional community college system. The work included developing the overall process, working through a forty-person internal systems change team, coaching the Program Manager, and interfacing directly with the Vice President of Human Resources as a process advisor. She guided the team to a comprehensive strategy, which integrated with the larger strategy of the college and enabled them to move forward in concert after experiencing a three-year delay in progress. She also designed and implemented a one-day training program for faculty and staff at the College.

- Leading a Competency Development Project for the Chicago Jobs Council. CJC was funded for a program to create cultural competency within a select group of member organizations. She designed the concept, conducted assessments of each of the six participating organizations, created large group learning processes and guided the program to a highly successful outcome over a two-year period.

- For a multinational consumer goods company, designing and directing the execution of a project to identify gender issues within Spain, the United Kingdom, the Netherlands, and France

- Structuring the strategy to execute the project

- Identifying and assembling consultant teams in each of the four countries

- Developing a model to integrate learnings from the client's United States operations with those countries covered by the study

- Authored various versions of the final report, which ultimately became the basis of a new diversity strategy in the client's key European operations

- For a $6 billion multinational beverage company, serving as project director and team consultant on a comprehensive, multi-year diversity strategy planning and execution engagement

  - Designing the overall strategy

  - Assembling and leading a team of 23 professionals who are engaged in the 6 key phases of the assignment in 4 business units

  - Providing ongoing, day-to-day support to the Executive Vice President of Diversity

  - Participating in conducting data gathering and analysis

  - Personally conducting executive level training for the Chief Operating Officer and his direct reports

  - Coordinating research, design, consulting and training delivery efforts in the United States, Latin America and Europe

- Designing and delivering a custom diversity training program for the account management group of one of the top five advertising agencies in the world

- Conducting a review of human resource systems for a Fortune 50 chemical commodities company, including methodology, design and execution via a project team

- Conducting the original needs analysis and directing the development of a comprehensive Diverse Workforce Management strategy for the largest region of a Fortune 10 communications company

  - Working with a senior-level task force to develop a long-term strategy and design an appropriate approach

  - Designing, writing and delivering a core diversity awareness and management skills training program that has subsequently been introduced to six additional strategic business units within the client organization

- Personally training more than 2500 managers and employees

- Developing a master trainer program for internal facilitators and certifying client trainers

- Designing and writing two modifications of the core program targeted to non-supervisory managers and sales personnel

- Personally conducting more than 120 training sessions for mid- to senior-level management groups

- Providing periodic one-on-one interventions for managers and employees

- Conducting a study of perceptions of minority employees for the largest operating company of a $3 billion consumer goods concern

  - Designing the survey approach and instrument

  - Conducting intensive interviews with survey participants

  - Providing a confidential analysis of findings to the Executive Committee

  - Designing a resolution strategy

  - Providing ongoing implementation support to the Vice President of Human Resources

- Conducting an analysis of employee focus groups that served as input to the diversity strategy of a Fortune 50 electronics and communications company

- Directing the design and execution of a unique candidate sourcing program that dramatically increased the number of minority brokers for a Wall Street financial firm

- Directing a human resource assessment for a world-class medical teaching institution

  - Structuring an analysis which examined 13 dimensions of the human resource system

  - Conducting more than 100 interviews with a cross section of employees

  - Managing the team to produce a comprehensive strategy that focused specifically on diversity issues

  - Presenting findings to the President and Executive Committee

  - Co-presenting findings and recommendations to employee groups with the President

– Representing organization in conversations with various community groups

Directing a one-year assignment, which entailed analysis of employee perspec
on human resource issues for a $1 billion commodity-based manufacturing cc

Other relevant experience includes the following:

- Speaking engagements at numerous professional and academic associations on
the subject of diversity and inclusion, including the Mid-Atlantic Placement
Association, the Midwest College Placement Association, the University of
Chicago, the Illinois Institute of Technology, the University of Michigan and the
University of Illinois.

- Selected as a contributing writer for the Best Practices section of the now defunct
Diversity Channel.

- Formerly the African-American Careers Expert for Monster.com.

Olivet received her A.B. from Smith College in Northampton, Massachusetts. She has
completed additional graduate studies at the Kellogg School of Management and National
Training Laboratories. She was a founding member of the Coalition of 100 Black Women,
Chicago Chapter.

Olivet has been featured on an ABC NEWS 20/20 special hosted by John Stossel, where
she was recognized as a subject matter expert on diversity. Olivet is the former host of
"Job Line," a live television program on employment that was broadcast on WGN-TV. She
is a frequent speaker on the subject of developing competency for diversity and inclusion in
the workforce, including keynote presentations to the Mid-Atlantic Placement Association,
Midwest College Placement Association and presentations at the University of Chicago, the
Illinois Institute of Technology, the University of Michigan and the University of Illinois. She
has been a contributing writer for the "Best Practices" section of The Diversity Channel
Now (www.thediversitychannelnow.com) and African-American Careers Expert for
Monster.com (www.monster.com).