**Merrill Lynch's Memorandum in Opposition to Plaintiffs' Motion for Class Certification**

# APPENDIX I:
# MADDEN REP.

**Evaluating Whether Employment Outcomes for
Brokers and Broker Trainees at Merrill Lynch
Are Racially Neutral**

**Expert Report of
Janice Fanning Madden. Ph.D.
and
Alexander Vekker, Ph.D.**

## TABLE OF CONTENTS

LIST OF TABLES.............................................................................................................iii

LIST OF FIGURES ...........................................................................................................v

I.    INTRODUCTION ....................................................................................................1
    *Qualifications of Experts*.............................................................................2
    *Conclusions with Respect to Compensation*................................................4
    *Conclusions with Respect to Account Distributions*...................................5
    *Conclusions with Respect to Teaming and Pooling Arrangements* ............6
    *Conclusions with Respect to Broker Attrition* ...........................................7
    *Conclusions with Respect to Broker Training Program* .............................7
II.   COMPENSATION ...................................................................................................9
    *Compensation Disparities by Race and Year* ...........................................11
    *Quintile Distributions by Race and Year* .................................................19
    *Racial Disparities in Income Increase with Length of Service* ................23
    *Summary* ....................................................................................................23
III.  ACCOUNT DISTRIBUTION ................................................................................24
    *Data*............................................................................................................28
    *Racial Difference in Productivity Arising from Racial Disparities in the Distribution of Accounts* ..........................................................................................................29
    *Do Account Characteristics Affect Whether It Is Distributed to an African American or a White Broker?*........................................................................................34
IV.  TEAMS AND POOLS...........................................................................................37
V.   ATTRITION ..........................................................................................................38
VI.  BROKER TRAINING PROGRAM (POA) ..........................................................40
    *POA Completion Differences by Race* .....................................................41
        POA Survival Analysis.........................................................................41
        Likelihood of Graduating from POA ...................................................42
    *Racial Disparities in Account Distributions in the POA Program* ...........43
    *Racial Disparities in Access to Pools and Teams in the POA Program* ...46
VII. RACIAL DIFFERENCES IN PRODUCTIVITY OF BROKERS.........................47
    *Conclusion*..................................................................................................48
VIII. CONCLUSIONS...................................................................................................48


APPENDIX A       Glossary of Terms ...............................................................83

ATTACHMENT A   Curriculum Vita of Drs. Janice Madden and Alexander Vekker............85

ATTACHMENT B   Summary of Testimony of Drs. Janice Madden and Alexander Vekker...105

ATTACHMENT C   Statement Regarding Compensation of Drs. Janice Madden and Alexander Vekker...................................................................................108

ATTACHMENT D   Materials Relied Upon ……………………………………………..110

## LIST OF TABLES

| | Tables | Page |
|---|---|---|
| Table 1 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2001 | 52 |
| Table 2 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2002 | 53 |
| Table 3 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2003 | 54 |
| Table 4 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2004 | 55 |
| Table 5 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2005 | 56 |
| Table 6 | Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2006 | 57 |
| Table 7 | Effect of Race of Financial Advisors on Yearly Asset Values and Prior Production Credits for Accounts Transferred from Financial Advisors Departing from Merrill Lynch and House Accounts, 2001-2006 | 58 |
| Table 8 | Effects of Characteristics of Transferred Accounts on Race of Recipient Financial Advisor | 59 |
| Table 9 | Proportions of African American and White Financial Advisors at Merrill Lynch Who Participate in Teams and Pools, by Year, 2001-2006 | 60 |
| Table 10 | Effects of Race of Financial Advisors on Increases in Asset Values Under Management, Due to Increases in Shares of Teams or Pools, for Financial Advisors Who Increased Their Shares, between Beginning and End of Each Year, 2001-2006 | 61 |
| Table 11 | Effects of Race on Departure from Financial Advisor Positions, All Employees Entering Financial Advisor Titles at Merrill Lynch from January 1, 2001 through 2006 | 62 |
| Table 12 | Effects of Race on Departure from the Broker Training (POA) Program, All Employees Entering POA Titles at Merrill Lynch from January 1, 2001 through 2006 | 63 |

**LIST OF TABLES**

Table 13   Effects of Race on Probability of Graduation from the Broker Training     64
           (POA) Program, All Employees Entering POA Program at Merrill Lynch
           from January 1, 2001 through October 2004

Table 14   Average Asset Values of Total Accounts Transferred to POAs By Month      65
           of Participation, 2001-2006

Table 15   Racial Differences in Asset Values and Prior Year Production Credits for  66
           Assets Under Management, at Graduation from POA Program, (2001-
           2006)

Table 16a  Proportions of African American and White POAs at Merrill Lynch Who      67
           Participate in Pools, by Year, 2001-2006

Table 16b  Proportions of African American and White POAs at Merrill Lynch Who      68
           Participate in Teams, by Year, 2002-2006

Table 17   Effect of Race of Recipient Broker on Changes in Production Credits      69
           Earned the Year after Transfer Relative to the Year before Transfer, 2001-
           2005

**LIST OF FIGURES**

| | **Figures** | **Page** |
|---|---|---|
| Figure 1 | Distribution Across Quintiles by Race and LOS, 2001 | 71 |
| Figure 2 | Distribution Across Quintiles by Race and LOS, 2002 | 72 |
| Figure 3 | Distribution Across Quintiles by Race and LOS, 2003 | 73 |
| Figure 4 | Distribution Across Quintiles by Race and LOS, 2004 | 74 |
| Figure 5 | Distribution Across Quintiles by Race and LOS, 2005 | 75 |
| Figure 6 | Distribution Across Quintiles by Race and LOS, 2006 | 76 |
| Figure 7 | Effect of LOS on Compensation by Race, 2001 | 77 |
| Figure 8 | Effect of LOS on Compensation by Race, 2002 | 78 |
| Figure 9 | Effect of LOS on Compensation by Race, 2003 | 79 |
| Figure 10 | Effect of LOS on Compensation by Race, 2004 | 80 |
| Figure 11 | Effect of LOS on Compensation by Race, 2005 | 81 |
| Figure 12 | Effect of LOS on Compensation by Race, 2006 | 82 |

## I.    INTRODUCTION

This report contains the results of our study of employment outcomes for brokers and broker trainees at Merrill Lynch. We have been asked to examine whether there are racial differentials in employment outcomes. We analyze compensation, the distribution of resources that improve the production and asset accumulation records of brokers and broker trainees, access to teams and pools, attrition, and whether there are racial differences in the likelihood of completing the broker trainee program.

From the data provided by Merrill Lynch, we have identified 751 individuals who are African American and 22,571 individuals who are white and were also employed between January 1, 2001 and December 31, 2006. Our analyses use data that were provided by Merrill Lynch on these employees and on approximately 21 million accounts that were managed by these brokers and broker trainees over the time period. We use these data to compare employment outcomes for African American and white employees who are similarly situated with respect to those qualifications that were attained independently of Merrill Lynch's actions. We use, for example, data that Merrill Lynch prepared to track payroll, job status and account changes. We have reviewed deposition testimony of Merrill Lynch witnesses who have described these data, as well as diversity, compensation, account distribution, and broker trainee program practices. We use the data provided by Merrill Lynch to examine statistically whether employment practices were racially neutral. Racially neutral practices exist when there are no systematic differences in employment outcomes—i.e., compensation, participation in teams, account transfers, attrition—by race for brokers and broker trainees with equivalent experience. Systematic differences exist when there are statistically significant patterns associated

1

with race; that is, systematic differences exist when there are racial differences that are unlikely to arise from random variation or chance.

### *Qualifications of Experts*

Janice Fanning Madden is a labor economist with extensive experience in the analysis of labor markets and, in particular, of racial differentials in labor markets. She is currently Professor of Regional Science, Sociology and Real Estate and chair of the Graduate Group in Demography at the University of Pennsylvania. She came to Penn in 1972 after completing a Ph.D. in economics at Duke University in 1972 and an M.A. in 1971. She received her bachelor's degree in economics and mathematics from the University of Denver in 1969. She served as Vice Provost for Graduate Education, Penn's chief officer for graduate education, from 1991 through 1999. She teaches courses dealing with economics, labor markets, and the relevant statistics both for graduate and undergraduate students at Penn. Her research dealing with the effects of race, gender, and urban location on labor market outcomes and metropolitan variations in income distribution has been published in the most prestigious economics and social science journals. She served as North American Editor of the international journal, *Urban Studies,* from 1997-2001. She has written five books: The Economics of Sex Discrimination (1972, reprinted 1975); Post-Industrial Philadelphia (1990); Work, Wages, and Poverty (1991); Changes in Income and Inequality within U.S. Metropolitan Areas (2000); and Mommies and Daddies on the Fast Track (2004). The National Science Foundation, the National Institute of Mental Health, the Brookings Institution, the U.S. Departments of Labor and of Housing and Urban Development and other federal

agencies and foundations have supported her research. She has been invited by the Federal Judicial Center to lecture federal and circuit judges on the use of statistics in discrimination litigation. She is also a senior consultant with Econsult Corporation. As a consultant at Econsult, she has been retained as an expert over the last thirty years by both plaintiffs and defendants in discrimination litigation involving ethnicity, race, age, and gender.

Alexander Vekker is Vice President of Econsult Corporation and Visiting Faculty of the Economics Department at the University of Pennsylvania. He has also taught at the Wharton School of the University of Pennsylvania, Drexel University and Peirce College. His consulting practice focuses on economic and statistical analysis in employment discrimination litigation. He received his Ph.D. in Economics from the University of Pennsylvania in 2001. His research (with Michael Morris) on temporary workers was published in the *Journal of Labor Research*. He also served as a referee for the *International Journal of Manpower*. In his most recent research work, which was published in *BMC Genomics,* he used his expertise in the application of statistics to contribute to a multidisciplinary research project.

We have reached several conclusions with respect to compensation, account distribution, teaming opportunities, attrition, and broker trainee program practices. We summarize the conclusions below. The details of the analyses that support these conclusions are discussed in the following sections.

### *Conclusions with Respect to Compensation*

We find that the awarding of compensation is not racially neutral.  For each year from 2001 through 2006, African American brokers are paid less than comparably experienced white brokers.  The average percentage differences (and the associated standard deviations) in annual compensation between African American and white brokers with equivalent experience, education, office location, and management responsibilities for each year are:

- 2001, African American brokers were paid 33.57% less (6.57 standard deviations)
- 2002, African American brokers were paid 36.53% less (7.37 standard deviations)
- 2003, African American brokers were paid 33.23% less (6.73 standard deviations)
- 2004, African American brokers were paid 37.98% less (8.03 standard deviations)
- 2005, African American brokers were paid 41.81% less (9.05 standard deviations)
- 2006, African American brokers were paid 42.34% less (9.07 standard deviations).

These compensation differences by race are extremely large and statistically significant (by the court's frequently used standards) for every year between 2001 and 2006.

Merrill Lynch categorizes brokers into quintiles that reflect a measure of performance that includes "production" on client accounts or assets.  Consistent with the compensation differentials, African American brokers are more likely to be in lower production quintiles than whites; that is, they are more likely to be in the fifth quintile and less likely to be in the first and second quintiles than whites of similar length of service (LOS).  We find that:

- For LOS 3 through 5, relative to whites, African Americans in:
  - 2001 were distributed 2.0 standard deviations lower across the quintiles
  - 2002 were distributed 1.5 standard deviations lower across the quintiles
  - 2003 were distributed 2.1 standard deviations lower across the quintiles
  - 2004 were distributed 2.4 standard deviations lower across the quintiles
  - 2005 were distributed 3.3 standard deviations lower across the quintiles
  - 2006 were distributed 3.3 standard deviations lower across the quintiles.

4

- For LOS 6 through 9, relative to whites, African Americans in:
  - 2001 were distributed 2.8 standard deviations lower across the quintiles
  - 2002 were distributed 3.3 standard deviations lower across the quintiles
  - 2003 were distributed 2.0 standard deviations lower across the quintiles
  - 2004 were distributed 1.3 standard deviations lower across the quintiles
  - 2005 were distributed 2.7 standard deviations lower across the quintiles
  - 2006 were distributed 2.6 standard deviations lower across the quintiles.

- For LOS over 10, relative to whites, African Americans in:
  - 2001 were distributed 3.0 standard deviations lower across the quintiles
  - 2002 were distributed 3.3 standard deviations lower across the quintiles
  - 2003 were distributed 3.3 standard deviations lower across the quintiles
  - 2004 were distributed 3.3 standard deviations lower across the quintiles
  - 2005 were distributed 3.3 standard deviations lower across the quintiles
  - 2006 were distributed 3.3 standard deviations lower across the quintiles.

- Broker compensation differentials by race increase with length of service (LOS).

### Conclusions with Respect to Account Distributions

The compensation of brokers depends on their overall business productivity level (production credits) and the type of business generated.[1]  If Merrill Lynch management provides African Americans with fewer opportunities to generate production credits, then any compensation differentials arising from the resulting production credits are discriminatory.  While there are many ways that Merrill Lynch management affects the opportunity to generate production credits, one that is more easily measured is the distribution of house accounts and of accounts previously managed by departing brokers to continuing brokers.  We find that the distribution of accounts to brokers by Merrill is not racially neutral.  Specifically, we find that:

- When brokers resigned for employment elsewhere[2] and their accounts were distributed to brokers or broker trainees remaining at Merrill Lynch,

---

1    Deposition of John Hogarty, October 5, 2006, pp. 43-44.

2    Brokers are presumed to have left for employment elsewhere when they resign for reasons other than death, disability, or retirement.

African American brokers and broker trainees received accounts that were 3.84 standard deviations lower in total asset value and 6.37 standard deviations lower in production credit history, than those distributed to white brokers between 2001 and 2006.

### *Conclusions with Respect to Teaming and Pooling Arrangements*

Racial differentials in compensation and account transfers are significantly associated with racial differentials in the likelihood of participating in teams and/or pools with other brokers, also known as financial advisors (FAs). Between 15% and 28% of the racial disparity in compensation is associated with pool and team membership policies at Merrill Lynch. African Americans are less likely than whites to be members of pools or teams. African Americans are less likely to increase their assets and production credits as a result of participation in teams and pools. Specifically, we find that in:

- 2001, 34% of African American and 60% of white FAs participated in pools, a difference of 5.43 standard deviations.
- 2002, 37% of African American and 65% of white FAs participated in pools, a difference of 5.89 standard deviations; 23% of African Americans and 50% of whites participated in teams, a difference of 5.38 standard deviations.
- 2003, 48% of African American and 68% of white FAs participated in pools, a difference of 4.46 standard deviations; 27% of African Americans and 51% of whites participated in teams, a difference of 4.94 standard deviations.
- 2004, 55% of African American and 71% of white FAs participated in pools, a difference of 3.63 standard deviations; 26% of African Americans and 51% of whites participated in teams, a difference of 5.16 standard deviations.
- 2005, 48% of African American and 73% of white FAs participated in pools, a difference of 5.69 standard deviations; 26% of African Americans and 51% of whites participated in teams, a difference of 5.27 standard deviations.
- 2006, 52% of African American and 76% of white FAs participated in pools, a difference of 5.70 standard deviations; 25% of African Americans and 52% of whites participated in teams, a difference of 5.65 standard deviations.

These differences in teaming and pooling opportunities by race directly decrease the relative ability of African Americans to compile production credits. We find that:

- Between 2001 and 2006, African American brokers received account assets that were 6.05 standard deviations lower than those received by white brokers who gained as the result of adjustments in pool shares.

- Between 2003 and 2006, African American brokers received account assets that were 4.98 standard deviations lower than those received by white brokers who gained as the result of adjustments in team shares.

### Conclusions with Respect to Broker Attrition

We find that attrition rates are significantly higher for African American FAs than for white FAs. We find that:

- Among FAs who enter the job on or after January 1, 2001, African American FAs are more than twice as likely to leave Merrill Lynch. The racial difference in attrition is 7.02 standard deviations.

- The racial differential in participation in pools and teams is associated with about half of the greater attrition rates of African American FAs. For African American and white FAs who participate in pools and teams at the same rate, African American FAs are 52% more likely to leave Merrill Lynch.

### Conclusions with Respect to Broker Training Program

The differential outcomes for African American and white brokers start with the 24 month broker training program, or "Paths of Achievement" (POA) program, and with the very start of the POA program. African Americans are less likely to succeed in the program. We find that:

- African Americans are 34% more likely to drop out of the program before completing (a difference of 4.49 standard deviations).

- African American POAs are less likely than white POAs to participate in pools;

7

- o In 2001, 12% of African American POAs are in pools, but 22% of white POAs participate in pools (1.92 standard deviations)

- o In 2002, 20% of African American POAs are in pools, but 39% of white POAs participate in pools (3.24 standard deviations)

- o In 2003, 20% of African American POAs are in pools, but 38% of white POAs participate in pools (2.48 standard deviations)

- o In 2004, 16% of African American POAs are in pools, but 36% of white POAs participate in pools (3.47 standard deviations)

- o In 2005, 16% of African American POAs are in pools, but 31% of white POAs participate in pools (3.18 standard deviations)

- o In 2006, 23% of African American POAs are in pools, but 41% of white POAs participate in pools (3.53 standard deviations).

- African American POAs are less likely than white POAs to participate in teams. After 12 months in the POA program, an average of 12% of African American POAs and 26% of white POAs are members of teams (4.73 standard deviations); after 24 months in the POA program, an average of 18% of African American POAs and 35% of white POAs are members of teams (3.57 standard deviations).

- The racial differential in pool and team participation by POAs is associated with approximately one third of the higher drop out rates for African Americans in the POA program.

- At the time of graduation from the POA program, African American broker trainees had accounts valued at $10.6 million lower than those of white broker trainees, a difference of 5.89 standard deviations. The accounts of African American broker trainees at POA graduation averaged $54 thousand less in production credits over the duration of the POA program than those of white broker trainees.

- Over the first two months in the POA program, accounts totaling an average of over $1,000,000 in asset value per trainee were distributed to white broker trainees, while accounts totaling an average of less than $500,000 were distributed to African American trainees. These differences are statistically significant.

- In all but two months of the POA program, white broker trainees received accounts that had higher average total asset values than those distributed

to African American broker trainees. These differences are statistically significant.

The bases for these conclusions are presented in the next six sections. Section II examines racial differences in compensation among brokers or financial advisors (FAs). Section III analyzes account distributions to determine whether there are racial disparities. Section IV analyzes racial differences in teaming and pooling arrangements. Section V examines racial differences in attrition from broker positions. Section VI analyzes the racial neutrality of the POA or broker trainee program. Section VII analyzes whether racial differences in the ability to generate production credits could account for the racial differences in employment outcomes. The last section summarizes our results.

There are also several attachments to the report. Attachment A includes our curriculum vitae. Attachment B provides a summary of our testimony in the last four years for each of us. Attachment C provides information on our compensation for preparing this report. Attachment D provides a list of materials that we relied upon.

## II.  COMPENSATION

Economists expect that compensation will vary with the productivity (i.e., individual efficiency in producing the desired output) of workers. "True" individual efficiency in producing is difficult to isolate for brokers, however, because numerous intermediate or complementary inputs provided by the employer such as office size and quality, number and quality of support staff, job title, access to teams and partners, and access to mentors also determine the observed number and quality of clients brought in by brokers of any given level of *individual* productivity (i.e., a combination of the individual's natural talent and effort). The challenge, then, is to sort out the effects of

9

individual productivity from the effects of the employer-provided complementary inputs on productivity.

Human capital theory provides a widely accepted set of characteristics that affect the productivity differences arising from the individual talent and effort differences (as opposed to those arising from access to complementary inputs) among workers. The theory focuses upon the investments that individuals make that increase their skills and thus make them more productive. The following characteristics are particularly important:

- Experience, measured by time with Merrill Lynch and time as a broker;
- Education.

Therefore, human capital theory leads us to some common sense conclusions. If one individual has more education, or more experience at Merrill Lynch, or more experience as a broker, he or she is likely to be more productive and to earn more compensation. To quantify racial differences in compensation, it is necessary to control for any systematic differences between African American and white brokers in their qualifications (that are the result of employee—as opposed to Merrill Lynch—actions) at the time of hire. There are then, two important elements of broker characteristics that determine whether they should be included in the analysis of Merrill Lynch's compensation practices: (1) the characteristics differentials are systematic by race after the inclusion of other included credentials; and (2) the characteristics differentials are the results of decisions made by the *individual employee*, not by Merrill Lynch.[3]

---

3       Merrill Lynch may provide training, titles, or other enrichments that increase the capacity of an individual to generate production credits. If Merrill Lynch controls who is offered the enrichment opportunities that increase production credits and if there are racial disparities in the incidence of such offers, then this is a practice that produces the racial disparities in compensation. The racial disparity in the

Compensation at Merrill Lynch is being studied in order to determine the extent to which it is affected by whether the broker is African American or white.  Therefore, it is only necessary that the analyses compare equivalently qualified groups of African American and white brokers.  Any characteristics that affect compensation that are possessed in equivalent proportions, or in equal intensity, by both racial groups after controlling for any characteristic differences already included in the analysis, cannot affect the size of the racial disparity and, therefore, cannot affect the true level of racial disparity in compensation, or in other employment outcomes.

### Compensation Disparities by Race and Year

The compensation analyses are not designed to set compensation for individual Merrill Lynch brokers.  Although it is difficult to imagine a situation where a computer or statistical analysis would be used to set compensation, such a model would have to include all relevant characteristics by which any individual employees differ.  In that way, a statistical analysis that is designed to set individual compensation is fundamentally different from an analysis that is designed to determine whether there are differences in compensation across two groups of employees (such as African American and white).  In fact, adding characteristics that do not differ between the races (even though they do differ among brokers within each race) to the analyses may render them less powerful[4] and more likely to lead to erroneous conclusions.

---

incidence of such offers identifies the practices that created the discrimination and can not provide a non-discriminatory basis for a racial disparity in compensation.

4       Power refers to the ability of the analysis to make correct decisions, that is, to uncover discrimination when it actually exists.

11

The effects of any racial differences among employees that arise from Merrill Lynch's decisions (such as allocation of the intermediate or complementary inputs that increase individual broker productivity) are part of Merrill Lynch's actions that potentially create racial disparities in compensation. Compensation differentials that cannot be explained by differences in the characteristics that brokers bring to Merrill Lynch are suspect if they are also associated with race. After appropriately taking account of productivity, economists generally attribute such differences to discrimination.

We examine whether there are any differences in compensation by race, after adjusting for potential racial differences in characteristics controlled by the individual employee (i.e., experience and education). The ordinary least squares regression technique that we employ is commonly used by economists to measure the effect of explanatory variables such as race, education, and experience, on compensation which is a continuous variable. We examine whether there are any differences in annual compensation by race among brokers employed by Merrill Lynch for the full year, after adjusting for potential racial differences in education, experience, office location and management responsibilities.[5] The dependent variable is (the natural logarithm[6] of) annual W-2 compensation for all analyses reported in Tables 1-6. The technique is illustrated in Table 1, which is a summary for Merrill Lynch brokers in 2001. Tables 2-6 repeat the same analyses for the years 2002 through 2006, respectively. In these analyses the regression coefficients for race tell us the percentage effects of race on

---

5    In this analysis and all subsequent analyses, we include only FAs in office complexes that have both African American and white FAs.

6    The use of logarithms is a technical adjustment that is commonly made in compensation analyses because it yields more accurate estimations of the effects of race on compensation.

annual compensation after adjusting (or controlling) for the effects of the other characteristics (i.e., independent variables) included in the regression equation.[7]

Table 1, column 1, reports that African American brokers received compensation for 2001 that was 33.57% less on average than the compensation received by white brokers with the same experience, education, office location, and management responsibilities.[8] The broker characteristics used in calculating the race difference in the first column are race, time at Merrill Lynch, time as a broker (LOS), and years of education.[9] The 33.57% racial difference is 6.57 standard deviations beyond no difference (or zero); the courts accept disparities that are two standard deviations beyond zero as evidence that a racially neutral process could not have generated the differences. Standard deviations are a measure that shows the probability an event could occur by chance. Standard deviations of 6.57 translate into a probability of less than 5 in 100 billion (or 1 in 20 billion) that the racial difference in compensation would be observed by chance were there no difference by race. The statistical significance of the race difference in compensation strongly rejects the possibility that the difference could have been generated by chance with a racially neutral process.

Table 1, column 2, adds or controls for another characteristic (or independent variable), the number of pooled accounts and team membership in which the broker participates. This analysis allows us to determine the effect of pooling arrangements on

---

7    Since the dependent variable is the natural logarithm of annual wages, each regression coefficient is only the approximate percentage effect of the dependent variable of a unit change in the independent variable. To get the actual percentage p, which is reported on Tables 2 through 7, we compute $p = e^{\beta} - 1$ where $\beta$ is the coefficient.

8    Management responsibilities are measured by including controls for the management titles of brokers.

9    We made use of all of the education data that were available, but information on education was available for only about a fifth of brokers.

racial differences in compensation. When the number of pooled accounts and team

membership is added to the analysis, African American brokers received compensation

for 2001 that was 28.32% less on average than the compensation received by white

brokers with the same experience and education. Because the racial disparity reported in

column 2 (when pooling differences by race are controlled) is lower than the disparity

reported in column 1, it must be the case that pooling arrangements at Merrill Lynch

disfavor African Americans. The racial compensation difference, after controlling for

pooling differences by race, is 5.55 standard deviations beyond no difference (or zero).

The statistical significance of the race differences in compensation, even after removing

the racial effects of Merrill Lynch's pooling policies, strongly rejects the possibility that

they could have been generated by chance with a racially neutral process.

The next two columns of Table 1 analyze racial disparities in compensation

among those who have spent their entire broker careers at Merrill Lynch.[10] Column 3

repeats the column 1 analysis and column 4 repeats the column 2 analysis using only

brokers who have worked at Merrill Lynch their entire career. Comparisons between

columns 1 and 2 and columns 3 and 4 allow us to evaluate whether there are differential

racial disparities for those who spent their entire career at Merrill Lynch relative to those

who have worked at other brokerages before coming to Merrill Lynch. For 2001, the

racial disparities among those who have spent their entire careers at Merrill Lynch are

greater than among those who transferred in to Merrill Lynch from other firms. The

career Merrill Lynch African American brokers received 35.07% (column 3) less than

white brokers with the same experience and education (as compared to 33.57% less for

---

10      Brokers are identified as spending their entire careers at Merrill Lynch if their hire date is within
two years of their registration date.

all brokers, including those with experience elsewhere) and 29.64% (column 4) less than

white brokers with the same experience, education and number of pooled accounts (as

compared to 28.32% less for all brokers, including those with experience elsewhere).

Tables 2 through 6 present the results when these same analyses are repeated for

2002 through 2006, respectively. They show that the racial disparities in broker

compensation at Merrill Lynch increased over the time period; Merrill Lynch teaming

and pooling policies are associated with increases in racial disparities in compensation,

and, in some of the years, racial disparities are greater among FAs who spent their entire

career at Merrill Lynch than among those who transferred in from other brokerage firms.

For 2002 (Table 2), African American brokers received compensation that was

36.53% less on average than the compensation received by white brokers with the same

experience, education, office location, and management responsibilities. The racial

difference is 7.37 standard deviations beyond no difference (or zero). The statistical

significance of the race differences in compensation strongly rejects the possibility that

they could have been generated by chance with a racially neutral process. As for 2001,

adding controls for the number of pooled accounts reduces the race disparity from

36.53% to 28.47%. This decrease in the disparity is consistent with account pooling

policies at Merrill Lynch increasing racial disparities in compensation. The racial

compensation difference of 28.47%, after controlling for pooling, is 5.76 standard

deviations beyond no difference (or zero). The statistical significance of the race

differences in compensation, even after removing the racially disparate effects of account

pooling policies, strongly rejects the possibility that they could have been generated by

chance with a racially neutral process.

15

For 2002 (Table 2) as for 2001, there are smaller racial disparities among brokers who worked for other brokerage firms before coming to Merrill Lynch than there are for those who have been at Merrill Lynch for their entire career. The career Merrill Lynch African American brokers received 38.49% (column 3) less than white brokers with the same experience and education (as compared to 36.53% less for all brokers, including those with experience elsewhere) and 30.29% (column 4) less than white brokers with the same experience, education and number of pooled accounts (as compared to 28.47% less for all brokers, including those with experience elsewhere).

For 2003 (Table 3), African American brokers received compensation that was 33.23% less on average than the compensation received by white brokers with the same experience, education, office location, and management responsibilities. The racial difference is 6.73 standard deviations beyond no difference (or zero). As with the prior years, adding controls for the number of pooled accounts, and whether the broker is a member of a team, reduces the race disparity from 33.23% to 26.40%. This decrease is consistent with account pooling and broker team policies at Merrill Lynch increasing the racial disparities in compensation. The racial difference of 26.40%, after controlling for pooling and membership in teams, is 5.36 standard deviations beyond no difference (or zero). The statistical significance of the race differences in compensation strongly rejects the possibility that they could have been generated by chance with a racially neutral process.

For 2003 (Table 3) as for 2001 and 2002, there are smaller racial disparities among brokers who worked for other brokerage firms before coming to Merrill Lynch than there are for those who have been at Merrill Lynch for their entire career. The

career Merrill Lynch African American brokers received 36.18% (column 3) less than
white brokers with the same experience and education (as compared to 33.23% less for
all brokers, including those with experience elsewhere) and 29.44% (column 4) less than
white brokers with the same experience, education and number of pooled accounts (as
compared to 26.40% less for all brokers, including those with experience elsewhere).

For 2004 (Table 4), African American brokers received compensation that was
approximately 38% less on average than the compensation received by white brokers
with the same experience, education, office location, and management responsibilities.
The racial difference is 8.03 standard deviations beyond no difference (or zero). The
statistical significance of the race differences in compensation strongly rejects the
possibility that they could have been generated by chance with a racially neutral process.
As for 2001 through 2003, adding controls for the number of pooled accounts, and
whether the broker is a member of a team, reduces the race disparity from 38% to
32.20%. The decrease in the disparity is consistent with account pooling and broker team
policies at Merrill Lynch increasing the racial disparity in compensation. The racial
difference of 32.20%, after controlling for pooling and membership in teams, is 6.92
standard deviations beyond no difference (or zero). The statistical significance of the
race differences in compensation strongly rejects the possibility that they could have been
generated by chance with a racially neutral process. As for 2001, 2002, and 2003, there
are smaller racial disparities among brokers who worked for other brokerage firms before
coming to Merrill Lynch than there are for those who have been at Merrill Lynch for their
entire career. The career Merrill Lynch African American brokers received
approximately 41% (column 3) less than white brokers with the same experience and

education (as compared to 38% less for all brokers, including those with experience elsewhere) and 35.49% (column 4) less than white brokers with the same experience, education and number of pooled accounts (as compared to 32.20% less for all brokers, including those with experience elsewhere).

For 2005 (Table 5), African American brokers received compensation that was approximately 42% less on average than the compensation received by white brokers with the same experience, education, office location, and management responsibilities. The racial difference is 9.05 standard deviations beyond no difference (or zero). The statistical significance of the race differences in compensation strongly rejects the possibility that they could have been generated by chance with a racially neutral process. As for 2001 through 2004, adding controls for the number of pooled accounts, and whether the broker is a member of a team, reduces the race disparity from 42% to approximately 35%. This decrease in the disparity is consistent with account pooling and broker team policies at Merrill Lynch increasing the racial disparities in compensation. The racial difference of 35%, after controlling for pooling and membership in teams, is 7.68 standard deviations beyond no difference (or zero). For 2005, the racial disparities among those who have spent their entire careers at Merrill Lynch (43.49% in column 3 and 37.31% in column 4) are greater than for those in the analyses including those who transferred in to Merrill Lynch from other firms (41.81% in column 1 and 35.28% in column 2).

For 2006 (Table 6), African American brokers received compensation that was 42.34% less on average than the compensation received by white brokers with the same experience, education, office location, and management responsibilities. The racial

18

difference is 9.07 standard deviations beyond no difference (or zero). The statistical significance of the race differences in compensation strongly rejects the possibility that they could have been generated by chance with a racially neutral process. As for 2001 through 2005, adding controls for the number of pooled accounts, and whether the broker is a member of a team, reduces the race disparity from 42.34% to 35.85%. As with the results for the previous year, this decrease in the disparity is consistent with account pooling and broker team policies at Merrill Lynch increasing racial disparities in compensation. The racial difference of 35.85%, after controlling for pooling and membership in teams, is 7.73 standard deviations beyond no difference (or zero). The statistical significance of the race differences in compensation strongly rejects the possibility that they could have been generated by chance with a racially neutral process. For 2006 as in the prior years, the racial disparities among those who have spent their entire careers at Merrill Lynch (45.02% in column 3 and 38.32% in column 4, after controlling for teams and pools) are greater than in the analyses including those who transferred in to Merrill Lynch from other firms (i.e., 42.34% and 35.85%).

### *Quintile Distributions by Race and Year*

Because for any given length of service (LOS), compensation is the result of production credits attributed to brokers, differences in production quintiles by race mirror compensation differentials. We have developed graphical representations of the distribution of compensation across white brokers and African American brokers within LOS groupings for each year to illustrate the racial disparities. We also test statistically

whether the pictured disparities could possibly arise by chance and strongly reject that possibility.

Figures 1 through 6 show the proportion of brokers in each quintile at year end, respectively, for 2001 through 2006, among groupings of brokers with LOS of 3 through 5, 6 through 9, and over 10. We remove all white brokers whose LOS exceeds that of the African American with the highest LOS; therefore, the comparisons reflect LOS groupings which have both African American and white brokers.

Figure 1 shows that in 2001, among brokers with LOS of 3 through 5, African Americans were disproportionately in the bottom quintile (5) while white brokers were disproportionately in the first and third (1 and 3) quintiles. This difference in the distribution by race of LOS 3-5 brokers across quintiles in 2001 is 2.0 standard deviations beyond zero. For brokers with LOS of 6 through 9 or more than 10, African Americans were disproportionately in the bottom two quintiles (4 and 5) while white brokers were disproportionately in the top two quintiles (1 and 2). The difference in the distribution by race of LOS 6-9 brokers across quintiles in 2001 is 2.8 standard deviations beyond zero. The difference in the distribution by race of LOS 10 and higher brokers across quintiles in 2001 is 3.0 standard deviations beyond zero.

Similar racial disparities in the distribution across quintiles occur for the succeeding years and LOS categories. African Americans are over-represented in the fifth quintile, most of the time in the fourth quintile, and underrepresented in the first and second quintiles.

Figure 2 shows that in 2002, among brokers with LOS of 3 through 5, African Americans were disproportionately in the fourth quintile while white brokers were

20

disproportionately in the top three quintiles. This difference in the distribution by race of LOS 3-5 brokers across quintiles in 2002 is 1.5 standard deviations beyond zero. For brokers with LOS of 6 through 9, African Americans were overwhelmingly in the bottom quintile and none were in the top quintile. White brokers were the only ones in the top quintile and were also disproportionately in quintiles 2 through 4. The difference in the distribution by race of LOS 6-9 brokers across quintiles in 2002 is 3.3 standard deviations beyond zero. Among brokers with LOS of 10 or more, African Americans were disproportionately in the bottom two quintiles (4 and 5) while white brokers were disproportionately in the top three quintiles (1, 2, and 3). This difference in the distribution by race of LOS 10 plus brokers across quintiles in 2002 is 3.3 standard deviations beyond zero.

Figure 3 shows that in 2003, among brokers with LOS of 3 through 5, African Americans were disproportionately in the third and fifth quintiles while white brokers were disproportionately in the top two quintiles. This difference in the distribution by race of LOS 3-5 brokers across quintiles in 2003 is 2.1 standard deviations beyond zero. For brokers with LOS of 6 through 9, African Americans were overwhelmingly in the bottom quintile and disproportionately in the third quintile. White brokers were overrepresented in the top two quintiles. The difference in the distribution by race of LOS 6-9 brokers across quintiles in 2003 is 3.3 standard deviations beyond zero. Among brokers with LOS of 10 or more, African Americans were disproportionately in the bottom quintile (5) while white brokers were disproportionately in the top three quintiles (1, 2, and 3). This difference in the distribution by race of LOS 10 plus brokers across quintiles in 2003 is 3.3 standard deviations beyond zero.

21

Figure 4 shows that in 2004, among brokers with LOS of 3 through 5, African Americans were disproportionately in the bottom quintile while white brokers were disproportionately in the top four quintiles. This difference in the distribution by race of LOS 3-5 brokers across quintiles in 2004 is 2.4 standard deviations beyond zero. For brokers with LOS of 6 through 9, African Americans were overwhelmingly in the bottom two quintiles. White brokers were disproportionately in quintiles 1 and 2. The difference in the distribution by race of LOS 6-9 brokers across quintiles in 2004 is 1.3 standard deviations beyond zero. Among brokers with LOS of 10 or more, African Americans were disproportionately in the bottom two quintiles (4 and 5) while white brokers were disproportionately in the top three quintiles (1, 2, and 3). This difference in the distribution by race of LOS 10 plus brokers across quintiles in 2004 is 3.3 standard deviations beyond zero.

Figures 5 and 6 show that African American brokers are overwhelmingly concentrated in the fifth quintile for all three LOS groupings for both 2005 and 2006 and that whites are overwhelming concentrated in the top two quintiles for the same LOS groupings and years. The difference in the distribution by race of LOS 3-5 brokers across quintiles in 2005 is 3.3 standard deviations beyond zero and in 2006 is 3.3 standard deviations beyond zero. The difference in the distribution by race of LOS 6-9 brokers across quintiles in 2005 is 2.7 standard deviations beyond zero and in 2006 is 2.6 standard deviations beyond zero. The difference in the distribution by race of LOS 10 plus brokers across quintiles in 2005 is 3.3 standard deviations beyond zero and in 2006 is 3.3 standard deviations beyond zero.

*Racial Disparities in Income Increase with Length of Service*

We examine how the racial disparities in compensation established above change as brokers become more experienced, that is, as they increase their LOS. Figures 7-12 illustrate the paths of compensation earned by African American versus white brokers as they increase their LOS. The patterns are traced out based on the coefficients for LOS in regression analyses that control separately for the compensation effects of LOS by race. Each of these figures shows the same phenomena: The difference in compensation by race widens with LOS. The racial disparity grows with time on the job.

*Summary*

African American brokers receive substantially and significantly less compensation each year than do white brokers with similar education and experience. Racial disparities in compensation for brokers increased between 2001 and 2006. Merrill Lynch's policies with respect to the formation of pools and teams among brokers account for some of the racial disparities in compensation.[11] Racial disparities in compensation tend to be equivalent or somewhat larger among brokers who have spent their entire careers at Merrill Lynch than among all Merrill Lynch brokers, including those who have worked at other brokerage firms before coming to Merrill Lynch. Racial disparities in compensation are larger among brokers with greater LOS.

---

11     The racial differences in teams and pools are discussed in more detail in Section IV below.

## III.  ACCOUNT DISTRIBUTION

The compensation differences by race documented in the previous section arise from differences in "production credits" by race.  There are many ways that Merrill Lynch management affects the asset accumulation and the production credits of a broker or a broker trainee.  Many office amenities that are under the control of management affect the ability of brokers to acquire accounts.  The size and quality (production credits generated) of accounts handled by brokers depends both on the business that they generate independently and on business that Merrill Lynch directs to them.  Working conditions (support staff, title, office environment, managerial support, membership in clubs, mentors, etc.,) that are under the control of Merrill Lynch managers affect the ability of brokers to attract and to maintain clients, thereby affecting the production credits received and the compensation of brokers.  Both the number and the abilities of the support staff, such as client associates or sales assistants assigned to assist a broker, contribute to his or her ability to generate new business and maintain continuing clients.[12] The title that the broker is allowed to use affects the perceptions of customers and, therefore, the production credits generated.[13] The size and quality (i.e., number of windows, view, furnishings) of the office space allocated to a broker affect his or her productivity in several ways.  Clients' perceptions of the quality of a broker are likely to be influenced by the broker's office space.  Clients are more likely to conduct transactions with brokers they trust.  Personal comfort during work affects the intensity of effort that workers bring to a task and also the duration of their work.  Brokers are not

---

[12]  Deposition of Daniel C. Sontag, January 17, 2007, pp. 73-75, pp. 88-90.

[13]  Deposition of Kim A. Pillar, February 23, 2007, pp. 175-176.

likely to be an exception. A better office will improve their performance. The quality of mentors provided early in a career,[14] the mentor's sharing of advice and clients, in particular, and the level of support of a manager throughout a career also affect the performance of brokers. Participation in pools and teams may also increase the productivity of brokers and broker trainees.[15]

More directly, the distribution or assignment of accounts and other opportunities to brokers and broker trainees increases the size and quality of their book. "Book" refers to the total assets that a broker has under her or his management and the production of those assets (that is, the production credits generated). The amount of assets under a broker's management and the production credits generated are used to assign additional resources that affect future production credits. Broker trainees have asset and commission targets that must be met to take some training segments.[16] Managers provide improvements in office space, staff support,[17] and assignment of future accounts based in part on the size and quality of the book.[18] Merrill Lynch affects the book of brokers (or broker trainees) through the assignment of leads, referrals, walk-ins, call-ins, initial public offering opportunities, and "inherited accounts" (that is, the re-assignment of the assets of brokers who leave their employment).

---

14    Deposition of Kim A. Pillar, February 23, 2007, pp. 311-312; deposition of W. Philip Sieg, January 16, 2007, p. 102; deposition of William Philip Sieg, December 1, 2006, p. 263.

15    Deposition of Kim A. Pillar, February 23, 2007, pp. 176; deposition of William Philip Sieg, June 1, 2007, p. 35-49; deposition of E. Stanley O'Neal, November 1, 2006, pp. 100-101 and pp. 231-233.

16    Deposition of E. Stanley O'Neal, November 1, 2006, pp. 218-219.

17    Deposition of Daniel C. Sontag, January 17, 2007, pp. 88-90.

18    Deposition of E. Stanley O'Neal, November 1, 2006, pp. 213-214.

It is difficult to measure variation among brokers in access to the other inputs that complement or increase their individual productivity, including the quality of office space, support staff, or mentoring. Even if these situations were measured, it would be difficult to quantify their effects on performance or generation of production credits. Merrill Lynch has not produced reliable records of the assignments of walk-ins, call-ins, leads, or referrals to brokers, so it is not possible to measure whether they are directed differently to brokers by race. The distribution of inherited accounts is easier to track and measure. For that reason, we examine the distribution of accounts from the house and from departing brokers to determine whether such distributions are neutral with respect to the race of the receiving brokers. The same decision makers who determine how the assets from the house and from departing brokers are distributed also approve the composition and terms of team and pool arrangements among brokers and assign office space, mentors, and support staff.[19] Therefore, if decisions about the distribution of assets from departing brokers or from the house are not racially neutral, the racial neutrality of decisions about the distribution of other, more difficult to measure complementary inputs or resources and other assets that affect the ability of brokers to generate production is also suspect. Any racial differentials in the distribution of inherited or house accounts are important because they are consistent with bias in the distributions of resources and of other assets that allow brokers to generate production credits and to receive compensation. Racial differences in these distributions are consistent with racial differences in production arising from racial discrimination.

---

19     Deposition of William Philip Sieg, December 1, 2006, p. 261; deposition of William Philip Sieg, June 1, 2007, p. 19; deposition of E. Stanley O'Neal, November 1, 2006, p. 190; deposition of Hartwell McIntyre Gardner, March 8, 2007, p. 152; deposition of William Philip Sieg, January 16, 2007, p. 114.

The effects of systematic racial differences both in the distribution of resources that improve the ability of a broker to acquire clients and, more directly, in the distribution of clients are amplified in a system that rewards "success" or where "success breeds success." A slight edge awarded early in one's career, for example as a broker trainee, allows one to qualify for additional resources and distributions that increase clients even more in the future. The effects of small annual differences in the distribution of accounts, or of other resources, accumulate over time as early career differences allow one to qualify for additional benefits (such as higher percentage commission rates, titles, and office space) based on account size or production.

Our analyses use data provided by Merrill Lynch to compare account distributions received by African American and white brokers. We use, for example, annual data that Merrill Lynch prepared to track account status. We use the monthly account detail production credit files to link accounts to the households. We use personnel records to track the employment status of brokers. We have reviewed depositions of Merrill Lynch witnesses who described these data and relevant practices. We use these data to examine statistically whether account distribution practices were racially neutral.

Racially neutral practices exist when there are no systematic differences in distribution outcomes—i.e., with respect to the likelihood of receiving a transfer and the asset value, account quality, and the prior production record of the accounts received—by race. Systematic differences exist when there are statistically significant patterns associated with race; that is, systematic differences exist when there are racial differences that are very unlikely to arise from random variation or chance.

27

*Data*

Merrill Lynch provided data files listing all account transfers by year for the period 2000-2006. The company provided annual data files on year-end asset values for 2000 through 2006. Year-end (along with monthly for most months) account detail files were provided for 2000 through 2006. Merrill Lynch provided personnel data that included the employment histories of brokers employed at Merrill Lynch between 2000 and 2006. Finally, the company provided a database listing the members of partnerships, and their shares in the partnerships, over the period 2000-2006.

We analyze the distribution of accounts from house accounts and from all brokers who resigned from, or were released by, Merrill Lynch in each calendar year. The transfer data are used to identify all accounts transferred from the brokers departing in each year in the period 30 days before and 30 days after their termination date. These records also include the identity of the recipient broker.

Many brokers are members of teams or pools that share their accounts. We assign a value of assets transferred to teams or pools to the participants based on their shares of the team or pool. We use the asset value at the time of transfer to assign share values for individual broker recipients who participate in a team or pool that receives transferred accounts.

We have examined the distribution of assets from departing brokers and from house accounts from several perspectives. We have analyzed how the characteristics of the account being transferred are associated with the race of the recipient broker and also racial differences in the total value of the transferred assets and in the prior production credit history of the transferred accounts received by recipient brokers in a year. The first

28

subsection below presents the results of an overall analysis of racial differences in assets under management and in production credits that arise from the distribution of accounts from brokers who left for employment elsewhere. All analyses in this subsection use the sum of accounts distributed to the individual broker each year as the unit of observation. The next subsection examines the effect of race of recipient broker on the quality of account received by broker account recipients. This subsection uses the individual transferred account, rather than the sum of accounts for the individual broker, as the unit of observation.

### *Racial Difference in Productivity Arising from Racial Disparities in the Distribution of Accounts*

In this section, we present several analyses of the direct and immediate effects on the asset accumulation and on the production credits of assets under the management of brokers as the result of account distributions from the house or from brokers who departed Merrill Lynch because they resigned or were terminated during each calendar year from 2001 through 2006.[20] We use a statistical technique that allows us to include the effects of all the ways that race may affect the distributions of assets (that is, the likelihood of receiving any transferred assets and any differentials in the value of assets received) into a single statistical model. The technique permits a statistical test of whether there are racial differences in the distribution of assets on total assets and on the production credits received on assets under broker management.

---

20    The indirect and long term effects of account distributions on compensation are not measured by this analysis. These effects include the increased rates of compensation that arise when the account distributions push a broker higher up on the grid and the value of referrals and the new business developed as the result of receiving those accounts. Also, because the decision makers on account distributions are the same as those affecting the other complementary inputs that add to production credits, differences in account distributions are evidence of differences in office space, mentorship, titles, other referrals and walk ins, etc., that also influence both immediate and long term account development and compensation.

The technique that labor economists commonly use to evaluate such processes is called a censored regression estimation method (also known as a "tobit regression"). Economists commonly use the censored or tobit regression technique when the variable to be explained, in this case the value of all assets transferred over the year to a broker or the value of the production credits on the assets, includes many observations for which the variable is equal to zero and others with a continuum of values. We use the censored regression technique to analyze whether there is any difference in the value of transferred accounts by race of broker recipient.

In our analyses, we include all accounts that were transferred up to 30 days before or 30 days after the departure of a broker. If an account was transferred to a team or a pool, the team shares were those that were in effect at the time the transfer took place. All transfers received from house accounts or from brokers departing are aggregated for each individual broker, either for the month or for the year.[21]

Table 7 presents the results of the tobit regressions of the race of the recipient broker on the total asset values (valued at the time of transfer and summed for the year or month for each broker) and on the prior year's production credits paid (also summed for the year or month for each broker) for all accounts transferred from brokers who left Merrill Lynch for employment elsewhere or from house accounts.

The first set of analyses (columns 1 and 2 of Table 7) examines annual account distributions between 2001 and 2006 to brokers that are employed for the full year. In order to eliminate confusion arising from including brokers who are not employed by Merrill Lynch for some of the time when these transfers occur, for these two analyses

---

21    Only brokers who were employed full year are included in the yearly analyses. All brokers who earned production credits within the month are included in the monthly analyses.

only, we include only those brokers who were employed by Merrill Lynch for the entire

calendar year. We use the personnel database to determine which of the brokers were

employed for the full year and were, therefore, eligible to receive transferred accounts for

the entire year. The first column of Table 7, reports the results when only race and year

variables are included in the regression; the second column reports the racial effect when

length of service is included in the regression.[22]  African American brokers who were

employed full year received significantly less asset value and prior commission credits in

transfers from departing brokers and from house accounts than did white brokers.[23]  The

racial differences in total asset values received from all accounts in a year, as listed in

column 2, are 2.75 standard deviations, a probability of 6.0 in 1,000 that a racially neutral

distribution could have yielded such a racial difference. The racial differences in

production credits are 3.13 standard deviations, a probability of 1.7 in 1,000 that a

racially neutral distribution system could have yielded the racial difference. These results

are beyond the levels required by the courts to dismiss chance as the reason for the racial

differences.

Because there are relatively few African American brokers who are employed by

Merrill Lynch for the full year and because there are such large variations in the size of

transfers across brokers, it is difficult to measure the racial differences in the size of

transfers with any statistical precision; that is, the relatively small number of African

American brokers and the relatively large variation in value of transfers make it hard to

---

22      The length of service (LOS) variables are entered into the tobit regression as quadratics, that is, as
linear time and as time squared.

23      The tobit coefficients reported in Table 7 should be viewed as indexes; they cannot be simply
translated into asset or commission dollars. The indicators of statistical significance, that is standard
deviations and the probability of chance, are the relevant data on the table.

see statistically a pattern were it to truly exist. For this reason, we pursue two additional analyses that add to the power or precision of the statistical analyses by increasing the number of observations of African Americans beyond those used in the full year analysis. First, we perform an analysis using monthly observations, rather than the yearly observations used in the first analysis. Second, we add broker trainees or POAs to the analyses. Both of these approaches increase the number of African American observations and, therefore, the power of the statistical analyses.

The third column of Table 7 examines monthly account distributions between 2001 and 2006 to brokers who received production credits in the month when the transfer occurred. Because African Americans have higher rates of attrition than whites (see discussion below), the relative number of African Americans included in the analysis of distributions by month is greater than in the analysis of full year brokers. For that reason, the analysis of patterns of racial differences in monthly transfers will be more precise or powerful than for the analysis of yearly transfers to brokers employed full year. The third column reports the racial effect when length of service, year and month are also included in the regression. African American brokers received significantly less asset value and prior commission credits in transfers from departing brokers and from house accounts than did white brokers. The racial differences in total asset values received from all accounts in a month, as listed in the third column, are 2.93 standard deviations, a probability of 3.4 in 1,000 that a racially neutral distribution could have yielded such a racial difference. The racial differences in production credits are 4.62 standard deviations, a probability of 4.0 in 1,000,000 that a racially neutral distribution system

32

could have yielded the racial difference. These results are beyond the levels required by the courts to dismiss chance as the reason for the racial differences.

The fourth column of Table 7 examines monthly account distributions between 2001 and 2006 to brokers and to broker trainees or POAs who received production credits in the month when the transfer occurred. Because the African American share of POAs is greater than the African American share of FAs, the relative number of African Americans included in the analysis of distributions to both FAs and POAs by month is greater than in the analysis of distributions to FAs alone. For that reason, the analysis of patterns of racial differences in monthly transfers to FAs and POAs will be more precise and powerful. The fourth column of Table 7, reports the racial effect when length of service, year, month and FA Job Title are included in the regression. African American brokers and POAs received significantly less asset value and prior commission credits in transfers from departing brokers and from house accounts than did white brokers. The racial differences in total asset values received from all accounts in a month, as listed in the fourth column, are 3.84 standard deviations, a probability of 1 in 10,000 that a racially neutral distribution could have yielded such a racial difference. The racial differences in production credits are 6.37 standard deviations, a probability of 2 in 10 billion (or 1 in 5 billion) that a racially neutral distribution system could have yielded the racial difference. These results are beyond the levels required by the courts to dismiss chance as the reason for the racial differences.

### *Do Account Characteristics Affect Whether It Is Distributed to an African American or a White Broker?*

The previous subsection reported on an analysis that finds that African American brokers received portfolios of accounts from house accounts and from brokers who departed Merrill Lynch for employment elsewhere, with statistically significantly lower total asset values and total prior year production credits. In this subsection, we examine whether the African Americans in the recipient group are further disadvantaged by receiving the accounts that are less likely to yield future production credits or that involve more effort per production credit generated. To test whether race of recipient has additional effects on account distribution (*beyond, or in addition to, its effects on total asset values and production credits*), we examine how the characteristics of accounts affect the likelihood that they are transferred to white or to African American brokers. We examine whether the characteristics of individual accounts, (their asset value, history of production credits, and whether they belong to higher wealth households, who are expected to be more likely to grow their accounts and to lead to other higher wealth clients) affect the likelihood that they are distributed to African American or to white brokers.

Between 2001 and 2006, 38% of accounts transferred to African American FAs were accounts of individuals whose household assets were between $100,000 and $249,000 and 62% were accounts of individuals whose household assets were over $250,000. In contrast, only 29% of accounts transferred to white FAs were accounts of individuals whose household assets were between $100,000 and $249,000 while 71%

34

were accounts of individuals whose household assets were over $250,000.[24] For African American FAs who received transferred accounts, the average asset value of the accounts was $92,000. For white FAs who received transferred accounts, the average asset value of the accounts was $103,000. These data suggest that higher quality accounts were directed away from African American FAs, even when they actually received transfers.

We use logistic regression analysis to test whether the size of the account or its production credit history in the previous calendar year and whether the account belongs to a household with over $250,000 in assets are associated with the race of the recipient broker. Because the unit of analysis or observation is the account and we investigate the race of the recipient of an account, this analysis only examines accounts transferred to individuals (i.e., not teams or pools) and includes only those individuals who received an account. We perform five analyses. We regress a variable indicating whether the recipient is African American on a variety of combinations of account characteristics, including the total asset value of the account, whether the account belongs to a member of a high asset (over $250,000) household, and the production credits earned by the account in the past 12 months. The logistic coefficient shows us the effect of each account characteristic on whether the account is distributed to an African American or a white FA.

Table 8 shows the results of these analyses. The racial effects reported in Table 8 occur *in addition to* the racial differential in the total asset value and in the prior commission history of *all accounts* received within a year. If the logistic coefficient is negative (positive), then African American brokers, when they receive accounts, are

---

24    Only accounts from households with at least $100,000 in assets are included in the analyses of transferred accounts in this report.

receiving fewer (more) of the accounts with the listed characteristic. The first column of Table 8 reports the logistic coefficient, the third column reports the likelihood that the coefficient is zero and the second column reports the number of standard deviations associated with the probability.

The first estimation analyzes the effect of asset value on the likelihood that an account is distributed to African American brokers. African American brokers were significantly less likely to receive accounts with higher asset values (after controlling for the wealth of the household) and also an account from a high wealth household (after controlling for the asset value of the account). They were 2.84 standard deviations less likely to receive an account as its asset value increased.

The second estimation analyzes the simultaneous effects of the total assets in an account and whether the account belongs to a household with over $250,000 in assets on the likelihood that the account is distributed to African American brokers. African American brokers were significantly less likely than white brokers (2.24 standard deviations) to receive accounts with higher asset values (after controlling for the wealth of the household). African American brokers were even less likely to receive an account (5.25 standard deviations), given its asset value, if it is owned by a member of a high wealth household.

Estimation III shows that African American brokers were significantly less likely (2.64 standard deviations) to receive accounts with a stronger history of generating production credits.

The fourth estimation analyzes the simultaneous effects of the account's history of production credits and whether the account belongs to a household with over $250,000

36

in assets on the likelihood that the account is distributed to African American brokers.

African American brokers were significantly less likely than white brokers (1.96 standard

deviations) to receive accounts with stronger production credit histories (after controlling

for the wealth of the household). African American brokers were even less likely to

receive an account (5.47 standard deviations), given its production history, if it is owned

by a member of a high wealth household.

Finally, the last estimation on Table 8 shows that African American brokers were

significantly less likely, (5.57 standard deviations), when they receive distributions at all,

to receive accounts owned by high wealth households.


## IV.    TEAMS AND POOLS

Teams and pools provide opportunities for less experienced brokers to be

mentored, to build client relationships, to network, and to take increasing responsibility

for the accounts in the pool or team when another member retires or leaves the firm.[25]

Teams and pools also are a means for older brokers to use younger brokers to administer

and grow their established accounts and to compensate them with increasing shares of the

production credits derived from the accounts.[26]  We use the term "pool" to describe an

arrangement where brokers share accounts and the term "team" to describe an

arrangement where brokers share several accounts, enough accounts to include at least

one-third of their production credits for all accounts under management.

African American FAs are less likely to be either in teams or pools than their

white counterparts for each year between 2001 and 2006.  Table 9 shows the proportions

---

25      Deposition of William Philip Sieg, June 1, 2007, pp. 35-38 and 45-53.

26      Deposition of William Philip Sieg, June 1. 2007, p. 15.

of African American and white FAs who participate in pools (2001-2006) or in teams (2002-2006) for each year and also reports the statistical significance of the racial differences. For each and every year from 2001 through 2006, the racial disparities in participation in pools and teams are very large and statistically significant.

The racial disparities in teaming and pooling opportunities, in turn, are associated with very large racial differences in the extent to which FAs are able to increase their total assets under management. Table 10 reports the results of a tobit regression which examines the racial disparities in an average year in asset value of assets acquired due to an increase in the FA's share of a pool (between 2001 and 2006) or a team (2003-2006), after controlling for any racial disparities in LOS. In an average year, white FAs are more likely than African American FAs to have the total assets under management increased by 6.05 standard deviations due to increases in their share of pool and by 4.98 standard deviations due to increases in their share of a team.

## V.   ATTRITION

When employees find their opportunities in their jobs are inferior to other opportunities in the labor market, they are more likely to seek employment elsewhere and to leave their jobs. Evidence that African Americans are less likely to continue as brokers (or broker trainees) than are comparable whites is consistent with the hypothesis that African Americans have fewer opportunities at Merrill Lynch relative to other employers than do whites. Among brokers who attained an FA title on or after January 1, 2001, 30% of the whites and 44% of African Americans have left Merrill Lynch.

38

We use survival analysis to determine whether location or Merrill Lynch's teaming policies contribute to these racial differentials, and to evaluate their statistical significance. Survival or duration (event history) analysis is a commonly used statistical technique that measures the effects of characteristics, such as race, on the duration that an individual participates in an activity such as employment as an FA at Merrill Lynch. The dependent variable, that is, the characteristic to be explained, in such an analysis is time on the job. Observed time on the job is a positive number that starts just above 0 (no time) and continues to the present. Survival analysis is the appropriate statistical technique for these data.

Table 11 presents the results of our analysis of time in the FA position for FAs who were given the title on or after January 1, 2001.[27] Table 11 reports the racial hazard ratio for attrition for two different analyses in the two columns. If the hazard ratio is one, there is no racial difference in likelihood of an FA leaving Merrill Lynch. If the hazard ratio is less than one, then whites are more likely to leave; if the hazard ratio is greater than one, then African Americans are more likely to leave than whites.

The first column in Table 11 shows the hazard ratio (2.11) when we control for the office in which the FA is hired. The hazard ratio of 2.11 indicates that the average attrition, for African American FAs each month, is 111% higher than for whites in the same office. This difference in attrition is 7.02 standard deviations, far beyond the level consistent with chance or randomness.

The second column of Table 11 shows the hazard ratio (1.52) when we control for the office in which the FA is hired and also for whether the FA is a member of a team.

---

27    We use the last spell of employment with Merrill Lynch for each of these FAs.

The hazard ratio of 1.52 indicates that the average attrition, for African American FAs each month when they participate in teams, is only 52% higher than that for whites on teams and in the same office.[28] This difference in attrition, when comparisons by race are restricted to those with the same team membership status, is 3.84 standard deviations, still far beyond a level that would be consistent with chance or randomness.

## VI. BROKER TRAINING PROGRAM (POA)

The differential outcomes for African American and white brokers begin with the broker training program, i.e., the "Pathways of Achievement" (POA) program, and in fact with the very start of the POA program.[29] African Americans are less likely to complete the program and, when they do complete it, have accumulated an inferior book to comparable white completers. African American POAs (i.e., broker trainees) receive inferior accounts to those allocated to white POAs for 26 of the 28 months of participation in the POA program, including at the very start of the program. African American POAs are also less likely to participate in pools than are white POAs. The analytical details that provide evidence for each of these racial differences are discussed below.

---

28    Since the analysis controls for team membership, it is also the case that the same differential of 52% occurs when we compare white and African American FAs in the same office who are both not on teams.

29    Since many POAs do not graduate after 24 months in the program we extend our analysis to 27 months. (Also see Deposition of Tamara Cassiday, December 20, 2006, p. 29.) This leaves 28 months of observation since there the first month is the "0" month of service.

***POA Completion Differences by Race***

To analyze whether there were racial differences in the completion of the POA program, we conduct two related, but different, analyses: (1) a survival analysis that calculates whether there is a statistical difference in the time spent in the program, or ultimately the likelihood of continuing or surviving to the next month of the POA program by race, and (2) an analysis of whether the likelihood of graduation from the POA program differs by race.

*POA Survival Analysis*

Survival analysis is a commonly used statistical technique that measures the effects of characteristics, such as race, on the duration that an individual participates in an activity such as the POA program. This is the same technique discussed above with respect to the analysis of attrition among FAs. All POAs start the program at month 0 and leave by month 27 for a total of 28 months observed. Duration analysis is the appropriate statistical technique for these data.

Table 12 presents the results of our analysis of time in the POA program. Table 12 reports the racial hazard ratio for attrition for two different analyses in the two columns. If the hazard ratio is one, there is no racial difference in likelihood of leaving; if the hazard ratio is less than one, then whites are more likely to leave; if the hazard ratio is greater than one, then African Americans are more likely to leave than whites. The first column of Table 12 shows the hazard ratio (1.34) when we control for the office in which the POA is hired. The hazard ratio of 1.34 indicates that the average attrition for African American POAs each month is 34% higher than that for whites in the same

office. This difference in attrition is 4.49 standard deviations, far beyond the level consistent with chance or randomness.

The second column of Table 12 shows the hazard ratio (1.23) when we control for the office in which the POA is hired as before, and also for whether the POA is a member of a team or a pool. The hazard ratio of 1.23 indicates that the average attrition for African American POAs each month when they participate in teams or pools is only 23% higher than that for whites on teams and in the same office. This difference in attrition, when comparisons by race are restricted to those with the same team and pool membership status, is 3.17 standard deviations, still far beyond a level that would be consistent with chance or randomness.

By comparing the results in the second column of Table 12 with those in the first column, we can see that racial differences in participation in pools and teams while in the POA program account for about one third of the difference in completion rates between the races.

*Likelihood of Graduating from POA*

For POAs who entered the POA program after January 1, 2001 and no later than October of 2004, 44% of whites completed or graduated from the program while only 26% of African Americans completed the program. To analyze statistically the racial differential in graduation rates, we use a logit regression analysis which allows us to control also for the month the POA entered the program. The logit regression analysis technique is commonly used by economists to measure the effect of explanatory variables such as race on a dependent variable that has only two possible outcomes, in this case whether or not a POA "graduates" from the POA program. This is the same statistical

42

procedure used above to analyze whether the characteristics of an account to be distributed affected whether the account went to an African American or a white broker.

Table 13 presents the results of our analysis of graduation from the POA program. Table 13 reports the marginal effect of race on the probability of graduation for two different analyses in the two columns. The first column shows that African Americans have an 18% (or 0.18) lower probability of graduating from the POA program when we control only for race. This difference in the likelihood of graduating is 5.53 standard deviations, far beyond the level consistent with chance. The second column shows that the marginal effect of race is -0.15 when we control for whether the POA is a member of a team or a pool. In this case, African Americans have a 15% lower probability of graduation when they (do not) participate in teams or pools and are compared only to whites who also (do not) participate in teams or pools. The difference in the racial effects between columns 1 and 2 of Table 13 imply that about one sixth of the racial difference in graduation rates from POA is due to racial differences in teaming and pooling opportunities. The racial difference in likelihoods of graduation, when comparisons by race are restricted to those with the same team and pool membership status, is 4.54 standard deviations, still far beyond a level that would be consistent with chance.

### *Racial Disparities in Account Distributions in the POA Program*

Racial disparities in the distribution of accounts to participants in the POA program begin at its very start and continue for every month of the program. Table 14 shows the average total asset value in transferred accounts that each POA in the period 2001 through 2006, by race, received in months 0 through 27 of participation in the POA

program. The Table also reports whether the difference observed between the total assets transferred to whites and to African Americans is independently statistically significant by the courts frequently applied standards of 2 standard deviations.[30] For the very first month in the program, African American POAs receive account transfers of $186,935 in total asset value, while white POAs receive $538,555, a difference of 6.21 standard deviations. This pattern of African American POAs receiving less than white POAs occurs in every month of the POA program.

The pattern of African American POAs receiving less than white POAs occurs in all but two months of the 27 months listed for the POA program. A test of statistical significance within a given month ignores the dependence in these outcomes across months and does not test for a pattern. One way to approach measuring the statistical significance of the pattern is as follows. If there were no systematic differences between the distributions to African American and white POAs, the probability that African American POAs have a higher distribution, of any size, in any month would be 50% and similarly the probability that white POAs that a higher distribution of any size would also be 50%. The probability of observing smaller distributions of any size to African Americans in 2 out of 2 months would be 25% (.5 times .5), which is also the probability of obtaining 2 heads in 2 flips of a fair coin. The probabilities of other outcomes can be computed based on the well-established binomial probability distribution. For example, in the case of 28 comparisons of racial disadvantage in account distributions, we expect:

---

30    This test of statistical significance within a given month ignores the dependence across months, and therefore the information included in the disparities showed in the remaining months on the Table. Were that information, which shows disparities in the overwhelming majority of months, included the so adjusted standard deviations on the African American disadvantage would be greater.

| Outcome | Probability if No Racial Disadvantage |
|---|---|
| 0 or more racial disadvantages of any size out of 28 | 1.0000 |
| 1 or more racial disadvantages of any size out of 28 | 0.9999 |
| 2 or more racial disadvantages of any size out of 28 | 0.9999 |
| 3 or more racial disadvantages of any size out of 28 | 0.9999 |
| 4 or more racial disadvantages of any size out of 28 | 0.9999 |
| 5 or more racial disadvantages of any size out of 28 | 0.9999 |
| 6 or more racial disadvantages of any size out of 28 | 0.9995 |
| 7 or more racial disadvantages of any size out of 28 | 0.9981 |
| 8 or more racial disadvantages of any size out of 28 | 0.9937 |
| 9 or more racial disadvantages of any size out of 28 | 0.9821 |
| 10 or more racial disadvantages of any size out of 28 | 0.9564 |
| ... | |
| 14 or more racial disadvantages of any size out of 28 | 0.5747 |
| ... | |
| 22 or more racial disadvantages of any size out of 28 | 0.0019 |
| 23 or more racial disadvantages of any size out of 28 | 0.0005 |
| 24 or more racial disadvantages of any size out of 28 | 0.00009 |
| 25 or more racial disadvantages of any size out of 28 | 0.00001 |
| 26 or more racial disadvantages of any size out of 28 | 0.0000015 |
| 27 or more racial disadvantages of any size out of 28 | 0.0000001 |
| 28 racial disadvantages of any size out of 28 | 0.0000000037 |

The probability of observing 26 out of 28 African American disadvantages in asset distributions which is 0.0000015 is a "one tail" probability. A "two tail" equivalent can be obtained by multiplying the "one tail" probability by two, which in this case is 0.000003 or 3 in one million, greatly in excess of the 0.05, or 5 in 100 probability (or two standard deviations) frequently used by the courts to dismiss chance as the basis for an observed pattern.

Given these patterns, it is not surprising that there is a very large racial differential in assets under management when POAs complete the training program. At the end of the POA program, African Americans have $10,600,000 less in total assets (a difference of 5.89 standard deviations) and their accounts yielded $54,125 less in production credits

(a difference of 5.51 standard deviations) over the prior 12 months than those under the management of graduating white POAs (See Table 15).

### *Racial Disparities in Access to Pools and Teams in the POA Program*

African American POAs are less likely to be in either teams or pools than their white counterparts. Tables 16a and Table 16b show the percentages of African American and white POAs who participate in pools (2001-2006) or in teams (2002-2006) in their 12th and 24th month in the program and also reports the statistical significance of these racial differences.[31]

Table 16a shows that African American POAs are less likely than white POAs to be in a pool in each year from 2001 through 2006. In 2001, only 12% of African American POAs were in pools, as compared to 22% of white POAs, a difference of 1.92 standard deviations. The racial disparities grow in subsequent years. In 2002, 20% of African American POAs were in pools, as compared to 39% of white POAs, a difference of 3.24 standard deviations. In 2003, 20% of African American POAs were in pools, as compared to 38% of white POAs, a difference of 2.48 standard deviations. In 2004, 16% of African American POAs were in pools, as compared to 36% of white POAs, a difference of 3.47 standard deviations. In 2005, 16% of African American POAs were in pools, as compared to 31% of white POAs, a difference of 3.18 standard deviations. In 2006, 23% of African American POAs were in pools, as compared to 41% of white POAs, a difference of 3.53 standard deviations. The racial disparities in pool participation are statistically significant.

---

31    Because we measure team and pool membership at year end, the proportion in teams is measured at the end of the year in which POAs reach their 12th or 24th month in the POA program.

Similarly, as shown in Table 16b, there are racial disparities in team participation. Twelve months after starting the POA program, only 12% of African American POAs, but 26% of white POAs participate in teams, a difference of 4.73 standard deviations. After 24 months in the POA program, only 18% of African American POAs but 35% of white POAs participate in teams, a difference of 3.57 standard deviations. The racial disparities in team participation are statistically significant by the court's standards.

The racial disparities in teaming and pooling opportunities, as indicated above, are associated with racial differences in the extent to which POAs are able to continue in, and graduate from, the program.

## VII.    RACIAL DIFFERENCES IN PRODUCTIVITY OF BROKERS

There is no evidence that African American brokers are less effective in generating production credits than their white counterparts, when given a similar opportunity. The data allow a natural experiment to test whether there are racial differences in productivity among brokers. By race, we compare the "next 12 months of production credits" generated by the recipient broker to the "prior 12 months of production credits" generated on accounts transferred from departing brokers. The "next 12 months production credits" are the result of the receiving broker's efforts; the "prior 12 months production credits" provide a control for the inherent capacity of the account to yield production credits.

Table 17 shows the result of this analysis. The percentage change in production credits for the next 12 months relative to the prior 12 months is regressed on the race, LOS, and office of FA recipients, on the initial levels of asset value and prior 12 months

production credits of the transferred accounts, and on the year for all assets transferred between 2001 and 2005.[32] While the sign of the coefficient of race is negative, indicating slower growth in production credits for African American brokers, it is not statistically significant by the standards frequently used by the courts. The analysis provides no support for the hypothesis that the compensation differentials by race arise from some sort of lower overall ability of African American brokers to generate production credits. Furthermore, the analysis may underestimate the relative productivity of African Americans because it does not control for any racial differentials in access to other complementary inputs, such as office quality, support staff, and mentorship, which increase the productivity of a broker relative to his or her "innate" capacities.

### *Conclusion*

The evidence on production credits generated the year after an account is transferred, controlling for the production credits generated the year before its transfer, shows no significant racial differentials. This is consistent with African Americans as a group and whites as a group being equally productive brokers.

## VIII.  CONCLUSIONS

A brief summary of the main results of our study:

African American brokers received compensation that was 33 to 42% less than that received by white brokers of similar experience and education.

---

32    Transfers in 2006 could not be included because we have no 2007 data that would provide information on the subsequent 12 months of production credits earned from the transferred account.

48

African American FAs and POAs were less likely than their white counterparts to have the advantages of participation in teams or pools with other brokers.

African American FAs and POAs were more likely to leave their jobs at Merrill Lynch than were white brokers or broker trainees of similar experience.

African American FAs and POAs received inferior account distributions, from the house or when brokers departed for employment elsewhere, than did white FAs and POAs of similar experience.

When given equivalent accounts, African American and white FAs produce similar production credits.

These systematic racial differences in the distribution of accounts demonstrate the ways that race affects the compensation of brokers at Merrill Lynch.  Because the decisions by managers to distribute accounts that directly generate production credits were not racially neutral, it is very likely that these same managers were not racially neutral in their decisions to distribute other accounts (such as referrals, leads, and walk-ins) and to provide resources that indirectly generate production credits (such as office space, staff support, mentoring and partnerships).  Furthermore, the use of production or total assets under management to distribute either accounts or resources that affect the ability to attract clients (such as training, titles, club memberships, and training) magnify the management-induced racial differentials in production.

The patterns of racial differences in account transfers are consistent with Merrill Lynch practices creating a widening racial gap over time in the production by brokers, as established in the compensation section above.  These Merrill Lynch-induced differences would generate a racial difference in compensation that increases with experience for

brokers, as evidenced earlier in this report. There are several ways that the evidence presented here supports this proposition.

- The transferred account effects (and the effects of any racial differences in the distribution of office space, support staff, referrals, leads, walk-ins, etc.,) are cumulative. The effects of racial differences in transfers and in the provision of other complementary inputs for producing production credits grow and accumulate over each year of employment for brokers.

  - Accounts are valuable beyond their own production credits because they offer opportunities for referrals and contacts with other prospects that, in turn, yield additional production credits.

Janice Fanning Madden, Ph.D.
June 5, 2008

Alexander Vekker, Ph.D.
June 5, 2008

50

# TABLES

## Table 1 through Table 17

**Table 1**

**Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2001**
**Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities**

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
| | | Adding Controls for Number of Pooled Accounts and Team Membership | | Adding Controls for Number of Pooled Accounts and Team Membership |
| | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Estimated Percentage Compensation Difference for African American Financial Advisors | -33.57% | -28.32% | -35.07% | -29.64% |
| Probability Difference is Due to Chance | 0.0000000005 | 0.000000029 | 0.00000000003 | 0.000000017 |
| Standard Deviations | -6.57 | -5.55 | -6.65 | -5.64 |

52

**Table 2**

**Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2002
Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities**

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
| --- | --- | --- | --- | --- |
| | (1) | Adding Controls for Number of Pooled Accounts and Team Membership (2) | (3) | Adding Controls for Number of Pooled Accounts and Team Membership (4) |
| Estimated Percentage Compensation Difference for African American Financial Advisors | -36.53% | -28.47% | -38.49% | -30.29% |
| Probability Difference is Due to Chance | 0.000000000002 | 0.0000000086 | 0.00000000000013 | 0.0000000043 |
| Standard Deviations | -7.37 | -5.76 | -7.41 | -5.87 |

53

# Table 3

## Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2003
## Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
| --- | --- | --- | --- | --- |
| | (1) | Adding Controls for Number of Pooled Accounts and Team Membership (2) | (3) | Adding Controls for Number of Pooled Accounts and Team Membership (4) |
| Estimated Percentage Compensation Difference for African American Financial Advisors | -33.23% | -26.40% | -36.18% | -29.44% |
| Probability Difference is Due to Chance | 0.00000000017 | 0.000000083 | 0.000000000004 | 0.000000013 |
| Standard Deviations | -6.73 | -5.36 | -6.94 | -5.69 |

**Table 4**

**Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2004**
**Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities**

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
| --- | --- | --- | --- | --- |
| | (1) | Adding Controls for Number of Pooled Accounts and Team Membership (2) | (3) | Adding Controls for Number of Pooled Accounts and Team Membership (4) |
| Estimated Percentage Compensation Difference for African American Financial Advisors | -37.98% | -32.20% | -40.69% | -35.49% |
| Probability Difference is Due to Chance | 0.00000000000001 | 0.000000000045 | 0.00000000000000005 | 0.0000000000041 |
| Standard Deviations | -8.03 | -6.92 | -8.13 | -7.25 |

## Table 5

### Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2005
### Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
|---|---|---|---|---|
| | (1) | Adding Controls for Number of Pooled Accounts and Team Membership (2) | (3) | Adding Controls for Number of Pooled Accounts and Team Membership (4) |
| Estimated Percentage Compensation Difference for African American Financial Advisors | -41.81% | -35.28% | -43.49% | -37.31% |
| Probability Difference is Due to Chance | < 0.00000000000001 | 0.0000000000002 | < 0.00000000000000001 | 0.00000000000016 |
| Standard Deviations | -9.05 | -7.68 | -8.83 | -7.68 |

56

# Table 6

## Compensation of Financial Advisors by Race and Merrill Lynch Career History, 2006
### Controlling for Length of Service, Time at Merrill Lynch, Education, Office, and Management Responsibilities

| | All Merrill Lynch Financial Advisors | | Financial Advisors Employed at Merrill Lynch Since Registration | |
| --- | --- | --- | --- | --- |
| | (1) | Adding Controls for Number of Pooled Accounts and Team Membership (2) | (3) | Adding Controls for Number of Pooled Accounts and Team Membership (4) |
| Estimated Percentage Compensation Difference for African American Financial Advisors | -42.34% | -35.85% | -45.02% | -38.32% |
| Probability Difference is Due to Chance | < 0.000000000000001 | 0.0000000000001 | < 0.000000000000001 | 0.00000000000006 |
| Standard Deviations | -9.07 | -7.73 | -9.08 | -7.81 |

57

## Table 7

### Effects of Race of Financial Advisors on Yearly Asset Values and Prior Production Credits for Accounts Transferred from Financial Advisors Departing from Merrill Lynch and House Accounts, 2001-2006
#### (Censored Tobit Regression Analysis)

| | Yearly Analysis, FAs Only | | Monthly Analysis, FAs only | Monthly Analysis, FAs and POAs |
|---|---|---|---|---|
| | Controlling for Year | Controlling for Year and Experience | Controlling for Month, Year, and Experience | Controlling for Month, Year, Experience, and FA Job Title |
| | (1) | (2) | (3) | (4) |
| *Estimation I* | | | | |
| **Total Asset Value at Transfer** | | | | |
| **Tobit Coefficient** | -1,385,940 | -1,387,527 | -710,113 | -722,806 |
| **Standard Deviations** | -2.83 | -2.75 | -2.93 | -3.84 |
| **Probability Effect is Due to Chance** | 0.0047 | 0.006 | 0.0034 | 0.0001 |
| *Estimation II* | | | | |
| **Prior Year Commissions** | | | | |
| **Tobit Coefficient** | -5,766 | -5,618 | -3,119 | -3,127 |
| **Standard Deviations** | -3.23 | -3.13 | -4.62 | -6.37 |
| **Probability Effect is Due to Chance** | 0.0012 | 0.0017 | 0.000004 | 0.0000000002 |

58

# Table 8

## Effects of Characteristics of Transferred Accounts
## on Race of Recipient Financial Advisor
### (Logit Regression Analysis)

| | Logit Coefficient | Standard Deviations | Probability Effect Is Due to Chance |
|---|---|---|---|
| | (1) | (2) | (3) |
| *Estimation I* | | | |
| Asset value at transfer | -0.00000060 | -2.84 | 0.0045 |
| *Estimation II* | | | |
| Asset value at transfer | -0.0000036 | -2.24 | 0.0251 |
| Account is from household with over $250k | -0.48263040 | -5.25 | 0.0000002 |
| | | | |
| *Estimation III* | | | |
| Production credits in prior year | -0.00005250 | -2.64 | 0.0083 |
| | | | |
| *Estimation IV* | | | |
| Production credits in prior year | -0.00003210 | -1.96 | 0.05 |
| Account is from household with over $250k | -0.50916530 | -5.47 | 0.00000005 |
| | | | |
| *Estimation V* | | | |
| Account is from household with over $250k | -0.52877250 | -5.57 | 0.00000003 |

# Table 9

## Proportions of African American and White Financial Advisors at Merrill Lynch Who Participate in Teams and Pools, by Year, 2001-2006

| Year | Pools | | | | Teams | | | |
|---|---|---|---|---|---|---|---|---|
| | % African Americans Participating (1) | % Whites Participating (2) | Standard Deviations (3) | Probability Difference is Due to Chance (4) | % African Americans Participating (5) | % Whites Participating (6) | Standard Deviations (7) | Probability Difference is Due to Chance (8) |
| 2001 | 34% | 60% | -5.43 | 0.0000006 | NA | NA | NA | NA |
| 2002 | 37% | 65% | -5.89 | 0.000000004 | 23% | 50% | -5.38 | 0.00000008 |
| 2003 | 48% | 68% | -4.46 | 0.000008 | 27% | 51% | -4.94 | 0.0000008 |
| 2004 | 55% | 71% | -3.63 | 0.00028 | 26% | 51% | -5.16 | 0.0000003 |
| 2005 | 48% | 73% | -5.69 | 0.00000001 | 26% | 51% | -5.27 | 0.00000014 |
| 2006 | 52% | 76% | -5.70 | 0.00000001 | 25% | 52% | -5.65 | 0.000000016 |

60

## Table 10

### Effects of Race of Financial Advisors on
Increases in Asset Values Under Management, Due to Increases in Shares of Teams or Pools,
for Financial Advisors Who Increased Their Shares, between Beginning and End of Each Year, 2001-2006
Controlling for Year and Length of Service
(Censored Tobit Regression Analysis)

|  | Pools | Teams |
|---|---|---|
|  | 2001-2006 | 2003-2006 |
| **Tobit Coefficient on African American** | -137,000,000 | -39,600,000 |
| **Standard Deviations** | -6.05 | -4.98 |
| **Probability Effect is Due to Chance** | 0.000000014 | 0.00000063 |

61

## Table 11

### Effects of Race on Departure from Financial Advisor Positions,
### All Employees Entering Financial Advisor Titles at Merrill Lynch from January 1, 2001 through 2006
(Survival/Event History Regression Analysis)

| | Controlling for Office | Adding Controls for Number of Pooled Accounts and Team Membership |
|---|---|---|
| Hazard Ratio for African American Financial Advisors | 2.11 | 1.52 |
| Standard Deviations | -7.02 | -3.84 |
| Probability Effect is Due to Chance | 0.000000000000022 | 0.0001 |

62

## Table 12

### Effects of Race on Departure from the Broker Training (POA) Program,
### All Employees Entering POA Titles at Merrill Lynch from January 1, 2001 through 2006
#### (Survival/Event History Regression Analysis)

| | Controlling for Office | Adding Controls for Number of Pooled Accounts and Team Membership |
|---|---|---|
| Hazard Ratio for African American POAs | 1.34 | 1.23 |
| Standard Deviations | -4.49 | -3.17 |
| Probability Effect is Due to Chance | 0.0000071 | 0.0015 |

63

## Table 13

### Effects of Race on Probability of Graduation from the Broker Training (POA) Program, All Employees Entering POA Program at Merrill Lynch from January 1, 2001 through October 2004
#### (Logit Regression Analysis)

|  | No Controls | Controlling for Number of Pooled Accounts and Team Membership |
|---|---|---|
| Marginal Effect of Being an African American POA | -0.18 | -0.15 |
| Standard Deviations | -5.53 | -4.54 |
| Probability Effect is Due to Chance | 0.000000032 | 0.0000056 |

64

| Table 14 |
|---|

**Average Asset Values of Total Accounts Transferred to POAs
By Month of Participation, 2001-2006**

| Month in POA Program | White POAs (1) | African American POAs (2) | Standard Deviations (3) | Probability Difference is Due to Chance (4) |
|---|---|---|---|---|
| 0 | $ 538,555 | $ 186,935 | -6.21 | 0.00000000053 |
| 1 | $ 560,291 | $ 279,961 | -2.38 | 0.0173 |
| 2 | $ 325,542 | $ 222,956 | -2.08 | 0.0375 |
| 3 | $ 273,504 | $ 150,330 | -3.56 | 0.0004 |
| 4 | $ 280,433 | $ 198,122 | -1.80 | 0.0719 |
| 5 | $ 243,215 | $ 205,882 | -0.82 | 0.4122 |
| 6 | $ 273,353 | $ 201,827 | -1.97 | 0.0488 |
| 7 | $ 236,351 | $ 199,389 | -0.90 | 0.3681 |
| 8 | $ 252,594 | $ 142,806 | -4.06 | 0.000049 |
| 9 | $ 277,158 | $ 97,780 | -4.92 | 0.00000085 |
| 10 | $ 348,891 | $ 209,945 | -2.35 | 0.0188 |
| 11 | $ 217,663 | $ 229,200 | 0.20 | 0.8415 |
| 12 | $ 336,586 | $ 291,307 | -0.64 | 0.5222 |
| 13 | $ 484,898 | $ 266,458 | -1.10 | 0.2713 |
| 14 | $ 509,849 | $ 97,746 | -2.03 | 0.0424 |
| 15 | $ 281,461 | $ 311,171 | 0.26 | 0.7949 |
| 16 | $ 317,636 | $ 232,556 | -0.90 | 0.3681 |
| 17 | $ 261,419 | $ 197,645 | -0.99 | 0.3222 |
| 18 | $ 273,708 | $ 150,437 | -2.59 | 0.0096 |
| 19 | $ 285,164 | $ 141,599 | -2.45 | 0.0143 |
| 20 | $ 248,105 | $ 103,517 | -4.37 | 0.0000124 |
| 21 | $ 216,587 | $ 164,652 | -0.91 | 0.3628 |
| 22 | $ 235,807 | $ 97,849 | -2.45 | 0.0143 |
| 23 | $ 232,132 | $ 185,168 | -0.62 | 0.5353 |
| 24 | $ 262,416 | $ 120,371 | -2.60 | 0.0093 |
| 25 | $ 199,439 | $ 182,700 | -0.15 | 0.8808 |
| 26 | $ 112,541 | $ 16,617 | -3.26 | 0.0011 |
| 27 | $ 42,845 | $ 20,591 | -1.18 | 0.2380 |

## Table 15

### Racial Differences in Asset Values and Prior Year Production Credits for Assets Under Management, at Graduation from POA Program, (2001-2006)
(Measured at MLOS 27)

|  | Coefficient for African American POAs (1) | Standard Deviations (2) | Probability Difference is Due to Chance (3) |
|---|---|---|---|
| *Estimation I* | | | |
| Asset Value | -10,600,000 | -5.89 | 0.0000000038 |
| *Estimation II* | | | |
| Production Credits | -54,125 | -5.51 | 0.0000000358 |

66

# Table 16 a

## Proportions of African American and White POAs at Merrill Lynch Who Participate in Pools, by Year, 2001-2006

| Year | % of African American POAs (1) | % of White POAs (2) | Pools | |
|------|------|------|------|------|
| | | | Standard Deviations (3) | Probability Difference is Due to Chance (4) |
| 2001 | 12% | 22% | -1.92 | 0.0549 |
| 2002 | 20% | 39% | -3.24 | 0.0012 |
| 2003 | 20% | 38% | -2.48 | 0.0131 |
| 2004 | 16% | 36% | -3.47 | 0.0005 |
| 2005 | 16% | 31% | -3.18 | 0.0015 |
| 2006 | 23% | 41% | -3.53 | 0.0004 |

67

# Table 16 b

## Proportions of African American and White POAs at Merrill Lynch Who Participate in Teams, by Year, 2002-2006

| Month after start of POA program | % of African American POAs (1) | % of White POAs (2) | Teams | |
|---|---|---|---|---|
| | | | Standard Deviations (3) | Probability Difference is Due to Chance (4) |
| 12 | 12% | 26% | -4.73 | 0.0000022 |
| 24 | 18% | 35% | -3.57 | 0.0004 |

68

## Table 17

### Effect of Race of Recipient Broker on
### Changes in Production Credits Earned the Year after Transfer
### Relative to the Year before Transfer, 2001-2005

| | |
|---|---|
| African American | -7.3% |
| Standard Deviations | -0.22 |
| Probability Effect is Due to chance | 0.8259 |

69

# FIGURES

## Figure 1 through Figure 12

**Figure 1**
**Distribution Across Quintiles by Race and LOS, 2001**

71



**Figure 2**
**Distribution Across Quintiles by Race and LOS, 2002**

72

**Figure 3**
**Distribution Across Quintiles by Race and LOS, 2003**

73



**Figure 4**
**Distribution Across Quintiles by Race and LOS, 2004**

74

**Figure 5**
**Distribution Across Quintiles by Race and LOS, 2005**



75

**Figure 6**
**Distribution Across Quintiles by Race and LOS, 2006**



76



**Figure 7**
**Effect of LOS on Compensation by Race, 2001**

77



**Figure 8**
**Effect of LOS on Compensation by Race, 2002**

78



**Figure 9**
**Effect of LOS on Compensation by Race, 2003**

79



**Figure 10**
**Effect of LOS on Compensation by Race, 2004**

80



Figure 11
Effect of LOS on Compensation by Race, 2005

81



Figure 12
Effect of LOS on Compensation by Race, 2006

82

# APPENDIX A

## Glossary

*Censored tobit regression analysis* – A statistical technique that measures the simultaneous effects of several independent variables, such as race or length of service (LOS), on a dependent variable, which can have several zero values and otherwise positive values, such as production credits on transferred accounts.

*Coefficient* – A number that measures the effect of one independent variable, such as race, on the dependent variable, such as salary or value of assets distributed, after all other independent variables are "controlled" or held to the same value. The race coefficient, then, would isolate the effect of race on salary or account distributions, when comparing employees who are otherwise the same with respect to all of the other independent variables included in the analysis. Tobit, logit, survival and ordinary least squares regression analyses compute coefficients for each independent variable.

*Dependent variable* –A variable to be explained, such as salary or whether graduated from POA, by independent variables, such as race and other employee traits. Tobit, logit, survival and ordinary least squares regression analyses have a dependent variable and several independent variables.

*Independent variable* – A variable, such as race, that is being analyzed to evaluate whether it explains or determines, in part, a dependent variable, such as salary or whether graduated from POA. Tobit, logit, survival and ordinary least squares regression analyses have a dependent variable and several independent variables.

*Logarithm* – A mathematical transformation of a number commonly used for variables such as salary or compensation to improve the "fit" or the ability of statistical model to track the pattern of variation across observations.

*Logit regression analysis* – A statistical technique that measures the simultaneous effects of several independent variables, such as race, number of pooled accounts and whether in a team, on a dependent variable that can have only two values, such as whether POA graduated from the program. The two possible values for whether a POA graduated from the program, are yes and no.

*Power* – The probability that a statistical test will correctly reject a false hypothesis. The power of a test increases as there are more observations and decreases as there are more controls or independent variables included in the analysis. In the context of litigation, the power of the test is usually the probability that the test will conclude that there has been discrimination when discrimination has, in fact, occurred. Other things being equal, one wants the power of a test to be as high as possible.

*Probability* – The likelihood that an event will occur in the long run with numerous replications using the same, or constant, system. Probability is expressed as a value between 0 and 1.

*Ordinary least squares (linear) regression analysis* – A statistical technique that measures the simultaneous effects of several independent variables, such as race, education, and experience, on a dependent variable that has a continuous set of values, such as compensation which can take any of value from zero into the millions.

*Standard deviations* – A measure of the likelihood that an observed difference (for example, white compensation minus African American compensation) or impact (for example, the effect of race on POA graduation) could have occurred purely by chance when the true difference or impact is zero. As the number of standard deviations increases, the likelihood that the difference or impact could have occurred purely by chance decreases. Equivalently, as the number of standard deviations increases, the level of statistical significance decreases.

*Statistical significance* – The probability that a null hypothesis will be rejected when it is, in fact, true. The courts have generally chosen the level of statistical significance as 0.05. In the context of litigation, statistical significance is usually the probability that the test will conclude that there has been discrimination when discrimination has not, in fact, occurred.

*Survival/event history regression analysis* – A statistical technique that measures the simultaneous contribution of time-constant characteristics, such as race, and time dependent characteristics, such as time in program, on the time to an event, such as time to graduation or time to departure.

# Attachment A

## CURRICULUM VITAE

- **JANICE F. MADDEN**

- **ALEXANDER VEKKER**

May 2008

## JANICE FANNING MADDEN

**ADDRESS:**      Department of Sociology
University of Pennsylvania
3718 Locust Walk
Philadelphia, PA  19104-6299

**TELEPHONE:**      Office  (215) 898-6739
Home       (215) 546-5144
Fax         (215) 898-2124
E Mail      madden@ssc.upenn.edu

**PERSONAL:**      Born 1/30/47
U.S. Citizen

**EDUCATION:**      Duke University, Durham, North Carolina
M.A., Economics, 1971
Ph.D., Economics, 1972

University of Denver, Colorado
B.A., *cum laude*, Economics, 1969

## EMPLOYMENT:

University of Pennsylvania, Philadelphia, PA:

Professor, Department of Sociology, 1994 to present; Department of Regional Science, 1988 to 1994; Associate Professor, 1979-88; Assistant Professor, 1972-78.  Professor, Department of Real Estate, The Wharton School, 1990 to present.

Chair, Graduate Group in Demography, 2007-8.

Director of Alice Paul Research Center and the Women's Studies Program, chair, Women's Studies Undergraduate Major, University of Pennsylvania, 1988-1991; 2002-2004.

Interim Director (1998-99); Director of the Masters of Government Administration Program (2000-2002), Fels Center of Government

Vice Provost for Graduate Education, 1991 to 1999.

Undergraduate Chair, Department of Regional Science, 1979-91.

Member of the Graduate Groups in Regional Science, in Demography, in

86

Sociology, and in City and Regional Planning.

Research Associate, Population Studies Center.

Professor, Fels Center of Government, 1999 to present.

Co-Director, Penn-Temple Philadelphia Economic Monitoring Project, 1987-91.

Visiting Scholar, Research Division, Federal Reserve Bank of Philadelphia, 1999-2000 and 2005.

Visiting Scholar, Indonesia Second University Development Project, University of Indonesia, Jakarta, 1991.

Member and Consultant, Scientific Advisory Committee, U.S. Army Family Research Program, 1987-92.

Consultant, HCR, Washington, D.C. 1983-85.

Faculty, Federal Judicial Center, Washington, D.C. 1983-84.

Board of Directors (1980-2002) and Consultant (1980-present), Econsult Corp., Philadelphia, PA.

Consultant, U.S. Equal Employment Opportunity Commission, 1979-1991.

Consultant, U.S. Department of Justice, 1984-1988.

Consultant, Abt Associates, Cambridge, Mass., 1979-81.

Staff Economist, National Commission on Employment and Unemployment Statistics Washington, D.C., 1978.

Instructor, Department of Economics, Duke University, Durham, NC, 1971-72.

Consultant, Low Income Housing Corporation, Durham, NC, 1971.

Economist, Federal Power Commission, Washington, D.C., 1970.

**HONORS:**

Boettcher Scholar, 1965-69
Phi Beta Kappa, 1969
AAUW Outstanding Senior Woman, 1969
James B. Duke Fellow, 1969-72
Manpower Development and Training Act Dissertation Fellow, 1972
Robert C. Daniels Foundation Term Chair in Urban Studies, 1990-2000

87

Academic Excellence Award, Trustees' Council of Penn Women, 1997
Leadership Alliance Award, 1999
Woman of Distinction, 2000, *Philadelphia Business Journal*
Fritz Pollard Alliance Game Ball Award, 2004
Faculty Award, Friars Senior Society of the University of Pennsylvania, 2004
Ballard Scholar, University of Pennsylvania Real Estate Center, 2005
Penn Women's Center 2007 Leadership Award

## PUBLICATIONS:

### Books:

*The Economics of Sex Discrimination* (Lexington, Mass.: D.C. Heath and Company, 1973). Second Printing, 1975.

*Post-Industrial Philadelphia: Structural Changes in the Metropolitan Economy* with William Stull (Philadelphia: University of Pennsylvania Press, 1990).

*Work, Wages, and Poverty: Income Distribution in Post-Industrial Philadelphia* with William Stull (Philadelphia: University of Pennsylvania Press, 1991).

*Changes in Income Inequality within U.S. Metropolitan Areas* (Kalamazoo, MI: Upjohn Institute for Employment Research, 2000).

*Mommies and Daddies on the Fast Track: Success of Parents in Demanding Professions* with Jerry A. Jacobs (ed.) *The Annals of the American Academy of Political and Social Sciences,* (November 2004)

### Articles:

"Practitioners' Roles and Practicum Courses in the Degree Program," with Robert Garris and William M. Rodgers III, *Journal of Policy Analysis and Management,* forthcoming.

"Population Changes and the Economy," *Wharton Real Estate Review,* Vol. IX(1) Spring 2005, pp. 41-61.

"Differences in the Success of NFL Coaches by Race, 1990-2002: Evidence of Last Hire, First Fire" *Journal of Sports Economics,* Vol. 5, no. 1, February 2004, 6-19.

"Has the Concentration of Income and Poverty Among Suburbs of Large U.S. Metropolitan Areas Changed Over Time? *Papers in Regional Science,* Vol. 82, no.2, April 2003, 249-75.

"The Changing Spatial Concentration of Income and Poverty among Suburbs of Large U.S. Metropolitan Areas" *Urban Studies*, Vol. 40, no. 3, March 2003, 481-503.

"Measuring Changes in the Spatial Concentration of Income and Poverty among Suburbs of Large U.S. Metropolitan Areas." In *Uddevalla Symposium 2001: Regional Economies in Transition*, (Uddevalla, Sweden: University of Trollhättan/Uddevalla, 2001), pp. 327-348.

"Creating Jobs, Keeping Jobs, and Losing Jobs: Cities and Suburbs in the Global Economy" *The Annals of the American Academy of Political and Social Science,* Vol. 572, November 2000, pp.78-90.

"Have Economic Changes Made Metropolitan Government More Attractive to Suburbs?" *State and Local Government* Vol. 1, Spring 2000, pp. 28-39.

"Do Racial Composition and Segregation Affect Economic Outcomes in Metropolitan Areas?" in E. Anderson and D. Massey (ed.) *Problem of the Century: Racial Stratification in the United States at Century's End* (New York: Russell Sage, 2001), pp. 290-316.

"The Challenges That Success Has Generated for the Research University," in W. Xin and M. Wanhua (ed.) *The University of the 21st Century: Proceedings of the Forum of Higher Education in Conjunction with the Centennial of Peking University* (Beijing: Peking University Press, 1998), pp. 127-130.

"Changes in the Distribution of Poverty across and within U.S. Metropolitan Areas: 1979-89," *Urban Studies,* vol. 33, No. 9, November 1996, pp. 1581-1600.

"Regional Science: A Call for Multi-Disciplinary Integration," *International Regional Science Review*, Vol. 17 (3), 1994, pp. 351-3.

"Problems Solved and Problems Unaddressed by the Civil Rights Act of 1991," *Forum for Social Economics* (Fall 1992), pp. 60-70.

"The Wage Effects of Residential Location and Commuting Constraints on Employed Married Women" with Lee-in Chen Chiu, *Urban Studies*, (June 1990), pp. 353-369.

"Residential Segregation and the Economic Status of Black Workers: New Evidence for an Old Debate" with Mark Hughes, *Journal of Urban Economics*, Vol. 29 (1991), pp. 28-49.

"The Distribution of Economic Losses Among Displaced Workers: Measurement Methods Matter," *Journal of Human Resources*, (Winter 1988), pp. 93-107.

"Gender Differences in the Cost of Displacement: An Empirical Test of Discrimination in the Labor Market," *American Economic Review* (May 1987), pp. 246-251.

"The Year of the Tenure Decision: Strategies for Survival," *Newsletter* of the American Economic Association Committee on the Status of Women in the Economics Profession (Spring/Summer 1987), pp. 8-13.

"Shifts among the Counties in Job and Resident Workers, 1960-1980" with Mark Hughes, in A.A. Summers and T.F. Luce (eds.), *Economic Development Within the Philadelphia Metropolitan Area* (Philadelphia: University of Pennsylvania Press, 1987), pp. 24-34 and 165-170.

"Achieving Title VII Objectives at Minimum Social Costs: Optimal Remedies and Awards" with Jennifer Wissink, *Rutgers Law Review* (Spring 1985), pp. 997-1017.

"The Persistence of Pay Differentials: The Economics of Sex Discrimination," *Women and Work: An Annual Review* (Beverly Hills: Sage Publications, 1985), pp. 76-114.

"Urban Wage Gradients: Empirical Evidence," *Journal of Urban Economics* (1985), pp. 291-301.

"The Measurement of Employment Discrimination: Reduced Forms, Reverse Regression, Comparable Worth and the Definition of Labor Markets" *Proceedings of the American Statistical Association, Social Statistics Section*, 1982, pp. 162-8.

"Interstate Sales and Employment Effects in the Wholesale and Retail Trade Industries of Changes in the Federal Minimum Wage Legislation, 1958-1977" with Joyce Cooper, *Report of the Minimum Wage Study Commission* (Washington, D.C.: Government Printing Office, 1981), pp. 273-296.

"Why Women Work Closer to Home" *Urban Studies* 18 (1981), pp. 181- 194.

"Spatial Implications of Increases in the Female Labor Force: A Theoretical and Empirical Synthesis" with Michelle White, *Land Economics* (November 1980), pp. 432-446.

"Urban Land Use and the Growth in Two Earner Households" *American Economic Review* 70 (May 1980), pp. 191-197.

"Economic Rationale for Sex Differences in Education" *Southern Economic Journal* 44 (April 1978), pp. 778-797.

"Women's Work Trips: An Empirical and Theoretical Overview" with Michelle White, *Women's Travel Issues: Research Needs and Priorities*, U.S. Department of Transportation, (Washington, D.C.: Government Printing Office, 1979), pp. 201-242.

"A Spatial Theory of Sex Discrimination" *Journal of Regional Science* 17 (December 1977), pp. 151-171.

"An Empirical Analysis of the Spatial Elasticity of Labor Supply" *Papers, Regional Science Association* 39 (1977), pp. 151-171.

"Discrimination--A Manifestation of Male Market Power? in C.B. Lloyd (ed.), *Sex, Discrimination and the Division of Labor* (New York: Columbia University Press, 1975), pp. 146-174.

"The Development of Economic Thought on the 'Women Problem'" *The Review of Radical Political Economics* 4 (July 1972), pp. 21-33.

**Comments and Reviews**:

Book Review: *The Face of Discrimination: How Race and Gender Impact Work and Home Lives* by Vincent J. Roscigno in *Social Forces*, forthcoming.

"Preface." *Mommies and Daddies on the Fast Rack: Success of Parents in Demanding Professions* with Jerry A. Jacobs (ed.) *The Annals of the American Academy of Political and social Sciences,* (November 2004)

Review: *The Boston Renaissance* (by Bluestone and Stevenson), *Detroit Divided* (by Farley, Danziger, and Holzer) and *The Atlanta Paradox* (edited by Sjoquist) in *Urban Studies* (Jan. 2002) Vol. 39, No. 1, pp 163-7.

Book Review, *The New Urban Frontier: Gentrification and the Revanchist City* in *Journal of Regional Science* (February 1998), 179-81.

"Comment: Work Norms and Professional Labor Markets" in Francine Blau and Ronald Ehrenberg (ed.) *Gender, Family, and the Workplace* (New York: Sage Publications, 1997), pp. 206-209.

Book Review, *Forbidden Grounds: The Case Against Employment Discrimination Laws* in *Journal Policy Analysis and Management* (1993).

"Discussion: Empirical Consequences of Comparable Worth" in M.A. Hill and M.R. Killingsworth (ed.) *Comparable Worth: Analyses and Evidence* (Ithaca, NY: ILR Press, 1989), pp. 107-111.

Book Review, *Regional Labor Markets*, in *Journal of Regional Science* (February 1989).

"Comparable Worth" *Journal of Policy Analysis and Management*, (Fall 1987), Vol. 7, No. 1, pp. 147-150.

"Review of Recent Research on Women and Work" *Signs: A Journal of Women in Culture and Society*, (Spring 1985), pp. 589-593.

"Availability Analyses for Affirmative Action Plans" in *Restructuring Availability Analysis for Affirmative Action Planning* (Abt Associates, Inc., 1981), pp. 181-191.

"Discussion: Has Occupational Licensing Reduced Geographic Mobility and Raised Earnings?" in S. Rottenberg (ed.) *Occupational Licensure and Regulation* (Washington, D.C.: American Enterprise Institute, 1980, pp. 337-339).

"Comments on Career Decisions" in E. Andrews, C. Gilroy, and C.B. Lloyd (ed.), *Women in the Labor Market*, (New York: Columbia University Press, 1979), pp. 158-167.

"Discussion: The Implications of Changing Family Patterns and Behavior for Labor Force and Hardship Measurement" in *Concepts and Data Needs*, National Commission on Employment and "Comments on Impacts of Transportation Control Plans" Proceedings of Conference on the Regional and Urban Impacts of Government Policy, State University of New York, Buffalo, NY, May 1978.

"The Patterns of Sex Discrimination" *Monthly Labor Review* 98 (November 1975).

Book Review, *Equal Employment Opportunity and the AT&T Case*, in *Journal of Human Resources*, (Winter 1977).

Book Review, *Time of Transition*, in *Signs: A Journal of Women in Culture and Society* (Summer 1978).

Book Review, *Women, Minorities and Employment Discrimination*, in *Industrial and Labor Relations Review*, (October 1978).

"Women and the New Reserve Army of the Unemployed: Comment III. " *Signs: A Journal of Women in Culture and Society* (Spring 1976).

**Working Papers:**

"Performance-based Pay and Gender Discrimination: Commissions for Stockbrokers" February 2008

"Status Caste Exchange: Preferences for Race and Poverty Status of Neighbors in Large Metropolitan Areas, 1970-2000" July 2007

"Gender Differences in the Wage Effects of Sexual Orientation," April 2007.

"Suburbanization, Racial Desegregation, and Spatial Dispersal of Poverty in Large Metropolitan Areas" November 2006

"The Racial and Income Dynamics of Suburbanization within Large U.S. Metropolitan Areas" June 2005.

"Notes on Issues in Counting Commercial Sex Workers and Trafficked Individuals" April 2004.

**Academic Conference and Invited Presentations** (last five years):

"Real Estate, Urban Issues and Demographics" 13th Annual Fisher Center Real Estate Conference, University of California at Berkeley, May 6, 2008.

"Performance-based Pay and Gender Discrimination in Compensation: The Case of Commissions for Stockbrokers" Workshop on Gender and the Labor Market, Centre for European Economic Research, Mannheim, Germany, March 28/29, 2008.

"Methodological Issues in Class Action Discrimination Lawsuits," Forum on Social Science Research and Title VII Class Action Litigation, Cornell University ILR Labor and Employment Law Program and The Impact Fund, January 31-February 1, 2008.

"Status Caste Exchange: Preferences for Race and Poverty Status of Neighbors in Large Metropolitan Areas, 1970-2000" Regional Science Association, Savannah, Georgia, November 9, 2007.

"Population and the Economy" Anglo-American Real Property Institute, Chicago, September 1, 2007.

"Why Racial and Poverty Segregation Are Connected: A Fixed Effects Analysis of Large Metropolitan Areas in 1970, 1980, 1990, and 2000" Oberlin College Department of Economics, February 9, 2007.

"Suburbanization, Racial Desegregation, and Spatial Dispersal of Poverty in Large Metropolitan Areas" Regional Science Association, Toronto, Canada, November 16, 2006.

"Suburbanization, Racial Desegregation, and Spatial Dispersal of Poverty in Large Metropolitan Areas" Association for Public Policy Analysis and Management, November 5, 2006, Madison, WI.

"Practitioners' Roles and Practicum Courses in the Degree Program," Robert Garris, Janice Madden, William M. Rodgers III, Association for Public Policy Analysis and Management Spring Conference, Park City, Utah, June 15-17, 2006.

"Evidence of Sex Discrimination, as Developed in the Classroom and in the Courtroom," University of Michigan, February 9, 2006.

"Explaining Variations in Racial and Poverty Segregation across Metropolitan Areas: A Fixed Effects Analysis of Census Tract Panel Data for 1970, 1980, 1990, and 2000," Regional Science Association, Las Vegas, Nevada, November 11, 2005.

"Explaining Variations in Racial and Poverty Segregation across Metropolitan Areas: A Fixed Effects Analysis of Census Tract Panel Data for 1970, 1980, 1990, and 2000," Association for Public Policy Analysis and Management, November 3, 2005, Washington, DC.

Discussant at Philadelphia Fed Conference, "Immigration in the U.S.: Economic Effects on the Nation and Its Cities" April 28, 2005

"Mommies and Daddies on the Fast Track," AAPSS Spring Conference, National Press Club, Washington, D.C., April 11, 2005

"The Racial and Income Dynamics of Suburbanization within Large U.S. Metropolitan Areas," paper presented at the North American Regional Science Conference, Seattle, November 14, 2004.

"The Racial and Income Dynamics of Suburbanization within Large U.S. Metropolitan Areas," paper presented at the Association for Public Policy and Management Conference, Washington, D.C., October 30, 2004.

"Notes on Issues in Counting Commercial Sex Workers and Trafficked Individuals" The Asia Foundation Roundtable Discussion, Phnom Penh, Cambodia, May 11, 2004.

"The Racial and Income Dynamics of Suburbanization in Large U.S. Metropolitan Areas: An Update" North American Regional Science Council meetings, Philadelphia, PA, November 2003.

"Differences in the Success of NFL Coaches by Race, 1990-2002: Evidence of Last Hire, First Fire," Sports Lawyers Association, Phoenix, Arizona, May 29, 2003.

**Reports:**

"The Demographic and Income Dynamics of Shifts within Large Metropolitan Areas, 1970-2000: Explaining Variations in Racial and Poverty Segregation across Large Metropolitan Areas" Office of Policy Development and Research, U.S. Department of Housing and Urban Development Grant H-21443RG (June 2006)

"Are the Suburbs Really Changing?  Examining Changes in the Distribution of Income and Poverty Among Suburban Municipalities of Large Metropolitan Areas" Center on Urban and Metropolitan Policy, The Brookings Institution (January 2001)

"Interstate Sales and Employment Effects in the Wholesale Trade and Retail Trade Industries of Changes in the Federal Minimum Wage Legislation, 1958-77" Contract No. J-9-M-0-0072, Minimum Wage Study Commission (March 1981).

"The Effects of Employment Location and Scheduling of Work Shifts on Women's Employment

Opportunities" Grant No. 91-42-78-31, Department of Labor (January 1981).

"The Geographic Targeting of Job Programs" Contract No. 99-0-2698-50-24, National Commission for Employment Policy, (October 1980).

"Report on House Bill 2044: Consequences for the General Assistance Population (joint with others), Senate, Commonwealth of Pennsylvania (May 1980).

"Effects of Changing Household Structure on Cities" Grant No. R01-H-31400-01, National Institute on Mental Health, (June 1980).

"Evaluating the Returns to the Education of Women: Economic Rationale for Sex Differences in Education" Grant No. NIG-G-74-0094, National Institute of Education, (January 1977).

"Evaluating the Returns to the Education of Women" Spencer Foundation, (January 1975).

"The Economics of Sex Discrimination" Grant No. 91-37-72-26 Manpower Administration, U.S. Department of Labor, (July 1972).

**FELLOWSHIPS AND GRANTS:**

Penn Urban Research Institute, "Faculty Forum: Cities around the World: Networks, Form, Function" January 2006-July 2007 co-investigators: Richard Estes and Don Kettl.

U.S. Department of Housing and Urban Development, "The Demographic and Income Dynamics of Shifts across Suburban Municipalities within Large Metropolitan Areas: 1970-2000." June 2004-September 2005.

Alfred P. Sloan Foundation, "Parents on the Fast Track in Demanding Professions." (with Jerry Jacobs) September 2003-April 2004.

Ronald McNair Grant to support undergraduate students to prepare for Ph.D. education, 2000-5, $1 million.

Brookings Foundation, "The Changing Demographics of Suburbs: Implications for City-Suburban Cooperation," May 1998-May 2000.

National Science Foundation "Analysis of Variation in the Intrametropolitan Distribution of Income and Earnings," February 1993-March 1995. REU June-August 1993.

W.E. Upjohn Institute for Employment Research, "Changes in Income Inequality within U.S. Metropolitan Areas," January 1993- December 1995.

Patricia Roberts Harris Grant to support doctoral students at Penn, 1993-8, $1.7 million.

William Penn Foundation joint with Ben Franklin Partnership, "Temple-Penn Philadelphia Economic Monitoring Project" July 1988-June 1991.

Faculty Grant, Mellon Foundation Program on Assessing and Revitalizing the Social Sciences, "Industrial Transitions, Work Schedule Changes and the Welfare of American Workers" May 1987 - December 1987.Faculty Grant, Mellon Foundation Program on Assessing and Revitalizing the Social Sciences, "City Residences and the Employment of Black Women Who Head Households" August 1986 - February 1987.

Public Policy Initiatives Fund, "The Economic Significance of Displacement for Workers: An Empirical Investigation of Gender Differences," July 1985 - June 1986.

Faculty Grant, Mellon Foundation Program on Assessing and Revitalizing the Social Sciences, "Racial Wage Gradients in the Philadelphia, New York, and Washington, D.C. Labor Markets: An Examination of the Gilded Ghetto Debate" May 1985 - December 1985.

National Commission on Employment Policy, "Geographic Boundaries of Labor Markets" June 1980 - October 1980.

Minimum Wage Study Commission, U.S. Department of Labor, "Interstate Employment Effects of the Federal Minimum Wage Law," March 1980 - February 1981.

U.S. Department of Labor, "The Effects of Employment Location and Scheduling of Work Shifts on Women's Employment Opportunities," September 1978 - May 1980.

National Institute of Mental Health, R01-MH-31400-01 "Effects of Changing Household Structure on Cities," July 1978 – July 1980.

National Institute of Education, "Evaluating the Returns to the Education of Women," September 1974 - May 1976.

Spencer Foundation, "Evaluating the Returns to the Education of Women," January 1974 - December 1974.

University of Pennsylvania Faculty Fellowship, "Deriving a Spatial Labor Supply Curve," June 1974 - September 1974.

**OTHER PROFESSIONAL ACTIVITIES:**

Chair, Doctoral Dissertation Prize Committee, Association for Public Policy and Management (APPAM), 2007.

Secretary, Association for Public Policy and Management (APPAM) Institutional Representatives Committee, 2007

Member, Benjamin R. Stevens Dissertation Fellowship Committee, North American Regional Science Association, 2005-8, Chair, 2006.

Chair and Organizer, North American Regional Science Meetings, Philadelphia, PA, November 20-22, 2003

Member, American Academy of Political and Social Sciences Board, 2001-7; member of Finance Committee, 2003-present.

Chair, National Research Council Committee on Assessing the Portfolio of the Science Resources Studies Division of the National Science Foundation, 1998-2000. Published report: *Measuring the Science and Engineering Enterprise: Priorities for the Division of Science Resources Studies* (Washington, DC: National Academy Press, 2000).

President, Association of Graduate Schools (AGS), 1996-97.

Association of American Universities (AAU) Committee on Graduate Education, 1996-98.

Board, Council of Graduate Schools, 1996-1999.

Graduate Record Examination Board (AGS representative) 1994-8; Research Committee member.

Steering Committee, AAU/AGS Project for Research on Doctoral Education, 1993-00.

Executive Committee, AGS, 1994-8.

North American Regional Science Council (elected steering committee for North American Regional Science Assn.), 1992-95 and 2008-11; conference organizer, 2003.

Editorial Boards:
  *International Economic Review*, 1978-1993.
  *Economic Geography*, 1991-1995
  *Women and Work*, 1984-present
  *Urban Studies,* 1996-present;
    U.S. editor, 1997-2001.

Advisory Board, The H. John Heinz III School of Public Policy and Management, Carnegie Mellon University, 1992-1998.

Advisory Committee, Graduate School of Arts and Sciences, Emory University, 1999

External Review Committees, The Sanford Institute of Public Policy, Duke University, 1995; graduate education at the University of Virginia, 1997, Graduate School of Arts and Science, Washington University at St. Louis, 2005.

Review Committee, Ontario Council on Graduate Studies, Canada, December 1998-March 1999.

Oversight Committee, Career Planning Center for Beginning Scientists and Engineers, National Academy of Sciences, 1996-1999.

Member, Committee on Vocational Education and Economic Development in Depressed Areas, National Research Council, National Academy of Sciences, 1982-83; prepared *Education for Tomorrow's Jobs* (Washington, D.C.: National Academy Press, 1983).

Review Panel, NSF Faculty Awards for Women, Social and Economic Science, 1991.

American Economic Association Committee on the Status of Women in the Economics Profession, 1975-78.

Advisory Council, Office of Employment and Training, City of Philadelphia, 1981-84; Budget Committee; Executive Committee; Chair, Long Range Planning Committee.

Vice-Chairman, Board of Trustees, Friends Select School, 1993-6 (member, 1991-2000, 2002-present). Chair of Finance Committee, 1998-2000.

Advisory Board, Philadelphia Child Support Project, 1987-1990.

Board of Directors, Creative Alternatives for Women, Jenkintown, Pa., 1979-82.

Board of Commissioners, Fellowship Commission, 1981-82.

Referee: American Economic Review; Journal of Political Economy; American Sociological Review; Economics of Education Review; Journal of Business and Economics; International Economic Review; Journal of Human Resources; Land Economics; Journal of Regional Science; Urban Studies; Regional Science and Urban Economics; International Regional Science Review; Regional Studies; Journal of Urban Affairs; Journal of Public Policy and Management; Economic Development and Cultural Change; Growth and Change; Journal of Sports Economics; Journal of Peace Science; Policy Analysis; Signs: A Journal of Women in Culture and Society; Environment and Planning; Urban Studies; Geographic Analysis; The Professional Geographer; Industrial Relations; Industrial and Labor Relations Review; Journal of Economic Behavior and Organization,

Journal of Sports Economics, American Sociological Review, Survey Research Center; Institute for Social Research, University of Michigan; National Council on Employment Policy, Washington, D.C.; American Academy, Berlin Germany.

Research Proposal Reviewer: National Institute of Education, U.S. Department of Health, Education and Welfare; National Science Foundation -- Economics, Geography and Regional Science, Social Indicators, Sociology, and Public Policy and Regulation Sections.

## COURSES TAUGHT:

Undergraduate: Quantitative Methods of Urban and Regional Analysis, Economics of Discrimination, Sociology of Discrimination, Location Theory, Principles of Economics, Principles of Regional Science, Urban Economics.

Graduate: Microeconomic Theory, Regional Development and Human Capital Investment, Workshop in Labor Economics, Location Theory and Regional Analysis, Regional Labor Market Issues, Gender and the Labor Market, Research in Demography, Economic Demography; Research Methods in Demography.

## FACULTY COMMITTEES AT PENN:

Head, Departmental Graduate Admissions Committee, 1973-77
Member, Departmental Dissertation Proposals Committee, 1973-77
Member, SAS Women's Advisory Committee, 1975-77
Member, SAS Women's Studies Governing Board, 1974-76
Member, SAS Distributional Requirements Subcommittee, 1975-77
Member, SAS Women's Studies Evaluation Committee, 1976-77
Member, University Benefits Committee, 1976-77
Member, SAS Regional Science Chairman Search Committee, 1976-77
Chair, Faculty Senate Nominating Committee, 2008 (member 1978, 1980)
Member, Women's Studies Committee, 1979-85
Hearing List, University Grievance Panel, 1979-82
Member, Search Committee for Executive Vice President, 1981
Member, SAS Undergraduate Statistics Education Committee, 1982
Chair, Faculty Senate Committee on the Faculty, 1981-82 (Member 1980-81, 2000-2004)
Member, President's Affirmative Action Council, 1982-1988 and 1991-1999.
Vice President, Women for Equal Opportunity at the University of Pennsylvania, 1981-82
Chair, Faculty Senate Committee on the Economic Status of the Faculty, 1984-85 (Member 1982-84); (Member 2000-2003).
Member, Urban Studies Committee, 1982-85
Chair, SAS Committee on Academic Freedom and Responsibility, 1986-1987 (Member 1987-1988).
Member, SAS Social Sciences Division Planning Committee, 1986-1988
Member, University Academic Planning and Budgeting Committee, 1987-90.

Member, Advisory Council, Women's Center, 1987-present.
Member, Provost's Committee for Planning the Academic Information Environment, 1988-1990.
Chair, SAS Committee on Committees, 1990-91 (Member 1989-90).
Faculty Affirmative Action Officer for the Social Sciences, SAS 1990-91.
Member, IRMC Education Subcommittee (use of computers in education), 1990-91.
Member, Provost's Staff Council, 1991-99.
Member, Minority Permanence Committee, 1992-99.
Member, Task Force on Revision of Just Cause and Other Personnel Procedures, 1992-93.
Member, Provost's Committee on Urban/Regional Programs, 1994-95.
Member, Search Committee for Associate Provost, 1995.
Member, Penn World Wide Web Steering and Advisory Committees, 1995-99.
Member, Executive Committee, Martin Luther King Holiday Activities, chair, external relations
       sub-committee, 1995-99.
Member, Council on Advice, University Chaplain's Office, 1995-96.
Member, Departmental Undergraduate Curriculum Committee, 1995-97.
Member, Student Services Re-engineering Committee, 1996-97.
Member, Department of Sociology Executive Committee, 1997-98, 2001-2002, 2006, 2007-8.
Member, Personnel Committee, Department of Real Estate, 1996-98.
Member, Program, Executive, and Curriculum Committees, Fels Center of Government, 1997-
       2002.
Member, Personnel Committee, Department of Sociology, 1997-98, 2003-4, 2005-6 (chair),
       2007-2008.
Chair, Student Health Insurance Committee, 1997-98, member, 1998-99.
Member, Distance Learning Committee, 1997-98.
Co-Chair, Ph.D. Funding Committee, 1997-99.
Chair, President's Committee on Asian American Students, 1998.
Member, SAS Saul Steinberg Lecture Committee, 1998.
Chair, Gender Equity in Athletics, 1999-2002.
Member, Deputy Provost Search Committee, 1999.
Member, Search Committee for Director of Fels Program, 1998-99.
Member, SAS Personnel Committee, 2000-2002.
Member, Gender Equity Task Force, 2000-2002.
President, Penn Chapter of Phi Beta Kappa, 2001-2002; Vice-President 2000-2001.
Member, Provost's National Research Council Study of Graduate Programs Committee, 2001-4.
Member, Committee on Graduate Prizes, 2002.
Chair, University Planning Committee on Organizations, Institutions, and Leadership, 2001-02.
Member, University Committee on School of Social Work, 2001.
Member, Dean Search Committee, School of Social Work, 2002-2003.
Member, Penn Middle States Committee on Graduate Education; chair of student support
       subcommittee, 2002-2004.
Member, Spatial Data Analysis Graduate Planning Committee, 2004-present.
Chair, TA Teaching Prize Committee, 2004.
Member, Executive Committee, Penn Urban Research Institute, 2004-present
Member, Minority Equity Committee, 2004-5.
Member, Faculty Senate Executive Committee, 2007-9.

Member, Search Committee for Fels Director, 2008.
Chair, Faculty Senate Nominating Committee, 2008.

May 2008

## ALEXANDER VEKKER

Econsult Corporation
3600 Market St., 6th floor
Philadelphia, PA 19104
Telephone: (215) 382-1894
Fax: (215) 382-1895
Email: vekker@econsult.com

## EDUCATION

University of Pennsylvania, Philadelphia, PA

Ph.D., Economics, 2001
Fields of concentration: Labor Economics, Applied Econometrics
Dissertation: "Essays in Labor Economics"


Moscow State Institute of Radio Engineering,
Electronics and Automation (Technical University), Moscow, Russia

Honors Diploma (equivalent to B.S./M.S.), Applied Mathematics, 1994


## EXPERIENCE

Vice President, Econsult Corporation, Philadelphia, PA, 2003-present

Visiting Faculty, Department of Economics, University of Pennsylvania, Philadelphia, PA,
     2006-present

Adjunct Faculty, Peirce College, Philadelphia, PA, 2005-2006

Adjunct Associate Professor, Department of Economics and International Business, Drexel
     University, Philadelphia, PA, 2002-2006

Senior Associate, Econsult Corporation, Philadelphia, PA, 2001-2003

Instructor, Managerial Microeconomics, The Wharton School, University of Pennsylvania,
     Philadelphia, PA, 2001

102

Instructor, Industrial Organization, Department of Economics, University of Pennsylvania, Philadelphia, PA, 1997

Instructor, Comparative Economic Systems, Department of Economics, University of Pennsylvania, Philadelphia, PA, 1997

## HONORS AND AWARDS

University of Pennsylvania Graduate Fellowship, 1995-1999

Scholarship of the New York Association for New Americans (NYANA), 1995-1996

Scholarship of the Moscow Mayor, 1993-1994

Scholarship of the Association of Russian Colleges, 1993

## PUBLISHED RESEARCH PAPERS

"An Alternative Look at Temporary Workers, Their Choices and the Growth in Temporary Employment," with Michael Morris. *Journal of Labor Research. Vol. 22 (2). Spring 2001.*

"Prevalence of the EH1 Groucho interaction motif in the metazoan Fox family of transcriptional regulators", with Sergey Yaklichkin, Steven Stayrook, Mitchell Lewis and Daniel S Kessler. *BMC Genomics, Vol. 8, 201. June 2007.*

## UNPUBLISHED RESEARCH PAPERS AND WORK IN PROGRESS

"Job Loss and Unemployment," mimeo, Department of Economics, University of Pennsylvania, November 2000.

"Is Temporary Employment Growing in the US," with Michael Morris (in progress).

## PRESENTATIONS

"Is Temporary Employment Growing in the US," Society of Economic Dynamics Annual Meeting, San Jose, Costa Rica, 2000

"An Alternative Look at Temporary Workers, Their Choices and the Growth in Temporary Employment," Center for Economic Studies, U.S. Census Bureau, Washington, DC, 2001

"Temporary Employment," Bureau of Labor Statistics, Washington, DC, 2001

"Why Do People Choose Temporary Jobs?" University of Pennsylvania, Philadelphia, PA, 2001

"Why Do People Choose Temporary Jobs?" Ohio University, Athens, OH, 2001

## OTHER PROFESSIONAL ACTIVITIES

Referee: *International Journal of Manpower*

Undergraduate thesis advising, Department of Economics, University of Pennsylvania

Guest appearance at the Voice of America call-in talk show, September 2007

# Attachment B

**SUMMARY OF TESTIMONY**
**SINCE JUNE 2004**

- **JANICE F. MADDEN**

- **ALEXANDER VEKKER**

EXPERT TESTIMONY OF DR. JANICE F. MADDEN
Since June 2004

1.    *Katherine Puffer, on behalf of herself and all others similarly situated, v. Allstate Insurance Company,* U.S. District Court for the Northern District of Illinois, Eastern Division, No. 04-C-5764 (February 2008)

2.    *Employees Committed for Justice, et al., v. Eastman Kodak Company,* United States District Court, Western District of New York; C.A. No.: 6:04-cv-06098-CJS (November 2007)

3.    *EEOC v. Outback Steakhouse of Florida, Inc., and OS Restaurant Partners, Inc. d/b/a Outback Restaurants,* United States District Court for the District of Colorado, Civ. No. 06-CV-01935-MSK-BNB (October 2007).

4.    *Nilda Gutierrez, et al. v. Johnson & Johnson,* U.S. District Court for the District of New Jersey, Civil Action No. 01-5302 (WHW) (January 2005, June 2006)

5.    *Tami Remien and Debra Fletcher, et al., v. EMC Corporation,* United States District Court for the Northern District of Illinois, Eastern Division, No. 04-CV-3727 (December 2005)

6.    *Williams, et al. vs. The Boeing Co., et al.,* United States District Court, Western District of Washington at Seattle, No. C98-761P (June 2005, August 2005, December 2005)

7.    *Margaret Twombly v. Merrill Lynch, Pierce, Fenner & Smith Incorporated,* Third Stage Hearing Panel Established Under Section 7.11(3) of the *Cremin v. Merrill Lynch* Settlement Agreement, 96 C 3773 (October 2004).

8.    *Toni Noel v. Smith Barney, Inc., et al.* Hearing as part of settlement in *Martens, et al., v. Smith Barney Inc., et al.* U.S. District Court Southern District of New York, No. 96 Civ. 3779 (JGK) (June 2004).

# EXPERT TESTIMONY OF DR. ALEXANDER VEKKER
## Since June 2004

1.      *Charles Taylor, et al. v. District of Columbia Water and Sewer Authority,* Civil Action No. 01-0561-HHK: United States District Court for the District of Columbia (August 2005).

2.      *Nilda Gutierrez, et al. v. Johnson & Johnson,* U.S. District Court for the District of New Jersey, Civil Action No.  01-5302 (WHW) (January 2005).

3.      *DeWayne Ketchum, et al. v. Sunoco, Inc. ,* Civil Action No. 01-CV-1042: United States District Court Eastern District Of Pennsylvania. (November 2004).

# Attachment C

**STATEMENT REGARDING COMPENSATION OF
JANICE F. MADDEN AND ALEXANDER VEKKER**

**STATEMENT REGARDING COMPENSATION OF
JANICE F. MADDEN AND ALEXANDER VEKKER.**

**RE:** *George McReynolds v. Merrill Lynch and Co., Inc., U.*S. District Court
for the Northern District of Illinois, Eastern Division, Index No.05C-6583

The services of Dr. Janice F. Madden and Dr. Alexander Vekker are offered through
Econsult Corporation. Their services are currently charged at the hourly rate of $540.00
and $285 respectively.

109

# Attachment D

**MATERIALS RELIED UPON**

| MATERIALS RELIED UPON | | |
| --- | --- | --- |
| **DOCUMENTS** | | |
| ML 100001-100891 | Merrill Lynch Data Dictionary | 12/19/2005 |
| MLE 00172 000027-000033 | PL455P05 Record Layout | |
| MLE 00393-000001 | Product Codes | |
| MLE 01002 000001-000044 | | |
| MLE 00172 000001-000016 | Element List for Table TBACCT | 12/21/2005 |
| **CORRESPONDENCE** | | |
| | Letter -  Dray to Friedman | 09/19/2006 |
| | Letter -  Bonk to Robot | 11/15/2007 |
| | Email – Dray to Robot | 06/06/2007 |
| | Email – Dray to Robot | 03/23/2007 |
| | Email – Dray to Robot | 04/09/2007 |
| | Email – Bonk to Robot | 03/03/2008 |
| | Email – Bonk to Robot | 03/04/2008 |
| | Email – Bonk to Robot | 01/23/2008 |
| | Letter – Bonk to Robot | 05/07/2008 |
| | Letter – Gavsie to Friedman | 06/07/2007 |
| | Letter – Bonk to Robot | 03/24/2008 |
| | Letter-  Gavsie to Friedman | 06/06/2007 |
| | Letter – Gavsie to Friedman | 05/31/2007 |
| | Letter – King to Friedman | 06/11/2007 |
| | Letter – Gavsie to Friedman | 06/15/2007 |
| | Letter – Bonk to Friedman | 08/21/2007 |
| | Letter – Dray to Friedman | 02/07/2007 |
| | Letter – King to Friedman | 01/18/2007 |
| | Letter – King to Friedman | 01/22/2007 |
| | Letter – Bonk to Robot | 11/01/2007 |
| | Letter – Lightfoot to Friedman | 11/13/2006 |
| | Letter – Dray to Friedman | 12/20/2006 |
| | Letter – Kemper to Friedman | 07/27/2006 |
| **DEPOSITIONS** | | |
| | Leopoldo Marichal | 06/21/2007 |
| | Pao-Ling Yu | 06/21/2007 |
| | Michael Dauber | 06/21/2007 |
| | John Hogarty | 10/05/2006 |
| | Daniel Sontag | 01/17/2007 |
| | Kim Pillar | 02/23/2007 |
| | Philip Sieg | 01/16/2007 |

| | Philip Sieg | 12/01/2006 |
| | Philip Sieg | 06/01/2007 |
| | Stanley O'Neal | 11/01/2006 |
| | Hartwell Gardner | 03/08/2007 |
| | Tamara Cassiday | 12/20/2006 |

<table>
<tr><td colspan="3" align="center">DATA FILES<br>(Provided By Merrill Lynch)</td></tr>
<tr><td></td><td>MLE CD 00003</td><td></td></tr>
<tr><td></td><td>MLE CD 00010</td><td></td></tr>
<tr><td></td><td>MLE CD 00014</td><td></td></tr>
<tr><td></td><td>MLE CD 00017</td><td></td></tr>
<tr><td></td><td>MLE CD 00019</td><td></td></tr>
<tr><td></td><td>MLE CD 00022</td><td></td></tr>
<tr><td></td><td>MLE CD 00027</td><td></td></tr>
<tr><td></td><td>MLE CD 00028</td><td></td></tr>
<tr><td></td><td>MLE CD 00030</td><td></td></tr>
<tr><td></td><td>MLE CD 00031</td><td></td></tr>
<tr><td></td><td>MLE CD 00032</td><td></td></tr>
<tr><td></td><td>MLE CD 00034</td><td></td></tr>
<tr><td></td><td>MLE CD 00038</td><td></td></tr>
<tr><td></td><td>MLE CD 00045</td><td></td></tr>
<tr><td></td><td>MLE CD 00046</td><td></td></tr>
<tr><td></td><td>MLE CD 00047</td><td></td></tr>
<tr><td></td><td>MLE CD 00049</td><td></td></tr>
<tr><td></td><td>MLE CD 00051</td><td></td></tr>
<tr><td></td><td>MLE CD 00052</td><td></td></tr>
<tr><td></td><td>MLE CD 00053</td><td></td></tr>
</table>