**Merrill Lynch's Memorandum in Opposition to Plaintiffs' Motion for
Class Certification**

# APPENDIX I:
# OUTTZ REP.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
-------------------------------------------------------------x
GEORGE MCREYNOLDS, et. al.,                   :    Case No. 05C6583
Individually on behalf of themselves and all others  :
similarly situated,                           :    Hon. Robert W. Gettleman
                                              :    Magistrate Judge Denlow
                Plaintiffs,                   :
                                              :
     - against -                              :
                                              :
MERRILL LYNCH, PIERCE,                        :
FENNER & SMITH INCORPORATED,                  :
                                              :
                Defendant.                    :
-------------------------------------------------------------x
```

## AFFIDAVIT OF DR. JAMES L. OUTTZ

DISTRICT OF COLUMBIA )
                       )     ss.:
                       )

JAMES L. OUTTZ, Ph.D., being first duly sworn, deposes and says:

1.      I submitted an expert report, dated November 14, 2008 (attached hereto as Exhibit A), in connection with the above-referenced matter.

2.      On November 20, 2008, I submitted a corrected version of Table 1, which appears on page 21 of my expert report. The attached expert report contains the correct version of Table 1.

3.      I submitted an amendment to my expert report, dated January 9, 2009 (attached hereto as Exhibit B).

4.      My expert report (with the corrected Table 1) and the amendment thereto constitutes my testimony and opinions with regard to class certification in connection with the above-referenced matter.

Dated May 12, 2009

_____
James L. Outtz

Subscribed and sworn to before me this
12 day of May , 2009.
Lorraine B Harrison
Notary Public
Commission Expires 07|31|2012

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------------------------

**GEORGE McREYNOLDS, et al.,**
**Individually and as Class Representatives,**

     **Plaintiffs,**

  v.

**MERRILL LYNCH, PIERCE, FENNER**
**& SMITH, INCORPORATED**

     **Defendant,**

---------------------------------------------------

**Case No. 05 C 6583**

**Judge Robert W. Gettleman**

**Magistrate Judge Denlow**


**EXPERT REPORT OF JAMES L. OUTTZ, Ph.D.**
**REGARDING CLASS CERTIFICATION ISSUES**


**November 14, 2008**

## **TABLE OF CONTENTS**

Executive Summary…………………………………………………………………………...…1-2

    A.       Background……………………………………………………………………..……1

    B.       Conclusions…………………………………………………………………....…1-2

I. Qualifications……………………………………………………………………………...…2-4

II. Assignment………………………………………………………………………………...…5

III. Analysis and Conclusions…………………………………………………………………5-40

    A.       Analysis of Financial Advisor Position……………………………………...……5-7

    B.       Job Analysis Methods and Procedures………………………………………….7-12

    C.       The Financial Advisor Position: General Conclusions…………………………....12-19

    D.       Job Analysis Findings: Key Drivers of Financial Advisors' Compensation……19-27

    E.       Racial Differences in Productivity & Compensation…………………………..27-28

    F.       Training Opportunities for Merrill Lynch Financial Advisors………………….28-32

    G.       Merrill Lynch's Management Assessment Center……………………………....32-40

IV. Summary…………………………………………………………………………………40-42

V. Appendices………………………………………………………………………………43-135

    Appendix 1      Previous Testimony………………………………………………..……44

    Appendix 2      Curriculum Vitae………………………………………………..…….45-92

    Appendix 3      List of Documents Relied Upon………………………………..…….93-107

    Appendix 4      Complex Director Interview Form…………………………………...108-119

    Appendix 5      Financial Advisor Interview Form…………………………………...120-130

    Appendix 6      Tables A –D………………………………………………………......131-135

## EXECUTIVE SUMMARY

A.  Background

-   I am an Industrial-Organizational (I/O) Psychologist with a specialization in selection and training. Industrial-Organizational Psychology is the application of psychological principles, theory and research to the world of work. I have over 25 years of experience in analyzing jobs to determine (a) what is done, (b) the context in which it is done, and (c) the knowledge, skills and abilities needed to perform the job successfully.

-   I have been retained by counsel for the defendant, Merrill Lynch, Pierce, Fenner and Smith, Incorporated ("Merrill Lynch"), to address specific issues plaintiffs raised regarding Financial Advisors ("FAs") at the company. My efforts in addressing each issue focus on the following critical points:

    -   the appropriate method of analysis for determining the drivers of Financial Advisor productivity and compensation;

    -   identifying the drivers of Financial Advisor productivity and compensation given the appropriate method of analysis;

    -   Merrill Lynch's training opportunities for Financial Advisors

    -   Merrill Lynch's human resource practices with regard to the movement of Financial Advisors into management.

-   My opinions are based upon a job analysis of the Financial Advisor and Complex Director positions at Merrill Lynch, which included examination of documents and materials filed in this case, deposition transcripts and exhibits, as well as interviews with a representative sample of FAs and Complex Directors.

B.  Conclusions

-   A job analysis of the FA position at Merrill Lynch indicates that the drivers of FA productivity and compensation include (but are not limited to) the following abilities, skills, attributes and other characteristics:

    -   access to (or the ability to gain access to) high net-worth clients;

    -   the ability to gain the trust of potential clients, particularly high net-worth clients;

    -   the ability to take risks – relatively little need for security, enjoyment of risk taking for potential profit, and an entrepreneurial spirit;

    -   the ability to efficiently prospect for affluent clients;

    -   job-related experience – experiences similar to the sales and financial aspects of the Financial Advisor position.

-   Plaintiffs' experts assert that discrimination in employment by Merrill Lynch caused

1

African American FAs to attain lower productivity and compensation levels than Caucasian FAs. However, plaintiffs' experts' analyses omitted information on factors other than race that are associated with FA productivity and resulting compensation. A significant factor that plaintiffs' experts did not analyze is network access to high net-worth individuals. This factor is important if a Financial Advisor is to bring sufficient assets under management to be a high producer at Merrill Lynch and earn higher compensation.

- Plaintiffs' expert, Dr. Bielby, asserts (at ¶ 18 of his report) that training resources that help an FA be an effective producer are distributed disproportionately to those who have the highest level of production. I found that although certain advanced training programs require demonstration of prior productivity, most training opportunities are available to all FAs regardless of production and all FAs are given the necessary training to become high producers. Significantly, any FA can earn a professional designation.

- Plaintiffs' expert, Dr. Bielby, asserts (at ¶ 62 of his report) that Merrill Lynch's Management Assessment Center ("MAC"), the process used to screen Financial Advisors for movement into management, is designed in a way that is highly vulnerable to racial bias and stereotypes. I did not see evidence of this. Merrill Lynch's MAC well exceeds the professional standards for such procedures. Rather than being vulnerable to racial bias and stereotypes, Merrill Lynch's MAC minimizes the possibility of bias by employing multiple checks and balances including multiple observations of each candidate by multiple assessors, training for assessors prior to participation in the process and standardized evaluation procedures designed to ensure consistent evaluations of candidates.

## I. QUALIFICATIONS

1.    I am an Industrial-Organizational (I/O) Psychologist in private practice in

Washington, DC for over 25 years. Industrial-Organizational Psychology is the application of

psychological principles, theory and research to the world of work. I hold a Ph.D. in I/O

Psychology, which I received from The University of Maryland in 1976. My area of specialization

is selection, which encompasses the manner in which organizations hire, retain, develop, evaluate

and promote employees.

2.    I am a Fellow in the Society for Industrial and Organizational Psychology (SIOP) as

well as the American Psychological Association, and recently completed a four-year term as a

consulting editor to the Journal of Applied Psychology. I served on the SIOP committee to revise

the Principles for the Validation and Use of Personnel Selection Procedures. The Principles detail

2

accepted professional practices regarding the development and validation of personnel selection practices and procedures. Over the past fifteen years, I have served on a number of committees of the National Academy of Sciences charged with addressing national issues of employment selection and organizational staffing. I also served on the National Academy of Sciences' Committee for the Study of Federal Aviation Administration Aviation Safety Inspector Staffing Standards. Past committee service includes the Committee on Workforce Needs in Information Technology and the Board on Testing and Assessment.

3. I have published works on a variety of topics including racial discrimination in employment; the role of cognitive ability tests in employment selection; the effect of testing medium on validity and subgroup performance, and implementing fair selection strategies. I have also written reviews of published texts on affirmative action and workforce diversity.

4. I have devoted a significant part of my practice over the past 25 years to the development and validation of selection procedures for public and private sector organizations. During that period of time, I have developed specific expertise in job analysis. Job analysis is the process of determining what a job is and what it takes to perform it well. When this is determined accurately, the information provides a solid foundation for employment practices and decisions in many areas, including hiring, training, promotion, compensation and employee turnover. I have made use of this job analysis experience extensively in forming my opinions in this case.

5. I have been retained by employers in both the public and private sectors and developed more than 100 selection devices and/or selection procedures for entry level and managerial positions. A representative sample of clients includes ALCOA, CSX Transportation, Publix Super Markets Inc., Potomac Electric Power Company, the cities of New York, Chicago and San Francisco, the Federal Deposit Insurance Corporation, the United States Department of Justice

3

(Federal Bureau of Investigation) and the United States Department of Labor. Selection procedures that I developed have been administered to more than 500,000 applicants for entry level and supervisory positions in organizations throughout the United States. I have been retained by legal counsel on behalf of organizations such as The Boeing Corporation, Johnson and Johnson, Matsushita Communications Industrial Corporation of USA, and Mack Trucks, Inc.

      6.    I have been retained as an expert by both plaintiffs and defendants in litigations involving human resource policies, practices and procedures such as promotion, job posting and performance appraisal. As an expert on plaintiffs' behalf, I have addressed issues of discrimination concerning race, ethnicity, gender and age. Over the course of my career, I have been retained by a number of organizations recognized as advocates for civil rights including the NAACP Legal Defense Fund, Puerto Rican Legal Defense Fund, the Lawyer's Committee for Civil Rights Under Law, the Civil Rights Division of the U.S. Justice Department and the Office of Federal Contract Compliance of the United States Department of Justice. I have testified at trial as an expert witness for plaintiffs as well as defendants on more than 20 occasions. A listing of the cases in which I have testified in the last four years is contained in Appendix 1 of this report. A more complete description of my experience and qualifications is contained in my curriculum vitae, which is in Appendix 2. My rate of compensation for services in this case is $375 per hour.

4

## II. ASSIGNMENT

Merrill Lynch has asked me to answer the following questions:

- Plaintiffs have alleged that race discrimination at Merrill Lynch is the cause of the earnings disparity in compensation between African American and Caucasian FAs at Merrill Lynch. They have submitted two reports from three experts (Drs. William T. Bielby, Janice Madden and Alexander Vekker), who claim that the record and the scientific literature supports that allegation. Given your expertise as an Industrial Organizational Psychologist, what is your opinion as to whether plaintiffs' experts have included or omitted all important variables in their analysis?

- Based on your expertise as an Industrial Organizational Psychologist and your job analysis of the FA position at Merrill Lynch, what are the drivers of a Financial Advisor's levels of productivity?

- Based on your expertise and your job analysis of the FA position, what is your opinion as to whether the analyses by Drs. Bielby, Madden and Vekker demonstrate that discrimination in employment by Merrill Lynch caused African American FAs to attain lower production levels than Caucasian FAs?

- Dr. Bielby asserts (at ¶ 18 of his report) that training resources that help Financial Advisors become effective producers are disproportionately distributed to those who have the highest level of production. Based on your expertise and your job analysis of the FA position, including an examination of Merrill Lynch's training programs, what is your opinion as to the availability of training opportunities for FAs at all levels of production?

- Dr. Bielby asserts (at ¶ 62 of his report) that the Management Assessment Center ("MAC") used by Merrill Lynch to screen employees who seek to move into management is designed in a way that is highly vulnerable to racial bias and stereotypes. Based on your expertise, your job analysis, and your study of the MAC, what is your opinion as to this assertion?

## III. ANALYSIS AND CONCLUSIONS

### A. Analysis of Financial Advisor Position

1.      In order to understand what causes earning disparities between African American

and Caucasian FAs, it is essential to begin by understanding the Financial Advisor position. A job

analysis or analysis of work provides the foundation for such an understanding.

2.      Although plaintiffs' experts claim that the record and scientific literature support

plaintiffs' allegation that discrimination at Merrill Lynch is the cause of the earnings disparity

between African American and Caucasian FAs, none of their reports reflect an analysis of the FA position. A job analysis is necessary[1] to identify and account for plausible, nondiscriminatory, job-related factors that could provide an alternative explanation for the earning disparities between African American and Caucasian FAs.

3.     A job analysis is a systematic study of a job to determine what is done, how it is done, the context in which it is done, as well as the knowledge, skills, abilities and other characteristics required to perform the job. The Principles for the Validation and Use of Personnel Selection Procedures, which address accepted professional practices in the field of industrial and organizational psychology, state the following with regard to the purposes for conducting a job analysis:

> There are two major purposes for conducting an analysis of work. One purpose is to develop selection procedures. Part of this process is an analysis of work that identifies worker requirements including a description of the general level of ability, skill, knowledge or other characteristics needed. Such an analysis of work would determine the characteristics workers need to be successful in a specific work setting, or the degree to which the work requirements are similar to requirements for work performed elsewhere. The other purpose is to develop or identify criterion measures by assembling the information needed to understand the work performed, the setting in which the work is accomplished, and the organization's goals.
>
> There is no single approach that is the preferred method for the analysis of work. The analyses used in a specific study of work are a function of the nature of the work, current information about the work, the organizational setting, the workers themselves, and the purposes of the study. Understanding the organization's requirements or objectives is important when selecting an appropriate method for conduct of an analysis of work. The choice of method and the identification of the information to be gathered by that method should include the relevant research literature.[2]

---

[1] Cascio, W. (1982), *Applied Psychology In Personnel Management*, 2nd Edition, VA: Reston Publishing. There are other factors that may impact the compensation of Financial Advisors, *e.g.*, account transfers, that are beyond the scope of my assignment. I understand that other experts have examined such factors.

[2] See Society of Industrial and Organizational Psychology, Inc. (2003). Principles for the Validation and Use of Personnel Selection Procedures (4th edition). Bowling Green, OH.

6

4.     In the fields of industrial and organizational psychology and human resource management, job analysis is considered critical to the proper evaluation of employment policies, practices and procedures. The best way to evaluate the effects of organizational polices and practices on employees in a specific a job is to first acquire a thorough understanding of the duties and responsibilities of that job, including an understanding of the context in which the job is performed and the attributes needed to perform it successfully.

5.     By conducting a systematic analysis of the FA position, including examination of relevant documents and interviews with both FAs and Complex Directors, I was able to learn about the drivers of compensation for Financial Advisors at Merrill Lynch.

## B.    Job Analysis: Methods and Procedures

6.     To gain an understanding of the job of a Merrill Lynch Financial Advisor, I examined deposition testimony taken in this matter, documents produced in discovery by Merrill Lynch, responses to interrogatories and legal documents filed by plaintiffs and Merrill Lynch, and other materials referenced in this report. Appendix 3 lists the documents that I relied on in forming my conclusions and expert opinions. Of particular relevance were those documents and deposition testimony detailing the duties and responsibilities of the FA position.

7.     To complete the job analysis, I conducted structured, in-person interviews with a random sample of Merrill Lynch Financial Advisors and Complex Directors at the locations where the interviewees worked. Therefore, my job analysis of the FA position was based upon the documents I reviewed as well as my interviews of both the FAs and Complex Directors. My interviews with the Complex Directors were also used to perform a job analysis of the Complex Director position; this enabled me to evaluate Merrill Lynch's MAC.[3] Interviews with these

---

[3] See Section III.G, *infra*, for my analysis of Merrill Lynch's MAC.

7

individuals provided me with a more detailed description of both positions.

8.    In order to ensure that my interviews of Complex Directors would provide sufficient information to allow me to understand all of Merrill Lynch's complexes, it was first necessary for me to obtain a random sample of Merrill Lynch's complexes.[4]  A sample of 32 office complexes was selected by Dr. Eugene P. Ericksen.  The sample of 32 office complexes was selected with replacement, such that each sample selection was independent of all other selections.  It was possible, therefore, for the same complex to be selected multiple times.[5]  Because three offices were selected twice, the sample required me to interview 29 individual Complex Directors (for purposes of data analysis, the three complexes that were selected twice were counted twice).[6]  Because these 32 office complex selections are a statistically valid sample, the findings based on this sample are representative of the total population of all Merrill Lynch office complexes.[7]

9.    The purpose of the Complex Director interviews was to gain information about the Complex Director and FA positions that could not be determined from documents alone.  The interviews were highly structured, as the interview questions were developed in advance and the interviews were standardized.  The same topics were covered with each Complex Director.  This was done to achieve consistency with regard to the information obtained.  A copy of the questionnaire used to conduct the Complex Director interviews is in Appendix 4.

10.    At my request, I also interviewed six African American Complex Directors, three of whom (Mr. Ted Bell, Ms. Marsha Jones, Mr. Stephen Pryor) were previously FAs at Merrill

---

[4] The interviews with Complex Directors were conducted between June 12 and September 13, 2007.

[5] See Expert Report of Eugene P. Ericksen on Class Certification Issues, dated November 14, 2008, p. 7 (hereinafter "Ericksen Expert Report").

[6] Ibid. The location of each complex is shown in Table A in Appendix 6. All alphabetically labeled tables are located in Appendix 6.

[7] Ibid.

8

Lynch.[8]  In addition, I also interviewed Mr. Phil Seig and Mr. John Hogarty, who testified in

depositions as corporate representatives (or "30(b)(6) witnesses") of Merrill Lynch. These

interviews provided me with an overview of many of Merrill Lynch's human resources policies.

      11.     The next stage of my job analysis was to conduct interviews with a representative

sample of Merrill Lynch Financial Advisors. The sample of FAs was selected from the 32

complexes that comprised the sample described above.[9]  The sample of FAs chosen from the 32

complexes is equally representative of FAs across all Merrill Lynch office complexes because the

32 complexes were a probability sample.[10]  Because the sampling was conducted with replacement,

some FAs were selected more than once. I interviewed 111 individual FAs that represented a

random sample of 128 FAs.[11]  My findings based on this statistically valid sample can be used

within certain confidence intervals to provide an accurate representation of the total population of

all FAs across all Merrill Lynch office complexes.[12]

      12.     The purpose of the FA interviews was also to gain information about the FA

position at Merrill Lynch, including information related to how FAs at Merrill Lynch build their

books of business. In my opinion, this information could not have been obtained from the

documents alone. The interviews were highly structured. The interview questions were developed

in advance and the interviews were standardized. After making minor adjustments to the interview

protocol based on my initial three or four interviews, I covered the same topics with each FA. This

---

[8] Table B shows the location of these Complex Directors. The interviews with African American Complex Directors were conducted between September 26 and October 26, 2007.

[9] See Ericksen Expert Report, p. 8.

[10] Ibid.

[11] Table C shows the Merrill Lynch complexes from which the FAs were sampled and the number of FAs interviewed from each complex. Table D shows their office location.

[12] See Ericksen Expert Report, pp. 12-14, for a discussion of these confidence intervals.

was done to achieve consistency with regard to the information obtained. A copy of the questionnaire used to conduct the FA interviews is in Appendix 5.

13.     The interviews with Financial Advisors were conducted without prior knowledge about the persons interviewed. That is, at the time the interviews were conducted, I did not have any information about the interviewee's employment history or production as an FA. With only one or two exceptions, each interview was held in a conference room rather than the FA's office. This limited the possibility that the interview setting might provide clues as to the level of success the FA has achieved within the firm.

14.     After each interview, I assigned the FA a rating from one to five based on whether I thought he or she was an outstanding performer, with "five" representing the best performers and "one" representing the poorest.[13] Because the interviews were, in essence, a job analysis, responses should result in an accurate assessment of each FA's job performance. This is important because it serves as an indicator of the depth of understanding of the job. After all interviews were completed, I reviewed the production ranking of each FA interviewed. I used an index known as a correlation coefficient to determine whether actual production rankings (FA performance) could be predicted at a greater than chance level based on the information from the interviews. A correlation coefficient is an index of the relationship between two or more variables. It indicates the degree to which a change in one variable is accompanied by a change in a second variable.[14]

---

[13] This 1 to 5 rating scale is the conventional scaling methodology in the field of psychology. I initially set up the scale with 5 representing the best performers and 1 representing the weakest performers. However, in reporting my results, I have recalibrated the scale such that 1 represents the strongest performers and 5 the weakest in order to be consistent with Merrill Lynch's production rankings by length of service in which the highest producers are in the first quintile and lowest producers are in the fifth quintile.

[14] Correlation coefficients range in value from -1 to +1. A positive correlation indicates that the relationship between variables is in the same direction. A negative correlation indicates that the relationship between variables is such that as one increases the other decreases.

10

15.     It is the magnitude of the relationship between two variables as indicated by the

correlation coefficient that is important. The United States Department of Labor has provided

guidelines for interpreting correlation coefficients.[15] These guidelines, which address the

usefulness of a correlation coefficient based upon its absolute value (*i.e.*, regardless of whether it is

positive or negative), state the following:

| Correlation Coefficient | Interpretation |
|:---:|:---:|
| Above .35 | Very beneficial |
| .21 - .35 | Likely to be useful |
| .11 - .20 | Depends on circumstances |
| Below .11 | Unlikely to be useful |

16.     The correlation between the ratings given to FAs based upon their job analysis

interview and their actual production ranking is .40, indicating a strong, statistically significant

correlation.[16]

17.     Because I did not interview African American FAs working at Merrill Lynch, it is

reasonable to consider whether or not my understanding of the nature of the position is limited only

to non-African American FAs. This is not the case for a number of reasons. First, interviews with

FAs contributed to my understanding of the position, and nothing in my interviews contradicted

descriptions of the job contained in the documents that I reviewed. I note that those descriptions

covered both African American and non- African American FAs at Merrill Lynch. Second, I

conducted interviews with three African American Complex Directors who had previously been

Financial Advisors at Merrill Lynch. Their descriptions of the position corresponded closely with

---

[15] U.S. Department of Labor Employment Training Administration (2000). *Testing and Assessment: An Employer's Guide to Good Practices*.

[16] See Ericksen Expert Report, p. 14, for discussion regarding this correlation coefficient.

11

the descriptions of the non-African American FAs I interviewed. Third, I reviewed deposition testimony of named plaintiffs. While such testimony differs from structured interviews, the named plaintiffs' experiences with respect to the job context, the book-building process and training were all consistent with my interviews with non-African American FAs and formal descriptions of the job.

18.     In addition, in my 25 years of conducting job analyses, I have not experienced a single instance where the structure of a job was found to be different based on responses from different racial groups. Thus, it is my opinion that the content of a Merrill Lynch Financial Advisor's job – *i.e.*, what is done, and what it takes be successful – does not differ by race.

## C.     The Financial Advisor Position: General Conclusions

19.     From my job analysis, I am able to conclude that a Financial Advisor's job, at its core, involves: (a) identifying and making contact with potential clients, (b) understanding the clients' financial goals and objectives, and then (c) utilizing the Merrill Lynch platform of financial services to develop financial plans designed to help clients achieve those goals and objectives.

20.     The key to the FA's job is finding clients with significant assets and persuading them to trust the Advisor enough to give him or her responsibility for these assets. Not only does this involve interacting with the clients to get them to entrust their own and their family's financial future to the Financial Advisor, but it also involves accepting the significant responsibility this task places upon a Financial Advisor. The Financial Advisor position is extremely difficult. Statistics show that more than 50% of those who begin the Paths of Achievement ("POA") program leave before becoming full Financial Advisors,[17] and 66% leave before they reach LOS 5, irrespective of

_____

[17] See Expert Report of Ali Saad, Ph.D. Regarding Class Certification Issues, November 14, 2008, pp. 59.

12

race or any other classification.[18]

21.     A Financial Advisor becomes responsible for his or her clients' assets, and indeed,

the Financial Advisor's own earnings and future livelihood depend on investing the assets properly

and achieving positive results. As described below in more detail, a Financial Advisor's earnings

are directly tied to the amount and productivity of assets under management. In addition to

maintaining existing client relationships, a Financial Advisor must constantly acquire new clients

to grow his book of business.

22.     A general picture of the Merrill Lynch FA position is provided in the job

description. It states:

> The Financial Advisor position is highly entrepreneurial and involves extensive client
> development, prospecting, and consultative selling. Financial Advisors listen to their
> clients' life goals and objectives and leverage the power of Merrill Lynch to develop
> financial plans that help them get there. They participate in training and development
> throughout their careers to continually improve their ability to provide the best advice and
> service for their clients...
>
> A bachelor's degree in a business related discipline is strongly preferred; an MBA, JD,
> CPA, CFP, CIMA, or other related professional certification is a plus. Merrill Lynch
> Financial Advisors are driven to be the best; they have a passion for excellence and work to
> exceed their clients' expectations....[19]

The job description for the POA Financial Advisor includes the following:

> Position Summary
>
> The POA Financial Advisor position is a fully licensed retail broker position that provides
> investment advice and recommendations to clients. This position begins with the
> assignment of a Merrill Lynch production number and can have a duration of up to 24
> months. This position focuses on the development of skills and knowledge needed to
> provide a wide range of investment strategies in order to better service the clients in
> meeting their objectives. The POA Financial Advisor strives to meet performance hurdles
> of the program as well as the following page:
>
> • Formulates and conducts marketing strategies to develop and enhance client
>   relationships;

---

[18] Ibid. at p. 59 fn. 108.

[19] MLE 00035-001365 "POA Job Description."

13

- Analyzes and determines client's financial resources, needs and objectives;
- Formulates strategies to meet client objectives;
- Advises client on financial strategies and financial products;
- Advises client on appropriate financial transactions, including the purchase and sale of financial products;
- Implements solutions agreed to by the client;
- Reviews progress toward the client goals & objectives;
- Strictly adheres to compliance and industry regulations.[20]

23.    Merrill Lynch trains FAs to use a four-step process in order to deliver Merrill

Lynch's platform of services. This platform of services is known as "Total Merrill" and is exhibited

by Figure 1 (below).[21]



**ESTABLISH OBJECTIVES**
Work closely with clients and prospects to assess their total financial picture, helping them to identify and prioritize their short and lon-term goals and to gain an understanding of their tolerance for risk

**REVIEW PROGRESS**
Meet periodically with clients to review their objectives, strategies and performance to assess their ongoing ability to achieve their goals

**SET STRATEGY**
Make asset allocation recommendations that set clients on track toward achieving their goals, taking clients' investment objectives, risk tolerance and time horizons into consideration

**Figure 1**
**Merrill Lynch Wealth Management Process**

**IMPLEMENT SOLUTIONS**
Recommend investments that are consistent with clients' objectives, risk tolerance and asset allocations.

---

[20] MLE 00041-001307 to MLE 00041-001316 "2006 Financial Advisor Paths of Achievement Program."

[21] MLEE 038 061444 "Strategic Direction & Capabilities – Wealth Management Process."

14

24.     Each step in this process involves the interaction between the FA and the client and is therefore highly individualized. A Financial Advisor's actions, reactions, suggestions, and adjustments must be tailored to the individual client's specific needs. The assets that a Financial Advisor convinces a client to entrust in his or her management comprise the FA's "book of business."

## Autonomy in Client Development, Hours, Compensation, and Teaming[22]

25.     My job analysis of the FA position at Merrill Lynch revealed that it is unlike a typical job in corporate America. In particular, the FA position is an entrepreneurial job in which the FA essentially operates a business within a business. The FA has significant autonomy with respect to client development, hours, compensation and teaming, which, among other things, distinguish the position from others at large companies.

26.     Each Financial Advisor has responsibility for and professional control of his or her book of business, including developing a list of potential clients. This is the case even though the assets are legally the responsibility of Merrill Lynch. Merrill Lynch shares a portion of the fees charged to each client with the Financial Advisor.

27.     This responsibility and control includes the autonomy to maintain and grow the FA's book of business. FAs can choose the methods and techniques to accomplish this so long as they fall within Merrill Lynch's legal compliance regulations and ethical guidelines. In fact, during interviews with FAs, many expressed the view that one of the major attractions of the FA position at the firm is the autonomy to control one's destiny.

_____

[22] "Teaming," as used in my interviews, was defined as a designation for a Financial Advisor who is considered to be a "teaming FA" or "on a team." A Financial Advisor is designated in this way if one-third or more of his or her production credits come from pooling situations.

15

28.     A Financial Advisor can set individual goals for him- or herself which represent his or her own personal definition of success. The Financial Advisors in the random sample were asked for their personal definitions of success when joining Merrill Lynch. Their responses included goals and objectives ranging from being happy with the job, to the number of new accounts brought in each day, to balancing work and family life. Thus, depending on one's personal definition of success, a Financial Advisor can pursue more or fewer clients, or work longer or shorter hours, to achieve that personal goal.[23] The Advisor's decisions within this flexible framework impact his or her compensation.

29.     A Financial Advisor's compensation is tied directly to productivity. The more productive the FA, in terms of the amount (and productivity) of assets under management, the greater his or her compensation.

30.     Merrill Lynch charges clients fees and commissions based on the total amount of assets that Merrill Lynch manages on either a transactional basis (*e.g.*, for each stock transaction) or on a recurring basis (*e.g.*, an annual fee for services provided). The amount and type of assets determine a Financial Advisor's production credits, which then serve as the basis for determining his or her salary. FAs also receive additional compensation in the form of deferred compensation, achievement awards and expense accounts. This additional compensation is also based directly on the FA's level of production. Thus, a Financial Advisor's productivity is not determined by persons inside the organization (*e.g.*, supervisors, managers), but instead, by customers and prospects who decide to place and retain their assets under a Financial Advisor's management.

31.     FAs have significant organizational clout. For example, if a Financial Advisor leaves Merrill Lynch, his or her book of business can also leave. In fact, this often occurs,

---

[23] A Financial Advisor has autonomy with regard to scheduling his or her day. A Financial Advisor can arrange appointments with clients in any way he or she chooses.

16

particularly with respect to Advisors with profitable books of business. These FAs are often the most aggressively recruited by other firms. Should a Financial Advisor leave with his or her book of business, Merrill Lynch's profits are directly affected.

32.     Because a Financial Advisor's compensation is derived directly from his or her book of business, joining a team can impact a Financial Advisor's compensation, as well as the FA's relationship with existing clients. When two or more FAs form a team, they are in essence merging their individual books of business. This is more akin to combining individual franchises than simply joining in a collaborative effort. At Merrill Lynch, if one-third or more of a Financial Advisor's production credits come from pooled accounts, the FA is considered to be in a teaming or at least a partial teaming relationship.[24]

33.     Merrill Lynch's Complex Directors do not and cannot attempt to impose or force teaming relationships or dictate the persons with whom an FA should team. Rather, the decision to team and with whom to team is left to each FA's individual discretion. There are two significant reasons for this. First, forcing one FA to form a team with another FA is contrary to Merrill Lynch's entrepreneurial work environment in which each FA has control of and professional responsibility for his or her book of business. Second, and perhaps most significantly, if Merrill Lynch forced or dictated teaming relationships it would cause FAs to simply leave the firm and take their book of business to a competitor.

34.     As expected, FAs therefore take great care in choosing the other FAs with whom they are willing to team. Interviews with the random sample of FAs showed that FAs consider a variety of factors when deciding whether to team, including complementary skills, record of success, work ethic, trust/honesty/integrity, compatibility, tenure with Merrill Lynch, similar

---

[24] See Team Formation: 10-Step Process, MLEE 010 000043-50, at p. 1 (defining a "multiple FA team" as "two or more FAs receiving at least 33% of their production from a Pool").

investment style/approach to the business, and orientation toward clients.

**Limited Role of Managers**

35.    My interviews with Complex Directors confirmed that a manager cannot and does not dictate specific methods that a Financial Advisor should use to build a book of business. The manager, for example, does not control where or how the Financial Advisor prospects for business. A manager therefore does not control the size of a Financial Advisor's book of business, and consequently, his or her production credits. Because FA compensation is objectively determined by FA production, managers do not provide performance reviews or evaluations that affect FA compensation as is traditionally the case for typical corporate positions.

36.    A manager can, however, monitor Financial Advisors' performance levels – both on an individual and an office-wide basis. When appropriate, managers offer advice to FAs regarding approaches the FA might use to develop and grow his or her book of business. Such advice might include coaching or support for events sponsored by a Financial Adviser. Managers seek to help each FA maximize their abilities and achieve the highest possible levels of production.

**Movement Into Management**

37.    The FA position is also unique in that when a Financial Advisor moves into management, it is not a "promotion" as that term is typically used. Rather, movement from FA to management is a new career in which the former FA no longer has a book of business and loses the autonomy that characterizes the Advisor position. In particular, once selected to be a manager, the compensation, hours and geographic location of the FA's office are all dictated by Merrill Lynch. In addition, because the manager no longer has a book of business, they often receive less compensation than some of the FAs they supervise. Indeed, if a Financial Advisor moves into management, this does not necessarily mean an increase in compensation. Throughout the career

18

of an FA, any increase in compensation or move to a larger office is based on an increase in productivity and not on a promotion or new job title.[25]

**Competitive Environment**

38.     Merrill Lynch's work environment is one of open competition and reward for production. Every FA's production level is recorded and made available to management. This productivity determines the FA's level of compensation. Additionally, Merrill Lynch uses productivity measures to allocate office space and location, award membership in recognition clubs, and determine title designations. Although Financial Advisors are collegial with each other and certainly not antagonistic toward one another, the competitive aspect of their work environment is unmistakable.

39.     Since FAs are compensated based on their performance as compared to other FAs with similar tenure, the work environment at Merrill Lynch is competitive both internally (*i.e.*, competition between FAs) and externally (*i.e.*, between Merrill Lynch and non-Merrill Lynch Financial Advisors). In essence, prospective clients may choose between competing Financial Advisors, rather than simply rejecting a given Financial Advisor.

40.     Although each Advisor's job performance is measured against that of other FAs with similar lengths of service, a Financial Advisor's competitors cannot influence what the Financial Advisor does or how much effort he or she expends. Each Advisor determines his or her target market, method of soliciting clients, platform of products (if any) in which to specialize and the level of personal success that will be sought.

**D.      Job Analysis Findings: Key Drivers of Financial Advisors' Compensation**

41.     My job analysis of the FA and Complex Director positions also enabled me to

---

[25] See Section III.G, *infra*, for a further discussion and separate analysis of Merrill Lynch's MAC.

identify specific skills, abilities and personal characteristics that a Financial Advisor must possess in order to build a large book of business. They include: the ability to gain clients' trust, prospect for clients, endure a difficult job, recover from setbacks (resilience), and either access to a wealthy social network or the ability to build a wealthy social network. Each is described below.

## Ability to Gain Clients' Trust

42.     FAs must have the ability to gain clients' trust. When asked "What are the success factors for FAs with regard to developing a book of business?" Complex Directors (including African American Complex Directors) indicated that gaining the trust and confidence of potential clients is one of the most important factors. In essence, clients entrust their financial assets, and to a large degree their family's financial hopes, with the FA. Investable assets represent a person's future, including, for example, their retirement savings, their children's education, long-term care for their parents, etc. The greater the percentage of a client's assets the Advisor manages, the greater must be the client's trust.

43.     Trust not only forms the foundation of the relationship between a client and a Financial Advisor, but it also helps to generate trust between the FA and potential new clients in the form of referrals from existing clients. The trust built with a client serves as a ticket that facilitates gaining the trust of potential new clients. This phenomenon of trust building and transfer highlights how important it is for a Financial Advisor to build networks in order to be highly productive.

## Prospecting

44.     FAs reported that they use many different prospecting methods in an effort to build their books of business. Each FA has the freedom to determine the method of soliciting prospects that works best for him or her. Table 1 shows the percentage of the sampled Financial Advisors

20

who indicated that a particular method of prospecting was effective in building their book of business during their first two years at Merrill Lynch.

**TABLE 1**

| Percentage of Financial Advisors Who Used Each Method of Prospecting | |
|---|---|
| **Solicitation Method** | **% Saying Method Was Effective** |
| Referral Solicitation | 83.6 |
| Social Prospecting/Networking | 82.7 |
| Seminars | 56.4 |
| Family Ties | 51.8 |
| Building on Relationships Formed Prior to Merrill Lynch | 50.0 |
| Cold Calling | 48.2 |
| Walk-Ins | 47.3 |
| Call-Ins | 43.6 |
| Joint Solicitation/Account Sharing | 42.7 |
| Lists of Leads | 33.6 |
| Direct Mailing | 23.6 |
| Cold Walking | 20.0 |
| Third Party Calling | 9.1 |

45.    Four-fifths of the sample FAs mentioned methods that involve networks and referrals (*i.e.*, referral solicitation, social prospecting/networking, family ties, and building on relationships formed prior to joining Merrill Lynch). Although nearly every FA reported that they came to Merrill Lynch with some social network, not all FAs were able to use their networks to develop a book of business.[26] Table 1 shows, however, that FAs overwhelmingly reported that the most effective strategy for building a book of business is through social networks, networking

---

[26] FAs reported that their social networks were made up of groups including: family & relatives; friends; classmates (high school or college); clients from a book of business brought to Merrill Lynch; colleagues from prior employers; clients/customers from prior employers; community groups (Chamber of Commerce, Junior League); and church members.

21

**TABLE 1 (corrected)**

| Percentage of Financial Advisors Who Used Each Method of Prospecting | |
|---|---|
| **Solicitation Method** | **% Saying Method Was Effective** |
| Referral Solicitation | 83.5 |
| Social Prospecting/Networking | 81.1 |
| Seminars | 54.3 |
| Family Ties | 53.5 |
| Building on Relationships Formed Prior to Merrill Lynch | 50.4 |
| Cold Calling | 48.8 |
| Walk-Ins | 45.7 |
| Call-Ins | 42.5 |
| Joint Solicitation/Account Sharing | 40.2 |
| Lists of Leads | 33.9 |
| Direct Mailing | 21.3 |
| Cold Walking | 18.9 |
| Third Party Calling | 9.4 |

(social prospecting) and referrals (which in turn expands their networks).

46.     To illustrate the importance of FAs having a social network from which to prospect for clients, I examined the FAs in the sample who listed cold calling as one of the methods they found effective in building their book of business. The responses of this group indicate that they made an average of 486 calls per week. However, these calls resulted in a face-to-face meeting with potential clients only an average of 4 times per week. This represents a success rate of less than one percent. Given the difficulty of getting face-to-face meetings with prospective clients, and the obvious importance of such meetings, the poor return on time spent cold-calling is noteworthy. And, of course, not all in-person meetings result in the prospect becoming a client.

47.     Table 1 also shows that there is considerable variation in the methods that FAs reported were effective in building their book of business.[27] Not only did FAs use unique combinations of methods to build their books, but FAs also reported variations within each method itself, (*e.g.*, their process for selecting prospects to cold call).

48.     The data collected in my interviews was given to Dr. Ericksen who calculated that when considering all 13 methods, the percentage of FAs who have similar methods for building effective books of business is less than one (about 0.23) percent.[28] Dr. Ericksen also noted that in most cases, when different FAs used the same pattern of methods, the two (or three) FAs were in

---

[27] Notably, all of these prospecting methods require that a Financial Advisor be able to interact well with other people. Specifically, a Financial Advisor must possess strong oral communication skills. In fact, most of the Financial Advisors interviewed indicated that social prospecting was one of the most effective methods of building their book of business. This finding supports the company's determination that social skills are important to a Financial Advisor's productivity level. A Financial Advisor must be able to explain Merrill Lynch's platform of services to both prospective and existing clients, and more importantly, explain how specific services will best serve an investor's needs. FAs must also be able to listen actively and respond appropriately to verbal and non-verbal cues.

[28] See Ericksen Expert Report, p. 15.

different offices.[29] Dr. Ericksen repeated the analysis omitting the three least used methods (cold walking, direct mailing and third party calling) and based on the remaining 10 methods, he found that 0.51 percent of FAs used exactly the same methods to build their books.[30] Finally, Dr. Ericksen repeated the analysis including only the 7 most commonly used methods.[31] Under this very conservative approach, the data show that only 1.85 percent of FAs used the same methods.[32]

### Access to Wealthy Network Ties or the Ability to Build Wealthy Network Ties

49. Merrill Lynch's internal analyses[33] throughout a period prior to and including the relevant time period in this case showed that the company disproportionately benefits from servicing its "high net-worth clients." As evidenced by Table 2 on the following page, 17% of the households account for 90% of profits. Given the relationship between household assets and profits, providing incentives to Financial Advisors for focusing their time on clients with $250,000 or more in investable assets is in Merrill Lynch's best interest and maximizes profitability.[34] Accordingly, Merrill Lynch's business model rewards FAs most for focusing on individuals with $250,000[35] or more of investable assets.[36]

---

[29] See ibid. at p. 15.

[30] See ibid. at pp. 15-16.

[31] See ibid. at p. 16.

[32] See ibid. at p. 16 and Table 12. Table 12 of Dr. Ericksen's report displays the percentages of FA pairs who use the same exact methods for each of the three analyses described above as well as standard errors and 95 percent confidence intervals for these estimates.

[33] For example, at its National Sales Managers meeting in 2000, Merrill Lynch reported on the importance of high-net-worth clients to its profitability. Table 2 shows data presented at that meeting.

[34] Merrill Lynch also learned from the FAs that it hired from its competitors that its competitors were focusing on this segment of the market. See MLEE 038 061440, "Strategic Direction & Capabilities – Benefits of Total Merrill."

[35] It is important to note that high net-worth clients are not necessarily individuals who have substantial income but rather, individuals with substantial assets to invest. An individual with substantial assets may also have a low income (*e.g.*, persons who are retired and living on a fixed

23

**TABLE 2**

| Client Segment Profitability Data Year 2000[37] | | | | | | |
|---|---|---|---|---|---|---|
| Household Assets | # of Households | % of Total | Assets ($Bil.) | % of Total | Pre-tax ($Mil.) | % of Total |
| 0 - $100K | 3,653,211 | 74% | $58 | 5% | $44 | 1% |
| $100K - 250K | 458,838 | 9% | $73 | 7% | $151 | 9% |
| $250K - $1 mil | 642,381 | 13% | $286 | 26% | $553 | 36% |
| $1 mil - $25 mil | 188,758 | 4% | $482 | 44% | $788 | 49% |
| 25 million + | 2,042 | <1% | $201 | 18% | $79 | 5% |

50.    FAs who come to Merrill Lynch with a social network that included such high net-worth individuals have a tremendous advantage over those FAs who do not. Those FAs who come to Merrill Lynch without wealthy network ties must either develop new wealthy networks or spend substantial time prospecting for clients relying on inefficient methods such as cold calling (*see* paragraph 46 above).

---

income). Additionally, an individual with a substantial income may have significant liabilities and thus few investable assets. Merrill Lynch's rationale for targeting high net-worth clients was derived from long-term analyses of its market share and competitive position in the financial services industry.

[36] Merrill Lynch has conducted studies of the relationship between the number of Merrill Lynch services clients use and client retention. Merrill Lynch found that with each additional service, client retention improved significantly. The main point here is that it is advantageous for both Financial Advisors and Merrill Lynch for FAs to focus their time and efforts on clients and prospects with $250,000 or more of investable assets. In fact, Merrill has developed a service (called the Financial Advisory Center) specifically for smaller clients in order to free FAs to spend more time pursuing and servicing clients of greater wealth.

[37] MLE 00094-000248 "NS Managers Meeting 2000 – National Sales Salesforce Growth."

51.     Because it is particularly time-consuming and difficult for FAs to prospect for new clients, FAs without wealthy networks face a daunting task. If a Financial Advisor has access only to low-income households, he or she must service a large amount of these households in order to attain sufficient production credits to earn a moderate living. Servicing each account requires a significant time investment. The FA must monitor the client's current investments, participate in meaningful conversations with the client, and continually advise the client about Merrill Lynch's available services. Thus, with a large number of these accounts, the FA has significantly less time to spend prospecting for new (wealthier) clients. Alternatively, if a Financial Advisor spends too much time prospecting, he or she will likely provide a lower level of service to his or her existing clients.

**Willingness to Take Risks**

52.     Interviews with Complex Directors indicate that there are several critical elements of risk associated with the FA position. First, applicants take a risk when accepting the position in the first place. Merrill Lynch seeks applicants who have demonstrated a record of success in a prior career, preferably one related to financial services or sales.[38] Unless the applicant comes to Merrill Lynch already licensed and with a book of business, he or she will have to go through the FA training program. Trainees are given a fixed salary that is usually lower than the trainee's prior salary. Complex Directors indicated that fifty to seventy percent of all applicants hired for the Financial Advisor position take a reduction in salary from their previous job.[39] These FAs are

---

[38] My interviews indicated five sources of Merrill Lynch's new hires, including those who (1) had a career in financial services; (2) had a career other than financial services; (3) were hired with a book of business; (4) were hired directly from college; and (5) were hired into a non-FA position and moved to the FA position.

[39] See, e.g., MLE-DALLASR0595 0000003-5 and MLE CD 36 (indicating that new hire joined Merrill Lynch from a job where he earned "100K+" and earned a starting salary of only $47,000);

25

betting on their ability to find individuals with significant assets and to persuade these potential clients to trust them with responsibility for these assets. Notably, applicants take this substantial risk without any guarantee that they will reach a higher level of income or recoup lost income.

**Resilience & The Ability To Interpret "No"**

53.     FAs face a high level of rejection. As a result, it is critical that a Financial Advisor has resilience and is able to bounce back from constant setbacks and disappointments in building and maintaining a book of business. They face what one Complex Director described as the "steady drip of rejection."[40] Interviews with FAs indicate that during their first two years at Merrill Lynch developing a book of business, a great deal of effort is required just to reach the point where a few potential clients are willing to participate in a face-to-face meeting. It is not surprising then that managers and FAs feel that the ability to withstand rejection is a key job requirement.

54.     Although FAs uniformly report that the most common response that a Financial Advisor receives from prospective clients is "no," the FAs interviewed reported that the manner in which a prospect expresses "no" including tone of voice, facial expression and gestures is critical to understanding of what the prospect really means. For example, the prospective client may be saying "no" because they were called at a bad time, or because they are unfamiliar with the investment opportunities initially proposed or because they already have a Financial Advisor. In all of these circumstances, the person could still be a potential client. Thus interpreting "no" is one of the most critical skills for an Advisor in order to be a high-producing FA.

---

MLE-CANAV2382 0001662-1664 and MLE CD 36 (indicating that new hire previously earned "$104K" at a prior job and then accepted a Merrill Lynch starting salary of only $90,000).

[40] Interview with Complex Director, Scott Crawford; See also MLE-NASH 00842-000563 (explaining, in a Financial Advisor's letter of resignation, that a Financial Advisor's job "requires a constant focus and a tremendous amount of stress and unfortunately, rejection").

**Summary of Key Drivers of FA Compensation**

55.     As described above, a Financial Advisor's salary is directly tied to the amount and productivity of assets under management. Therefore, the drivers of FA productivity are the drivers of FA compensation. Based on my job analysis of the FA position, I conclude that, for a job in corporate America, the FA's job is uniquely autonomous and entrepreneurial. In fact, the FA's success depends directly on his or her interactions with persons (*i.e.*, potential clients) outside of Merrill Lynch, and therefore, the drivers of FA productivity/compensation are external to Merrill Lynch. A Financial Advisor's level of productivity is dependent on the FA's ability to identify clients with significant assets and to persuade those clients to trust the FA enough to give him or her responsibility for these assets. This is one of the reasons referrals are so important, for they assist in identifying potential clients and they assist in reassuring potential clients that the FA is trustworthy. Thus, the kinds of clients that a Financial Advisor brings to his or her book early in his or her career have an influence, through networks, on the kinds of clients they subsequently recruit. Likewise, it is critical to either have a social network containing significant wealth or have the ability to build such network ties. In short, an FA must have access to wealth and the ability to convert that access into clients.

**E.     Racial Differences In Productivity & Compensation**

56.     It is my opinion that any analysis that attempts to demonstrate the cause or causes of disparity in production between African American and Caucasian Financial Advisors at Merrill Lynch must take into account the factors associated with FA productivity described above. My job analysis indicates that there are many factors that drive a Financial Advisor's productivity. These factors operate in combination based on the individual circumstances of a given Financial Advisor.

57.     In light of the research presented in the Expert Report of Dr. Roberto Fernandez,

27

however, racial disparities in access to wealth, one of the key drivers in FA productivity, must be closely examined. Dr. Fernandez concluded that: 1) research shows that, in American society, networks tend to coalesce around demographic factors such as race;[41] and (2) research shows that there are large disparities in wealth along racial lines in this country such that Caucasians comprise the overwhelming majority of the population of high financial net-worth.[42] Because FAs need to gain access to individuals of high financial net-worth, these findings must be considered in determining the cause or causes of racial differences in production and compensation.

**F.**     **Training Opportunities for Merrill Lynch Financial Advisors**

58.     Merrill Lynch offers a wide variety of training resources that are available to all FAs. Unless a Financial Advisor comes to Merrill Lynch with the relevant licensing and certification, he or she comes into the firm as a POA trainee. The POA program consists of a pre-production and production phase. During the pre-production phase, FAs receive academic and skills training designed to prepare them to pass the relevant licensure examinations and acquire the necessary technical knowledge of Merrill Lynch's platform of services. During the production phase of the program, the employee is given the title POA Financial Advisor. Once a POA FA enters the production phase and must actually acquire clients and bring assets under management, client acquisition skills and financial planning knowledge become paramount. As evidenced by plaintiff Hank Wilson's deposition testimony, Merrill Lynch provides trainees with a Paths of Achievement Program Guide[43] that makes each trainee aware of the training programs available.[44]

---

[41] See Expert Report of Roberto Fernandez, dated November 14, 2008, pp. 17-34.

[42] See ibid. at pp. 6, 11, 15-16.

[43] The program guide to which Mr. Wilson referred contains detailed information regarding the training opportunities available to POA FAs including "learning maps" that guide POA FAs development from the first day on the job through LOS 24. See MLE 00041-001450. The program guide is made available to every POA-Financial Advisor.

The POA FA must meet certain performance objectives, including reaching specific levels of production credits, in order to graduate from the program and become a Financial Advisor.

59.     Table 3 below shows the training that Merrill Lynch emphasizes and, in many instances, mandates for Financial Advisors at various stages of their career.

## TABLE 3[45]

| Training Segment | Training Emphasis |
|---|---|
| Paths of Achievement (POA) pre-production newly hired FA Trainees | Broad-based academic <br>• Licensing – Series 7 & 66 <br>• Communications/sales skills <br>• Wealth management process <br>• Investment knowledge <br>• ML Orientation |
| POA FAs – first 2 years in production | Broad-based academic & Business development <br>• Client acquisition skills <br>• Financial planning knowledge |
| Experienced FAs transitioning to Merrill Lynch | Merrill Lynch Knowledge <br>• ML wealth management process <br>• Total Merrill <br>• ML Orientation |
| FAs with 2-5 years of experience | Role specific & Client specific <br>• Professional designations <br>• Client acquisition <br>• Wealth management process <br>• Wealth management Advisor (WMA Program) |
| Advanced FAs LOS 6+ years | Specific & Technical <br>• Professional designations <br>• Investment strategies <br>• Practice management <br>• Wealth management <br>• Wealth management Advisor (WMA Program) |

---

[44] Deposition of Hank Wilson, April 4, 2007, p. 92, line 24 to p. 93, line 3.

[45] MLE 00134-000177 to MLE 00134-000178 "FA Training Summary for Bob McCann."

60.    Throughout a Financial Advisor's career, Merrill Lynch offers training programs[46]

via a wide variety of sources, including:

- Local office classroom training;
- Developmental assessments conducted at the local office for the purpose of providing feedback regarding the FA's strengths and weaknesses;
- A tuition assistance program that allows FAs to further their training and development (*e.g.*, obtaining professional designations) at Merrill Lynch's expense;
- Internal support and consultation from specialists who have advanced expertise with regard to specific Merrill Lynch products or services;
- Videotaping of FA presentations at the local office with coached feedback;
- One-on-one coaching or mentoring at the local level;
- Consultation and support from Merrill Lynch's Practice Management Consulting Group, a unit devoted to assisting FAs to manage their practice.

61.    The extensive list of delivery strategies described above indicates that every FA has

the opportunity to learn and develop in ways that will result in higher productivity.

62.    In addition, Merrill Lynch also uses a computer-based learning management system

called Merrill Lynch University (MLU)[47] that is available to every Financial Advisor at Merrill

Lynch via a personal work station that is provided when the FA is hired. MLU contains several

hundred courses available to the FA twenty-four hours a day, seven days a week. In addition, FAs

have access to course material from anywhere via the internet. This learning management system

also allows Merrill Lynch to track or monitor completion rates.

63.    Plaintiffs testified that they had the opportunity to take advantage of Merrill Lynch's

---

[46] For a summary of some of the many learning and development opportunities Merrill Lynch offers to FAs, see Developing Excellence Branch Management Guide to Employee Learning & Development: "Financial Advisor (FA) Development," MLE 00169-001024. This document, as well as my interviews, confirms Merrill Lynch's efforts to encourage FAs to attend and utilize this wide array of learning resources to the greatest extent possible.

[47] See MLE 00169-001007 (providing details about MLU and stating that managers should encourage and promote "awareness and use of MLU").

30

training programs.[48] Plaintiffs Hank Wilson, Christina Coleman, Mark Johnson and Stephen Smartt testified that they participated in training through MLU and/or courses offered by organizations outside Merrill Lynch under the sponsorship of the firm.[49] This testimony was consistent with my interviews as well.

64.     There are also certain training programs in which FAs are invited to participate based on a demonstration of prior productivity, which usually translates to production at least above the bottom 40% of FAs by LOS. However, this production requirement does not come into play until the POA FA has had an opportunity to begin building a book of business.

65.     Merrill Lynch offers these Princeton-based training programs only to FAs in the higher production levels because these programs are designed not only to develop one's skills, but also as important "recognition" and "retention device[s]."[50] Merrill Lynch operates in an extremely competitive business environment. By offering these programs which, according to Phil Sieg, are "regarded across Wall Street as being very strong,"[51] only to highly productive Financial Advisors, Merrill Lynch is able to recognize these FAs' significant achievements. Not only does this recognition provide Financial Advisors with incentives to continue their efforts, but more importantly, it keeps them from seeking opportunities at Merrill Lynch's competitors.

66.     Significantly, however, as explained by Mr. Phil Sieg, the self-study program and POA coaching are "available to everyone."[52] Merrill Lynch "strive[s] very hard to have it be very

---

[48] See, e.g., Deposition of Frankie Ross, May 17, 2007, p. 146, line 19 to p. 147, line 8.

[49] Deposition of Hank Wilson , April 4, 2007, p. 89, line 12 to p. 90, line 2.; Deposition of Christina Coleman, March 26, 2007, p. 117, line 17 to p. 118, line 2.; Deposition of Mark Johnson, March 21, 2007, p. 323, line 22 to p.324, line 6.; Deposition of Stephen Smartt, May 31, 2007, p. 34, line 18 to p. 35, line 5.

[50] Deposition of Phil Sieg, December 1, 2006, Volume I, p. 19, line 13.

[51] Ibid. at p. 19, lines 16-18.

[52] Ibid. at p. 52, line 22 to p. 53, line 12.

31

similar, complex to complex."[53] Furthermore, "anybody can earn a professional designation and there's not a quintile restriction to do that. The only place where there is a quintile requirement is the Princeton-based programs."[54]

67.     It should also be noted that there were only five complaints of discrimination against African-Americans related to training made by FAs or FA trainees during the time period from 2001 though 2006, and only two of those complaints occurred after 2002.[55]

## G.      Merrill Lynch's Management Assessment Center

68.     Movement into management at Merrill Lynch is determined by performance in Merrill Lynch's MAC. The MAC is designed to identify individuals who have the potential to become "better than average" branch office directors.[56] In order to evaluate whether the MAC is designed in a way that is highly vulnerable to racial bias and stereotypes (as plaintiffs' expert asserts), I conducted a detailed examination of both its design and implementation.

69.     My evaluation of Merrill Lynch's MAC is based upon (a) discussions with Mr. Phil Sieg regarding the process as well as examination of his deposition testimony, (b) interviews with Complex Directors, (c) documents that describe each component of the process (d) observation of the process over a three-and-one-half day period, (e) standards in the field of human resource management regarding the proper design and implementation of assessment centers, and (e) my twenty years of experience in developing assessment centers.

---

[53] Ibid.

[54] Ibid.; see also id. at p. 60, line 16 to p. 61, line 7.

[55] Second Amended Exhibit A – Merrill Lynch's Supplemental Response to Interrogatory No. 8 (Plaintiffs' First Set of Interrogatories).

[56] Deposition of Phil Sieg, December 1, 2006, Volume II, p. 234, line 17 to line 25.

## What is an Assessment Center?

70.     An assessment center is an organization-specific process used to evaluate whether persons can perform successfully in higher level jobs such as manager.[57] Assessment centers have several characteristics that make them unique as a selection device.

71.     First, an assessment center is a process, rather than a place. During that process candidates are evaluated in small groups as well as on an individual basis.

72.     Second, assessment centers are designed to measure multiple characteristics utilizing several, or multiple, techniques. Assessment techniques consist of problems, called simulations, which are designed to duplicate actual job situations that incumbents face. In the case of Merrill Lynch's MAC, the simulations are designed to model the kinds of situations that branch managers face.

73.     A third characteristic unique to assessment centers is that most assessment exercises are performance tests that require behaviors similar, but not identical, to those required in the job. This is because the work situation usually cannot be reproduced exactly in exercises that, by definition, are simulations. However, assessment center exercises typically have high fidelity to the job and provide an accurate prediction of future job success, while remaining appropriate for candidates who are not yet familiar with the job.[58]

74.     Finally, assessment centers are unique in that participants are evaluated by persons called assessors who are specifically trained for that purpose. These assessors often have extensive

---

[57] For a comprehensive description of the assessment center as a selection device, see Gatewood, R. & Field, H. (1994). *Human Resource Selection*, The Dryden Press. pp. 638-658; Guion, R. (1998). *Assessment, Measurement, and Prediction for Personnel Decisions*. Lawrence Erlbaum Associates, Inc. pp. 638-670.; Heneman, H. & Judge. T. (2003). *Staffing Organizations*. McGraw-Hill. pp. 513-529.

[58] Guion, R. (1998). *Assessment, Measurement, and Prediction for Personnel Decisions*. Lawrence Erlbaum Associates, Inc. pp. 638-670.

33

experience in the position the participants are seeking. Each assessor observes each candidate in more than one exercise. At the end of the assessment center, the assessors pool their evaluations to determine each candidate's overall assessment center score. The assessors participate in a process in which they integrate their judgments about each candidate to reach a final overall consensus rating. This integration process is considered a critical advantage that contributes to the validity of the assessment center process.

**Professional Standards Regarding Assessment Centers**

75.     The field of Human Resources has established standards for assessing the validity of assessment centers. Validity refers to the degree to which inferences made on the basis of a selection device or process have been demonstrated to be accurate. In the present case, Merrill Lynch makes the inference that candidates who pass the MAC are more likely to be above-average directors within two years than candidates who fail. The primary question raised by this inference is whether there is sufficient evidence to support it. This question will be addressed in the paragraphs that follow. First, I will review the scientific evidence from the field of industrial and organizational psychology regarding the validity of the assessment centers. Second, I will discuss the professional standards regarding the development and use of assessment centers. Third, I will evaluate the design and implementation of Merrill Lynch's MAC based upon these professional standards.

76.     Simply put, the validity evidence for assessment centers is substantial.[59] For example, Arthur *et al.* collected data from over 30 validity studies of assessment centers and analyzed it using meta-analytic techniques. The results of their analysis showed validity coefficients that were statistically significant and substantial, ranging from .25 to .39. Their

---

[59] Arthur, W., Day, E., McNelly, T. & Edens, P. (2003). Meta-analysis of the Criterion-related Validity of Assessment Center Dimensions, *Personnel Psychology*, 56, pp. 125-154.

research also showed that the dimensions typically measured by assessment centers can be reduced

to the six listed below.

- Communication: The ability to convey oral and written information and respond to questions and challenges.
- Consideration/Awareness: Consideration for the feelings and needs of others as well as the impact and implications of decisions relevant to other components both inside and outside the organization.
- Drive: The ability to originate and maintain a high activity level, set high performance standards and persist in their achievement, and express the desire to advance to higher job levels.
- Influencing others: The ability to persuade others to do something or adopt a point of view in order to produce desired results and take action in which the dominant influence is one's own convictions rather than the influence of others' opinions.
- Organizing and planning: The ability to systematically arrange one's work and resources as well as that of others for efficient task accomplishment; and the extent to which an individual anticipates and prepares for the future.
- Problem solving: The ability to gather information; understand relevant technical and professional information; effectively analyze data and information; generate viable options, ideas and solutions; select supportable courses of action for problems and situations; use available resources in new ways; and generate and recognize imaginative solutions.

Establishing of the validity of the six dimensions above is significant because these dimensions are

quite similar to those assessed by the MAC.

77.    Professional standards for the development and use of assessment centers were

promulgated in 1987.[60]  These standards list the following as essential elements for an assessment

center:

- A job analysis of relevant behaviors must be conducted to determine the dimensions, attributes, characteristics, qualities, skills, abilities, motivation, knowledge, or tasks that are necessary for effective job performance and to identify what should be evaluated by the assessment center.
- The type and extent of the job analysis depends on the purpose of assessment, complexity of the job, the adequacy and appropriateness of prior information about

---

[60] Task Force on Assessment Center Guidelines. (1989). Guidelines and Ethical Considerations for Assessment Center Operations. *Public Personnel Management*, 18(6).

the job, and the similarity of the new job to jobs which have been studied previously.

- If past job analyses and research are used to select dimensions and exercises for a new job, evidence of the comparability of the jobs must be provided.

- When the job does not currently exist, analyses can be done of actual projected tasks which will compose the new job.

- Behavioral observations by assessors must be classified into some meaningful and relevant categories such as dimensions, attributes, characteristics, aptitudes, qualities, skills, abilities, knowledge, or tasks.

- The techniques used in the assessment center must be designed to provide information for evaluating the dimensions, etc. previously determined by the job analysis.

- Multiple assessment techniques must be used. These can include tests, interviews, questionnaires, sociometric devices, and simulations. The assessment techniques are developed or selected to tap a variety of behavior and information relevant to the predetermined dimensions, etc. The assessment techniques will be pre-tested prior to use to ensure that the techniques provide reliable, objective, and relevant behavioral information for the organization in question. Pre-testing might entail trial administration with participants similar to Assessment Center candidates, thorough review by subject matter experts as to accuracy and representativeness of behavior sampling, evidence from the use of these techniques for similar jobs in similar organizations, etc.

- The assessment techniques must include sufficient job-related simulations to allow multiple opportunities to observe the candidate's behavior related to each dimension, etc. being assessed.

## Evaluation of Merrill Lynch's Management Assessment Center

78.    The Merrill Lynch Management Assessment Center meets and exceeds all of the

requirements listed above with respect to both its design and its implementation.

79.    The management selection process at Merrill Lynch begins when a Financial

Advisor expresses interest in management or is identified as having leadership potential.

Interviews with Complex Directors revealed that, once identified, prospective management

candidates are invited to assume leadership roles (*e.g.*, POA coach, mentor, project coordinator,

etc.) that allow them to experience leadership requirements and demonstrate their capabilities and

continued interest. Upon a manager's recommendation, the FA is invited to participate in a highly

36

structured and difficult management selection process known as the management assessment

center.

80.     Job analysis interviews with Complex Directors indicate that their responsibilities

include recruitment and hiring of Financial Advisors, monitoring and managing the performance of

their complex in comparison with other complexes, administering the budget and developing

subordinates.

81.     Individuals who successfully complete the MAC move first into the Associate

Director position. The position summary states the following:

> The Associate Director is a business partner to the Managing Director, responsible for
> achieving revenue growth, increased assets under management, and an appropriate business
> mix for the Private Wealth Office. The Associate Director plays a key role in building and
> managing the human capital of the office by working collaboratively with the Managing
> Director to identify and recruit outstanding talent, acclimate competitive hires to the Merrill
> Private Wealth business and develop staff capability to position Merrill Lynch services and
> products with their clients.[61]

Persons selected to attend the MAC are typically FAs who have a demonstrated record of

accomplishment.   Mr. Phil Sieg testified with regard to the kind of manager Merrill Lynch is

looking for via the MAC:

> Q. When Merrill Lynch is conducting an Assessment Center, it's looking for the
> next generation of managers; right?
>
> A. Specifically what we're looking for is people who are able to be above average
> directors after two years of, you know, of experiences as an associate director. So,
> yes.[62]

82.     The content of each of the MAC exercises is based upon actual situations that

managing directors at Merrill Lynch face on a day-to-day basis.  Examination of each exercise as it

is actually administered indicates substantial fidelity between the exercises and the job of a

---

[61] MLE 00031-000767 to MLE 00031-000771 "GPC Compensation: Private Wealth Management
Division June 2003."

[62] Deposition of Phil Sieg, December 1, 2006, Volume II, p. 234, line 17 to line 25.

37

Complex Director as revealed by the interviews conducted with the random sample of Complex Directors at Merrill Lynch. This high level of fidelity likely exists because Complex Directors served as subject matter experts in the design of each exercise. Having Complex Directors serve as subject matter experts provides a job analysis foundation for the MAC process. Professional standards dictate that the validity evidence for a promotion process like the MAC begin with a job analysis.[63]

83.     The MAC exercises are developed and implemented by Merrill Lynch managers who themselves occupy the position for which selections are made. These individuals are in effect "subject matter experts" who determine the content of each exercise and ensure that the behaviors required of the candidates during each exercise reflect the dimensions needed to be successful in the job. Indeed, examination of each exercise operation revealed that only subject matter experts could have devised problems of such high similarity to the actual job. The fact that each assessment center exercise mirrors actual job situations confirms that high fidelity exists between the two which, after all, is the purpose of building a center based on a job analysis.

84.     Assessors make observations of candidates based on specific dimensions or attributes required for job success. The dimensions are nested within different exercises such that every dimension is measured more than once. The exercises elicit behaviors by the candidate that can be used to measure targeted dimensions.

85.     Different assessment exercises are used to ensure that each candidate has several ways to demonstrate successful performance on all of the dimensions measured. Some exercises require the candidate to play the role of a manager and interact with an actor who may be a client or subordinate. Other exercises require the candidate to work individually to analyze data and

[63] See for example the *Principles for the Validation and Use of Personnel Selection Procedures (4th edition),* Society of Industrial and Organizational Psychology, Bowling Green, OH, 2003.

develop plans for improving the performance of a business unit. Still other exercises require the candidate to work within a team to achieve a common goal. All of the exercises in the MAC are pre-tested or piloted prior to actual use. They are revised periodically to be consistent with changes in the requirements of the position.

86.     Following the completion of all assessment center exercises, Merrill Lynch conducts an integration process to determine each candidate's overall performance and make a final recommendation. All of the assessors participate in the integration meeting and discuss the candidates independently, without comparing one to another. Each assessor makes an oral presentation to the group describing the candidate's performance in the exercises evaluated by that assessor's team. A facilitator then posts the ratings from each assessor's team on a large screen. When ratings from all of the assessor teams are posted, they comprise a matrix of ratings (each on a scale of 1 to 5) for every dimension (attribute) measured by each exercise. Since each dimension is measured by more than one exercise, the matrix provides multiple snapshots of the candidate's performance with regard to a given attribute that is deemed to be required for the job.

87.     By providing an opportunity for the assessors to discuss, in detail, each candidate's performance, the assessors can question or challenge each other as necessary about the specific behaviors that formed the basis for a given rating. By requiring assessors to articulate behavior-based justifications for specific ratings, the integration process helps to remove any biases and facilitates an objective rating for each candidate.

88.     Following this active discussion, the entire group agrees on a rating for each dimension. These dimension ratings are examined and discussed by the group to determine an overall recommendation. If a candidate receives at least a 70% affirmative vote, the candidate is "recommended." If not, he or she is "not recommended." Candidates are informed of the final

decision within two days of completing the Management Assessment Center. Within 30 days, individual feedback sessions with each candidate are held. Candidates who receive a "not recommended" and wish to be reassessed can attend a subsequent assessment center, typically after an eighteen-month development period.

89.     In summary, the MAC is well designed and professionally administered. Assessors are trained before being allowed to take part in the process. The evaluations of each candidate are based on observable behavior and documented. Multiple evaluations of each candidate across multiple exercises ensures that no single assessor can unduly influence or bias a candidate's score. The dimensions are derived directly from the requirements of the management position. Considering these factors together demonstrates that, in my opinion, the MAC is a valid and fair process.

## IV.  SUMMARY

90.     I have been asked by Merrill Lynch to address a number of assertions made by plaintiffs and to provide an opinion regarding drivers of FA productivity. Specifically, I have been asked to address the following questions:

A.      Have plaintiffs' experts included all important variables in their analyses of the disparity in compensation between African American and Caucasian Financial Advisors at Merrill Lynch?

B.      What are the drivers of FAs' level of productivity?

C.      Do the analyses by Dr. Bielby, Madden and Vekker demonstrate that discrimination in employment by Merrill Lynch caused African American FAs to attain lower production levels than Caucasian FAs?

D.      Are training opportunities at Merrill Lynch available for FAs at all levels of production?

E.      Is the Merrill Lynch Management Assessment Center (MAC) designed in a way that is highly vulnerable to racial bias?

40

91.     The answers to the questions above are based upon my analysis of the Financial

Advisor and Complex Director positions at Merrill Lynch. It was necessary to conduct a job

analysis because these questions require an understanding of what each position entails and what is

required to be a highly productive FA. One cannot adequately determine, for example, the factors

associated with disparities in compensation between African American and Caucasian FAs at

Merrill Lynch without acquiring a thorough understanding of what Financial Advisors do, the

knowledge, abilities and personal attributes required to perform as a Financial Advisor, as well as

the context in which the job is performed. Likewise, one cannot assess the adequacy of the training

programs or the validity of the MAC without first comprehending the FA and Complex Director

positions, respectively.

92.     I have drawn the following conclusions based upon my job analysis:

- The compensation of Financial Advisors at Merrill Lynch is based on productivity.

- Plaintiffs' experts, Drs. Bielby, Madden and Vekker, failed to include in their
  analyses important non-discriminatory, job-related factors associated with FA
  productivity.

- My job analysis of the Financial Advisor position indicates that there are many
  drivers of FA productivity, the most important of which are access to networks of
  high net-worth potential clients, or the ability to build such networks; the ability to
  gain the trust of prospective clients; a willingness to take risks, and resilience or the
  ability to understand and overcome rejection by prospective clients.

- Because access to wealthy networks is a key driver of FA productivity, differences
  in access to wealth by race must be considered in determining the cause or causes of
  racial differences in compensation.

- Most of the training opportunities are available to all FAs regardless of production
  and all FAs are given the necessary training to become high producers.
  Significantly, any FA can earn a professional designation.

- The Management Assessment Center used by Merrill Lynch to screen candidates for
  movement into management is based upon accurate job analysis information. The
  exercises comprising the MAC measure attributes required to be a successful
  manager. Candidates are evaluated by assessors who are well-trained. The
  assessment process includes multiple exercises that allow each candidate to be
  evaluated on multiple job-related dimensions. Assessors pool their evaluations of
  each candidate to reach an overall assessment. For these reasons, it is my opinion

41

that the MAC meets and exceeds professional standards with regard to the design and implementation of such procedures. Therefore, it is also my opinion that the MAC is not designed in a way that is highly vulnerable to racial bias as plaintiffs' expert, Dr. Bielby, asserts.

93.    If more information becomes available, I reserve the right to amend this report.

James L. Outtz, Ph.D.

 11 - 14 - 0 8
Date

42

**Appendix 1**

**Previous Testimony**

## Previous Testimony

Listed below are the cases in which I have testified in the past four years:

Merton Simpson, et al., v. New York State Department of Civil Service, et al., United States District Court, Northern Division of New York, Case No. 04-CV-1182. (Deposition)

Equal Employment Opportunity Commission, et al. v. Outback Steakhouse of Florida, Inc., et al., United States District Court for the District of Colorado, Case No. 06-cv-09135-EWN-BNB. (Deposition)

Shirley Williams v. Sprint/United Management Co., United States District Court for the District of Kansas, Case No. 03-2200-JWL. (Deposition)

Nilda Gutierrez, et al., v. Johnson and Johnson, United States District Court, District of New Jersey, Case No. 01-5302 (WHW). (Deposition)

Sharyn Stagi, et al., v. National Railroad Passenger Corporation, et al., United States District Court for the Eastern District of Pennsylvania, Case No. 2:03-CV-05702(JK). (Deposition)

John Burke v. City of Bridgeport, et al., Superior Court Judicial District of Fairfield at Bridgeport, March 2008, Case No. CV 07-4021941 S. (Trial)

Sharon Phillips, et al., v. Washington Suburban Sanitary Commission, et al., Circuit Court for Prince George's County Maryland, Case No. CAL 04-12870. (Trial)

John Bolton v. City of Bridgeport, Superior Court Judicial District of Fairfield, Connecticut, Docket No. CV 04-0409828 S. (Trial)

Arthur L. Lewis, Jr., et al., v. City of Chicago, United States District Court Northern District of Illinois, Eastern Division, Case No. 98 C 559k. (Trial)

Johnny Reynolds, et al., v. Alabama Department of Transportation, et al., United States District Court Northern Division, Case No. CV 85-T-665-N. (Deposition & Hearing)

**Appendix 2**

**Curriculum Vitae**

# VITAE

## James L. Outtz, Ph.D.

**Outtz & Associates**
**Suite 800**
**816 Connecticut Avenue, N.W.**
**Washington, D.C. 20006**

**Tel: 202-822-3882**
**Fax: 202-822-3884**

**September 2008**

### JAMES L. OUTTZ, Ph.D.

Education

| | |
|---|---|
| **Ph.D.**<br>**Industrial/Organizational**<br>**Psychology** | University of Maryland, College Park Maryland<br>December 1976 |
| **M.S.**<br>**Industrial Psychology** | Northeast Louisiana University, Monroe, Louisiana<br>January 1972 |
| **B.A.**<br>**Sociology** | Northeast Louisiana University, Monroe, Louisiana<br>May 1969 |

## *Professional Affiliations*

### American Psychological Association

Fellow – Society for Industrial and Organizational Psychology

Member - Division of Evaluation and Measurement

Member – Committee On Psychological Tests and Assessment (1990 through 1992)

### Recent Honors

Invited by the Equal Employment Opportunity Commission to participate in a panel discussion to brief the Commission and interested parties on current employment testing policies and trends, the effect of employment tests on racial and ethnic minorities and how to design selection procedures that are effective without respect to race color or other protected bases.

Invited to give a presentation on adverse impact at the annual conference of People Assessment in Industry, Pretoria, South Africa

Selected by the Board of Scientific Affairs of the American Psychological Association to give a one-hour Master Lecture in applied psychology at the 2007 American Psychological Association Convention in San Francisco, California.

**American Psychological Association Division 14**
**The Society for Industrial and Organizational Psychology (SIOP)**

Chair – M. Scott Meyers Award Committee

**Past Member:**

Ad Hoc Committee on Revision of the SIOP Principles

Ad Hoc Committee on Revision of the Uniform Guidelines

Program Committee for the Ninth Annual Conference

External Affairs Committee

**The American Educational Research Association**

Member

**The International Personnel Management Association**

Member

**Society for Human Resource Management**

Member

# Public Service

**National Academy of Sciences, National Research Council**

Member – Committee to Study FAA Aviation Safety Inspector Staffing Standards (October 2004 to October 2006)

Member – Committee on Workforce Needs in Information Technology (1999 to 2001)

Member - Board on Testing And Assessment, Commission on Behavioral and Social Sciences (1992 through 1996)

# Publications

Outtz, J. Adverse Impact, Implications for Organizational Staffing and High Stakes Selection, Lawrence Erlbaum, under contract.

Outtz, J., (2005) Race Discrimination Cases: Common Themes. In Employment Discrimination Litigation: Behavioral, Quantitative and Legal Perspectives, Landy, F. (Ed) New York, New York, Jossey – Bass/Pfeiffer.

Outtz, J. and Landy, F. (2005) Some Concluding Thoughts. In Employment Discrimination Litigation: Behavioral, Quantitative and Legal Perspectives, Landy, F. (Ed) New York, New York, Jossey – Bass/Pfeiffer.

Cascio, W., Goldstein, I., Outtz, J., and Zedeck, S. (2004) Technical Issues in Staffing Decisions. In Test Score Banding in Human Resource Selection: Legal, Technical, and Societal Issues, Aguinis, H. (Ed.) New York, New York, Quorum Books.

Outtz, J. (2004) The Psychology and Management of Work Force Diversity. A Book Review. Personnel Psychology. Vol. 57 No. 4 1041-1044

Outtz, J., (2002) The Role of Cognitive Ability Tests in Employment Selection. Human Performance Vol. 15 No. (½) 161-171.

Campion, M., Outtz, J., Zedeck, S., Schmidt, F., Kehoe, J., Murphy, K., and Guion, R. (2001) The Controversy over Score Banding in Personnel Selection: Answers to Key Questions. Personnel Psychology, Volume 54, No. 1, 149-185.

Outtz, J. (1998) Affirmative Action: A Review of Psychological and Behavioral Research. A Book Review. Personnel Psychology, Volume 51, No. 1, 216-219.

Outtz, J. (1998) Testing Medium, Validity and Test Performance. In Beyond Multiple Choice: Evaluating Alternatives to Traditional Testing for Selection, Hakel, M. (Ed.) Hillsdale, New Jersey, Erlbaum Associates, Inc.

Outtz, J. (1997) Developing and Implementing Fair Systems of Assessment. Paper prepared for the Committee on Access Diversity and Civil Rights, National Skill Standards Board, Washington, DC

Zedeck, S., Cascio, W., Goldstein, I., and Outtz, J. (1996) An Alternative to Top-down Selection. In Fair Employment strategies In Human Resource Management, Barrett, R. (Ed.) Westport, Connecticut, Quorum Books.

Cascio, W., Zedeck, S., Goldstein, I., and Outtz, J. (1995) Selective Science or Selective Interpretation. American Psychologist Vol. 50, No. 10, 881-882.

Cascio, W., Goldstein, I., Outtz, J., and Zedeck, S., (1995) Twenty Issues and Answers about Sliding Bands. Human Performance Vol. 8, No. 3, 227-242.

Outtz, J. (1992) The Sliding-band Referral Method: An Innovative Procedure for Selecting or Promoting Employees. Employment Testing, Vol. 1, No. 10, 169-173.

Zedeck, S. Outtz, J. Cascio, W., and Goldstein, I. (1991) Why Do Testing Experts Have Such Limited Vision? Human Performance Vol. 4, No. 4 297-308.

Cascio, W. Outtz, J. Zedeck, S. and Goldstein, I., (1991) Statistical Implications of Six Methods for Establishing Cutoff Scores in Personnel Selection. Human Performance Vol. 4, No. 4, 233-64.

Outtz J., (1977) Racial Bias As a Contaminant of Performance Evaluation. Research Report #15, Contract #N00014-75-C-0884, Personnel and Training Research Programs, Science Division, Office of Naval Research, Arlington, Virginia.

"Alternative Uses of Traditional Selection Procedures" (manuscript in preparation).

## *Current Employment*

Industrial Psychologist in Private Practice

## *Current and Previous Consultant Activities*

| | |
|---|---|
| **Consultant**<br>August 2008 to<br>Present | **Miles & Stockbridge** |

Retained as expert witness on behalf of defendant Mack Trucks with respect to matters affecting or relating to a claim of gender discrimination brought by the Office of Federal Contract Compliance (OFCCP).

**Consultant**
December 2007 to
Present

**Gary, Williams, Finney, Lewis, Watson & Sperando, P.L.
Stewart, Florida**

Retained as expert witness for the plaintiff in the case of Merton Simpson et al. v. NYS Department of Civil Service (Case No. 04-CV-1182). The case involves claims of racial discrimination based on a statewide promotion examination.

**Consultant**
December 2007 to
Present

**Morgan, Lewis & Bockius LLP
Pittsburgh, Pennsylvania**

Retained as expert witness for the defendant in the case of Sharyn Stagi et al. v. National Railroad Corporation (Amtrak) (Civil Action No. 2:03-cv-5702, E.D Pennsylvania). The case in involves claims of gender discrimination with regard to promotions.

**Consultant**
December 2007 to
Present

**Baker Hostetler
Denver, Colorado**

Retained as expert witness for the defendant in the case of EEOC v. Outback Steakhouse (Case No. 06-cv-01935-EWN-BNB). The case involves claims of gender discrimination in promotions.

**Consultant**
November 2007 to
Present

**Obermayer Rebmann Maxwell & Hippel LLP**
**Pittsburgh, Pennsylvania**

Retained as expert witness for the plaintiff in the case of Rupert, et
al. v. PPG Industries, Inc. (Case No. 07-00705). The case involves
claims of age discrimination with regard to reductions in force
conducted by the company.

**Consultant**
April 2007 to
Present

**Social Security Administration**
**Baltimore, Maryland**

Retained as expert witness for the defendant in the case of Paulette
L. Taylor v. Commissioner of Social Security Agency (Case No.
SSA-02-0001; EEOC Case No. 120-2002-01441X). The case
involves claims of racial discrimination against African Americans
with regard to promotions.

**Consultant**
April 2007 to
Present

**Weil, Gotshal & Manges LLP**
**New York, New York**

Retained as expert witness for the defendant in a case involving a
financial services firm. The case involves claims of race
discrimination against African Americans with regard to
compensation, promotion and other human resources practices.

**Consultant**
May 2006 to
December 2006

**Washington Suburban Sanitary Commission**
**Laurel, Maryland (WSSC)**

Testified as expert witness for the defendant in the case of Phillips
v. Washington Suburban Sanitary Commission (Case No. 04-
12879). The case involved current and former employees who sued
WSSC alleging among other things that they were discriminated
against in their compensation on the basis of race and ethnicity. The
jury verdict was for the defendant with regard to the issues about
which I testified.

**Consultant**
January 2006

**City of Bridgeport**
**Bridgeport, Connecticut**

Testified as expert witness for the defendant in the case of John
Bolton et al. v. City of Bridgeport (3:04CV00670 (JBA). The case
involved a claim of racial discrimination by non-minority
applicants for the position of firefighter. Plaintiffs contested an oral
interview that was part of the selection process. The court ruled for
the defendant.

**Consultant**
July 2005 to April
2006

**Milberg Weiss Bershad & Schulman LLP**
**New York, New York**

Retained as expert witness for the plaintiff in the case of Frank
Warren, et al. v. Xerox Corporation. The case involved claims of
race discrimination with regard to territory assignment,
compensation and promotion for current and former sales
employees. The case was settled prior to trial.

**Consultant**
October 2004 to
Present

**Alcoa Inc.**
**Pittsburgh, Pennsylvania**

Retained to develop an entry-level test for apprentice positions at
the Company's Cleveland, Ohio facility.

**Consultant**
July 2004 to
September 2007

**The Popham Law Firm, P.C.**
**Kansas City Missouri**

Retained as expert witness for the plaintiff in the case of Shirley
Williams vs. Sprint/United Management Company. The case
involves claims of age discrimination with regard to a reduction-in-
force carried out by the defendant.

**Consultant**
April 2004 to
Present

**Weiner & Katz LLC**
**Livingston, New Jersey**

Retained as expert witness for the plaintiff in the case of Bishop et.
al. v State of New Jersey et. al. This case involves a claim of racial
discrimination with regard to a promotion examination for the
position of fire captain.

**Consultant**
April 2004 to
November 2005

**Lieff, Cabraser, Heimann**
**& Bernstein, LLP**
**San Francisco, California**

Retained as expert witness for the plaintiff in the case of Gonzalez
et al. v. Abercrombie & Fitch Stores, Inc., A&F California, LLC
and A&F Ohio, Inc. The case involved a claim of racial
discrimination in hiring. The case was settled prior to trial.

53

**Consultant**
March 2004 to
June 2004

**U.S. Department of Commerce**
**Office of General Counsel**
**Washington, DC**

Retained as expert witness for the defendant in the case of Janet
Howard v. Donald L. Evans, Secretary U.S. Department of
Commerce. The case involves a claim of racial discrimination by
African American employees with regard to the Department of
Commerce performance appraisal system. I was retained to
evaluate the adequacy of plaintiff expert's report.

**Consultant**
March 2004

**City of Bridgeport**
**Bridgeport, Connecticut**

Testified as expert witness for the defendant in the case of John
Bolton v. City of Bridgeport (CV 04-0409828 S). The case
involved a claim of racial discrimination by non-minority
applicants for the position of firefighter. The court ruled for the
defendant.

**Consultant**
**January 2004**

**City of Chicago**
**Chicago, Illinois**

Testified as expert witness for the defendant in the case of Arthur
Lewis Jr. et al., v. City of Chicago (United States District Court
Northern District of Illinois, Eastern Division, Case No. 98 C
5596). This case involved a claim of racial discrimination in the
hiring of entry lee firefighters. The District Court ruled in favor of
the plaintiff.

**Consultant**
January 2003 to
October 2003

**Fisher & Phillips LLP**
**Atlanta, Georgia**

Retained to conduct an evaluation of the human resources practices
of Matsushita Communication Industrial Corporation of U.S.A.
("MCUSA") relating to pay and promotion for its hourly, salaried-
nonexempt, supervisory and management employees.

| | |
|---|---|
| **Consultant**<br>November 2002 to<br>Present | **Paul, Weiss, Rifkind,**<br>**Wharton & Garrison** |

Retained as expert witness for the defendant in the case of Gutierrez, et al. v. Johnson & Johnson, Inc. The case involves claims of racial discrimination by African American and Hispanic salaried employees. The District Court ruled for the defendant.

| | |
|---|---|
| **Consultant**<br>November 2002 | **City of Chicago**<br>**Chicago, Illinois** |

Testified as expert witness for the defendant in the case of Horan et al. v. The City of Chicago. I offered an opinion regarding the proper interpretation and use of the results of an entry-level firefighter examination. The District Court ruled for the defendant.

| | |
|---|---|
| **Consultant**<br>April 2002 to<br>March 2003 | **Publix Super Markets, Inc.**<br>**Lakeland, Florida** |

Retained to provide assistance in the development and validation of modifications to a selection battery for Assistant Department Manager and Department Manager positions.

| | |
|---|---|
| **Consultant**<br>April 2002 to<br>December 2003 | **Arent, Fox, Kintner, Plotkin & Kahn, PLLC**<br>**Washington, D.C.** |

Retained as expert for the defendant in the case of Wicks, et al., v. Metso Paper USA. This case involved a complaint of age discrimination by former employees at the Clark Summit facility of the Beloit Company who were not selected for retention by Metso Paper USA after its acquisition of the Clark Summit facility.

| | |
|---|---|
| **Consultant**<br>October 2001 to<br>August 2002 | **Epstein Becker & Green, P.C.**<br>**Washington, D.C.** |

Retained as expert witness for the Defendant in the case of Thornton et al., v. ICMA Retirement Corporation. This case involved a complaint of racial discrimination by current and former African American employees.

**Consultant**
July 2001 to
December 2001

**Cohen, Milstein, Hausfeld & Toll, P.L.L.C.**
**Washington, D.C.**

Retained as expert for the plaintiff in the case of Donaldson et al. v,
Microsoft (No. C00-1684-P). This case involved claims of racial
discrimination by African American employees who alleged among
other things discrimination in compensation, promotion as well as
retaliation.

**Consultant**
February 2001 to
December 2002

**City of San Francisco**
**San Francisco, California**

Retained to develop and validate a Firefighter examination for the
City of San Francisco Fire Department.

**Consultant**
February 2001 to
July 2006

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and validate an examination for the position of
Firefighter.

**Consultant**
January 2001 to
October 2003

**Thelen, Reid and Priest, LLP**
**Washington, D.C.**

Retained to monitor, review, and provide input to the Bureau of
Alcohol, Tobacco, and Firearms regarding the development and
validation of a promotion process for First-Level Supervisor positions.

**Consultant**
January 2000 to
December 2003

**Gordon, Silberman, Wiggins and Childs**
**Birmingham, Alabama**

Retained as expert for the plaintiff in the case of Johnny Reynolds
et al. v Alabama Department of Transportation (Case No. CV 85-T-
655-N). This case involved monitoring a consent degree entered by
plaintiff and defendant regarding the selection, and promotion
practices of the Alabama Department of Transportation

**Consultant**
January 2000 to
December 2001

**Spriggs and Davis, PA**
**Tallahassee, Florida**

Retained as expert for the plaintiff in the case of Middleton, et al.,
v. Publix Supermarkets, Inc.

**Consultant**
March 2000 to
December 2001

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and validate promotion examinations for the
positions of Police Sergeant and Police Detective.

**Consultant**
July 1999 to
September 2001

**City of San Francisco**
**San Francisco, California**

Retained to develop an Officer Candidate Promotion System for the
City of San Francisco Fire Department.

**Consultant**
June 1999 to
January 2003

**CSX Transportation**
**Jacksonville, Florida**

Retained to validate tests and selection procedures used for hiring
and promotion in several departments including Train and Engine
Service, Yardmaster, Dispatcher, Mechanical Operations, and
Engineering.

**Consultant**
June 1999 to
August 2002

**NAACP Legal Defense Fund**
**Los Angeles, California**

Retained as expert for the plaintiffs in the case of Rios, et al., v.
Regents, et al. Retained to evaluate the admissions procedure of
the University of California at Berkeley.

**Consultant**
December 1998 to
Present

**Federal Deposit Insurance Corporation**
**Washington, D.C.**

Retained to provide expert services to the Legal Division of the
Federal Deposit Insurance Corporation (FDIC) regarding
employment discrimination matters. Responsibilities include
conduct of validation studies regarding selection and promotion
procedures used by the organization.

**Consultant**
December 1998 to
January 2000

**Vladeck, Waldman, Elias and Engelhard, P.C.**

Retained as expert for the plaintiffs in the case of Rodolico v.
Unisys Corporation. Responsibilities included an evaluation of a
reduction in force carried out by Unisys with regard to engineers
employed by Company.

57

**Consultant**
August 1998 to
December 2001

**City of San Francisco**
**San Francisco, California**

Retained to develop a Firefighter Cadet Program to replace the
Firefighter selection procedures used in the past. Project included the
development and validation of screening procedures for entering the
program, program content, and methods of evaluating performance.

**Consultant**
July 1998 to
January 2001

**Arter and Hadden**
**Washington, D.C.**

Retained as expert witness for the defendant in the case of Beebe,
et al., v. the National Association of Social Workers Inc. (NASW).
Responsibilities included evaluation of the procedures used by the
NASW to select persons for senior management positions.

**Consultant**
June 1998 to July
2005

**Arent, Fox, Kintner, Plotkin and Kahn**
**Washington, D.C.**

Retained as expert for the defendant, INA Bearing Company Inc.,
in response to a Show Cause Notice from the U.S. Department of
Labor, Office of Federal Contract Compliance. Responsibilities
include an analysis of the Company's selection procedures for
specific craft positions.

**Consultant**
March 1998 to
Present

**Vladeck, Waldman, Elias, and Engelhard, PC**
**New York, New York**

Retained as expert for the plaintiff in the case of Lott v.
Westinghouse. Responsibilities include evaluation of the
performance appraisal and promotional procedures of the
Westinghouse Company.

**Consultant**
November 1997 to
January 2001

**Perkins Coie**
**Seattle, Washington**

Retained on behalf of The Boeing Company to provide
recommendations regarding the validity, fairness, and operational
use of the Company's First-Level Management Selection System.

**Consultant**
October 1997 to
January 1999

**Hermina Law Group**
**Laurel, Maryland**

Retained as expert for the plaintiff in the case of Richard v. Bell
Atlantic Corporation, et al. Responsibilities include review of the
testing and promotion procedures of the Bell Atlantic Corporation.

**Consultant**
July 1997 to
November 1997

**National Skills Standards Board**
**Washington, D.C.**

Retained to prepare a paper on alternative methods of assessing
national skills standards.

**Consultant**
May 1997 to
June 1997

**Gordon, Silberman, Wiggins and Childs**
**Birmingham, Alabama**

Testified as expert witness for the plaintiff in the case of Moore, et
al., v. Norfolk Southern. My testimony addressed the appropriateness
of using validity generalization as a strategy for establishing the job
relatedness of cognitive ability tests used in a clinical assessment
process, and the feasibility of alternatives to the cognitive ability
tests used by the defendant. I demonstrated that there were
alternatives to the defendant's cognitive ability tests that had less
adverse impact and equivalent validity.

**Consultant**
June 1996 to
June 1997

**The George Washington University**
**Washington, D.C.**

Retained to provide consultation with regard to implementation of a
reduction in force (RIF) at the George Washington University
Medical Center. Responsibilities included examination of
implementation decisions from a psychometric standpoint.

**Consultant**
January 1996 to
May 1997

**Vladeck, Waldman, Elias, and Engelhard. P.C.**
**New York, New York**

Retained as expert for the plaintiff in the case of Krueger v. N.Y.
Telephone. Retained to examine the report of defendant's expert
regarding a downsizing plan implemented by the New York
Telephone Company. Responsibilities included evaluation of the
conclusions in the report, providing assistance in preparing for
defendant expert's deposition, and preparing a rebuttal report.

**Consultant**
December 1995 to
March 1999

**Williams and Connolly**
**Washington, D.C.**

Retained to evaluate the work necessary to validate certain CSXT
Railroad Company employment practices in connection with
pending litigation.

**Consultant**
November 1995 to
May 1997

**City of Columbus**
**Columbus, Ohio**

Retained to provide consultant services to complete a job analysis for
the position of Firefighter and, if appropriate, make recommendations
to modify the City's testing method. Responsibilities included meeting
with key City personnel regarding the project; providing job analysis
training to Civil Service Commission staff; reviewing job analysis
data; providing written comment to the Civil Service Commission
regarding acceptability of the work, and recommending possible
modifications to the Firefighter examination.

**Consultant**
August 1995 to
June 2001

**United States Department of Justice**
**Federal Bureau of Investigation**
**Washington, D.C.**

Retained to serve on a three-person Review Committee, under the
terms of a settlement agreement, to monitor and comment upon the
proposals and recommendations of experts hired by the FBI.
Responsibilities include evaluation of proposals and
recommendations of experts with regard to promotion practices of
the Agency specifically relating to the Career Development
Program, Performance Appraisal Report System, Management
Appraisal Program, and Initiation of Disciplinary Proceedings.

**Consultant**
June 1995 to
January 2000

**O'Melveny and Myers**
**Washington, D.C.**

Retained as expert for the defendant, Ford Motor Company, in
employment discrimination litigation. Responsibilities include
performing statistical and other analyses of employment data of the
Ford Motor Company and Ford Motor Credit.

**Consultant**
March 1995 to
April 1997

**Cohen, Milstein, Hausfeld and Toll**
**Washington, D.C.**

Retained as expert for the plaintiff in the case of Roberts v. Texaco,
Inc. Responsibilities included review of Texaco's selection and
promotion policies and practices to determine whether they are
excessively subjective and inadequately audited or monitored and,
therefore, are likely to have an adverse impact on African
American employees.

**Consultant**
February 1995 to
May 1995

**Koskoff, Koskoff and Bieder**
**Bridgeport, Connecticut**

Retained as expert witness for the intervening defendants in the
case of Burke, et al., v. Bridgeport Civil Service Commission, et al.
I testified regarding the development and validation of a written
examination for Police Officer and the use of a banding procedure
to interpret test scores.

**Consultant**
December 1993 to
December 1994

**City of Columbus Civil Service Commission**
**Columbus, Ohio**

Retained to advise the Civil Service Commission with respect to
professionally acceptable strategies for test grading and application
certification. Also retained to prepare a position paper on "Banding"
as a selection strategy and provide recommendations to City
officials.

**Consultant**
October 1993 to
September 1995

**Potomac Electric Power Company**
**Washington, D.C.**

Retained to (a) develop selection procedures for all first-level
supervisor positions, (b) develop alternative selection procedures
for entry-level positions, and (c) evaluate and revise the
qualification card program which determines progression into
skilled craft positions.

| | |
|---|---|
| **Consultant**<br>September 1993 to<br>Present | **City of Chicago**<br>**Chicago, Illinois** |

Retained to develop and validate a written examination for the position of Firefighter. The examination is administered to approximately twenty-five thousand applicants. It incorporates audiovisual technology as well as nontraditional item format designed to enhance validity and reduce adverse impact.

| | |
|---|---|
| **Consultant**<br>June 1993 to<br>March 1995 | **City of Detroit**<br>**Detroit, Michigan** |

Retained to develop promotion examinations for the positions of Police Lieutenant, Sergeant, and Investigator in the Detroit Police Department.

| | |
|---|---|
| **Consultant**<br>February 1992 to<br>May 1992 | **CORE Corporation, Inc.,**<br>**Berkeley, California** |

Retained to work with the firm to develop and validate an entry-level Firefighter examination for the City of San Francisco.

| | |
|---|---|
| **Consultant**<br>January 1992 to<br>January 2000 | **U.S. Department of Justice**<br>**Federal Bureau of Investigation**<br>**Washington, D.C.** |

Retained to conduct a review and analysis of the Career Development Program for Mid-Level Managers (GS-14 and GS-15) and propose modifications.

| | |
|---|---|
| **Consultant**<br>July 1991 to<br>December 1991 | **Arnold and Porter**<br>**Washington, D.C.** |

Retained (with agreement of the Federal Bureau of Investigation) to assist the law firm in preparation for possible litigation on behalf of a class of African American FBI agents who claimed that the FBI discriminated against them on account of race in violation of Title VII of the Civil Rights Act of 1964.

**Consultant**
June 1991 to
January 1995

**East Bay Municipal Utility District**
**Oakland, California**

Designed and developed an entry-level test for apprentice positions in the Plant and Equipment Maintenance Division of the Maintenance Department. The positions included Electrical Worker, Mechanical Maintenance Worker (including auto mechanic), Carpentry Worker, and Instrument Worker. A new video-based testing format was used to present test information. This format produced greater fidelity between the test and the jobs. Results showed good variance, high reliability, and a significant reduction in test score differences across race, ethnicity, and gender.

**Consultant**
April 1991 to
January 1996

**United States Department of Justice**
**Civil Rights Division**
**Washington D.C.**

Retained as expert witness for the plaintiff in the case of United States v. State of New Jersey (CV 950-73) to review validation evidence, determine whether fire service tests are job-related, and possibly testify regarding findings.

**Consultant**
May 1992 to
June 1998

**United States Department of Justice**
**Civil Rights Division**
**Washington D.C.**

Retained in the case of United States v. Nassau County to assist in the design, development, and validation of a new device for use by Nassau County in the selection of candidates for the position of Police Officer. Responsibilities also included consultation with U.S. attorneys assigned to the case, and testimony by deposition and/or at trial as required.

**Consultant**
February 1991 to
March 1991

**Arent, Fox, Kintner, Plotkin and Kahn**

Retained as expert witness for the defendant in the case of Edward L. Jolly v. Northern Telecom Inc. (Civil Action No. 90-322-A). Retained to testify regarding the type of evaluation required for an industrial psychologist to reach the expert opinion that one employee is more qualified than another for promotion to a mid-level management position.

**Consultant**
November 1990

**City of San Francisco**
**San Francisco, California**

Testified as expert witness for the defendant in the case of Officers for Justice, et al., v. Civil Service Commission of the City and County of San Francisco. This case involved the contention by plaintiffs that a system of test score interpretation called "sliding bands," which I developed, is statistically inappropriate and does not represent a reasonable alternative to the use of test scores in strict rank order. The district court ruled for the defendant. The decision was upheld by the Ninth Circuit Court of Appeals. In its opinion, the Ninth Circuit Court of Appeals wrote

"... we find that the efforts exerted in this process culminated in a unique and innovative program which succeeds in addressing past harms to minorities while minimizing future harmful effects on non-minority candidates. The successful efforts of all parties and the district court in reaching this resolution are to be lauded." (Officers for Justice v. Civil Service Commission of the City and County of San Francisco, Nos. C-73-0657 RFP and C-77-2884 RFP, N.D. Cal., 21, August 1991)

**Consultant**
September 90 to
September 1991

**City of Huntington**
**Huntington, West Virginia**

Retained to review the City of Huntington's Civil Service Rules and selection procedures for hiring Police Officers and Firefighters, provide an opinion regarding the validity of the procedures, and determine whether the adverse impact of the procedures could be reduced.

**Consultant**
April 1990 to
April 1991

**NAACP**
**Baltimore, Maryland**

Retained to provide expert opinion regarding the validity of the College Level Academic Skills Test (CLAST). This test was being used by the State of Florida to measure the achievement level of third-year college students pursuing a teaching career.

**Consultant**
December 1989

**City of Bridgeport**
**Bridgeport, Connecticut**

Testified as expert witness for the defendant in the case of Bridgeport Guardians Inc., Hispanic Society Inc., v. City of Bridgeport (Civil Action No. B-89-547, TFGD), U.S. District Court, District of Connecticut. The case involved a charge by the plaintiffs that the promotion process for the position of Police Sergeant in the Bridgeport Police Department had adverse impact against Black and Hispanic candidates, and was not valid. I gave testimony that in my opinion the promotion process did not have an adverse impact against these groups and was valid.

**Consultant**
December 1989

**Bramhall, Duncan and Ohm**
**Attorneys at Law**
**Little Rock, Arkansas**

Testified as expert witness for the plaintiff in the case of Grady Anthony v. City of Little Rock (Case No. LR-C-88-236), U.S. District Court, Eastern District of Arkansas, Western Division. The case involved a charge by the plaintiff that the procedure used to set the cutoff score on a Police Lieutenant examination was neither valid nor psychometrically correct. The court ruled that while plaintiff's arguments were plausible, and the defendant's promotion procedure was "far from perfect," it did meet the requirements of the Uniform Guidelines and was valid and reasonable.

**Consultant**
August 1989 to
December 1989

**Congress of the United States**
**Office of Technology Assessment**
**Washington, D.C.**

Retained to assist the Office of Technology Assessment in the evaluation of the validity and reliability of paper-and-pencil integrity tests. Assignment included review of validation studies and submission of a written report of my findings.

**Consultant**
July 1989 to
January 1998

**United States Department of Justice**
**Federal Bureau Investigation**
**Washington, D.C.**

Served on a committee with Drs. Robert Guion and Charles Lawshe to review and monitor the development of selection procedures for the positions of Supervisory Fingerprint Examiner and Latent Fingerprint Specialist.

65

**Consultant**
May 1989 to
June 1989

**District of Columbia Public Schools**
**Washington, D.C.**

Retained to serve as a member of a technical review committee for
the District of Columbia Public Schools' Teacher Content Knowledge
Assessment Program. The committee's task was to review the
procedures used to develop and validate an entry-level teacher
certification test.

**Consultant**
March 1989 to
July 1989

**United States Department of Labor**
**Office of Federal Contract Compliance**
**Washington, D.C.**

Retained to review validation studies from the New York Tele-
phone Company to determine whether they were in compliance
with the standards set forth in the Uniform Guidelines on Employee
Selection Procedures. The validation studies were conducted to
determine the validity and fairness of tests used to screen applicants
for the position of Service Representative, as well as positions in
entry-level and outside crafts.

**Consultant**
February 1989 to
January 1997

**East Bay Municipal Utility District**
**Oakland, California**

Retained to lead a team of three independent experts (James Outtz,
Wayne Cascio, and Sheldon Zedeck) mutually agreed upon by the
parties to perform the work of the "Testing and Selection Expert"
in the Case of McIntosh, et al., v. East Bay Municipal Utility
District. The Team's responsibilities included (a) review of the
company's policies, practices and procedures with regard to testing
and selection, (b) identification of practices and procedures not in
compliance with the Uniform Guidelines on Employee Selection
Procedures, and (c) formulation of recommendations to bring such
practices and procedures into compliance.

66

**Consultant**
February 1989 to
January 1996

**Giant Food Inc.**
**Landover, Maryland**

Retained to conduct a criterion-related validation study of the company's selection procedure for the position of Retail Trainee. Retail Trainee is a first-level management position in the company's food stores. Responsibilities included research methodology, as well as reporting the results. Since completing this project, I have been retained to revise the selection procedure and conduct a second validation study.

**Consultant**
December 1988 to
February 1989

**New York State Department of Civil Service**
**Albany, New York**

Developed and conducted two three-day training courses on contemporary approaches to reducing adverse impact in employment selection procedures. The training courses were presented to sixty members of the department's professional test development staff.

**Consultant**
February 1988 to
May 1990

**CORE Corporation**
**San Francisco, California**

Retained to join a committee of testing experts in the development and validation of selection procedures for positions from Firefighter to Battalion Chief in the San Francisco Fire Department. This project included conduct of a job analysis and the development of written tests as well as job simulations.

**Consultant**
January 1988 to
September 1989

**City of Baltimore**
**Baltimore, Maryland**

Retained to provide technical assistance in the development and validation of a promotion procedure for the position of Fire Battalion Chief in the Baltimore Fire Department. Project included conduct of a job analysis and the development of a written test and job simulations.

**Consultant**
October 1987 to
January 1998

**City of New Orleans**
**New Orleans, Louisiana**

Retained to provide technical assistance with regard to the
development and validation of selection procedures for the
positions of Police Officer and Police Lieutenant, in accordance
with an agreement made by the City of New Orleans in the case of
Williams v. City of New Orleans (Civil Action No. 73-649). In
accordance with the settlement, the City of New Orleans agreed to
consult with an Industrial Psychologist designated by plaintiffs.

**Consultant**
October 1987 to
April 1993

**City of New York**
**New York, New York**

Retained to provide technical assistance with regard to the
development and validation of selection procedures for the
positions of Police Lieutenant and Sanitation Supervisor. The
project included conduct of a job analysis as well as development
of written tests and job simulations.

**Consultant**
August 1987 to
January 1997

**Amalgamated Transit Union Local 998**
**West Allis, Wisconsin**

Retained to evaluate the Milwaukee County Transit System's
selection procedure for the position of Shipper/Receiver and to
offer an opinion as to its validity.

**Consultant**
July 1987 to
January 1989

**Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen and Bartnick**
**Detroit, Michigan**

Retained as expert witness for the plaintiff in the case of Hugely, et
al., v. General Motors Corporation, U.S. District Court, Eastern
District of Michigan (Civil Action No. 83 C.V. 2866 DT). I was
retained to evaluate the performance appraisal system used by
General Motors for certain managerial positions and to offer an
opinion as to its validity.

**Consultant**
May 1987 to
November 1987

**Reiders, Travis, Mussina, Humphreys and Harris**
**Williamsport, Pennsylvania**

Retained as expert witness for the plaintiffs in the case of Johns, et
al., v. Phillips ECG v. United Steel Workers of America, et al., U.S.
District Court for the Middle District of Pennsylvania. In this case,
White female employees charged that the company discriminated on
the basis of sex, and violated the Equal Pay Act.

**Consultant**
May 1987 to
June 1987

**Cincinnati Civil Service Commission**
**Cincinnati, Ohio**

Retained to advise the Civil Service Commission as to the merit of
an appeal by Jon Sears, an employee of the City of Cincinnati. Mr.
Sears claimed that he was denied promotion to a managerial
position because of his race. I assisted the Commission in
conducting a public hearing regarding the matter and, after
reviewing relevant documents and a transcript of the hearing,
recommended that Mr. Sears' appeal for promotion be denied.

**Consultant**
February 1987 to
March 1988

**Baltimore City Civil Service**
**Baltimore, Maryland**

Retained as expert witness for the defendant in the case of Thomas
DeShields v. Mayor and City Council of Baltimore, et al. (Civil
Action No. 3-84-1905). Mr. DeShields charged that the promotion
examination process for the position of Battalion Chief in the Fire
Department was not valid, had an adverse impact against Blacks,
and resulted in disparate treatment against him because of his race.
The court ruled for the defendant.

**Consultant**
August 1986 to
January 1987

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and administer a content-valid promotion
procedure for the position of Police Lieutenant, including pre-test
study materials, a written test, and work sample exercises.

69

| | |
|---|---|
| **Consultant**<br>August 1986 to<br>September 1986 | **Office of the Associate General Counsel, Personnel Appeals Board**<br>**U.S. General Accounting Office**<br>**Washington, D.C.** |

Retained as expert witness for the complainant in the case of Chennareddy v. U. S. General Accounting Office. This case involved a charge of racial discrimination in promotions. I reviewed the promotional procedure at issue, prepared a written report, and testified at the Personnel Appeals Board Hearing.

| | |
|---|---|
| **Consultant**<br>July 1986 to<br>October 1990 | **Fitzpatrick and Associates**<br>**Washington, D.C.** |

Retained as expert witness for the plaintiff in the cases of James Short, et al., v. Federal Bureau of Investigation (EEOC Complaint No. 033-079-X0377) and Bennett, et al., v. Federal Bureau of Investigation (EEOC Complaint No. 033-085-X5323). I was retained to review the promotion process for the position of Fingerprint Specialist in the Latent Fingerprint Section of the FBI and to offer an opinion as to its validity and fairness.

| | |
|---|---|
| **Consultant**<br>June 1986 to<br>July 1986 | **Legal Department, City of Bridgeport**<br>**Bridgeport, Connecticut** |

Retained as expert witness for the defendant in the case of Association Against Discrimination Inc. v. City of Bridgeport. The case involved a charge by Black applicants for the position of Firefighter that rank ordering of candidates on an eligibility list was a racially discriminatory method of interpreting the scores on a Firefighter written test. I developed a system of interpreting the test scores based upon "band scoring" which was acceptable to the plaintiff, the City of Bridgeport, and the District Court. The Court ordered that the "banding" system be adopted.

| | |
|---|---|
| **Consultant**<br>March 1986 to<br>January 1988 | **Baltimore Civil Service**<br>**Baltimore, Maryland** |

Retained to develop the 1986 and 1987 Police Sergeant promotion procedures based upon the system of "Targeted Testing" originally developed and implemented in 1984. This project involved the continued use of a pre-test study manual for the written test, and development and implementation of a written test and oral examination.

| | |
|---|---|
| **Consultant**<br>February 1986 to<br>February 1991 | **NAACP Legal Defense and Educational Fund**<br>**New York, New York**<br><br>Retained as expert witness for the defendants in the case of Bushey v. New York State Department of Correctional Services. My testimony was to be directed to the question of whether a promotion procedure, which had less adverse impact than another and was as valid, should be used in lieu of the procedure with greater adverse impact. |
| **Consultant**<br>January 1986 to<br>December 1989 | **Bridgeport Civil Service Commission**<br>**Bridgeport, Connecticut**<br><br>Retained to develop content-valid promotion procedures for the positions of Fire Lieutenant and Telecommunications Operator. The project included conduct of a job analysis, development of a written test and oral board examination, and administration of both. |
| **Consultant**<br>January 1986 to<br>February 1988 | **City of St. Petersburg**<br>**St. Petersburg, Florida**<br><br>Retained to develop a promotion procedure for the positions of Police Sergeant and Police Lieutenant. This project was a continuation of the "Targeted Testing" format initiated in 1984. The project included development of a pre-test study manual, written examination, and an assessment center. |
| **Consultant**<br>September 1985 to<br>December 1985 | **The American Civil Liberties Union**<br>**Hartford, Connecticut**<br><br>Retained as expert for the plaintiff in the case of Cicero Booker v. City of Waterbury Connecticut. In this case, Black applicants alleged that the promotional procedures used by the Waterbury Police Department were discriminatory. I prepared a report stating my opinion as to the validity and fairness of the promotional procedures and submitted it to the Court. |

**Consultant**
April 1985 to
September 1986

**San Francisco Lawyers Committee For Urban Affairs**
**San Francisco, California**

Retained as expert witness for the plaintiff in the case of United
States v. City of San Francisco. This was a Title VII case in which
Black and Female applicants for the position of Firefighter charged,
among other things, that the entry-level Firefighter Examination used
by the City of San Francisco (in 1984) was racially discriminatory.
The parties agreed upon a settlement of the case that called for the
development of a new entry-level examination.

**Consultant**
March 1985 to
December 1985

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and validate a written examination for the
position of Police Officer. The project included conduct of a job
analysis, development, administration and scoring of a written test,
and documentation of its validity. I agreed to serve as expert
witness for the City of Bridgeport in the event of litigation
involving this test.

**Consultant**
March 1985 to
July 1985

**Communications Workers of America**
**Washington, D.C.**

Retained to develop a training program aimed at improving the
performance of CWA members on written tests and other selection
and promotion procedures (e.g., work sample training modules)
administered by the companies of the Bell System.

**Consultant**
January 1985

**Bramhall and Duncan**
**Attorneys at Law**
**Little Rock, Arkansas**

Testified as expert witness for the plaintiffs in the case of Gilbert v.
City of Little Rock. This case was remanded to the District Court
after a ruling for plaintiffs by the Eighth Circuit Court of Appeals.
The City of Little Rock's appeal to the U.S. Supreme Court was
denied.

**Consultant**
September 1984 to
July 1985

**Baltimore City Civil Service Commission**
**Baltimore, Maryland**

Retained to develop a content-valid promotion procedure for the
positions of Police Sergeant and Lieutenant. Development of the
Police Sergeant examination was ordered by the U.S. District Court
for the District of Maryland in the case of Vanguard Justice Society
v. Harry Hughes. I was selected by both plaintiffs and defendants
(and approved by the Court) to develop the procedure.

**Consultant**
June 1984 to
July 1984

**Bridgeport Civil Service Commission**
**Bridgeport, Commission**

Retained to develop and validate a written examination for the
position of Firefighter. The project included conduct of a job analysis,
development, administration and scoring of a written test, as well as
documentation of its validity. I agreed to serve as expert witness for
the City of Bridgeport in the event of litigation involving the test.

**Consultant**
January 1984 to
July 1985

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and validate a promotional procedure for the
position of Police Detective. The project included conduct of a job
analysis, as well as development of the procedure, its implementa-
tion, and documentation of its validity. I also agreed to serve as
expert witness for the City of Bridgeport in the event of litigation
involving this procedure.

**Consultant**
November 1983 to
January 1985

**Mexican American Legal Defense and Educational Fund**
**Chicago, Illinois**

Retained as expert for the plaintiff in the case of Rosario v. Cook
County Department of Corrections. This case involved a charge of
racial discrimination by Hispanic Corrections Officers seeking pro-
motion to the position of Sergeant. The case was settled prior to trial.

**Consultant**
September 1983 to
December 1985

**City of St. Petersburg**
**St. Petersburg, Florida**

Retained to develop and/or guide the development of promotion
procedures for several positions within the Police and Fire
Departments, including Police Sergeant, Police Lieutenant, Fire
Lieutenant, Fire Captain, and Deputy Chief. Each promotion
procedure was based upon a system known as "Targeted Testing"
developed by me. I also agreed to serve as expert witness for the City
of St. Petersburg in the event of litigation involving these procedures.

**Consultant**
June 1983 to
December 1984

**New York State Department of Civil Service**
**Albany, New York**

Retained as consulting industrial psychologist to serve as plaintiff's
representative in the development and implementation of new
selection procedures for the positions of Correction Captain and
Corrections Lieutenant in the New York State Department of
Correctional Services. Development of the new procedures was
ordered by the Court based upon a consent decree in the case of
Kirkland v. New York State Department of Correctional Services.

**Consultant**
November 1982 to
January 1985

**Legal Action of Wisconsin Inc.**
**Milwaukee, Wisconsin**

Retained as expert witness for the plaintiff in the case of Martin v.
State of Wisconsin.

**Consultant**
November 1982 to
June 1983

**Bridgeport Civil Service Commission**
**Bridgeport, Connecticut**

Retained to develop and administer a content-valid promotion
procedure for the position of Police Sergeant. This project included
conduct of a job analysis, development of a written test and
structured oral interview, as well as implementation and scoring of
the procedure. I agreed to serve as expert witness for the City of
Bridgeport in the event of a legal challenge regarding the
procedure. No such challenge arose.

**Consultant**
October 1982 to
October 1990

**Perry, First, Reiher, Lerner and Quindel**
**Attorneys at Law**
**Milwaukee, Wisconsin**

Retained as expert witness for the plaintiff in the case of League of
Martin v. City of Milwaukee. This case involved a charge by Blacks
within the Milwaukee Police Department that the Department's
promotion procedures for positions above Police Officer, particularly
those for Police Sergeant, were racially discriminatory. The case was
settled prior to trial. As part of the settlement, defendants agreed to
develop new promotion procedures. It was my responsibility to assist
and advise counsel for plaintiffs with regard to monitoring the
development of the new promotion procedures.

**Consultant**
September 1982 to
December 1987

**Rosen and Dolan**
**Attorneys at Law**
**New Haven, Connecticut**

Testified as expert witness for the plaintiffs in the case of Men and
Women for Justice v. State of Connecticut. This was a Title VII
case involving a charge of discrimination regarding the selection
procedure for the position of State Trooper. The case was settled
prior to a ruling by the Court. As part of the settlement agreement, I
was designated by counsel for plaintiffs as consulting industrial
psychologist responsible for assisting the Connecticut State Civil
Service in the development of a new selection procedure for the
position of State Trooper.

**Consultant**
August 1982 to
June 1995

**Arent, Fox, Kintner, Plotkin and Kahn**
**Washington, D.C.**

Retained as expert witness for the plaintiffs in the case of Cook v.
Boorstin. This was a Title VII case that involved a charge by
Blacks that certain promotion procedures used by the Library of
Congress were racially discriminatory.

**Consultant**
April 1982

**McCants, Kramer and Gerals**
**Washington, D.C.**

Served as expert witness for the defendant in the case of
Mccullough v. United Services Organization. This was a Title VII
case involving a charge by a Black employee that she was denied a
promotion because of her race.

**Consultant**
January 1982 to
June 1995

**City of Toledo**
**Toledo, Ohio**

Retained as court-appointed expert in the case of Sarabia v. Duck.
I was responsible for assisting the Toledo Civil Service Commission in
the development and validation (in accordance with the Uniform
Guidelines on Employee Selection Procedures) of a non-discriminatory
selection procedure for the position of Police Officer. Responsibilities
included assisting in the identification of subject areas to be tested,
formulation of appropriate test questions, and standardization of each
component of the selection process (e.g. background investigation,
psychological evaluation and oral interview).

**Consultant**
December 1981 to
April 1982

**Personnel Department**
**City of Hartford**
**Hartford, Connecticut**

Developed a content-valid promotion procedure for the position of
Police Sergeant. The project involved conduct of a job analysis,
development, implementation, and scoring of the procedure, as well
as documentation of its validity. I also agreed to testify as an expert
witness for the City of Hartford in the event of a legal challenge
regarding the procedure.

**Consultant**
December 1981 to
January 1982

**Phillip Duncan and Manual Pruitt**
**Attorneys at Law**
**Little Rock, Arkansas**

Testified as expert witness for the plaintiff in the case of Gilbert v.
City of Little Rock. This was a Title VII case involving a charge by
Blacks that the promotional procedures used by the Little Rock
Police Department were racially discriminatory.

**Consultant**
October 1981 to
January 1982

**District of Columbia Government**
**Washington, D.C.**

Retained to provide an assessment of the validity and fairness of
the entry-level written examination for Police Officer. My primary
responsibility was to provide a recommendation regarding the most
appropriate use of the examination in light of professional
standards and the Uniform Guidelines on Employee Selection
Procedures and to make a recommendation as to available
alternatives.

**Consultant**
August 1981 to
December 1982

**Sommers, Schwartz, Silver, and Schwartz**
**Southfield, Michigan**

Retained as expert witness for the plaintiff in the case of Geoffrion v. Rubbermaid, Inc. This was a case in which a female employee charged that her employer violated the Equal Pay Act by paying her less than her male counterparts for the same work.

**Consultant**
June 1981 to
December 1989

**The National Black Coalition of Federal Aviation Employees**
**Memphis, Tennessee**

Retained to provide technical assistance with regard to the validity and fairness of the selection procedures used by the Federal Aviation Administration to select Air Traffic Controllers.

**Consultant**
May 1981 to
September 1985

**Committee to Develop Joint Technical Standards for**
**Educational and Psychological Testing**
**American Psychological Association, American Educational**
**Research Association, and the National Council on**
**Measurement in Education**
**Washington, D.C.**

Served as a technical advisor to the Committee. As such, I responded to specific questions, provided general counsel, and in some instances, reviewed Committee materials pertaining to the development of new joint technical standards for educational and psychological testing.

**Consultant**
April 1981 to
September 1981

**Biggs and Bataglia**
**Wilmington, Delaware**

Testified as expert witness for the plaintiff in the case of Wilmore, et al., v. City of Wilmington, et al. This was a Title VII case in which Blacks charged racial discrimination on the part of the Wilmington Fire Department through the use of racially discriminatory promotion procedures.

**Consultant**
January 1981 to
February 1981

**National Association of Social Workers**
**Washington D.C.**

Retained to provide technical advice with regard to the development of guidelines for the conduct of job analyses, when validating educational credentials.

**Consultant**
September 1980 to
January 1985

**The Law Project**
**Atlanta, Georgia**

Retained as expert witness for the plaintiff in the case of Jeanette
Turner v. Georgia Department of Labor. Served as consultant to the
plaintiff in the case of Kennedy, et al., v. Crittenden, et al. My
responsibilities included assisting counsel in monitoring the
development of new selection procedures at a large state hospital.

**Consultant**
September 1980 to
May 1981

**Puerto Rican Legal Defense and Educational Fund**
**New York, New York**

Retained as expert witness for the plaintiff in the case of Hispanic
Society, et al., v. Civil Service Commission of the City of New
York, and Guardians Association of the City of New York v. Civil
Service Commission of the City of New York. In both Title VII
cases, minorities charged that the New York City Police Department
discriminated against them by using entry-level and promotion
procedures that were not valid and had adverse impact. Both cases
were settled prior to trial. As part of the settlement agreement, the
City of New York agreed to retain consultants to develop new
selection procedures for the positions of Police Officer and Police
Sergeant. I was retained by counsel for plaintiff to monitor the
development of new selection procedures. I cooperated with the
City's consultants in developing the new entry-level Police Officer
examination and provided assistance.

**Consultant**
August 1980 to
October 1980

**Jephunneh Lawrence**
**Attorney at Law**
**Washington, D.C.**

Testified as expert witness for the plaintiff in the case of Minnis, et
al., v. The Home Loan Mortgage Corporation. This was a Title VII
case in which the plaintiff charged that the defendant had
discriminated on the basis of race by using promotion procedures
that were not valid and had adverse impact.

**Consultant**
August 1980 to
September 1980

**Chambers, Stein, Ferguson and Becton, P.A.**
**Charlotte, North Carolina**

Retained to provide technical assistance to counsel for plaintiff
regarding determination of the existence of adverse impact in the
case of Bishop, et al., v. City of Greensboro Police Department.

78

**Consultant**
March 1980 to
May 1980

**Arent, Fox, Kintner, Plotkin and Kahn**
**Washington, D.C.**

Retained as expert witness for the plaintiff in the case of Miller v.
Staats. This case involved a charge by Black employees of the
Government Services Administration that the agency discriminated
against them by making use of a promotion procedure (and, more
specifically, a performance appraisal process) that was not valid
and had adverse impact. The case was settled prior to trial. As part
of the settlement, the Government Services Administration agreed
to retain an outside consultant to develop new promotion procedures.
I assisted counsel for plaintiffs in monitoring this work.

**Consultant**
January 1980 to
November 1980

**Detroit Police Department**
**Detroit, Michigan**

Retained to develop content-valid promotion examinations for the
positions of Police Sergeant and Police Lieutenant. Both examinations
were developed on the basis of a system called "Targeted Testing"
created by me. Both examinations proved to be valid and fair and
produced no adverse impact.

**Consultant**
June 1979 to
June 1981

**San Francisco Lawyers Committee For Urban Affairs**
**San Francisco, California**

Retained as expert witness for the plaintiff in the case of Luevano
v. Campbell. This was a Title VII case in which plaintiff charged
that the U.S. Civil Service Commission relied upon a racially
discriminatory examination (PACE) in screening candidates for
middle-management positions in the Federal Government. The case
was settled prior to trial. The Civil Service Commission agreed to
discontinue use of the test.

**Consultant**
May 1979 to
December 1989

**Communications Workers of America**
**Washington, D.C.**

Retained to provide technical assistance with regard to the
evaluation (as to validity and fairness) of selection procedures
developed by the American Telephone and Telegraph Company.