**Merrill Lynch's Memorandum in Opposition to Plaintiffs' Motion for
Class Certification**

# APPENDIX I:
# SAAD REP.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

-----------------------------------------------------------x

GEORGE MCREYNOLDS, et. al.,          :          Case No. 05C6583
Individually on behalf of themselves and all others :
similarly situated,                  :          Hon. Robert W. Gettleman
                                     :          Magistrate Judge Denlow
            Plaintiffs,              :
                                     :
    - against -                      :
                                     :
MERRILL LYNCH, PIERCE,               :
FENNER & SMITH INCORPORATED,         :
                                     :
            Defendant.               :
-----------------------------------------------------------x

### AFFIDAVIT OF DR. ALI I. SAAD

STATE OF CALIFORNIA        )
                           )          ss.:
LOS ANGELES COUNTY         )

ALI I. SAAD, Ph.D., being first duly sworn, deposes and says:

1.      The expert report I submitted in connection with the above-referenced matter,

dated November 14, 2008 (attached hereto as Exhibit A), constitutes my testimony and opinions

with regard to class certification.

2.      On November 20, 2008, I provided corrected versions of Exhibits 25, 26, 61, and

62. The attached expert report contains the correct versions of these exhibits.

Dated May 12, 2009

_____
Ali I. Saad

Subscribed and sworn to before me this
12 day of May, 2009.
_____
Notary Public
Commission Expires 12\20\2010

DANIELLE L. HANDEL
Commission # 1713039
Notary Public - California
Los Angeles County
My Comm. Expires Dec 29, 2010

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

------------------------------------------------

**GEORGE MCREYNOLDS,** *et al.,*
**Individually and as Class Representatives,**

                    **Plaintiffs,**

          **v.**

**MERRILL LYNCH, PIERCE, FENNER**
**& SMITH, INCORPORATED,**

                    **Defendant**

------------------------------------------------

Case No. 05 C 6583

Judge Robert W. Gettleman

Magistrate Judge Denlow

**EXPERT REPORT OF ALI SAAD, PH.D. REGARDING CLASS**
**CERTIFICATION ISSUES**

**November 14, 2008**

# Table of Contents

1. ASSIGNMENT ........................................................................................... 1

2. QUALIFICATIONS .................................................................................. 2

3. EXECUTIVE SUMMARY ......................................................................... 3

4. THE STRUCTURE OF THE MADDEN-VEKKER ARGUMENT AND ITS
   FLAWS .................................................................................................... 5

5. WHAT EVIDENCE SUPPORTS THE CONCEPT THAT EXTERNALLY
   CAUSED DIFFERENCES IN ACCESS TO WEALTH IS A CRUCIAL
   OMITTED VARIABLE IN MADDEN AND VEKKER'S
   ANALYTICAL APPROACH? ................................................................. 16

6. THE MERRILL DATA DEMONSTRATE LARGE DIFFERENCES
   BETWEEN AFRICAN AMERICAN AND WHITE BROKERS IN THE
   SELF-GENERATION OF ACCOUNT DOLLARS ............................... 23

   Early POA Self-Generation of Accounts ............................................... 23

   Early POA Differences Between African American and White POAs in
      Self-Generation of Assets Persist Into the Future.................................. 27

   The Correct Approach to Studying the Merrill Data Requires Taking into
      Account Measures of Employee Productivity ......................................... 29

7. COMPENSATION ................................................................................... 29

   Compensation for Similarly Situated Workers ....................................... 30

   There is Enormous Underlying Variability in the Compensation of FAs ........... 33

   Summary of Compensation Studies ......................................................... 34

8. OTHER PRACTICES AND POLICIES ................................................... 35

   Account Transfers .................................................................................... 35

      Response to Aggregated Account Transfer Analysis .............................. 35

      Response to Madden and Vekker ADP Account Transfers Analysis ...... 35

      Analysis of the Merrill ADP Policy ....................................................... 39

   Analysis of FA and POA Pooling Arrangements ................................... 41

      Response to Madden and Vekker's Pooling Analysis ............................ 42

      Pooling Decisions Are Individualistic and Non-Random ....................... 45

      Analysis of FA and POA Pooling Based on Pool-Joining ...................... 47

      Analysis of Pool Renewal ....................................................................... 48

      Analysis of Merrill Designation of FA "Team" Status ........................... 50

**TABLE OF CONTENTS**
**(continued)**

Page

9. STUDIES OF OTHER PRACTICES POTENTIALLY SUBJECT TO
   DISCRETIONARY LOCAL DECISION-MAKING.......................................... 51

   External Representation ...................................................................................... 51

        Analysis of African American Workforce Representation...................... 52

   POA African American Representation Analysis............................................... 53

        Dr. Bielby's Summary of Merrill's State by State Representation is
        Misleading.................................................................................................. 55

   POA Starting Salary............................................................................................ 55

   The Impact of Asset and PC "Hurdles" During the POA Program .................... 56

   POA Terminations .............................................................................................. 58

   FA Terminations ................................................................................................. 60

   Length of Service Rollbacks .............................................................................. 61

   Forgiveness of Excess Compensation................................................................. 62

   Management Assessment Center Attendance ..................................................... 63

   Success at the MAC ............................................................................................ 64

   Title Changes ...................................................................................................... 65

   Certifications....................................................................................................... 67

   Conclusion .......................................................................................................... 68

10. RESPONSE TO DR. BIELBY'S REPORT ............................................................. 68

   Social Isolation.................................................................................................... 69

   Multicultural Marketing...................................................................................... 72

   Only One Version of Dr. Bielby's "Cumulative Advantage" Opinion Is
   Supported by the Merrill Data – That System Is Not "Inherently
   Biased" but is "Attributable to [Observed] Differences in
   Productivity"......................................................................................................... 72

11. CONCLUSION........................................................................................................ 75

ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL

## 1. Assignment

I am a labor economist. I was retained by Weil, Gotshal & Manges, LLP, counsel for

defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill") in the matter of George

McReynolds et al. v. Merrill Lynch, to provide my expert opinions in connection with

allegations of race discrimination against African American Financial Advisors brought by

plaintiffs. These allegations are summarized in plaintiffs' Second Amended Complaint and the

plaintiffs' Responses and Objections to the Defendant's Third Set of Interrogatories.[1] To

support their claims, plaintiffs submitted reports from Drs. Janice Madden and Alexander

Vekker and from Dr. William Bielby.[2] My assignment was to provide my opinions in the

following areas:

1. Drs. Madden and Vekker opine that their work constitutes statistical evidence consistent with

employment discrimination by Merrill Lynch managers against African American Financial

Advisors ("FAs" or "brokers" or "POAs").[3] They base their opinion on a claim that they have

studied "similarly situated" African American and white FAs at Merrill and found statistically

significant differences in pay and other employment practices. I was asked to provide a response

to their report in two general areas: first, is their analytical framework correct, and did they in fact

study similarly situated African American and white FAs, as they claim, and second, in light of

their analytical framework, are the statistical procedures used and studies produced by

Madden/Vekker reliable and correct, and do they provide statistical evidence supporting the

---

[1] Plaintiffs' Second Amended Complaint, November 6, 2006; Plaintiffs' Responses and Objections to
Defendant's Third Set of Interrogatories, February 12, 2006.

[2] Expert report of Dr. William T. Bielby, June 5, 2008.

[3] Expert report of Dr. Janice Fanning Madden and Dr. Alexander Vekker. "Evaluating Whether Employment
Outcomes for Brokers and Broker Trainees at Merrill Lynch Are Racially Neutral." June 5, 2008.

1

allegation that Merrill policies and/or its managers' actions are biased against its African American brokers?

2. I was also asked to respond to certain aspects of Dr. Bielby's opinion. Dr. Bielby discusses a number of mechanisms that he asserts cause bias against African American brokers at Merrill. He provides no empirical analysis to support his claims. I have examined these mechanisms where the data permit and provide my responses. In addition, while Dr. Bielby does not perform any formal studies of the workforce representation of African American brokers at Merrill, he makes a series of statements regarding the subject that I was asked to address.

3. Given the claims in the case as described in detail in plaintiffs' legal papers, I was asked to provide an opinion as to whether the empirical evidence available to me is consistent with a hypothesis of discrimination by Merrill and/or its managers against its African American brokers.

**2. Qualifications**

I am the Managing Partner of Resolution Economics LLC, a firm whose activities include performing economic and statistical analyses in connection with litigation and other consulting matters. I have extensive experience providing statistical and economic analyses in connection with class action employment discrimination matters. I hold a Ph.D. in Economics from the University of Chicago, with a specialization in labor economics, and a B.A. degree in history and economics from the University of Pennsylvania. I have been qualified as an expert witness in both Federal and State Courts. My resume, including all publications and testimony over the past four years, is appended to this report as Appendix 1. My hourly fee for services rendered is $650. The

2

bases for my opinions are summarized herein, and reflected in the backup material that I am providing with my report.

## 3. Executive Summary

In this report, I study employment practices at Merrill Lynch, Pierce, Fenner and Smith, Incorporated ("Merrill") that affect the earnings of Financial Advisors ("FAs"), and I consider whether there is statistical evidence consistent with a hypothesis of discrimination against African American FAs. I do this by considering both Merrill data and publicly available data, and by studying that data as it relates to the assertions made by plaintiffs and their experts, Drs. Janice Madden, Alexander Vekker, and William Bielby. I conclude that the empirical evidence contained in the data is entirely inconsistent with the theories offered by plaintiffs and their experts, and I find no valid statistical evidence supporting a claim of discrimination towards African American FAs.

Plaintiffs and I agree that a transparent relationship exists between broker production and compensation, and that there is a disparity between overall average African American and white FA earnings at Merrill. As a result of the direct relationship between productivity and compensation, a key to understanding patterns in compensation is understanding the drivers, or inputs, to production.

In this report I show, in contrast to theories offered by plaintiffs and their experts, that Merrill and its managers are race-neutral in all empirically observable decision-making processes. Plaintiffs' assertions that Merrill policies amplify inequalities are not supported when simple mistakes in their empirical analyses are corrected. I also show that with respect to those policies and practices in which managers at Merrill are able to exercise discretionary decision-making, they do so in a race neutral fashion. As discussed in more detail below, in evaluating such discretionary

3

decision-making, I assume that the data relied upon by Drs. Madden and Vekker can appropriately be aggregated, an issue on which I take no position and which is a question for further evidentiary support. I demonstrate in this report that the disparities I observe empirically are not consistent with biased decisions by Merrill and/or its managers.

In evaluating plaintiffs' claims and their expert reports, I consider the causes of the observed surface disparities, and demonstrate that substantial differences between African American and white FAs at Merrill appear within the first months of the initial two-year training program (Paths of Achievement or "POA"), without any observable influence by Merrill. I conclude through empirical analysis, again assuming that data may appropriately be aggregated, that these differences are consistent with differential access to wealth on the basis of race. My findings in this regard are consistent with the job analysis conducted by Dr. James Outtz. Therefore, I conclude that there is no statistical evidence that the surface compensation disparities reported by plaintiffs' experts are caused by Merrill.

Plaintiffs identify three Merrill drivers of the surface disparity – account transfers, pooling of accounts, and manager discretion. Plaintiffs' experts study only the first two, but after simply correcting basic and elementary errors in their data and computations, there are no empirically observable disparities and thus no evidence that those two drivers are the cause of the earnings shortfall. As to manager discretion, plaintiffs chose not to analyze the data produced to them, preferring instead to conclude that based on their analyses of account transfers, there must be discrimination in decisions over which managers have some discretion. However, when I analyze that data, I show that for decisions in which managers have discretion and for which adequate data exist, there is no disparity between similarly situated African American FAs and white FAs. Having found that plaintiffs' analyses offer no explanation for the disparity, I examined the data

further and found it strongly consistent with differences in the wealth networks of African

American and white FAs, which is a factor external to Merrill. This crucial explanatory variable

was omitted by plaintiffs' experts.

## 4. The Structure of the Madden-Vekker Argument and Its Flaws

FAs at Merrill earn compensation by being associated with assets invested at Merrill.[4] The

FA becomes associated with assets by, among other things, reaching out to those with investable

wealth and convincing them to invest with Merrill. These assets yield revenue to Merrill that is

shared with FAs according to written and transparent formulae (production credits or "PCs").

Depending on the number of years of experience of the FA (called "length of service" or "LOS"),

his or her level of PCs, and the type of assets underlying particular PCs, certain percentages of

those PCs are paid to the FA.[5] These types of formulae are consistent with what labor economists

would expect for businesses such as Merrill.[6] The data produced in this case show that on the

surface, African American FAs earn less than white FAs at Merrill. Plaintiffs allege that this is

because Merrill Lynch and/or its managers discriminate against similarly situated African

American brokers. In support of these allegations, plaintiffs have submitted the aforementioned

reports by Drs. Madden and Vekker, and Dr. Bielby.[7] When proper analyses are conducted,

---

[4] Dr. James Outtz describes the nature of the FA job in detail in his expert report. I present only an overview here. Expert report of Dr. James Outtz, November 14, 2008.

[5] See, for example, the 2006 payout grid rate. Advisory Division 2006 U.S. Based Financial Advisor Incentive Compensation Program Appendix, MLE 00040 – 000562.

[6] Lazear, E. and K. Shaw (Fall 2007), "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives* Vol. 21, No. 4, pp. 91–114; Milgrom, P. and J. Roberts, (1992) "Compensation and Motivation," *Economics Organization & Management*. Chapter 12. Englewood Cliffs, New Jersey: Prentice Hall.

[7] This report, like the reports of plaintiffs' experts, is submitted in connection with the class certification stage of this litigation. Drs. Madden and Vekker and I conduct our statistical studies aggregated over the entirety of Merrill data produced in this litigation. It is my understanding that Merrill managers at the office and complex level are given discretion in the application of certain Merrill policies and have decision-making authority in many matters. The statistical studies proffered by Drs. Madden and Vekker, as well the ones discussed here, examine "average" statistical

however, the empirical evidence in this case is inconsistent with the hypothesis that Merrill discriminates against African American FAs.

A Crucial Omitted Variable: Access to Wealth

Drs. Madden, Vekker, and Bielby's theory is that African American and white FAs begin work at Merrill with what they describe as the same distributions of productive characteristics, and because of adverse treatment by Merrill Lynch and its managers, African American brokers end up with unequal employment outcomes. Among the job-related characteristics they claim are possessed equally by African American and white brokers are relationship building skills, client management skills, and technical investment advice skills. There is no evidence in this case that allows us, or plaintiffs, to evaluate this claim for these characteristics. However, as I will

---

relationships between race and certain employment practices. These statistical relationships may be the product of particular national policies or practices, and/or independent decisions made by hundreds or even thousands of individual decision makers, and may also be the product of societal factors entirely exogenous to Merrill.

I understand that a relevant issue for purposes of plaintiffs' motion for class certification is whether the proposed class members are subject to common forms of treatment due to the application of a national policy or practice, or because of what plaintiffs claim to be centrally controlled decisions of local managers. Plaintiffs' statistical studies all assume that productivity by FAs is determined by national policies or practices. My studies accept these assumptions solely for purposes of my responses, but I do not address here the factual questions as to whether there exist any national policies or practices, or whether there exist centrally controlled decisions by local managers. If the facts of the case separately demonstrate that any particular employment practice is *not* commonly decided by a national policy/practice or a centrally controlled decision-making process, then the aggregation of the statistical results reflecting the "average" outcomes for putative class members of such practices may not yield meaningful information as to the decisions in question.

For example, assume we are examining ten Merrill offices. Suppose in five of these offices ADP account transfers are awarded totally to white brokers, with no regard for the ADP rules, and totally to African American brokers in the other five, again with no regard for the ADP rules. On average, in this hypothetical, statistical analysis of the aggregated ADP process would indicate fair treatment of African Americans. However, in no offices are transfers fair – in half they are biased against African Americans, in half they are biased against whites. In this hypothetical, managers in *every* office appear to be using race as a factor in decision-making, yet the averaged results obscure that fact. As a further example, suppose now that in three of the ten offices all transfers went to whites, despite the ADP rankings, and in the other seven offices, transfers followed the ADP rankings exactly, such that no management discretion was utilized at all. On average, one might find transfers are statistically significantly biased against African Americans. Yet there are clearly different circumstances in terms of managers' decisions with respect to race in the different offices and no common pattern of manager discretion being biased against African Americans.

If the Court were to conclude, based on a review of detailed non-statistical evidence at the office level that is not amenable to formal statistical analysis, that there is no common decision-making pattern across offices or complexes, then aggregated statistical analyses, regardless of whether they are consistent or inconsistent with bias against African American FAs, may not be valuable for purposes of determining whether it is appropriate to certify a class which would require common forms of proof.

demonstrate in detail below, there is an enormous difference between African American and white

FAs in a critical job-related factor not studied by them and entirely exogenous to Merrill Lynch:

access to sources of wealth. The expert reports filed in this matter by Drs. Roberto Fernandez and

James Outtz describe access to wealth; Dr. Fernandez studies the phenomenon as it relates to the

nature of social networks in American society, and Dr. Outtz observes it as applied to FAs.[8] A

crucial part of the FA job is that FAs must go outside of Merrill to the market of potential clients.[9]

Assets are not obtained for FAs by a "sales force" – they are obtained by the FAs themselves.[10]

Drs. Madden and Vekker do not take this crucial factor into account in their statistical

work. Instead, they begin by summarizing two related findings: 1) African American brokers earn

33% to 42% less than white brokers[11] and 2) are thus in lower production quintiles.[12] They then

study one Merrill employment practice that I infer they believe bears significant responsibility for

the large earnings disparity they report in their first six tables: account transfers.[13] They claim that

racial bias in decisions made by Merrill and its local managers with regard to account transfers

leads to biased outcomes by race in account transfers and hence, bias in ultimate earnings. "While

there are many ways that Merrill Lynch management affects the opportunity to generate

---

[8] Expert Reports of Drs. Roberto Fernandez and James Outtz, November 14, 2008.

[9] Outtz, pp. 12-14.

[10] Outtz, pp. 12-14.

[11] Madden and Vekker, p. 4.

[12] Merrill's brokers are grouped into five equal sized production groupings called quintiles. Those whose production (PCs) is at the top of the scale are in the first quintile, those at the bottom in the 5th quintile. These quintiles correspond closely with ultimate compensation, because the production credits generated are shared according to various percentage formulae with the FAs. Second Amended Complaint, p. 9.

[13] I say "infer" because nowhere in their report do Drs. Madden and Vekker attempt to explain the size of the compensation disparity they observe. Given that the only two practices related to compensation that they study are account transfers and pooling, I infer that they think these are an important part of the explanation.

production credits, one that is more easily measured is the distribution of house accounts and of accounts previously managed by departing brokers to continuing brokers."[14]

Without further testing their claim of bias in the inputs to production, Drs. Madden and Vekker simply assume, based on their account transfers study, that the employer-provided inputs must be unfairly withheld from African American brokers. This is because they assume that the direction of causality flows from withheld inputs to lower production. In contrast, the overall conclusion of my work is that the causal factors associated with differential production arise from the social context external to Merrill. Lower social network access to wealth leads to lower production, which in turn may lead to differences in the distribution of additional inputs. Some of the additional inputs they assert are withheld based on their accounts transfer study are subject to empirical test – I will demonstrate below that the statistical results from correctly evaluating a number of Merrill practices are *not* consistent with the notion that Merrill distributes such inputs unfairly. But putting aside these other inputs, Madden and Vekker fail to mention access to wealth as a factor to consider in statistical analysis. Importantly, access to wealth is a factor that is *not* under the control of Merrill, yet crucially important to the productivity of brokers. Neglecting such external factors causes Drs. Madden and Vekker to incorrectly assess the direction and bases of the causality involved.

With no basis other than what turn out to be incorrect findings in their account transfers analyses, Drs. Madden and Vekker assert that "[A]ny racial differentials in the distribution of inherited or house accounts are important because they are consistent with bias in the distributions of [other] resources and of other assets that allow brokers to generate production credits and to

---

[14] Madden and Vekker, p. 5.

8

receive compensation."[15] Data were produced to them that would have enabled them to conduct statistical tests of several of these "other" practices, yet Madden and Vekker did not study these data, choosing instead to dismiss these practices as necessarily biased – or "suspect," as they say.

I turn next to explaining why Drs. Madden and Vekker's pivotal account transfers study is wrong.

Elementary Data Errors and Other Mistakes in Drs. Madden and Vekker's Account Transfer Studies Cause Those Studies to Fail, With No Modification to The Conceptual Approach Followed

Drs. Madden and Vekker provided to Merrill Lynch a copy of the series of computer programs they used to analyze the data produced in this case. Among these were several programs that were the basis of the POA account transfers analysis summarized in Table 14 of their report. Their analysis is structured to examine each month in POA and focuses on the dollars of assets transferred to African American and white POAs. The analysis then statistically compares African American to white POAs to determine if observed differences month-by-month are statistically significant. What they report in Table 14 of their report is that 15 of 28 months studied contain large and statistically significant shortfalls in dollars of assets transferred to African American POAs. They also report that in eight out of ten of the first months of POA, African American POAs receive statistically significantly fewer transfer dollars than whites. They claim that these findings show that Merrill favors white POAs in the important early POA stage, which supports the significant disparities in outcomes seen later in FA careers. This conclusion is wrong, due to elementary errors they commit in the handling of data described below. There is no disparity in account transfers between African American and white POAs.

The "False Zeros" Problem

---

[15] Madden and Vekker, p. 26.

The data produced by Merrill contains transferred account dollar figures per POA when a POA received such a transfer and does not contain a record when no dollars were transferred. Missing records cannot be processed by computerized statistical programs. Thus, Drs. Madden and Vekker instructed the computer to create records where no record existed and inserted a value of zero for the transferred amount in those months. Conceptually, this is appropriate.

They made an enormous error in how they did this. Their analysis covers a 28-month window of time for each POA. POAs were hired at all points in time covering the data production window – 1/1/2000 to 12/31/2006. In order to study the data for all POAs combined over all years in the period, Drs. Madden and Vekker took all 28 records per person (including the new zero records) and simply stacked them together, regardless of when in chronological time each POA actually started work at Merrill.[16] Drs. Madden and Vekker neglected the element of *calendar* time, and simply focused on "number of months" time. Thus, POAs hired in March 2001 and December 2006 were both treated as having 28 months eligible for the analysis. For a POA hired in December 2006, this practice necessarily resulted in Madden and Vekker creating data records containing zeros for the period from January 2007 through March 2009 – 27 months of false zeros. Of course this is wrong – data after December 2006 was not in the data production window. At this writing, it is not yet March 2009. Had that data been produced, surely there would be dollar values in some months and missing records for other months – requiring the insertion of valid zeros in those other months. (An example of this from their data for an African American POA can be seen in Exhibit 1.) Thousands of false zeros were added by Drs. Madden and Vekker's computer program, for people hired on or after December 2004. Overall, there were 1,068 POAs with one or more added erroneous "zero" records.

---

[16] They dropped only POAs who terminated.

This error is consequential because proportionately more African American POAs appear in the latter part of the data production period.[17] Of the 1,068 POAs who were inaccurately assigned zeros, 9.6 percent were African American, almost 50 percent above their 7.0 percent representation in the Madden and Vekker data. Adding the false zeros makes it *appear* that African American brokers received far fewer transfers (more zeros) than they actually did, and as a result, makes them appear to have received statistically significantly fewer dollars than whites. Simply fixing this one problem eliminates many of the statistically significant adverse findings they report in Table 14.

The "Zero African American FAs Present" Problem and a Technique Issue

Moving to the next mistake, Drs. Madden and Vekker's restrict the data underlying their Table 14 to include those office *complexes* containing one or more African American brokers. Conceptually, this could be an appropriate restriction, but given the nature of account transfers at Merrill, it is not. Account transfers take place within offices. More than 90 percent of total transfers occur within an office. Because there are a number of *offices* with no African American brokers that are within multi-office *complexes* having at least one African American, analyzing transfers at the complex level makes little sense. This is a permutation of the "zeros" problem. In offices where there are no African Americans, African Americans cannot receive transfers. In order to reach relevant conclusions, one must use *office* as the unit of analysis in a study of account transfers.

---

[17] For example, Table 3 of Dr. Bielby's report shows that African Americans were 4.2 percent of POA hires in 2001 and 5.9 percent in 2006.

Further, Drs. Madden and Vekker improperly include transfers a POA makes to him or herself. Such events appear as transfers in the data, but actually occur under certain circumstances such as when an FA changes offices, so these records should be dropped.

The final problem with Drs. Madden and Vekker's analysis in Table 14 is with the method they use to assess statistical significance. In their other account transfers studies, they utilize a statistical technique called a "Tobit" model in order to handle data with large proportions of "zero" data. On page 30 of their report, which discusses their analysis of account transfers, they point out the reason why the Tobit approach is the correct method to use in the analysis of account transfers:

> "The technique that labor economists commonly use to evaluate such processes is called a censored regression estimation method (also known as a "tobit regression"). Economists commonly use the censored or tobit regression technique when the variable to be explained, in this case, the value of all assets transferred over the year to a broker or the value of the production credits on the assets, include many observations for which the variable is equal to zero and others with a continuum of values. We use the censored regression technique to analyze whether there is any difference in the value of transferred accounts by race of broker recipient."[18]

They do not use this method in the Table 14 POA transfers study. Exhibit 2 shows how skewed the distribution of transfers is, with a mass of observations at zero and a long "tail" of non-zero transfers. It is clear that the Tobit model is the technique they should have used in Table 14.[19]

Fixing the "zero" data errors, the "zero office" restriction error, dropping transfers in which an POA transferred accounts to himself or herself, and using the Tobit approach, with no change to the concept or nature of the practice under study, entirely changes the conclusions drawn from this

---

[18] Madden and Vekker, p. 30.

[19] Because the data are so skewed, Madden and Vekker could either have bootstrapped confidence intervals or run a tobit model. In analyses characterized by "marked positive skewness," such as is present in the transfer data where there are many zeros and a long "tail" to the right, Cochran (1977) proposes a guide to the sample size necessary to make the normal distribution (and therefore the use of the t-test) approximately correct: $n > 25 * G^2$ where G equals Fisher's measure of skewness. The greater the skew, the greater the required sample size needed to justify using a t-test. Based on their data, Drs. Madden and Vekker would need a sample size of more than 400,000 observations on whites; they have only 89,964 observations. Cochran, W. (1977), *Sampling Techniques*. Third Edition. New York: John Wiley and Sons, p. 42. .

analysis. This is shown in Exhibit 3. For months one through 28, there are no statistically
significant shortfalls in transfers to African American POAs. In month zero, there is a small
difference, so small in fact, that changing just two African American POAs from real zeros to just
$1 in transfers in that month eliminates the statistical significance in that month. Their own
analysis of POA account transfers, conducted on accurate data and using the correct technique,
thus evidences no bias toward African American POAs.

Drs. Madden and Vekker also fail to point out that in proportion to their total assets,
African American POAs receive similar amounts in transfers, regardless of source, as their white
counterparts. Exhibit 4 shows the percent of total assets that come from transfers for African
American and white POAs. African American POAs consistently have the same or higher
proportion of their books of business originating from transfers. The exhibit indicates that over the
course of their career in the POA program, there is no inequality in transfers, relative to
production.

As noted, Drs. Madden and Vekker use transfers as their primary example of the "ways that
Merrill Lynch management affects the opportunity to generate production credits."[20] The reality,
however, is that their analysis of transfers, when elementary analytic errors are corrected, does not
itself provide any evidence of bias against African American brokers.

Madden and Vekker's Pooling Analyses

Drs. Madden and Vekker also claim that their pooling studies demonstrate bias against
African American brokers. Once again, critical flaws in their work cause these studies to fail –
they do not demonstrate bias against African American brokers.

---

[20] Madden and Vekker, p. 5.

Pooling is a phenomenon whereby brokers voluntarily form joint business arrangements, contributing some or all of their assets to form larger combinations referred to as "pools."[21] These pools are frequently comprised of two brokers, although there are many pools involving more than two brokers.

In addition to technical problems described below, Drs. Madden and Vekker have not modeled the actual pooling process because there is no manager-driven pooling policy to model. While managers may approve pools proposed by FAs who wish to form a pool, managers are not responsible for creating pools.[22] According to the record and to the work of Dr. Outtz, voluntary actions of FAs drive pool formation.[23] Modeling pooling behavior thus means modeling the individual decisions made by FAs; Drs. Madden and Vekker do not address these decisions by FAs.

Drs. Madden and Vekker's approach to pooling as summarized in their Table 9 is as follows: they compare the percentage of African Americans participating in pools to the percentage of whites participating in pools in that year and identify a statistical shortfall using this comparison, and conclude that this disparity is consistent with the exclusion of African American brokers from pooling opportunities due to their race. They do not attempt to demonstrate how pooling at the individual level is an employment practice driven by Merrill and its managers. Nor do they consider the logic of pooling.

Even assuming aggregated data could reflect the nature of a practice that is highly individualized, a critical flaw in Madden and Vekker's pooling analysis is that they compare the proportion of African American brokers *present* over the years 2001 through 2006 (the reference,

---

[21] Outtz, p. 17; MLE-DETROIT 02100 000(483-500); MLE-DETROIT 02100 000(501-503).

[22] With the possible exception of the Associate POA program, which began in 2006, and which pairs POAs with FAs. MLE00178-001416, MLE00028-000(785-792).

[23] Deposition of William Philip Sieg, June 1, 2007, p. 65-66; Outtz, p. 18.

14

or incumbent group) to the proportion of African American brokers *participating* in pools during that same period (the pool member group). Many pools, however, were formed before 2001, at points in time when the proportion of African American FAs at Merrill was lower.[24] Drs. Madden and Vekker have a timing mismatch: they are comparing participation in pools during the data production period to a benchmark that was not formed during that same period of time. This error is analogous to comparing promotions in a particular year to a benchmark from some other year. It is technically wrong. Furthermore, the timing mismatch in their analysis biases their findings towards "finding" that African American FAs participated in pools at lower rates than expected. This bias results because representation of African Americans among FAs was 1.6 percent as late as 1997 and was close to 2.6 percent by 2006.[25] The correct approach to studying pooling, which I demonstrate in detail later in this report, is to examine pool-joining behavior *during the data production window*.

With no viable POA account transfers analysis and no analysis of pooling behavior that studies the impact during POA, Drs. Madden and Vekker are left with no explanation for the gap in compensation with which they begin their report. They do not point to any evidence related to policies and practices in place at Merrill and fail to consider circumstances involving managerial discretionary decision-making. As mentioned above, they could have studied other areas in which Merrill and/or its managers might exercise discretion, such as starting salary, length of service rollbacks[26] and forgiveness of excess salary draws,[27] but they did not.[28] Because I show that none

---

[24] For example, African Americans were 1.6 percent of all FAs in 1996 and 1997 but were 2.1 percent of FAs in 2002. Trend FA Headcount, MLEE 060 048917.

[25] See MLEE 060 048917 and PCHR Management Support and Analysis, MLE 00799-000192.

[26] Length of service (LOS) is incorporated into the compensation rate grid. Low LOS brokers are given a more generous payout, so rolling back LOS can positively affect pay. The plaintiffs' November 2006 complaint specifically alleges bias in this practice (p. 5).

of the internal policies over which managers at Merrill have some discretion and I have data are unequal, I consider what factors external to Merrill explain the observable surface gap in compensation between African American and white FAs?

## 5. What Evidence Supports the Concept That Externally Caused Differences in Access to Wealth is a Crucial Omitted Variable in Madden and Vekker's Analytical Approach?

Dr. Fernandez's report documents the large differences in wealth between African American and white households in America. He also describes how in this country, the racial composition of the social networks of African Americans and whites are homophilous by race. As a result of my analysis below, I conclude that the evidence is consistent with the notion that African American FAs possess lower access to wealth than white FAs. This phenomenon is completely external to Merrill. Lower African American FA access to wealth leads to differences in *self-generation* of accounts (those accounts initially brought to Merrill by POAs and FAs themselves).[29] I demonstrate briefly below the nature of differences in access to wealth – a more detailed presentation follows in a later section of the report.

Exhibit 5 depicts the percentage of self-generated assets for African American POAs relative to white POAs month by month. A figure of 100 percent indicates that African American and white brokers generate the same number of dollars. Note that early in POA, African American

---

[27] It is possible for a broker to receive more in salary than he or she earned based on production credits. The excess amount carries forward. If the broker earns more than his/her salary in the following month, the amount above salary can be used to offset the carry forward. It is within the discretion of managers to forgive the carry forward amount.

[28] I analyze these practices elsewhere in this report and find no disparity between African American and white FAs.

[29] Self-generated assets are determined by assessing the month-to-date value of all assets originated by a particular broker, irrespective of whether the broker continues to manage the assets during the month in which they are measured. Assets originated in pools are credited to brokers based on their current value in accordance with the broker's pool credit percentage at the time the assets were originated.

16

POAs self-generate only 30 percent as much as white POAs; by month 24, they still self-generate 54 percent relative to white POAs.[30] Given the immediate emergence of this pattern, it is difficult to see how Merrill could have been responsible for it.

Evidence that the differences in self-generation result from the types of forces identified by Dr. Fernandez is reflected by geographic and wealth patterns for African American and white brokers at Merrill. In order to conduct this study, I requested and received data on the address of each Merrill customer.[31] Using this information, I located Merrill's customers geographically and identified them as customers of white or African American FAs. Using publicly available Census data, I then computed the African American percentage of residents present in the various areas served by African American and white FAs.[32] Using the Merrill data, I then computed the average invested wealth of the Merrill customers in these various geographic locations. From these building blocks, I am able to compare the wealth and race dimensions of the customer bases for both African American and white FAs at Merrill.

As an illustration, the maps in Exhibits 6 to 9 show the data for Chicago, Washington DC, Detroit, and Atlanta. The top map in each exhibit highlights high wealth households in the metropolitan area, i.e., areas for which the average household account size is $1 million or more.[33] The dark areas of the middle map indicate areas in which a highly disproportionate share of

---

[30] Part of the early growth in the ratio is because poor performing POAs leave Merrill. After about 15 months, as attrition slows, the ratio remains relatively flat.

[31] The exact address was not given to me. Instead, I have data at the hundred block level, which allows me to pinpoint with high accuracy where the account originates from. The publicly available data used to identify racial and wealth measures is available at the block group level.

[32] The Merrill address data was linked to U.S. Census data on the number of residents of different races occupying each particular hundred block. These frequency counts were used to calculate the proportion of African American residents residing in the hundred block. The Census data is a nationally representative and comprehensive data set covering all 50 states, collecting data on demographics, income and housing characteristics. It is the only publicly available data set with a sample size large enough to provide estimates for small geographic areas, such as the block level, for the entire country.

[33] Twelve percent of households at Merrill are valued at $1 million or more. These households account for 75 percent of Merrill's total asset holdings.

account holders (households) at Merrill work with African American brokers. The dark areas of the bottom map use Census data to indicate areas with high concentrations of African American households. These maps indicate that African American brokers in Chicago, for example, service areas of Chicago that are simultaneously lower in wealth and higher in the percentage of African American residents.

The empirical findings for self-generation and the geographic race/wealth locus of clients by race of broker are consistent with Dr. Fernandez's opinions regarding access to whites of African Americans generally in America. Based on these results, I conclude that Drs. Madden and Vekker have missed a key explanatory factor for the large differences in compensation they report.

Dr. Outtz, who is a recognized expert in job analysis, has produced a report in this case that describes at length the various factors that relate to the productivity of an FA.[34] As noted above, one of the key factors he identifies is access to wealth. Based on his report, it is clear that a critical criterion of FA productivity that contributes to success as an FA is an ability to tap into a set of contacts in order to generate assets. Plaintiffs mention this in their legal papers.[35] The record also reflects the importance of access to wealth to success as an FA.[36] Even a casual look at the many

---

[34] Outtz, pp. 27.

[35] See, for example, the plaintiffs' Responses and Objections to Defendant's Third Set of Interrogatories, p. 9: "Several of Merrill Lynch's most senior executives have testified that the reasons African Americans have lower production is that it is difficult for African American FAs to cross racial boundaries *and* that whites have greater access to wealth." This example illustrates the issue; below, I analyze this phenomenon in more detail.

[36] For example, a job description used in the recruiting process for FAs states the following:

"The Financial Advisor position is highly entrepreneurial and involves extensive client development, prospecting, and consultative selling. Financial Advisors listen to their clients' life goals and objectives and leverage the power of Merrill Lynch to develop financial plans that help them get there…. Initial training experiences will give you a foundation of financial planning skills and prepare you for the Series 7 General Securities Exam. In addition, our Paths of Achievement program provides comprehensive training over five years to develop exceptional client advisory skills in the investment process, balance sheet management, estate planning, and other competencies to serve a broad range of clients. We offer a generous base salary plus cash incentives from day one, even as you earn your licenses and build your business. In addition, you will be able to participate in our industry leading compensation and benefit programs and have the potential for equity participation in the growth of our firm." (MLEE 058 000207)

mass market books devoted to explaining the ins and outs of being a financial advisor stress the importance of access to wealth and networking. [37]

Further evidence of the importance of sources of wealth for FA productivity is found in a survey Dr. Outtz conducted of a representative sample of FAs. In it, he asked FAs to identify which methods from a list of 13 techniques were effective means of generating a book of business in their first two years at Merrill. Almost all of the respondents identified that various types of social networking were important (building on prior client relationships, family ties, referral solicitation and social prospecting).[38] Failing to consider this crucial job-related, externally generated, non-discriminatory factor renders the conclusions of Drs. Madden and Vekker unreliable and biased.

---

It is also clear from depositions taken in the case that both Merrill management and plaintiffs agree on key aspects of the FA job:

"The primary value added most of our financial advisors deliverance, first and foremost, is a relationship with wealthy individuals, people who tend to have more wealth rather than less wealth and people who tend to have more complex financial needs than less complex financial needs. That relationship and bond of trust and confidence allows the client to be receptive to a whole host of advice, guidance, products and services, and the primary vehicle for delivery of all of those is the financial advisor and the relationship or the team of financial advisors and the relationship as the case may be and the relationship between that financial advisor and the client. [...]In my hypothetical, people who are part of a community who have personal relationships who extend those personal relationships into their business relationships, and through those relationships built a book of business. " – Deposition of E. Stanley O'Neal, November 1, 2006, pp. 130, 163 and 164.

"My position is that relationship building is a very important part of what a financial advisor needs to be able to do, and I would define "relationship building" as, first of all, having a group of people through which – through some form of prospecting or social networking or conducting seminars, or things like that. That you are able to garner a first meeting; that you are then able to present what Merrill Lynch does; that you are hopefully able to begin the financial planning process; hopefully analyze their current position; analyze their goals; begin to formulate some version of a financial plan; open a relationship and have that be a very long term relationship." – Deposition of William Philip Sieg, Dec. 1, 2006, p. 30.

"Because you have to work, you have to build your business, you have to bring in clients, you have to go through a process before you could even – before this grid application even becomes applicable." – Deposition of Mark E. Johnson, March 21, 2007, p. 82.

[37] Examples include W. Lloyd Williams, *Attract Clients: A Financial Advisor's Guide to Building and Running a Practice*, Canada: Kutsuro Press, 2006, and Peter and Katherine Vessenes, *Building Your Multi-Million Dollar Practice*, Chicago: Kaplan Publishing, 2005.

[38] Outtz, pp. 21-22.

I turn next to a closer look at Madden and Vekker's analytical approach to compensation.

<u>The Madden-Vekker Human Capital Approach Ignores Differences in Valuable Job Related Initial Stocks of Labor Market Capital, and Relies Upon Irrelevant and Missing Variables</u>

Based on their unsupported assertion that "employer-provided complementary inputs" are unfairly distributed, and with no reference to the qualifications of the job, they move to the use of the textbook version of the human capital approach:[39] They argue that: "The theory focuses upon the investments that individuals make that increase their skills and thus make them more productive.... Therefore, human capital theory leads us to some common sense conclusions. If one individual has more [formal] education, or more experience at Merrill Lynch, or more experience as a broker, he or she is likely to be more productive and to earn more compensation."[40] Madden and Vekker therefore decide to use as statistical proxies for their inputs to production only education and job experience. Formal education obtained in degree granting programs of instruction and prior work experience are factors that most labor economists would agree are potentially relevant when studying the earnings of many occupations. But that same human capital literature also suggests that in circumstances where other factors also bear a relationship to productivity, those factors ought to be incorporated as well.[41] The factors Drs. Madden and Vekker considered and used bear relatively little relationship to the employment outcomes of any FA, regardless of race, let alone permit one to discern whether African American FAs are treated differently than white FAs by Merrill.

---

[39] Madden and Vekker, p. 10.

[40] Madden and Vekker, p. 10.

[41] Haltiwanger, J., J. Lane and J. Spletzer (June 2007) "Wages, Productivity, And The Dynamic Interaction Of Businesses And Workers," *Labour Economics,* 14(3), pp. 575-602; Abowd, J., F. Kramarz and D. Margolis (1999) "High Wage Workers And High Wage Firms," *Econometrica*, pp. 251–334; Goldin, C. and L.F. Katz, "Technology, Skill, And The Wage Structure: Insights From The Past," *American Economic Review, May* 86 (1996) (2), pp. 252–257.

Notwithstanding the above, Drs. Madden and Vekker did not possess formal education data for approximately 93 percent of FAs. And for the few FAs for whom education data exists, virtually all FAs share the same level of formal education – an undergraduate college degree. Thus there is no variation in education among the FAs studied by Madden and Vekker that could serve to contribute statistically to an explanation of the substantial observed variation in compensation, irrespective of the race of the FA. Drs. Madden and Vekker's statistical backup confirms this because it shows that none of the education variables are statistically significant.

The other variable used by Madden and Vekker is quantity of industry job experience. Holding the quantity of industry experience constant in their statistical analysis also leaves unexplained most of the variation in pay among FAs. Examining only *white* FAs present for the full year 2004 with exactly eight years of FA experience reveals enormous pay variation. Quintile 1 white FAs at LOS 8 in 2004 earned an average of $441,836, while quintile 5 white FAs at LOS 8 earned $94,396 on average. Exhibit 10 depicts the compensation of *only* white brokers as a function of experience using Drs. Madden and Vekker's regression model. There is substantial variation in FA earnings at Merrill among whites, holding industry experience constant.[42]

Omitted variables *that are correlated* with included variables of interest will lead an analyst to attribute too much or too little impact to the included variables. Statisticians and econometricians call this "omitted variable bias."[43] In the human capital literature, a considerable

---

[42] In the context of the human capital approach taken by Drs. Madden and Vekker, one could view differential access to wealth as simply another type of prior experience – a type of life experience that causes some FAs, regardless of race, to possess greater access to sources of wealth than others. Dr. Bielby cites this notion in his report when discussing traits of successful FAs: "associated with circles of wealth via prior education and employment." Bielby, pp. 45.

[43] The principal of omitted variable bias can be demonstrated with the following example. Suppose a company wanted to estimate the impact of different types of fertilizer on crop yield. They collect data on yield and the type of fertilizer applied. There are two types of fertilizer – A and B. The company estimates the statistical relationship between the type of fertilizer applied and yield by using a statistical model that relates yield to type of fertilizer applied. They conclude that fertilizer A has a greater impact on yield than fertilizer B. However, suppose it turns out that for farming plots receiving fertilizer type A, greater rainfall occurred.

amount of research has focused on the biases caused by omitting important statistical determinants of earnings when conducting studies designed to measure the impact of other variables of interest on earnings.[44] Drs. Madden and Vekker have committed this important mistake, rendering their results unreliable for assessing plaintiffs' claims.

Drs. Madden and Vekker do not argue that production is irrelevant.[45] Instead, as discussed above, they assert that Merrill managers influence and control production by controlling and restricting access for African American FAs to the various inputs that generate production for FAs at Merrill.[46] This is a hypothesis subject to statistical test. Rather than testing their hypothesis, Drs. Madden and Vekker simply speculate that because of the results of their account transfer studies, which I have shown are technically and analytically wrong, other practices influencing

---

Rainfall was omitted from the statistical analysis. Would the company be correct to infer that fertilizer A was most effective? Clearly not. If rainfall was measured and included in the analysis, it may be that fertilizer B was more effective at increasing yield, holding constant other factors, such as rainfall. Thus, the analysis that omits rainfall would produce a biased finding, in that fertilizer A was incorrectly concluded to have the greater impact on yield. Instead, in that analysis, all of the observed increases in yield were attributed to fertilizer, when in fact some of the increases in yield were due to rainfall.

Another way to explain the impact of omitted variables on a statistical analysis is that if the *share* of white brokers with superior access to wealth is larger than the *share* of African American brokers with such access, combining African American and white brokers into one statistical analysis, with no wealth access control results in what statisticians refer to as a *composition effect*. The bias in such a study results from differences in the (unmeasured and unadjusted) composition of the analytical population of African American and white brokers being compared. See for example, Greene, W. (1993) *Econometric Analysis*, 2nd Edition, NY: Macmillan Publishing Company, pp. 245-248 or any basic econometrics book.

[44] Mincer, J. (1974) *Schooling, Experience and Earnings*, New York: National Bureau of Economic Research. Griliches, Z. (1977) "Estimating the Returns to Schooling: Some Econometric Problems," *Econometrica*, 45:1-22. Willis, R. (1986) "Wage Determinants: A Survey and Reinterpretation of Human Capital Earnings Functions," Chapter 10, *Handbook of Labor Economics, Volume 1*, Edited by O. Ashenfelter and R. Layard. Elsevier Science Publishers BV.

[45] "After appropriately taking account of productivity, economists generally attribute such [compensation] differences to discrimination." Madden and Vekker, p. 12.

[46] "Merrill Lynch may provide training, titles, or other enrichments that increase the capacity of an individual to generate production credits. If Merrill Lynch controls who is offered the enrichment opportunities that increase production credits and if there are racial disparities in the incidence of such offers, then this is a practice that produces racial disparities in compensation. The racial disparity in the incidence of such offers identifies the practices that created the discrimination and cannot provide a non-discriminatory basis for a racial disparity in compensation." Madden and Vekker, footnote 3, pp. 9-10.

production must also be biased against African American FAs. I tested those other inputs (for which I had data) that Drs. Madden and Vekker decided not to test and found no bias against AA.

I turn next to analysis of the Merrill data and show that this data demonstrates substantial differences between African American and white brokers in their self-generation of assets from prospective clients. The findings are strongly consistent with the hypothesis that African American brokers possess lower access to wealth than their white counterparts.

## 6. The Merrill Data Demonstrate Large Differences Between African American and White Brokers in the Self-Generation of Account Dollars

### *Early POA Self-Generation of Accounts*

The hypothesis posed is whether there exists quantitative evidence consistent with differences between African American and white FAs in access to wealth. I requested client account level information, with dollar assets per account and origination attribution of these accounts to specific POAs and FAs.

The data show immediate and substantial differences in the value of accounts self-generated by African American and white POAs. Exhibit 5, which was touched on above, summarizes these data. The figure is constructed as the average percentage of African American POA assets relative to white POAs. If self-generated assets were equal, this percentage would be equal to 100 percent. As can be seen in the figure, the percentage does not equal 100 percent, and is in fact well below that figure. In month one, before Merrill could have exerted any influence, African American POAs present in that month generate on their own 30 percent of the dollars whites present in month one generate on their own.

Looking across the figure, the ratio of African American to white dollars generated starts at roughly 30 percent initially, and then rises over time to be roughly 50 percent towards the end of

the program. Some of the rise in this ratio is a result of the very lowest performing members of each race group dropping out of the program and thus not being present as the POA program progresses.[47]

There is evidence in the Merrill data that African American and white brokers are tapping into different sources to obtain their assets – with African American sources having less apparent wealth. I described above the approach whereby using Merrill data, it is possible to identify the geographic locations from which white and African American POAs obtain their accounts. Using Census and other government data, wealth profiles are assigned to these areas.[48] Comparing measures of household wealth for areas where white and African American POAs generate their accounts reveals a substantial difference. The 75th percentile measure for the value of real estate for account areas serviced by whites is $340,657, while for blacks the corresponding measure is $268,334.[49] Accounts of white POAs are typically generated in neighborhoods where the 75th percentile household income is $165,559 while for African American POAs the figure is $114,842.[50]

---

[47] Disproportionate numbers of African American POAs drop out, which is why the ratio rises and then stabilizes. This is consistent with their relatively low self-generation when compared with whites. A later analysis in this report shows that African American and white POAs leave Merrill at similar rates, taking their asset generation into account.

[48] Publicly available data contain information related to household wealth, as well as household income by detailed geographic location. This data is utilized and superimposed on each POA's geographic book of business map.

[49] These differences and the differences in income utilized are likely to understate the true differences in access between African American and white brokers. There are two reasons for this. First, Census data are collected using what is referred to as top-coding. If Census respondents' incomes or real estate values are above $200,000 or $1 million respectively, the Census simply records these figures rather than the true figures. Second, these differences do not reflect possible within-location differences in wealth access by race. Based on the homophily opinions of Dr. Fernandez, it is likely that within each geographic location, white brokers continue to enjoy greater access to the white wealthy households *relative to* African American brokers. I have not accounted for that here.

[50] A common way to characterize geographic areas is by average or median household income or property values. However, Merrill is not targeting median income households, but rather wealthy households. Thus, I characterize households' geographic areas by their 75th percentile of household income or property values in order to focus on the high end of the distribution as the natural target for investing. Welniak, E. and K. Posey,

Based on the opinion of Dr. Fernandez, I hypothesize that white and African American FAs in general obtain accounts from areas with differing racial characteristics. To test this hypothesis I examined the racial composition of the areas from which white FAs and African American FAs obtained their accounts.

Next, racial characteristics were assigned to each household account held at Merrill using U.S. Census data, Merrill customer address information, and specialized geo-coding software.[51] At the third month in POA, each POA's self-generated book of business was compared to the demographics of the neighborhoods where the accounts were originated. Results show that the initial clients acquired by African American POAs were more than *four times* as likely to be African American when compared to white POAs. By assigning racial probabilities to POA accounts I find that an average of 24 percent of African American POAs' assets are estimated to have been obtained from African American clients (see Exhibit 12).[52] In contrast, white POAs are estimated to generate approximately six percent of their business from African American households.

---

(June 2005) "Household Income: 1999," U.S. Census Bureau: C2KBR-36. These figures are weighted by the relative concentration of brokers present in each geographic location. In addition, looking at the percentage of households with stated values at or above $500,000, $750,000, and $1,000,000 shows that in each case, the percentages for white POAs' geographic areas of self-generation are approximately double that for African American POAs. See Exhibit 11.

[51] Each customer household was assigned a U.S. Census tract and 'hundred block' unit based on customer address information provided by Merrill. With the assistance of geo-coding software, the address data was linked to frequency counts of the number of residents occupying each particular hundred block. These frequency counts, broken out by race, were used to calculate the proportion of African American residents residing in the hundred block. The frequency counts for Census-defined income groups were also linked to the households and the median and 75th percentiles were computed based on the counts provided.

[52] The household address data produced by Merrill does not contain the race of the household. I cannot know with certainty the race of a particular household. I do know the race composition of the local neighborhoods where these households reside. Therefore, if a given neighborhood is 15% African American according to the Census data, I assume that the account in question has a probability of 15% of being African American. Given the racial homophily opinion of Dr. Fernandez, this approach is likely to understate the true extent of the racial differences between African American and white clients, since the same forces that cause African American and white POAs to derive assets from different locations would also be likely to apply *within* each location.

This is an important because it is also true that as the concentration of African American residents in a given area increases, median household account size decreases. As shown in Exhibit 13, the median value of the household assets invested at Merrill in neighborhoods with under one percent African American population was $133,000. Moving to neighborhoods with four to five percent African American residents results in a decline in median household account values of approximately $28,000.

As the population density of African American clients in a particular geographic area rises, the median value of the assets per-household invested with Merrill declines. Households originating from areas with 50-100 percent African American populations are valued between 22 percent and 45 percent of the value of households from high-density white areas. This finding is consistent with the broader opinion of Dr. Fernandez, which concludes that there are significant differences in the distribution of wealth between African Americans and whites in America.

Exhibit 14 represents the concepts visually. The chart shows the two dimensions of wealth and racial composition and locates African American and white POAs in that space. The vertical axis represents the average property value of the Census blocks serviced by each group, while the horizontal axis represents the average racial composition of the hundred blocks. The circles are based on the African American and white POA account locations across all of the hundred blocks that they service. Focusing on household wealth, the 75th percentile for the average hundred block serviced by African American POAs is less than for white POAs. Concurrently, the average hundred block serviced by African American FAs has a higher percentage of African American residents. Recall that the households studied in this chart are those that were self-generated and personally acquired under management in the first year of each POA's career.

26

The results of my analyses are consistent with a hypothesis that access to wealthy clients differs along racial lines. African American POAs are more likely to acquire their business from locations containing a higher proportion of African American residents and residents of these areas tend also to have lower levels of wealth. This fact manifests itself in two observable outcomes: 1) a typical African American POA's book of business is disproportionately comprised of households located in less wealthy areas and, 2) the level of self-generated assets for the typical African American POA exhibits a shortfall relative to his or her white counterpart.[53]

### Early POA Differences Between African American and White POAs in Self-Generation of Assets Persist Into the Future

The early differences between African American and white POAs are highly predictive of future success at Merrill. Of those POAs who were in the top 25th percentile of asset self-generation during early POA, 99 percent remained active at the sixth month mark (see Exhibit 15). In contrast, 22 percent of POAs in the bottom 25th percentile had left the program within six months. By the end of the program, POAs that were in the top 25th percentile at the third month were three times more likely to have remained at Merrill. Among these early high performers,

---

[53] One can also examine the patterns of account acquisition between differently performing whites and find evidence of differential access to wealth among them. For example, one can compare the top and bottom groups of white early career FAs and see that low performing whites, much like less successful African American POAs, lack inroads into a wealthy base of clients. By classifying households into six groups based on the real estate value of the areas where they reside, Q5 whites are found to consistently acquire accounts of smaller value. For example, among households residing in areas with a 75th percentile real estate value between $400K and $500K, the average household account obtained by Q1 POAs was nearly twice as large ($433K in assets for Q1, compared to $226K for Q5). Q5 white POAs exhibit a statistically significant shortfall compared to Q1 whites POAs across all six of the real estate value groups. By the 24th month of POA, Q5 whites' level of self-generated assets is only 54 percent of the assets generated by their Q1 counterparts, suggesting that POAs at Merrill who are less able to access wealthy clients are more likely to be in the lower quintiles, regardless of their race.

27

there is no statistically significant difference in the level of attrition between African American and white POAs (see Exhibit 16).[54]

As summarized in Exhibit 17, early self-generation of account assets is also positively correlated with the quintile ranking a POA achieves by the 24th month after starting the POA program.[55] POAs that place in quintile one at month 24 had self-generated an average of 2.5 times as many assets by the third month of POA as those that placed in quintile five.[56]

In addition to African Americans, Dr. Fernandez's report discusses Hispanics and Asian Americans.[57] Hispanic and Asian American brokers can also be examined with respect to the wealth/race locus of their accounts. Exhibit 18 depicts the wealth/race breakdown for Hispanic compared to white brokers, while Exhibit 19 depicts Asian Americans compared to white brokers.[58] On both charts, it is evident that when compared to white brokers, Hispanic and Asian American brokers draw their Merrill clients from areas more heavily populated by Hispanics and Asian Americans, respectively. Notably, Asian American brokers tend to get their clients from areas that are of slightly higher wealth than the areas from which white FAs get their clients. This finding is consistent with the figures reported by Dr. Fernandez – "While Asian Americans are a

---

[54] Among low performers, there were also no statistically significant differences in attrition between African American and white POAs.

[55] The 24th month is used because that is when many POAs graduate from the program. POAs can graduate early if they are particularly successful in gathering assets; they are included in this analysis as graduates.

[56] Moreover, since this analysis is limited to those POAs who were still active at the 24th month, it excludes the poorest performing POAs who dropped out before their second year of service. If they are included, the asset disparity between the top and bottom groups would be more pronounced.

[57] See for example, Fernandez report tables, as well as discussion on pp. 4-12.

[58] The sample studied is limited to states with significant Hispanic and Asian populations. For Hispanics, this is Hispanic and white brokers in California, Texas and Florida; for Asians, Asian and white brokers in California.

small proportion of those with high financial net worth, in contrast with the other groups [and similarly to whites] their proportion of the population increases as one goes up the wealth scale."[59]

### *The Correct Approach to Studying the Merrill Data Requires Taking into Account Measures of Employee Productivity*

The evidence discussed above indicates that there are important causal factors of the observed compensation differential between African American and white brokers that are external to Merrill. These factors were not considered by Drs. Madden and Vekker. I find below that when measures of production are considered in the statistical analysis and specifically, early POA measures of self-generated production, the pay disparities between FAs disappear. Furthermore, controlling for production also eliminates disparities in a number of other studied employment practices. If Merrill and/or its managers were treating African American FAs as an "outgroup," as Dr. Bielby posits, why would having any particular level of production help African American FAs with any of these other employment practices at Merrill? His theory suggests that one should see statistically significant racial disparities in employment practices, even *after* controlling for production. I do not find any evidence of this in the Merrill data.

## 7. Compensation

Human capital theory, as well as an extensive empirical literature, is clear: to understand differences in labor market pay, one must focus on productivity. Drs. Madden and Vekker agree with this point.[60] As shown above, there are immediate and substantial differences in the POA

---

[59] Fernandez, p. 15.

[60] As they point out: "Economists expect that compensation will vary with the productivity (i.e., individual efficiency in producing the desired output) of workers. "True" individual efficiency in producing is difficult to isolate for brokers, however, because numerous intermediate or complementary inputs provided by the employer such as office size and quality, number and quality of support staff, job title, access to teams and partners, and access to mentors also determine the observed number and quality of clients brought in by brokers of any given level of *individual* productivity (i.e., a combination of the individual's natural talent and

program indicating that African American brokers obtain substantially fewer assets through self-generation. I have also shown how those early differences are correlated with later performance. The evidence presented in the preceding analyses indicate that the observed differences are consistent with differences in social network access to wealth established prior to employment at Merrill.

Compensation can be studied by taking into account the early POA differences in asset generation as a proxy for differences in access to wealth. The results show that there are no statistically significant differences in compensation between African American and white brokers, taking their *early self-generation* differences into account. This finding is directly contrary to the speculative conclusion reached by Drs. Madden and Vekker, which is that the substantial surface differences in compensation are caused by Merrill. My finding is consistent with the notion that differences in access to wealth, which are external to Merrill and correlate with race, explains observable differences between African American and white FA earnings.

### *Compensation for Similarly Situated Workers*

Given the production window of the data in this case, self-generated accounts attributable to an FA can only be clearly identified for FAs who started their employment in the data production period; while I can identify newly self-generated accounts among older FAs, I cannot identify the source of accounts they were holding at the beginning of the data production window.[61] Thus, the analysis is performed for early career brokers. I begin my analysis by running the Madden and Vekker model on the subset of FAs for which I have the data necessary to also

---

effort). The challenge, then, is to sort out the effects of *individual* productivity from the effects of the employer-provided complementary inputs on productivity." Madden and Vekker, pp. 9-10.

[61] Many early career FAs in 2001 began their careers in prior years and so I cannot identify their self-generated assets. Rather than analyze very few FAs in that year, the analysis begins with 2002.

perform statistical analysis taking PCs originating from self-generated assets into account. The results are consistent in this sample to what Drs. Madden and Vekker found for all FAs, showing large and statistically significant disparities in African American pay (see Exhibit 20). As seen in the table in the row entitled "Coefficient on African American," these annual pay disparities range from 31 percent to 55 percent less for African American FAs than for white FAs over the period studied.

I note that a crucial omitted statistical factor in Madden and Vekker's approach is pre-Merrill differences in access to wealth. Access to wealth is exogenous to Merrill, but is directly associated with productivity as the data summarized above show. One cannot, however, simply control for production under the assumption that it is therefore unbiased. Yet, there are no direct measures of access to wealth. In the absence of such a direct measure, I perform a compensation analysis that controls explicitly for self-generated production as a *proxy* for differences in access to wealth. There is an econometric method designed to address this type of circumstance.

Labor economists typically use a technique called Instrumental Variables to address this class of problems. The idea is that the problematic independent variable, *i.e.*, total production, is suspected to be improperly correlated with another independent variable of interest, *i.e.*, race. The technique replaces actual total production with its predicted value (called its "instrument"), where the prediction for the possibly "tainted" total production variable is based on "untainted" self-generation variables. Intuitively, it is a "but-for" exercise: what would FA production be in the absence of possible biased influence by Merrill, based on analysis of other known, untainted variables?

Typically in an econometric analysis, it is difficult to find untainted variables that are predictive of the assumed tainted variable, but do not also belong directly in the statistical analysis.

31

In this case, however, I have exactly such a measure: PCs based on self-generated assets. Self-generation is largely out of Merrill's control. This makes self-generated PCs an ideal candidate for Instrumental Variable techniques.

The analysis of compensation then proceeds in two stages. Total production is predicted using self-generated production ("stage one") and this prediction is then used as a control variable in the pay regressions ("stage two") to study statistical differences between African American and white FAs in their pay. When I do this, there are no instances where African American total compensation is statistically significantly different from whites – in some years it is slightly above, in others, slightly below. Exhibits 21 and 22 contain the results of applying the Instrumental Variables method to studying the difference in compensation between African American and white FAs.

Exhibit 21 replaces total production with the value of total production that is predicted by overall self-generation. In no case is there a statistically significant difference between African American and white FA compensation and the R-squared figures are much higher than in the Madden-Vekker models with no production control. The race coefficients range from -2.6 percent to +2.8 percent and are not statistically significantly different from zero.

This technique can also be applied using only *early POA* self-generation, that is, POA month three self-generated production. Turning to Exhibit 22, there are again no statistically significant differences in compensation between African American and white FAs. The coefficients range from -4.4 percent to +16.2 percent. These results are striking: controlling only for early POA PCs from self-generation of assets, the large and statistically significant shortfall in African American FA pay that is observed using the Madden and Vekker approach disappears. Since early POA self-generation is not under the control of Merrill, these statistical results are

inconsistent with the notion that Merrill causes the substantial disparities in African American and white FA earnings.

### There is Enormous Underlying Variability in the Compensation of FAs

FA earnings are striking in their variability: two FAs with identical years of experience can have enormously different earnings levels. For example, Quintile 1 white FAs with 8 years LOS in 2004 earned an average of $441,836, while quintile 5 white FAs at LOS 8 earned $94,396.

The Census Bureau publishes statistics by occupation on earnings for full-year, full-time workers. As a measure of earnings variability, they compare the difference in earnings between the 75th and 25th percentiles to the median (the 50th percentile).[62] The higher the ratio, the more spread out are earnings. For full-year, full-time workers in the economy, across all occupations, the figure is 0.85. When I calculate the same figure for FAs at Merrill, and restrict to white FAs, the figure equals 1.21, which is 43 percent higher. Consider that the economy-wide number is just that, a summary measure aggregated across *all* occupations, industries, and localities. In contrast, the FA estimate is for workers in the same occupation, the same industry, and the same company, and yet there is much larger variability in their earnings.

High dispersion in earnings is inherent to the broker occupation. Drs. Madden and Vekker note the fanning out of the pay differential gap between black and white FAs.[63] They imply, but do not directly state, that this phenomenon is somehow due to Merrill. However, it is a standard finding in the empirical human capital literature that, as a function of different initial stocks of human capital, age earnings profiles fan out over time.[64] In this case, one can analogize to

---

[62] Weinberg, D. (May 2004), "Evidence from Census 2000 about Earnings by Detailed Occupation for Men and Women." *Census 2000 Special Reports*. CENSR-15.

[63] Madden and Vekker, p. 23.

[64] Huggett, M., G. Ventura, A. Yaron (2006) "Human capital and earnings distribution dynamics," *Journal of Monetary Economics,* 53, pp. 265–290; M. Huggett, G. Ventura, A. Yaron (2007), "Sources of Lifetime

differing initial stocks of "access to capital." Referring back to Exhibit 10, which is generated for white FAs only, using Drs. Madden and Vekker's statistical compensation model, demonstrates that the same fanning out occurs among whites, just as human capital theory would predict.[65] Nothing about the chart relates to Merrill's actions – it is a phenomenon implied by the human capital model.

There is also observed significant variability in FA earnings across offices. Exhibit 23 shows the mean, 10th percentile and 90th percentile earnings for full-year FAs by office. Without knowing more about the local circumstances in each office, it is impossible to determine what drives such extensive variation.

Focusing only on average earnings among FAs obscures the fact that broker earnings variability is substantial.

### Summary of Compensation Studies

It has been demonstrated that there is a crucial omitted variable in the analysis of compensation performed by Drs. Madden and Bielby. The significance of this variable, access to wealth, for the Merrill context is supported by the opinion of Dr. Outtz. Clear evidence of its

---

Inequality," National Bureau of Economics Working Paper Series, No. 13224; Smith, J. and F. Welch (1979) "Inequality: Race Differences in the Distribution of Earnings," *International Economic Review* 20, 515-526; A. Deaton and C. Paxson (1994) "Intertemporal Choice and Inequality," *Journal of Political Economy* 102, 437-467.

[65] There is a similar issue with the Madden and Vekker finding that in some years, the racial pay disparity is wider among brokers who spend their careers at Merrill (Madden and Vekker, p. 15). Again, this is a standard labor market phenomenon that has nothing to do with Merrill. Competitive hires are not selected at random from other firms. It is well known that voluntary movements from one firm to another in an industry, much like voluntary migration of peoples around the world, is a highly self-selective process. Jovanovic, B. (October 1979) "Job Matching and the Theory of Turnover," *Journal of Political Economy.* 87, no. 5, pt. 1, pp. 972-90. Mortensen, D. (1986) "Job Search and Labor Market Analysis," Chapter 15, *Handbook of Labor Economics*, Volume 1, Elsevier Science Publishers. Lane, J. and M. Parkin (1998) "Turnover in an Accounting Firm," *Journal of Labor Economics* 16:4, pp. 702-717. The most successful workers are often recruited heavily and paid handsome up-front amounts in order to induce their movement. See for example, Milgrom and Roberts (1992), p. 366. If one were to study the Merrill brokers who join other firms, one would likely also find that this self-selected group did better at their new firm than the incumbents at that firm.

existence and extent is found in the Merrill data. Incorporating this factor via early POA self-generation into the compensation analysis demonstrates that there is no statistically significant difference in compensation between African American and white brokers at Merrill. The balance of this report will go on to study a variety of additional employment practices at Merrill, some of which Madden and Vekker study, and others which they do not. None of these practices are found to evidence statistically significant differences between African American and white brokers.

## 8. Other Practices and Policies

### *Account Transfers*

**Response to Aggregated Account Transfer Analysis**

I have discussed above the problems with Drs. Madden and Vekker's Analysis of POA transfers by month. That analysis contains numerous data and technical errors, which once corrected, do not show that African American POAs received statistically significantly fewer transfer dollars than white POAs. Note that in the corrected version of Madden and Vekker's Table 14, I used no statistical controls. Their analysis fails due only to technical mistakes they made. I also showed that African American POAs self-generate substantially fewer assets than white POAs and that their share of transfers relative to the overall total of their assets is the same.

**Response to Madden and Vekker ADP Account Transfers Analysis**

Drs. Madden and Vekker also produce analyses of ADP transfers and claim to find large and statistically significant differences between African American and white brokers. However, just as there are no statistically significant differences in *total* account transfers between African American and white POAs, there are also no differences when I restrict the analysis to ADP transfers. Based on their Table 7, Drs. Madden and Vekker argue that African American FAs and POAs receive lower value ADP transfers in terms of asset value as well as PC generation.

35

However, the policy itself considers office rank, which Drs. Madden and Vekker ignore. On the basis of finding fewer transfers using this "rank-free" analysis, they conclude that local managers act with bias towards African American brokers. The relevant test to address this question is whether African American brokers are treated differently, *taking the rules of the policy into account*. That is, do managers, having the discretion to do so, apply the rules of the policy in favor of white FAs?[66] As demonstrated below, once rank is taken into account, there is no statistical evidence that managers favor white brokers.

Madden and Vekker's ADP analysis also contains a number of technical mistakes which make their conclusions unreliable. There are three major technical flaws: 1) inconsistent estimation of standard errors, which are critical to assessing statistical significance; 2) inclusion of offices not containing African American FAs; and 3) an incorrect assumption that transfers are appropriately analyzed at the complex, as opposed to the office level.

In their Tables 7 and 8, Drs. Madden and Vekker analyze yearly and monthly total ADP account distributions received by each FA (and POAs in one version of the analysis) from house accounts and from departing FA brokers.

In their ADP studies, Madden and Vekker selectively use the correct statistical methodology to account for data records that are related. When groups of records in data are related, the data are described as "clustered."[67] In this case, there are often multiple ADP account transfers in the same month or in different months to the same individual. Transfers to a specific individual in a given month or across months are likely to be related to each other (for example, transfers are of clients, and one client may have several accounts). There are mathematical

---

[66] See, for an example of how accounts are distributed, MLEFIFTH0348-0000(572-574).

[67] For example, if one were studying six years of pay for a single group of employees, one year for each employee, then there are clusters of size six for each employee. The information from each year for an employee is not independent of the other years.

36

techniques that take clustering into account. If clustering is not taken into account, the impact is that measures of statistical significance are overestimated. "Valid statistical inference requires obtaining standard errors that control for clustering."[68] For no reason that is noted by them, Madden and Vekker use the clustering adjustment in six of the studies underlying their Table 7, but inexplicably fail to use it in two of these analyses. This has the result of substantially increasing their reported levels of statistical significance.

Drs. Madden and Vekker also examine ADP transfers within office complexes. This is not appropriate. Merrill's policy calls explicitly for transfers of departing broker accounts based on rank within an *office*, not an *office complex*.[69] Ninety-seven percent of ADP transfers occur within specific offices. Even if office complex was the correct business unit for account transfers, Drs. Madden and Vekker do not correctly restrict the data and erroneously include office complexes without any African American FAs in the relevant period. The impact of this mistake serves to overstate the extent to which transfers go to whites.

By accounting for the clustering issue and removing account transfer data records where there is no African American FA present in the same year, month and office, the Madden/Vekker

---

[68] Cameron, A.C. and P.K. Trivedi (2005) *Microeconometrics: Methods and Applications,* Cambridge University Press, pp. 836-837. When analyzing clustered data, which typically occurs in studies of employees over time, it is necessary to alert the statistical software that records can be related to each other. If the statistical software is not alerted to these relationships between related groups of records, the software will treat each observation as unique and independent. Multiple regression methods assume that the units of data used in an analysis are generated independently from one another and the mathematics used to compute the standard errors necessary for assessing statistical significance rely upon this assumption, unless special techniques are adopted. If that assumption is violated, there are mathematical techniques that should be used to adjust the standard errors so that accurate measures of statistical significance are obtained. When clustered data are fed to a computer program, with no warning to the computer sub-routine used, the number of unique and unrelated records that are available for analysis is overstated. The effect of this is to inflate the computer-generated measures of statistical significance.

[69] Office complex can include many individual offices which can be geographically distant from each other. For example, the complex "Southland Com" in Drs. Madden and Vekker's analysis includes offices located in Dothan, AL, Montgomery, AL, Columbus, GA and Macon, GA. Drs. Madden and Vekker's data also includes what looks like closed offices: the "WSTRN CLSD OFC" complex has offices in Illinois, Texas, California, Oregon, Minnesota, North Dakota, Alaska, North Carolina, Indiana, Wisconsin, Wyoming, Arizona and Florida, among others.

monthly transfer analyses reveal large, statistically significant *positive*, *i.e.*, *non-adverse* findings, for African American FAs. In fact, the corrected result is so large and strong that I then examined their back-up programs in more detail and discovered yet another error, which related to their office definition.[70]

Drs. Madden and Vekker also attempt to analyze the effects of the characteristics of transferred accounts on the race of the recipient FA. They analyze the effects of the characteristics of transferred accounts on the race of the recipient FA. Their strategy uses the characteristics of transferred accounts to predict the race of the recipient financial advisor. Drs. Madden and Vekker state that "Because the unit of analysis or observation is the account and we investigate the race of the recipient of an account, this analysis only examines accounts transferred to individuals...."[71] However, Drs. Madden and Vekker's prior analysis of transfers from departing brokers included transfers to both individuals and individuals through teams or pools. Also, their analysis of transfers to POAs included transfers to both individuals and individuals through teams or pools. Correcting this inconsistency produces dramatically different results.

Drs. Madden and Vekker's analysis was modified to analyze the effects of the asset value at transfer and production credits in the prior year on the race of the recipient FA but including transfers to individuals through pools (both to and from). Their results change dramatically based on this one modification. All of the coefficients for asset value at transfer and production credits in the prior year are no longer statistically significant.

---

[70] Drs. Madden and Vekker also merged on records without transfers that also did not have the individual's office. This in effect groups these brokers into one large "unknown" office, *i.e.*, as if they shared an office. When they then restricted the analysis to offices with African American brokers, this "unknown" office was included because it looked like it had both African American and white FAs.

[71] Madden and Vekker, p. 35.

Exhibit 24 summarizes the results of this modification to the Madden/Vekker analysis. The next section examines the actual Merrill Lynch ADP policy, taking office rank into account.[72]

### Analysis of the Merrill ADP Policy

Merrill office managers are responsible for administering the ADP in accordance with specific terms. Under versions of the ADP as amended from 2001 through 2006, local managers used either the "draft" method or the "assignment" method for distribution of departing broker accounts.[73] Under the assignment method, managers were responsible for distributing accounts by descending size according to the ADP ranking list. The draft method calls for accounts to be selected by the FAs themselves in the order of each FA's office ranking on the ADP ranking list. Under either policy, circumstances exist wherein managers can depart from the ranking list by, for example, deciding to bypass office rank because of particular licensure requirements, language skills, or by relying on their judgment to transfer certain accounts to particular FAs due to special relationships. In other words, discretion continues to exist at the local level, but is constrained by the guidelines of the policy.[74]

For the years 2003 to 2006, information on FA rank is available in the data produced in the case. This data can be used to compare how ADP transfers were actually distributed in an office in a given month relative to how they would have been distributed under an assignment method based

---

[72] In addition, Madden and Vekker's back-up material shows that their pseudo-R-squared figures range from 0.0078 to 0.0149. Less than one percent of the variation is explained by the model, making it largely irrelevant. In a standard regression, R-squared is the percent of total variation in the dependent variable that is accounted for by the independent variables (right hand side) of the model. It varies from 0 (none of the variation is explained by the variables) to 1, (the entirety of the variation is explained by the model). Greene (1993). *Econometric Analysis, Second Edition.* p. 152.

[73] MLE 00025-000(432-435), MLE 00031-0000(57-60), MLE 00040-00(1443-1472).

[74] See for example, MLE-FIFTH0348 0000(572-574), which shows accounts of different sizes being transferred together because the account holders are relatives.

solely on the ranking list without any deviation. This comparison used the assignment method as a benchmark and presumes that even if the draft method were used, the top-ranked FAs would choose the largest available accounts. The results of this type of analysis constitute a statistical test as to whether bias could be excluded in the administration of the ADP policy toward African American brokers, because one can compare the actual ADP accounts obtained by African American brokers to the amounts that would be obtained under an assignment method with no exceptions. If more assets are actually transferred to African American brokers than an assignment method without any deviation would suggest, then any possibility of bias inferred from this practice would have been excluded.

Looking at Exhibit 25, in 2003, there were 759 African American FAs who were in offices in months with ADP transfers. Had transfers been dispersed solely under an assignment method using ADP office rank without any deviation, African American FAs would have on average received $72,432 less than they actually did; in other words, they were $72,432 better off with the actual transfers awarded than they would have been had accounts been distributed solely under an assignment method without any deviation. Rank takes into account production measures, but it also takes other criteria into account such as certifications, net new money and household retention.[75] Plaintiffs and their experts describe Merrill's broker compensation system as "success breeds success." While there is no reason to suggest that such a system is inherently biased, it is worth comparing the ADP implications of the actual ranking criteria to a hypothetical scheme relying purely on production.[76] Given that the latter relies only upon production, it is closer to

---

[75] These vary by year. See MLE 00025–000435, MLE 00031–000060, MLE 00040–001470, MLE 00040–001463, MLE 00040–001454.

[76] Increasing rewards of employment are universally observed to follow with higher levels of performance. "Success breeds success" is not a "Merrill" system. Lazear, E. and K. Shaw (Fall 2007). "Personnel Economics: The Economist's View of Human Resources," *Journal of Economic Perspectives* Vol. 21, No. 4, pp. 91–114. Milgrom, P. and J. Roberts (1992).

what plaintiffs describe as "success breeds success." Exhibit 26 summarizes the results of comparing the ADP transfers that African American and white FAs would receive under the actual rank scheme, compared to a pure production scheme. As can be seen, African American FAs would do significantly worse if they received transferred accounts based solely on production.

### Analysis of FA and POA Pooling Arrangements

As noted above and in the depositions as well as the expert report of Dr. Outtz, pooling is a practice whereby FAs and POAs voluntarily and autonomously choose to form business arrangements which they believe will benefit themselves, and more importantly, their clients.[77] Plaintiffs claim that similarly situated African American brokers are excluded from pooling opportunities relative to their white counterparts. Drs. Madden and Vekker conclude that their statistical studies support this claim. They also conclude that their findings constitute additional statistical evidence that Merrill controls and withholds inputs that influence the generation of production credits, thereby lowering African American earnings relative to their white counterparts.

Pooling is an especially difficult practice to study using statistical methods. Pooling arrangements are essentially business arrangements, and it is likely that a number of factors influence the formation of pools. Dr. Outtz describes some of this complexity in his expert report.[78] As such, the data available is likely to omit numerous relevant factors. In the case of two potential pool members, a limitless set of different factors may dictate whether the FAs will choose to form a pool. Nevertheless, the data permit us to get some idea of the factors responsible for explaining pooling arrangements which may exist when all FAs are viewed in the aggregate.

---

[77]Deposition of William Philip Sieg, June 1, 2007, pp. 65-66; Deposition of Daniel Sontag, January 17, 2007, p. 294 and p. 296; Outtz, pp.17-18.

[78] Outtz, pp. 17-18.

Assuming such aggregation is appropriate as Drs. Madden and Vekker do, I believe it is possible to get a sense of a possible relationship of race to pooling.

### Response to Madden and Vekker's Pooling Analysis

Drs. Madden and Vekker do not approach the study of pooling correctly. In addition to failing to account for or mention the subtleties involved, they also commit technical errors in the studies that they do perform.

As noted, Drs. Madden and Vekker study whether fewer African American FAs than expected are observed participating in pools in a given year. Consequently, they compare pool participation that is the product of current *and past* FA behavior and current *and past* FA populations, against a benchmark constructed from only the *current population* of African American and white FAs and POAs. This is improper – it mixes apples and oranges. Many pools present in the "current" data were formed in past years when a different population of African American and white FAs were available as potential members. This can be seen in Exhibit 27, looking at the 12,022 pools that existed at December 2006. Less than one-quarter had formed within a year of December 2006 and could therefore be meaningfully assessed using a 2006 benchmark population. But 16.5 percent of the pools were six or more years old, meaning they formed when there was a different population of FAs "available" to form a pool.[79] Thus, the appropriate analysis evaluates the rate of pool-joining that occurs during the data production window, a period for which I have the relevant data needed to construct a correct benchmark. The relevant benchmark population of African American and white FAs for a year end analysis of who joins pools throughout the course of the year is the population of African American and white FAs,

---

[79] Once formed, less than a fifth of pools ever experience any changes of membership. See Exhibit 28.

along with their characteristics, who were available to join pools at the start of each year prior to the point in time when pools are formed.[80]

Over the period 2001 to 2006, there were about 2,300 FAs present and producing for the full year in offices and years with both African American and white FAs present.[81] Although approximately 1,400 FAs in total were members in pools each of these years, only between 498 and 596 FAs joined pools in any given year. Clearly, most FAs participating in pools in a given year joined in prior years, indicating that a year-end benchmark population is inappropriate.

Drs. Madden and Vekker also present an analysis of POA pool participation in Table 16a of their report that suffers from the same problem as their FA analysis of pool participation. It assesses POA pool participation at year end by a benchmark population also at year end. This is especially inaccurate in the POA program due to high rates of POA attrition. An appropriate analysis for POAs should include only POAs in offices and months where there are also African American POAs available to form pools.

Madden and Vekker's Analysis of Pool Benefits is Flawed

Drs. Madden and Vekker's analysis of the benefits of pooling is also flawed. Table 10, entitled "Effects of Race of Financial Advisors on Increases in Asset Values Under Management, Due to Increases in Shares of Teams or Pools, for Financial Advisors Who Increased Their Shares, between Beginning and End of Each Year, 2001-2006" appears to consider a small and rather strangely defined subset of pool activity. Under their definition, a pool that doubled its assets would not be considered a pool in which FAs were "able to increase their total assets under

---

[80] This approach is analogous to conducting a promotion study, wherein promoted members of a protected group are compared to incumbent members of that group available for promotion *during the window of time* pertaining to promotions. One would not compare the proportions of African Americans promoted in 1995 to the composition of African Americans present in 2004. Yet that is in essence what Drs. Madden and Vekker did in their analysis of pool participation.

[81] Pools tend to form within offices. See Exhibit 30.

management" because prior to the increase an FA held a 20 percent share of the pool and after the doubling the FA still held a 20 percent share. Of course, the value of that 20 percent share would have doubled from (for example) $500,000 to $1 million – this should in fact count as an increase in assets under the FA's management.

Moreover, and similar to their analysis of account distributions, Drs. Madden and Vekker's analysis does not account for the data being clustered. Their analysis also erroneously includes FAs who had no increase in pool or team shares. Since this is specifically what they were intending to analyze ("for Financial Advisors Who Increased Their Shares"), they erroneously include individuals who did not experience an increase in their pool or team share. Modifying their analyses to correct for these errors shows that there are no statistically significant differences by race for pools and teams.

### Madden and Vekker's Approach to the Analysis of Pooling Activity Does Not Account for the Nature of the Decisions Involved

Pool participation is the result of two distinct decisions, made at different points in time. The first is the decision to join pools, and the second is whether to remain in a pool after it has formed. I examine these decisions separately using the benchmark populations relevant to and in existence when these decisions are made. In addition, offices vary a great deal in the extent to which its FAs choose to participate in pools, as reflected in Exhibit 29. There are 45 offices in which less than half of the brokers are in pools and 20 offices at which all FAs are in pools. Given this variation, it is appropriate to account for office characteristics; Madden and Vekker fail to do so.

44

**Pooling Decisions Are Individualistic and Non-Random**

Some indications of the types of factors influencing pool formation are observable in the Merrill data. The data show that FAs with similar productivity characteristics are more likely to form and remain in pools together than two randomly chosen FAs.

Merrill's business model for FAs is to ask them to target households with larger net worth.[82] According to the record, the larger the household, the more complex the nature of the account.[83] It is plausible that households with similar amounts of invested assets share other characteristics. One could hypothesize that household account size would be one measure of the nature of an FA's book of business. Under this hypothesis, the total level of assets may be less important than the specific types and sizes of households managed: accounts totaling $100 million comprised of ten $10 million household accounts are likely in the aggregate to be different than a $100 million aggregate of accounts comprised of 100 $1 million accounts. A $40 million dollar "book" with four $10 million accounts might be more similar to the first account described than the second. If one knew the details of the types of assets within the accounts, further similarities (and differences) could be studied.[84]

To test this hypothesis, the average household size in the books of business of the 2,239 FAs who joined pools in 2004 are compared with the average household size of the other members of the pools they joined.[85] FAs were ranked into deciles according to their average household asset size in December 2003, whether they joined pools or not, with decile one representing FAs who had the largest average household asset size in their book of business prior to joining a pool in

---

[82] For example, in 2006, affluent households were defined as having invested assets of more than $100,000 and production credits associated with these accounts were paid at a higher grid rate. Advisory Division 2006 U.S. based Financial Advisor Incentive Compensation Program, MLE 00040-000554.

[83] Deposition of E. Stanley O'Neal, p. 145-146.

[84] This data was not available for study.

[85] This analysis is not restricted to offices with African American FAs.

2004. The average household size of other pool members with whom each FA pooled were also ranked by decile. In Exhibit 31, the X and Y axes indicate, respectively, the decile of the pool joiner and the average decile of other pool members in the joined pool.[86] The height of the bars indicates the percentage of all pool joiners in a given decile who matched to a given decile for other pool members. For example, the tallest bar (at the back of the chart) indicates that roughly 10 percent of pool joiners were decile one. They joined pools with other decile one members more frequently than with members of any of the other deciles. In fact, the decile one-decile one match is the most frequently observed pairing in the data.

By comparison, the lowest bar (on the far left of the chart) shows that almost no decile one pool joiners formed a pool with other members whose books of business were in the lowest decile of household asset size. The percentages are also higher along the diagonal than the percentages off the diagonal, meaning that FAs with similar average household asset size match themselves in pools together, regardless of their average household account size.

These findings are consistent with the theory of "positive assortative matching," and indicate the importance of taking FA characteristics into account in analysis of pool-joining.[87] FAs with higher productivity are more likely to pool in general, and when they pool, they are more likely to match with other FAs who have similar productivity.[88]

---

[86] Since a pool may have multiple other pool members, the average decile of other pool members may contain decimals, such as 1.5.

[87] Gary Becker first articulated this theory, which has since been applied in a variety of labor market matching studies. Becker, G. (1973) "A Theory of Marriage: Part I," *Journal of Political Economy*, Vol. 81, No. 4, pp. 813-846.

[88] A chi-square test indicates that the probability of finding positive assortative matching by chance alone is less than one percent.

**Analysis of FA and POA Pooling Based on Pool-Joining**

I now examine pool-joining decisions, taking into account FA and office characteristics. The population of potential pool joiners included in the analysis is those present when the pool-matching decisions are made, in offices and years in which there are African American FAs present.

The results are displayed in Exhibit 32. Taking into account FA characteristics and levels of interest in pooling in each office, there are no statistically significant differences in the rate that similarly situated African American and white FAs join pools in any year. In three of the six years studied, African American FAs pool at a higher rate, and in three years they pool at a lower rate (see column [8]), although none of the differences are statistically significant. (None of the Z-scores in column [9] are greater than two in absolute value.) These results are quite different than the results of the flawed participation study presented by Drs. Madden and Vekker.

POAs also join pools. Like FAs, the benchmark population of potential pool joiners included in a POA pool-joining analysis should be restricted to those present when the pool matching decisions are made. Because the population of POAs changes so rapidly from month to month during the POA program, the population is restricted to offices and months with at least one African American POA.

Unlike FAs, POAs begin with little or no track record as to their productivity, possibly creating uncertainty about whether pooling is an optimal strategy for building their book of business and uncertainty as to whether they would be a good pool partner from the perspective of others. On the other hand, prior industry and prior Merrill experience are characteristics which may legitimately influence pooling behavior.

Looking at the results in Exhibit 33, there are no statistically significant differences by year in the rates at which African American and white POAs join pools. None of the Z-scores in

47

column [9] are greater than two in absolute value. However, these results group together POAs with prior industry and no prior industry experience. There is likely to be variation in the extent and nature of POA prior industry experience about which there is no accurate data. This information might be important in determining which POAs join pools, especially since POAs have a relatively short production track record. POAs without prior industry experience can be studied separately. Exhibit 34 summarizes the results of the analysis. As can be seen in column [7], there is very little difference between the expected and actual numbers of African American POAs joining pools, taking into account their production and office location. Column [8] shows that none of the Z-scores is greater than two in absolute value.

### Analysis of Pool Renewal

Once FAs join pools, members decide if and when to end their involvement in the pool. There is an annual "re-up" event, where pool members decide whether to continue their current arrangement. At the formation of the pool, members establish split percentages for pool assets.[89] Annually, members decide whether to continue or to dissolve a pool, presumably depending on whether the pool has met their expectations. Managers sign off annually on the renewal of pools, but pool members can quit their pools at any point in time.[90] One metric identified in Merrill Lynch documents for whether a pool is effective is whether the pool's assets are growing.[91] There is wide variation in the initial growth rate of pool assets, with over a quarter of all pools seeing negative asset growth in their first year.

A statistical model called a "proportional hazards" model can be used to analyze the length of time FAs or POAs remain in each pool that they form. This statistical technique generates what

---

[89] MLE-DETROIT 02100 000(483-500) and MLE-DETROIT 02095-000(137-138).

[90] MLE-DETROIT 02100 000(483-500).

[91] MLE-DETROIT 02098 000846.

are referred to as "hazard ratios," that estimate the relative probabilities of quitting a pool for African American and white POAs and FAs based on the variables or characteristics included in the model. Relevant characteristics for predicting a pool member's chances of quitting a pool are the local office pooling rate, measures of pool success, such as asset growth in the first year and the characteristics of others in the pool, such as whether another member terminates from Merrill.

The hazards model demonstrates that African American FAs are not observed to quit pools at greater rates than whites. The results are summarized in Exhibit 35. The top row examines POAs while the bottom row covers FAs. For POAs, African Americans do not have a statistically significantly greater risk of quitting pools; the Z-score is less than two in absolute value.

Turning to the bottom row of the exhibit, when FA pooling decisions are analyzed using variables for the characteristics of FAs, offices and pools involved, there are no statistically significant differences observed in the rates that African American and white FAs choose to quit pools. The Z-score is again less than two in absolute value.

The oversimplified aggregated participation studies of Drs. Madden and Vekker do not account for the factors influencing pooling behavior, and do not examine the correct population of potential pooling participants.

The findings for pooling for FAs and POAs are also inconsistent with Dr. Bielby's theory that similarly situated African American brokers are excluded from and fail to remain in pools due to their isolation based on race.[92] What Dr. Bielby asserts is that because African Americans are a small fraction of brokers, this leads to their exclusion. In order for Dr. Bielby to be correct in this assessment, white brokers would specifically act to exclude similarly situated African American brokers from pools. The empirical results do not support that hypothesis.

---

[92] Bielby, p. 24.

**Analysis of Merrill Designation of FA "Team" Status**

Merrill Lynch began designating FAs and POAs individually with "Team" status in January 2002, based on whether a broker's year-to-date PCs from pools (and splits) exceed 33 percent of their year-to-date PCs. Teaming is an individual-level designation: a team member can be in a pool with two "non-team" FAs because the non-teamers do not have 33 percent of their PCs coming from pools. Around 20 percent of pools contain members with both "Team" and non-"Team" status, as shown in Exhibit 36. Moreover, managers have no control over whether an FA becomes a team member – there is no *practice* to examine. It is simply a designation based on PCs data.

Madden and Vekker's "Team" participation analyses include brokers who are not in pools, even though the "Team" designation depends on first participating in a pool. Thus, an appropriate analysis of "Team" designations should compare similarly situated groups of FAs and POAs who are in pools. For FAs, the cohort of those who received initial "Team" designation in January 2002 cannot be assessed since their "Team" designation reflects a history of pooling that often precedes the largest possible data production window.

Exhibit 37 contains the results of the analysis examining the incidence of team designation for African American and white broker pooling participants. Among all FAs in pools who received the "Team" designation after 2002, African American and white FAs are equally likely to have the "Team" designation in each year. None of the Z-scores in column [9] exceed two in absolute value.

Among POAs in pools (Exhibit 38) there are also no statistically significant differences in the share of African American and white POAs with the "Team" designation in any years.

50

### 9. Studies of Other Practices Potentially Subject to Discretionary Local Decision-Making

Drs. Madden, Vekker, and Bielby argue Merrill allows its managers to operate in a manner that permits them to exercise their discretion with bias towards African American brokers. They offer no statistical evidence of this, and do not study a number of relevant employment practices which they could have studied to test their hypothesis. Drs. Madden and Vekker instead extrapolate their flawed account transfers findings to a whole range of other practices and Dr. Bielby accepts the statistical studies of Madden and Vekker as true without performing any of his own.

Practices Involving Possible Managerial Discretion During the POA Program

There are a number of employment practices that relate to the POA portion of broker careers. These include hiring and initial workforce representation, the setting of starting salaries, achievement of POA asset and PC hurdles, and termination from the program. I review these practices in this section.

#### *External Representation*

Plaintiffs argue that African American representation at Merrill is "low" in their legal papers.[93] While no statistical analyses are presented to address this claim, Dr. Bielby references certain Merrill workforce data that he *implies* must reflect Merrill's under-hiring and/or under-representation of African Americans. He does this with words chosen to create an impression in the reader, *e.g.*, "extremely low,"[94] but provides no statistical benchmarks against which Merrill figures can be judged.

---

[93] Response to the Third Set of Interrogatories, pp. 6-7.

[94] Bielby, p. 70.

51

In order to determine whether African American workforce percentages at a particular employer are "low" or "high," labor economists must first establish a benchmark for comparison to company data. Dr. Bielby has produced no benchmarks.

In the context of class certification, the "analysis" provided by Dr. Bielby is particularly problematic. Hiring decisions are local in nature – down to the office level. There is no evidence that Merrill exerts any authority over hiring decisions made by local office managers. It is also true that most labor markets, except for especially high paying jobs, are local in nature. The doctrine of a "relevant labor market" is well established in both the economics and the legal contexts.[95] The relevant labor market, or qualified labor market, as it is sometimes referred to, is characterized by a skills/qualifications dimension as well as a geographic dimension.[96]

**Analysis of African American Workforce Representation**

A methodology for evaluating workforce representation for a particular occupation is to compare measures of company workforce representation to measures taken from the industry in which it operates, or to the labor market from which it draws its hires.[97] That approach is used here. I first evaluate overall Merrill African American workforce representation among brokers compared to the Census[98] and then turn to representation among POAs.

---

[95] Jordan, W. C., ed. (1998), *Employment Discrimination Law*, Third Edition, 1998 Supplement, Chicago: American Bar Association, pp. 549-554.

[96] The analyses presented here in response to Dr. Bielby's assertions regarding African American workforce representation are aggregated, as they must be in order to respond to him. However, since hiring decisions are local and based on local labor market composition and conditions, one should consider the representation at each local level. The analysis here is therefore presented solely to rebut the assertions of Dr. Bielby.

[97] See Jordan, W. C., *op. cit.*

[98] This data is the most recent comprehensive large sample available for study. A large sample is required, since the object population, African Americans in particular jobs, are relatively few in proportional terms, and a data source that was not large to begin with would yield both very few data points, as well as lead to wider error associated with whatever estimates one constructed.

I start by determining the relevant occupational code in the Census. The relevant occupations in the Census are "Personal Financial Advisors" (census occupation code 085) and "Securities, Commodities, and Financial Services Sales Agents" (code 482) within the Securities, Commodities, Funds, Trusts, and Other Financial Investments Industry (code 697).[99] Since there are many levels of qualifications present in the Census job codes, not all persons identified in a particular code may be in the *relevant* job market of the target employer – that is, some form of control for qualifications is required. To a labor economist, it is natural to think of compensation as a method for focusing in on particular quality groups within an occupation.[100] Merrill is a high-end employer within the broker industry – not an average employer, and employees of Merrill would be expected to earn more, on average, than the average broker at the average employer. Thus, in order to align the Census data to an appropriately representative comparison group, the Census data are weighted according to the income distribution of FAs at Merrill.

The African American representation in the Census comparison group equals 1.9 percent. This compares to a figure for African American brokers at Merrill of 2.0 percent in 2004. Results for other years of the data production window are similar: representation at Merrill is in line with the Census benchmark.

### POA African American Representation Analysis

I turn now to African American representation among those who are recent arrivals at Merrill as compared to the labor markets from which they came. Comparing the composition of successful applicants to the labor markets from which they came is an appropriate way to examine

---

[99] Complete documentation for these codes is provided in Appendix 3 attached to this report.

[100] Samuelson, P. and W. Nordhaus (1985), *Economics*, Twelfth Edition, NY: McGraw Hill. Juhn, C., K. Murphy and B. Pierce. (1993) "Wage Inequality and the Rise in Returns to Skill," *Journal of Political Economy*, 101(3), pp. 410-442; Reardon, E. (1997) "Demand-Side Changes and the Relative Economic Progress of Black Men: 1940-90," *Journal of Human Resources* 32(1): 69-97.

Merrill's ultimate hiring outcomes versus a relevant benchmark. Merrill chose a representative sample of its offices for recovery of a variety of additional documents in connection with discovery in this litigation.[101] I was provided with documents from the sampled complexes, which included prior job history for most of those hired during the data production window. Prior employment information was included on employment applications and U-4 forms.[102] Using this information, prior job experience was coded to match the census job categories.[103] Because they were hired, race is also available for these individuals. Using these data, it is possible to statistically compare African American representation among these successful hires at Merrill to the African American representation in the labor markets from which they were drawn.

In order to reflect the sampled Merrill POA populations, the Census data were limited to individuals having earnings of $50,000 per year or more, working in the states where the 29 sampled complexes were located. This figure was used because it is the average for Merrill POA starting salaries.[104]

African Americans were 3.8 percent of Merrill hires in the U-4 and Employment Application data. This can be compared to the proportion of African Americans in the corresponding Census data, which is 4.1 percent. There is no statistically significant difference between these figures. These results indicate that African American representation at these offices

---

[101] It is my understanding that Dr. Eugene Ericksen created the sample design. He has filed a report in this matter describing his methods, which will not be repeated here.

[102] The U-4 form requires applicants to list their employment history for the last ten years, and while the employment application does not ask for ten years worth of information, it does ask applicants to list their three most recent jobs. In constructing the prior job data for analysis, observations were discarded which described an activity that could not be described as regular employment. These descriptions included activities such as: student, retiree, intern, unemployed, homemaker, any answers such as "unknown," or "position not provided," and the like. If the most recent activity listed was not actually employment, the next chronological entry that did reflect employment was used in the analysis.

[103] Documentation for the coding method and the Census documents relied upon are contained in Appendix 3.

[104] For many, this dollar amount is lower than what they could earn elsewhere: Dr. Outtz reports that trainees usually take a pay cut when they join Merrill. Outtz, p. 25. See, e.g., MLE-DALLASR0595 0000003-5; MLE-CANAV2382 0001662-1664, MLE CD 36.

of Merrill aligns with the representation of African Americans in the "feeder" industries and occupations from which POAs come. Dr. Bielby's claims of "very low" representation might be true in an abstract sense relative to 100 percent but mean nothing when compared to relevant labor market benchmarks.

### Dr. Bielby's Summary of Merrill's State by State Representation is Misleading

Dr. Bielby also notes that Merrill offices in a number of states do not have any African American brokers. Once again, he fails to provide any evidence as to how this fact compares with relevant benchmarks. Zero African American broker representation in states for Merrill relates closely to zero representation in states according to the Census: in 21 states the Census shows zero representation and Merrill has no African American brokers in 23 states. Even though the year 2000 Census information is from an earlier time period, and would not be expected to match up perfectly with Merrill figures taken at later points in time, it is interesting to note that "zero states" at Merrill and the Census match quite closely. In fact, the simple correlation between the Merrill and Census representation figures is .65 – which is high. This result demonstrates that pointing to the simple fact that Merrill has no African American brokers in certain states is largely meaningless – it is fully expected, given the geographic locations where African American brokers are found generally.

### *POA Starting Salary*

Another practice which is handled with discretion at the local level is the setting of POA salaries.[105] Newly hired POAs are paid a fixed starting salary. In addition to alleging that production-based pay is biased against African American brokers, plaintiffs in their legal papers

---

[105] While FAs are paid on a percentage of production, they start their careers with compensation based on salaries plus incentive pay. See for example, the 2006 Financial Advisor Paths of Achievement Program, MLE00041-001309; this pay structure was also in place from 2001 to 2005.

also allege that African American POAs receive lower starting salaries.[106] Plaintiffs' experts do not study starting salaries although they had the data to do so.

Without controlling for prior experience, the coefficient on African American (0.021 or 2.1 percent) is not statistically significant as shown in the second column of Exhibit 39. The t-statistic, which is in the parentheses under the coefficient, is below the benchmark level of two required for statistical significance. Controlling for office and experience, the African American coefficient is also statistically insignificant. There are no racial disparities found in starting pay.

This result is inconsistent with a claim that Merrill managers exercise bias in their treatment of African American brokers.

### The Impact of Asset and PC "Hurdles" During the POA Program

The POA program has explicit monthly (2001-2002) or quarterly (2003-2006) performance hurdles based on cumulative asset and production credit measures, as well as financial planning points. It is my understanding that these hurdles are designed to keep POAs on track for becoming FAs. The asset performance hurdles are shown in Exhibit 40. For example, in 2001-2002, the three month asset hurdle required POAs to have gathered $1.25 million in assets attributable to them.

Assets as early as month three of POA are highly correlated with assets observed later in POA careers. The correlations, summarized in Exhibit 41, are all statistically significant. For example, POA assets at month three are correlated to month 24 at the level of 0.85. This is high: perfect correlation equals one. Missing a hurdle is thus predictive of later performance – only 24.5

---

[106] Response to the Third Set of Interrogatories, p. 8.

percent of both African American and white POAs who miss the month three target are still employed at month 24, as seen in Exhibit 42.[107]

POAs who miss hurdles do not automatically terminate, although those missing a hurdle have smaller chances of making subsequent hurdles and ultimately staying in the POA program. Those missing a given hurdle, but making the next hurdle, will, in general, have missed the prior hurdle by a relatively small amount. Looking at Exhibit 43, 75 percent of whites and 89 percent of African American POAs who missed the month three hurdle do not meet the hurdle at month six. Those who do meet the six month hurdle were closer to making the month three hurdle than those missing the six month mark, and by month six, they were well above the hurdle amount. In contrast, those who missed both hurdles were so far below the hurdles that even though they doubled their assets over the period they were still below the month 3 hurdle at the six month mark.

According to plaintiffs, white POAs missing hurdles receive disproportionate assistance from Merrill, while similarly situated African American POAs do not. If that were true, white POAs who made it over various hurdles would be observed to receive a disproportionate share of transfer dollars. This is not what is observed empirically. Turning to Exhibit 44, and examining POAs who missed the month three hurdle, one sees that African American POAs who made it over the hurdle at month six relied *more* on transferred assets ($1.2 million from transferred and ADP assets) than self-generated and liability assets ($830,306). White POAs missing the month three hurdle but crossing the month six hurdle obtained more assets through self-generated and liability assets ($1.8 million) and received *less* than African American POAs through transfers ($1.1

---

[107] Months in the POA program are sometimes referred to as MLOS.

million). This finding is completely inconsistent with the theories of Drs. Madden, Vekker and Bielby.

### *POA Terminations*

POAs are not automatically dismissed if they miss a hurdle, nor do they automatically depart on their own. Because the hurdles rise over time and there is no immediate termination for missing any one hurdle, an important issue is by how much a POA misses the target: it is considerably easier for a POA to meet a subsequent, higher hurdle if he or she misses the current target by a smaller amount.

In their statistical analysis, Drs. Madden and Vekker examine POA terminations without taking into account the hurdles or any other measures of POA performance. Even if they believe that Merrill is somehow responsible for African American POAs missing hurdles, if they are studying whether Merrill *also* treats similarly situated African American brokers worse with regard to terminations, they should control for performance. The POA termination analysis they conduct does not provide any test of the behavior of Merrill towards African American POAs due to their race. Nor does such a result shed any light on whether Merrill managers exercise discretion to disadvantage African American brokers as alleged by the plaintiffs and as posited by Drs. Madden, Vekker and Bielby.

Given the self-generation results discussed above, which indicate consistently lower self-generation for African American POAs, it will be a foregone conclusion that failing to control for performance will yield a "finding" that African American POAs are terminated at excessive rates. I show here that the relevant comparison, involving the termination rates of similarly situated African American and white POAs, reveals that there is no statistically significant difference in

their respective rates of termination. This is a finding inconsistent with plaintiffs' claim that

Merrill and/or its managers treat African American POAs worse than their white counterparts.

Many more people start the POA program than go on to be FAs. For those hired between

March 2001 and December 2002, for example, 62 percent left Merrill before they reached LOS

four.[108]  Overall, 52.7 percent of all POAs who enter the program between 2001 and 2004 do not

go on to be FAs. As Dr. Outtz describes, a job as a broker is demanding.[109]

Exhibit 45 summarizes the results of statistical analyses of POA terminations for all

POAs.[110]  The analysis takes into account whether the POA was "on target," and their distance

from the hurdle at each three month interval.[111]  Terminations at each hurdle are shown, and

aggregated over all hurdle points. Looking at the bottom row, 310 African American POAs left

the program, when 410 were expected to leave, based on their distance from the hurdle and

whether they were on-target. The Z-score is -5.4, meaning that African Americans left POA at a

rate statistically significantly less than expected.

Exhibit 46 presents the results for POAs "not on target" at each hurdle point. Looking

again at the bottom row indicates that 292 African American POAs not on target terminated, when

388 were expected to terminate. The Z-score is -5.4, indicating that statistically significantly fewer

African American POAs than white POAs terminate.

Exhibit 47 depicts assets levels relative to the hurdle for POAs who missed the month 6

hurdle, by their termination status and race. Those who were terminated for not meeting standards

---

[108] Looking only at those hired between March 2001 and December 2001, 66 percent left Merrill before they reached LOS 5.

[109] Outtz, pp. 12-27.

[110] Termination reasons omitted from the analysis are "death" or "retirement." There were only a handful of POAs experiencing these termination reasons. This analysis is restricted to POAs in offices with at least one African American FA or POA active during the relevant time period.

[111] The technique used is the aggregated one-sample binomial model, or aggregated Z-score model. Strata were defined by distance from the hurdle and "on target" at each month, then aggregated to a final result.

at month six had assets well below the hurdle while those who were not terminated, but had missed the hurdle, had assets near or well above the hurdle. What is of note is that African American POAs who missed the six-month hurdle did so by a larger amount than white POAs who were termed (the left pair of bars). African American POAs not termed made the MLOS six hurdle by a much smaller margin on average than white POAs who were not termed (the bars on the right). Exhibit 48 repeats the analysis for the hurdle at month nine. It confirms that missing a hurdle does not lead to automatic termination for not meeting standards but that those who are terminated are typically well below the hurdle. A similar pattern for African American and white POAs' asset levels relative to hurdles for those termed and not termed is seen here at month nine.

These findings are not consistent with the theories of Drs. Madden, Vekker and Bielby.

### FA Terminations

Plaintiffs claim that African American FAs terminate at excessive rates from Merrill.[112] Drs. Madden and Vekker produce an analysis which they suggest supports this claim, but which in reality has little or no value for purposes of analyzing terminations at Merrill. In addition, Drs. Madden and Vekker engage in particularly baseless speculation linking their observation of surface level differences in termination to a whole host of inter-related concepts.[113]

The relevant test to study FA terminations is whether similarly situated African American FAs terminate from Merrill at greater rates than white FAs. A selection-pools approach can be used to examine this question. This method starts by constructing subsets of employees who differ only by race. Thus in any given stratum, all FAs share the same productive attributes, and differ

---

[112] Second Amended Complaint, p. 7.

[113] Madden and Vekker, p. 38.

only in that some are African American and others are white. In a race neutral termination process, individuals belonging to the same strata are hypothesized to be equally likely to terminate.

Strata are defined by LOS and production group. Production group is defined as quintile, with the lowest quintile divided into high and low. Exhibit 49 contains the results, which aside from 2004, show that there are no statistically significant differences in termination between African American and white FAs. Over all years, there is no statistically significant difference in terminations between African American and white FAs. The Z-score of 1.57 is below the threshold value of two.

### *Length of Service Rollbacks*

Plaintiffs allege that Merrill discriminates against African American brokers by "manipulating the length of service ("LOS") designation of non-African Americans to manipulate earnings and performance."[114] As noted above, FAs at Merrill are compensated based on their production, taking into account LOS and asset mix. FAs can request a reduction in their LOS for a variety of reasons, such as leaves of absence, transfers to a new office, or other reasons. The reduction can be achieved by decreasing the LOS by one or more years or by not advancing LOS forward a year when the time comes to do so.[115] LOS reductions are considered beneficial, since the benchmarks to achieving certain compensation and other employment benefits are lower with lower LOS.

Drs. Madden and Vekker do not analyze LOS rollbacks, though they had the data to do so. LOS rollbacks are within the discretion of local office Merrill managers, and would therefore be a practice that Madden and Vekker could have studied in order to test managerial bias.

---

[114] Second Amended Complaint, p. 5.

[115] All rollbacks that occur in offices where there was an African American FA are included for analysis.

The results in Exhibit 50 show that African American FAs are statistically significantly more likely than white FAs to receive LOS rollbacks. Thirty-three percent of African American FAs received a rollback as opposed to 26 percent of white FAs. This difference is statistically significant. Exhibit 51 examines the amount of time for LOS rollbacks for those FAs receiving rollbacks. White and African American FAs who experienced a LOS rollback had a similar amount of time rolled back. The probability associated with the measured difference between African American and white FAs is 0.27, well above the threshold value of 0.05.

As a result, proper statistical analysis shows that LOS rollbacks, which are administered by local managers, are not adverse toward African American FAs, either in incidence or in length. These findings are inconsistent with the theories of Drs. Madden, Vekker and Bielby.

### *Forgiveness of Excess Compensation*

While FAs are paid based on production, they receive a salary against anticipated production. As a result, it is possible for FAs to receive more compensation in a given month than is ultimately earned, based on their production credits. In such cases, the excess amount paid to the FA is "carried forward" to the following month. If in the following month, the FA earns more, based on production, than his or her salary, the excess amount earned can be used to offset the "carry forward" amount. However, it is in the discretion of Merrill Managers at the local level to "forgive" the excess compensation received (or a portion of it) when a draw exceeds production-based earnings, which allows the FA to retain the excess compensation.

Drs. Madden and Vekker do not analyze excess compensation forgiveness, although the data to do so was available to them. I studied both the rates at which excess compensation was forgiven comparing African American and white FAs, as well the dollar amounts forgiven.

The results summarized in Exhibit 52 show that African American FAs are statistically significantly more likely to experience a situation in which they accrue excess compensation. The data reveals that African American and white FAs receive forgiveness at the same rate in each year from 2001 to 2006, as shown in Exhibit 53. Thus, while African American FAs are disproportionately represented among those in excess situations, the rate at which they are forgiven equals that of white FAs.

Turning next to the amounts forgiven, which are summarized in Exhibit 54, statistical analysis demonstrates that with the exception of 2002, the amounts forgiven were the same for African American and white FAs. These results are inconsistent with plaintiffs' claims that Merrill and/or its managers treat African American brokers worse than its white brokers relative to forgiveness of excess compensation.

### *Management Assessment Center Attendance*

Another practice not examined by Drs. Madden and Vekker, but mentioned in plaintiffs' legal filings is movement of FAs into management.[116] It could be inferred that Drs. Madden and Vekker believe that movement to management must be biased, because they consider all unstudied practices as biased, based on their flawed analysis of account transfers. Moreover, one might expect, under Dr. Bielby's theory of "isolation" that African American FAs would attend the Management Assessment Center (MAC) in Princeton, New Jersey at lower rates than their similarly situated white counterparts. However, the statistical evidence demonstrates that there is no shortfall in the numbers of African American FAs selected to attend MAC or in the number of African American FAs emerging successful from the MAC.

---

[116] "[D]enying African Americans the opportunity to participate in the Management Assessment Center ("MAC") and to become managers;" Second Amended Complaint, Nov. 6, 2006, p. 4.

Compared to the benchmark population of FAs formally eligible for attendance at the MAC[117], which is LOS greater than four and being in quintiles one through three, African American FAs are significantly over-represented among those participating in the MAC during 2001-2006. Exhibit 55 summarizes the results. Note that very few FAs participate in the MAC: fewer than 25 per year on average out of over 4,000 eligible. Only five African Americans participated but only one was expected. The Z-score associated with this difference is 3.41, which is statistically significant. If one broadens the definition of the source pool for attendance to all FAs, the results are not statistically significant. (See Exhibit 56.)

### Success at the MAC

Success at the MAC is defined in this analysis as passing the MAC and being considered eligible for a Director position. Director positions do not open immediately for successful candidates, and so in any given year, there may exist a mismatch between those who attend in that year and those becoming successful in that same year. Thus, I compare the proportions of African Americans among participants and among successful candidates in the same year. Not all successful candidates will have participated in that year – they may have waited for an appropriate position to open. I am able to match specific participants to some of those selected as successful from those participants. I also conduct an analysis on that group.

Another complicating factor is that participants at the MAC also come from sources outside of FAs. These sources include outside direct hires and other, non-FA Merrill positions. When using all MAC participants as the benchmark, and using any definition of successful candidates (*e.g.*, FAs only, FAs and non-FAs, or FAs, non-FAs and outside hires), African Americans receive their expected number of successful events. Exhibit 57 summarizes the results. The bottom row

---

[117] Deposition of William Sieg, November 29, 2006, pp. 58-59, regarding eligibility.

of the table shows the matched group. Though the number of successes is very small overall, the African American success was at the expected level. The same is true in the higher rows of the table to the broader definitions of successful selections. In all cases, there is no statistically significant difference between the actual and expected number of African Americans who achieved success at the MAC.

These findings are inconsistent with a claim that Merrill treats African American FAs worse than similarly situated white FAs.

### Title Changes

Plaintiffs claim that because of a policy whereby "success breeds success," African American FAs are denied recognition title changes from FA to Senior FA. They further claim that the title change itself leads to greater compensation.[118] Drs. Madden and Vekker could have studied these claims, but they did not. Had they done so, they would have found that there is no evidence of bias against African American FAs in the receipt of higher titles, and they would have found that no increase in production is independently conferred by the event of a change in title.

The recognition title guidelines call for managers at the local level to examine certain PCs or revenue thresholds ("best ball" test is used) and approve title changes meeting these criteria as well as additional "compliance, regulatory and other legal considerations" criteria.[119] The PCs and Revenue thresholds are five or ten year cumulative thresholds. Given the data production window in the case, it is difficult to study the title change process controlling for these cumulative thresholds, which move through time, and start and stop at many points in time. Instead I performed a test that approximates these thresholds, by statistically controlling for LOS and

---

[118] Plaintiffs' Second Amended Complaint, p. 11, also Plaintiffs' Responses to Defendants' Third Set of Interrogatories, p. 15, states titles "affect the ability of FAs to develop their business."

[119] MLE 00040-000570.

quintile.[120] I examined three types of title change: receipt of Sr. FA, AVP, and VP. Exhibit 58 summarizes the results. For receipt of Sr. FA, African American FAs received statistically significantly more Sr. FA titles. Column 8 shows that the excess number of Sr. FA titles was eight, with a corresponding Z-score just over two. For receipt of the AVP title, African American FAs and Sr. FAs, both of which were among those receiving the AVP title, received significantly fewer such titles. The shortfall was approximately ten. The Z-score was just over two in absolute value. Finally, for receipt of the VP title, there was no statistically significant difference between the actual and expected number of African American brokers receiving this title. When the three types of titles are combined over all of the years in the data production window, there was no statistically significant difference in titles received by African Americans. The Z-score fort the combined analysis is -.20, which is not statistically significant.

Drs. Madden and Vekker claim that receipt of titles is one of the inputs to production withheld from African Americans that would have allowed African Americans to generate greater PCs. They did not test either the receipt of titles, which I find to be equal for similarly situated African American and white brokers, nor did they test their assertion that receipt of a title confers an increased ability to generate PCs. I conducted this test, limiting the analysis to white FAs alone, as Madden and Vekker claim that it is white brokers whose PCs are enhanced via higher titles. Cohorts of white FAs were constructed, and Sr. FA title receipt events in August 2004 were studied. The findings are that there is no statistically significant change in PCs after receipt of a title. Furthermore, the effect itself is very small. (Results are similar looking at title changes occurring in August 2003.) This can be seen in Exhibit 59. The upper line summarizes PC growth

---

[120] There is a predictable statistical bias to this approach. As noted above African American FAs amass fewer PCs on average than white FAs. Given the mathematics of overlapping PCs distributions, with the average for African American FAs being lower than for white FAs, it will be the case that *within* quintiles, African Americans will have lower average PCs. If this is true, it will increase the chances of finding shortfalls in title receipt for African Americans.

over time for FAs who received a title change. The lower line summarizes PC growth over the same time frame for the control group.

There are two features of the exhibit that are of particular interest. The first is that there is no title change effect on the level or growth of PCs. Growth after August 2004 continues virtually on the same path as the trend prior to that month. The second feature of interest is that titles are awarded based on level of production: higher producers receive a title change and lower producers do not. This is to be expected: titles are based on measures of production and on a clean compliance record. In short, title changes have no causal effect on compensation. Rather, the change merely signifies that receiving FAs are themselves more productive for other reasons.[121]

### *Certifications*

In the ADP transfer process, FAs and POAs receive an office rank based on a number of criteria, as described elsewhere in the report. Each criterion is associated with a point value, and the sum of an FA's points goes into the determination of rank. One of the criteria is professional certifications. Certifications indicate that the FA or POA has completed a course of study and passed exams in areas of specialization depending on the exam (for example, the Chartered Financial Analyst certification exam covers topics including accounting, portfolio management and securities analysis).[122] Some certifications are worth four points and others two points.[123] Exhibit 61 shows that eight percent of

---

[121] A more formal regression analysis confirms this result, as shown in Exhibit 60. PCs are regressed on whether a white FA received a title change, controlling for time elapsed since the change, and office location. The table shows the coefficient on a variable indicating that the FA received a title change in August 2004. None of the coefficients on title change are statistically significant, whether I look at one month after the title change or longer periods.

[122] Merrill reimburses FAs for the cost of obtaining a certification, irrespective of the FA's production level. See for example, *Professional Designations Guide*, May 2002. MLEE063-004588.

[123] According to the 2006 ADP criteria, Chartered Financial Analyst, Certified Investment Management Analyst, Chartered Financial Consultant, and Certified Financial Planner certifications are worth 4 points.

African American FAs acquired any of the four-point certifications between 2001 and 2006 versus 24 percent of white FAs. The difference is statistically significant. When I examine the data by the LOS at which they obtained the certification, differences between African American and white FAs are also statistically significant except among FAs with more than 10 years LOS.

Exhibit 62 shows that almost 16 percent of African American FAs acquire any of the two-point certifications between 2001 and 2006 versus 31 percent of white FAs. This is a statistically significant difference. When I examine the data by LOS at first acquisition, differences between African American and white FAs are statistically significant only among FAs with zero to five years LOS.[124]

*Conclusion*

The results of the preceding sections are inconsistent with plaintiffs' theories and plaintiffs' experts' unsupported assertions that Merrill and its managers withhold inputs to production to African American brokers.

## 10. Response to Dr. Bielby's Report

I have responded to Dr. Bielby's discussion of African American workforce representation above. I pointed out that his workforce statements do not rely upon any quantitative analysis, or refer to any labor market benchmarks. None of Dr. Bielby's other assertions are backed up by

---

Wealth Management Advisor, Private Wealth Advisor, Chartered Retirement Planning Counselor certifications are worth 2 points under the ADP ranking system. 2006 *Redistribution Policy and Process*, MLE 00040 – 001454.

[124] Drs. Madden and Vekker used years of formal education as an independent variable in their compensation analyses. I point out above that data is missing for 93% of the people they study, and point out that it is unlikely such information would relate to the FA job. However, given their approach, which is based on the human capital model, they could have instead used the certifications data that was available to them.

empirical tests either, but his report does contain a number of broad statements, some of which are subject to empirical test.

### Social Isolation

I understand his theory to be as follows: whites constitute an overwhelming majority of FAs and Merrill managers of FAs. They exert their influence over various employment practices to the detriment of African American FAs. That is, they treat similarly situated African American FAs worse than they treat whites FAs, and in so doing, restrict access of African American FAs to the inputs to production. In addition, Dr. Bielby opines that due to their "very low" representation, African American brokers are "isolated" within the Merrill culture – leading to their inability to participate in the mainstream of FA and POA life at Merrill. He asserts that this leads to lower performance, higher attrition rates, and lower pooling rates. It is worth noting again that Dr. Bielby adopts the results of Drs. Madden and Vekker as true and his work is an attempt to fashion an explanation for those findings.

If Merrill managers were treating African American FAs as an "outgroup," as Dr. Bielby posits, we should see statistically significant disparities in employment practices between African American and white FAs, even *after* controlling for productivity. Yet I find that African American FAs join pools, receive transfers, and are promoted at the same rates as equally productive white FAs – they are not barred by their race, as Dr. Bielby's theory implies they would be. The data are entirely inconsistent with his theory. His theory predicts one would see statistically significant adverse disparities for African American FAs in Merrill employment practices, even *after* controlling for production. We do not see this. These practices include account transfers, pooling, FA terminations, POA terminations, receipt of transfers in order to make POA hurdles, LOS rollbacks, excess compensation forgiveness, MAC attendance, selections into management from

MAC candidates, and the setting of starting salaries. The fact that there exists no statistical evidence of bias against African American FAs in any of these practices contradicts Dr. Bielby's "culture of bias" argument.

There are several specific points raised by Dr. Bielby that are subject to empirical test. As noted, Dr. Bielby assumes as true the surface compensation disparities identified by Madden and Vekker as demonstrating bias against African American FAs at Merrill. One of the mechanisms that he cites as possibly responsible for this is "social isolation": if African American FAs are unable to participate in office activities influencing compensation due to being isolated, their compensation would suffer. For example, he argues that "isolation" could affect pooling opportunities for African American FAs. He states:

> "As noted above, African American FAs are substantially less likely than other FAs to be on teams, and they almost always comprise a small minority in local offices. And as social science research shows, in employment settings, minorities often find themselves excluded from informal networks, isolated, and disadvantaged in terms of support from both peers and management....The extremely low representation of African Americans in the workforce overall and at individual complexes contributes to isolation and exclusion from social networks, and is likely to result in them receiving less support and productivity-enhancing resources than their counterparts who are not African American."[125]

And:

> "If African Americans tend to be isolated and excluded from informal social networks, and if through the operation of cumulative advantage mechanisms African American FAs are generating fewer production credits than non-African Americans and are perceived to be less productive, than [sic] they are less likely to be invited to join established teams. This *is especially likely to be true for an African American FA if the existing and newly forming teams in his or her office are comprised exclusively of FAs who are not African Americans.* And, of course, this is true by definition for any African American who is in an office with no other African American FAs." [126] (emphasis added)

---

[125] Bielby, pp.33-34 and 70-71.

[126] Bielby p. 24-25.

He offers no quantitative tests of this hypothesis, even though data related to the issue were produced. The isolation hypothesis can be tested by looking to see if especially "isolated" African Americans – that is, single African American FAs in an office – participate in pools at rates different than African American FAs who are in offices with one or more other African American brokers. Under Dr. Bielby's theory, "solo" African American FAs would be less likely to be members of pools when compared to African Americans who are in offices with two or more African American FAs present.

Exhibit 63 summarizes the results of comparing the proportions of African American FAs pooling in offices with one, two, and three or more African American FAs present for the year 2004. There is no statistically significant difference between the pooling rates among the three groups – the pooling rates are essentially the same, regardless of the number of African American FAs in an office.[127] In addition, the majority of the pools in which African American brokers participate have white broker members. (See Exhibit 64.) Depending on the year, between 75 percent and 89 percent of pools in which African American brokers participate are mixed race pools.

A further implication of Dr. Bielby's assertion is that "solo" FAs should be less productive due to their greater isolation. The results in Exhibit 65 show no such effect: being the only African American in an office has no discernable effect on productivity. None of the coefficients on "solo" African American broker are statistically significant.

Finally, I can test whether having an African American Complex Director has a positive impact on African American FAs under that manager. Looking at Exhibit 66, there is no statistically significant effect of having an African American Complex Director on production

---

[127] With the exception of 2001, the results are the same in all other years. In 2001, the pooling rate for offices with one African American broker exceeded the pooling rate for offices with two African American brokers, but was lower than the pooling rate for offices with three or more African American brokers.

levels of African American brokers except in a single year (2005). These results are inconsistent with Dr. Bielby's theory, since African American Complex Directors might be expected, under *his* theory, to offset whatever isolation African American brokers might experience in these offices.

In sum, the evidence from the Merrill data is inconsistent with Dr. Bielby's social isolation theory.

### *Multicultural Marketing*

Dr. Bielby also discusses the Multicultural Marketing program instituted at Merrill in 2005 at great length. However, he has produced no empirical evidence at all to support his claim that this is an example of how Merrill channels its African American brokers in ways that serve to limit and reduce their internal opportunities generally at Merrill. For example, he singles out the 2006 "FA Tool Kit" for special mention. I can examine the data produced in the cases to see if there are any before/after differences associated with the introduction of these materials.

There are methodological drawbacks to pre/post comparisons (observed changes could be due to other, unmeasured factors) but if the impact of the marketing materials Dr. Bielby discusses are of the magnitude he implies, I should be able to detect an effect. Exhibit 67 focuses on pooling and hiring, which one might expect to be affected by real or perceived reductions in African American POA opportunities. Looking at these practices before and after the introduction of the Multicultural Marketing materials, there is no meaningful change.

### *Only One Version of Dr. Bielby's "Cumulative Advantage" Opinion Is Supported by the Merrill Data – That System Is Not "Inherently Biased" but is "Attributable to [Observed] Differences in Productivity"*

Dr. Bielby stresses the explanatory role in his approach of a theory called "cumulative advantage." This theory is summarized by him as follows:

"The system used by Merrill Lynch for compensating employees is one of "success breeds success." For example, for a given LOS, the payout rate on production increases with the FA's level of production. Also, for a variety of training, resources, and opportunities, eligibility is based on an FA's production quintile ranking. Through these and similar mechanisms, resources that help an FA be an effective producer are distributed disproportionately to those who have the highest level of production. As a result, those who become the highest producers and are paid on production at the highest rate also have the greatest capacity to improve their effectiveness as a result of the company's support. This has a cumulative impact on compensation, as "the rich get richer." Social scientists describe these kinds of reward systems as systems of *cumulative advantage*. In a cumulative advantage system, factors that result in even small disparities between individuals have a cumulative impact and generate growing disparities. A cumulative advantage system is not inherently discriminatory, so long as disparities are attributable to individual differences in productivity that have not emerged as a result of differential, discriminatory treatment by the organization. On the other hand, when organizational policies and practices give one group an advantage over the other, even if it is just a mild benefit or "tailwind" favoring the advantaged group, small discriminatory disparities grow to large ones." [128]

Based on my reading of Dr. Bielby's treatment of this subject, there is a fairly simple implication of that theory that receives a test in the Merrill data. Dr. Bielby presents two alternative theories for how the cumulative advantage process could work. In the first, white brokers get various advantages that enhance their productivity over *similarly situated* African American brokers, that serve to *gradually* generate a disparity over time between white and African American brokers where initially there was no disparity. The key is that the advantages conferred on white brokers are unfair, since they are *initially* similarly situated to African American brokers.

In the second version of the theory, white FAs *fairly* get the various advantages because they are "attributable to individual differences in productivity" that are initially present. The productivity of white FAs under this view of the theory must therefore *initially exceed* that of African American FAs in order to get the various advantages. In theory one, the cohorts of

---

[128] Bielby, p. 12-14.

African American and white POAs start equal and progressively become unequal, while under theory two, they start POA unequal, and stay unequal.

Dr. Bielby believes, without any empirical proof, that the first theory is true, and that Merrill is responsible for any observed earnings disparities. This is because he does not study, and thus disregards, empirical proof present in the Merrill data consistent with differences in access to wealth that are correlated to race. He acknowledges that "it is indeed the case that in the United States, personal wealth is greater among white households than among African American households…. As a result, among adults in the United States, a smaller fraction of African Americans were raised in a milieu in which family, friends, and acquaintances came from households of significant wealth than is the case for non-African Americans."[129] However, he goes on to say that "Although I have not done a systematic analysis, anecdotal materials I have reviewed indicate …there is scant, if any, evidence that among those in the Merrill Lynch FA workforce, African Americans have less access to social networks of wealth than do non-African Americans…."[130]

I have presented evidence above consistent with the hypothesis that there *are* substantial differences in access to wealth between African American and white FAs. The evidence also supports the conclusion that there is no race-based or race-applied cumulative advantage system at Merrill. The evidence instead supports a conclusion that there is a natural process where rewards of employment go to those with higher productivity, including highly productive African American brokers.

---

[129] Bielby, pp. 15-16.

[130] Bielby, p. 16.

74