IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE McREYNOLDS, et al., Individually and as Class Representatives, Plaintiffs, v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Defendant. | Case No.: 05-C-6583 Judge Robert W. Gettleman Magistrate Judge Denlow |

**MERRILL LYNCH'S MEMORANDUM IN SUPPORT OF ITS MOTION TO BAR CERTAIN OPINIONS OF PLAINTIFFS' EXPERTS JANICE FANNING MADDEN, Ph.D., AND ALEXANDER VEKKER, Ph.D.**

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

**MAYER, BROWN LLP**
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

*Attorneys for Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated*

Dated: May 15, 2009

## PRELIMINARY STATEMENT

Plaintiffs have submitted a principal report and rebuttal report of two labor economists, Drs. Janice Madden and Alexander Vekker, who opine that Merrill Lynch practices are the cause of earnings disparities between Merrill Lynch Caucasian and African American Financial Advisors ("FAs"), as well as the earnings disparities between Caucasians and African Americans in the training program for that position, known as Paths of Achievement ("POA"). Merrill Lynch moves under *Daubert* v. *Merrel Dow Pharm.*, 509 U.S. 579 (1993) and its progeny, to exclude portions of the rebuttal report because portions of that report are unscientific and misleading.[1] Specifically, Merrill Lynch seeks to exclude those portions of the rebuttal report and deposition testimony that (a) purport to demonstrate statistically that wealthy potential Caucasian clients are just as likely to meet and open accounts with African American POAs/FAs as they are to meet and open accounts with Caucasian POAs/FAs, which means that the African American-Caucasian earnings differential they observe is not caused by a differential access to wealth external to Merrill Lynch; and (b) criticize a "GeoCoding" study performed by defendant's labor economist, Dr. Ali Saad, which demonstrated using data from the U.S. Census that African American POAs draw more of their clients from addresses with higher concentrations of African Americans and less wealth than did Caucasian POAs.[2]

These two parts of their rebuttal report do not satisfy the standards established by *Daubert*. The statistical analysis of differences in access to wealth uses a measure for this access that likely has so much "measurement error" that it is outside what is considered acceptable as a matter of good statistical study. Drs. Madden and Vekker ("Dr. Madden") fail to acknowledge that one of the consequences of their failure to utilize a proper measure is that it makes what they identify as the race differential in African American and Caucasian earnings completely

---

[1] Drs. Madden and Vekker did not submit a sworn affidavit setting forth their opinions and testimony. Presumably the opinions and testimony that they are prepared to present in support of class certification, and which Defendant seeks to exclude in part, are contained in: (1) their report, dated June 5, 2008, attached hereto as Exhibit A; (2) their rebuttal report, dated February 23, 2009 ("Madden Rebuttal Rep."), attached hereto as Exhibit B hereto; and, (3) at Dr. Madden's deposition on April 24, 2009 ("Madden Dep."), attached in relevant part hereto as Exhibit C.

[2] In his Geo-Coding analysis, Dr. Saad used geo-coding software to link the hundred block address data of Merrill Lynch customers to the frequency count of the number of residents occupying each particular hundred block. *See* Exhibit D, Affidavit of Dr. Ali Saad, dated May 12, 2009, attaching Expert Report of Dr. Ali Saad, dated Nov. 14, 2008 ("Saad Rep.") at 25, n.51.

unreliable. This is bad science and thus inadmissible. And, Dr. Madden is just wrong about Dr. Saad's GeoCoding analysis in two respects. First, she criticizes Saad for not performing certain coding corrections that he in fact did perform and which were part of the backup to his report provided to Dr. Madden. Second, Dr. Madden failed to test the impact of some of the "errors" she found, but yet argues that the entire analysis should be excluded. When tested, these "errors" prove to be trivial with no meaningful impact on the results or the validity of the conclusions that Dr. Saad reached. This too is bad science, and thus inadmissible.

Both issues are relevant to the central debate on the merits that plaintiffs make as their principal argument in support of class certification. Defendant believes that the Court does not need to reach these issues because as demonstrated in its brief in opposition to the motion for class certification, Rule 23 precludes certifying this class even if plaintiffs are right on the merits. However, to the extent that the Court concludes otherwise, and these merits are relevant, then the question of the difficulties African American FAs and POAs have in acquiring wealthy Caucasian clients becomes much more central to the issues before the Court.

## FACTUAL BACKGROUND

Dr. Madden opines in her initial report that because she observes earnings disparities between Caucasians and African Americans in FA and POA positions, and because those disparities are not explained by education, experience, or the office in which they work, the disparity must be caused by Merrill Lynch's discrimination. In response to this report, Merrill Lynch demonstrated that this conclusion was wrong for a number of reasons, including Dr. Madden's omission of an important variable from her analysis, access to wealth. Defendant demonstrated (1) that such access is a critical component of the job, (2) that wealth is segregated in our society, with most being held by Caucasians and relatively little being held by African Americans, (3) that networks in our society also are very segregated along racial lines, (4) that crossing cultural boundaries, including racial lines, is difficult, and (5) that therefore, Caucasians and African Americans will differ in their ability to access wealth and that this is thus an important variable in explaining the observed earnings disparity which Dr. Madden has failed to account for in her analysis. The issue is important, because under Supreme Court and Seventh Circuit case law, the Court needs to scrutinize statistical analyses to determine whether critical

variables have been omitted, such as availability in a hiring case, interest in management in a promotion case, or here access to wealth.[3]

In support, Merrill Lynch offered the report of Dr. James Outtz, an Industrial Organizational Psychologist, who did a job analysis which established that developing clients by gaining access to wealth is a critical component of the job.[4] This has been conceded by plaintiffs' experts, and is not in dispute. *See* Deposition of William T. Bielby, Ph.D., dated March 30, 2009 ("Bielby Dep.") at 107:11-13; 107:17-108:7, attached hereto as Exhibit F (agreeing that developing clients is a significant part of the FA job, that social networks are substantially segregated by race, and that "it would be difficult to have a substantial book [of business] without having wealthy clients"); Madden Dep. at 106:13 - 17; 110:14-20 (agreeing that financial advisors would want to generate accounts from wealthy individuals in order to succeed and also agreeing with Dr. Bielby that it would be difficult to have a substantial book of business without having wealthy clients). Merrill Lynch also offered the opinion of Dr. Roberto Fernandez, a sociologist who opined about the wealth disparities in the United States between Caucasians and African Americans and the segregation of social networks, such that Caucasians have relationships of trust almost exclusively with other Caucasians, and African Americans have relationships of trust almost exclusively with other African Americans. *See* Exhibit G, Affidavit of Roberto M. Fernandez, dated May 12, 2009, attaching Expert Report of Roberto M. Fernandez, dated November 13, 2008, ("Fernandez Rep.") at 17-35. This also is not in dispute at the societal level. What is in dispute is the extent to which those segregated networks apply to

---

[3] *See, e.g. Bazemore v. Friday*, 478 U.S. 285, 400 n.10 (1986) (stating that "some regressions [may be] so incomplete as to be inadmissible as irrelevant"); *Mozee v. Amer. Commrc'l Marine Serv. Co.*, 940 F.2d 1036, 1046 (7th Cir. 1991); *Equal Employment Opportunity Comm'n v. Sears, Roebuck & Co.*, 839 F.2d 302, 327 (7th Cir. 1988); *Equal Employment Opportunity Comm'n v. Consol. Servs. Sys.*, 777 F. Supp. 599, 605 (N.D. Ill. 1991).

[4] As explained by Dr. Outtz, "[a] job analysis is a systematic study of a job to determine what is done, how it is done, the context in which it is done, as well as the knowledge, skills, abilities and other characteristics required to perform the job." Outtz Rep. at 6. A thorough understanding of the duties and responsibilities of an FA provides the proper context for considering the effect of policies or practices on any individual FA. *See* Exhibit E, Affidavit of Dr. James L. Outtz, dated May 12, 2009, attaching Expert Report of Dr. James L. Outtz, dated November 14, 2008 ("Outtz Rep.") at 7.

African Americans who become FAs at Merrill Lynch and the extent to which African American FAs in fact do have more difficulty accessing wealth than Caucasians due to societal factors.[5]

The question of a missing variable is particularly salient in a business where more than 60% of Caucasians hired by Merrill Lynch into POA are no longer in the business within 5 years. *See, e.g.*, MLE00053 – 000666 (only 29% of POAs hired between January 1992 and December 1995 remain after 5 years); *see also* Saad Rep. at 59, n.108 (for POAs hired March 2001 through December 2001, 66% left before they reached LOS 5). Given that high failure rate, which is the result of the difficulty every FA faces in developing relationships of trust with external customers and converting those into business, it is not surprising that this extra barrier that African Americans have, and which is completely external to Merrill Lynch, would have such a significant impact on African American broker success.

Dr. Saad tested this hypothesis in three ways: (1) he demonstrated that from the *very first month* of POA, African Americans on average self-generated significantly less assets than Caucasians (only 30% of Caucasians in the very early months); (2) he demonstrated using GeoCoding software that African Americans in POA draw the clients that they self-generate from areas with more African Americans and less wealth than Caucasian POAs; and (3) using an econometric tool known as Instrumental Variable ("IV") analysis, Dr. Saad used the assets self-generated in the third month of the POA program ("MLOS3SG") as an "instrument" to examine an otherwise immeasurable phenomenon, the social networks that POAs brought with them to Merrill Lynch (pre-Merrill access) and tested whether they differed by race.[6] He found that they did.

---

[5] Merrill Lynch's former CEO, Stan O'Neal, who is African American, testified almost three years ago about the obstacles arising from wealth and network segregation for FAs striving to build business. Mr. O'Neal stated as follows: "I think it is a fact of existence that reaching across cultural boundaries and racial boundaries [on] a consistent basis, can be a challenge in this country, maybe perhaps a challenge in every country to varying degrees, and that the concentration of wealth in most important parts of this country in the hands of, is mostly in the hands of whites, which means that by definition almost, most African-American financial advisors have to reach across racial and cultural community boundaries to establish those relationships in order to be successful, to build a broad book of business." Deposition of E. Stanley O'Neal, dated November 1, 2006 ("O'Neal Dep.") at 130-131, attached hereto as Exhibit H.

[6] Instrumental variables are used in statistics and econometrics to estimate causal relationships when controlled experiments are not feasible. *See* www.wikipedia.org entry for "Instrumental Variables;" *see also* Kennedy, Peter, *A Guide to Econometrics*, Third Edition, MIT Press, at 159 ("[A]n instrumental variable technique is a general estimation procedure applicable to situations in which the independent variable is not independent of the disturbance."), attached hereto as Exhibit I. Regression equations

In response, Dr. Madden does not challenge the first finding that African Americans have significantly fewer self-generated assets from the very beginning of POA, starting at around 30% of Caucasians and decreasing to about 50% as the weakest performers terminate, nor does she explain how this squares with her analysis. She opines that Dr. Saad's GeoCoding analysis is rife with error, rendering it unreliable. She then challenges the IV analysis as assuming its conclusion, and takes self-generated assets at month 3 of POA and adds this variable to her Ordinary Least Squares ("OLS") regression, finds that this disparity in self-generated assets does have an impact on the African American-Caucasian earnings disparity, but that the impact is small, leaving a large residual disparity that she opines is unexplained and thus must by definition be caused by discrimination.[7]

As stated above, Dr. Madden's criticisms of Saad's GeoCoding analysis either ignore what Saad actually did or are untested speculation, which when subject to analysis prove to be insignificant. However, Dr. Madden's use of MLOS3SG in her OLS regression is even more misleading. As demonstrated below, she takes what was intended as an instrument in an IV analysis designed to examine one *small aspect* of access to wealth – the pre-existing social networks that someone brings with them to the POA training program – and uses it as a measure in her OLS regression to demonstrate that the impact of *all aspects* of access to wealth – those that someone brings to POA and those that one develops while in POA – is very small. She never examined the extent to which MLOS3SG measures all aspects of access to wealth. If as one suspects it is a very imperfect measure, then one cannot scientifically draw the unqualified, categorical conclusions that she has drawn that access to wealth does not differ by race and thus does not impact the African American-Caucasian earnings disparity. The issue is called

---

generally evaluate the relationship between a set of independent variables and a dependent variable. The portion of the variation in, i.e. the different observations of, the dependent variable that is not accounted for by the independent variables in the model is referred to as the "error" or "disturbance." The independent variables included in an OLS regression model should have no correlation to the disturbance in the model. It is therefore fundamental that if one or more variables does have a correlation with the disturbance in the model, that an analyst use a different econometric approach. In our case, Dr. Madden's analysis reflected by Table R2b of her rebuttal report includes an independent variable, MLOS3SG, that is correlated with the disturbance in her model, since a large part of the access to wealth influence that Dr. Madden seeks to capture is not contained in the MLOS3SG variable itself. As a result, measurement error arises.

[7] An OLS regression measures the causal effect of several independent variables (such as education and experience) upon a dependant variable (such as the earnings of high school teachers).

"measurement error" or "attenuation bias" in statistics, which can lead to biased, unreliable results.[8]

Dr. Madden sought to defend this in her deposition by saying that to the extent that self-generation was not an adequate measure because it had too much error, then this would not impact the measurement of the race effect in her regression. Madden Dep. 286-287. However, this is just wrong. It is elementary, and beyond any scientific dispute, that when you put a variable that does not measure something well into a regression equation, you introduce error into your regression, and the other measures in your equation are distorted. In this case, as explained more fully below, the error in measurement associated with MLOS3SG is likely tremendous, which in the case of Dr. Madden's model, distorts the race effect so that is cannot be measured with any accuracy. Therefore, Dr. Madden's analysis and conclusions on this issue are unscientific, the results from the analysis are biased and cannot assist the trier of fact, and should be excluded.

## ARGUMENT

Before considering an expert's opinion, the Court must determine that it is both relevant and reliable. *Daubert*, 509 U.S. at 589. This test is satisfied only when the following three criteria are met: (1) the witness "must be qualified as an expert by knowledge, skill, experience, training, or education;" (2) "the expert's reasoning or methodology underlying the testimony must be scientifically reliable;" and (3) the testimony "must assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). These requirements apply equally in the class certification context. *See Srail v. Village of Lisle*, 249 F.R.D. 544, 557, 562 (N.D. Ill. 2008) (addressing admissibility of

---

[8] For a description of measurement error, see Cameron, A. Colin and Pravin K. Trivedi (2005) *Microeconometrics*, Ch. 26, p. 899, attached hereto as Exhibit J, stating as follows: "That is, measurement error is triggered by unobservable (or latent variables) when such variables are replaced by proxy variables. Here are some examples. Consider the problem of testing for the presence of gender bias in a study of earnings. The obvious approach is to regress a measure of earnings on a categorical gender variable while controlling for qualifications, age, experience, and so forth. However, the most relevant variable may be the individual's on-the-job productivity, which may not be directly observed and a proxy may be used instead. Therefore, the impact of measurement error on inferences about gender discrimination is an important issue."

expert and applying the *Daubert* factors before determining class certification); *see also Blades v. Monsanto Co.*, 400 F.3d 562, 575 (8th Cir. 2005).[9]

## I. DR. MADDEN HAS NOT MEASURED ACCESS TO WEALTH AND THUS HER CONCLUSIONS ARE UNSCIENTIFIC

Dr. Madden's fundamental error in attempting to measure access to wealth is to take an imperfect measure of *one small piece* of the larger mosaic of access to wealth (pre-Merrill social networks), claim that she has a measure for *all* access to wealth in all its many facets, and use that to test whether access to wealth impacts the African American-Caucasian earnings disparity. *See* Madden Rebuttal Rep. at 8-10. She finds that it has some impact, but rather than recognizing that this small impact is significant -- since she has only an imperfect measure for one small aspect of the broader concept of "access to wealth" that determines whether an FA is successful -- she instead draws a categorical, unqualified conclusion that it is irrelevant because it does not explain more of the disparity, even though there is no reason to expect that it would. Madden Rebuttal Rep. at 10. This rebuttal "analysis" is bad science. By using an imperfect measure of one small piece of access to wealth as a measure for all access to wealth, Dr. Madden arbitrarily chose a statistical technique that was inappropriate, served only to confuse the reader as to what Dr. Saad truly attempted to measure and was designed to achieve results consistent with Plaintiffs' theory. In *Remien v. EMC Corp.*, No. 04 C 3727, 2008 WL 597439, at *3 (N.D. Ill. Mar. 3, 2008), the court granted defendant's motion to exclude plaintiffs' statistician on grounds that his similar cherry-picking of methodologies did not satisfy *Daubert*. The court stated that in choosing methods oriented to the results sought, "[t]here was an abandonment of the principles of [his] discipline and intellectual independence necessary to the predication of a minimum level of reliability on his opinions and findings." *Id.*

Dr. Madden states at page 8 of her rebuttal report that "[i]f Dr. Saad believes that access to wealth differs by race, that a racial difference in access to wealth is the cause of racial disparities in compensation, and that production on self-generated assets provide a measure of access to wealth, then all he need do is add this measure to our compensation regression analyses at Tables 1 through 6 of our initial report." Until this point, her assessment is conceptually

---

[9] Unreliable expert reports simply have no place in a court's class certification inquiry. *See, e.g., Mehl v. Canadian Pac. Ry., Ltd.*, 227 F.R.D 505, 509 (D.N.D. 2005), *superseded by statute on other grounds*, Federal Railway Safety Act, Section 1528, 84 Stat. 971 (1970) (codified as amended at 49 U.S.C.A. § 20106(a) (2007)) ("It cannot be that a court could certify a class . . . on the basis of an expert opinion so flawed that it is inadmissible as a matter of law.").

correct. She fails to realize, however, that there is no readily available "measure" of access to wealth in the Merrill Lynch data, and this is the precise reason that Dr. Saad utilized an IV analysis to estimate production stemming from one small piece of such access, "*pre-Merrill access to wealth.*" Saad Rep. at 31.

Definitions are important. Dr. Saad never said that MLOS3SG was an instrument for *all* access to wealth, as Madden claims. He said only that it was an instrument for "*pre-Merrill differences in access to wealth.*" Saad Rep. 31 (emphasis added). Elsewhere in his report he defines "access to wealth" as "social networks." *See, e.g.*, Saad Rep. at 8, 30. As a snapshot at a single moment in time, MLOS3SG, cannot even possibly capture the full impact of *pre*-Merrill Lynch access to wealth, and it certainly does not reflect the impact of social networks that brokers continue to utilize and further develop during their tenure at Merrill Lynch.[10]

A straightforward way to explain the bias introduced by Dr. Madden's inappropriate use of MLOS3SG is the following: MLOS3SG captures imperfectly only one component of the true variable we wish to measure, which is access to wealth broadly defined and including both pre-Merrill and post-hire access. Specifically, MLOS3SG captures only *some* component of the overall variance in *pre*-Merrill Lynch access to wealth. One can analogize this to the example offered in footnote 10 above, in that the observation of MLOS3SG is a single observation not indicative of the general effects of *pre*-Merrill Lynch access to wealth in the same way that a measure of blood pressure at any given time is a single observation not indicative of the general effects of long-term blood pressure. And, even more significantly, it has very little if anything to say about access developed through one's efforts after someone joins Merrill Lynch.

In other words, by controlling only for the *single observation only* in an OLS regression, a large portion of the true variable of interest – the general effect of access to wealth – is left unaccounted for. MLOS3SG cannot even partially capture the effects of access to wealth that

---

[10] A simple analogy can illustrate this point. A well-accepted predictor of heart attack risk is long-term blood pressure. The way that Dr. Madden utilizes Dr. Saad's instrumental variable – MLOS3SG – would be akin to a medical researcher using a single observation of blood pressure as the equivalent of long-term blood pressure for purposes of assessing heart attack risk. Of course, a single observation of blood pressure is unreliable to serve this purpose, as it could be impacted by an infinite number of factors and would not properly capture the measure of long-term blood pressure. Likewise, MLOS3SG cannot capture the long-term impact of access to wealth and other non-Merrill Lynch-related factors, which is why Dr. Saad's analysis proceeds in two stages with an IV analysis, the first of which is used to estimate productivity caused by the long-term effect of non-Merrill Lynch factors.

impacts productivity after the third month of POA, whether that access itself pre-existed hire at Merrill Lynch or develops post-hire at Merrill Lynch. As a matter of statistics, the portion of the a variable of interest (access to wealth) left unaccounted for by the *substituted variable* (MLOS3SG) used in an OLS regression serves to improperly distort the apparent impact of all variables used in the equation. The problem is particularly significant here because not only does Dr. Madden fail to account for the imperfections in the extent to which MLOS3SG measures pre-Merrill access to wealth, but she uses MLOS3SG to measure the entirety of an FA's ability to gain access to wealth, which by definition it could never do. Therefore, the amount of error or distortion is enormous.

This distortion expresses itself as a result of the error arising from measuring the problematic variable (MLOS3SG) as if it were the true variable of interest (access to wealth). This is what scientists refer to as "measurement error." Dr. Madden conducted her analysis under the premise that when a variable suffering from measurement error is introduced into an OLS regression equation, only the coefficient on that variable (here MLOS3SG) suffers from bias. Madden Dep. at 283:20 – 287:18. This is factually incorrect as a matter of science. Quite to the contrary, it is universally accepted as a matter of statistics that a control variable suffering from measurement error contaminates all variables in an OLS regression model.[11] Here that distorts the impact of race on earnings. Dr. Madden's methodology is not generally accepted or reliable as science.

In the context of attempting to analyze the effects of *pre-Merrill Lynch* access to wealth, it is likely that there is an extremely high degree of measurement error associated with the MLOS3SG variable.[12] This error would be even greater with respect to any attempt to measure all access to wealth in its many facets. As a result, the coefficients of each variable in Dr. Madden's OLS regression become extremely biased. What this means is that in the analysis she

---

[11] *See* Affidavit of Christopher Winship, Ph.D., dated May 13, 2009, attached hereto as Exhibit K; *see also* Greene, William H., *Econometric Analysis*, Macmillan Publishing Company, at 298 (noting that where a variable with measurement error was used in a regression analysis, "[t]he coefficient on the badly measured variable is still biased toward zero. The other coefficients are all biased as well, though in unknown directions. <u>A badly measured variable contaminates all of the least squares estimates.</u>") (emphasis added), attached hereto as Exhibit L.

[12] For a detailed description of an analysis conducted in order to illustrate one way to assess the degree measurement error associated with the MLOS3SG variable, see affidavit of Ali I. Saad, Ph.D., dated May 13, 2009, attached hereto as Exhibit M.

performs, the coefficient on the MLOS3SG variable is biased towards zero, such that the apparent impact of that variable is artificially reduced. This artificial reduction results in much of the apparent impact to move within the coefficients of the remaining variables in the model. This is what statisticians refer to as "contamination bias" resulting from the measurement error associated with the problematic variable. In the case of Dr. Madden's model, the race variable takes on the bias introduced by the measurement error of MLOS3SG.[13] As a result, the race variable observed by Dr. Madden becomes artificially distorted by absorption of the portion of the unobserved variable (access to wealth) that is not captured by MLOS3SG. Therefore, Dr. Madden's reported results in tables R2a and R2b, along with her discussion of the same at pages 4-12 in the "Compensation" section of her rebuttal report are extremely misleading and unscientific as a test of the hypothesis she posits. As such, this analysis serves only to distort the evidentiary record before the Court and should be excluded pursuant to Fed. R. Evid. 702 and the standard set forth in *Daubert*.

## II. DR. MADDEN'S CRITICISMS OF DR. SAAD'S GEOCODING ANALYSIS HAS NO SCIENTIFIC BASIS AND OFFERS NO EMPIRICAL SUPPORT

In her February 23, 2009 rebuttal report, Dr. Madden argues that Dr. Saad's GeoCoding analysis is not reliable because his analysis (1) contained residential as well as business addresses of Merrill Lynch customers and (2) was fraught with coding errors. Madden Rebuttal Rep. at 28-29. Both criticisms are merely speculative with no scientific basis, serve only to distort the evidentiary record, and should be excluded.

### A. Excluding Business-Held and Institutional Accounts Does Not Alter Dr. Saad's Conclusions

Dr. Madden could have assessed the impact of using business addresses on Dr. Saad's conclusions, but did not endeavor to do so. In fact, Dr. Madden correctly states that an analyst could "use the available indicators on the account electronic files to eliminate from his analyses the accounts of institutions, businesses, and organizations." Madden Rebuttal Rep. at 27-28.

---

[13] *See* Kennedy, Peter, *A Guide to Econometrics*, Third Edition, MIT Press, at 137, attached hereto as Exhibit N. Peter Kennedy, a commonly cited econometrician, has identified this problem as the "implication of using incorrectly measured variables, whether these measurement errors arise from the whims of the village watchmen or from the use by econometricians of a proxy variable in place of an unobservable variable suggested by economic theory." *Id.* At her deposition, Dr. Madden recognized *A Guide to Econometrics* as a text with which she is familiar and one that is relied upon in her field. Madden Dep. at 18:3-19:6.

She chose not to do so, however. In response to Dr. Madden's criticisms, Dr. Saad subsequently performed the analysis relevant for testing Plaintiffs' hypothesis regarding the inclusion of those accounts having business account indicators in the Merrill Lynch data. Using Merrill Lynch account level data produced in this litigation, Dr. Saad separated households associated with Social Security Numbers from those with TAX/Employer Identification Numbers and re-conducted his GeoCode analysis including only those accounts associated with Social Security Numbers.[14] He concluded that while removing institutional and business-held accounts from the analysis does change the percentages that appear in his report slightly, doing so does not alter any qualitative conclusions. The results of this analysis are shown in Exhibit O, attached hereto. When business-held and institutional accounts are excluded from the analysis, the results remain consistent with the finding that accounts acquired by African American POAs are drawn from neighborhoods with higher average concentrations of African American residents and from neighborhoods with systematic lower average neighborhood wealth, as measured at the 75th percentile of the value of real estate. The results, even after excluding what Dr. Madden identifies as "business" accounts, are still highly statistically significant. Had Dr. Madden undertaken the analysis that she suggests, she would have seen her speculative criticism has no scientific validity, and should therefore be excluded pursuant to both Fed. R. Evid. 702 and the admissibility standard set forth in *Daubert*.

Dr. Madden further speculates that Dr. Saad's analysis may be inaccurate because a customer of Merrill Lynch may "choose to have her account [statement] mailed to her workplace rather than her home." Madden Rebuttal Rep. at 28. Again, Dr. Madden does not attempt to validate this criticism in any way or assess the frequency with which non-residential 100-block addresses are reported in the data. Dr. Saad did.

Using the population of 100-block addresses analyzed in his GeoCoding studies, Dr. Saad first randomly selected 500 households to serve as a representative sample of the larger population of 100-block addresses. In order to assess whether each 100-block address represented a business or residential address, he relied upon the visual information contained in

---

[14] This was done using a SSN/TAX_ID indicator available in the Merrill Lynch data set entitled "TBACCT." Dr. Madden also used the TBACCT data files in her original analysis, but not for this purpose.

Google Maps.[15] For nearly all of the street addresses in the random sample, Google Maps provides a clear aerial view of the 100-block, a more-detailed street-level view of the 100-block, or both. Dr. Saad then classified each of the of the 100-block addresses in the random sample as "Residential," "Non-Residential," or "Unknown" based on the image provided. The first two categories were reserved for 100-block addresses which he could unequivocally classify as a residential or business address from the Google Map images, and any images that did not clearly represent residential or business addresses were classified as "Unknown" for purposes of the analysis. For the sample of 500 addresses, 7.8% were identified as "Unknown," 84.4% were identified as "Residential," and 7.8% were identified as "Non-Residential." The results appear in Exhibit P, attached hereto.

To further confirm the results of his testing of Dr. Madden's theory, Dr. Saad re-ran several variations of the GeoCode analysis which appears in Exhibit 14 of his report. First, he ran the analysis using only the random sample of 500 in order to ensure that the results of analyzing the sample of accounts remained consistent with conclusions reached in the original analysis. They did. Following that exercise, he re-ran the analysis among the sample after removing all of the addresses classified as "Non-Residential." Subsequently, he ran the analysis removing both "Non-Residential" as well as "Unknown" addresses. In all three variations of the analysis, the results differ only slightly and the conclusions remain unchanged. The results appear in Exhibit Q, attached hereto. Again, Dr. Madden has offered no scientifically valid test to support her baseless criticisms.. The opinions proffered in Dr. Madden's rebuttal report related to Dr. Saad's GeoCoding analysis fail the basis tests of science and should be excluded.

### B. Dr. Madden's Criticisms Regarding Alleged Coding Errors is Factually Incorrect and Misleading

Dr. Madden also speculates about possible errors in the mechanical process by which Dr. Saad attached Census information to the certain types of 100-block addresses. Like her other criticisms of Dr. Saad's GeoCoding analysis, these opinions are unscientific and should be deemed inadmissible. Specifically, Dr. Madden states that Dr. Saad's analysis "did not geocode, and therefore omitted, most of the addresses that included 'apt', '#', 'unit', or 'Fl', which

---

[15] See maps.google.com – other information sources such as the UPS delivery database and county assessors zoning records require specific addresses in order to make a determination regarding commercial/residential status. With 100-block information, a visual assessment of the location is required.

account for over 15% of the addresses in the database." Madden Rebuttal Rep. at 29. This is incorrect as a matter of fact. While the initial output of any analysis utilizing GeoCode software contains certain standard issues that must be accounted for by an analyst, there are well-accepted methods to resolving these issues, and Dr. Saad employed them. Dr. Saad was aware that without what analyst commonly refer to as "post-processing," 100-block addresses containing unit and apartment numbers might be incorrectly coded. As a part of the analysis, therefore, Dr. Saad resolved any improper coding related to 100-block addresses containing unit or apartment numbers. As a part of post-processing the initial data output from his GeoCode analysis, nearly 200,000 households were assigned with Census statistics to resolve the issue Dr. Madden raises.[16] Addresses with unit numbers are correctly coded to the relevant Census data in his analysis. The programs used in post-processing to account for addresses having unit numbers were included as a part of the backup material provided with his November 14, 2008 report.[17] Dr. Madden's criticism is unfounded and simply wrong.

Dr. Madden further speculates that Dr. Saad's GeoCoding analysis is flawed because 100-block addresses containing only two digits and therefore having a "leading 0" are either not included in Dr. Saad's analysis or are coded improperly. Madden Rebuttal Rep. at 29. Dr. Madden states that Dr. Saad "miscoded addresses with a leading '0,' which account for almost 7% of the addresses in the database." *Id.* While it is true that these "leading 0" addresses comprise approximately 6.2% of the 100-block addresses used in the analysis, the criticism raised actually only affects a negligible portion of that 6.2%. Dr. Madden references two examples in her rebuttal report – both cherry-picked – where the coding is incorrect. Madden Rebuttal Rep. at 29. This is misleading and not scientifically or statistically tested or supported, since these two examples are not in any way representative of a larger-scale issue. After receiving Dr. Madden's rebuttal report, Dr. Saad scientifically tested the extent of the impact of

---

[16] In addition to this data cleaning procedure, Dr. Saad also calculated aggregates for each ML-serviced ZIP code based on the block-group level data. For addresses that remained missing after clean-up, the ZIP code aggregates were applied. These accounts were not 'omitted' from the analysis.

[17] The specific program which accounted for the issue raised by Dr. Madden is entitled "Addresses -- (4) Retain and Cleanup for G Files.sas," which was provided as a part of the backup materials to Dr. Saad's November 14, 2008 report and also subsequently identified in the December 24, 2008 email from Jason Bonk to Linda Friedman and George Robot. *See* Exhibit R, Affidavit of Jason Bonk, dated May 14, 2009, attaching Email from Jason Bonk to Linda Friedman and George Robot, dated December 24, 2008.

improperly coded 100-block addresses due to their having a "leading 0," and concluded that approximately 88% of all two-digit hundred-block addresses were in fact coded appropriately. Thus, only approximately seven-tenths of one percent (0.7%) of the total number of 100-block addresses included in his analysis were improperly coded due to leading zeroes in the street address.[18] This is an insignificant small percentage of addresses that were miscoded, and has no impact on the conclusions reached from his analysis. Dr. Madden's opinions related to this issue are likewise speculative and unscientific. As a result, those opinions should be excluded pursuant to Fed. R. Ev. 702 and the standard set forth in *Daubert*.

## CONCLUSION

For the foregoing reasons, Merrill Lynch respectfully requests that the Court exclude the above-referenced portions of Drs. Madden and Vekker's rebuttal report, along with any opinions and testimony related to the same subject matter.

Dated: May 15, 2009

By:     s/ Nicholas J. Pappas
WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

--and--

MAYER, BROWN LLP
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

---

[18] The 0.7% figure reflects the percentage of the approximate 7% subset having two digit hundred blocks that are actually affected by coding issues.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 15, 2009 she caused copies of Defendant Merrill Lynch's (1) NOTICE OF MOTION, (2) MOTION TO BAR CERTAIN OPINIONS OF PLAINTIFFS' EXPERTS JANICE FANNING MADDEN, PH.D. AND ALEXANDER VEKKER, PH.D., AND (3) MEMORANDUM IN SUPPORT to be served by ECF to each attorney having an email address on file with the Court and by hand delivery to:

> Linda Friedman
> Stowell & Friedman
> 321 S. Plymouth Court, 14th Floor
> Chicago, IL 60604

May 15, 2009                     /s/ Lori E. Lightfoot
                                 Lori E. Lightfoot