## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE McREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, Individually on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Case No. 05-C-6583 |
| Plaintiffs, | ) ) | Judge Robert W. Gettleman |
| | ) | Magistrate Judge Morton Denlow |
| v. | ) ) | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, | ) ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTIONS TO STRIKE

Attorneys for Plaintiffs and Putative Class

Mary Stowell
Linda D. Friedman, Attorney No. 06190092
George Robot
Suzanne E. Bish

**STOWELL & FRIEDMAN, LTD.**
321 South Plymouth Court
Suite 1400
Chicago, IL  60604
(312) 431-0888

## TABLE OF CONTENTS

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**...........................................................................................1

Common Issues of Law and Fact....................................................................................3

ARGUMENT...................................................................................................................5

Legal Standard ...............................................................................................................7

I.    Plaintiffs Have Established All Rule 23(a) Requirements...........................................8

   A. Commonality ...........................................................................................................8

      1.    Courts Have Regularly Certified Similar Class Actions Brought By Financial Advisors Against Retail Brokerage Firms ...................................9

      2.    This Is Not An Across-The-Board Case But Instead Challenges A Discrete Set Of Uniform Policies or Practices In A Single Business Unit .................10

      3.    Commonality Is Met By Plaintiffs' Challenge to Defendant's Uniform National Written Policies and Practices, Which Are Of The Type Regularly Certified and Tried On A Class Basis...........................................11

      4.    The Named Plaintiffs' Testimony And Class Member Declarations Establish Commonality...............................................................................16

      5.    Class-Wide Statistics Establish Commonality.............................................17

         (a)    Plaintiffs' Statistical Proof Ties the Disparities To Policies Or Practices 17

         (b)    Merrill Lynch's Expert Reports Further Establish Commonality.............20

            (i)    Merrill Lynch's Experts Rise Or Fall Together...............................20

            (ii)    Dr. Saad Ignored Dr. Outtz's Job Analysis .....................................22

   B. Typicality ...............................................................................................................27

   C. Adequacy ...............................................................................................................29

II.   The Proposed Class Meets Conditions For Rule 23(b)(2) Or Hybrid Certification ..31

III.  The Proposed Class Satisfies Rule 23(b)(3) ............................................................36

**PLAINTIFFS' RESPONSE TO MERRILL LYNCH'S MOTIONS TO STRIKE**.......43

IV.   The Court Should Deny Merrill Lynch's Motions to Strike Plaintiffs' Witnesses
      and Bar Plaintiffs' Experts.................................................................................43

    A. Response to Motion to Strike Dr. Madden's Opinions..............................43

    B. Response to Motion to Strike Dr. Bielby's Opinion.................................44

        1.    Bielby's Testimony Is Sufficiently Tied To The Record .............................44

        2.    Bielby's Methods Satisfy Rule 702 .............................................48

    C. Response to Motion to Strike Plaintiffs' Declarations..............................52

**CONCLUSION** ...................................................................................54

## TABLE OF AUTHORITIES

### Cases

*Abt v. Mazda American Credit*, 98-C-2931 1999 U.S. Dist. LEXIS 6169 ................................28

*Accord Ellis v. Costco,* 240 F.R.D. 624, 642-643, (N.D. Cal. 2007) ............................................33

*Adams v. Pinole Point*, 92-1962, 1994 U.S. Dist. LEXIS 6692 (N.D. Cal. May 18, 1994)....14, 15

*Aliotta v. Gruenberg*, 237 F.R.D. 4, 12-13 (D.D.C. 2006) ........................................................36, 37

*Allen v. Int'l Truck and Engine Corp.,* 358 F.3d 469, 471 (7th Cir. 2004) ................................32

*Amoachev v. Smith Barney* (S.D.N.Y.)........................................................................................9

*Anderson v. Boeing Co.*, 222 F.R.D. 521, 541 (N.D. Okla. 2004) ..........................................32, 33

*Arnold v. Cargill Inc.*, 01-2086, 2006 US Dist. LEXIS 41555 (D. Minn. June 20, 2006)45, 47, 51

*Augst-Johnson v. Morgan Stanley* (D.C.) ...................................................................................9

*Bartelson v. Dean Witter,* 86 F.R.D. 57 (E.D. Pa. 1980).............................................................9

*Bell v. Addus, Inc.*, 06-5188, 2007 U.S. Dist. LEXIS 78950(W.D. Wash. Oct. 12, 2007) ...............37, 54

*Betty Dukes v. Wal-Mart*, 222 FRD 189, 192 (D. Cal. 2004)............................................45, 47, 51

*Binion v. Metropolitan Pier*, 163 F.R.D. 517, 5223-26 (N.D. Ill. 1995)......................................14

*Blihovde v. St. Croix County Wis.*, 219 F.R.D. 607, 621 (W.D. Wis. 2003) ...............................40

*Butler v. Home Depot, Inc.,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997)................................45, 51

*Calvin v. Sherriff of Will County,* 03 C 3086, 2004 U.S. Dist. LEXIS 8717 (N.D. Ill., 2004)13, 34

*Caridad v. Metro North Commuter R.R.*, 191 F.3d 283, 291-2 (2nd Cir. 1999) ....................14, 51

*Carnegie v. Household International*, 376 F.3d 656, 659–61 (7th Cir. 2004) ...............................34, 41

*Cremin v. Merrill Lync*h, 96 C 3773 ..................................................................................9, 10, 33

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)............................................. passim

*De La Fuente v. Stokely-Van Camp, Inc.* 713 F.2d 225, 232 (7th Cir. 1983)........................28, 41

*Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 201-322 (N.D. Ill. 2004)....................9, 32

*Dunn v. City of Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005)............................................8, 40

*Eisen v. Carlisle & Jacquelin,* 417 U.S.156, 177 (1974) ........................................................7, 54

*Espinoza v. Dominos Pizza,* 07-1601, 2009 U.S. Dist. LEXIS 31093 (C.D.Cal. Feb. 18, 2009).53

*Flavel v. Svedala Indus.,* No. 92-1095, 1994 U.S. Dist. LEXIS 19774 at *1 (E.D. Wis. Oct. 25, 1994)...51

*Fry v. UAL Corporation,* 136 F.R.D. 626 (N.D. Ill., 1991) ..................................................37

*Gary v. Sheahan* 1999 U.S. Dist LEXIS 5616 (N.D. Ill. 1999) ..................................................40

*Gaspar v. Linvatec Corp.*, 167 F.R.D. at 51, 57 (N.D. Ill. 1996)....................................28

*General Falcon Co. v. Falcon*, 457 U.S. 147 (1982) .......................................................7

*Great Northern Nekoosa Corp. v. ASEA*,657 F.Supp.1253, 1256 (W.D.Ark. 1987) ................6

*Green v. USX*, 896 F.2d 801, 805 (3rd Cir. 1990).......................................................14

*Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir. 1985) ........................................14, 32

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998).............................28

*Health and Welfare Fund*, 98-C-4302 1999 U.S. Dist. LEXIS 14853 (N.D. Ill. Aug. 20, 1999) ...8

*Hnot v. Willis Group Holdings, Ltd.* 228 F.R.D. 476, 486 (S.D. N.Y. 2005) ...................... passim

*Hoffman v. Grossinger Motors, Inc.*, No. 96-5362, 1999 U.S Dist LEXIS 2392......................29

*Hurst v. F.W. Woolworth Co.*, 95-6584, 1997 U.S. Dist. LEXIS 17233, at *2 (S.D.N.Y. Nov. 3, 1997)..51

*In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)...........................................32

*In re Monumental Life Ins. Co.*, 365 F.3d 408, 418 (5th Cir. 2004)...............................32

*Indianapolis Minority Cntr.s v. Wiley*, 94-1175, 1998 U.S. Dist, LEXIS 23349 (D. Ind., May 13, 1998) 49

*Intl. Bhd. Of Teamsters v. United States*, 431 U.S. 324 (1977)............................... passim

*Jaffe v. Morgan Stanley* (N.D. Ca.) ..............................................................................9

*Jefferson v. Ingersoll Int'l.*, 195 F.3d 894, 897 (7th Cir. 1999)..............................8, 31, 32, 41

*Jefferson v. Windy City* 196-C-7686 998 U.S. Dist. LEXIS 12262 (N.D. Ill. Aug. 3, 1998)..........8

*Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 889 (D. Minn. 1993) ...................................46

*Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) ......................................................8

*Krueger v. New York Telephone*, 163 FRD 433, 440 (S.D.N.Y. Sept. 22, 1995).........................44

*Lemon v. Int'l .Union of Opt.*, 216 F.3d at 577, 579-582 (7th Cir. 2000) ..........................31, 32, 33

*Levitt v. Pricewaterhouse*, 04-5170, 2007 U.S. Dist. LEXIS 52756 (S.D.N.Y. July 19, 2007)....53

*Liberles v. Cook County*, 709 F.2d 1122, 1136-37 (7th Cir. 1983) ..................................33

*Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326 (4th Cir. 1983)...............................14

*Martens v. Smith Barney* ...................................................................................9, 10

*Massie v. IDOT*, 96-C-4830, 1998 U.S. Dist. LEXIS 8680 at *17-18 (N.D. Ill. June 5, 1998)....33

*McClain v. Lufkin Industries, Inc.*, 187 F.R.D. 267 277 (E.D. Tex. 1999) ..................................31

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 625 (N.D. Ill. 1989)......................................30, 36

*Moreno v. DFG*, 02-C-4019 2003 U.S. Dist. LEXIS 8700 (N.D. Ill. May 21, 2003).........8, 41, 42

*Morgan v. United Parcel Service, Inc.* 169 F.R.D. 349 (E.D. Mo. 1996) .........................14, 51

*Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004) .............................37

*Olympia Exp., Inc. v. Lineee Aeree*, 02-2858; 2007 U.S. Dist. LEXIS 14307 (N.D. Ill. Feb. 27, 2007) ...52

*Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 373-74 (N.D. Ill. 1997) .................14

*Palmer v. Combined Ins. Co. of America*, 217 F.R.D. 430, 438 (N.D. Ill. 2003) ..................33, 37

*Pirolozzi v. Stanbano*, 07-795, 2009 U.S. Dist. LEXIS 42575 *9 (D. Ohio, May 8, 2009) ...................49

*Portis v City of Chicago*, 2003 U.S. Dist. LEXIS 1572 (N.D. Ill., 2003) .....................................40

*Price Waterhouse v. Hopkins*, 490 U.S. 228; 255-56 (1989) ......................................................47

*Puffer v. Allstate*, 225 F.R.D. 450 (N.D. Ill. 2009)....................................................................17

*Reid v. Lockheed Martin, Aero, Co.* 205 F.R.D. 655, 667-68 (N.D. Ga. 2001) ...........................14

*Remien v. EMC Corp*, 2008 U.S. Dist. LEXIS 74174 at 14 (N.D. Ill. 2008)................................34

*Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2004) ...........................................10

*Robinson v. Metro North Commuter Railroad*, 267 F.3d 147 (2nd Cir. 2001).......................passim

*Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 477 (E.D.N.Y. 2001) ..............................................37

*Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992)....................................................8, 17

*Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992) .................................................17

*Rossini v. Ogilvy Mather, Inc.*, 798 F.2d 590, 598 (2nd Cir. 1986)...........................................14

*Sagun Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208, 214 (D. Mass. 2009)...47

*Sally Naeem v. McKesson Drug Company*, 444 F.3d 593, 610 (7th Cir. 2006) .........................47

*Satchell v. Fed. Ex.*, 03-02659 2005 U.S. Dist LEXIS 37354 (N.D. Cal. Sept. 27, 2005)......13, 34

*Silverstein v. Penguin*, 01-309, 2006 U.S. Dist. LEXIS 61750(S.D.N.Y. Aug.29, 2006) ...........53

*Smith v. Nike Retail*, 234 F.R.D. 648, 659 (N.D. Ill. 2005).................................................passim

*Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1199 (7th Cir. 1971)....................................2

*Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 301-303, 327 (N.D. Cal. 1992)..................45, 51

*Stewart v. General Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir. 1976) ..............................33, 37

*Toney v. Rosewood Care Center*, 1999 U.S. Dist. LEXIS 4744 (N.D.Ill. 1999) ........................43

*Tyus v. Urban Search Management*, 103 F.3d 256, 263-264 (7th Cir. 1996) ...........................47

*United States v. Sinclair*, 74 F.3d 753 (7th Cir. 1996) .............................................................47

*Vigars v. Valley Christian Center of Dublin*, 805 F.Supp. 802, 808 (N.D.Cal. 1992) ..................2

*Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467, 1477 n.11 (S.D.Tex. 1992).......................6

*Wagner v. Nutra Sweet*, 95 F.3d 527, 534 (7th Cir. 1996) ........................................................8

*Walker v. Soo Line R.R.*, 208 F.3d 581, 590-91 (7th Cir. 2000)...........................................50, 52

*Weizeorick v. ABN AMRO Mortgage Group, Inc.* 01 C 713, 2004 U.S. Dist. LEXIS 15467 .......29

*Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347 (N.D. Ill., 1998)........................................40

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Confronted with undeniable hard facts from its own analyses and employment data, which establish that African American Financial Advisors ("FAs" or "brokers") suffer statistically significant higher attrition rates and earn statistically significant lower wages than white FAs, Merrill Lynch resorts to an explanation for the disparities that, oddly, synchronizes with Plaintiffs' class-wide claims of racial bias. Plaintiffs allege that Merrill Lynch promulgates the myth that African Americans cannot succeed as FAs because, simply stated, they cannot garner white clients. Merrill Lynch, therefore, under firm-wide policies, systematically treats African Americans as inferior to whites and provides different and less favorable income-generating opportunities and support to African Americans, resulting in their dramatically less favorable employment outcomes at Merrill Lynch. Through class-wide evidence, Plaintiffs seek the opportunity to prove that Merrill Lynch policies or practices are discriminatory, and to end them.

More specifically, Plaintiffs allege that Merrill Lynch maintains and instills its managers with harmful stereotypes and generalizations about African Americans. *See* discussion at Pl. Mem. at Sec. I, Part C. Although Merrill Lynch managers hire African Americans as part of amorphous "diversity goals," they consider long-term retention of African Americans to conflict with Merrill Lynch's directive that managers maximize revenue. *See* Ex. 100 at MLE 00373-265; Ex. 93 at MLE 00003-146, 174. African Americans are not viewed as having the potential to succeed other than, perhaps, as FAs to African American clients. *See, e.g.,* Ex. 20 at 77-79; Ex. 22 at 405; Ex. 25 at 50; Ex. 30 at 12; Ex. 42 at 139; Ex. 53 at 31; Ex. 64 at MLE 00951 889. Accordingly, Merrill Lynch has established firm-wide policies or practices that steer resources and opportunities to whites and seek to race-match clients to FAs.[1] Plaintiffs' experts study Merrill Lynch's account transfer and teaming policies or practices and connect statistically significant disparities associated with these policies or practices to the statistically significant

---

[1] As explained in Plaintiffs' Memorandum in Support of Class Certification ("Pl. Mem." or "Opening Memorandum") Plaintiffs' allegation that Merrill Lynch is rife with harmful racial profiling and stereotypes about African Americans is supported not only by experts and anecdotal evidence but also by a legion of Merrill Lynch's own documents describing its policies or practices, as well as their impact. *See, e.g.,* Pl. Mem at 8-14, 36-43; Ex. 83 at MLE 00357-798. Ex. 48 at 106-07; Ex. 46 at 63-66; Ex. 82, 83, 90; Ex. 48 at 61-62 104-05, Ex. 82 at MLE 00357-832; Ex. 82 at MLE 00666 – 000356, 000319; Ex. 83 at 00357 – 000832;Ex. 42 at 123; Ex. 44 at 185-86; Ex. 43 at 194; Ex. 45 at 277; *see also* Ex. 2 at 35-36, 46.

racial disparities in compensation and attrition between white FA and African American FAs.

Ironically, rather than deny Plaintiffs' charge of systemic racial bias, Merrill Lynch seeks to defend its harmful racial generalizations and stereotypes as representing the truth and merely good business. Merrill Lynch's experts' reports and its pleadings set forth a defense based on the following syllogism:

**PREMISE**: FAs bring in clients of high net worth to make money for Merrill Lynch, a for-profit company;

**PREMISE**: There is more wealth in the white community than the African American community. Because of race and customer bigotry,[2] Africans Americans cannot cross "racial and cultural barriers" to access white wealth.[3] As a consequence, whites have greater access to persons of wealth.

**CONCLUSION**: Whites are better FAs than African Americans.

The battle lines are therefore clearly drawn between the parties as to the cause of the huge racial disparities. Plaintiffs contend that Merrill Lynch's own systemic bias and discriminatory policies or practices result in these disparities. To Merrill Lynch, "external" forces, *i.e.* the "demographics of wealth" coupled with racial bigotry or customer bias, create the advantage for whites, so Merrill Lynch is not legally responsible for racial disparities or for the less favorable outcomes of African Americans, even if it perpetuates any race-based market advantage in favor of white FAs.[4]

---

[2] Merrill Lynch does not limit its defense to "external" forces such as "access to wealth" but also advises the Court that customer preference or bias plays a part: "among the numerous individual factors the Court would have to consider are what impact the remnants of societal discrimination had on each African American FAs' production." Merrill Lynch's Memorandum in Opposition to Class Certification ("Opposition" or "MOP") at 41. Under Title VII Law, it is well established that the preferences of fellow employees or customers do not justify discrimination. *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1199 (7th Cir. 1971) (airline's no-marriage rule for stewardesses was not justified by passenger preference); *Vigars v. Valley Christian Center of Dublin*, 805 F.Supp. 802, 808 n.4 (N.D.Cal. 1992) (fellow employees' and customers' preferences do not constitute bona fide occupational qualification). The Equal Employment Opportunity Commission guidelines on discrimination also reject "preferences of co- workers, the employer, clients or customers." 29 CFR 1604.2(a)(1)(iii).

[3] *See e.g.* MOP at 9-10 and 41-42 ("African American FAs on average have fewer social connections with potential clients of wealth")("the wealthy population in this country is overwhelmingly white and access to wealthy clients is generally not common for African Americans")("African Americans have lesser access to wealth, which resides largely in the white community and face barriers as a result of segregation of social networks").

[4] At their depositions, Merrill Lynch's top executives consistently focused on race as the explanation for the less favorable employment outcomes for African Americans. These explanations included that African American FAs are disadvantaged because they must "cross racial boundaries" and lack access to

**Common Issues of Law and Fact**

Where, as here, Plaintiffs charge that systemic racial discrimination through national policies or practices resulted in gross disparities in client account transfers, FA teams, attrition and earnings, and Merrill Lynch counters that African Americans as a group are not as capable as whites at their jobs, a class action is plainly the most efficient, expeditious, and fair manner to resolve the case. This case should proceed as a class because it raises questions that are quintessentially systemic in nature and rely on class-wide proof to resolve. This case also raises common issues of great importance to the parties and to civil rights jurisprudence.

The common factual issues include the simple and ultimate question of which side is right: Plaintiffs with their traditional race discrimination claims or Merrill Lynch, with its novel theory that "external" forces drove the adverse outcomes of African Americans? Second, if Merrill Lynch is correct that "external" forces, which include societal bias, create a market advantage for whites, common issues of law must include whether a corporation may then implement policies or practices that result in higher white pay and retention because whites enjoy a race-based market advantage? More specifically, is it lawful for a corporation to rely on cumulative advantage rewards systems that institutionalize and exacerbate racial bigotry by denying African Americans resources and business opportunities while rewarding and compensating white FAs for alleged "productivity" that is tainted by the race-based market advantage? These Merrill Lynch cumulative advantage systems include, but are not limited to, Merrill Lynch's national broker training program,[5] compensation plan,[6] account distribution

---

social networks of wealthy individuals. *See* Ex. 42 at 129-32, 138-39, 142-145, 147-148, 150, 245-246, 269-70; Ex. 43 at 265-270; Ex. 45 at 120-121, 127-130. One executive explained that to be successful, African Americans must "cross into the white community." Ex. 45 at 128-129. He explained that an African American FA might prospect a client over the phone with success only to meet for the first time and have the prospective client realize the FA's race; the African American FA would then have "an additional need to cross over and dissipate that" barrier. *See id.* at 129; *see also* Ex. 42 at 130-31.

[5] Although the criteria changed somewhat from 2001 to 2006, to attend the first live training sessions in Princeton, New Jersey, FA Trainees typically had to rank at least in the top 40%, or in the 1st and 2nd quintiles, in the national ranking system. *See* Ex. 42 at 8. To attend the remaining three national POA training modules, the Trainee had to rank no lower nationally than the 3rd quintile. *See* Ex. 53 at 19. As Plaintiffs' experts establish, African Americans were grossly underrepresented in the top three quintiles. *See* Ex. 1, Report of Drs. Madden and Vekker ("Madden Rep."). at 4.

[6] Merrill Lynch's compensation plan pays FAs based on production. *See* Ex. 51 at 43. Thus, discriminatory treatment that adversely impacts production results in lower wages. Further, two FAs with the same length of service who both produce $300,000 and transact identical business are compensated at the same rate, *e.g.* 30%. *See* Ex. 51 at 39-45. However, if one FA produces $400,000 with the same length of service and the same transactions, he is compensated at a higher rate, *e.g.* 40%. The higher

policy and practices ("NAP"),[7] teaming policies and practices,[8] and management assessment center ("MAC").[9] Another common question is whether the facts establish a violation of federal civil rights laws regarding Merrill Lynch's teaming policies or practices, which undisputedly and unlawfully segregate its workforce and disproportionately exclude African Americans from employee teams, and their considerable associated income and benefits. *See, e.g.,* Ex. 42 at 109-111; Ex. 44 at 139-140, 144-47; Ex. 55 at 62-63, 68-69.

Plaintiffs also challenge the above policies and practices under a disparate impact theory. Plaintiffs' disparate impact claims turn exclusively on common questions of law and fact. In tacit recognition of this fact, Merrill Lynch makes no serious arguments that Plaintiffs' disparate impact claims are not appropriate for class treatment. Nor could it, as Plaintiffs have identified neutral, uniform policies or practices and offered evidence from their experts and Merrill Lynch's own studies of their disparate impact on African Americans. More tellingly, Merrill Lynch offers in its Opposition a number of purported business justifications for these firm-wide policies. *See, e.g.,* MOP at 13, 19, 27. Resolution of these disparate impact claims, therefore, will turn on whether Merrill Lynch can establish business necessity for these policies or practices. Then, if business necessity is shown, common questions will arise regarding less discriminatory alternatives, *e.g.* whether the alternative of Merrill Lynch not rewarding the effects of the race-based market advantage or customer bias and not allowing segregated teams would satisfy its legitimate interests.[10] 42 U.S.C. §2000e-(k)(1)(A)(ii). Common legal questions

---

percentage is paid not only on the amount between $300,000 and $400,000, but also on the entire $400,000, *i.e.* retroactive to the first dollar. *See* Ex. 51 at 68-71. Thus, the grid is progressive and widens the wage gap caused by Merrill Lynch's racial discrimination. Likewise, Merrill Lynch's compensation system compounds any discrimination on the part of its customers, again by granting a cumulative advantage to whites. *See* Ex. 2 at 13.

[7] Merrill Lynch's NAP results in the transfer of statistically significantly more lucrative accounts to whites. *See* Ex. 1 at 5-6, 49.

[8] Merrill Lynch recognizes the importance of teaming to a FAs success. Yet, Merrill Lynch's executives continue to insist that it cannot force or arrange such "marriages." *See, e.g.,* Ex. 42 at 109-111; Ex. 44 at 139-140, 144-47; Ex. 55 at 62-63, 68-69.

[9] Quintile rankings are also used to exclude African Americans from the MAC because an FA must rank in the 1st or 2nd quintile, and in some instances the 3rd quintile to attend the MAC. *See* Ex. 1 at 71-76; *see also* Ex. 2 Bielby Rep. at 46-47.

[10] This situation is not new to the civil rights arena. For example, until the 1970s, few police departments were integrated by race or gender. As a parallel, Plaintiffs do not believe that the law would allow male police officers to reject female police officers as partners because they feared that women would not save their lives or even because they worried that their spouses would not like their husbands to spend so much time with women partners. In that example, it is easy to understand why the segregated teams are not lawful. Wall Street holds no special place under the law and there is no legitimate business reason for

include whether it is lawful for a corporation to allocate valuable resources and income generating opportunities under cumulative advantage systems that punish and adversely impact African American FAs on account of race.[11] Alternatively, does a corporation have a legal responsibility under Title VII to minimize the use of cumulative advantage rewards systems, including the compensation plan, when whites have a race-based market advantage if, as a result of that advantage, those systems necessarily have a racial disparate impact?

Lastly, as explained in Plaintiffs' Opening Memorandum, Plaintiffs rely on the testimony of expert sociologist, William Bielby, Ph.D. ("Bielby"), to explain the organizational context in which their systemic claims arose. Bielby studied the entire record and, applying a substantial, well-established body of social and industrial psychology research regularly accepted by courts, concluded that Merrill Lynch structured its workplace and developed a uniform system of personnel policies and practices likely to promote stereotypes and lead to racially biased decision making. A common issue of fact or law is whether Merrill Lynch's employment policies, organizational structures, culture and/or institutionalized decision making practices together facilitate or permit discrimination against African Americans.

Plaintiffs have presented ample evidence that meets the requirements of Federal Rule of Civil Procedure 23 ("Rule 23"), including statistical and other expert evidence, class representative testimony and putative class member declarations, a wealth of record evidence and Merrill Lynch documents regarding Merrill Lynch's uniform policies or practices and their harmful impact on African American FAs. For the reasons stated in Plaintiffs' Opening Memorandum and below, this case is deserving of class action status.

## ARGUMENT

Merrill Lynch provides the Court with an "appendix of 100 cases" in which class certification was denied. Plaintiffs could easily distinguish these cases and trump that presentation with a few hundred cases in which class certification was granted, including many from this District. Of course, none of this is particularly helpful to the Court, which must

---

allowing the segregated teams to persist. The argument that an employer could accede to the perceived threat that its employees would quit if forced to team was among the earliest to fall in the civil rights movement when restaurants were not allowed to deny African Americans entrance for fear of white flight.

[11] Resources tied to production include, for example, account distributions, training, offices, titles, sales assistant support, expense accounts and reward trips. *See* Ex. 42 at 227-28 (office space); Ex. 45 at 84-85, 90; Ex. 45 at 88-90 (sales assistance); *id.* at 85-86 (recognition clubs and expense accounts); Ex. 51 at 234 (titles); *see also* Exs. 204 – 209.

exercise its discretion based on the facts of this case to determine if Rule 23 is met. Using words to describe Plaintiffs' claims such as "kitchen sink" " blunderbuss" and "hopelessly fragmented," Merrill Lynch borrows a page from "big box" retailers defending class action discrimination claims and urges rejection of this lawsuit largely on the incorrect ground that federal district courts simply cannot manage national class action lawsuits. In its Opposition, Merrill Lynch largely ignores the massive record in this case, most notably Merrill Lynch's own reports describing its common policies or practices and their discriminatory impact on African Americans. Instead, Merrill Lynch relies on misleading sound bytes from the Plaintiffs' depositions and inaccurate and unfounded statements in managers' declarations,[12] which were created after the close of discovery from witnesses not disclosed during discovery, seeking to create conflict between the Plaintiffs where none exists, and to inject confusion into an otherwise clear-cut case.

Nothing Merrill Lynch offers, however, changes the fact that this case is straightforward. Significantly, unlike the bulk of the cases Merrill Lynch cites, this case involves a single job, FA, and a single business unit, United States Private Client ("USPC"). Further, contrary to the impression Merrill Lynch attempts to create, its branch offices are not run as independent fiefdoms.[13] Rather, Merrill Lynch branch offices are governed by uniform national policies or practices that are designed, approved and implemented at the highest levels of Merrill Lynch. Plaintiffs identify and challenge these specific policies or practices and their experts connect these policies or practices directly to the lower compensation and higher attrition of African Americans, as do Merrill Lynch's own studies. When the undisputed facts of this case are

---

[12] In support of its Opposition, Merrill Lynch submitted 44 affidavits of Merrill Lynch Complex Directors. As is set forth more fully in the attached Chart C, the affidavits are not credible in light of the deposition testimony, the underlying documentary record, and publicly available information. The Affidavits are replete with defects or impeachment materials and cross-examination of these Directors would reveal inconsistencies and misrepresentations. See Chart C. Courts routinely give little weight to such declarations where other evidence supports a contrary position or the declaration is unreliable. *See Villar v. Crowley Maritime Corp.*, 780 F.Supp. 1467, 1477 n.11 (S.D.Tex. 1992) (affidavit contained "blatant misrepresentations" and deemed untrustworthy, afforded no weight); *Great Northern Nekoosa Corp. v. ASEA*, 657 F.Supp.1253, 1256 (W.D.Ark. 1987) (giving "only slight weight" to affidavits that set forth statements that are allegedly "argumentative, conclusory, irrelevant, or inaccurate"). Therefore, Merrill Lynch's 44 Director affidavits are unreliable as they are rife with inadequacies, inconsistencies, and misrepresentations, and should be afforded no weight.

[13] Indeed, the brokerage industry is subject to strict regulatory oversight from the Securities Exchange Commission ("SEC") and Financial Industry Regulatory Authority ("FINRA"), so a stronger nexus exists between the individual offices and corporate management than is generally the case in corporate America.

examined under the proper legal framework, Plaintiffs easily meet the standards for class certification set forth in Rule 23.

**Legal Standard**

As early as 1974, the Supreme Court admonished lower courts that "nothing" in Rule 23 "gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S.156, 177 (1974). Yet, in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982), ten years later, the same court explained that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 160. As Judge Shadur explained in *Smith v. Nike Retail Svcs.* , 234 F.R.D. 648, 659 (N.D. Ill. 2005), "courts must walk a fine line, and one that is not 'easily discernible'… between those two extremes -- an approach that allows for a 'preliminary inquiry' into the merits but only to the extent needed to deal with Rule 23 considerations…"(internal citations omitted). The parties in this case have vastly different views on where that line should be drawn.

Merrill Lynch's Opposition obliterates any rational resting place between "not conduct[ing] a merits inquiry" but "prob[ing] behind the pleadings" to resolve the class certification question. To Merrill Lynch, the class certification process is nothing short of a full-blown trial on the merits. Mentioning no fewer than three times that its former Chief Executive Officer ("CEO") is African American and the grandson of a slave, "born and raised in the Jim Crow south of the 1950's and 1960's," Merrill Lynch wants the Court to bypass the requirements of Rule 23, skip the *Teamsters* trial, and exonerate Merrill Lynch from liability on the ground that Merrill Lynch just could not have engaged in discrimination[14] against African Americans.[15]

---

[14] Toward this end, Merrill Lynch submits expert reports from Olivet Jones and Jerome Williams, Ph.D. regarding its "good faith" efforts to diversify and market to its diverse customers. These reports regard the merits of Plaintiffs' claims and are not relevant to class certification. Because Merrill Lynch does not reference the reports and explain why they are part of the record, neither the Court nor the Plaintiffs should be left to guess how to respond to them and the reports should be stricken. Additionally, if the case proceeds to the merits, Plaintiffs intend to file *Daubert* motions on these reports because they do not meet the requirements of Fed.R.Evid. 702. Plaintiffs do not seek to impose this burden on the Court at this juncture, however, because Merrill Lynch does not appear to rely on these reports in its Opposition.

[15] Merrill Lynch charges that "the slander that Merrill Lynch has a discriminatory culture is beyond all reason given its long-time African American CEO and the substantial effort and resources it devotes to affirmative action initiatives." MOP at 36. It is not slander to say that Merrill Lynch has a discriminatory culture, as women successfully established this fact. *See Cremin v. Merrill Lynch*, 96 C 3773, (finding of class-wide liability eligible for collateral estoppel treatment). More importantly, Merrill Lynch misses the point. The fact that Barack Obama is President of the United States does not mean that racial

*Intl. Bhd. Of Teamsters v. United States*, 431 U.S. 324 (1977). But, the law is clear that the focus at this stage of the proceedings is not on which side wins but whether Rule 23 is met. *Falcon*, 457 U.S. at 161. A district court has broad discretion in determining whether to certify a class and its determination will not be overturned absent a showing that it abused its discretion. *Wagner v. Nutra Sweet*, 95 F.3d 527, 534 (7th Cir. 1996).

## I.      Plaintiffs Have Established All Rule 23(a) Requirements

Merrill Lynch asserts that Plaintiffs have not met Rule 23(a)'s commonality, typicality or adequacy requirements. The record and relevant case law demonstrate that Plaintiffs' proposed class easily meets these factors.

### A.      Commonality

Commonality is construed permissively under Rule 23(a)(2) and requires a single common issue of law or fact, not that every question of law or fact be common to every member of the class. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992); *Dunn v. City of Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005) (Gettleman, J.). Commonality may be satisfied, for example, where the question of law linking the class members is substantially related to the resolution of the litigation even though the individuals are not identically situated. *See Rosario*, 963 F.2d at 1018. Factual variation among the class is not fatal to a class action if common questions of law exist. *See Rosario*, 963 F.2d at 1018; *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Moreover, Rule 23 "does not mandate absolute commonality; a common nucleus of operative fact is usually enough to satisfy the requirement." *Joncek v. Local 714 International of Teamsters Health and Welfare Fund, et al.*, 98-C-4302, 1999 U.S. Dist. LEXIS 14853 (N.D. Ill. Aug. 20, 1999)(Gettleman, J.). "Common nuclei of fact are typically manifest where…the defendants have engaged in a standardized conduct towards members of the proposed class." *Moreno v. DFG Foods*, 02-C-4019, 2003 U.S. Dist. LEXIS 8700 at *21 (N.D. Ill. May 21, 2003); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). So long as class members assert a common complaint and demonstrate that they are subject to the same harm, commonality exists. *See Jefferson v. Windy City Maintenance*, 196-C-7686 1998 U.S. Dist. LEXIS 12262, *17 (N.D. Ill. Aug. 3, 1998).

---

discrimination is a thing of the past any more than one can expect Clarence Thomas to support affirmative action. To suggest otherwise is simply to indulge in the same race-based generalizations challenged in this suit.

### 1.    Courts Have Regularly Certified Similar Class Actions Brought By Financial Advisors Against Retail Brokerage Firms

As explained in Plaintiffs' Opening Memorandum, this is not the first time Merrill Lynch has been charged with class-wide discrimination. Merrill Lynch previously represented to Judge Castillo that all elements of Rule 23(a) and (b)(2) were met and stipulated to a gender class action certification of female FAs in *Cremin v. Merrill Lynch. See* Ex. 215, *Cremin* Stip. of Settlement, at Exs. C, 3; D, 2; G, 3-5; Ex. 214 at 32-33, 40.[16] Like this case, *Cremin* challenged Merrill Lynch's national account transfer and promotion policies, among other things.[17] *See Id.* Nonetheless, Merrill Lynch now contends that identically situated African American FAs cannot establish commonality, typicality or adequacy under Rule 23(a) and that, in any event, a federal court cannot manage a class action with a national brokerage firm.

Merrill Lynch asks this Court to ignore the reasoned opinions of other federal courts who approved certification of nearly identical discrimination nationwide class actions brought by FAs in retail brokerage firms, and which similarly challenged pay and promotion practices.[18] Merrill Lynch contends that the court's certification of a nationwide class in *Bartelson v. Dean Witter,* 86 F.R.D. 57 (E.D. Penn. 1980), is simply too old, but the legal issues involved have not changed significantly since that case was issued, particularly regarding Rule 23(a)'s requirements. Merrill Lynch then suggests that the federal judges involved in the other cases abdicated their due process responsibilities because the cases were mere class settlements and that the defendants in those cases, including Merrill Lynch, made false representations to the respective

---

[16] Plaintiffs easily meet Rule 23's commonality, typicality and adequacy standards. However, Merrill Lynch should be judicially estopped from challenging any Rule 23 standard other than manageability. *See Carnegie v. Household International*, 376 F.3d 656, 659–61 (7th Cir. 2004); *Rissetto v. Plumbers Local* 343, 94 F.3d 597, 605 (9th Cir. 1996) ("We now make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions taken in the same litigation.")

[17] Indeed, *Cremin* arbitration panels found that Merrill Lynch had engaged in a pattern or practice of pay and promotion sex discrimination after consideration of expert testimony of Drs. Madden and Bielby, among other evidence.

[18] *See, e.g., Jaffe/Curtis-Bauer v. Morgan Stanley* & Co, No. C 06-3903 THE (N.D. Cal. 2008)(Henderson, J.)(certified nationwide race discrimination class of FAs and FA Trainees); *Augst-Johnson v. Morgan Stanley* Case No 06-1142 (D.D.C 2007)(Roberts, J.)(certified nationwide sex discrimination class of FAs and FA Trainees); *Amoachev v. Smith Barney* C-05-1298 (S.D.N.Y, 2008)(Hamilton, J.)(S.D.N.Y.)(certified nationwide sex discrimination FA class); *Martens v. Smith Barney* Cas No. 96-CIV-3779 (S.D.N.Y. 1998)(Motley, J.)(certified multi-position nationwide sex discrimination class); *Cremin v Merrill Lynch* N. 96 C 3773 (N.D. Ill. 1998)(Castillo, J.) (certified nationwide FA sex discrimination class).

courts that Rule 23 was met just to acquire settlements.[19] This argument is unfounded. The law requires even heightened judicial scrutiny of certification requirements in settlement cases, and these courts met their duty in holding that Rule 23 was met by the law and facts presented. *Reynolds v. Beneficial National Bank,* 288 F.3d 277 (7th Cir. 2004). It is highly improbable that Merrill Lynch and the other Wall Street defendants would have agreed to these multi-million dollar settlements had they believed common certification issues were not presented.

2. **This Is Not An Across-the-Board Case But Instead Challenges A Discrete Set of Uniform Policies or Practices In A Single Business Unit**

Merrill Lynch incorrectly accuses the Plaintiffs, who in good faith raise serious questions concerning their civil rights, of making an "across the board"[20] challenge "yoked together with some artificial theory that a pervasive discrimination practice is at work." MOP at 30. This is not an "across the board" suit brought by a single person who seeks class action status on a generalized policy of discrimination but is unaware of the nature of the claims of others similarly situated. To the contrary, as explained in Plaintiffs Opening Memorandum and below, this case involves a single job, FA, within a single business unit, USPC, where Plaintiffs challenge specific, uniform policies or practices that apply to and harm African American FAs, including Plaintiffs and putative class members who submitted declarations to this Court.

---

[19] Derisively labeling other national class certifications of cases involving brokerages as "drive by" class settlements (MOP at 66), Merrill Lynch dishonors Judge Constance B. Motley's work in *Martens* and Judge Castillo's handling of *Cremin.* Far from an easy ride to certification, Merrill Lynch neglects to mention that the *Martens* class certification was challenged by two of the three lead plaintiffs, who hired their own counsel and were supported by the New York branch of the National Organization for Women; nor does it inform the Court that Judge Motley initially rejected the settlement in a thorough decision while nonetheless certifying the class as satisfying each of Rule 23's requirements. *Martens v. Smith Barney,* 181 F.R.D. 243, 269 (S.D.N.Y. 1998). Likewise, Merrill Lynch's suggestion that Judge Castillo abdicated his judicial responsibilities by signing off on a class settlement without making any Rule 23 findings is belied by the express Order entered by Judge Castillo including such findings. *See* Ex. 228.

[20] The phrase "across the board" comes from the Supreme Court's decision in *Falcon.* This case is a far cry from *Falcon,* which involved a single plaintiff who did not identify any other plaintiffs subjected to the treatment he claimed to have experienced. *See Falcon,* 457 U.S. at 158-159 n. 15. Plaintiffs submit declarations from 10% of the putative class members to establish that others experienced the same pattern or practice of discrimination and agree with the allegations in this suit. Yet, even *Falcon* does not foreclose an "across the board" suit. In a footnote in *Falcon,* the Supreme Court explained that in another case, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion practices in the same general fashion, such as through entirely subjective decision making processes." *Id.* at n. 15 The footnote explains that Title VII prohibits discriminatory employment practices, not an abstract policy of discrimination. *See id.* Plaintiffs, here, do challenge discriminatory policies or practices.

### 3. Commonality Is Met By Plaintiffs' Challenge to Defendant's Uniform, National Written Policies and Practices, Which Are Of The Type Regularly Certified and Tried On A Class Basis

Merrill Lynch attempts to defeat commonality by claiming, in essence, a right to try every class member's case at the liability phase (ignoring Plaintiffs' disparate impact claims) and/or by asserting that its national policies are immune from challenge. Neither argument has merit.

Arguing that FAs operate their own businesses and succeed or fail based on their ability to generate business from wealthy, largely white clients, Merrill Lynch contends that to fully understand why any FA succeeded or failed, the Court must view each individual case in a vacuum, without consideration of common proof. *See* MOP at 31-32. Characterizing Plaintiffs' claims as involving "the entire Nation[21] and disparate decision makers and decisions," Merrill Lynch argues this lawsuit lacks any "unifying force" sufficient to satisfy Rule 23. MOP at 31.

The unifying force, of course, is that all decisions were made pursuant to the same firm-wide, uniform policies or practices designed, monitored and implemented by the highest levels of Merrill Lynch. The uniformly less favorable outcomes for African Americans also connect the claims of class members. For example, the parties agree that attrition is significantly higher and earnings are significantly lower for African American FAs. According to statistics, these huge disparities cannot be the result of chance or a random distribution. *See* Ex. 1 at 38-40. Rather, Plaintiffs allege that they result from Merrill Lynch's uniform policies or practices, which apply to every class member in the same way.

Even if this case is about managerial discretion executed across hundreds of offices toward individual FAs, common sense and statistics dictate that it cannot be the case that in nearly every instance where discretion is exercised, African Americans are on the losing end of the decision. There is simply no lawful basis for the race effect in so many employment decisions.

The Second Circuit's decision in *Robinson v. Metro North Commuter Railroad*, 267 F.3d 147 (2nd Cir. 2001) is instructive. In *Robinson,* the district court denied certification of a liability

---

[21] Merrill Lynch does not mention that the vast majority of Merrill Lynch offices, over 85%, had no African Americans employed as tenured FAs. *See* Ex. 2 at 8. Nor does Merrill Lynch disclose that while African Americans represented approximately 4.5% of Merrill Lynch's FA Trainees hired between 2001 and 2006, approximately 90% of the offices hired no African American Trainees in each of those years *See id.* at 9. Thus, with respect to the employment of African American FAs, the trial, in any event, would not involve "the entire Nation."

class under 23(b)(2) because the district court posited that "discriminatory acts of particular department managers in particular individual situations" would have to be tried and would "overwhelm the liability phase." *Robinson,* 267 F.3d at 168. In reversing the district court, the Second Circuit explained that the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination. "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics. Such anecdotal evidence is not introduced to establish that particular instances of discrimination actually occurred, nor that the particular employees were victims of discrimination, but rather to provide such "texture." *See Id.* at 168. "And to ensure that the liability phase remains manageable, the district court may limit the anecdotal evidence as it deems appropriate." *Id.,* citing Fed.R.Evid. 403. Thus, for liability purposes and determining commonality, the centerpiece of the case is the statistical proof[22] and patterns or practices,[23] not the individual claims. Like *Robinson,* this case is a traditional *Teamsters* case, which will rely on statistics and patterns or practices rather than individual decisions.

Plaintiffs claim, and Merrill Lynch does not dispute, that Merrill Lynch has centralized, uniform policies or practices regarding compensation, broker training, account distributions, teaming and management assessment. Plaintiffs allege and offer evidence that these national policies or practices either expressly favored whites based on discriminatory factors, or delegated to its managers the discretion to favor whites. Merrill Lynch agrees that the Supreme Court permits challenges to subjective decision making, which would establish commonality, but contends that commonality does not exist because its managers exercised their discretion as a matter of national policy. *See* MOP at 38. Merrill Lynch apparently posits that policies that contain "objective" factors are somehow immune from liability and only unfettered manager discretion presents common issues susceptible to challenge. *See id.* As explained below, this is not the law, as courts recognize that in the real world, policies have both objective and subjective

---

[22] "[S]tatisical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim." *Robinson,* 267 F.3d at 160. Plaintiffs bring claims under both disparate treatment and disparate impact theories of liability.

[23] Pattern or practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals. Plaintiffs must prove more than sporadic acts of discrimination but must establish that intentional discrimination was the defendant's standard operating procedure. *See Teamsters,* 431 U.S. at 336.

elements.[24] *See, e.g., Satchell v. Fed. Ex. Corp.*, 03-02659, 2005 U.S. Dist LEXIS 37354 *17 (N.D. Cal. Sept. 27, 2005)("A court may certify a class where the challenged personnel policies contain both objective and subjective components.").

To demonstrate that Merrill Lynch's argument does not defeat commonality but, instead, strengthens Plaintiffs' commonality argument, Plaintiffs provide the following example: Merrill Lynch's NAP until 2006 permitted "FA to FA" transfers, which undisputedly benefited white Trainees and FAs because: (1) Senior FAs often redirected accounts received through Merrill Lynch's NAP to white Trainees; and(2) Senior FAs were urged to "cull their books," or to shed certain client relationships to free time to work on larger accounts and redirected these accounts to whites. *See* Ex. 54 at 213; Ex. 116 at MLE 00034 23-24; Ex. 117 at MLE 00100 51-53. Plaintiffs allege that Merrill Lynch and its managers intentionally allowed these transfers to provide an advantage to white FA Trainees and FAs. Here, commonality is established through the NAP, which permitted such FA to FA transfers. Another approach to the same set of facts is to say that managers, too, exercised discretion in allowing these FA to FA transfers. For there to be a racial effect, however, managers would have to exercise the discretion consistently in a pattern or practice to the disadvantage of African Americans, thus creating the systematic race effect and establishing commonality.

Under either interpretation of Merrill Lynch's policies, commonality is established. First, as this Court held in *Calvin v. Sheriff of Will County,* 03 C 3086, 2004 U.S. Dist. LEXIS 8717 *12 (N.D. Ill., 2004)(Gettleman, J.), the policy challenges predominate over the individual questions and class certification is, therefore, proper. Second, if the case is about discretion, commonality is also established by the pattern or practice of alleged discriminatory discretionary

---

[24] Judge Shadur rejected a similar argument, explaining that *Falcon's* reference to entirely subjective decision making processes is not a requirement but only one of many potential ways a plaintiff might establish commonality and typicality. *Smith*, 234 F.R.D. 648, 661 n.12 (N.D. Ill. 2006). Judge Shadur cited the decision of Judge Castillo finding commonality in *Buycks-Roberson v. Citibank Fed.Sav.Bank*, 162 F.R.D. 322, 330-31 (N.D. Ill. 1995) where the defendant allowed low level managers discretion to apply neutral underwriting criteria. *Id.* Other courts likewise do not find fatal to a claim of subjective decision making that the decisions are made under policies that contain objective and subjective factors. *Satchell*, 2005 U.S. Dist LEXIS 37354 at *21-22 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988)) (subjective decision making is a practice subject to challenge under Title VII); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (N.D. Cal. 1990).

decisionmaking.[25] *See, e.g., Falcon,* 457 U.S. at 159 n. 15; *Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 291-2 (2nd Cir. 1999); *Rossini v. Ogilvy Mather, Inc.,* 798 F.2d 590, 598 (2nd Cir. 1986); *Binion v. Metropolitan Pier,* 163 F.R.D. 517, 523-26 (N.D. Ill. 1995); *Orlowski v. Dominick's Finer Foods, Inc.,* 172 F.R.D. 370, 373-74 (N.D. Ill. 1997); *Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir. 1985); *Green v. USX,* 896 F.2d 801, 805 (3rd Cir. 1990); *Lilly v. Harris-Teeter Supermarket,* 720 F.2d 326 (4th Cir. 1983); *Adams v. Pinole Point Steele Co.,* 92-1962, 1994 U.S. Dist. LEXIS 6692 at *27 (N.D. Cal. May 18, 1994)(rev'd on other grounds).

Next, citing multi-business unit cases (which this is not) and a case from the Northern District of Georgia, Merrill Lynch claims that there is a "consensus" view that "a plaintiff may represent a multi-facility class only where centralized and uniform employment practices affect all facilities the same way." *Reid v. Lockheed Martin, Aero, Co.* 205 F.R.D. 655, 667-68 (N.D. Ga. 2001). *See* MOP at 31-32. As an initial matter, Plaintiffs meet this standard, as Merrill Lynch's centralized, uniform policies and practices (including its compensation, NAP, and teaming policies) in its retail business unit must be followed by all branch managers and FAs and apply to all Merrill Lynch branch offices in the same way. Citing only a handful of cases from this district, Merrill Lynch claims that "the consensus holds in this district." *Id.* Plaintiffs disagree with Merrill Lynch's conclusion of the lessons to be drawn from *Reid* and the law in this District. Merrill Lynch's reference to *Reid* is curious as, unlike this case, *Reid* expressly found that there were no centralized and uniform policies or practices at the multi-facility Lockheed plants. *Reid,* 205 F.R.D. at 669. The *Reid* court distinguished a case cited by the *Reid* plaintiffs, *Morgan v. United Parcel Service, Inc.* 169 F.R.D. 349 (E.D. Mo. 1996) on the ground that "*Morgan* involved decisions made by relatively high level managers pursuant to uniform procedures originating at the highest level of the corporation." *Reid,* 205 F.R.D at 670. *Reid* held the "decentralized decisions in *Morgan* were actually fairly centralized." *Id.* Here, the facts are identical to *Morgan.* Merrill Lynch managers made decisions pursuant to national policy or practice set at the highest level of Merrill Lynch.

---

[25] The notion that systems that mix subjective and objective components are not subject to attack on an adverse impact theory is squarely rejected in *Watson,* 487 U.S. at 989-991. *See also Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424, (N.D. Cal. 1990).

In addition, contrary to Merrill Lynch's claim, there is no "consensus" view in this district on this topic.[26] Indeed, many judges have certified class actions that did not involve single plants, and virtually every judge has certified class actions finding commonality, including most of same judges whose opinions are cited by Merrill Lynch.[27] What is critical in each case is that judges exercise discretion and judgment as to whether to certify class actions based on the facts presented in the case at hand and not based on any consensus that no national class actions should be certified.

---

[26] The cases cited by Merrill Lynch do not form a consensus involving multi-facility cases, as some involve multi-division or multi-job, not multi-facility cases, and most were decided on other grounds. *See, e.g., Gorence v. Eagle Food Centers,* 93-4862, 1994 U.S. Dist. LEXIS 11438, at *23 (N.D. Ill. Aug. 15, 1994)(Moran, J.)(plaintiffs failed to identify a policy or practice responsible for discrimination but court noted that "[d]ifferences in individual cases will not defeat commonality"); *Betts v. Sundstrand* Corp. 97-50188, 1999 U.S. Dist LEXIS 9743, at *22 (N.D. Ill. June 21, 1999)(Reinhard, J.)(commonality lacking in part due to the "wide range of jobs included in the prospective class"); *Adams v. RR Donnelly,* 98-4025, 2001 U.S. Dist. LEXIS 4247 at *60 (N.D. Ill. April 6, 2001)(Kennelly, J.)("[t]hough the Court believes it may be possible in an appropriate case to certify a company-wide class involving multi-division company, this is not an appropriate case..." but court certified three classes of African American employees at various defendant locations)(class certification granted in part and denied in part); *Tooley v. Burger King,* 93-7531, 1995 U.S. Dist. LEXIS 4525 at *5 (N.D. Ill. Mar. 23, 1995)(Lindberg, J.)(when some of the restaurants were owned by one defendant, while others were owned by another defendant, court held "there is no reason to believe that BKC-owned restaurants had the same policies as those that were owned by Friedman"); *Gerlib v. R.R. Donnelly & Sons,* 95-7401, 1997 U.S. Dist. LEXIS 16842 at *12-13 (N.D. Ill. Oct. 24, 1997)(Anderson, J.)("We do not know which divisions have had workforce reductions, the frequency and timing of such workforce reductions, or which types of jobs were affected. Nor do we know whether the various divisions offered the same supplemental benefits under the same circumstances and to the same categories of employees as did the CMD. Additionally, we do not know whether any other division offered enhanced retirement benefits in the context of a complete shutdown as was the case with the CMD.").
[27] *See e.g. Hill v. Shell Oil Company,* 98-5766, 2002 U.S. Dist. LEXIS 13396 (N.D. Ill., March 28, 2002)(Moran, J.); *Latuga v. Hooters,* 93-7709, 1995 U.S. Dist. LEXIS 10713 (N.D. Ill., July 25 1995) (Rosemond, J.); *Johns v. DeLeonardis,* 92-2547, 1992 U.S. Dist. LEXIS 18210 (N.D. Ill., Nov. 30, 1992) (Plunkett, J.)(strip search); *Warnell v. Ford Comp.,* 98-1503, 1999 U.S. Dist. LEXIS 16563 (N.D. Ill., Oct. 15, 1999)(Bucklo, J.); *Hill v. Amoco,* 97-7501, 2001 U.S. Dist. LEXIS 3082 (N.D. Ill., March 15, 2001)(Gottschall, J.); *Toney v. Rosewood,* 98-0693, 1999 U.S. Dist LEXIS 4744 (N.D. Ill., March 31, 1999)(Coar, J.); *Batte v. White Cap,* 97-4830, 1999 U.S. Dist. LEXIS 4658 (N.D. Ill., March 30, 1999)(Anderson, J.); *Massie v. Illinois Department of Transportation,* 96-4830, 1998 U.S. Dist. LEXIS 8680 (N.D. Ill., June 5, 1998)(Norgle, J.); *Orlowski v. Dominick's Finer Food,* 95-1666, 1997 U.S. Dist. LEXIS 1984 (N.D. Ill., Feb. 21, 1997)(Bucklo, J.); *Smith,* 2006 U.S. Dist. LEXIS 12375 (Shadur, J.); *Moreno v. DFG Foods,* 02-4019, 2003 U.S. Dist. LEXIS 8700 (N.D. Ill., May, 21, 2003)(Pallmeyer, J.); *Bell v. Woodward,* 03-50190, 2005 U.S. Dist LEXIS 60 (N.D. Ill., Jan 3, 2005)(Reinhard, J.); *Buycks-Roberson v. Citibank Federal Savings Bank,* 94-4094,1995 U.S. Dist. LEXIS 9342 (N.D. Ill., June 29, 1995)(Castillo, J.); *Palmer v. Combined Insurance,* 02-1764, 2003 U.S. Dist. LEXIS 15082 (N.D. Ill., Aug. 29, 2003)(Zagel, J.); *Daniels v. Fed. Reserve Bank of Chicago,* 98-1186, 2000 U.S. Dist. LEXIS 6833 (N.D. Ill., March 28, 2000)(Hibbler, J.)

### 4. The Named Plaintiffs' Testimony and Class Member Declarations Establish Commonality

Merrill Lynch retrieves a few misleading snippets from the deposition testimony of the putative class representatives[28] and argues that because class members do not have identical beliefs or experiences, there is a lack of commonality in the class claims.[29] A fair reading of the Plaintiffs' testimony reveals that their experiences, complaints, and the harm they suffered were strikingly similar, regardless of branch office, manager, education, experience, or other factors. *See* Ex. A (chart summarizing key issues of Plaintiffs' testimony).[30] See Chart A. From the most junior to the most senior FA, and from the most successful FA to those terminated for "low production," each Plaintiff complained of being harmed by the Merrill Lynch policies or practices they challenge in this lawsuit. *See Id.* For example, even those FAs Merrill Lynch

---

[28] Each plaintiff was deposed for at least a full day, many late into the evening and a few over a two day period.

[29] For example, Merrill Lynch claims that plaintiffs disagree with one another over the challenged practices, creating conflict. Merrill Lynch cites LaRue Gibson's position on the Firm's small ticket policy and George McReynolds' position on teams. Merrill Lynch claims that Gibson liked the small ticket policy as it let him spend time with his family. Gibson testified, however, that:

> [t]here is a term called red-lining, where you were not allowed, where banks would actually red-line areas where people of color live, and they would not lend them money. One of the great direct ways to wealth is through home ownership. Right? If you can't borrow money to buy a home, you can't get there. You know, I would argue that Merrill Lynch's policy of small ticket policy, hundred thousand dollar minimums, and those kinds of things, if you believe that the African-American community has less money, I believe that that is a form of red-lining from an investment perspective. Now, you could take issue with that, whether you agree with that or not. But the fact of the matter is that if Merrill Lynch's management then encourages African-Americans to go after a market that is already deemed not to be large enough and not to have the wealth that wouldn't even meet the policies that the firm set up, and there is documentation that tells them how to do this, that is not really good support. That is leading them down over a cliff.

Ex. 25 at 51-52. Nonetheless, Gibson testified that he has to "live by the rules that the firm has." *Id.* at 53. Clearly, Gibson is in line with the class on the small ticket policy. Merrill Lynch uses George McReynolds' statement that he is "no longer interested in joining a team and would rather remain a solo practitioner" to argue there is no common team experience. MOP at 13. But Merrill Lynch omits that McReynolds' reason for giving up on teaming is that he was harmed by Merrill Lynch's teaming practices. While Merrill Lynch claims that it does not "arrange marriages," McReynolds' manager forced him to join a team for the sole benefit of two failing white FA Trainees and to transfer a substantial portion of his client book to these white FA Trainees; he nearly lost his job as an FA as a result. *See* Ex. 30 at 80-91. McReynolds' challenge to teaming as a device to steer assets to whites is consistent with the class allegation and belies Merrill Lynch's defense that it does not "arrange marriages." *See* Ex. 30 at 56, 60, 109-112.

[30] Merrill Lynch provides the Court with transcript excerpts from the Plaintiffs' depositions. In many instances, the pages cited present a fair and complete reading of the Plaintiffs' testimony, however, only an incomplete sound byte is referenced in Merrill Lynch's Opposition.

16

deems as successful allege that they were denied client accounts under the NAP and favorable teaming opportunities pursuant to Merrill Lynch's teaming policies.[31] *See* Ex. 242, Chart A. Similar testimony of such a broad range of class members over 40, including class member declarants, further buttresses commonality.[32] Moreover, the law is clear that class members' experiences need not be identical and factual variations do not defeat commonality so long as they proceed under similar legal theories, which they plainly do here. *See Rosario*, 963 F.2d 1017-18.

### 5.    Class-wide Statistics Establish Commonality

Like most class actions, commonality in this case is established through statistical evidence. *Teamsters*, 431 U.S. at 339-4.

### (a) Plaintiffs' Statistical Proof Ties The Disparities To Policies or Practices

This statistical proof is not difficult to understand because, unlike cases which aggregate many different jobs and business units, *e.g. Puffer v. Allstate*, 225 F.R.D. 450 (N.D. Ill. 2009), this case involves analysis of a single job, FA, and a single business unit, Merrill Lynch's retail brokerage. The statistical evidence offered also ties the disparities to specific policies or practices challenged by Plaintiffs.

Plaintiffs' experts control for office location but "aggregate" data from offices in which African Americans are employed to study the impact of the Firm's policies or practices.[33] Although Merrill Lynch now complains about the aggregation of data, Merrill Lynch's experts, too, aggregated the data to conduct their analyses. Studying the data in an aggregate manner is reasonable and, indeed, the only appropriate approach given that Merrill Lynch policies or

---

[31] For example, first quintile FA Plaintiff Gibson testified he could not form a team despite his success and ultimately had to approach the CEO to form a partnership, and that he ultimately lost considerable assets as a result of the partnership. *See* Ex. 25 at 150-51. Thus, Gibson suffered the same experience as fifth quintile FA Plaintiff McReynolds under Merrill Lynch's teaming practices. *See* note 27 *supra*. The two men similarly complained of being harmed by the same account distribution and other policies and practices as well.

[32] The declarations of the putative class members also support commonality, as the declarants testified they, too, were subjected to the same policies or practices as plaintiffs and as are challenged in this lawsuit. *See generally* Exs. 3- 19. The declarants worked in Merrill Lynch branch offices across the country and had varied levels of production and experience. *Id.*

[33] To aggregate data does not mean that every FA was deemed equally likely to receive account distributions. For example, Merrill Lynch challenges the use of aggregate statistics with respect to account distributions. The results of all offices were aggregated, however, the statistical analyses controlled for location making only those in the office where the distribution took place eligible to receive the distribution. *See* Ex. 229 at 13-15.

practices at issue apply across the U.S. in the same manner. Indeed, Merrill Lynch relies on aggregate compilations of performance from FAs across the country rather than make local comparisons, for example in its national compensation plan, training program, quintile performance rankings (used in the NAP), and MAC. Merrill Lynch's internal studies also routinely aggregate FAs from offices around the country.[34] Merrill Lynch's objection regarding the propriety of using "aggregate statistics" is not well founded.

The statistical evidence is compelling and largely undisputed. With respect to compensation, Plaintiffs' experts found that the awarding of compensation at Merrill Lynch was not race neutral but yielded annually from 2001 to 2006 between 6.57 and 9.07 standard deviations between the compensation of whites and African Americans, and African Americans earned 33 to 42% less in annual compensation than whites. *See* Ex. 229 Madden Rebuttal at 4. Plaintiffs' experts controlled for length of service, time at Merrill Lynch, education, office location and management responsibilities. *See id.*

Likewise, Plaintiffs' experts found that Merrill Lynch managers provided African Americans fewer opportunities to earn compensation through the distribution of house accounts and accounts previously managed by departing brokers. African Americans received accounts with 3.84 standard deviations lower in total asset value and 6.37 standard deviations lower in production history than those distributed to whites between 2001 and 2006. *See* Ex. 1 at 28-36. Plaintiffs' experts also concluded that African American Trainees received accounts with lower asset values beginning in the first month of the training program and continuing for 26 of the 28 months thereafter, with statistical significance at 5.20. *See* Ex. 229 at 18.

Plaintiffs' experts also found that racial differentials in compensation and account transfers were significantly associated with racial differentials in the likelihood of participating in teams and/or pools with other FAs. Between 15% and 28% of the racial disparity in compensation was found to be associated with pool and team membership policies at Merrill Lynch. *See* Ex. 229 at 7. African American FAs were less likely to increase their assets and production credits as a result of team participation for differences between 4.94 and 5.38 standard deviations. *See* Ex. 1 at 6-7. The differences in teaming and pooling opportunities by race directly decrease the relative ability of African Americans to compile production credits. ~~African Americans received account assets that were 6.05 standard deviations lower than those~~

---

[34] *See, e.g.*, Ex. 239, Schetler Dep. Ex. 7 at MLE 00799-000196 – 000201.

received by white brokers. *See id.* at 7. Adjustments in pool shares were 4.98 standard deviations lower for African Americans.[35] *See id.* Disparities are certainly tied to the practice of teams.

With respect to attrition, Plaintiffs' experts found that African American FAs were twice as likely to leave Merrill Lynch as whites for a difference of 7.02 standard deviations. *See id.* Plaintiffs' experts also tied the racial difference in participation in pools and teams as associated with about one-half of the greater attrition rates of African American FAs. *See id.* Finally, with respect to the broker training program, Plaintiffs' experts found that African Americans were 34% more likely to terminate before completing the program, a difference of 4.49 standard deviations and less likely to participate in pools or teams with statistical significance.[36] *See id.* at 7-8. For example, after twelve months in the training program, African American Trainees are 4.73 standard deviations less likely to participate in teams and, after twenty months, 3.57 standard deviations less likely to participate in teams. *See id.* Again, Plaintiffs' experts connect the racial difference in team participation in the training program with approximately one-third of the higher drop out rates for African Americans. Thus, attrition is yet another outcome of the common policies or practices.

Plaintiffs' statistics establish that African American FAs across the country experienced the same pattern or practice of discrimination.

---

[35] The team data were available only for 2003-2006. *See* Ex. 1 at 7.

[36] Merrill Lynch's expert, Ali Saad, Ph.D. ("Saad") asserts that Plaintiffs' statistics present a "chicken and egg" issue and argues that race is not the variable that determines team membership but, instead, more successful FAs form teams. Because African Americans are not successful, Saad argues they are not invited to be on teams. There is a battle of experts in this area, as Plaintiffs experts disagree with Saad. *See Wilfong v. Rent-A-Center*, 00-0680, 2001 US Dist. LEXIS 22718 at * 11-13, n.5 (stating that "[i]t is not this court's role to determine the ultimate correctness of either party's [experts] contentions in the context of class certification."); *Krueger v. New York Telephone Company*, 163 FRD 433, 440 (S.D.N.Y. September 22, 1995) (granting class certification, it is inappropriate for the court to determine the ultimate correctness of the parties' statistical expert opinions because such matters are directed at the merits of the case). Further, Plaintiffs' experts find statistically significant differences in teaming early in the careers of FAs, before they are successful, which refutes the notion that success comes first. Finally, African Americans received accounts with lower asset values for 26 of the 28 months in the training program with statistical significance at 5.20 standard deviations. *See* Ex. 229 at 18. Thus, even if Saad were correct that FAs with higher assets team with greater frequency, there is a "chicken and egg" issue in Saad's "chicken and egg" issue, as Plaintiffs allege that the higher asset values of whites are the product of discrimination.

### (b) Merrill Lynch's Expert Reports Further Establish Commonality

As in Merrill Lynch's Opposition, its experts, for the most part, do not offer their own statistical analysis to contradict Plaintiffs' experts' findings. *See* MOP at 9. Unable to explain away the huge disparities in client account transfers, teams, pay or attrition, Merrill Lynch charges that Plaintiffs' experts' compensation studies "omit the crucial variable of access to wealthy potential clients." MOP at 1-2 and asserts that African Americans have fewer social connections with potential clients of wealth, who are white. *See id.* Merrill Lynch claims that its statistical expert, Ali Saad, PhD. ("Saad") "performed his own study of this phenomenon, examining publicly available census data" and "concluded that access to networks of potential clients with substantial wealth varies by race among Merrill Lynch FAs." MOP, citing Saad Rep. 1-2, 6-9, 16-23. Merrill Lynch concludes that "as a result, customers independently generated by African American FAs participating in the training program early in their careers arise from neighborhoods with significantly higher African American populations and significantly lower levels of average wealth." MOP at 10, citing Saad at 25-26.

As explained above, Merrill Lynch's "access to wealth" establishes commonality by raising a class wide defense.

### (1) Merrill Lynch's Experts Rise or Fall Together

On the merits, Merrill Lynch's experts do not destroy commonality by undermining the validity of Plaintiffs' expert analyses. As explained by Plaintiffs' expert, Bielby, four of Merrill Lynch's eight experts present a "knee bone connected to the thigh bone" logic, as each expert builds on the prior expert. *See* Ex. 230, Bielby Rebuttal at 4. As a consequence, the end result is subject to attack if any of the component parts is wrong or misused.

Merrill Lynch employed Eugene Ericksen, Ph.D. ("Ericksen"), to select a scientific sample for use by its expert, James Outtz, Ph.D., ("Outtz") to survey Merrill Lynch FAs to determine the drivers of FA productivity. Next, Roberto Fernandez, Ph.D., ("Fernandez") opines that there are race-based differences in the general population with respect to the drivers of success he believes were identified by Outtz. Finally, Saad purports to prove that there are race-based differences with respect to Merrill Lynch FAs and the drivers to success, which Saad believes were identified by Outtz. Several broken links exist in this expert chain.

First, Outtz's methodology was insufficient to reach any results during one-hour interviews with white FAs. Outtz asked a number of questions, including the following

categorical (yes/no) question as to whether the FA relied on various techniques for developing business: "which of these methods of obtaining clients was most effective for you in developing your book of business during your first two years at Merrill Lynch?" One option was "social prospecting/networking," but neither "access to wealth" nor "social relationships" was included as an option.[37] *See* Ex. 231, Outtz Report at 123. Of those interviewed, 82.7% responded "yes" to the question of whether "social prospecting/networking" was effective for them. By including the undefined term "networking" with social prospecting, Outtz conflated these concepts and did not limit the response to social contacts or friends. *See id.*

Outtz also asked the FA to explain his or her top 10 accounts and how they were garnered. At the end of the interview, Outtz guessed the production level of the FA. Outtz believes that he properly identified the drivers of success because his guesses correlated with quintile performance. But after interviewing 94 FAs who had been at Merrill Lynch long enough to obtain a quintile ranking, Outtz identified correctly only four individuals as his top category performers who were, in fact, 1st quintile performers, and only one out of the 94 FAs in the bottom category ranking who actually was in the 5th quintile.[38] *See* Ex. 232, Outtz dep. at 254-55. Outtz scored 41-42 persons as being in the middle, which is average, meaning that after spending an hour with those FAs, Outtz could predict nothing more than that they were average. *See id.* at 258. Given that under Merrill Lynch's system, quintile rankings were distributed in a uniform manner (20% in each quintile), had Outtz simply dropped the names randomly into five buckets, he would have had a predicted accuracy rate of 18% (94/5), considerably higher than his outcome in the top or bottom cohorts, a fact he admits. *See id.* at 257.[39]

---

[37] This question is wrought with problems as the persons interviewed varied in length of service from rookie to 35 years of employment. Obviously a person who started in the 1970s at Merrill Lynch would not have had access to the internet and would have been working at a time when the business did not have small ticket rules or an emphasis on prospecting high net worth clients. Of course, it is unlikely that any person could remember specific events from 35 years earlier with accuracy or discern them from every other year of employment.

[38] Outtz interviewed 111 persons but only 94 had been with Merrill Lynch for sufficient time to be assigned quintile rankings. *See* Ex. 230 at 159.

[39] Outtz had not studied the record enough to reach informed opinions. He thought he was ranking interviewees by their production and was unaware that an FA with a length of service ("LOS") of 5 years in the first quintile would be a substantially lower producer than an LOS 35 in the first quintile. Thus, Outtz's placement of FAs in rank order by production and then comparing the quintiles, which combines production with LOS, was not a correct way to test Outtz's theory. Outtz also inexplicably used an industrial psychology scale of 1-5 to rank employees with 5 being the highest and then compared his

### (2) Dr. Saad Ignored Dr. Outtz' Job Analysis

Saad concludes that Outtz identified "access to wealth" as a "job related" criterion for FA success.[40] Saad then purports to isolate the "self-sourced"[41] accounts of an FA Trainee during his or her first three months, and to have determined that African American FAs' "sources" have less apparent wealth as African American clients have less wealth. Saad concludes that he has established that it is the differences in "access to wealth" between white FAs and African American FAs that are responsible for the compensation and attrition disparities.

Significantly, Outtz outright rejects Saad's study as a proper measure of "access to wealth." Outtz, the expert who performed the job study and supposedly identified "access to wealth" as the job-related factor, disagrees with Saad's understanding and measurement of "access to wealth." As Outtz explained, "I've simply offered the opinion that the use of the first three months, in terms of independent production, as a measure of access to wealth, based on my understanding and information I've collected about this job, is an inaccurate assumption." Ex. 232 at 61-65. Clearly, there is a fumble in the passing of the baton from Outtz to Saad.

Outtz defines "access to wealth" in far broader terms than Saad. The crux of Merrill Lynch's defense is that the "external factor" of access to white wealth explains the enormous racial compensation and attrition disparities. Plaintiffs, however, contend that the "access to wealth" variable is largely an internal factor significantly controlled by Merrill Lynch. Outtz agrees with Plaintiffs. Outtz, after interviewing a sample of Merrill Lynch white FAs and Merrill Lynch managers, determines not that "access to wealth" is the critical job-related driver of success but that how one "gains access to wealth" or a network is equally important. However, Outtz finds that how an FA "gains access to wealth" is largely dependent on internal factors controlled by Merrill Lynch. For example, Outtz concedes that if a manager referred a lead to a FA Trainee that resulted in a new client, that client would be part of the FA Trainee's

---

results to a quintile where 5 is the lowest. *See* Ex. 232 at 150-164. Outtz's methodology is unscientific and unsound and his results are unreliable.

[40] Saad uses the word "job-related," (Ex. 233 at 19) but Outtz did not perform any validity study. *See* Ex. 232 at 20-25.

[41] As Plaintiffs' experts point out, the claim that any account is "self-sourced" is dubious. There is no way to know from the data whether the account was a walk-in, lead, referral from an FA or otherwise "self-sourced" from a pre-existing network. For example, whites receive more account distributions beginning in the first month of the training program. If those accounts generate referrals or related accounts, Saad counts those accounts as part of the broker Trainees "self-sourced" accounts. *See* Ex. 229 at 17-19.

network and the FA Trainee has gained access to a larger network. *See id.* Similarly, if the FA Trainee receives an account distribution of a client who is involved in community activities and invites the FA Trainee to meet others in the same activities, any new business developed is part of the FA Trainee's network according to Outtz. *See id.* at 82-83. Similarly, if a younger broker was put on a team with another broker and the young broker was able to cultivate the clients of the more experienced team member, Outtz would consider the younger broker's network to include all of the potential business sources from that team. *See id.* at 84-85. Outtz is clear that the driver he identified for FA success is not simply "access to wealth," what Saad erroneously interprets as the ability to "tap into a set of (pre-existing) contacts," but includes how a person "gains access" to wealth, which includes developing a network while at Merrill Lynch with resources provided by Merrill Lynch. *See* Ex. 233 at 18. To Outtz, the network also is not properly measured at the point of hire, or three months later, but continues to grow through the course of employment. *See* Ex. 232 at 84.

Thus, Saad's first three-month study of "access to wealth" is meaningless because it does not study the criterion identified by Outtz as a driver of FA success.

Equally important, Saad's statistical results, properly calculated and interpreted, do not support his conclusions but, instead, support Plaintiffs' arguments of differential treatment of similarly situated African American and white FAs. *See, e.g.,* Ex. 2 at 1-2; Ex. 229 at 35-36. Saad purports to isolate "self-sourced" accounts by broker Trainees in the first three months to establish that African American Trainees self-source more accounts from African Americans, whose home values are lower than those of white clients self-sourced by white Trainees. According to Saad, the race-based FA compensation disparities are caused because "African American and white brokers are tapping into different sources to obtain their assets with African American sources having less apparent wealth." Ex. 233 at 24. To reach this conclusion, Saad "geo-codes" the clients to identify their race and wealth.

First, Saad's geo-coding does not meet *Daubert* standards. As the Court may recall, in performing his studies and speculating as to the race of Merrill Lynch clients, Saad relied on 100 block addresses rather than actual addresses because Merrill Lynch refused to provide him with the actual addresses or wealth of its clients, citing privacy interests. With only the 100-block ~~addresses, Saad could not discern whether the address was a business or residence. Saad,~~ nevertheless, included and assigned a racial identity to accounts of institutions, businesses or

organizations with no racial identity. *See* Ex. 229 at 28. Saad also could not determine whether the addresses were homes reflecting client wealth or business addresses of clients who had account statements mailed to their workplace, accountant, or other location. *See id.* Additionally, Saad's technique averages the income, race and housing values for all residents in a census track, assuming uniform wealth within areas. Saad estimates that white FAs have 6% African American clients, while African American clients comprise 24% of the books of business of African American FAs. These estimates grossly misstate African American households, thereby confirming Saad's methodological flaws. Merrill Lynch hired a consultant, Donnelly, to append ethnicity or race to client records. Provided with correct names and addresses by Merrill Lynch, Donnelly determined that less than 2% of accounts opened between 2002 and 2005 belonged to African American clients. The over-coding of clients as African American likely is a result of miscoding businesses or business addresses as residences and affixing African American as the race with too great a frequency to these business addresses. *See* Ex. 229 at 27-33.[42] Based on these faulty geo-coding studies, Saad concludes that African American Trainees generate substantially more of their new accounts from African American clients, whom he claims are poorer, than do white Trainees.[43]

---

[42] Plaintiffs make these assumptions only because Merrill Lynch refused to provide correct address information to Plaintiffs to rebut Dr. Saad's geo-coding. At that time, the Court noted:
> ….if the defendants, if Merrill Lynch, gave their experts insufficient information to reach the opinions that they had, I mean, that's something your experts are probably going to conclude, at which point you will have what seems to me at least a colorable, if not a pretty strong *Daubert* motion.
> You, meaning the defendants here, make your own bed in a sense. And, if all you gave them were addresses, and they drew some conclusions based on the demographics of those addresses, it's not going to take very much persuasion, it would seem to me to throw any conclusions reached from that type of information into serious doubt.

Dkt. 330, Ex. E.

[43] Despite the Court's admonition, Merrill Lynch has moved to strike Madden's criticisms of the geo-coding based on untimely new studies. Well after the Court's deadline for expert disclosures, and rather than seeking leave to amend Saad's report or otherwise put Plaintiffs on notice of any new studies, Merrill Lynch filed with its Opposition a *Daubert* motion on Madden's criticisms of Saad's geo-coding. Saad submitted a new declaration claiming that he used GoogleMaps on a sample of his original report and determined that the flaws in the geo-coding identified by Madden do not make any difference to his findings. Saad's use of GoogleMaps fails to meet the scientific standard for expert testimony. As Madden succinctly testified when asked if the geo-coding defects and errors of using the "100 block" approach could not simply be remedied by a subjective visual check against Google.com's aerial maps and street views:
> As an urban economist, I found that shocking. It sounds like you've never lived in a city.
> If you look at res -- you look at buildings around here, you can't tell from the Google

Second, Saad makes critical flaws when he applies his geo-coding to his compensation analysis. Saad, who is not an expert in housing patterns or geo-coding, claims he was able to explain racial production differences by access to white wealth as measured by self-generation of accounts in the first three months of the broker-training program. However, Saad's computer back up of his studies shows that he actually established just the opposite. It shows that: (1) African American FAs received 35.7% to 53.3% fewer production credits (ranging from 3.02 to 5.90 standard deviations difference) between 2002 and 2006 than whites with the *same* experience and *same* levels of production on self-generated assets in the first three months of the training program; and (2) African American FAs received 14.4% to 39.7% fewer production credits (ranging from 1.6 to 5.13 standard deviations difference) between 2002 and 2006 than whites with the *same* experience and the *same* levels of production credits on total current self-generated assets. [44] Because Saad finds that production credits translate directly into compensation, these differences in current production credits by race for FAs with the same self-generated production early in their career translate into the compensation differentials found by Plaintiffs' experts.

Saad's conclusions are based on a fundamental scientific methodology error. Saad improperly used race in the first stage of his instrumental variables analysis, which ensured that there will be no race effect. A proper methodology reveals the above-cited dramatic race effect. As explained in the Madden Rebuttal Report, for 2006, Saad compares the production of an African American and a white FA with the same length of service by looking at their self-generated assets accumulated during their first three months in the training program. *See* Ex. 229 at 7-10. For the white FA, Saad grows the self-generated production from the first three months into current production at the average rate or pattern generally experienced by FAs at his length of service. Saad then takes this calculated or expected "current production" and enters it as a determinant (a

---

aerial photos whether they're residences or office buildings. Some of them, in fact, are former office buildings that are now residences. I mean, that's just impossible.
Ex. 234 Madden dep. at 227-28.

[44] As Madden finds, Saad provides no explanation for why, if a racial difference in access to wealth were to reduce the productivity of African American FAs, that Saad finds large statistically significant differentials in total production when he controls for the racial difference in production from self-generated accounts. i.e. he compares similarly situated African Americans and whites with respect to self-generated accounts but whites earn more compensation. Ex. 229 Madden Rebuttal Rep. at 3.

control variable) of the FA's compensation in the analysis that he performs. For the African American FA, Saad uses the same analysis with an important exception. After calculating the expected current production based on the average growth trend, he then reduces the expected "current production" of the African American FA by 48.6%. *See id.* So, rather than assuming that an African American would achieve the same expected current production as a white FA, Saad discounts his or her current production based on race and enters the racially discounted value of current production for the control value in his compensation analysis. This reduction is made for all African American FAs, but not for white FAs who are expected to get the full average effect of their early production on their current production.[45]

As a result of his totally unjustifiable 48.6% discounting of the expected current production of only African American FAs, Saad masks the true racial disparities by making it appear as if African American FAs have less current production. He then reaches the predetermined conclusion that African Americans are paid less because their current production is lower. *See* Ex. 233 at 22. In fact, the racial differential in compensation is hidden by a systematically racially based underestimation of African Americans current production. *See* Ex. 229 at 4-10. When Madden corrects for Saad's misuse of race to reduce predicted earnings, Saad's study shows that differences in access to wealth cannot explain differences in compensation. To the contrary, Saad's studies support the hypothesis that the racial differences in measured current production are attributable to racial differences in resources and opportunities provided by Merrill Lynch.[46] *See id.* at 10.[47]

---

[45] An interesting point overlooked by Merrill Lynch's experts is that not all whites, of course, have access to wealth. For example, Merrill Lynch produced the files of its managers. In order to attend the MAC, these managers had to rank in the 1st or 2nd quintile with some exceptions for the 3rd quintile. Yet, the backgrounds of these managers as described in the MAC files confirm that many did not have access to wealth. *See, e.g.* Ex. B, (chart of manager backgrounds). The most glaring example is Dan Sontag, head of Global Wealth and Investment Management (the retail brokerage) testified that, hired at age 22, "I had zero network" when he started to build his book of business. Indeed, Sontag had recently moved to Colorado Springs where he "did not know a soul, so most of he way that I built my business was either through what I would describe as cold calling or what I would describe as cold walking, which is essentially knocking on doors in the business community and introducing yourself." Ex. 45, Sontag Dep. at 57-58. Sontag admitted that he did receive account distributions. *See id.* at 56.

[46] Madden establishes that there were not statistically significant differences in production when African Americans are compared to whites regarding sales on current clients or transferred accounts. *See* Ex. 229

In sum, Plaintiffs' statistical evidence shows statistically significant differences in compensation and attrition tied to Merrill Lynch's uniform practices, including teaming and account distributions. Merrill Lynch's experts do not undermine Plaintiffs' statistical evidence to any degree and certainly not to the degree to eliminate commonality. On the contrary, Merrill Lynch's experts introduce, *albeit* with flaws, a class-wide defense that also establishes commonality.[48] Further, when the proper methodology is applied to Merrill Lynch's expert's work, the results support Plaintiffs' claims that Merrill Lynch's policies or practices led to the less favorable employment outcomes for African Americans.

## B. Typicality

There is a substantial nexus between the concepts of commonality and typicality. As the Supreme Court explained in *Falcon*, the requirements "tend to merge" as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claim are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon,* 457 U.S. at 157 n. 13. Because commonality and typicality are so closely related, a finding of one often results in a finding of the other. *See Joncek,* 1999 U.S.Dist LEXIS

---

at 3. Merrill Lynch's internal studies reach similar conclusions. *See* Ex. 240; MLE 00373-000261 at 000271-72.

[47] Although Saad submitted a declaration in support of Merrill Lynch's *Daubert* motion regarding Madden's methodology in re-running his studies to eliminate race in the first stage of the instrumental variable, he never disputes or attempts to justify the use of race in the first stage of his instrumental variables analysis. In any event, as argued in Plaintiffs' motion to strike, Saad's new declaration, submitted well after the expert disclosure deadlines and after Madden's deposition, should be struck as untimely. *See* Dkt. 300 at 5-10.

[48] On the same day that Plaintiffs filed their Motion for Class Certification, Merrill Lynch also filed a Motion for Summary Judgment, arguing it was immune from suit due to Section 703(h) of Title VII. The Court appropriately ruled that class certification should proceed before any motions for summary judgment, including for among other reasons, that the class should be defined and Plaintiffs' counsel should not be placed in a conflict of interest. Nonetheless, Merrill Lynch cuts and pastes much of its motion for summary judgment into the class certification brief in its Opposition and argues that since Merrill Lynch is entitled to judgment on Plaintiffs' challenges to the compensation system that those challenges its compensation system is immune from liability and, therefore, cannot form the basis of satisfying Plaintiffs' Rule 23 commonality obligations. Plaintiffs disagree but rely on the Court's ruling deferring briefing on the 703(h) defense and incorporate their Motion to Strike the Motion for Summary Judgment and the transcript of those proceedings should the Court desire to consider this issue. Plaintiffs also provide the Court with Judge Kennelly's ruling on Merrill Lynch's identical motion filed before him on the related *McReynolds'* action before Merrill Lynch consented to transfer that suit to this Court. *See* Ex. 241. Finally, Plaintiffs point out that the 703(h) defense is also a common question of law and fact, which requires merits discovery.

14853 at *11. Merrill Lynch concedes that commonality and typicality are closely related and argues that Plaintiffs fail to satisfy typicality for the same reasons that they fail to establish commonality. *See* MOP at 48-9. Plaintiffs' contend that the Court should find typicality for the same reasons it should find commonality.

Typicality exists if the named Plaintiffs' claims are "reasonably coextensive" with those of absent class members. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998). "The requirement of typicality is satisfied if Plaintiffs' claim arises from the same event or practice or course of conduct that gives rise to the claims of the other class members and if the claims are based on the same legal theory." *Joncek*, 1999 U.S. LEXIS at 14853 at *11.

As the pleadings, Plaintiffs' testimony, and the Declarations show, Plaintiffs' claims are typical because they arise from the same discriminatory policies and practices that give rise to the claims of other class members and proceed on the same overriding disparate treatment and disparate impact legal theories: that Merrill Lynch's uniform policies and practices keep African Americans "lower paid and out of higher level jobs." *De La Fuente v. Stokely-Van Camp, Inc.* 713 F.2d 225, 232 (7th Cir. 1983); *see also Gaspar v. Linvatec Corp.*, 167 F.R.D. at 51, 57 (N.D. Ill. 1996); *See, e.g.,* Ex. A; Ex. 3-19.

Moreover, as this Court explained in *Abt v. Mazda American Credit*, 98-C-2931, 1999 U.S. Dist. LEXIS 6169 *9-10 (N.D. Ill. Apr. 12,1999)(Gettleman, J), the "existence of defenses unique to the named plaintiff does not automatically preclude a finding of typicality because Rule 23(a)(3) requires typicality of the plaintiff's claims, not defenses. Typicality is destroyed only when such defenses are likely to usurp a significant portion of plaintiff's time and energy, distracting him from representing the interests of other class members." *Id.* at *9-10. Merrill Lynch has not identified any such unique defenses, only claimed that it has the right to challenge every decision under its policies as to each Plaintiff and class member. On the contrary, Merrill Lynch offers a common defense, and the presentation of any Plaintiff's claim is anecdotal evidence to support the class or undercut the defense of "lack of access" to wealth. Thus, typicality exists under Rule 23(a).

### C.    Adequacy

Merrill Lynch does not challenge counsel's adequacy but instead focuses on the putative class representatives. Rule 23(a)(4) requires that the representative plaintiffs' interests not be antagonistic to those of the remainder of the class. *See Weizeorick v. ABN AMRO Mortgage Group, Inc.*, 01 C 713, 2004 U.S. Dist. LEXIS 15467 *15 (N.D. Ill. Aug. 2, 2004).

Merrill Lynch argues that the putative class representatives are not adequate because the proposed class is "riven with conflicts of interest that would pit members against each other in every aspect of the trial." *See* MOP at 50-51. According to Merrill Lynch, that competition exists over access to the MAC, account distributions, allocation of desirable client associates, and office space. *See id.* Merrill Lynch's argument is legally and factually unfounded.

First, the law is clear that only actual, not potential or hypothetical, conflicts are considered, and Merrill Lynch can point to none.[49] *See Hoffman v. Grossinger Motors, Inc.,* 96-5362, 1999 U.S. Dist LEXIS 2392, *19 (N.D. Ill. Mar. 1, 1999). For example, Plaintiffs' primary challenge to the MAC is to the policy that permits only FAs in the 1st and 2nd (and in rare cases 3rd) to attend the MAC. Merrill Lynch's exclusion of FAs in the 4th and 5th quintile disproportionately disadvantages African Americans, as it bars approximately 70% of African American FAs from consideration for the MAC but only 40% of whites. *See* Ex.1 at 76 (Fig. 6). As explained throughout Plaintiffs' pleadings, this lawsuit alleges that FA quintile rankings are the product of systemic discrimination and, thus, the MAC screen is tainted as well. With respect to the remainder of Plaintiffs' challenge to the MAC, Plaintiffs who attended the MAC take issue with the biased assessment process, as evidenced by MAC materials that included generalizations and stereotypes about African Americans. Thus, Merrill Lynch's suggestion that Plaintiffs generally challenge the MAC as a denial of promotion for every class member is factually inaccurate. Instead, Plaintiffs seek to establish in the *Teamsters* hearing that the quintile screen is unlawful and that the MAC itself is discriminatory. Class members' goals in

---

[49] Merrill Lynch contends that the "clash of interests is particularly stark between the interests of African Americans who succeeded under Merrill Lynch's policies and those who did not." MOP at 50. It cites as an example Plaintiff Johnson's deposition testimony that he would be displeased if FAs who lacked his production nevertheless received the vice president title he earned. *See* Ex. 27 at 22. Clearly, Johnson's displeasure was not directed at his fellow class members but at non-African American FAs who received the title of vice president through production generated by favoritism in account distributions. *See id.* at 22-24. Throughout his deposition, Johnson described at length the ways in which he was harmed by the same policies that harmed other African Americans and noted his alignment with less successful and failing FAs. *See, e.g.,* Ex. 27 at 32-34, 55, 58-59, 72, 86, 108,143-44, 145, 248, 278, 321-23.

this regard are consistent and pose no conflicts.

With respect to the allocation of resources within the offices, the class is not "rife" with conflict. Plaintiffs and class members all seek to work on a level playing field vis-à-vis whites, *i.e.* to be able to compete where their talent and skills would place them absent the discrimination. In addition, contrary to Merrill Lynch's claim, African Americans do not often compete against one another as there are too few African Americans for such competition or conflict to arise. As Plaintiffs' expert Bielby explained, "African Americans are outnumbered by more than 70 to 1 in the FA workforce. As recently as 2006, the vast majority of Merrill Lynch offices had no African American FAs, and the majority of African American FAs who work at Merrill Lynch do so in offices in which there are no other FAs of the same race." *See* Ex. 2 at 11-12, Table 2 at 9. During the liability period, "a newly hired African American Trainee was unlikely to have an African American Trainee peer, and he or she was likely to be hired into an office that had no African American FAs or at most token African American representation." *Id.* Thus, there was no competition for resources or real conflict between African Americans but only between African Americans and whites.

More importantly, Merrill Lynch's assertion that adequacy is destroyed if class members were denied the same benefit would eliminate all class employment litigation and is not well founded. Merrill Lynch's view is not the law, as explained in *Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 625 (N.D. Ill. 1989):

> Marriott also contends that because class members compete against *each other* for the same promotions, none can adequately represent the class. That absurd proposition would of course doom almost every *class* action charging discrimination in promotion—a drastic rewrite of the law in this area. After all, when *no* woman is promoted, it is impossible to determine which one should have been (see *Armstrong*, 117 F.R.D. at 627 *n. 10 and cases cited there). In the universe Marriott would create, discrimination law would be simpler because class-discriminatory promotion would be cost-free. That view must of course be rejected.

(emphasis in original) *See also Smith*, 234 F.R.D. at 662.

Accordingly, adequacy is met under Rule 23.[50]

---

[50] If necessary, class members interested in but denied management opportunities could be treated as a sub-class, for the remedial phase eliminating any issues.

## II. The Proposed Class Meets Conditions For Rule 23(b)(2) or Hybrid Certification

Class actions for declaratory or injunctive relief are allowed under Rule 23(b)(2) where, as here, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Racial discrimination is such a ground, and cases seeking injunctive relief against class-wide race discrimination are appropriately brought under Rule 23(b)(2). *See Robinson, et al. v. Sears Roebuck & Co.,* 111 F.Supp. 2d 1101, 1114 (E.D. Ark. 2000); *McClain v. Lufkin Industries, Inc.,* 187 F.R.D. 267, 277 (E.D. Tex. 1999)(rev'd. on other grounds)("Civil Rights cases alleging class-based discrimination are classic examples of suits suitable for certification under 23(b)(2)").

Merrill Lynch argues, incorrectly, that Rule 23(b)(2) certification is not available in cases involving damages, that back pay cannot be awarded by formula, and that Plaintiffs' claims cannot be tried in a single liability trial because liability does not turn on conduct applicable to the class and a liability trial would require a full analysis of each class members' claims and the decisions made by different managers.

First, Merrill Lynch's assertion that the Seventh Circuit prohibits 23(b)(2) certification where damages are sought is wrong. The issue that is "doubtful" in this Circuit is not whether Rule 23(b)(2) is allowed for cases involving damages but whether Rule 23(b)(2) may ever be used to certify a "no-notice, no opt-out class" when damages are sought. *See Jefferson v. Ingersoll Int'l.,* 195 F.3d 894, 897 (7th Cir. 1999). Plaintiffs do not request a "no-notice, no opt-out class." Far from barring damages class actions, *Jefferson* "instructs" district courts to consider three options for handling class actions that seek monetary relief: (1) Rule 23(b)(3) certification for all proceedings; (2) divided or hybrid certification, *e.g.* Rule 23(b)(2) for liability and equitable relief and Rule 23(b)(3) for damages, which avoids any potential due process problems by introducing the procedural protections of Rule 23(b)(3); and (3) certification under Rule 23(b)(2) for both monetary and equitable remedies with notice and an opportunity to opt out under the court's under Rules 23(d)(2) and 23(d)(5). *See Lemon v. Int'l .Union of Opt.,* 216 F.3d 577, 579-582 (7th Cir. 2000). This case can be certified under any of these options, which the Seventh Circuit has recently reiterated remain available and should be considered at

certification, contrary to Merrill Lynch's suggestion.[51] *See Allen v. Int'l Truck and Engine Corp.,* 358 F.3d 469, 471 (7th Cir. 2004); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005).

Second, contrary to Merrill Lynch's claims, the possibility that monetary relief is substantial does not make a case unsuitable for Rule 23(b)(2).[52] Back pay is an integral remedy of this case and Title VII jurisprudence, and it is deemed equitable under 42 U.S.C. 2000e-5(g)(1). *See Jefferson*, 195 F.3d at 896; *In re Monumental Life Ins. Co.*, 365 F.3d 408, 418 (5th Cir. 2004); *Anderson v. Boeing Co.*, 222 F.R.D. 521, 541 (N.D. Okla. 2004); *Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 201-322 (N.D. Ill. 2004); *Hnot v. Willis Group Holdings, Ltd.* 228 F.R.D. 476, 486 (S.D. N.Y. 2005)(Plaintiffs sought monetary damages "but declaratory, injunctive, and equitable relief predominate. Plaintiffs seek to reform defendants' practices to provide for equitable employment opportunities and compensation for women. At any rate, the primary monetary relief sought, damages for back pay awarded under Title VII is considered equitable.") Thus, back pay is not a bar to Rule 23(b)(2) certification.[53] *See Massie v. IDOT,*

---

[51] The cases cited by Merrill Lynch do not dictate a contrary result. *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) does not provide that it is doubtful that Rule 23(b)(2) may ever be used to certify a case seeking damages. *See* MOP at 51. On the contrary, *Ticor* held the *writ of certiorari* was improvidently granted and the appeal was dismissed. *Jefferson v. Ingersoll Int'l Inc.*, authorized the very divided certification (23(b)(2) and 23(b)(3) requested by Plaintiffs. *Jefferson,* 195 F.3d at 896. Likewise, *Lemon v. Int'l Union* confirms that *Jefferson* allows for divided certification. *Lemon,* 266 F.3d at 581

[52] Merrill Lynch also cites *Bishop v. Gainer*, 272 F.3d 1009 (7th Cir. 2001) for the proposition that back pay is problematic in a promotion case with limited positions because not all plaintiffs would have been promoted. As discussed *supra*, Merrill Lynch is wrong in characterizing Plaintiffs' challenges to the MAC as seeking promotion for every class member. Instead, the promotion challenge largely focuses on the policies which bar the majority of African Americans from attending the MAC due to quintile rank and also the use of discriminatory materials at the MAC. In any event, if Plaintiffs prevail at the *Teamsters* hearing and there were class members who sought damages for denial of promotion, Seventh Circuit case law explains that the lost chance theory is a tool that can be used to resolve such claims with fairness to both Merrill Lynch and the class members. The case Merrill Lynch cites, *Bishop,* was decided on other grounds because the Court held that the district court's Rule 23(b)(2) certification was not for back pay. However, in a subsequent class action, *Biondo v. City of Chicago*, 382 F.3d 680, 688 (7th Cir. 2004), the Seventh Circuit approved the use of lost promotional opportunity to determine back pay where Plaintiffs would not have all been promoted. ("The City does not dispute the district court's central approach: asking the jury to determine the probability that being held back in 1986 cost the plaintiffs later chances for advancement. This "loss of a chance" method is the best way to handle probabilistic injuries. *See Bishop v. Gainer,* 272 F.3d 1009, 1015-16 (7th Cir. 2001); *Doll v. Brown,* 75 F.3d 1200, 1205-07 (7th Cir. 1996); *Griffin v. Michigan Department of Corrections,* 5 F.3d 186, 189 (6th Cir. 1993) If four people competing for one position lost an equal chance to get it, then each should receive 25% of the benefits available.

[53] Compensatory and punitive damages are also sought under Rule 23(b)(3) through hybrid certification. Because Notice and opt out rights exist under Rule 23(b)(3), Plaintiffs' "damage," requests do not

96-C-4830, 1998 U.S. Dist. LEXIS 8680 at *17-18 (N.D. Ill. June 5, 1998).

Plaintiffs contend that back pay may be determined in the aggregate because its determination will involve the same statistical presentation used to prove liability. An aggregate back pay award could be computed based on a wage shortfall analysis, which measures the additional earnings African Americans would have earned in a race neutral distribution of compensation. The Seventh Circuit allows equitable allocation of an aggregate award by formula to injured class members, in lieu of a host of individual cases. *See, e.g., Stewart v. General Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir. 1976); *Liberles v. Cook County*, 709 F.2d 1122, 1136-37 (7th Cir. 1983).

Plaintiffs similarly maintain that punitive damages may be addressed in conjunction with the *Teamsters* hearing.[54] An aggregate award of punitive damages is consistent with Rule 23(b)(2) certification, because, as with injunctive relief, "the focus is on the defendant's conduct, as opposed to the class members' harms, and the relief is sought for the class as a whole." [55] *Palmer v. Combined Ins. Co. of America*, 217 F.R.D. 430, 438 (N.D. Ill. 2003)(certifying punitive damages class in sex discrimination case); *Accord Ellis v. Costco*, 240 F.R.D. 624, 642-643, (N.D. Cal. 2007), *13; *Anderson v. Boeing*, 222 F.R.D. 521, 541-42 (N.D. Okl. 2004). It thus meets the Seventh Circuit's definition of "incidental damages," because it does not depend "in any significant way on the intangible, subjective differences of each class member's circumstances," and does not "require additional hearings to resolve the disparate merits of each individual's case." *Lemon,* 216 F.3d at 581.

Merrill Lynch disagrees with the suggestion that an aggregate award, or common fund, may be appropriate either for back pay or punitive damages. However, it is unclear whether Merrill Lynch's disagreement as to the propriety of common fund versus individualized relief

---

implicate due process concerns. *See Mount v. LaSalle Bank,* 92 C 5645, 1994 U.S. Dist. LEXIS 4027, *26 (N.D. Ill. Mar. 31, 1994)(citing to *Williams v. Burlington Northern*, 832 F.2d 100, 103-104 (7th Cir. 1987))

[54] The Supreme Court in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534-35 (1999) held that liability for punitive damages depends on the employer's mental state, rather than the nature of the alleged discriminatory conduct. Plaintiffs respectfully submit that this standard lends itself to classwide *Teamsters* determination since it involves the same evidence and neither the claim nor the damages focuses on individual victims of discrimination.

[55] Moreover, the focus is on the corporation's actions and knowledge as a whole, not the actions of any single manager or any specific decisions. Thus, the same high-level internal reports regarding the employment outcomes of African Americans and Merrill Lynch's exclusive culture and hostile or inattentive managers, particularly in light of *Cremin's* pattern or practice finding, are relevant to both liability and to punitive damages.

would persist in the face of certification and following a loss at a *Teamsters* pattern or practice hearing, both of which, of course, must occur before any remedial phase would be ordered. More importantly, perhaps, the resolution of the best approach to damages, *i.e.* common fund versus individualized relief, need not be decided in conjunction with the class certification. Courts routinely stay consideration of such issues until the conclusion of the *Teamsters* trial. *See e.g. Calvin*, 2004 U.S. Dist. LEXIS 8717 at *14 (Gettleman, J.)( "If defendants are found liable, the court may revisit the damages issues, including whether to certify another class or subclasses, or hold individual hearings, for the purposes of resolving damages" and "The fact that damages may vary based on each plaintiff's mental state is not, however, a sufficient reason to deny certification." *See Carnegie v. Household, Int'l.*, 376 F.3d 656, 661 (7th Cir. 2004)(suggesting options to address for damages issues and stressing that the prospect of such issues "need not defeat class treatment" of at least liability); *Hnot*, 228 F.R.D. at 486; *Satchell v. FedEx. Corp.*, 2005 U.S. Dist. LEXIS 37354 at 439 ("The precise procedures to be used in the second phase, if any, will be determined later in the litigation); *Taylor v. District of Columbia Water & Sewer Authority*, 241 F.R.D. 33, 47-48 (D.D.C. 2007); *Warren v. Xerox*, 01-CV-2909, 2004 US Dist. LEXIS 5115 *48 (E.D.N.Y. Jan. 26, 2004)(certifying race discrimination employment class under Rule 23(b)(2) but severing liability and injunctive phase from remedial phase).

Finally, rehashing its argument on commonality, Merrill Lynch contends that Plaintiffs do not meet Rule 23(b)(2) because Merrill Lynch has not "acted on grounds generally applicable to the class" or identified a common injury.[56] *See* MOP at 53. Again, Merrill Lynch fundamentally misconstrues or misunderstands the nature of a *Teamsters* hearing and the purpose of injunctive relief.

As the Second Circuit explained in *Robinson*, referring to the *Teamsters* hearing, "generally a pattern or practice suit is divided into two phases: liability and remedial. At the liability stage, the plaintiffs must produce sufficient evidence to establish a *prima facie* case of a policy, pattern, or practice of intentional discrimination against a group. Plaintiffs have typically depended upon two kinds of circumstantial evidence to establish the existence of a policy,

---

[56] Merrill Lynch cites *Remien v. EMC Corp*, 2008 U.S. Dist. LEXIS 74174 at 14 (N.D. Ill. 2008)(Kocoras, J). However, the court in *Remien* found a small promotion class not cohesive because some members of the class had been promoted. *But see, Wilfong*, 2001 U.S. Dist. LEXIS 22718 at *26 (the fact that some plaintiffs have been promoted does not render them unsuitable as class representatives, the real question is whether progress toward even greater success in their professional career has been impeded).

pattern or practice of intentional discrimination: (1) statistical evidence aimed at establishing the defendant's past treatment of a protected group; (2) testimony from protected class members detailing specific incidents of discrimination." *Robinson*, 267 F.3d at 158. Merrill Lynch may challenge the statistics, present its own statistical summary or present anecdotal and other non-statistical evidence tending to rebut the inference of discrimination.

For purposes of discussion, Plaintiffs select the practice of teams to underscore the value of the class-wide trial, but the argument is the same for every challenged policy or practice. As explained in Plaintiffs' Opening brief, Merrill Lynch FAs team with other Merrill Lynch FAs pursuant to Merrill Lynch's national policy or practice. Merrill Lynch assigns teams a production number under which commissions generated by the team are shared. *See* Ex. 55 at 8-9. Merrill Lynch's slogan concerning teams is 1+1=3 because it is assumed that the total team commissions will exceed the sum of the individual team member's commission. *See Id.* at 34-5. By Merrill Lynch policy, team members share in account distributions, combine production to qualify for sales assistance, offices and other perks. *See id.* at 35-42. Significantly, when a team member leaves Merrill Lynch, the remaining team members inherit the departing team member's client book without having to compete for the assets under the national NAP. The remaining team member retains the entire book of business and, the new inherited assets can be used to increase points and ranking for future account distributions.

In the FA population, approximately 50% of whites are on teams, nearly double the African American rate. *See* Ex. 1 at 6, 60. For 2006, the probability that the racial difference in team participation would exist due to chance or in the absence of racial differences is .000000016, a probability of an event that occurs 16 times in one billion instances. *See id.*

As it argues throughout the Opposition, Merrill Lynch contends that Plaintiffs cannot satisfy Rule 23(b)(2) with respect to the challenge to teams and claims an entitlement at a *Teamsters* hearing to cross-examine every class member on team formation. Thus, Merrill Lynch further contends that a *Teamsters* trial about teams serves no purpose. Plaintiffs disagree with this contention, offering an analogy to show the compelling probative value of a *Teamsters* trial: Suppose a coin is tossed 100 times resulting in 99 tails. Clearly, the conclusion that there is something wrong with the coin or the coin is not a "fair coin" reasonably follows. Here, if Plaintiffs are successful at a *Teamsters* hearing, a remedy could be imposed with injunctive relief, which declares the coin "not fair" and requires its replacement. Merrill Lynch wants to

defeat this possibility by demanding that each individual coin toss be separately tried where it could then argue that each coin toss of tail was reasonable given the 50/50 probability of tail in each coin toss and that nothing was wrong with the coin. *Teamsters* rejects Merrill Lynch's approach to liability under Rule 23.

Significantly, should the Plaintiffs prove a pattern or practice of discrimination, the court may proceed to fashion class-wide injunctive relief. *See Robinson*, 267 F.3d at 159. The intended role of Rule 23(b)(2) class actions is to adjudicate "final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole." Fed.R.Civ.P. Rule 23(2), Advisory Note to 1996 amendments; *see Owner-Operator Independent Drivers Association v. Allied Van Lines*, 231 F.R.D. 280, 282-283 (N.D. Ill. 2005).[57] While Defendant contends that injunctive relief is not possible because the class is not cohesive, Plaintiffs are prepared to design and ask the Court to order appropriate injunctive relief, including policy reforms, to benefit the class as a whole. Because Plaintiffs seek injunctive and declaratory action to end the discriminatory policies and practices, Rule 23(b)(2) certification is proper.

Plaintiffs have established that Rule 23(b)(2) is met.

## III.    The Proposed Class Satisfies Rule 23(b)(3)

To certify a case under Rule 23 (b)(3), the Court must find that questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Courts regularly hold that common issues predominate in pattern or practice employment discrimination cases, particularly as to liability. *See, e.g., Aliotta v. Gruenberg*, 237 F.R.D. 4, 12-13 (D.D.C. 2006) (pattern-or-practice "predominates because the evidence used will be common among the plaintiffs and potential class members"); *Smith*, 234 F.R.D. at 666 ("a number of other courts in this Circuit have found predominance satisfied even where plaintiffs sought to certify a single class victimized by a variety of discriminatory conduct"); *Bell v. Woodward*

---

[57] *See Smith*, 234 F.R.D. at 665-666; *Meiresonne*, 124 F.R.D. at 625 ("Plaintiffs do challenge a systemic discriminatory promotional policy and ask for final injunctive and declaratory relief that will apply to the class. That directly tracks the standard set out in 23(b)(2)"); *Buycks-Roberson v. Citibank Federal*, 162 F.R.D. at 334 ("the general applicability factor is satisfied by Plaintiffs' allegation that Citibank engaged in a subjective application of neutral underwriting criteria for the purpose of racial discrimination").

*Governor Co.*, 03 C 50190, 2005 U.S. Dist LEXIS 60 *10 (N.D. Ill. Jan. 4, 2005) 2005 WL
23340, *3 (N.D. Ill. Jan. 4, 2005) ("issues related to liability based on the plaintiffs' pattern or
practice claims will have common questions of law and fact" and "[t]hese common questions
will predominate over the individual damage determinations of each class member"); *Newsome
v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004); *Rodolico v. Unisys Corp.*, 199
F.R.D. 468, 477 (E.D.N.Y. 2001) ("pattern or practice of intentional discrimination in the
planning and execution of" RIF predominates over individual relief issues); *Fry v. UAL
Corporation*, 136 F.R.D. 626 (N.D. Ill. 1991)("[p]redominance is usually decided on the
question of liability and if the liability issue is common to the class, common questions are held
to predominate").

     Merrill Lynch argues that "even if plaintiffs could prove a pattern or practice of
discrimination," individualized inquiries would be required to determine liability for each class
member.[58] MOP at 55. This statement is not correct.[59] At the liability stage of a pattern-or-
practice trial, the focus is not on individual decisions, but on a pattern of discriminatory decision-
making. *Teamsters*, 431 U.S. at 360 n.46. Because common issues of law and fact exist sufficient
to warrant a *Teamsters* liability trial, the class should be certified even if Merrill Lynch intends
to raise individual defenses in the post-*Teamsters* remedial phase. *Fry v. UAL Corporation*, 136
F.R.D. 626 (N.D. Ill., 1991)("[p]redominance is usually decided on the question of liability and
if the liability issue is common to the class, common questions are held to predominate" ).
*Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001) ("defendants asserted

---

[58] Merrill Lynch relies on *Radmonovich v. Combined Ins.*, 216 F.R.D. 424 (N.D. Ill. 2003) where Judge
Alesia denied class certification, but found commonality for a nationwide Title VII pay/promotion class
of 6500 women; Judge Zagel later certified a separate class of the same workforce for class wide punitive
damages. *Palmer*, 217 F.R.D. at 436-37. Here, the data presented to Plaintiffs through 2006 establish that
*Radmonovich* involves approximately 10 times the number of class members as this case.

[59] *Aliotta*, 237 F.R.D. at 12-13 (pattern-or-practice "predominates because the evidence used will be
common among the plaintiffs and potential class members"); *Smith*, 234 F.R.D. at 666 ("a number of
other courts in this Circuit have found predominance satisfied even where plaintiffs sought to certify a
single class victimized by a variety of discriminatory conduct"); *Bell*, No. 03 C 50190, 2005 U.S. Dist
LEXIS at *10 ("issues related to liability based on the plaintiffs' pattern or practice claims will have
common questions of law and fact" and "[t]hese common questions will predominate over the individual
damage determinations of each class member"); *Newsome*, 219 F.R.D. at 365; (finding that common
issues predominate for 23(b)(3) certification because "the classwide liability phase of this action turns on
common employer practices rather than on individual employee reactions." *Rodolico*, 199 F.R.D. at 477
("Specifically rejecting Plaintiff's contention that the court needed to look at each individual Plaintiff
because Plaintiff's company-wide practice of intentional discrimination in the planning and execution of"
RIF predominates over individual relief issues).

'highly individualized' defenses to each of the instances of individual discrimination asserted by plaintiffs," but "those defenses would not become the focal point until the second stage of trial and could be dealt with in a series of individual trials, if necessary"). Accordingly, Merrill Lynch's argument regarding the remedial phase is not sufficient reason to deny class certification under Rule 23(b)(2) or Rule 23(b)(3) for trial of the pattern or practice claims.[60]

Recognizing, however, that Plaintiffs must prevail at the *Teamsters* pattern or practice hearing in order to advance to the remedial phase puts the proper perspective on Merrill Lynch's predominance and superiority arguments. A finding of liability as to a pattern or practice of discrimination has both practical and legal ramifications. Although Merrill Lynch wants the Court to judge the potential complexity of the remedial phase based on the evidence it would offer in an attempt to prove that 100% of the class members were not victims of the established pattern or practice of discrimination, this defeats the purpose of the *Teamsters* hearing. Indeed, the finding of the pattern or practice must mean *something*, including that victims of the unlawful conduct exist. The jury verdict on the *Teamsters* hearing means that the jury found that the compensation and attrition disparities were connected to unlawful policies or practices. This finding would not exist unless there were class members who were treated unlawfully. Thus, the purpose of the remedial phase cannot be to revisit or nullify the *Teamsters* finding with respect to 100% of the class but instead is to identify the "outliers" or class members who were not damaged by the unlawful pattern or practice.

From a legal standpoint and practical standpoint, the pattern or practice findings render futile the type of individualized proof Merrill Lynch informs the Court it would offer in the remedial phase. For example, Merrill Lynch claims that before the jury can award damages to

---

[60] Contrary to Defendant's suggestion, the Seventh Circuit endorses certification of at least some class issues on efficiency grounds, regardless of individualized damages questions. *See Allen v. Int'l Truck and Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004)(vacating denial of class certification "with instructions to certify a class under Rule 23(b)(2) for equitable matters and to reconsider the extent to which damages matters also could benefit from class treatment); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)("[a] single hearing may be all that's necessary to determine whether Allstate had a policy of forcing its employee agents to quit"); *Carnegie v. Household* Int'l. Inc., 376 F. 3d 656, 661 (7th Cir. 2004)("a class action has to be unwieldy indeed before it can be pronounced an inferior alternative" to duplicative individual lawsuits). Under this same case law, the Seventh Circuit also rejected Merrill Lynch's claims that large classes should not be certified (Opp. at 54). As Judge Posner explained in *Carnegie*, in rejecting the defendant's argument that a class was not manageable because it had millions of class members as "no argument at all, ... [t]he more claims there are, the more likely a class action is to yield substantial economies in litigation." 376 F.3d at 661.

any class member, the jury must determine which NAP method was used to distribute an account and the Plaintiff's rank under that method. *See* MOP at 55. However, if Plaintiffs establish the pattern or practice of discrimination, these class-wide findings debunk any attempt to justify the distributions via NAP rankings. Any proof by Merrill Lynch that accounts were distributed by NAP rank will not exonerate Merrill Lynch because the *Teamsters* verdict establishes that the rankings were unlawfully compiled to favor whites.

As an example, Plaintiffs focus on quintile rankings. Merrill Lynch relies on a national quintile ranking system that places FAs into quintiles based on production. Merrill Lynch creates a list of all FAs in the country and ranks them by commissions generated which is referred to as production. It then divides the list into 5 even quintiles. As shown in the sample graph below and is undisputed, approximately 70% of African American FAs are represented in

DISTRIBUTION OF LOS 10+ FCs BY QUINTILE AND RACE



the bottom two Quintiles. Ex. 1 at 76 (Fig. 6). Significantly, Merrill Lynch uses these national quintile rankings to award points under its NAP. *See* Ex. 197-201. For most years between 2001 and 2006, FAs in the 5th quintile were ineligible to receive distributions under the NAP. *Id.* If Plaintiffs prevail on the *Teamsters* hearing, they will have established a national pattern and practice of racial discrimination, which necessarily infected or tainted the national quintile rankings as the rank order of FAs would have been dramatically different but-for discrimination. Clearly, African American FAs would have dispersed in a uniform distribution with 20% in each quintile but-for discrimination. Because the NAP rankings are based on national quintile rankings, neither the NAP rankings nor the quintile rankings can be used in a post *Teamsters* remedial phase to justify account distributions under the NAP because discrimination in any

office in the country hopelessly tainted the national rankings. Plaintiffs submit, therefore, that if they prevail on common class-wide issues, there will be few "complex determinations" for the jury to render on the remedial phase as the NAP rankings[61] and similar performance rankings will be nullified[62]

In a case such as this, where the heart of the class challenge is to policies or practices that rank, screen or segregate on the basis of race, a verdict in favor of the class at a *Teamsters* hearing means that the selection devices cannot be used by Merrill Lynch in the remedial phase to justify denying individual class members relief. Any other outcome would simply turn *Teamsters* on its head. Thus, the remedial phase in this case will focus on what would have happened but for the pattern or practice of discrimination, which is proven by performing a wage shortfall analysis which compares the wages earned by African Americans to those that would have been earned had there been a uniform (non-discriminatory) or normal distribution of resources and wages.[63]

Further, as explained *supra*, Plaintiffs do not believe that it is necessary to resolve all damages issues or the manner in which the remedial phase will proceed in conjunction with class certification, but do maintain that the law does not require that they forego damages in order to seek reform. Congress wisely vested broad discretion with the Court to properly fashion make-whole relief for civil rights violations. This case presents no more difficulty in that regard than any other class action. *See Gary v. Sheahan* 96 C 7294, 1999 U.S. Dist LEXIS 5616 *10-11 (N.D. Ill. Mar. 31, 1999); *Blihovde v. St. Croix County Wis.*, 219 F.R.D. 607, 621 (W.D. Wis. 2003); *Denberg v. United States R. Retirement Bd.* 696 F.2d 1193, 1207 & n. 7 & n. 8 (7th Cir. 1983); *Portis v City of Chicago*, 02 C 3139, 2003 U.S. Dist. LEXIS 1572 *11-13 (N.D. Ill. Sept. 5, 2003); *Dunn v Kimble*, 231 F.R.D. 367, 377-378 (N.D. Ill. 2005)(the possibility of

---

[61] This is not to say that Merrill Lynch may not challenge some of the anecdotal evidence in the *Teamsters* trial to refute the existence of the pattern or practice of discrimination. But the *Teamsters* trial is not a trial of the individual circumstances of the entire class; it involves proof of only a sufficient number of claims to allow for the class-wide finding to proceed to the remedial phase. As explained, *supra,* to ensure that the liability phase remains manageable, district courts may limit the anecdotal evidence as they deem appropriate, *Robinson*, 267 F.3d at 168. Fed.R.Civ.P. 403.

[62] Again, to illustrate the circularity of Merrill Lynch's argument, if an exam is given and is discriminatory because no minorities pass the exam, it would make no sense to judge whether the resulting promotions were fair by examining whether the promotions were awarded to those with the highest scores.

[63] For this reason, at the remedial phase class members are bolstered by a presumption that each was a victim of the established pattern or practice. *Teamsters*, 431 U.S. at 336.

individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required).

As this Court recognized in *Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347, 358 (N.D. Ill., 1998)(Gettleman, J.), successful class actions have a stronger deterrent effect than individual actions that might otherwise not be filed. Here, the Plaintiffs chose to proceed as a class because of their strong desire to bring about change.[64] Plaintiffs are justified in their belief that together they stand a far greater chance of accomplishing their goals of reforming Merrill Lynch and Wall Street so that other African Americans will not suffer the same harm.

Rule 23(b)(2) is properly used in conjunction with 23(b)(3) to address injunctive and monetary claims. *See Jefferson*, 195 F.3d at 898 ("It is possible to certify the injunctive aspects of the suit under 23(b)(2) and the damage aspects under 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each person to exercise control over the damage aspects."). As Judge Shadur explained in *Smith v. Nike*, 234 F.R.D. 648, District Courts have available a number of "imaginative solutions" to the problems presented by individual damages issues (citing *Carnegie v. Household Int'l. Inc.*, 376 F. 3d 656, 661 (7th Cir.

---

[64] *See* Ex. 20, at 273-74 (filed lawsuit because wants to see Merrill Lynch change and for people to understand what it feels like to be discriminated against as an African American); Ex. 21 at 301 (hopes to accomplish "a level playing field for African Americans so that their production when weighted against the production of majority will be somewhat consistent as opposed to the large disparities that exist today because the patterns and practices and culture that exists at Merrill Lynch."); Ex. 22 at 345 (hopes to level the playing field and give African Americans the opportunity to be successful); Ex. 23 at 337 (believes change is needed and that there is a remedy for the "indignities that African Americans have to endure because of the culture at Merrill Lynch"); Ex. 24 at 7 (wants a change in Merrill Lynch's practices and policies); Ex. 25 at 496-97 (goal is to "create a company where people can really be judged on the content of their character, their talent, their ability, their merit, as opposed to who they know, how they look," and to provide the opportunity for success at a level one should succeed at); Ex. 26 at 513 (an institutional cost would bring about change); Ex. 27 at 325 ("that there will be a change that allows the concept of the meritocracy to be certainly more accurate than it is now and that there will be an equal playing field for African Americans to do well in this business"); Ex. 30 at 306-8 (wants to achieve fair compensation and change in the policies that has been disadvantaged by); Ex. 31 at 342 (believes that Merrill Lynch could "turn around" if management wanted to make that change, but believes there needs to be a new program and compensation to "help get things on track"); Ex. 32 at 11-12 (wants a change in policies, including account distributions, allocation of resources and managerial support, so that African Americans can achieve success); Ex. 33 at 126 (wishes to be part of something great in making Merrill Lynch a level playing field for African Americans); Ex. 34 at 342-43 (wants to see a change in the culture and policies that disadvantage African Americans); Ex. 35 at 384 (believes systemic change needed because wants "to see the firm that I love do better and become more diverse and more inclusive and more supportive of African American FAs"); *see also* Ex. 11 at ¶ 6 (hopes to change policies for other African Americans); Ex. 12 at ¶ 6 (wants to see Merrill Lynch implement standards for management that do not discriminate on the basis of race so that other African Americans may succeed).

2004) and the Court will be able to address such issues if and when they arrive."[65] *De La Fuente*, 713 F.2d at 233 (it is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members.); *Owner-Operator Independent Drivers*, 231 F.R.D. at 285 ("Class certification in the face of individualized damages is particularly appropriate when a common factual issue acts as a predicate to recovery by any class member"); *See also generally Moreno*, 2003 U.S. Dist. LEXIS 8700 (N.D. Ill. 2003)(allowing class action in case that involved constructive discharge allegations).

 Lastly, even given the possibility of individualized hearings, certification is appropriate because a class action is superior to and more manageable than the alternative if class treatment is denied. Plaintiffs have identified in Answers to Interrogatories more than one hundred class members who support and are relying on this lawsuit even though Notice has not issued in this case. As explained in over forty declarations of putative class members submitted to the Court, it is reasonable to expect, that hundreds of individual claims would be joined in this proceeding consistent with §1981's national venue provisions if class certification were denied. Alternatively, hundreds of individual claims, all relying on pattern and practice evidence, would be filed across the country. If that happened, there would be no possibility for class wide injunctive relief or a common fund if class certification were denied. Merrill Lynch's threat of complex, duplicative individualized proceedings would then become a certainty as class members would present an seek to rely upon same common pattern or practice evidence to prove their claims in courts across the country. *See, e.g., Allen*, 358 F.3d at 471 (questioning logic of denying class certification due to individualized damage questions because plaintiffs would still be entitled to present "evidence about the plaint-wide environment," among other reasons. Thus, as Judge Shadur reasoned under similar circumstances, "the need for careful administration of a class action poses fewer problems than the alternative of separate lawsuits by over 230 individual class members, each advancing his own claims." *Smith* at 234 F.R.D. at 667. Superiority measures "whether class certification will have practical utility in the suit." *Toney v. Rosewood*

---

[65] *Biondo v. City of Chicago*, 382 F.3d 680 (7th Cir. 2004) represents an outstanding example of a creative judge resolving the issues of damages and preserving the benefit of Rule 23. Chief Judge Holderman in *Biondo* held a *Teamsters* liability hearing in which the Plaintiffs' prevailed. Thereafter, Judge Holderman held three "sample" jury trials on damages after designating three subclasses. With the benefit of the jury trials, the parties were able to resolve hundreds of claims, including agreeing to a common fund settlement for one subclass. *See Chicago Firefighters Union Local No. 2, et al. v. City of Chicago*, Case No. 88 C 3773 (Holderman, J.), Dkt. No. 1360.

*Care Center*, 98 C 0693, 1999 U.S. Dist. LEXIS 4744 *32 (N.D. Ill. Mar. 31, 1999).  Because this case involves allegations of generally applied discriminatory policies or practices, and both its prosecution and defense will rely upon common statistical and other evidence, class action is a superior means for requiring the class members to litigate on their own or as groups of individuals. *See Toney*, 1999 U.S. Dist. LEXIS 4744 *19.

The Seventh Circuit has expressly rejected Merrill Lynch's Seventh Amendment challenge to bifurcation or hybrid certification (Opp. at 63), stating that "[c]ertifying a class for injunctive relief while handling damages claims individually, does not transgress the seventh amendment." Allen, 358 F.3d at 471.

For all of the reasons stated herein, the Plaintiffs have established that they meet Rule 23(a) and 23(b)(2) and (b)(3) and they respectfully request that the Court allow them to prosecute this suit on behalf of themselves and all others similarly situated.

## PLAINTIFFS RESPONSE TO MERRILL LYNCH'S MOTIONS TO STRIKE

### IV.  The Court Should Deny Merrill Lynch's Motions to Strike Plaintiffs Witnesses and Bar Plaintiffs' Experts

Merrill Lynch's Opposition resembles a Russian Matryoshka "nested" doll where each pleading gives birth to another hidden pleading ultimately leaving the Court with the burden of determining whether every argument made by Plaintiffs should be disbelieved, every case certifying a class cited by Plaintiffs should be discarded, every witness declaration submitted by Plaintiffs should be struck and every expert offered by Plaintiffs should be excluded.  In addition to its 66-page Opposition memorandum, Merrill Lynch covets an additional 47 pages rearguing each point under the guise of motions to strike experts Madden and Bielby and the declarations of putative class members.  Mindful of the burden the parties placed on the Court with these pleadings and of the disfavor the law places on striking evidence and barring witnesses, Plaintiffs assume the Court's familiarity with the parties' briefs on class certification and respond only to specific issues raised in Merrill Lynch's motions to strike and bar.

### A.  Response to Motion to Strike Dr. Madden's Opinions

Merrill Lynch moves to bar Plaintiffs' expert Madden ("Madden Motion").  The Madden Motion addresses only Madden's rebuttal criticisms of Merrill Lynch's expert, Saad's geo-coding methodology, and does not seek to challenge Madden's affirmative studies.  Plaintiffs responded to the Madden motion by seeking to strike the motion because it introduces a new

declaration and study from Saad, which were not produced during discovery, in violation of this Court's scheduling Order and Federal Rule of Civil Procedure Rule 26. Plaintiffs also now submit the declaration of Madden, which explains her difficulties in responding to the new Saad study because Saad failed to produce any output on his new studies, which was required by the Court-approved Stipulation of the Parties. *See* Ex. 235, Madden Declaration; Ex. 236, Stipulation of Parties. Madden provides a substantive response to other parts of the declaration, which Plaintiffs incorporate by reference. *See* Ex. 235. Clearly, however, the debate between Saad and Madden is a "battle of the experts" that needs not be resolved in conjunction with the motion for class certification. *Wilfong*, 2001 U.S. Dist. LEXIS 22718 at *11-13, n.5 ("[i]t is not this Court's role to determine the ultimate correctness of either party's [experts'] contentions in the context of class certification."); *See also Krueger v. New York Telephone*, 163 F.R.D. 433, 440 (S.D.N.Y. Sept. 22, 1995). Thus, the Madden motion should be denied.

### B. Response to Motion to Strike Dr. Bielby's Opinion

Merrill Lynch moves to bar Plaintiffs' expert Bielby ("Bielby Motion"), arguing that Bielby's testimony and opinions fail the admissibility test of Federal Rule Evidence Rule 702 and the standards established by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Under *Daubert*, there are three requirements for admissibility: (1) the witness must be qualified as an expert by knowledge, skill, experience, training or education; (2) the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and (3) the testimony must assist the trier of fact to understand that evidence or to determine a fact in issue. *Id.* Merrill Lynch does not challenge Bielby's qualifications but argues that his testimony is not relevant and, therefore, does not assist the trier of fact. Alternatively, Merrill Lynch argues that Bielby's opinions are not scientifically reliable.

### 1. Bielby's Testimony is Sufficiently Tied to the Record

Over the past twenty-five years, Bielby has conducted research on issues of workplace discrimination, organizational behavior and organizational policies and practices. He is past President of the American Sociological Association and has received national awards from three different professional associations for his research. He has a Ph.D. in Sociology and is currently a Professor of Sociology at the University of Illinois where he teaches courses on organizational behavior, research methods and social inequality. Bielby is also Professor Emeritus at the University of California, Santa Barbara where he served on the faculty of sociology and chaired

the Department of Statistics and Applied Probability. *See* Ex. 2 at Ex. B. He has been certified as an expert and offered testimony in many cases. *See e.g., Arnold v. Cargill Incorporated*, 01-2086, 2006 US Dist. LEXIS 41555 (D. Minn. June 20, 2006); *Betty Dukes v. Wal-Mart,* 222 FRD 189, 192 (D. Cal. 2004); *Butler v. Home Depot, Inc.,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997); *Stender v. Lucky Stores, Inc.,* 803 F. Supp. 259, 301-303, 327 (N.D. Cal. 1992).

Based on well-established research and scientific knowledge, Bielby's expert report in this case provides a scientific framework that can be used to determine whether Merrill Lynch's polices or practices contribute to the barriers and advancement of African American FAs. *See generally* Ex. 2. Using an organizational case study method, Bielby analyzed specific features of Merrill Lynch's account distribution, teaming, promotion, marketing and diversity polices in light of a large body of established social science research on the practices that produce, maintain or minimize discrimination. *See id.* He concludes that Merrill Lynch's policies or practices create a system that increases the likelihood of discrimination and that social science research can provide an explanation for the observed statistical disparities in compensation and employment opportunities suffered by African American FAs. *See id.* Further, Bielby concludes that Merrill Lynch's diversity programs are permeated with racial stereotypes and have inadequate accountability and responsibility structures that can allow racial barriers to persist. *See id.*

Merrill Lynch argues that while Bielby's opinions rely in part on the social isolation African Americans face at Merrill Lynch, they are not relevant "since he does not conclude that Merrill Lynch either did something inappropriate or failed to do something with respect to the representation of African Americans at Merrill Lynch." *See* Bielby Motion at 3. Because this is not a hiring case, Bielby did not study the applicant pool to confirm that Merrill Lynch discriminated in hiring and that the distribution of African Americans is the result of hiring discrimination. Merrill Lynch uses this fact to argue that if low representation of African American FAs is not Merrill Lynch's fault, then any discrimination must also not be Merrill Lynch's fault. This argument is wrong on both counts.

First, while Bielby did not study Merrill Lynch's hiring practices, he repeatedly references the treatment of African Americans and their statistically significant higher attrition rates. More specifically, Bielby stated that "with respect to the issue of social isolation, one reason African Americans are few and far between is because there are African Americans who

have been with the firm and are no longer there and they leave at a greater rate than do white FAs." *See* Ex 238 at 189. Bielby then explained that the high attrition rate could be contributing to the perception that African Americans cannot be as successful as white FAs, which in turn can be contributing to the low representation of African Americans in teams and in management positions. *See* Ex 238 at 80-1, 189, 190. Bielby also testified that he relied on the Madden Report, which connects the attrition to account transfers and teams.[66] Thus, it is not accurate that Bielby places no fault on Merrill Lynch for the social isolation.

Second, the argument that Merrill Lynch is not responsible for the discrimination against African Americans unless it caused the low representation finds no support in the law. A simple example demonstrates the hollowness of Merrill Lynch's argument. If a woman was hired into a job that was previously exclusively male, (*e.g.* firefighter), and was, therefore, the only woman in the job, an employer would nonetheless face responsibility if the woman suffered sexual harassment. *See, e.g., Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 889 (D. Minn. 1993). As Bielby explained, the fact that African Americans are "few and far between" at Merrill Lynch is undisputed and comprises an important part of the organizational context that shapes the experiences of African American POAs and FAs. *See* Ex. 230 at 21-22. Bielby's testimony about social science scholarship and the effect of organizational context assists the trier of fact in understanding the allegations in this case. And, Bielby strikes the appropriate balance between providing the social science scholarship while not usurping the role of the jury.

Indeed, the Seventh Circuit does not allow expert testimony on the ultimate issue to be decided by a jury. *See, e.g., Naeem v. McKesson Drug Company*, 444 F.3d 593, 610 (7th Cir. 2006) ("we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance."); *United States v. Sinclair,* 74 F.3d 753, n.1 (7th Cir. 1996) ("Our own cases have determined that Federal Rules of Evidence 702 and 704 prohibit

---

[66] Likewise, Merrill Lynch asserts that Bielby's opinions are not relevant because he does not opine that the categorical variable defining the "in-group" is race. Bielby does conclude "far from being a colorblind meritocracy, race permeates policy and practice in a way that creates substantial obstacles to equal employment opportunity for Merrill Lynch's African American employees." Ex. 2 at 72. Nonetheless, Merrill Lynch contends that unless Bielby offers the opinion that the categorical variable for the "in-group" is race that all of his opinions are not relevant. Again, this is the ultimate fact in the case and Bielby is correct not to usurp that fact finding from the jury. Clearly, based on the totality of the evidence, a reasonable jury could find that the categorical variable for the "in-group" is race and Bielby's review of the sociological research will aid the jury.

experts from offering opinions about legal issues that will determine the outcome of a case"). Other courts, too, have rejected identical arguments, concluding that having an expert tell the jury what to think about the particular facts of the case does not give the testimony validity, but weakens its admissibility. *See Tuli v. Brigham & Women's Hospital, Inc.,* 592 F. Supp. 2d 208, 214 (D. Mass. 2009).[67] Conversely, courts hold that opinions of the kind offered by Bielby are probative.[68] For example, both the Supreme Court and the Seventh Circuit have specifically endorsed the use of the kind of evidence offered by Bielby. *See Price Waterhouse v. Hopkins,* 490 U.S. 228; 255-56 (1989) (utilizing expert evidence on sex stereotyping by a sociologist to assist fact-finder on question of whether a promotional decision was gender discrimination);[69] *Tyus v. Urban Search Management,* 103 F.3d 256, 263-264 (7th Cir. 1996) (proposed testimony of sociologist on how an all-white advertising campaign affects African Americans was clearly relevant because it would have given the jury a view of the evidence beyond their everyday experience).

Accordingly, Merrill Lynch's relevance objections should be overruled.

---

[67] *See also Hnot,* 2007 U.S. Dist. LEXIS 40243 *7-10 (S.D.N.Y. 2007) (suggesting that a sociologist opinion that "undertakes to tell the jury what to think about the particular facts of the case" would not be admissible); *Arnold,* 2006 US Dist. LEXIS 41555 at *23 (finding defendant's assertion that relevance of a sociologist's opinion depends on the ultimate issue of whether defendant engaged in intentional discrimination to be mistaken); *Bowers v. National Collegiate,* 564 F.Supp.2d 322, 362 (D.N.J. 2008) (limiting testimony of sociologist who purported to testify that a policy discriminated against disabled individuals); *Smith v. Ford Motor Company,* 215 F.3d 713, 721 (7th Cir. 2000) (an expert's testimony need not relate to the ultimate issue in the case in order to be relevant under Rule 702).

[68] *See e.g., Arnold,* 2006 US Dist. LEXIS 41555 * 7-10 (court agrees that Bielby's opinion that [defendant] has a strong corporate culture is relevant because it makes it more likely than not that common questions exist at the class certification stage"); *Ellis,* 240 F.R.D. at 654 ("The court find[s] [the social scientist's] opinion to be probative on the question of commonality and therefore denies defendant's motion to strike her declaration."); *Hnot,* 2007 U.S. Dist. LEXIS 40243 *7-10 (collecting cases).

[69] In *Price Waterhouse,* the Supreme Court relied on expert testimony that the decision-maker "was likely influenced by stereotypes" even though the expert admitted that she "could not say with certainty whether any particular comment was the result of stereotyping." *Price Waterhouse,* 490 US at 235-36. Contrary to Merrill Lynch's argument, courts do not require that the expert identify whether specific incidents were caused by discrimination. *See e.g., Dukes,* 222 FRD 189, 192 (rejecting contention that Bielby's testimony could not establish commonality because he could not quantify the degree of stereotyping at Wal-Mart); *Hnot,* 2007 U.S. Dist. 40243 at *7 (rejecting argument that expert testimony should be excluded because even though expert proffered to testify that certain conditions were conductive to gender stereotyping, he failed to show that those circumstances were actually present in defendant's workplace).

## 2.     Bielby's Methods Satisfy Rule 702

Merrill Lynch hired Christopher Winship, Ph.D., ("Winship") to provide a report attacking Bielby's methodology. Winship is a self-proclaimed "*Daubert* expert" who has offered expert reports in seven cases stating that plaintiffs' sociological experts do not follow scientific methodology.[70] Ex. 237, Winship Dep. at 28-30, 32-33. In this case, Winship did not review any of the documents or deposition testimony, which form the basis of Bielby's opinions. He also neither had access to data nor read the expert reports of all experts in the case. *See id.* at 13-16, 26. Winship is not an expert on organizational policies and practices and has not written any articles in this area. *See id.* at 111-115. He has no experience in analyzing organizational documents to assess a company's culture, has not completed any "in-group" research and is not an expert in personnel practices as they affect the amount of inequality that exists in an organization. Winship admits that part of his opinions are legal and that he has neither testified before, nor been certified by any court as an expert. *See id.* at 111.

Relying largely on Winship, Merrill Lynch argues that Bielby: 1) used methods that cannot be replicated; 2) "failed to employ the level of intellectual rigor required of social scientists;" 3) relies on insufficient facts and data; and 4) relies on unsupportive and self-limiting scientific research." Bielby Motion at 12-17. Each of these criticisms is without merit.

Merrill Lynch's argument that Bielby used methods that cannot be replicated is an argument that is not applicable to the type of expert work performed by Bielby in this case. Given the nature of his expertise, Bielby applied social science research and theories to the facts of the case. *See generally* Ex. 2. The exact method he employed, like many employed by scientists in his field, is not capable of being tested in a laboratory or to the same extent as those employed by scientists in more technical fields. This, however, does affect the reliability of his methods.[71] Because strict replication is not available when quantitative methodologies are

---

[70] The experts Winship criticizes are nationally known and respected and include: Dr. Eugene Borgida, Dr. Susan Fiske, Dr. Barbara Reskin, Dr. Tomaskovic-Devey and Dr. Bielby. *See* Ex. 237, Winship dep. at 28-30. From November 14 to January 2009, Winship authored three reports and admits that certain portions of the reports were just cut and pasted into each other. *See Id.* at 32-33.

[71] As Bielby explained during his deposition:
> Most organizational case studies are qualitative and not quantitative ... the notion of strict replication as understood by physicists or laboratory scientists is not used in the qualitative-methodology literature. . . if you are doing ethnography where you are observing everyday action , that can never be replicated . . . . It doesn't mean it's not

concerned, courts have consistently ruled that testing and the ability to replicate do not affect the admissibility of social science testimony.[72]

Likewise, the argument that Bielby's intellectual rigor was lax is based on an erroneous charge that he failed to test available hypothesis. For this argument, Merrill Lynch relies on Saad. According to Merrill Lynch, Bielby concluded that Merrill Lynch managers exercise discretion in a way that disadvantages African Americans but that Bielby did not test this theory. Again, Merrill Lynch repeats the claim that Saad compared account distribution under the NAP with how accounts would have been distributed in the absence of manager discretion. As discussed above, Saad did not conduct this study but instead compared distribution under the draft versus assignment approach, both of which rely on the NAP rankings and not managerial discretion. However, Madden did study the effects of managerial discretion by including teams and FA to FA transfers in her account transfer analysis and showed, consistent with Bielby's theories that managers do not favor African Americans. Merrill Lynch argues that Bielby conceded that "if one were to find that a strict application of the non-discretionary account distribution criteria would have resulted in African Americans receiving less, he would conclude that the exercised discretion was not disadvantageous to African Americans." Bielby Motion at 14. Madden's studies establish the opposite that in a random sampling that African Americans would have received statistically significantly more lucrative accounts than they did receive with manager discretion. *See* Ex. 1 at 5; 24-37. This conclusion supports Bielby's hypothesis. Merrill Lynch's criticisms of Bielby are unfounded.

Further, Merrill Lynch's criticism that Bielby failed to take into consideration facts and data available to him and instead "cherry picked" is unfounded. Merrill Lynch cites a single

---

scientific. It means that there is a different notion of what replicability means from an inductive approach.
So you could send an ethnographer [to the] same organization on a different occasions. Of course they can't replicate what that first person did. You can't generate the same facts and so on, but you can see whether this inductive approach leads to the same sense of understanding and the same set of generalizations about what going on here . . . .
*See* Ex. 238, Bielby dep. at p.47.

[72] *See e.g., Bowers,* 564 F. Supp. 2d at 361 (the fact that the social sciences generally do not produce a 'testable hypothesis' does not render the resulting testimony unreliable); *Indianapolis Minority Contractors v. Wiley,* 94-1175, 1998 U.S. Dist, LEXIS 23349 *37-40 (D. Ind., May 13, 1998) (stating that the four factors identified in *Daubert* do not relate to the social sciences, but instead to methods that are capable of being tested through controlled experimentation); *cf. Pirolozzi v. Stanbano,* 07-195, 2009 U.S. Dist. LEXIS 42575 *9 (D. Ohio, May 8, 2009) (admitting expert testimony even though study could not be replicated for the purpose of scientific testing).

error it claims Bielby made after reviewing millions of pages of documents, including hundreds of record citations, in his reports. Merrill Lynch also criticizes Bielby for not relying on the Plaintiffs' depositions. Bielby reasonably explained that he chose to review the record rather than rely on the testimony of Plaintiffs because he wanted to understand how Merrill Lynch's personnel system operated from the perspective of the people who were responsible for its design, oversight, implementation and who made decisions within its context, and not how the system is perceived by the people who are making allegations of discrimination. *See* Ex. 238, Bielby dep. at 41. Merrill Lynch selects a few sound bytes from the Plaintiffs' depositions, which it believes are helpful to its case, and claims that Bielby should have relied on that specific testimony. Clearly, had Bielby relied on the thousands of pages of examples of discriminatory treatment testified to by the Plaintiffs, Merrill Lynch would have criticized Bielby for allowing the Plaintiffs to influence his opinions. This argument, however, is not a basis to exclude Bielby but is classic fodder for cross examination, as the Seventh Circuit held in *Walker v. Soo Line R.R.*, 208 F.3d 581, 590-91 (7th Cir. 2000). There, the Court held that the admission of an expert was not error even though the opponent claimed the expert engaged in "inadequate" investigation and reached "faulty" conclusions. *Walker*, 208 F.3d at 590-91. Those issues were better dealt with in cross-examination and should be left to the jury to decide. *Id.* Thus, even if Merrill Lynch is correct – which it is not –the record provides no basis for exclusion.

Indeed, after reviewing Bielby's testimony as to his methods,[73] Winship admitted that the method used by Bielby is accepted in qualitative sociological research, is widely used by sociologists in the field and that scientists using this method have made important contributions to social science research on work and organizations. *See* Ex. 237 at 101-104. Winship further testified that in the social sciences, it is appropriate to draw inferences and causal connections as Bielby did in the absence of randomized. *See id.* at 110. Winship conceded that Bielby's method of searching the entire database of documents using search terms complies with scientific methodology. *See id.* at 125-126.

---

[73] Bielby had access to all of Merrill Lynch's documents concerning personnel practices, diversity and equal employment opportunity with respect to Merrill Lynch's FA workforce as produced in this lawsuit. Further, Bielby had access to the entire database of depositions, including the Rule 30(b)(6) depositions of the company's executives who are responsible for implementing and overseeing the company's personnel policies and practices. These executives testified on behalf of Merrill Lynch on such topics as compensation, training, promotions, diversity and FA teams.

Given this backdrop, numerous courts have accepted the methodology employed by

Bielby in this case as reliable.[74] And, importantly, a number of courts have explicitly rejected

*Daubert* challenges to Bielby of the very kind brought here by Merrill Lynch.[75] In those cases,

Bielby employed the same method of study he employed here.[76] *See* Ex. 230 at p. 40.

Finally, relying on Winship, Merrill Lynch argues that Bielby failed to present a fair,

unbiased summary of the literature. Winship concedes that Merrill Lynch's expert, Olivet Jones

included no literature review with her report, yet Merrill Lynch proffers this expert. *See* Ex. 237

at 24-27. Bielby's report contains hundreds of literature cites, but Merrill Lynch bases its entire

argument on its analysis of only two of these cites, hardly making his opinions unreliable. In any

event, this criticism again "unquestionably presents the sort of questions that go to the weight of

---

[74] *Hnot*, 2007 U.S. Dist. 40243 at *7 (collecting cases); *Bowers*, 594 F. Supp. at 361 ("This is not cutting-edge science, but is instead a conventional social science approach that courts have routinely admitted as methodologically reliable"); *Home Depot, Inc.,* 984 F. Supp. at, 1265 (denying motion to exclude because the theories underlying social scientists opinions have been tested in field laboratories, have been the subject of peer review and are generally accepted by experts in the field). *See also, Hurst v. F.W. Woolworth Co.,* 95-6584, 1997 U.S. Dist. LEXIS 17233, at *2 (S.D.N.Y. Nov. 3, 1997) (rejecting argument that testimony of industrial psychologist about stereotypes would not be helpful to the jury); *Flavel v. Svedala Indus.,* No. 92-1095, 1994 U.S. Dist. LEXIS 19774 at *1 (E.D. Wis. Oct. 25, 1994) (finding that expert testimony about stereotypes in the workplace would be both reliable and relevant); *Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1505 (M.D. Fla. 1991) (stating that testimony of sociologist in gender discrimination case provided a "sound, credible theoretical framework").

[75] *See Arnold,* 2006 US Dist. LEXIS 41555 at *23 (finding that Bielby's methodology was reliable while rejecting arguments that he should be excluded because his opinions offered speculative conclusions that cannot be quantified); *Dukes,* 222 FRD at 192 (finding that Bielby employed an acceptable social science methodology and rejecting claim that testimony should be excluded because Bielby could not testify with specificity how regularly stereotypes played a role in employment decisions); *Butler,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997) (rejecting defendant's argument that Bielby's report was unreliable because it drew sweeping conclusions from selective review of testimony); *E.E.O.C. v. Morgan Stanley,* 324 F. Supp. 2d 451, 4610-62 (S.D.N.Y. 2004) (rejecting Morgan Stanley's argument that Bielby's method was not reliable because he omitted inconsistent research); *Stender,* 803 F. Supp. 259 at 301-303, 327 (finding Bielby's testimony to be persuasive and rejecting Morgan Stanley's criticisms of his use of the research).

[76] Merrill Lynch wrongly asserts that multiple Courts have excluded Bielby's opinions. It cites three cases in support of its argument, none of which excluded Bielby. In *EEOC v. Morgan Stanley,* the Court explicitly found that Bielby "is qualified and that his methodology is reliable" and that his report "provides a theoretical explanation for discrimination." The court in *Morgan Stanley* only disallowed Bielby from testifying that the deficiencies of Morgan Stanley's policies were evidence of discrimination. Likewise, in *Gosho v. Lewis,* 00-1611, 2002 US Dist. LEXIS 28139 (N.D. Cal. October 1, 2002) and *Robinson v. Metro-North Commuter ,* 175 F.R.D. 46, 48 (S.D.N.Y. 1997), the courts did not exclude Bielby's opinions, but found them to be unpersuasive under the circumstances of the cases. Indeed, the *Robinson* decision which is heavily relied on by Merrill Lynch, is not good law because it was reversed on appeal. *See Caridad v. Metro-North Commuter,* 191 F.3d 283 (2nd Cir. 1999).

the evidence of the testimony rather than its admissibility." *Hnot*, 2007 U.S. Dist. LEXIS 40243 at *4 (S.D.N.Y June 1, 2007).[77]

Merrill Lynch has failed to put forth any evidence that would require this Court to disregard the holding of the numerous courts that have found testimony of the kind offered by Bielby to be relevant and his methods reliable. Merrill Lynch's motion should be denied.

### C. Response to Motion to Strike Plaintiffs' Declarations

Merrill Lynch moves to strike the declarations of class members ("Declaration Motion") on the ground that the declarations fail to meet evidentiary standards and rules. Merrill Lynch also argues that the declarations should be stricken because Plaintiffs are offering the declarations solely as merits-type proof. Neither challenge to the declarations is well-founded. Merrill Lynch's representations of the class members' declarations are not accurate.

Consistent with national class action litigation, Plaintiffs attached declarations of current and putative class-members in support of their Opening Memorandum to support Rule 23 elements, including superiority, and not to prove the claims.[78] Merrill Lynch argues that the declarations should be stricken in their entirety because they are "without foundation," "not tied to the class period at issue," and "lacking in specifics," (Declaration Motion at 1) but this misunderstands the purpose and use of the declarations and is nothing more than ordinary impeachment properly directed to their weight not admissibility.[79] *See Silverstein v. Penguin Putnam, Inc.*, 01-309, 2006 U.S. Dist. LEXIS 61750, *2 (S.D.N.Y. Aug. 29, 2006) (alleged inconsistencies in declarations go to the weight not to admissibility); *Espinoza v. Dominos Pizza,*

---

[77] *Olympia Exp., Inc. v. Lineee Aeree Italiane*, 02-2858; 2007 U.S. Dist. LEXIS 14307 at *43 (N.D. Ill. February 27, 2007) (reversed on other grounds) (the absence of evidence of specific treatises does not require the expert's analysis to be excluded from evidence).

[78] *See, e.g., Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999)(class action method superior "to repeated adjudication of [employment discrimination] claims piecemeal and *seriatum* as brought forward first by the fourteen named plaintiffs and then by any other plaintiffs who may choose to sue[.]"); *Walker v. Bankers Life & Cas.* Co., 06 C 6906, 2007 U.S. Dist. LEXIS 73502 at *29-30 (N.D. Ill. Oct. 1, 2007)(superiority is met, stating "[m]ultiple proceedings involving common issues could therefore result in an enormous duplication of effort and would likely hinder judicial economy and efficiency in adjudicating the core issues"); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("[C]lass action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury.").

[79] With respect to Merrill Lynch's argument that the Declarations are allegedly not "tied to the class period at issue," so-called "time-barred" evidence of discrimination prior to the charging period may be relevant. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

*LLC*, 07-1601, 2009 U.S. Dist. LEXIS 31093 at *34 (C.D.Cal. Feb. 18, 2009)(in employment action where classes were certified, the court afforded declaration that allegedly contained incomplete information less weight).

Plaintiffs offer these declarations to establish that class members from across the country raise similar claims and to establish the superiority of the class action device. They also plainly debunk Merrill Lynch's claim that this is an "across the board" challenge as in *Falcon*, because Plaintiffs identified over 100 individuals in their interrogatory answers who believed they were subjected to the treatment Plaintiffs claim to have experienced and submit the declarations to support this contention. In short, Merrill Lynch sets forth no legal basis for striking the declarations.

Additionally, Merrill Lynch seeks to impose the heightened affidavit requirements of the merits phase under Rule 56(e)(1) despite the fact that under Rule 23 there is no parallel language.[80] *Levitt v. PricewaterhouseCoopers, LLP*, 04-5170, 2007 U.S. Dist. LEXIS 52756, *4 (S.D.N.Y. July 19, 2007) (denying motion to strike declarations because "Rule 56(e) applies only to affidavits made regarding motions for summary judgment, not motions for class certification."). As the Supreme Court observed in *Eisen v. Carlisle and Jacqueline*, 417 U.S. 156, 178 (1974), class certification is "not accompanied by the traditional rules and procedures applicable to civil trials." Evidence submitted for use in a determination of the issues of class

---

[80] Of the nearly 40 cases that Merrill Lynch cites in support of its argument, the majority are orders regarding non-class claims, summary judgment, or both. Summary judgment is a standard to which Plaintiffs are not held at this stage. *See Moore v. Simpson*, 96 CV 2971, 1997 U.S. Dist. LEXIS 13791, at *4-5 (N.D. Ill. Sept. 5, 1997)( "[c]lass certification motions are not subject to the same standards as motions for dismissal for failure to state a claim or motions for summary judgment"). Of the cases that Merrill Lynch cites specifically with class claims and/or certification pursuant to Rule 23, many of these are distinguishable on various grounds and are incorrectly cited or paraphrased. *See e.g. Massey v. Zema Sys. Corp.*, 95 C 3504, 1998 US Dist. LEXIS 15736 at * 12-15 (N.D. Ill. Sept. 30, 1998) (denying motion to strike declarations even under Rule 56(e) standard); *Genenbacher v. CenturyTel Fiber Co.* II, 244 F.R.D. 485, 489 (C.D. Ill. 2007) (assumed, without analysis, that a hearsay statement was inadmissible in support of predominance); *Oscar Private Equity Ins. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 267(5th Cir. 2007)(states nothing regarding the admissibility of declarations); *Unger v. Amedisys, Inc.*, 401 F.3d 316, 325 (5th Cir. 2005)(same); *Mars Steel Corp. v. Cont'l Bank*, 880 F.2d 928, 938)(7th Cir. 1989)(court ruling on issues relating to fairness hearing, not Rule 23 certification or issues specific to certification); *Converse v. Ameritech*, 179 F.R.D. 533, 536 (W.D.Mich. 1997)(striking only those declarations of individuals whose names had not previously been disclosed); *Commander Properties v. Beech*, 164 F.R.D. 529, 542 (D.Kan. 1995)(where court struck the *portions* of an affidavit that were not based on personal knowledge).

certification need not be admissible at trial.[81] Accordingly, the Court has discretion to consider the class members' declarations offered by Plaintiffs for the purpose for which they are intended and should deny Merrill Lynch's Motion.

## CONCLUSION

For the reasons, stated herein, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court grant their Motion for Class Certification and deny Merrill Lynch's Motions to Bar testimony of Drs. Madden, Bielby and class members.

Respectfully submitted on behalf of Plaintiffs and the putative class,

**STOWELL & FRIEDMAN, LTD**

**By:**

_____/s/ Linda D. Friedman_____

Attorney No. 06190092

**STOWELL & FRIEDMAN, LTD.**
321 South Plymouth Court
Suite 1400
Chicago, IL 60604
(312) 431-0888
LFriedman@sfltd.com

---

[81] *See, e.g., Carrier v. American Bnkrs. Life Assur. Co. of Fla.*, No. 05-CV-430, 2008 U.S. Dist. LEXIS 8603, at *6 (D.N.H. Feb. 1, 2008); *Hayden v. Freightcar American , Inc.*, 2007-201; 2008 U.S. Dist. LEXIS 9913, *6 (W.D. Pa. Jan. 11, 2008); *Heffelfinger v. EDS Corp.*, 07-00101, 2008 U.S. Dist. LEXIS 5296, at *8-10, n.18 (C.D. Cal. Jan. 7, 2008); *Bell v. Addus Health-care, Inc.*, 06-5188, 2007 U.S. Dist. LEXIS 78950, at *5-6 (W.D. Wash. Oct. 12, 2007); *Fischer v. Ciba Specialty Chemicals Corp.*, 238 F.R.D. 273, 279 (S.D. Ala. 2006).