## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

GEORGE McREYNOLDS, MAROC
HOWARD, LARUE GIBSON, JENNIFER
MADRID, FRANKIE ROSS, MARVA YORK,
LESLIE BROWNE, HENRY WILSON,
LEROY BROWN, GLENN CAPEL,
CHRISTINA COLEMAN, J. YVES LABORDE,
MARSHELL MILLER, CARNELL MOORE,
MARK JOHNSON, CATHY BENDER-
JACKSON, and STEPHEN SMARTT,
Individually on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER
& SMITH, INCORPORATED,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 05-C-6583

Judge Robert W. Gettleman
Magistrate Judge Morton Denlow

Jury Trial Demanded

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION AND PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTIONS TO STRIKE

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

Legal Standard .................................................................................................. 2

I.   Plaintiffs Have Established All Rule 23(a) Requirements ........................... 3

    A. Commonality ........................................................................................... 3

        1.   Defendant's Uniform, National Written Policies and Practices Are The
             Type Regularly Certified and Tried On A Class Basis ....................... 4

        2.   Commonality Is Established Through Putative Class Member
             Declarations. ..................................................................................... 8

        3.   Class-Wide Statistics Establish Commonality ................................. 9

            (a)   Plaintiffs' Statistical Proof Ties The Disparities To Policies Or
                  Practices ...................................................................................... 9

            (b)   Merrill Lynch's Expert Reports Further Establish Commonality ........... 11

                (1)   Merrill Lynch's Experts Rise or Fall Together ....................... 12

                (2)   Dr. Saad Ignored Dr. Outtz's Job Analysis ........................... 12

    B. Typicality ............................................................................................... 17

    C. Adequacy ............................................................................................... 18

II.  The Proposed Class Meets Conditions For Rule 23(b)(2) Or Hybrid Certification .. 19

III. The Proposed Class Satisfies Rule 23(b)(3) .......................................... 24

IV.  The Court Should Deny Merrill Lynch's Motions to Strike Plaintiffs' Witnesses
     and Bar Plaintiffs' Experts ..................................................................... 29

    A. Response to Motion to Strike Dr. Madden's Opinions .......................... 29

    B. Response to Motion to Strike Dr. Bielby's Opinion .............................. 30

        1.   Bielby's Testimony Is Sufficiently Tied To The Record .................. 30

        2.   Bielby's Methods Satisfy Rule 702 ................................................ 33

C.  Response to Motion to Strike Plaintiffs' Declarations ................................................ 36

**CONCLUSION** ................................................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Accord Ellis v. Costco,* 240 F.R.D. 624, 642-643, (N.D. Cal. 2007)......................................22

*Adams v. Pinole Point Steele,* 92-1962, 1994 U.S. Dist. LEXIS 6692 (N.D. Cal. May 18, 1994)....6, 7

*Aliotta v. Gruenberg,* 237 F.R.D. 4, 12-13 (D.D.C. 2006) ................................................24, 25

*Allen v. Int'l Truck and Engine Corp.,* 358 F3d 469, 471 (7th Cir. 2004)..........................................20

*Anderson v. Boeing Co.,* 222 F.R.D. 521, 541 (N.D. Okla. 2004) ..............................................21, 22

*Arnold v. Cargill Inc.,* 01-2086, 2006 US Dist. LEXIS 41555 (D. Minn. June 20, 2006)......30, 33, 36

*Battle v. White Cap,* 97-4830, 1999 U.S. Dist. LEXIS 4658 (N.D. Ill., March 30, 1999) ...................8

*Bell v. Addus,* 06-5188, 2007 U.S. Dist. LEXIS 78950, (W.D. Wash. Oct. 12, 2007).............8, 24, 25

*Betty Dukes v. Wal-Mart,* 222 FRD 189, 192 (D. Cal. 2004) ................................................30

*Binion v. Metropolitan Pier,* 163 F.R.D. 517, 5223-26 (N.D. Ill. 1995)........................................6

*Bishop v. Gainer,* 272 F.3d 1009, 1015-16 (7th Cir. 2001)................................................1, 20

*Blihovde v. St. Croix County Wis.,* 219 F.R.D. 607, 621 (W.D. Wis. 2003) ...............................28

*Butler v. Home Depot, Inc.,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997)................................31, 36

*Buycks-Roberson v. Citibank,* 94-4094,1995 U.S. Dist. LEXIS 9342 (N.D. Ill., June 29, 1995)5, 8, 24

*Calvin v. Sheriff of Will County,* 03 C 3086, 2004 U.S. Dist. LEXIS 8717, *12 (N.D. Ill., 2004) 6, 22

*Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 291-2 (2nd Cir. 1999)..........................6, 37

*Carnegie v. Household International,* 376 F.3d 656, 659–61 (7th Cir. 2004) ..................................22

*Daniels v. Fed. Reserve Bank,* 98-1186, 2000 U.S. Dist. LEXIS 6833 (N.D. Ill., March 28, 2000) ....8

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993)......................................................passim

*Dunn v. City of Chicago,* 231 F.R.D. 367, 372 (N.D. Ill. 2005)................................................3, 27

*Eisen v. Carlisle & Jacquelin,* 417 U.S.156, 177 (1974)................................................2

*Flavel v. Svedala Indus.,* No. 92-1095, 1994 U.S. Dist. LEXIS 19774 (E.D. Wis. Oct. 25, 1994).....36

*Fry v. UAL Corporation,* 136 F.R.D. 626 (N.D. Ill., 1991)................................................24, 25

*Gary v. Sheahan* 1999 U.S. Dist LEXIS 5616 (N.D. Ill. 1999)................................................28

*Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147 (1982) ..............................................2

*Gerlib v. R.R. Donnelly & Sons,* 95-7401, 1997 U.S. Dist. LEXIS 16842 (N.D. Ill. Oct. 24, 1997)....7

*Green v. USX,* 896 F.2d 801, 805 (3rd Cir. 1990) ................................................6

*Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir. 1985) ................................................6, 21

*Health and Welfare Fund, et al.,* 98-C-4302 1999 U.S. Dist. LEXIS 14853 (N.D. Ill. Aug. 20, 1999)4

*Hill v. Amoco,* 97-7501, 2001 U.S. Dist. LEXIS 3082 (N.D. Ill., March 15, 2001)............................8

*Hill v. Shell Oil Company,* 98-5766, 2002 U.S. Dist. LEXIS 13396 (N.D. Ill., March 28, 2002) ........7

iv

*Hoffman v. Grossinger Motors, Inc.,* No. 96-5362, 1999 U.S. Dist LEXIS 2392 .............................. 18

*Hurst v. F.W. Woolworth Co.,* 95-6584, 1997 U.S. Dist. LEXIS 17233 (S.D.N.Y. Nov. 3, 1997) ..... 36

*In re Allstate Ins. Co.,* 400 F.3d 505, 508 (7th Cir. 2005) ..................................................... 20

*In re Monumental Life Ins. Co.,* 365 F.3d 408, 418 (5th Cir. 2004) ............................................ 21

*Indianapolis Minority Cntrs. v. Wiley,* 94-1175, 1998 U.S. Dist, LEXIS 23349 (D. Ind., May 13, 1998) .34

*Jefferson v. Ingersoll Int'l.,* 195 F.3d 894, 897 (7th Cir. 1999) ........................................... 4, 20, 21

*Jefferson v. Windy City,* 196-C-7686 998 U.S. Dist. LEXIS 12262, *17 (N.D. Ill. Aug. 3, 1998) ....... 4

*Jenson v. Eveleth Taconite Co.,* 824 F. Supp. 847, 889 (D. Minn. 1993) ....................................... 32

*Johns v. DeLeonardis,* 92-2547, 1992 U.S. Dist. LEXIS 18210 (N.D. Ill., Nov. 30, 1992) ................ 8

*Keele v. Wexler,* 149 F.3d 589, 594 (7th Cir. 1998) ............................................................ 4

*Kohen v. Pacific Invst. Management Company,* LLC, NO. 05 C 4681 (7th Cir. July 7, 2009) ........... 23

*Krueger v. New York Telephone,* 163 FRD 433, 440 (S.D.N.Y. Sept. 22, 1995) ............................... 30

*Latuga v. Hooters,* 93-7709, 1995 U.S. Dist. LEXIS 10713 (N.D. Ill., July 25 1995) ......................... 7

*Lemon v. Int'l .Union of Opt.,* 216 F.3d at 577, 579-582 (7th Cir. 2000) .................................... 20, 22

*Liberles v. Cook County,* 709 F.2d 1122, 1136-37 (7th Cir. 1983) ............................................ 21

*Lilly v. Harris-Teeter Supermarket,* 720 F.2d 326 (4th Cir. 1983) ........................................... 6

*Massie v. IDOT,* 96-C-4830, 1998 U.S. Dist. LEXIS 8680 at *17-18 (N.D. Ill. June 5, 1998) .......... 21

*McClain v. Lufkin Industries, Inc.,* 187 F.R.D. 267 277 (E.D. Tex. 1999) .................................... 20

*Meiresonne v. Marriott Corp.,* 124 F.R.D. 619, 625 (N.D. Ill. 1989) ....................................... 19, 24

*Moreno v. DFG Foods,* 02-4019 2003 U.S. Dist. LEXIS 8700 at *21(N.D. Ill. May 21, 2003) ..4, 8

*Morgan v. United Parcel Service, Inc.* 169 F.R.D. 349 (E.D. Mo. 1996) ...................................... 7, 36

*Newsome v. Up-To-Date Laundry, Inc.,* 219 F.R.D. 356, 365 (D. Md. 2004) ................................ 24, 25

*Orlowski v. Dominick's Finer Foods, Inc.,* 172 F.R.D. 370, 373-74 (N.D. Ill. 1997) ....................... 6, 8

*Palmer v. Combined Ins. Co. of America,* 217 F.R.D. 430, 438 (N.D. Ill. 2003) ........................... 22, 25

*Pirolozzi v. Stanbano,* 07-795, 2009 U.S. Dist. LEXIS 42575 *9 (D. Ohio, May 8, 2009) ............... 34

*Portis v City of Chicago,* 2003 U.S. Dist. LEXIS 1572 (N.D. Ill., 2003) ...................................... 28

*Price Waterhouse v. Hopkins,* 490 U.S. 228; 255-56 (1989) ................................................... 33

*Puffer v. Allstate,* 225 F.R.D. 450 (N.D. Ill. 2009) ............................................................ 9

*Reid v. Lockheed Martin, Aero, Co.* 205 F.R.D. 655, 667-68 (N.D. Ga. 2001) .............................. 6

*Remien v. EMC Corp,* 2008 U.S. Dist. LEXIS 74174 at 14 (N.D. Ill. 2008) .................................. 23

*Robinson v. Metro North Commuter Railroad,* 267 F.3d 147 (2nd Cir. 2001) ......................... passim

*Rodolico v. Unisys Corp.,* 199 F.R.D. 468, 477 (E.D.N.Y. 2001) ............................................ 24, 25

*Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir. 1992) ................................................... 3, 9

*Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992) ................................................. 9

*Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (N.D. Cal. 1990) .......................................... 5, 7

*Rossini v. Ogilvy Mather, Inc.*, 798 F.2d 590, 598 (2nd Cir. 1986) .......................................... 6

*Sagun Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208, 214 (D. Mass. 2009) ......... 33

*Sally Naeem v. McKesson Drug Company*, 444 F.3d 593, 610 (7th Cir. 2006) ............................ 32

*Satchell v. Fed. Ex.*, 03-02659 2005 U.S. Dist LEXIS 37354 *17(N.D. Cal. Sept. 27, 2005) ........ 5, 22

*Smith v. Nike Retail*, 234 F.R.D. 648, 659 (N.D. Ill. 2005) ................................................ passim

*Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1199 (7th Cir. 1971) ................................... 1

*Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 301-303, 327 (N.D. Cal. 1992) ..................... 31, 36

*Stewart v. General Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir. 1976) ................................ 21

*Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001) .................................... 25

*Toney v. Rosewood Care Center*, 1999 U.S. Dist. LEXIS 4744 (N.D.Ill. 1999) ........................ 29

*Tooley v. Burger King*, 93-7531, 1995 U.S. Dist. LEXIS 4525 at *5 (N.D. Ill. Mar. 23, 1995) ..... 7

*Tyus v. Urban Search Management*, 103 F.3d 256, 263-264 (7th Cir. 1996) ........................... 33

*United States v. Sinclair*, 74 F.3d 753 (7th Cir. 1996) .................................................... 32

*Vigars v. Valley Christian Center of Dublin*, 805 F.Supp. 802, 808 (N.D.Cal. 1992) ................. 1

*Walker v. Soo Line R.R.*, 208 F.3d 581, 590-91 (7th Cir. 2000) ........................................ 35, 37

*Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999) ..................................... 8, 37

*Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990-91 (1988) ................................... 5, 7

*Weizeorick v. ABN AMRO Mortgage Group, Inc.* 01 C 713, 2004 U.S. Dist. LEXIS 15467 ......... 18

*Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347 (N.D. Ill., 1998) ................................. 28

*Wilfong v. Rent-A-Center*, 00-0680, 2001 US Dist. LEXIS 22718 ..................................... 30

# INTRODUCTION

This is the rare discrimination case in which the defense bolsters the Plaintiffs' request for class certification by offering a class defense to undisputed racial differences in employment outcomes. The parties agree that Merrill Lynch's African American Financial Advisors ("FAs" or "brokers") earn wages that are statistically significantly lower than white FAs and suffer statistically significantly higher attrition rates. Merrill Lynch's experts' reports and pleadings offer a class defense to these disparities, which not only synchronizes with Plaintiffs' systemic claims but also independently establishes that class certification is an efficient, effective and appropriate mechanism to resolve this dispute.

Merrill Lynch's defense is based on the following syllogism:

**PREMISE**: Successful FAs bring in clients of high net worth to make money for Merrill Lynch, a for-profit company;

**PREMISE**: There is more wealth in the white community than in the African American community. Because of race and customer bigotry,[1] Africans Americans cannot cross "racial and cultural barriers" to access white wealth.[2] As a consequence, whites have greater access to persons of wealth.

**CONCLUSION**: Whites are better FAs than African Americans and, accordingly, deserve greater wages and lower attrition.

Indeed, the battle lines are clearly drawn between the parties as to the cause of the undisputed racial disparities. Plaintiffs allege fairly traditional race class discrimination claims.

---

[1] Merrill Lynch does not limit its "external" forces defense to "access to wealth" as it advises the Court that customer preference or bias plays a part: "among the numerous individual factors the Court would have to consider are what impact the remnants of societal discrimination had on each African American FAs' production." Merrill Lynch's Memorandum in Opposition to Class Certification ("Opposition" or "MOP") at 41. Under Title VII the preferences of fellow employees or customers do not justify discrimination. *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1199 (7th Cir. 1971) (airline's no-marriage rule for stewardesses was not justified by passenger preference); *Vigars v. Valley Christian Center of Dublin*, 805 F.Supp. 802, 808 n.4 (N.D.Cal. 1992) (fellow employees' and customers' preferences do not constitute bona fide occupational qualification). The Equal Employment Opportunity Commission guidelines on discrimination also reject "preferences of co- workers, the employer, clients or customers." 29 CFR 1604.2(a)(1)(iii).

[2] *See, e.g.,* MOP at 9-10 and 41-42 ("African American FAs on average have fewer social connections with potential clients of wealth")("the wealthy population in this country is overwhelmingly white and access to wealthy clients is generally not common for African Americans")("African Americans have lesser access to wealth, which resides largely in the white community and face barriers as a result of segregation of social networks").

1

Merrill Lynch blames "external" forces, *i.e.* the "demographics of wealth" coupled with racial bigotry or customer bias, for the advantage for whites; Merrill Lynch insists that it is not legally responsible for racial disparities or for the less favorable outcomes of African Americans, even if it intentionally perpetuates the market advantage it presumes exists for white FAs.[3]

In their Opening memorandum, Plaintiffs presented ample evidence to satisfy the requirements of Federal Rule of Civil Procedure 23 ("Rule 23"). Now, Merrill Lynch's race-based systemic defense provides yet another reason to certify this class.

## ARGUMENT

Using words to describe Plaintiffs' claims such as "kitchen sink," " blunderbuss" and "hopelessly fragmented," Merrill Lynch urges rejection of the class largely on the incorrect ground that the class is no more than an amalgamation of hundreds of individual claims and serves no purpose. Relying on misleading sound bites from the Plaintiffs' depositions and unfounded statements in manager declarations it prepared post-discovery,[4] Merrill Lynch seeks to create conflict between the Plaintiffs where none exists, and to inject confusion into an otherwise clear-cut dispute. Nothing Merrill Lynch offers, however, alters the conclusion that this case is straightforward.

### Legal Standard

As early as 1974, the Supreme Court admonished lower courts that "nothing" in Rule 23 "gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin,* 417 U.S.156, 177 (1974). Yet, ten years later, in *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982), the Court explained that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 160. Judge Shadur, in *Smith v. Nike Retail Svcs.*, 234 F.R.D. 648, 659 (N.D. Ill. 2005), reconciled this

---

[3] Merrill Lynch's executives testified that African American FAs are disadvantaged because they must "cross racial boundaries" and, thus, African Americans lack access to social networks of wealthy individuals. *See* Ex. 42 at 129-32, 138-39, 142-145, 147-148, 150, 245-246, 269-70; Ex. 43 at 265-270; Ex. 45 at 120-121, 127-130. Merrill Lynch concedes that skin color is the reason African Americans cannot "cross into the white community." Ex. 45 at 128-129. One executive explained the problem as follows: an African American FA might prospect a client over the phone with success only to meet for the first time and have the prospective client realize the FA's race; the African American FA would then have "an additional need to cross over and dissipate that" barrier. *See id.* at 129; *see also* Ex. 42 at 130-31.

precedent to mean, "courts must walk a fine line, and one that is not 'easily discernible'...

between those two extremes -- an approach that allows for a 'preliminary inquiry' into the merits

but only to the extent needed to deal with Rule 23 considerations..."(internal citations omitted).

To Merrill Lynch, however, the class certification process entitles it to nothing short of a

full-blown trial on the merits. Mentioning no fewer than three times that its former Chief

Executive Officer ("CEO") is African American and the grandson of a slave, "born and raised in

the Jim Crow south of the 1950's and 1960's," Merrill Lynch wants the Court to bypass any

analysis of the requirements of Rule 23 and just exonerate Merrill Lynch from liability on the

ground that Merrill Lynch could not have engaged in discrimination[5] against African

Americans.[6] But, the law is clear that the focus at this stage of the proceedings is not on which

side wins but whether Rule 23 is met.  Accordingly, while Plaintiffs dispute many of the factual

and legal issues raised by Merrill Lynch, they focus attention not on these "merit" disputes but

on the requirements of Rule 23. *Falcon*, 457 U.S. at 161.

## I.  Plaintiffs Have Established All Rule 23(a) Requirements

Merrill Lynch wrongly asserts that Plaintiffs have not met Rule 23(a)'s commonality,

typicality or adequacy requirements.

### A.  Commonality

Commonality is construed permissively under Rule 23(a)(2) and requires a single

common issue of law or fact, not that every question of law or fact be common to every member

of the class. *See Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992); *Dunn v. City of

Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005) (Gettleman, J.). Commonality may be satisfied,

for example, where the question of law linking the class members is substantially related to the

resolution of the litigation even though the individuals are not identically situated. *Id.* Factual

---

[4] In support of its Opposition, Merrill Lynch submitted 44 affidavits of Complex Directors.  The affidavits
are not credible in light of the admissions of Merrill Lynch Rule 30(b)(6) deponents, the underlying
documentary record and publicly available information. *See* Ex. 244, Chart C.
[5] Toward this end, Merrill Lynch submits expert reports from Olivet Jones and Jerome Williams, Ph.D.
regarding its "good faith" efforts to diversify and market to its diverse customers.  These reports neither
pertain to class certification nor meet the standards of Fed.R.Evid. 702. Because Merrill Lynch does not
even reference the reports in the MOP, the reports should be stricken.
[6] Merrill Lynch charges, "the slander that Merrill Lynch has a discriminatory culture is beyond all reason
given its long-time African American CEO and the substantial effort and resources it devotes to
affirmative action initiatives." MOP at 36.  It is not slander, however, to say that Merrill Lynch has a

variation among the class is not fatal to a class action if common questions of law exist. *See Rosario*, 963 F.2d at 1018; *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Moreover, Rule 23 "does not mandate absolute commonality; a common nucleus of operative fact is usually enough to satisfy the requirement." *Joncek v. Local 714 International of Teamsters Health and Welfare Fund, et al.*, 98-C-4302, 1999 U.S. Dist. LEXIS 14853 (N.D. Ill. Aug. 20, 1999)(Gettleman, J.). "Common nuclei of fact are typically manifest where…the defendants have engaged in a standardized conduct towards members of the proposed class." *Moreno v. DFG Foods*, 02-C-4019, 2003 U.S. Dist. LEXIS 8700 at *21 (N.D. Ill. May 21, 2003); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *see Jefferson v. Windy City Maintenance*, 196-C-7686 1998 U.S. Dist. LEXIS 12262, *17 (N.D. Ill. 1998).

1.  **Defendant's Uniform, National Written Policies and Practices Are The Type Regularly Certified and Tried On A Class Basis**

Merrill Lynch argues this lawsuit lacks any "unifying force" sufficient to satisfy Rule 23. MOP at 31. Contending that FAs operate their own businesses and succeed or fail based on their ability to generate business, Merrill Lynch reasons that to fully understand why any FA succeeded or failed, the Court must view each individual case in a vacuum, without consideration of common proof. *See* MOP at 31-32.

The unifying force, of course, is that all decisions were made pursuant to the same Firm-wide, uniform policies or practices designed, monitored and implemented by the highest levels of Merrill Lynch and in a manner consistent with the Firm culture. The uniformly less favorable outcomes for African Americans also connect the claims of class members. According to the law of probabilities, the huge racial disparities cannot be the result of chance or a random distribution. *See* Ex. 1 at 38-40. Rather, Plaintiffs allege that the disparities result from Merrill Lynch's culture and uniform compensation, account distribution and teaming policies or practices, which apply to every class member in the same way. Merrill Lynch's "access to wealth" defense is also a unifying force, raising common issues of law and fact.

The Second Circuit's decision in *Robinson v. Metro North Commuter Railroad*, 267 F.3d 147 (2nd Cir. 2001) is instructive. In *Robinson*, the district court denied certification of a liability class under 23(b)(2) because the district court posited that "discriminatory acts of particular

discriminatory culture, as women successfully established this fact. *See Cremin v. Merrill Lynch*, 96 C 3773, (finding of class-wide liability eligible for collateral estoppel treatment).

department managers in particular individual situations" would have to be tried and would "overwhelm the liability phase." *Robinson,* 267 F.3d at 168. In reversing the district court, the Second Circuit explained that the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination. "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics." *Id.*, citing Fed.R.Evid. 403. Thus, for determining commonality, the centerpiece of the case is the statistical proof[7] and patterns or practices,[8] not the individual claims. Like *Robinson,* this case is a traditional *Teamsters* case, which relies on patterns or practices rather than individual decisions.

Merrill Lynch concedes that branch managers must follow national policy, including on account distribution and teams but argues that commonality does not exist because its managers exercised discretion as a matter of national policy. *See* MOP at 38. Merrill Lynch apparently posits that policies that contain "objective" factors are somehow immune from liability and only unfettered manager discretion presents common issues susceptible to challenge. *See id.* As explained below, this is not the law, as courts recognize that in the real world, policies have both objective and subjective elements. *See, e.g., Satchell v. Fed. Ex. Corp.*, 03-02659, 2005 U.S. Dist LEXIS 37354 *17 (N.D. Cal. Sept. 27, 2005)("A court may certify a class where the challenged personnel policies contain both objective and subjective components"). [9]

To demonstrate that Merrill Lynch's argument does not defeat but strengthens Plaintiffs' commonality argument, Plaintiffs provide the following example: Merrill Lynch's National

---

[7] Plaintiffs bring claims under both disparate treatment and disparate impact theories of liability. "[S]tatisical proof almost always occupies center stage in a *prima facie* showing of a disparate impact claim." *Robinson,* 267 F.3d at 160.

[8] Pattern or practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals. Plaintiffs must prove more than sporadic acts of discrimination; they must establish that intentional discrimination was the defendant's standard operating procedure. *See Teamsters,* 431 U.S. at 336.

[9] Judge Shadur rejected a similar argument, explaining that *Falcon's* reference to entirely subjective decision making processes is not a requirement but only one of many potential ways a plaintiff might establish commonality and typicality. *Smith,* 234 F.R.D. 648, 661 n.12 (N.D. Ill. 2006). Judge Shadur cited the decision of Judge Castillo finding commonality in *Buycks-Roberson v. Citibank Fed.Sav.Bank*, 162 F.R.D. 322, 330-31 (N.D. Ill. 1995) where the defendant allowed low-level managers discretion to apply neutral underwriting criteria. *Id.* Other courts likewise do not find fatal to a claim of subjective decision making that the decisions are made under policies that contain objective and subjective factors. *Satchell,* 2005 U.S. Dist LEXIS 37354 at *21-22 (citing *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 990-91 (1988)) (subjective decision making is a practice subject to challenge under Title VII); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (N.D. Cal. 1990).

Account Distribution Policy ("NAP") until 2006 did not expressly prohibit "FA to FA" transfers, which undisputedly benefited white Trainees and FAs because: (1) Senior FAs often redirected accounts they received through Merrill Lynch's NAP to white Trainees; and (2) Senior FAs were urged to "cull their books," or to shed certain client relationships to free time to work on larger accounts and redirected these smaller accounts to whites. *See* Ex. 54 at 213; Ex. 116 at MLE 00034 23-24; Ex. 117 at MLE 00100 51-53. Plaintiffs allege that Merrill Lynch and its managers intentionally allowed these transfers to provide an advantage to white Trainees and FAs. Here, commonality is established through the NAP, which did not expressly prohibit such FA to FA transfers. Yet, another approach to these facts is to say that managers, too, exercised discretion in allowing these FA to FA transfers. Managers would have to exercise their discretion, however, consistently in a pattern or practice to the disadvantage of African Americans in order for there to be a race effect from the FA to FA transfers.

Under either interpretation of Merrill Lynch's policies, commonality is established. First, as this Court held in *Calvin v. Sherriff of Will County,* 03 C 3086, 2004 U.S. Dist. LEXIS 8717 *12 (N.D. Ill. 2004)(Gettleman, J.), the policy challenges predominate and class certification is, therefore, proper. Second, if the challenge is to managerial discretion, commonality is also established by the pattern or practice of alleged discriminatory discretionary decision-making.[10] *See, e.g., Falcon,* 457 U.S. at 159 n. 15; *Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 291-2 (2nd Cir. 1999); *Rossini v. Ogilvy Mather, Inc.,* 798 F.2d 590, 598 (2nd Cir. 1986); *Binion v. Metropolitan Pier,* 163 F.R.D. 517, 523-26 (N.D. Ill. 1995); *Orlowski v. Dominick's Finer Foods, Inc.,* 172 F.R.D. 370, 373-74 (N.D. Ill. 1997); *Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir. 1985); *Green v. USX,* 896 F.2d 801, 805 (3rd Cir. 1990); *Lilly v. Harris-Teeter Supermarket,* 720 F.2d 326 (4th Cir. 1983); *Adams v. Pinole Point Steele Co.,* 92-1962, 1994 U.S. Dist. LEXIS 6692 at *27 (N.D. Cal. May 18, 1994)(rev'd on other grounds).

Next, citing multi-business unit cases (which this is not) and a case from the Northern District of Georgia, Merrill Lynch claims that there is a "consensus" view that "a plaintiff may represent a multi-facility class only where centralized and uniform employment practices affect all facilities the same way." *Reid v. Lockheed Martin, Aero, Co.* 205 F.R.D. 655, 667-68 (N.D. Ga. 2001). *See* MOP at 31-32. As an initial matter, Plaintiffs meet this standard, as Merrill

Lynch's centralized, uniform policies and practices (including its compensation, NAP, and teaming policies) in its retail business unit must be followed by all branch managers and FAs and apply to all Merrill Lynch branch offices in the same way. Moreover, Plaintiffs disagree with Merrill Lynch's conclusion of the lessons to be drawn from *Reid* and the law in this District. Merrill Lynch's reference to *Reid* is curious as the *Reid* court expressly found that there were no centralized and uniform policies or practices at the multi-facility Lockheed plants. *Reid,* 205 F.R.D. at 669. In so holding, the *Reid* court distinguished a case cited by the *Reid* plaintiffs, *Morgan v. United Parcel Service, Inc.* 169 F.R.D. 349 (E.D. Mo. 1996) on the ground that "*Morgan* involved decisions made by relatively high level managers pursuant to uniform procedures originating at the highest level of the corporation." *Reid,* 205 F.R.D at 670. *Reid* held the "decentralized decisions in *Morgan* were actually fairly centralized." *Id.* Here, the facts are unlike Reid but identical to *Morgan.* Merrill Lynch managers made decisions pursuant to national policy or practice set at the highest level of Merrill Lynch. In addition, contrary to Merrill Lynch's claim, there is no "consensus" view in this district on this topic.[11] Indeed, many judges have certified class actions that did not involve single plants, and virtually every judge has certified class actions finding commonality, including most of same judges whose opinions are cited by Merrill Lynch.[12] What is critical in each case is that judges exercise discretion and

---

[10] Systems that mix subjective and objective components are also subject to attack on an adverse impact theory. *Watson,* 487 U.S. at 989-991. *See also Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1424, (N.D. Cal. 1990).

[11] The cases cited by Merrill Lynch do not form a consensus involving multi-facility cases, as some involve multi-division or multi-job, not multi-facility cases, and most were decided on other grounds. *See, e.g., Gorence v. Eagle Food Centers,* 93-4862, 1994 U.S. Dist. LEXIS 11438, at *23 (N.D. Ill. Aug. 15, 1994)(Moran, J.)(plaintiffs failed to identify a policy or practice responsible for discrimination but court noted that "[d]ifferences in individual cases will not defeat commonality"); *Betts v. Sundstrand* Corp. 97-50188, 1999 U.S Dist LEXIS 9743, at *22 (N.D. Ill. June 21, 1999)(Reinhard, J.)(commonality lacking in part due to the "wide range of jobs included in the prospective class"); *Adams v. RR Donnelly,* 98-4025, 2001 U.S. Dist. LEXIS 4247 at *60 (N.D. Ill. April 6, 2001)(Kennelly, J.)("[t]hough the Court believes it may be possible in an appropriate case to certify a company-wide class involving multi-division company, this is not an appropriate case..." but court certified three classes of African American employees at various defendant locations)(class certification granted in part and denied in part); *Tooley v. Burger King,* 93-7531, 1995 U.S. Dist. LEXIS 4525 at *5 (N.D. Ill. Mar. 23, 1995)(Lindberg, J.)(where some restaurants were owned by one defendant, while others were owned by another defendant, court held "there is no reason to believe that BKC-owned restaurants had the same policies as those that were owned by Friedman"); *Gerlib v. R.R. Donnelly & Sons,* 95-7401, 1997 U.S. Dist. LEXIS 16842 at *12-13 (N.D. Ill. Oct. 24, 1997)(Anderson, J.)("We do not know which divisions have had workforce reductions, the frequency and timing of such workforce reductions, or which types of jobs were affected...").

[12] *See e.g. Hill v. Shell Oil Company,* 98-5766, 2002 U.S. Dist. LEXIS 13396 (N.D. Ill. March 28, 2002)(Moran, J.); *Latuga v. Hooters,* 93-7709, 1995 U.S. Dist. LEXIS 10713 (N.D. Ill. July 25 1995)

judgment as to whether to certify class actions based on the facts presented in the case at hand and not based on any consensus that national class actions should not be certified.

### 2. Commonality is Established Through Putative Class Member Declarations

Merrill Lynch retrieves a few misleading snippets from the deposition testimony of the putative class representatives and argues that because class members do not have identical beliefs or experiences, there is a lack of commonality in the class claims.[13] A fair reading of the Plaintiffs' testimony reveals that their experiences, complaints, and the harm they suffered were strikingly similar, regardless of branch office, manager, education, experience, or other factors.

---

(Rosemond, J.); *Johns v. DeLeonardis*, 92-2547, 1992 U.S. Dist. LEXIS 18210 (N.D. Ill. Nov. 30, 1992) (Plunkett, J.)(strip search); *Warnell v. Ford Comp.*, 98-1503, 1999 U.S. Dist. LEXIS 16563 (N.D. Ill. Oct. 15, 1999)(Bucklo, J.); *Hill v. Amoco*, 97-7501, 2001 U.S. Dist. LEXIS 3082 (N.D. Ill. March 15, 2001)(Gottschall, J.); *Toney v. Rosewood*, 98-0693, 1999 U.S. Dist LEXIS 4744 (N.D. Ill. March 31, 1999)(Coar, J.); *Battle v. White Cap*, 97-4830, 1999 U.S. Dist. LEXIS 4658 (N.D. Ill. March 30, 1999)(Anderson, J.); *Massie v. Illinois Department of Transportation*, 96-4830, 1998 U.S. Dist. LEXIS 8680 (N.D. Ill. June 5, 1998)(Norgle, J.); *Orlowski v. Dominick's Finer Food*, 95-1666, 1997 U.S. Dist. LEXIS 1984 (N.D. Ill. Feb. 21, 1997)(Bucklo, J.); *Smith*, 2006 U.S. Dist. LEXIS 12375 (Shadur, J.); *Moreno v. DFG Foods*, 02-4019, 2003 U.S. Dist. LEXIS 8700 (N.D. Ill. May, 21, 2003)(Pallmeyer, J.); *Bell v. Woodward*, 03-50190, 2005 U.S. Dist LEXIS 60 (N.D. Ill. Jan 3, 2005)(Reinhard, J.); *Buycks-Roberson v. Citibank Federal Savings Bank*, 94-4094,1995 U.S. Dist. LEXIS 9342 (N.D. Ill. June 29, 1995)(Castillo, J.); *Palmer v. Combined Insurance*, 02-1764, 2003 U.S. Dist. LEXIS 15082 (N.D. Ill. Aug. 29, 2003)(Zagel, J.); *Daniels v. Fed. Reserve Bank of Chicago*, 98-1186, 2000 U.S. Dist. LEXIS 6833 (N.D. Ill. March 28, 2000)(Hibbler, J.)

[13] For example, Merrill Lynch claims that plaintiffs disagree with one another over the challenged practices, creating conflict. Merrill Lynch claims that LaRue Gibson ("Gibson") liked the small ticket policy as it let him spend time with his family. Gibson testified, however, that:"[t]here is a term called red-lining, where you were not allowed, where banks would actually red-line areas where people of color live, and they would not lend them money. One of the great direct ways to wealth is through home ownership. Right? If you can't borrow money to buy a home, you can't get there. You know, I would argue that Merrill Lynch's policy of small ticket policy, hundred thousand dollar minimums, and those kinds of things, if you believe that the African-American community has less money, I believe that that is a form of red-lining from an investment perspective. Now, you could take issue with that, whether you agree with that or not. But the fact of the matter is that if Merrill Lynch's management then encourages African-Americans to go after a market that is already deemed not to be large enough and not to have the wealth that wouldn't even meet the policies that the firm set up, and there is documentation that tells them how to do this, that is not really good support. That is leading them down over a cliff." Ex. 25 at 51-52. Gibson testified that he has to "live by the rules that the firm has." *Id.* at 53. Clearly, Gibson is in line with the class on the small ticket policy. Similarly, George McReynolds ("McReynolds") statement that he is "no longer interested in joining a team and would rather remain a solo practitioner" is also consistent with the common team experience. MOP at 13. McReynolds' reason for giving up on teaming is that he was harmed by Merrill Lynch's teaming practices. While Merrill Lynch claims that it does not "arrange marriages," McReynolds' manager forced him to join a team for the sole benefit of two failing white Trainees and to transfer a substantial portion of his client book to these white Trainees; he nearly lost his job as an FA as a result. *See* Ex. 30 at 80-91; Ex. 30 at 56, 60, 109-112.

*See* Ex. 242 (chart summarizing key issues of Plaintiffs' testimony).[14] From the most junior to the most senior FA, and from the most successful FA to those terminated for "low production," each Plaintiff complained of being harmed by the Merrill Lynch policies or practices they challenge in this lawsuit. *See id. See* Ex. 242, Chart A.[15] Similar testimony of such a broad range of class members buttresses commonality.[16] Moreover, the law is clear that class members' experiences need not be identical and factual variations do not defeat commonality so long as they proceed under similar legal theories, which they plainly do here. *See Rosario*, 963 F.2d 1017-18.[17]

### 3. Class-wide Statistics Establish Commonality

Like most class actions, commonality in this case is established through statistical evidence. *Teamsters*, 431 U.S. at 339-4.

### (a) Plaintiffs' Statistical Proof Ties The Disparities To Policies or Practices

This statistical proof is not difficult to understand because, unlike cases which aggregate many different jobs and business units, *e.g. Puffer v. Allstate*, 225 F.R.D. 450 (N.D. Ill. 2009), this case involves analysis of a single job, FA, and a single business unit, Merrill Lynch's retail

---

[14] Merrill Lynch provides the Court with transcript excerpts from the Plaintiffs' depositions. In many instances, the complete pages cited rather than the sound bite captured in the MOP present a fair and complete reading of the Plaintiffs' testimony.

[15] For example, first quintile FA Plaintiff Gibson testified he could not form a team despite his success and ultimately had to approach the African American CEO to seek help in forming a partnership with the African American CEO's white FA. Nonetheless, Gibson ultimately lost considerable assets as a result of the partnership. *See* Ex. 25 at 150-51. The CEO's white FA was not disciplined after a sales assistant submitted a complaint that the white FA made racially derogatory remarks. See Ex. 135. Instead, the partnership ended and Gibson lost considerable assets, suffering the same experience as fifth quintile FA Plaintiff McReynolds under Merrill Lynch's teaming practices. *See* note 13 *supra*. Gibson and McReynolds similarly complained of being harmed by the same account distribution and other policies and practices as well.

[16] The declarations of the putative class members also support commonality, as the declarants testified they, too, were subjected to the same policies or practices as plaintiffs and as are challenged in this lawsuit. *See generally* Exs. 3- 19. The declarants worked in Merrill Lynch branch offices across the country and had varied levels of production and experience. *Id.*

[17] Merrill Lynch cuts and pastes much of its motion for summary judgment on Section 703(h) into the class certification brief in its Opposition and argues that since Merrill Lynch is entitled to judgment on Plaintiffs' challenges to the compensation system, those challenges cannot form the basis of satisfying Plaintiffs' Rule 23 commonality obligations. Plaintiffs disagree both with the assertion that Merrill Lynch is entitled to judgment on its 703(h) defense and that the defense does not establish commonality. Plaintiffs incorporate herein their Motion to Strike the Motion for Summary Judgment and the transcript of those proceedings should the Court desire to consider this issue. Plaintiffs also provide the Court with Judge Kennelly's ruling on Merrill Lynch's identical motion filed before him on the related *McReynolds'* action before Merrill Lynch consented to transfer that suit to this Court. *See* Ex. 241.

brokerage. Plaintiffs' experts also connect the statistical evidence to the challenged policies or practices.[18]

The statistical evidence is compelling and largely undisputed. With respect to compensation, Plaintiffs' experts found that the awarding of compensation at Merrill Lynch was not race neutral but yielded annually from 2001 to 2006 between 6.57 and 9.07 standard deviations between the compensation of whites and African Americans, and African Americans earned 33 to 42% less in annual compensation than whites. *See* Ex. 229 Madden Rebuttal at 4.[19] Likewise, Plaintiffs' experts found that Merrill Lynch managers provided African Americans fewer opportunities to earn compensation through the distribution of house accounts and accounts previously managed by departing brokers. African Americans received accounts with 3.84 standard deviations lower in total asset value and 6.37 standard deviations lower in production history than those distributed to whites between 2001 and 2006. *See* Ex. 1 at 28-36. African American Trainees received accounts with lower asset values beginning in the first month of the training program and continuing for 26 of the 28 months thereafter, with statistical significance at 5.20. *See* Ex. 229 at 18. Plaintiffs' experts also found that racial differentials in compensation and account transfers were significantly associated with racial differentials in the likelihood of participating in teams and/or pools with other FAs. Between 15% and 28% of the racial disparity in compensation was found to be associated with pool and team membership policies at Merrill Lynch. *See* Ex. 229 at 7.[20] The differences in teaming and pooling opportunities by race directly decrease the relative ability of African Americans to compile production credits. African Americans received account assets that were 6.05 standard deviations lower than those received by white brokers. *See id.* at 7. Adjustments in pool shares were 4.98 standard deviations lower for African Americans.[21] *See id.*

With respect to attrition, African Americans were 34% more likely to terminate before completing the program, a difference of 4.49 standard deviations, and less likely to participate in

---

[18] *See, e.g.*, Ex. 239, Schetler Dep. Ex. 7 at MLE 00799-000196 – 000201.
[19] Plaintiffs' experts controlled for length of service, time at Merrill Lynch, education, office location and management responsibilities. *See id.*
[20] African American FAs were less likely to increase their assets and production credits as a result of team participation for differences between 4.94 and 5.38 standard deviations. *See* Ex. 1 at 6-7.
[21] The team data were available only for 2003-2006. *See* Ex. 1 at 7.

pools or teams with statistical significance.[22] *See id.* at 7-8. For example, after twelve months in the training program, African American Trainees are 4.73 standard deviations less likely to participate in teams and, after twenty months, 3.57 standard deviations less likely to participate in teams. *See id.* Plaintiffs' experts connect the racial difference in team participation in the training program with approximately one-third of the higher drop out rates for African Americans. African American FAs were twice as likely to leave Merrill Lynch as whites for a difference of 7.02 standard deviations. *See id.* Plaintiffs' experts also tied the racial difference in participation in pools and teams as associated with about one-half of the greater attrition rates of African American FAs. *See id.*

### (b) Merrill Lynch's Expert Reports Further Establish Commonality

Merrill Lynch's experts, for the most part, do not offer their own statistical analysis to contradict Plaintiffs' experts' findings. *See* MOP at 9. Unable to explain away the huge disparities in pay, attrition, client account transfers or teams, Merrill Lynch charges that Plaintiffs' experts' compensation studies "omit the crucial variable of access to wealthy potential clients" (MOP at 1-2) and asserts that African Americans have fewer social connections with potential clients of wealth, who are white. *See id.* Merrill Lynch claims that its statistical expert, Ali Saad, PhD. ("Saad"), "performed his own study of this phenomenon, examining publicly available census data" and "concluded that access to networks of potential clients with substantial wealth varies by race among Merrill Lynch FAs." MOP, citing Saad Rep. 1-2, 6-9, 16-23. *See* Def. Ex. in Def's App. 1 to Response to Class Cert. Merrill Lynch concludes "as a result, customers independently generated by African American FAs participating in the training

---

[22] Merrill Lynch's expert, Ali Saad, Ph.D. ("Saad") asserts that Plaintiffs' statistics present a "chicken and egg" issue and argues that race is not the variable that determines team membership but, instead, more successful FAs form teams. Because African Americans are not successful, Saad argues they are not invited to be on teams. There is a battle of experts in this area, as Plaintiffs experts disagree with Saad. *See Wilfong v. Rent-A-Center*, 00-0680, 2001 US Dist. LEXIS 22718 at * 11-13, n.5 (stating that "[i]t is not this court's role to determine the ultimate correctness of either party's [experts] contentions in the context of class certification."); *Krueger v. New York Telephone Company*, 163 FRD 433, 440 (S.D.N.Y. September 22, 1995) (granting class certification, it is inappropriate for the court to determine the ultimate correctness of the parties' statistical expert opinions because such matters are directed at the merits of the case). Further, Plaintiffs' experts find statistically significant differences in teaming early in the careers of FAs, before they are successful, which refutes the notion that success comes first. African Americans trainees received accounts with lower asset values for 26 of the 28 months in the training program with statistical significance at 5.20 standard deviations. *See* Ex. 229 at 18. Thus, even if Saad were correct that FAs with higher assets team with greater frequency, there is a "chicken and egg" issue

program early in their careers arise from neighborhoods with significantly higher African American populations and significantly lower levels of average wealth." MOP at 10, citing Saad at 25-26. The "access to wealth" theory on the pleadings establishes commonality as a class wide defense.

### (1) Merrill Lynch's Experts Rise or Fall Together

On the merits, the "access to wealth" theory does not destroy commonality by undermining the validity of Plaintiffs' expert analyses. As explained by Plaintiffs' expert Bielby, four of Merrill Lynch's eight experts present the "knee bone connected to the thigh bone" logic, as each expert builds on the prior expert. *See* Ex. 230, Bielby Rebuttal at 4. As a consequence, the end result is subject to attack if any of the component parts is flawed.

Merrill Lynch employed Eugene Ericksen, Ph.D. ("Ericksen"), to select a scientific sample for use by its expert, James Outtz, Ph.D. ("Outtz") to survey Merrill Lynch FAs to determine the drivers of FA productivity. Next, Roberto Fernandez, Ph.D. ("Fernandez") opines that there are race-based differences in the general population with respect to the drivers of success he believes were identified by Outtz. Finally, Saad purports to prove that there are race-based differences with respect to Merrill Lynch FAs and the drivers to success, which Saad believes were identified by Outtz. Several broken links exist in this expert chain.

### (2) Dr. Saad Ignored Dr. Outtz' Job Analysis

Outtz conducted a job study of Merrill Lynch FAs. He interviewed FAs and asked a number of questions, including the categorical question: "which of these methods of obtaining clients was most effective for you in developing your book of business during your first two years at Merrill Lynch?" Outtz included in a list of choices for the FAs the words "social prospecting/networking," but neither "access to wealth" nor "social relationships" was included as an option. *See* Ex. 231, Outtz Report at 123. Of the FAs interviewed, 82.7% responded "yes" to the question of whether "social prospecting/networking" was effective for them. *See id.*

Saad believes that Outtz' results isolate "access to wealth" as a "job related" criterion for FA success and that this criterion is limited to "social prospecting" or the ability to "tap into a set of (pre-existing) contacts."[23] *See* Ex. 233 at 18. Saad designs a study, which he believes will test

---

in Saad's "chicken and egg" issue, as Plaintiffs allege that the higher asset values of whites are the product of discrimination.

[23] Saad incorrectly uses the word "job-related," (Ex. 233 at 19) but Outtz did not perform any validity study. *See* Ex. 232 at 20-25.

the differences by race in "access to wealth." Saad purports to isolate the "self-sourced"[24] accounts of a Trainee during his or her first three months, and to have determined that African American FAs' "sources" have less apparent wealth as African American clients have less wealth. Saad concludes that it is the differences in "access to wealth" between white FAs and African American FAs that are responsible for the compensation and attrition disparities.

Significantly, Outtz outright rejects Saad's three month study and finds it inaccurate in light of Outtz' job study. As Outtz explained, "I've simply offered the opinion that the use of the first three months, in terms of independent production, as a measure of access to wealth, based on my understanding and information I've collected about this job, is an inaccurate assumption." Ex. 232 at 61-65. Clearly, there is a fumble in the passing of the baton from Outtz to Saad.

Indeed, Outtz defines the terms social prospecting/networking or "access to wealth" in far broader terms than Saad. The crux of Merrill Lynch's defense is that the "external factor" of access to white wealth explains the enormous racial compensation and attrition disparities. Plaintiffs, however, contend that the "access to wealth" variable is largely an internal factor significantly controlled by Merrill Lynch. Outtz agrees with Plaintiffs. Outtz, after interviewing a sample of Merrill Lynch white FAs and Merrill Lynch managers, determines that how one gains access to wealth, not simply access to wealth is the driver of FA success. Outtz finds that how an FA "gains access to wealth" is largely dependent on internal factors controlled by Merrill Lynch. For example, Outtz concedes that if a manager referred a lead to Trainee that resulted in a new client, that client would be part of the Trainee's network and the Trainee has gained access to a larger network. *See id.* Similarly, if the Trainee receives an account distribution of a client who is involved in community activities and invites the Trainee to meet others in the same activities, any new business developed is part of the Trainee's network according to Outtz. *See id.* at 82-83. Similarly, if a younger broker was put on a team with another broker and the young broker was able to cultivate the clients of the more experienced team member, Outtz would consider the younger broker's network to include all of the potential business sources from that team. *See id.* at 84-85. Outtz is clear that the driver he identified for FA success is not simply

---

[24] As Plaintiffs' experts point out, the claim that any account is "self-sourced" is dubious. There is no way to know from the data whether the account was a walk-in, lead, referral from an FA or otherwise "self-sourced" from a pre-existing network. For example, whites receive more account distributions beginning in the first month of the training program. If those accounts generate referrals or related accounts, Saad counts those accounts as part of the Trainees "self-sourced" accounts. *See* Ex. 229 at 17-19.

"access to wealth," or which Saad erroneously interprets as the ability to "tap into a set of (pre-existing) contacts," but how a person "gains access" to wealth, which includes developing a network while at Merrill Lynch with resources provided by Merrill Lynch. *See* Ex. 233 at 18; Ex. 232 at 84.

Thus, Saad's first three-month study of "access to wealth" is meaningless because it does not study the criterion identified by Outtz as a driver of FA success.

Equally important, Saad's statistical results, properly calculated and interpreted, do not support his conclusions but, instead, support Plaintiffs' arguments of differential treatment of similarly situated African American and white FAs. *See, e.g.,* Ex. 2 at 1-2; Ex. 229 at 35-36. Saad purports to isolate "self-sourced" accounts by broker Trainees in the first three months to establish that African American Trainees self-source more accounts from African Americans, whose home values are lower than those of white clients self-sourced by white Trainees. According to Saad, the race-based FA compensation disparities are caused because "African American and white brokers are tapping into different sources to obtain their assets with African American sources having less apparent wealth." Ex. 233 at 24. To reach this conclusion, Saad "geo-codes" the clients to identify their race and wealth.

First, Saad's geo-coding does not meet *Daubert* standards. As the Court may recall, in performing his studies and speculating as to the race of Merrill Lynch clients, Saad relied on 100-block addresses rather than actual addresses because Merrill Lynch refused to provide him with the actual addresses of its clients, citing privacy interests. With only the 100-block addresses, Saad could not discern whether the address was a business or residence. Saad, nevertheless, included and assigned a racial identity to accounts of institutions, businesses or organizations with no racial identity. *See* Ex. 229 at 28. Saad also could not determine whether the addresses were homes reflecting client wealth or business addresses of clients who had account statements mailed to their workplace, accountant, or other location. *See id.* Additionally, Saad's technique averages the income, race and housing values for all residents in a census track, assuming uniform wealth within areas. Saad estimates that white FAs have 6% African American clients, while African American clients comprise 24% of the books of business of African American FAs. These estimates grossly overstate the number of African American households. Merrill Lynch hired a consultant, Donnelly, to append ethnicity or race to client records. Provided with correct names and addresses by Merrill Lynch, Donnelly

14

determined that less than 2% of accounts opened between 2002 and 2005 belonged to African American clients. The over-coding of clients as African American likely is a result of miscoding businesses or business addresses as residences and affixing African American as the race with too great a frequency to these business addresses. *See* Ex. 229 at 27-33.[25] Based on these faulty geo-coding studies, Saad concludes that African American Trainees generate substantially more of their new accounts from African American clients, whom he claims are poorer, than do white Trainees.

Second, Saad's studies support Plaintiffs. Saad's computer back up of his studies shows that he actually established the opposite of what he sought to prove as he included a control in the analysis so that only similarly situated individuals would be compared to one another. Saad actually established that: (1) African American FAs received 35.7% to 53.3% fewer production credits (ranging from 3.02 to 5.90 standard deviations difference) between 2002 and 2006 than whites with the *same* experience and *same* levels of production on self-generated assets in the first three months of the training program; and (2) African American FAs received 14.4% to 39.7% fewer production credits (ranging from 1.6 to 5.13 standard deviations difference) between 2002 and 2006 than whites with the *same* experience and the *same* levels of production credits on total current self-generated assets.[26] Because Saad finds that production credits translate directly into compensation, these differences in current production credits by race for FAs with the same self-generated production early in their career translate into the compensation differentials found by Plaintiffs' experts.

---

[25]Merrill Lynch's refusal to provide its expert with accurate information renders Saad's work subject to exclusion. At the Court noted when Plaintiffs first raised this issue:
"….if the defendants, if Merrill Lynch, gave their experts insufficient information to reach the opinions that they had, I mean, that's something your experts are probably going to conclude, at which point you will have what seems to me at least a colorable, if not a pretty strong *Daubert* motion.
    You, meaning the defendants here, make your own bed in a sense. And, if all you gave them were addresses, and they drew some conclusions based on the demographics of those addresses, it's not going to take very much persuasion, it would seem to me to throw any conclusions reached from that type of information into serious doubt." Dkt. 330, Ex. E.
[26] As Madden finds, Saad provides no explanation for why, if a racial difference in access to wealth were to reduce the productivity of African American FAs, that Saad finds large statistically significant differentials in total production when he controls for the racial difference in production from self-generated accounts. i.e. he compares similarly situated African Americans and whites with respect to self-generated accounts and whites earn more compensation. Ex. 229 at 3.

Saad makes a fundamental scientific methodology error when he interprets these results as favorable to Merrill Lynch. As explained in the Madden Rebuttal Report, for 2006, Saad compares the production of an African American and a white FA with the same length of service by looking at their self-generated assets accumulated during their first three months in the training program. *See* Ex. 229 at 7-10. For the white FA, Saad grows the self-generated production from the first three months into current production at the average rate or pattern generally experienced by FAs with the same length of service. Saad then takes this calculated or expected "current production" and enters it as a determinant (a control variable) of the FA's compensation in the analysis that he performs. For the African American FA, Saad uses the same analysis with an important exception. After calculating the expected current production based on the average growth trend, he then reduces the expected "current production" of the African American FA by 48.6%. *See id.* So, rather than assuming that an African American would achieve the same expected current production as a white FA, Saad discounts his or her current production based on race and enters the racially discounted value of current production for the control value in his compensation analysis. This reduction is made for all African American FAs, but not for white FAs who are expected to get the full average effect of their early production on their current production.[27]

As a result of his totally unjustifiable 48.6% discounting of the expected current production of only African American FAs, Saad masks the true racial disparities by making it appear as if African American FAs have less current production. He then reaches the predetermined conclusion that African Americans are paid less because their current production is lower. *See* Ex. 233 at 22. In fact, the racial differential in compensation is hidden by a systematically racially based underestimation of African

---

[27] An interesting point overlooked by Merrill Lynch's experts is that not all whites, of course, have access to wealth. For example, Merrill Lynch produced the files of its managers. In order to attend the MAC, these managers had to rank in the 1st or 2nd quintile with some exceptions for the 3rd quintile. Yet, the backgrounds of these managers as described in the MAC files confirm that many did not have access to wealth. *See, e.g.,* Ex. 243, (Chart B, manager backgrounds). The most glaring example is Dan Sontag, head of Global Wealth and Investment Management (the retail brokerage) who testified that when hired at age 22, "I had zero network" when he started to build his book of business. Indeed, Sontag had recently moved to Colorado Springs where he "did not know a soul, so most of he way that I built my business was either through what I would describe as cold calling or what I would describe as cold walking, which

Americans current production. *See* Ex. 229 at 4-10. When Madden corrects for Saad's misuse of race to reduce predicted earnings, Saad's study shows that differences in access to wealth cannot explain differences in compensation. To the contrary, Saad's studies support the hypothesis that the racial differences in measured current production are attributable to racial differences in resources and opportunities provided by Merrill Lynch.[28] *See id.* at 10.[29]

In sum, Plaintiffs' statistical evidence shows statistically significant differences in compensation and attrition tied to Merrill Lynch's uniform practices, including teaming and account distributions. Merrill Lynch's experts do not undermine Plaintiffs' statistical evidence to any degree and certainly not to the degree to eliminate commonality. On the contrary, Merrill Lynch's experts introduce, *albeit* with flaws, a class-wide defense that also establishes commonality. Further, when the proper methodology is applied to Saad's work, the results support Plaintiffs' claims that Merrill Lynch's policies or practices led to the less favorable employment outcomes for African Americans.

### B. Typicality

There is a substantial nexus between the concepts of commonality and typicality. As the Supreme Court explained in *Falcon*, the requirements "tend to merge" as "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claim are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n. 13. Merrill Lynch concedes that commonality and typicality are closely related and argues that Plaintiffs fail to satisfy typicality for the same reasons that they fail to establish commonality. *See* MOP at 48-9. Plaintiffs contend that the

---

is essentially knocking on doors in the business community and introducing yourself." Ex. 45, Sontag Dep. at 57-58. Sontag admitted that he did receive account distributions. *See id.* at 56.

[28] Madden establishes that there were not statistically significant differences in production when African Americans are compared to whites regarding sales on current clients or transferred accounts. *See* Ex. 229 at 3. Merrill Lynch reached similar conclusions. *See* Ex. 240; MLE 00373-000261 at 000271-72.

[29] Although Saad submitted a declaration in support of Merrill Lynch's *Daubert* motion regarding Madden's methodology in criticizing his work, he never disputes or attempts to justify the use of race in the first stage of his instrumental variables analysis. In any event, as argued in Plaintiffs' motion to strike, Saad's new declaration, submitted well after the expert disclosure deadlines and after Madden's deposition, should be struck as untimely. *See* Dkt. 330 at 5-10.

Court should find typicality for the same reasons it should find commonality. *See Joncek,* 1999 U.S.Dist LEXIS 14853 at *11.

### C.    Adequacy

Merrill Lynch does not challenge counsel's adequacy but instead focuses on the putative class representatives.  Rule 23(a)(4) requires that the representative plaintiffs' interests not be antagonistic to those of the remainder of the class. *See Weizeorick v. ABN AMRO Mortgage Group, Inc.,* 01 C 713, 2004 U.S. Dist. LEXIS 15467 *15 (N.D. Ill. Aug. 2, 2004).

Merrill Lynch argues that the putative class representatives are not adequate because the proposed class is "riven with conflicts of interest that would pit members against each other in every aspect of the trial." *See* MOP at 50-51.  According to Merrill Lynch, that competition exists over access to the Management Assessment Center ("MAC"), account distributions, allocation of desirable client associates, and office space. *See id.*  Merrill Lynch's argument is legally and factually unfounded.

First, the law is clear that only actual, not potential or hypothetical, conflicts are considered, and Merrill Lynch can point to none.[30] *See Hoffman v. Grossinger Motors, Inc.,* 96-5362, 1999 U.S. Dist LEXIS 2392, *19 (N.D. Ill. Mar. 1, 1999).  For example, Plaintiffs' primary challenge to the MAC is to the policy that permits only FAs in the 1st and 2nd (and in rare cases 3rd) quintiles to attend the MAC.  Merrill Lynch's exclusion of FAs in the 4th and 5th quintile disproportionately disadvantages African Americans, as it bars approximately 70% of African American FAs from consideration for the MAC but only 40% of whites. *See* Ex.1 at 76 (Fig. 6).  As explained throughout Plaintiffs' pleadings, this lawsuit alleges that FA quintile rankings are the product of systemic discrimination and, thus, the MAC screen is tainted because it is based on quintile rankings. The few Plaintiffs who attended the MAC also take issue with the biased assessment process, as evidenced by MAC materials that included generalizations and stereotypes about African Americans.  Merrill Lynch's suggestion that Plaintiffs generally

---

[30] Merrill Lynch contends that the "clash of interests is particularly stark between the interests of African Americans who succeeded under Merrill Lynch's policies and those who did not." MOP at 50.  It cites as an example Plaintiff Johnson's deposition testimony that he would be displeased if FAs who lacked his production nevertheless received the vice president title he earned. *See* Ex. 27 at 22.  Clearly, Johnson's displeasure was not directed at his fellow class members but at non-African American FAs who received the title of vice president through production generated by favoritism in account distributions. *See id.* at 22-24.  Throughout his deposition, Johnson described at length the ways in which he was harmed by the

challenge the MAC as a denial of promotion for *every* class member is factually inaccurate. Instead, Plaintiffs seek to establish in the *Teamsters* hearing that the quintile screen is unlawful and that the MAC itself includes discriminatory features. Class members' goals in this regard are consistent and pose no conflicts.

Similarly, with respect to the allocation of resources within the offices, the class is not "rife" with conflict. Plaintiffs and class members all seek to work on a level playing field vis-à-vis whites, *i.e.* to be able to compete where their talent and skills would place them absent the discrimination. In addition, contrary to Merrill Lynch's claim, African Americans do not often compete against each other, as there are too few African Americans for such competition or conflict to arise. As Plaintiffs' expert Bielby explained, "African Americans are outnumbered by more than 70 to 1 in the FA workforce. As recently as 2006, the vast majority of Merrill Lynch offices had no African American FAs, and the majority of African American FAs who work at Merrill Lynch do so in offices in which there are no other FAs of the same race." *See* Ex. 2 at 11-12, Table 2 at 9. Thus, there was no competition for resources or real conflict between African Americans but only between African Americans and whites.[31] Accordingly, adequacy is met under Rule 23.[32]

## II. The Proposed Class Meets Conditions For Rule 23(b)(2) or Hybrid Certification

Class actions for declaratory or injunctive relief are allowed under Rule 23(b)(2) where, as here, "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Racial discrimination is such a ground, and cases seeking injunctive relief against class-wide race discrimination are appropriately brought under Rule 23(b)(2). *See Robinson, et al. v. Sears Roebuck & Co.,* 111 F.Supp. 2d 1101, 1114 (E.D. Ark.

---

same policies that harmed other African Americans and noted his alignment with less successful and failing FAs. *See, e.g.,* Ex. 27 at 32-34, 55, 58-59, 72, 86, 108,143-44, 145, 248, 278, 321-23.
[31] More importantly, Merrill Lynch's assertion that adequacy is destroyed if class members were denied the same benefit would eliminate all class employment litigation and is not well founded. Merrill Lynch's view is not the law, as explained in *Meiresonne v. Marriott Corp.,* 124 F.R.D. 619, 625 (N.D. Ill. 1989): "Marriott also contends that because class members compete against *each other* for the same promotions, none can adequately represent the class. That absurd proposition would of course doom almost every *class* action charging discrimination in promotion—a drastic rewrite of the law in this area…" (emphasis in original); *see also Smith,* 234 F.R.D. at 662.

19

2000); *McClain v. Lufkin Industries, Inc.*, 187 F.R.D. 267, 277 (E.D. Tex. 1999)(rev'd. on other grounds.

First, Merrill Lynch's assertion that the Seventh Circuit prohibits 23(b)(2) certification where damages are sought is wrong. The issue that is "doubtful" in this Circuit is not whether Rule 23(b)(2) is allowed for cases involving damages but whether Rule 23(b)(2) may ever be used to certify a "no-notice, no opt-out class" when damages are sought. *See Jefferson v. Ingersoll Int'l.*, 195 F.3d 894, 897 (7th Cir. 1999). Plaintiffs do not request a "no-notice, no opt-out class."

Far from barring damages class actions, *Jefferson* "instructs" district courts to consider three options for handling class actions that seek monetary relief: (1) Rule 23(b)(3) certification for all proceedings; (2) divided or hybrid certification, *e.g.* Rule 23(b)(2) for liability and equitable relief and Rule 23(b)(3) for damages, which avoids any potential due process problems by introducing the procedural protections of Rule 23(b)(3); and (3) certification under Rule 23(b)(2) for both monetary and equitable remedies with notice and an opportunity to opt out under the court's under Rules 23(d)(2) and 23(d)(5). *See Lemon v. Int'l .Union of Opt.*, 216 F.3d 577, 579-582 (7th Cir. 2000). This case can be certified under any of these options, which the Seventh Circuit has recently reiterated remain available and should be considered at certification, contrary to Merrill Lynch's suggestion.[33] *See Allen v. Int'l Truck and Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005).

Second, contrary to Merrill Lynch's claims, the possibility that monetary relief is substantial does not make a case unsuitable for Rule 23(b)(2).[34] Back pay is an integral remedy

---

[32] If necessary, class members interested in but denied management opportunities could be treated as a sub-class, for the remedial phase eliminating any issues.

[33] The cases cited by Merrill Lynch do not dictate a contrary result. *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994) does not provide that it is doubtful that Rule 23(b)(2) may ever be used to certify a case seeking damages. *See* MOP at 51. On the contrary, *Ticor* held the *writ of certiorari* was improvidently granted and the appeal was dismissed. *Jefferson v. Ingersoll Int'l Inc.*, authorized the very divided certification (23(b)(2) and 23(b)(3)) requested by Plaintiffs. *Jefferson*, 195 F.3d at 896. Likewise, *Lemon v. Int'l Union* confirms that *Jefferson* allows for divided certification. *Lemon*, 266 F.3d at 581

[34] Merrill Lynch also cites *Bishop v. Gainer*, 272 F.3d 1009 (7th Cir. 2001) for the proposition that back pay is problematic in a promotion case with limited positions because not all plaintiffs would have been promoted. As discussed *supra*, Merrill Lynch is wrong in characterizing Plaintiffs' challenges to the MAC as seeking promotion for every class member. Instead, the promotion challenge largely focuses on the policies which bar the majority of African Americans from attending the MAC due to quintile rank and also the use of discriminatory materials at the MAC. In any event, if Plaintiffs prevail at the

of this case and Title VII jurisprudence and is deemed equitable under 42 U.S.C. 2000e-5(g)(1). *See Jefferson*, 195 F.3d at 896; *In re Monumental Life Ins. Co.*, 365 F.3d 408, 418 (5th Cir. 2004); *Anderson v. Boeing Co.*, 222 F.R.D. 521, 541 (N.D. Okla. 2004); *Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 319-322 (N.D. Ill. 2004); *Hnot v. Willis Group Holdings, Ltd.* 228 F.R.D. 476, 486 (S.D. N.Y. 2005). Thus, back pay is not a bar to Rule 23(b)(2) certification.[35] *See Massie v. IDOT*, 96-C-4830, 1998 U.S. Dist. LEXIS 8680 at *17-18 (N.D. Ill. June 5, 1998).

Plaintiffs contend that back pay may be determined in the aggregate because its determination will involve the same statistical presentation used to prove liability. An aggregate back pay award could be computed based on a wage shortfall analysis, which measures the additional earnings African Americans would have earned in a race neutral distribution of compensation. The Seventh Circuit allows equitable allocation of an aggregate award by formula to injured class members, in lieu of a host of individual cases. *See, e.g., Stewart v. General Motors Corp.*, 542 F.2d 445, 452-53 (7th Cir. 1976); *Liberles v. Cook County*, 709 F.2d 1122, 1136-37 (7th Cir. 1983). Similarly, Plaintiffs maintain that punitive damages may be addressed in conjunction with the *Teamsters* hearing.[36] An aggregate award of punitive damages is

---

*Teamsters* hearing and there were class members who sought damages for denial of promotion, Seventh Circuit case law explains that the lost chance theory is a tool that can be used to resolve such claims with fairness to both Merrill Lynch and the class members. The case Merrill Lynch cites, *Bishop*, was decided on other grounds because the Court held that the district court's Rule 23(b)(2) certification was not for back pay. However, in a subsequent class action, *Biondo v. City of Chicago*, 382 F.3d 680, 688 (7th Cir. 2004), the Seventh Circuit approved of the use of lost promotional opportunity in a class action to determine back pay where Plaintiffs would not have all been promoted. ("The City does not dispute the district court's central approach: asking the jury to determine the probability that being held back in 1986 cost the plaintiffs later chances for advancement.) *See also Bishop v. Gainer*, 272 F.3d 1009, 1015-16 (7th Cir. 2001); *Doll v. Brown*, 75 F.3d 1200, 1205-07 (7th Cir. 1996); *Griffin v. Michigan Department of Corrections*, 5 F.3d 186, 189 (6th Cir. 1993).

[35] Compensatory and punitive damages are sought under Rule 23(b)(3) through hybrid certification. Because Notice and opt out rights exist under Rule 23(b)(3), Plaintiffs' "damage" requests do not implicate due process concerns. *See Mount v. LaSalle Bank*, 92 C 5645, 1994 U.S. Dist. LEXIS 4027, *26 (N.D. Ill. 1994)(citing *Williams v. Burlington Northern*, 832 F.2d 100, 103-104 (7th Cir. 1987))

[36] The Supreme Court in *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 534-35 (1999) held that liability for punitive damages depends on the employer's mental state, rather than the nature of the alleged discriminatory conduct. Plaintiffs respectfully submit that this standard lends itself to classwide *Teamsters* determination since it involves the same evidence and neither the claim nor the damages focuses on individual victims of discrimination. Moreover, the focus is on the corporation's actions and knowledge as a whole, not the actions of any single manager or any specific decisions. Thus, the same high-level internal reports regarding the employment outcomes of African Americans and Merrill Lynch's

consistent with Rule 23(b)(2) certification, because, as with injunctive relief, "the focus is on the defendant's conduct, as opposed to the class members' harms, and the relief is sought for the class as a whole." *Palmer v. Combined Ins. Co. of America*, 217 F.R.D. 430, 438 (N.D. Ill. 2003)(certifying punitive damages class in sex discrimination case); *Accord Ellis v. Costco*, 240 F.R.D. 627, 642-643, (N.D. Cal. 2007), *13; *Anderson v. Boeing*, 222 F.R.D. 521, 541-42 (N.D. Okl. 2004). Such a class meets the Seventh Circuit's definition of "incidental damages," under Rule 23(b)(2) because it does not depend "in any significant way on the intangible, subjective differences of each class member's circumstances," and does not "require additional hearings to resolve the disparate merits of each individual's case." *Lemon*, 216 F.3d at 581.

Merrill Lynch disagrees with the suggestion that an aggregate award, or common fund, may be appropriate either for back pay or punitive damages. However, it is unclear whether Merrill Lynch's disagreement as to the propriety of common fund versus individualized relief would persist in the face of certification and following a loss at a *Teamsters* pattern or practice hearing, both of which, of course, must occur before any remedial phase would be ordered. More importantly, perhaps, the resolution of the better approach to damages, *i.e.* common fund versus individualized relief, need not be decided in conjunction with the class certification. Courts routinely stay consideration of such issues until the conclusion of the *Teamsters* trial. *See, e.g., Calvin*, 2004 U.S. Dist. LEXIS 8717 at *14 (Gettleman, J.)("The fact that damages may vary based on each plaintiff's mental state is not, however, a sufficient reason to deny certification.") *See Carnegie v. Household, Int'l.*, 376 F.3d 656, 661 (7th Cir. 2004)(suggesting options to address for damages issues and stressing that the prospect of such issues "need not defeat class treatment" of at least liability); *Hnot*, 228 F.R.D. at 486; *Satchell v. FedEx. Corp.*, 2005 U.S. Dist. LEXIS 37354 at 39 ("The precise procedures to be used in the second phase, if any, will be determined later in the litigation); *Taylor v. District of Columbia Water & Sewer Authority*, 241 F.R.D. 33, 47-48 (D.D.C. 2007); *Warren v. Xerox*, 01-CV-2909, 2004 US Dist. LEXIS 5115 *48 (E.D.N.Y. Jan. 26, 2004)(certifying race discrimination employment class under Rule 23(b)(2) but severing liability and injunctive phase from remedial phase).

Finally, rehashing its argument on commonality, Merrill Lynch contends that Plaintiffs do not meet Rule 23(b)(2) because Merrill Lynch has not "acted on grounds generally applicable

---

exclusive culture and hostile or inattentive managers, particularly in light of the *O'Bannon* suit and *Cremin's* pattern or practice finding, are relevant to both liability and to punitive damages.

to the class" or identified a common injury, asserting that no purpose is served by the class action[37] *See* MOP at 53.

The practice of teams underscores the value of the class-wide trial. The analysis is the same for every challenged policy or practice. As explained in Plaintiffs' Opening brief, Merrill Lynch FAs team with other Merrill Lynch FAs pursuant to Merrill Lynch's national policy or practice. Merrill Lynch assigns teams a production number under which commissions generated by the team are shared. *See* Ex. 55 at 8-9; *See id.* at 34-5. By Merrill Lynch policy, team members share in account distributions, combine production to qualify for sales assistance, offices and other perks. *See id.* at 35-42. Significantly, when a team member leaves Merrill Lynch, the remaining team members inherit the departing team member's client book without having to compete for the assets under the national NAP. These new inherited assets are then used to increase points and ranking for future account distributions. In the FA population, approximately 50% of whites are on teams, nearly double the African American rate. *See* Ex. 1 at 6, 60. For 2006, the probability that the racial difference in team participation would exist due to chance or in the absence of racial differences is .000000016, a probability of an event that occurs 16 times in one billion instances. *See id.*

As it argues throughout the Opposition, Merrill Lynch contends that Plaintiffs cannot satisfy Rule 23(b)(2) with respect to the challenge to teams and claims an entitlement at a *Teamsters* hearing to cross-examine every class member on team formation. Thus, Merrill Lynch further contends that a *Teamsters* trial about teams serves no purpose. Plaintiffs disagree with this contention, offering an analogy to show the compelling probative value of a *Teamsters* trial: Suppose a coin is tossed 100 times resulting in 99 tails. Clearly, the conclusion that there is something wrong with the coin or the coin is not a "fair coin" reasonably follows. Here, if Plaintiffs are successful at a *Teamsters* hearing, a remedy could be imposed with injunctive relief, which declares the coin "not fair" and requires its replacement. Merrill Lynch wants to defeat this possibility by demanding that each individual coin toss be separately tried where it

---

[37] Merrill Lynch cites *Remien v. EMC Corp*, 2008 U.S. Dist. LEXIS 74174 at 14 (N.D. Ill. 2008)(Kocoras, J). However, the court in *Remien* found a promotion class not cohesive because some members of the class had been promoted. *But see, Wilfong*, 2001 U.S. Dist. LEXIS 22718 at *26 (the fact that some plaintiffs have been promoted does not render them unsuitable as class representatives, the real question is whether progress toward even greater success in their professional career has been impeded); *See also, Kohen v. Pacific Invst. Management Company*, LLC, NO. 05 C 4681 (7th Cir. July 7, 2009)("...class will often include persons who have not been injured by the defendant's conduct").

could then argue that each coin toss of tail was reasonable given the 50/50 probability of tail in each coin toss and that nothing was wrong with the coin. *Teamsters* rejects Merrill Lynch's approach to liability under Rule 23.

Significantly, should the Plaintiffs prove a pattern or practice of discrimination, the Court may proceed to fashion class-wide injunctive relief, including on the issue of teams. *See Robinson*, 267 F.3d at 159. The intended role of Rule 23(b)(2) class actions is to adjudicate "final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole." Fed.R.Civ.P. Rule 23(2), Advisory Note to 1996 amendments; *see Owner-Operator Independent Drivers Association v. Allied Van Lines,* 231 F.R.D. 280, 282-283 (N.D. Ill. 2005).[38] While Defendant contends that injunctive relief is not possible because the class is not cohesive, Plaintiffs are prepared to design and ask the Court to order appropriate injunctive relief, including policy reforms, to benefit the class as a whole. Because Plaintiffs seek injunctive and declaratory action to end the discriminatory policies and practices, Rule 23(b)(2) certification is proper.

## III. The Proposed Class Satisfies Rule 23(b)(3)

To certify a case under Rule 23 (b)(3), the Court must find that questions of law or fact common to the members of the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.[39]

---

[38] *See Smith*, 234 F.R.D. at 665-666; *Meiresonne*, 124 F.R.D. at 625 ("Plaintiffs do challenge a systemic discriminatory promotional policy and ask for final injunctive and declaratory relief that will apply to the class. That directly tracks the standard set out in 23(b)(2)"); *Buycks-Roberson v. Citibank Federal*, 162 F.R.D. at 334 ("the general applicability factor is satisfied by Plaintiffs' allegation that Citibank engaged in a subjective application of neutral underwriting criteria for the purpose of racial discrimination").

[39] Courts regularly hold that common issues predominate in pattern or practice employment discrimination cases, particularly as to liability. *See, e.g., Aliotta v. Gruenberg*, 237 F.R.D. 4, 12-13 (D.D.C. 2006) (pattern-or-practice "predominates because the evidence used will be common among the plaintiffs and potential class members"); *Smith*, 234 F.R.D. at 666 ("a number of other courts in this Circuit have found predominance satisfied even where plaintiffs sought to certify a single class victimized by a variety of discriminatory conduct"); *Bell v. Woodward Governor Co.*, 03 C 50190, 2005 U.S. Dist LEXIS 60 *10 (N.D. Ill. Jan. 4, 2005) 2005 WL 23340, *3 (N.D. Ill. Jan. 4, 2005) ("issues related to liability based on the plaintiffs' pattern or practice claims will have common questions of law and fact" and "[t]hese common questions will predominate over the individual damage determinations of each class member"); *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004); *Rodolico v. Unisys Corp.*, 199 F.R.D. 468, 477 (E.D.N.Y. 2001) ("pattern or practice of intentional discrimination in the planning and execution of" RIF predominates over individual relief issues); *Fry v. UAL Corporation*, 136 F.R.D. 626 (N.D. Ill. 1991)("[p]redominance is usually decided on the question of liability and if the

Merrill Lynch argues that "even if plaintiffs could prove a pattern or practice of discrimination," individualized inquiries would be required to determine liability for each class member. [40] MOP at 55. This statement is not correct.[41] As explained *supra*, at the liability stage of a pattern-or-practice trial, the focus is not on individual decisions, but on a pattern of discriminatory decision-making. *Teamsters*, 431 U.S. at 360 n.46. Because common issues of law and fact exist sufficient to warrant a *Teamsters* liability trial, the class should be certified even if Merrill Lynch intends to raise individual defenses in the post-*Teamsters* remedial phase. *Fry v. UAL Corporation*, 136 F.R.D. 626 (N.D. Ill. 1991)("[p]redominance is usually decided on the question of liability and if the liability issue is common to the class, common questions are held to predominate"); *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1107 (10th Cir. 2001) ("defendants asserted 'highly individualized' defenses to each of the instances of individual discrimination asserted by plaintiffs," but "those defenses would not become the focal point until the second stage of trial and could be dealt with in a series of individual trials, if necessary"). Accordingly, Merrill Lynch's argument regarding the remedial phase is not sufficient reason to deny class certification under Rule 23(b)(2) or Rule 23(b)(3) for trial of the pattern or practice claims.[42]

---

liability issue is common to the class, common questions are held to predominate").

[40] Merrill Lynch relies on *Radmonovich v. Combined Ins.*, 216 F.R.D. 424 (N.D. Ill. 2003) where Judge Alesia denied class certification, but found commonality for a nationwide Title VII pay/promotion class of 6500 women; Judge Zagel later certified a separate class of the same workforce for class wide punitive damages. *Palmer*, 217 F.R.D. at 436-37. *Radmonovich* was a substantially larger class.

[41] *Aliotta*, 237 F.R.D. at 12-13 (pattern-or-practice "predominates because the evidence used will be common among the plaintiffs and potential class members"); *Smith*, 234 F.R.D. at 666 ("a number of other courts in this Circuit have found predominance satisfied even where plaintiffs sought to certify a single class victimized by a variety of discriminatory conduct"); *Bell*, No. 03 C 50190, 2005 U.S. Dist LEXIS at *10 ("issues related to liability based on the plaintiffs' pattern or practice claims will have common questions of law and fact" and "[t]hese common questions will predominate over the individual damage determinations of each class member"); *Newsome*, 219 F.R.D. at 365; (finding that common issues predominate for 23(b)(3) certification because "the classwide liability phase of this action turns on common employer practices rather than on individual employee reactions." *Rodolico*, 199 F.R.D. at 477 ("Specifically rejecting Plaintiff's contention that the court needed to look at each individual Plaintiff because Plaintiff's company-wide practice of intentional discrimination in the planning and execution of" RIF predominates over individual relief issues).

[42] Contrary to Merrill Lynch's suggestion, the Seventh Circuit endorses certification of at least some class issues on efficiency grounds, regardless of individualized damages questions. *See Allen v. Int'l Truck and Engine Corp.*, 358 F.3d 469, 471 (7th Cir. 2004)(vacating denial of class certification "with instructions to certify a class under Rule 23(b)(2) for equitable matters and to reconsider the extent to which damages matters also could benefit from class treatment; *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)("[a] single hearing may be all that's necessary to determine whether Allstate had a policy of

To reach the remedial phase, Plaintiffs must prevail at the *Teamsters* pattern or practice hearing, a recognition that puts the proper perspective on Merrill Lynch's predominance and superiority arguments. Indeed, a finding of liability as to a pattern or practice of discrimination has both significant legal and practical ramifications. In judging the potential complexity of the remedial phase, Merrill Lynch's "right" to prove that 100% of the class members were not victims of the established pattern or practice of discrimination should not be the focal point as this vantage point defeats the purpose of the *Teamsters* hearing. Indeed, the finding of the pattern or practice must mean *something*, including that there is a presumption that the preponderance of class members were victims of the unlawful conduct. The jury verdict on the *Teamsters* hearing means that the jury found that the compensation and attrition disparities were connected to unlawful policies or practices. This finding would not exist unless there were class members who were treated unlawfully. Thus, logically, the purpose of the remedial phase cannot be to revisit or nullify the *Teamsters* finding with respect to 100% of the class but instead exists to identify the "outliers" or class members who were not damaged by the unlawful pattern or practice.

From legal and practical standpoints, the pattern or practice findings render futile the type of individualized proof Merrill Lynch informs the Court it would offer in the remedial phase. For example, Merrill Lynch claims that before the jury can award damages to any class member, the jury must determine which NAP method was used to distribute an account and the Plaintiff's rank under that method. *See* MOP at 55. However, if Plaintiffs establish the pattern or practice of discrimination, these class-wide findings debunk any attempt to justify the distributions via NAP rankings. Any proof by Merrill Lynch that accounts were distributed by strict NAP rank order will not exonerate Merrill Lynch because the *Teamsters* verdict establishes that the rankings were unlawfully compiled to favor whites. Consequently, strict adherence to a discriminatory rank order cannot be a lawful defense.

As an example, Plaintiffs focus on quintile rankings. As explained in Plaintiffs' Opening Memorandum, Merrill Lynch relies on a national quintile ranking system, placing FAs into five quintile buckets based on production. Merrill Lynch creates a list of all FAs in the country and ranks them by commissions generated, which it refers to as production quintiles. As previously

forcing its employee agents to quit"); *Carnegie v. Household* Int'l. Inc., 376 F. 3d 656, 661 (7th Cir. 2004)("a class action has to be unwieldy indeed before it can be pronounced an inferior alternative" to

explained, 70% of African American FAs are placed in the bottom two quintiles where only 40% of African Americans should reside in a uniform non-discriminatory distributions. Ex. 1 at 76 (Fig. 6). Merrill Lynch uses these national quintile rankings to award points under its NAP. *See* Ex. 197-201. For most years between 2001 and 2006, FAs in the 5th quintile were ineligible to receive distributions under the NAP. *Id.* If Plaintiffs prevail on the *Teamsters* hearing, they will have established a national pattern and practice of racial discrimination, which necessarily infected or tainted the national quintile ranking as the rank order of FAs would have been dramatically different but for discrimination. Clearly, African American FAs would have dispersed in a uniform distribution with 20% of African Americans evenly dispersed in each quintile but for the discrimination. Because the NAP rankings are based on national quintile rankings, neither the NAP rankings nor the quintile rankings can therefore be used in a post *Teamsters* remedial phase to justify account distributions under the NAP because discrimination hopelessly tainted the national rankings. These rankings are not relevant in a post-Teamsters remedial phase, thereby reducing the "complex determinations" that the jury must render.

In a case such as this, where the heart of the class challenge is to policies or practices that rank, screen or segregate on the basis of race, a verdict in favor of the class at a *Teamsters* hearing means that the selection devices cannot be used by Merrill Lynch in the remedial phase to justify denying individual class members relief. Any other outcome would simply turn *Teamsters* on its head. Thus, the remedial phase in this case will focus on what would have happened but for the pattern or practice of discrimination, which is proven by performing a wage shortfall analysis which compares the wages earned by African Americans to those that would have been earned had there been a uniform (non-discriminatory) or normal distribution of resources and wages.[43]

Further, as explained *supra*, Plaintiffs do not believe that it is necessary to resolve all damages issues or the manner in which the remedial phase will proceed in conjunction with class certification, but do maintain that the law does not require that they forego damages in order to seek reform. Congress wisely vested broad discretion with the Court to properly fashion make-whole relief for civil rights violations. This case presents no more difficulty in that regard than any other class action. *See Dunn v City of Chicago*, 231 F.R.D. 367, 377-378 (N.D. Ill. 2005)(the

---

duplicative individual lawsuits).

possibility of individualized damage inquiries does not defeat class certification even if individual hearings ultimately may be required).[44]

More importantly, as this Court recognized in *Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347, 358 (N.D. Ill. 1998)(Gettleman, J.), successful class actions have a stronger deterrent effect than individual actions that might otherwise not be filed. Here, the Plaintiffs chose to proceed as a class because of their strong desire to bring about change.[45] Plaintiffs are justified in their belief that as a class, together, they stand a far greater chance of accomplishing their goals of reforming Merrill Lynch and Wall Street thereby serving not only the class members but also the purposes of our nation's civil rights laws.

Lastly, even given the possibility of individualized hearings, certification is appropriate because a class action is superior to and more manageable than the alternative if class treatment is denied. Plaintiffs have identified in Answers to Interrogatories more than one hundred class members who support and are relying on this lawsuit even though Notice has not issued in this case. As explained in over forty declarations of putative class members submitted to the Court, it is reasonable to expect that hundreds of individual claims would be joined in this proceeding consistent with §1981's national venue provisions if class certification were denied. Alternatively, hundreds of individual claims, all relying on pattern and practice evidence, would be filed across the country. If that happened, there would be no possibility for class wide injunctive relief or a common fund if class certification were denied. Merrill Lynch's threat of complex, duplicative individualized proceedings would then become a certainty as class members would seek to rely upon the same pattern or practice evidence to prove their claims in courts across the country. *See, e.g., Allen,* 358 F.3d at 471 (questioning logic of denying class certification due to individualized damage questions because plaintiffs would still be entitled to present "evidence about the plant-wide environment," among other reasons). Thus, as Judge Shadur reasoned under similar circumstances, "the need for careful administration of a class

---

[43] For this reason, at the remedial phase class members are bolstered by a presumption that each was a victim of the established pattern or practice. *Teamsters*, 431 U.S. at 336.

[44] *See also, Gary v. Sheahan* 96 C 7294, 1999 U.S. Dist LEXIS 5616 *10-11 (N.D. Ill. Mar. 31, 1999); *Blihovde v. St. Croix County Wis.*, 219 F.R.D. 607, 621 (W.D. Wis. 2003); *Denberg v. United States R. Retirement Bd.* 696 F.2d 1193, 1207 & n. 7 & n. 8 (7th Cir. 1983); *Portis v City of Chicago*, 02 C 3139, 2003 U.S. Dist. LEXIS 1572 *11-13 (N.D. Ill. Sept. 5, 2003).

[45] *See* Ex. 20, at 273-74; Ex. 21 at 301; Ex. 22 at 345 (; Ex. 23 at 337; Ex. 24 at 7; Ex. 25 at 496-97; Ex. 26 at 513 (an institutional cost would bring about change); Ex. 27 at 325; Ex. 30 at 306-8; Ex. 31 at 342 Ex. 32 at 11-12; Ex. 33 at 126; Ex. 34 at 342-43; Ex. 35 at 384; Ex. 11 at ¶ 6.

action poses fewer problems than the alternative of separate lawsuits by over 230 individual class members, each advancing his own claims." *Smith* at 234 F.R.D. at 667. Superiority measures "whether class certification will have practical utility in the suit." *Toney v. Rosewood Care Center*, 98 C 0693, 1999 U.S. Dist. LEXIS 4744 *32 (N.D. Ill. Mar. 31, 1999). Because this case involves allegations of generally applied discriminatory policies or practices, and both its prosecution and defense will rely upon common statistical and other evidence, class action is a superior means for requiring the class members to litigate on their own or as groups of individuals. *See Toney*, 1999 U.S. Dist. LEXIS 4744 *19.

For all of the reasons stated herein, the Plaintiffs have established that they meet Rule 23(a) and 23(b)(2) and (b)(3) and they respectfully request that the Court allow them to prosecute this suit on behalf of themselves and all others similarly situated

## IV.  The Court Should Deny Merrill Lynch's Motions to Strike Plaintiffs Witnesses and Bar Plaintiffs' Experts

Merrill Lynch's Opposition resembles a Russian Matryoshka "nested" doll where each pleading gives birth to another hidden pleading ultimately leaving the Court with the burden of determining whether every argument made by Plaintiffs should be disbelieved, every case certifying a class cited by Plaintiffs should be discarded, every witness declaration submitted by Plaintiffs should be struck and every expert offered by Plaintiffs should be excluded. In addition to its 66-page Opposition memorandum, Merrill Lynch submitted an additional 47 pages rearguing each point under the guise of motions to strike experts Madden and Bielby and the declarations of putative class members. Mindful of the burden the parties placed on the Court with these pleadings and of the disfavor the law places on striking evidence and barring witnesses, Plaintiffs resist the temptation to respond with *Daubert* motions on Merrill Lynch's eight experts and motions to exclude its affiants. Instead, Plaintiffs credibly support their argument that at class certification, Merrill Lynch's arguments, if applicable in any respect, properly speak to the weight of this evidence rather than its admissibility and hold any cross-fire. Plaintiffs also assume the Court's familiarity with the parties' briefs on class certification and limit this response to the new issues raised in Merrill Lynch's motions

### A.  Response to Motion to Strike Dr. Madden's Opinions

Merrill Lynch moves to bar Plaintiffs' expert Madden's rebuttal criticisms of Merrill Lynch's expert, Saad's geo-coding methodology, and does not seek to challenge Madden's

affirmative studies. ("Madden Motion"). Plaintiffs responded to the Madden motion with a motion to strike because the Madden motion relies a new declaration and study from Saad, not produced during discovery, in violation of this Court's scheduling Order, a Court-approved Stipulation of the parties and Federal Rule of Civil Procedure Rule 26. Plaintiffs also now submit the declaration of Madden, which explains her difficulties in responding to the new Saad study because Saad failed to produce any output for his new studies. *See* Ex. 235, Madden Declaration; Ex. 236, Stipulation of Parties. Madden provides a substantive response to other parts of the declaration, which Plaintiffs incorporate by reference. *See* Ex. 235. Clearly, however, the debate between Saad and Madden is a "battle of the experts" that needs not be resolved in conjunction with the motion for class certification. *Wilfong*, 2001 U.S. Dist. LEXIS 22718 at *11-13, n.5 ("[i]t is not this Court's role to determine the ultimate correctness of either party's [experts'] contentions in the context of class certification."); *See also Krueger v. New York Telephone*, 163 F.R.D. 433, 440 (S.D.N.Y. Sept. 22, 1995). Thus, the Madden Motion should be denied.

### B. Response to Motion to Strike Dr. Bielby's Opinion

Merrill Lynch moves to bar Plaintiffs' expert Bielby ("Bielby Motion"), citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Merrill Lynch concedes that Bielby is qualified as an expert[46] but argues that his testimony is not relevant and, therefore, does not assist the trier of fact. Alternatively, Merrill Lynch argues that Bielby's opinions are not scientifically reliable.

### 1. Bielby's Testimony is Sufficiently Tied to the Record

Based on well-established research and scientific knowledge, Bielby's expert report in this case provides a scientific framework that can be used to determine whether Merrill Lynch's polices or practices contribute to the barriers and advancement of African American FAs. *See generally*, Ex. 2. Using an organizational case study method, Bielby analyzed specific features

---

[46] Over the past twenty-five years, Bielby has conducted research on issues of workplace discrimination, organizational behavior and organizational policies and practices. He has a Ph.D. in Sociology and is currently a Professor of Sociology at the University of Illinois where he teaches courses on organizational behavior, research methods and social inequality. Bielby is also Professor Emeritus at the University of California, Santa Barbara where he served on the faculty of sociology and chaired the Department of Statistics and Applied Probability. He is past President of the American Sociological Association and has received national awards for his research. *See* Ex. 2 at Ex. B. He has been certified as an expert and offered testimony in similar class cases. *See, e.g., Arnold v. Cargill Incorporated*, 01-2086, 2006 US Dist. LEXIS 41555 (D. Minn. June 20, 2006); *Betty Dukes v. Wal-Mart*, 222 FRD 189, 192 (D. Cal. 2004);

of Merrill Lynch's account distribution, teaming, promotion, marketing and diversity polices in light of a large body of established social science research on the practices that produce, maintain or minimize discrimination. *See id.* He concludes that Merrill Lynch's policies or practices create a system that increases the likelihood of discrimination and that social science research can provide an explanation for the observed statistical disparities in compensation and employment opportunities suffered by African American FAs. *See id.* Further, Bielby concludes that Merrill Lynch's diversity programs are permeated with racial stereotypes and have inadequate accountability and responsibility structures that can allow racial barriers to persist. *See id.*

Merrill Lynch argues that despite the fact Bielby's opinions rely in part on the social isolation African Americans face at Merrill Lynch, they are not relevant "since he does not conclude that Merrill Lynch either did something inappropriate or failed to do something with respect to the representation of African Americans at Merrill Lynch." *See* Bielby Motion at 3. Admittedly, because this is not a hiring case but is at the class certification phase on other issues, Bielby did not study the applicant pool to confirm that Merrill Lynch discriminated in hiring and that the distribution of African Americans throughout the offices is the result of hiring discrimination. Merrill Lynch uses this fact to argue that if low representation of African American FAs is not Merrill Lynch's fault based on hiring discrimination, then any discrimination must also not be its fault. This argument is wrong on both counts.

First, while Bielby did not study Merrill Lynch's hiring practices, he repeatedly references the treatment of African Americans and their statistically significant higher attrition rates. More specifically, Bielby stated that "with respect to the issue of social isolation, one reason African Americans are few and far between is because there are African Americans who have been with the firm and are no longer there and they leave at a greater rate than do white FAs." *See* Ex 238 at 189. Bielby then explained that the high attrition rate could be contributing to the perception that African Americans cannot be as successful as white FAs, which in turn can be contributing to the low representation of African Americans in teams and in management positions. *See* Ex 238 at 80-1, 189, 190. Bielby also testified that he relied on the Madden

---

*Butler v. Home Depot, Inc.,* 984 F. Supp. 1257, 1265 (N.D. Cal. 1997); *Stender v. Lucky Stores, Inc.,* 803 F. Supp. 259, 301-303, 327 (N.D. Cal. 1992).

Report, which connects the attrition to account transfers and teams.[47] Thus, it is not accurate that Bielby places no fault on Merrill Lynch for the social isolation.

Second, and more importantly, the argument that Merrill Lynch is not responsible for the discrimination against African Americans unless it caused the low representation finds no support in the law. A simple example demonstrates the hollowness of Merrill Lynch's argument. If a woman was hired into a job that was previously exclusively male, (*e.g.* firefighter), and was, therefore, the only woman in the job, an employer would nonetheless face responsibility if the woman suffered sexual harassment. *See, e.g., Jenson v. Eveleth Taconite Co.*, 824 F. Supp. 847, 889 (D. Minn. 1993). As Bielby explained, the fact that African Americans are "few and far between" at Merrill Lynch is undisputed and comprises an important part of the organizational context that shapes the experiences of African American POAs and FAs. *See* Ex. 230 at 21-22. Bielby's testimony about social science scholarship and the effect of organizational context assists the trier of fact in understanding the allegations in this case. And, Bielby strikes the appropriate balance between providing the social science scholarship while not usurping the role of the fact-finding jury.

Indeed, the Seventh Circuit does not allow expert testimony on the ultimate issue to be decided by a jury. *See, e.g., Naeem v. McKesson Drug Company*, 444 F.3d 593, 610 (7th Cir. 2006) ("we previously have stated that allowing a witness to testify as to a legal conclusion may cause the jury to accord too much weight to that testimony, and may infer that the jury should look to that witness for legal guidance."); *United States v. Sinclair*, 74 F.3d 753, n.1 (7th Cir. 1996) ("Our own cases have determined that Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case"). Other courts, too, have rejected identical arguments, concluding that having an expert tell the jury what to think about the particular facts of the case does not give the testimony validity, but weakens its admissibility. *See Tuli v. Brigham & Women's Hospital, Inc.*, 592 F. Supp. 2d 208,

---

[47] Merrill Lynch asserts that Bielby's opinions are not relevant because he does not opine that the categorical variable defining the "in-group" is race. Bielby does conclude "far from being a colorblind meritocracy, race permeates policy and practice in a way that creates substantial obstacles to equal employment opportunity for Merrill Lynch's African American employees." Ex. 2 at 71-2. Whether the categorical variable for identifying the "in-group" is race is the ultimate question. Based on the totality of the evidence, a reasonable jury could find that the categorical variable for designating the "in-group" is race and Bielby's review of the sociological research will aid the jury.

214 (D. Mass. 2009).[48] Conversely, courts hold that opinions of the kind offered by Bielby are probative.[49] For example, both the Supreme Court and the Seventh Circuit have specifically endorsed the use of the kind of evidence offered by Bielby. *See Price Waterhouse v. Hopkins,* 490 U.S. 228; 255-56 (1989) (utilizing expert evidence on sex stereotyping by a sociologist to assist fact-finder on question of whether a promotional decision was gender discrimination);[50] *Tyus v. Urban Search Management,* 103 F.3d 256, 263-264 (7th Cir. 1996) (proposed testimony of sociologist on how an all-white advertising campaign affects African Americans was clearly relevant because it would have given the jury a view of the evidence beyond their everyday experience). Accordingly, Merrill Lynch's relevance objections should be overruled

### 2. Bielby's Methods Satisfy Rule 702

Merrill Lynch hired Christopher Winship, Ph.D., ("Winship") a self-proclaimed "*Daubert* expert" who has offered expert reports in seven cases stating that those plaintiff sociological experts do not follow scientific methodology.[51] Ex. 237, Winship Dep. at 28-30, 32-33. Winship did not review any of the documents or deposition testimony, which form the basis of Bielby's opinions. He also neither had access to data nor read the expert reports of all experts in the case. *See id.* at 13-16, 26. Winship is not an expert on organizational policies and practices and has not written any articles in this area. *See id.* at 111-115. He has no experience

---

[48] *See also Hnot,* 2007 U.S. Dist. LEXIS 40243 *7-10 (S.D.N.Y. 2007) (suggesting that a sociologist's opinion that "undertakes to tell the jury what to think about the particular facts of the case" would not be admissible); *Arnold,* 2006 US Dist. LEXIS 41555 at *23 (finding defendant's assertion that relevance of a sociologist's opinion depends on the ultimate issue of whether defendant engaged in intentional discrimination to be mistaken); *Bowers v. National Collegiate,* 564 F.Supp.2d 322, 362 (D.N.J. 2008) (limiting testimony of sociologist who purported to testify that a policy discriminated against disabled individuals); *Smith v. Ford Motor Company,* 215 F.3d 713, 721 (7th Cir. 2000) (an expert's testimony need not relate to the ultimate issue in the case in order to be relevant under Rule 702).

[49] *See, e.g., Arnold,* 2006 US Dist. LEXIS 41555 * 7-10 (court agrees that Bielby's opinion that [defendant] has a strong corporate culture is relevant because it makes it more likely than not that common questions exist at the class certification stage"); *Ellis,* 240 F.R.D. at 651 ("The court find[s] opinion to be probative on the question of commonality and therefore denies defendant's motion to strike her declaration."); *Hnot,* 2007 U.S. Dist. LEXIS 40243 *7-10 (collecting cases).

[50] Contrary to Merrill Lynch's argument, courts do not require that the expert identify whether specific incidents were caused by discrimination. In *Price Waterhouse,* the Supreme Court relied on expert testimony that the decision-maker "was likely influenced by stereotypes" even though the expert admitted that she "could not say with certainty whether any particular comment was the result of stereotyping." *Price Waterhouse,* 490 US at 235-36.; *Hnot,* 2007 U.S. Dist. 40243 at *7 (rejecting argument that expert testimony should be excluded because even though expert proffered to testify that certain conditions were conductive to gender stereotyping, he failed to show that those circumstances were present in workplace).

[51] From November 14, 2008 to January 2009, Winship authored three reports and admits that certain portions of the reports were just cut and pasted into each other. *See id.* at 32-33.

in analyzing organizational documents to assess a company's culture, has not completed any "in-group" research and is not an expert in personnel practices as they affect the amount of inequality that exists in an organization. Winship admits that part of his opinions are legal and that he has neither testified before, nor been certified by any court as an expert. *See id.* at 111.

Relying on Winship, Merrill Lynch argues that Bielby used methods that cannot be replicated but this is an argument that is not applicable to the type of expert work performed by Bielby. Given the nature of his expertise, Bielby applied social science research and theories to the facts of the case. *See generally,* Ex. 2. The exact method he employed is not capable of being tested in a laboratory or to the same extent as those employed by scientists in more technical fields. This, however, does affect the reliability of his methods. Because strict replication is not available when quantitative methodologies are concerned, courts have consistently ruled that testing and the ability to replicate do not affect the admissibility of social science testimony.[52] *See* Ex. 238, Bielby Dep. at p. 47.

Likewise, the argument that Bielby's intellectual rigor was lax is based on an erroneous charge that he failed to test available hypotheses. According to Merrill Lynch, Bielby concluded that Merrill Lynch managers exercise discretion in a way that disadvantages African Americans but that Bielby did not test this theory. Merrill Lynch repeats a claim it makes in its Opposition that Saad compared account distribution under the NAP with how accounts would have been distributed in the absence of manager discretion. Saad did not conduct this study but instead compared distribution under the draft versus assignment approach, both of which rely on the NAP rankings and not managerial discretion. *See* Ex. 234, Madden Dep. at 313-318. Bielby did rely on Madden who did study the effects of managerial discretion by including teams and FA to FA transfers in her account transfer analysis and showed, consistent with Bielby's theories that managers do not favor African Americans. Merrill Lynch argues that Bielby conceded, "if one were to find that a strict application of the non-discretionary account distribution criteria would have resulted in African Americans receiving less, he would conclude that the exercised

---

[52] *See, e.g., Bowers,* 564 F. Supp. 2d at 361 (the fact that the social sciences generally do not produce a 'testable hypothesis' does not render the resulting testimony unreliable); *Indianapolis Minority Contractors v. Wiley,* 94-1175, 1998 U.S. Dist. LEXIS 23349 *37-40 (D. Ind. May 13, 1998) (the four factors identified in *Daubert* do not relate to the social sciences, but instead to methods that are capable of being tested through controlled experimentation); *cf. Pirolozzi v. Stanbano,* 07-795, 2009 U.S. Dist. LEXIS 42575 *9 (D. Ohio May 8, 2009) (admitting expert testimony even though study could not be replicated for the purpose of scientific testing).

discretion was not disadvantageous to African Americans." Bielby Motion at 14. Madden's studies establish the opposite, that in a random sampling that African Americans would have received statistically significantly more lucrative accounts than they did receive with manager discretion. *See* Ex. 1 at 5, 24-37. This conclusion supports Bielby's hypothesis.

Further, Merrill Lynch's criticism that Bielby "cherry picked" is unfounded. Merrill Lynch cites a single error it claims Bielby made after reviewing millions of pages of documents, including hundreds of record citations, in his reports. Merrill Lynch also criticizes Bielby for not relying on the Plaintiffs' depositions. Bielby reasonably explained that he chose to review the record rather than rely on the testimony of Plaintiffs because he wanted to understand how Merrill Lynch's personnel system operated from the perspective of the people who were responsible for its design, oversight, implementation and who made decisions within its context, and not how the system is perceived by the people who are making allegations of discrimination. *See* Ex. 238, Bielby Dep. at 41. Clearly, had Bielby relied on the thousands of pages of examples of discriminatory treatment testified to by the Plaintiffs, Merrill Lynch would then have criticized Bielby for allowing the Plaintiffs to influence his opinions. In any event, this argument is not a basis to exclude Bielby but is classic fodder for cross-examination, as the Seventh Circuit held in *Walker v. Soo Line R.R.*, 208 F.3d 581, 590-91 (7th Cir. 2000). There, the Court held that the admission of an expert was not error even though the opponent claimed the expert engaged in "inadequate" investigation and reached "faulty" conclusions. *Walker*, 208 F.3d at 590-91. Those issues were better dealt with in cross-examination and should be left to the jury to decide. *Id.* Thus, even if Merrill Lynch is correct, the record provides no basis for exclusion.

Indeed, after reviewing Bielby's testimony as to his methods, Winship admitted that the method used by Bielby is accepted in qualitative sociological research, is widely used by sociologists in the field and that scientists using this method have made important contributions to social science research on work and organizations. *See* Ex. 237 at 101-104. Winship further testified that in the social sciences, it is appropriate to draw inferences and causal connections as Bielby did in the absence of randomized data. *See id.* at 110. [53] Winship conceded that Bielby's

---

[53] Numerous courts have accepted the methodology employed by Bielby in this case as reliable. *Hnot*, 2007 U.S. Dist. 40243 at *7 (collecting cases); *Bowers*, 594 F. Supp. at 361 ("This is not cutting-edge science, but is instead a conventional social science approach that courts have routinely admitted as methodologically reliable"); *Home Depot, Inc.*, 984 F. Supp. at, 1265 (denying motion to exclude because

method of searching the entire database of documents using search terms complies with scientific methodology. *See id.* at 125-126; Ex. 230 at p. 40. [54]

Finally, relying on Winship, Merrill Lynch argues that Bielby failed to present a fair, unbiased summary of the literature. Bielby's report contains hundreds of literature cites, but Merrill Lynch bases its entire argument on its analysis of only two of these cites, hardly making his opinions unreliable. Tellingly, Winship concedes that Merrill Lynch's own expert, Olivet Jones, included no literature review whatsoever with her report, yet Merrill Lynch tenders Jones' report to the Court. *See* Ex. 237 at 24-27. In any event, this criticism again "unquestionably presents the sort of questions that go to the weight of the evidence of the testimony rather than its admissibility." *Hnot*, 2007 U.S. Dist. LEXIS 40243 at *4 (S.D.N.Y June 1, 2007).

Simply put, Merrill Lynch has failed to put forth any argument or evidence that would require this Court to disregard the holding of the numerous courts that have found testimony of the kind offered by Bielby to be relevant and his methods reliable. [55] The Court should deny Merrill Lynch's motion as Bielby's testimony meets the standards set forth in Fed.R.Evid. 702.

## C. Response to Motion to Strike Plaintiffs' Declarations

Merrill Lynch moves to strike the declarations of class members ("Declaration Motion")

---

the theories underlying social scientists opinions have been tested in field laboratories, have been the subject of peer review and are generally accepted by experts in the field). *See also, Hurst v. F.W. Woolworth Co.*, 95-6584, 1997 U.S. Dist. LEXIS 17233, at *2 (S.D.N.Y. Nov. 3, 1997) (rejecting argument that testimony of industrial psychologist about stereotypes would not be helpful to the jury); *Flavel v. Svedala Indus.*, No. 92-1095, 1994 U.S. Dist. LEXIS 19774 at *1 (E.D. Wis. Oct. 25, 1994) (finding that expert testimony about stereotypes in the workplace would be both reliable and relevant); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1505 (M.D. Fla. 1991) (stating that testimony of sociologist in discrimination case provided a "sound, credible theoretical framework").
[54] A number of courts have explicitly rejected *Daubert* challenges to Bielby of the very kind brought here by Merrill Lynch. *See Arnold*, 2006 US Dist. LEXIS 41555 at *23 (finding that Bielby's methodology was reliable while rejecting arguments that he should be excluded because his opinions offered speculative conclusions that cannot be quantified); *Butler*, 984 F. Supp. 1257, 1265 (N.D. Cal. 1997) (rejecting defendant's argument that Bielby's report was unreliable because it drew sweeping conclusions from selective review of testimony); *Stender*, 803 F. Supp. 259 at 301-303, 327 (finding Bielby's testimony to be persuasive and rejecting Morgan Stanley's criticisms of his use of the research).
[55] Merrill Lynch wrongly asserts that multiple Courts have excluded Bielby's opinions. In *EEOC v. Morgan Stanley,* the Court explicitly found that Bielby "is qualified and that his methodology is reliable" and that his report "provides a theoretical explanation for discrimination." The court in *Morgan Stanley* disallowed Bielby from testifying only that the deficiencies of Morgan Stanley's policies were evidence of discrimination, a contention Bielby does not make in this case. Likewise, in *Gosho v. Lewis*, 00-1611, 2002 US Dist. LEXIS 28139 (N.D. Cal. October 1, 2002) and *Robinson v. Metro-North Commuter*, 175 F.R.D. 46, 48 (S.D.N.Y. 1997), the courts did not exclude Bielby's opinions, but found them to be

on the ground that the declarations fail to meet evidentiary standards and rules. Despite the hundreds of pages of unsupported sworn affidavits submitted with its Opposition, Merrill Lynch now oddly argues that declarations offered must not pertain to the merits. While Merrill Lynch's proof does relate to the merits, the declarations presented by putative class members are offered primarily to demonstrate Rule 23(b)(3)'s superiority requirement is met[56] and to refute the notion that this is an "across the board" suit as described in *Falcon*. Putative class members merely desire the Court to know that they both exist and are relying on this action, which they view as the superior means to litigate race claims. Thus, given the limited purpose of the declarations, the putative class members meet the appropriate evidentiary standards applicable to class certification. Accordingly, the Court has discretion to consider the class members' declarations offered by Plaintiffs for the purpose for which they are intended and should deny Merrill Lynch's Motion.

### CONCLUSION

For the reasons, stated herein, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request the Court grant their Motion for Class Certification and deny Merrill Lynch's Motions to Bar testimony of Drs. Madden, Bielby and class members.

**STOWELL & FRIEDMAN, LTD**

**By:**

_____/s/ Linda D. Friedman_____

Attorney No. 06190092
**STOWELL & FRIEDMAN, LTD.**
321 South Plymouth Court
Chicago, IL 60604
(312) 431-0888
LFriedman@sfltd.com

---

unpersuasive. It is not clear whether that conclusion in *Robinson* would hold since *Robinson* was reversed. *See Caridad v. Metro-North Commuter*, 191 F.3d 283 (2nd Cir. 1999).

[56] *See, e.g., Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999)(class action method superior "to repeated adjudication of [employment discrimination] claims piecemeal."); *Walker v. Bankers Life & Cas. Co.*, 06 C 6906, 2007 U.S. Dist. LEXIS 73502 at *29-30 (N.D. Ill. Oct. 1, 2007)("[m]ultiple proceedings involving common issues could therefore result in an enormous duplication of effort and would likely hinder judicial economy and efficiency in adjudicating the core issues"); *Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 911 (7th Cir. 2003) ("[C]lass action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury").