IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| GEORGE McREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, Individually on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | Case No. 05-C-6583 |
| Plaintiffs, | ) ) | |
| | ) | Judge Robert W. Gettleman |
| v. | ) | Magistrate Judge Morton Denlow |
| | ) | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, | ) ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' CORRECTED MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION**

Plaintiffs, on behalf of themselves and all others similarly situated and through their counsel,

Stowell & Friedman, Ltd., respectfully submit this Corrected Memorandum of Law In Support of

Their Motion For Class Certification.

Filed Under Seal on November 21, 2008

Attorneys for Plaintiffs and Putative Class

Mary Stowell, Bar No. 02750015
Linda D. Friedman, Bar No. 06190092
George Robot, Bar No. 06237979
Suzanne E. Bish, Bar No. 06242534

**Stowell & Friedman, Ltd.**
321 South Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

FACTUAL PRESENTATION .................................................................................5

I.      Merrill Lynch Has A Uniform Management And Branch Office Structure ......................5

II.     Merrill Lynch Has A Strong, Uniform Corporate Culture That Disadvantages African Americans ..................................................................................................5

      A.    Merrill Lynch's Corporate Culture Instills And Reinforces Consistency In Corporate Practices, Attitudes And Employment Decisions ..................................5

      B.    The Firm's Culture is "White-Male Dominated" And Exclusionary ....................7

      C.    Merrill Lynch Culture Is Pervaded By Harmful Racial Stereotypes That Affect Decisions And Policies Regarding FAs And Clients And Perpetuate Racial Bias And Segregation ..................................................................................8

III.    Merrill Lynch Has Uniform Employment Polices And Practices That Disadvantage African Americans ...........................................................................12

      A.    Merrill Lynch's Uniform Hiring Practices Harm African Americans...................13

          1.    Merrill Lynch Excludes African Americans From The POA Program ...............................................................................................13

          2.    Low African American Representation Harms All African American Employees ...........................................................................15

      B.    Merrill Lynch Has A Uniform, National Broker Training Program.....................16

      C.    Merrill Lynch's Firm-Wide Cumulative Advantage Systems Compound Racial Discrimination ........................................................................................19

      D.    Merrill Lynch's Teaming Practice are Uniform and Harm African American POAs and FAs ....................................................................................23

      E.    Merrill Lynch's National Account Distribution Policy Harms African Americans ............................................................................................................27

      F.    Merrill Lynch's Management Selection Process is Uniform and Disadvantages African Americans...................................................................31

      G.    Merrill Lynch's Compensation Plan Discriminates Against African Americans ............................................................................................................33

          1.    The Grid Is Progressive and Creates a Cumulative Advantage.....................33

          2.    The Household and Small Ticket Components of the Compensation Plan Discriminate Against African Americans ....................34

          3.    The Penalty Box Discriminates Against African Americans .........................35

IV.     Merrill Lynch Has Long Known Of Discrimination But Has Taken No Effective Remedial Action Or Instituted Policies To Prevent Continued Discrimination...............36

ARGUMENT ...................................................................................................................43

I.      Class Certification Is Warranted Based On Regular Certification Of Nearly Identical
        Broker Classes, Including A Sex Discrimination Class Stipulated To By Merrill Lynch
        And Approved By A Court In This District. ...................................................................43

        A.      Courts Have Routinely Held That Broker Classes Meet Rule 23's Class
                Certification Requirements ....................................................................................43

        B.      Merrill Lynch Has Stipulated To Certification Of A Similar Broker Class ..........45

II.     Plaintiffs' Proposed Class Warrants Class Treatment Under Rule 23...............................45

        A.      The Proposed Class Satisfies All Requirements of Rule 23(a)............................45

                1.      The Proposed Classes Are Sufficiently Numerous To Preclude
                        Joinder. .......................................................................................................45

                2.      Plaintiffs' Claims Raise Numerous Common Questions Of Law
                        And Fact. .....................................................................................................45

                3.      Plaintiffs' Claims Are Typical Of Proposed Class Members'
                        Claims...........................................................................................................48

                4.      The Named Plaintiffs And Their Counsel Will Adequately
                        Represent And Zealously Protect The Interests Of The Class. .....................49

        B.      Plaintiffs' Proposed Class Should Be Certified Under Rule 23(b)(2) For
                Liability, Injunctive and Equitable Relief.............................................................50

        C.      Plaintiffs' Proposed Class Also Meets The Requirements Of Rule
                23(b)(3). ................................................................................................................50

                1.      Questions Of Law And Fact Common To The Class Predominate
                        Over Questions Affecting Only Individual Class Members..........................51

                2.      Class Treatment Is Superior To Other Available Methods For The
                        Fair And Efficient Adjudication Of The Class Claims..................................53

CONCLUSION................................................................................................................55

**TABLE OF AUTHORITIES**

## Cases

*Acosta v. Scott Labor LLC*, 2006 U.S. Dist. LEXIS 153 (N.D. Ill. Jan. 3, 2006) ....................... 55
*Adams v. RR Donnelley & Sons*, 98 C 4025, 96 C 7717, 2001 U.S. Dist. LEXIS 4247, at *32 (N.D. Ill. Apr. 6, 2001)............................................................................................................................ 47
*Albemarle Paper Co. v. Moody,* 422 U.S. 405(1975)................................................................. 2
*Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471-72 (7th Cir. 2004)............................... 51
*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-16 (1997).................................. 45, 50
*Augst-Johnson v. Morgan Stanley,* Case No. 06-1142 (D.D.C.) ............................................... 45
*Barefield et al. v. Chevron, U.S.A., Inc.,* No. 86-2427 ............................................................. 48
*Bell et al. v. Woodward Governor Co.*, No. 03 C 50190, 2005 U.S. Dist. LEXIS 60, at *4 (N.D. Ill. Jan. 3, 2005) .................................................................................................................... 46
*Bowe v. Colgate-Palmolive Co.* 416 F.2d 711, 720 (7th Cir. 1969)............................................ 54
*Brown v. Board of Educ.,* 347 U.S. 483 (1954) ......................................................................... 1
*Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 337 (N.D. Ill. 1995)................ 48
*Carnegie v. Household International*, 376 F.3d 656, 659–61 (7th Cir. 2004) ........................... 45
*Cremin v. Merrill Lynch & Co.*,328 F. Supp. 865 (N.D.Ill, 2004) ........................... 2, 36, 45, 50
*De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)...................... 48, 49
*Dean v. Intl. Track & Engine Corp.*, 220 F.R.D. 319, 320-21 (N.D. ll. 2004)......................... 47
*Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 171-73 (N.D. Cal. 2004)............................... 48
*Dunn v. City of Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005)................................................ 46
*Duran v. Elrod*, 760 F.2d 756 (7th Cir. 1985) ......................................................................... 2
*Dyer Neely v. Chicago,* 101 F.R.D. 83 (N.D. Ill. 1984)........................................................... 2
*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)........................................................ 43
*Equal Employment Opportunity Commission v. Merrill Lynch, Pierce, Fenner & Smith, Incorporated C.A. No. 76-754* ................................................................................................ 2
*Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996)........................................... 46, 50
*Gautreaux v. Chicago Housing Authority*, 296 F. Supp. 907 (N.D. Ill. 1969)............................ 2
*Gay v. Waiters' and Dairy Lunchmen's Union*, 549 F.2d 1330, 1333 (9th Cir. 1977) ............. 1
*Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982)......................................... 54
*Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990) .......................................... 55
Griggs v. Duke Power Co., 401 U.S. 424 (1970............................................................................ 2
*Hazelwood School Dist. v. United States*, 433 U.S. 299. 309-312 ........................................... 3
*In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005) ...................................................... 52
*International Brotherhood of Teamsters v. United States,* 431 U.S. 324 (1977) ...................... 3
*Jaffe v. Morgan StanleyDW, Inc.*, Case No. C 06-3903, 2007 U.S. Dist. LEXIS 8502 (N.D. Cal. Jan. 19, 2007)....................................................................................................................... 45
*Jane Does v. City of Chicago*, No. 79 C 789 (N.D. Ill. Jan. 12, 1982)................................... 2
*Johns v. DeLeonardis*, 145 F.R.D. 480, 484-85 (N.D. Ill. 1992) ........................................... 51
*Jones v. R.R. Donnelley & Sons Co.*, 124 S. Ct. 1836 (2004) ................................................. 3
*Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir 1998); *Bell,* 2005 U.S. Dist. LEXIS 60, at *6... 46, 48
*King v. Gen. Elec. Co.,* 960 F.2d 617, 623 (7th Cir. 1992) ....................................................... 46
*Kolstad v. Am. Dental Ass'n.*, 527 U.S. 526, 544-45 (1999) .................................................. 48
*Kosen v. American Express Financial Advisors, Inc.*, No. 1:02CV00082 (D.D.C) .................... 45
*Kremnitzer et al. v. Cabrera & Rephen, P.C.*, 202 F.R.D. 239, 242 (N.D. Ill. 2001) ................ 52
*Liberles v. County of Cook*, 709 F.2d 1122, 1136 (7th Cir. 1983) ............................................. 53

*Mary Kay Bartelson and Equal Employment Opportunity Commission v. Dean Witter & Co., Incorporated and Dean Witter Reynolds, Inc.* C.A. No. 78-839 .............................................. 2

*Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 624 (N.D. Ill. 1989) ............................................ 47

*Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 U.S. Dist. LEXIS 14785, *18 (N.D. Ill. Aug. 9, 2002) ...................................................................................................................................... 51

*O&G Spring*, 38 F.3d at 880 ....................................................................................................... 53

*O'Bannon v. Merrill Lynch*, Fenner & Smith, Inc. C.A. No. 73-905 ......................................... 2

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 284 (N.D. Ill. 2005) ................................................................................................................................... 51

*Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D.Ill. 1983) ................................................... 2

*Palmer v. Combined Ins. Co. of Am.* 217 F.R.D. 430, 438-39 (N.D. Ill. 2003). ......................... 48

*Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986)( ..................................................... 46

*Rissetto v. Plumbers Local* 343, 94 F.3d 597, 604-5 (9th Cir. 1996) ........................................ 45

*Romasanta v. United Airlines, Inc., 537 F.2d 915, 918* (7th Cir. 1976) ........................................ 1

*Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992) .................................................... 46

*Segar v. Smith*, 738 F.2d 1249, 1283 (D.C.Cir. 1984) ................................................................. 3

*Shakman v. Dem. Org. Of Cook Cty.*, 481 F.Supp. 1315 (N.D.Ill 1979) ..................................... 2

*Smith v. Nike Retail Serv.*, Inc., No. 03 C 9110, 2006 U.S. Dist. LEXIS 12375, at *40-41 (N.D. Ill. Mar. 22, 2006) ....................................................................................................................... 52

*Stewart v. Gen'l. Motors Corp.*, 542 F.2d 445, 451-53 (7th Cir. 1976) .................................... 53

*Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 677 (7th Cir. 2001) ...................................... 43

*Tucker v. Walgreen Co.*, 2007 U.S. Dist. LEXIS 74628 No. 05-440-GPM, 07-172-GPM (S.D. Ill. Oct. 5, 2007) ............................................................................................................................... 55

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002) .................. 44

*United Hispanics of DuPage v. Village of Addison*, 988 F.Supp. 1130 (N.D. Ill. 1997) .......... 2

*United States v. Bd. Of Ed. Of City of Chicago* No. 80 C. 5124 ................................................. 2

*Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) ................................................... 49

*Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 387 (N.D. Ill. 1999) ............................................ 52

*Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 997 (1988). ................................................... 47

*Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 254 (3d Cir. 1975) ............................................ 1

*Wilfong v. Rent-A-Center*, 2001 U.S. Dist LEXIS 22718, (S.D. Ill. 2001) ................................ 55

*Williams v. Pharmacia, Inc.,* 137 F.3d 944, 952 (7th Cir. 1998) ................................................ 48

**INTRODUCTION**

<u>The Parties</u>

Defendant Merrill, Lynch, Pierce, Fenner and Smith, Inc.[1] ("Merrill Lynch" or "the Firm") is the country's largest provider of brokerage and brokerage-related services. The Firm employs over 14,000 persons nationwide as Financial Advisors ("FAs" or "brokers") to aid clients in identifying and reaching their financial goals through a diverse range of investment strategies and investment products. *See* Dkt. 76, Def. Answer at 2. Pursuant to 42 U.S.C. § 2000e *et seq.* of the Civil Rights Act of 1964 ("Title VII") and 42 U.S.C. § 1981, Plaintiffs challenge Merrill Lynch's racially discriminatory policies and practices in its retail brokerage unit, referred to as Global Private Client ("GPC"). Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs seek to represent a class of African American brokers and broker trainees ("Trainees") subjected to the Firm's discriminatory, company-wide policies and practices.[2]

<u>Background</u>

In 1966, Congress enacted Rule 23. The temporal proximity of Title VII of the Civil Rights Act enacted in 1964 and Rule 23 is not a coincidence; the right of action and the means for enforcement of that right go hand in hand. Title VII and Rule 23 work together not only in the sense that class actions are an effective instrument through which to change employers' discriminatory behavior, but also in the sense that a wrong done to an individual because of that individual's race, gender, or religion is effectively an attack upon all members of that group. *Romasanta v. United Airlines, Inc.,* 537 F.2d 915, 918 (7th Cir. 1976).[3] Title VII, in hand with Rule 23, was implemented to change the law and workplace culture: the way people act and ultimately the way they think.

---

[1] Bank of America Corp. has announced that it will purchase Merrill Lynch in an all stock transaction, thereby assuming liability for this action. *See* http://ml.com/index.

[2] The putative class includes brokers, broker trainees and persons hired with intent to enter the Firm's broker training program, even if they never received a broker production number; persons who had production numbers but also performed managerial duties, including sales or producing managers; and persons who attended the firm's management assessment center, including without limitation Steven Smartt, Jennifer Madrid, Wilfred Morrison and Mark Standard.

[3] *See Gay v. Waiters' and Dairy Lunchmen's Union*, 549 F.2d 1330, 1333 (9th Cir. 1977)("Since the purpose of Title VII is to eliminate such class-based discrimination, class actions are favored in Title VII actions for salutary policy reasons"); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 254 (3d Cir. 1975) (same); *see also* Melissa Hart, *Will Employment Discrimination Class Actions Survive?* 37 Akron L. Rev. 813, 816 (2004)("[s]ince the late 1960s, private class action suits have been perhaps the most important means for challenging and eliminating systemic employment discrimination").

While *Brown v. Board of Education,* 347 U.S. 483 (1954), enjoys widespread recognition as a watershed in the civil rights movement and a legal victory that wrought immense social change, it is easy to take for granted the parallel changes that the watershed Title VII cases brought about in the American workplace. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424 (1971); *Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975); *Int'l. Bhd. of Teamsters v. United States,* 431 U.S. 324 (1977). Judges in this Circuit, too, preside over landmark class cases that fulfill the promise of our civil rights laws. *See, e.g. Gautreaux v. Chicago Housing Auth.*, 296 F. Supp. 907 (N.D. Ill. 1969)(constitutional challenge to residential segregation of public housing); *Shakman v. Dem. Org. Of Cook Cty.*, 481 F.Supp. 1315 (N.D. Ill. 1979)(constitutional challenge to political patronage system); *Doe v. City of Chicago*, No. 79 C 789, 1982 U.S. Dist. LEXIS 14417 (N.D. Ill. Jan. 12, 1982)(constitutional challenge to strip searches of female arrestees); *U.S. v. Bd. of Educ.,* No. 80 C. 5124, 1983 U.S. Dist. LEXIS 20222 (N.D. Ill. 1983)(school desegregation).[4]

Notwithstanding the compelling body of legal precedent, Plaintiffs anticipate that Merrill Lynch will vigorously contest class certification, arguing that Wall Street does not need oversight of this kind. Federal courts, however, have routinely certified class action discrimination lawsuits against Wall Street firms. Indeed, in 1998, Judge Castillo certified an analogous gender discrimination class action brought by female brokers against Merrill Lynch, resulting in a pattern and practice finding in favor of the women. *Cremin v. Merrill Lynch & Co.,* 328 F. Supp. 865 (N.D. Ill. 2004); *see also* brokerage class actions cited at Argument, Part I.

*McReynolds v. Merrill Lynch* is a sorely needed sequel to one of the earliest brokerage lawsuits, brought by the Equal Employment Opportunities Commission ("EEOC") against Merrill Lynch in 1976 based on the Firm's refusal to employ African Americans, women and Latinos as brokers. *EEOC/O'Bannon v. Merrill Lynch,* No. 73-905, No. 76-754 (W.D. Pa.). To resolve the lawsuit, Merrill Lynch entered into a consent decree and agreed to hiring goals of up

---

[4] *See also Palmer v. City of Chicago*, 562 F. Supp. 1067 (N.D. Ill. 1983)(constitutional challenge to failure to produce exculpatory information in "street files"); *Dyer Neely v. Chicago,* 101 F.R.D. 83 (N.D. Ill. 1984)(disability challenge to automatic disqualifier of medical conditions in Police Dept.); *Duran v. Elrod*, 760 F.2d 756 (7th Cir. 1985)(jail conditions); *Buycks-Roberson v. Citibank Savings Bank* 162 F.R.D. 322 (N.D. Ill. 1995)(redlining in lending practices); *United Hispanics of DuPage v. Village of Addison*, 988 F.Supp. 1130 (N.D. Ill. 1997)(Fair Housing challenge).

to 6.5% for African American brokers.[5]  However, 32 years have passed, and today only 1.2 –
1.4% of brokers at Merrill Lynch are African American.  *See* Ex. 2, Report of William Bielby,
Ph.D., at 8-9, Table 2; Ex. 96, Americas Advisory Diversity Headlines, at MLEE 018 18237.

      The prolonged underrepresentation of African American brokers at Merrill Lynch results
from more than a failure to hire.  Since 2001, only a handful of African Americans advanced to
the rank of branch manager at Merrill Lynch.  *See, e.g.,* Ex. 42, O'Neal Dep. at 122.  African
American FAs suffer at every level due to the Firm's discriminatory employment policies and
practices.  African American Trainees were 34% more likely not to complete the broker training
program from 2001 to 2006, a difference of 4.49 standard deviations.  *See* Ex. 1, Report of Janice
Madden,[6] Ph.D. and Alex Vekker, Ph.D. ("Madden Rep.") at 41-42.  African Americans who
completed the training program or were hired laterally after 2001 were more than twice as likely
as non-African Americans to leave Merrill Lynch by 2006, a racial difference in attrition of 7.02
standard deviations.  *Id.* at 7.

      The financial impact of Defendant's discriminatory practices is startling.  While courts
ordinarily accept as evidence of discrimination statistical significance of two standard
deviations,[7] the disparities in compensation between African American and white brokers from
2001 to 2006[8] at Merrill Lynch were considerably larger:

| Annual Compensation Percentage Differences Between African American & White FAs | | Standard Deviations |
|---|---|---|
| 2001 | African American brokers were paid 33.57% less | 6.57 |
| 2002 | African American brokers were paid 36.53% less | 7.37 |
| 2003 | African American brokers were paid 33.23% less | 6.73 |
| 2004 | African American brokers were paid 37.98% less | 8.03 |
| 2005 | African American brokers were paid 41.81% less | 9.05 |
| 2006 | African American brokers were paid 42.34% less | 9.07 |

[5] From 1984 to 1995, Merrill Lynch did not meet the decree's goals and asked the court to extend the
Consent Decree.  In 1995, the EEOC and Merrill Lynch represented to the court that the Firm was
adopting a voluntary affirmative action plan and agreed to allow the Consent Decree to expire.  Ex. 210 at
P 5522; Exs. 211-12 at P 5485-86; Ex. 213 at MLE 03449-597.

[6] Janice Fanning Madden is a labor economist with extensive experience in the analysis of labor markets
and racial differentials in labor markets.  She is currently Professor of Regional Science, Sociology and
Real Estate and chair of the Graduate Group in Demography at the University of Pennsylvania.  Alex
Vekker is Visiting Faculty of the Economics Department at the University of Pennsylvania.

[7] A .05 level of significance (1.96 standard deviations) is considered statistically and legally significant.
*See, e.g. Hazelwood School Dist. v. United States*, 433 U.S. 299, 309-312 & n.14, 7 (1977).

[8] 42 U.S.C. Section 1981 generally applies a four-year statute of limitations. *Jones v. R.R. Donnelley &
Sons Co.*, 124 S. Ct. 1836 (2004). This lawsuit was filed in November 2005, but the parties entered into a
class standstill agreement dating back to May 2005.

Ex. 1 at 14, Tables 1-6.  These racial disparities in compensation occur with fewer than a 1 in 20 billion probability that they are due to chance rather than by race.  *Id.* at 13.[9]

Despite this statistical evidence, Merrill Lynch filed a motion for partial summary judgment ("Motion").  Although Merrill Lynch concedes the huge class-wide racial differences in compensation, it maintains that these disparities result solely from whites "producing" more commissions, resulting in more wages under its grid-based, uniform compensation plan.  Motion at 2.  Presumably, Merrill Lynch also will argue that the lower rates of attrition and other more favorable outcomes for whites are performance-based.  Thus, Merrill Lynch asks the Court to find summarily that its status as the 1 out of 20 billion for compensation disparities is owed not to its discriminatory practices, but to the fact that whites simply are more competent.

But as explained below, there is nothing simple about the African American experience at Merrill Lynch, which does not operate as a meritocracy.  The Firm concedes that the stunningly less favorable outcomes for African Americans are not explained by racial differences in qualifications, work ethic, integrity, career aspirations, values or desire.  Ex. 44, Gardner Dep. at 34-35; Ex. 43, McCann Dep., at 54-55; Ex. 42 at 22-26; Ex. 46, Barry Dep. at 297-299.  Instead, as Plaintiffs' expert, Professor of Sociology William T. Bielby, concluded, "[t]he company's policies and practices reinforce beliefs that its African American FAs fall behind because of their own personal failings and perceived client bias, which creates resistance to diversity interventions and reinforces the biases built into the company's cumulative advantage system.  Far from being a colorblind meritocracy, race permeates policy and practice in a way that creates substantial obstacles to equal employment opportunity for Merrill Lynch's African American employees."  Ex. 2 at 71-72.  In the end, the only thing measured by Merrill Lynch's various systems is the cumulative effect and injurious compounding of its systemic race discrimination.

Real change at Merrill Lynch is long overdue, and only a class action has the potential to bring about that change.  Here, Plaintiffs present an abundance of common legal and factual issues regarding Merrill Lynch's uniform, national policies and practices and the harm they cause to African American FAs.  The ultimate legal and factual question is one uniquely suited for class treatment: whether the less favorable outcomes for African Americans at Merrill Lynch

---

[9] The Madden model includes office complexes that have both African American and white FAs. Madden examined annual compensation, controlling for education and experience and adjusting for potential racial differences in office location and management responsibilities. Ex. 1 at 12-13.

are the product of systemic, pervasive racial discrimination or whether whites are simply better at this job, as Merrill Lynch asks this Court to summarily adjudge.

## FACTUAL PRESENTATION

### I.    Merrill Lynch Has a Uniform Management and Branch Office Structure.

Merrill Lynch's GPC unit is led from the top of the Firm through a uniform management and branch office structure.  The Firm employs national personnel policies and practices that are centrally created, approved and monitored by senior executives, and that apply to every FA in the U.S.  The Firm also maintains uniform personnel, compensation, diversity, and anti-discrimination policies, and has centralized Human Resources and Legal departments.[10]

The Firm's Chairman and Chief Executive Officer ("CEO") oversees GPC.  Ex. 59 at MLEE 004130.  GPC is directly managed by Senior Vice Presidents who report to the Firm's Vice Chairman and President of GPC.  Ex. 59 at MLEE 038 004154.  Managing Directors report to the Firm's Head of the Advisory Division within GPC.  *Id.* at 4157.  Approximately 136 Directors oversee groupings of branch offices, known as complexes, and report to Managing Directors in the Firm's Central, Northeast, Southeast and Western Divisions.  Ex. 54, 1/16/07 Sieg. Dep. at 24;  Ex. 139, 2006 GPC Supervisory Structure, at MLE 00105-167.  Directors, also called branch managers, supervise and manage the Firm's approximately 14,800 brokers in 621 retail branch offices according to Firm-wide personnel policies.  Ex. 43 at 82-84; Ex. 139 at MLE 00105-167.

Merrill Lynch's retail branch employees hold titles that are centrally and uniformly defined, job coded and maintained by Merrill Lynch's corporate Human Resources department ("HR").  Ex. 50, Schetler Dep. at 41-42.  The branch offices all employ persons who hold titles that are uniform throughout the Firm, for example, FA, POA Advisor (called "Trainees" herein), and Client Associate.

### II.   Merrill Lynch Has A Strong, Uniform Corporate Culture That Disadvantages African Americans.

#### A.   Merrill Lynch's Corporate Culture Instills And Reinforces Consistency In Corporate Practices, Attitudes And Employment Decisions.

Merrill Lynch's GPC unit has a strong, uniform corporate culture that shapes behavior

---

[10] *See, e.g.,* Ex. 59 at MLEE 038 004154, 4130 (head of GPC HR reports to head of GPC, who reports to CEO), *id.* at 4195, 4130 (centralized Legal Department reports to CEO); Ex. 51, Hogarty Dep. at 250 (compensation plans apply to all U.S. FAs); Ex. 78, centralized EEO policy applies to Merrill Lynch "worldwide," at MLE 00894 - 000065.

and ensures consistency in corporate norms, practices, and employment decisions. Merrill Lynch has steadily served retail brokerage clients since 1940 (www.ml.com), and its "bull logo" is recognized worldwide, carrying with it a shared set of attitudes and beliefs.[11] As explained by the Firm's head of Human Resources "[t]he Merrill Lynch culture has always been an important part of who we are as a company." *See* Ex. 71 at MLMRE 006 0003320.

The Firm's culture is touted and disseminated in executive speeches and communications with FAs, management, and the public.[12] Merrill Lynch offers many forums to instill and reinforce its strong organizational culture and to "brand" Merrill Lynch to its workforce and marketplace, including its Firm-wide new hire broker training program and company-wide policies and activities.[13] The method of selecting and training the branch managers who run the Firm's retail brokerage branch offices also perpetuates the culture. Merrill Lynch promotes largely from within its FA ranks, ensuring a consistent culture. *See* Ex. 52 at 54. As explained in Part III.F. below, Merrill Lynch managers sponsor new management candidates, who attend and are assessed at a single, nationwide assessment by the Firm's managers, who are likely to support and select managers who look and think like them.[14] Management candidates learn about the company's shared values and culture at the management assessment center ("MAC"). *See, e.g.,* Ex. 52, 12/1/06 Sieg Dep. at 234-37 (MAC has evolved over the years to reflect and support the culture of the Firm). The candidates who "pass" assessment become the next

---

[11] *See, e.g.,* Ex. 72, Talking Points 4/18/01, at MLE 00116-268, (in 2001 speech, former CEO O'Neal points to bull as symbol of Firm's "strong brand"); Ex. 67, P. Polito 10/17/03 speech, at MLE 00117 001600 (underscoring the "power behind Merrill's symbol, the bull… and global brand name").

[12] *See, e.g.,* Ex. 74 at MLEE 003 003316 (At 2005 GPC Manager's Meeting, O'Neal remarked, "Historically, Merrill Lynch has had a very strong culture – one of our hallmarks. It's one of our greatest strengths. It still is today"); Ex. 73, Excerpted Remarks from CEO on Managing in Difficult Times, at MLE 00117 – 000516; Ex. 127, Diversity Council Subcommittees Addressing Priority Issues, at MLEE 018 040007; Ex. 69, Leadership Model Frequently Asked Questions, at MLMRE 006 001327; Ex. 81, *DiversityInc – Wall Street's Top Black Execs Give Some Tips*, at MLEE 014 006460.

[13] *See, e.g.,* Ex. 66, Rewards & Recognition Planning, at MLEE 038 009641 (use of Firm-wide internal communication tools such as recruiting materials, meetings, web sites, leadership forums and recognition programs "To Further the Culture"); Ex. 60, Mercer Delta Consulting Memo, at MLEE 003 001463 (Merrill conducts Firm-wide surveys of its culture and each Executive Committee member "owns" the culture work of his or her unit); Ex. 144, GPC 2005 Training Plan, at MLE 00859 – 000889 (national new hire training program includes "Transitioning to ML"); Ex. 143, GPC 2004 Training Plan, at MLE 00859 – 001427 (same); Ex. 209, 2006 U.S. Based FA Incentive Comp. Pgm., at MLE 00040 – 000558-59 (national FA Recognition Club).

[14] *See* Ex. 52 at 93-94 (MAC a nationwide program with a single set of criteria for admission, single process for participation applied uniformly), at 82 - 84 (sponsorship by manager required for admission); Ex. 164 at MLEE 013 000186 ("veteran" managers serve as feedback coaches).

generation of branch managers responsible for hiring, training, mentoring and developing FAs and for distributing resources and opportunities in the offices they manage.[15]   This process again ensures cultural continuity.

### B.  The Firm's Culture is "White Male Dominated" and Exclusionary.

Top-level executives, board members and senior management readily admit the white male nature and exclusionary aspects of the Firm's corporate culture.  Former CEO Stan O'Neal ("O'Neal") and President of Global Private Client Robert McCann ("McCann"), among others, have acknowledged that Merrill Lynch's culture has long been "white male dominated" and exclusionary.  *See e.g.,* Ex. 74, 1/12/05 GPC Manager's Meeting Remarks, at MLEE 003 003317 (O'Neal described Firm's culture as "predominantly white male oriented"); Ex. 61 at MLE 00174 – 23 (in 2006, "McCann admitted that Merrill Lynch is a male, white-dominated environment").  As O'Neal said in a 2004 speech, "[t]he majority is white male – so that's what has been perpetuated." *See* Ex. 75, 10/13/04 ESO Talking Points, at MLE 001117.

Merrill Lynch has long acknowledged cultural obstacles to diversity and a need to "Drive Cultural Change" to improve, but has not achieved this change.[16]  *See* Ex. 94, 2001 USPC Diversity Exec. Summ., at MLMRE 006 001595.  As Dame Judith Mayhew Jonas, a former director of the Firm's external diversity board and current member of the Board of Directors, told managers at a 2006 national meeting, Merrill Lynch is "still a business more white and more male" and "the [diversity] numbers aren't there.  They don't support that we are an organization that 'gets it' in regards to equal opportunity."  *See* Ex. 70 at MLE 00256 – 000044, 49; *id.* at 43 (referring to Merrill Lynch's "exclusionary" cultural heritage).[17]

Consistent with the Firm's culture, its own research studies and reports confirm that African Americans are treated as outsiders and denied management support, mentoring,

---

[15] *See* Ex. 164 at MLEE 013 185; Ex. 52, 12/1/06 Sieg Dep., at 234 (same), 236 (managers responsible for competitive recruiting, hiring, training and mentoring).

[16] *See also* Ex. 68, African American FA Training Symposium Remarks, 6/29/04, at MLE 194 –796 (Head of Advisory Sontag notes "we do a lot around diversity …but don't really know which of these initiatives are most effective around creating a culture in which everyone has an opportunity to succeed").

[17] *See also* Ex. 56, DVD 17 at 108-111. Head of HR in 2001 presentation: "Why after so many years of programs focused on diversity does our FC population remain almost exclusively white and predominantly male?[...] It's the stereotyping and the exclusion from the naturally occurring networks and mentoring relationships that seem to be available to white men but still are formidable barriers for women and minorities").

resources and business and teaming opportunities.[18]  For example, in a 2005 Merrill Lynch
Research Study, African American FAs and managers reported their lack of support by managers
who "ignore and are not proactive towards helping an African American advisor to succeed" and
"lack of enthusiasm towards the African American FA," as well as concerns that "African
Americans advisors are 'shut out' of institutional deals and new offerings."  Ex. 64 at MLE
00951-904; *see also* Ex. 99, 12/10/03 African American FA Focus Group Notes, at MLE 00188-
712 (lack of management support for African American FAs in branch offices).  A presentation
to Mac Gardner ("Gardner"), Senior Vice President and Head of Americas, explained that the
Firm's largely white branch managers lacked affinity with "diverse markets."  Ex. 88 at MLE
00202 - 572; Ex. 46 at 106-07; *see also* Ex. 94 at MLMRE 006 001616 (a 2001 diversity study
concluded that "Diverse Financial Advisors often feel isolated, disconnected in the local branch
office.").

 The Firm's white male dominated, exclusionary culture disadvantages African Americans
and impedes their career advancement in a number of ways.  In January 2002, a widely
disseminated diversity study concluded, among other things, that the Firm's managers lacked
"the knowledge, experience, training and comfort levels to adequately create or manage a diverse
workforce" and that "management practices relating to the hiring, training, supervision and
support/coaching of women and minority FAs has led to low rates of success and high rates of
turnover among these groups." Ex. 93 at MLE 00003-146.  This same report explained, "[i]t is
more difficult for women and minority FAs to develop mentoring or coaching relationships.
Some of this difficulty can be traced to the uneasiness of the more experienced FAs with what
they believe to be the different business models of women and minorities.  There is also the
belief that women and minorities are likely to fail so mentoring is a 'waste of valuable time.'"
*Id.* at 174.  Widespread dissemination of reports espousing these stereotypical beliefs reinforces
this aspect of Merrill Lynch's culture.

 **C.  Merrill Lynch Culture Is Pervaded By Harmful Racial Stereotypes That Affect
 Decisions And Policies Regarding FAs And Clients And Perpetuate Racial Bias
 and Segregation.**

---

[18] *See, e.g.,* Ex. 94 at MLMRE_006_001615 (2001 Study noted "the existence of informal support and
developmental systems which largely exclude women and minorities.  These systems represent a major
impediment to the development of job skills and career advancement for these groups"); Ex. 168, 4/4/02
Consulting Group – Diversity ACTM at MLE 00196 - 000055 (2002 study that only 9% of African
American FAs were on teams in December 2001 compared with the firm average of 35%).

The Merrill Lynch culture is extremely race-conscious and pervaded by harmful stereotypes about African American FAs and the Firm's own clients and potential clients. Imbedded in the Merrill Lynch culture is a belief that African Americans lack the requisite skills to succeed. For example, a Merrill Lynch presentation to management acknowledged that African American FAs were excluded from teams because of negative assumptions about their competence. *See* Ex. 109 at MLE 206-646 (primary challenge to African Americans on teams is the "perception (or misperception) as to the competency of the AAFA in their marketplace."). Many plaintiffs similarly reported that their managers and colleagues viewed them along stereotypical lines.[19]

As reflected in company materials, Merrill Lynch makes assumptions and decisions about its African American FAs based on racial stereotypes about their backgrounds and social status. For example, a presentation to Merrill Lynch managers suggested that they encourage African Americans to "learn to play golf or other activities designed to learn how 'business gets done' in manners the AAFA might not be familiar with." *Id.* at 645. *See also* Ex. 98 at MLE 00179-000519 (HR report proposed that Merrill Lynch develop "training modules on culture, such as Country Club etiquette" for African American FAs). The management assessment process, too, is replete with harmful racial stereotyping, and thus teaches and perpetuates stereotypes to the Firm's managers. *See, e.g.,* Ex. 52 at 263 – 272 (depictions in MAC exercises of angry black female FA who is a low producer); Ex. 163, Business Issues: Situational Judgment Activity, at MLEE 013 405 (depiction of coaching an African American FA, described as "difficult," "articulate," "failing in the business," and "tough and abrasive" so "because she is not liked, nobody wants to team with her"). Negative stereotypes are so deeply ingrained in the Firm's culture that in 2001, the Firm explored looking for different abilities or skills in African American FAs than in non-African American FAs. *See, e.g.,* Ex. 92, 8/22/01 2001 Multicultural Business Plan, at MLE 00196 095.

These and many other company materials reflect and perpetuate the deeply imbedded

---

[19] *See, e.g.,* Ex. 31, Moore Dep. at 225 - 27 (at sales meeting for entire office complex, video shown of a white FA pretending to solicit two African American clients depicted by mug shots of two famous black athletes); Ex. 27 at 253-54 (sales manager taking photographs of FAs in his office told Johnson that he did not need to take his photograph because he could get it "from the police precinct"); Ex. 27 at 302-315 (manager sent Johnson to anger management classes after Johnson expressed disapproval of discrimination); Ex. 20 at 26-27 (White teammate to Bender-Jackson expressed belief that it did not look good for him to team with her; he no longer had access to account distributions, leads and referrals).

stereotypes that African Americans are fundamentally different from, and inferior to, their white counterparts in the business world. Evidencing this belief, the Firm even concluded at one point that "[t]he strategy to hire diverse FAs may be in conflict with a Managing Director's goal to maximize current revenue." Ex. 100, 9/03 FA Diversity Comparison Data, at MLE 00373-265.

Merrill Lynch's race-based corporate culture is also evident by its practice of racially steering African American FAs to African American clients and away from white clients, based in part on the Firm's unsubstantiated assumptions about the racial prejudice of its clients. *See, e.g.,* Ex. 42 at 139; Ex. 53 at 31. As one Plaintiff explained, "it has been my experience for more years than I can remember that Merrill Lynch has always tried to steer Financial Advisors of color to the market that looks exactly like them." See Ex. 25, Gibson Dep. at 50. Another Plaintiff testified that her manager directed her to build her book of business by focusing on African American clients. Her manager even followed a Mercedes-Benz car driven by an African American who was taking his family to church and wrote down the license plate number for her to track and prospect. *See* Ex. 20, Bender-Jackson Dep. at 77-79. A focus group of African American FAs and managers criticized the Firm's "always trying to fit an African American client with an African American advisor, especially when an advisor leaves the business. Because of the high turnover of African American advisors, this often results in a client being paired with 2 or 3 advisors just because they are African Americans. Ultimately, this 'shuffling' results in the client becoming frustrated and requesting a white advisor, because they feel they will provide a more stable relationship." Ex. 64 at MLE 00951 889.

Merrill Lynch views its clients and potential clients with the same stereotypical and race-based lens as it views its African American FAs. As a result, in addition to racial steering of African American FAs to African American clients, Merrill Lynch engages in the racial profiling, categorization and segregation of its clients by race, ethnicity, gender, and even religion, and the dissemination of harmful stereotypes about these groups in corporate materials. A prime example is the Firm's Multicultural and Diversified Business Development Group, now known as the Multicultural Marketing Group ("MMG"), which was formed with the approval of the CEO and which has always enjoyed support and leadership from the Firm's senior executives. Ex. 46 at 55-57. MMG was tasked for a time with both coordinating diversity activities across the Firm and developing diverse markets. *Id.* at 158; Ex. 92. To accomplish this task, Merrill Lynch segregated its "diverse" clients into different markets, using race-

10

matching to select a leader of each diverse market. Ex. 46 at 63-66. For example, the South Asian market was headed by an Indian woman, the African American market by an African American man, and so on. *Id.* For each racialized market niche, Merrill Lynch developed a national marketing plan, which set forth the group's relative wealth, geographic concentration, investment tendencies, and "cultural traits." *See, e.g.*, Exs. 82, 83.

The harmful stereotypes applied to African Americans were astonishing. The national marketing plan created for FAs to prospect affluent African Americans identified six "segments" of African Americans, including the "entertainer/athlete" "community leader/activist & small business owner," and "emerging." Ex. 82 at MLE 00666-326. Merrill Lynch then taught its FAs the "mindset" of each segment. According to Merrill Lynch, the "entertainer/ athlete" has a mindset that includes "money to burn/big spender;" the mindset of the "community leader/activist & small business owner" includes "don't trust the system" and "cash is king;" and the "emerging" African American has a mindset that includes "it's my time." *See id.* at 356 ("Segment markets based on core beliefs, lifestyle, buying behavior, age (*e.g.* Trendsetters, Assimilators, Business Owners, Technicians, Entertainers, Hip Hop, etc."); *see also* Ex. 48, Chopra Dep. at 104-05, Ex. 82 at MLE 00357-832.

As part of its national marketing plan, MMG also developed and issued "cultural sensitivities" in a "toolkit" designed to train its managers and FAs to penetrate diverse markets. *See* Ex. 90; Ex. 48, at 61-62. The toolkit contained gross generalizations and stereotypes, including the following "African American Market Cultural Sensitivities:"

- As a general rule, business etiquette [of African Americans] is identical to that of American customs. Ex. 90 at MLE 00666-72
- The church serves as the backbone of the community and a hub for socialization. *Id.*
- Almost half of all [African American] households are single-parent homes. *Id.*

It is not clear how categorizing African Americans as church-going folks from single parent households who follow the same business etiquette as "American customs" will assist Merrill Lynch FAs in garnering these clients. It is clear, however, that use of these "Cultural Sensitivities" reinforce stereotypes, including those regarding "Hip Hop" African Americans "who don't trust the system," throughout Merrill Lynch. Ex. 82 at MLE 00666 – 000356, 000319; Ex. 83 at 00357 – 000832. Though they supervised MMG and approved its activities, none of the Firm's top executives later defended use of these materials, and admitted they had no legitimate business purpose, calling them "ridiculous" and "offensive," among other things. *See,*

*e.g.,* Ex. 44 at 185-86; Ex. 43 at 194; Ex. 45 at 277.

As part of its multicultural activities, the Firm engaged a consulting firm to "ethnically code" its clients, using client names, zip codes and other information to determine race, ethnicity and even religion.[20]  After this racial profiling, Merrill Lynch then issued "Investment Profiles and Behavior By Race or Gender," also wrought with gross generalizations and stereotypes.  Ex. 82.  For example, according to these Profiles, African Americans, Hispanics and Women are not "Savvy Investors," although South Asians are financially savvy.  *See* Ex. 83 at MLE 00357-798. African Americans also "Need Education" and "Prefer Cash" investments, but are not "Fee Sensitive" or "Technical in Nature." *Id.*  These Investor Profiles were presented to the head of GPC.  *Id.* at 788; Ex. 48 at 106-07.  The Firm's generalizations that its African American clients are not financially savvy, lack technical skills, and need education harm the Firm's clients and reinforce such views regarding African American FAs.  *See* Ex. 2 at 35-36, 46.

After studying these and other materials, Plaintiffs' expert concluded that the Firm's "racialized approach to multicultural marketing led to the development of assumptions that to be successful, African American FAs needed to possess unique talents not identified as success factors for non-African American FAs." *See, e.g.,* Part III.A. re: African American hiring standards.  These business practices "create barriers for career advancement for African American employees, because they limit opportunities outside the racialized niche." Ex. 2 at 36. The materials themselves also activate and reinforce harmful stereotypes about African American clients and employees: "Merrill Lynch's racialized approach to business development is built upon cultural stereotypes, typecasts its African America FAs in a way that limits their opportunities to excel, and engages in racial profiling of its customers in a way that reinforces stereotypes." *See* Ex. 2 at 71.

## III.  Merrill Lynch Has Uniform Employment Polices and Practices That Disadvantage African Americans.

Merrill Lynch's GPC unit is centrally controlled by senior corporate executives, who make important strategy decisions and study, devise and implement uniform, Firm-wide policies and practices that govern the hiring, training, compensation, assignment of resources and

---

[20] *See* Ex. 86 at INFO 249 (contract for Merrill Lynch to license "ethnic code"); Ex. 87 at INFO 68 (invoice showing 3.2 million records processed for ethnic coding); Ex. 82 at MLE 00666 - 000290 (describing Donnelly process of racially profiling clients); Ex. 85, 10/25/05 E-mail re: Preliminary Ethnic Client Numbers, at MLMRE 001 24383 - 24391 (showing races and religions of clients that Merrill Lynch coded); Ex. 48 at 91, 92-100.

business opportunities, management selection, teaming, and other personnel issues of its FA workforce. The Firm's common set of personnel policies and practices disadvantage African Americans in virtually every aspect of their careers at Merrill Lynch.

### A. Merrill Lynch's Uniform Hiring Practices Harm African Americans.

1. <u>Merrill Lynch Excludes African Americans From the POA Program.</u>

Merrill Lynch boasts that its Paths of Achievement ("POA") national broker training program is the best on Wall Street. Ex. 43 at 121. But its national hiring practices from 2001 through 2006 systematically and intentionally excluded African Americans from participating in the program.

Merrill Lynch grants its nearly all-white management team the discretion to make hiring decisions, allegedly subject to Firm-wide guidelines. Required recently by the Office of Federal Contract Compliance Programs ("OFCCP")[21] to verify its hiring practices, Merrill Lynch described a "company wide" process for selecting FA Trainees for the POA. Ex. 136 at MLE 02231-000112. Under its national hiring process, a designated manager first meets with candidates, then administers two examinations, the Financial Information Aptitude Test ("FIAT") and the Financial Advisor Selection Test ("FAST"). *Id.* Only applicants who receive a Recommended or Highly Recommended score reportedly may proceed with the interview process for POA, using company-wide selection forms and preprinted "Candidate Interview Forms."[22] *Id.* Based on the candidate's score and interview feedback, the manager decides whether to extend an offer to join POA. *Id.* Merrill Lynch acknowledges that through this hiring process or otherwise, it has not identified any differences between African Americans and whites in the factors that lead to success as a broker. Ex. 44 at 34; Ex. 43 at 54-55; Ex. 42 at 23-36; Ex. 46 at 297-299.

Contrary to what Merrill Lynch reported to the OFCCP, its Director of Human Resources testified that Directors are *not* required to follow the Firm's hiring policy to select POA candidates. Ex. 45 at 215-216. "Lacking a consistent hiring standard or review, managers have near absolute discretion in recruiting and hiring." Ex. 93 at MLE 0003-172. Given this discretion and the Firm's exclusionary, biased culture, it is not surprising that managers do not recruit and hire African Americans. Instead, managers rely on their subjective judgments and

---

[21] OFCCP administers and enforces Executive Order 11246, which bans discrimination and requires Federal contractors to take affirmative action to ensure equal employment opportunities.
[22] Few forms were produced in this case; it does not appear that they are used with any regularity, if at all.

stereotypes about African Americans. *See, e.g.,* Ex. 94, 2001 Study, at MLMRE 006 001613 ("Lacking standard requirements for job performance and competence, interviewers often disproportionately rely on the 'fit' concept"). Even Merrill Lynch managers admit their lack of comfort or knowledge when prospecting minorities and assessing minority candidates' business strategies. Ex. 93 at MLE 00003-00174. As a 2005 Research Study reported, given the Firm's hiring practices and culture, "[m]anagers are more apt to hire a white person out of school for the POA program than an African American." Ex. 64 at MLE 00951-903.[23]

Consistent with the Firm's race-based culture and beliefs about the racial preferences of its clients, Merrill Lynch applies more onerous hiring standards to African Americans than whites. For example, in a Diversity POA training guide, a long-time manager states that "when hiring diverse individuals, we look for candidates with previous work experience who have obtained their MBA." Ex. 137, Diverse POA Hiring Guide, at MLE 00137-1184. *See also* Ex. 20 at 107 (manager happy to talk to African American candidates if they had at least a master's degree). There are no such standards for majority candidates, for whom a bachelor's degree is only "preferred," not required. Ex. 136 at MLE 02231-000115. Similarly, African Americans are often grilled about their contacts and business plans, unlike white candidates. *See* Ex. 33 at 114-116, 202-209.

Merrill Lynch studies and reports also reflect the more rigorous standards applied to African American candidates. For example, the 2001 Multicultural Business Plan included guidance to train managers hiring into the FA training program "to be adept in identifying these skills/characteristics found in successful diverse FAs" which include "an ability to build relationships with individuals they are not comfortable with," "thick skin, fearless,"[24] and the

---

[23] As a 2001 study concluded, the Firm's branch managers lack a commitment to diversity and tend to recruit from non-diverse sources. *See, e.g.,* at MLMRE 006 001612 (hiring issues include managers lack of commitment to diversity and "pool of diversity candidates at schools that USPC historically has recruited from is smaller than desired"). Another study found that "the Firm's passive methods of recruiting - primarily referrals and applications - work well for White males but have not produced enough quality women or minority candidates. The overall process tends to be self-replicating." Ex. 93 at MLE 00003-172.

[24] According to Subha Barry ("Barry") Merrill Lynch's Head of Global Diversity, no systematic job analysis went into developing the profile of skills presumed to be needed to be a "successful diverse FA." *See* Ex. 46 at 294-296. To Barry, thick skin meant the ability of candidates to let rejection "flow off their back," even if due to race. *Id.* at 295. Barry further testified regarding her own stereotypical beliefs that African American FAs at Merrill Lynch lack the skills to succeed. She claimed "there are enough African Americans that actually would have the ability to have all those characteristics and succeed in the business," but they are in jobs at other firms "where the barriers to entry are not as difficult." *Id.* at 298.

"ability to thrive in an environment where they are the minority."[25]  Following a focus group with successful African Americans, HR similarly recommended that Merrill Lynch hire only grade "'A-people' African Americans" or those with "transferable experience and skills" such as "tough skin." Ex. 98, 12/03 African American FA Task Force Focus Group, at MLE 179-517.

The results of the Firm's hiring process demonstrate its company-wide practice of segregation and exclusion of African Americans from the Firm's POA program.  *See, e.g.,* Ex. 94, 2001 USPC Diversity Executive Summary, at MLMRE 006 001613 ("Representation of diverse [FA]s in branch offices poorly reflects the demographics of the surrounding community").  For example, as of the date this lawsuit was filed, Merrill Lynch did not employ tenured African American FAs in the majority of states, denoted here in red:



Ex. 44 at 37; Ex. 43 at 70-71.  Thus, the first challenge for African Americans is getting hired at Merrill Lynch.

        2.    <u>Low African American Representation Harms All African American Employees</u>

Merrill Lynch's failure to hire and retain African Americans has important consequences for African Americans who work for the Firm.  Due to the Firm-wide discriminatory practices discussed herein, African American FAs and Trainees are literally "few and far between" and outnumbered by more than 70 to 1 in the FA workforce. Ex. 2 at 11-12.  A large body of social science research explains the negative consequences of a highly skewed workplace for the career experiences and outcomes of those who are in the minority. *Id.* at 17-18.  Thus, "low African American representation, especially among FAs and the managers who supervise them, is a key aspect of the *organizational context* for Merrill's African American employees." *Id.* at 17.  For example, social science research shows that African Americans and other persons of color in

---

[25] Ex. 92 at MLE 00196-95.  The MMG "Toolkit" repeated this list. Ex. 97 at MLE 00991-543.

predominately white work settings receive less support in the form of mentorship and professional development, are more likely to be socially isolated, and are more likely to be excluded from informal workplace social networks than their white peers.[26]  *See also* Part II.A. Accordingly, African Americans must not only overcome Merrill Lynch's exclusionary hiring practices, they must also survive in isolation, to their detriment, once employed at Merrill Lynch.

### B.  Merrill Lynch Has A Uniform, National Broker Training Program.

Merrill Lynch employs a national, Firm-wide broker training program, the POA, which is governed by an annual POA Program Guide that sets forth the program's requirements.  *See* Ex. 49, Cassidy Dep. at 5-6, 23, 26-30.[27]  POA candidates undergo up to four months of training while working in a branch office and obtaining industry licenses. *See* Ex. 141, 11/14/02 POA Program Redesign, at MLE 00053 - 001322-23; Ex. 52 at 356.  Thereafter, the candidate may spend another four months in a branch office observing and learning before he or she receives a production number[28] and is officially considered a Trainee.  *See id.* at 356.  Merrill Lynch offers Trainees two forms of training: (1) local branch office training, including mentoring by seasoned FAs, and (2) national training by invitation only at Merrill Lynch's headquarters in Princeton, New Jersey.  Ex. 53 at 5-9.  As discussed *infra*, the Firm employs a national "quintile" ranking system, which places POAs from across the country into five quintiles based on the assets in a Trainee's production number and the commissions generated from those assets.  *Id.* at 16-17.

---

[26]Although each class representative spoke about social isolation and exclusion from networks, Frankie Ross explained it poignantly, "[w]hen I think of the culture at Merrill Lynch, it just - it causes me to build up an emotion that I have to control because it hurts. It's difficult to explain verbally the pain that I feel and the pain that I have heard other [African American] brokers express in many of the meetings that we have had and the conversations that we have had about the treatment, the isolation, the lack of interest, the feelings that we don't belong that permeate, you know, our system.  When we think about the number of African Americans in the different offices around the United States and in my office in particular, where I have been for the most part the only African American over 20 years and certainly the only successful one over the last 20 years and the only one that's been around longer than three years, it's a feeling that's hard to put to words.  The culture where you're excluded from invitations to events, invitations to –invites to homes, invites to lunch a culture where to a great extent people don't know who you are, they don't know you as a person, they don't know much about you. You are just there. They don't respect you. You are not invited to participate to a great extent as an equal.  That's the culture that I have experienced at Merrill Lynch and that the culture that many of the [McReynolds] steering committee members and many of the members, that are part of the class, people that you now, just talk at our symposiums, where we get a chance to interact with different brokers across the United States, they express very similar feelings about their experiences at Merrill Lynch."  *See*, Ex. 32, Ross Dep. at 108-110.

[27] *See* 2001 – 2006 Program Guides at Ex. 191, Ex. 192, Ex. 193, Ex. 194; Ex. 195; Ex. 196.

[28] Merrill Lynch assigns each FA a production number, which records and tracks client transactions and the commissions they generate to each FA.  *See* Ex. 53 at 6.

Although the criteria changed somewhat from 2001 to 2006, to attend the first live training sessions in Princeton, New Jersey, Trainees typically had to rank at least in the top 40%, or in the 1st and 2nd quintiles, in the national ranking system. *Id.* at 8. To attend the remaining three national POA training modules, the Trainee must rank no lower nationally than the 3rd quintile. Ex. 53 at 19. To graduate from the POA and become a full fledged FA, a Trainee must meet the national "hurdles" set forth in the POA Guide for assets under management and commissions generated. *See, e.g.,* Ex. 49 at 87; Ex. 191, 2001 Program Guide, at MLE 00010 - 000304; Ex. 196, 2006 Guide, at MLE 00302 - 000004-5.

Although Trainees compete based on their assets and production, Merrill Lynch does not require that they generate the assets or commissions on their own or through their own efforts. Instead, rankings are based on total commissions generated and assets under management in a Trainee's production number, regardless of the source of the assets, and including accounts given by another FA, inherited in a distribution, shared with another FA or assigned by a manager. Ex. 53 at 15-18. Thus, Trainees are credited with accounts of prospective clients who walk or call in to the office request an FA, accounts generated by leads or referrals provided by the Firm, and accounts transferred from other FAs in the office.[29] *Id.* at 14-15. Due to racial bias and the Firm's exclusionary culture, African American Trainees do not receive the same account opportunities from other FAs or managers as white Trainees.

Perhaps most importantly, Merrill Lynch allows Trainees to pool accounts or form teams and share accounts or commissions with other Trainees or established brokers.[30] *See* Ex. 55 6/1/07 Sieg Dep. at 18-19. As explained in Part III.D., due to the Firm's discriminatory teaming practices, African Americans are disproportionately excluded from teams, which also causes harm in the POA program. *See, e.g.,* Ex. 93 at MLE 003-00175 (2002 survey recognized, Merrill Lynch's "voluntary model for forming teams appears to disadvantage women and minority FAs … Many managers recognize the value of the team as a training tool but few new women or

---

[29] Until July, 2006, no Merrill Lynch policy prohibited "FA to FA" transfers, which benefited white Trainees because: (1) Senior FAs often redirected accounts received through the Firm's account distribution policy to Trainees; (2) Senior FAs were urged to "cull their books," or to shed certain client relationships to free time to work on larger accounts. Ex. 116, GPC FA Account Distribution Policy Review, 9/7/05, at MLE 00034 23-24; Ex. 117 at MLE 00100 51-53; Ex. 54 at 213.

[30] A pool number is assigned to an account to be shared by team members who agree to a percentage split of commissions only for the pooled account. Ex. 55 at 8-9. Teams, as opposed to pools, exist when more significant portions of the team members' businesses merge and they derive at least one-third of their commissions from the pooled accounts. *Id.* All team assets are merged under a single team number. *Id.*

minority FAs get early team assignments."); Ex. 55, 06/01/07 Sieg Dep. at 53 (Firm study determined there was a higher retention rate of POAs on teams). Thus, African Americans lose accounts that white Trainees receive through pools or teams. As a result of the above, Trainees compete against other Trainees in the POA program, but the rankings are not based on quantity or quality of the business brought in solely by the POA.

Professor Madden studied African American and white Trainees during the POA program. Given the Firm's culture and discriminatory practices, whites complete Merrill Lynch's POA program at a rate and performance greater than African Americans due to racial bias and race-based exclusion from networks, including teams. Professor Madden found that African American Trainees are disproportionately excluded from teams and pools, receive fewer client accounts and less productive client accounts during the POA program, and graduate at a lower rate than white Trainees. Her findings included the following:

- African American Trainees were less likely than whites to participate in pools by statistically significant margins;[31]

- African American POAs were less likely than whites to participate in teams by statistically significant margins;[32]

- The racial differential in pool and team participation is associated with approximately one-third of the higher drop-out rates for African American Trainees;

- At the time of graduation from POA, African American Trainees had accounts valued $10.6 million less than those of white Trainees, a difference of 5.89 standard deviations. African American Trainees' accounts averaged $54,000 less in production credits over the duration of the POA program than the accounts of white Trainees;

- In the first two months in the POA program, white brokers received accounts totaling an average of over $1,000,000 in asset value per Trainee, while African Americans received accounts totaling an average of less than $500,000. Again, these differences are statistically significant;

- In most months of the POA, white Trainees received accounts that had significantly higher average total asset values than those distributed to African American Trainees.

*See* Ex. 1 at 7-9. Professor Madden found that the racial favoritism begins in the very first month of the POA program, when African American Trainees received account distributions

---

[31] Beginning in 2002, 39% of white POAs but only 20% of African American POAs participated in pools for a difference of 3.24 standard deviations. Ex. 1 at 8. The outcome was about the same from 2003-2006 with the standard deviations ranging from 2.48 to 3.53 difference in favor of whites. *Id.*

[32] After 12 months in the POA program, an average of 12% of African American POAs and 26% of white POAs are team members (4.73 standard deviations); after 24 months in the POA program an average of 18% of African American POAs and 35% of white POAs are in teams (3.57 standard deviations). *Id.*

with asset values of $186,935, while white POAs received $538,555, for a difference of 6.21 standard deviations.  Ex. 1 at 43-44.  African American POAs cannot compete against white Trainees assigned accounts by management or gifted accounts by white brokers.

As a result of Merrill Lynch's discriminatory polices and practices, only 26% of African Americans completed the POA program from 2001 to 2004. *See* Ex. 1 at 42.  The racial difference in the likelihood of graduating the POA is 5.53 standard deviations and is consistent with a finding of racial discrimination.  *See* Ex. 1 at 43.

> Opportunity Hoarding

Citing Sociologist Charles Tilly, Professor Bielby describes the phenomenon of "opportunity hoarding" as what happens when the dominant group forms tight social networks that have control over resources, and concluded that this phenomenon resulted from Merrill Lynch's policies and practices.  Ex. 2 at 25-26.  This concept applies via many of the Firm's policies and programs, including the POA program:

> If members of a group acquire access to a resource that is valuable, renewable, subject to monopoly, supportive of network activities, and enhanced by the network's modus operandi, network members regularly hoard access to the resource, creating beliefs and practices that sustain their control. If that network is categorically bounded, opportunity hoarding thereby contributes to the maintenance of categorical inequality.

*Id.* As Plaintiffs' expert explains, as applied to Merrill Lynch, teams comprise the network, inherited accounts (accounts of departing FAs that are transferred to team members who stay with the Firm) comprise the renewable resource that is supportive of the network and race is the categorical boundary.  *Id.* at 26.  The exclusion of African Americans from teams and pools and the disproportionate directing of accounts to white Trainees give whites an unfair advantage. The Firm's systems compound this injury to the tremendous disadvantage of African American Trainees, including by conditioning valuable training on quintile ranking. *See* Ex. 93 at 174 (Per Merrill managers: "Princeton POA training either does not happen for women and minority FAs or comes too late, due to high turnover or failure to meet the performance requirements.")

**C. Merrill Lynch's Firm-Wide Cumulative Advantage Systems Compound Racial Discrimination.**

To make matters worse, Merrill Lynch intentionally compounds the racial favoritism toward whites in the POA and throughout an FA's career through its cumulative advantage policies and practices.  As with POAs, Merrill Lynch relies on a national quintile system to rank

19

all FAs. The Firm groups and compares FAs in similar length of service ("LOS") "bands" for purposes of ranking and dividing them into quintiles.

Due to their differential treatment during the POA program and afterwards, the 26% of African Americans who complete the POA program rank well below their majority peers by the time they reach an LOS at Merrill Lynch of three years. *See* Ex. 1 at 75-76 (for 2005-2006). In a normal, race-neutral distribution, 20% of African Americans would reside in each of the five quintiles. However, African American FAs are over-represented in the fourth and fifth, or lowest quintiles, as shown in the following graph for the year 2006, which tracks whites in blue and African Americans in red by LOS three to five years.



*See* Ex. 1 at 76. Thus, by LOS 3-5, over 70% of African Americans are in the bottom two quintiles, where only approximately 40% should reside. Conversely, only 10% of African Americans make it to the top two quintiles, rather than the approximately 40% expected in a normal distribution. African Americans were distributed 3.3 standard deviations lower across the quintiles by LOS 10 or more, relative to whites, from 2002 to the present. Ex. 1 at 5. Similar results occur in each LOS band.[33] Clearly, the disadvantages faced in the POA penalize African Americans throughout their careers. Equally important, discrimination at any point during an African American FA's career is intentionally and continually compounded through the quintile and similar systems, which require African Americans to compete at an unfair disadvantage

---

[33] *E.g.*, a Merrill chart showed in 2003, there were zero African American brokers in the first quintile in LOS 6-9. Ex. 44 at 83-84. Merrill Lynch distributes these quintile rankings company-wide to managers.

against whites.

Merrill Lynch and its top executives have long known that African Americans are overrepresented in the bottom quintiles and "exhibit the greatest disparity from expected levels when measured by production quintiles." Ex. 43 at 168; Ex. 47, Kim Pillar Dep. at 147-148; Ex. 42 at 194-96; Ex. 93, at MLE 00003-157. Nonetheless, Merrill Lynch relies on its national quintile ranking system and commissions in an FA's production number, or "production," to distribute valuable resources, business and advancement opportunities to FAs, including accounts from departing brokers. Quintile rankings are used to exclude African Americans from management, because an FA must rank in the 1st or 2nd quintile, and in some instances the 3rd quintile to attend the MAC. Ex. 42 at 123. Similarly, Merrill Lynch relies on an FA's production to assign offices, titles, sales assistant support and award other perks such as expense accounts and reward trips.[34]

Social scientists refer to systems such as the quintile system or reliance on production as systems of "cumulative advantage." Ex. 2 at 13. In a cumulative advantage system, factors that result in even small disparities between individuals have a negative, cumulative impact. *Id.* at 13, n. 13. "[W]hen organizational policies and practices give one group an advantage over the other, even if it is just a mild benefit of 'tailwind' favoring the advantaged group, small discriminatory disparities grow to large ones." *Id.* at 14.

There are two ways in which Merrill Lynch's cumulative advantage systems harm African Americans. First, any discrimination in the training program or during the careers of African American FAs causes them to lag behind in production, while whites launch ahead. *Id.* at 13-14. The gap between African Americans and whites is widened when a cumulative advantage system misperceives whites as better and, therefore, provides them with greater resources, opportunities and support on the pretext that they earned it, when in truth the disparities are due to racial bias. *Id.* Under the Firm's cumulative advantage system, for example, white Trainees in higher quintiles due to accounts received through teams that exclude

---

[34] *See* Ex. 51, Hogarty Dep. at 234 (titles awarded on production). *See also* 2001 - 2006 Compensation Guides: Ex. 204 at MLE 00040 000868-69, 855-856 (2001); Ex. 205 at MLE 00012 000153-154 (2002); Ex. 206 at MLE 00040 000652-668 (2003); Ex. 207 at MLE 00113 000092-94 (2004); Ex. 208 at MLE 00040 – 000604, 592-593 (2005); Ex. 209 at MLE 00040 – 000570, 558-59 (2006). *See* Ex. 45 at 84-85, 90; Ex. 42 at 227-28 (production a factor in awarding office space); Ex. 45 at 88-90 (sales assistance awarded based on production); *Id.* at 85-86 (admission to Recognition Clubs and expenses accounts based on production).

African Americans will qualify for national training and additional accounts under the Firm's policies, which count such production toward eligibility rankings.[35] *Id.* African American Trainees must compete on an unequal planning field then fall behind because of accounts that were not gifted to African Americans on account of race and lose out on additional benefits. *Id.* at 28-29.

Second, when asked to explain the reason for entrenched racial disparities at Merrill Lynch, the Firm's top executives testified that African American FAs are disadvantaged because they must "cross racial boundaries" and lack access to social networks of wealthy individuals. Ex. 42 at 129-32, 138-39, 142-145, 147-148, 150, 245-246, 269-70. Ex. 45 at 120-121, 127-130; Ex. 43 at 265-270. This assertion demonstrates how deeply stereotypes are ingrained in Merrill Lynch's culture. One executive explained that to be successful, African Americans must "cross into the white community." Ex. 45 at 128-129. He explained that an African American FA might prospect a client over the phone with success only to meet for the first time and have the prospective client realize that the FA's race; the African American FA would then have "an additional need to cross over and dissipate that" barrier. *Id.* at 129. Merrill Lynch believes that since "the concentration of wealth in most parts of this country is mostly in the hands of whites," African Americans face an additional burden to reach across racial and cultural barriers and reach white wealth. Ex. 42 at 130-31. To Plaintiffs, this is an elaborate way of saying that Merrill Lynch believes its clients harbor racial animus that impacts the production of FAs.

Under Merrill Lynch's cumulative advantage quintile system, white Trainees and FAs are treated as better, and African Americans are punished, due to differences the Firm believes are due in part to customer bias. Although Merrill Lynch might argue it cannot control customer bias, the Firm has chosen to implement a common set of policies and practices that exacerbate the impact of any such bias, while maintaining the pretext that decisions are merit-based. For example, if an African American loses accounts due to customer bias that white FAs do not face, whites will rank higher on the eligibility rankings and receive larger and more profitable account assignments, as well as better resources such as offices and sales assistance.[36] Thus, when Merrill Lynch distributes accounts and resources under a cumulative advantage system, it intentionally punishes African Americans for both internal bias and for what it believes is the

---

[35] *See* Ex. 191 at MLE 00010 – 301; Ex. 192; Ex. 193; Ex. 194; Ex. 195; Ex. 196.
[36] For most of the relevant period, only FAs not in the fifth quintile qualified for account distributions.

racial bigotry of its customers,[37] thus institutionalizing the bias and widening the racial advantage.[38]

### D. Merrill Lynch's Teaming Practices Are Uniform and Harm African American POAs and FAs.

The racial bias Merrill Lynch readily admits exists in the real world does not end at the Firm's door. The Firm's teaming policies and practices plainly demonstrate its racial bias and unlawfully segregate and discriminate against African Americans.

As discussed above, FAs can merge businesses and share accounts and commissions through teams. Teams are governed by written team agreements that must be reviewed, signed and approved by management. *See, e.g.,* Ex. 174 at MLEE 010 – 50; Ex. 175 at MLEE 024 178942. Merrill Lynch actively promotes teams to FAs through Firm-wide teaming practices, and teams have been embraced and promoted at the highest level of management, including by the Firm's CEO.[39] Merrill Lynch even formed and devoted an entire corporate department, the Team Consulting Group, to support, study, promote, and develop uniform policies and guidelines

---

[37] The parties vigorously dispute the degree to which external racial bias affects African Americans. Plaintiffs contend that Merrill Lynch exaggerates external forces and assumes that the highly improbable attrition, compensation and promotion outcomes are due solely to customer bias or lack of access to social networks of wealthy individuals. It readily accepts society's bias but claims it ends at Merrill Lynch's doors. Merrill Lynch offers no proof to support its assumptions of its clients' bias, that the *McReynolds* class members lack access to wealth, or that white FAs automatically have access to wealth. Ex. 42 at 130-3. As Plaintiffs' expert explained, "educational gains and occupational mobility have contributed to the emergence of a growing African American affluence." Indeed, many of Merrill Lynch's African American FAs attended prestigious colleges and universities, had experience in professional careers before joining the firm and come from relatively advantaged family backgrounds. Conversely, many white and non-African American FAs did not attend elite institutions and came from modest, working class and lower middle class backgrounds. *See. e.g.,* Ex. 2 at 16; Ex. 145 at P 04424-4521; Exs. 146 – 162. Plaintiffs also believe Merrill Lynch exaggerates the degree to which African Americans face external bias it offers as an excuse for African Americans lack of success. "Simply assuming that African Americans FAs will face rejection from whites, have difficulty crossing cultural boundaries, and lack access to networks of wealthy individuals can activate and reinforce stereotypes, in the same way as does assuming that many of the African American clients that the African American FAs are encouraged to prospect for business are in single-parent family households or that potential clients who are African American community leaders have a 'cash is king' mindset." *See* Ex. 2 at 45-47; *see also* discussion, *supra*, at Part II.

[38] The Firm's CEO admitted that racial bigotry on the part of prospective clients is a factor that explains some of the differences in outcomes for African Americans compared to whites. Ex. 42 at 152.

[39] Ex. 106 at MLMRE 009 005282-83, 2001 Remarks by head of HR to Board ("we know that there are compelling productivity and retention reasons to encourage our FAs to form teams"); Ex. 57, DVD 0003-000003, at 11-12, O'Neal 2003 speech to management ("[W]hat we can do better than anyone else is having 13,000 successful relationship managers working in teams. Our job in management is to make it easier for you to create and maintain these critical relationships"); Ex. 76 at MLE 00190 – 000454 (2005 McCann speech); Ex. 169 at MLEE 005 001818, 2006 (McCann presentation).

for FA teams. Ex. 55, at 108-110. The Team Consulting Group is headed by senior Merrill Lynch executives and regularly issues uniform materials about teams to all managers and FAs. *Id.* In these and other ways, managers are provided with uniform guidance about how to arrange, manage, support and promote teams from inception through dissolution.[40] *Id.* at 108-112; 55-59*;* Ex. 44, at 152. Thus, Merrill Lynch management actively participates in forming teams.

Teams provide substantial benefits to team members.[41] In promoting teams, Merrill Lynch regularly pronounces that "1+1=3." *See* Ex. 55 at 33-35. Merrill Lynch studies reveal that FAs in teams have higher assets and production, higher levels of retention, and more high net worth clients than FAs who are not in teams. *See, e.g.,* Ex. 171, MLE 00134 - 000044-66. Perhaps most importantly, team members inherit the assets of departing team members. Thus, while the Firm distributes the assets of departing brokers who are not on teams pursuant to rankings on a national account distribution policy, team members inherit assets of departing team members without going through the ranking process. For example, if an FA knows that he is going to retire, he can establish a team with another FA and transition his book of business to that FA.[42] Ex. 118 at MLE 00190 - 212 (problems with account distribution policy include FAs

---

[40] *See, e.g.,* Ex. 186, "Focus on Formation: Director Resource Guide for Building High Performance Teams;" Ex. 182, "Team Dissolution Guide for Managers;" Ex. 176; Ex. 174, "Team Formation: 10-Step Process;" Ex. 173, "Team FAQs;" Ex. 175, "Steps to Completing Team/Pool Agreement;" Ex. 178, "Team Formation Workbook;" Ex. 179; Ex. 172; Ex. 180, "Team Compensation Agreement;" Ex. 181; Ex. 177; Ex. 189; Ex. 190 at MLE 00149-429; Ex. 183; Ex. 184; Ex. 188; Ex. 185; Ex. 187.

[41] According to Merrill Lynch, teams allow for better client service, improved client acquisition and production, client coverage when an FA is out of the office, joint marketing, and synergies of skill sets and specializations, among other benefits. *See* Ex. 55 at 35-37; Ex. 112 at MLE 00053 - 504-513; Ex. 183 at MLE 00155 - 000683. Participation in teams can help a more junior FA attain new clients and succeed at the Firm; help "save" a failing FA; or help transition the accounts of a retiring or departing FA to a team member. *See* Ex. 142 MLEE 016 036844 - 36848-51; *Id.* at MLEE 016 036853-56 (Firm estimates $185 million in savings from reduced hiring and overhead through improved retention of teamed FAs); Ex. 173 at MLEE 010 000031 ("often existing teams are looking to add expertise, provide more in-depth client service, or cultivate a partner for an impending FA's retirement); Ex. 113 at MLE 00295 - 001078 (teams improve production and retention of POAs and FAs, specifically with respect to average assets and production credits); Ex. 114 at MLE 00819 - 000607. Indeed, in 2003, Stan O'Neal proposed teaming as the foundation of GPC's business model. Ex. 57, MLE DVD 003-000003, at 11-12.

[42] This can happen a number of ways. An FA can set a team production split to reflect a planned retirement so that the split may start at 90% to 10% ratio in favor of the retiree and move to 100% in favor of the staying team member over time. Also, a team member can inherit a retiring FA's book of business under the account distribution policy. For example, if a junior and senior FA form a team with the senior FA placing $250 million in client assets in the team agreeing to a 90/10 split in favor of the senior FA, the junior FA will inherit all assets under the national account distribution policy three years later when the senior FA leaves. Even if the senior FA leaves before three years, the junior FA receives a distribution equal to his share of the team plus a team incentive. Thus, if two FAs form a team weeks before an FA

"pre-selling" their books and ineligible team members receiving accounts). Any inheritance through teaming places the inheriting FA at an advantage to acquire points under the national ranking systems on future account distribution of departing FAs. Team members can similarly structure their splits to maximize their earnings and entitlements.

In order to form teams, African Americans must team with whites because they largely work in offices in which there are no other African Americans. Instead of presenting African Americans as able partners to white FAs in any market, Merrill Lynch's racialized culture dubs the problem of teaming for African Americans as "the lack of recognition by those seeking team members that AAFAs bring a perspective on the African American marketplace." Ex. 109 at MLE 00206-646. Merrill Lynch also blames African Americans for their lower participation rates on teams, suggesting that they "might be encouraged to learn to play golf or other activities other activities designed to learn how 'business gets done" in manners the AAFA might not be familiar with." *Id.* at 645. Merrill Lynch management participates in the segregation by failing to find and facilitate team opportunities for African Americans and knowingly allows its white FAs to engage in exclusionary practices and segregation because it assumes that if Merrill Lynch "forced" white FAs to team with African Americans, they would leave Merrill Lynch. Ex. 55 at 65-66. Fear of flight, however, has never been a lawful excuse for segregation.

The exclusion of African Americans from teams is harmful. For example, racial differentials in compensation and account transfers are significantly associated with racial differentials in the likelihood of participating in teams and/or pools with other brokers. Between 15% and 28% of the racial disparity in compensation is associated with pool and team membership policies at Merrill Lynch. *See* Ex. 1 at 6. Thus, to the extent African Americans are allowed to participate in teams, the compensation disparities lessen but remain statistically significant. *Id.* at 12-19.

In the FA population, no less than 50% of whites are on teams, nearly double the African American rate. Ex. 1 at 6. The following chart represents the participation rates of full-fledged FAs by race during the liability period:

---

retires and combine assets with a 50/50 split, the remaining FA will receive his 50% of the book, plus an additional 50% of the departing FA's book as a "team incentive."

| | Pools | | Difference Standard Deviations | Teams | | Difference Standard Deviations |
|---|---|---|---|---|---|---|
| | African American | White FAs | | African American | White FAs | |
| 2001 | 34% | 60% | 5.43 | N/A | N/A | N/A |
| 2002 | 37% | 65% | 5.89 | 23% | 50% | 5.38 |
| 2003 | 48% | 68% | 4.46 | 27% | 51% | 4.94 |
| 2004 | 55% | 71% | 3.63 | 26% | 51% | 5.16 |
| 2005 | 48% | 73% | 5.69 | 26% | 51% | 5.27 |
| 2006 | 52% | 76% | 5.70 | 25% | 52% | 5.65 |

*See* Ex. 1 at 60.  For 2006, the probability that the racial difference in team participation would exist due to chance or in the absence of racial differences is .000000016, a probability of an event that occurs 16 times in one billion instances.  *Id.*

Rather than address the segregation and systematic exclusion of African Americans from teams, Merrill Lynch offered African Americans token participation in a lesser form of teams called "virtual teams."  Under virtual teams, African American FAs from different offices were encouraged to team with each other rather than with white FAs in their offices.  According to Merrill Lynch, "by combining the talents of a group of FAs, the diverse team is able to capitalize on the different strengths and talents found within the group, particularly in non-traditional markets  (e.g. athletes, entertainers, casino operators, et al)." Ex. 109 at MLE 00206-642.  To promote diverse virtual teams, Merrill Lynch pledged to "focus on AAFA teams (via media) in local markets." *Id.* at 639.  The virtual team experiment failed African Americans, who were forced to team with African American FAs in other offices, making communication difficult and depriving the virtual team of dedicated office staff, common phone lines, or management support or accountability.  The experiences of class representatives underscore that this "separate but equal concept" was a failure.[43]

---

[43] Plaintiff Rocky Howard ("Howard") was strongly encouraged to form a virtual team of African American FAs to pursue black business by the head of the Firm's diversity group, and asked for and received from management the names of African American FAs in the Dallas/Fort Worth region. Ex. 26, Howard Dep. at 213-214; Ex. 26; 429-434. Obviously, it would not be lawful for a white FA to ask his manager to identify white FAs from other offices so that he could form a team of white FAs.  Segregated teams are not lawful simply because the team members are African Americans.  These FAs came from four different offices, making it difficult to coordinate schedules or to get together as a group.  *Id.* Working in different offices with no dedicated phone for the team for prospective clients, no dedicated staff, and no dedicated manager for assistance, and without the support and resources given to white

Virtual teams also served the interests of managers who did not want to hire African Americans. For example, in offices or regions in which there were no African American FAs, white FAs could "borrow" an African American from a different office or region for a client presentation. As one plaintiff explained, virtual teams were a way for white FAs *not* to team with African American FAs but to "sort of rent or borrow an African American financial advisor to pitch business to say, the endowment of an historically black college, for example, … any kind of African American prospect. And then when the business comes in disproportionately and in many cases the African American is cut out from the benefits of landing that business." *See* Ex. 27, Johnson Dep. at 93, 224.

In sum, due to racial bias and assumptions that white clients will not work with African American FAs, Merrill Lynch refuses to support, encourage or arrange favorable teams for African Americans. Virtual teaming is not a lawful response or beneficial substitute for including African Americans on real teams. As a result of the Firm's teaming practices, African Americans are denied the many benefits that can accompany team participation. Because Merrill Lynch's cumulative advantage policies favor teams, and thus white FAs, African American FAs are forced to compete with white FAs who have been assisted by teams from which African Americans are excluded. White team members receive assets, production, management and administrative support, and other benefits. As a result, they receive a greater share of departing FA accounts, as well as better offices, sales assistance, titles, expense funding and other resources that are essential to developing and servicing clients.

### E.  Merrill Lynch's National Account Distribution Policy Harms African Americans.

Since 1999, Merrill Lynch has employed a uniform, National Account Distribution Policy that governs the distribution of accounts of departing FAs, as well as walk-ins, call-ins, and manager referrals.[44] In every Merrill Lynch branch office, managers are directed to assign

---

teams and with a race-based agenda, these virtual teams failed. *See also* Ex. 32 at 332. Another plaintiff explained that the African American only virtual teams concept only magnified the problems African Americans faced as single FAs. ("[T]here is a continuing concept of blacks just going after black business, and that is just not the way that you build the business."..".…[t]he whole idea of the teaming concept, which has been taught to me as one plus one equals three. And, so, if you add two African Americans, that we typically don't get one plus one equals two or three. And so, that the concept of two blacks joined together as a team doesn't make sense to me.") Ex. 25 at 480-81.

[44] The distribution policies at Exhibits 197-202 are approved and issued annually by an operating committee of senior executives and apply to all branch offices. Ex. 54 at 14-18, *Id.* 21-22.

the client accounts of FAs who leave the Firm due to death, disability, retirement or acceptance of other employment to remaining FAs pursuant to these policies. Account distributions greatly contribute to an FA's compensation and ability to generate new business because the inherited accounts can generate commissions, and thus compensation, as well as referrals for new accounts. Ex. 42 at 224-227. In addition, under the Firm's cumulative advantage system, inherited accounts count toward production, which is a criterion to allocate resources, such as additional account distributions, office, titles, sales assistants, and expense accounts. Ex. 42 at 227-228; Ex. 45 at 79-81, 84-85, 88-90; Ex. 51 at 234; Ex. 53 at 37-39.

The policies adopted discriminate against African Americans by relying upon discriminatory factors and allowing for undue discretion and subjectivity that permit the policy to be manipulated to the disadvantage of African Americans.

Merrill Lynch's national account distribution policy not only relies on factors that are tainted by the Firm's discrimination, it allows manipulation in favor of white FAs in a number of ways. The national policy provided for a ranking system,[45] but did not include a procedure for distributing accounts among ranked FAs. *See* Ex. 54 at 112-118; Ex. 118 at MLE 00190 - 000212 (no standard reassignment process). As a result, until the 2006 policy, branch managers retained discretion as to the distribution procedure, which they exercised in a manner that harmed African Americans due to the Firm's culture. In some offices, managers permitted departing FAs to assign their own accounts. *See, e.g.*, Ex. 20 at 113-114. Other managers advised FAs that distributions would be based on managerial discretion, which the *Cremin* lawsuit had found discriminatory. *See* Ex. 140. Merrill Lynch addressed this issue only after this lawsuit was filed. *See* Ex. 201 at MLE 00100 000268. "[F]or the first time in 2005, OGC Risk evaluated the account redistribution policy and found in particular that a 'process for distribution was lacking from the current policy." By 2006, African Americans had surpassed considerable harm from discriminatory distributions, and the 2006 distribution policy continued to punish for discrimination. *See* Ex. 1 at 5-6; Ex. 2 at 26-34.

The policy was also "gamed" in other ways. Prior to 2003, Merrill Lynch allowed FAs to team with a colleague anticipating retirement to deliberately circumvent the ranking system and inherit the retiree's entire book of client accounts. Ex. 54 at 54-57, 225-228. In 2003, Merrill

---

[45] *See, e.g.,* Eligibility Ranking Criteria in Ex. 202, 2005 Advisory Division Account Redistribution: Review & Update On 2004 Performance, (MLEE 016 009510).

Lynch added a requirement that in order to automatically inherit a teammates' entire book, the team must be in existence for three years or longer. However, even for teams in existence fewer than three years, the remaining team member receives a "team incentive" equal to his or her share of the team asset, plus that team member's share under the account distribution policy.[46] No three-year rule exists regarding pooled accounts, which are assigned to the remaining pool members irrespective of the time the pool had been in existence. *Id.* Thus, African Americans who are disproportionately excluded from teams and pools are disadvantaged when distributions are made to teams and pools by virtue of Merrill Lynch's national account distribution policies.

The policy also allowed white FAs to steer accounts around the policy and rankings FA to FA transfers. *See* Ex. 54 at 211-213; Ex. 120 at MLEE 018 037856 ("Currently our account redistribution policy does not specifically apply to transferring of accounts from one FA to another. [I]t only applies to redistributing accounts when an FA leaves production for any reason. [T]ransferring has happened since the dawn of day from one FA to another, or when FAs cull their books - and managers move accounts from FA to FA, unrelated to an FA leaving production"); Ex. 2 at n. 65-66. A Merrill Lynch 2006 study confirmed that 25% of the accounts of departing brokers were distributed by the departing broker two weeks before the broker left the Firm, and those accounts disproportionately transferred to white men.[47] Ex. 224 at MLE 00178 000212; Ex. 225 at MLE 00190-001079. FAs who received accounts under the policy were permitted to redirect those accounts to other FAs, and to "cull" their books of client accounts and give them to other FAs. Ex. 54 at 213. Firm-wide audits confirmed that senior FAs often redirected accounts received to junior FAs or mentees. *See, e.g.,* Ex. 116 at MLE 00034 - 000023-24. As explained, *supra*, African American POAs, received statistically significantly fewer accounts than whites through such distributions. Ex. 1 at 7-9.

After this lawsuit was filed, Merrill Lynch disallowed FA to FA transfers outside of the

---

[46] Thus, if a team with a 50/50 split is in existence for only one month prior to retirement, the non-retiring team member is assigned his 50% of the team assets plus an additional 50% of the departing FAs share. Thus, only 25% of the assets are distributed to other FAs pursuant to the rankings. Ex. 201 at MLE 00100-000261-263. Also, nothing prevented a departing FA from adjusting the team shares weeks before his departure. Thus, if the split at the time of departure favored the staying FA with a 90% share, the staying FA would receive 90% of the book plus an additional 90% of the remaining 10% so that only 1% of the book would be distributed under the rankings. *Id.*

[47] As the Director of GPC Diversity explained, "a scenario might be: You know you're leaving so you transfer your accounts to the FA of your choice, prior to leaving." MLE 00182 000003. Likewise, an express benefit of pooling is that if the pool member leaves, the remaining pool member takes full ownership of the pooled assets.

ranking system, but African Americans suffered ongoing harm. As plaintiffs' expert found, "[b]ecause distributed accounts are a resource that increase an FA's book and production, the company's policy and practices regarding account distributions contribute to the cumulative disadvantage of African American FAs. And at the same time, they support and sustain a "rich get richer" white-dominated culture in which valuable and scarce resources are controlled by the ingroup and channeled away from the African American outgroup."[48] Ex. 2 at 34.

Expert studies confirm the harm caused to African Americans by Merrill Lynch's account transfer policies. To study the impact of the Firm's account transfer and teaming policies, Plaintiffs' expert analyzed the transfer of accounts from all brokers who resigned from or were released by Merrill Lynch in each calendar year. This analysis is limited to transfer activity 30 days before and 30 days after the termination date.[49] Ex 1 at 28. Dr. Madden analyzed how the characteristics of a transferred account are associated with the race of the recipient broker, the racial differences in the total value of the transferred assets, and the production credit history in the accounts received by recipient brokers. *See id.* Dr. Madden concluded that African Americans received fewer accounts in terms of asset value and commissions generated from those accounts and lesser quality accounts. Some of her findings are set forth below:

- African American FAs received less asset value and prior commission credits in transfers from departing brokers than did white brokers. Ex. 1 at 32-33.

  - The racial differences in total asset values are 2.93 standard deviations.
  - The racial differences in production credits from accounts are 4.62 standard deviations, a probability of 4 in 1,000,000 that a racially neutral distribution system could have yielded the racial difference.

- When Trainees are added to the analysis, the racial differences in total asset values received from all accounts received by FAs and Trainees in a month are 3.84 standard deviations, a probability of 1 in 10,000 that a racially neutral distribution could have yielded such as racial difference. *Id*. at 33

- The racial differences in production credits from accounts received by FAs and Trainees are 6.37 standard deviations, a probability of 1 in 5 billion that a racially neutral distribution system could have yielded the racial difference. *Id*.

African Americans also received lower quality account transfers:

---

[48] Managers continued to have discretion in distributing other resources, including walk-ins, call ins, branch manager referrals and marketing leads. Ex. 54 at 44-45.

[49] This approach necessarily undercounts transfers because many FAs who intend to retire create a "succession plan" whereby they begin to dissipate their client accounts to other FAs of their choosing months or years before their actual "retirement," by transfers and through teams.

- Of accounts transferred to African Americans, 38% were of households between $100,000 and $249,000 and 62% were accounts over $250,000. Ex. 1 at 34.

- Of the accounts transferred to whites, 29% were between $100,000 and $249,000 and 71% were accounts over $250,000. *Id*. at 34-35.

- African Americans were 2.84 standard deviations less likely than whites to receive an account as its asset value increased; 2.24 standard deviations less likely to receive accounts if the account belonged to a household with higher asset values; and 5.25 standard deviations less likely than whites to receive an account owned by a member of a high wealth household. *Id.* at 36.

- African Americans were 2.64 standard deviations less likely to receive accounts with a stronger history of generating production credits. *Id.*

- African Americans were 5.47 standard deviations less likely to receive an account owned by a member of a high wealth household, given its production history. *Id.*

- African Americans were 5.57 standard deviations less likely to receive accounts owned by high wealth households. *Id.*

### F. Merrill Lynch's Management Selection Process is Uniform and Disadvantages African Americans

Merrill Lynch employs Firm-wide management assessment and selection policies and practices . Since 1971, Merrill Lynch has conducted at least annually a management assessment center ("MAC") where it selects future managers, largely from within its FA ranks. Ex. 52 at 36-37. To attend MAC, an FA must rank nationally in the first or second quintile with some exceptions for third quintile, a criterion that disproportionately excludes approximately 80% of African American FAs.[50] *See* Ex. 1 at 71-76. FAs must also be sponsored by a manager, a selection criterion that was found discriminatory in the *Cremin* gender discrimination class action. *See, e.g.,* Ex. 217 at 13-14 (MAC recommendations tainted by bias against female brokers). Given the Firm's culture and its managers' discomfort with African Americans, this criteria places African Americans at a disadvantage as well.

The few African Americans invited to the MAC suffer discrimination at the assessment center. The assessment is performed by Merrill Lynch managers, including those who have never hired African Americans and are likely to view, support and ultimately select, managers who look and think like them. *See also* Ex. 75 at MLE 00116-17 (CEO O'Neal remarked in a speech, it is "human nature" to "gravitate towards people like you-you share similar backgrounds, the majority is white male-so that's what is perpetuated."). It is an honor for

---

[50] The quintile requirement is not job related as Merrill Lynch also allows persons who have never been FAs or had any production to attend the MAC. Ex. 52 at 56-57.

managers to be selected as assessors, where they participate in shaping the next generation of managers.[51]  Ex. 52 at 165.  The MAC is, by intent and design, a mechanism for screening out those who might not conform to the culture.

Once at the MAC, candidates are evaluated on a variety of exercises related to management tasks by assessors who observe the exercises and rate each candidate by observing at least one exercise.  Ex. 2 at 49-50.  Rather than relying on an objective system for weighing the independent ratings of assessors, the final assessment is reached through an "integration meeting" where candidates are openly discussed.  So important is the group-think consensus that following integration, all individual assessments on exercises are "not retained" so that after integration, only proof of the final votes remain.  Ex. 53 at 313-27; 340-43.  The absence of a paper trail makes it impossible to determine variances or to audit or monitor the evaluation process for bias.  Ex. 2 at 50.  In the final analysis, the specific information based on individual assessor ratings is set aside, and the subjective judgment of the group prevails.  Ex. 52 at 302-312, 327-330.  This kind of subjective and highly discretionary decision-making is highly vulnerable to racial bias and leads toward favoritism to the majority group.  Ex. 2 at 50.  Significantly, successful candidates then become branch managers responsible for hiring, training, mentoring and developing FAs and for distributing resources and opportunities.

Merrill Lynch asserts that since 2005, "inclusiveness is threaded throughout the Assessment Center."  Ex. 53 at 161-162.  Unfortunately, Merrill Lynch's thread is entwined with stereotypical generalizations and prejudice.  Ex. 2 at 48.  Merrill Lynch contends that the individual exercises on which candidates are rated are composites of "real situations that someone might face as a complex manager."  Ex. 52 at 259-61.  In one exercise for a fictional office, although twenty-six roles are included, just one is written to represent an African American, a  "frustrated" African American FA with a "short temper" who is "struggling in the fifth quintile."  Ex. 2 at 48 n. 116.  It is well established in social science literature that such stereotypical associations are reinforced by using information consistent with stereotypical expectations and are undermined by specific information that runs counter to the stereotype. Ex.

---

[51] Little effort is made to disqualify managers from serving as assessors even those who exhibit exclusionary practices.  When OGC advised that a particular manager should not be an assessor due to claims of discrimination lodged against him, including allegations of racial slurs, he was nonetheless allowed to assess at the MAC because the executive in charge "gave him the impression that he might be invited." Ex. 52 at 165. The manager had been put on "zero tolerance" after several women and minorities complained of discrimination under his management. Ex. 45 at 153-155.

2 at 48. The assessor training materials, too are rife with stereotypes. For example, in an exercise on "coaching a difficult minority FA," an African American female FA is described as "failing in the business," "tough and abrasive," "not well liked" and so "nobody in the office wants to team with her." *Id.* This is the only exercise that identifies an individual as African American. Ex. 2 at 48. As Merrill Lynch concedes, these exercises would have been equally effective if the difficult person had not been identified as African American. *Id.* at 49.

As a result of these stereotypes and racial bias, many African Americans "fail" the management assessment. [52] *See, e.g.,* Ex. 29 at 239-43; 240-43; Ex. 39 at 9. The few African Americans who meet the Firm's discriminatory criteria to attend "pass" MAC are unlikely to make it to management. *See* Ex. 93 at MLE0003-150 (minority progress to management between 1994 and 2001 "negligible"); Ex. 108 at MLEE 038 055021 (DiversityInc. Financial Index has more than double the percentage of African Americans who received promotions than managers at Merrill Lynch).

## G. Merrill Lynch's Compensation Plan Discriminates Against African Americans

Merrill Lynch issues annual compensation plans that apply to every FA in the United States. *See* Ex. 51 at 250, 252, 254. These plans are approved by the Firm's executive management, including the CEO, legal, and sometimes by the Board of Directors. Ex. 51 at 32-33, 252-253. [53] Plaintiffs allege that as a result of the discriminatory practices described herein, African Americans are paid less than whites by statistically significant margins. Plaintiffs further contend that the national compensation plans are also discriminatory and further reduce African Americans' earnings through at least four components of the plan: 1) FAs are paid based on a progressive grid, which compounds discrimination; 2) the Firm's household policy; 3) the Firm's small ticket policy; and 4) the Firm's "penalty box."

---

[52] Consistent with the racial stereotyping at the MAC, Plaintiff Jennifer Madrid was assessed as inflexible, confrontational and hostile. Ex. 29 at 239. This assessment is consistent with the bias, but markedly different from Madrid's recommendation that she "has been a consistent leader and achiever throughout her life … [and] displayed magnificent organizational and leadership skills [w]hether it has been working with all FAs in goal setting, organizing programs to benefit in our office in specific production goals… I believe she is a strong a candidate as I have seen in 20 years at Merrill Lynch." *Id.*

[53] Executive management does not just review and approve the compensation plan, it participates in generating its specific components. *See* Ex. 51 at 223-24 (executive management creates hurdles in the plan). Additionally, it determines and administers the offshoots of the compensation plans. *See, e.g.,* Ex. 51 at 223-226 (executive management determines locations for Recognition Club trips); *Id.* at 227-28 (executive management conducts cost analysis of Recognition Clubs).

1.    The Grid Is Progressive and Creates a Cumulative Advantage

Merrill Lynch's compensation plan pays FAs based on production.  Ex. 51 at 43.  Thus, discriminatory treatment which impacts production results in lower wages.  Further, two FAs with the same length of service who both produce $300,000 and transact identical business are compensated at the same rate, e.g. 30%.  Ex. 51 at 39-45. However, if one FA produces $400,000 with the same length of service and the same transactions, he is compensated at a higher rate, *e.g.* 40%. The higher percentage is paid not only on the amount between $300,000 and $400,000, but on the entire $400,000, *i.e.* retroactive to the first dollar.  Ex. 51 at 68-71. Thus, the grid is progressive and widens the wage gap caused by Merrill Lynch's racial discrimination.  Likewise, Merrill Lynch's compensation system compounds any discrimination on the part of its customers, again by granting a cumulative advantage to whites, who do not encounter such bias.  Ex. 2 at 13.

2.    The Household and Small Ticket Components of the Compensation Plan
      Discriminate Against African Americans

In addition to the progressive nature of the grid, Merrill Lynch's compensation plan pays out different rates based on the size of the customers' "household," which also exacerbates any internal or external racial discrimination.  Since at least 2001, Merrill Lynch began to limit, and ultimately deny, FAs compensation for servicing clients whose household investments fell under $100,000.  Merrill Lynch required its FAs to relinquish household accounts of $100,000 or below to its Financial Advisory Center ("FAC"), where clients are not assigned an FA but can call in and speak with a revolving door of personnel.[54]  As one manager told his FAs, "if there are still [FAs] that really enjoy servicing small accounts, please let me know and I will get you a nice salary job in the Investor Services Group [FAC], so you can deal with poor people to your heart's content."  Ex. 51 at 26-27.  FAs may receive compensation on accounts under $100,000 *if* those accounts belong to a household with wealth in excess of $100,000.  A household is not a single client but includes all related individuals, *e.g.*, the adult children of a client are grouped in a household even if they do not live under one roof or have joint investment accounts.  *Id.* at 51-

---

[54] In 2001, Merrill Lynch eliminated all payout on transactional business with respect to small households. *See* Ex. 204 at MLE 00040 833-34.  In 2002, Merrill Lynch paid for transactional business at a generally lower rate for small households, and even annuitized business.  *See* Ex. 205 MLE 00012 – 000142, at 142-143.  This policy remained generally the same until 2005.  *See* Ex. 207 at MLE 00113 – 00078, at 78-79).  In 2005, the compensation policy eliminated payment accounts under $50,000.  *See Id.* at MLE 00040 – 000589.  This policy continued through 2006.  *See id.* at MLE 00040 – 000564-565.

52.

As explained in Part II above, Merrill Lynch hired a consultant to determine the race of its clients. As a result of the racial profiling, Merrill Lynch maintains its household policies with knowledge that: (1) African Americans clients fall disproportionately below the $100,000 threshold compared to the white clients (*see* MLE 00357 000788-873 at 805; MLE 0202-000132-42 at 135; (2) a disproportionately high number of accounts under $100,000 are assigned to African American FAs in account distributions (*see* MLE 00190-001073); and (3) African American FAs have books of business that are disproportionately comprised of smaller households (*see* Ex. 101 at MLE 00190-000935-946, 937, Ex. 100 at MLE 00373-264, 285). Plaintiffs allege that each of these facts is the product of the Firm's discriminatory policies and practices and that the household policy discriminates against African American clients and FAs.

Another Merrill Lynch policy, the "small ticket" policy, reduces payout for small transactions performed for clients unless they are considered affluent households. Merrill Lynch's own studies confirmed that this policy, too, disproportionately harms African Americans. *See* Ex. 204, Small Ticket Policy.[55]

### 3. The Penalty Box Discriminates Against African Americans

In order to justify the higher grid payouts to whites who are the beneficiaries of favored treatment, Merrill Lynch created a "penalty box" in which certain FAs are paid grid percentage rates below the lowest on the grid. For FAs who are have been with the Firm for 5 years and whose production falls below a certain minimum level, the "penalty box" punishes them in two significant ways: (1) it diminishes the amount those FAs earned on business, and (2) it forces FAs to pay back money to the Firm.

For example, once an FA falls below the penalty box mark, 100% of the FA's production is reduced to the penalty box rate for the year, including the commissions already paid before the FA fell into the penalty box. The Firm determines around October of each year which FAs are likely to fall below the minimum threshold and adjusts their draw to reflect the "over payment" for the first 10 months of the year. Thus, FAs often owe the Firm money, called "excess compensation" and the Firm may elect to deduct the "overpayment" from commission checks. *See* Ex. 35, at 54. Once placed in the penalty box, FAs earn no more than minimum wage. For

---

[55] Plaintiff LaRue Gibson described the household and small ticket policies as a form of "red-lining" of clients, also designed to lead African American FAs "down over a cliff." *See* Ex. 25, Gibson Dep. at 52.

example, one named Plaintiff had a month of $10,000 in commission and received $300 before taxes in pay because she was in the penalty box. Ex. 35 at 53-54.

As Merrill Lynch is aware, over 70% of African Americans are in the bottom two quintiles of production by their sixth year. Madden at 71-76. For obvious reasons, the penalty box disproportionately diminishes the wages and causes African American FAs to leave Merrill Lynch as few employees can afford to work for minimum wage or to owe their employer money. The penalty box intentionally contributes to the statistically significant and higher attrition rate and lower wages for African Americans.

## IV.   Merrill Lynch Has Long Known Of Discrimination But Has Taken No Effective Remedial Action Or Instituted Policies To Prevent Continued Discrimination.

Merrill Lynch has long been aware of the systemic impediments and cultural challenges facing African Americans. Nevertheless, it has not reformed its discriminatory practices or culture and the deplorable results for African Americans remain.

Merrill Lynch's own studies, surveys, employee focus groups and presentations to senior management and the Board of Directors demonstrate that since 2001, African Americans have been underutilized as FAs and in management, suffered higher attrition rates than whites, been disproportionately excluded from favorable teams, lacked mentoring and sponsorship from management and senior FAs, received fewer and less valuable client accounts, trapped in the fourth and fifth quintiles, earned less than whites, and subjected to a white-male dominated, exclusionary culture.[56] A long history of litigation placed Merrill Lynch squarely on notice of its systemic discrimination, from the EEOC's lawsuit in the 1970s charging the Firm with discrimination against African Americans, women and Hispanics, to the *Cremin* lawsuit and the class-wide finding that Merrill Lynch engaged in a pattern or practice of gender discrimination against its female FAs. Due to its discriminatory practices and culture, since 2001, at least sixty formal complaints of race discrimination have been lodged with the Firm's Human Resources department.[57] *See* Ex. 133.

African Americans did their best to overcome the racial bias and systemic obstacles

---

[56] *See, e.g.,* Exs. 94, 93, 56, 98.
[57] This chart is under-inclusive, as it lists only formal complaints recorded by Merrill Lynch. Nevertheless, the chart, and the supporting documents produced, reveal that investigations of complaints, if any, are cursory and rarely result in a finding in favor of the complaining employee. *Id.* Of the 60 complaints produced in this lawsuit, Merrill Lynch found merit in only three. *Id.* Moreover, there appear to be no real consequences for those who engage in discrimination, or managers who permit it to happen.

without resorting to litigation.  Unable to receive any support or assistance from Merrill Lynch but eager to succeed in a job they loved, a group of African American FAs from across the country paid their own expenses to meet in Chicago in 1994.  See, e.g., Ex. 20, Bender-Jackson Dep. at 166; Ex. 25, LaRue Gibson Dep. at 82-85; Ex. 30, McReynolds Dep. at 306-307.  At this meeting, they sought to share information and pool their resources to improve their opportunities and to achieve change at Merrill Lynch.  See Ex. 30 at 307 ("[W]e got together as a group trying to do what we could do to make things better, but we realized that the biggest problem we were having was with management.")  They discussed their common experiences of exclusion and denial of opportunities. As one named plaintiff explained,

> [T]he idea was that we felt we were not getting the level of support from the firm that we needed.  But by the same token, we knew we still had to feed our children and feed our families.  The question was … what were we going to do to try to help ourselves be more successful.  And we flew out to Chicago on our own dime and we shared stories.  And there was a lot of commonalities, a lot of upsetting stories – you know, a lot of situations with the infamous "N" word in the office, all those kinds of things.  We all had those stories.  Then we sat down and said, okay, now you all know you are not crazy.  … You are within an island within an office.  You feel lonely.  You know you are not crazy.  Ex. 25 at 82-83. *See also* Ex. 20 at 166; Ex. 30 at 306-07.

After learning of this meeting, Merrill Lynch co-opted it developing a firm-sponsored meeting for African Americans.  Ex. 30 at 307.  Although the Firm presented a new "diversity initiative" ever year, these measures failed, and the plight of African Americans did not improve. Ex. 30 at 307 ("[E]ach year there was a new plan that was being devised as to how we're going to make things better, we being Merrill Lynch, but for the black brokers, the number of brokers didn't change very much.  The washout rate was very high.  We couldn't really see the changes."); Ex. 25 at 84-85 (Merrill Lynch learned of the meeting and "decided well, we can do this in-house.  I remember being against that, because …  Not everyone will say what's on their mind… You have managers who you think may have some influence on your career… Now, that is part of growing up in a culture at Merrill Lynch").

The Firm's continued failings are due to senior management's lack of genuine commitment to diversity and equal employment opportunities.  As just one illustration, although Merrill Lynch claimed that diversity and EEO accountability was to be shared by executive management, senior executives and the head of HR had no knowledge of the Firm's affirmative action plans, which had been mandated by the EEOC since 1996.  GPC President McCann testified that he did not know if the company had an affirmative action plan, as did Dan Sontag,

head of the Americas Client Relationship Group.  Ex. 43 at 61; Ex 45 at 233.

During a time the Firm was earning record revenues and profits and its stock was at an all-time high,[58] Merrill Lynch made no attempt to invest consistently in its HR and Diversity functions.  Merrill Lynch did not give clear direction as to which personnel or departments were accountable for the Firm's diversity and equal employment efforts, nor implement the structural accountability necessary to achieve real reform.  *See, e.g.,* Ex. 2 at 61 ("it is difficult to determine which units or individuals were responsible for diversity and equal employment opportunity" in GPC); *id.* at 55 (at "the corporate level and within GPC, lines of authority, responsibility and accountability for diversity and EEO have been shifting, ambiguous, and diffuse from 2001 through the establishment of the Office of Diversity in June 2006 and beyond").

The personnel selected by the Firm to lead its HR and diversity efforts demonstrate that the Firm does not value these functions.  For example, in 2003, Merrill Lynch tapped Kim Pillar to head HR for GPC.  Ex. 47, Pillar Dep. at 45.  Ms. Pillar, who earned an Associates degree and started her career at Merrill Lynch in an administrative role, had no formal training in HR, and testified that she learned about HR by reading "Diversity Inc." magazine.  *Id.* at 41-43. Ms. Pillar had never seen an affirmative action plan and had no involvement or responsibility with regard to the Firm's affirmative action plans or their results.  *Id.* at 209-210, 269-270. Ms. Pillar had not heard of the OFCCP, was not aware that the OFCCP audited and entered into a conciliation agreement with Merrill Lynch, and lacked a basic understanding of issues crucial to her role, including how to determine whether correlations were statistically significant and how to validate an employment examination to determine whether it was discriminatory.  *Id.* at 210-212, 126-127.

Although Merrill Lynch created a number of different "diversity" initiatives over the years, there is no real commitment to these watered-down programs, which repeatedly fail.[59]  *Id.* at 16-19 (removed from her role as head of Human Resources as soon as she began to "build momentum" on diversity front); Ex. 91 at MLE 00668 – 000793 ("management is inconsistent with regard to the importance of diversity initiatives"); Ex. 79 at MLEE 038 020481. African Americans describe these programs as window-dressing not intended to improve the working

---

[58] *See* MLE 00827-000177 at MLE 000180.
[59] Ex 63, at MLMRE_014_019221 – 22 (executive email acknowledging failures).

conditions and opportunities of African Americans.[60]  *See, e.g.,* Ex. 29  at 113, 250-252

("[W]hen they put me on the diversity ATCM, I could see the practices that the entire firm was

doing, it was not just my office.  It was not just my district, it was the entire country.  … Merrill

Lynch knows what's going on and they allow these practices, they allow these patterns to

continue happening, they can see the discrimination, and they have the statistics and they don't

do anything about it, and they have not done anything about it for 30 years."); *see* Ex. 22,

Browne Dep. at 376.

    Worse, Merrill Lynch knew of specific policies and practices that disadvantaged African

Americans, but refused to implement changes to them.  Merrill Lynch ignored or rejected any

meaningful proposals designed to attack the real problems facing African American FAs and

achieve real change.[61]  For example, Merrill Lynch was well aware of the exclusion of African

Americans from teams, which it deemed the "keys to success" for FAs, and the harm that

resulted from this exclusion.  Indeed, Merrill Lynch predicted that its teaming policies would

prevent African American FAs from succeeding at Merrill Lynch.[62]  Nevertheless, the Firm

rejected repeated pleas from its Diversity ACTM, FA focus groups and others to reform the

Firm's teaming practices or hire African American FAs on teams, although its own documents

---

[60] Each year Merrill Lynch has a new slogan, but refuses to look determine what went wrong, and fix it. *See, e.g. ,*Ex. 80 MLE 00184 – 000455 –513, 475 (manager at 2003 meeting: "in the two and a half years I've been at Merrill Lynch I don't see us doing a lot of postmortems.  I see us doing the pendulum thing. So we start out over here and we measure everything and then because we're not moving the needle we relinquish the measures.  Well, if Merrill Lynch weren't meeting its numbers, would we stop measuring what those numbers are and reporting them to the street?  It would be ludicrous, no").

[61] One plaintiff closely involved in the Firm's diversity efforts testified "that I got off the diversity ACTM was that I was so disillusioned and disgusted by the fact that here was an opportunity, … the managers had appointed us from these different regions to be part of this diversity ACTM, and when we were trying to come up with ideas for how to improve the discrimination, or try to remedy the situation, they were not interested in hearing it. And eventually I am not the only one that left, not only the firm, but, you know, I got off the committee shortly thereafter when we realized that they were not serious about making any kind of change or improvement."  Ex. 29 at 249-50.

[62] A 2005 report explains that "we all know that teams are the key to success.  Regularly, the majority are helped through POA [b]y management directing accounts that are being distributed, or informally attaching them to a team and are given assets as needed to reach goals.  Again, minorities are not included, and more times than not, have a much more difficult time reaching managerial goals set for them." Ex. 134 at MLEE 018 055258. *See, e.g.,* Ex. 111 at MLEE 021 000589 (2001 e-mail from head of HR to SVP Americas, M. Gardner: "our women and minority FAs will have a far better chance of retention and success if they are on teams"); Ex. 93 at MLE0003 –175 (acknowledging in 2002 study that the "low rates of invitations [to Black FAs] to join teams will pose future problems" and that the "voluntary model of forming teams appears to disadvantage women and minorities").

reveal such proposals made good business sense.[63] *See, e.g.,* MLE 00089 – 001204 – 1206
(2002 Merrill Lynch study confirms it is possible to place and/or hire FAs onto teams and posits
that hiring FAs onto teams could save $150 million over five years). Instead, the Firm's
executives continue to insist that it cannot force or arrange such "marriages." *See, e.g.,* Ex. 42 at
109-111; Ex. 55 at 62-63, 68-69; Ex. 44 at 139-140, 144-47. Despite this harmful segregation,
Merrill Lynch has continued to increase the importance and relative advantages of teams in its
policies.

Merrill Lynch has also long acknowledged an exclusionary, white male culture that
harms African Americans and a management workforce that does not properly or fairly manage
African American FAs.[64] *See* Part I.B. Nevertheless, the Firm has refused to reform its culture,
properly train its management, or discipline managers who discriminated against African
Americans, including those who did not hire African Americans in 28 states. *See, e.g.,* Ex. 65 at
MLE 00973 - 000881 ("Currently, there are no training programs to help diverse FAs assimilate
into a majority male dominated corporate environment").[65]

---

[63] *See, e.g.,* Ex. 10 at MLEE 017– 8219 (in response to 2005 letter to management about the paucity of
African Americans on teams, K. Pillar acknowledges that D. Sontag has "heard that enough before," as
teaming for Black FAs was raised by the Black FA focus group and the Diversity ACTM); Ex. 170 at
MLEE 016 048697, Ex. 170 at MLEE 016 048699-700, 702 (in 2001, it was proposed to hire FAs
directly onto teams or pools as a way to increase teams, decrease FA turnover, and increase production of
senior FAs); Ex. 168 at MLE 00196 - 000057-58 (in 2002, Teams Consulting Group proposes hiring
diverse POAs onto teams ad holding managers accountable for doing so); Ex. 99 at MLE 00188 - 000712,
at MLEE 00188 - 000714 (2003 African American Focus group recommended hiring minority FAs onto
teams); Ex. 93 at MLE00003 - 00175 (2002 USPC study suggesting that management be held
accountable in women and minority team participation); Ex. 107 at MLEE 018 087615 (in T. Kassel 2002
presentation to the Board of Directors, she states that Merrill Lynch had begun hiring diverse FAs onto
teams but had no documents to indicate it actually happened).

[64] *See, e.g.,* Ex. 102 at MLEE 060 – 012909 (2004 study identifies "management accountability" as a
"significant action the Firm can institutionalize to address the metrics behind the performance of African
American FAs," which must be "owned" by line management and championed by senior management);
Ex. 62 at MLMRE_014_19223 -24 (2004 e-mail from J. Gorman to other executives that FA is "right"
and Merrill Lynch's "record is poor" in response to the following: "In my tenure at the firm, managers
have figured out (to some degree) how to get FAs to do financial planning, annuitized business, and
teams. These have been HUGE culture changes that have been lead. These are also culture changes that
have been directed from the top, measured, and then accepted over time. This gives me great hope that
we can successfully address diversity issues, but we will have to address them in the same way that we
have driven other change.[ …] [P]ressure must be applied by your team on the people who CAN make a
difference. The only people at the firm who hire/fire FAs are the Directors/Managing Directors. This is
the group that will make us successful, or maintain the status quo") (emphasis is original).

[65] Ex. 95 at MLMRE_006_002082 (2001 e-mail to "fix basic management issues; diversity issues are a
direct result of poor management skills"); Ex. 108 at MLEE 038 055024 (2006 DiversityInc. study

Merrill Lynch even forced programs on African American FAs that it knew would harm their chances to succeed. For example, the Firm's racial steering practices designed to match African American FAs with African American clients through its multicultural business development and virtual team practices ran counter to the Firm's own conclusions that to succeed, African American FAs needed "diverse book" and should not focus on African American clients. Ex. 93 at MLE00003-00160 (2002 study, to succeed, African American FAs "must develop books that both gender and racially diverse").[66]

After this lawsuit was filed, and in response to a New York Times article, Plaintiffs believe Merrill Lynch assembled a *McReynolds* Task Force and attempted to quickly develop and publicly announce new "diversity" measures. One of these was a "Diversity CFO," which it would financially penalize managers who failed to develop minority FAs. However, the CFO lumped all "diverse employees" together, (women, LGBT, Hispanic, South Asian, Native American, African American, Special Needs), so a manager could fail dismally with regard to African Americans but still meet the CFO.[67] The open, negative reaction of Merrill Lynch's management team illustrates the Firm's ongoing hostile culture and lack of commitment to diversity. The Firm's managers complained about and openly rejected the CFO.[68] Out of a possible 20 points, well over half (97) of the Firm's 170 managers earned 5 points or fewer, and 54 managers earned only one point on the Diversity CFO. *See* Ex. 123 at MLE 00992 – 000001 to 000006. No manager was disciplined or terminated for diversity shortcomings.

Another blatant public relations move was the Firm's public announcement of an "Office of Diversity" after settlement discussions ended with the plaintiffs in this case. At the time of this announcement, none of the top-level management positions had been filled, other than the person designated to head the office, Colbert Narcisse, GPC's Chief Operating Officer.[69]

---

confirmed that the Firm's CEO did not sign off on executive compensation tied to diversity, unlike 70% of DiversityInc.'s "Top Financial" employers).

[66] Ex. 80 at MLE 00184 - 000455, 000499 (at 2003 Diversity ACTM meeting, "if you have African American FAs that work primarily or exclusively in an African American marketplace, generally speaking what you have is a big train wreck"); Ex. 99 at MLE 00188 - 000712 ("African American FAs need a more diverse book than any other ethnic group,"); Gibson Dep. at 50-52.

[67] *See* Ex. 122 at MLE 00179 –000908-909 (2004 and 2005 Diversity CFO based on general "diversity" benchmarks, including all minority and female); MLE 01367 - 000234 (same).

[68] *See* Ex. 42 at 198-200; Ex. 43 at 143; Ex. 125 at MLEE 021 006021 ("low morale" among Directors due to the Diversity CFO); Ex. 121 at MLEE 018 075292 - 075293, at MLEE 018 075292 (Directors threatened to ignore the Diversity CFO altogether in favor of other, less challenging goals).

[69] Ex. 43 at 101-102; Ex. 47 at 252.

Mr. Narcisse, a former investment banker, had no prior experience managing any organizational unit relating to diversity or human resources and did not relinquish any of his full-time duties as COO.[70]  Senior management positions were not staffed until September of 2006 and Regional Division Managers were not appointed until February of 2007. *See* Ex. 130 at MLE 00829 00071; Ex. 129 at MLMRE 001 24889; Ex. 128 at MLMRE 004 842; Ex. 132 at MLEE 023 047953-54.  At that time, the Office of Diversity had no physical location, and the office's website was still being created.[71]  Since its inception, it has been headed by at least three different personnel.  Ex. 2 at 67.  No progress is evident from the Office of Diversity.[72]

Rather than commit to real reform, the Firm has even sought to hide its abysmal results from the Board of Directors Committee commissioned to oversee the Firm's antidiscrimination efforts, the Public Policy Committee.  After recognizing that there was again no improvement in the plight of African Americans, senior management created one presentation for the CEO, which included a detailed breakout showing the lack of progress for African Americans.  *See* Ex. 103 at MLEE 018 036922.  The presentation to the Board of Directors, however, was adjusted to aggregate all "minorities" and not to disclose the poor results for African Americans.[73]

As Professor Bielby concluded "[t]he company's diversity programs, offices and initiatives have inadequate accountability and responsibility structures, and the company has chosen to decouple its diversity efforts from both its core operations and its legal obligations not to discriminate, in effect, choosing 'symbol over substance.'"  Ex. 2 at 71.  Real change and equal opportunities for African Americans at Merrill Lynch will occur only with class certification.

---

[70]Ex. 43 at 94-95.  Mr. Narcisse was replaced as COO of GPC in May of 2007, and his successor, Navtej Nandra, also succeeded him has head of the Office of Diversity (Ex. 48, at 127-128.)

[71]Ex. 43 at 92-93; Ex. 49 at 252-253, 258.  *See also* Ex. 131 at MLEE 021 032210-17 at 032214. The Office of Diversity website launched on March 5, nine months after the announcement of the creation of the Office.  Ex. 126 at MLMRE 004 1966.

[72] As Professor Bielby concluded in the Firm's efforts, "organizations make decisions about whether to implement, staff, and commit to meaningful structures of responsibility and accountability… And they make deliberate decisions about whether or not to emphasize symbolism over substance by, for example, announcing new organizational units dealing with diversity long before there are meaningful structures of responsibility and accountability in place that can minimize bias." Ex. 2 at 67-68.

[73] *Compare* Ex. 104 at MLEE 00180 –7–10 (Board presentation with collapsed view of only women and minorities in headcount, hiring and recruiting, promotion, and retention/development) with Ex. 105, MLEE 002 002008 – 2023, at 2016 (presentation to CEO with "minority groups 'broken out'" acknowledging that "black FA turnover in [quintiles 1 and 2] (14%) remains well above the average 1st and 2nd quintile turnover (4%)").

**ARGUMENT**

To remedy Merrill Lynch's discriminatory employment practices, Plaintiffs seek to certify a class of African Americans who are or were employed at Merrill Lynch as Financial Advisors or Trainees[74] for any period from January 1, 2001 to the present.

In evaluating Plaintiffs' motion for certification, the Court need only determine whether Plaintiffs have demonstrated that the proposed class meets the requirements of Rule 23, as amended, and should not conduct a preliminary inquiry into the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974) ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action.") As the Seventh Circuit has explained, Rule 23 "depends on making a definitive class certification decision *before* deciding the case on the merits, and on judicial willingness to certify classes that have weak claims as well as strong ones." *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 677 (7th Cir. 2001).

**I.     Class Certification Is Warranted Based On Routine Certification Of Nearly Identical Broker Classes, Including A Sex Discrimination Class Stipulated To By Merrill Lynch And Approved By A Court In This District.**

**A.  Courts Have Routinely Held That Broker Classes Meet Rule 23's Class Certification Requirements.**

Because of the uniform nature of their business operations and management structure, centralized corporate oversight, and national policies that apply to all FAs, lawsuits against national brokerage firms such as Merrill Lynch present model cases for class certification. As previously noted*,* Judge Castillo certified a very similar gender discrimination class action against Merrill Lynch in 1998. *See* Ex. 215, *Cremin* Stip. of Settlement, Ex. C, 3; Ex. D, 2; Ex. G, 3-5; Ex. 214 *Cremin* Fairness Hr'g Tr. at 32-33, 40, Sept. 2, 1998. The business and organizational structure of Merrill Lynch has remained largely the same since that time. Indeed, the Firm's policies have grown only more uniform and centralized, making them even more appropriate for certification. In *Cremin,* as here, the plaintiffs charged Merrill Lynch with systemic discrimination based on compensation and promotion practices that led to statistically significant compensation disparities and the near-exclusion of women from management positions. Ex. 215 at Ex. D, 2; s*ee also* Ex. 214 at 32-33, 40. As in this case, the challenged practices in *Cremin* included the discriminatory distribution of client accounts, the

---

[74] *See* definition at footnote 2 *supra,* n. 2.

discriminatory exercise of discretion by predominantly male managers in a white male-dominated organizational structure, and a management assessment and selection system that disproportionately denied women opportunities to join management. Ex. 226, *Cremin, et al. v. Merrill Lynch, Inc.,* No. 96 C3773 (N.D. Ill.), Dkt. 64, Dkt. 63, Pls.' Mem. In Supp. of Pet. For Class Cert. 2-11) In connection with a resolution by the parties, Judge Castillo held that the class met Rule 23's requirements and certified a nationwide settlement class of female FAs and Trainees subjected to Merrill Lynch's firm-wide, discriminatory policies and practices in its U.S. retail brokerage branch offices.[75] Ex. 215 at Ex. G, 5. As this Court is aware, before approving a settlement class, a court must first determine that class certification is appropriate and conclude that the requirements of Rule 23 are met. *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002).

Other courts have routinely certified similar classes of brokers challenging as discriminatory many of the same, firm-wide policies and practices at issue in this case: the distribution of accounts and resources, teaming practices, compensation practices, the management selection process, and a pervasive, biased culture and work environment. *See, e.g., Jaffe v. Morgan Stanley DW, Inc.*, No. C 06-3903, 2007 U.S. Dist. LEXIS 8502 (N.D. Cal. Jan. 19, 2007) (provisionally certified race discrimination settlement class of FAs and Trainees); *Martens et al. v. Smith Barney, v. Smith, Barney*, Inc., 181 F.R.D. 243 (S.D.N.Y. 1998) (certified sex discrimination settlement class of brokers and other claimants); Dkt. No. 195, 8/13/08 Order in 8/13/08 *Amochaev v. Citigroup Global Markets, Inc.* No. C-05-1298 (N.D. Cal.) (certified sex discrimination broker settlement class, $33 million fund); Dkt. No. 43, 10/26/07 Order in *Augst-Johnson v. Morgan Stanley,* No. 06-1142 (D.D.C.) (certified sex discrimination broker settlement class, $46 million fund); *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657, 660, 676 (E.D. Pa. 1980) (certified a hiring, compensation and promotion class of "all present and future female employees and job applicants" of Dean Witter in brokerage business unit) Dkt. No. 15, 6/16/02 Order in *Kosen v. American Express Financial Advisors, Inc.*, No. 1:02CV00082 (D.D.C) (certifying sex discrimination broker settlement class for advancement, account

---

[75] This Court is entitled to rely on Judge Castillo's determination that the requirements of Rule 23 were met. *See, e.g., Cremin v. Merrill Lynch*, 328 F. Supp. 2d 865, 867-8 (N.D. Ill. 2004)(pattern and practice findings of arbitration panel in settlement proceeding entitled to collateral estoppel effect).

distribution, promotion, compensation, and termination claims, $31 million fund and).[76]

### B. Merrill Lynch Has Stipulated To Certification Of A Similar Broker Class.

Merrill Lynch stipulated to class certification in the *Cremin* sex discrimination class

action. The Seventh Circuit has held that judicial estoppel precludes defendants in Merrill

Lynch's position from challenging the adequacy of a class for litigation purposes after stipulating

to a class for settlement purposes. *Carnegie v. Household International*, 376 F.3d 656, 659–61

(7th Cir. 2004); *Rissetto v. Plumbers Local* 343, 94 F.3d 597, 604-5 (9th Cir. 1996) ("We now

make it explicit that the doctrine of judicial estoppel is not confined to inconsistent positions

taken in the same litigation.") Thus, Merrill Lynch should be judicially estopped from

challenging any of Rule 23's requirements other than manageability.

## II.     Plaintiffs' Proposed Class Warrants Class Treatment Under Rule 23.

To be certified, a proposed class must satisfy the four requirements of Rule 23(a) --

numerosity, commonality, typicality and adequacy of representation -- and one of the three

alternatives in Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-16 (1997).

Plaintiffs have provided ample factual support that the class they propose meets all requirements

of Rule 23(a), as well as Rule 23(b)(2) and 23(b)(3).

### A. The Proposed Class Satisfies All Requirements of Rule 23(a).

#### 1.     The Proposed Classes Are Sufficiently Numerous To Preclude Joinder.

Rule 23(a)(1) requires that the class be sufficiently large to make joinder impracticable.

*Bell et al. v. Woodward Governor Co.*, No. 03 C 50190, 2005 U.S. Dist. LEXIS 60, at *4 (N.D.

Ill. Jan. 3, 2005). According to Merrill Lynch's workforce data, there are over 700 putative class

members who work or worked at the Firm's branch offices across the United States since 2001.

As a result, joinder is impracticable, and numerosity is met. *See, e.g., Bell*, 2005 U.S. Dist.

LEXIS 60, at *4 (certifying class estimated at 100); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62

(N.D. Ill. 1986)(certifying class of 29 in light of geographic dispersion).

#### 2.     Plaintiffs' Claims Raise Numerous Common Questions Of Law And Fact.

The commonality requirement is a "'low hurdle' easily surmounted." *Gaspar v. Linvatec*

*Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996) (citation omitted). To meet commonality, Plaintiffs

---

[76] *See* Dkt. No. 15  06/16/2002 Minute Order in *Kosen v. American Express Financial Advisors, Inc.*,
Case No. 1:02CV00082 (D.D.C.) (final approval of 03/22/2002 proposed consent decree); Ex. 223, *Kosen
v. American Express Financial Advisors, Inc.*, Case No. 1:02CV00082, Final Consent Decree, (avail. at
http://www.sprengerlang.com/files/DOCS_MSP_66336_v1_American_Express_Consent_Decree.pdf)

need only present one issue of law or fact common to the class. *Id.* at 57; *Dunn v. City of Chicago*, 231 F.R.D. 367, 372 (N.D. Ill. 2005) (Gettleman, J.); *Riordan*, 113 F.R.D. at 63. Commonality is met if class members' grievances derive from "a common nucleus of operative fact," and factual variations among class members' claims will not defeat certification. *Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992); *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir 1998). Courts typically find commonality where, as here, a "defendant has engaged in 'standardized conduct' toward the members of the proposed class." *Nike* at 660, citing *Keele*, 149 F.3d, at 594; *Bell,* 2005 U.S. Dist. LEXIS 60, at *6.

This case presents many common questions of fact and law. The class will proceed under common, compatible theories of pattern or practice disparate treatment and disparate impact discrimination, which present inherent class-wide proof and turn on questions of fact and law common to the class. *See, e.g., Bell*, 2005 U.S. Dist. LEXIS 60, at *8-11 (finding commonality and certifying pattern or practice and disparate impact race discrimination).

First, to prove that Merrill Lynch engaged in a pattern or practice of discrimination and that unlawful discrimination was Merrill Lynch's regular policy, *see, e.g., King v. Gen. Elec. Co.,* 960 F.2d 617, 623 (7th Cir. 1992), Plaintiffs will present evidence of the following common issues of fact, among others: (1) evidence of Merrill Lynch's uniform branch office, management and job structure; (2) evidence of a strong, uniform, and racially-biased corporate culture that ensures uniformity and consistency in practices and attitudes across the Firm; (3) evidence that Merrill Lynch has developed and implemented uniform, firm-wide employment policies and practices, for example, regarding hiring and training, teaming, account distribution and transfer, management assessment and selection, compensation, and multi-cultural marketing; (4) expert evidence that the Firm's common employment policies and practices result in statistically significant disparities to the disadvantage of African Americans;[77] (5) expert evidence that the Firm's common employment practices are structured to disadvantage African Americans, are riddled with racial stereotypes, and encourage or fail to deter racial bias; (6) anecdotal evidence from the sixteen named plaintiffs and other class members about how they were similarly

---

[77] Statistical evidence alone presents common issues. *See, e.g., Smith v. Nike Retail Servs.*, 234 F.R.D. 348, 662 (N.D. Ill. 2006); *see also Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 624 (N.D. Ill. 1989)(evidence of statistical disparities resulting from centralized system presents a common issue); *Wilfong, et al. v. Rent-A-Center, Inc.*, No. 00 CV 0680 DRH, 2001 U.S. Dist. LEXIS 22718, No. 00-cv-0680 at *11-12 (S.D. Ill. Dec. 27, 2001)(regarding commonality, statistics demonstrate that there is a class of women affected by the company-wide policy of sex discrimination").

harmed by Firm-wide discriminatory employment practices;[78] (7) evidence that Merrill Lynch has long been aware of its intentional racial discrimination but has refused to take effective remedial action. Merrill Lynch's defense to this evidence and claims also raises common issues of fact and law, as evidenced by its Motion for summary judgment on class issues.

Second, Plaintiffs will offer common evidence that Merrill Lynch's facially neutral employment practices had a disparate impact on African American FAs. *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 997 (1988). Plaintiffs' disparate impact claims will turn on common questions as to (1) whether the challenged practices adversely affected members of the class, through presentation and analysis of the Firm's own disparate impact studies and of both sides' expert statistical evidence, (2) whether Merrill Lynch can present sufficient evidence of business necessity, and (3) whether there were non-discriminatory alternatives. *Dean v. Intl. Track & Engine Corp.*, 220 F.R.D. 319, 320-21 (N.D. ll. 2004) (granting class certification, common questions of law and fact regarding challenged policy and whether it had a disparate impact on African Americans). Plaintiffs' disparate impact claims are, by their very nature, class claims that present common questions of fact and law. *Id.*

Should Plaintiffs prevail on liability, this matter will also present common questions with regard to class-wide relief. If Plaintiffs prevail under Title VII, an equitable award of back pay is presumptive.[79] Make-whole relief to the class will be based on expert statistical evidence of the class-wide injury that resulted from Defendant's discriminatory policies, likely the same statistical evidence upon which Plaintiffs will rely to prove liability. *See, e.g., Buycks-Roberson v. Citibank Fed. Sav. Bank*, 162 F.R.D. 322, 337 (N.D. Ill. 1995).

Plaintiffs will seek a class-wide award of punitive damages to hold Merrill Lynch accountable for its reckless disregard of the civil and equal employment rights of African American FAs, and to deter similar misconduct by Merrill Lynch (and other companies) in the future. Whether Merrill Lynch acted with reckless indifference to the discriminatory effects of

---

[78] Plaintiffs have submitted sworn testimony of over 60 class members, nearly 10% of class; this anecdotal evidence satisfies commonality. *See Smith*, 234 F.R.D. 348, at 662; *See also Hill*, 2002 U.S. Dist. LEXIS 13396 at *9 (commonality met when class cites to "numerous customer declarations and complaints of allegedly discriminatory treatment"); *Adams v. RR Donnelley & Sons*, 98 C 4025, 96 C 7717, 2001 U.S. Dist. LEXIS 4247, at *32 (N.D. Ill. Apr. 6, 2001)(commonality met employee declarations and statistical evidence of pattern or practice of discrimination).

[79] The Seventh Circuit has recognized that front pay, too, is equitable under Title VII. *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 952 (7th Cir. 1998) (front pay is the functional equivalent of reinstatement and "falls squarely within the statutory language authorizing any other equitable relief").

its employment practices is another question common to the class litigated through common evidence of senior management's knowledge of the systemic discrimination in its workplace and response in light of that knowledge.[80] *See Kolstad v. Am. Dental Ass'n.*, 527 U.S. 526, 544-45 (1999); *Barefield et al. v. Chevron, U.S.A., Inc.,* No. 86-2427, 1988 U.S. Dist. LEXIS 15816, at *11 (N.D. Cal. Dec. 6, 1988) (punitive damages hinge on defendant's conduct toward class as a whole); *Dukes v. Wal-Mart Stores, Inc*., 222 F.R.D. 137, 171-73 (N.D. Cal. 2004). The determination of an appropriate class-wide award to meet the objectives of punitive damages is also a common question. *See Palmer v. Combined Ins. Co. of Am.* 217 F.R.D. 430, 438-39 (N.D. Ill. 2003). Thus, Plaintiffs' proposed class satisfies commonality.

3.   Plaintiffs' Claims Are Typical Of Proposed Class Members' Claims.

Typicality is closely related to commonality and is met when "the named representatives' claims have the same essential characteristics as the claims of the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983); *Keele*, 149 F.3d at 595. A plaintiff's claim is typical if it "arises from the same … practice or course of conduct that gives rise to the claims of other class members and … is based on the same legal theory." *Keele*, 149 F.3d at 595, quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). Typicality is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996).

Typicality is satisfied because each of the class representatives challenge and were similarly harmed by the same, Firm-wide policies and practices as the members of the proposed class they seek to represent under the same disparate impact and pattern or practice legal theories of liability. *Smith*, 234 FRD at 648, at 659; *Bell*, 2005 U.S. Dist. LEXIS 60, at *7. As their testimony demonstrates, all of the sixteen class representatives were subjected to Merrill Lynch's uniform employment practices, which denied them and other class members valuable client accounts and other business opportunities and resources, excluded them from favorable teams and the benefits and competitive advantages that accompany team membership, and depressed

---

[80] This same body of common evidence (that Merrill Lynch's corporate officers knew of but ignored racial disparities, continued to maintain discriminatory practices, and failed to take appropriate corrective action) will also be an integral part of Plaintiffs' pattern or practice claims, as it shows intent.

their earnings and opportunities to advance.[81]  Plaintiffs have also submitted the declarations of

over 46 putative class members, current and former Merrill Lynch FAs, who attest that they

suffered from the same discriminatory practices and culture as the sixteen class representatives.

*See, e.g.* Decs. at Ex. 19.  Thus, the Plaintiffs' claims are typical of the class.

      4.    The Named Plaintiffs And Their Counsel Will Adequately Represent And Zealously Protect The Interests Of The Class.

Under Rule 23(a)(4), class representatives are adequate if their counsel is deemed

capable, they vigorously pursue the litigation, and their interests do not clash with the class.  *See*

*Wagner v. NutraSweet Co.,* 170 F.R.D. 448, 451 (N.D. Ill. 1997).  Plaintiffs have zealously

pursued this action on behalf of the proposed classes.  *See* Exs. 3-18. As explained in their decs,

Plaintiffs filed their claims on behalf of proposed class members,[82] investigated Merrill Lynch's

treatment of African Americans on a nationwide basis, and pursued extensive class discovery in

this case.  *See Gaspar*, 167 F.R.D. at 58-59.  In addition, Plaintiffs spent considerable time

meeting with counsel and each other to discuss their experiences and legal options; understand

their role as fiduciaries for the class; make informed litigation strategy decisions on behalf of the

class; and review and provide input regarding expert analysis, among other things.  *Id.* Each of

the named Plaintiffs was deposed at length for periods that far exceeded the seven-hour limit of

Rule 30(d)(1).  *See, e.g.,* Exs. 20-35.  The Plaintiffs have a common goal and share the same

interests as the class: to end Defendant's discriminatory policies and practices and achieve fair

compensation for class members harmed by these practices.  Ex. 3-18.

Finally, the named Plaintiffs retained qualified counsel with substantial experience

---

[81] *See, e.g.,* Ex. 26 at 460-61 (given worthless accounts), 303-04 (Caucasian broker given a disproportionately large book); Ex. 25 at 72-73 (management disproportionately directs accounts to their favorite FAs), at 91 (exclusion from account distributions); Ex. 27 at 32-33 (teams used to circumvent Account Distribution policy), at 58-59 (denied account distributions), at 143-44 (same), at 145 (lack of management support); Ex. 24, Coleman Dep. at 20-24 (exclusion from teams), 38-85 (denied equitable account distributions); Ex. 34 at 94-95 (denied training), at 372-73 (denied account distributions, management support, training), at 310-11 (denied walk-ins and call-ins); Ex. 23, Capel Dep. at 13-84 (no mentoring), at 357-58 (teams used to pass assets to other FAs); Ex. 20 at 99-102 (never received walk-ins, call-ins, or management referrals), at 35-37 (management gave incentives to non-African Americans to join teams), at 266-67 (excluded from team because potential teammate reported his clients would "not feel comfortable with a black woman"), at 271 (African Americans denied equitable offices, sales support); Ex. 35 at 316-17 (lack of management support); Ex. 21 at 190-91 (excluded from teams); Ex. 30 at 44-53 (teams used to circumvent Account Distribution policy), 65-68 (excluded from management); *See* Ex. 28, LaBorde Dep. at 72-73 (teams increase compensation), at 85-89 (other benefits of teams), at 115, 120 (denied opportunity to be on a team); Ex. 32 at 318 (given unproductive accounts).
[82] In addition, certain Plaintiffs filed representative charges with the EEOC.  *See* Exs. 37-41.

49

representing plaintiffs in complex class action employment discrimination cases, including a nationwide class of female FAs against this same Defendant. *See* Ex. 19A. *See, e.g.,* Ex. 214, *Cremin* Fairness Hrg Tr, at 36-37.

**B. Plaintiffs' Proposed Class Should Be Certified Under Rule 23(b)(2) For Liability, Injunctive and Equitable Relief.**

Plaintiffs' proposed classes can be certified under Rule 23(b)(2) because Merrill Lynch "has acted or refused to act on grounds generally applicable to the class," making injunctive or declaratory relief "appropriate … with respect to the class as a whole." Rule 23(b)(2). As the Supreme Court has held, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes. *Amchem Prods.,* 521 U.S. at 614. Plaintiffs have alleged and will present evidence that Merrill Lynch acted in a discriminatory manner by employing common, discriminatory practices that adversely affected class members as a whole. Plaintiffs therefore seek declaratory, injunctive and equitable relief with respect to the class as a whole.[83]

Plaintiffs respectfully submit that their proposed classes should be certified under Rule 23(b)(2) for liability, injunctive and equitable relief and common damages questions. This hybrid, or divided, approach to certification protects the rights of absent class members by providing them the opportunity to opt-out for damages issues under Rule 23(b)(3) or Rule 23(e)(C)(3) and has been recently reaffirmed by the Seventh Circuit and employed by courts in this Circuit. *See Allen*, 358 F.3d at 470 (remanded with order that harassment case be certified under Rule 23(b)(2) class for equitable matters and suggesting hybrid certification for damages issues); *Smith*, 2006 U.S. Dist. LEXIS 12375, at *37 (relying on Seventh Circuit authority, certifies race discrimination employment classes under Rule 23(b)(2) for equitable relief and Rule 23(b)(3) for other issues).

**C. Plaintiffs' Proposed Class Also Meets The Requirements Of Rule 23(b)(3).**

A class action may be maintained under Rule 23(b)(3) if (1) questions of law or fact common to members of the class predominate over questions affecting only individual members, and (2) a class action is superior to other available methods for the fair and efficient adjudication

---

[83] Plaintiffs seek lost pay for the class as a whole, which while monetary in nature, is a form of equitable relief. 42 U.S.C. § 2000e-5(g). Plaintiffs also seek class injunctive relief, including an end of or reform to Merrill Lynch's discriminatory policies and practices, and regular reporting to and monitoring by this Court. This relief is substantial and will benefit the entire class.

of the controversy. *See* Fed.R.Civ.P. 23(b)(3). Plaintiffs' proposed class satisfies both elements. Under Seventh Circuit law, a class action is a superior method to fairly and efficiently resolve Plaintiffs' claims because of the policy interests underlying Title VII and principles of judicial economy. *See Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 471-72 (7th Cir. 2004).

     1.    <u>Questions Of Law And Fact Common To The Class Predominate Over Questions Affecting Only Individual Class Members.</u>

Predominance under Rule 23(b)(3) "'normally turns on the answer to one basic question: is there an essential common factual link between all class members and [Merrill Lynch] for which the law provides a remedy?'" *Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 284 (N.D. Ill. 2005)(quoting *Johns v. DeLeonardis*, 145 F.R.D. 480, 484-85 (N.D. Ill. 1992)). This case provides many common factual links, including those underlying Plaintiffs' theories of liability and class-wide relief.[84]

Common questions predominate because "[l]iability in this case is predicated on the same legal theor[ies] and the same alleged misconduct by [Merrill Lynch] toward the class members." *Kremnitzer et al. v. Cabrera & Rephen, P.C.*, 202 F.R.D. 239, 242 (N.D. Ill. 2001)(granting class certification under Rule 23(b)(3)). Indeed, certification here is "particularly appropriate [because] a common factual issue [liability] acts as a predicate to recovery by any class member" on Plaintiffs' claims. *Owner-Operator Indep. Drivers Assoc., Inc.*, 231 F.R.D. at 285 (*citing In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005))(predominance satisfied where a common threshold factual issue will determine ability of class members to recover).

Plaintiffs' common questions relate, first and foremost, to whether Merrill Lynch is liable for a pattern or practice of discrimination and whether its employment policies and practices had a disparate impact on African American FAs. Resolving these common questions is *the* dominant issue in this case and plainly predominates over any individual questions.

Plaintiffs' disparate impact claims rest squarely on common questions with regard to whether Merrill Lynch maintained facially neutral policies and practices that had a disparate impact upon African American FAs. Likewise, Plaintiffs' efforts to obtain a jury determination that Merrill Lynch maintained a pattern or practice of race discrimination also raises common

---

[84] Many courts have held that "a finding of commonality [under Rule 23[a]] will likely satisfy a finding of predomination. … Like the Rule 23(a)(2) standard, issues are considered to predominate when there is a common nucleus of operative fact among all the class members." *Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 U.S. Dist. LEXIS 14785, *18 (N.D. Ill. Aug. 9, 2002), *aff'd* 319 F.3d 910 (7th Cir. 2003). Thus, the numerous common fact and law questions in Arg. Part II.A.2. also demonstrate predominance.

questions that predominate.[85] As described in Part II.A.2., neither party's arguments or statistical and anecdotal evidence relies on individual questions that are not common to the class.

Not surprisingly, then, courts in this Circuit routinely hold that common questions in pattern or practice and disparate impact employment discrimination claims predominate over questions relating only to individual class members. *See, e.g., Smith v. Nike Retail Serv.*, Inc., No. 03 C 9110, 2006 U.S. Dist. LEXIS 12375, at *40-41 (N.D. Ill. Mar. 22, 2006)(predominance met, and class certified, in Title VII and §1981 race discrimination case); *Bell*, 2005 U.S. Dist. LEXIS 60, at *8-11 (certifying disparate impact and pattern or practice race discrimination pay and promotion claims pursuant to Rule 23(b)(3)); *Wilfong*, 2001 U.S. Dist. LEXIS 22718, at *27-28 (whether Rent-A-Center engaged in a pattern or practice of discrimination provided "the essential factual link between all class members and the defendant" sufficient to satisfy predominance under Rule 23(b)(3))(internal quotation omitted); *Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 387 (N.D. Ill. 1999) (certifying sexual harassment class action under Rule 23(b)(3) notwithstanding factual differences regarding the treatment of individual class members).

Assuming Plaintiffs can establish liability, other significant issues that can and should be resolved on a class-wide basis are lost pay relief, whether Merrill Lynch is liable for punitive damages, and the amount of punitive damages to which the class is entitled. Upon a finding of liability in a Title VII case, the prospect of a class-wide back pay award raises common questions regarding the aggregate pay class members lost due to discrimination and whether and how the Court should determine and apportion back pay to class members. *See O&G Spring*, 38 F.3d at 880. An aggregate award may be made to the entire class based on expert statistical evidence of the class-wide injury, which will likely be presented to the Court in connection with Plaintiffs' evidence on liability. *See Stewart v. Gen'l. Motors Corp.*, 542 F.2d 445, 451-53 (7th Cir. 1976)(district court may decide to award back pay "on a classwide basis to be divided among the entire group which they represent" to provide "incentive for employers to obey the statute" and to properly compensate victims of discrimination); *see also Liberles v. County of Cook*, 709 F.2d 1122, 1136 (7th Cir. 1983); *O&G Spring*, 38 F.3d at 880 (affirming district court's pro rata award of aggregate back pay determination).

If Plaintiffs prove Merrill Lynch engaged in a pattern or practice of discrimination,

---

[85] To establish pattern or practice liability, Plaintiffs must prove a "regular, purposeful, less-favorable treatment of a protected group," *King*, 960 F.2d at 623, or "that discriminatory [treatment] was the standard operating procedure." *O&G Spring*, 38 F.3d at 878 n.8 (citing *Teamsters*, 431 U.S. at 336).

common questions regarding whether punitive damages are appropriate, and if so in what amount, also arise and, when combined with the aforementioned questions on liability and lost pay relief, also predominate. The Defendant's conduct, not the individual circumstances of class members, is at issue given the purpose of punitive damages, and an aggregate class-wide punitives award is preferable. *See Palmer*, 217 F.R.D. at 440 ("[T]his case is directed at the practices and procedures at Combined, and punitive damages can be awarded to the class as a whole … questions concerning Combined's alleged systemic discrimination predominate over individual questions"); *Barefield*, 1988 U.S. Dist. LEXIS 15816, at *11.

Thus, deciding liability under Plaintiffs' disparate impact and pattern or practice theories raises class-wide issues, which serve as a predicate to recovery for the class and establish predominance. Additionally, because the trial of those class-wide liability issues also provides evidence from which the Court can resolve common class-wide damages issues, those issues predominate over individual questions. Because the evidence relevant to all of these issues can be presented in a single proceeding, this case is far more manageable as a class action.

### 2. Class Treatment Is Superior To Other Available Methods For The Fair And Efficient Adjudication Of The Class Claims.

Class treatment of Plaintiffs' discrimination claims challenging Defendant's conduct on a company-wide basis is superior to other alternatives of adjudication. In addition to obvious efficiency gains, certifying Plaintiffs' claims for liability and class relief advance the policy interests of Title VII: "[t]o allow the case to proceed as a class action with respect to both equitable and non-equitable relief best serves one of the primary purposes of Title VII, which is 'to bring an end to the proscribed discriminatory practices.'" *Palmer*, 217 F.R.D. at 441 (quoting *Bowe v. Colgate-Palmolive Co.* 416 F.2d 711, 720 (7th Cir. 1969)).

Each of the non-exclusive factors set forth in Rule 23(b)(3) weigh in favor of certification.[86] First, there is no need for individuals to pursue separate actions here, because the underlying claims rely on the same proof. Moreover, the financial burden of proving Merrill Lynch's pattern of discrimination would make the prosecution of individual actions very difficult for most class members. There is little incentive for an individual plaintiff to pursue a pattern or

---

[86] These factors are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

practice or disparate impact claim because of the substantial burdens and costs involved in data and expert discovery, particularly as compared to an individual's potential recovery. Similarly, many potential plaintiffs are deterred by the practical, as well as financial, risks entailed in suing their employer. *Warnell*, 189 F.R.D., at 388 (a "class action will permit adjudication of possibly meritorious claims which otherwise might not be brought on behalf of women who are unable or unwilling to sue their employer, a risky and frightening business even for a brave employee"). Therefore, as the *Bell* court held, "the interest of individual class members in individually controlling the liability phase of the pattern or practice and disparate impact actions is not great." *Bell*, 2005 U.S. Dist. LEXIS 60, at *10. Indeed, without class certification, individual class members may lack the ability to discover how a particular alleged discriminatory practice affects others outside of their office, or to obtain the presumption established by a successful pattern or practice trial "that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters*, 431 U.S. at 362; *see also, Gilty v. Village of Oak Park*, 919 F.2d 1247, 1252 (7th Cir. 1990). This fact, too, weighs in favor of class certification. *See Wilfong*, 2001 U.S. Dist. LEXIS 22718, at *27-28.

Second, Plaintiffs are not aware of any related class action or disparate impact litigation pending against Merrill Lynch. Third, it would be desirable to consolidate actions in one forum. Class members are dispersed across the country and allege they were subjected to the same Firm-wide discriminatory policies and practices. Holding at least a single liability trial before this Court – a Court familiar with the applicable facts and law – would prevent numerous courts across the country from hearing the same evidence regarding the geographically separated class members' claims in multiple proceedings and prevent inconsistent judgments. *See Bell*, 2005 U.S. Dist. LEXIS 60, at *10-11; *Warnell*, 189 F.R.D. at 388 (pattern or practice class superior to "repeated adjudication of sexual harassment claims piecemeal and *seriatim*" by named plaintiffs and "other plaintiffs who may choose to sue,").

Fourth, this case presents no impediments to manageability, as demonstrated in part by the regular certification of similar employment and civil rights cases. *See, e.g., Smith*, 2006 U.S. Dist. LEXIS 12375, at *41-43 (class action superior, particularly at liability stage); *Wilfong v. Rent-A-Center*, 2001 U.S. Dist LEXIS 22718, No. 00-0680 (S.D. Ill. 2001); *Bell*, 2005 U.S. Dist. LEXIS 60, No. 03 C 50190, at 7-8 (N.D. Ill. Jan. 3, 2005); *Tucker v. Walgreen Co.*, 2007 U.S. Dist. LEXIS 74628 No. 05-440-GPM, 07-172-GPM (S.D. Ill. Oct. 5, 2007) (certifying

employment race discrimination class under Rule 23(b)(2) for injunctive aspects and under Rule 23(b)(3) for damages aspects); *Dunn v. City of Chicago*, 231 F.R.D. 367, 367 (N.D. Ill. 2005)(Gettleman, J.) (class of post-arrest detainees certified under Rule 23(b)(3)); *Acosta v. Scott Labor LLC*, 2006 U.S. Dist. LEXIS 153 (N.D. Ill. Jan. 3, 2006)(Gettleman, J.) (certifying classes of laborers denied pay, overtime, and minimum wage under Rule 23(b)(3)). Moreover, as described above, class treatment allows the Court to employ and easily manage a single trial, where common statistical, anecdotal and other evidence may be weighed to determine liability and common damage issues. *See Allen*, 358 F.3d at 471. Accordingly, class treatment is superior to any other means of adjudication for the fair and efficient resolution of Plaintiffs' claims and those of the class.

## CONCLUSION

For the reasons stated herein, Plaintiffs have established Rule 23's requirements for class certification and respectfully request that this Court grant their motion for class certification.

Respectfully submitted on behalf of Plaintiffs and the putative class,

Linda D. Friedman

Mary Stowell, Bar No. 02750015
Linda D. Friedman, Bar No. 06190092
George Robot, Bar No. 06237979
Suzanne E. Bish, Bar No. 06242534

**Stowell & Friedman, Ltd.**
321 South Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888