**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **GEORGE McREYNOLDS**, et al.,<br>Individually and as Class Representatives,<br><br>Plaintiffs,<br>v.<br><br>**MERRILL LYNCH, PIERCE, FENNER<br>& SMITH, INCORPORATED**,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No.: 05-C-6583**<br><br>**Judge Robert W. Gettleman**<br>**Magistrate Judge Denlow** |

**MERRILL LYNCH'S *CORRECTED* MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**MAYER BROWN LLP**
Stephen M. Shapiro
Lori E. Lightfoot
Timothy S. Bishop
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

**WEIL, GOTSHAL & MANGES LLP**
Jeffrey S. Klein
Nicholas J. Pappas
Salvatore A. Romanello
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

*Attorneys for Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated*

Filed: May 15, 2009
Updated: August 7, 2009

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

PLAINTIFFS' CLAIMS .................................................................................... 4

STATEMENT OF FACTS ................................................................................ 6

I.   Merrill Lynch's Decentralized Wealth Management Business Provides
     Circumscribed Discretion To Hundreds Of Local Managers. .............................. 6

II.  Financial Advisors Operate Their Own Businesses Within A Business
     And Are Paid Based On Their Success. .......................................................... 7

     A.   Autonomous FAs Succeed Or Fail Based On Their Ability To
          Generate Business From Wealthy Clients. ................................................ 7

     B.   Merrill Lynch Mechanically Calculates FAs' Compensation Based
          On Their Production. ......................................................................... 10

III. Hundreds Of Independent Decisionmakers Are Responsible For The
     Practices About Which Plaintiffs Complain. ................................................. 12

     A.   FAs' Pooling And Teaming Experiences Are Highly
          Individualized. ................................................................................ 12

          1.   There is no common team experience. ........................................... 12

          2.   Plaintiffs' teaming analysis omits the critical variable. .................... 15

     B.   Whether Particular Account Distributions And Transfers Involve
          Discrimination Requires Close Attention To Individual
          Circumstances. ................................................................................ 16

          1.   There is no common account distribution or transfer; each
               is unique. ............................................................................... 16

          2.   Managers' exercise of discretion in account distributions is
               constrained by the ADP and has benefited many African
               American FAs. ........................................................................ 18

          3.   There is no evidence that the ADP is discriminatory; its
               effect depends on individual choices made by each FA. ................... 19

     C.   Termination Practices For POA FAs Are Highly Varied. ......................... 21

     D.   FAs' Training And Mentoring Experiences Are Highly
          Individualized. ................................................................................ 22

          1.   Training experience depends on individual choices made
               by FAs and managers. ............................................................... 22

          2.   Mentoring experience depends on individual choices made
               by FAs and managers. ............................................................... 24

     E.   Merrill Lynch Has No Uniform Hiring Practice For FAs. ........................ 25

# TABLE OF CONTENTS
(continued)

**Page**

IV. Moves Into Management Involve Individualized Considerations. ..................... 27

    A. Determining Whether Discrimination Affects Any FA's Attendance At The Management Assessment Center Requires Individualized Inquiries. ......................................................... 27

    B. Determining Whether Discrimination Affects Any FA's Experience At MAC Requires Individualized Inquiries. ........................ 29

ARGUMENT .................................................................................................. 29

I. No Class May Be Certified Because Plaintiffs Have Not Satisfied Rule 23(a)'s Commonality, Typicality, Or Adequacy Requirements. ........................ 30

    A. "Across-the-Board" Suits Like This One Inherently Lack Commonality. ........................................................................... 30

    B. Decentralized Decisionmaking And Broad FA Autonomy Mean That The Issues To Be Tried Are Highly Individualized, Not Common To The Class. .................................................................. 31

    C. Plaintiffs' Own Testimony Refutes Commonality. ................................. 34

    D. Plaintiffs' Theory That Merrill Lynch Has A Culture Of Discrimination That Leads To Opportunity Hoarding By Caucasians Does Not Create Commonality. ............................................. 36

    E. Plaintiffs' Statistical Evidence Does Not Establish Commonality. ........ 40

        1. Plaintiffs' statistics do nothing to eliminate the need for highly individualized inquiries to determine liability. ................. 40

        2. Plaintiffs' statisticians fail to establish a link to Merrill Lynch actions. ............................................................ 43

    F. Because Title VII Bars Challenge To Merrill Lynch's Production-Based Compensation Program, Plaintiffs' Compensation Claim Cannot Satisfy Commonality. .................................................. 46

    G. Plaintiffs Are Not Typical Representatives Of The Proposed Class. ...... 48

    H. Plaintiffs Are Not Adequate Class Representatives. ............................... 49

II. The Proposed Class Does Not Satisfy Rule 23(b)(2). .......................................... 51

III. The Proposed Class Does Not Satisfy Rule 23(b)(3). .......................................... 54

    A. Individual Issues Predominate Over Any Common Issues. ..................... 54

    B. A Class Action Is Not Superior To Alternative Methods Of Adjudication. ......................................................................... 60

IV. Hybrid Certification Would Be Improper. ......................................................... 61

**TABLE OF CONTENTS**
(continued)

**Page**

V.     Prior Broker Class Certifications Carry No Weight Here. .................................. 64

CONCLUSION.......................................................................................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abram v. UPS,*
    200 F.R.D. 424 (E.D. Wis. 2001) ........................................................44

*Acosta v. Scott Labor LLC,*
    2006 U.S. Dist. LEXIS 153 (N.D. Ill. Jan. 3, 2006) ................................60

*Adams v. R.R. Donnelley & Sons,*
    2001 U.S. Dist. LEXIS 4247 (N.D. Ill. Apr. 6, 2001) ......................32, 56

*Adler v. Wallace Computer Servs.,*
    202 F.R.D. 666 (N.D. Ga. 2001) ..........................................................62

*Allen v. City of Chicago,*
    828 F. Supp. 543 (N.D. Ill. 1993) ..............................3, 31, 33, 49, 50

*Allen v. CTA,*
    2000 U.S. Dist. LEXIS 11043 (N.D. Ill. July 28, 2000)............31, 38, 49

*Allen v. Int'l Truck & Engine Corp.,*
    358 F.3d 469 (7th Cir. 2004) ...............................................................63

*Allison v. Citgo Petrol. Corp.,*
    151 F.3d 402 (5th Cir. 1998) ...............................56, 58, 59, 60, 61, 63

*Allstate Ins. Co., In re,*
    400 F.3d 505 (7th Cir. 2005) .....................................................51, 53, 62

*Am. Nurses' Ass'n v. Illinois,*
    783 F.2d 716 (1986)............................................................................33

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997)........................................................3, 50, 54, 57, 64

*Amos v. Geico Corp.,*
    2008 U.S. Dist. LEXIS 72889 (D. Minn. Sept. 24, 2008) ......................53

*Andrews v. Chevy Chase Bank,*
    545 F.3d 570 (7th Cir. 2008) .............................4, 35, 54, 56, 60, 61, 62

*Arnold v. Cargill Inc.,*
    2006 U.S. Dist. LEXIS 41555 (D. Minn. June 20, 2006).................37, 44

## TABLE OF AUTHORITIES (CONT)

**Page(s)**

*Augst-Johnson v. Morgan Stanley*,
   No. 06-11432 (D.D.C. Oct. 26, 2007) ....................................................................66

*Bacon v. Honda of Am. Mfg.*,
   370 F.3d 565 (6th Cir. 2004) ................................................................................38

*Balderston v. Fairbanks Morse Engine Div.*,
   328 F.3d 309 (7th Cir. 2003) ..........................................................................40, 45

*Bartelson v. Dean Witter & Co.*,
   86 F.R.D. 657 (E.D. Pa. 1980) ..............................................................................66

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ..............................................................................................41

*Beck v. Boeing Co.*,
   203 F.R.D. 459 (W.D. Wash. 2001) ......................................................................46

*Bell v. Woodward Governor Co.*,
   2005 U.S. Dist. LEXIS 60 (N.D. Ill. Jan. 3, 2005) ..............................................55

*Bennett v. Roberts*,
   2000 U.S. Dist. LEXIS 8351 (N.D. Ill. June 14, 2000) ..............................32, 40, 52

*Betts v. Sundstrand Corp.*,
   1999 U.S. Dist. LEXIS 9743 (N.D. Ill. June 21, 1999) ..................................32, 38

*Bishop v. Gainer*,
   272 F.3d 1009 (7th Cir. 2001) ..............................................................................52

*Blise v. Antaramian*,
   409 F.3d 861 (7th Cir. 2005) ................................................................................37

*Blyden v. Mancusi*,
   186 F.3d 252 (2d Cir. 1999) ..................................................................................64

*Bridgestone/Firestone, Inc., In re*,
   288 F.3d 1012 (7th Cir. 2002) ........................................................................57, 61

*Broussard v. Meineke Discount Muffler Shops*,
   155 F.3d 331 (4th Cir. 1998) ................................................................................57

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ..........................................................................63, 66

*Clark v. Experian Info. Solutions*,
   256 F. App'x 818 (7th Cir. 2007) ..........................................................................62

### TABLE OF AUTHORITIES (CONT)

**Page(s)**

*Claybourne v. Omaha Pub. Power Dist.*,
211 F.R.D. 573 (D. Neb. 2002)............................................................45

*Coates v. Johnson & Johnson*,
756 F.2d 524 (7th Cir. 1985) ...............................................................43

*Cohen v. Blockbuster Entm't*,
878 N.E.2d 132 (Ill. App. Ct. 2007) .....................................................65

*Colindres v. Quietflex Mfg.*,
235 F.R.D. 347 (S.D. Tex. 2006).........................................................56

*Cooper v. S. Co.*,
390 F.3d 695 (11th Cir. 2004) ...........................................44, 49, 56, 63

*Council 31, AFSCME v. Doherty*,
169 F.3d 1068 (7th Cir. 1999) .............................................................33

*Cremin v. Merrill Lynch*,
No. 96 C 3773 (N.D. Ill. 1998).......................................................43, 65

*Cullen v. Ind. Univ. Bd. of Trs.*,
338 F.3d 693 (7th Cir. 2003) ...............................................................48

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003)...............................................................................57

*Diamond v. T. Rowe Price Assocs.*,
852 F. Supp. 372 (D. Md. 1994) ..........................................................47

*Dukes v. Wal-Mart, Inc.*,
No. 04-16688, Order Granting Rehearing En Banc (9th Cir. Feb. 13, 2009).........................38

*Dunn v. City of Chicago*,
231 F.R.D. 367 (N.D. Ill. 2005)............................................................60

*E. Tex. Motor Freight Sys. v. Rodriguez*,
431 U.S. 395 (1977).............................................................................49

*EEOC v. Chicago Miniature Lamp Works*,
947 F.2d 292 (7th Cir. 1991) ..........................................................33, 42

*EEOC v. Consol. Serv. Sys.*,
989 F.2d 233 (7th Cir. 1993) ...............................................................48

*EEOC v. Int'l Profit Assocs., Inc.*,
2007 U.S. Dist. LEXIS 78378 (N.D. Ill. Oct. 23, 2007).........................59

**TABLE OF AUTHORITIES (CONT)**

**Page(s)**

*EEOC v. Morgan Stanley*,
    324 F. Supp. 2d 451 (S.D.N.Y. 2004) ...................................................................37

*EEOC v. O & G Spring & Wire Forms Specialty Co.*,
    38 F.3d 872 (7th Cir. 1994) ...............................................................................59

*EEOC v. Sears, Roebuck*,
    839 F.2d 302 (7th Cir. 1988) .............................................................................41

*Ellis v. Elgin Riverboat Resort*,
    217 F.R.D. 415 (N.D. Ill. 2003).........................................31, 36, 38, 43, 49, 50, 66

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997) .............................................................................52

*Farrell v. Butler Univ.*,
    421 F.3d 609 (7th Cir. 2005) .....................................................................33, 43, 56

*Garcia v. Johanns*,
    444 F.3d 625 (D.C. Cir. 2006)...........................................................................31

*Gaston v. Exelon Corp.*,
    247 F.R.D. 75 (E.D. Pa. 2007)..........................................................................52

*Gen. Tel. Co. v. EEOC*,
    446 U.S. 318 (1980).........................................................................................49

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982)................................................................................3, 30, 38, 49

*Gerbush v. Hunt R.E. Corp.*,
    79 F. Supp. 2d 260 (W.D.N.Y. 1999) ...............................................................47

*Gerlib v. R.R. Donnelley & Sons*,
    1997 U.S. Dist. LEXIS 16842 (N.D. Ill. Oct. 24, 1997).......................................32

*Gilty v. Vill. of Oak Park*,
    919 F.2d 1247 (7th Cir. 1990) ...........................................................................45

*Gorence v. Eagle Food Centers*,
    1994 U.S. Dist. LEXIS 11438 (N.D. Ill. Aug. 15, 1994)..................................31, 60

*Hamilton v. O'Connor Chevrolet*,
    2006 U.S. Dist. LEXIS 44149 (N.D. Ill. June 12, 2006) .....................30, 58, 61, 62

*Humphrey v. Int'l Paper*,
    2003 U.S. Dist. LEXIS 16040 (N.D. Ill. Sept. 10, 2003) ..................................60, 61

**TABLE OF AUTHORITIES (CONT)**

**Page(s)**

*Hyderi v. Wash. Mut. Bank*,
    235 F.R.D. 390 (N.D. Ill. 2006)............................................................................54

*Hydrogen Peroxide Antitrust Litig. , In re*,
    552 F.3d 305 (3d Cir. 2008)...........................................................2, 30, 35, 56

*Int'l Bhd. of Teamsters v. United States*,
    431 U.S. 324 (1977)................................................................33, 41, 47, 48, 57

*Jefferson v. Ingersoll Int'l, Inc.*,
    195 F.3d 894 (7th Cir. 1999) ....................................................................51, 63

*Jones v. GES Expo. Servs.*,
    2004 U.S. Dist. LEXIS 17981 (N.D. Ill. Sept. 3, 2004) ........................................32

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ................................................................................30

*Larkin v. Pullman-Standard Div.*,
    854 F.2d 1549 (11th Cir. 1988) ...........................................................................47

*Lemon v. Int'l Union*,
    216 F.3d 577 (7th Cir. 2000) ....................................51, 53, 54, 56, 58, 63

*Liberles v. County of Cook*,
    709 F.2d 1122 (7th Cir. 1983) .............................................................................59

*Lindsey v. Normet*,
    405 U.S. 56 (1972)...............................................................................................57

*Martens v. Smith Barney, Inc.*,
    181 F.R.D. 243 (S.D.N.Y. 1998) .........................................................................66

*McDaniel v. Anheuser-Busch*,
    987 F.2d 298 (5th Cir. 1993) ...............................................................................64

*McDaniel v. Qwest Commc'ns*,
    2006 U.S. Dist. LEXIS 37066 (N.D. Ill. May 23, 2006) ......................................65

*McDougal-Wilson v. Goodyear Tire & Rubber Co.*,
    427 F. Supp. 2d 595 (E.D.N.C. 2006)...................................................................47

*Mirfasihi v. Fleet Mortgage Corp.*,
    551 F.3d 682 (7th Cir. 2008) ...............................................................................50

*Monreal v. Potter*,
    367 F.3d 1224 (10th Cir. 2004) ...........................................................................62

## <u>TABLE OF AUTHORITIES (CONT)</u>

**Page(s)**

*Mozee v. Am. Commercial Marine Serv. Co.*,
    940 F.2d 1036 (7th Cir. 1991) ..................................................................43

*Nagel v. ADM Investor Servs.*,
    217 F.3d 436 (7th Cir. 2000) ....................................................................61

*NCAA I-A Walk-On Football Players Litig. , In re*,
    2006 U.S. Dist. LEXIS 28824 (W.D. Wash. May 3, 2006)........................50

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000)...................................................................................57

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...................................................................................65

*Oshana v. Coca-Cola Co.*,
    472 F.3d 506 (7th Cir. 2006) ....................................................................30

*Pakovich v. Broadspire Servs.*,
    535 F.3d 601 (7th Cir. 2008) ....................................................................65

*Palmer v. Combined Ins. Co.*,
    217 F.R.D. 430 (N.D. Ill. 2003).................................................................59

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
    487 F.3d 1042 (7th Cir. 2007) ..................................................................60

*Patterson v. Gen. Motors Corp.*,
    631 F.2d 476 (7th Cir. 1980) ...............................................................30, 49

*Payton v. County of Carroll*,
    473 F.3d 845 (7th Cir. 2007) ....................................................................49

*People Who Care v. Rockford Bd. of Educ.*,
    246 F.3d 1073 (7th Cir. 2001) ..................................................................42

*Personnel Adm'r v. Feeney*,
    442 U.S. 256 (1979)...................................................................................33

*Plywood Antitrust Litig., In re*,
    655 F.2d 627 (5th Cir. 1981) ....................................................................64

*Puffer v. Allstate Ins. Co.*,
    255 F.R.D. 450 (N.D. Ill. 2009) ...................................................... *passim*

*Pullman-Standard v. Swint*,
    456 U.S. 273 (1982)...................................................................................43

<u>**TABLE OF AUTHORITIES (CONT)**</u>

**Page(s)**

*Radmanovich v. Combined Ins.*,
  216 F.R.D. 424 (N.D. Ill. 2003)................................................30, 34, 54, 55, 56, 60

*Radue v. Kimberly-Clark Corp.*,
  219 F.3d 612 (7th Cir. 2000) ...............................................................41

*Ramirez v. DeCoster*,
  194 F.R.D. 348 (D. Me. 2000)..............................................................64

*Reeb v. Ohio Dep't of Rehab. & Corr.*,
  435 F.3d 639 (6th Cir. 2006) ................................................53, 57, 58, 61

*Reid v. Lockheed Martin Aero. Co.*,
  205 F.R.D. 655 (N.D. Ga. 2001)...........................................................31

*Remien v. EMC Corp.*,
  2008 U.S. Dist. LEXIS 74174 (N.D. Ill. Mar. 3, 2008)....................................1, 33, 51, 53, 60

*Retired Chicago Police Ass'n v. City of Chicago*,
  7 F.3d 584 (7th Cir. 1993) ................................................................50

*Rhodes v. Cracker Barrel Old Country Store, Inc.*,
  2002 U.S. Dist. LEXIS 25962 (N.D. Ga. Dec. 31, 2002)....................................40

*Rhone-Poulenc Rorer Inc., In re*,
  51 F.3d 1293 (7th Cir. 1995) ......................................................61, 63, 64

*Robertson v. Sikorsky Aircraft Corp.*,
  2001 U.S. Dist. LEXIS 11662 (D. Conn. July 5, 2001)......................................52

*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
  211 F.3d 1228 (11th Cir. 2000) ...................................................54, 58, 61

*Sandoval v. City of Chicago*,
  2007 U.S. Dist. LEXIS 77829 (N.D. Ill. Oct. 18, 2007)......................................32

*Scott v. Dallas County Hosp. Dist.*,
  2003 U.S. Dist. LEXIS 6744 (N.D. Tex. Apr. 21, 2003) .....................................47

*Scott v. Parkview Mem. Hosp.*,
  175 F.3d 523 (7th Cir. 1999) ...............................................................37

*Sec'y of Labor v. Fitzsimmons*,
  805 F.2d 682 (7th Cir. 1986) ...............................................................51

*Serrano v. Cintas Corp.*,
  2009 U.S. Dist. LEXIS 26606 (E.D. Mich. Mar. 31, 2009) ..................................52

**TABLE OF AUTHORITIES (CONT)**

**Page(s)**

*Shook v. Bd. of County Comm'rs,*
543 F.3d 597 (10th Cir. 2008) ...........................................................................53

*Simon II Litig., In re,*
407 F.3d 125 (2d Cir. 2005)...............................................................................59

*Smith v. Nike Retail Servs.,*
234 F.R.D. 648 (N.D. Ill. 2006)..........................................................................55

*Smith v. Sheriff of Cook County,*
2008 U.S. Dist. LEXIS 60248 (N.D. Ill. July 16, 2008)......................................62

*Smith v. Texaco, Inc.,*
263 F.3d 394 (5th Cir. 2001) .......................................................................55, 63

*St. Jude Med., Inc., In re,*
425 F.3d 1116 (8th Cir. 2005) ...........................................................................54

*Stanley v. Univ. of S. Cal.,*
13 F.3d 1313 (9th Cir. 1994) .............................................................................43

*Stastny v. S. Bell,*
628 F.2d 267 (4th Cir. 1980) ...........................................................31, 44, 45, 52

*State Farm Mut. Auto. Ins. Co. v. Campbell,*
538 U.S. 408 (2003)...........................................................................................58

*Stewart v. Gen. Motors Corp.,*
542 F.2d 445 (7th Cir. 1976) .............................................................................59

*Szabo v. Bridgeport Machs., Inc.,*
249 F.3d 672 (7th Cir. 2001) ...............................................................................3

*Tagatz v. Marquette Univ.,*
861 F.2d 1040 (7th Cir. 1988) ...........................................................................44

*Thorogood v. Sears, Roebuck & Co.,*
547 F.3d 742 (7th Cir. 2008) .................................................................30, 58, 61

*Ticor Title Ins. Co. v. Brown,*
511 U.S. 117 (1994)...........................................................................................51

*Tooley v. Burger King Corp.,*
1995 U.S. Dist. LEXIS 4525 (N.D. Ill. Mar. 23, 1995).......................................32

*Tucker v. Walgreen Co.,*
2007 U.S. Dist. LEXIS 74628 (S.D. Ill. Oct. 5, 2007) ........................................60

<u>**TABLE OF AUTHORITIES (CONT)**</u>

**Page(s)**

*TWA v. Hardison,*
  432 U.S. 63 (1977)............................................................................47

*Valley Drug Co. v. Geneva Pharm., Inc.,*
  350 F.3d 1181 (11th Cir. 2003) ........................................................51

*Vega v. T-Mobile USA, Inc.,*
  2009 U.S. App. LEXIS 7682 (11th Cir. Apr. 7, 2009) .......................57

*Vollmer v. Selden,*
  350 F.3d 656 (7th Cir. 2003) ............................................................64

*Vulcan Golf, LLC v. Google Inc.,*
  254 F.R.D. 521 (N.D. Ill. 2008).........................................................57

*Wachtel v. Guardian Life Ins. Co.,*
  453 F.3d 179 (3d Cir. 2006)........................................................29, 61

*Walters v. Cent. States Coca-Cola Bottling Co.,*
  U.S. Dist. LEXIS 17207 (N.D. Ill. Oct. 16, 2001) ............................57

*Warnell v. Ford Motor Co.,*
  189 F.R.D. 383 (N.D. Ill. 1999).........................................................55

*Watson v. Ft. Worth Bank,*
  487 U.S. 977 (1988)....................................................................37, 38

*West v. Prudential Sec.,*
  282 F.3d 935 (7th Cir. 2002) ......................................................40, 56

*Western Elec. Co. v. Stern,*
  544 F.2d 1196 (3d Cir. 1976)............................................................57

*Wilfong v. Rent-A-Center,*
  2001 U.S. Dist. LEXIS 22718 (S.D. Ill. Dec. 27, 2001).....................55

*Yahoo! Litig., In re,*
  251 F.R.D. 459 (C.D. Cal. 2008) .......................................................65

*Yi v. Sterling Collision Ctrs.,*
  480 F.3d 505 (7th Cir. 2007) ............................................................48

**STATUTES**

28 U.S.C. § 2072(b) ...............................................................................57

42 U.S.C. § 1981a(b)(1)....................................................................58, 61

**TABLE OF AUTHORITIES (CONT)**

Page(s)

42 U.S.C. § 1981a(b)(3) ..................................................................................58

42 U.S.C. § 2000e-2(h) ..................................................................................47

42 U.S.C. § 2000e-5(g) ..................................................................................61

42 U.S.C. § 2000e-5(g)(2)(B) ........................................................................57

42 U.S.C. § 2000e-5(k) ..................................................................................61

RULES

Fed. R. Civ. P. 23 ...............................................................................29, 61, 65, 66

Fed. R. Civ. P. 23(a) ..............................................................................30, 31, 62

Fed. R. Civ. P. 23(b)(2) ...........................................30, 51, 52, 53, 61, 62, 65, 66

Fed. R. Civ. P. 23(b)(3) ..........................................................29, 30, 54, 61, 62

Fed. R. Civ. P. 65 ...........................................................................................53

Fed. R. Civ. P. 65(d)(1) ..................................................................................53

OTHER AUTHORITIES

Fentonmiller, *Damages, Jury Trials, & the Class Action Under the Civil Rights Act of 1991*, 12 Lab. Law. 421 (1997) ...............................................................35

Greiner, *Causal Inference in Civil Rights Litigation*, 122 Harv. L. Rev. 533 (2008) ..................43

Piar, *The Uncertain Future of Title VII Class Actions After the Civil Rights Act of 1991*, 2001 B.Y.U. L. Rev. 305 (2001) ..........................................................61, 64

Redish & Kastanek, *Settlement Class Actions*, 73 U. Chi. L. Rev. 545 (2006) ...........................64

Wolf, *Evading Friendly Fire: Achieving Class Certification After the Civil Rights Act of 1991*, 100 Colum. L. Rev. 1847 (2000) ..........................................64

7B Charles A. Wright, et al., *Federal Practice & Procedure* § 1797.2 (3d ed. 2005) .................64

## PRELIMINARY STATEMENT

There are many issues the Court must address in deciding whether to certify this class, and we review them in detail below. But two points should be highlighted from the very start.

*First*, plaintiffs create the impression that this Court should grant class certification as a matter of course and that any other decision would put this Court outside the mainstream of judicial precedent. Nothing could be further from the truth. Plaintiffs cite no case outside the settlement context in which a court has ever certified a nationwide discrimination case seeking monetary relief against a financial services firm. And courts have declined to certify a class as broad and fragmentary as this one, involving more than 1,000 class members in more than 100 office complexes challenging dozens of different types of actions by hundreds of different managers over a period that extends for at least 8 years—a sharp contrast to the single facility, limited time-frame cases upon which plaintiffs rely. Indeed, Judge Schenkier and Judge Kocoras both recently refused to certify classes similar to the one sought here in cases brought by the same law firm that has brought this action and supported by some of the same experts making the same arguments made here. *Puffer v. Allstate Ins. Co.*, 255 F.R.D. 450 (N.D. Ill. 2009), *pet. for leave to appeal denied*, No. 09-8005 (7th Cir. Mar. 25, 2009); *Remien v. EMC Corp.*, 2008 U.S. Dist. LEXIS 74174 (N.D. Ill. Mar. 3, 2008). In fact, contrary to plaintiffs' suggestion, denial of class certification in discrimination cases is commonplace. We attach as Exhibit 1 a table setting forth more than 100 such cases.[1]

---

[1] Merrill Lynch is concurrently filing five appendices containing materials supporting this Memorandum.

**Appendix I** contains expert reports ("[Name] Rep."), organized by expert.

**Appendix II** contains affidavits ("[Name] Aff.") from affiants submitted by Merrill Lynch, organized alphabetically with name tabs. The affidavits are from managers in those sample office complexes selected by Merrill Lynch's sampling expert witness, Dr. Eugene Ericksen. Dr. Ericksen selected this group of 29 complexes to serve as a random and representative sample of all 143 complexes nationwide, allowing for comparison of characteristics between and among complexes nationwide. Ericksen Rep. 5-7. Appendix II also includes affidavits from managers who have worked closely with each of the plaintiffs and from employees who are familiar with Merrill Lynch's policies and practices. For the Court's convenience, **Tab A** to Appendix II contains a summary of significant testimony from all of these affidavits, organized by topic ("App. II, Tab A pt. [#]"). **Tab B** to Appendix II contains a chart summarizing testimony regarding the claims of each plaintiff. A review of the chart shows that individual issues predominate and that each plaintiff's experience at Merrill Lynch is highly individualized.

**Appendix III** contains excerpts from deposition transcripts ("[Name] Dep."), organized alphabetically with name tabs.

**Appendix IV** contains other documents ("Ex. [#]") cited by Merrill Lynch, organized by exhibit number.

**Appendix V** contains unreported cases cited by Merrill Lynch, organized alphabetically by case name.

*Second*, a core question in the consideration of whether class treatment is appropriate is: what would a class trial prove that helps to resolve the claims of over 1,000 class members? The 16 putative class representatives' depositions show that no claim is typical of any other, that questions are anything but common, that whatever little may be common does not predominate, and that class litigation is not the superior form of adjudicating the claims of over 1,000 highly compensated professionals employed during different time periods in over 100 office complexes under the supervision of hundreds of different managers. Plaintiffs are required to—but have not—identified the "'nature of the evidence that will suffice to resolve [the] question[s]'" at the heart of their claims and "'how specific issues will play out'" at trial. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). "'If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.'" *Id.*

Plaintiffs and their experts focus on two issues—Merrill Lynch account distributions and teaming between two or more Merrill Lynch Financial Advisors ("FAs")—as the principal cause of earnings disparity between Caucasian and African American FAs.[2] In fact, plaintiffs' statisticians elected not to study any other Merrill Lynch practice. With respect to account distributions, Merrill Lynch employed an objective system for distribution of accounts based on published criteria. And the unrefuted evidence shows that to the extent there was deviation from that policy, it *favored* African Americans. Plaintiffs' testimony, by itself, also illustrates why class certification is inappropriate for these claims. Some plaintiffs testified that they benefited from transfers outside of the policy; some plaintiffs testified that they could have improved their ranking for distributions, such as by earning industry certifications paid for by Merrill Lynch, but chose not to do so; and some plaintiffs complain that they were disadvantaged by manager discretion under the policy.[3] But that is the point—plaintiffs' stories are all different and proof as to one proves nothing as to anyone else.

---

[2] Concurrently with this Opposition we have filed motions to strike under *Daubert* the report of plaintiffs' sociologist Dr. Bielby and portions of the report of plaintiffs' statisticians Drs. Madden and Vekker. We show in this Opposition that even if admissible, plaintiffs' experts' opinions fail to homogenize the individualized issues necessary to adjudicate plaintiffs' claims class-wide. *See Hydrogen Peroxide*, 552 F.3d at 323 ("opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded"); *Puffer*, 255 F.R.D. at 468 (finding Madden report failed to establish commonality, after rejecting *Daubert* challenge).

[3] *See* Bender-Jackson Dep. 113-14, 293; Browne Dep. 172; Coleman Dep. 159; Howard Dep. 93; Johnson Dep. 29-30; Madrid Dep. 398-400.

The same is true of teaming. Some plaintiffs testified that they wanted to team but were denied the opportunity, while others testified that they did not want to join a team, preferring to remain solo practitioners, and turned down invitations to join. And while some plaintiffs testified they were on teams that benefited them, others said they were on teams that harmed them.[4]

This pattern repeats itself with dozens of other practices plaintiffs challenge in their kitchen sink complaint, none of which were studied by plaintiffs' statisticians. For example, some plaintiffs complain that they did not receive any mentoring, while others testified that they received mentoring from Caucasian FAs that was critical to building their careers. And, to give one more example, some plaintiffs testified that they received the exact same training opportunities that plaintiffs allege Merrill Lynch denied to African American FAs.[5]

The Supreme Court and Seventh Circuit require district courts to undertake "a rigorous analysis" before certifying a class under Title VII. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). The class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). Key issues of fact and law must be "applicable in the same manner to each member of the class." *Gen. Tel.*, 457 U.S. at 155. As can be seen from the quick review above and as shown more fully below, this putative class is hopelessly fragmented, not cohesive, given that hundreds of managers made disparate decisions impacting over 1,000 putative class members in over 100 office complexes over 8 years or more. Plaintiffs fail to identify, let alone analyze, any policy or practice of Merrill Lynch that ties these countless individual decisions together—and merely providing a "broad formulation" designed "to characterize [a defendant's] conduct as standardized" does not suffice. *Allen v. City of Chicago*, 828 F. Supp. 543, 552 (N.D. Ill. 1993). Courts have refused to certify cases with similar characteristics, and two judges in this Court recently rejected precisely such attempts by the same plaintiffs' counsel pressing the case at bar.

In the face of all this, plaintiffs offer aggregated statistics, lumping together all putative class members across all offices over the entire class period. Those statistics tell courts and juries

---

[4] *See* Bender-Jackson Dep. 8-11, 4-8, 292-93; Brown Dep. 218-21; Capel Dep. 284-86; Coleman Dep. 22-26, 50; Gibson Dep. 160-61, 202-03; Johnson Dep. 221; Madrid Dep. 48-52, 70-71; McReynolds Dep. 161-63; York Dep. 265-66.

[5] *See* Capel Dep. 63; Howard Dep. 44-45; Gibson Dep. 147; Madrid Dep. 59, 92-93; Ross Dep. 147; Smartt Dep. 43-44, 31-34; Wilson Dep. 89, 220-22; York Dep. 76, 83, 134-36, 332-33.

nothing about any particular claimant. Gross statistical disparities—to the extent they exist, which Merrill Lynch disputes—are not sufficient to certify a class in a case involving hundreds of decisionmakers in over 100 office complexes around the country making thousands of disparate decisions over an 8 year period. As the Seventh Circuit recently put it, "If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008).

## PLAINTIFFS' CLAIMS

Plaintiffs make two claims—that Merrill Lynch's national policies discriminate against African American FAs and that its managers discriminate against African American FAs by exercising biased subjective discretion. Plaintiffs purport to address the latter claim, but they have not begun to show how any national policy disadvantages African Americans.

Plaintiffs claim that distribution of accounts to FAs is skewed in favor of Caucasians. But they concede that Merrill Lynch distributes accounts from departing FAs pursuant to a national policy that ranks FAs against published objective criteria. Plaintiffs' statisticians analyze distributions as though that policy does not exist. They do not identify any criterion that is discriminatory, let alone analyze how that criterion impacts putative class members. Plaintiffs' sociologist attributes racial disparities in these account distributions to "in-group bias" and "opportunity hoarding," manifested when Caucasian FAs seek to ensure that limited opportunities such as valuable accounts or valuable teaming opportunities are reserved for their "in-group" to the exclusion of the African American "out-group." This allegedly leads to the exclusion of African American FAs from account distributions when Caucasian office managers exercise biased discretion to distribute accounts without regard to rankings or based on a particular client's need or preference—raising a multitude of individualized issues.

The only other policy studied by plaintiffs' statisticians is teaming, where two or more FAs decide on their own to pool efforts. Merrill Lynch's only national teaming policies are to encourage the practice, to provide guidance as to what FAs and managers should consider when deciding whether and how to team, and to require that branch managers approve teams in their offices. Plaintiffs do not challenge Merrill Lynch's decision to encourage teams, nor any of the guidelines, which are only guidelines and entirely race neutral. Nor do they address the impact of any particular guideline on African Americans. Instead, plaintiffs point only to the end result— that African American FAs are not on teams with the same frequency as Caucasians. Plaintiffs

couple their statistical analyses with their sociologist's theory that "in-group bias" leads to "opportunity hoarding," which purportedly explains why African American FAs team less frequently than Caucasians. Accordingly, plaintiffs challenge not a policy, but the decisions of thousands of individual FAs about who they want to team with, and of hundreds of managers across the country about which teams to approve.

Plaintiffs challenge other policies that likewise turn out to be localized and individual decisions: the exercise of managerial discretion in assigning mentors; the discretion exercised by individual FAs to mentor or not mentor members of the putative class; the exercise of managerial discretion in deciding who to sponsor for the Management Assessment Center; and numerous other exercises of business judgment at the local level, ranging from the assignment of sales assistants ("Client Associates") to the roll back of length of service designations. Instead of studying these policies, plaintiffs' experts speculate that "if the decisions by managers to distribute accounts that directly generate production credits were not racially neutral, it is very likely that these same managers were not racially neutral in their decisions to distribute other accounts (such as referrals, leads, and walk-ins) and to provide other resources that indirectly generate production credits (such as office space, staff support, mentoring and partnerships)." Madden & Vekker Rep. 49 (hereafter "Madden Rep."). But defendant's expert Dr. Ali Saad, a labor economist and statistician, studied some of these same policies and demonstrated empirically that they were race-neutral or favored African American FAs. Saad Rep. 51-74.

Plaintiffs target only one national policy that has a uniform impact on FAs: Merrill Lynch's national compensation grid, which determines how every FA—Caucasian and African American—is paid. This is a purely mathematical formula. It considers objective facts about the revenue each FA produces and compensates FAs accordingly. As demonstrated below, Congress declared that a production and merit based system of that sort cannot form the basis of any discrimination claim, irrespective of whether it has any disparate impact on a protected class.

Significantly, plaintiffs' sociologist admitted in his deposition that he could not opine whether the "in-group" was Caucasian FAs and the "out-group" African American FAs such that race was the "categorical" boundary separating the in and out groups. He could not rule out the explanation that success, not race, was the boundary—that the mechanism at work was not Caucasians excluding African Americans from limited opportunities, but instead successful FAs excluding unsuccessful FAs regardless of their race. Bielby Dep. 133-35.

## STATEMENT OF FACTS

**I.     Merrill Lynch's Decentralized Wealth Management Business Provides Circumscribed Discretion To Hundreds Of Local Managers.**

Plaintiffs characterize Merrill Lynch as a centrally controlled organization that enforces uniform policies that affect each FA in the same way and with a common insidious purpose—race discrimination. This picture of an organization permeated with blatant discrimination from top to bottom is impossible to reconcile with the fact that Merrill Lynch was run throughout the putative class period by Stan O'Neal, an African American grandson of a slave born and raised in the Jim Crow south of the 1950s and 1960s.[6]

The record contradicts plaintiffs' characterization. The Court need only consider the managers who independently made the decisions that plaintiffs challenge. Merrill Lynch employs 135 Complex Directors ("Directors"), each of whom manages the operations of branch offices within his or her Complex, and who in the aggregate are responsible for 15,000 FAs in over 600 branch offices spread across the nation. They report to 30 Regional Managing Directors, most also functioning as Directors, who in turn report to five Divisional Managing Directors ("DMDs").[7] These DMDs report to a Senior Vice President ("SVP") for the Advisory Division, who reports to the President of Merrill Lynch's Global Wealth Management ("GWM") business. Walsh Aff. ¶¶30-33; *see also* Sieg 1/16/07 Dep. 23-24; McCann Dep. 82-83. Plaintiffs deposed both the SVP for the Advisory Division and the President of GWM, and examined their documents and emails. There is no evidence whatsoever that they harbor any racial animus. In fact, until his departure from Merrill Lynch in January 2009, the President of GWM was the executive sponsor of Merrill Lynch's global Black Professional Network. McCann Dep. 300.

Merrill Lynch FAs provide financial products and services to more than three million clients, including individuals, small businesses, and 401(k) and stock option plans. Sieg Aff. ¶3. Each of these clients must decide not only to entrust its financial future to Merrill Lynch, rather than to one of many competitors, but also decide which of 15,000 FAs should handle its account. *See* McCann Dep. 322 (clients "don't [do] business with a corporation, they do business with a financial adviser who they trust and respect. That is how people drive their business here").

---

[6] *See* Ex. 2 (MLE00257-000001-7, Remarks by Stan O'Neal, Chairman and Chief Executive Officer Merrill Lynch & Co., Inc., at Howard University Opening Convocation 2004).

[7] *See* Walsh Aff. ¶¶31-33. The exact number of Regions and Divisions has changed over time; these are the numbers that applied during most of the period studied in preparation for this motion.

At the local level, each Director manages his or her Complex as a stand-alone business. The Directors monitor profits and losses of the Complex and make employment decisions regarding FAs, constrained to varying degrees by national policies. *E.g.*, Schimpf Aff. ¶¶3-4; Tate Aff. ¶¶4-5; Root Aff. ¶¶3-4; *see also* App. II, Tab A pt. 1. Plaintiffs offer no evidence that the policies themselves are discriminatory; instead, they offer evidence regarding the localized implementation of those policies. For example, while Merrill Lynch provides guidance as to qualities a Director should assess in making hiring decisions, a Director also must consider circumstances specific to individual candidates, the needs of the particular Complex, and the availability of qualified candidates in the local market. *Id.*; Sieg Aff. ¶¶4-5. The autonomy and control afforded to each FA and local manager results in a multitude of individualized applications of the company's policies and guidelines, which, we demonstrate below, makes class adjudication improper.

## II. Financial Advisors Operate Their Own Businesses Within A Business And Are Paid Based On Their Success.

Plaintiffs and their experts never discuss the nature of the FA's job. But understanding that job is critical to understanding the issues relevant to class certification. This is not a job where assignments are handed out by a boss or someone decides on a subjective basis how much to pay. While some accounts are distributed by management, there is no dispute that FAs are responsible for building a book of business by soliciting clients in the community, and that they are paid based on an objective grid that corresponds to production.

### A. Autonomous FAs Succeed Or Fail Based On Their Ability To Generate Business From Wealthy Clients.

Dr. James Outtz, an expert in industrial psychology retained by Merrill Lynch, explained that FAs operate with considerable autonomy. Outtz Rep. ¶¶25-28; Ex. 3 at MLE 00035-001365 ("The [FA] position is highly entrepreneurial and involves extensive client development, prospecting and consultative selling"). FAs have extraordinary authority and control over their business generation activities, including client development strategy, hours invested, and cooperative efforts with other FAs and staff. With their freedom to form client relationships, FAs essentially operate their own individual businesses within a business. *Id.*

To increase his or her compensation, an FA must identify a prospective client and persuade the client to open an account. That entails persuading clients to entrust the FA with their financial futures—including their children's education and their own retirement. This last

point is important. Unlike other sales jobs, the FA sells a relationship of trust. A car or real estate salesperson sells a product. An FA is selling him or herself because clients must trust the FA with their financial future. O'Neal Dep. 129-30; Outtz Rep. ¶30 (FA "productivity is not determined by persons inside the organization (*e.g.*, supervisors, managers), but instead, by customers and prospects who decide to place and retain their assets under a Financial Advisor's management"). As plaintiffs and their expert concede, the success of any FA depends on success in gaining trust of potential clients with substantial wealth. *See* Wilson Dep. 227-28 (admitting that access to clients with larger assets benefits FAs); Johnson Dep. 106 (high net worth clients helped him succeed); Bielby Dep. 107-08 ("It would be difficult to have a substantial book without having wealthy clients," and agreeing client/FA relationship is "one of trust").

Contrary to plaintiffs' hypothesis of a single cause that explains productivity, there is no "one size fits all" model for how FAs build their books of business. FAs employ a multitude of strategies to increase their client base and share of existing clients' business. Outtz Rep. ¶¶47-48. Plaintiffs concede that there are as many different paths to building a book of business as there are FAs. *See* McReynolds Dep. 25 ("[e]very [FA] has a different strategy and what works with one person won't necessarily work for another"); Browne Dep. 135 (the factors necessary for an FA to be successful "vary tremendously because everybody's different in their various skill sets"); Gibson Dep. 72 (agreeing there is no one "blueprint" for an FA, regardless of race, to build a book of business).

For example, plaintiff Leslie Browne landed one of his largest clients, a municipality, because he performed services for that client prior to working at Merrill Lynch. Browne Dep. 125. Browne's varied book of business includes an African American client he knew prior to becoming an FA; a corporate client he met while attending an event paid for by Merrill Lynch; and a governmental unit he learned about on the internet. *Id.* at 145-68. By comparison, plaintiff Glenn Capel's largest clients are family accounts of a Caucasian FA who retired from Merrill Lynch after forming a relationship with Capel. Capel Dep. 63-64. Plaintiff LaRue Gibson acknowledged, "my book of business and the way I built my business is very different. … Most advisors get 80 percent of their business from 20 percent of their clients. I get 80 percent of my

business from about 50 to 60 percent of my clients." Gibson Dep. 333-34, 341. Plaintiffs' depositions are replete with unique individualized examples of book-building.[8]

Local managers confirm that FAs use a multitude of strategies. Some gain expertise in specific products, such as 401(k) accounts, thereby carving out niche markets. Others prospect for clients through charitable and community activities. Many FAs enter the industry after succeeding in other professions and arrive with preexisting relationships. Still others succeed by organizing investment seminars. *E.g.*, Hotham Aff. ¶¶24; Good Aff. ¶¶21-24; Hornberger Aff. ¶¶30-33; *see also* App. II, Tab A pt. 2.

Dr. Outtz studied how FAs build their books of business. He found that the percentage of FAs who have similar methods for building books of business is less than one-quarter of one percent. Outtz Rep. ¶48 (citing Ericksen Rep. 15). The FA population covers the entire United States and caters to a nearly infinite variety of clients. The fact finder would need to identify all of the causes of each plaintiff's productivity before it could conclude that race discrimination, rather than non-discriminatory factors, caused that plaintiff's lower productivity. In the face of this immense variety of business strategies, plaintiffs' statistical aggregation of the experiences of thousands of FAs provides no meaningful information. *See* Saad Rep. 5 n.7; *infra*, pp. 43-46.

Experts retained by Merrill Lynch have shown that Madden and Vekker's statistical analysis—in addition to papering over the individual circumstances that would have to be examined to determine liability and damages—also omits the crucial variable of access to wealthy potential clients. *See infra*, pp. 41-42. The evidence shows that African American FAs on average have fewer social connections with potential clients with wealth. Defendant's expert Dr. Roberto Fernandez—a sociologist specializing in social networks, social inequality, and race relations—relied on scientific research and publicly available data in concluding that "the wealthy population in this country is overwhelmingly white" and that access to wealthy clients "is generally not common for African Americans." Fernandez Rep. 36. Dr. Outtz conducted a job analysis of the FA position by interviewing a representative sample of managers and FAs. His analysis confirmed that "FAs without wealthy networks face a daunting task." Outtz Rep. ¶ 51.

---

[8] *See* Bender-Jackson Dep. 122-29, 291; Brown Dep. 163-72, 184-89, 193-205; Coleman Dep. 157, 162; Gibson Dep. 316-32; Howard Dep. 93-94, 114-28; Johnson Dep. 16-21; LaBorde Dep. 42-43, 247-48; Madrid Dep. 162-65, 398-408; McReynolds Dep. 272-75, 278-91; Moore Dep. 120, 123-28, 130-36; Ross Dep. 219-25; Wilson Dep. 141-43; York Dep. 336, 155, 156, 160-62.

Defendant's expert Dr. Saad performed his own study of this phenomenon, examining publicly available census data. He concluded that access to networks of potential clients with substantial wealth varies by race among Merrill Lynch FAs. Saad Rep. 1-2, 6-9, 16-23. As a result, customers independently generated by African American FAs participating in the Paths of Achievement ("POA") training program early in their careers arise from neighborhoods with significantly higher African American populations and significantly lower levels of average wealth. *Id.* at 25-26.[9]

The impact of this disparity is stark and persistent. 99% of all POA FAs who succeeded in generating assets early in the program remained in the program at the six month mark, regardless of race. In contrast, 22% of those who were least successful in self-generating assets had left the program by then. Those most successful in generating their own business were three times more likely to be at Merrill Lynch at the end of the POA program than those who had difficulty doing so. Those who were in the 1st quintile (the top 20% in Merrill Lynch's ranking system) at the conclusion of the twenty-four month program had self-generated 2.5 times as many assets by the third month of POA as those who were in the 5th quintile (the bottom 20%) at the end of the program. Saad Rep. 27-28. Plaintiffs' experts' failure to take account of disparities in access to wealthy investors fatally undermines their statistical analysis.

**B.**     **Merrill Lynch Mechanically Calculates FAs' Compensation Based On Their Production.**

Merrill Lynch has designed an objective, transparent, and equitable compensation system for FAs, the U.S. Based Financial Advisor Incentive Compensation Program ("Compensation Program"). Although some of the system's details have changed over time, its central principle has remained the same: Merrill Lynch pays FAs based on a percentage of the Production Credits ("PCs") and other revenue generated when one of the FA's clients uses or purchases a Merrill Lynch financial product or security. Hogarty Dep. 43-49. Merrill Lynch uses no discretion in calculating FA incentive compensation, which is based on a precise mathematical formula and the grids contained in the Compensation Program. *See* Ex. 4 (grids utilized in 2001-2006 Compensation Programs). This ensures a fair and transparent application to all FAs.

---

[9] In 2008, Merrill Lynch replaced the POA Program with the Practice Management Development Program. References to the PMD Program will be by its former name, POA.

Plaintiffs claim that the Compensation Program discriminates against African American FAs because (i) FAs earn compensation based on production, (ii) FAs earn different payment rates based on the size of the customers' accounts and of the transaction, and (iii) as each FA reaches increased length of service ("LOS") levels, he or she must meet production hurdles or else earn a lower rate of payout, referred to as a "penalty box." Pl. Br. 33-36. The record contradicts these conclusory allegations of discrimination, and in any event the Compensation Program is immunized from challenge under section 703(h) of Title VII as a merit or production based compensation system. *See infra*, pp. 47-48.

Higher-producing FAs earn more than lower-producing FAs precisely because they produce more revenues for Merrill Lynch. Hogarty Dep. 93-94. This merit and production based Compensation Program is consistent with the programs used by virtually every major wealth management company in the industry. *See* Ex. 5 at MLE 0090-000625. The program makes business sense. The company must retain its most productive and profitable FAs, who competitors recruit aggressively. Outtz Rep. ¶31 (should an FA "leave with his or her book of business, Merrill Lynch's profits are directly affected"). Even plaintiffs recognize that Merrill Lynch must pay its most profitable FAs the highest compensation. LaRue Gibson observed, "since 1993, I have been first quintile" and "I am called three or four times a week and offered ungodly amounts of money to go across the street. That is a risk that the firm faces." Gibson Dep. 115, 118. And George McReynolds testified: "if you took away the incentive" for FAs to build their books of business "it would hurt the company." McReynolds Dep. 301-02.

Some plaintiffs even agree with these policies. LaRue Gibson, for example, testified that Merrill Lynch's small ticket policy allowed him to transition smaller households to the Financial Advisory Center ("FAC"), a call center supported by Investment Associates, so that instead of managing small accounts he could spend time with his family. Gibson Dep. 53-54. Gibson advised some clients that they would be better served by the FAC. *Id.* at 231-32. Other plaintiffs complain that the small ticket policy is discriminatory. *See* Ross Aff. ¶16; Bender-Jackson Dep. 248. Plaintiffs cannot establish a class with unified, non-adverse interests when some plaintiffs criticize a policy as discriminatory that others embrace.

Plaintiffs' testimony illustrates why class certification is impossible with respect to the "penalty box." Merrill Lynch adopted a "penalty box" based on objective, transparent criteria. Once an FA reaches a certain LOS, the FA remains in a penalty box—earning a lower compensation rate—unless he or she meets minimum production or revenue requirements.

Hogarty Dep. 118-23. Plaintiff Leroy Brown testified that "multiple causes" in addition to "discriminatory treatment" resulted in him being in the penalty box. Brown Dep. 47-48. These included market events (*id.* at 36-37), his attempt to reopen his divorce decree (*id.* at 27-28), and his extended leave of absence. *See id.* at 23-26. This Court would need to consider each of these non-discriminatory factors before it could conclude that discrimination placed Brown in the penalty box. The same sort of individual inquiry would be necessary for each claimant.

III. **Hundreds Of Independent Decisionmakers Are Responsible For The Practices About Which Plaintiffs Complain.**

A. **FAs' Pooling And Teaming Experiences Are Highly Individualized.**

1. There is no common team experience.

Merrill Lynch does not maintain "uniform" pooling and teaming policies that discriminate. Pl. Br. 23. Plaintiffs do not point to any centralized policy related to pooling and teaming that is discriminatory. Nor have their statisticians studied any centralized policy. In fact, FAs *themselves decide* whether to form cooperative relationships to serve or prospect for clients and split the PCs generated from that joint effort. Sieg Aff. ¶¶86-87. Merrill Lynch refers to such relationships as "pools." If one-third of an FA's PCs come from pooled accounts, Merrill Lynch considers that FA to be a member of a "team." *Id.* ¶86.

Merrill Lynch provides guidance—and only guidance—on what FAs and managers should consider when deciding to form or approve a pool or team. Undisputed evidence shows that this guidance is non-discriminatory, objective, and race-neutral. Sieg Aff. ¶¶90-91 (providing examples of materials that "contain only objective recommendations that apply to all FAs equally, regardless of race"). For example, among the written materials is an outline of recommended steps to take in forming a team; tools to help FAs analyze the likelihood that a team will benefit clients; and a framework for FAs to decide on a fair allocation of PCs. *Id.* ¶91. Rather than attack any of these guidelines, plaintiffs focus on the localized team formation process—the way in which thousands of FAs in offices around the country come together to form pools or teams and the decisions by hundreds of managers approving them.

Affidavits submitted by local managers demonstrate that varying combinations of thousands of FAs made individual decisions about whether to form pools or teams. While many FAs seek out pooling and teaming opportunities, many others prefer to work alone. Some "want to retain their client relationships for themselves" and "have observed firsthand FA teams that have failed." Bettencourt Aff. ¶16. Thousands of FAs have decided not to participate in pools

-12-

and teams, including many high producers.[10] Plaintiffs' experts concede that many successful FAs are not on teams, and that FAs do not need to be on teams to be successful. Bielby Dep. 94.

Plaintiffs' testimony confirms the individual nature of each decision. Each of the six (of 16) plaintiffs who entered into a pool or team had a unique experience. Plaintiff Jennifer Madrid was invited by a successful Caucasian FA to pool with him. Madrid Dep. 48-52. Madrid testified that this arrangement led to a substantial increase in her book of business. *Id.* at 70-71. Plaintiff George McReynolds testified that he joined a team with Caucasian Lona Spencer, which has since dissolved. McReynolds described this experience as a positive one, saying that it was a "partnership of equals" and that he "really respected her brain." McReynolds Dep. 161-63. His subsequent teaming experience with two different Caucasian FAs was not successful from his perspective, and he contends that he fared poorly in that team because of his race. *Id.* at 80-87.

Plaintiffs who did not join a pool had individualized reasons. Leroy Brown passed up a teaming opportunity because he did not want to team with other FAs. Brown Dep. 226-27. Mark Johnson never asked anyone to team and did not want to partner with other FAs. Johnson Dep. 221. George McReynolds testified he is no longer interested in joining a team and would rather remain a solo practitioner. McReynolds Dep. 211. This evidence confirms what plaintiffs' expert Dr. Bielby concedes: "there are lots of factors" that "influence whether someone gets on a team" besides the alleged "hurdle" of race. Bielby Dep. 82.

The frequency of teaming and pooling also varies widely at Merrill Lynch depending on the practices and preferences of individuals in particular offices. As explained by Dr. Saad, without contradiction, "[t]here are 45 offices in which less than half of the brokers are in pools and 20 offices at which all FAs are in pools." Saad Rep. 44. So, for example, plaintiff Glenn Capel testified that he has had trouble teaming in his office because most FAs there are "comfortable operating as sole proprietors." Capel Dep. 284-86.

Merrill Lynch managers do not force FAs to join pools or teams, which would run counter to "Merrill Lynch's entrepreneurial work environment." Outtz Rep. ¶33. If Merrill Lynch required FAs to join pools, they would "simply leave the firm and take their book of

---

[10] *E.g.*, Root Aff. ¶¶16-19 (providing examples of FAs, including high producing African American, who are not on teams because they are cautious about working with another FA who might be less motivated for success); Nevins Aff. ¶12 (identifying high producing FA who has never joined a team because he prefers to work alone); King Aff. ¶14 (identifying three high producing FAs who prefer to remain solo practitioners to have more control over their own client relationships); *see also* App. II, Tab A pt. 4.

business to a competitor." *Id.*; *see* Sieg 6/1/07 Dep. 65; Gardner Dep. 53. The reasons why this is true are obvious. Each FA is an entrepreneur who controls his or her own compensation by building a book of clients. FAs on teams pool those accounts and agree on how compensation is going to be divided among them. Sieg Aff. ¶88. If managers forced FAs to team, they would in effect require FAs to alter the compensation they would otherwise earn independently and to share access to their clients. *Id.*; *see also* Schimpf Aff. ¶16; Packard Aff. ¶11; Hotham Aff. ¶12; App. II, Tab A pt. 5. For this and other reasons, plaintiff LaRue Gibson indicated that he would "entertain the introduction" if a manager asked him to team with a fifth quintile FA, but he must have the final decision (Gibson Dep. 206-07):

> I would push back and say, first, you should let me interview that person, so I have an understanding of [what] their abilities are. So, maybe we should have an understanding of their, of personalities. So, the idea would be that if … you can make it worth my while from a compensation perspective, I am willing to talk to you about it.

Although they do not force teams, local managers do have discretion to approve or disapprove pools and teams. Sieg Aff. ¶92. Each approaches that process differently based on their management style and the office culture. For example, Maryland complex manager Carol Nevins scrutinizes the formation of pools and teams to make sure FAs have a plan to improve client service. *See* Nevins Aff. ¶10 ("I will approve requests from FAs to form or joins teams if FAs have a solid business plan and work well together. By contrast, I do not approve of proposed teams if I determine that the team will not benefit all of the prospective teammates"). New York complex manager Chandler Root has a more hands off approach. *See* Root Aff. ¶12 ("I have never denied anyone the opportunity to team"). *See also* App. II, Tab A pt. 6.

A fact finder seeking to understand why any FA chose to pool or team (or not to do so) and agreed on a particular compensation split would need to hear testimony from local managers and FAs (Sieg Aff. ¶98), as plaintiffs concede. *See* Gibson Dep. 216 (confirming that in order to evaluate pooling and teaming relationships, one needs to conduct a factual inquiry into each situation).[11] The trier of fact also would need to hear testimony from FAs who did not participate, because the availability of FAs is a critical factor in every FA's pooling decision. Sieg Aff. ¶98.

---

[11] *See also* Miska Aff. ¶¶13-15 ("No two teams in this complex are identical … [b]ecause so many factors go into the decision to form a team"); Casey Aff. ¶¶13-15; Thelander Aff. ¶20; App. II, Tab A pt. 3.

In sum, plaintiffs' contention that Merrill Lynch maintains uniform pooling and teaming policies because "managers are provided with uniform guidance about how to arrange, manage, support and promote teams" is faulty and offers no support for class certification. Pl. Br. 24. Plaintiffs do not explain how race-neutral "guidance" results in uniformity in the reasons for pool or team formation, much less how such myriad reasons all could be discriminatory. Some FAs may not join teams because of discrimination. But many are not on teams because they do not want to be (like Mark Johnson) or because, like Glenn Capel, the office does not have a teaming culture. A class-wide trial would shed no light on the cause of any particular teaming or pooling decision; only individualized inquiry could determine whether discrimination was a factor.[12]

### 2.  Plaintiffs' teaming analysis omits the critical variable.

Plaintiffs posit that teaming leads to increased production, but fail to control for the "chicken and egg" issue: are FAs on teams more successful because successful FAs prefer to work together and establish a synergistic relationship that improves production even more, or do unsuccessful FAs join forces and become successful by virtue of their teaming experience? Plaintiffs assert the latter with no proof. *See* Bielby Dep. 135 (admitting he did not study whether "a successful black will have a harder time getting on a team than a successful white"). Dr. Saad's analysis shows that the correct explanation is the former.

Dr. Saad evaluated whether the average amount of assets per client in an FA's book of business influences whether and with whom the FA teams. He empirically concludes, without refutation from plaintiffs' experts, that higher producing FAs—those with the largest average client asset size in their books prior to joining—are more likely to join pools and highly likely to do so with other high producing FAs. Saad Rep. 44-46. Unsuccessful Caucasian FAs are just as unlikely to pool as unsuccessful African American FAs. *Id.* at 47. Even George McReynolds

---

[12] Plaintiffs' baseless assertion that Merrill Lynch offered African Americans "token participation" in a "lesser form of teams" called "virtual teams" (Pl. Br. 26) does not change the individualized nature of the issue. Sieg Aff. ¶100. The virtual team concept existed long before the class period and refers to FAs in different offices who share ideas and skills. Sieg 6/1/07 Dep. 110-11. Virtual teams apply to specific client relationships, as opposed to sharing substantial books of business. Accordingly, a "virtual team" is "not a team for all purposes." O'Neal Dep. 301. It is a complement to, not a substitute for, regular pools and teams, and FAs of all races and ethnicities are free to participate or not in one, the other, or both. *Id.* at 301-06. Plaintiffs provide no evidence that Caucasian FAs "borrow" African American FAs for virtual teams (Pl. Br. 26), and the testimony by plaintiffs is directly contrary. Neither plaintiff who participated in virtual teams worked in such an arrangement with a Caucasian. Rather, both were instrumental in forming virtual teams of African American FAs, with the objective of approaching high net worth African American communities. Howard Dep. 218-19; Ross Dep. 153-54.

acknowledged that he would prefer to team with other high producing FAs, someone who "looked like they were knocking the ball out of the park." McReynolds Dep. 195. *See also* Hornberger Aff. ¶17; Packard Aff. ¶14; Hotham Aff. ¶16; App. II, Tab A pt. 7.

Dr. Saad also rebutted plaintiffs' incorrect contention that pooling is racially unbalanced in the POA program. He offered two studies, only one of which plaintiffs challenge. In the first study, which is unrefuted, he concluded that prior industry experience heavily influences whether an individual pools accounts—those with prior industry experience are more likely to pool in the POA program than those without that experience. After controlling for prior industry experience, the disparity disappears with regard to the rate at which African American and Caucasian POA FAs pool. Saad Rep. 47-48. Dr. Saad also shows that there is no shortfall in the number of African American FAs who join pools when the analysis considers the most critical variables: who is employed in an office in which there is at least one African American FA when pool-joining decisions are made. *Id.* at 47.

**B.     Whether Particular Account Distributions And Transfers Involve Discrimination Requires Close Attention To Individual Circumstances.**

1.     There is no common account distribution or transfer; each is unique.

In attacking distribution of accounts of departing FAs plaintiffs are really complaining, as with teaming, about local decisions, not Merrill Lynch's national policy. In fact, plaintiffs' statisticians never studied the national policy, which unquestionably uses objective criteria to rank FAs and distribute accounts. And plaintiffs' own testimony demonstrates the tremendous variation in individual experiences, confirming that proving anything about account distributions or transfers as to one plaintiff proves nothing as to any other.

Plaintiff Glenn Capel's testimony illustrates the uniqueness of each account distribution. Capel testified that he inherited one of his top accounts from a Caucasian FA (Capel Dep. 77); that his two most recent clients came from account distributions (*id.* at 90-91); that he once received a client through the ADP, but after the client complained that Capel mishandled her account it was transferred to another FA (*id.* at 269-70); that he lost out on four distributions when all assets went to remaining members of the departing FAs' teams in accordance with the ADP (*id.* at 328-29); but that he received other accounts from Ken Taylor, an African American,

when Taylor departed Merrill Lynch and left his accounts with members of his team—Capel and two others (*id.* at 343-44).[13]

Plaintiffs' depositions are rife with instances where they benefited from the circumscribed discretion built into the ADP. Jennifer Madrid testified that she received one of her most lucrative clients from an account transfer from a Caucasian FA, Scott Franklin. According to Madrid, she took the account on the advice of Franklin. The account provided her with percentage payouts: "[T]hey blow up for several months of the year. You get money fund payout, and like they blow up to 85, $100 million … And one time they did a trade, even at 5 cents or 6 cents a trade, whatever I gave them, that was huge. That was, like, a bunch of PCs." Madrid Dep. 399-400. When Madrid left Merrill Lynch, she transferred all of her accounts (including accounts that were not pooled) to a Caucasian male. *Id.* at 57-62; 291-93.

Plaintiff Bender-Jackson testified that when plaintiff Christina Coleman left Merrill Lynch the company did not distribute her accounts under the ADP, but instead Coleman "went around and divvied her accounts out"—including to Bender-Jackson. Bender-Jackson Dep. 113-14. Plaintiff Leslie Browne acknowledged that he also benefited from an account distribution. Browne Dep. 172-74. When Farrell Arceneaux left the Ft. Worth office in 2006, some of his clients requested that Browne become their FA, and Browne received these accounts. *Id.*

Examples like these show that liability, if any, cannot be determined based on any "representative" experience. Juries sitting in trials of 1,000 class members would have to consider each plaintiff's unique history. Even plaintiffs acknowledge that one cannot understand an account distribution without examining the individual decisions that went into it. *See* McReynolds Dep. 115-16 (without knowing "exact things" about an account distribution, he cannot answer questions about that distribution); Bender-Jackson Dep. 241 (to determine whether the ADP was followed, you have to look to the specifics of the particular office). The Director of the Philadelphia Mainline Complex describes the complexity inherent in that examination (Bowman Aff. ¶13):

> [T]he Wayne office deviated from the ADP ranking list to satisfy client needs for both the second and third largest households in the Desfor distribution. But for those exceptions, the households would have gone to Greg Serian and Carl

---

[13] *See also*, *e.g.*, Coleman Dep. 159, 164-70; Gibson Dep. 325-26; Howard Dep. 93, 119, 120, 123, 132-33, 340-41, 379, 496; Johnson Dep. 114; Madrid Dep. 398-99, 400; Moore Dep. 121, 126; Ross Dep. 259; Wilson Dep. 48-49; York Dep. 334.

Gordinier, two Caucasian FAs, who instead earned the fourth and fifth largest households, respectively.[14]

> 2. Managers' exercise of discretion in account distributions is constrained by the ADP and has benefited many African American FAs.

Contrary to plaintiffs' assertion, the ADP does not allow "undue discretion and subjectivity that disadvantages African American FAs." Pl. Br. 28. The ADP provides guidance as to when managers should depart from the rankings established by the ADP's objective criteria. For example, the 2004 ADP set forth the following examples of situations in which management could depart from ADP rankings to allocate accounts: to honor a client request for a specific FA; to consider a client's needs for an FA with a particular language skill, state registration, business specialization, or other expertise; to consider an existing FA relationship with a client or an existing team relationship; to consider an FA's failure to contact a client; or to consider FA availability at the time of the distribution. Sieg Aff. ¶116. Plaintiffs' sociologist Dr. Bielby acknowledges that these criteria "are reasonable … on their face." Bielby Dep. 117-18.

Merrill Lynch goes to great lengths to ensure that FAs and local managers exercise discretion within limits set forth in the ADP. Sieg Aff. ¶116. First, to promote transparency— which Dr. Bielby agrees limits the operation of subconscious bias (Bielby Dep. 111-12)—Merrill Lynch publishes the ADP on its intranet website. Walsh Aff. ¶42. Managers must input account distribution results from their offices on a nightly basis, allowing each FA to view the results. These policies allow managers and FAs to monitor application of the ADP in their complexes. *Id.* Second, Merrill Lynch maintains a number of vehicles that FAs can use to complain about the ADP. *Id.* ¶43. Nevertheless, other than the complaints made by plaintiffs through the filing of this lawsuit, African American FAs have virtually never complained that the ADP discriminated against them. *Id.* Third, Merrill Lynch has conducted numerous evaluations of the ADP, some by task forces and focus groups of managers and FAs, including diverse FAs who submitted declarations in support of plaintiffs' motion. *Id.* ¶¶44-45. Fourth, Merrill Lynch reviews data from all distributions to monitor whether local offices complied with the ADP. *Id.* ¶46.

Plaintiffs speculate that FAs "could have" used account transfers, teaming, or succession plans to "game" the ADP. Pl. Br. 29-30 n.46, n.47, n.49. But they provide no factual support for this speculation and their statisticians are conspicuously silent on this issue. In contrast, Dr. Saad

---

[14] *See also* Flippen Aff. ¶9; Beck Aff. ¶41; Leigh Aff. ¶¶8-9, 11; App. II, Tab A pt. 9.

demonstrates empirically and without contradiction that African American FAs receive *greater* assets through the ADP than they would have if assets of departing brokers were distributed strictly based on ADP ranking. Saad Rep. 39-41; *see* Bielby Dep. 105 (conceding that such evidence would show that "exercised discretion was not disadvantageous to African Americans"). The *only* evidence is that the exercise of this discretion, which is impossible to evaluate on a class-wide basis in any event, favors African American FAs.

3.  There is no evidence that the ADP is discriminatory; its effect depends on individual choices made by each FA.

Plaintiffs assert that Merrill Lynch's national account distribution policy relies on "discriminatory factors." But plaintiffs never studied the impact that any factor had on African American FAs and never explain why any factor is discriminatory. Plaintiffs fail to establish even the most basic predicate of their claim: that account distributions "greatly contribute to the FA's compensation." Pl. Br. 27. The only evidence in the record refutes that allegation. *See*, *e.g.*, Schimpf Aff. ¶7 ("I am not aware of any FA who became a top producing FA because he or she received accounts from an account distribution"); *see also* App. II, Tab A pt. 11. Beyond this, plaintiffs concede that the ADP established objective criteria for ranking FAs that are known to all FAs[15] and that distributions occur in a fish-bowl environment so that everyone knows how all FAs in the office are ranked and how many accounts each FA in the office received.[16]

Though the ADP has changed over time, it has always depended on race neutral, objective criteria that rank each office's FAs in order of eligibility to receive or select accounts. Sieg Aff. ¶¶104-05. These criteria include an FA's (1) annualized revenue; (2) net new households or new money; (3) certifications; (4) household retention; (5) redistribution retention; and (6) upon the departure of a team member, the duration of the team's existence. *Id*. To provide more FAs with a chance to earn distributions, Merrill Lynch also structured the ranking criteria with a "best ball" qualifier, which allowed FAs to score points based either on the FA's raw number under a particular criterion or on the FA's percentage growth under that criterion on a year-over-year basis. *Id*. ¶114. Under the "best ball," FAs with historically low production or

---

[15] *See*, *e.g.*, Johnson Dep. 29-30 (agreeing that criteria apply to all FAs); Madrid Dep. 148-49 (explaining that she was ranked higher than other FAs because she had certifications); Gibson Dep. 107 (agreeing that points impact an FA's position on the rankings list).

[16] *See* Madrid Dep. 147 ("that was maybe 2001, that they put something in the computer system or 2002 where you could actually see what accounts were being transferred, and to who").

-19-

few accounts may score points for a recent increase in their books of business, while FAs with large, established books score points based on their total production. *Id.* Plaintiffs and their experts omit any mention of the best ball qualifier. In doing so they seriously misrepresent the policy.[17]

Nor have plaintiffs explained how the ranking criteria are discriminatory. They focus on the revenue criterion, but ignore "best ball." And they focus on two Merrill Lynch certifications that require a certain number of high net worth households, but ignore the industry certifications that are earned by studying and passing an exam. These industry certifications receive twice as many points as Merrill Lynch certifications. They also ignore the fact that Merrill Lynch pays the cost of these industry certifications regardless of the FA's level of production.

Unlike plaintiffs' experts, Dr. Saad conducted statistical analyses on how the ADP actually works and its impact on African American FAs. Dr. Saad demonstrates that African American FAs obtain *greater* assets under the ADP ranking criteria than they would if accounts were distributed strictly according to levels of production. Saad Rep. 38-40. Plaintiffs' experts have not submitted any evidence to contradict these findings. Dr. Saad also shows empirically that in the POA program African Americans generate substantially fewer assets through their own actions than do Caucasians, but that African Americans' share of transferred assets relative to their total assets is the same as the ratio for Caucasians. *Id.* at 35. In other words, despite not generating as many assets, African American POA FAs receive the same proportion of transferred assets as Caucasian POA FAs relative to total assets. Again, plaintiffs' experts submitted no evidence to the contrary.

Every FA controls his or her ranking according to these standards. Plaintiffs' testimony shows how. For example, Mark Johnson testified that his manager recommended that he obtain an industry certified financial planner designation to improve his ADP ranking. Johnson Dep. 92. Although Merrill Lynch pays for the classes and exams, and no manager ever refused to sponsor him, Johnson admitted that he has not sought to obtain any certifications. *Id.* Plaintiff Bender-Jackson testified that there is nothing preventing her from taking certification courses to get more

---

[17] In revising the ADP for 2004 to improve client retention, Merrill Lynch made the best ball qualifier inapplicable for revenue growth for FAs in the fourth and fifth quintile, which limited the number of large accounts distributed to FAs who were likely to have less ability to sustain and grow their accounts. Because of perceived dissatisfaction of certain FAs with these changes, in 2006 the company reapplied the best ball qualifier for percentage of revenue growth for FAs in all quintiles. Sieg Aff. ¶122.

ADP points. She stated that she is in the process of obtaining her CFP designation and as a result will improve her ADP ranking. Bender-Jackson Dep. 293-94.

Managers confirm that each FA, regardless of race, can increase his or her own ADP ranking. *E.g.*, Bernard Aff. ¶9; Roccanova Aff. ¶7; McLaughlin Aff. ¶3; *see also* App. II, Tab A pt. 10. For example, in the Washington D.C. complex in the fourth quarter of 2004, four African Americans ranked in the top ten among FAs with an LOS 0–3 on the ADP ranking list. Leigh Aff. ¶10. Out of more than 80 FAs in the complex with an LOS of 4 and higher, African Americans ranked fifth and thirteenth. *Id.* During this time, many African American FAs received more assets than Caucasian FAs who ranked higher than they did. *Id.* ¶11; *see also* Hornberger Aff. ¶7.

That some African American FAs benefited from the ADP is itself enough to defeat class certification. It demonstrates that stark conflicts exist among members of the putative class. And the combination of constrained manager discretion in deviating from ADP rankings in allocating accounts plus individual FA control over their rankings means that a class trial would be impossible and certainly of no use to subsequent juries that must resolve the claims of the 1,000 class members.

### C. Termination Practices For POA FAs Are Highly Varied.

Plaintiffs contend that "discriminatory policies and practices" caused fewer African Americans to complete the POA program, on average, than Caucasians. Pl. Br. 18-19. Again, plaintiffs fail to identify any national policy or practice, but instead focus on local decisionmaking by hundreds of managers across the country. Termination practices vary by complex, with managers possessing discretion to take into account complex resources, the size of the POA FA class, and each POA FA's performance. Cassidy Aff. ¶¶15-17. For the Court to discern the facts with respect to the treatment of any particular FA, an individual assessment is required of the circumstances of each discharge; aggregated statistics about dismissals in different offices at different times and by different managers shed no light on anything that will be meaningful for juries hearing the cases of the 1,000 absent class members.

The varied experiences of the hand-picked plaintiffs are illustrative. Merrill Lynch terminated Henry Wilson's employment at a Pennsylvania branch because after a year in the POA program his assets under management were less than what was required at the end of the first month. Wilson Dep. 129-30. Wilson recognized that his performance was so poor "that he wasn't even in the game" (*id.* at 223-24), and took responsibility for bringing in only $200,000 in

assets in the year he worked as a POA FA—far lower than the target of $4 million in annuitized assets and $7 million in assets and liabilities. *Id.* at 386-87; Ex. 6 at MLE 00041-001295. For Stephen Smartt, managers in the Fifth Avenue complex made an exception to their general probation practice when they provided him with an additional three months in the POA program before placing him on probation and eventually asking for his resignation. Roccanova Aff. ¶23. Christina Coleman's manager allowed her to graduate from POA without a Certified Financial Manager designation, a graduation requirement at the time. Coleman Dep. 90-91.

To the extent that aggregate statistics are relevant, Dr. Saad concludes empirically that when similarly situated POA FAs are evaluated—by considering how far an FA is from the goal line that must be crossed to continue in the program and graduate—there is no statistically significant difference in terminations along racial lines. In fact, considering African American FAs who were doing poorly in meeting goals, Dr. Saad shows that African Americans terminate from the POA program at a statistically significant lower rate than expected. Saad Rep. 58-60. Likewise, Dr. Saad finds no statistically significant difference in the termination of similarly situated African American and Caucasian FAs after graduation from the POA program. *Id.* at 60-61. Plaintiffs have not refuted any of these findings. And plaintiffs' expert conceded that when examining termination decisions and whether those decisions were being made in a way that discriminated against African Americans, it was appropriate to control for production. Bielby Dep. 202-03.

**D.    FAs' Training And Mentoring Experiences Are Highly Individualized.**

1.    Training experience depends on individual choices made by FAs and managers.

Merrill Lynch does not exclude individuals from any training program because they are African American. Sieg Aff. ¶30. To the contrary, it has designed a number of training programs to provide opportunities and resources for diverse FAs, including African American FAs, above and beyond those offered to non-diverse FAs. *See* Jones Rep. 31-33.

Plaintiffs' own varied experiences show that there is no common pattern. Marva York attended training programs at Merrill Lynch's Princeton home office while in the POA program. York Dep. 76. These are precisely the programs that plaintiffs attack as excluding African Americans. And York's manager matched her with an executive coach to aid her with business development. *Id.* at 332-33. Stephen Smartt attended an off-site training session as well as local "lunch and learns" at his complex. Smartt Dep. 31-34. Frankie Ross attended training programs

at the African American symposiums as well as more formal programs in the home office. Ross Dep. 146-47.

Some plaintiffs chose not to take advantage of training opportunities. Christina Coleman chose not to take training programs for the Certified Financial Planner designation because she pursued adjunct teaching positions instead. Coleman Dep. 135-38. George McReynolds explained that he made no effort to access Merrill Lynch University online courses, other than mandatory ones. McReynolds Dep. 294. Leslie Browne did not attend a number of mandatory POA training meetings. Browne Dep. 271-79. Henry Wilson did not seek out available training during his tenure. Wilson Dep. 42-44.

Given the autonomous nature of the FA position, each FA determines what training he or she receives. Outtz Rep. ¶¶60-62; Armondo Aff. ¶22; Beck Aff. ¶¶94, 96-97; Cunningham Aff. ¶51; *see also* App. II, Tab A pt. 16. For instance, "[a]nybody can earn a professional designation and there's not a quintile restriction to do that." Sieg 12/1/06 Dep. 52-53. If an FA participates in a certification course that develops investment skills, Merrill Lynch pays the full cost of the course. Sieg Aff. ¶50. Merrill Lynch also encourages FAs to seek certifications by awarding points for them in the ADP rankings.[18]

Contrary to plaintiffs' characterization (Pl. Br. 16-17), Merrill Lynch's home office training program is not a material component of the POA program. Sieg 12/1/06 Dep. 51. Nor is it representative of the types of training available to POA FAs. *Id*. at 42, 49-57. In fact, the home office-based programs are the only training programs that have a quintile requirement. Merrill Lynch uses these events to reward high producing POA FAs for exceptional contributions and to encourage them to remain employed with the firm. Sieg Aff. ¶52; Sieg 12/1/06 Dep. 19; *see also* Outtz Rep. ¶65; Woodlock Aff. ¶47. The vast majority of a POA FA's training experience is based upon (i) Merrill Lynch University, an online computerized system offering a wide array of training courses, and (ii) programs delivered at the office level, which branch managers design and implement.[19] These programs provide all POA FAs—regardless of production—with the skills necessary for development and success. Sieg Aff. ¶¶44-47, 66; Sieg 12/1/06 Dep. 19.

---

[18] Dr. Saad concludes, and plaintiffs do not contest, that African American FAs are significantly less likely to obtain certifications than Caucasian FAs. Saad Rep. 67-68.

[19] Branch managers have discretion to design and implement training programs, subject to the mandate that programs not discriminate. Sieg Aff. ¶¶66-67; Outtz Rep. ¶¶60-62. As a result, local training

2. <u>Mentoring experience depends on individual choices made by FAs and managers.</u>

Plaintiffs contend that African Americans receive less mentoring. Pl. Br. 16. Merrill Lynch, however, does not maintain a national mentorship program. Sieg 12/1/06 Dep. 260. Managers establish programs locally, resulting in large variation. *E.g.*, Good Aff. ¶27; Hornberger Aff. ¶37; Foley Aff. ¶25; *see also* App. II, Tab A pt. 17. At least six of the plaintiffs benefited from mentoring relationships. LaRue Gibson testified about the mentorship he received from a Caucasian father/son team:

> [O]ne of the reasons that I was successful … was because of the support of a father/son team that fought to allow me to sit near them so that I could observe how they ran their business so that I could learn. So that I could apply the hard work, the ethics, the hard work ethic that I had, the talent that I feel that I have, and then I could learn how to run a business appropriately, how to look at statements, how to talk to clients, how to choose investments.

Gibson Dep. 147. Jennifer Madrid developed a close relationship with a successful Caucasian FA, which "benefited [her] tremendously." Madrid Dep. 59. Marva York received mentoring from a "million dollar producer" Caucasian FA as well as her African American manager in Newark. York Dep. 83, 134-36. Glenn Capel had a Caucasian mentor in his office. Capel Dep. 63. Stephen Smartt testified that plaintiff Mark Johnson served as his mentor and that he received the support of his Caucasian complex Director in the Fifth Avenue office. Smartt Dep. 125. Henry Wilson testified that he went to lunch with a high producing Caucasian FA in the office who provided him with advice. Wilson Dep. 53-54.

Mentoring programs vary considerably by complex. Sieg Aff. ¶¶83-85. Some managers use formal, mandatory mentoring programs, assigning each POA FA a more senior FA mentor. *E.g.*, Armondo Aff. ¶27; Bernard Aff. ¶¶32-33. In other complexes, mentoring relationships are informal and based on individual circumstances. *E.g.*, Root Aff. ¶28; Hotham Aff. ¶28; *see also* App. II, Tab A pt. 18. A classwide trial could not reach any valid conclusions about whether African American FAs are discriminated against in mentoring, because an individualized inquiry would be necessary to reveal the reasons for any particular mentoring decision. Moreover, none of the jury's findings would be useful in subsequent trials of individual claims.

---

opportunities for FAs vary among complexes. *E.g.*, Markham Aff. ¶¶60-61; Lowery Aff. ¶¶31-32; Shepherd Aff. ¶62; *see also* App. II, Tab A pt. 15.

### E.    Merrill Lynch Has No Uniform Hiring Practice For FAs.

There is no "uniform" hiring practice at Merrill Lynch. Pl. Br. 13. Local managers decide which FA candidates to hire based on the needs of their complex and each manager's individualized evaluation of a candidate based on varying criteria. *E.g.,* Bell Aff. ¶33; Woodliff Aff. ¶3; Nevins Aff. ¶26; Armondo Aff. ¶30; *see also* App. II, Tab A pt. 19; Sieg Aff. ¶5; McReynolds Dep. 172-73 (offices set up different hiring procedures).

Plaintiffs' testimony shows that inquiries into hiring decisions cannot be made on a class-wide basis. Henry Wilson claims that despite his hiring, he was discriminated against in the hiring process because the manager did not respond quickly enough to his request for an interview. Wilson Dep. 70-71, 98. Wilson acknowledged that his race was not set forth in the information provided to Merrill Lynch, but speculated that Merrill Lynch knew that he was African American based on his zip code. *Id.* at 71. He later testified that he must have also mailed a bio to Merrill Lynch, even though his one-page letter requesting an interview was sent by facsimile and there was no indication that any bio was sent. *Id.* at 71-75. Eventually, the manager who hired Wilson exercised his discretion to provide him the highest possible starting salary ($80,000) even though Wilson failed the FIAT exam. *Id.* at 105; Blanche Aff. ¶32.[20]

Plaintiff Carnell Moore's experience is also revealing. When Moore interviewed for the FA position, the complex Director told him that if he "failed" any of the preliminary hiring exams, he would "be out." Moore Dep. 31. Moore missed "one too many questions" on the FIAT exam, but explained to the Director that "the test was not indicative of [his] job performance" and asked for the chance to work at Merrill Lynch to prove his potential. *Id.* at 32. According to Moore, his Director told him "[w]ell, I don't want any man to say I stood in [the way] of their career, so I'll give you a shot," and hired Moore. *Id.*

---

[20] The FIAT exam predicts whether a prospective hire is likely to pass the exam required by regulators to obtain the license necessary to purchase and sell securities. In 2008, Merrill Lynch set mandatory passage levels on the FIAT. Previously, branch managers determined the weight to give to an applicant's scores and had discretion to allow candidates to proceed to an interview despite their exam results. Bernard Aff. ¶28 (considering scores outcome determinative); Houston Aff. ¶28 (evaluating candidates individually and allowing candidates to advance to the interview phase despite exam failure); Markham Aff. ¶76 (same); Chahine Aff. ¶68 (hiring candidates despite failure of FIAT). Plaintiffs' assertion that only applicants with Recommended or Highly Recommended scores "may proceed with the interview process for POA" (Pl. Br. 13) is false, and contradicted by the record.

Merrill Lynch provides branch managers with mandates and guidelines that limit their decisionmaking authority. *See* Sieg Aff. ¶¶9-13 (explaining Merrill Lynch's "Matter of Respect" and Affirmative Action policies prohibiting discrimination in hiring); *id.* ¶¶17-21 (explaining guidelines that provide for administration of hiring exams and the use of a "Candidate Interview Form").[21] But Merrill Lynch does not dictate what managers consider in making hiring decisions beyond excluding race and other prohibited factors. Branch managers make non-discriminatory hiring decisions after considering, to varying degrees, an applicant's education level, prior sales experience, potential to build a book of business, business and social networks, success in past jobs, observable behaviors in various categories such as resilience, achievement, drive, extroversion, preparedness during the interview, and performance on hiring exams. *Id.* ¶5; *see also* McGauley Aff. ¶¶7-10; Packard Aff. ¶¶27-28; Chahine Aff. ¶¶66-67.

Branch managers take a variety of actions to increase the number of qualified African American POA FA hires, which they consider an important business objective. *E.g.,* Armondo Aff. ¶¶31-32; Beck Aff. ¶87; *see also* App. II, Tab A pt. 20. Newport Beach complex Director Jodi Rolland described efforts she has taken:

> In order to build a diverse and inclusive culture in the Newport Beach complex, I made efforts to increase the number of diverse hires, including hosting various career events for minority candidates. For example, we hosted an event at the University of California Irvine ("UCI"), where we worked with UCI's career placement center to ensure that we invited diverse candidates. We also hosted an event at the University of Southern California ("USC"), in which USC's Black Alumni Association helped sponsor the event and invited diverse alumni.

Rolland Aff. ¶36. Managers often communicate to FAs that they are seeking to hire diverse candidates (*e.g.*, King Aff. ¶29; Roccanova Aff. ¶32), and work with local diverse organizations, seeking to network with diverse candidates themselves. *E.g.*, Anderson Aff. ¶28; Chahine Aff. ¶54; Miska Aff. ¶19.

---

[21] The Candidate Interview Form provides a rating scale to help structure decisionmaking in local hiring meetings. Plaintiffs' assertion that "it does not appear that [these forms] are used with any regularity, if at all" is not supported by the record. Pl. Br. 13. Many branch managers, as well as interviewing FAs, use Candidate Interview Forms when evaluating POA FA candidates. *See*, *e.g.*, Blanche Aff. ¶4; Houston Aff. ¶28; Bowman Aff. ¶¶26-28.

## IV. Moves Into Management Involve Individualized Considerations.

### A. Determining Whether Discrimination Affects Any FA's Attendance At The Management Assessment Center Requires Individualized Inquiries.

An FA must qualify for and pass review at the Management Assessment Center ("MAC") to become a complex director. Sieg Aff. ¶136. Branch managers identify candidates for MAC based on individualized assessments. *E.g.*, Shepherd Aff. ¶¶40-41; Hotham Aff. ¶¶29-31; Miska Aff. ¶23; *see also* App. II, Tab A pt. 21. Plaintiffs incorrectly assert that MAC is "by intent and design, a mechanism for screening out those who might not conform to culture." Pl. Br. 32. Even assuming the Court could analyze the experiences of each FA at Merrill Lynch in this aggregated manner—which it cannot—the same types of statistics plaintiffs trumpet elsewhere in their papers destroy their arguments here. Dr. Saad shows empirically that for those qualified by firm policy to attend MAC, the number of African American FAs who actually attended *significantly exceeded what random chance would have predicted*. Saad Rep. 63-64.

FAs who wish to attend MAC must be in the first or second production quintile (or with some exceptions, the third quintile).[22] Plaintiffs incorrectly assert that Merrill Lynch uses these requirements "to exclude African Americans." Pl. Br. 31. Merrill Lynch has valid business reasons for requiring FAs who attend MAC to rank in the top three fifths in production. FAs who have reached high levels of production will obviously be more effective managers of others who are trying to do the same. Sieg Aff. ¶136. As one Director observed, "experience as a successful FA helped me to become a successful director, as it allowed me to more easily gain the respect of the FAs whom I managed." Foley Aff. ¶16; *see also* Bell Aff. ¶¶31-32; Miska Aff. ¶23; Casey Aff. ¶28; App. II, Tab A pt. 24.

Plaintiffs criticize the quintile eligibility requirement for attending MAC as discriminatory. However, considering the entire population of African American FAs (qualified or not), the number who attended MAC still exceeded what would have been predicted by

---

[22] Non-producing employees, such as Specialists or Marketing Managers, can apply for management positions. Because these candidates do not have a production record, they must obtain a "distinction rating" in their job. Sieg Aff. ¶137. Contrary to plaintiffs' contention that "the quintile requirement is not job related as Merrill Lynch allows persons who have never been FAs or had any production to attend" MAC (Pl. Br. 31 n.50), this eligibility requirement is comparable to requiring a FA to be in a top quintile; it indicates a high level of success. Sieg Aff. ¶137. Diverse employees have come from these roles, including Keith Henry, an African American who is Director of the Bridgewater, N.J., Complex, and Jennifer Povlitz, a Caucasian woman who is Regional Managing Director in San Francisco. *Id.*; Beck Aff. ¶53.

chance. Saad Rep. 63-64. And the record demonstrates that many Directors have sponsored or offered to sponsor qualified diverse candidates for MAC, including some of the named plaintiffs. *E.g.*, Halpin Aff. ¶¶9-10; Root Aff. ¶25; Packard Aff. ¶22; Foley Aff. ¶17; Beck Aff. ¶13; Madrid Dep. 198-200; Gibson Dep. 263-64; *see also* App. II, Tab A pt. 23. FAs who lack the support of their Director have the opportunity to find another member of management to sponsor them. Sieg Aff. ¶152; *see also* Sieg 11/29/06 Dep. 133-34. A number of candidates have attended MAC without the support of their immediate Director. Sieg 11/29/06 Dep. 134-42.

The question whether discrimination affected any particular FA interested in pursuing a management position is highly individualized and cannot be determined in a class trial. The Court would need to hear testimony from the individual FA and his or her managers. Plaintiffs' experiences illustrate this problem. Of those eligible, only one plaintiff—Jennifer Madrid— sought to attend MAC. She was able to attend MAC because she received sponsorship and support from her Caucasian Director. Madrid Dep. 198-200, 222-26.[23] No other plaintiff eligible to attend MAC ever elected to pursue a managerial position, and some turned down invitations to do so. LaRue Gibson testified that despite frequent requests from managers to attend MAC, he did not want to give up his "life line, the book [he has] nurtured and built." Gibson Dep. 261-64. Mark Johnson had no interest in management. Johnson Dep. 145-46, 197. George McReynolds also elected not to pursue a management position. McReynolds Dep. 270-71. Leroy Brown told his manager he was not interested in taking on management responsibilities. Woodliff Aff. ¶27.

This is consistent with the evidence of Merrill Lynch branch managers. Chandler Root, Regional Managing Director of the Los Angeles Mountain region, stated that he:

> specifically approached Ken Hines, an African American FA, and requested that he attend the MAC. Mr. Hines replied that he is not interested in attending. He reasoned that he wanted to focus on his production and his book of business, and that he could be more successful as a FA, managing his own accounts.

Root Aff. ¶25; *see also* Root Aff. ¶25; Beck Aff. ¶50; Conrad Aff. ¶28; App. II, Tab A pt. 22.

---

[23] Contrary to plaintiffs' assertion (Pl. Br. 33 n.52), they have not shown that Madrid is representative of other African Americans who attended MAC and were purportedly treated unfairly on account of race (plaintiffs conspicuously fail to identify any such person except Madrid). Madrid's particular circumstances—an assessor who interviewed her stated that she was "very confrontational," "accusatory," and "very defensive" when the fact that she failed the bar exam after law school was raised (Shepherd Aff. ¶45)—confirm that proving her claim would establish nothing about any other MAC attendee's claim.

**B.      Determining Whether Discrimination Affects Any FA's Experience At MAC Requires Individualized Inquiries.**

Plaintiffs assert that "[t]he few African Americans invited" to MAC "suffer discrimination" and that "subjective and highly discretionary decision-making is highly vulnerable to racial bias." Pl. Br. 31-32. But Dr. Saad empirically concludes that African Americans successfully graduate from MAC at expected rates. Saad Rep. 64-65. And Merrill Lynch has taken steps to ensure that the evaluation process promotes legitimate and non-discriminatory business objectives. Outtz Rep. ¶¶83, 85, 87.

MAC is designed to evaluate skills that successful Directors must possess. Merrill Lynch managers known as "Assessors" evaluate candidates through interviews, activities, and role plays. Sieg Aff. ¶156. These activities generate specific observable behavior that can be described and verified so that the Assessors can accurately evaluate specific job-relevant behaviors. *Id.*; Outtz Rep. ¶¶72-74. Assessors evaluate fourteen different "dimensions" that together reflect a candidate's management potential. Sieg Aff. ¶156. The evaluation process involves four steps: observing the candidate during the activity, recording the observations, categorizing how the candidate's behavior fits under each category, and rating the candidate on how he or she performed. *Id.* ¶159. Merrill Lynch directs Assessors not to use assumptions, labels, or stereotypes. *Id.*

Merrill Lynch consulted with an expert in the field of "assessment center processes" to confirm that this process was a valid way to determine whether a participant could become an "above average director." Sieg Aff. ¶156; Sieg 11/29/06 Dep. 122-23. Dr. Outtz, an expert in the development and validation of selection procedures, confirmed that MAC meets and exceeds professional standards for the design and implementation of such procedures and that it is not designed in a way that is vulnerable to racial bias. Outtz Rep. ¶¶4-5, 78, 87, 89 & p. 62. Proof of discrimination would be individual in nature.

## ARGUMENT

Rule 23 requires this Court rigorously to "tes[t]" whether "the issues likely to be presented at trial" are "susceptible to class-wide proof." Fed. R. Civ. P. 23, 2003 Adv. Comm. Notes. It imposes an obligation on the Court to "find" that each Rule 23 element is met and "to include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment" in order to "facilitate meaningful appellate review." *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 184, 186 (3d Cir. 2006); Rule 23(b)(3), (c)(1)(B). Yet

plaintiffs provide no hint how their claims could be adjudicated class-wide. They do not address the "'nature of the evidence that will suffice to resolve [the] question[s]'" at the heart of their claims or "'how specific issues will play out'" at trial—inquiries critical to determine whether issues are common or individual and which predominate. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008); *see Hamilton v. O'Connor Chevrolet*, 2006 U.S. Dist. LEXIS 44149, at *18-*19 (N.D. Ill. June 12, 2006) (courts must "inquire how the case will be tried," including by "identifying the substantive issues that will control the outcome"); *Radmanovich v. Combined Ins.*, 216 F.R.D. 424, 430, 435 (N.D. Ill. 2003) (courts must consider "the proof necessary" to establish "the substantive elements" of claims and "defenses"). Given the morass of individualized issues requiring particularized inquiry described above, these are fatal defects that implicate the Seventh Circuit's insistence on "caution in class certification generally" because of the "enhanced risk of costly error." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 745-46 (7th Cir. 2008). Certification should be denied because plaintiffs have not met their burden of satisfying the commonality, typicality, and adequacy standards of Rule 23(a), the general applicability requirement of Rule 23(b)(2), or the predominance and superiority criteria of Rule 23(b)(3). *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).

I.      **No Class May Be Certified Because Plaintiffs Have Not Satisfied Rule 23(a)'s Commonality, Typicality, Or Adequacy Requirements.**

A.      **"Across-the-Board" Suits Like This One Inherently Lack Commonality.**

Commonality tests whether plaintiffs' claims rest on a "common nucleus of operative fact." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). Plaintiffs' claims do not. This blunderbuss discrimination suit attacks every aspect of Merrill Lynch's employment relationship with its African American FAs in hundreds of separately managed business units across the country over 8 years. *See* 2d Am. Compl. ¶ 7 (alleging 26 disparate types of discrimination). In doing so plaintiffs resurrect a type of claim long ago rejected as a proper basis for a class action—the "across-the-board" challenge to varied employment actions yoked together with some artificial theory that a pervasive discriminatory practice is at work. *See Gen. Tel. Co.*, 457 U.S. at 157-58. Thirty years ago, the Seventh Circuit explained that omnibus claims of racial discrimination in "compensation, terms, conditions, and privileges of employment" cannot be certified for class adjudication because each employee's claim will turn on "substantially different facts." *Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 479-82 (7th Cir. 1980).

Since then courts have regularly refused to certify such sprawling and amorphous class proceedings like this one. *E.g.*, *Allen v. CTA*, 2000 U.S. Dist. LEXIS 11043, at *16, *29-*30 (N.D. Ill. July 28, 2000) (declining to certify class alleging "across-the-board" race discrimination in "policies and practices of denying equal" promotions, pay, and terms and conditions of employment because of the "individualized nature of the claims"); *Allen v. City of Chicago*, 828 F. Supp. 543 (N.D. Ill. 1993) (refusing to certify across-the-board allegations of discriminatory layoffs, demotions, compensation, and work conditions). Because plaintiffs' claims—spanning many years, the entire Nation, and disparate decisionmakers and decisions—lack any "unifying force" sufficient to satisfy Rule 23(a), class certification must be denied. *Id.* at 552.

**B.      Decentralized Decisionmaking And Broad FA Autonomy Mean That The Issues To Be Tried Are Highly Individualized, Not Common To The Class.**

As demonstrated above, plaintiffs' claims turn not on proof common to the putative class but on a wide range of disparate questions that can only be resolved by considering evidence particular to the FA and his or her managers. This means that plaintiffs' proposed nationwide class, encompassing many years during which local decisionmakers came and went and policies changed, does not satisfy Rule 23(a). Commonality is "relatively easily satisfied" where "a small, centralized group" makes the key employment decisions, but in case after case courts have found commonality lacking and denied certification when a proposed class spans multiple business units with their own managers making "decentralized" decisions. *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 424 (N.D. Ill. 2003). In those cases the condition that makes some suits alleging racial discrimination "well-suited to class adjudication"—that the discrimination "aris[es] out of the employer's standard operating procedure"—is not met. *Id.* at 422. The "consensus" view is that "a plaintiff may represent a multi-facility class only where centralized and uniform employment practices affect all facilities *in the same way*." *Reid v. Lockheed Martin Aero. Co.*, 205 F.R.D. 655, 667-68 (N.D. Ga. 2001) (emphasis added); *accord Garcia v. Johanns*, 444 F.3d 625, 632 (D.C. Cir. 2006) (no commonality where "multiple decisionmakers" had "significant local autonomy"); *Stastny v. S. Bell*, 628 F.2d 267, 279 (4th Cir. 1980).

That consensus holds in this district. In *Gorence v. Eagle Food Centers*, 1994 U.S. Dist. LEXIS 11438, at *27 (N.D. Ill. Aug. 15, 1994), Judge Moran found that the discrimination claims lacked commonality because claimants worked in multiple "separate and distinct" "organizational units," each with "its own distinct management hierarchy and decisionmaking

process." In *Betts v. Sundstrand Corp.*, 1999 U.S. Dist. LEXIS 9743, at *22 (N.D. Ill. June 21, 1999), Judge Reinhard found no commonality—even in a case involving just a single plant— where there was no "centralized hiring decisionmaker," given the "sheer number of managers" who made decisions. Rejecting a promotion class for lack of commonality in *Adams v. R.R. Donnelley & Sons*, 2001 U.S. Dist. LEXIS 4247, at *15-*17, *38 (N.D. Ill. Apr. 6, 2001), Judge Kennelly observed that defendant operated 40 plants organized in five business units each with its own management decisionmakers, resulting in "considerable variation in the way the various divisions handle" promotions. *Accord Tooley v. Burger King Corp.*, 1995 U.S. Dist. LEXIS 4525, at *5 (N.D. Ill. Mar. 23, 1995) (no commonality where each "restaurant manager made his or her own decisions regarding hiring, discharge, discipline, wage increases, promotions, demotions, and job assignments") (Lindberg, J.); *Gerlib v. R.R. Donnelley & Sons*, 1997 U.S. Dist. LEXIS 16842, at *13 (N.D. Ill. Oct. 24, 1997) (it is "well established" that class may not encompass "different business units" when "challenged employment decisions were made at the individual unit") (Anderson, J.); *Bennett v. Roberts*, 2000 U.S. Dist. LEXIS 8351, at *12 (N.D. Ill. June 14, 2000) (no commonality where "each building principal uses his or her discretion in determining the criteria for selecting and recommending candidates") (Plunkett, J.); *Jones v. GES Expo. Servs.*, 2004 U.S. Dist. LEXIS 17981, at *31 (N.D. Ill. Sept. 3, 2004) (issues "individualized" when "defendant's decision-making procedure is decentralized") (Filip, J.); *Sandoval v. City of Chicago*, 2007 U.S. Dist. LEXIS 77829, at *14-*15 (N.D. Ill. Oct. 18, 2007) (Conlon, J.).

The lack of commonality is even more pronounced here than in the usual multi-business-unit cases. That is because FAs also operate as relevant "decisionmakers" as a result of the autonomous nature of their jobs. As we have described, Merrill Lynch brokers run their own businesses as substantially independent entrepreneurs. FAs determine what client development strategies to use, what type of clients to focus on, how much time and effort to devote to their business, what certifications to pursue, and whether to accept an account to which the FA would be entitled under the ADP, or to seek an account transfer outside the ADP. Teaming proposals are joint decisions, subject to management approval. And an FA must decide whether to pursue a change of career by seeking a management position—a change many do not wish to make.

FA autonomy makes the putative class highly fragmented. Here, as in *Puffer*, 255 F.R.D. at 467, plaintiffs' anecdotes only "highlight the differences and uniqueness in the individual plaintiffs' claims." Plaintiffs' stories attest to the variety of teaming and pooling experiences that

result from FA autonomy. *Supra*, pp. 12-16. And plaintiffs, and managers who administer account distributions, have explained that to understand any particular distribution one has to look at the individual decisions that went into it. *Supra*, pp. 16-21. The same is true with respect to moves to management. The plaintiffs have widely varied experiences with MAC—including rejecting suggestions that they consider a management career. *Supra*, pp. 27-29; *Remien*, 2008 U.S. Dist. LEXIS 74174, at *8 (no commonality where some class members promoted but others "did not wish to be promoted"). These issues are no less individualized just because plaintiffs restate them at a high level of generality in a "broad formulation" designed "to characterize [Merrill Lynch's] conduct as standardized." *Allen*, 828 F. Supp. at 552 (rejecting plaintiffs' claim of commonality based on that pleading tactic).

In a disparate treatment case the "central inquiry" is "the intent of the employer." *EEOC v. Chicago Miniature Lamp Works*, 947 F.2d 292, 298 (7th Cir. 1991). Plaintiffs argue that "common" evidence that "Merrill Lynch's corporate officers knew of but ignored racial disparities" and failed to correct them "shows intent" to discriminate. Pl. Br. 48 n.80. But Seventh Circuit law forecloses that argument. *See Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 722 (1986) (in a disparate treatment case, "[k]nowledge of a disparity is not the same thing as an intent to cause or maintain it"); *Council 31, AFSCME v. Doherty*, 169 F.3d 1068, 1072 (7th Cir. 1999); *see Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (discriminatory intent "implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker" selected a course of action "'because of' … its adverse effects upon an identifiable group"). The fact-specific nature of each management decision in the areas plaintiffs challenge means that Merrill Lynch's intent could only be ascertained by considering evidence regarding the motives of each of hundreds of managers who made the decisions at issue. *See also infra*, pp. 54-59 (discussing other liability and remedy issues that turn on individualized inquiry).

The layers of manager discretion and FA autonomy present here mean that this suit is not even directed to a particular "employment policy or practice," which is the first requirement for a pattern or practice or disparate impact class action, but rather at thousands of diverse decisions. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (in a pattern or practice suit plaintiffs must establish that "racial discrimination was the company's standard operating procedure," the "regular rather than the unusual practice"); *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005) (plaintiffs in a disparate impact case must "isolate and identify the specific employment practices that are allegedly responsible for any observed statistical disparities").

### C.     Plaintiffs' Own Testimony Refutes Commonality.

The nature of plaintiffs' claims, and the localized nature of the decisions, mean that liability cannot be established as to any particular African American FA with evidence common to the class. Proving that African American FAs generally do not participate in pools or teams or receive account distributions in the same amount as Caucasian FAs would prove nothing useful for juries that must resolve whether a particular class member has been subject to discrimination, as the examples from plaintiffs' own depositions detailed above prove.

Plaintiffs focus on account distributions and pooling. But a number of the representative plaintiffs benefited from deviations from the ADP, consistent with Dr. Saad's unrebutted finding that African American FAs received more accounts than they would under a strict application of ADP rankings. *Supra*, pp. 16-19. Many also benefited from pooling—while others claim they did not. *Supra*, p. 13. This variation shows that even a finding that African American FAs generally were disadvantaged would not advance the inquiry into whether a particular class member suffered discrimination, other than shifting the burden of proof to defendant, which is not a sufficient reason to certify a class. *See Radmanovich*, 216 F.R.D. at 439 ("shifting of the burden of proof to the defendant" does "not change the fact that class certification is not appropriate" if "individual issues will dominate the liability determination").

A closer look at four of the plaintiffs is instructive. LaRue Gibson is a million dollar producer in Merrill Lynch's flagship World Financial Center office in Manhattan. He has been with the firm for 21 years; credits a Caucasian father-son team with providing him with invaluable mentoring at the start of his career; was part of one of the largest, most successful teams at Merrill Lynch, which did not work out for reasons he claims are discriminatory; currently is on a team that he is happy with; and has refused invitations to join management. Gibson Dep. 8, 143-50, 263-64.

Proof of any of those facts proves nothing about the experience of Jennifer Madrid, a successful FA who worked in a different office in New York City. Madrid testified that one of the most successful FAs in her office, a male Caucasian, invited her to pool with him, and this arrangement led to her substantially increasing her book of business. Unlike Gibson, she wanted to move to management, but was not successful at MAC. Madrid Dep. 174-75, 264.

Contrast Gibson's and Madrid's experiences with that of Rocky Howard, an unsuccessful FA. Howard spent twenty years in Merrill Lynch's Fort Worth, Texas office. He did not want to go into management. Howard Dep. 200. He testified to personal problems that impeded his

performance, including that he became the primary care-giver for his niece and nephews, accepted a job in an office where he had no significant ties to the community, and spent significant time traveling abroad to participate in tango dancing. *Id.* at 49-52, 79-83.

Another unsuccessful FA, Leroy Brown worked in Merrill Lynch offices in New Jersey before moving to the Punta Gorda, Florida office. He complains that there "has never been a manager that approached" him to be "in a majority team" and that while in Punta Gorda he has only received one account distribution. Brown Dep. 70-71. Brown admits that a variety of personal problems impeded his production. He ascribes "multiple causes" for his having been placed in the penalty box in 2003, including "market causes," a divorce, and personal health problems, in addition to discrimination. *Id.* at 23-29. Brown also admitted that he has "never been a good account opener. Even in my best year … I was in the last quintile in new accounts." *Id.* at 321-22. None of his experiences, including the purported discrimination he was exposed to, bear any semblance to the experiences of Gibson, Madrid, or Howard.

As these disparate experiences show, plaintiffs cannot prove, as they must to "satisfy the commonality requirement," that Merrill Lynch's "employment policies or practices must have affected the putative class members in the same or similar ways." *Puffer*, 255 F.R.D. at 460; *id.* at 461 (denying certification because of "the heterogeneity of the class members and individual decision makers"). One manager's decision will not affect FAs in other complexes or offices, and one FA's decisions will not track another's. *See* Gibson Dep. 81 (an FA "in New York has had a different experience than someone in California who has had a different experience than someone in Illinois or Florida"). Beyond each plaintiff's affirmative case, Merrill Lynch is entitled to present evidence as to each FA showing that no discrimination occurred or that managers would have made the same decision absent any discrimination. *Infra*, pp. 57-58.

Accordingly, even if common questions pervaded the pattern or practice issue (which they do not), class certification still is "unsuitable" because "proof of the essential elements of the cause of action requires individual treatment." *Hydrogen Peroxide*, 552 F.3d at 311. The full-blown trials that would be needed to make "separate liability determinations" for each claimant "would be tantamount to a life sentence" for both judge and jury. Fentonmiller, *Damages, Jury Trials, & the Class Action Under the Civil Rights Act of 1991*, 12 Lab. Law. 421, 438 (1997); *see also Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008) (class certification should be denied where a liability determination would only give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies).

### D. Plaintiffs' Theory That Merrill Lynch Has A Culture Of Discrimination That Leads To Opportunity Hoarding By Caucasians Does Not Create Commonality.

In the face of overwhelming precedent refusing to certify employment discrimination classes against employers with decentralized decisionmaking, plaintiffs try to "bridge the gap" between their individualized allegations and those of the putative class by offering the theory of a sociologist, Dr. Bielby, who sees illicit stereotypes everywhere, even in Merrill Lynch's affirmative action efforts and marketing to minority communities. *Ellis*, 217 F.R.D. at 422. Bielby asserts that Merrill Lynch's production-based meritocracy, which he calls a system of "cumulative advantage," operates within a "culture" of discrimination in which "race permeates policy and practice," and opines that diffuse responsibility for achieving diversity goals "allow[s] discriminatory barriers to persist." Bielby Rep. ¶¶18, 63, 87; Pl. Br. 4, 46. Plaintiffs use Bielby's nebulous "social framework" theory to convert essentially every decision made by Merrill Lynch managers and FAs into a discriminatory one: the culture is biased, which leads Caucasian managers and FAs to hoard resources for themselves and to create barriers for African Americans. Pl. Br. 8 (culture "pervaded by harmful racial stereotypes" that "affect decisions"); Bielby Dep. 132. According to Bielby, because of this culture and "opportunity hoarding," Caucasians are less likely to invite African Americans to join their teams (Bielby Rep. ¶¶29-30), and managers are less likely to depart from the ADP to benefit African Americans (¶¶35-38, 42) and less likely to use their discretion to sponsor African Americans for MAC (¶58), and the "subjective judgment" of assessors at MAC disfavors African Americans (¶62).

The slander that Merrill Lynch has a discriminatory culture is beyond all reason given its long-time African American CEO and the substantial effort and resources it devotes to affirmative action initiatives. And Bielby's theory is deeply flawed, as we show in our *Daubert* motion. But even if Bielby were right about Merrill Lynch's culture, that would only highlight the need for thousands of inquiries into individual manager and FA decisions. As even Bielby admits, a "racialized" culture does not presumptively result in *every* manager using "discretion in a way that favors whites over African Americans," and individualized factors may "counteract the impact" of any bias in any particular decision. Bielby Dep. 101, 104-05. The trier of fact would thus need to determine whether the culture in a particular Complex or office was "racialized" (something Bielby did not investigate), and if so, whether any particular decision with regard, for example, to account distributions or MAC was discriminatory, or whether a particular FA's decision not to team with an African American was motivated by race. Because

Bielby did not "study any individual decision" (*id.* at 136) and there is "considerable distribution" in the extent to which individuals hold and act upon bias, with some managers being biased and others not (*id.* at 167-71), intent and causation, as well as injury and damages, could be determined only in individualized trials. Bielby's generalized theory does not tie even one *actual* decision to discrimination. It is impossible to see how it supports class certification.

Courts have seen through these efforts to fabricate commonality in cases involving multiple business units and decisionmakers. In *Puffer*, Judge Schenkier found unpersuasive "on the issue of commonality" the opinion of an organizational sociologist that an employer had a "uniform culture of paternalism across the company," that this culture infected decisionmakers' exercise of "discretion" to "the systematic disadvantage of female managers," and that the employer's "practices fail[ed] to check the biases that discretion permits." 255 F.R.D. at 468. Denying class certification, Judge Schenkier observed that this theory failed to show that managers exercised their discretion "in a uniform way that caused" gender disparities. *Id.*; *see also Arnold v. Cargill Inc.*, 2006 U.S. Dist. LEXIS 41555, at *32-*37 (D. Minn. June 20, 2006) (Bielby's opinion that "corporate culture" "fosters discrimination" did not create commonality where decisionmaking was "decentralized" over 90 business units; class certification denied); *EEOC v. Morgan Stanley*, 324 F. Supp. 2d 451, 462 (S.D.N.Y. 2004), *aff'd in part, rev'd in part on other grounds*, 2004 U.S. Dist. LEXIS 12724 (S.D.N.Y. 2004) (Bielby's social framework evidence did "not illuminate the initial inquiry, i.e. whether [defendant] discriminates," and would "confuse the jury about the burden of proof" because it "asks the jury to begin with the expectation of discrimination").

Key to Bielby's theory is the notion that the subjective elements of managers' decisionmaking translate a general firm culture into hoarding behavior and discriminatory decisions. But "nothing in Title VII prohibits employers from using subjective criteria." *Puffer*, 255 F.R.D. at 459-60. The Seventh Circuit recognizes that "[s]ubjective evaluations" are often "critical" to decisionmaking, especially decisions concerning "professional positions" like an FA (*Blise v. Antaramian*, 409 F.3d 861, 868 (7th Cir. 2005)) and "managerial" jobs. *Watson v. Ft. Worth Bank*, 487 U.S. 977, 999 (1988); *see Scott v. Parkview Mem. Hosp.*, 175 F.3d 523, 525 (7th Cir. 1999) ("no formulary of approved answers can replace a nuanced evaluation of candidates. Nor does federal law require private employers to … prefer paper-heavy evaluations over contextual assessments by knowledgeable reviewers"). Here, those subjective decisions are

limited by racially neutral, non-discriminatory guidelines established at the national level. This is the opposite of what courts have found to be inherently discriminatory.[24]

The evidence also contradicts Dr. Bielby's theory. Whenever discretionary decision-making could be studied, Dr. Saad—unlike plaintiffs' experts—examined it and found that there was no racial difference in the discretionary judgments reached by managers or that differences favored African Americans. *See* Saad Rep. 58-61 (no difference in termination of similarly situated Caucasian and African American FAs after graduation from POA program; differences in terminations for failing to meet POA performance goals favor African Americans); *id.* at 63-64 (more African Americans attended MAC than random chance would predict). Bielby dismisses these findings because decisions about issues such as LOS adjustments are "limited by a variety of company policies." Bielby Rebuttal Rep. 18-19. But other policies he attacks—pooling/teaming and account distributions—are similarly limited. And Bielby concedes that if African Americans would actually receive fewer assets under a system that eliminated manager discretion and distributed accounts based strictly on ADP rankings—precisely what Saad found without contradiction to be the case (Saad Rep. 39-40)—then "exercised discretion was not disadvantageous to African Americans." Bielby Dep. 105.

The other leg of Dr. Bielby's argument is that African American FAs are "socially isolated" because they are often the only African American FA in an office. He asserts that this

---

[24] Plaintiffs have not argued that Merrill Lynch had a uniform policy of permitting managers to make discretionary decisions that itself creates a common question, with good reason. Even leaving employment decisions to the "unchecked discretion" of supervisors—not alleged here—raises "no inference of discriminatory conduct." *Watson*, 487 U.S. at 990. And as plaintiffs concede, all of the decisions about which they complain were made within a framework of objective national policies, based on productivity (in the case of compensation and eligibility for MAC) or more complex standards (in the case of ADP rank and MAC assessment). Manager discretion was exercised within these confines. That precludes a finding of commonality based on alleged subjectivity of decisionmaking. *See Gen. Tel.*, 457 U.S. at 159 n.15 (only "entirely subjective decisionmaking processes" could "conceivably" suggest a practice of discrimination); *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 571 (6th Cir. 2004) (no commonality where defendant employed objective criteria "such as time in service, attendance records, and test scores," in combination with subjective criteria); *Ellis*, 217 F.R.D. at 426 (no commonality where "decentralized" decisionmakers considered "both objective and subjective factors"); *Allen*, 2000 U.S. Dist. LEXIS 11043, at *28-*29 (no commonality where local decisionmakers did not have "unfettered discretion"); *Betts*, 1999 U.S. Dist. LEXIS 9743, at *21 (no commonality where managers "not completely unfettered" but constrained by an evaluation form with "objective inputs"). A Ninth Circuit decision that relied upon discretionary decisionmaking as a basis for certifying a huge class of female employees, based on Dr. Bielby's opinion, has been heard en banc and stripped of any precedential status. *See Dukes v. Wal-Mart, Inc.*, No. 04-16688, Order at 2 (9th Cir. Feb. 13, 2009).

causes them to be excluded from "mentorship and professional development" and leads members of the "in-group," Caucasian males, to engage in "opportunity hoarding," which results in African Americans being excluded from teams and account transfers. Bielby Rep. ¶¶22, 30-32. But we have already seen that plaintiffs such as Jennifer Madrid and LaRue Gibson benefited from mentoring by Caucasian FAs (*supra*, p. 24); that plaintiffs such as Madrid benefited from account transfers by Caucasian FAs and decisions by Caucasian managers with respect to account transfers (*supra*, pp. 16-17); that plaintiffs such as Madrid were invited by Caucasians to join pools and/or teams (*supra*, p. 13); and that plaintiffs like Gibson were invited by Caucasian managers to enter a management track (*supra*, p. 28). Bielby did not consider these facts (*see* Bielby Dep. 136), which contradict his argument and make a class trial improper.

Dr. Bielby rests his "opportunity hoarding" theory on his view that teams of mostly Caucasian FAs comprise a "network," that account distributions are a scarce resource that teams "'hoard'" to "'sustain their control,'" and that "race is the categorical boundary" that perpetuates inequality. Bielby Rep. ¶32. But Bielby admits that in fact he has not studied and has no opinion about whether "a successful black will have a harder time getting on a team than a successful white because of opportunity hoarding." Bielby Dep. 135. In other words, Bielby admits he has not determined whether it is *race* or *success* that is the categorical boundary that leads to fewer teaming opportunities for African Americans. That gaping hole in Bielby's theory—with the supposed exclusion of African Americans from teams being the principal explanation why African Americans receive fewer account distributions—makes it impossible for plaintiffs to establish commonality based on his opinion.[25]

When Dr. Saad tested Bielby's theory empirically, it did not survive scrutiny. If Bielby were correct that "social isolation" harms African American FAs, "solo" African American FAs would be less likely to be members of pools compared to African Americans in offices with other African American FAs; "solo" African American FAs should be less productive than African American FAs in offices with other African American FAs; and African American FAs

---

[25] Dr. Bielby also argues that African American FAs are "pigeonholed" and "steered" toward African American clients as a result of Merrill Lynch's multicultural marketing and other practices. Bielby Rep. ¶¶44-55. But the company's efforts "are very much in line with the best practices of the most successful and effective multicultural marketing firms." Williams Rep. 2. Bielby's assertions that these standard efforts lead to pigeonholing or steering are rank speculation. In any event, Merrill Lynch's multicultural marketing practices obviously do nothing to bind together the individualized nature of plaintiffs' claims.

with an African American manager should do better than African American FAs with a Caucasian manager. Dr. Saad found that not one of these propositions is true. Saad Rep. 71-72.

Only by considering unique fact presentations at trial concerning decisions of hundreds of managers in hundreds of offices across the country could the trier of fact determine whether any particular exercise of subjective judgment had been tainted by a discriminatory culture, even assuming that plaintiffs could prove such a culture existed. Dr. Bielby's sweeping generalizations cannot support a finding that plaintiffs have met their burden to prove commonality.

### E. Plaintiffs' Statistical Evidence Does Not Establish Commonality.

#### 1. Plaintiffs' statistics do nothing to eliminate the need for highly individualized inquiries to determine liability.

In another effort to gloss over the tens of thousands of disparate decisions by hundreds of managers and thousands of FAs that would be at the heart of any trial, plaintiffs offer the statistical opinion of Drs. Madden and Vekker. But statistical evidence cannot create common issues where, as here, other evidence shows that proof of discrimination would depend on inquiries into the actions and intentions of hundreds of decisionmakers in hundreds of separate business units and of thousands of largely autonomous FAs with different business methods and experiences. *See Balderston v. Fairbanks Morse Engine Div.*, 328 F.3d 309, 319-20 (7th Cir. 2003) (statistics "must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; [and] the plaintiff and the other similarly situated employees must have shared a common supervisor"); *Bennett*, 2000 U.S. Dist. LEXIS 8351, at *16 (statistics "do nothing to bind together the individualized nature of claims of the prospective class and the lack of a centralized hiring decisionmaker"); *Rhodes v. Cracker Barrel Old Country Store, Inc.*, 2002 U.S. Dist. LEXIS 25962, at *205-*206 (N.D. Ga. Dec. 31, 2002) (even if statistical evidence showed "a pattern consistently adverse to African-Americans, the decentralized nature of [defendant's] employment decision-making" and "the individualized nature of the class claims" would "prevent class certification"). In other words, plaintiffs' experts' statistical analysis cannot override the established legal principles that prohibit certification of a hopelessly fragmented nationwide class like that proposed here. *See West v. Prudential Sec.*, 282 F.3d 935, 938 (7th Cir. 2002) (plaintiffs cannot "obtain class certification just by hiring a competent expert").

Focusing on disparities in compensation between African American and Caucasian FAs, plaintiffs contend that—along with anecdotal evidence that we have shown in fact undermines

commonality—Drs. Madden and Vekker's statistics create a class-wide presumption of discrimination. Failing to certify a class in those circumstances, they say, is inconsistent with "watershed Title VII cases" like *Teamsters*. Pl. Br. 2; *see id.* at 46-47, 54. But the presumption plaintiffs seek was justified in *Teamsters* because minority truck drivers were assigned "lower paying, less desirable jobs" and "overwhelmingly excluded" from long-haul jobs that paid better. 431 U.S. at 329, 342 n.23. Though perfectly qualified for long-haul jobs, African American drivers were misled about job requirements, their applications were ignored, and managers stated bluntly that race prevented the class members from getting the job. *Id.* at 338 & n.19.

In contrast, here there are no tell-tale indicia of intentional discrimination. Merrill Lynch's policies are racially neutral on their face. An African American who experienced the most rank form of discrimination in the Jim Crow South ran the business unit where plaintiffs worked at the beginning of the class period and was President and then CEO and Chairman during most of the rest of the class period. As we have explained, the evidence shows that managerial discretion was either neutral or favored African Americans in everything from account distributions to terminations from the POA program. *See supra*, pp. 18-19, 22. This case presents nothing like the cut-and-dried case for presuming intentional class-wide discrimination in *Teamsters*; detecting any discrimination here requires scrutiny of individualized evidence.

Among the numerous individual factors the Court would have to consider are what impact the remnants of societal discrimination had on each African American FA's production. Merrill Lynch experts Drs. Fernandez and Outtz have shown that African Americans often have weaker social networks of wealthy potential clients, which are important tools to develop business. Fernandez Rep. 17-35; Outtz Rep. ¶¶44-51. Dr. Bielby concedes both that social networks are substantially segregated by race, and that it "would be difficult to have a substantial book [of business] without having wealthy clients." Bielby Dep. 108. Bielby acknowledges too that individuals "prefer" those "in the same categories" as themselves, that FA-client relationships depend on "trust," that potential clients may be influenced by bias in deciding who to trust, and that clients have little "individuating information" about brokers and no constraints on their decisionmaking, which may make bias more prevalent. *Id.* at 107-08, 111, 174, 181-82. The fact that plaintiffs do nothing to control for this in their analysis renders it inherently unreliable. *See Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616-17 (7th Cir. 2000); *EEOC v. Sears, Roebuck*, 839 F.2d 302, 311 (7th Cir. 1988).

Although a Title VII defendant is under no obligation to "include in its own statistical analysis variables that it asserts are missing from the plaintiff's analysis" (*Chicago Min. Lamp Works*, 947 F.2d at 301), Dr. Saad has shown that differences in access to networks of wealthy investors explain the disparities plaintiffs cite. Dr. Madden's response is to distort Dr. Saad's analysis and claim that it establishes that this "access to wealth" has only a small impact. She does this by taking what Dr. Saad identifies as an "instrument" for pre-Merrill social networks in an Instrumental Variable analysis and using it as a direct "measure" of access to wealth in a simple Ordinary Least Squares ("OLS") regression. She then claims that in doing so she has incorporated this omitted variable into her analysis and that disparities remain. Madden Rebuttal Rep. 5-11. This sleight of hand is disingenuous at best, because (a) it misconstrues the workings of an Instrumental Variable analysis, (b) it is improper to use the instrument of an Instrumental Variable analysis as a measure in an OLS regression, and (c) the instrument that she uses does not capture the access to wealth that clearly impacts African Americans' ability to succeed. Dr. Madden's OLS regression proves nothing. These defects are addressed in detail in our *Daubert* motion to strike portions of Madden's reports.

The record establishes that African Americans have lesser access to wealth, which resides largely in the white community, and face barriers as a result of the segregation of social networks. Fernandez Rep. 2-35. Merrill Lynch's former CEO, Stan O'Neal, testified to this: "I think it is a fact of existence that reaching across cultural boundaries and racial boundaries [on] a consistent basis can be a challenge … and that the concentration of wealth in most important parts of this country … is mostly in the hands of whites, which means that by definition … most African American financial advisors have to reach across racial and cultural community boundaries to establish those relationships in order to be successful." O'Neal Dep. 130-31.

These additional burdens in accessing wealth are particularly salient in a business in which over 60% of Caucasians hired for this job at Merrill Lynch are no longer employed in the business within 5 years. *See* Saad Rep. 59 n.108; *see also* Ex. 7 at MLE00053-000666. Given that high failure rate it is not surprising that the extra barrier African Americans face, which is completely external to Merrill Lynch, would have such a significant impact on African American broker success. Those additional burdens resulting from general societal conditions are not the legal responsibility of Merrill Lynch. *See People Who Care v. Rockford Bd. of Educ.*, 246 F.3d 1073, 1076 (7th Cir. 2001) (defendant "has no legal duty to remove those vestiges of societal discrimination for which it is not responsible"). The fact that Merrill Lynch's aggressive

affirmative action programs have not "effective[ly] remedia[ted]" all the adverse effects on African American FAs of societal differences (Pl. Br. 47) cannot be the basis for asserting that Merrill Lynch *intended* or *caused* African American FAs' generally poorer outcomes. *See Pullman-Standard v. Swint*, 456 U.S. 273, 292 n.23 (1982) (knowledge of or even acquiescence in another entity's discrimination does not show discriminatory purpose); Greiner, *Causal Inference in Civil Rights Litigation*, 122 Harv. L. Rev. 533, 577 (2008) ("Title VII compels the defendant firm to avoid its own discrimination, not to take remedial action based on someone else's"); *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322-23 (9th Cir. 1994).

2.      Plaintiffs' statisticians fail to establish a link to Merrill Lynch actions.

Beyond these threshold legal barriers to class certification, plaintiffs' statistical analysis suffers from another fatal defect. It fails to link any Merrill Lynch practice to disparate outcomes for African Americans. Such a showing is essential to establishing commonality in a pattern or practice or disparate impact suit. *Farrell*, 421 F.3d at 616 (disparate impact); *Coates v. Johnson & Johnson*, 756 F.2d 524, 532 (7th Cir. 1985) (disparate treatment); *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1045, 1051 (7th Cir. 1991); *Ellis*, 217 F.R.D. at 423.

**Compensation**. In finding that African American FAs on average are paid less than Caucasian FAs, Drs. Madden and Vekker used experience and education as proxies for broker production. Madden Rep. 10 (an FA with more education and more experience "is likely to be more productive"). But experience and education do not distinguish among productive and unproductive FAs, regardless of race. An analysis limited to Caucasian FAs and *holding experience constant at eight years* shows that FAs in the first quintile made an average of $440,000 while fifth quintile FAs made less than $100,000. Saad Rep. 21 & Ex. 10. Differences in education do not explain disparities in FA compensation either. The few FAs for whom data existed almost all attained the same level of education (an undergraduate degree). *Id.* at 21. In contrast, Madden and Vekker failed to take proper account of a variable that has great explanatory force—access to wealth. *See supra*, pp. 41-42. In short, as Dr. Saad explained, plaintiffs' experts used factors that bear little relationship to compensation, regardless of race, "let alone permit one to discern whether African American FAs are treated differently than white FAs by Merrill." Saad Rep. 20.

**Account Distributions**. Concededly using aggregated statistics that hide local variations (Madden Dep. 144-47), Drs. Madden and Vekker found that Merrill Lynch managers gave African American FAs inferior account distributions. But aggregate statistics cannot establish

commonality in multi-decisionmaker suits. *Cooper v. S. Co.*, 390 F.3d 695, 717 (11th Cir. 2004); *Stastny*, 628 F.2d at 278-79; *Abram v. UPS*, 200 F.R.D. 424, 431 (E.D. Wis. 2001); *see* Saad Rep. 5 n.7. And Madden and Vekker arrived at their conclusion only because they *failed to control for FA rank under Merrill Lynch's ADP policy*, even though ADP requires managers to consider an FA's rank. Once rank is taken into account, the disparities disappear. Saad Rep. 36; *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) ("failure to control for differences in rank" rendered statistician's study of pay discrimination "worthless"). In fact, African American FAs would have received *lower* value accounts under the ADP had they been distributed under a strict application of the rankings, without managerial discretion. Saad Rep. 39-40 & Ex. 25. Plaintiffs do not dispute that fact. Madden Dep. 171-76.

*Pools/Teams*. Madden and Vekker find that African American FAs join pools and teams at lower rates than Caucasians. But their aggregate statistics ignore the fact that pooling rates vary by office and do not control for the undisputed fact that FAs with higher average household asset size are more likely to join pools and to do so with FAs with similar average household asset size. Saad Rep. 44-46 & Exs. 29, 31; Madden Dep. 295-96, 308-09. Both of these race-neutral factors impact thousands of Caucasian FAs and only a few hundred African American FAs. Plaintiffs challenge none of these analyses. And Dr. Saad found no statistically significant difference in the rate at which African American and Caucasian POA FAs join pools. Saad Rep. 47-48 & Exs. 33-34. Nor, controlling for FA interest in pooling by office as well as FAs' average household asset size, quintile rank, and LOS, did Saad find any statistically significant difference in the rate at which African American and Caucasian FAs pool. *Id.* at 47 & Ex. 32; *see also id.* at 50 & Exs. 37-38 (no statistically significant difference in the rate that African American and Caucasian POA FAs and FAs in pools received team designation).

*Attrition*. Drs. Madden's and Vekker's failure to control for FA production renders their study of attrition rates meaningless. Taking production into account, African American POA FAs left Merrill Lynch at a statistically significant *lower* rate than Caucasian POA FAs. Saad Rep. 58-60 & Exs. 45-48; *see id.* at 60-61 & Ex. 49 (no statistically significant racial difference in FA terminations in all but one year); *Arnold*, 2006 U.S. Dist. LEXIS 41555, at *52-*53 (no commonality because racial disparities were "statistically eliminated in performance-related terminations when actual performance is taken into account"). Plaintiffs do not challenge this analysis, other than to assert that production is a "tainted variable." But that rhetorical assertion does not explain why African American POA FAs leave Merrill Lynch at lower rates than

similarly productive Caucasians. If Merrill Lynch were a racist organization where local managers regularly exercised discretion in a biased manner, as plaintiffs contend, there would be more terminations of African Americans with similar production as Caucasians, not fewer.

Plaintiffs attempt to sustain their "tainted variable" argument by claiming that account transfers to POA FAs enable Caucasians to succeed at a greater rate. While the experts disagree on that issue, Dr. Saad has shown that both in proportion to their self-generated assets and in raw dollar terms African American POA FAs receive more in transfers than Caucasians. African American POA FAs who missed the three-month performance hurdle established by the POA program but made it over the six-month hurdle received $1.2 million in transferred assets, although they had only $830,306 in self-generated assets. By contrast, Caucasian POA FAs who missed the three-month hurdle but made it over the six-month hurdle had only $1.1 million in transferred assets, but $1.8 million in self-generated assets. Saad Rep. 57-58 & Ex. 44.

*Hiring*. Plaintiffs cite the low percentage of African American FAs and POA FAs at Merrill Lynch. Pl. Br. 3; *see* Bielby Rep. ¶¶12-16. But Dr. Bielby frankly admits that he failed to consider Merrill Lynch's "hiring and representation of African Americans … relative to an externally defined relevant labor market." Bielby Rebuttal Rep. 21. Drs. Madden and Vekker too concede that "there are reasons external to Merrill Lynch for African American FAs to be distributed across locations or office complexes differently than white FAs," yet fail to take account of variant labor markets. Madden & Vekker Rebuttal Rep. 13. But that is precisely what courts say is relevant. *See Balderston*, 328 F.3d at 319 ("[t]he Supreme Court has emphasized the importance of looking to the proper base 'group' when making statistical comparisons"); *Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1254 (7th Cir. 1990) (it is "eligibility rate, not under-representation, that is telling"); *Claybourne v. Omaha Pub. Power Dist.*, 211 F.R.D. 573, 592 (D. Neb. 2002) (denying certification of race discrimination class because "[s]tatistics laying bare a racially unbalanced workforce … absent further evidence drawing comparisons with the relevant labor market" did not prove commonality).

Plaintiffs' aggregate statistics completely fail to take account of the availability of candidates in the labor market or the fact that hiring is done locally and depends on local labor markets. Saad Rep. 52 & n.96; *see Stastny*, 628 F.2d at 278-79. Census Bureau data show that the overall representation of African American FAs at Merrill Lynch mirrors the availability of African American financial advisors in the labor market. Saad Rep. 52-53; *id.* at 53-55 (no statistically significant difference between the percentage of African American POA FAs and

African American representation in "feeder" industries from which POA FAs are hired). And plaintiffs' observation that Merrill Lynch has no African American FAs in states such as Idaho and Utah is meaningless: the availability of qualified African American financial advisors is statistically zero in 21 of the 23 states where the firm does not employ African American brokers. *Id.* at 55; *see Beck v. Boeing Co.*, 203 F.R.D. 459, 463-64 (W.D. Wash. 2001) (commonality not established by statistics that "do not apply at each and every location covered by the putative class"), *aff'd in part, vacated in part on other grounds*, 60 F. App'x 38 (9th Cir. 2003). Plaintiffs do not contest these findings.

*Quintile System.* Plaintiffs observe that African American FAs are "underrepresented" in the upper quintiles of Merrill Lynch's race-neutral quintile system, which mechanically ranks FAs based on production and LOS, and assert that using quintile rank as a factor in distributing accounts and other resources constitutes a "cumulative advantage system" that "intentionally punishes African Americans." Pl. Br. 19-23. But because plaintiffs have not shown discrimination in *any* input used to calculate quintile rank, distributing resources based on quintile rank cannot be discriminatory. Dr. Saad has shown that "rewards of employment go to all those with higher productivity, including highly productive African American brokers." Saad Rep. 74. Dr. Bielby concedes that "[a] cumulative advantage system is not inherently discriminatory" if "disparities are attributable to individual differences in productivity that have not emerged as a result of differential, discriminatory treatment by the organization," as is the case here. Bielby Rep. ¶18.[26]

> ### F. Because Title VII Bars Challenge To Merrill Lynch's Production-Based Compensation Program, Plaintiffs' Compensation Claim Cannot Satisfy Commonality.

Plaintiffs challenge only one element that applies without variation to all members of the proposed class: Merrill Lynch's Compensation Program. That Program, which determines compensation for every FA, is transparent and formulaic, consisting of grids used to calculate an FA's compensation based on the FA's production. Pl. Br. 33; *supra*, pp. 10-12. That this Program applies equally to all FAs does not help plaintiffs satisfy the commonality requirement.

---

[26]   Plaintiffs provide no statistical support for their assertion that Merrill Lynch discriminates against African American brokers in other employment practices such as starting compensation and admission to MAC. Dr. Saad shows that no such discrimination exists. Saad Rep. 51-74.

First, because the Program's grids mechanically convert an FA's production into a compensation number, plaintiffs' real complaint is not with the Program but with the factors that they claim cause African American FAs to be less productive, such as account distributions and teaming. *See Larkin v. Pullman-Standard Div.*, 854 F.2d 1549, 1576-77 (11th Cir. 1988) (distinguishing between intent as to system and practices feeding into the system), *vacated on other grounds*, 493 U.S. 929 (1989); *Teamsters*, 431 U.S. at 348 (when system allegedly perpetuates discrimination in other employment practices, plaintiffs must seek "appropriate relief as a direct remedy for discrimination" in those practices). Here, we have shown, those factors raise individualized issues, not issues common to the putative class. Accordingly, plaintiffs' attack on the Compensation Program does not satisfy Rule 23's commonality requirement.

Second, the Compensation Program cannot justify certification of a burdensome race discrimination class because it is immunized from challenge by Section 703(h) of Title VII, which protects "different standards of compensation" pursuant to a bona fide "merit system" or "system which measures earnings by quantity or quality of production." 42 U.S.C. § 2000e-2(h).[27] Merrill Lynch's Program awards compensation based on production (*see* O'Neal Dep. 245), as plaintiffs concede. *See* Ex. 9 at 8; *McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 605 (E.D.N.C. 2006) (upholding system that based earnings on store volume); *Diamond v. T. Rowe Price Assocs.*, 852 F. Supp. 372, 396 (D. Md. 1994) (upholding system that based earnings on mutual fund performance). Because it rewards production and revenues, the Program is also a merit system. *See Scott v. Dallas County Hosp. Dist.*, 2003 U.S. Dist. LEXIS 6744, at *5-*6 (N.D. Tex. Apr. 21, 2003) (mathematical matrix for awarding compensation was a merit system), *aff'd*, 85 F. App'x 361 (5th Cir. 2003); *Gerbush v. Hunt R.E. Corp.*, 79 F. Supp. 2d 260, 264 (W.D.N.Y. 1999) (tying compensation to revenue was a merit system), *aff'd*, 234 F.3d 1261 (2d Cir. 2000).

Section 703(h) "unequivocally mandates" that a merit or production system cannot be unlawful without proof of "discriminatory purpose"; "discriminatory consequences" are not enough. *TWA v. Hardison*, 432 U.S. 63, 82 & n.13 (1977); *supra*, p. 33 (knowledge of disparate

---

[27] Based on Section 703(h) Merrill Lynch moved for summary judgment on plaintiffs' challenge to its Compensation Program. The Court struck that motion in order to resolve class certification first. Because Section 703(h) eliminates plaintiffs' challenge to the sole program that applies without variation to all putative class members, this Court should resolve the issue now (though it need not do so if it holds for other reasons that plaintiffs have not proved commonality).

results is not intent). In determining purpose courts ask if a merit or production system (1) applies equally to all racial groups, (2) is rational and in accord with industry practice, (3) did not "have its genesis in racial discrimination," and (4) was "negotiated and has been maintained free from any illegal purpose." *Teamsters*, 431 U.S. at 355-56. These considerations show that Merrill Lynch's Program is not intentionally discriminatory. It applies evenhandedly to every FA, regardless of race. It is consistent with mainstream industry practice, as nearly all firms reward FAs based on their level of production. Ex. 5 at MLE 00090-000625; *see Yi v. Sterling Collision Ctrs.*, 480 F.3d 505, 510-11 (7th Cir. 2007) (although it is "possible" for an entire industry to violate the law while escaping government attention, more likely explanation is that compensation system is a "bona fide commission system"). And the Program was adopted to keep Merrill Lynch competitive "within the marketplace" by rewarding performance in a manner to "align the objectives" of the FA, the firm, and the client. Hogarty Dep. 19; *see EEOC v. Consol. Serv. Sys.*, 989 F.2d 233, 236 (7th Cir. 1993) (when "the most efficient method" of running a business is "adopted because it is the most efficient," there is no discrimination). The Program is a legitimate business practice, negotiated and maintained to increase the firm's revenue. *See Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 700-04 (7th Cir. 2003) (employee's greater revenue justified greater pay). Because it falls squarely within Section 703(h) it is immune from challenge and cannot be the basis for finding commonality.[28]

### G. Plaintiffs Are Not Typical Representatives Of The Proposed Class.

Plaintiffs acknowledge that to satisfy typicality they must show that, with regard to the "company's actions," the named representatives' claims have "the same essential characteristics as the claims of the class at large." Pl. Br. 48. Commonality and typicality are closely related, and here plaintiffs fail to satisfy typicality for the same reasons that their claims are individualized and not common. There were hundreds of company decisionmakers exercising discretion over exceptions to the ADP, whether to approve teams, whether to sponsor an FA for MAC, and other judgments about which plaintiffs complain. FAs had broad autonomy to make decisions regarding their own businesses, including with regard to ADP and teaming. In these

---

[28] Plaintiffs' failure to point to any evidence that the Compensation Program was adopted as a tool of discrimination is not for want of discovery. Plaintiffs have not only had access to the pertinent documents relating to the establishment and implementation of the Compensation Program, but they have also deposed the Merrill Lynch employees involved in the relevant decisions.

circumstances, where the reasons for a particular account distribution, teaming, or other outcome cannot be determined without particularized evidence, there is no way in which "the named representative [can] establish the bulk of the elements of each class member's claims when they prove their own claims." *Allen*, 2000 U.S. Dist. LEXIS 11043, at *31. Decentralized decisionmaking, combined with FA autonomy, means that a named plaintiff's claim will always be atypical—it will never establish the important elements of any other class member's case. *E.g.*, *Payton v. County of Carroll*, 473 F.3d 845, 853-54 (7th Cir. 2007) (typicality lacking where each defendant "independently determined how much to charge, why, and under what circumstances"); *Allen*, 2000 U.S. Dist. LEXIS 11043, at *31 (typicality lacking where defendant "fills positions, promotes employees and makes pay decisions using different methods in its various departments"); *Cooper*, 390 F.3d at 714-15 (no typicality where decisions "were made by individual managers in disparate locations" based on "individual plaintiffs' characteristics").

As detailed above (*supra*, pp. 34-35), plaintiffs' own testimony confirms that "the circumstances of each [claimant] are unique and require consideration of numerous individualized factors." *Ellis*, 217 F.R.D. at 429.

### H.    Plaintiffs Are Not Adequate Class Representatives.

Plaintiffs acknowledge that a claimant is an adequate representative only if his or her interests do not clash with those of the class. Pl. Br. 49. Here, a shared abstract goal "to end Defendant's discriminatory policies and practices and achieve fair compensation" (*id.*) is not enough to paper over deep conflicts among putative class members. *See Ellis*, 217 F.R.D. at 429 (adequacy requirement is concerned with avoiding "antagonistic or conflicting claims").

The "mere fact that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination." *E. Tex. Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 405-06 (1977); *accord Gen. Tel.*, 457 U.S. at 159 n.15. In fact, intra-class conflicts are especially prevalent in employment discrimination cases, including "between employees and applicants who were denied employment" and among employee competitors for promotions and "fringe benefits." *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 331 (1980). It is well established that "the same plaintiff could not represent these classes" with competing interests. *Id.*; *see Patterson*, 631 F.2d at 482 (plaintiff inadequate where "other members of the purported class may have been in competition with plaintiff for the promotion … he was allegedly denied"); *Allen*, 828 F.

Supp. at 553 (adequacy lacking because "members of the putative class may have competed with one or more of the representative parties for a single position or promotion" and "multiple class members would request reinstatement to the same position"); *Ellis*, 217 F.R.D. at 430 (same).

Here, competition among proposed class members extends to access to MAC, appointment to a limited number of managerial positions, receipt of a limited number of ADP distributions, and allocation of desirable CAs and office space. It likewise infects plaintiffs' complaints about teaming, because the number of desirable teams is limited. Ultimately, these issues come down to a conflict over limited resources and their use to increase production and compensation. Dr. Bielby concedes that the "scarce resource[s]" at issue here "have a 'zero-sum' quality to them"—"what gets allocated to one person or team cannot also be allocated to another." Bielby Rebuttal Rep. 17-18. For example, Bielby recognizes that every account allocated to one plaintiff would be an account not allocated to any other class member. *Id.* at 18. Dr. Madden too admits that account transfers involve a zero sum allocation of resources. Madden Dep. 128. Conflicts over basic resources would affect the determination of liability, back pay, damages, and prospective relief. *See, e.g.*, Wilson Dep. 269 (agreeing that "when an account is distributed, that one person gets it and everyone else does not"); Brown Dep. 47 (plaintiffs allege African American FAs were discriminated against in the allocation of IPOs, but Brown acknowledged that "everybody wanted more [IPOs] all the time, and there was an undersupply").

Competition for limited resources among class members means there is "no structural assurance of fair and adequate representation for the diverse groups and individuals affected." *Amchem*, 521 U.S. at 627; *see id.* at 610; *In re NCAA I-A Walk-On Football Players Litig.*, 2006 U.S. Dist. LEXIS 28824, at *27 (W.D. Wash. May 3, 2006) ("to prove that he is entitled to a particular piece of the damages pie, each class member will have to offer proof that necessarily will involve arguing that a threshold number of other players … would not have gotten that same scholarship money"). This clash of interests is particularly stark between the interests of African Americans who succeeded under Merrill Lynch's policies and those who did not. *See* Johnson Dep. 22 (plaintiff would be displeased if FAs who lacked his production nevertheless received the vice president title he earned); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (adequacy lacking in challenge to settlement where "[m]embers who had actually benefitted from [the] settlement were also included in the putative class").

In sum, the proposed class is "riven with conflicts of interest" that would pit members against each other in every aspect of the trial. *Mirfasihi v. Fleet Mortgage Corp.*, 551 F.3d 682,

686 (7th Cir. 2008), *pet. for cert. filed* (Mar. 30, 2009) (No. 08-1221). A class fractured by such conflicts of interest and clashing incentives may not be certified. *See Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697-98 (7th Cir. 1986) (adequacy lacking because "for every dollar that is expended" on some class member "there will be one less dollar available" for class members with competing claims); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1190 (11th Cir. 2003) (class certification denied where "economic interests" of class members were "antagonistic"; "no circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class"); *Remien*, 2008 U.S. Dist. LEXIS 74174, at *11 (certification denied where class lacked "consistent interests").

## II.   The Proposed Class Does Not Satisfy Rule 23(b)(2).

If Rule 23(b)(2) may ever be used to certify a class seeking damages, which is doubtful (*see Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994)), it "would be permissible only when monetary relief is incidental to the equitable remedy." *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). Damages are incidental if their computation "is mechanical, 'without the need for individual calculation.'" *In re Allstate Ins. Co.*, 400 F.3d 505, 507 (7th Cir. 2005). Incidental damages do not depend on "'intangible, subjective differences of each class member's circumstances'" or "'require additional hearings to resolve the disparate merits of each individual's case.'" *Lemon v. Int'l Union*, 216 F.3d 577, 581 (7th Cir. 2000).

Plaintiffs concede that their demand for compensatory and punitive damages prevents the class as a whole from being certified under Rule 23(b)(2) by limiting their request under that provision to liability, injunctive relief, and unspecified (because non-existent) "common damages" issues. Pl. Br. 50. Plaintiffs are right to concede the point: "individual claims for compensatory or punitive damages typically require judicial inquiry into the particularized merits of each individual plaintiff's claim." *Lemon*, 216 F.3d at 580. "[E]ach class member" must show that Merrill Lynch "caused her personal injury" as well as "the magnitude of injury to determine compensatory damages." *Id.* at 581. To recover punitive damages, "each class member" also "must establish that the defendant possessed a reckless indifference to the plaintiff's federal rights—a fact-specific inquiry into that plaintiff's circumstances." *Id.* The need for these individualized inquiries demonstrates that the damages demanded by plaintiffs are not "incidental." *See id.* at 582 (vacating (b)(2) certification of Title VII class because "the requested

-51-

monetary damages are not incidental"); *Puffer*, 255 F.R.D. at 470 (denying (b)(2) certification because "final relief appears to relate predominantly to money damages").

The "backpay" plaintiffs seek also weighs against Rule 23(b)(2) certification. Courts recognize that "the underlying premise of (b)(2) certification—that the class members suffer from a common injury that can be addressed by classwide relief—begins to break down when the class seeks to recover back pay or other forms of monetary damages to be allocated based on individual injuries." *Eubanks v. Billington*, 110 F.3d 87, 95 (D.C. Cir. 1997). As the Seventh Circuit has explained, "'[s]uppose there were five applicants for one job, the employer discriminated against four, all four were equally well qualified, and the fifth got the job. Would all four of the discriminated against applicants be entitled to back pay … ? Obviously not.'" *Bishop v. Gainer*, 272 F.3d 1009, 1016 (7th Cir. 2001). Because the backpay claims here are "'uniquely individual to each class member,'" those claims destroy class cohesion. *Eubanks*, 110 F.3d at 94. As in *Bishop*, "[d]etermining back pay awards for the class" would be "a ludicrous task." 272 F.3d at 1018-19; *see also Serrano v. Cintas Corp.*, 2009 U.S. Dist. LEXIS 26606, at *31 (E.D. Mich. Mar. 31, 2009) (denying Rule 23(b)(2) certification of discrimination class because "back pay and front pay would require individualized determinations for each class member"); *Gaston v. Exelon Corp.*, 247 F.R.D. 75, 87 (E.D. Pa. 2007) (same); *Robertson v. Sikorsky Aircraft Corp.*, 2001 U.S. Dist. LEXIS 11662, at *28 (D. Conn. July 5, 2001) (same); *Bennett*, 2000 U.S. Dist. LEXIS 8351, at *12 (same); *infra*, p. 59 (Seventh Circuit requires individualized backpay awards when employer sets pay using objective standards, as Merrill Lynch does).

But even if plaintiffs had not sought compensatory and punitive damages and backpay, Rule 23(b)(2) certification would still be improper because they have not shown that Merrill Lynch's liability turns on conduct that is generally applicable to the class. *See* Fed. R. Civ. P. 23(b)(2). Nothing suggests that Merrill Lynch's national policies, which evolved over the lengthy class period, were in any way discriminatory. And we have shown, and plaintiffs themselves demonstrate in their depositions, that in implementing those policies hundreds of local managers, who came and went from hundreds of offices scattered across the country, used their discretion in making countless employment decisions such as distributing accounts, approving pools and teams, providing training opportunities, and sponsoring FAs for MAC. These local variations refute the notion that Merrill Lynch's conduct is, in any respect, generally applicable. *See Stastny*, 628 F.2d at 280 n.20 ("If facility concentrated discrimination" is

involved, "then it is not the case, as contemplated by Rule 23(b)(2), that the party opposing the class 'has acted … on grounds generally applicable'" to the class); *Amos v. Geico Corp.*, 2008 U.S. Dist. LEXIS 72889, at *37 (D. Minn. Sept. 24, 2008) (when "the particular means through which [defendant] allegedly accomplished the discrimination"—here the separate decisions of individual managers—"splinters the class into hundreds of discrete groups … the proposed class lacks the cohesion necessary for certification under 23(b)(2)").

Plaintiffs' failure to identify "common injury" also "definitively prevents the interests of the proposed class from being cohesive." *Remien*, 2008 U.S. Dist. LEXIS 74174, at *14. The immense "variance in circumstances" about which they complain destroys cohesion because the Court would be required to conduct countless "individual hearings" to determine who is "entitled to relief." *Allstate*, 400 F.3d at 508; *see Reeb v. Ohio Dep't of Rehab. & Corr.*, 435 F.3d 639, 651 (6th Cir. 2006) (vacating (b)(2) certification; "whether the discriminatory practice actually was responsible for the individual class member's harm, the applicability of nondiscriminatory reasons for the action, showings of pretext, and any affirmative defense all must be analyzed on an individual basis"). And because plaintiffs themselves differ on what relief would be appropriate, any injunctive remedy necessarily must "differentiat[e] … among class members." *Lemon*, 216 F.3d at 580; *see Shook v. Bd. of County Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008) ("under Rule 23(b)(2) the class members' injuries must be sufficiently similar that they can be addressed in a single injunction that need not differentiate between class members"); *supra*, p. 50 (describing conflicts as to remedial measures).

Given this lack of cohesiveness, plaintiffs' blunderbuss complaint, and their sociologist's vague theories of discrimination, no injunction here could "state its terms specifically" and "describe in reasonable detail" the "acts restrained or required," as Fed. R. Civ. P. 65(d)(1) requires. The plethora of individual issues we have identified could not properly be addressed by an injunction, and those "individual issues cannot be avoided simply by formulating an injunction at a stratospheric level of abstraction" without becoming "'too vague to satisfy Rule 65.'" *Shook*, 543 F.3d at 604; *see also Remien*, 2008 U.S. Dist LEXIS 74174, at *13 n.3 ("It is difficult to imagine an injunction that would put in place the sweeping system of oversight Plaintiffs envision and still satisfy the requirements" of Rule 65). Any injunction directed to practices that plaintiffs challenge would inevitably be overbroad and would chill lawful conduct.

Rule 23(b)(2)'s requirement that a defendant's alleged conduct be generally applicable to all class members means that "the interests of the class members" must be "cohesive and

homogeneous such that the case will not depend on adjudication of facts particular to any subset of the class nor require a remedy that differentiates materially among class members." *Lemon*, 216 F.3d at 580; *accord Amchem*, 521 U.S. at 623. Indeed, "even greater cohesiveness generally is required than in a Rule 23(b)(3) class." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005). The class plaintiffs propose is not cohesive—it is hopelessly fragmentary.

## III. The Proposed Class Does Not Satisfy Rule 23(b)(3).

Rule 23(b)(3) requires that common questions predominate over individual ones and that class adjudication is the superior method for resolving the case. Plaintiffs fail both tests.

### A. Individual Issues Predominate Over Any Common Issues.

Contrary to plaintiffs' suggestion (Pl. Br. 51), the predominance inquiry is "far more demanding" than commonality. *Amchem*, 521 U.S. at 624. The Seventh Circuit has stated that if "class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate." *Andrews*, 545 F.3d at 577; *see Hyderi v. Wash. Mut. Bank*, 235 F.R.D. 390, 402 (N.D. Ill. 2006) ("when the class proceedings would at most settle a limited slice of the litigation, and the litigation would likely require substantial individualized proceedings to resolve the class members' claims" "precedent supports denial of class certification"). Even if plaintiffs could satisfy commonality, individual issues predominate here because a class trial on plaintiffs' pattern or practice or disparate impact claim would do nothing to obviate the need for a thousand complex and fact-intensive trials to resolve intent, causation, injury, Merrill Lynch's defenses, and damages for each class member.

Because "liability questions are not subject to class-wide proof and would instead require 'individual and fact intensive' determinations, it cannot be said that common issues predominate." *Radmanovich*, 216 F.R.D. at 436. Even if plaintiffs could prove a pattern or practice of discrimination, "a jury would need to consider each putative class member's claim individually to determine liability." *Puffer*, 255 F.R.D. at 471. The "jury would have to look into each supervisor's motivations in making employment decisions for each individual class member." *Id.* at 472; *accord Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1235 (11th Cir. 2000). And "each individual plaintiff" must prove that discrimination "caused [plaintiff's] personal injury." *Lemon*, 216 F.3d at 581. These issues require "an individualized inquiry into each putative plaintiff's circumstances … to determine whether employment actions taken toward a particular employee were based on [race] or instead on legitimate, nondiscriminatory

-54-

reasons." *Puffer*, 255 F.R.D. at 471. "Such an inquiry would involve different witnesses and proofs for various putative class members to determine, among other things, the motivation of each individual supervisor and the quality and quantity of production of each employee." *Id.* Thus, *Puffer* and *Radmanovich* both denied certification of discrimination classes on predominance grounds because "each plaintiff would need to come forth with proof of how the pattern or practice of discrimination impacted her." *Radmanovich*, 216 F.R.D. at 436-37.[29]

Much as plaintiffs seem intent on litigating a fictional composite case, they cannot avoid individualized inquiries as to liability. For example, to resolve allegations of discrimination in a single account distribution a jury must determine which ADP method was used to distribute the account; plaintiff's rank under that method; whether plaintiff could have improved rank by obtaining industry certifications paid for by Merrill Lynch; whether and the extent to which discrimination in areas relevant to ADP rank affected that individual plaintiff's rank; which accounts in the distribution were most desirable to which FAs; whether the departing FA was on a team and if so whether the team was formed to evade the ADP; whether the individual distributing the account departed from ADP for non-discriminatory reasons such as the need for specialized skills to handle the account; and whether any asserted flaw in the distribution was the result of intentional discrimination. To make that complex determination the jury must review extensive documentation and hear from numerous witnesses, including the individual in charge of the distribution; FAs involved in the distribution; witnesses to any alleged discrimination that purportedly affected plaintiff's rank; and, in some cases, the client. That fact-specific inquiry must be repeated for each distribution challenged by each class member, an obstacle compounded by significant changes made to the ADP during the class period. *See* Sieg Aff. ¶109, Ex. C (summarizing key changes); *Smith v. Texaco, Inc.*, 263 F.3d 394, 416 n.35 (5th Cir. 2001) (changes in employment policies meant that "plaintiffs potentially will have suffered harm

---

[29] Plaintiffs' predominance cases (Pl. Br. 52) are readily distinguishable. Unlike the sprawling class proposed here, they involved a single facility (*Smith v. Nike Retail Servs.*, 234 F.R.D. 648 (N.D. Ill. 2006)), or two nearby facilities (*Bell v. Woodward Governor Co.*, 2005 U.S. Dist. LEXIS 60 (N.D. Ill. Jan. 3, 2005), *see* Ex. 10 at 8; *Warnell v. Ford Motor Co.*, 189 F.R.D. 383 (N.D. Ill. 1999)), and thus implicated fewer decision-makers and less divergent policies. In *Wilfong v. Rent-A-Center*, 2001 U.S. Dist. LEXIS 22718, at *9-*11, *14 n.6 (S.D. Ill. Dec. 27, 2001), the court certified a sex discrimination class advocated by the EEOC where female employees declined by 50% after new executives who "insert[ed] themselves in almost every aspect of the operation of the stores" expressly instituted a "company policy" to "get rid of women." There is no remotely comparable corporate policy here.

from different policies"), *vacated by settlement*, 281 F.3d 477 (5th Cir. 2002); *Colindres v. Quietflex Mfg.*, 235 F.R.D. 347, 382 (S.D. Tex. 2006).

Similar inquiries would be indispensable to resolve claims of discrimination in the other 25 employment practices challenged by plaintiffs. A class trial on plaintiffs' pattern or practice claim would do nothing to reduce the need for hundreds of follow-on trials to resolve all these individualized disputes. *See Allison v. Citgo Petrol. Corp.*, 151 F.3d 402, 421 (5th Cir. 1998) ("The second stage of a pattern or practice claim is essentially a series of individual lawsuits"). Because a pattern or practice trial would not establish liability as to a single class member, but leave that determination to hundreds of subsequent trials, certification must be denied. *See Andrews*, 545 F.3d at 577 (class certification makes no sense when it will only spawn "hundreds or thousands of individual proceedings requiring individually tailored remedies"); *Hydrogen Peroxide*, 552 F.3d at 311 (class certification should be denied when "'proof of the essential elements of the cause of action requires individual treatment'").

**Causation.** To pull one strand out of this morass, and understand its complexity, the Court need only consider the fact-intensive issue of causation. To establish liability in this case, "each individual plaintiff" must establish that Merrill Lynch "caused [plaintiff's] personal injury." *Lemon*, 216 F.3d at 581; *see, e.g., Farrell*, 421 F.3d at 617 (disparate impact plaintiff must prove that he "was personally injured by the defendant's alleged discriminatory practice"); *Allison*, 151 F.3d at 424 ("an essential factual element of both [disparate impact and pattern or practice] claims is a finding that the challenged employment practice caused each individual class member to suffer an adverse employment action"). That issue would not be addressed at all by a pattern or practice or disparate impact determination.

To sustain their burden at the class certification stage, plaintiffs must show that they can establish at trial, through common proof, that the challenged employment practices are "causally related" to the purported racial disparities. *Adams*, 2001 U.S. Dist. LEXIS 4247, at *42. Because plaintiffs have not shown how they could establish causation with common proof, class certification must be denied. *See Cooper*, 390 F.3d at 716-19 (rejecting certification of discrimination class because Dr. Madden failed to analyze variables necessary to determine whether disparities were "attributable to factors other than race"); *Radmanovich*, 216 F.R.D. at 436-37. *See also West*, 282 F.3d at 939-40 (reversing class certification because plaintiff's expert failed to show causation could be established class-wide).

*Merrill Lynch's defenses.* Merrill Lynch's defenses also raise individualized liability issues. *See Vulcan Golf, LLC v. Google Inc.*, 254 F.R.D. 521, 531 (N.D. Ill. 2008) ("affirmative defenses which require individual resolution" are considered in deciding "whether individual issues predominate"). Plaintiffs appear to envision a class trial that could mechanically award damages without allowing Merrill Lynch to raise individual defenses to plaintiffs' claims. But both the Rules Enabling Act and the Due Process Clause prohibit class adjudication if it would entail "sacrificing procedural fairness" and "abridg[ing]" the "substantive right" of defendants to raise and present evidence on every available individualized defense. *Amchem*, 521 U.S. at 613, 615 (citing Rules Enabling Act, 28 U.S.C. § 2072(b)); *see Lindsey v. Normet*, 405 U.S. 56, 66 (1972) ("'Due process requires that there be an opportunity to present every available defense'"); *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 465 (2000). "Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected." *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002).

Any trial must afford Merrill Lynch its right to prove that each employment decision was made "for lawful reasons" untainted by discrimination before damages or other individual relief may be awarded. *Teamsters*, 431 U.S. at 362; *see Vega v. T-Mobile USA, Inc.*, 2009 U.S. App. LEXIS 7682, at *44 (11th Cir. Apr. 7, 2009) (no predominance when employer would "proffer individualized and varying evidence to defend against claims of individual class members"); *Western Elec. Co. v. Stern*, 544 F.2d 1196, 1199 (3d Cir. 1976) (in a Title VII case "defendants must be allowed to present any relevant rebuttal evidence they choose, including evidence that there was no discrimination against one or more members of the class"); *Reeb*, 435 F.3d at 651 ("the applicability of nondiscriminatory reasons for the action … must be analyzed on an individual basis"); *Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331, 345 (4th Cir. 1998) (reversing certification where class adjudication forced defendant to "defend against a fictional composite").

Merrill Lynch also is entitled to present a "mixed motive" defense by showing that it "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B); *see Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Walters v. Cent. States Coca-Cola Bottling Co.*, U.S. Dist. LEXIS 17207, at *17 (N.D. Ill. Oct. 16, 2001), *aff'd*, 51 F. App'x 969 (7th Cir. 2002). The viability of that defense, which would bar damages and other relief (42 U.S.C. § 2000e-5(g)(2)(B)(ii)), must be resolved on an individual basis, making a class action at best an inefficient way to proceed and at worst a deprivation of Merrill

Lynch's right to mount its defense. *See Rutstein*, 211 F.3d at 1236 (predominance lacking where employer "can escape liability by showing that an individual plaintiff would have been denied or terminated even if no such policy or practice had existed"). Other potential individualized defenses include mitigation and the statute of limitations.

**Compensatory damages.** Damages "must be considered" in resolving predominance. *Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *37-*39 (citing cases); *Thorogood*, 547 F.3d at 748 (denying class certification where "the amount of damages will vary").[30] Here, individualized inquiry would be necessary to determine the amount of any compensatory damages to which a particular class member might be entitled. "[E]ach individual plaintiff" must "show the magnitude of injury to determine compensatory damages." *Lemon*, 216 F.3d at 581. Compensatory damages include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, [and] loss of enjoyment of life." 42 U.S.C. § 1981a(b)(3). Such factors implicate "facts and issues specific to individuals rather than the class as a whole: what kind of discrimination was each plaintiff subjected to; how did it affect each plaintiff emotionally and physically, at work and at home; what medical treatment did each plaintiff receive and at what expense; and so on." *Allison*, 151 F.3d at 419; *accord Reeb*, 435 F.3d at 651; *Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *37 (predominance lacking because determining damages would be "highly plaintiff- and episode-specific").

**Punitive damages.** Contrary to plaintiffs' extraordinary assertion that punitive damages may be determined class-wide before liability to any plaintiff has been established (Pl. Br. 52-53), the Seventh Circuit has held that punitive damages claims require "inquiry into the particularized merits of each individual plaintiff's claim." *Lemon*, 216 F.3d at 580-81. Due process mandates that punitive damages "have a nexus to the specific harm suffered by the plaintiff." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003). Title VII similarly allows punitive damages only if the employer discriminated "with malice or with reckless indifference to the federally protected rights of an aggrieved *individual*." 42 U.S.C. § 1981a(b)(1) (emphasis added). Punitive damages therefore cannot be awarded without individualized inquiry because "[s]ome plaintiffs may have been subjected to more [virulent]

---

[30] As Judge Filip observed, plaintiffs may not "gerrymander predominance" by "sever[ing] issues" such as damages "until the remaining common issue predominates." *Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *20-21; *accord Puffer*, 255 F.R.D. at 472 n.18; *Allison*, 151 F.3d at 422.

discrimination than others: with greater public humiliation, for longer periods of time, or based on more unjustifiable practices," or "discriminatory practices may have been gradually ameliorated year by year" or "implemented more—or less—harshly depending on the … facility involved." *Allison*, 151 F.3d at 417. Accordingly, punitive damages in employment cases are "uniquely dependent on the subjective and intangible differences of each class member's individual circumstances," and so "must be determined after proof of liability to individual plaintiffs, not "merely upon a finding that "defendant engaged in a pattern or practice of discrimination." *Id.* at 417-18; *see In re Simon II Litig.*, 407 F.3d 125, 138-39 (2d Cir. 2005).[31]

   **Backpay.** Plaintiffs also err in asserting that "aggregate" backpay may be awarded class-wide, using some as yet to be determined formula. Pl. Br. 52. Cases plaintiffs themselves cite hold that "[w]here possible, an individualized remedy should be utilized" to determine backpay, with a narrow exception when an "individualized method of calculation is impossible" because the employer used "no objective standards" in awarding benefits. *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976); *see EEOC v. O & G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 879 n.9 (7th Cir. 1994). Here, Merrill Lynch awards benefits based on "objective standards." *See supra*, p. 10.

   *Stewart* required individual inquiries to determine "which employees are entitled" to backpay (542 F.2d at 453), because "[i]t was obvious … that not all members of the class would have been promoted but for the discriminatory promotion policy." *Liberles v. County of Cook*, 709 F.2d 1122, 1136 (7th Cir. 1983). Because it is far from "obvious" that plaintiffs would have received the benefits they seek absent the purported discrimination—whether higher compensation or appointment to management—individualized inquiries into backpay are essential. And if Merrill Lynch establishes a mixed motive defense with respect to any plaintiff, no backpay could be awarded at all.

---

[31] *Palmer v. Combined Ins. Co.*, 217 F.R.D. 430 (N.D. Ill. 2003), cited by plaintiffs (Pl. Br. 53), is a "rare exceptio[n] to existing case law" where punitive damages could be assessed class-wide because plaintiffs did not seek compensatory damages and were neither "spread across separate facilities" nor challenged "policies that may have changed over the years or have been inconsistently implemented." *Id.* at 438-39. When plaintiffs in associated litigation on the same facts sought compensatory damages, class certification was denied for lack of predominance and superiority. *Id.* at 436. *See EEOC v. Int'l Profit Assocs., Inc.*, 2007 U.S. Dist. LEXIS 78378, at *28-*36 (N.D. Ill. Oct. 23, 2007) (distinguishing *Palmer*).

**B.      A Class Action Is Not Superior To Alternative Methods Of Adjudication.**

Plaintiffs bear the burden of demonstrating that class adjudication would be superior to individual litigation and that a class trial would be manageable. But they have failed to submit a trial plan of the sort that would allow the Court to evaluate the efficiency and workability of class proceedings. In fact, a class trial would result in no meaningful efficiencies and would be hopelessly unmanageable, making individual litigation far superior.

As demonstrated above, a pattern or practice trial here would not establish liability as to any individual plaintiff. Obviously, a class trial that resolves only a pattern or practice claim without obviating the need for hundreds of such follow-on jury trials "to determine whether each putative class member suffered discrimination … offers little in the way of efficiency." *Puffer*, 255 F.R.D. at 472. And, as the Seventh Circuit has held, the need for hundreds of "individual proceedings" to resolve liability and damages makes it impossible to discern how "a class action would be the superior means to adjudicate the claims." *Andrews*, 545 F.3d at 577; *see Allison*, 151 F.3d at 419 ("individual-specific issues relating to the plaintiffs' claims" prevent "the superiority of the class action device"). Accordingly, courts in this District repeatedly have denied certification of employment discrimination classes that "would not eliminate the need" for individual proceedings, because class adjudication would be unmanageable and not superior to individual litigation. *Puffer*, 255 F.R.D. at 472; *accord Remien*, 2008 U.S. Dist. LEXIS 74174, at *15; *Radmanovich*, 216 F.R.D. at 439; *Humphrey v. Int'l Paper*, 2003 U.S. Dist. LEXIS 16040, at *70 (N.D. Ill. Sept. 10, 2003); *Gorence*, 1994 U.S. Dist. LEXIS 11438, at *34.[32]

Nor is class certification needed "to afford putative class members an opportunity to litigate claims of discrimination." *Puffer*, 255 F.R.D. at 473; *accord Radmanovich*, 216 F.R.D. at 439; *Humphrey*, 2003 U.S. Dist. LEXIS 16040, at *70. Merrill Lynch FAs—in whatever quintile—are a relatively highly paid segment of the population. When "a class member has a large enough stake to be able to litigate on his own, the case for class-action treatment is weakened." *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007); *see*

---

[32] Plaintiffs' cited cases (Pl. Br. 54-55) do not suggest class adjudication would be manageable. *Tucker v. Walgreen Co.*, 2007 U.S. Dist. LEXIS 74628 (S.D. Ill. Oct. 5, 2007), involved a settlement class and did not consider manageability. Class adjudication was superior in *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005), because plaintiffs challenged a police practice applied without variation. *Acosta v. Scott Labor LLC*, 2006 U.S. Dist. LEXIS 153 (N.D. Ill. Jan. 3, 2006), held only that a state-law class alleging failure to pay overtime wages is compatible with individual FLSA claims; *see also supra*, p. 59 n.31.

*Nagel v. ADM Investor Servs.,* 217 F.3d 436, 443 (7th Cir. 2000) (rejecting class certification where "each class member had a sufficiently large stake to be able to afford to litigate on his own"); *Andrews*, 545 F.3d at 577-78. This is particularly true in Title VII cases, where attorneys' fees and compensatory and punitive damages are available to prevailing plaintiffs. 42 U.S.C. § 2000e-5(g), (k); 42 U.S.C. § 1981a(b)(1). A plaintiff's ability to recover attorneys' fees and costs "provides substantial incentives to bring meritorious individual suits" (*Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *41), as does the availability of "substantial compensatory and punitive damages." *Humphrey*, 2003 U.S. Dist. LEXIS 16040, at *70. Consequently, "[c]ountless" discrimination suits "are brought individually." *Puffer*, 255 F.R.D. at 473. Well paid plaintiffs like Merrill Lynch FAs are unlikely to be deterred from filing individual suits because "[c]laims of economic loss for employees in these salary brackets could be substantial." *Id.*; *see Reeb*, 435 F.3d at 651; *Rutstein*, 211 F.3d at 1241 n.21; *Allison*, 151 F.3d at 420.

Far from being superior, a certified class would "place undue pressure on [Merrill Lynch] to settle regardless of the actual merit of the suit." *Puffer*, 255 F.R.D. at 473; *see Rutstein*, 211 F.3d at 1241 n.21. By contrast, trying plaintiffs' claims in front of "multiple juries in individual cases will ensure that such momentous issues of liability are determined by a process involving the collective judgment of many juries, not the potential caprice of one." Piar, *The Uncertain Future of Title VII Class Actions After the Civil Rights Act of 1991*, 2001 B.Y.U. L. Rev. 305, 340 (2001); *see Thorogood*, 547 F.3d at 745; *Bridgestone/Firestone*, 288 F.3d at 1020; *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995).

## IV.    Hybrid Certification Would Be Improper.

Plaintiffs vaguely ask this Court to certify classes "under Rule 23(b)(2) for liability, injunctive and equitable relief and common damages questions" and under Rule 23(b)(3) for other damages issues. Pl. Br. 50. What this means is unclear: plaintiffs do not explain it in their brief and they have failed to submit a trial plan. *See* Fed. R. Civ. P. 23, 2003 Adv. Comm. Note (many courts considering class certification require a trial plan); *Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *46 (a "cursory proposal" for trying the case is "inadequate to discharge Plaintiff's burden of showing that class certification is appropriate"). Plaintiffs' failure to present a trial plan makes it impossible for the Court to comply with Rule 23(c)(1)(B)'s mandate that district courts "include in class certification orders a clear and complete summary of those claims, issues, or defenses subject to class treatment." *Wachtel*, 453 F.3d at 184.

Perhaps what plaintiffs seek—given that the Seventh Circuit bars Rule 23(b)(2) certification of their monetary claims (*supra*, pp. 51-52)—is certification of issues going to injunctive relief under Rule 23(b)(2) and issues going to causation and damages under Rule 23(b)(3). But to obtain that sort of "hybrid" certification plaintiffs must first satisfy Rule 23(a), which they have failed to do. *Supra*, pp. 30-51. Hybrid certification is also inappropriate because "the liability stage does not satisfy either Rule 23(b)(2) or 23(b)(3)." *Monreal v. Potter*, 367 F.3d 1224, 1237 n.12 (10th Cir. 2004). As we have explained, even if demands for monetary relief were stripped out of plaintiffs' claims, they do not comply with the Rule 23(b)(2) requirement that Merrill Lynch acted or refused to act on grounds generally applicable to the class. *Supra*, pp. 52-54. Nor have plaintiffs met their burden of demonstrating that common issues predominate over individual ones or that a class action is superior, precluding Rule 23(b)(3) certification. *Supra*, pp. 54-61.

Beyond this, courts reject hybrid or bifurcated certification where, as here, the vast majority of liability questions, individual facts and defenses, and compensatory and punitive damages questions would require individual resolution. In *Puffer*, Judge Schenkier rejected plaintiffs' proposal (advanced by the same counsel) that one jury resolve the pattern or practice allegations and "follow-on juries" resolve causation and damages. He explained that a class proceeding that required countless jury trials "to determine whether each putative class member suffered discrimination and, if so, their individual damages, offers little in the way of efficiency." 255 F.R.D. at 472. The same lack of efficiency defeats hybrid certification here. *See Andrews,* 545 F.3d at 577 (class should not be certified when it will only "give rise to hundreds or thousands of individual proceedings"); *Clark v. Experian Info. Solutions*, 256 F. App'x 818, 822 (7th Cir. 2007) ("the need for individualized findings" defeats "efficiency" of limited class certification); *Allstate*, 400 F.3d at 508 (hybrid certification may be permissible when it leads to "more efficient" conduct of litigation); *Smith v. Sheriff of Cook County*, 2008 U.S. Dist. LEXIS 60248, at *5-*6 (N.D. Ill. July 16, 2008) (need for "individualized determinations of causation" defeats the "efficiency" of limited certification); *Hamilton*, 2006 U.S. Dist. LEXIS 44149, at *47 (Seventh Circuit has authorized hybrid procedure only where efficiency savings were significant and "class-wide proceedings would definitively settle" liability); *Adler v. Wallace Computer Servs.*, 202 F.R.D. 666, 673 (N.D. Ga. 2001) (denying "hybrid certification" that leaves "the

daunting task of considering each plaintiff's individual circumstances to determine whether Defendant is liable to a particular class member").[33]

Bifurcation would also violate the Seventh Amendment, which guarantees "a right to have juriable issues determined by the first jury impaneled to hear them … and not reexamined by another finder of fact." *Rhone-Poulenc*, 51 F.3d at 1303; *see Lemon*, 216 F.3d at 582 ("a district court that proceeds with divided certification must adjudicate the damages claims first before a jury to preserve the Seventh Amendment right to a jury trial"); *Jefferson*, 195 F.3d at 898. If a "phase one" jury found a pattern or practice of discrimination, then multiple "phase two" juries would be needed to resolve the hundreds of lengthy follow-on trials addressing individual causation, Merrill Lynch's defenses, and damages. *See Smith*, 263 F.3d at 415 (convening one jury "to hear all the issues regarding the pattern and practice claims" as well as "the quantum of compensatory and punitive damages" "creates an insurmountable superiority obstacle"). But because "of the individualized inquiries that would be needed before liability was determined as to each plaintiff," "any finding by an initial jury that [Merrill Lynch's] policies and practices generally were discriminatory … would likely be unconstitutionally reexamined by follow-on juries in determining whether any particular plaintiff suffered discrimination." *Puffer*, 255 F.R.D. at 472; *accord*, *e.g.*, *Cooper*, 390 F.3d at 722; *Allison*, 151 F.3d at 423-25.

The danger that a phase two jury would reexamine phase one findings is increased if plaintiffs are right that determinations about teaming and account distributions in phase one determine something that lightens the load of phase two juries. It is impossible to see how those subsequent juries could avoid reexamining phase one determinations when they decide liability, causation, and damages for each individual plaintiff. If the phase one jury found anything that helped a phase two jury to decide a particular class member's claim, that phase two jury *must* be reexamining elements that went into the phase one verdict.

For example, an anecdote by a particular plaintiff, relied on by a phase one jury when it found a pattern or practice of discrimination, might be rejected by a second jury as unbelievable

---

[33] This case is not like *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 659-62, 664 (7th Cir. 2004) (Pl. Br. 50), a RICO case where liability turned on "a single, uniform question" and defendants previously had successfully "urged the district court to accept the giant class as appropriate for a global settlement," triggering judicial estoppel. Merrill Lynch has contested certification from the outset and urged the impossibility of litigating claims and defenses here on a class-wide basis. Nor is it like *Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469, 470-72 (7th Cir. 2004), where hybrid certification was held appropriate where only 27 plaintiffs in a single plant sought damages.

or not evidence of discrimination. Similarly, if a phase one jury found that plaintiffs had established that discrimination was Merrill Lynch's "standard operating procedure," phase two juries would contradict that finding if they concluded that a significant number of the class had not been discriminated against. *See* Wolf, *Evading Friendly Fire: Achieving Class Certification After the Civil Rights Act of 1991*, 100 Colum. L. Rev. 1847, 1876 (2000) (such findings would "effectively negate the verdict of the first jury"); Piar, *supra*, 2001 B.Y.U. L. Rev. at 340 ("In the second phase, when the liability to the particular employees who were involved in these events [considered by the first jury] is adjudicated, the liability jury would be free to decide that there was no discrimination present, thereby discounting evidence that the first jury found dispositive"). The issues are compounded by Merrill Lynch's right to prove affirmative defenses, such as mixed motive, which by necessity require the jury hearing the individual claims of the 1,000 class members to reexamine liability findings made by the first jury. *See Ramirez v. DeCoster*, 194 F.R.D. 348, 354 n.4 (D. Me. 2000) (employer's defenses require jury "to re-weigh the evidence establishing the presumption of liability" against "the evidence rebutting that presumption").

Because the phase two juries' task would go well beyond mere "mathematical computations" (*In re Plywood Antitrust Litig.*, 655 F.2d 627, 636 (5th Cir. 1981)), these dangers of unconstitutional reexamination of issues decided by the first jury are real and bar bifurcation. *See Rhone Poulenc*, 51 F.3d 1302-03 (court must "carve at the joint," "not divide issues … in such a way that the same issue is reexamined by different juries"); *Blyden v. Mancusi*, 186 F.3d 252, 268-69 (2d Cir. 1999); *McDaniel v. Anheuser-Busch*, 987 F.2d 298, 305 (5th Cir. 1993).

## V.     Prior Broker Class Certifications Carry No Weight Here.

Plaintiffs rely heavily on decisions certifying broker *settlement* classes. Pl. Br. 43-45. But because parties in such cases lack an "adversarial relationship," the district court has no "independently-derived information" opposing certification. *Vollmer v. Selden*, 350 F.3d 656, 660 (7th Cir. 2003); *see* 7B Charles A. Wright, et al., *Federal Practice & Procedure* § 1797.2, at 153 (3d ed. 2005) (questioning whether courts addressing settlement classes "are presented with adequate information to make an appropriate certification decision"). This lack of "true adverseness" makes it impossible for the court to "assure itself of the appropriateness of class certification." Redish & Kastanek, *Settlement Class Actions*, 73 U. Chi. L. Rev. 545, 550 (2006). Despite the Supreme Court's call for "heightened" scrutiny (*Amchem*, 521 U.S. at 620), the

decisions cited by plaintiffs demonstrate that rigorous Rule 23 analysis is often lacking in cases that settle. They are not relevant precedents here.

In *Cremin v. Merrill Lynch*, No. 96 C 3773 (N.D. Ill. 1998), Merrill Lynch stipulated to class certification under Rule 23(b)(2) for settlement purposes only. The court approved the settlement without written opinion, making only brief oral comments regarding adequacy of representation and not even alluding to the Rule 23 requirements that are hotly contested in this case. Because the settlement provided for a separate claims resolution process, the court did not have to concern itself with injury for each class member, which would have to be dealt with here through endless individualized jury trials. And because *Cremin* was certified under Rule 23(b)(2) only, the court did not address Rule 23(b)(3)'s predominance and superiority requirements.

Plaintiffs are wrong in suggesting that *Cremin* "judicially estops" Merrill Lynch from challenging Rule 23 requirements here other than manageability. Pl. Br. 45. The *Cremin* gender-discrimination settlement agreement explicitly provided that Merrill Lynch did not "waive, affect, or limit in any way the Firm's objections or defenses to any class certification in any other action or proceeding of whatsoever kind or nature." Ex. 8, ¶ 5.2; *see Cohen v. Blockbuster Entm't*, 878 N.E.2d 132, 139-40 (Ill. App. Ct. 2007). Beyond this, judicial estoppel only prevents a party from repudiating a "'legal or factual ground'" on which it prevailed in a lawsuit "'in subsequent litigation based on the underlying facts.'" *Pakovich v. Broadspire Servs.*, 535 F.3d 601, 606 n.2 (7th Cir. 2008). It applies when a party's later position is "'clearly inconsistent' with its earlier position" and that party derives unfair advantage from the switch. *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). *Cremin* and *McReynolds* involve different plaintiffs, different time periods during which different policies applied and different personnel made decisions, and a different type of alleged discrimination. The suits are not based on the same "underlying facts," Merrill Lynch's opposition to certification is not "clearly inconsistent" with its stipulation in the *Cremin* gender suit under Rule 23(b)(2) only, and Merrill Lynch derives no unfair advantage by opposing certification here. *See In re Yahoo! Litig.*, 251 F.R.D. 459, 464-65 (C.D. Cal. 2008). As Judge Pallmeyer explained, "[s]upport for a *settlement* class is not inconsistent with Defendants' current position that class *litigation* would be a nightmare. Defendants are entitled to see classwide settlement, classwide litigation, and serial individual litigation as three distinct ways of resolving their dispute." *McDaniel v. Qwest Commc'ns*, 2006 U.S. Dist. LEXIS 37066, at *20-*21 (N.D. Ill. May 23, 2006).

Class certification in the other broker cases plaintiffs cite also took place in the settlement context, without adversarial presentation or rigorous analysis to ensure compliance with Rule 23.[34] In *Martens v. Smith Barney, Inc.*, 181 F.R.D. 243, 259 (S.D.N.Y. 1998), the court found commonality and typicality simply because plaintiffs alleged "a pattern of discriminatory treatment." In *Augst-Johnson v. Morgan Stanley*, No. 06-11432 (D.D.C. Oct. 26, 2007), the court in two paragraphs repeated, without analysis, plaintiffs' allegations that Rule 23 was satisfied. In none of the "drive by" settlement certifications plaintiffs cite did the court inquire closely whether plaintiffs made "'a specific showing of underlying facts which might raise an inference of a common question of pattern and practice through allegations of specific incidents of discrimination, supporting affidavits,' or statistical evidence," let alone inquire whether individual trials would be needed to prove liability and damages. *Ellis*, 217 F.R.D. at 423.

Equally important, settlement classes require *no consideration of manageability*, which is a major stumbling block here. *Supra*, pp. 60-61. As explained by the Seventh Circuit in *Carnegie,* 376 F.3d at 660, "a class might be suitable for settlement but not for litigation" because "settlement might eliminate all the thorny issues that the court would have to resolve if the parties fought out the case."

## CONCLUSION

In this sprawling, nationwide proceeding, encompassing a multitude of discrepant and sharply disputed factual issues, plaintiffs have truly served up "a Frankenstein monster posing as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 169 (1974). The putative class action is completely improper under legal standards the Supreme Court and Seventh Circuit have laid down. Plaintiffs' motion for class certification under Fed. R. Civ. P. 23 should be denied.

---

[34] Long before the development of today's rigorous approach to Rule 23 the district court in *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657 (E.D. Pa. 1980), certified a litigation class of female brokers seeking only equitable, not monetary, relief. Unlike here, Dean Witter conceded that "local variations" in its policies were "few" and "insignificant." *Id.* at 667. Certification under Rule 23(b)(2) alone obviated the need for predominance and superiority findings.

By: _____/s/ Jeffrey S. Klein_____
　　　　Jeffrey S. Klein

**MAYER BROWN LLP**　　　　　　**WEIL, GOTSHAL & MANGES LLP**
Stephen M. Shapiro　　　　　　　　Jeffrey S. Klein
Lori E. Lightfoot　　　　　　　　　Nicholas J. Pappas
Timothy S. Bishop　　　　　　　　Salvatore A. Romanello
71 S. Wacker Drive　　　　　　　　Allan Dinkoff
Chicago, IL 60606　　　　　　　　　767 Fifth Avenue
(312) 782-0600 (Phone)　　　　　　New York, NY 10153
(312) 701-7711 (Facsimile)　　　　　(212) 310-8000 (Phone)
　　　　　　　　　　　　　　　　　(212) 310-8007 (Facsimile)

*Attorneys for Defendant Merrill Lynch, Pierce, Fenner & Smith, Incorporated*

Dated:  August 7, 2009

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on August 7, 2009, she caused a copy of the foregoing Merrill Lynch's *Corrected* Memorandum in Opposition to Plaintiffs' Motion for Class Certification to be served by ECF to each attorney having an email address on file with the Court and by messenger delivery to:

        Linda Friedman
        Stowell & Friedman
        321 S. Plymouth Court, 14th Floor
        Chicago, IL 60604

                                _____/s/ Lori E. Lightfoot_____
                                   Lori E. Lightfoot