IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE MCREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK, LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, individually on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | No. 05 C 6583 |
| v. | ) ) | Judge Robert W. Gettleman |
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, | ) ) ) | |
| Defendant. | ) | |

**<u>AMENDED MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs George McReynolds, Maroc Howard, Larue Gibson, Jennifer Madrid, Frankie Ross, Marva York, Leslie Browne, Henry Wilson, Leroy Brown, Glenn Capel, Christina Coleman, J. Yves Laborde, Marshell Miller, Carnell Moore, Mark Johnson, Cathy Bender-Jackson, and Stephen Smartt, individually and on behalf of all others similarly situated, have brought a two count second amended putative class action complaint against defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000(e) et seq. (Count I), and 42 U.S.C. § 1981 (Count II). Plaintiffs have moved pursuant to Fed. R. Civ. P. 23 to certify a class, defined as:

African-American financial advisors ("FAs") and FA Trainees ("Trainees") who are or were employed in the retail brokerage unit, referred to as Global Private

Client ("GPC") of defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., from January 2001 to the present.

The parties have engaged in lengthy and often contentious discovery proceedings including both factual and expert discovery.  Not surprisingly, this has resulted in overly lengthy briefs with countless unnecessary citations and footnotes.[1]  For the reasons discussed below, the motion is denied.

## FACTS

Defendant is the largest provider of brokerage and brokerage related services in the United States.  It employs over approximately 15,000 FAs to aid clients in identifying and reaching their financial goals.  The company employs 135 Complex Directors ("Directors") each of whom manages the operation of a number of branch offices within his or her complex.  There are over 600 branch offices within the 135 complexes, employing the approximate 15,000 FAs. The Directors report to 30 Regional Managing Directors, most of whom are also Directors themselves, and who in turn report to 5 Divisional Managing Directors ("DMDs").  The five DMDs report to a Senior Vice-President ("SVP") for the Advisory Division, who reports to the President of defendant's Global Wealth Management ("GWM") business.

Each Director manages his or her complex as a stand alone business.  The Directors monitor profits and losses of their complexes and make individualized employment decisions

---

[1]Although the court allowed the parties to exceed the 15 page limit provided by LR 7.1, the court did not expect the parties to abuse this allowance.  For example, plaintiffs' opening brief is 55 pages (the "Argument" section does not begin until page 43) with 86 footnotes, many of which contain as much or more text than the page on which they appear.  Worse yet, many of the footnotes in both parties' briefs contain argument or substantive factual points that belong in the text.  Added to the hundreds of pages of exhibits submitted with the instant motions, the burden placed on the court was as taxing as it was unnecessary.

2

regarding FAs, constrained only by national policies.  Each FA basically operates his or her own

business within a business.  Each FA is responsible for building a book of business by soliciting

clients in the community, although some accounts are distributed by management.  Each FA is

paid based on an objective grid.  Compensation is increased based on increased production.  In

addition, defendant's compensation plan pays different rates based on the size of the customer's

"household," which is not a single client but includes all related individuals.  For example, the

adult children of a client are grouped in a "household" even if they do not live under one roof or

have joint investment accounts.  Since 2001 FAs received compensation for accounts under

$100,000 only if those accounts belong to a "household" with wealth in excess of $100,000.

As each FA reaches increased length of service levels ("LOS"), the FA must meet certain

production hurdles or else earn a lower rate of payout.  This requirement is referred to as the

"penalty box."  Once in the penalty box the FA remains in until he or she meets certain minimum

production or revenue requirements.  Thus, the longer an FA is employed at defendant, the more

business that FA is expected to generate.

## DISCUSSION

"The class-action device was designed as `an exception to the usual rule that litigation is

conducted by and on behalf of the individual named parties only.'" General Telephone Co. of

Southwest v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442 U.S. 682,

700-01 (1979)).  Class relief is particularly appropriate when the issues involved are common to

the class as a whole and when the issues turn on questions of law applicable in the same manner

to each member of the class.  Id.  The court has broad discretion in determining whether to

certify a class, and the proponent bears the burden of showing that certification is warranted. Sandoval v. City of Chicago, 2007 WL 3087136 (N.D. Ill. 2007).

Fed. R. Civ. P. 23, which governs class actions, requires a two step analysis to determine whether class certification is appropriate. First, plaintiffs must satisfy all four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Martinez v. Haleas, 2009 WL 2916852 at *2 (N.D. Ill. 2009); Harriston v. Chicago Tribune Co., 992 F.2d 697, 703 (7th Cir. 1993). These requirements are prerequisites to certification, and failure to meet any one of them precludes certification of the class. Parker v. Risk Management Alternatives, Inc., 206 F.R.D. 211, 212 (N.D. Ill. 2002). Additionally, plaintiffs must satisfy one of the conditions of Fed. R. Civ. P. 23(b).

When evaluating whether a party has met its burden of proving that a class should be certified, the court should not consider the merits of the underlying claim, Eisen v. Carlisle and Jacqueline, 417 U.S. 156, 166 (1974), but may "probe behind the pleadings" to determine whether the named plaintiffs' claims fairly encompass those of the class they seek to represent. Falcon, 457 U.S. at 160; Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 673 (7th Cir. 2001). Where factual and legal questions that "would strongly influence the wisdom of class treatment" are disputed, the court will not merely accept plaintiffs' assertions as true, but will require some evidence before making a decision. Szabo, 249 F.3d at 675-76. That decision, may, at times, require inquiry into any preliminary resolution of disputed issues of fact, even if those same factual issues are also relevant to the merits of the case. Id.

4

**Rule 23(a) Requirements**

    **1. Numerosity**

Under Rule 23(a)(1), plaintiffs must show that the class is so numerous that joinder of all members is impracticable. The exact number of class members need not be pleaded or proved, but impracticability of joinder must be positively shown and cannot be speculative. Parker, 206 F.R.D. at 212. Plaintiffs define the proposed class as African-American FAs and FA Trainees who are or were employed in a retail brokerage unit referred to as Global Private Client, from January 1, 2001 to the present. In a footnote, plaintiffs indicate that the class includes brokers, broker trainees and persons hired with intent to enter defendant's broker training program, even if they never received a broker production number, persons who had production numbers but also performed managerial duties, including sales or producing managers and persons who attended the firms Management Assessment Center ("MAC"). According to plaintiffs, the are approximately 700 class members, which is sufficiently large to satisfy the numerosity requirement.

    **2. Commonality**

Rule 23(a)(2) requires the presence of questions of law or fact common to the class. The Rule does not mandate absolute commonality; a common nucleus of operative facts is usually enough to satisfy the requirement. Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998). A common nucleus of operative fact is usually found where "defendants have engaged in standardized conduct towards members of the proposed class . . .." Id. Thus, racial discrimination in an employment context, arising out of the employer's standard operating procedure, is generally well-suited to class adjudication. Falcon, 457 U.S. at 157. In a Title VII

action, however, commonality is the "most critical element and one in which the class action and merit inquiries essentially collide." Stastny v. S. Bell Tel. & Co., 628 F.2d 267, 274 (4th Cir. 1980). As Falcon makes clear, a party attempting to maintain a pattern or practice discrimination class action must demonstrate more than shared membership in a protected class, but must offer sufficient evidence to bridge the gap between his or her own individual claim and those of class members who suffered the same injury.

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiffs] to bridge that gap [they] must prove much more than the validity of their own claims. [Falcon, 457 U.S. at 157-58.]

Thus, the inquiry into whether plaintiffs meet the commonality requirement necessarily overlaps with the merits of their claim that defendant discriminates against blacks. Count One of plaintiffs' second amended complaint, which is brought under Title VII, is actually very broad, encompassing both a pattern or practice discriminatory treatment claim and a discriminatory impact claim. Although the parties do not differentiate between the claims, those claims require different proofs. Under a disparate impact theory, plaintiff need not prove intentional discrimination, only that defendants' facially neutral actions adversely affected a protected group. Teamsters v. United States, 431 U.S. 324, 355 n.15 (1977). To establish a pattern or practice disparate treatment claim, however, plaintiffs must show that intentionally discriminatory practices were defendant's standard operating procedure, not merely sporadic or isolated occurrences. Id. at 336. To do so plaintiffs may offer direct evidence of intentional discrimination or they may offer evidence of a combination of circumstances from which a court

6

or jury may infer discriminatory intent. Ellis v. Elgin River Boat Resort, 217 F.R.D. 415, 420

(N.D. Ill. 2003).

Obviously, establishing commonality under a disparate treatment theory is more difficult

than doing so under the disparate impact theory. Clayborne v. Omaha Public Power Dist., 211

F.R.D. 573, 592 (D. Neb. 2002). After Falcon, a plaintiff seeking certification of a class alleging

pattern or practice discrimination must make "a specific showing of underlying facts which

might raise an inference of a common question of pattern and practice through allegations of

specific incidents of discrimination, supporting affidavits or statistical evidence." Ellis, 217

F.R.D. at 423. Subjective employment processes may provide a common basis for a class-wide

claim of discrimination if these subjective employment criteria were uniformly "used as a mask

for discrimination." Puffer v. Allstate Ins. Co., 255 F.R.D. 450, 460 (N.D. Ill. 2009).

Plaintiffs allege that defendant has engaged in a pattern or practice of race discrimination

and that it has policies and practices that result in a disparate impact on African-Americans.

They contend that defendant knows of this "systemic discrimination" which results from a

hostile corporate culture, as well as policies and practices that steer business opportunities away

from African-American FAs. This "culture" and policy allegedly include maintaining

stereotypical views about African-Americans that underlie personnel decisions, impeaches the

work environment, and denies African-American FAs the same opportunities and support that

other FAs are given. To support their motion for certification plaintiffs identify what they

consider to be several issues of common fact that they claim will prove a pattern or practice,

including:

    1. Defendant has a uniform branch office management and job structure;

2.  Defendant has a "strong, uniform, racially-biased corporate culture that ensures uniformity and consistency in practices and attitudes across the country;

3.   Defendant has implemented and developed firm-wide employment policies regarding hiring and training, teaming, account distribution and transfer, management assessment and selection and multi-cultural markets;

4.  Expert evidence that common employment practices result in statistically significant disparities to the disadvantage of African-Americans;

5.  Anecdotal evidence for 16 named plaintiffs and other class members; and

6.  Evidence that defendant was aware of race discrimination but refused to take action.

After identifying these so-called common issues, however, plaintiffs offer little to establish the "significant proof" required by Falcon, to establish that the asserted discriminatory culture manifested itself in the "same general fashion" as to all putative class members.  Falcon, 457 U.S. at 159 n.15.  In fact, however, plaintiffs' attempt to make this showing is undermined by the different experiences of the proposed class members, in terms of length of service with the defendant, income, position levels, the people who made the relevant employment decisions, and the conflicting and unconvincing anecdotal evidence found in their declarations.

Commonality is generally easily satisfied when an individual or even a small centralized group makes decisions.  Ellis, 217 F.R.D. at 424.  It is also more easily satisfied in a disparate impact case where all of the proposed class members have been impacted by a facially neutral policy.  Neither situation is present in the instant case.[2]

---

[2]Plaintiffs do allege in conclusory fashion a disparate impact, but the gravamen of their complaint, as well as the evidence presented, is not that neutral policies neutrally applied have a discriminatory impact, but that defendant is subverting its neutral policies by applying them in an intentionally discriminatory fashion.

Instead, plaintiffs allege that defendant has a corporate culture of racial discrimination that it implements through the discretionary decisions of over 15,000 FAs, over 600 branch office managers, 135 complex directors, 30 Regional Managing Directors and 5 Divisional Managers situated across the entire United States. Such decentralized procedures, that allow decision-makers across the country to consider subjective factors makes it far more difficult to establish that the employer engages in a pattern or practice of discrimination as a standard operating procedure, and thus more difficult to establish commonality. Id. (citing Stastny, 628 F.2d at 276).

In the instant case, the putative class members were supervised and reviewed by hundreds of different people, held a wide variety of salary levels and positions and had totally different experiences. For example, some putative plaintiffs claim they were denied access to the management program (MAC) while others were recommended for management and reached at least vice-president levels. Some putative plaintiffs were hugely successful financially, while others never got through the FA training program. Each individual plaintiff's experience was the result of countless decisions made by themselves, other FAs in their branch offices, their branch managers and so on up the chain of command. Plaintiffs' position essentially is that all of these decisions were made by racist employees of a racist company. As numerous decisions from this district demonstrate, however, class certification should be denied when the plaintiffs' class definition implicates numerous, independent decision-makers resulting in the need for numerous individual inquiries. See Puffer, 255 F.R.D. at 460-61 (and cases cited therein).

Plaintiffs place great reliance on statistical evidence to establish commonality. They have provided statistics to demonstrate that for the years in question there was low African-

American representation in the FA workforce; African-American FAs were compensated at lower rates; African-American FAs were less likely than whites to participate in teams; African-American trainees were less likely to participate in pools; and white trainees received accounts that had significantly higher average total asset values than those distributed to African-American trainees.

Plaintiffs argue that these raw statistics alone are sufficient to establish commonality, and the court might be inclined to agree with plaintiffs if this were a true disparate impact case. As explained above, however, it is not. Take, for example, plaintiffs' claim that African-American FAs are compensated at lower rates than white FAs. According to plaintiffs, between 2001 and 2004 African-American FAs earned 33 to 42 % less in annual compensation than white FAs. If this were a disparate impact case, that statistic would present a compelling argument for finding commonality and certifying a class. But plaintiffs do not argue that defendant's facially neutral compensation program applied neutrally leads to the resulting discrepancy in compensation. Instead, plaintiffs argue that all of the factors that lead to the application of the facially neutral compensation program had been applied in an intentionally discriminatory manner, resulting in the discrepancy.

Defendant pays its FAs based on production. It pays FAs based on a percentage of the production credit ("PCs") and other revenue generated when one of the FA's clients uses or purchases a Merrill Lynch financial product or security. There is no discretion in calculating FA incentive compensation, which is based on a precise mathematical formula and grids contained in the program. Plaintiffs do not claim that the compensation program itself is discriminatory, but rather that it works to African-American's disadvantage because the discriminatory culture at

10

defendant stunts the African-Americans' ability to produce. For example, because African-Americans are given fewer opportunities to team with high-producing FAs, and thus do not get to inherit shared accounts when those originating FAs retire, the African-Americans FAs tend to have lower production. Lower production means not only lower compensation, but also receipt of fewer of the accounts that are distributed through the firm account distribution program. Receipt of fewer accounts again means less production and less compensation, creating a vicious circle that acts to prevent African-American FAs from succeeding. Thus, it is the individual allegedly discriminatory decisions along the way, such as a white FA's decision not to team with an African-American FA that leads to the asserted disparity in compensation, not a neutral application of the mathematical formula.

Defendant, of course, has supplied its own statistical experts who, not surprisingly, attack plaintiffs' evidence.[3] In particular, defendant's experts criticized plaintiffs' statisticians for failing to take into account that African-American FAs on average have fewer personal social connections with potential clients with wealth. Defendant's expert performed a study of published available census data and concluded that access to networks of potential clients with substantial wealth varies by race among defendant's FAs. As a result, customers independently generated by African-American FAs' participation in the training program early in their careers

---

[3]Defendant has also moved to strike the testimony and conclusions of plaintiff's expert as inadmissible under Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm. Inc., 509 U.S. 579 (1993). The court is mindful of the Seventh Circuit's instruction that "the district court must perform a full Daubert analysis before certifying the class if the situation warrants." American Honda Motor Company Inc. v. Allen, 600 F.3d 813, 816 (7th Cir. 2010). In the instant case, however, plaintiffs are unable to establish the requirements for the class certification, even with their experts' reports and testimony. Therefore, there is no reason to reach defendant's motion to strike, and it is denied as moot.

come from neighborhoods with significantly higher African-American populations and significantly lower average wealth.

The contrasting statistical evidence and expert testimony demonstrates the danger of relying too heavily on statistical evidence supported by raw data. "It is said that you can find a statistic to prove anything." Barricks v. Eli Lilly and Co., 481 F.3d 556, 559 (7th Cir. 2007). As Mark Twain put it, "there are three kinds of lies – lies, damned lies and statistics." Puffer, 255 F.R.D. at 461. That is why although statistical evidence may be a useful tool to prove discrimination, it is rarely sufficient in itself. Adams v. Ameritech Services, Inc., 231 F.3d 414, 423 (7th Cir. 2001). Statistical evidence that fails properly to take into account nondiscriminatory explanations does not permit an inference of discrimination. Puffer, 255 F.R.D. at 461.

To bolster their statistical evidence, plaintiffs present "anecdotal" evidence in the form of declarations from 19 named plaintiffs and 47 putative class members which purport to show that discrimination occurred uniformly company-wide across the country. Defendant has moved to strike the class members' declarations on the grounds that they lack foundation, are not tied to the class period and are otherwise conclusory and so lacking in specifics as to be worthless.

The court agrees that most of the declarations provide little support on the commonality issue because they are so vague. All 19 named plaintiffs' declarations and 27 of the 47 putative class members' declarations are lawyer crafted statements that simply allege the declarants' general belief that defendant has a history of discriminatory practices toward African-Americans. Each of these declarants indicates that since 1994 they have seen themselves as part of a group acting to advance the interest of African-American FAs at defendant. Such general allegations

12

unaccompanied by specific discriminatory acts are too vague to be of any use. Puffer, 255 F.R.D. at 467 (citing Mattenson v. Baxter Healthcare Corp., 438 F.3d 763, 770 (7th Cir. 2000)). Of the 20 declarations that actually identify a particular instance of alleged discrimination, six contain simple conclusory statements, such as the declarant was denied a management position because of race. Absent first-hand factual support, such declarations are not probative of commonality. Puffer, 255 F.R.D. at 467.

The remaining 14 declarations do provide some anecdotal evidence of discriminatory treatment, but rather than support commonality among the class, they demonstrate the differences and uniqueness of each individual claim. Some of the individual claims are petty in nature while others are more serious. On the more serious side, one declarant states that his manager pressured him into relinquishing his production number and moving to an investment advisor salaried position, and that after returning to a production position he was discouraged from applying for a management position until the instant action was filed. Another stated that when accounts were distributed he always got the African-American accounts while still another alleged that when the largest producing FA in the defendant's branch office retired, the declarant did not receive an equitable share of that FA's assets. One other declarant indicated that although he already had Series 7, 31 and 3 licenses from his previous employment at another brokerage firm, he was terminated from the training program at Wayne, Pennsylvania, but given an option to go to a salaried position at the New Jersey Financial Advisory Center ("FAC"). He worked at the FAC from 2005 to early 2007, and while he had been one of the very few African-Americans at Wayne, over 25% of the salaried employees at the FAC were African-American.

On the other end of the spectrum, one declarant stated that he saw and heard a senior FA make an insensitive joke about President Obama. Another indicated that although he had achieved a production level to qualify for a private office he was denied one. Still another indicated that when he went to company sponsored events his office mates did not sit with him. Finally, another declarant stated that he was invited to go to a party at his manager's home but refused to go because he had heard that the manager had a confederate flag in his house.

As demonstrated by these declarations, the individuals worked in different offices, had different supervisors, and allegedly experienced vastly different forms of discrimination. The declarations serve not to support commonality, but to underscore the lack of commonality in the proposed class. Because commonality is lacking, class certification is inappropriate.

### 3. **Typicality**

Plaintiffs have also failed to meet their burden of establishing typicality. Rule 23(a)(3) requires plaintiffs to establish that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality inquiry is closely related to the commonality inquiry. Keele, 149 F.3d at 595. "'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives a rise to the claims of other class members and is based on the same legal theory. Id.'" (quoting De La Fuente v. Stokley-Van Camp, Inc., 713 F.2d 255, 262 (7th Cir. 1985).

As with commonality, a comparison of the claims of the named plaintiffs and the declarations of the putative class members show a lack of typicality. The variations among the experiences of the class members would necessitate individual inquires to determine whether the individual suffered racial discrimination.

Additionally, even if individual class members could establish a prima facie case of discrimination, defendant's defenses would vary between the putative class members. For example, defendant could present arguments of a legitimate non-discriminatory reason for a putative class member's failure to make it through the training program. Such evidence would necessarily differ for each individual claimant. Consequently, the court would have to examine numerous individual factors to determine the parameters of each individual claim, negating typicality. See Payton v. County of Carroll, 473 F.3d 845, 854 (7th Cir. 2007).

## Rule 23(b) Requirements

Plaintiffs' proposed class also fails under Rule 23(b). Plaintiffs seek certification under a hybrid of Rule 23(b)(2) and 23(b)(3). Under Rule 23(b)(2) plaintiff seeks certification for liability, injunctive and equitable relief and common damages issues. Under Rule 23(b)(3), plaintiffs seek compensatory and punitive damages. A Rule 23(b)(2) class is appropriate when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Certification under Rule 23(b)(2) is generally limited to cases "when the main relief sought is injunctive or declaratory, and the damages are only incidental." In re Allstate Insurance Co., 400 F.3d 505, 507 (7th Cir. 2005). Rule 23(b)(2) certification is inappropriate where final relief relates exclusively or predominately to money damages. Puffer, 255 F.R.D. at 470. This is because under Rule 23(b)(2) class members are not given a chance to opt out, and employees with significant damage claims may prefer to litigate on their own and have a constitutional right to a jury trial. See Jefferson v. Ingersoll International Inc., 195 F.3d 894 (7th Cir. 1999) (holding that Rule 23(b)(2) may not be used,

even in a pattern or practice suit, unless persons with significant damage claims are allowed to opt out of the class to the extent that the litigation concerns financial relief). In the instant case, the individual putative class members' financial interests are too high to be considered incidental to the requested equitable relief. Consequently, opt out rights must be extended to the members, and certification under Rule 23(b)(2) is inappropriate.

Certification under Rule 23(b)(3) requires plaintiffs to demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance requirement is similar to the typicality of claims and defenses requirement of Rule 23(a)(3), but is "far more demanding" than Rule 23(a)'s commonality requirement. Amchen Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997).

In the instant case, the court has already determined that plaintiffs' proposed class fails to meet the commonality and typicality requirements. Because plaintiffs' statistical evidence alone is insufficient to establish company-wide discrimination in a manner that affects each class member in the same way, each individual putative class members' claim for liability and damages will have to be tried to a jury. These inquiries would involve different witnesses and proofs for each member to determine, among other things, the motivation of each supervisor who made the individual allegedly discriminatory decision. "If the class certification only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies, it is hard to see how common issues predominate . . . ." Puffer, 255 F.R.D. at 471 (quoting Andrews v. Chevy Chase Bank, 545 F.3d 570, 577 (7th Cir.2008)). For these same

16

reasons, a divided certification, with certification of a 23(b)(2) class for the equitable issues and certification of a 23(b)(3) class for the damages issues is also inappropriate. There is no predominance of common issues to certify a 23(b)(3) class for any issue, and even if there were, because of the right to a jury trial the damages cases would all have to be tried first, eliminating any advantage to certifying the instant case as a class action.

Finally, certification under Rule 23(b)(2) for all issues, combined with notice and an opportunity to opt out as though certified under Rule 23(b)(3), is also inappropriate. See Lemon v. International Union of Operating Engineers, Local 139, 216 F.3d 577, 580-81 (7th Cir. 2000); Jefferson, 195 F.3d at 898. Obviously, certification under this approach is advantageous to plaintiffs, because it avoids Rule 23(b)(3)'s requirement that common issues predominate and that a class action be the superior method of resolving the dispute. This court agrees with Judge Kennelly, however, that the Seventh Circuit's suggestion of this approach in Lemon and Jefferson was not intended to permit plaintiffs in a case involving significant damage claims to avoid consideration of whether a class action would be a manageable way to resolve the case. See Adams v. R.R. Donnelley & Sons, 2001 WL 336830 at *16 (N.D. Ill. 2001). Consequently, the court concludes that even if plaintiffs could establish all the requirements of Rule 23(a), which they cannot, they cannot establish the requirements of Rule 23(b).

As Judge Kennelly noted in Adams, although it maybe possible in an appropriate case to certify a company-wide class involving multiple branch offices across the country, this is not the appropriate case. The large number of individual issues involved in trying the individual claims as class claims would completely overwhelm any common issue. As Judge Kennelly noted, if such individual issues were limited to damages, a different conclusion would be reached because

17

individualality in damages issues does not necessarily undermine the predominance of common issues, and there likely would be a proper way to structure a trial or trials with a minimum of inefficiency without doing violence to the parties' Seventh Amendment rights. Id. In the instant case, however, as in Adams, there are several separate layers of individual issues, including the variation in personnel practices among the various branch offices, and how various office managers and complex managers handle individualized personnel decisions. These extra layers of individualized issues lead the court to conclude that common issues do not predominate over individual issues, and that trial of the claims as a class action would be unmanageable. Accordingly, plaintiffs' motion for class certification is denied.[4]

## CONCLUSION

For the reasons discussed above, plaintiffs' motion for class certification is denied.

ENTER:    August 9, 2010

_____
**Robert W. Gettleman**
**United States District Judge**

---

[4]The court rejects plaintiffs' argument that defendant's stipulation to certification of a settlement class in Cremin v. Merrill Lynch, No. 96 C 3773 (N.D. Ill. 1998), mandates certification in the instant case. Cremin involved different plaintiffs, different time periods during which different personnel applied different practices, and a different type of alleged discrimination. Defendant never agreed in Cremin or any other case to certification of a litigation class. "Support for settlement class is not inconsistent with Defendant's current position that class litigation would be a nightmare." McDaniel v. Qwest Communications Corp., 2006 WL 1476110 at *6 (N.D. Ill. 2006) (emphasis in original).