## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE MCREYNOLDS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 05 C 6583 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Jeffrey T. Gilbert |
| MERRILL LYNCH, PIERCE, FENNER | ) | |
| & SMITH, INCORPORATED | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION AND MEMORANDUM TO RECONSIDER OR IN THE ALTERNATIVE TO CLARIFY AND/OR NARROW THE DEFINITION OF THE CLASS

Plaintiffs hereby move the Court to reconsider its denial of their petition for class certification. Plaintiffs also clarify and/or narrow the definition of the class. This motion is filed not out of disrespect but to provide the Court with an opportunity to consider Plaintiffs' arguments prior to the filing of a Rule 23(f) petition. In support of their motion, Plaintiffs state as follows:

1. Plaintiffs understand that the Court's class certification opinion was not a draft. They appreciate that the Court spent considerable time and resources resolving the class certification motion and do not intend to reargue matters the Court has already expressly rejected. The purpose of this motion is to ask the Court to reconsider two issues. First, the Court held *sua sponte* that to state a disparate impact claim, Plaintiffs must establish that a facially neutral policy was also "neutrally applied." Plaintiffs respectfully submit that this standard is incorrect under governing case law, including the Civil Rights Act of 1991 ("1991 CRA"), 42 U.S.C. § 2000e-2(k), *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977 (1988) and the Supreme Court's most recent case on disparate impact, *Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010). Second, the law on class certification is fast-developing, including the extent to which Courts must resolve relevant challenges to experts and conflicts between experts. After class certification briefing in this case, the Seventh Circuit issued *American Honda Motor Company v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010), which holds that when expert material is critical to class certification, as here, a court must conclusively resolve any challenge to the expert's work. *Daubert* motions were pending before this Court to strike Plaintiffs' experts, Dr. Janice Madden

1

("Madden") and Dr. William Bielby ("Bielby"). Madden was a critical witness to Plaintiffs both for her expert opinions and because she debunked Defendant's expert, Dr. Ali Saad ("Saad"). The debate between the experts was presented in cross motions filed by the parties. Defendant moved to bar Madden, and Plaintiffs moved to strike Saad's declaration in support of Defendant's *Daubert* motion on Madden as "junk science." The Court denied all motions to strike experts as moot. However, citing Mark Twain's quip about "lies, damned lies and statistics," the Court *de facto* barred Plaintiffs' statistical expert. The Court also *de facto* granted the Bielby *Daubert* motion, making no reference to Bielby in its review of the evidence or its decision. Plaintiffs intend to argue in their Rule 23(f) request for appeal that the Court disregarded *American Honda* by failing to conduct a rigorous analysis of the experts' testimony or the challenges to them. Plaintiffs believe that it is fair and respectful to present both issues to your Honor for consideration prior to filing the appeal.

**Legal Standards**

2. "A motion for reconsideration performs a valuable function where 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Bank of Waunakee v. Rochester Cheese Sales Inc.* 906 F. 2d 1185, 1191 (7th Cir. 1990)(citation omitted). Motions for reconsideration are also appropriate to correct manifest errors of law or fact or if there is a controlling or significant change in the law since an issue was submitted to the court. *Id.; Keene Corp. v. Int'l Fidelity Ins. Co.*, 561 F. Supp. 656, 665 (N.D. Ill. 1983), *aff'd*, 736 F.2d 388 (7th Cir. 1984). Rule 23(f) tolls the time for appeal to provide the district court an opportunity to correct errors and "fine-tune" its class certification decision and thereby reduce the number of Rule 23(f) petitions. *Shin v. Cobb County Bd. of Educ.*, 248 F.3d 1061, 1064 (11th Cir. 2001); *Blair v. Equifax Check Svcs*, 181 F.3d 832, 837 (7th Cir. 1999).

**Class Definition**

3. Plaintiffs adopted the proposed class definition from *Cremin et al. v. Merrill Lynch* (N.D. Ill.), the class gender discrimination lawsuit. Plaintiffs clarify the definition of the class as African American Financial Advisors ("FAs" or "brokers") and FA Trainees with production numbers from 2001 to the present. This definition only captures persons who performed the function of broker and only during the time that they performed this position. This is a class of workers who all held the same job, performed the same job function, and were subjected to and

harmed by the same national policies and practices.  Based on level of production, brokers are given titles, such as Vice President.  The titles do not, however, mean that these brokers are managers.  Op. at 9.

**The Disparate Impact Claim**

4.  Plaintiffs originally filed a single count Complaint under 42 U.S.C. §1981 seeking relief for intentional discrimination.  Because Section 1981's statute of limitation is four years compared to the shorter 300 days under Title VII and the intentional discrimination claims under the two statutes are otherwise co-extensive, Plaintiffs amended their Complaint to add Title VII claims so they could also prosecute claims under a disparate impact theory not available under §1981.

5.  The Court recognized that Plaintiffs' statistical evidence on compensation "would present a compelling basis for finding commonality and certifying a class" in a disparate impact case, but denied class certification, finding Plaintiffs had failed to prosecute a "true" disparate impact claim.  Op. at 10.  Without legal citation, the Court *sua sponte* held that a "true" disparate impact claim required that a facially neutral policy also be "neutrally applied."  Op. at 8, n.2, 10. Plaintiffs respectfully submit that this was not a correct application of the law or the facts.

6.  To Plaintiffs' knowledge, no court has held that plaintiffs forfeit a disparate impact claim by also alleging intentional discrimination or by not establishing that the "neutral policy" was also "neutrally applied."  Op. at 8, n.2; 10.  On the contrary, as the Court of Appeals for the District of Columbia explained in *Segar v. Smith*, 738 F.2d 1249 (D.D.C. 1984) either theory may be applied to a particular set of facts:

> This disparate impact concept may be relevant in two ways to a case involving allegations of class-wide discrimination. First, in addition to bringing a pattern or practice disparate treatment claim, plaintiffs may well challenge the disparate impact of specific employment practices and thus force the employer to prove the job-relatedness of those practices. See *Griggs* [*v. Duke Power Co.*, 401 U.S. 924, 432 (1971)]. Second, plaintiffs' pattern or practice disparate treatment challenge to the employment system as a whole may also implicate disparate impact analysis. A pattern or practice disparate treatment case shares with a typical disparate impact suit the allegation that an employer's practices have had a systemic adverse effect on members of the plaintiff class. See [*Int'l. B'hd of*] *Teamsters* [*v. US*, 431 U.S. 324, 326, n.15 (1977)] ("Either theory may, of course, be applied to a particular set of facts"). Though a plaintiff class will initially seek to show a disparity among the comparably qualified in order to prove disparate treatment, an employer may seek to defend by pointing to a specific, arguably non-discriminatory, employment practice as the cause of the observed disparity.

> In such situations, the defendant may appropriately be required to demonstrate the business necessity of the practices causing the disparity because **the court will have before it all the elements of a traditional disparate impact claim.** **(emphasis supplied)**

*Id.* at 1266 (internal citations omitted); *see also McReynolds v. Sodexho*, 349 F. Supp. 2d 1, 28 (D.D.C. 2004) (disparate impact and disparate treatment claims converge because both attack "systemic results of employment practices" and "proof of each claim will involve a showing of disparity between the minority and majority groups in an employer's workforce") (internal citations omitted).

7. *Lewis v. City of Chicago*, issued after our class certification briefing, reiterates that the plaintiffs' burden is lower regarding a disparate impact claim. In *Lewis*, the Supreme Court, relying on the 1991 CRA, explained that a disparate impact claim "'is established' if an employer 'uses' an 'employment' practice' that causes a 'disparate impact.'" *Lewis*, 130 S. Ct. 2191, 2198 (2010). "Unless and until the defendant pleads and proves a business necessity defense, the plaintiff wins simply by showing the stated elements." *Id.* As the Seventh Circuit explained, to achieve its aims, "[d]isparate impact [liability] is primarily intended to lighten the plaintiff's heavy burden of proving intentional discrimination after employers learned to cover their tracks." *Id.* at 2199 (citing *Lewis v. City of Chicago*, 528 F.3d 488, 491-492 (7th Cir. 2008)).

8. That Plaintiffs routinely assert and courts regularly certify class challenges under both disparate treatment and disparate impact theories on the same facts and employment practices is beyond debate. Following our class certification briefing, the Fourth Circuit ordered certification of a class that challenged the same promotion policy under a disparate treatment and disparate impact theory. *Brown v. Nucor Corp.*, 576 F.3d 149, 156 (4th Cir. 2009) (holding plaintiffs "presented valid statistical evidence that independently indicates a disparate impact and disparate treatment in job promotions"). In another class case that went to verdict after briefing in this case, *Velez v. Novartis Pharm. Corp.*, the district court held a single trial on plaintiffs' disparate impact and pattern or practice disparate treatment claims, as well as common punitive damages issues. Exhibit A, *Novartis* Trial Plan; *see also Velez*, 244 F.R.D. 243, 257-67 (S.D.N.Y. 2007).

9. Accordingly, consistent with well-established law governing disparate impact claims, Plaintiffs presented statistics demonstrating that African American FAs earned lower wages and suffered higher attrition than white FAs. Although the Court repeatedly cites *General Telephone*

*Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), Plaintiffs did not base either their disparate treatment or disparate impact claims on an "across-the-board" theory of racial discrimination. Instead, Plaintiffs met their burden under the 1991 CRA by identifying specific employment policies or practices and presenting statistical evidence of those polices' adverse impact on African Americans. Plaintiffs also identified components of certain policies or practices that caused racial compensation and attrition disparities, *e.g.*, the national quintile system. Because "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation," these statistics establish the cause of action regardless of intent. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).

    10. Plaintiffs' undisputed statistics include the following:

- From 2001 to 2006, African Americans earned 33 to 42% less in annual compensation than whites, resulting in between 6.57 and 9.07 standard deviations. Ex. 1 at 4.
- African American FAs received accounts with 3.84 standard deviations lower in total asset value and 6.37 standard deviations lower in production history than those distributed to whites between 2001 and 2006. Ex. 1 at 28-36.
- African American Trainees received accounts with lower asset values beginning *in the first month* of the training program and continuing for 26 of the 28 months thereafter, with statistical significance at 5.20. Ex. 229 at 18.
- African American FAs and Trainees are excluded from teams and pools by statistically significant margins ranging from 3.63 to 5.70 from 2001 to 2006. Ex. 1 at 37-38, Table 9.
- Between 15% and 28% of the large racial compensation disparities are related to pool and membership policies at Merrill Lynch. *Id.* at 6, 14-19, 23. Racial differences in teaming and pooling directly decrease African American FAs' relative ability to compile assets and production. *Id.* at 7, 38, Table 10.
- African Americans were 34% more likely to terminate before completing the training program, a difference of 4.49 standard deviations. *Id.* at 7-8.
- Racial difference in participation in pools and teams as associated with about one-half of the greater attrition rates of African American FAs. *Id.* at 7.

Pl. Exs. 197-201; Madden Rep., Ex. 1 at 5-6, 30-37.

    11. The Court's decision that Plaintiffs did not plead a "true" disparate impact claim was also rejected by *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977 (1988)(rev'd on other grounds). In *Watson*, the Supreme Court acknowledged that its prior decisions applying disparate impact analysis involved standardized tests or criteria, while its cases applying disparate treatment theory involved decisions based on the exercise of personal judgment or the

application of subjective criteria. The Court rejected this distinction and reversed a lower court's failure to evaluate statistical evidence to determine whether the petitioner, who brought a disparate treatment claim, also made out a *prima facie* case of discrimination under a disparate impact theory. The Court explained, "even if one assumed that any such discrimination [by individual supervisors] can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain." *Id.* at 990.

12. Likewise, relying on *Watson*, the Seventh Circuit recognized in *Mozee, et al v. American Commercial Marine Service Corp.*, 940 F.2d 1036 (7th Cir. 1991) that "[Defendant's] practice of allowing its foremen complete discretion in their choice of whom to promote to permanent and temporary leadmen is properly the subject of either a disparate impact or disparate treatment inquiry." *Id.* at 1044. Subjective decision-making is the opposite of a facially neutral policy neutrally applied. "[I]n subjective practice cases, plaintiffs argue that it is the very subjectivity of the step in the employment process —taking unquantifiable attributes into account—that causes the discrimination." *Id.* at 1050.

13. Plaintiffs' challenge to Merrill Lynch's national account distribution and teaming policies and practices fall squarely within the types of claims contemplated in *Watson* and *Mozee*. Indeed, Plaintiffs offer expert testimony of Bielby and a wealth of non-statistical evidence to support their conclusion that "subconscious stereotypes and prejudices" lead managers to exercise discretion allowed under national policies to the disadvantage of African Americans, *e.g.*, steering client accounts based on race of client or FA. While Merrill Lynch focuses its defense to these national policies on whether the "categorical variable" disproportionately excluding African Americans from account distributions and teams is race or production, Merrill Lynch does not dispute that its national policies disproportionately exclude and harm African Americans. Thus, the uncontested statistics on account distributions and teams establish commonality for Plaintiffs' disparate impact claim. The fact that Plaintiffs prosecute their claims under both a disparate impact and disparate treatment theory dooms neither claim.

14. Finally, although Plaintiffs disagree that a disparate impact claim requires them to plead and prove that a facially neutral policy was also "neutrally applied," the Court misunderstood aspects of Plaintiffs' disparate impact claims that would meet the Court's heightened standard. In addition to Plaintiffs' affirmative disparate impact claims (and as the above *Segar* case explains), Plaintiffs also predicate disparate impact claims on Merrill Lynch's

6

defense. In explaining the differential outcomes by race at Merrill Lynch, its executives testified that because "the concentration of wealth in most parts of this country is mostly in the hands of whites," African Americans face an additional burden to reach across racial and cultural barriers to reach white wealth. Ex. 42 at 130-31. Consistent with *Segar*, Plaintiffs' disparate impact claims challenge Merrill Lynch's facially neutral national account distribution policy and teaming policies, which incorporate and reward or punish for that customer bias.

15. Plaintiffs seek to prove that Defendant's facially neutral national account distribution and team policies unlawfully perpetuate and institutionalize customer bias when Merrill Lynch distributes the client accounts that it controls to FAs who are disproportionately favored by white customers and when white FAs elect to team with other white brokers who receive account distributions. *Chaney v. Plainfield Healthcare*, No. 09-3661, 2010 U.S. App. LEXIS 14804, *10-11 (7th Cir. July 20, 2010)("[i]t is now widely accepted that a company's desire to cater to the perceived racial preferences of its customers is not a defense under Title VII for treating employees differently based on race."); *see also Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 744 (7th Cir. 1999) (evidence of segregated sales force supported Title VII claim). Plaintiffs will also establish that Merrill Lynch distributes other valuable business resources through discriminatory national rankings, *e.g.*, officer titles, offices, sales assistants, and training. Thus, Plaintiffs' disparate impact claims also challenge these policies, which are facially neutral and neutrally applied.

16. Finally, certifying a class action of a disparate impact claim fulfills the efficiency and policy aims of class litigation. The Seventh Circuit recently reiterated that class certification is a "sensible and legally permissible alternative" where individual suits "would cost orders of magnitude more to litigate than the claims would be worth." *Pella Corp. v. Saltzman,* 606 F.3d 391, 393 (7th Cir. 2010). As Merrill Lynch concedes, its expert Dr. Ali Saad charged in excess of $10,000,000 for his report, and the Plaintiffs (through counsel) invested in excess of $1,000,000 for their expert reports. Clearly, the cost of prosecuting Plaintiffs' claims on a disparate impact theory is prohibitive for any single plaintiff or group of plaintiffs, particularly since remedies for disparate impact are limited. 42 U.S.C.§2000e-5(g)(1); 42 U.S.C. §§1981a(1). No plaintiff or law firm would prosecute an individual disparate impact claim challenging Merrill Lynch's employment policies or practices because of these costs. *Bert v. AK Steel Corp.*, No. 1:02 cv 467, 2007 U.S. Dist LEXIS 4125, *13-14 (S.D. Ohio, Jan. 19, 2007). Moreover, if individual

class members are forced to challenge Defendant's policies through separate actions, dozens of courts across the country will be forced to consider and rule upon the exact same body of common evidence regarding these impact claims, creating judicial inefficiencies and risks of inconsistent outcomes.

17. A trial of Plaintiffs' disparate impact claims will address a simple question prosecuted and defended with common, rather than individualized, evidence: whether Merrill Lynch's facially neutral policies are justified by business necessity. Because trials of disparate impact claims focus on common evidence regarding the challenged policies, their impact, and purported business necessities and less discriminatory alternatives, they are particularly appropriate for Rule 23(b)(2) certification. This disparate impact class would not require a jury trial, does not involve emotional and punitive damages, and the predominant relief would be injunctive, as the Court can end the discrimination by ordering the use of less discriminatory policies. The equitable damages are incidental under Rule 23(b)(2) because they flow directly from statistical disparities easily computed as the compensation shortfall between the races. *In re: Allstate*, 400 F.3d 505, 507 (7th Cir. 2005). Thus, a disparate impact claim is properly certified under Rule 23(b)(2), or under Rule 23(b)(3) given the ease of managing such a class.

**The Disparate Treatment Claim and Statistical Evidence**

18. Although the Court found that the statistical disparities in compensation showing that African Americans earned 33 to 42% less in annual compensation than whites present a compelling argument for finding commonality and certifying a class under a disparate impact theory, the Court discounted Plaintiffs' considerable statistical evidence in analyzing certification of Plaintiffs' intentional discrimination claims. Op. at 10-12. The Court noted, "it is said that you can find a statistic to prove anything." *Id.* at 12. Citing Mark Twain, the Court equated statistics with "damned lies" and *de facto* granted Defendant's *Daubert* motion of Madden. Op. at 12.

19. The Court noted that Defendant's expert criticized Plaintiffs' statisticians for failing to take into account that African American FAs on average have fewer personal social connections with potential clients with wealth. The Court held:

> Defendant's expert performed a study of published available census data and concluded that access to networks of potential clients with substantial wealth varies by race among defendant's FAs. As a result customers independently generated by African American FAs' participation in the training program early in their careers come from

neighborhoods with significantly higher African American populations and significantly lower average wealth.

Op. at 11-12. The Court warned that the contrasting statistical evidence and expert testimony demonstrated the danger of relying on statistical evidence. *Id.* at 12. Accepting Defendant's representations both about Madden's work and Defendant's expert's findings, the Court concluded that "statistical evidence that fails properly to take into account nondiscriminatory explanations does not permit an inference of discrimination." *Id.*

20. After class certification briefing, the Seventh Circuit held that where statistics are used to establish any Rule 23 factor, the Court must resolve any challenge to the reliability of expert information relevant to class certification. *American Honda*, 600 F.3d at 815-816. The Seventh Circuit reiterated this holding and discredited the lower court's rejection of the parties' statistics simply because of contrast in the expert reports in *West v. Prudential Sec., Inc.,* 282 F.3d 935, 938 (7th Cir. 2002), holding that:

> A district judge may not duck hard questions by observing that each side has some support...Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives.

*Id.*

21. Based on *American Honda*, the Court erred when it failed to conduct a rigorous analysis of the statistics to determine which, if any, of the statistics were "damned lies." While the Court denied as "moot" all expert motions to strike, the Court's *de facto* ruling was to grant *Daubert* motions on both of Plaintiffs' experts, Madden and Bielby.

22. Equally important, the Court made a factual error in finding that Madden did not control for the contention that African American FAs have fewer personal connections with potential clients of wealth. Op. at 11-12. Madden uses Saad's own measure of access to wealth as a control. Madden found that differences in pre-existing social networks did not explain the racial compensation disparities. Ex. 229 at 7-10.

23. The Court relied *carte blanche* upon Saad's study of clients attained by FAs during their first three months in production (Op. at 11), but did not hold an evidentiary hearing to choose between competing perspectives on Madden's and Saad's work. As a result, the Court did not discover that Saad's study: (1) relied on a racially biased methodology; (2) was rejected by another defense expert upon whose opinions Saad relied to devise his studies and reach his conclusions; and (3) properly calculated and interpreted, supported Madden's studies and

9

opinions and Plaintiffs' arguments of differential treatment of similarly situated African American and white FAs. Ex. 229 at 35-36. As explained below, while Saad masked his findings, his studies proved that when white FAs and African American FAs have the same experience and same access to wealth, white FAs still earn statistically significant higher wages. Ex. 229 at 7-10.

24. Saad purports to isolate and study the impact of "self-generated" accounts by FA Trainees in their first three months to establish that African American FA Trainees self-source more accounts from African Americans, who are poorer. To reach his conclusion, Saad compares the production of African American and white FAs with the same lengths of service by looking at the assets they accumulate during the first three months in the training program. *See* Ex. 229 at 7-10. Saad's study and conclusions are replete with errors.

25. Saad assumes that all new accounts obtained by FA Trainees during this three-month period are "self-sourced" assets. Merrill Lynch's data shows otherwise. Madden's analysis of client account transfers to FA Trainees showed that African American FA Trainees received accounts with lower asset values beginning *in the first month* of the training program and continuing for 26 of the 28 months thereafter, with statistical significance at 5.20. *See* Ex. 229 at 18. Saad also includes as "self-generated" assets that originate from pools with other FAs. Madden showed that African Americans are disproportionately excluded from such pools in the training program. *See* Ex. 1 at 46-47. Saad's study ignores these significant racial differentials, which show that in addition to any pre-Merrill Lynch network, white FAs are relying on relationships and resources disproportionately provided to them by Merrill Lynch to garner new clients.

26. Saad's purportedly "race-neutral" three-month study inexplicably treats white FAs and African American FAs differently. For white FAs, Saad grows self-generated production from the first three months into expected "current production" at the average rate or pattern generally experienced by FAs with the same length of service. But Saad's analysis of African-American FAs is different. After calculating the expected current production based on the average growth trend, Saad reduces African Americans' expected "current production" **by 48.6%**. *See* Ex. 229 at 7. Rather than assuming that African American and white FAs with the same length of service and same self sourced accounts would achieve the same expected current

production, Saad discounts African American production. *Id.* Saad then enters the racially different expected current production amounts as controls in his compensation analysis. *Id.*

27. By unjustifiably discounting the expected current production of African American FAs but not whites, Saad reaches the predetermined conclusion that African Americans are paid less because their current production is lower. *See* Ex. 229 at 5-8. Saad's work masks the true racial disparities by making it appear as if African American FAs have less current production. *See* Ex. 229 at 6-7. When Madden corrects for Saad's misuse of race to reduce predicted earnings, Saad's study shows that differences in access to wealth cannot explain differences in compensation. *See* Ex. 229 at 9-10. To the contrary, Saad's studies support the hypothesis that the racial differences in measured current production are attributable to racial differences in resources and opportunities provided by Merrill Lynch. *Id.*

28. Neither Saad nor Merrill Lynch can establish that racial differences in access to wealth explain the statistically significant wage or attrition disparities. Saad's computer back-up of his studies shows that he actually established the opposite of what he sought to prove. As explained in Madden's Rebuttal, Saad actually established that African American FAs received 35.7% to 53.3% fewer production credits (ranging from 3.02 to 5.90 standard deviations' difference) between 2002 and 2006 than whites with the *same* experience and *same* levels of production on self-generated assets in the first three months of the training program. Ex. 229 at 5, 7. Because Saad finds that production credits translate directly into compensation, these differences translate into the compensation differentials found by Plaintiffs' experts. *Id.* at 6.

29. In light of the above, Plaintiffs respectfully submit that a more appropriate quote to describe Saad's work comes not from Mark Twain but Benjamin Franklin: "Half the truth is often a great lie."

30. Ultimately, the very expert Saad relied on in designing his study rejected Saad's study. Merrill Lynch hired Dr. James Outtz to conduct a job analysis of the FA position to identify factors that lead to FA success. Based on Outtz's work, he outright rejected Saad's study as inaccurate. Outtz opined, "the use of the first three months, in terms of independent production, as a measure of access to wealth, based on my understanding and information I've collected about this job, is an inaccurate assumption." Ex. 232 at 61-65.

31. While Saad assumed that Merrill Lynch did not influence its FAs' "access to wealth," Outtz testified that this was not the case. After interviewing a sample of Merrill Lynch managers

and (white) FAs, Outtz testified that how an FA "gains access to wealth" is dependent on internal factors controlled by Merrill Lynch. Ex. 232 at 82-85. For example, Outtz conceded that an FA's network, and access to wealth, would include clients resulting from Merrill Lynch leads, account transfers and distributions, and team participation, among other things. Ex. 232 at 82-85. Outtz is clear that the "access to wealth" driver he identified for FA success is not what Saad erroneously interprets as the ability to "tap into a set of (pre-existing) contacts," but includes developing a network with resources and clients provided by Merrill Lynch. Ex. 233 at 18; Ex. 232 at 84. Outtz's testimony raises significant questions about the reliability and relevance of Saad's work.

32. Outtz's findings also demonstrate that reasonable experts (even Defendant's own experts) disagree about whether it is proper to control for the variable "access to wealth" and, if so, how. Consistent with Madden, Outtz's findings suggest "access to wealth" is a variable tainted by Merrill Lynch's conduct, which Plaintiffs allege is discriminatory. Merrill Lynch admitted further unlawful taint by acknowledging racial bias on the part of prospective clients as a factor explaining differences in outcomes for African Americans in self-generated accounts. Ex. 42 at 152. Thus, the tainted "access to wealth" variable used by Saad is inappropriate for inclusion in an expert study.

33. Another conflict between the experts that the Court did not resolve involved Saad's use of 100-block addresses to predict the race and net worth of Merrill Lynch clients. The use of 100-block rather than actual addresses of Defendant's clients renders Saad's conclusions about their racial make-up of and net worth junk science. Rather than relying on reliable data regarding the actual address and race of Merrill Lynch's clients (which Plaintiffs requested and Merrill Lynch could easily have provided), Saad relied on this questionably proxy from Merrill Lynch to determine race. Saad used a "geo-coding" process to assign racial identity but could not reliably discern whether the 100-block addresses were business or residential. Thus, Saad assigned racial identity to accounts of institutions, businesses and organizations with no such identity and could not distinguish between clients' residential addresses and business addresses where statements were sent. *See* Ex. 229 at 28. Based on Merrill Lynch's own commissioned internal reports, Saad's unreliable methodology grossly overestimated the number of African-American clients of African-American FAs. That the Court did not question the reliability of Saad's geo-coding was surprising given the Court's assurances to Plaintiffs that the use of the

100 block addresses, "would seem to me to throw any conclusions reached from that type of information into serious doubt." Dkt. 330-6 at 4.

34. In sum, Defendant's experts do not undermine Plaintiffs' statistical evidence to any degree and certainly not to the degree to eliminate commonality or typicality.

35. Although the Court concluded that Plaintiffs did not otherwise establish commonality without the statistics, the Court's expectation that commonality would be established solely by the declarations was not analytically correct. The Second Circuit's decision in *Robinson v. Metro North Commuter Railroad*, 267 F.3d 147 (2nd Cir. 2001), is instructive. In *Robinson*, the district court denied certification of a class under 23(b)(2) because it posited that "discriminatory acts of particular department managers in particular individual situations" would have to be tried and would "overwhelm the liability phase." *Id.* at 156-57. The Second Circuit reversed and explained that the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination. "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics." *Id.* at 168. Like *Robinson*, Plaintiffs' disparate treatment claims present a traditional *Teamsters* case, and will rely on patterns or practices rather than individual decisions. Statistics alone can prove intent and establish liability under both a pattern or practice disparate treatment and disparate impact theory. *EEOC v. O&G Spring*, 38 F.3d 872, 876 (7th Cir. 1994)(citing *Teamsters*, 431 U.S. at 339-40, n.20); *see also Teamsters*, 431 U.S. at 335, n.15. ("Either theory, of course, may be applied to a particular set of facts"). Thus, the centerpiece for determining commonality is statistical proof, not individual examples of harm.

36. The declarations the Court criticized for being vague did not seek to explain how the declarants were discriminated against and harmed by the challenged practices. Instead, class member declarations were largely intended to show manageability consistent with Judge Shadur's logical conclusion in *Smith v. Nike Retail Svcs.*, 234 F.R.D. 648 (N.D. Ill. 2006), that even given certain individualized or administrative issues, class treatment would "pose far fewer problems than the alternative of separate lawsuits by over 230 individual class members, each advancing his or her own assortment of discriminatory actions." *Id.* at 667 (internal citations omitted). Likewise, the named Plaintiffs' declarations demonstrated their service on behalf of the class and adequacy to serve as class representatives. The sixteen Plaintiffs explained in their

*depositions* how they were harmed in the same way by the Defendant's uniform, discriminatory practices, regardless of their length of service, region of the country, management team, or level of success. Although not referenced by the Court, Plaintiffs tendered excerpts and a summary chart of this deposition testimony to the Court. *See* Pl. Ex. 242.

37. Most importantly, after discounting the statistics, the Court limited its review of the anecdotal and common evidence to class member declarations, perhaps because it had difficulty discerning the purpose of this evidence in the absence of the statistics. For example, the Court ignored Bielby's expert report, which summarized much of the evidence and explained how Defendant's national policies operated to disadvantage African American class members in the same way. *See, e.g.,* Ex. 2 at 19-34, 70-71. The Court did not consider Plaintiffs' non-statistical class-wide evidence which included: national written policies and guidelines; depositions of Firm executives, corporate representatives and Human Resource personnel; national internal studies and reports demonstrating racial disparities in representation, production, teams, compensation, account transfers and attrition; internal reports acknowledging cultural and other obstacles faced by African American FAs; reports of Firm-sponsored focus groups, committees and cultural surveys of employees and managers; widely disseminated multi-cultural marketing materials and national marketing plans that Firm executives admitted contained racially offensive stereotypes; affirmative action plans and failings; a long history of discrimination litigation; and employee complaints of discrimination. *See generally id.* In *Mozee*, the Seventh Circuit held that it was appropriate for the district court in finding a pattern and practice of discrimination to consider some of the very kind of non-statistical class-wide evidence offered by Plaintiffs, *e.g.*, dismal performance on affirmative action plans. *Mozee,* 940 F.2d at 1043. Along with Plaintiffs' statistics, Plaintiffs' nonstatistical class-wide evidence and class-member declarations provide the "texture" to enable the fact-finder to conclude that racial animus drove the decision making process and/or that it is more likely than not when managers exercised discretion or chose whom to support, they did so in conformity with a firm culture of racial bias. *See also Dukes et al. v. Wal-Mart,* 603 F.3d 571, 600, 603 (9th Cir. 2010).

38. It is clear that the Court was frustrated by the parties' extensive submissions. Plaintiffs respectfully submit that since the enactment of Rule 23(f), class certification law has developed at an alarming pace and completely transformed the task of filing and responding to a class certification petition from a straightforward one that could be accomplished in 15 pages to

a process nearly tantamount to a *Teamsters* trial. Plaintiffs respectfully submit that the volume of pleadings filed in this case by both parties is on par with that filed in similar litigation and was not meant to be disrespectful to the Court. To the extent that the Court construed the filings as disrespectful, Plaintiffs and their counsel apologize. They note, however, that an ironic result of the accelerated development of class certification law is that it has slowed the development of substantive civil rights law, as Plaintiffs must seemingly win a certification trial just to gain the right to prosecute their claims. There are important issues raised in this case that affect the lives and civil rights of real people. Plaintiffs seek to reverse undisputed longstanding adverse statistical outcomes on Wall Street for African Americans. In reviewing this motion, Plaintiffs ask the Court to consider that they were not seeking judgment with their class motion, only the right to move forward with their claims.

WHEREFORE, Plaintiffs ask the Court to grant their motion for reconsideration, certify a disparate impact class, and schedule a *Daubert* hearing on the statistical evidence to aid it in determining whether to certify a disparate treatment class under Rule 23(b)(2) or Rule 23(b)(3).

Respectfully submitted,

By: /s/ Linda D. Friedman

Mary Stowell - Attorney No. 02750015
Linda D. Friedman – Attorney No. 06190092
George Robot – Attorney No. 06237979
Suzanne E. Bish – Attorney No. 06242534
**STOWELL & FRIEDMAN, LTD**
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888

## CERTIFICATE OF SERVICE

I, Linda D. Friedman, an attorney, hereby certify that on August 16, 2010, I caused a true and correct copy of attached *Plaintiffs' Motion And Memorandum To Reconsider Or In The Alternative To Clarify And/Or Narrow The Definition Of The Class* to be served via ECF on the following counsel of record:

Jeffrey S. Klein
Nicholas J. Pappas
Salvatore Romanello
Allan Dinkoff
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
phone: (212) 310-8000
fax: (212) 310-8007
jeffrey.klein@weil.com

Lori Lightfoot
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
phone: (312) 782-0600
fax: (312) 701-7711
llightfoot@mayerbrown.com

Respectfully submitted,

By: /s/ Linda D. Friedman

Mary Stowell - Attorney No. 02750015
Linda D. Friedman – Attorney No. 06190092
George Robot – Attorney No. 06237979
Suzanne E. Bish – Attorney No. 06242534
Stowell & Friedman, Ltd.
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888