IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GEORGE MCREYNOLDS, et al.,                    )
                                              )
          Plaintiffs,                         )    Case No. 05 C 6583
                                              )
          v.                                  )    Judge Robert W. Gettleman
                                              )    Magistrate Jeffrey T. Gilbert
MERRILL LYNCH, PIERCE, FENNER                 )
& SMITH, INCORPORATED,                        )
                                              )
          Defendant.                          )

**MEMORANDUM IN SUPPORT OF MOTION TO RECONSIDER AND TO CLARIFY
AND/OR NARROW THE CLASS DEFINITION**

Plaintiffs hereby move the Court to reconsider its denial of their petition for class

certification. Plaintiffs also clarify and/or narrow the definition of the class.

**I.    Class Definition**

Plaintiffs clarify the class definition as African American Financial Advisors ("FAs" or

"brokers") and FA Trainees with production numbers from 2001 to the present. This definition

captures only persons who performed the function of broker and only during the time that they

were brokers. Class members all held the same job, performed the same job function, and were

subjected to and harmed by the same national policies and practices. Brokers are given titles,

such as Vice President. The titles do not mean that these brokers are managers. Op. at 9.

**II.   The Disparate Impact Claim**

The Court recognized that Plaintiffs' statistical evidence on compensation "would present

a compelling argument for finding commonality and certifying a class" in a disparate impact

case, but denied class certification, finding Plaintiffs had failed to prosecute a "true" disparate

impact claim. Op. at 10. Without legal citation, the Court *sua sponte* held that a "true" disparate

impact claim required that a facially neutral policy also be "neutrally applied." Op. at 8, n.2, 10.

Plaintiffs respectfully submit that this was not a correct application of the law or the facts.

To Plaintiffs' knowledge, no court has held that plaintiffs forfeit a disparate impact claim by alleging intentional discrimination or by not establishing that the "neutral policy" was also "neutrally applied." On the contrary, as the Court of Appeals for the District of Columbia explained in *Segar v. Smith*, 738 F.2d 1249 (D.D.C. 1984), either theory may be applied to a particular set of facts:

> This disparate impact concept may be relevant in two ways to a case involving allegations of class-wide discrimination. First, in addition to bringing a pattern or practice disparate treatment claim, plaintiffs may well challenge the disparate impact of specific employment practices and thus force the employer to prove the job-relatedness of those practices. *See Griggs* [*v. Duke Power Co.*, 401 U.S. 924, 432 (1971)]. Second, plaintiffs' pattern or practice disparate treatment challenge to the employment system as a whole may also implicate disparate impact analysis. A pattern or practice disparate treatment case shares with a typical disparate impact suit the allegation that an employer's practices have had a systemic adverse effect on members of the plaintiff class. *See* [*Int'l. B'hd of*] *Teamsters* [*v. US*, 431 U.S. 324, 326, n.15 (1977)] ("Either theory may, of course, be applied to a particular set of facts"). Though a plaintiff class will initially seek to show a disparity among the comparably qualified in order to prove disparate treatment, an employer may seek to defend by pointing to a specific, arguably non-discriminatory, employment practice as the cause of the observed disparity. In such situations, the defendant may appropriately be required to demonstrate the business necessity of the practices causing the disparity because **the court will have before it all the elements of a traditional disparate impact claim.**

*Id.* at 1266 (emphasis supplied, internal citations omitted); *see also McReynolds v. Sodexho*, 349 F. Supp. 2d 1, 28 (D.D.C. 2004).

*Lewis v. City of Chicago*, the Supreme Court's most recent decision on disparate impact, relies on the express language of the 1991 Civil Rights Act, 42 U.S.C. §2000e-2(k) ("1991 CRA"). In *Lewis*, the Supreme Court explained that a disparate impact claim "'is established' if an employer 'uses' an 'employment practice' that causes a 'disparate impact.'" *Lewis*, 130 S. Ct. 2191, 2198 (2010). "Unless and until the defendant pleads and proves a business necessity

2

defense, the plaintiff wins simply by showing the stated elements." *Id.* As the Seventh Circuit earlier explained, "[d]isparate impact [liability] is primarily intended to lighten the plaintiff's heavy burden of proving intentional discrimination after employers learned to cover their tracks." *Id.* at 2199 (citing *Lewis v. City of Chicago*, 528 F.3d 488, 491-92 (7th Cir. 2008)).

Following class certification briefing, the Fourth Circuit ordered certification of a class that challenged the same promotion policy under a disparate treatment and disparate impact theory. *Brown v. Nucor Corp.*, 576 F.3d 149, 156 (4th Cir. 2009) (holding plaintiffs "presented valid statistical evidence that independently indicates a disparate impact and disparate treatment in job promotions"). In another class case that went to verdict after briefing in this case, *Velez v. Novartis Pharm. Corp.*, the district court held a single trial on plaintiffs' disparate impact and pattern or practice disparate treatment claims, as well as common punitive damages issues. Exhibit A, *Novartis* Trial Plan; *see also Velez*, 244 F.R.D. 243, 257-58 (S.D.N.Y. 2007).

Accordingly, consistent with governing statutory and case law, Plaintiffs presented statistics demonstrating that African American FAs earned lower wages and suffered higher attrition than white FAs. Although the Court repeatedly cites *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982), Plaintiffs did not base either their disparate treatment or disparate impact claims on an "across-the-board" theory of racial discrimination. While the 1991 CRA allows Plaintiffs to identify groups of policies or practices, Plaintiffs identified specific employment policies or practices and their disparate impact, *i.e.*, the national account distribution policy and national teaming policy. §42 U.S.C. 2000e-2(k)(1)(A)(i), (B)(i). Plaintiffs presented statistical evidence of those polices' adverse impact on African Americans. Plaintiffs also identified components of certain policies or practices that caused racial compensation and attrition disparities, *e.g.*, Merrill Lynch's reliance on racially tainted national

quintile rankings of brokers and cumulative advantage systems to distribute accounts and other resources. Because "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation," these statistics establish the cause of action regardless of Defendant's intent. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971).

## A. Defendant's Account Distribution and Teaming Policies Cause Disparate Impact

The following statistics are too compelling to ignore:

- From 2001 to 2006, African Americans earned 33 to 42% less in annual compensation than whites, resulting in between 6.57 and 9.07 standard deviations. Ex. 1 at 4.

- African American FAs and FA Trainees received accounts with 3.84 standard deviations lower in total asset value and 4.76 standard deviations lower in production history than those distributed to whites between 2001 and 2006. Ex. 229 at 42, Table R4a.

- African American Trainees received accounts with lower asset values beginning *in the first month* of the training program and continuing for 25 of the 27 months thereafter, with statistical significance at 5.20. Ex. 229 at 18, Table R5a.

- African American FAs and Trainees were excluded from teams and pools by statistically significant margins from 3.63 to 5.89 from 2001 to 2006. Ex. 1 at 37-38, Table 9.

- Between 15% and 28% of the large racial compensation disparities were related to teaming and pooling at Merrill Lynch. Ex. 1 at 6, 14-19, 23. Racial differences in teaming and pooling directly decrease African American FAs' relative ability to compile assets and production. *Id.* at 7, 38.

- African Americans were 34% more likely to terminate before completing the training program, a difference of 4.49 standard deviations. Ex. 1 at 7.

- Racial difference in participation in pools and teams is associated with about one-half of

4

the greater attrition rates of African American FAs. Ex. 1 at 7.

Under the 1991 CRA, Plaintiffs established a traditional disparate impact theory by identifying specific employment practices and the resulting statistically significant disparities.

## B. Plaintiffs' Intent Allegations Do Not Doom Their Disparate Impact Claims

Plaintiffs' allegations of intent do not doom the disparate impact claim. The notion that disparate impact claims must challenge a neutral policy that was applied neutrally was rejected by the Supreme Court even before the 1991 CRA in *Watson v. Forth Worth Bank & Trust*, 487 U.S. 977 (1988)(rev'd on other grounds). In *Watson*, the Supreme Court acknowledged that its prior decisions applying disparate impact analysis focused on facially neutral policies that were neutrally applied, such as standardized tests or criteria. It contrasted those cases to disparate treatment cases, which until the *Watson* decision involved decisions based on intent or the exercise of personal judgment or the application of subjective criteria. The Court rejected any hard-line distinctions between the two theories that would limit disparate impact claims only to facially neutral policies that are neutrally applied. *Id.* at 990. The Court reversed a lower court's failure to evaluate statistical evidence to determine whether the petitioner, who brought a disparate treatment claim to challenge subjective decision making, also made out a *prima facie* case of discrimination under a disparate impact theory. *Id.* at 999-1000. Subjective decision-making is the opposite of a facially neutral policy neutrally applied. *Mozee, et al. v. American Commercial Marine Service Corp.*, 940 F.2d 1036, 1050 (7th Cir. 1991)("In subjective practice [disparate impact] cases, plaintiffs argue that it is the very subjectivity of the step in the employment process —taking unquantifiable attributes into account—that causes the discrimination.") *Watson* allowed the disparate impact challenge to subjective decisions for reasons equally applicable to this case: "even if one assumed that any such discrimination [by

5

individual supervisors] can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain." 487 U.S. at 990.

Plaintiffs' challenge to Merrill Lynch's national account distribution and teaming policies and practices meet the express language of 1991 CRA based on their adverse impact and regardless of Plaintiffs' intent allegations. Plaintiffs' claims also fall squarely within the types of claims contemplated, before the 1991 CRA was passed, in *Watson* and *Mozee*. Rather than simply resting on the "numbers," Plaintiffs offer the expert testimony of Bielby and a wealth of non-statistical class-wide evidence to support their conclusion that "subconscious stereotypes and prejudices" led managers to exercise whatever discretion is provided by Defendant's national policies to the disadvantage of African Americans, *e.g.*, steering client accounts based on race of client or FA. While Merrill Lynch focuses its defense to these national policies on the reason African Americans are excluded from account distributions and teams, Merrill Lynch does not dispute that its national policies disproportionately exclude and harm African Americans. Thus, the uncontested statistics on account distributions and teams establish commonality for Plaintiffs' disparate impact claim.

## C. Plaintiffs' Disparate Impact Claims Meet The Court's Heightened Standard

Although Plaintiffs disagree that a disparate impact claim requires them to plead and prove that a facially neutral policy was also "neutrally applied," the Court misunderstood aspects of Plaintiffs' disparate impact claims that would meet the Court's heightened standard. In addition to Plaintiffs' affirmative disparate impact claims (and as the above *Segar* case explains), Plaintiffs also predicate disparate impact claims on Merrill Lynch's defense. In explaining the differential outcomes by race at Merrill Lynch, its Chairman and Chief Executive Officer testified that the racial bias of prospective clients is a factor that explains some of the differences

in the outcomes for African Americans. Ex. 42 at 152, 130-31; *see also* Ex. 43 at 265-70; Ex. 45 at 127-30. Consistent with *Segar*, Plaintiffs' disparate impact claims challenge Merrill Lynch's facially neutral national account distribution and teaming policies, which incorporate and reward or punish for that customer bias.

Plaintiffs seek to prove that Defendant's facially neutral national account distribution and team policies unlawfully perpetuate and institutionalize customer bias when Merrill Lynch distributes the client accounts that it controls to FAs to mirror the results of the marketplace where Merrill Lynch claims its customers disproportionately favor white brokers. Plaintiffs also challenge the national teaming practice of allowing white FAs to elect to team with other white brokers who receive account distributions and who will not be objectionable to clients. This practice segregates the workforce. *Chaney v. Plainfield Healthcare*, No. 09-3661, 2010 U.S. App. LEXIS 14804, *10-11 (7th Cir. July 20, 2010)("It is now widely accepted that a company's desire to cater to the perceived racial preferences of its customers is not a defense under Title VII for treating employees differently based on race."); *see also Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 744 (7th Cir. 1999)(evidence of segregated sales force supported Title VII claim). Plaintiffs will also establish that Merrill Lynch distributes other valuable business resources through discriminatory national rankings that are tainted by customer bias, *e.g.*, officer titles, offices, sales assistants, and training. Thus, Plaintiffs' disparate impact claims challenge these policies, which are facially neutral and neutrally applied.

**D. Class Treatment is Appropriate on Plaintiffs' Disparate Impact Claims**

A trial of Plaintiffs' disparate impact claims will address a simple question prosecuted and defended with common, rather than individualized, evidence: whether Merrill Lynch's facially neutral policies are justified by business necessity. Because trials of disparate impact

claims focus on common evidence regarding the challenged policies, their impact, and purported business necessities and less discriminatory alternatives, they are particularly appropriate for Rule 23(b)(2) certification. This disparate impact class would not require a jury trial, does not involve emotional and punitive damages, and the predominant relief would be injunctive, as the Court can end the discrimination by ordering the use of less discriminatory policies. The equitable damages are incidental under Rule 23(b)(2) because they flow directly from statistical disparities easily computed as the compensation shortfall between the races. *In re: Allstate*, 400 F.3d 505, 507 (7th Cir. 2005). Thus, a disparate impact claim is properly certified under Rule 23(b)(2), or under Rule 23(b)(3) given the ease of managing such a class.

## III. The Disparate Treatment Claim And Statistical Evidence

The Court discounted Plaintiffs' considerable statistical evidence in analyzing certification of Plaintiffs' intentional discrimination claims. Op. at 10-12. The Court noted, "it is said that you can find a statistic to prove anything." *Id.* at 12. Citing Mark Twain, the Court equated statistics with "damned lies" and *de facto* granted Defendant's *Daubert* motion of Madden. *Id.*

The Court noted that Defendant's expert criticized Plaintiffs' statisticians for failing to take into account that African American FAs on average have fewer personal social connections with (white) potential clients with wealth. The Court held:

> Defendant's expert performed a study of published available census data and concluded that access to networks of potential clients with substantial wealth varies by race among defendant's FAs. As a result, customers independently generated by African-American FAs' participation in the training program early in their careers come from neighborhoods with significantly higher African-American populations and significantly lower average wealth.

*Id.* at 11-12. The Court warned that the contrasting statistical evidence and expert testimony demonstrated the danger of relying on statistical evidence. *Id.* at 12. Accepting Defendant's

representations both about Madden's work and Defendant's expert's findings, the Court

concluded that "statistical evidence that fails properly to take into account nondiscriminatory

explanations does not permit an inference of discrimination." *Id.*

## A. The Law Requires A More Rigorous Analysis Of The Statistical Evidence

After class certification briefing, the Seventh Circuit held that where statistics are used to

establish any Rule 23 factor, the Court must resolve any challenge to the reliability of expert

information relevant to class certification. *American Honda Motor Corp. v. Allen*, 600 F.3d 813,

815-16 (7th Cir. 2010). The Seventh Circuit discredited the lower court's rejection of the

parties' statistics simply because of contrast in the expert reports and reiterated its holding in

*West v. Prudential Sec., Inc.,* 282 F.3d 935, 938 (7th Cir. 2002):

> A district judge may not duck hard questions by observing that each side has
> some support…Tough questions must be faced and squarely decided, if necessary
> by holding evidentiary hearings and choosing between competing perspectives.

Based on *American Honda*, the Court erred when it failed to conduct a rigorous analysis

of the statistics to determine which, if any, of the statistics were "damned lies." While the Court

denied as "moot" all expert motions to strike, the Court's *de facto* ruling was to grant *Daubert*

motions on both of Plaintiffs' experts, Madden and Bielby.

## B. The Court Erred On The Facts: Madden Did Control For Access to Wealth

First, the Court made a factual error in finding that Madden did not control for the

contention that African American FAs have fewer personal connections with potential clients of

wealth. Op. at 11-12. Madden uses Saad's own measure of access to wealth as a control.

Madden found that differences in pre-existing social networks did not explain the racial

compensation disparities. Ex. 229 at 9-10.

Next, the Court relied upon Saad's study of clients attained by FAs during their first three

months in production (Op. at 11), but did not hold an evidentiary hearing to choose between

9

competing perspectives on Madden's and Saad's work. As a result, the Court did not discover that Saad's study: (1) relied on a racially biased methodology; (2) was rejected by another defense expert upon whose opinions Saad relied to devise his studies and reach his conclusions; and (3) properly calculated and interpreted, supported Madden's studies and opinions and Plaintiffs' arguments of differential treatment of similarly situated African American and white FAs, Ex. 229 at 35-36. As explained below, while Saad masked his findings, his studies proved that when white FAs and African American FAs have the same experience and same access to wealth, white FAs still earn statistically significant higher wages. Ex. 229 at 5-6, 7-10, 35.

Saad purports to isolate and study the impact of "self-generated" accounts by FA Trainees in their first three months to establish that African American FA Trainees self-source more accounts from African Americans, who are poorer. Saad compares the production of African American and white FAs with the same lengths of service by isolating the assets they accumulate during the first three months in the training program. Ex. 229 at 7-10. Saad assumes that all new accounts obtained by FA Trainees during this three-month period are "self-sourced" assets. Merrill Lynch's data shows otherwise. Madden's analysis of client account transfers to FA Trainees showed that African American FA Trainees received accounts with lower asset values beginning *in the first month* of the training program and continuing for 25 of the 27 months thereafter, with statistical significance at 5.20. Ex. 229 at 18, Table R5a. Saad also includes as "self-generated" assets that originate from pools with other FAs. Madden showed that African Americans are disproportionately excluded from such pools in the training program. Ex. 1 at 46-47. Saad's study ignores these significant racial differentials, which show that in addition to any pre-Merrill Lynch network, white FAs are relying on relationships and resources disproportionately provided to them by Merrill Lynch to garner new clients.

10

## C. Madden's Criticism of Saad Was Too Important To Overlook

Madden's criticisms of Saad were more serious than misdefining "self-generated" assets. Saad's purportedly "race-neutral" three-month study inexplicably treats white FAs and African American FAs differently. Saad compares two FAs with the same "self generated" accounts and length of service. For white FAs, Saad grows self-generated production from the first three months into expected "current production" at the average rate or pattern generally experienced by FAs with the same length of service. But Saad's analysis of African-American FAs is different. After calculating the expected current production based on the average growth trend, Saad reduces African Americans' expected "current production" **by 48.6%**. Ex. 229 at 7. Thus, rather than assuming that African American and white FAs with the same length of service and same self sourced accounts would achieve the same expected current production, Saad discounts African American production. *Id.* Saad then enters the racially different expected current production amounts as controls in his compensation analysis. *Id.* at 7-8.

By unjustifiably discounting the expected current production of African American FAs but not whites, Saad reaches the predetermined conclusion that African Americans are paid less because their current production is lower. Ex. 229 at 5-8. Saad's work masks the true racial disparities by making it appear as if African American FAs have less expected current production. *Id.* at 6-7. When Madden corrects for Saad's misuse of race to reduce predicted production and earnings, Saad's study shows that differences in access to wealth cannot explain differences in compensation. *Id.* at 9-10. To the contrary, Saad's studies support the hypothesis that the racial differences in measured current production are attributable to racial differences in resources and opportunities provided by Merrill Lynch. *Id.*

As explained in Madden's Rebuttal, Saad actually established that African American FAs received 35.7% to 53.3% fewer production credits (ranging from 3.02 to 5.90 standard

11

deviations' difference) between 2002 and 2006 than whites with the *same* experience and *same* levels of production on self-generated assets in the first three months of the training program. Ex. 229 at 5, 7. Because Saad finds that production translates directly into compensation, these differences translate into the compensation differentials found by Plaintiffs' experts. *Id.* at 6.

Ultimately, the very expert Saad relied on in designing his study rejected Saad's study. Merrill Lynch hired Dr. James Outtz ("Outtz") to conduct a job analysis of the FA position to identify factors that lead to FA success. Based on Outtz's work, he rejected Saad's study as inaccurate. Outtz opined that "the use of the first three months, in terms of independent production, as a measure of access to wealth, based on my understanding and information I've collected about this job, is an inaccurate assumption." Ex. 232 at 62-63. While Saad assumed that Merrill Lynch did not influence its FAs' "access to wealth," Outtz testified that this was not the case. After interviewing a sample of Merrill Lynch managers and (white) FAs, Outtz testified that how an FA "gains access to wealth" is dependent in part on internal factors controlled by Merrill Lynch. Ex. 232 at 82-85. For example, Outtz conceded that an FA's network, and access to wealth, would include clients resulting from Merrill Lynch leads, account distributions, and team participation, among other things. *Id.* at 82-85. Outtz acknowledges the "access to wealth" driver he identified for FA success is not what Saad erroneously interprets as the ability to "tap into a set of (pre-existing) contacts," which could be measured in the first three months, but includes developing a network with resources and clients provided by Merrill Lynch. Ex. 233 at 18; Ex. 232 at 84. Outtz's testimony raises significant questions about Saad's work. Outtz's findings also demonstrate that reasonable experts (even Defendant's own experts) disagree about whether it is proper to control for the variable "access to wealth" and, if so, how.

Another conflict between the experts that the Court did not resolve involved Saad's use

of 100-block addresses to predict the race and net worth of Merrill Lynch clients. That the Court did not question the reliability of Saad's geo-coding was surprising given the Court's statements that the use of the 100 block addresses "would seem to me to throw any conclusions reached from that type of information into serious doubt." Dkt. 330-6 at 4.

In sum, Defendant's experts do not undermine Plaintiffs' statistical evidence to any degree and certainly not to the degree to eliminate commonality or typicality.

## D. The Liability Phase Is Preoccupied With Statistics

Although the Court concluded that Plaintiffs did not establish commonality without the statistics, the Court's expectation that commonality and other Rule 23 requirements would be established solely by the declarations was not analytically correct. First, the declarations the Court criticized for being vague did not seek to explain how the declarants were discriminated against and harmed by the challenged practices. Instead, class member declarations were largely intended to show manageability consistent with Judge Shadur's reasoning in *Smith v. Nike Retail Svcs.*, 234 F.R.D. 648, 667 (N.D. Ill. 2006). Likewise, the named Plaintiffs' declarations demonstrated their service on behalf of the class and adequacy to serve as class representatives. The sixteen Plaintiffs explained in their *depositions* how they were harmed in the same way by the Defendant's uniform, discriminatory practices, regardless of their length of service, region of the country, management team, or level of success. Although not referenced by the Court, Plaintiffs tendered excerpts and a summary chart of this deposition testimony to the Court. Ex. 242.

This "anecdotal" evidence, standing alone, was not intended to establish commonality. In *Robinson v. Metro North Commuter Railroad*, 267 F.3d 147 (2nd Cir. 2001), the district court denied certification of a class under 23(b)(2) because it posited that "discriminatory acts of

particular department managers in particular individual situations" would have to be tried and would "overwhelm the liability phase." *Id.* at 156-57. The Second Circuit reversed and explained that the liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination. "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics." *Id.* at 168. By requiring the Plaintiffs to establish commonality with the class member declarations and insisting that the declarations neither be too vague nor too specific, the Court set an impossible and erroneous standard for class certification.

## E. The Court Failed to Consider Non-Statistical Class-Wide Evidence

The elimination of Plaintiffs' statistics also shaped other parts of the Court's review. For example, the Court limited its review of the anecdotal and common evidence to class member declarations, perhaps because it had difficulty discerning the purpose of the wealth of non-statistical class-wide evidence offered by Plaintiffs. For example, the Court ignored Bielby's expert report, which summarized much of the evidence and explained how Defendant's national policies operated to disadvantage African American class members in the same way. *See, e.g.,* Ex. 2 at 19-34, 70-72. Other non-statistical class-wide evidence the Court did not consider included: national written policies and guidelines; depositions of Firm executives, corporate representatives and Human Resource personnel; national internal studies and reports demonstrating racial disparities in representation, production, teams, compensation, account transfers and attrition; internal reports acknowledging cultural and other obstacles faced by African American FAs; reports of Firm-sponsored focus groups, committees and cultural surveys of employees and managers; widely disseminated multi-cultural marketing materials and national

marketing plans that Firm executives admitted contained racially offensive stereotypes; affirmative action plans and failings; a long history of discrimination litigation; and employee complaints of discrimination. *See generally id.* In *Mozee*, the Seventh Circuit held that it was appropriate for the district court in finding a pattern and practice of discrimination to consider some of the very kinds of other anecdotal and non-statistical class-wide evidence Plaintiffs offered here, *e.g.*, dismal performance on affirmative action plans, past racial disparities, etc. *Mozee,* 940 F.2d at 1051. Plaintiffs' non-statistical class-wide evidence establishes commonality and other Rule 23 requirements and enables the fact-finder to conclude that racial animus drove the decision making process and/or that it is more likely than not that, when managers exercised discretion or chose whom to support, they did so in conformity with a firm culture of racial bias. *See also Dukes et al. v. Wal-Mart*, 603 F.3d 571, 600, 603 (9th Cir. 2010).

WHEREFORE, Plaintiffs ask the Court to grant their motion for reconsideration, certify a disparate impact class, and schedule a *Daubert* hearing on the statistical evidence to aid it in determining whether to certify a disparate treatment class under Rule 23(b)(2) or Rule 23(b)(3).

Respectfully submitted,

By: /s/ Linda D. Friedman

Mary Stowell
Linda D. Friedman – Attorney No. 06190092
George Robot
Suzanne E. Bish
**STOWELL & FRIEDMAN, LTD**
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888

## CERTIFICATE OF SERVICE

I, Linda D. Friedman, an attorney, hereby certify that on August 18, 2010, I caused a true and correct copy of attached *Plaintiffs' Memorandum In Support Of Motion To Reconsider And To Clarify And/Or Narrow The Class Definition* to be served via ECF on the following counsel of record:

Jeffrey S. Klein
Nicholas J. Pappas
Salvatore Romanello
Allan Dinkoff
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
phone: (212) 310-8000
fax: (212) 310-8007
jeffrey.klein@weil.com

Lori Lightfoot
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
phone: (312) 782-0600
fax: (312) 701-7711
llightfoot@mayerbrown.com

Respectfully submitted,

By: /s/ Linda D. Friedman

Mary Stowell
Linda D. Friedman – Attorney No. 06190092
George Robot
Suzanne E. Bish
**STOWELL & FRIEDMAN, LTD.**
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888