IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GEORGE McREYNOLDS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Case No. 05 C 6583 |
| ) | |
| v. ) | Judge Robert W. Gettleman |
| ) | Magistrate Jeffrey T. Gilbert |
| MERRILL LYNCH, PIERCE, FENNER ) | |
| & SMITH, INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO RECONSIDER**

Merrill Lynch African American Financial Advisors earn 42% less in annual compensation than their white counterparts and have a 34% higher attrition rate. When considered, these staggering statistical disparities – evidenced throughout Merrill Lynch offices over a five-year period – simply cannot be explained, as Defendant argues, as random individual decision-making. To the contrary, as explained below, they reflect the discriminatory effects of firm-wide corporate employment policies and practices that demand a classwide resolution.

ARGUMENT

I. **The Court Relied on Defense Expert Saad's "Access to Wealth" Study, Which Defendant Has Now Abandoned**

In opposing class certification, Defendant repeatedly criticized Plaintiffs' experts for failing to account for the racial impact of differential access to white wealth. Dkt. 386 at 23-24; *id.* at 21-22, 55-57. According to Defendant and its expert, "access to wealth" accounted for the compensation disparities, not any discriminatory practice by Merrill Lynch:

> Defendant's expert Dr. Saad performed his own study of this phenomenon, examining publicly available census data. He concluded that access to networks of potential clients with substantial wealth varies by race among Merrill Lynch FAs. . . . As a result, customers independently generated by African American FA [trainees] arise from neighborhoods with significantly higher African American populations and significantly lower levels of average wealth.

1

*Id*. at 24. The Court recognized the centrality of this study to Merrill Lynch's defense and adopted the above language, as follows:

> [D]efendant's expert criticized plaintiffs' statisticians for failing to take into account that African American FAs on average have fewer personal social connections with potential clients with wealth. Defendant's expert performed a study of published available census data and concluded that access to networks of potential clients with substantial wealth varied by race among defendant's FAs. As a result, customers independently generated by African-American FAs' participation in the training program early in their careers come from neighborhoods with significantly higher African-American populations and significantly lower average wealth. Op. at 11–12.

The Court then rejected Plaintiffs' statistics because "the contrasting statistical evidence and expert testimony demonstrates the danger of relying too heavily on statistical evidence supported by raw data." *Id*. at 12.

In its motion for reconsideration, Plaintiffs demonstrated that Saad's work was fatally flawed and when properly interpreted, supported Plaintiffs' contention that Defendant's conduct, and not access to white wealth, caused the disparities. With these flaws exposed, Defendant now retreats from Saad's access to wealth study, and denies that it or the Court relied upon it:

> Plaintiffs' three page attack on one small part of Dr. Saad's analysis regarding access to wealth is completely off point. Merrill Lynch did not rely on this one small portion of his analysis in its opposition to class certification, and the Court did not rely upon it in its decision.

(Opp. at 15). The Court and Defendant plainly relied upon Saad's work.

Even if it were possible to accept Defendant's hair-splitting and reject "one small part" of Saad's work, Defendant seeks to abandon the only relevant portion of Saad's study: its purpose and ultimate conclusion. Saad sought to prove that racial differences in access to wealth cause racially disparate outcomes. Using flawed geo-coding techniques, Saad observed what he concluded were racial differences in access to wealth. What he proved, however, was that access to white wealth does not, in fact, cause or explain the huge compensation and other disparities

2

between African American and white FAs. To the contrary, Saad's study reveals statistically significant compensation disparities even between white and African American FAs with the *same* access to wealth, a result Saad tried to hide by discounting the predicted wages of African Americans by 48.6%.

Defendant's abandonment of Saad's work undermines the Court's reasoning in rejecting Plaintiffs' statistical evidence and in denying class certification and warrants reconsideration in light of Plaintiffs' now uncontested statistical evidence. Statistics are the centerpiece of disparate impact and pattern-or-practice claims because they link the Defendant's uniform policies and practices to the disparate outcomes for African Americans. As the Third Circuit recently explained in a disparate impact case:

> a plaintiff will typically have to demonstrate that the disparity in impact is sufficiently large that it is highly unlikely to have occurred at random, and to do so by using one of several tests of statistical significance. There is no precise threshold that must be met in every case, but a finding of statistical significance with a probability level at or below 0.05, or at 2 to 3 standard deviations or greater, will typically be sufficient.

*Stagi v. National R.R. Passenger Corp.*, No. 09-3512, 2010 U.S. App. LEXIS 17261, *20 (3rd Cir. Aug. 16, 2010).[1] Standard deviations in this case far exceed the 2 to 3 threshold. This same proof also establishes Plaintiffs' differential treatment claim. *EEOC v. O&G Spring,* 38 F.3d 872, 876 (7th Cir. 1994) (statistics alone can establish disparate impact and treatment liability).

Defendant suggests that Plaintiffs cannot seek reconsideration because they previously argued, based on then-existing law, that the Court need not resolve the expert debate at class certification. Plaintiffs pointed out the flaws in Saad's work and explained their belief that the expert debate itself demonstrated common issues appropriate for certification and trial that the

---

[1] *Stagi* also reaffirms that, contrary to Defendant's argument (at 7), aggregate statistics can establish commonality. *Id.* at *43-44. Indeed, Merrill Lynch routinely studied its entire FA workforce and their experts did the same.

Court need not decide at that juncture. Dkt. 382 at 17, 36. Plaintiffs never argued that the Court should simply conclusively resolve the expert debate without probing the basis of the expert opinions. Plaintiffs properly seek reconsideration based on new law. *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (opinion issued to resolve "uncertainty surrounding the propriety of conducting a *Daubert* analysis at the class certification stage").

**II       Plaintiffs Have Plead True Disparate Impact Claims That Should be Certified**

   **A. Defendant Relies On Outdated Case Law**

In its Opinion, the Court found that Plaintiffs' statistics were compelling and would support commonality and certification if this were a "true disparate impact" claim, which it defined as a challenge to a facially neutral policy applied in a neutral manner. In their motion to reconsider, Plaintiffs presented governing case law demonstrating the viability of their disparate impact claims, most notably the 1991 Civil Rights Act and *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988).[2] Defendant does not, and cannot, meaningfully dispute this authority.

In *Watson,* the Supreme Court resolved a circuit split and held that disparate impact theory applies to policies or practices that involve discretionary or subjective decision-making, including those involving individual decisions of individual managers. Defendant ignores *Watson* altogether, relying instead on four cases from this Circuit (at 4-5 and n.8) that predate the 1991 Civil Rights Act and *Watson* and hold that disparate impact analysis applied only to "objective employment criteria." *Griffin v. Board of Regents*, 795 F.2d 1281, 1288 n.14 (7th Cir. 1986)(noting circuit split); *De La Fuente v. Chicago Tribune Co.*, No. 84 C 4596, 1985 U.S. Dist. LEXIS 17512, *10-11 (N.D. Ill. July 25, 1985) (same); *Beard v. Whitley Cty.*, 840 F.2d 405, 407 n.1 (7th Cir. 1988); *Khan v. Grotnes Metalforming Systems, Inc.*, 679 F. Supp. 751, 761

---

[2] Plaintiffs also stated that their identification of the policies and statistical evidence alone was sufficient to establish a disparate impact claim under *Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010).

4

(N.D. Ill. 1988). These outdated cases fail to advance Defendant's argument because they reflect the wrong side of the circuit split that was eventually resolved by *Watson*.

Defendant also relies on a handful of district court decisions from the Fourth Circuit, but these cases are no longer good law in light of the Fourth Circuit's more recent opinion cited by Plaintiffs, *Brown v. Nucor Corp.*, 576 F.3d 149 (4th Cir. 2009), which vacated the denial of class certification and instructed the district court to certify a disparate impact class challenging a "promotion procedure" that allowed individual managers to make individual decisions using "subjective criteria." *Id.* at 152, 160.[3]

Apparently conceding that Plaintiffs are correct that disparate impact claims are not limited to facially neutral policies applied neutrally but extend to subjective decision-making, Merrill Lynch next argues (at 8) that only policies or practices that are *entirely* subjective can be challenged under a disparate impact theory. This argument was rejected in an opinion upon which this Court relied, *Puffer v. Allstate*, 255 F.R.D. 450, 459-460 (N.D. Ill. 2009), and other cases. *See, e.g., Smith v. Nike Retail Servs., Inc.*, 234 F.R.D. 648, 661 n.12 (N.D. Ill. 2006)(entirely subjective decision making not required); *Satchell v. FedEx Corp.*, No. C 03-02659 SI, 2005 U.S. Dist. LEXIS 37354, *17 (N.D. Cal. Sep 28, 2005) ("[a] court may certify a class where the challenged personnel policies contain both objective and subjective components"). Indeed, the Supreme Court held in *Watson* that disparate impact analysis is appropriate for employer practices that are wholly *or partially* subjective. 487 U.S. at 989-90.

---

[3] Defendant's cases suffer other flaws. *Lott v. Westinghouse Savannah River Co.*, 200 F.R.D. 539 (D.S.C. 2000), was remanded by the Fourth Circuit for reconsideration of class certification of a promotion claim with a different class representative in a case ignored by Merrill Lynch, *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 275 (4th Cir. 2005). Both *Lott* and *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452 (D. Md. 2002), relied on the pre-*Watson* case *Brooks v. Circuit City Stores, Inc.*, No. DKC 95-3296, 1996 U.S. Dist. LEXIS 9869, *12 (D. Md. June 17, 1996), for the proposition that disparate impact analysis cannot apply to subjective employment decisions. *Lott*, 200 F.R.D. at 553-54; *Medlock*, 336 F. Supp. 2d at 464 n.6 (granting summary judgment in individual case). *See also Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 541 (N.D. Ala. 2001) (relying on *Lott,* decided before *Anderson* and *Brown*).

Any other result would "allow[] employers . . . easily to insulate themselves from liability under *Griggs*," and "disparate impact analysis might effectively be abolished." *Id.* at 990. Here, Plaintiffs' disparate impact claims are actionable.[4]

### B. Saad Did Not Test Subjective Decision-Making In Policies Plaintiffs Challenge

Defendant incorrectly contends (at 7) that Saad tested subjective decision-making and found no disparate impact on African Americans, without contradiction from Plaintiffs or their experts. But Saad did not test subjective decision-making in any of the firm-wide policies and practices challenged by Plaintiffs. Moreover, Plaintiffs and their experts did, in fact, challenge Defendant's studies, which did *not* test subjectivity. Bielby Reb. at 18-20. For example, Saad claims to have studied changes in FA titles as evidence of management discretion. FA titles, however, are not discretionary but are based on objective standards expressly set forth in Defendant's annual compensation plans. *See, e.g.,* Pl. Mem. Exs. 204 at 39-40; 209 at 19-20. Saad's studies are incorrect and irrelevant.

### III. Defendant's Cases Involve Diverse Putative Classes And Not A Class Of Employees Who Hold A Single Job In A Single Business Unit Governed By Firm-Wide Policies

Plaintiffs seek certification of a class comprised of employees in a single job in a single business unit who were undisputedly subjected to the same, uniform policies and practices. The cases Defendant cites against certification bear no resemblance to the facts, claims, or procedural posture of this case.[5] By contrast, Defendant's legal authorities all involve highly diverse classes[6] consisting of multiple job classifications (*e.g.* including jobs from receptionist to

---

[4] Even *Bacon v. Honda of Am. Mfg.*, 370 F.3d 565, 570, n.4 (6th Cir. 2004), cited by Defendant, assumes the correctness of the lower court's finding of commonality on the disparate impact claims.
[5] Defendant relies on several cases in which classes *were* certified and decided on the merits. *Griffin v. Bd. of Regents*, 795 F.2d 1281 (7th Cir. 1986); *Morgan v. UPS*, 380 F.3d 459 (8th Cir. 2004); *Bishop v. Gainer*, 272 F.3d 1009 (7th Cir. 2001); *EEOC v. Joe's Stone Crab*, 220 F.3d 1263 (11th Cir. 2000).
[6] Defendant also cites individual, not class, cases. *Beard v. Whitley Cty.*, 840 F.2d 405 (7th Cir. 1988); *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452 (D. Md. 2002); *Khan v. Grotnes Metalforming Sys.*, 679 F. Supp. 751 (N.D. Ill. 1988); *Farrell v. Butler Univ.*, 421 F.3d 609 (7th Cir. 2005).

attorney, part time to full time workers, union and management) in myriad departments throughout the employer's organization. For example:

| Case Cited by Defendant | Description of Class Members |
|---|---|
| *Abram v. UPS*, 200 F.R.D. 424, 425, 432 (E.D. Wis. 2001) | all African American supervisors throughout the company, encompassing 425 different jobs |
| *Allen v. CTA*, 2000 U.S. Dist. LEXIS 11043 (N.D. Ill. July 31, 2000) | "all exempt CTA employees, with hundreds of different jobs in dozens of different departments" |
| *Bacon v. Honda*, 370 F.3d 565, 571 (6th Cir. 2004) | all hourly and salaried workers and supervisors, from welders to accountants, in over 30 departments at four plants making different products |
| *Betts v. Sundstrand*, 1999 U.S. Dist. LEXIS 9743, *10-11 (N.D. Ill. June 21, 1999) | "all job categories" including clerical and professional, hourly and salaried, from janitor to financial analyst, "throughout all of defendant's departments" |
| *Brooks v. Circuit City*, 1996 U.S. Dist. LEXIS 9869, *2-3 (D. Md. June 17, 1996) | "all African-American job applicants and all present and former African-American employees who applied for or held jobs in Circuit City's stores or as district or general managers…many different positions under dozens of different supervisors." |
| *Cooper v. Southern*, 390 F.3d 695, 703-04 (11th Cir. 2004) | exempt, non-exempt, union and non-union workers, from manual laborers to skilled professionals and managers, in 4 states with diversified operations and "widely divergent operating and management structures" and "criteria for employment decisions" |
| *De La Fuente v. Chicago Tribune*, 1985 U.S. Dist. LEXIS 17512, *1 (N.D. Ill. July 25, 1985) | "all non-white employees classified by Defendant as clerical, technical, and/or professional employees" |
| *Lott v. Westinghouse*, 200 F.R.D. 539, 552-54 (D.S.C. 2000) | past, present, and future employees in 18 separate divisions of 4 different companies and performing jobs from "nuclear operations to fire-fighting to medical services to construction to janitorial services" |
| *Puffer et al. v. Allstate*, 255 F.R.D. 450, 460 (N.D. Ill. 2009) | employees performing "hundreds of different jobs" and "entirely different functions," including HR, IT, attorney, and sales positions, "across varied business divisions and segments" |
| *Rhodes v. Cracker Barrel*, 213 F.R.D. 619, 623-25 (N.D. Ga. 2003) | multitude of jobs, including dishwasher, janitor, cook, water, host, and cashier, at 454 restaurants in 41 states |
| *Stastny v. Southern Bell*, 628 F.2d 267, 269 (4th Cir. 1980) | A "broadly defined" class comprised of all employees in dozens of dispersed facilities |
| *Wright v. Circuit City*, 201 F.R.D. 526, 541 (N.D. Ala. 2001) | African American workers "in different departments, and at different levels within the company hierarchy" |

Only one of the cases Defendant cites involves a single job, *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415 (N.D. Ill. 2003), in which an applicant class was originally certified by

7

Judge Gottschall, then decertified by Magistrate Judge Ashman. But *Ellis* did not include a disparate impact claim, and unlike this case, the class offered no statistical evidence to support and unite plaintiffs' disparate treatment hiring claims. *Id.* at 421, 426. Defendant's cases do not support a consensus that national class actions cannot be certified or that this class is unmanageable.[7] Rather, courts routinely certify similar cases, including brokerage cases in which commonality is established through statistics and firm-wide policies and practices. *See cases* at Dkt. 380, Pl. Class Mem. at 2, 43-45.

IV. **Plaintiffs' Disparate Impact and Pattern or Practice Claims Challenge Firm-Wide Policies and Practices, Rely On Common Evidence, And Are Manageable**

Throughout its Opposition, Defendant asserts that Plaintiffs' class claims are not "manageable" because they involve "individualized" decisions by individual managers. Plaintiffs challenge policies and patterns, not individual managers' decisions or deviations from Defendant's policies.[8] To accept Defendant's argument that a challenge to such practices is too individualized for class treatment would eviscerate the purpose of Rule 23. Plaintiffs' claims are well-suited for class treatment because they challenge the design, operation and impact of the policies themselves, which were created and approved by a small group of senior executives and which are centrally administered and monitored at the corporate level. As a result, a liability trial of Plaintiffs' class claims would center on common evidence regarding the policies themselves

---

[7] The non-employment cases Defendant cites also involved diverse classes. *E.g. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (persons exposed to asbestos products manufactured by 20 companies); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015-16 (7th Cir. 2002) (3 million vehicle owners in nationwide product liability class action governed by 50 states' laws); *Rodriguez v. Ford Motor Credit Co.*, No. 01 C 8526, 2002 U.S. Dist. LEXIS 7280, *6-7 (N.D. Ill. Apr. 19, 2002) (thousands of customers of 7,500 car dealerships, each having separate financing policies).

[8] Even individual decisions militate in favor of, not against, class treatment when statistics prove, as here, a pattern of consistent unfavorable treatment across a company. Plaintiffs' expert studies controlled for office location, which showed that pursuant to firm-wide policies, Defendant's managers, regardless of location or other factors, made similarly discriminatory decisions with regard to white and African American FAs. Statistics prove that these decisions were not random or motivated by non-discriminatory factors. *Stagi*, 2010 U.S. App. LEXIS 17261 at *20, 57.

8

and their adverse impact on African Americans, not individual claims or defenses.

    **A.    Plaintiffs Properly Identified Defendant's Firm-wide Teaming And Account Distribution Policies And Practices And Offered Substantial Evidence They Caused An Adverse Impact On Class Members**

        1.  <u>Plaintiffs Identified And Challenged Defendant's Teaming Practices</u>

Defendant claims (at 9) that Plaintiffs cannot mount a class-wide challenge to its teaming practices because there is no teaming policy that has a disparate impact on African Americans. Contrary to Defendant's assertions, Plaintiffs identified and presented evidence of Defendant's firm-wide, corporate policy and practice of allowing and encouraging teams of FAs and then formally recognizing and providing additional benefits to those teams. Pl. Mem. at 23-27; Exs. 166-190, policies; Ex. 55, Def. 30(b)(6) Team Dep. This is a clearly identifiable practice subject to challenge under both a disparate impact and disparate treatment theory.

Defendant's inaccurate contention that Plaintiff did not provide evidence of the disparate impact of its teaming practices is belied by Defendant's own studies, which confirm Plaintiffs' statistics and report the firm-wide exclusion of African Americans from teams and the harm caused by that exclusion. For example, the Firm's Team Consulting Group reported to senior management that, as of December 2001, only 9% of African American FAs were on teams, compared to the firm-wide average of 35%. Pl. Mem. Ex. 168 at 5; *see also* Ex. 101 at 937 (confirming teaming disparities throughout class discovery period). Consistent with Madden's results, Defendant's studies show the substantial benefits of teams to FAs, including higher production, earnings, and rates of retention. Pl. Mem. Ex. 112; Ex. 171 at 3, 21. Defendant's own internal studies concede that its "teaming model disadvantages women and minority FAs" and that African American FAs face cultural impediments to joining teams at Merrill Lynch. Pl. Mem. Ex. 93 at 175; Ex. 109 at 15-16 (challenges to teaming for African Americans include perceptions as to their competency). Title VII expressly prohibits practices such as Defendant's

9

teaming practices that segregate the workforce, as well as affecting employee compensation and other terms and conditions of employment. Title VII, Sec. 2000e-2. That such practices have disproportionately affected African Americans as a group renders those claims appropriate for class treatment.

The Plaintiffs' testimony demonstrates that class members were harmed in the same manner by Defendant's teaming practices (regardless of their success, level of production, manager, or office) by being excluded from *favorable* teams and by having to compete with white FAs who benefited from participation in such teams. All plaintiffs testified that they were excluded from *favorable* teams and harmed by that exclusion. Ex. 242, Chart A. Most testified they were denied the opportunity to join teams at all, and the few who joined teams explained that they were harmed by those teams. *Id.* Defendant's effort to differentiate the specific experiences of certain plaintiffs inaccurately describes the testimony (at 9) of Plaintiffs Gibson, Johnson, and Madrid, and misses the overall point, that all were harmed by Merrill Lynch's teaming practices. Ex. A, Madrid Dep. 52-55, 293-95; Ex. B, Johnson Dep. 222-23; Pl. Mem. Ex. 25, Gibson Dep. 150-52.[9]

Defendant next incorrectly argues (at 10) that Plaintiffs cannot show harm from Defendant's teaming practices because Saad studied teams and found that African Americans are excluded from teams not because of race, but because they have less valuable accounts than whites. Saad's study was not of teams, only pools, which are very different and can be

---

[9] For example, Madrid did not testify that she "had a very positive teaming experience with a successful Caucasian FA" (Opp. at 9), but that she was invited by the white FA to form a *pool*, not a team, in an arrangement she found degrading. Madrid Dep. 52-55, 293-95. Plaintiff Johnson testified that he did not want to team *because* Merrill Lynch's teaming practices harmed African Americans and would harm him, too. Johnson Dep. at 222-23. While Defendant acknowledges Gibson's negative teaming experience with a white FA (who openly acknowledged he did not want to team with Gibson because of his race), it ignores his testimony that despite his Yale degree and million dollar producer status, no one wanted to team with him and no manager helped him team. Gibson Dep. at 150-52.

established when FAs share a single account.[10] Moreover, Saad's pool studies rely on a variable, average size of an FA's accounts, that Madden and Merrill Lynch studies showed to be tainted. Madden found that African Americans received less valuable account transfers than whites and were excluded from pool and team participation by statistically significant margins *from the very beginning of* and throughout an FA's career. Pl. Mem. Ex. 1, Madden Rep. at 6-8, Tables 8, 16a, 16b; Ex. 229, Reb. at 35, Tables R4a-c, R5a-c, R6. Merrill Lynch's own studies, too, show that African American FAs receive less valuable accounts in account distributions. Pl. Mem. Ex. 119 at 2. Defendant and its expert ignore these studies, and the substantial evidence that even if pool (or team) participation is related to an FA's average account value, African Americans have lower account values *because of* Defendant's teaming and account distribution policies, which Plaintiffs also challenge.

2. Defendant's National Account Distribution Policy Harms African Americans

Contrary to Defendant's claim (at 11), Plaintiffs produced evidence of a centralized account distribution policy and the adverse impact of that policy. Plaintiffs challenge Merrill Lynch's national Account Distribution Policy ("ADP"), which includes: (1) a ranking scheme that uses objective factors to determine eligibility, rank FAs, and then distribute client accounts based on rank, and (2) a team provision that allows surviving team members to inherit accounts and use those accounts to garner additional points under the ranking system for other distributions.

Consistent with Plaintiffs' claims, scientific principles, and Defendant's internal studies, Plaintiffs' expert studied the overall impact of the ADP on the FA population and found significant racial disparities in its operation. Pl. Mem. Ex. 1, Madden at 5-6, 24-37; Pl. Mem.

---

[10] Madden also showed that Saad unjustifiably restricted his pool study to reduce sample size and mask disparities. Saad studies as few as 16 African American FAs in a single year, a number so low it ensures no meaningful standard deviation analysis. *Brown v. Nucor Corp.*, 576 F.3d 149, 155 n.5 (4th Cir. 2009).

Ex. 119 at 2 (Merrill Lynch study reports that African Americans disproportionately assigned low value accounts as compared to whites). Defendant suggests (at 11) that Plaintiffs should have dissected and separately studied each and every component of the ADP, but this is illogical given the policy's structure and interrelated factors. For example, Defendant awarded separate points for production quintile *and* recognition club membership, but both are determined on the same factor, production.

Moreover, contrary to Defendant's contention, Plaintiffs' expert did study the primary components of the ADP, including quintiles, production, and the impact of teams. For example, the quintile eligibility requirement disproportionately excludes African American FAs from receiving *any* accounts, and the production factor is heavily weighted in favor of whites. The adverse impact of teaming is discussed above.

Plaintiffs' expert even studied certifications, the one factor Defendant incorrectly identifies as non-discriminatory (at 10-11). Contrary to Defendant's statement, many of the certifications for which it awards points are not industry designations but internal Merrill Lynch certifications awarded on discriminatory factors, including management sponsorship or production. Madden determined it was not appropriate to control for such tainted internal certifications. Pl. Mem. Ex. 229, Madden Reb. at 15-16. Even when she took industry certifications into account, however, African American FAs received fewer transferred accounts than their white counterparts. *Id.*

Defendant's related suggestion that Plaintiffs' expert should have controlled for the very rankings they challenge is a circular argument that tests nothing and is designed to mask racial disparities in account distributions. For example, if a promotional exam allegedly discriminated against African Americans, their scores would be lower. Controlling for test score would show

12

only that people with the highest scores received the promotions, not whether the test was discriminatory. This is no different from controlling for FA rank. Because the variable is allegedly tainted, the control is not proper. *See, e.g., James v. Stockham Valves & Fittings Co.* 559 F.2d 310, 332 (5th Cir. 1977)(use of racially biased factor in statistical study is improper and may inject bias in study, insufficient to rebut inference of discrimination).

Similarly, Defendant claims (at 11) that Saad performed his own study and established that African Americans fared better under the ADP than under a nonexistent policy based solely on "production." Saad's study is wholly irrelevant. Production – or a proxy for production – is one of the driving factors in the account distribution rankings and is itself racially biased, as shown by Madden and numerous Merrill Lynch studies establishing that African Americans are over-represented in the lowest production quintiles. While using production alone might cause African Americans to do worse than a policy that uses production as one of four factors, this simply means that both the ADP and Saad's fictional policy are discriminatory.

### B. Plaintiffs' Systemic Claims Are "Manageable" And Challenge Policies and Patterns, Not Individual Managers' Decisions

A trial of Plaintiffs' disparate impact claims would focus entirely on common evidence of firm-wide policies, their impact, business justification, and whether less discriminatory alternatives exist. Manageability is not a requirement under Rule 23(b)(2), so Defendant's manageability arguments do not apply to Plaintiffs' disparate impact claims. These claims are properly certified under Rule 23(b)(2) because they are tried to the Court and not a jury and do not seek punitive or compensatory damages but only the equitable relief of back pay.[11]

Similarly, a *Teamsters* pattern and practice liability trial, which determines whether

---

[11] Defendant's argument that classes seeking back pay cannot be certified is simply wrong. *Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 322 (N.D. Ill. 2004) (certifying "classic" Rule 23(b)(2) Title VII class, and holding that back pay, front pay, and jobs are forms of equitable relief that "do not remove [the] action from the bounds of 23(b)(2)")

13

discrimination is an employer's "standard operating procedure," presents an inherent class issue typically litigated with common evidence best presented in a single proceeding.[12] *Mozee v. Am. Comm. Marine Serv. Co.*, 940 F.2d 1036, 1051-41 (7th Cir. 1991). The *Teamsters* hearing focuses on class-wide statistical, expert and other common evidence, not individual decisions, defenses or anecdotal evidence, which the Court may limit under Fed. R. Evid. 403. *Int'l B'hd of Teamsters*, 431 U.S. at 360; *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 168 (2d Cir. 2001). A *Teamsters* Phase I trial would not entail a review of the facts of each class member's claim and the employer's defenses thereto. *Robinson*, 267 F.3d at 168 (reversing denial of class certification because it "misapprehended the nature of the proof required at the liability stage" by assuming that it included proof of discrete acts of discrimination by individual managers). Such a procedure would nullify Rule 23 and the Supreme Court's teachings in *Teamsters*. A class liability trial in this case, focusing on common proof of Defendant's standard practices and their resulting impact, is far more efficient and manageable than potentially hundreds of individual suits to adjudicate the same common issues. *See Carnegie v. Household Int'l*, 376 F.3d 656, 660-61 (7th Cir. 2004); *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)("A single hearing may be all that's necessary to determine whether Allstate had a policy of forcing its employee agents to quit").

Even Plaintiffs' non-statistical class-wide evidence in support of their pattern or practice claim relies upon common evidence of Defendant's policies, conduct and corporate knowledge and not on individual stories or witnesses. This evidence includes internal Merrill Lynch studies and reports to senior management of racial disparities among FAs and management beliefs about

---

[12] Pattern-or-practice class action trials proceed in two phases: Phase I, the liability phase, to determine whether the employer engaged in a pattern or practice of discrimination; and follow-on hearings in Phase II, the remedial phase, to determine whether the employer has rebutted the presumption that each class member was harmed by the discriminatory pattern or practice. *Int'l B'hd of Teamsters v. U.S.*, 431 U.S. 324, 360-62 (1977).

African American FAs (Ex. C); national corporate marketing and business plans for minority markets, which include widely disseminated stereotypes about African American FAs and clients (Exs. D, E); and national African American focus group (Ex. F).

A recent trial of class disparate impact and disparate treatment claims demonstrates the manageability and efficiency of class actions in prosecuting the claims of class members. *See Velez v. Novartis Pharmaceuticals Corp.*, 04 Civ. 09194 (S.D.N.Y.), Trial Plan at Ex. A to Plaintiffs' Motion to Reconsider. In *Velez,* the court certified a company-wide class comprised of thousands of female sales-related employees across the United States who alleged class claims of discrimination in compensation, promotion, and pregnancy. The *Velez* court successfully held a simultaneous jury and bench trial on the class pattern and practice liability, disparate impact and punitive damages claims and heard evidence of classwide equitable relief (front and back pay) while the jury deliberated. This procedure applies well to this case, is eminently manageable, and fully preserves Defendant's Seventh Amendment rights.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for reconsideration, credit their statistical evidence, and certify their disparate impact and disparate treatment claims. Alternatively, Plaintiffs request that the Court hold a *Daubert* hearing.

Respectfully submitted on behalf of Plaintiffs,

/s/ Linda D. Friedman

Linda D. Friedman, Attorney No. 06190092
STOWELL & FRIEDMAN, LTD.
321 S. Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888

## CERTIFICATE OF SERVICE

I, Linda D. Friedman, an attorney, hereby certify that on September 15, 2010, I caused a true and correct copy of attached *Plaintiffs' Reply In Support Of Motion To Reconsider* to be served via ECF on the following counsel of record:

| | |
|---|---|
| Jeffrey S. Klein | Lori Lightfoot |
| Nicholas J. Pappas | Mayer Brown LLP |
| Salvatore Romanello | 71 S. Wacker Drive |
| Allan Dinkoff | Chicago, IL 60606 |
| Weil, Gotshal & Manges LLP | phone: (312) 782-0600 |
| 767 Fifth Avenue | fax: (312) 701-7711 |
| New York, NY 10153 | llightfoot@mayerbrown.com |
| phone: (212) 310-8000 | |
| fax: (212) 310-8007 | |
| jeffrey.klein@weil.com | |

Respectfully submitted,

By: /s/ Linda D. Friedman

Mary Stowell
Linda D. Friedman – Attorney No. 06190092
George Robot
Suzanne E. Bish
**STOWELL & FRIEDMAN, LTD.**
321 Plymouth Court, Suite 1400
Chicago, IL 60604
(312) 431-0888