**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| GEORGE MCREYNOLDS, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., <br><br> Defendant. | Case No. 05 C 6583 <br><br> Hon. Robert W. Gettleman <br> Magistrate Jeffrey T. Gilbert |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' TRIAL PLAN**

MAYER BROWN LLP
Stephen M. Shapiro
Timothy S. Bishop
Lori E. Lightfoot
71 S. Wacker Drive
Chicago, IL 60606
--and--

WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein
Nicholas J. Pappas
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153

Plaintiffs' trial plan fails to address a key obstacle to class certification – plaintiffs still have not demonstrated how they would establish at a class-wide trial that any Merrill Lynch policy "manifested itself in the 'same general fashion' as to all putative class members." Opinion ("Op.") at 8 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). Plaintiffs addressed this issue at oral argument by stating that Merrill Lynch's quintile system impacts all putative class members in the same way because FAs across the country compete with each other to be in the higher quintiles, and quintiles control account distributions. However, this is demonstrably false – FAs compete for rankings on the account distribution list only against other FAs in their office, since all distributions happen within a single office, not across offices.

Even if there were a common issue to try – which there is not – individualized issues of liability and damages remain for each putative class member under any of the trial structures proposed by plaintiffs. The law requires that causation and damages be resolved on an individual basis for each class member. The "central inquiry" in disparate treatment cases is "the intent of the employer." *EEOC v. Chi. Min. Lamp Works*, 947 F.2d 292, 298 (7th Cir. 1991). As the Court recognized (at 16), "different witnesses and proofs" would be required for "each" class member to determine "the motivation of each supervisor" who made the challenged decisions. *Accord Puffer v. Allstate Ins. Co*, 255 F.R.D. 450, 472 (N.D. Ill. 2009), *pet. for leave to appeal denied*, No. 09-8005 (7th Cir. Mar. 25, 2009). While intent is not an element of plaintiffs' disparate impact claim, causation remains a critical issue[1] and will involve similar individualized proof.

Plaintiffs dismiss these causation and damages problems in the name of convenience or Title VII's "overarching purpose of making victims of discrimination whole." But the plain

---

[1] *Farrell v. Butler Univ.*, 421 F.3d 609, 617 (7th Cir. 2005) (disparate impact plaintiff must prove that he or she "was personally injured by the defendant's alleged discriminatory practice").

language of Title VII, as well as the Rules Enabling Act and Due Process, prohibit this cavalier approach to defendant's rights. The question of how to resolve 1,000 individual claims is not solved, as plaintiffs suggest, by having a class trial and "follow on" subsequent trials. Plaintiffs' counsel here proffered a similar plan in *Puffer*, and Judge Schenkier rejected it for reasons that are just as applicable here.[2] Similarly, damages cannot be resolved on a class-wide basis. Damages can be awarded only after individual jury trials for each class member on plaintiffs' disparate treatment claims and non-jury trials on plaintiffs' disparate impact claims. Contrary to plaintiffs' suggestion (at 2), these trials (jury or non-jury) cannot be conducted by a special master.

### I. The Trial Plan Does Not Address the Need to Determine Causation and Damages for Each Class Member

Plaintiffs' trial plan rests on two incorrect propositions – that whether an individual FA was injured by an alleged national policy is irrelevant (Plan at 2, 5), and that following a pattern-or-practice finding, defendant will just consent to a common fund (Plan at 5). Wishful thinking about defendant's strategy is hardly a basis for certifying a class,[3] and the case law is clear that whether an individual was injured by the alleged national policy is the critical issue.

As a threshold matter, plaintiffs' trial plan clashes with this Court's conclusion that plaintiffs have never established any causal link between the policies at issue and any discriminatory treatment of African American FAs in hundreds of offices across the country. Aggregate statistics cannot establish commonality in multi-decision maker suits.[4] "[I]t is the

---

[2] 255 F.R.D. at 472.

[3] Merrill Lynch intends to demand an individualized resolution of every claim, since it will pay only meritorious claims, not every claim submitted by any class member.

[4] *Cooper v. S. Co.*, 390 F.3d 695, 717 (11th Cir. 2004), *overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006); *Stastny v. S. Bell Tel and Tel Co.*, 628 F.2d 267, 278-79 (4th Cir. 1980);

individual allegedly discriminatory decisions along the way, such as a white FA's decision not to team with an African-American FA that leads to the asserted disparity in compensation, not a neutral application of the mathematical formula." Op. at 11. Plaintiffs have not shown in their motion for reconsideration "a manifest error of law or fact," nor have they "present[ed] newly discovered evidence,"[5] that gives the Court a basis to change this finding. The trial plan just assumes this issue away – failing to address it at all.

To this day, plaintiffs have never addressed the Seventh Circuit's decision in *Andrews v. Chevy Chase Bank*, 545 F.3d 570 (7th Cir. 2008), even though it was relied on by the Court (Op. at 16) and cited extensively by defendant, and even though it goes to the very heart of whether a class trial is appropriate here. The Seventh Circuit reversed class certification in *Andrews*, finding that the equitable remedy of rescission would require too many individualized inquiries despite the strong common issue of whether uniform loan disclosure forms complied with the law. Class certification should be denied if it "only serves to give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies." *Id*. at 577. Other than plaintiffs' suggestion that the Court create a common fund, which as shown below is impermissible, plaintiffs have not explained why this exact scenario will not play out here. And even if a common fund were appropriate for back pay awards (which it is not), a thousand individual trials would still be necessary to resolve each plaintiffs' claim to compensatory and punitive damages.

Judge Schenkier got it right when he denied Stowell & Friedman's motion for class certification in *Puffer* on this very ground: "To prove that an individual plaintiff suffered gender

---

*Bennett v. Roberts*, No. 96 C 6917, 2000 WL 781868, at *5 (N.D. Ill. June 15, 2000); *Betts v. Sundstrand*, No. 97 C 50188, 1999 WL 436579, at *7 (N.D. Ill. June 21, 1999); *see also* Saad Rep. 5 n.7.

[5] *LB Credit Corp. v. Resolution Trust Corp.*, 49 F.3d 1263, 1267 (7th Cir. 1995).

discrimination under disparate impact or disparate treatment theories of Title VII …, an individualized inquiry into each putative plaintiff's circumstances would be necessary to determine whether employment actions taken toward a particular employee were based on gender or instead on legitimate, nondiscriminatory reasons." 255 F.R.D. at 471 (citing *Warren v. Solo Cup Co.*, 516 F.3d 627, 629-30 (7th Cir. 2008)).

The same is true here. The FA position is entrepreneurial, and a variety of personal circumstances determine an individual's level of success, regardless of discrimination. The enormous range of compensation for White FAs illustrates the point. Looking just at Whites who have been brokers for 8 years, the average compensation for 1st Quintile White FAs (the best performers) was $442,000 and the average compensation for 5th Quintile White FAs (the worst performers) was $94,000. (Saad Rep. at 33.) This is quite different from the cashier and other jobs at issue in *Wal-mart*, for example, also relied on by plaintiffs (at 3).[6] In fact, plaintiffs in *Wal-mart* argued that damages could be awarded formulaically because the records of Wal-mart accounted for all variables, including performance, and plaintiffs accepted those performance ratings as untainted by discrimination. Here, the records do not account for all the variables, because the only measure of FA performance in Merrill Lynch's records is the FA's production, which plaintiffs argue is tainted. Therefore, even under *Wal-mart*, plaintiffs approach would be improper.

If production is removed from the equation, the only way to determine what an FA's performance would have been absent discrimination is to make an individualized inquiry for each FA. The fact-finder would need to make individualized determinations as to the reason an FA did not team, for example. Was it because of discrimination, or, for example, as in the case

---

[6] *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 184-85 (N.D. Cal. 2004).

of named plaintiff Glen Capel, because FAs in his office generally do not team, and the FA Mr. Capel approached about teaming declined, not to team with a White FA but to remain on his own. Capel Dep. 286:6-8, 287:20-289:5. The fact-finder would also have to determine on an individual basis whether personal factors impacted an FA's performance, as illustrated by named plaintiff Rocky Howard deciding to care for his nephew and niece, which he conceded had a significant impact on his performance, Howard Dep. 50-52, 478-82, or named plaintiff Leroy Brown's deciding to restrict his production because he was in the middle of divorce proceedings, Brown Dep. 27:19-28:9. And the fact-finder would need to consider such factors as named plaintiffs Mark Johnson's and Cathy Bender Jackson's decisions not to obtain industry certifications, which would have improved their ranking under the account distribution policy, even though Merrill Lynch pays all the costs and they were urged by their manager to do so. Johnson Dep. 92:11-17; Bender Jackson Dep. 293. These and a host of other individualized factors, having nothing to do with discrimination by Merrill Lynch, are central to the liability inquiry. Plaintiffs' trial plan suggests no way in which they are amenable to class resolution.

Plaintiffs' other response is that the Court should simply put this question off until after the class-wide trial. (Plan at 5). But the Seventh Circuit made it clear in *Andrews* that this is inappropriate; how class members' claims will be resolved is a critical inquiry at the class certification stage, and the question cannot be deferred.[7]

---

[7] *Accord* Comments to 2003 Amendments to Rule 23(c)(1) ("A critical need is to determine how the case will be tried."); *Hohider v. United Parcel Service, Inc.*, 574 F.3d 169, 202 (3d Cir. 2009) (unanimous panel, Justice Sandra Day O'Connor sitting by designation) (citing Comments to 2003 Amendments to Rule 23, court held that the district court's "deferral of [an analysis of how the trial plan would deal with monetary relief] post class certification was an abuse of discretion.").

## II. Neither Aggregated Damages Nor Sample Trials Are Permissible in This Case

Plaintiffs argue that the Court need not worry about trying individualized damages claims because class-wide damages can be awarded instead in the form of aggregated punitive damages, a common fund for back pay, and formulaic damages, none of which plaintiffs argue would necessitate examining whether each putative class member was in fact injured. Even if plaintiffs were correct as to the amount of damages (which they are not), plaintiffs' argument misses the point that the Court must first determine causation – that each plaintiff was actually injured by the alleged discriminatory policies, which by definition will require 1,000 trials. Section 706(g)(2)(A) of Title VII, 42 U.S.C. § 2000e-5(g)(2)(A), prohibits any award of back pay to individuals who were not injured by the discriminatory conduct (either intentional discrimination or disparate impact). As the Supreme Court said in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561 (1981), "a court [is] not authorized to give [any relief] to non-victims." *Id*. at 581 (citing 110 Cong. Rec. at 7214).[8]

Plaintiffs' effort to avoid the strictures of section 706(g)(2)(A) should be rejected. Plaintiffs argue (at 2) that the "core purpose" of Title VII is to "make persons whole." But that is not a license to ignore the command of Title VII that only actual victims of discrimination are entitled to recovery. The procedural device of a class trial may not cut off the substantive rights afforded to defendants by Title VII to establish that individual class members were not victims of discrimination or, for example, to establish a mixed-motive defense, which eliminates any right

---

[8] *Accord, e.g.*, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 245 n. 10 (1989) ("Title VII does not authorize affirmative relief for individuals as to whom, the employer shows, the existence of systemic discrimination had no effect."); *East Texas Motor Freight Sys. Inc. v. Rodriquez,* 431 U.S. 395, 404 n.9 (1977) (reversing class certification: "Even assuming, *arguendo*, that the company's failure even to consider [plaintiffs'] applications was discriminatory, the company was entitled to prove at trial that the [plaintiffs] had not been injured because they were not qualified and would not have been hired in any event.").

to damages on an intentional discrimination claim. 42 U.S.C. § 2000e-5(g)(2)(B). The Rules Enabling Act and the Due Process Clause prohibit class certification that would "sacrifice[e] procedural fairness" or "abridge" the "substantive right[s]" of defendants to present individualized defenses. *Amchem Products v. Windsor*, 521 U.S. 591, 613, 615 (1997). *Accord In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002) ("Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.").

Beyond this, plaintiffs' premise that damages may be aggregated is wrong. First, plaintiffs' argument for an aggregated punitive damages award was expressly rejected by the Seventh Circuit in *Lemon v. Int'l Union*, 216 F.3d 577, 581 (7th Cir. 2000) (in a race discrimination class action under Title VII, holding that, in order to recover punitive damages, each class member "must establish that the defendant possessed a reckless indifference to the plaintiff's federal rights – a fact specific inquiry into that plaintiff's circumstances"). *Accord Allison v. Citgo Petroleum*, 151 F.3d 402, 417-18 (5th Cir. 1998).

Second, as to backpay, the Seventh Circuit has made clear that "[w]here possible, an individualized remedy should be utilized because it will best compensate the victims of discrimination without unfairly penalizing the employer." *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976). Individualized hearings are essential when "not all members of the class" were harmed by a particular policy found to be discriminatory. *Liberles v. County of Cook*, 709 F.2d 1122, 1136 (7th Cir. 1983). Conversely, class-wide remedies are appropriate only when it is "obvious" that all class members were harmed by the policy found to be discriminatory (*id.*), and the employer used "no objective standards" in awarding benefits under that policy, *Stewart*, 542 F.2d at 452. Plaintiffs' contrary citations are inapposite. They all

involve situations where an individualized method of computation is impossible[9] or the defendant did not object to the remedy.[10] Neither condition is present here.

Here, it is abundantly clear that, even if a particular policy were found to be discriminatory, not all class members would have been harmed by that policy, and even those who were harmed would have been harmed in different degrees. For example, if Merrill Lynch's teaming policy were found to be discriminatory, Mark Johnson, who testified that he has no interest in teaming, should not be entitled to an award; nor should Jennifer Madrid, who testified as to her positive teaming experience; nor should Glenn Capel, who testified that he did not get on a team not because of his race but because FAs in his office generally do not team at all.[11]

Similarly, if Merrill Lynch's account distribution policy were found to be discriminatory, individual hearings would be needed to determine whether class members would have participated in distributions had they been ranked higher under a non-discriminatory policy. Many FAs do not participate because clients acquired through the account distribution process are difficult to retain, do not fit the FA's business model, or are considered likely to leave with the departing FA. Individual hearings would also be needed to determine whether local managers would have legitimately distributed an account to another FA in order to honor a client request; tap a language skill, registration, or specialization; build on an existing relationship; or reflect FA availability. Determining class-wide damages based on some yet-to-be-identified

---

[9] *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 281 (5th Cir. 2008); *Segar v. Smith*, 738 F.2d 1249, 1290 (D.C. Cir. 1984) (approving the district court's decision to hold individualized hearings for pay grades where such hearings were "feasible").

[10] *EEOC v. O & G Spring*, 38 F.3d 872, 879 (7th Cir. 1994).

[11] Johnson Dep 221:14-20, Madrid Dep. 59:23-60:3, 70-71, Capel Dep. 286:6-8 At his deposition, plaintiffs' sociologist, Dr. Bielby, walked away from the core conclusion of his report, testifying that he had no opinion on whether a successful African American FA would have a harder time getting on a team than a successful White FA. Bielby Dep. 134:25-135:23.

formula would unfairly punish Merrill Lynch while inappropriately providing a windfall to some FAs and under compensating others.

Third, plaintiffs do not suggest that compensatory damages can be awarded on a class-wide basis. With good reason: the Seventh Circuit has held that, to recover compensatory damages, "each class member" must show that the policy found to be discriminatory "caused … personal injury" as well as "the magnitude of injury to determine compensatory damages." *Lemon*, 216 F.3d at 581. Instead, plaintiffs suggest (at 6) so-called "sample trials" to determine compensatory damages. Plaintiffs cite *Biondo v. City of Chicago*, 382 F.3d 680 (7th Cir. 2004), as endorsing this approach, but it is clearly distinguishable. *Biondo* involved claims brought as a result of single, standardized test; it was not a class action; and the damages trials were conducted for groups of plaintiffs. They did not serve as "sample trials" that enabled the court to avoid holding trials as to each plaintiff's claims. Br. and App. of Defendant-Appellant, the City of Chicago, 2002 WL 32305244, at *5-6. Significantly, the *Biondo* litigation has gone on for twenty years, with no end in sight. 382 F.3d at 692. That is hardly a road map litigants or the Court should be anxious to follow.

At the end of the day, the individual claims of each class member must be individually adjudicated both to protect Merrill Lynch's rights and to ensure that each class member is afforded the relief to which he or she is entitled, rather than some "average."

### III. Plaintiffs Misrepresent Seventh Circuit Precedent

Plaintiffs' reliance (at 2 & 5) on *In re Allstate Ins. Co.*, 400 F.3d 505 (7th Cir. 2005), is completely misplaced. First, *Allstate* makes it clear that certification under Rule 23(b)(2) is improper here because damages (including back pay) are not incidental. *Id*. at 507. Second, *Allstate* requires district courts to hold individual hearings after any class-wide liability determination on common issues to determine who is "entitled to relief." *Id*. at 508. Finally,

*Allstate* concluded that "hybrid" certification is appropriate only where it leads to "more efficient" litigation. *Id*. That is not the case here because (a) as this Court correctly found, plaintiffs really complain about the operation of policies at the local level, not the terms of the policies themselves (Op. at 11); and (b) in any event, a class wide trial would necessarily "give rise to hundreds or thousands of individual proceedings requiring individually tailored remedies," *Andrews*, 545 F.3d at 577. In these circumstances, the Seventh Circuit has determined that it is "hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims." *Id*.

Judge Schenkier in *Puffer* rejected the same trial plan plaintiffs propose here (by the same attorneys), that one jury resolve the pattern-or-practice allegations of discrimination and "follow on juries" resolve causation and damages. He explained that a class proceeding requiring countless "follow on" jury trials "to determine whether each putative class member suffered discrimination and, if so, their individual damages, offers little in the way of efficiency." *Puffer*, 255 F.R.D. at 472.[12]

Plaintiffs' reliance (Plan at 5) on *Carnegie v. Household Int'l, Inc*., 376 F.3d 656 (7th Cir. 2004), is also misplaced. There, judicial estoppel barred the defendants from contesting the Rule 23 requirements save manageability because they previously had successfully "urged the district court to accept the giant class as appropriate for a global settlement." *Id*. at 659-60. As significantly, each class member's maximum damages was $30. Class actions are particularly suited for such "negative value" claims, where the cost of litigation far exceeds any recovery. "[O]nly a lunatic or a fanatic sues for $30." *Id*. at 661. Conversely, in *Andrews*, the Seventh

---

[12] For the reasons given by Judge Schenkier in *Puffer*, 255 F.R.D. at 472, and at page 63 of Defendant's Opposition to Plaintiffs' Motion for Class Certification, any bifurcated trials would run afoul of the Seventh Amendment reexamination clause if one jury must determine pattern-or-practice at the class trial with separate juries resolving individual causation and damages questions for individual class members.

Circuit found that class certification was inappropriate because the $50,000 each putative class member could recover if successful in his or her individual action was an adequate incentive for putative class members to bring suit, particularly in light of TILA's fee-shifting provisions for successful plaintiffs. 545 F.3d at 577-78. Far more than $50,000 is at stake for the highly-compensated putative class members here, and under Title VII and Section 1981 attorneys' fees are available to a prevailing plaintiff. *Accord Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) ("[I]f a class member has a large enough stake to be able to litigate on his own, the case for class-action treatment is weakened."). This makes perfectly good sense in light of the Supreme Court's admonition that the "class-action device was designed as 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Op. at 3 (quoting *Falcon*, 457 U.S. at 155).

### IV. Second Circuit Precedent in *Robinson* and *Novartis* Is Inconsistent with Governing Seventh Circuit Decisions

Plaintiffs argue (Plan at 5) that the trial plan in *Velez v. Novartis* provides a road map for this case. However, the plan utilized in *Novartis* is completely inappropriate under controlling Seventh Circuit case law, and cannot serve as a template here. *Novartis* – and much of plaintiffs' trial plan (at 3, 4, 6) – rests on the Second Circuit's decision in *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001), which not only predates the Second Circuit's decision in *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006), and involved a class of far more limited scope, but also is flatly inconsistent with the jurisprudence of this Circuit.

Class certification in *Robinson* and *Novartis* was premised entirely on escaping the requirements of Rule 23(b)(3) by certifying the case under (b)(2) instead. One of the ways the Second Circuit was able to do this in *Robinson* was to hold that non-incidental damages can be

awarded in a Rule (b)(2) case, and plaintiffs urge this Court to follow that precedent. But the Seventh Circuit specifically rejected that approach in *Lemon* and *Allstate*, adopting instead a bright-line rule that (b)(2) is appropriate only when the damages are "incidental," meaning capable of mechanical calculation without taking into account individual circumstances. 216 F.3d at 581; 400 F.3d at 507-08. As demonstrated above and at length in defendant's earlier filings, damages here are not mechanical; rather, each class member's individual circumstances will determine any damages.

Plaintiffs rely (Plan at 4) on *Allen v. Int'l Truck*, 358 F.3d 469 (7th Cir. 2004), for the proposition that this case can be certified under (b)(2), but the dicta in *Allen* suggesting that opt-out rights could be given to absent class members of a (b)(2) class predate the Seventh Circuit's clear statement in *Allstate* that this is not permissible, resolving previous ambiguity under Seventh Circuit precedents. *Allstate*, 400 F.3d at 508. And *Allen* is plainly distinguishable in that it involved 350 class members alleging rank discrimination at *a single facility*, not 1,000 class members spread out in hundreds of offices across the country. 358 F.3d at 470. [13]

The second premise of *Robinson* is that individual liability issues are irrelevant in deciding whether to certify a class, which was the approach taken in *Novartis* and urged by plaintiffs here. But that is inconsistent with the Seventh Circuit's later decision in *Andrews*, and with district court decisions in the Seventh Circuit addressing commonality and predominance in discrimination cases. Judge Schenkier's and Judge Kocoras' decisions denying class

---

[13] That also distinguishes the other circuit court cases relied on by plaintiffs, such as *Biondo*, 382 F.3d 680 (non-class action; firefighters in the City of Chicago who challenged use of test scores; case went on for 2 decades); *Thiessen v. Gen. Elec. Corp.*, 267 F.3d 1095 (10th Cir. 2001) (23 plaintiffs in an opt-in ADEA case); *Boykin v. Georgia-Pacific Corp.*, 706 F.2d 1384 (5th Cir. 1982) (rank discrimination dating to the early 1970s at a single saw-mill plant in Gross, Mississippi).

certification of discrimination claims – in cases brought by Stowell & Friedman based on the same arguments advanced here – are but two examples.[14]

## V. The Court Cannot Refer Individual Hearings on Liability to a Special Master

Plaintiffs incorrectly suggest (at 2) that the Court may appoint a special master pursuant to Rule 53(a) of the Federal Rules of Civil Procedure to resolve causation and damages issues for 1,000 absent class members, at least as it relates to back pay. Such an appointment would neither be appropriate nor constitutional here. Rule 53(a)(1)(B) provides that a special master may be appointed to "hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by (i) some exceptional condition; or (ii) the need to perform an accounting or resolve a difficult computation of damages." Neither requirement is satisfied here.

Even aside from the rule itself, a referral to decide causation and damages would be unconstitutional. "[I]t is axiomatic that the 'judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III.'" *Stauble v. Warrob, Inc.*, 977 F.2d 690, 693 (1st Cir. 1992) (quoting *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59 (1982)). While Article III may not require that a district judge find every fact and determine every issue of law "on collateral issues," referring "meat-and-potatoes issues of liability" violates Article III, and constitutes an "abdication of the judicial function." *Id.* at 695.

In this case, a so-called Phase I *Teamsters* trial would not resolve defendants' liability as to any particular class member; therefore, the appointment of a special master to make both liability and damages determinations for each class member would be an "abdication" of "the essential

---

[14] *Puffer*, 255 F.R.D. 450, and *Remien v. EMC Corp.*, No. 04 C 3727, 2008 WL 4067324 (N.D. Ill. Aug. 28, 2008), *pet. for leave to appeal denied*, No. 08-8028 (7th Cir. Oct. 10, 2008); *see also Patterson v. GM Corp.*, 631 F.2d 476, 481 (7th Cir. 1980).

judicial function," the exact type of appointment that *Stauble* condemns. *Id.*; *see also Cadwell Indus., Inc. v. New York Hosp.-Cornell Med. Ctr.*, No. 88 Civ. 7307, 1993 WL 60604, at *2 (S.D.N.Y. Feb. 26, 1993) (denying motion to appoint a special master to make damage determinations because, even if the issues involved were complicated, the appointment would vest decision-making power in someone other than the trier of fact on issues potentially dispositive of the case).

Turning to the requirements of Rule 53, plaintiffs make no attempt to explain how this case satisfies the rule's "exceptional condition" requirement. Plaintiffs may point to the large number of individual hearings the Court would have to conduct, but the Supreme Court has held that neither the congestion of a court's docket, nor the length of time a trial would require, nor the complexity of the issues warrant a finding of exceptional conditions under Rule 53. *La Buy v. Howes Leather Co.*, 352 U.S. 249, 258-59 (1957); s*ee also*, *Borom v. Town of Merrillville*, No. 2:07 C 98, 2008 WL 155018, at *3 (N.D. Ind. Jan. 15, 2008) (explaining that ordinary trial burdens do not constitute exceptional circumstances). Litigants in complex cases, like Merrill Lynch and absent class members here, are no less entitled to trial before a court than their counterparts in more mundane disputes. *La Buy*, 352 U.S. at 259.

### VI. The Court Cannot Hold a Bench Trial on a Disparate Impact Claim Before a Jury Resolves Liability Issues, Nor are Back Pay and Front Pay Equitable

Plaintiffs suggest (Plan at 1, 2) that their disparate impact claim is equitable. That is true to the extent the only relief sought is an injunction and declaratory judgment. However, plaintiffs also seek back and front pay in this non-jury proceeding. This is impermissible for two reasons. First, back pay and front pay are not equitable relief, as the Supreme Court indicated in *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 218 n.4 (2002). But even if they were, there is a constitutional barrier to litigating this case without a jury on the so-called equitable claims.

There is no question that under *Beacon Theatres* and *Dairy Queen*,[15] legal issues must be tried to a jury before equitable issues are resolved by a court to preserve a party's right to a jury trial. If this Court finds for plaintiffs under the scenario plaintiffs have suggested, they clearly intend to use that finding to support their individual actions for compensatory and punitive damages. Therefore, Merrill Lynch's right to a jury trial would be violated, which is one more reason why plaintiffs' trial plan is unworkable.

### VII. There Are No Common Issues to be Tried

At oral argument, plaintiffs' counsel sought to create a common issue by arguing that Merrill Lynch maintains a national quintile system and that FAs from various offices compete with each other to be in the First Quintile and thus for account distribution rankings. Plaintiffs told the Court that where an FA stood relative to peers around the country mattered for purposes of the Account Distribution Policy. (Tr. 7, Oct. 18, 2010.) This is demonstrably false.

First, quintiles are not an independent variable; they merely reflect production. Beyond this, an FA in Toledo is not competing with an FA in Miami for accounts. In fact an FA in the Merrill Lynch Chicago West Wacker office is not competing with an FA in the Merrill Lynch Oak Brook office for account distributions. There is no dispute that accounts are distributed under the Account Distribution Policy ("ADP") only *within individual offices* and FAs compete to be ranked on the ADP ranking list only against other FAs in their office. Sieg Aff. ¶¶ 104, 106; Flippin Aff. ¶ 4, Packard Aff. ¶ 6, Blanche ¶ 3, Gaynor Aff. ¶ 3, Bender Jackson Dep. at 241. In some offices, a Third Quintile FA may be the biggest producer, and enjoys whatever perquisites may come with that rank. *See* MLE 00040 – 001445**.** This confirms that there is no common issue to try, and that this Court was correct when it denied the motion for class certification.

---

[15] *Dairy Queen, Inc. v. Wood*, 369 U.S. 469 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959).

Dated: November 23, 2010						By: _/s/ Lori E. Lightfoot__

MAYER BROWN LLP
Stephen M. Shapiro
Timothy S. Bishop
Lori E. Lightfoot

71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600 (Phone)
(312) 701-7711 (Facsimile)

--and--

WEIL, GOTSHAL & MANGES LLP
Jeffrey S. Klein
Nicholas J. Pappas
Allan Dinkoff
767 Fifth Avenue
New York, NY 10153
(212) 310-8000 (Phone)
(212) 310-8007 (Facsimile)

**CERTIFICATE OF SERVICE**

    The undersigned, an attorney, hereby certifies that on November 23, 2010, he caused a copy of the foregoing DEFENDANT'S RESPONSE TO PLAINTIFFS' TRIAL PLAN, and CERTIFICATE OF SERVICE to be served by ECF to each attorney having an email address on file with the Court and by messenger for November 23, 2010 delivery to:

    Linda Friedman
    Stowell & Friedman
    321 S. Plymouth Court, 14th Floor
    Chicago, IL 60604

November 23, 2010                                  By: /s/ James V. Hart_____