# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE MCREYNOLDS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 05 C 6583 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Jeffrey T. Gilbert |
| MERRILL LYNCH, PIERCE, FENNER | ) | |
| & SMITH, INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFFS' AMENDED POST-*WALMART*
## MOTION FOR CLASS CERTIFICATION

The Court granted Plaintiffs' Motion to Stay the class determination.  Given the amount of time and energy the Court and parties invested in class certification briefing, Plaintiffs understood that the Court agreed that it was appropriate and fair to review the Supreme Court's pending decision in *Wal-mart Stores, Inc. v. Dukes*, No. 10-277, 131 S.Ct. 2541, 180 L.Ed.2d 374, 2011 WL 2437013 (2011)("*Dukes*"), as part of the class certification process.  Plaintiffs appreciate the Court's willingness to allow them an opportunity to present this motion.[1]

1.   The Supreme Court's decision in *Dukes* did not end civil rights class action lawsuits. To the contrary, the Court reaffirmed the seminal Supreme Court decisions of *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988), and *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977), and reaffirmed that Title VII claims can be prosecuted as class actions under disparate impact and pattern or practice disparate treatment theories where, as here, plaintiff

---

[1] Plaintiffs persist in their position that certification is also proper on their disparate treatment class claims. However, Plaintiffs acknowledge both the Court's stated concerns over "follow on jury trials" and that the disparate treatment jury trial with its intent proof requirement is not as simple as the disparate impact class claim.  They also acknowledge the Court's denial of their motion for reconsideration.  Thus, this motion addresses only certification of the disparate impact claims.

employees challenge clear, uniform employment policies and practices, and a class action can resolve common issues related to those challenges.

2.   As the Supreme Court explained in *Dukes*, class treatment is appropriate and claims can productively be litigated at once if a "common contention … is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 2011 WL 2437013 at *7. Thus, the key inquiry is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

3.   The Supreme Court's analysis of the key issue for certification supports Plaintiffs' certification bid.  Whether brought on an individual or class basis, Plaintiffs' disparate impact claims all target "facially neutral employment practices that have significant adverse effects on protected groups." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986-87 (1988). The focus of any disparate impact trial is on the policy and its impact and business necessity, not individual actions by individual employees or supervisors. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) ("Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation.") A disparate impact claim "'is established' if an employer 'uses' an 'employment practice' that causes a 'disparate impact.'" *Lewis v. City of Chicago*, 130 S. Ct. 2191 (2010).  "Unless and until the defendant pleads and proves a business necessity defense, the plaintiff wins simply by showing the stated elements." *Id.*

4.   Thus, every class member's disparate impact claim is dependent upon *answers* to the *same* questions of whether (1) the policies at issue have an adverse impact (2) that is not justified by business necessity and (3) for which no less discriminatory alternative exists.  Class treatment of Plaintiffs' disparate impact claims challenging discrete Merrill Lynch policies therefore meets the *Dukes* standard by resolving factual and legal issues "central to the validity of each one of the

2

claims [of all class members] in one stroke" – *i.e.,* in one liability trial of the policies at issue. *Dukes,* at *1, 7. During this bench trial, the facially neutral, firm-wide policies Plaintiffs challenge would be established and described by Merrill Lynch corporate reports, policy documents and corporate representative testimony; the impact of these corporate policies would be adjudicated based on the testimony of each side's statistical and industry experts and consideration of Merrill Lynch corporate admissions (in the form of testimony and internal reports and studies); and whether the policies were justified by business necessity and the existence of less discriminatory alternatives would be the subject of testimony by Merrill Lynch executives and industry experts, among others. Answers to these questions would be efficiently decided in a single trial and would largely resolve the litigation, leaving only issues of individual class member relief, which could be efficiently administered with the assistance of a Special Master.

5. In conducting a trial of these policy-based claims, this Court would also decide fundamentally important legal questions common to all class members, including whether it is lawful for a corporation to allocate valuable resources and income generating opportunities under cumulative advantage policies that punish and adversely impact African American Financial Advisors on account of race. Alternatively, does an employer have a legal responsibility under Title VII to minimize the use of cumulative advantage policies when that employer claims that white employees have a race-based market advantage based on customer preference and bias if, as a result of that advantage, those policies necessarily have a racial disparate impact?

6. Absent certification of Plaintiffs' disparate impact claims, hundreds of different courts will have to hear the same common evidence to answer the same factual and legal issues "central to the validity of each one of the claims" of every class member, wasting judicial resources and likely resulting in inconsistent decisions. *Dukes,* at *1, 7. Of equal importance, Plaintiffs will not be able to achieve their primary objective in bringing this lawsuit: meaningful injunctive reform

to end the rampant race discrimination at Merrill Lynch and to provide equal employment opportunities for its employees, regardless of race. As Plaintiffs previously explained to the Court, the cost of presenting expert testimony on the disparate impact claims already exceeds $10,000,000. Individual plaintiffs and class members cannot reasonably bear the expenses necessary to repeatedly prosecute these systemic claims.

Class Definition and Class Claims

7. Consistent with the holding and guidance of *Dukes*, Plaintiffs move to certify a class of approximately 700 individuals employed as Financial Advisors ("FAs") in the Global Private Client business unit of Merrill Lynch since 2001 under Rule 23(b)(2) for liability and equitable issues, or 23(c)(4) for specific issues, and Rule 23(b)(3) for individual remedial relief, or under Rule 23(b)(3) for both.

8. Plaintiffs identify and challenge under the disparate impact theory of Title VII two uniform, mandatory, written policies and practices designed, approved and monitored at the corporate level by senior Merrill Lynch executives, the Firm's: (1) National Account Distribution Policy ("NADP"), and (2) Teaming Policies and Practices.

9. Plaintiffs allege and offer substantial evidence that these firm-wide policies and practices have a disparate impact on African Americans in their compensation and terms and conditions of employment and segregate the Merrill Lynch workforce in violation of Title VII, 42 U.S.C. Sec. 2000e *et seq*. Title VII expressly prohibits practices that operate to segregate the workforce, as well as those that affect an employee's compensation and other terms and conditions of employment. Title VII, Sec. 2000e-2 (unlawful employment practice for an employer to "limit, segregate, or classify his employees … in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin").

10. Although *Dukes* focused on a pattern or practice disparate treatment case, the Supreme Court reaffirmed in that case that Title VII can be violated by employment practices, such as those raised here, that rely on "criteria that result in disparate impact, and by the use of these practices on the part of many different superiors in a single company." *Dukes*, at *7. Thus, Plaintiffs' disparate impact claims are actionable and certifiable under the most recent Supreme Court precedent.

Challenged Employment Practices And Evidence Of Adverse Impact

11. Plaintiffs challenge Merrill Lynch's teaming practices, which are promulgated and monitored by a centralized corporate department and which disadvantage African American FAs. *See* Dkt. 262, Pl. Mem. at 23-27; Written Policies and Related Documents at Dkt. Nos. 366-4 to 363-8, 353-1 to 353-14, 362-2 to 363-7 (Exs. 166-190); Def. 30(b)(6) Team Dep. at Dkt. No. 356-21 (Ex. 55).

12. Plaintiffs challenge three aspects of Merrill Lynch's account distribution policy: (1) its ranking factors and system under which most accounts are distributed, and (2) the provision allowing team members to inherit client accounts without regard to the ranking system and (3) the policy of allowing FA to FA transfers of client accounts, which disadvantaged African Americans and existed until this lawsuit was filed. *See, e.g.*, Policies at Dkt. Nos. 353-15 to 353-19 (Exs. 197-201). These criteria and provisions disadvantage African Americans by statistically significant margins.

13. Unlike most class actions, much of the evidence is undisputed in this case. Defendant concedes that it has uniform, company-wide teaming and account distribution policies and practices that are mandatory and apply to every class member. Defendant also has admitted the disparate impact of these policies, including that African American FAs are disproportionately

5

excluded from teams and are harmed by such exclusion,[2] and receive fewer and less valuable client accounts under the ADP than white FAs.[3]

14. In addition to Defendant's corporate admissions, Plaintiffs offered substantial expert statistical evidence of an adverse impact of the challenged policies, which this Court has already accepted. Am. Op. at 8-10. This statistical evidence includes the following conclusions:

- From 2001 to 2006, Merrill Lynch paid African Americans 33 to 42% less in annual compensation than it paid whites, resulting in between 6.57 and 9.07 standard deviations. Dkt. 343-2 (Ex. 1) at 4.

- African American FAs and FA Trainees received accounts with 3.84 standard deviations lower in total asset value and 4.76 standard deviations lower in production history than those distributed to whites between 2001 and 2006. Dkt. 364-5 (Ex. 229) at 42, Table R4a.

- African American FA Trainees received accounts with lower asset values beginning *in the first month* of the training program and continuing for 25 of the 27 months thereafter, with statistical significance at 5.20. Dkt. 364-5 (Ex. 229) at 18, Table R5a.

- African American FAs and FA Trainees were excluded from teams and pools by statistically significant margins from 3.63 to 5.89 from 2001 to 2006. Dkt. 343-2 (Ex. 1) at 37-38, Table 9.

- Between 15% and 28% of the large racial compensation disparities were related to teaming and pooling policies and practices at Merrill Lynch. Ex. 1 at 6, 14-19, 23. Racial differences in teaming and pooling directly decrease African American FAs' relative ability to compile assets and production. *Id.* at 7, 38.

- African Americans were 34% more likely to terminate before completing the FA training program, a difference of 4.49 standard deviations. *Id.* at 7.

---

[2] A wealth of Merrill Lynch's own internal studies admit the firm-wide exclusion of African Americans from teams and the harm caused by that exclusion. The Team Consulting Group reported to senior management that, as of December 2001, only 9% of African American FAs were on teams, compared to the firm-wide average of 35%. Dkt. 363-5 at 6. Similar Merrill Lynch studies confirm racial teaming disparities throughout the class discovery period. *See, e.g.,* Ex. 101 at 523. Consistent with the expert studies, Defendant's own studies show the substantial benefits of teams to FAs, including higher production, earnings, and rates of retention. Ex. 112; Dkt. 353-1 at 4, 22; Dkt. 361-7. Firm studies also concede that its "teaming model disadvantages women and minority FAs" to their detriment and that AAFAs face cultural impediments to joining teams at Merrill Lynch. Dkt. 347-1 at 175; Dkt. 357-9 at 16-17 (challenges to teaming for African Americans include the "perception (or misperception) as to the competency of the AAFA").

[3] For example, Defendant's studies show that it distributes a disproportionately high number of low value accounts (under $100,000) to AAFAs in account distributions. Ex. 119, MLE 190-1073.

- Racial difference in participation in pools and teams is associated with about one-half of the greater attrition rates of African American FAs. *Id.* at 7.

Therefore, Plaintiffs have made the evidentiary showing necessary for certification and trial of their disparate impact claims. Moreover, Merrill Lynch has conceded that the reasons for the disparities are race-based. When asked to explain the racial differences in employment outcomes for African Americans, Merrill Lynch's Chief Executive Officer and other senior executives testified that they were due to racial bias among clients and racial marketplace advantages enjoyed by white FAs. Dkt. 366-8 (Ex. 42) at 152, 130-31; Dkt. 366-9 (Ex. 43) at 265-70; Dkt. 366-11 (Ex. 45) at 127-30. Nevertheless, Merrill Lynch continued to develop and maintain company policies that compounded the effects of customer racial bias, rewarding white employees and denying African American employees compensation and an integrated workforce.

The Proposed Class Meets All Rule 23(a) Requirements

15. As this Court previously held, the proposed class of approximately 700 FAs meets Rule 23(a)(1) numerosity. Am. Op. at 5. In addition, the named Plaintiffs and their counsel have zealously prosecuted the class claims and adequately represented the putative class, and no conflict exists that would prevent their adequate representation of the class, meeting Rule 23(a)(4).

16. Plaintiffs' proposed class meets Rule 23(a) commonality and typicality, and the guidelines set forth in *Dukes* regarding these factors.[4] The Supreme Court's rejection of commonality of the *Dukes* class was largely based on the lack of a uniform, concrete corporate policy. The Supreme Court held that Walmart's granting of unfettered, decentralized discretion to its managers to make pay and promotion decisions "is just the opposite of a uniform

---

[4] While the Supreme Court did not address typicality specifically, it noted that commonality and typicality inquiries are similar and tend to merge. *Dukes*, at *7, n. 5. Plaintiffs meet typicality for the same reasons they meet commonality.

employment practice that would provide the commonality needed for a class action; it is a policy against having uniform employment practices." *Dukes*, at *9. Thus, the Court made clear that uniform employment policies or practices, such as those challenged by Plaintiffs in this case, can establish the commonality necessary for a class action.

17. Here, Plaintiffs seek certification of the precise type of uniform employment practices envisioned by the Supreme Court in *Dukes* as appropriate for class certification. Plaintiffs challenge two centralized uniform, written, mandatory policies that are centrally developed and approved by senior corporate executives. These policies apply to every class member and must be followed by every Merrill Lynch manager in every branch office.

18. Upon certification, this Court's answers in a classwide trial to the common questions listed below would rely on common (not individual) proof, and would necessarily generate "common answers apt to drive the resolution of the litigation" (*id.* at *7):

<u>Common Factual Questions Raised and Answers Sought</u>

- What are the terms of the facially neutral National Account Distribution Policy and Teaming Policies and Practices?
- Does the NADP have an adverse impact on African Americans?
- Do Merrill Lynch's Teaming Policies and Practices have an adverse impact on African Americans?
- Are Merrill Lynch's NADP and teaming policies and practices justified by business necessity?
- If so, are there less discriminatory alternatives to the NADP and teaming policies and practices that would achieve the same business goals?

<u>Common Legal Questions Raised And Answers Sought</u>

- Is it lawful for an employer to permit employees to "team" and recognize and bestow benefits and resources on those teams when the result of this employment practice is a racially segregated workforce and lower compensation for African Americans?
- Is it lawful for an employer to maintain employment policies to distribute valuable client accounts and resources based on criteria the employer concedes differ by race, and those racial differences are the product of racial marketplace advantages, and racial bias among clients and potential clients?

- Is it lawful for an employer to implement policies and practices that award lucrative client accounts and other valuable benefits and resources based upon criteria that disadvantage African Americans?

- Whether an employer's unsubstantiated defense that its employees would quit if the employer changed its policy to integrate teams can constitute a reasonable business necessity as a matter of law?

19. Accordingly and under governing law, liability on Plaintiffs' disparate impact claims can be efficiently tried in a manner that honors the rights of both the employer and class members, and that has the capacity for meaningful and long overdue reform.

Certification Is Appropriate Under Rule 23(b)(2) and Rule 23(b)(3)

20. Plaintiffs' proposed disparate impact class can be certified for liability and equitable issues under Rule 23(b)(2) and/or Rule 23(c)(4) because Merrill Lynch "has acted or refused to act on grounds generally applicable to the class," making injunctive or declaratory relief "appropriate … with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court has held, "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of Rule 23(b)(2) classes. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Disparate impact claims do not require a jury trial, so raise no Seventh Amendment concerns. Disparate impact claims are properly certified under Rule 23(b)(2) and/or Rule 23(c)(4) because they challenge firm-wide policies rather than individual acts of discrimination and seek injunctive and equitable relief rather than compensatory or punitive damages. *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 896 (7th Cir. 1999); *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1128 (7th Cir. 1987); *Dean v. Int'l Truck & Engine Corp.*, 220 F.R.D. 319, 322 (N.D. Ill. 2004) (actions "challenging the discriminatory practices of employers remain classic examples of Rule 23(b)(2) cases"); 42 U.S.C. § 2000e-5(g)(1); 42 U.S.C. § 1981a(a)(1).

21. If the Court found in favor of Defendant after a trial, no further proceedings would be warranted. If the Court found in favor of Plaintiffs, it would order injunctive relief to

immediately remedy the systemic discrimination. The Seventh Circuit has extolled the benefits of even partial class certification where, as here, injunctive relief is at issue and explained the problems such relief presents in individual discrimination cases. *Allen*, 358 F.3d at 471. As the Court explained:

> handling equitable issues on a class-wide basis would solve a problem sure to bedevil individual proceedings: How is it feasible to draft and enforce an injunction that will bear on these 27 plaintiffs alone, and *not* on the other 323 black employees? Unless it is possible to prepare such relief-and we do not see how it could be, or why a court should try-then the equitable aspects of the litigation are class-wide whether the judge certifies a class action or not. (The need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about.) Formal certification has ... benefits over the informal approach: first, class certification obliges counsel (and the representative plaintiffs) to proceed as fiduciaries for all 350 employees, rather than try to maximize the outcome for these 27 at the potential expense of the other 323..." *Id.*

22. Upon a liability finding, the Court would then provide for a mechanism to resolve individual relief for class members. The Supreme Court in *Dukes* held that individualized claims for monetary relief may no longer be certified under Rule 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief." *Dukes*, at *12. Such individual relief issues are present in every class action, however, and do not preclude certification under Rule 23(b)(3).

23. Consistent with *Dukes*, Plaintiffs' claims for individual relief, as well as liability, are properly certified under Rule 23(b)(3). Predominance is plainly met as resolving the common legal and factual questions of whether Merrill Lynch's employment policies had a disparate impact on African American FAs is *the* dominant issue in this case and plainly predominates over questions affecting only individual class members.[5] Fed.R.Civ.P. 23(b)(3). "In determining

---

[5] Common questions predominate because there is "an essential common factual link between all class members and [Merrill Lynch] for which the law provides a remedy," *i.e.* whether Merrill Lynch's policies had a disparate impact on class members. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 284 (N.D. Ill. 2005). "Liability in this case is predicated on the same legal theory and the same alleged misconduct by [Merrill Lynch] toward the class members." *Kremnitzer et al. v. Cabrera & Rephen, P.C.*, 202 F.R.D. 239, 242 (N.D. Ill. 2001)(granting certification under Rule 23(b)(3)). Indeed, certification here is "particularly appropriate [because] a common factual issue [liability] acts as a

whether common issues will predominate overall, district courts are required to consider *all* factual or legal issues, including those conceded by the party opposing class certification or resolved earlier in the litigation." *United States v. New York*, No. 07-CV-2067, 2011 WL 2680474, *5 (E.D.N.Y. July 8, 2011)("*NYC Firefighters*")(citations omitted). In addition, and for the reasons discussed elsewhere, under Seventh Circuit law, a class action is a superior method to fairly and efficiently resolve Plaintiffs' claims because of the policy interests underlying Title VII and principles of judicial economy. *See Allen*, 358 F.3d at 471-72.

24. Each of the non-exclusive factors set forth in Rule 23(b)(3) also weigh in favor of certification.[6] First, there is no need for individuals to pursue separate actions here, because the underlying claims rely on the same proof. Moreover, the financial burden of proving the disparate impact of Merrill Lynch's policies would make the prosecution of individual actions very difficult for most class members, given the substantial burdens and costs involved in data and expert discovery, which here well exceed $10,000,000. Many potential plaintiffs are also deterred by the practical risks entailed in suing their employer. *Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D.Ill. 1999) (a "class action will permit adjudication of possibly meritorious claims which otherwise might not be brought on behalf of women who are unable or unwilling to sue their employer, a risky and frightening business even for a brave employee").

25. Second, Plaintiffs are not aware of any related class action or disparate impact race discrimination litigation pending against Merrill Lynch. Third, it would be desirable to

---

predicate to recovery by any class member" on Plaintiffs' claims. *Owner-Operator Indep. Drivers Assoc., Inc.*, 231 F.R.D. at 285 (*citing In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)(predominance satisfied where a common threshold factual issue will determine ability of class members to recover).

[6] These factors are: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.

consolidate actions in one forum. Class members are dispersed across the country and allege they were subjected to the same Firm-wide discriminatory policies and practices. Holding at least a single liability trial before this Court – a Court familiar with the applicable facts and law – would prevent numerous courts across the country from hearing the same evidence regarding the geographically separated class members' claims in multiple proceedings and prevent inconsistent judgments. *See Bell et al. v. Woodward Governor Co.*, No. 03 C 50190, 2005 U.S. Dist. LEXIS 60 (N.D. Ill. Jan. 3, 2005), at *10-11; *Warnell*, 189 F.R.D. at 388. Fourth, as explained herein, this case presents no impediments to manageability, which must be considered against the alternative of multiple suits across the country.[7]

26. Following *Dukes*, Plaintiffs therefore acknowledge that individual proceedings will be necessary to determine individualized class member relief. Plaintiffs recommend that the Court appoint a Special Master to conduct follow-on proceedings for individual relief issues, a longstanding proper approach for disparate impact clams that does not require a jury. As a New York court recently held after issuance of the *Dukes* decision, "a special master is one of the tools available to the court to make class actions more manageable." *NYC Firefighters*, 2011 WL 2680474, at *28. Moreover, there are many well-qualified candidates who might assist the Court in administering a fair resolution for all parties, including former federal judges from this District, such as Judges David Coar and Wayne Anderson, who have vast experience with the relevant laws and currently provide arbitration services at JAMS. A Special Master would gain considerable efficiencies to conduct multiple hearings after learning the business, policies and practices of Merrill Lynch and the job of Financial Advisors, among other things. Certification

---

[7] *See, e.g., Smith*, 2006 U.S. Dist. LEXIS 12375, at *41-43 (class action superior); *Wilfong v. Rent-A-Center*, 2001 U.S. Dist LEXIS 22718, No. 00-0680 (S.D. Ill. 2001); *Bell*, 2005 U.S. Dist. LEXIS 60, No. 03 C 50190, at 7-8 (N.D. Ill. Jan. 3, 2005); *Tucker v. Walgreen Co.*, 2007 U.S. Dist. LEXIS 74628 No. 05-440-GPM, 07-172-GPM (S.D. Ill. Oct. 5, 2007) (certifying employment race discrimination class under Rule 23(b)(2) for injunctive aspects and under Rule 23(b)(3) for damages).

of disparate impact claims for a liability trial and administration by a Special Master of individual relief is consistent with longstanding Seventh Circuit precedent instructing District Courts, under Rule 23, to "devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues," including appointing a special master. *Carnegie v. Household Int'l Inc.*, 376 F.3d 656, 661 (7th Cir 2004) (internal quotations omitted).

27. Thus, individual relief and damages issues do not preclude certification. The Seventh Circuit favors certification of at least liability issues and has held "[c]ertifying a class for injunctive purposes, while handling damages claims individually, does not transgress the seventh amendment." *Allen v. Int'l. Truck and Engine Corp*, 358 F.3d 469, 471-72 (7th Cir. 2004) (ordering certification of a racial harassment class under Rule 23(b)(2) for liability and equitable issues and directing the district court to consider whether any damages issues would also benefit from certification). Indeed, "[p]artial certification would be a more efficient procedure than litigating the class-wide issue of [Defendant's policies] anew in more than [700] separate lawsuits." *In re Allstate Ins. Co.*, 400 F.3d 505, 507-08 (7th Cir. 2005) (noting that district court could first hear class-wide issue of whether defendant had policy of forcing employees to resign in violation of ERISA, then conduct individual hearings to determine which class members resigned because of policy); *Allen*, 358 F.3d at 471; *Carnegie v. Household Int'l*, 376 F.3d 656, 661 (7th Cir. 2004).

28. The recent *NYC Firefighters* case applying the *Dukes* decision and adopting the class treatment of liability and damages Plaintiffs propose is particularly instructive. *See NYC Firefighters*, attached hereto as Exhibit A. The United States and individual plaintiffs sued the City of New York alleging that the City's use of four employment practices to screen and select entry-level firefighters had an unlawful disparate impact on black and Hispanic applicants. As the Plaintiffs here propose, the New York court bifurcated the litigation into liability and, if necessary, remedial phases, and certified a liability class for plaintiffs' disparate impact and pattern or

13

practice claims. After a trial, the court found the City of New York liable for both disparate

impact and a pattern and practice of racial discrimination.

29. After *Dukes* was issued, the City filed a motion to reconsider and to decertify the

liability class and argued class treatment was improper on remedial issues as well. On

reconsideration, the court held "that its decision to certify the question of the City's liability for

disparate impact and pattern-or-practice disparate treatment violations under Rule 23(b)(2) was

consistent with *Wal–Mart*." *NYC Firefighters,* at \*6. Carefully analyzing the *Dukes* decision and

other precedents, the court noted that partial or issue certification remained favored and sensible

under governing law in the case of disparate impact claims because "[t]he initial classwide phases

of a disparate impact claim similarly focus on the defendant's employment actions vis-à-vis the

protected group as a whole," and "[i]ndividual issues arise … only if the class establishes the

employer's liability and the litigation proceeds to the remedial phase." *Dukes,* at \*10.

30. The court found that in light of *Dukes,* individualized monetary claims belong in Rule

23(b)(3). It certified sub-classes for the determination of individual compensatory damages under

Rule 23(b)(3). The court rejected the City's arguments against Rule 23(b)(3) certification because

individualized damages issues could require "potentially thousands of individualized proceedings

that will overwhelm the litigation of issues common to the subclasses." *NYC Firefighters,* at \*25.

The court explained that "the larger the number of victims of the City's discrimination, the

greater the economies of scale achieved by adjudicating common claims in a class proceeding."

*Id.* at \*26. This is consistent with Seventh Circuit precedent in *Allen, Carnegie* and *In re Allstate.*

31. The court also explained that manageability must be viewed in light of the alternative

of individual lawsuits: "In deciding whether class certification will achieve substantial efficiencies,

the proper comparison is not between class litigation and no litigation at all, but between class

litigation and actions conducted separately by individual class members." *Id.* at \*26. Under this

analysis, class treatment of Plaintiffs' disparate impact claims here is plainly more efficient and manageable.

32. Most importantly, the court took stock of its fundamentally important role in enforcing the civil rights laws and making whole victims of discrimination, even in the event of potentially thousands of individual hearings:

> Though the hearings that will be required to resolve these claims may be large in number [over 7,000], the court will not shrink from the task of making the victims of the City's discrimination whole. The court is prepared to do what is necessary to give all parties the opportunity to fully litigate their claims and defenses. *Id.* at 20.

> …The court is amply equipped to respond to any manageability concerns as they arise and the "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." (quotation marks omitted). *Id.* at 28 (internal citations omitted).

33. To redress the denial of the civil rights of African American FAs at Merrill Lynch, and under *Dukes* and other Supreme Court and Seventh Circuit precedent, this Court should certify Plaintiffs' disparate impact claims under the model set forth in the *NYC Firefighters* case.

WHEREFORE, for the reasons set forth herein, and based on the arguments and facts set forth in their prior briefing to this Court – which they incorporate by reference (Docket Nos. 260, 262, 380, 382, 414, 422 and exhibits), Plaintiffs respectfully request that the Court grant their motion for class certification.

Respectfully submitted on behalf of Plaintiffs and those similarly situated,

/s/ Linda D. Friedman

Linda D. Friedman
George Robot
Suzanne E. Bish
STOWELL & FRIEDMAN LTD.
321 S. Plymouth Court, Suite 1400
Chicago, Illinois 60604
(312) 431-0888

## CERTIFICATE OF SERVICE

I, Linda D. Friedman, an attorney, hereby certify that on July 18, 2011, I caused a true and correct copy of the attached *Plaintiffs' Amended Post-Walmart Motion for Class Certification* to be served via ECF and electronic mail on the following counsel of record:

Jeffrey S. Klein
Nicholas J. Pappas
Salvatore Romanello
Allan Dinkoff
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
phone: (212) 310-8000
fax: (212) 310-8007
jeffrey.klein@weil.com

Lori Lightfoot
Mayer Brown LLP
71 S. Wacker Drive
Chicago, IL 60606
phone: (312) 782-0600
fax: (312) 701-7711
llightfoot@mayerbrown.com

Respectfully submitted,

By: /s/ Linda D. Friedman