IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE MCREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK, LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, Individually on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 05-C-6583  Hon. Robert W. Gettleman  Magistrate Judge Gilbert |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR PROVISIONAL CERTIFICATION OF
SETTLEMENT CLASS; PRELIMINARY APPROVAL OF CLASS ACTION
SETTLEMENT; AND APPROVAL AND DISTRIBUTION OF NOTICE OF
SETTLEMENT**

After nearly eight years of hard-fought litigation and active supervision by this Court, Plaintiffs are pleased to submit to the Court the parties' proposed settlement, which provides both meaningful injunctive relief to increase opportunities for African American financial advisors and financial advisor trainees at Merrill Lynch and a $160 million common fund for claims of monetary losses. This historic settlement was negotiated at arm's length, is "fair, reasonable and adequate" and easily satisfies all the criteria for preliminary approval under federal law. Fed. R. Civ. P. 23(a), (b), and (e).

Many class actions settle before or shortly after they are filed. Not this one. As the Court is well aware, the parties have litigated this case vigorously since November 2005. The Court's docket contains almost 600 entries, yet it does not reflect the full complexity of the litigation and the voluminous documents submitted to the Court. The parties exchanged millions of documents and numerous expert reports, conducted dozens of depositions, and fought scores of motions. Lawyers on each side spent tens of thousands of hours litigating the case. Class representatives and the Plaintiffs' Steering Committee travelled long distances on many occasions to attend Court hearings on discovery and class certification motions, depositions of Merrill Lynch executives, and meetings with Class Counsel.[1] With the certification of the disparate impact class and a class-wide disparate impact liability trial scheduled for January 2014, the parties face more litigation, including motions for decertification, additional document/ESI discovery, depositions, and motions for summary judgment, plus further proceedings to determine monetary relief for class members and to litigate the merits of Plaintiffs' intentional discrimination claims. Parties and counsel on both sides are now very aware of the strengths and weaknesses of their

---

[1] This motion incorporates by reference the definitions in the Settlement Agreement, attached hereto as Exhibit 1, and all capitalized terms not defined herein shall have the same meanings as set forth in the Settlement Agreement.

case and the risks and uncertainties of further litigation.

Likewise, through its efforts and active involvement, the Court is very familiar with this case. Over the past eight years, the Court reviewed, researched, and ruled on the parties' disputes, including disputes concerning the merits of Plaintiffs' claims, class certification, and discovery, all while consistently permitting the attorneys to present lengthy oral arguments before ruling on the complex and sometimes novel issues in this case. The Court allowed Plaintiffs to file not only a motion to reconsider the denial of class certification, but also an amended class certification motion following the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011). In the wake of *Dukes*, which the Court recognized changed the landscape for class litigation, the Court took the unusual and decent step of asking the Seventh Circuit Court of Appeals to review its class certification ruling in order to ensure full development of the law. As a result, this Court is intimately familiar with the parties' claims and defenses and the factual background of this case, making the Court uniquely qualified to assess the fairness, reasonableness, and adequacy of the proposed settlement. *See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985) (affirming settlement approval in part because district court had "participated in countless hours of pretrial conferences, reviewed massive submissions and ruled on a great number of legal and factual questions" over a five-year period).

## SUMMARY OF SETTLEMENT TERMS

The proposed Settlement Agreement provides comprehensive injunctive relief designed to ensure a level playing field for all financial advisors and trainees, regardless of race as well as substantial monetary relief for Settlement Class Members.

**I.** **Programmatic Relief.** The programmatic relief in the settlement applies innovative solutions that respond to each of Plaintiffs' allegations concerning racial disparities in

compensation, attrition, teaming, and account distributions. These provisions will remain in effect throughout the three-year duration of the settlement.

A. **Teams and Pools/Account Distribution.** Plaintiffs allege that Merrill Lynch allows brokers to form their own teams and then prescribes criteria for account distribution that favor the already successful -- those who owe their success to having been invited to join a successful or promising team. Thus, Plaintiffs' primary concern over the account distribution policy ("ADP") is that the Firm's teaming and pooling practices skew the ADP rankings in favor of those who participate in teams and pools. Plaintiffs agree with Merrill Lynch that teaming and pooling are advantageous business practices and do not seek to eliminate them. The parties agree that a desirable outcome of this Settlement would be to increase African American participation in pools and teams and eliminate teams or pools that are formed for improper reasons.

1. **Training for FA Trainees.** Plaintiffs allege that African American financial advisor trainees are excluded from teams, thereby depressing their rankings compared to white trainees on teams and excluding them from Merrill Lynch's recognition training programs offered only to trainees ranked in the first quintile (top 20%). Current rankings are based on the trainee's total production credits, including credits generated by team accounts not garnered by the trainee. In the settlement, Merrill Lynch agreed to distinguish and reward high performing trainees who are not on teams. In addition to the current rankings of all trainees based on production credits (regardless of source), Merrill Lynch will also separately rank non-team trainees by net new household accounts generated. The top 20% from both rankings will be eligible for Merrill Lynch's recognition training programs.

2. **Elimination of Account Transfers for Trainees.** Additionally, to address Plaintiffs' allegations that white trainees disproportionately receive account distributions under

3

the national account distribution policy because of their higher participation in pool and teams, Merrill Lynch agrees that during the settlement period, in addition to implementing initiatives to increase African American representation in teams or pools, trainees will not be eligible for account distribution until they achieve the first 12-month hurdle in the training program.

3.    **Attrition Study.**  Plaintiffs strongly believe, based on their experts' analysis of data from 2001 to 2006, that teaming and account distribution opportunities correlate strongly with success in the training program, and the lack of such opportunities correlates with higher trainee attrition rates. In 2008 Merrill Lynch revised its training program, now known as Practice Management Development ("PMD"), and although PMD data has not yet been analyzed, Merrill Lynch has agreed to conduct an internal study of the impact of teams, pools, and account distributions on trainee performance and attrition rates, without regard to race, for the past three years. The results of this study will give Merrill Lynch information on whether its training program is serving the needs of all trainees, regardless of race.

4.    **"Rooney" Rule.**  Merrill Lynch will maintain a policy that, before approving a team, management will instruct financial advisors and trainees to consider a variety of potential teammates, offer suggestions at an early point in the formation process, and instruct financial advisors and trainees that the decision to team or not to team with particular financial advisor or trainee may not be made on the basis of the individual's race or other legally protected characteristic.

5.    **Elimination of Teams or Pools Formed Solely to Transfer Accounts.**

Plaintiffs allege that financial advisors often form teams or pools in anticipation of retirement or resignation and/or solely as a mechanism to transfer accounts. For example, Plaintiffs contend that large books of business may be directed from a retiring financial advisor to a colleague by

4

placing the accounts in a pool. Similarly, studies conducted by Plaintiffs' experts showed that financial advisors who join competing firms often direct accounts to colleagues within 14 days prior to departure. Finally, Plaintiffs maintain that established financial advisors sometimes place smaller accounts in pools to help trainees meet hurdles. Plaintiffs allege that these practices are improper and contribute to the higher representation of whites in teams or pools and lower compensation and higher attrition for African Americans. To address these concerns, Merrill Lynch has agreed to maintain policies prohibiting these practices and to audit and monitor the formation of teams or pools to ensure legitimacy.

      **6.**     **Householding Review.** The ADP mandates the distribution of accounts according to a formula for ranking financial advisors by past success, among other criteria. In a given distribution, the highest ranking financial advisor is given the best account (or the first choice of accounts), the second highest receives the next best account (or the second choice), and so on. In many offices, white financial advisors typically occupy the top spots on the ranking lists. Plaintiffs allege that the number of accounts distributed is often artificially reduced by a process known as "householding," or grouping several accounts together and awarding them to a single financial advisor. As a result, the same few top-ranked financial advisors often receive virtually all of the distributed accounts. Under the settlement, Merrill Lynch managers will review all accounts before distributions to ensure they have not been improperly householded.

      **7.**     **Mediation in Team Agreements.** Merrill Lynch will give all financial advisors and trainees the option of adding a non-binding mediation process to their teaming agreements. Under this process, Merrill Lynch would pay half of the fees of a neutral, third-party mediator selected by the team from the roster of the Financial Industry Regulatory Authority, to assist in resolving disputes concerning the division of team assets when a team dissolves.

**B.**     **Appointments.**  As important as the measures described above will be in immediately improving opportunities and resources available to African American financial advisors and trainees at Merrill Lynch, perhaps the most significant and creative aspect of the settlement, however,  is Merrill Lynch's agreement to four sets of appointments designed to enhance the programmatic relief and ensure it is effective in bringing about lasting change.

**1.**     **Leadership Council.**  Merrill Lynch will create a Leadership Council that includes the class representatives and recommends to management further policy and diversity initiatives to improve opportunities for African Americans. Instead of insisting that its litigation opponents resign in order to benefit from the settlement, as employers often do in settling employment discrimination cases, Merrill Lynch has agreed to engage the class representatives – with decades of experience as African American financial advisors at Merrill Lynch – in monitoring and maximizing the effectiveness of the settlement's programmatic relief.

**2.**     **Expert Scientific Study.**  Merrill Lynch will engage two experts – one to be chosen by the class representatives and their counsel with the other to be chosen by Merrill Lynch – to review and evaluate Merrill Lynch's teaming and pooling policies and practices and recommend improvements to them. The two experts will design a scientific study, which will be reviewed and discussed with Merrill Lynch and Class Counsel. As part of the study, the experts will be able to interview Merrill Lynch management, as well as financial advisors and trainees in six Merrill Lynch offices, about teaming and pooling. Unlike the typical expert study provided in employment discrimination settlements, where the employer retains sole control over the selection and work of an expert or consultant, this settlement ensures the active involvement of an expert selected by the class representatives in the process. At the conclusion of the study, the experts will prepare and present their report to Merrill Lynch executives.

3. **Monitor/Coach.** Merrill Lynch will appoint a Monitor/Coach to monitor the opportunities and resources provided to African American financial advisors and trainees, including teams and account distributions, and their performance as compared to non-African American financial advisors and trainees. The Monitor/Coach will also coach African American financial advisors and trainees regarding business development and recommend policy changes to Merrill Lynch to enhance the opportunities and resources available to African American financial advisors and trainees.

4. **Dedicated PMD Coaches.** Merrill Lynch will assign two PMD coaches (one on the East Coast and one on the West Coast) to work full-time with the Monitor/Coach to coach African American financial advisor trainees, with the direct mission of eliminating racial disparities in attrition.

C. **Diversity Fund.** Plaintiffs allege that Merrill Lynch disproportionately denies African American financial advisors funding to speak at and host business development events, like seminars and luncheons, for the purpose of attracting new clients. Merrill Lynch agreed to increase funding to its Diversity Fund to $1 million per year to fund business development events for minority and female financial advisors.

D. **Voluntary Exit Interviews.** Currently Merrill Lynch does not routinely perform exit interviews. Under the settlement, however, Merrill Lynch agreed to conduct exit interviews with any willing, departing financial advisors or trainees. The Monitor/Coach may participate in the interviews of departing African American financial advisors or trainees, so that Merrill Lynch can gather accurate information and track any employee issues related to obstacles faced by African Americans.

7

**E.      Informational Discussions with Settlement Class Members and Class Counsel.**

For privacy reasons, the claim forms of Settlement Class Members detailing acts of

discrimination will not be shared with Merrill Lynch. Nevertheless, for Settlement Class

Members willing to disclose the details of their experiences to Merrill Lynch, the settlement

provides a mechanism to gather this information and report it to management for corrective

action where appropriate. In this and other provisions of the settlement, Merrill Lynch exhibits a

willingness to learn about the problems faced by African American financial advisors and to

explore solutions to them.

**F.      Manager Evaluations.**  To encourage managers to promote workforce diversity and

inclusion, Merrill Lynch will consider a distinct "diversity and inclusion" component in

assessing the performance of its Complex Directors and Resident Directors.

**G.       New Manager Selection.**  Merrill Lynch will interview at least one diverse

candidate, where available, for any open Executive or Director position in the U.S. Wealth

Management business.  The Monitor/Coach will also be available to assist African American

management candidates with advice on management and placement opportunities.

**H.      No Arbitration for Employment Discrimination.**  Merrill Lynch will not require

employees to arbitrate any employment discrimination claims.

**I.      Annual Reports to Class Counsel.**  During the three-year term of the settlement,

Merrill Lynch will provide to Class Counsel an annual report summarizing Merrill Lynch's

compliance with the programmatic relief and describing any new programs and policies designed

by Merrill Lynch to increase the representation and success of African Americans. Merrill Lynch

also will meet with Class Counsel annually to respond to any questions regarding the annual

report.

8

II.     **Monetary Relief.**   In addition to the comprehensive injunctive relief described above,

Merrill Lynch will establish a Settlement Fund of $160 million ($160,000,000.00), plus interest

from the date of Preliminary Approval until the deposit into the Settlement Fund. This

Settlement Fund will compensate Settlement Class Members, including the class representatives;

provide for all attorneys' fees, costs and service awards to class representatives and Steering

Committee Members awarded by the Court; and provide for all costs of administering the

Settlement.

**ARGUMENT**

I.     **The Settlement Class Meets All Requirements of Rule 23(a), Rule 23(b)(2), and Rule
       23(b)(3) and Should Be Certified.**

Before assessing whether the settlement is within the range of reasonableness for

purposes of preliminary approval, the Court should conduct an independent class certification

analysis. The Settlement Class must meet all of the requirements of Federal Rule of Civil

Procedure 23(a) and one of the requirements of Rule 23(b). This Court already certified a

nationwide disparate impact race discrimination class in this case and held that it met all

standards for certification under Rules 23(a), 23(b)(2), and 23(c)(4). The Settlement Class, which

includes disparate treatment as well as disparate impact claims, meets those standards for the

same reasons. Indeed, the only meaningful question for analysis under Rule 23 is whether the

Settlement Class now also satisfies the requirements of Rule 23(b)(3).

The Settlement Class satisfies all of the requirements for certification under Rule

23(b)(3). The parties' settlement is a relevant consideration in the class certification analysis.

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997).  Because Rule 23(b)(3)

certification is proposed in the context of a settlement, the "court need not inquire whether the

case, if tried, would present intractable management problems, for the proposal is that there be

9

no trial." *Id.* at 620 (citation omitted). Any manageability or predominance concerns relating to individual proceedings and defenses are satisfied by the settlement and its claims resolution process. *See Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660 (7th Cir. 2004).

## II.     The Settlement Should Be Preliminarily Approved.

"Federal Rule of Civil Procedure 23(e) requires court approval of any settlement that effects the dismissal of a class action. Before such a settlement may be approved, the district court must determine that a class action settlement is fair, adequate, and reasonable, and not a product of collusion." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279 (7th Cir. 2002) (citation omitted). At the preliminary approval stage, courts review class action settlements to determine whether they are within the range of possible approval. *American Int'l Group, Inc. v. ACE INA Holdings, Inc.*, Nos. 07 C 2898, 09 C 2026, 2011 WL 3290302, at *6 (N.D. Ill. July 26, 2011) (Gettleman, J.). "[T]he court's task is . . . not to conduct a full-fledged inquiry into whether the settlement meets Rule 23(e)'s standards." *Id.*

In determining whether to preliminarily approve a settlement, the Seventh Circuit has directed courts to assess: (1) the strength of the plaintiffs' case compared to the terms of the proposed settlement; (2) the likely complexity, length, and expense of continued litigation; (3) the opinion of competent counsel; and (4) the stage of the proceedings and the amount of discovery completed. *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir.1996). All of these factors warrant preliminary approval of the proposed settlement.

### A.     This Settlement Warrants Preliminary Approval.

#### 1.     The Settlement Provides Innovative and Meaningful Programmatic Relief.

As described above, the Settlement provides creative programmatic relief that will materially improve the business opportunities available to African American financial advisors and trainees at Merrill Lynch. To take but a few examples, in an attempt to better understand the

obstacles that African American financial advisors and trainees face regarding teaming, and to devise meaningful, practical solutions that will increase teaming opportunities for all employees, Merrill Lynch has agreed to engage two experts who will conduct an in-depth and genuinely scientific study that will involve interviews of personnel from at least six branch offices, and to provide two experts with real access of important data and executives. In another unprecedented step, the settlement will establish a Leadership Council, which will include all willing, currently employed class representatives over a three-year period, to monitor the Settlement's injunctive relief, provide input on important Merrill Lynch policies, and meet and discuss issues with Merrill Lynch executives. Similarly, a Monitor/Coach will also be appointed to monitor the Settlement's injunctive relief, receive and review key data and information regarding the relative representation and performance of African Americans, and work with management in order to retain and promote African American financial advisors and trainees. To combat the racially disparate rates of attrition in the training program, the Monitor/Coach will be assisted by two dedicated coaches who will mentor and assist African American financial advisor trainees across the country. Without question, the settlement provides significant and valuable injunctive relief to Settlement Class Members.

## 2. The Proposed Settlement Fund Is Fair To All Settlement Class Members.

The Settlement Fund of $160 million is one of the largest common funds ever achieved in settlement of an employment discrimination class action.[2] The Settlement Fund will provide exceptional monetary relief to Settlement Class Members allegedly harmed by the policies and practices challenged in this litigation. The Settlement also provides a process to allocate fairly and reasonably the benefits of the settlement among all Settlement Class Members, including the

---

[2] For example, a similar class action by both African American and Latino brokers settled for one-tenth the amount. *Curtis-Bauer v. Morgan Stanley & Co.*, No. C 06-3903, 2008 U.S. Dist. LEXIS 85028, at *14-15, 22 (N.D. Cal. Oct. 22, 2008) ($16 million settlement fund for more than 1,300 brokers and trainees).

class representatives.

The claims resolution process for distributing the Settlement Fund provides Settlement Class Members with two practical options depending on their circumstances and preferences: (1) a simple claims process resulting in an expedited monetary payment based on objective criteria, including length of service, length of employment within the class period, and average compensation disparities; or (2) an individualized claims process in which qualified third-party neutrals will assess the individual facts of the claims and other factors. In order to make the best informed decisions, the neutrals will receive training from case experts and Class Counsel and a statistical office analysis regarding the demographics and opportunities available at claimants' individual branch offices, and Settlement Class Members will have the option of presenting their claims to the neutrals. An Extraordinary Claims Fund of $25 million will also be available for Settlement Class Members whose circumstances warrant additional compensation. A Special Master will review and approve all monetary awards to ensure fairness and consistency.

**B. The Settlement Is an Outstanding Result for the Class in Light of the Risks of Proceeding through Trial and Appeal.**

Absent this Settlement, continued litigation of this action would be complex and lengthy, requiring the investment of considerable resources by both sides and the Court. As the Court is well aware, liability in this case is hotly contested, and both sides would face considerable risks should the litigation proceed. In contrast to the complexity, delay, risk and expense of continuing litigation, the proposed settlement will produce prompt, certain and substantial recovery for Settlement Class Members. In light of the complicated, uncertain and lengthy litigation facing Settlement Class Members, a settlement that provides outstanding injunctive and monetary relief is plainly in the best interests of the Settlement Class.

**C. The Settlement Is Supported By Competent, Experienced Counsel And Is The Product of Arm's Length, Informed Negotiations After Extensive, Hard-Fought**

12

**Litigation.**

Based on its experience and an in-depth analysis of the merits, record, and risks of this action, Class Counsel enthusiastically recommends this settlement to the Court for approval. This is not a settlement reached pre-filing, pre-certification, or after only a limited litigation period. This settlement was reached only after nearly eight years of vigorous litigation and months of unsuccessful negotiations with experienced mediators. Fact and expert class certification and merits discovery was extensive, including voluminous electronic discovery of documents, data and e-mails and dozens of depositions. Using personnel, payroll and client account data, plaintiffs' statistical experts performed extensive analyses, including multi-variant regression analyses, studying racial disparities in compensation, account transfers, teaming and pooling, and analyzing other policies and practices related to the prosecution of this case. The experts also conducted extensive analyses of the damages of class members. Merrill Lynch conducted similar expert studies and retained at least eight experts in this case. As a result of the substantial investigation, discovery and litigation of the claims and defenses at issue in this case, the parties negotiated the proposed settlement with complete knowledge regarding the strengths and weaknesses of the case and the amounts necessary to fairly compensate Settlement Class Members for their losses.

The terms of the proposed settlement agreement being presented to the Court were reached only after the assistance of an experienced and nationally recognized mediator, Linda Singer of JAMS. The settlement negotiations were protracted and difficult and occurred in New York, New York, Washington, DC, and Chicago, Illinois. The mediation sessions were attended by the class representatives and senior Merrill Lynch executives, as well as counsel for the parties. The settlement is the non-collusive product of years of hard-fought litigation. These factors weigh heavily in favor of approval of the settlement.

### III. The Proposed Payments for Class Representatives' Service Awards and Attorneys' Fees Are Reasonable, Particularly Given the Length and Outcome of the Litigation.

Class Counsel is honored to have advocated for the class alongside the class representatives and pleased to petition the Court to award Service Awards to compensate the class representatives for their considerable efforts on behalf of the class. Class Counsel respectfully submits that this case and settlement may well change the landscape of Wall Street as well as discrimination and class action law. The $250,000 Service Awards provided for by the settlement are comparable to similar awards granted by courts in similar cases to class representatives who made substantial investments and sacrifices and achieved historic results for the classes of employees they represented. *Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 09194, 2010 WL 4877852, at *26 (S.D.N.Y. Nov. 30, 2010) (class representatives awarded $175,000 to $425,000 in a $150 million settlement); *Martens v. Smith Barney*, No. 96 Civ. 3779, 1998 WL 1661385, at *4 (S.D.N.Y. July 28, 1998) (class representatives awarded service bonuses up to $150,000 per named plaintiff, $1.9 million in the aggregate); *Cremin v. Merrill Lynch*, No. 96 C 3773 (N.D. Ill. 1998) (Castillo, J) (same). Class Counsel will file a separate motion in support of the Service Awards.

The settlement also provides for Class Counsel to petition the Court for reasonable attorneys' fees and costs in an amount no greater than 25% of the Settlement Fund. The 25% contingency corresponds to the contingency rate negotiated by the class representatives and set forth in fee agreements entered into prior to the filing of this lawsuit. *See Silverman v. Motorola Solutions, Inc.*, Nos. 12-2339, 12-2354, slip op. at 3 (7th Cir. Aug. 14, 2013). Class Counsel also entered agreements to represent over one hundred fifty Settlement Class Members for either a 25% or 33 1/3% contingency rate. Thus, the market rate is the best evidence of a reasonable and fair attorney fee.

14

A fee of 25% of the Settlement Fund is reasonable and well within the range of attorneys' fee awards given the risk and cost of the litigation and the tens of thousands of hours invested by Class Counsel. However, given that the Settlement exceeds $100 million, Class Counsel voluntarily reduces its contingency fee and requests a fee of 25% of the first $100 million and 15% of the next $60 million in the Settlement Fund, an amount Class Counsel will establish is substantially lower than awarded in comparable class employment discrimination litigation.

Class Counsel will submit a separate fee petition with the Motion for Final Approval, along with a request for reimbursement of class costs advanced up to $5 million.

## IV.     **The Proposed Class Notice Is Appropriate.**

A settlement must provide adequate notice to Settlement Class Members so that each Settlement Class Member can make an informed choice about whether to opt out, object and/or file a timely claim and have an opportunity to receive a monetary award. The Proposed Class Notice is clear, accurate and satisfies due process. The Notice provides a detailed summary of the terms of the settlement, including the proposed claims resolution process for monetary awards. It also informs Settlement Class Members how and when to file objections, and describes the procedures for opting out and submitting a claim.

## CONCLUSION

For all the foregoing reasons, the parties respectfully request that the Court issue an order: (1) certifying a Settlement Class; (2) preliminarily approving the proposed class action settlement; (3) appointing Class Counsel and the Class Representatives to represent the Settlement Class; (4) approving and directing distribution to the Class of a Notice of Settlement; and (5) setting a schedule for the final approval process. Exhibit 2 is the Order proposed by the Parties.

15

Dated: August 28, 2013

Respectfully submitted,
**STOWELL & FRIEDMAN, LTD.**

By: ___/s/ *Linda D. Friedman*_____
       Linda D. Friedman

303 W. Madison, 26th floor
Chicago, Illinois 60606
(312) 431-0888 (tel)
(312) 431-0228 (fax)
Lfriedman@sfltd.com