IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GEORGE McREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK, LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, Individually and on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 05-C-6583<br><br>Hon. Robert W. Gettleman<br><br>Magistrate Judge Gilbert |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, | ) ) ) ) | |
| Defendant. | ) | |

**PETITION FOR SERVICE AWARDS TO CLASS REPRESENTATIVES AND STEERING COMMITTEE**

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888 (tel)
(312) 431-0228 (fax)

## TABLE OF CONTENTS

 Page

I. The Class Representatives Deserve Service Awards to Compensate Them for Their Extraordinary Time and Effort in this Case, Undertaken at Great Personal and Professional Risk, Which Led to an Excellent Outcome for the Class ...................................................................................................................... 2

    A. The Class Representatives Devoted Significant Time and Effort to Advancing the Interests of the Class in this Litigation. .......................................... 5

    B. The Class Representatives Risked Substantial Personal, Financial, and Reputational Harm. ................................................................................................ 8

    C. The Class Representatives Pursued the Best Interests of the Class Instead of their Own Financial Interests. ................................................................ 9

II. The Efforts of the Steering Committee Warrant Service Awards. ............................. 10

Conclusion ............................................................................................................................... 11

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| 1 | Declaration of George McReynolds |
| 2 | Declaration of Maroc Howard |
| 3 | Declaration of LaRue Gibson |
| 4 | Declaration of Jennifer Madrid |
| 5 | Declaration of Frankie Ross |
| 6 | Declaration of Marva York |
| 7 | Declaration of Leslie Browne |
| 8 | Declaration of Henry Wilson |
| 9 | Declaration of Leroy Brown |
| 10 | Declaration of Glenn Capel |
| 11 | Declaration of Christina Coleman |
| 12 | Declaration of J. Yves LaBorde |
| 13 | Declaration of Marshell Miller |
| 14 | Declaration of Carnell Moore |
| 15 | Declaration of Mark Johnson |
| 16 | Declaration of Cathy Bender |
| 17 | Declaration of Stephen Smartt |
| 18 | *Martens v. Smith Barney Inc.*, No. 96 Civ. 3779, 1998 WL 1661385 (S.D.N.Y. July 28, 1998) |
| 19 | Declaration of Linda D. Friedman |
| 20 | *Curtis-Bauer v. Morgan Stanley & Co.*, No. 3:06-cv-3903 (N.D. Cal. 2008)<br>    Dkt. 158, Order preliminarily approving class action settlement<br>    Dkt. 250, Order granting final approval to class action settlement |
| 21 | *Tucker v. Walgreen Co.*, No. 05-cv-440 (S.D. Ill. 2008)<br>    Dkt. 129, Plaintiffs' motion for final approval of class action settlement<br>    Dkt. 135, Minute entry granting motion for settlement |
| 22 | Transcript of Final Approval Hearing, *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 96 C 3773 (N.D. Ill. Sept. 2, 1998) |
| 23 | *Calibuso v. Bank of America Corp.*, No. 10 Civ. 1413 (E.D.N.Y. 2013)<br>    Dkt. 178, Order granting preliminary approval of class action settlement<br>    Dkt. 154, Plaintiffs' brief in support of preliminary approval |

Class Counsel is honored to present this petition for service awards to an extraordinary group of African American employees who selflessly spent thousands of hours to guide this litigation for the past eight years, at great personal and financial risk to themselves and their families. Unlike most class actions,[1] this one was driven from the beginning not by lawyers, but by African American financial advisors committed to reforming Merrill Lynch's policies and practices. In 1994, more than a decade before litigation was filed, a group of African American financial advisors began attempting to improve opportunities at Merrill Lynch by speaking with management, joining firm committees, and mentoring other African American financial advisor trainees. When those efforts failed, the Class Representatives filed suit and devoted countless hours to assisting Class Counsel and experts in understanding and analyzing the operation of Merrill Lynch's policies and practices, preparing for and testifying at lengthy depositions, attending court hearings, responding to Merrill Lynch's discovery requests, and negotiating directly with Merrill Lynch executives.[2] (Exhibits 1-17, Declarations of Class Representatives.)

The Class Representatives never wavered in their commitment to reforming Merrill Lynch for future generations of African American financial advisors and to seeking justice for past wrongs suffered by the class. The Class Representatives remained a cohesive group throughout the long litigation, consistently placing the interests of the class ahead of their own personal interests. As a result, these Class Representatives achieved a settlement of historic proportions that will bring systemic change to the way African Americans are treated by Merrill

---

[1] *See Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 876 (7th Cir. 2012) (noting that "class actions are almost always the brainchild of lawyers" who then seek out a named plaintiff).
[2] There was no "class" and the named plaintiffs in this litigation did not become "Class Representatives" until this Court certified a disparate impact class in July 2012. For ease of reference, however, this Petition uses the terms "class" and "Class Representatives" to refer to the settlement class certified and the Class Representatives appointed by this Court on September 4, 2013, even when discussing earlier time periods.

1

Lynch, and perhaps by the financial services industry as a whole. These courageous men and women deserve to be compensated for the many sacrifices they made for the benefit of the class.

**I.  The Class Representatives Deserve Service Awards to Compensate Them for Their Extraordinary Time and Effort in this Case, Undertaken at Great Personal and Professional Risk, Which Led to an Excellent Outcome for the Class.**

Service awards for these Class Representatives are appropriate "in light of the benefit [the representatives] bestowed on [the] class, the risks [they] faced in bringing the case and the time [they] spent pursuing it." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming incentive award to named plaintiff because "suit . . . resulted in structural reforms to the Health & Welfare Fund as well as a cash recovery of more than $13 million," and "[m]ost significantly, . . . [plaintiff] reasonably feared workplace retaliation"). "Service awards are common in class action cases and serve to compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiffs." *Beckman v. KeyBank, N.A.*, No. 12 Civ. 7836, 2013 U.S. Dist. LEXIS 60894, at *40-41 (S.D.N.Y. Apr. 29, 2013) (approving service awards to 8 named plaintiffs and 4 other plaintiffs in FLSA settlement reached before complaint was filed).

Courts have recognized that class representative service awards are particularly appropriate in employment discrimination cases. *E.g.*, *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (approving $300,000 incentive awards for each class representative, noting they participated directly in mediation, achieved outstanding settlement, and "took risks, bore hardships, and made sacrifices that absent class members did not" during two years of race discrimination litigation). As one court explained:

> [W]hen it comes to incentive awards, . . . there is a fundamental distinction between litigation based on claims of racial, gender or other discrimination, and securities-based litigation . . . or antitrust suits . . . . In securities cases, it is rare

> that the plaintiff – usually a shareholder who has little continuing contact with the defendant – is exposed to or can establish personal risk by reason of his or her having prosecuted the suit. In discrimination-based litigation, the plaintiff is frequently a present or past employee whose present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril.

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997) (footnotes omitted) (approving $85,000 incentive award for lead plaintiff in race discrimination case that settled two years after filing); *accord Velez v. Novartis Pharm. Corp.*, No. 04 Civ. 9194, 2010 U.S. Dist. LEXIS 125945, at *69-74 (S.D.N.Y. Nov. 30, 2010) (granting service awards between $175,000 and $425,000 to 26 named plaintiffs who released their claims for emotional distress).

Representatives of discrimination classes "will often be key witnesses and may also act as liaisons between the attorneys and members of the class," and they "may suffer retaliation on the job or loss of employment prospects" as well. Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 U.C.L.A. L. Rev. 1303, 1315-16 (2006). Because these class representatives must spend more time on the litigation and assume greater risk of retaliation and other harms, service awards in employment discrimination cases are not only more commonly granted, but they also tend to be higher than in any other type of class action, both in dollar amount and as a percentage of the class recovery. *Id.* at 1333, 1337, 1339. Whereas the median total service award in a securities or consumer class action is less than 0.025%, the median total service award in an employment discrimination case is more than 40 times that amount, or 2.09% of the class recovery. *Id.* at 1339.

Courts have consistently rewarded class representatives whose services to the class were exceptional in nature or duration. *E.g.*, *Cobell v. Salazar*, 679 F.3d 909, 916 n.5 (D.C. Cir. 2012) ($2 million incentive award for lead class representative who personally funded some expenses

3

in 15-year litigation); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1242 (S.D. Fla. 2006) (awarding $1.767 million each to eight class representatives in 15-year-long contract litigation brought by gasoline dealers). Indeed, courts in discrimination cases have approved more generous service awards than those requested here for class representatives who spent less time and effort on the litigation than the Class Representatives in this case. *E.g.*, *Ingram*, 200 F.R.D. at 694 ($300,000 incentive awards for two years of race discrimination litigation); *Velez*, 2010 U.S. Dist. LEXIS 125945, at *69-74 (service awards up to $425,000 for six-year gender discrimination litigation); *Martens v. Smith Barney Inc.*, No. 96 Civ. 3779, 1998 WL 1661385, at *4 (S.D.N.Y. July 28, 1998) (incentive awards up to $150,000 for two-year gender discrimination litigation) (Exhibit 18).[3]

All of the relevant factors support the service awards requested in this case. First, the Class Representatives' efforts led to outstanding injunctive and monetary relief for the class. In awarding service awards of $300,000, the *Ingram* court reasoned:

> In addition to the services they have provided and the risks they have incurred, the magnitude of the relief the Class Representatives obtained on behalf of the class warrants a substantial incentive award. The Class Representatives have fulfilled both the class's interest in effecting fundamental change at Coca-Cola and its interest in receiving fair amends for injuries allegedly suffered while working for the Company. Rewarding such efforts creates the proper incentives for individuals to come forward and undertake the arduous efforts needed to challenge alleged discrimination on a class-wide level, thus fulfilling the policies and purposes underlying Title VII.

*Ingram*, 200 F.R.D. at 694. The same is true in this case. The benefits bestowed on the class by this settlement are described in Class Counsel's Petition for Attorneys' Fees and Costs, filed contemporaneously with this Petition.

---

[3] *See also Calibuso v. Bank of America Corp.*, No. 10 Civ. 1413, Dkt. 154 at 9-11, Dkt. 178 (E.D.N.Y. Sept. 6 & Oct. 15, 2013) (settlement reached before expert discovery and now pending final approval, where four class representatives are requesting service awards of $35,000 each plus separate fund of $775,000 for representatives, in addition to participation in class fund, and minimum settlement payment for other class members is $500) (Exhibit 23).

Second, the Class Representatives devoted enormous amounts of time and energy in order to achieve this favorable outcome.

Third, the Class Representatives assumed tremendous personal, professional, and financial risk in order to advance the best interests of the entire class.

Fourth, under the settlement, the Class Representatives have agreed to release all of their claims against Merrill Lynch, not just the class claims that were the subject of the litigation.

### A. The Class Representatives Devoted Significant Time and Effort to Advancing the Interests of the Class in this Litigation.

The Class Representatives played a crucial role in every aspect of this litigation. The Court may recall that Class Representatives – who live and work in various states across the country – attended a majority of court hearings in this case. Lead plaintiff George McReynolds consistently attended court proceedings, even though health problems prevented him from air travel or driving long distances. His wife drove McReynolds almost 500 miles from Nashville to Chicago for court hearings, then the same distance back home again – effectively tripling the amount of time McReynolds spent away from his business. (Exhibit 1, McReynolds Decl. ¶ 37.) Other Class Representatives, including Frankie Ross, Maroc Howard, Marshell Miller, and Glenn Capel also drove or flew long distances to support the class at important court hearings. (*E.g.*, Exhibit 5, Ross Decl. ¶¶ 33-34; Exhibit 2, Howard Decl. ¶ 38; Exhibit 13, Miller Decl. ¶19, Exhibit 10, Capel Decl. ¶ 21.)

The Class Representatives spent even more time on litigation activities outside the courtroom. As detailed in their attached declarations (Exhibits 1 through 17), each Class Representative actively participated in fact and expert discovery; meetings and phone calls with Class Counsel, experts, and class members; and settlement negotiations with Merrill Lynch

executives. More than half the Class Representatives filed charges of discrimination with the Equal Employment Opportunity Commission.

Discovery in this case was extensive, and the Class Representatives played a vital role in the discovery process. The Representatives assisted Class Counsel in drafting and responding to written discovery requests; reviewing and analyzing voluminous documents, data, and information produced by Merrill Lynch; and helping the experts to understand the inner workings of Merrill Lynch's compensation, training, teaming, pooling, and account distribution policies. Each Class Representative prepared for and testified at a lengthy (one- to three-day) deposition and withstood aggressive questioning about his or her professional competence. The Class Representatives also attended, and assisted Class Counsel in preparing for, the depositions of Merrill Lynch executives and experts.

Equally important was the work the Class Representatives did in keeping the lines of communication open between class members and Class Counsel. The Representatives met with Class Counsel in person and by phone, both individually and as a group, to discuss litigation strategy and developments. When required to travel to attend meetings, court hearings, or mediations, the Class Representatives often paid their own travel expenses. The Class Representatives discussed the litigation during more than 80 conference calls with Class Counsel. Communicating regularly with class members about the litigation, the Class Representatives served as liaisons between counsel and the class, and often mentored individual African American financial advisors struggling to survive at Merrill Lynch. At the Merrill Lynch African American Symposium in November 2006, for example, the Class Representatives wore buttons reading "McReynolds Supporter" in a successful effort to encourage class members to

6

come forward and discuss the litigation and their concerns about Merrill Lynch's policies and practices.

Because the case attracted media attention, the Class Representatives frequently fielded calls about the litigation from African American financial advisors, both current and former, as well as from news reporters. Over the past eight years, each Class Representative has spent literally hundreds of hours in meetings and phone calls relating to this case.

Of course, this settlement would not have been possible without the Class Representatives' active involvement in the mediations. The Class Representatives participated in seven mediations sessions in 2006 in New York and San Francisco and seven more mediation sessions this year in New York, Chicago, and Washington, D.C. Showing tremendous courage, these Class Representatives – many of them current Merrill Lynch employees – sat across the table from high-level Merrill Lynch executives, described their personal experiences of workplace discrimination, and advocated for fundamental changes in the firm's policies toward African Americans. They repeatedly rejected Merrill Lynch's settlement offers until the Class Representatives were satisfied that the final proposal was fair to the entire class. Despite widely varying individual circumstances and perspectives, the Class Representatives maintained their unity of purpose and never lost the focus on the interests of the unnamed class members they represented. *See Ingram*, 200 F.R.D. at 694 (granting service awards because class representatives "directly participated in the mediation process and vigorously asserted the interests of the class."); *cf. In re Southwest Airlines Voucher Litig.*, No. 11 C 8176, 2013 U.S. Dist. LEXIS 120735, at *31 (N.D. Ill. Aug. 26, 2013) (approving incentive awards in part because one of the class representatives attended a single mediation session).

The time that Class Representatives devoted to this litigation likely cost them and their families significant amounts of money. Financial advisors are paid based on commissions, which are generated through servicing existing clients and developing new ones. Nevertheless, the Class Representatives selflessly took a tremendous amount of time away from their business in order to prosecute this litigation for the benefit of the class. (Exhibit 19, Friedman Decl. ¶¶ 6, 10.)

### B. The Class Representatives Risked Substantial Personal, Financial, and Reputational Harm.

In assuming a public role in this litigation, the Class Representatives subjected themselves to risks that were serious in both consequences and probability of occurring. First, there was the very real possibility that existing and potential clients would shy away from doing business with a financial advisor involved in highly publicized litigation against his or her brokerage firm. Even if clients somehow overlooked the media coverage of this case, it was filed in the age of Google and PACER, when Americans – and especially financially savvy investors – routinely conduct online searches of people they encounter professionally. A Google or PACER search will inevitably hit upon the names of each Class Representative. By agreeing to become named plaintiffs, the Class Representatives assumed the serious risk that they would lose a significant amount of business, and hence income, because of their public status as named plaintiffs – a risk that will follow them forever in this digital age.

Second, when the Class Representatives agreed to be the public face of this class, they knew they were putting their careers and livelihoods in peril. If they lost their jobs at Merrill Lynch, they would forever find it difficult to find another Wall Street job. "Wall Street traditionally shuns those who litigate against it." Roderick Boyd, *Woman Who Sued UBS Aims to Get Back on Wall Street*, New York Sun (Apr. 19, 2005), www.nysun.com/business/woman-

8

who-sued-ubs-aims-to-get-back-on-wall-street/12459. For example, in 1998, Allison Schieffelin was earning $1 million per year as a senior bond saleswoman at Morgan Stanley's Institutional Equity Division. But after Schieffelin complained to the EEOC of gender discrimination, Morgan Stanley fired her – and as of April 2005 (seven months before this suit was filed), no other Wall Street firm would hire her. *Id.* Acknowledging her public role in the litigation, the EEOC allocated to Schieffelin $12 million of a $54 million settlement fund to benefit a class of women employed in the Institutional Equity Division. *EEOC v. Morgan Stanley & Co.*, 256 F.R.D. 124, 125 (S.D.N.Y. 2004).

Unfortunately, several of the Class Representatives were fired or forced to resign from Merrill Lynch during the pendency of the litigation. Those Representatives have found it difficult or impossible to find other jobs in their field because of the taint associated with their status as named plaintiffs in this litigation. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (recognizing post-employment retaliation as violation of Title VII).

Third, the Class Representatives risked hostility and ostracism from their co-workers because of their public allegations of race discrimination against Merrill Lynch, and those risks materialized immediately after their names appeared on the complaint in this case. Every day for the last eight years, each Class Representative who is a current employee has had to walk through the door of his or her branch office and face pointed stares, isolation, exclusion from group activities, and outright hostility from managers and other Merrill Lynch employees. This is exactly the type of workplace environment that causes courts to award high service awards to class representatives in discrimination cases. *See Ingram*, 200 F.R.D. at 694; *Roberts*, 979 F. Supp. at 202 (class representatives "subjected to retaliatory action by Texaco supervisors and employees, ranging from hostility to threats to assignment changes").

9

C. **The Class Representatives Pursued the Best Interests of the Class Instead of their Own Financial Interests.**

In the face of these risks, the Class Representatives selflessly put aside their personal interests in order to advance the interests of the whole class. Unlike other class members, the Class Representatives must give Merrill Lynch a general release of all their claims. Each Class Representative has a standstill agreement with Merrill Lynch that tolls the statute of limitations for a broad range of individual claims beyond the class claims that are the subject of this settlement – *e.g.*, breach of contract, wrongful termination, age and gender discrimination, and claims under state and local laws. Rather than pursuing these valid and timely individual claims, however, the Class Representatives chose to relinquish them in favor of a settlement that benefits the entire class. Granting the requested service awards would partially compensate the Class Representatives for sacrificing their individual claims for the sake of the class. *See Velez*, 2010 U.S. Dist. LEXIS 125945, at \*73-74 (granting enhanced service awards because named plaintiffs released their claims for emotional distress damages); *Curtis-Bauer v. Morgan Stanley & Co.*, No. 3:06-cv-3903, Dkt. 158 at 5-8, Dkt. 250 at 19 (N.D. Cal. Feb. 7 & Oct. 22, 2008) (approving $25,000 service award plus $125,000 award for class representative's time-barred, non-class claims) (Exhibit 20); *Tucker v. Walgreen Co.*, No. 05-cv-440, Dkt. 129 at 32-33, Dkt. 135 (S.D. Ill. Mar. 17, 2008) (approving enhancement awards totaling approximately 2.5% of common fund to class representatives and class members who filed EEOC charges and executed broader release of individual claims) (Exhibit 21); *In re Revco Sec. Litig.*, Nos. 851, 89 CV 593, 1992 WL 118800, at \*7 (N.D. Ohio May 6, 1992) (approving $200,000 incentive award for class representative who pursued class securities claims in lieu of valid individual claim for $514,000).

## II. The Efforts of the Steering Committee Warrant Service Awards.

In addition to the Class Representatives, six other members of the Steering Committee actively assisted in this litigation from its inception through July 2012, when the Court certified a disparate impact class. These Steering Committee members – Linda Davila, Genie Lynch, Lance Slaughter, Al Scales Reynolds, Anthony Smith, and Brent Watson – participated in seven mediation sessions in 2006 in New York and San Francisco. Although they chose not to become Class Representatives, these Steering Committee members continued to assist Class Counsel in investigation and discovery, and four of them prepared and submitted to the Court individual declarations about their personal experiences at Merrill Lynch. They devoted significant time and energy to the litigation for the benefit of the class. (Ex. 19, Friedman Decl. ¶¶ 14-15.) In addition, like the Class Representatives, the Steering Committee members have individual claims subject to tolling agreements (*id.* ¶ 11), yet they are required to execute a general release of all claims against Merrill Lynch. Accordingly, these six Steering Committee members should receive service awards.[4]

## Conclusion

Judge Castillo's praise for class representatives in an earlier gender suit against Merrill Lynch is even more apt for the Class Representatives in this case:

> And let me just say one last word about the class representatives in this case because any time someone, whoever it is, enters into uncharted territory, there's a lot of courage that goes into that. What comes to mind, maybe because I

---

[4] *See* Ex. 19, *Curtis-Bauer*, No. 3:06-cv-3903, Dkt. 158 at 5-8, Dkt. 250 at 19 (class representative awarded $150,000, far more than any class member, despite joining litigation after tentative settlement had been reached); *Ingram*, 200 F.R.D. at 694 (granting service awards to class members who submitted affidavits); *Bellifemine v. Sanofi-Aventis U.S. LLC*, No. 07 Civ. 2207, 2010 U.S. Dist. LEXIS 7979, at *21 (S.D.N.Y. Aug. 6, 2010) (approving service awards up to $60,000 to unnamed class members who devoted time and energy to litigation); *Velez*, 2010 U.S. Dist. LEXIS 125945, at *74-75 (granting service awards to unnamed class members who spent time and money on case, testified at trial, and released claims for emotional distress damages).

> spent part of this summer reading the book, is the Lewis and Clark journey and the book Undaunted Courage.
>
> I really believe that the class representatives in this case showed that similar type of undaunted courage in going ahead with this case and having their names be part of a piece of litigation that could seriously impact their careers. And so I really would like to commend the class representatives in this case.
>
> . . . . In view of all their labors that they undertook, I do not consider it at all a bonus to approve the payments that will be made to the class representatives, but I in particular commend all of you. . . . I believe that the special incentive payments are just a small way to compensate you for extra time that you've taken away from your careers, your families and your loved ones, and certainly I will approve [a total of $600,000 to eight representatives].

Transcript of Final Approval Hearing at 38-39, *Cremin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 96 C 3773 (N.D. Ill. Sept. 2, 1998) (Exhibit 22).

For all of the foregoing reasons, Class Counsel respectfully requests that this Court approve service awards of $250,000 to each Class Representative and $75,000 each to the six members of the Steering Committee.

                                      Respectfully Submitted,

                                      STOWELL & FRIEDMAN, LTD.

                                      By: /s/ Linda D. Friedman
                                               Lead Class Counsel

Linda D. Friedman
Suzanne E. Bish
George S. Robot
**STOWELL & FRIEDMAN, LTD.**
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
Phone: 312.431.0888
Fax:    312.431.0228