# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GEORGE McREYNOLDS, MAROC HOWARD, LARUE GIBSON, JENNIFER MADRID, FRANKIE ROSS, MARVA YORK LESLIE BROWNE, HENRY WILSON, LEROY BROWN, GLENN CAPEL, CHRISTINA COLEMAN, J. YVES LABORDE, MARSHELL MILLER, CARNELL MOORE, MARK JOHNSON, CATHY BENDER-JACKSON, and STEPHEN SMARTT, Individually on behalf of themselves and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>MERILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED,<br><br>Defendant. | Case No. 05-C-6583<br><br>Judge Robert W. Gettleman<br>Magistrate Judge Gilbert |

## DECLARATION OF GEORGE McREYNOLDS

I, George McReynolds, declare under penalty of perjury that the following statements are based on my personal knowledge and observations and are true and accurate to the best of my belief.

1. I have been the lead plaintiff and member of the Steering Committee in the above-referenced action since the inception of this litigation. In 2004 I approached Stowell & Friedman along with Maroc "Rocky" Howard regarding issues relating to my employment at Merrill Lynch, which I believed were discriminatory. Together Rocky Howard and I retained Stowell & Friedman. In 2005, when I was 61 years old, I filed the original complaint in federal court asserting the Section 1981 claim, and Maroc Howard filed the underlying class charge of discrimination with the EEOC that became the basis for the Title VII claims of the class case.

1

2. We have been working side by side with Stowell & Friedman on this case for the past nine years. Rocky Howard and I alone have spent hundreds of hours aiding Class Counsel in the drafting of complaints, motions, and briefs; reaching out to and bringing in other former and current African American Financial Advisors to serve as Class Representatives or members of the Steering Committee; serving as a mentor and liaison to the class members; and prosecuting the class claims. During the past nine years, hardly a day passed when I did not spend time on this case, whether it was speaking with the attorneys, the Class Representatives, the experts, class members, and the media; or reading briefs, transcripts, and case law; or traveling to and attending depositions, court proceedings, and mediations. For example, in 2012 alone, I spent more than 85 hours on conference calls relating to this case with Class Counsel, Class Representatives, and others.

3. I began my career at Merrill Lynch in 1983 as what is now known as a Financial Advisor in the downtown Nashville, Tennessee office. I am 69 years old and currently hold the title of Assistant Vice President, Financial Advisor.

4. In 2004, I contacted Stowell & Friedman, Ltd. to consult with them about the discrimination I had experienced and was continuing to experience at Merrill Lynch on the basis of my race. Among other things, I recently had been forced onto a team with two white trainees. When the team split up, I lost $40 million in my client assets to the trainees, I lost my office, and I was left working from a carrel just outside the ladies' restroom.

5. I spent my adult work life at Merrill Lynch, and I always believed that it was the best firm on Wall Street. Indeed, I hoped my children would join me in working at Merrill Lynch. But my children have watched me being beaten down not only by overt

2

racism in my office, but also by the impact of Merrill Lynch's discriminatory policies and practices, including the teaming, pooling, and account distribution policies. After seeing the way Merrill Lynch treated me and other African Americans, two of my children told me they would never work for a place like Merrill Lynch. A third child who has a MBA was told she was not qualified even though a colleague's son without a college degree was hired. This was a great disappointment to me, but it also motivated me to fight for reform at Merrill Lynch.

6. Based on our discussions, Stowell & Friedman told me that I had a strong case against Merrill Lynch for race discrimination, and if I chose to file an individual lawsuit, it probably could be resolved fairly quickly. This option offered a strong possibility of prompt relief for my work environment issues and my urgent financial pressures. My other option, the attorneys told me, was to file a class action challenging the discriminatory treatment of all African American Financial Advisors. This would require much greater time and effort. In my presence, Rocky Howard was given the same options.

7. After much thought and consideration, I decided to initiate class litigation against Merrill Lynch because I believe that Merrill Lynch must treat African American Financial Advisors fairly. I felt that someone had to stand up to Merrill Lynch and force them to stop their discriminatory practices. I knew I had to do something not only to demonstrate to my children that you need to stand up for what is right and take a stand against discrimination, but to try to effectuate systemic reform within Merrill Lynch so that future generations of African Americans would want to join Merrill Lynch.

8. Although I initially filed suit in federal court alone against Merrill Lynch, the lawsuit was amended thereafter to include additional African American Financial

3

Advisors as Class Representatives. Stowell & Friedman told me that Maroc and I could remain the only representatives of the class, or we could decide to include additional African American Financial Advisors as Class Representatives. If Maroc and I were the only Class Representatives, we could maintain cohesiveness and control of the litigation. But Maroc and I decided that we should open things up to include as Class Representatives a broad range of African American Financial Advisors across the country, from trainees to the most experienced Financial Advisors and everyone in between. We realized this would complicate the litigation process, because inevitably each Class Representative has his or her own personality, history with the firm, ideas, and views of the most important issues for this litigation. But we believed it was important to have Class Representatives that could bring these other perspectives to the table for the benefit of the class.

9. I attended seven mediation sessions with Merrill Lynch executives shortly after the litigation was filed. I viewed Merrill Lynch's early settlement proposals as inadequate, however, because they would not resolve the systemic discrimination at the firm or fairly compensate class members for the economic harm suffered. I rejected these proposals because I did not believe they would serve the best interests of the class.

10. In 2006, Merrill Lynch learned that the New York Times was about to publish an article about this class litigation alleging race discrimination, including the fact that Merrill Lynch had no tenured African American Financial Advisors in over half the states in the country. Around that time, I was told that Merrill Lynch hired several hundred African Americans to be Financial Advisor trainees. Unfortunately, the firm had no plan to support these new African American trainees. The named plaintiffs looked on with horror from our branch offices as, one by one, these African Americans began to fail

4

because they lacked the support and opportunities that white trainees enjoyed, and were then fired or forced to resign.

11. Being the perceived leader of a group of 17 strong minded and determined Class Representatives has required patience and a tremendous amount of time. I promised Stowell & Friedman that I would work hard to ensure that the Class Representatives held strong as a group, and not as individuals. I regard myself as a peacemaker, and I tried to be a voice of reason. I knew that in order to achieve success, we would have to be united in our goals and not let the process wear us down. But this required me to spend a lot of time communicating with the attorneys and the other Class Representatives over the past eight years, particularly when we suffered litigation disappointments and when the economic downturn increased financial pressures. At times, as with any group, there were disagreements about the direction to take the litigation. Some people lost faith in the litigation process. However, I take pride in how we managed the difficult and long process of shepherding this litigation through to a successful conclusion. I am proud that, despite all our challenges and disappointments, the Class Representatives maintained their unity in seeking justice and reform for the whole class instead of pursuing their own personal and financial interests.

12. Since 1994, I have seen myself as part of a group acting to advance the interests of African American Financial Advisors at Merrill Lynch. In 1994, I met with other Merrill Lynch African American Financial Advisors in Chicago in an effort to build a support system and to determine what we could do to make Merrill Lynch a better place for us to work. Most of those in attendance worked in offices where they were the only African American Financial Advisors. They had never met one another before and were surprised to learn that other African American Financial Advisors at Merrill Lynch were

suffering under the same discriminatory policies and practices. In speaking with others at this meeting, I realized that Merrill Lynch management was one of the biggest obstacles in our path to success. Though Merrill Lynch did not sponsor the 1994 Chicago meeting, I believe that the meeting and others like it that we held in subsequent years prompted Merrill Lynch to create and sponsor an annual African American symposium beginning in the late 1990s in order to gain control of what they perceived as a potential problem. At each symposium, Merrill Lynch would promise change, and each time the Firm failed to deliver on that promise. Indeed, very little has changed for the better at Merrill Lynch with respect to the Firm's treatment of African American Financial Advisors.

13. I am unable to fully articulate the financial and emotional impact that this lawsuit and my role as a Class Representative have had on me.

14. My involvement in this case has taken its toll emotionally, financially and professionally. As a Class Representative who also was a current Financial Advisor at Merrill Lynch, I had to walk through the door of the office in Nashville, Tennessee every day for the last eight years. I have had to keep my head up and keep my mind focused on my clients and building my business. This was not easy when faced with the pointed stares of my colleagues and outright hostility from management. When I had a heart attack, I learned that my co-workers placed bets on whether I would survive. Later, when it was clear that I did survive, they placed bets that we would lose the lawsuit.

15. From the beginning, I had a target on my back, as did Cathy Bender who joined me as a named plaintiff when we filed the Second Amended Complaint in November 2006. Because I initiated the class action, there was a lot of focus on the lawsuit in my office and on the two of us. Once the lawsuit became public and our participation became well known, people in the office stopped talking to us. I was

6

excluded from group activities. Other Financial Advisors would not look me in the eye. The sales manager in the office never offered me any help.

16. The experience has been extremely isolating. I felt that I was under a microscope in terms of my work performance. I have had no opportunities to team with other Financial Advisors and both management and my co-workers have drawn a wide circle around me and kept their distance. My business suffered. My production decreased due to the lack of support and opportunities.

17. Because my name appears first in the caption, I know that my name has become synonymous with this litigation. In deciding to come forward and put my name on the initial Complaint, I knew I would be forever altering my position within Merrill Lynch and the entire industry. From the moment I initiated the Employee Dispute Resolution process internally at Merrill Lynch, I was tagged a "troublemaker" not only at Merrill Lynch but in the financial industry. Financially, the risk I took initiating this lawsuit was tremendous.

18. My name will always be associated with this lawsuit on the Internet. Whenever anyone searches Google, PACER, the electronic litigation-filing database, or any other search engine, my name will pop up as the lead plaintiff in a class race discrimination lawsuit against Merrill Lynch. My name also appears in numerous newspaper articles discussing the litigation and discrimination against African Americans on Wall Street. I have been one of the faces of this litigation for over eight years. I believe that much has changed since 2005 regarding the topic of race in this country. Today I find the public aspect of the litigation a source of pride. However, during earlier years I was fearful that the publicity would harm my business and family.

19. The lawsuit has impacted me in other ways as well. Since making the decision to put my name on the class complaint and to become an active member of the litigation, I have been concerned about losing clients. Most of my client base is white. I also have been concerned that potential clients would shy away from working with a broker involved in major litigation against his brokerage firm, particularly in light of the media attention given to the case. I have no way to measure whether potential clients have been deterred from using me as their broker as a result of my involvement in this case. This has created an additional layer of stress for me over the past nine years.

20. It is almost impossible to quantify the amount of time I have spent on the case over the last nine years since I first approached Stowell & Friedman, Ltd. about this case. It took an entire year to develop the case before we filed, and that was before the case really got started.

21. As lead plaintiff and Steering Committee member, I worked closely with Class Counsel to explain my experiences at Merrill Lynch and to develop the underlying evidence necessary to develop and prosecute the case. We met extensively with Class Counsel as a group to discuss Merrill Lynch's policies and practices and the experiences of African American Financial Advisors, and to understand our role and duties as Class Representatives. We also met with experts regarding Merrill Lynch policies, how to understand and analyze those policies, and how to understand the range of potentially recoverable losses caused by those policies. We prepared for and participated in seven days of mediation sessions in New York and San Francisco in an attempt to settle the case at the early stages of the litigation. As part of this mediation and negotiation process, we worked extensively with our counsel and experts to devise and present

proposals and counterproposals for injunctive relief, policy reforms, and initiatives to level the playing field for African Americans at Merrill Lynch.

22. Over the last nine years, I have spent many hundreds of hours speaking with our attorneys and participating in Steering Committee calls. I have attended in-person Steering Committee meetings all over the country, including in Chicago and New York. During these meetings, we discussed litigation strategy and provided information to Class Counsel about the company. We discussed our roles as Class Representatives; reviewed company data, documents, and records; and otherwise assisted in the litigation of the case.

23. I reviewed documents, assisted in the discovery process, attended depositions of members of Merrill Lynch's senior management team, and worked closely with our experts. I estimate that I have participated in well over 80 conference calls as a lead plaintiff and member of the Steering Committee over the last eight years, in addition to the numerous in person meetings I attended with other Steering Committee members relating to this suit. In addition, I participated in countless individual calls with Stowell & Friedman to discuss the progress of the case, as well as scores of smaller group calls made to Stowell & Friedman along with other Class Representatives. I also had extensive email communications with Class Counsel since I first became involved in this litigation in 2004.

24. In addition to speaking to the attorneys and the other Class Representatives, I have devoted a significant amount of time speaking with other African American Financial Advisors who worked for Merrill Lynch around the country regarding issues of the discriminatory impact of Merrill Lynch's policies and practices on African American Financial Advisors and about this lawsuit, including at Merrill Lynch

9

sponsored symposiums and meetings. For example in November 2006, I attended Merrill Lynch's African American symposium and wore a button that stated "McReynolds Supporter" in order to make myself available to any African American Financial Advisor interested in discussing this case. Many members of senior management attended this symposium and were visibly disturbed by the buttons.

25. Since 2004, I have never wavered in my commitment to the case or my determination to fight for change within the organization, regardless of the impact on my professional career and personal life. I have received numerous telephone calls from other African Americans who heard about the lawsuit and contacted me for more information. I provided information about the suit, answered their questions, and directed these African Americans to our attorneys. Many of these phone calls and meetings took place in the evenings and on weekends.

26. I participated in all of the mediation sessions. These mediations occurred in New York City, San Francisco, Chicago, and Washington, D.C. During the mediations, I contributed my thoughts and opinions about settlement ideas and the dialogue between the parties. Many African American Financial Advisors that I spoke with chose not to get actively involved in the litigation because of the fear that their involvement would negatively impact their careers. I knew that these individuals were relying on me to continue to fight for them. This knowledge placed a heavy burden on my shoulders.

27. Every time there was an important hearing or argument before Magistrate Judge Gilbert, Judge Gettleman, or the Seventh Circuit, I would travel to Chicago to support Class Counsel and represent the putative class. By my estimate, I attended

numerous court hearings over the course of the litigation. I often travelled to Chicago at my own expense to attend these hearings.

28. As one of the two initial plaintiffs, I have always played a prominent role in any media attention that the suit received. I was interviewed by the New York Times on two separate occasions, the Chicago Tribune, Wall Street Journal and many other media outlets from around the country. My name appeared in articles that were picked up on Bloomberg and all the other financial and business websites on the Internet numerous times throughout the course of the litigation. To say that my role in this case was very visible is an understatement.

29. I participated in the media because I felt that our story needed to be told and that Merrill Lynch needed to recognize how its policies and practices negatively impact African American Financial Advisors like myself and make it difficult if not impossible to succeed at the same rate as our white counterparts. I knew that by stepping forward I would forevermore be putting my financial livelihood at risk. I also knew I would be saddled with the burden of carrying this case forward to the end, regardless of the outcome.

30. As a Class Representative and lead plaintiff, I was required to review and aid Class Counsel in drafting answers and producing documents responsive to defendant's written discovery requests, including specifically answers relating to my experiences and history as a Financial Advisor at Merrill Lynch. This took a significant amount of time. Every time Class Counsel was preparing a written discovery request or responding to discovery issued by Merrill Lynch, I worked with them to craft our responses and requests. For example, I personally participated in the drafting of plaintiffs' responses to questions 2, 3, 5, 9, 14, 17, and 20 of Defendant's Third Set of

Interrogatories to Plaintiffs, and I verified that the description of some of defendant's policies and practices as described in plaintiff's response to question number 2 of the Defendant's Third Set of Interrogatories was true and correct to the best of my knowledge.

31. In addition to helping Class Counsel prepare and respond to written discovery, I had my deposition taken on August 14, 2007 in Nashville, Tennessee. I was required to take time away from the office and my family. In addition to the deposition, I spent many hours working with Class Counsel to prepare for the deposition. We prepared on the phone and in person for at least two or more additional days prior to the deposition.

32. The deposition process was also stressful and difficult, because I was required to speak at length about the discrimination I confronted throughout my career at Merrill Lynch and the way that Merrill Lynch's practices, like the company's teaming and account distribution policies, had negatively impacted my career. I also had to withstand questioning which I perceived as challenging my capabilities as a broker by opposing counsel. While the lawyers on the other side were professional and respectful, the process left me feeling like a failure as a Financial Advisor even though I have had a long and successful career. I also was still recovering from major surgery so the deposition took a real toll on my physical well-being.

33. I also helped Stowell & Friedman prepare for the depositions of many Merrill Lynch witnesses and experts. This required me to review numerous documents produced in discovery.

34. As a current employee, I also participated in at least two meetings in 2006 with the experts employed by the class to analyze the business data and records so that

our experts could understand how Merrill Lynch's account distribution, pooling, and teaming policies worked in practice and how leads, referrals, and other business was distributed by Merrill Lynch management in the branch offices.

35. I attended the depositions of our experts Dr. Janice Madden and Dr. William Bielby, as well as the deposition of Merrill Lynch's expert organizational psychologist, James Outtz. It was important to attend these depositions so that I could help Class Counsel.

36. Because I am committed to this litigation and its prosecution, I have found it necessary to take time away from work and my family. The amount of time I have taken away from my business over the last eight years to serve in my capacity as lead plaintiff has been significant. Every conference call, mediation session, court hearing and meeting with Class Counsel that I attended required time away from servicing my clients and developing new business. Because my income depends on commissions, the time I spent away from work has had a direct impact on my family's finances.

37. Because I was coming from Tennessee, there was additional travel time associated with each trip. Also, in 2007, I suffered a heart attack and had other serious health problems that made commercial air travel difficult. As a result, whenever the litigation required me to travel to meetings with lawyers or court hearings in Chicago, my wife had to drive me there. I estimate that over the last eight years, my commitment to this litigation and my role as lead plaintiff have taken me away from the office well over 100 days, and this does not include the countless hours that I spent at night and on the weekends conferring with other Class Representatives or other African American Financial Advisors who either were working for Merrill Lynch or who at one time

13

worked for the company. I also covered some of the costs associated with this travel out of my own pocket, which placed additional financial pressure on me and my family.

38. I believe my serious health problems in 2007 were due in part to the stress of the litigation and the workplace pressures associated with my role as lead plaintiff in a lawsuit accusing my employer of race discrimination. At that time I had to make another choice: whether or not to continue as lead plaintiff in light of my poor health. I could have retired, but I decided to remain the lead plaintiff because I was determined to see this litigation through to its conclusion and to keep fighting for racial equality at Merrill Lynch.

39. Although I am now 69 years old and my health is still problematic, I have once again chosen to remain at Merrill Lynch instead of retiring, because I want to be a member of the first Leadership Council – the body established by this settlement to monitor the effectiveness of the injunctive relief to which Merrill Lynch has agreed.

40. I am proud of the Class Representatives for holding together, putting aside their personal and financial interests, and finishing the task we started for the benefit of the entire class. I am also proud of Merrill Lynch for agreeing to initiatives that will make a real difference to African Americans at the firm now and in the future. I believe the Settlement will forever transform the way African Americans are treated at Merrill Lynch, and because of the firm's leadership position, I believe this transformation will extend to the financial services industry in general.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_[signature]_  11-07-2013

14

George McReynolds                              Date